UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL     |   DOCKET NO. 6:10CV00473
                          |
                          |   JUNE 27, 2012
VS.                       |
                          |   10:05 A.M.
                          |
D-LINK CORPORATION,       |
ET AL                     |   TYLER, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 213

REPORTER'S TRANSCRIPT OF CLAIM CONSTRUCTION HEARING

BEFORE THE HONORABLE KEITH GIBLIN
UNITED STATES MAGISTRATE JUDGE

------------------------------------------------------------

APPEARANCES:

FOR THE PLAINTIFFS:     THEODORE STEVENSON, III
                        BRADLEY WAYNE CALDWELL
                        ASHLEY NICOLE MOORE
                        MCKOOL SMITH
                        300 CRESCENT COURT
                        SUITE 1500
                        DALLAS, TEXAS 75201

FOR THE DEFENDANTS:     LUKE L. DAUCHOT
                        KIRKLAND & ELLIS, LLP
                        333 SOUTH HOPE STREET
                        29TH FLOOR
                        LOS ANGELES, CALIFORNIA 90071

                        ADAM R. ALPER
                        KIRKLAND & ELLIS, LLP
                        555 CALIFORNIA STREET
                        27TH FLOOR
                        SAN FRANCISCO, CALIFORNIA 94104

2

                              JOHN P. BOVICH
                              CHRISTINE MORGAN
                              DOYLE JOHNSON
                              REED SMITH, LLP
                              101 SECOND STREET
                              SUITE 1800
                              SAN FRANCISCO, CALIFORNIA 94105

                              STEVEN BAIK
                              REED SMITH
                              1510 PAGE MILL ROAD
                              SUITE 1010
                              PALO ALTO, CALIFORNIA 94304

                              GREGORY AROVAS
                              KIRKLAND & ELLIS, LLP
                              601 LEXINGTON AVENUE
                              NEW YORK, NEW YORK 10022

                              TREY YARBROUGH
                              ATTORNEY AT LAW
                              100 E. FERGUSON
                              SUITE 1015
                              TYLER, TEXAS 75702

                              MICHAEL E. JONES
                              POTTER MINTON
                              110 NORTH COLLEGE
                              SUITE 500
                              TYLER, TEXAS 75710

                              CHARLES AINSWORTH
                              ATTORNEY AT LAW
                              604 WEST WOLDERT STREET
                              TYLER, TEXAS 75702

COURT REPORTER:               TONYA B. JACKSON, RPR-CRR
                              FEDERAL OFFICIAL REPORTER
                              300 WILLOW, SUITE 239
                              BEAUMONT, TEXAS  77701

      PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
    TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

INDEX

PAGE

U.S. PATENT NO. 6,772,215

MR. STEVENSON                                      8

MR. DAUCHOT                                       18

MR. STEVENSON                                     37

MR. DAUCHOT                                       41

MR. STEVENSON                                     43

MR. DAUCHOT                                       49


DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MR. BOVICH                                        55

MR. STEVENSON                                     58

MR. BOVICH                                        61


U.S. PATENT NO. 6,330,435

MS. MOORE                                         63

MR. ALPER                                         75

MS. MOORE                                         96

MR. ALPER                                         99


U.S. PATENT NOS. 5,987,019 AND 6,466,568

MR. CALDWELL                                     101

MR. AROVAS                                       115

Claim Construction Hearing

4

MR. CALDWELL                                        134

MR. AROVAS                                          136

MR. CALDWELL                                        138

MR. BOVICH                                          146

MR. CALDWELL                                        161

MR. BOVICH                                          166


                U.S. PATENT NO. 5,790,516

MR. STEVENSON                                       167

MR. AROVAS                                          174

MR. STEVENSON                                       191

MR. AROVAS                                          191

MR. STEVENSON                                       193

MR. AROVAS                                          196

MR. STEVENSON                                       206

MR. AROVAS                                          210

Claim Construction Hearing

THE COURT:  Okay.  We're on the record in Cause No. 6:10CV473, *Ericsson, Incorporated, versus D-Link Corporation, et al.*  We're here today for a claim construction hearing.

What I'll do, I guess, to begin with, I'll ask local counsel from each side to introduce themselves, starting with the plaintiffs introducing themselves and the attorneys that will be arguing today.

MR. STEVENSON:  Good morning, your Honor.  Ted Stevenson for Ericsson.

THE COURT:  Good morning, Mr. Stevenson.

MR. STEVENSON:  I'll be arguing, along with Brad Caldwell and Ashley Moore of our firm.

THE COURT:  Good morning.  Okay.

MR. JONES:  Your Honor, Mike Jones and Charlie Ainsworth for Intel Corporation.  And the attorneys for Intel that will be arguing are Mr. Luke Dauchot --

MR. DAUCHOT:  Good morning, your Honor.

THE COURT:  Good morning.

MR. JONES:  -- Mr. Greg Arovas --

THE COURT:  Okay.

MR. AROVAS:  Good morning.

THE COURT:  Good morning.

MR. JONES:  -- and Mr. Adam Alper.

MR. ALPER:  Good morning, your Honor.

Claim Construction Hearing

6

THE COURT:  Good morning.

MR. JONES:  And also here from Intel are Mr. Allon Stabinsky and Mr. Ben Eapen.

THE COURT:  Good morning, gentlemen.

MR. YARBROUGH:  Your Honor, I'm sorry.  Excuse me.  We've got one more appearance.  Trey Yarbrough, John Bovich, Chris Morgan, Doyle Johnson, and Steve Baik on behalf of Netgear, D-Link Systems, the two Acer entities, and Gateway.

THE COURT:  Okay.  I've went through the tutorials, I've went through the briefing.  I appreciate the parties' completeness on everything.  So, what we'll do is -- again, I think everyone knows I like to go turn by turn.  We'll start with Ericsson.  We'll start with the first patent and go forward.

Any questions about procedure or anything before we begin?

MR. STEVENSON:  No, your Honor.

THE COURT:  Okay.  You can proceed.

MR. STEVENSON:  May it please the court.

In this case there are eight patents in issue, and many of these patents had birth from Ericsson's pioneering work in cellular telephony in the mid to late Nineties.  The inventions that we're talking about in this case deal with error control, lead transmission

protocols, quality of service for real-time applications, methods of pulse shaping to reduce intersymbol interference. And these mid to late Nineties cellular inventions were then carried over into the 802.11n standard which was begun development in the 2002 time frame. That carryover is understandable as both are radio transmission protocols, and 802.11n encountered a lot of the problems that Ericsson had solved successfully with regard to cellular telephony. And as a result, many of the solutions in the 802.11 standard used the successful technology Ericsson had developed in the cellular realm.

Now, we only have five patents to argue today out of the eight. Three of them don't have any claim construction disagreements. I will be presenting on the '215 patent. And we'll tackle that first because I think probably in the progression of the technologies and the discussion of the technologies, they build on each other; and I think the '215 is a logical starting point.

Ms. Moore will argue the '435.

Mr. Caldwell will present on the '019 and the '568. Those are divisionals of each other, and we think they can be taken up together.

And then I'll address the court, finally, on the '516 patent.

8

So, with that background, if the court wants, I'll start into the '215 patent.

THE COURT:  Please.

MR. STEVENSON:  The '215 patent was filed in April of 1999, and it teaches a method by which a radio receiver can inform the transmitter that it has failed to receive certain packets.  In the scheme in the '215 patent, radio transmission from transmitter to receiver is accomplished by essentially grouping the symbols into packets, which is just a logical division of the stream of symbols.  And the data is sent and considered at this logical level on a packet-by-packet basis.  The packets are called "PDUs" in the patent.

Sometimes PDUs, or packets, get dropped on the way from transmitter to receiver due to poor transmission characteristics.  It can be interference, intersymbol interference, or just a number of other things that can cause a drop.  And in that situation, the receiver must inform the transmitter which PDUs, or which packets, were dropped so that the transmitter, if appropriate, can re-transmit them.

The invention in the '215 patent concerns the construction and format of the message from the receiver to the transmitter, informing which packets have been dropped.  And that in the patent is called the "feedback

Claims Construction Hearing

9

response message."

And more specifically, the invention of the '215 patent allows the receiver to choose the format of the feedback response mechanism and use a type identifier field in the response to inform the transmitter which type of format it's choosing.

A number of formats for the feedback response mechanism are discussed in the patent; for instance, a list.  That would be just a list of the packets that were not successfully received.  Another way that it can be done is bitmap.  And a bitmap would essentially be a matrix with entries in it that correspond to the PDUs that were sent, and a 1 or a 0 might indicate whether that PDU was successfully received or not.  And then another technology or another way of doing it in the patent is called a "compressed bitmap," which is a bitmap which is then compressed to save space.

Importantly, the different messages -- an advantage of this, different formats of the message may be more preferable than others in certain circumstances. But the invention here is not limited to a list or a bitmap or a compressed bitmap -- those are three examples -- but rather the invention is to build in choice at the receiver side of a type of feedback response format to use and also then to provide a way

10

that the receiver can indicate which it's choosing to the transmitter so that they can communicate and be in sync.

THE COURT:  Right.

MR. STEVENSON:  Now, there are several advantages listed in the patent to doing this.  They're typically in the summary of the intention, although they're in other spots.  One advantage is this allows the receiver to choose a feedback response message type that minimizes the size of the transmission.  Another advantage is that the protocol overhead is minimized.  Another advantage that's listed in the patent is that the receiver can choose, if it wants to, a type of response that will maximize the number of packets that can be transmitted as dropped if you have a fixed length feedback response message.  But all those, importantly, as I will discuss in my remarks, are advantages that flow from the invention; and the invention is giving the receiver the choice of what type of format to use.

This is a representative claim.  This is claim 1.  And the way it's been claimed is as "a method for minimizing feedback responses in an ARQ protocol, comprising the steps of."  And as we know, the preamble isn't a limitation.

The three limitations are:  One, sending a plurality of first data units over a communication link;

two, receiving the plurality of first data units; and then, third, responsive to the receiving step, constructing a message field for a second data unit, that message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.  And that's the way the applicant chose to claim its invention.

The first term at issue is the term "constructing a message field."  It appears in the claim as "responsive to the receiving step, constructing a message field," "including a type identifier field."  And as the court can see, that is the language right here (indicating) that remains to be construed.

The dispute between the parties on this claim is does the advantage that is gained from incorporating this message field that allows a choice, does the advantage of minimizing the size or number of feedback responses necessarily have to be read in when it doesn't appear in the claim element.  So, Ericsson's construction is "responsive to the receiving step, generating a message field, including a field that identities the message type of the feedback response message from a number of different message types."

The defendants' is fairly similar to Ericsson's until we get to the end, in which they add

that this be done, quote, in order to minimize the size or number of feedback responses.  They've, in their construction, gone to two of the advantages, and not even all the listed advantages in the patent, and incorporated those as limitations of the claims.  And importantly, that is the error here in the defendants' approach.  The applicant did not claim these specific advantages.

Typically to import a limitation that is not expressly in the claim into the claim, the defendant must prove that there is a clear surrender of subject matter or a clear and unmistakable disclaimer.  And the *Thorner* case, which is one of the most recent, says (reading) we don't read limitations from the specification into the claim, and we don't redefine words.  Only the patentee can do that.  For a disclaimer, there must be a clear and unmistakable disclaimer.

Now, importantly in the briefing, the defendants never point to anything in the prosecution history which would constitute a disclaimer requiring that the advantage of minimization of the size of the feedback response message be read in.  As the Court knows, frequently defendants will come into court and say in prosecution with the patent office, the applicant alleged that this was the important part of his invention that gets over the prior art; and in those circumstances,

13

if there's an unmistakable surrender, that may be read in as a limitation. But in this case the defendants haven't even argued that because no such statement was made during the prosecution.

In other cases, defendants will sometimes argue a specification disclaimer, that there is an attempt to get over the prior art in the specification by touting a limitation or an element of the claim that doesn't appear in the claim elements. In this case the defendants haven't argued that either. They've not pointed to a specification disclaimer in their brief and they haven't alleged it nor a prosecution history disclaimer.

What they have argued essentially is that they believe the advantage of minimizing the feedback response message is the crux of the invention, and we disagree about that. It's very important -- and our argument is that the invention is creation of a choice in the receiver of multiple different formats of messages to use and then also the creation of a type identifier field which allows the receiver to identity to the transmitter which it is choosing. But very clearly the applicant stopped and did not choose to include a requirement that the advantage be met as an element. And that's very clear and it's expressed in the patent and we believe

error to read in something the applicant didn't include.

THE COURT:  Is this more or less a *Retractable* problem?  In other words, you're aware of *Retractable* that says, if you look at the invention itself, are you not supposed to read limitations from the specifications into the claim but you look at the invention itself to determine what the inventor invented.  Is this a legal issue?  I know that the court split more or less in *Retractable* about whether -- or are you just depending on the claims or you rely on the claims?  Is this a legal issue that I need to decide which way I'm going to go?

MR. STEVENSON:  This is an issue where you rely on the claim.

THE COURT:  Okay.

MR. STEVENSON:  And the claim here is written very clearly and overtly.  And I think the claim really controls the inquiry, and the plain language of the claim controls.  So, the first element here is the preamble. And we're going to talk about the preamble in a second, but I'm going to reserve that for my next remarks.  But the preamble says "a method for minimizing feedback responses in an ARQ protocol, comprising the steps of." The preamble is not a limitation -- it's well established in law -- unless certain narrow exceptions are met.

The first step is sending a plurality of data

units, and I don't think there's any -- there's no dispute over that.

The next step is receiving the plurality of data units.  No real dispute over that.

The third element is where the dispute is. And the way the applicant chose to claim it and the way the patent office examined it was "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a field length, and a content field."  That's the way it's claimed in 1.  Other claims are similar, 15 and 25, and discuss selection of different formats.

But importantly, the applicant didn't put in a fourth element that says "such that the feedback response size is minimized" or "we've maximized the ability to put a list of protocol dropped units in the fixed field." That isn't put in there because it's an advantage of the invention.

What's especially, I think, instructive for the court is the fact that the preamble says "minimizing feedback responses."  Okay?  It's well understood that preambles are not limitations in patent law; and for a preamble to be considered a limitation, it has to jump through a fairly narrow range of exceptions.

Claim Construction Hearing

16

Unsurprisingly, it has come up a lot in patent litigation whether preambles are limitations.  And there's a case, *Catalina Marketing versus Coolsavings,* in which the Federal Circuit says, "Preamble language merely extolling benefits or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant."

So, in this case what's important is that the applicant put the minimization of feedback responses in the preamble where it's not a limitation.  Had the applicant meant for the patent office to judge his patent claim against the prior art including minimization as an actual element, that's how he would have written it and he would have put it as the last element.  The fact that the applicant didn't do that is a clear signal that that shouldn't be read in.

Importantly, the defendants in their briefing have never asserted that the preamble is a limitation. The reason they haven't asserted it is they can't make that case under the law because the law is pretty clear that if you just extoll the benefits of your invention, the preamble isn't a limitation.  What they're now trying to do is read this in as a fourth element even though under the -- what I'll call the "front-door approach," the preamble wouldn't be let in.  And they're trying to

Claim Construction Hearing

argue it in by saying, "We think this is the crux of the invention.  We think this is, in our subjective view of the patent, the most important thing about the patent."

What they're wrong about is this is the advantage to be obtained; and the invention is, as is expressed in the claims, giving the receiver a choice and constructing a message field that has a type identifier so it can express what it has chosen to use as a format for communicating the packets that have been dropped.

That's all I have on this term.  There's one other term, and then there's an indefiniteness argument on this patent.  But if the court wishes, I'll yield the podium and let them respond.

THE COURT:  Thank you, counsel.  We're here on this claim right here.

MR. DAUCHOT:  Good morning, your Honor.

THE COURT:  Good morning.

MR. DAUCHOT:  My name is Luke Dauchot.  I'm here on behalf of Intel, and I will be speaking -- I represent Intel, but I will be speaking on behalf of all of the defendants.

A couple of points, your Honor.  First let me introduce some of the other people at the table who are going to be handling some of the work here today.  I'll be dealing with the '215 patent that Mr. Stevenson just

addressed, along with Mr. Bovich.  The '435 patent, the second one, is going to be handled by Mr. Alper.  The '568 and '019 -- and those two come together -- is going to be handled by Mr. Arovas and Mr. Bovich as well.  And then last, but not least, the '516, Mr. Arovas and Mr. Bovich I think as well are going to be handling that one.

THE COURT:  Okay.

MR. DAUCHOT:  Your Honor, let me just begin with where Mr. Stevenson started; and that was really sort of an infringement issue as to whether or not these inventions are actually in the standard at issue.  I won't belabor the point.  Obviously we differ with the plaintiffs on that point, but I think infringement is probably an issue for a later day.

THE COURT:  Correct.

MR. DAUCHOT:  One additional point, your Honor, we have our slides prepared.  We have them in binders.  We can do one of two things, save them and hand them to the court and others at the end of the day or hand them out now, whatever the court prefers.

THE COURT:  Let's do it at the end of the day because I like to refer back to them when I'm writing my order.  So, if you'll just hand them to us at the end of the day.  Make sure my law clerk gets a copy of them,

also.  If I could have two copies of the slides.

MR. DAUCHOT:  Okay.  Terrific.

So, let me pick up on the claim construction issue.  And your Honor asked plaintiffs' counsel as to whether this is a question of law or otherwise.  And this is on how the court goes about construing a claim.  I'm not going to suggest that this court isn't well aware of how to go about it.  But there is one question; and that is, you know, how important is the specification in this process.

And with all due respect to plaintiffs' counsel, the notion that the specification only comes into play if there's an express disclaimer in the specification or if there is an express definition in the specification has been rejected by the Federal Circuit in the *Phillips* case.  In the *Phillips* case, the issue there was whether or not the plain and ordinary meaning meant if you put blinders on to the spec in the prosecution history and just focused on the dictionary definition or whether you really ought to read the plain and ordinary meaning, customary meaning to one of skill in the art in the context of the spec and in the intrinsic record.  And the court was clear and that is that the claim terms, even if one takes the position that they really are subject to a plain and ordinary meaning as understood by

Claim Construction Hearing

20

one of skill in the art, has to be read in the context of the specification.

And there is one case in particular that captures it, your Honor, a case that was cited both by *Phillips* and recently by this court, the Eastern District of Texas.  It's in the briefing, but we might as well put it up to put this into context.

Eric, can you put up Slide 23?

There we go.

It's the *Renishaw* case, your Honor.  And, again, it was cited by the *en banc* court in *Phillips* and has been cited since then.

The point here is that -- and I'll focus on what we've highlighted here -- that a construction that a court adopts "that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."

The defendants' position here, not just with respect to the '215 but with respect to all of these patents, is that one should not go about construing these claim terms with blinders on to what the inventor actually invented.

So, with that, let me turn to the next --

Eric, let's go to Slide 2.  And I don't need

to spend much time on that slide.  It's the '215;
Mr. Stevenson introduced it.

Next slide, please, Eric.

Okay.  What's the debate about, your Honor?
Well, here's the issue.  If we read the plaintiffs'
construction, proposed construction, one would think that
the invention here is just about identifying the type of
feedback response that a receiver sends back to the
transmitter.  Just identifying, right?  So, "including a
field that identifies the message type of the feedback
response message from a number of different message
types."

Now, I think that no one in this courtroom
disputes the notion -- and I should say plaintiffs don't
dispute the notion -- that there is more to this claim
term than -- or this claim element than strictly an
identification process.  In fact, if I heard
Mr. Stevenson correctly, you know, the idea with the
invention here is to build in a choice, if you will, of
potential responsive messages.  In their briefing -- and
we'll call those "S-PDUs."  Your Honor, I'm assuming
you're familiar with S --

THE COURT:  Yes.

MR. DAUCHOT:  Terrific.

So, you know, if you heard plaintiffs, they

22

said, well, the notion here in the invention is to build a choice into the system as to the kind of an S-PDU you're going to use. And in plaintiffs' briefing on *Markman*, I think the term is "efficient switching between different types of S-PDUs." In fact, if you take their tutorial, which I know the court has looked at, it's the same thing. If we go through the tutorial in the '215, the plaintiffs explain that, look, you can construct an S-PDU in any number of different ways. You can use a bitmap; you can use a list. And the key here is figuring out which is best in responding to a particular message coming from the transmitter to the receiver.

And our position is that that characteristic -- so, that element of choosing which S-PDU is really the most effective one in response to the data-PDU -- that's it. That's what this claim element captures. Now, our proposed construction captures that. That's the debate here.

Next slide, please.

Now, a point on the preamble. The preamble does explain what this invention is about. It's "a method for minimizing feedback responses." Now let's take a step back in, you know, the question about whether or not the preamble is limiting.

Our position is that yes, that preamble is

limiting because that preamble does represent the heart of the invention as explained in the specification.  We do mention repeatedly the preamble in the claim construction briefing.  That said, is that the only way to have "minimizing" appear as part of the construction?  No.  Because you do have the claim term, your Honor, "responsive to."  You are constructing something -- you are constructing a feedback message responsive to what you get from the transmitter.

And if one reads the specification, this "constructing responsive to" captures the minimization point.  Because it's not just enough to say, "Look, we're going to construct for the sake of constructing."  How do you choose?  What's the point?

Now, plaintiffs' counsel describes the point as an advantage.  Well, hold on a second.  When we choose, logically speaking, we must have a point in mind.  We're selecting between alternatives for a reason.  It's not just, you know, picking alternatives out of a hat.  And what the patent explains is the point of the invention here is you are selecting alternatives to minimize the S-PDU that is transmitted in response to the receipt of a D-PDU.

Next slide, please.

If you capture, your Honor -- let's begin with

the title of the patent, a "Method for Minimizing Feedback Responses in ARQ Protocols."  That's the name of the patent.  If you go to the abstract, right up front, "A method for minimizing feedback responses in an ARQ protocol is disclosed."

Background of the invention, "The present invention relates," et cetera, et cetera, "to a method for minimizing feedback responses in ARQ protocols."

Again, as plaintiffs point out, there's more here to just identifying to the transmitter the type of a feedback response you have.  And as I will explain in a second, that's prior art.  That's well-known.

So, if it's more than just identifying, it has to be choosing, selecting.  And if we get to the point is selecting, well, why?  Why are you selecting one over the other?  And that's where the minimization comes in.

All right.  Let me take a step back, your Honor, just to put this into better context.

Next slide, please.

And this is really part of the tutorial, your Honor.  You have a D-PDU coming in from the transmitter to the receiver.

Next slide, please.

And the receiver will respond to the transmitter if there are some problems with the D-PDUs

Case 6:10-cv-00473-RWS   Document 255   Filed 07/23/12   Page 25 of 213 PageID #: 5974
Claim Construction Hearing

25

that it received or didn't get or for whatever reason that there's an issue; you have an S-PDU that it sends back.

Now, from a prior art standpoint --

Next slide, please.

-- the two different types of feedback responses, the list and bitmap.  The patent, the specification explains, look, you can use a list; you can use a bitmap.  It has that.  Those are options.  But those options are part of the prior art.  So, it's not as if this invention is about creating a list response or about creating a bitmap response.  It has to be more than that, and I think the plaintiffs acknowledge that.

Next slide, please.

Nor is this case about, you know, as part of the data packet, including a field that tells the transmitter exactly what kind of an S-PDU you're using. That's prior art, too; and I don't think plaintiffs' counsel would dispute that or the plaintiffs would dispute that.

So, if it's not about the kind of response you're building and if it's not about identifying it to, what's this about?  Well, what's this about is creating one that is responsive to the data packets being received from the transmitter and creating one that is best suited

409.654.2833

Claim Construction Hearing

26

from a minimization standpoint.

Next slide, please.

All right.  So, what does the specification tell us?  Well, what the specification tells us is that a prior art problem with these S-PDUs is that there's static; that is, the system provides for one and only one.  So, no matter what you're getting from the transmitter by way of -- or no matter how many D-PDUs haven't been received or otherwise erroneously received, no matter how many, you always have one way to communicate back to the transmitter that, hey, we didn't get this stuff or this stuff didn't come in properly.  One way being either the list, one way either being a bitmap, compressed bitmap, whatever.  It's the static problem that's the issue.

So, how does this patent propose to address the static problem?  Well, the --

Next slide, please.

The answer is -- and it lays in -- it's in Table 1 and elsewhere in the patent.  The answer is figuring out which one is the smallest.  Okay?  Minimizing the response.  So, as Table 1 points out, you have a given number of D-PDUs that have not been accurately received; and the variance is the same, right?  Because it's not just the number as explained in the

tutorial; it's also how spread apart these things are that haven't been received.  And you have a calculation.  And there you have it in Table 1.  You have the number of bytes it takes to explain it to the transmitter from a list perspective, and you have the number of bytes that it takes to explain it to the transmitter from a bitmap perspective.

And what the patent explains is, you know, depending on what you have, you have different sizes; and what you should do is you should choose the smallest one, minimize the S-PDUs that are getting sent back to the transmitter so that you make the system more efficient, you optimize it.

Next slide.

Now, as I pointed out, your Honor, in the tutorial, the plaintiffs -- and I think in the briefing as well -- appear to agree.  "The most appropriate or preferable method for encoding a re-transmission request in an ACK message" -- and that's -- an ACK message is an S-PDU, acknowledgement message -- "may vary in practice, depending, for example, on the number and arrangement of lost packets."

So, what the tutorial explains is it varies.  Sometimes you want to use the list; sometimes you want to use the bitmap.  Sometimes -- why?  Why?  Optimization of

28

the system.  You want to minimize the number of the S-PDUs being sent.

Next slide.

So, the element here, "responsive," we've covered that.

Next slide.

So, again we're back to the problem that I pointed out at the front end, your Honor.  Despite agreement here that the claimed invention is about far more than just identifying an S-PDU type, the plaintiffs' construction invites that conclusion; and that's a source of confusion, your Honor, that we ought not to have.  And at some point, you know, the question is going to come from an infringement standpoint exactly do we infringe, do we not infringe and we ought to have a claim construction in place that captures the invention in the claim language and this doesn't.  You read that; and you think, hey, this is just about telling the transmitter what we've chosen to use.  It's about far more than that.

Next slide, please.

And, so, the defendants' construction captures that.  We capture the point that it being responsive to what the transmitter sends means selecting -- in essence, selecting an S-PDU that is most appropriate.  And selecting the S-PDU that's most appropriate, what's "most

appropriate" mean?  Well, "most appropriate" means you minimize the number of S-PDUs, that you minimize the S-PDUs being sent.

How do we know that?  How do we know that that's the most appropriate?  Your Honor, it's all over the patents.  Not just all over the specification, not just in the title, but it's in the claim language itself, in the preamble.

Next slide, please.

Now tellingly, your Honor, the plaintiffs essentially admit as much, that this does belong in the claim language.  Here's why.  When we shift to the means-plus-function claims -- claim 45 is one of them. And again, your Honor, this is all in the briefing, right?  We're dealing with 112 ¶ 6 and you have the claim language and it's the inventor's prerogative to lay out the invention in a means -- the claim in a means-plus-function way.  So, what you have is the claim explaining, look, this is what we're trying to accomplish; and you look to the patent for the structure, the specification for the structure as to how to go about it.

And here, if you read claim 45, the last element here, which is all subject to the means-plus-function, it essentially captures the same

thing that you have in the other claims.  Claim 1, right? Means for receiving a plurality of data units and constructing one to several message fields for a second data unit, et cetera, et cetera.  Same thing.  Same point as claim 1.

Now, what do the plaintiffs here state must be part of the structure to accomplish what's claimed here? Well, they explain.  "Whereby different mechanisms" -- and by "different mechanisms," we've talking about different sorts of S-PDU's, right?  Bitmap, lists, compressed bits, whatever -- "can be used to indicate erroneous data units" -- and what do they say -- "so as to optimize performance."  They concede that the optimization process must be part of the structure.  Why do they concede it?  Because that is the heart of the invention.  That's what's "responsive to" means.

Responsive just doesn't mean from a temporal standpoint.  You know, you get it; you respond.  The point is you construct something responsive to, you tailor it.  You tailor your S-PDU based on what you're getting so as to optimize the system.

Now we take another step back; and we say, "Well, what does optimization mean?"  Well, optimization, according to the patent specification -- and it's clear all over -- is minimizing the S-PDUs being sent.  Less is

better.  Less makes for more efficient transmission.

Next slide, please.

One additional point -- and as to the amount of the structure that's been disclosed by the plaintiffs -- I don't think plaintiffs' counsel went into it.  I don't know how significant a dispute it is; but one thing is absolutely clear, that the structure that the plaintiffs point to in the specification to support claim 45, the means-plus-function claims, is just insufficient.  And if you read it, you know, sometimes they reach in for the list; they leave out the bit.  I mean, it's just incomplete.  What we have proposed, your Honor, is really a complete recitation of the structure in the specification to accomplish what's claimed in claim 45.

Next slide, please.

And not to belabor the point here.  Next slide.

So, actually -- can you flip back here, Eric, to 18?

So, we have all of the structure recited.  I'm sure the court is going to go through it.  I'm not going to go through it, your Honor, chapter and verse; but I will highlight one point.  And that is if this minimization, this optimization is the key to the

32

invention, if that's what response -- you know, "constructing something responsive to" means in that last element in claim 1 and then in claim 45 as well, where is it in the specification from a structure standpoint? Well, the specification does provide structure for that.

Next slide, please.

The specification explains how to go about calculating the size of a list S-PDU.  So, you've got the data coming in from the transmitter.  You know what's, you know, somehow corrupted, either by not receiving it or whatever.  You can calculate -- and the patent teaches you how to calculate -- how many bytes it would take to tell the transmitter about what you haven't gotten properly through a list mechanism.  We have that as part of the structure.

Next slide.

We also have in the specification structure that discloses how you go about figuring out -- communicating what you haven't properly received to the transmitter through a bitmap process, a bitmap S-PDU; and that's part of the structure as well.  So, you've got the message.  You know what you haven't properly gotten.  You can calculate how many bytes it would take to do it with a list.  You can calculate how many bytes it would take to do it with a bitmap.  And then what?

33

Next slide, please.

And "then what" is you compare it.  And that's Table 1.  So, you go through the comparison process.  That algorithm, if you will, is part of the structure that the defendants have as part of the claim construction for the means-plus-function claims.

And with that, your Honor, I think I am done unless the court has some additional questions.

THE COURT:  I just have one quick question for you.  In your proposed construction, it says to minimize -- at the tail end of it, you put "to minimize the size or number of the feedback responses."  You didn't put "to optimize performance."

I note in the abstract it says one such criterion to optimize performance is "to minimize the size of the S-PDUs.  A second such criterion used is to maximize the number of sequence numbers included in an S-PDU of limited size."

Doesn't the abstract -- if I were to go along with your construction, doesn't the abstract essentially tell me that those are two criteria but there could be more?

MR. DAUCHOT:  Fair question, your Honor; and I went through the same -- I had the same question.  Let me start with this first reaction.  The preamble in the

34

claim does explain this is to minimize. But more importantly, minimization, the minimization concept captures both of those. And let me take a step back. I think it's laid out in column 5, line 50.

Do you have the patent, Eric?

All right. What we have here states, "Essentially, in accordance with the first embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance" -- so, the minimization is there to optimize -- "in accordance with certain criteria." What it notes is (reading) one such criterion used to minimize is the size of the S-PDUs; a second such criterion used is to maximize the number of sequence numbers that you include in the S-PDU.

So, what it's basically saying, look, the concept is minimize the S-PDUs being sent back to the transmitter. And what minimization captures is both the number of S-PDUs or the amount of bytes that you actually have in an S-PDU. So, both ultimately -- optimization ultimately captures minimization, although minimization in two distinct ways. The minimization process is either a function of having fewer bytes in an S-PDU -- you're

Claims Construction Hearing

35

making that S-PDU smaller -- or you simply reduce the number of S-PDUs that are getting shipped back to the transmitter.  And that is also a minimization, if you will, but minimization created by, you know, maximizing the amount of sequence numbers that you can fit into a single one.

THE COURT:  But the patent doesn't tell me that -- what I was getting at is the patent -- it says "one such" and "a second such."  The patent doesn't tell me that those are the only two ways to optimize performance.  There may be other ways out there.  So, by taking that language and putting it from the specifications into the claim, aren't I limiting the invention to those two --

MR. DAUCHOT:  That's a point well taken.

Optimization.  Let's start with optimization. What does optimization mean?  You want it -- less is better.  So, the question is what less are we talking about?  What's less?

Well, from an S-PDU standpoint, you can have either fewer, minimize the number of S-PDUs being sent, minimize the number, or minimize the size.

THE COURT:  Right.

MR. DAUCHOT:  So, what we propose in the claim captures that optimization, either/or.  And if you read

the patent, your Honor, which I know the court has done and likely will do again, the optimization means minimization. So, you minimize the number of S-PDUs or the amount of bytes in an S-PDU. That's the point. You want to minimize that to optimize the system.

THE COURT: Okay. All right. Thank you, counsel.

Counsel?

MR. STEVENSON: May I respond briefly, your Honor?

THE COURT: Yes, you can respond briefly.

And, Mr. Stevenson, just to let you know a road map where we may be going, I'm assuming that we'll address the summary judgment next, right?

MR. STEVENSON: Yes.

THE COURT: Okay.

MR. STEVENSON: Actually I was going to address the next term and --

THE COURT: Okay.

MR. STEVENSON: -- Mr. Dauchot may have jumped ahead. The second half of his slides, the ones that he pointed to saying that we use the word "optimization" in the structure, had actually nothing to do with this claim element and nothing to do with the claims that we have been talking about. I think that was a jump ahead to the

next term we're going to take up, which is claim 45, which is the means-plus-function.

THE COURT: All right.

MR. STEVENSON: And those are argued and those are evaluated, means-plus-function, under very different rules than what we're talking about here. So, I think that the second half of the slides where he was arguing that because optimization appears in our structure for the means-plus-function, I think that has no bearing on the claims we're talking about here. And I'm going to take that term up next.

THE COURT: Okay.

MR. STEVENSON: But I wanted to finish this term because I understood the court wanted to go term by term.

THE COURT: Sure.

MR. STEVENSON: On the preamble, the joint claim construction statement, which is the list of matters to be determined by the court on claim construction, is silent and the defendants never asked that any of the preambles be taken up as limitations and it's not in the joint claim construction statement. While I was sitting here, I looked for about the fifth time at pages 11 through 14 of the defendants' brief. Nowhere in there do they ever argue that the preamble

should be a limitation.  And Mr. Dauchot in his remarks, although he said in one or two sentences "We think the preamble is a limitation with regard to minimizing the feedback response size," he never really even attempted in his slides or in his argument to make the case for why the preamble should be a limitation.

As the court knows, there's a lot of law and a lot of rules as to when a preamble can be read in; and it's a very exceptional case when it can.  I presented the court with what obviously the governing law is which is if it's an advantage of the invention that's in the preamble, you don't read it in; and Mr. Dauchot never attempted to address that.  So, I think with regard to the preamble issue, although that's not before the court, even if it was, I would suggest that it's a fairly easy decision that the preamble is not a limitation.

If you would switch over to our slide show, please.

Mr. Dauchot cited the *Renishaw* case, and he had it underlined in red.  And the *Renishaw* case said, in the very beginning, "The construction that stays true to the claim language" and then also embodies the invention is usually "the correct construction."  And that's the Federal Circuit pointing us back to the claim language.

The reason, of course, the claim language is

so important is that is what the applicant presents to the patent office to get examined against the prior art and to get awarded as a patent. And the applicant controls how he drafts the claim, what he wants the patent office to examine; and if the patent office awards him a patent, the applicant receives it on what has been examined and he's stuck with the way he wrote it for the duration of the patent.

The reason it's wrong to incorporate advantages is apparent for a few reasons. The first is I guess I'll say a commonsense reason. All patents have advantages. All right. You don't go and file a patent on something that you don't believe is advantageous, but you're not required as the applicant to claim your advantage.

For instance, let's say I developed a new rubber compound that makes car tires a lot better. It makes them corner better, brake better, better wear characteristics. I may write a patent application describing how to make my new polymer and how to use it in a car tire; and then I may spend ten pages talking about the advantages, why it's better, how it accomplishes the better advantages. But when it comes down to me writing my claim, it's my choice. And if I want to write a claim that says "a rubber compound

40

comprised of these materials," period, and have that examined, that's my prerogative and if the patent office, after examination, awards it to me, that's the scope of my patent.  If, on the other hand, I want to add an additional element that says "such that this rubber compound allows your car to brake better and corner better," right, well, then I've raised the bar for myself in proving infringement later on because now I've got to go out in the field and I've got to conduct performance tests or otherwise make that element of proof.  So, as the applicant, I have that choice; and if I can get a patent, based on the search of the office, without adding additional limitations that relate to the advantages, it's in my benefit to do so.  And if I'm awarded a patent, it's not fair for the defendants to come back later and then try to incorporate the advantages that I didn't advertly incorporate in.

The last point is with regards to *Phillips* and a lot of the -- you know, what's the role of the specification in this?  How much do we defer to the specification?  Frequently parties will look at a specification when they're trying to interpret what a word means to a person skilled in the art.  Here we're not arguing over words in the patent claim.  What we're arguing about really is importing wholesale a brand-new

Claim Construction Hearing

41

limitation that isn't really hooked into or tied into any of the words. What we're talking about is taking, as defendants want -- this concept right here, "minimizing feedback responses," taking it out of the preamble where it is not a limitation and moving it down here as the last limitation, "whereas feedback responses are minimized." In that context, where you're basically wholesale adding a new limitation, the law is very clear. You've got to have an express disclaimer, either in the specification or the file history, and it's got to be clear and unmistakable and they've never pointed to one. And that I think fatally dooms the record.

That's all I have on this term. Unless the court wishes to hear more on this, I was going to --

THE COURT: I'm going to go ahead and give counsel like two minutes.

MR. DAUCHOT: Two minutes. I appreciate that, your Honor.

Let's take a step back. Both parties agree that "constructing responsive to," that that claim language requires some explanation. There's no dispute there. So, once you get to the point where the parties agree, look, something requires elucidation for the jury, we are now in a claim construction mode. So, the question is what does "constructing responsive to" mean?

If you look to the specification, is there any dispute here that "constructing responsive to" means constructing something in light of what you're getting from the transmitter?  That's "constructing responsive to."  You're getting D-PDUs.  Some of them are missing; some of them are corrupted, whatever; and now you need to construct an S-PDU.  You need to respond to that problem.

So, what are you constructing?  Well, you're constructing a type of S-PDU -- okay -- that best responds to it, that optimizes, if you will.  That's our only point that there is actually a selection process, a choice process here built into that system where the system does something to react to what it's getting from the transmitter at any given point in time and choosing among alternatives.

Now, we think that minimization is the best way to put it, given what's in the preamble and given what's in the specification.  But if this element of selection to optimize is -- if the court prefers that given what the specification states -- you know, ultimately we think minimization is better; but at a minimum, your Honor, we ought to have the claim term that the construction reflect the fact that we have a receiver that is, for any given set of D-PDUs coming, building something responsive to that and in so doing, selecting

among a number of alternatives.

Now, Mr. Stevenson wants to say minimization is an advantage. I beg to differ. It's not that it's an advantage. It's the point. Why are you selecting four? You're choosing among alternatives. Which alternative are you going to pick? The answer to that is the one that minimizes. That's not an advantage. It's how you go about picking. That's the algorithm that they've included in claim 45, which we'll get to.

So, that's the point. It's not the advantage. It's the way you go about selecting, if you will. Why? Why?

So, with that, your Honor, I'll rest, unless the court has some additional questions.

THE COURT: I don't have any. Let's go to the next claim.

MR. STEVENSON: The next claim is claim 45. This is a claim that is written in means-plus-function format, and I have the competing constructions up here which I'm not going to walk through in detail. I will put them up there to suggest that the dispute between the parties primarily centers around the structure that we read in to accomplish the function.

First, the law briefly. Means-plus-function claim elements are governed by 35 U.S.C. § 112 ¶ 6.

They're a special class of claim element that have special rules of construction.  The Federal Circuit has established a two-step process for construing means-plus-function claims such as this.

The first step is to determine what the function is in the means-plus-function clause.

Then, secondly, once the function has been determined, the next step is to determine the corresponding structure that is disclosed in the specifications.  And then the law is that the scope of the claim is the structure that performs the function and equivalents thereof.

And I'll note one probably typographical error in the defendants' construction, and that is in their construction they didn't include "and equivalents thereof" in the structure.  We did, and that is directly out of 35 U.S.C. § 112 ¶ 6.  And we believe that any construction is mandatory language to instruct the jury with.

But now moving on to the substantive dispute. We're back, I think, to the prior argument which is is minimization or optimization a required part of the function.  And it's not.  If you look at the claim and the recited function, it doesn't recite minimization, it doesn't recite optimization.  It recites essentially

constructing the feedback response message.  Constructing a message.  And it doesn't say that it has to be minimized, maximized, or put any boundaries on that particular function.

The statute and the Federal Circuit have been very clear that the court must strictly read the function and then look for the structure that meets the function that has been strictly reviewed.

If I can move to -- well, I'll just click ahead to Slide 14.

Let me deal with the defendants' proposed structures.  So, what I've done here in the sequence of about three or four slides that I've got is I've gone through the portions of the specification that in their claim construction the defendants had advocated meets the function of constructing this feedback response message.  And I've put them up here, and I'm not going to read through them in detail.  What I'll try to do at a high level is describe for the court what these passages deal with and why the defendants have inappropriately grabbed portions of the specification to try to read in as the structure and why the structures they've identified don't really match up with what the actual function is.

So, one of the first structures they identify is the patent at column 3, lines 6 through 13 and 36

through 42.  And essentially what this portion of the specification deals with is a way that you can calculate the size of the S-PDU -- that's the feedback response message -- how you can basically estimate or calculate the size of that.  But, again, that is not part of the constructing process.  That's a separate algorithm or a separate calculation that can be used if you want to know the size of it.  But that isn't pinned to the function in this claim which is actually constructing the message. You don't have to calculate the size to construct it.

The next section I'd like to point the court to is Table 1 in the patent; and that appears in the discussion at column 4, lines 1 through 29.  What this portion of the specification does is it essentially compares the size of the feedback response message, or the S-PDU, for different methods of preparing them.  So, they take a number of hypothetical examples of erroneous or dropped packets and which packet numbers those are in the sequence and then they go ahead and calculate how many bits the bitmap would result in -- it's always 141 -- or the list would result in and sometimes it's bigger, sometimes it's smaller.

Again, what they're doing here is they're going back to their point which is we think this function requires their minimization and that calculation of what

Claim Construction Hearing

47

the minimum one is and then reading in structure where that is described as the advantage and trying to make that actually structure that has to be met either literally or equivalently for infringement; and I think that's erroneous.

The next portion they cite to is figures 4 through 6.  These portions of this specification are and these figures actually show the form or the actual output, the feedback response message.  So, this is a logical representation of what would be a bunch of symbols transmitted over the air, but it's a logical representation of what the feedback response messages looks like.  This is a little bit closer.  But I think that it is the output of the algorithm -- it's not really part of the algorithm -- that the court should read into the structure.  This is the end product, not the actual algorithm itself.  However, I will candidly concede that figures 4, 5, and 6 are probably a closer question than the other portions of the specification we looked at for purposes of whether they constitute structure under 112 ¶ 6.

Finally we look at the portions the defendants cite at column 4, 30 through 41 and 42 through 45.  What they've cited here is a description of the problem to be solved -- and that's really not part of the structure;

that's setting up the problem to be solved -- and then the summary of the invention which again is not a -- the structure that's described in the embodiment that comes later and after this.  So, what they've done is they've taken the nonstructural discussion in the summary and in the problem to be solved and tried to read that in as corresponding structure, and that's not really corresponding structure.

In addition, I will also note that if the court looks at the summary of the invention, the part they excluded right underneath lists four different advantages to be obtained.  And those advantages, only a couple of which we talked about in connection with the first term, are:  Saving radio interface bandwidth resources; secondly, reducing protocol overhead; third, increasing system capacity; and, lastly, reducing the number of feedback responses in a selective repeat ARQ protocol.  So, I know the court identified, in its question about optimization, what things can be considered; and Mr. Dauchot answered you by pointing to two.  But he pointed to two of the four advantages and didn't point the court to all of them.

In summary, I think if the court looks at the defendants' structures that they are trying to identify, they aren't really the actual structures for constructing

the feedback response message.  What they are is hooks for them to argue that the advantages of the invention, as expressed in the summary or in the tables, need to be carried forward into claim 45.  And, again, for the reasons we've discussed earlier, we think that departs from the rules for claim construction means-plus-function laws.

THE COURT:  Thank you, counsel.

MR. DAUCHOT:  Eric, can you put up Slide 16, please?

Your Honor, I do agree with Mr. Stevenson on this point, that this debate here is really an extension of what -- of the initial debate.  Right?  The question is:  What's the claim capture?

Is it about how to construct an S-PDU in line format?  Of course not.  If you read the specification, your Honor, it says that's in the prior art.

Is this claim about going about constructing a bit format S-PDU in response to what the transmitter sends?  Of course not.  The specification tells us all that that's in the prior art.

So, if building something responsive to isn't building the actual list type of an S-PDU or building the actual bit type of an S-PDU, what's it about?  What's the claim "responsive to" mean?  It's building something in

response to after getting something from the transmitter.

The plaintiffs answer the question. In their brief they called it "efficient switching"; and during argument, their counsel for plaintiff said you build in choice. And the only point that we have is, fine, you build in choice. The receiver, upon getting something to the transmitter, has an option. What kind of an S-PDU am I going to send to optimize the process? Am I going to send a list one? Am I going to send a bit one? Am I going to send a compressed bit? Am I going to send a combination?

And, in fact, the inventor at the tail end of the specification says, look, these are just examples of the sorts of things you can create in response to what the transmitter sends in order to optimize the process.

And what we point to is the structure that captures what the claim explains building something in response to what the transmitter sends means. And that means let's figure out how many bytes it would take to create a list, let's figure out how many bytes we would need to create a bit S-PDU, let's compare, and let's pick the one that optimizes, minimizes the number or size of S-PDUs. That structure, your Honor, we capture. That structure, they don't capture, although they concede -- and this is a concession -- in their own proposed

51

structure that optimization is part of it.  And that's the root of this dispute, your Honor.  Is it just about, hey, let's identify to the transmitter what we've built?  No.  It can't be.  It's about more than that.

THE COURT:  How do I get around, if I chose to do so, *Micro Chem*?  Everyone agrees that that's a seminal case.  And the court in *Micro Chem* says, "Judges, look at the claim language to determine the function and the claim language essentially only."  So, how do I -- you know, how do I just take my focus away from everything that's after the means for to determine the function which is going to help determine my structure?

MR. DAUCHOT:  Precisely.  And what the claim language notes is it's a means for receiving something from the transmitters and constructing one to several message fields in response to it.  I mean, that's the function.  That's what we're trying to accomplish here.

Now, how do you accomplish that?  What's the patent tell us?  The patent tells us you figure out how many bytes it would take to do it one way; you figure out how many bytes it would take to do it another way; you compare; and you pick the one that optimizes, which if you read the specification means you create the least amount of S-PDUs or the smallest S-PDU and in some respects it can be the flip side of the same coin.  But

52

the patent explains that, and that's the structure we capture.  That's what Table 1 is about.  Figure out what it takes to do it one way -- and that's in our structure -- figure out what it takes to do it another way, pick the smallest one, and go with that.  And that is the structure, really the heart of the structure that's captured -- or that's the structure that captures the heart of the function.

Because, your Honor -- let's take a step back -- it can't be that what this language means is you get something from the transmitter as part of this ARQ protocol, the automatic repeat protocol, and in response to what you get from the transmitter, you send an S-PDU.  You build an S-PDU, and you send it back.  How can that be?  Plaintiffs will concede that that's not the invention.  It can't be.  That's all over the prior art.

The specification tells you that constructing something in response, just simply getting something and sending something back blind to what you got, in static format, if you will, as the specification explains, that's prior art.  The problem is the prior art static format.  You got to be able to bob and weave depending on what you're getting from that transmitter; and that's the heart, adjusting, creating an S-PDU among a lot of different choices that basically optimizes the way to

53

signal back to the transmitter what you haven't gotten properly.

And to your question, your Honor, that structure is I think the function -- if that's the function, it can't be -- and I think plaintiffs' counsel will concede this -- it can't be that the function here is, hey, you've got a system and you've got the receiver sending something back to the transmitter saying "I didn't get what you said properly."  That can't be it.  Can't be.

There's more to it than that.  And the more to it than that is the selection to optimize.  That's the key.  That's the "responsive to."  That's the key.  And that is the structure to which we point in the specification.  Figure out how to do it one way, figure out what it will take to do it the other way, compare, pick.  That's Table 1.

Does that answer your question, your Honor?

THE COURT:  Well, I guess the answer that I was looking for is that we have to determine in a means-plus-function what the function is.  So, we're at a disagreement on what the function is, of course.

MR. DAUCHOT:  That's correct, your Honor.

THE COURT:  And, so, but when I determine what the function is under *Micro Chem*, I look at the claim

54

language, period.

MR. DAUCHOT:  Well, yes -- that's not quite -- you look at the claim language read in light of the specification.  And, so, what we agree -- it is not that if you -- in trying to explain what the function is, there is no law that prohibits you from construing what the function is.  And essentially what we are submitting is is that the function here, that the terminology needs to be construed.  To your question, what's the function -- and, your Honor, you know what?  That's the essence of the dispute.  What's the function here?

THE COURT:  That's clear.  And, you know, *Micro Chem* tells me that the statute does not permit limitation of a means-plus-function claim by adopting a function different than that explicitly recited in the claim.

MR. DAUCHOT:  That's correct.

THE COURT:  So, I look at that claim, everything after the means for, and I determine the function looking at that claim.

MR. DAUCHOT:  Well, when you say the function expressly recited, the law is not that in trying to figure out -- in trying to construe what the explicit function recited is, that you need to put blinders on and you can't construe that language.  You can.  The law does

55

authorize the court and I think the law compels the court -- if there is some, you know, uncertainty as to exactly what that language means, the law authorizes the court to construe it.

Having construed it, now the question is: Okay. I've construed this claim. What's the function as construed by the court? That's -- I think that's the law, your Honor, what is the function as construed by the court.

THE COURT: Okay. Are we ready to go forward?

What's next -- the motion for summary judgment?

MR. STEVENSON: Yes, your Honor.

THE COURT: Okay. Let's take about a five-minute recess, and then we'll come back out and address the summary judgment.

(Recess, 11:16 a.m. to 11:28 a.m.)

THE COURT: Okay. We're moving on to the defendants' motion for summary judgment.

Counsel.

MR. BOVICH: Yes, your Honor. Thank you. John Bovich on behalf of the defendants.

The issues relating to the dispute over the function of claim 45 are largely joined, I think, in the context of claim construction. Your Honor has a dispute

before you as to what the function means; and after resolving that, we have to figure out what the structure is.  So, I'll incorporate a lot of the arguments that Mr. Dauchot raised in terms that I want to focus on why summary judgment is appropriate just on the undisputed facts before you as opposed to the claim construction dispute.

But on the dispute as to the function, the question of how we construe that function is answered in defendants' briefs regarding the motion for summary judgment specifically in response to your Honor's question about *Micro Chem*, what do we do with this function language and are we allowed to construe it or must we take it as it's written in the claim.  And the answer is your Honor is allowed to apply ordinary principles of claim construction in determining what this function means.  And the case law is the cardiac pacemaker case decided by the Federal Circuit.  To the extent that we disagree over what this function is, we have a dispute which needs to be resolved, it is a claim construction dispute and ordinary principles apply.

I noted your Honor's decision in the *Mettler Toledo* case.  That was a dispute over the meaning of the function in a means-plus-function claim construction dispute.  And the dispute was resolved not by repeating

the function language verbatim but by figuring out what it is the function means in resolving the dispute.

So, I would submit that your Honor is free to use ordinary claim construction principles, including referring to the spec, referring to the preamble in order to resolve that dispute. Because, after all, we're not arguing over what the function says. We're arguing over what it means, and that's what needs resolution.

Putting that aside and turning to the motion for summary judgment, I want to show you why -- regardless of the dispute before us, why on the undisputed facts summary judgment is appropriate.

If I can turn to our deck, Slide 4.

These are the proposed structures that the parties have proposed. And you can see we've already harped on this language. In the proposed structure offered by the plaintiffs, they agree that this is not just a method of presenting a choice. You actually have to do something; you actually have to choose. And this choice can't be an accident. This choice has to be done according to certain criteria.

So, it has to do what? The plaintiff answers this question -- this is Undisputed Fact No. 1 -- No. 1, "so as to optimize performance." It comes from them, and it is their view of the patent.

Could I turn to the plaintiffs' slide deck for just a minute?  I don't know if we have that punched up.  Slide No. 15.

Undisputed Fact No. 2.  This is the plaintiffs' view of what the structure is; and the plaintiffs tell us that this structure from the patent, column 4, including Table 1, these are the techniques for optimizing.  So, we know that the choice has to be made "so as to optimize" and we know that these are the techniques for us to do this optimization and this all comes from the plaintiff.

And Undisputed Fact No. 3 is that they've already told us they are not offering this structure that we see on their Slide 15.  They're not proposing it.  So, the goal they have to reach is optimization.  They tell us what we need to do to reach that goal, and they tell us that they will not propose that structure.  And that's why the claim is indefinite.

THE COURT:  Okay.

MR. BOVICH:  Thank you, your Honor.

THE COURT:  Thank you.

MR. STEVENSON:  Your Honor, let's start out with the standard of review that the court has to apply to this motion for invalidity based on indefiniteness.  The standard is a clear and convincing evidence standard.

If the defendants want to prevail, they must show by clear and convincing evidence that the specification lacks disclosure of any structure sufficient to be understood by one of skill in the art as being adequate to perform the required function. And the argument I believe they're making is that there isn't structure in the patent that discusses how to do optimization.

Now, interestingly, I find that quite at odds with the first set of positions that we heard from Mr. Dauchot, which is this is the crux of the invention, this is what the patent is written about, it's all about how to minimize and how to optimize. Now we've turned 180 degrees and I believe the argument now is there's no disclosure in the patent of how to do optimization, even though they contend that's the crux of the patent that needs to be read in.

With respect to this particular motion, though, I think the court -- the briefs submitted on claim construction is very instructive for the court. What I've got up on the Elmo now is a page from -- this is page 13 from the claim construction brief. This is the defendants' brief on claim construction. And it says, "the '215 patent expressly illustrates how the invention is achieved, by calculating the sizes of list and bitmap feedback responses in response to different

60

sequences of incoming data units, allowing for the system to select the particular feedback response with the smallest size."

So, this is the characterization of the specification in the claim construction brief that they now say there's no support for how to optimize.

Then they cite to Table 1 as the first citation in that statement in the claim construction brief, and I think that's educational as well.

Can we please switch back to the computer and go to the next slide?

This is Table 1.  So, what the patent talks about is a technique; if you want to see how to optimize, what you can do is you can calculate for each S-PDU what the size of it would be under the list method or the bitmap method or whatever other method you want to choose and then presumably, if you want, choose the smallest, if that meets all your criteria.  You may have other reasons for optimization; but if size is your primary consideration, that's one way you can achieve it; and that's an example.

So, from that standpoint -- it's tough for the defendants to have it both ways.

I think there is clear algorithmic support in the specification for the concept of what it means to

optimize at least in one particular situation. Naturally, optimization is in the eye of the beholder and different system designers are going to have different views about what the best way to perceive is and which advantages they deem the most worthy, but there is a structure that discloses to a person of skill in the art how to do this. And I think for that reason not only is there no clear and convincing evidence, we've actually proved that the structure exists; and the motion should be denied.

THE COURT: Thank you, sir.

Go ahead.

MR. BOVICH: Your Honor, I want to make sure we're 100 percent clear on this because this is a mischaracterization of our argument. The defendants absolutely concede that there is adequate structure in the specification to support optimization. Our position on summary judgment is very narrow. It is that under the plaintiffs' construction, the plaintiffs' proposed structure, they are not giving you that adequate structure; but there is no doubt in our minds that that structure exists in the patent. It's simply that they are not proposing adequate structure to you. And, so, under their proposed claim construction -- and only theirs -- the claim would be indefinite because their

62

proposed structure does not give you the adequate structure we need.  For example, Table 1.

THE COURT:  So, I'm on confused.  So, this is a claim construction issue and not a motion for summary judgment anymore.  In other words, I think what you're admitting to me is the patent has enough algorithmic support, and under *WMS Gaming* or anything else, to keep from being indefinite; but you're telling me that if I -- that their structure is inadequate.  Is that what you're telling me?

MR. BOVICH:  100 percent true, your Honor.  We absolutely admit that there is adequate structure in the patent.  Judge Davis has a rule on submitting arguments regarding indefiniteness.  We noticed this problem with their construction.  So, as we identified it, we thought we'd bring it to the court's attention now.  But there's absolutely no doubt that there is adequate structure in the patent.

THE COURT:  Okay.

MR. BOVICH:  Thank you, your Honor.

THE COURT:  Thank you.  Next term.

MR. STEVENSON:  I believe that is all from the '215, your Honor.  We're ready to move on to the next patents, and Ms. Moore will be presenting on that.

THE COURT:  Okay.  Ms. Moore.  You're the

'435; is that correct?

MS. MOORE:  That's correct, your Honor.

THE COURT:  Okay.  The obsolete packets.

MS. MOORE:  That's right.  So, as you just mentioned, this is the discard message patent.  I'll give you a brief rundown.  You've seen the tutorial.  You've seen ours; you've seen theirs.  Here is a screenshot from that tutorial.  Essentially what's important to note for this particular patent is that eventually patents *[sic]* are going to become obsolete because, for example, either they have been transmitted by the transmitter a number of times and have not gotten there and therefore become obsolete in the process or the transmitter has successfully sent them to the receiver but somewhere in the transmission process they got garbled and the receiver does not understand what it got.  At that point it can send the acknowledgement message that Mr. Stevenson addressed with the '215 patent.  It can send an acknowledgement message back to the transmitter a number of times.  And, again, the transmitter can continue to send that particular packet over and over again until it is successfully received by the receiver in a way that it can understand; or again it becomes obsolete at a certain point such that the discard message should be used.  And that is because otherwise the

Claim Construction Hearing

64

transmitter and receiver at some point will become deadlocked waiting for these packets to get transmitted back and forth successfully to the receiver.

When these packets become obsolete, the transmitter will send what's called a "discard message" to the receiver and at that point the receiver will note which packets it should discard because the transmitter has also discarded them and the receiver will then no longer expect to receive those packets and move on with these set of successfully received packets and present those to the user in a video or an email or streaming audio, one of the many things that can be sent back and forth to the receiver.

One thing I want for us to keep in mind as we're talking about the discard message is it can take one of several formats.  We discussed several of them in the tutorials.  We showed several figures.  I won't belabor that point.  But to keep in mind for our disputes here, the discard message can essentially have one of two formats.

The first format is the explicit identification of discarded packets.  That's a message that says, "I, the transmitter, have discarded Packets 1, 3, and 8."  I'm going to send that to the receiver; and the receiver will then say, "Oh, I no longer need to wait

on Packets 1, 3, and 8."

Another option that's important for us to know and remember for these disputes is that the discard message can also send just enough information so that the receiver can deduce which packets have been discarded by the transmitter.  In other words, an example would be a discard message that says, "I have discarded all packets older than Packet 10."  It sends that message to the receiver; and the receiver then will know, "Okay.  I must delete Packets 1 through 9."  So, it's a computation that must occur or some kind of deduction that must occur. It's not an explicit ID of the packets that have been discarded at the transmitter.

We believe that the claim covers both of these embodiments, the explicit identification embodiment and this deduction embodiment, I'll call it, the one that doesn't have an explicit ID.  How do we know that?  We have the word "indicating" here in this transmitting step.  This is part of what's being construed today. It's a data packet discard notification message that's sent from the transmitter to the receiver, as I mentioned earlier.  And what does that message do?  It indicates data packets the transmitter has discarded.  It doesn't say you must have an explicit identification.  It doesn't say you have to contain the sequence numbers of those

data packets.  It doesn't tell you that it has to be an explicit identification versus this deduction embodiment I mentioned a moment ago.

What's another way from the claim that we know that this is the right interpretation?  If you look at the third step, after the receiver has gotten this discard notification message, the receiver is going to compute which data packets have been discarded.

What does that mean?  It means this message can take, again, one of several formats.  If it's the explicit identification, the receiver will then note what those explicit IDs are.  Packets 1, 3, and 8.

However, this message can also be the deduction embodiment I mentioned.  It can say, "Delete packets older than Packet 10."  The receiver there will compute I need to delete Packets 1 through 9.  It is not an explicit ID.  It does a simple computation step to figure out exactly what needs to be deleted and exactly what has been discarded at the transmitter.  This computing step, again, confirms that the message itself doesn't have to have an explicit identification.  It can simply state "Delete packets older than Packet 10."

We also have a dependent claim here, dependent claim 6.  It says that the message does include the sequence number for each packet to be discarded by the

67

receiver. That is the explicit identification embodiment I mentioned earlier. This is a dependent claim. So, obviously, by the doctrine of claim differentiation, claim 1, the broader claim, would include a broader concept of both an explicit identification embodiment and a message that just has enough information that you can compute which packet you will need to discard.

As we see from defendants' responsive brief, they appear to agree with this concept that, as they note in their brief at page 7, defendants even believe that their proposal doesn't require the explicit identification. In other words, defendants believe their proposal is also broad enough to cover the explicit identification and this deduction embodiment because they state here that their "proposal neither requires that individual sequence numbers be contained in the message, nor excludes any embodiments." To me, that appears to agree with our argument that the independent claim is broad enough to cover both the explicit identification and the deduction embodiment.

So, let's go to the constructions now to see what it is that we're actually arguing about. And keep, again, both embodiments in mind that I have discussed earlier.

What we have here is the claim language on the

left that's in dispute, "data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded." I'll place particular importance on the word "indicating" there. In Ericsson's construction, we simply carry forward that word "indicating," or "that indicates." It's a plain meaning word. It's not going to be confusing to the jury. It requires no construction here.

Defendants' construction instead removes the word "indicates" and replaces it with "containing the identity." That's where we're having this dispute about which embodiments are covered by this particular claim.

It's Ericsson's position that "containing the identity" also has a plain meaning that a jury would understand, and it is not an embodiment that would -- or I'm sorry -- a construction that would cover both embodiments. "Containing the identity" means just what it says, the message must contain the identity of the packets to be discarded at the receiver.

If we go back to the two examples I mentioned earlier, we have the explicit identification. That means a message that says Packets 1, 3, and 8 should be deleted. That is and would be covered by "containing the identity" language. The problem we have now is when you got to the deduction embodiment -- for example, a message

69

that says, "Delete all packets older than Packet 10," that is not "containing the identity" of the packets to be discarded.  If that were the case, you would need to say, "Please delete Packets 1 through 9."  That's not contained in the identity of discarded packets.

Instead, it is a simple notification to the receiver you must delete something and you are going to have to figure out what you need to delete, but the identity is not contained in that message.  Packets 1 through 9 are not specifically mentioned in that message.  Instead, it was Packet 10 and said please delete everything older than that.  For this reason, we believe the "containing the identity" language is incorrect.

I'll also discuss now the "unacknowledged" portion of this disputed claim language.  We mentioned in the briefing there are two embodiments discussed in the '435 patent.  It is the acknowledged embodiment and the unacknowledged embodiment.  If we look here at column 1, lines 14 through 22, it really lays them out in contrast; and you can see exactly what we're talking about here.  There's an acknowledged embodiment.  That's this first one here in orange.  It says "negatively acknowledged (NACKed)."  That is the acknowledgement embodiment we're going to be discussing.

The alternative embodiment, separated,

70

importantly, by the word "or," is the unacknowledged embodiment.  And this particular portion of the specification goes on to tell you exactly what the unacknowledged embodiment is.  It is when "the receiver after a predetermined amount of time after being transmitted (i.e., have timed out)." That means the packets have timed out.  They never even made it to the receiver to get an acknowledgement one way or the other.  So, someone turned on a microwave; the packets got zapped.  The receiver never even knew they needed to expect them, much less get them and perform an acknowledgement.

So, these are the two embodiments we are going to be discussing.  They're discussed in detail in the specification.  The problem we have with defendants' construction is that inserting the word "unacknowledged," which importantly doesn't appear anywhere in the claim language at all -- it is completely inserted with the defendants' construction -- it reads out one of the preferred embodiments.  In particular, it reads out this NACK, or acknowledgement, embodiment because of the word "unacknowledged."

As we note in the specification for both of these alternative embodiments, the NACK and the time-out embodiment, the transmitter can then transmit the discard

notification message.  It doesn't matter which of these embodiments is used.  The discard message will be triggered by both the NACK and the time-out embodiment. So, the claims in the inventive aspects of the '435 patent apply to both the acknowledgement embodiment and the unacknowledgement embodiment.

I'll just put these up here to go through really briefly.  Just to let you know, we do have an acknowledgement embodiment.  It is called the "re-transmission request" discussed at figure 8.  The re-transmission request, that's the acknowledgement that's getting sent back from the receiver to the transmitter.  That is the acknowledgement embodiment.

After the NACK comes back to the transmitter, the transmitter will send the discard notification message if those packets are too obsolete.  And that's what is described here at column 4, lines 53 through 67.

In the alternative, we have the unacknowledged embodiment, that time-out embodiment I described earlier. This is described as the "non-expected cells" that have been sent in a discard message to the receiver.  They're non-expected because the receiver never got them because they timed out.  The transmitter tried several times, and they just never even made it to the receiver for him to acknowledge one way or the other whether these packets

were received correctly.  It's a slightly different calculation, but a discard message is also sent in this particular embodiment.

And, again, the reason that defendants' construction is incorrect is the insertion of this acknowledgement -- "unacknowledged" word in their construction.  It reads out this very first embodiment here that's in orange, the one at column 4, lines 53 through 67.

As the court is well aware -- we've briefed this -- (reading) a claim interpretation that excludes a preferred embodiment from claim scope is rarely, if ever, correct.  That's our position with respect to the word "unacknowledged."  It reads out this preferred embodiment that was described at column 4.  It, therefore, is incorrect because the claims, as I noted earlier with the words "indicating" and the fact that the receiver has to compute which packets are going to be deleted, is covered by both the unacknowledged embodiment and the acknowledged embodiment and it's also covered by the word "indicating" which we mentioned early "containing the identity" -- taking the word "indicating" out of the claim term and replacing it with "containing the identity" is also incorrect.

Thank you, your Honor.  If you have any

further questions --

THE COURT: Just a couple of questions.

MS. MOORE: Sure.

THE COURT: Your construction included "a control message in an Automatic Repeat Request." Why should I include "a control message" instead of "a message," and why should I insert the language "Automatic Repeat Request"?

MS. MOORE: Sure, I'll address that really quickly for your Honor.

What we are seeking to construe here is, looking at the claim language, what is the jury unlikely to understand or be unfamiliar with? Rather than something like the word "indicating," which we think the jury is going to understand, we think they would likely be unfamiliar with this "data packet discard notification message." We wanted to put some meat on the bones there so that the jury would understand what exactly does that mean in the context of this patent.

So, what is it? It's a control message. It's not a message that has the actual payload data. It's not something that has the voice packet. It's not something that has the video data that's going to be displayed to the user. Because in figure 7 of this particular patent, it shows you the receiver is going to do different

Claim Construction Hearing

74

things.  If it gets the control message or if it gets this discard notification message, it's going to switch modes and figure out what do I need to do?  Oh, I need to delete some packets.  I don't need to do anything with reviewing the actual payload data and see if I have properly decoded the voice data or properly decoded the video data, for example.

However, if it's not a control message, that means it actually does have the video, the voice, the actual data the user is interested in seeing; so, it does a different set of operations.  What it does is it looks to see if those packets have been decoded correctly.  Do I need to send an acknowledgement message?  Do I need to send a negative acknowledgement message?  Do I need to continue to wait for more packets?

So, it's just a way of noting to the jury that we're going to do something different here with the discard message.  It's not your plain vanilla data that would be end up being displayed to the user.

And it's similar with this Automatic Repeat Request protocol.  All that does is describe the environment in which this message would even be helpful.

In both defendants' tutorial and our tutorial, we acknowledge that the discard message is in response to an ACK.  What does ARQ protocol mean?  It means that

there is an environment in which there is a transmitter and receiver and they're going to continue to wait on each other until all the packets have been received correctly or there has been a number of acknowledgements and each entity can then move on once everything has been received correctly.  If it's outside of this environment, it's unknown whether the discard message would provide any use because perhaps the receiver isn't even waiting on packets because it's following a different protocol.

THE COURT:  Okay.  Thank you, Ms. Moore.

MR. ALPER:  Good morning, your Honor.  My name is Adam Alper.

THE COURT:  Good morning, sir.

MR. ALPER:  I'm here to speak for the defendants on the '435 patent.

Go to Slide 2.

As we saw from the prior presentation, the title of the '435 patent is "Data Packet Discard Notification" and there's one disputed term for us to decide with respect to the '435 patent and it, in fact, regards the data packet discard notification message.

So, let's go to the next slide.

We'll see the one independent claim of the patent and the disputed term -- we've highlighted it -- regards "transmitting a data packet discard notification

message from the transmitter to the receiver indicating data packets the transmitter has discarded."

If we go to the next slide, what we've put here up on the screen are the parties' competing constructions and really the disputes between the parties break up into three primary categories and we've color-coded them here. We'll walk through these disputes; and we're going to take them kind of in reverse order, from the bottom to the top, in order of what we think are the significance of the disputes.

The first one regards which data packets are the ones that are being discarded -- right -- the unacknowledged ones or acknowledged ones. We'll talk about that a little bit.

The next one is what does "indicating" mean in the claims.

And then, lastly, what a message is, when we talk about a "message." And that one, if you look at our construction, we can resolve one of those disputes right off the bat.

As your Honor noticed a few moments ago, the plaintiffs have included that the message is in an automatic repeat request protocol; and we can agree with that, that this is -- that the claims require an automatic repeat request protocol. In fact, we're going

to talk about that a bit. That's actually an important point to understanding what packets are the discarded packets.

So, with that, let's start with the first dispute; and that is which data packets are discarded. And like I said, the dispute really revolves around whether these are unacknowledged packets or acknowledged packets.

If we can go to the next slide, what we've done is we've put our construction up at the top of the screen and then we've put the plaintiffs' construction down at the bottom and we've highlighted in red the aspect of the constructions that we'll talk about here.

And what we saw from the plaintiffs' presentation and we have been discussing are there are really two categories of packets that are relevant to this dispute. There are unacknowledged packets on the one hand, and there are acknowledged packets on the other hand. And to really kind of crystalize what the dispute is between the parties' two proposals, what we say is that when the patent talks about packets that are discarded in this discarded -- that are included in the discard notification message, the patent is referring to unacknowledged packets. And what the plaintiffs say is that -- and you see their construction, it doesn't

78

have -- it repeats the claim language.  But what they are really saying is that the discard notification can be made up of unacknowledged packets or exclusively acknowledged packets.  And what we're going to see is that it's -- as opposed to acknowledged packets, the unacknowledged packets are what create the problem that the patent talks about.  They are the way to solve the problem that the patent talks about and that if you included only acknowledged packets in the data packet discard notification message, you wouldn't solve the problem that the patent talks about.

So, let's start on this by talking about in general what the patents are all about.  I think both sides would agree with this.  They're about ARQ protocol.

So, if we go to the next slide.

What is an ARQ protocol?  An ARQ protocol refers to a protocol for re-transmitting packets that have not been successfully received; and, so, you see that when you look at what ARQ stands for.  It's an automatic repeat request.  "Repeat" for repeating the transmission of packets that have not yet been successfully received.  And what I'd like to do very briefly is to talk about how ARQ works when packets are successfully received and then contrast that with when they are not successfully received because that's really

the main point of ARQ.  Because, of course, if packets were always successfully received, we wouldn't need a protocol in the first place.

Let's go to the next slide.

What we've depicted here at the top half of the screen is a transmitter on the left and a receiver on the right, and then in between them is a transmission channel.  You can see in the transmitter there's a buffer; and that's just a memory or a series of memories that holds packets to be transmitted.  And in ARQ protocols, the transmitter will label each packet with a sequence number; and then the transmitter will transmit those packets in sequence number order.

And when a packet is successfully received, if we now go down to the bottom half of the screen, you can see the receiver also has a buffer.  It will receive the packet into the buffer.  And when it's successfully received, what the receiver does is it sends a message to the transmitter acknowledging the successful receipt of that packet; and that, in ARQ protocol, is what we call an "acknowledgement."  It's when you acknowledge the successful receipt of a packet, and that's what we've labeled here.  It's also called an "ACK."  Here you see the receiver is sending a message called "ACK 1," acknowledging the successful receipt of Packet 1.  That's

Claims Construction Hearing

80

when the system is working as you hoped it would, right, and packets are being successfully received.

Let's talk about what the real focus of ARQ is and the real focus of the '435 patent, and that's when packets are not successfully received.

So, if we go to the next slide, what you can see at the top half on the screen is you see Packet 1 is being transmitted but this time it runs into interference and, so, it doesn't get all the way across.  In this instance the packet will not be successfully received. As a result, the receiver, under ARQ, will not send a message acknowledging successful receipt; and it's at that point that the transmitter deems that packet unacknowledged.  Right?  And as a result of the packet being unacknowledged because it hasn't been acknowledged, the transmitter knows that it needs to re-transmit the packet in order to try to get the thing successfully across the channel.  Right?  And that is the point of ARQ, that if you don't get a message acknowledging successful receipt, you know that you need to re-transmit the message until you can have it successfully received.

And this is not the only way that this can happen.  There's another way -- and, in fact, plaintiffs' counsel, Ms. Moore, discussed this -- and that's in the case of a negative acknowledgement.

If we go to the next slide.

This is going to illustrate the exact same principle.  Here the Packet No. 1 perhaps gets all the way to the receiver, but it shows up with errors.  And in that instance, the receiver will -- once again, it will not send a message acknowledging successful receipt, an ACK.  What it will do is it will send a negative acknowledgement; and what that is is it's an affirmative message telling the receiver that the packet has not been successfully received.  And in both those instances, whether you haven't gotten anything or whether you've gotten a negatively acknowledged message, it's saying the same thing, that the transmitter is going to deem the packet unacknowledged and it's going to try to get it across by re-transmitting it.

In fact, when we look at the specification, it describes the ARQ protocol and those two things in exactly that way.

So, if we go to the next slide, this is in the background of the invention.  It tells us "some messages (e.g., words, cells, et cetera) sent by a transmitter to a receiver that are negatively acknowledged" or -- "or," both of these -- "remain unacknowledged" are "stored in ARQ buffers in the transmitter, until they can be successfully transmitted."  So, that is the patent

telling us that we are going to group in one category the negatively acknowledged messages and the yet-to-be acknowledged messages and those are the ones we're going to try to re-transmit and that's the focal point of this patent.  And, in fact, that's the backdrop of which the applicants came up with their invention because what they noticed was that when you have unacknowledged packets, whether they were NACKed or whether they just remained unacknowledged, a problem arose and, as your Honor noted earlier, a problem with obsolete packets arose.  Because if a packet hasn't been sent yet -- for instance, if you have a video streaming transmission or voice or something like that where packets are marching along, the packet can become obsolete.

And what happens in ARQ, if we go to the next slide, in those circumstances, as the applicants recognize, is that the transmitter will discard that packet, that unacknowledged packet that it's been trying to get across that it can't.  And what the applicants recognize is that could cause a problem because in those circumstances, at times in the receiver, the receiver will still be expecting that unacknowledged packet.  Right?

THE COURT:  Uh-huh.

MR. ALPER:  So, as a result, the applicants

83

recognize that a problem called "deadlock" arises. And if we look at the bottom half of the screen, we can see it. Right? It's when the transmitter is now ready to move on to the next set of packets -- 4, 5, and 6 -- because it's gotten rid of Packet 1 but the receiver isn't accepting those packets yet. On the other hand, we look at the receiver. The receiver is still expecting Packet 1 but the transmitter is no longer sending Packet 1 because it's been discarded and as a result, the system is in deadlock. Right? The transmitter wants to send something that can't be received, the receiver wants to receive something that is no longer being transmitted, and we're stuck. And the applicants highlighted this problem in the specification in exactly that way.

So, if we go to the next slide, in the background of the invention, they tell us, "after the transmitter has attempted a number of times to re-transmit a particular message," "the message should be discarded from the transmitter's ARQ buffer. However, if the receiver continues to expect discarded messages" -- the ones that the transmitter was continuing to try to re-transmit because they hadn't been acknowledged -- "the system can go into deadlock."

And what the applicants recognized with that problem -- and that was the problem. It all revolved

84

around messages the receiver is still expecting, unacknowledged messages of course.  And what the applicants recognized is that if we can come up with a way to tell the receiver to stop expecting those unacknowledged messages, then that would solve the problem; and that's where they came up with the data packet discard notification message.

So, if we go to the next slide, that's their invention.  When a message that you can't get across on the transmitter side gets discarded, the applicants realize the system can go into deadlock because the receiver is still expecting that message.  So, what we've got to do is we have to tell the receiver to no longer expect that message so the system can go -- can move along and move on to the next set of packets and transmit them in the ordinary course of things.

And if we look at the specification in the summary of the invention, that is precisely what they tell us.

If we go to the next slide, in the summary of the invention when they tell us what -- after describing the problem and telling us that it revolves around unacknowledged packets, they tell us "a cell discard notification message" -- and it says "cell," but they tell us elsewhere that "cell" and "packet" are the same

85

thing.  So, they say (reading) the cell discard notification message indicates to the receiver which cells or packets the receiver need no longer expect to receive.  And which of the packets that the receiver is expecting to receive?  Not the acknowledged ones that it's already gotten.  It's expecting to receive the ones that the transmitter was unable to transmit.  Those are the unacknowledged messages.

So, now let's talk -- remember the debate between the parties, we say that the discard notification is unacknowledged messages, or at least unacknowledged messages; they say that it can be made up exclusively of acknowledged messages.  And what we're going to see -- I'm just going to go through a bit of the evidence here -- beginning with the claims, that that is not the case in this patent.

So, with that, I'd like to turn to -- start where you usually would start with construing claim language, which is the claim language itself.

So, let's go on to the next slide.

Now, as Ericsson put in their claim construction and I think we all agree at this point, an automatic repeat request protocol is the context of the invention; and, in fact, we're agreeing that it's actually a requirement of the claims.  And recall that in

86

ARQ what you're trying to do is re-transmit unacknowledged packets, right, that have not yet been successfully received.

And, so, when the claim language talks about data packets the transmitter has discarded, we are talking about that in the context of ARQ. And in the context of ARQ, those data packets that have been discarded, those discarded packets, are the unacknowledged packets. And, in fact, they say that we're reading the word "unacknowledged" into the claims; but the fact of the matter is that in the context of ARQ, which we all agree is a requirement of the claims, that word is already there because it talks about the discarded packets in ARQ and the discarded packets are the unacknowledged ones. And what we're going to see is that is repeated throughout the entirety of the rest of the evidence.

So, if we go to the very first four lines of the patent, the field of the invention -- look at the next slide -- it tells us "The present invention relates to management of unacknowledged data frames." And I think there's two takeaways from this.

The first is it says the patent regards unacknowledged data frames. It doesn't say "unacknowledged and acknowledged." It doesn't say just

"acknowledged."  It says "unacknowledged data frames."

But the next thing is it says this is the present invention.  It's not telling us that this is just an embodiment, it's an example, it regards a dependent claim.  This is the patentee's way of signaling to us that he's not talking about something specific.  He's talking about something that applies to the entirety of the invention.  But it's not just here.  We're going to also see it throughout the rest of the specification and in every embodiment.  Because when we look at the background of the invention, the patent tells us that the discarded packets are the unacknowledged packets.

So, we look at the background of the invention and their description of this to tell us that (reading) some messages sent by a transmitter to a receiver that are either negatively acknowledged or remain unacknowledged, those messages are the ones that should be discarded from the transmitter's ARQ buffer.

So, in the field of the invention they tell us it's unacknowledged; in the background of the invention they tell us the discarded messages are the unacknowledged messages.

Now, what about the problem?

Let's go to the next slide.

Recall the patent tells us -- when they set up

the problem of the patent, which is what the invention is intended to solve, they tell us, "after the transmitter has attempted a number of times to re-transmit a particular message" -- those are the unacknowledged messages; obviously you're not re-transmitting messages that are acknowledged -- "the message should be discarded."  That's the unacknowledged messages.  It's those messages that the receiver continues to expect, and it's those messages that cause the problem of deadlock.

Now let's contrast that with acknowledged messages, do acknowledged messages cause the problem of deadlock; and the answer is absolutely not.

If we go to the next slide.

Remember -- I put the background of the invention back down here (indicating).  Remember, deadlock is caused when "the receiver continues to expect discarded messages."  But an acknowledged message has already been received and a message that has already been received is not one, of course, that is expected and it's certainly not one that the receiver is going to wait on and cause the deadlock problem, which the patent tells us is the problem that they're trying to solve.

And, in fact, when it comes to the solution of the patent, the problem isn't talking about -- or the patents aren't talking about solving a problem with

89

successfully received packets, the ones that you're going to acknowledge successful receipt of.  You're, of course, talking about solving a problem with unacknowledged packets that have become obsolete.

So, we look at the next slide.

In the summary of the invention, what do they tell us the invention is about?  It's an invention "that allows obsolete or otherwise superfluous packets to be safely discarded at the transmitter.  Thus, clogging of ARQ buffers and deadlocking of the system can be avoided."  It doesn't say that the problem is with acknowledged packets.  It's the unacknowledged now obsolete packets that we're focusing on in the patent.

And when it comes to the data packet discard notification message itself, what does the summary of the invention tell us?  It tells us that it's the unacknowledged packets.

So, we go to the next slide.

This is again in the summary of the invention, a very key part of the patent.  It tells us again that the (reading) cell discard notification message indicates which cells or packets the receiver need no longer expect.  We know.  The receiver is not expecting packets it already has, right?  It's expecting the packets that it doesn't have that are unacknowledged that causes the

90

deadlock problem and then give rise to the discard notification message.

So, let's look at the parties' two constructions again.  We see -- consistent with ARQ protocols, which we agree are part of the claims, consistent with the problem of the patents, consistent with the field of the invention, and consistent with what the patent tells us is the solution to that problem, we clarify that the discarded packets are the unacknowledged ones.

In conflict with all of that, though, Ericsson proposes that you can have a discard notification that exclusively only contains acknowledged packets which of course would completely miss the point of the invention.

And, in fact, when we look at Ericsson's own description of the invention, they say it in the same way.

Let's go to the next slide.

This is from their belief.  They tell us that (reading) if the receiver still has not correctly received one or more of the data packets, they become obsolete.  These are packets that the receiver has not yet acknowledged.  This will eventually create the deadlock problem, these unacknowledged packets.

They then tell you that (reading) the '435

Claim Construction Hearing

91

patent solves this problem by allowing the transmitter to send a discard notification message that tells the receiver that the transmitter has deleted those obsolete data packets, the ones they are telling you are yet to be acknowledged.

But then we go compare that description of the invention with the claim construction and we see that that is missing, that they actually include acknowledged messages in the notification.

Now, their main argument as to why we shouldn't include "unacknowledged data packets" is that we are excluding an embodiment by not including "negatively acknowledged packets" in our construction. And I have two things to say on that.

The first is we can resolve that really easily.  We can actually put "unacknowledged" or "negatively acknowledged data packets" into our construction.  We can add that.  Because as I've been discussing, it refers to the same thing; it gets to the same point.  They're both referring to packets that have not yet -- that you need to re-transmit that have not been successfully received.  So, that's one way to resolve that right off the bat.

The other way -- the fact of the matter is, however, though, as we were talking, negatively

92

acknowledged packets are unacknowledged packets.

So, if we go to the next slide, I respectfully disagree with Ericsson's characterization of what the specification says here.  It actually groups negatively acknowledged packets and those that just haven't received an acknowledgement yet that remain unacknowledged in the same group and they tell you those are the ones that are stored in the buffer and -- until they can be successfully transmitted.

If we go to the next slide, those two fall in one category.  Right?  We have those that have not been acknowledged because they get jammed in the channel and then we have the ones that are actually affirmatively unacknowledged, if you will, that are negatively acknowledged and in both of those situations you have a situation that could actually lead to the problem of the patents.  Right?  These are packets that need to be discarded, as a result are still being expected, as a result the receiver is waiting on them, causes deadlock and you need to send a discard notification message.

You contrast that with acknowledged packets. And acknowledged packets are just the complete opposite, right?  These are ones that have been successfully received and do not cause the problem in the patent and certainly you don't need to waste bandwidth by sending a

discard notification just to tell the receiver what it's already received.

So, that is unacknowledged.

Let's go to the next slide.

My next thing is just to touch briefly on the other two disputes. The first of those two is what does the term "indicate" mean. And let me just say a quick word. We are not intending to change the meaning of "indicate." As we mentioned in our briefing, we think "identify" carries the same meaning as "indicate"; but in the context of the patent, we thought it would just be a little bit more helpful to use our language. But that doesn't seem to be really the main issue that we're having conflict with the plaintiff on.

What their -- their argument I think is that they say our construction requires an explicit identification of each individual sequence number in the data packet discard notification message. So, they're saying when we say "contains the identity of," that's going to be a requirement that you put like 1, 2, 4, 7, 8, 9, each individual one on its own; and as a result, the embodiments and that's just not the case. We're just saying you've got to identify; and if you look at the embodiments, you can see they're all identifying the sequence numbers.

So, if we flip to Slide 28, there's a couple of embodiments.  There is the list message embodiment; and what this is showing you, this is a diagram of a data packet discard notification message that a transmitter would send to a receiver when it's discarded packets. And in this approach what you see is the transmitter is using ranges of packets.  So, that first line in yellow is the starting sequence number of a first packet that's been discarded, and then that L1 tells you -- it's a length field, and that tells you the next ten packets are being discarded.  So, that tells you 16 through 25 is being discarded and then the purple, 128 through 141. And I don't think anyone would disagree that that is identifying packets that are being discarded.  It certainly isn't explicitly listing each individual sequence number, but we're not saying that's a requirement.

THE COURT:  Can you come up with any other proposed construction besides "identifying"?  I noted in claim 13 that the inventor used "identifying" and "indicated" differently.  So, that at least means that he had two different meanings for that.  So, I think that is -- "identifying" to me seems to be confusing.  When I first read it, I thought it may mean give me the sequence numbers.  Is there any other construction that you could

Claim Construction Hearing

95

go about besides "identifying"?

MR. ALPER:  I think that, frankly, from our perspective, "indicating" means the same -- I do recognize that in the specification they do use both terms.  To be clear, "indicating" for us is fine.  We thought that "identifying" was consistent with the specification, but "indicating" is very -- obviously is what the patents are using to describe the two embodiments in the specification.  So, that works.

One thing that I'll just comment on very briefly, although I don't know that this is something that we -- that's necessary to dwell on, is that the plaintiffs mentioned that there's an embodiment which allows the receiver to deduce what was discarded; and the embodiments that we're talking about and that they displayed all indicate the sequence numbers.

So, in any event, "indicating" I think would be sufficient.

THE COURT:  Okay.

MR. ALPER:  All right.  So, that takes care of that one.

If we go to Slide 31, there's just one remaining issue; and that's what a "message" is.  Like I said earlier, we're fine with including an "ARQ protocol" in the construction.  In fact, that's important.  So,

that just leaves whether we need to say that this is a
control message.

And here are the two problems with that.  One
is that the patent never refers to the data packet
discard notification message as a control message.  It
never uses those terms.

And the second, if we go to the next slide, is
this.  The accused messages in the accused standards that
the plaintiff is saying embody the data packet discard
notification fall into a class of messages that the
standard refers to as a "control frame."  And, so, what
our concern is is although we're spending a lot of time
in looking at the claim language and the jury will have
the benefit of your Honor's claim construction which
actually tells us what a data packet discard notification
is, that they could be confused if we inject the word
"control" in, which actually has very little to do with
what a data packet discard notification is.  So, we would
say it's unnecessary and actually, in fact, would be
prejudicial.

THE COURT:  Okay.  Thank you, sir.

Ms. Moore, five minutes.

MS. MOORE:  Yes, your Honor.  Thank you.

If we could have our slides back up again.

I'll just briefly address the

unacknowledgement argument, as I think that's really the only thing we're still fighting over.

Essentially, as I mentioned earlier, there are two embodiments:  An acknowledgement, a negative acknowledgement, and an unacknowledgement.  It seems to me that the defendants' construction simply obscures the meaning of the negative acknowledgement.  You are getting an acknowledgement back.

And, similarly, with ARQ protocols, a negative acknowledgement is not the only way to go about sending your response message back to the transmitter.  You can use positive acknowledgements, you can use other schemes, some of which do have acknowledgements.

So, that is the problem.  We have this fundamental disagreement about what the word "unacknowledged" means; and that's what we're seeking to avoid is creating confusion for the jury about what does "unacknowledged" mean.  Is a negative acknowledgement encompassed in that?  I think that it's subject to debate, and that's a problem we shouldn't present to the jury by inserting this word "unacknowledged" where it's not otherwise in the claims.

Importantly, the patent never calls a negative acknowledgement "unacknowledged."  It uses separate words to describe the separate concepts:  "Acknowledgement,"

"negative acknowledgement."  Unacknowledged is the time-out embodiment, where the receiver never even got something that it knew it needed to acknowledge one way or the other, positively or negatively.  It uses the words differently.  The claims are broad enough to encompass both of these embodiments.  And I think from a fundamental level defendants don't disagree that the claims cover both of these embodiments.  It's just what does the word "unacknowledged" mean and does it actually encompass both of these.

I think it becomes utterly confusing for the jury to try and figure out what those words mean when you've got two different concepts described with the words, both "acknowledged" and "unacknowledged."  It will only seek to increase confusion.

And just also as a side note, in a deadlock situation, that can be created from a negative acknowledgement.  You can get a deadlock when you have a time-out.  You can also get a deadlock by having positively acknowledged packets still in the buffer.  If they aren't moved out of the buffer, you're still going to get a deadlock eventually because you can't move them out to move on to the next set of packets.

That's all I have, your Honor.  Thank you.

THE COURT:  Mr. Alper, I'll give you the last

word.  One minute.  How about that?

MR. ALPER:  I can do it in one minute, your Honor.  Thank you.

THE COURT:  You're welcome.

MR. ALPER:  If we can go back to our slides, I think I can resolve the "unacknowledged" issue very quickly.  Go to Slide 4.

I think if there is an issue with what is an unacknowledged packet versus a negatively acknowledged packet, I think we can resolve all of that by just inserting "negatively acknowledged" into the construction and then that will capture -- will resolve the problem. So, if we put in there -- if the issue is whether "unacknowledged" is sufficient, we think it is because it captures the invention; but you could simply say "unacknowledged" or "negatively acknowledged" data packets the transmitter has discarded.  And, in fact, if you wanted to even be more clear, because of the issues that I was discussing, you could say "containing the identity" -- or "indicating at least unacknowledged or negatively acknowledged data packets" because that's what we're saying.  You've got to at least have that in there because that's the only thing that's going to solve the problem of the inventions.

THE COURT:  What we'll do is we can move on to

the next limitation; and I'll give the parties a chance -- take a break here in a minute, and maybe you can come up with some agreement -- if you can't, you can't -- a stipulation.

MR. ALPER: Certainly.

And just one other point on the "indicating." If you were trying to resolve the disputes between the two -- but we like the word "indicating" -- we could simply put "contains an indication of."

THE COURT: Okay.

MR. ALPER: Thank you, your Honor.

THE COURT: Thank you.

What's next?

MR. STEVENSON: Your Honor, I believe that's it for this patent. And if the court wants, we can start the next group of two patents or --

THE COURT: On the '516?

MR. STEVENSON: Yes.

THE COURT: Okay. I've been trying to take a break every hour and 15 minutes, hour and a half. When was our last break? About 11:30 maybe?

COURTROOM DEPUTY: 11:25.

THE COURT: 11:25? Let's take another short break. I'm going to go through lunch. I know everyone probably has planes to catch this afternoon. So, I'm

going to go through lunch and skip a lunch break.  We'll take about a five-, ten-minute break right now, rest room break; and then we'll finish up.

(Recess, 12:26 p.m. to 12:45 p.m.)

THE COURT:  Let's go to the next patent.

MR. STEVENSON:  Your Honor, at the break we, at your suggestion, conferred regarding agreement.  We suggested that instead of the word "unacknowledged" we just insert the word "discarded" packets.  We didn't reach agreement on that.  So, I think the matter is ripe for consideration.

THE COURT:  Okay.  Thank you.

MR. ALPER:  And, your Honor, just to be clear, we had proposed an alternative to accommodate one of the concerns that plaintiffs raised and that is that the construction regards "at least unacknowledged or negatively acknowledged" and added "positively acknowledged packets" in.  But you've got to have "at least unacknowledged."

THE COURT:  All right.  Are we ready for the next one?

MR. CALDWELL:  Yes, your Honor.

THE COURT:  That's the '019 and the '568.

MR. CALDWELL:  Your Honor, Brad Caldwell; and I will address those two.  Your Honor, the '019 and the

102

'568, one is divisional, the other is common specification; and I think the parties agree that they can be taken up together.

The '019 and '568 patents were developed in connection with Ericsson developing technology related to a cell phone standard known as "TDMA," time division multiple access.  It expressly states it's applicable to a lot of different other systems, but the predominance of the description in the patent is describing the TDMA preferred embodiment that Ericsson was thinking about.  And that's where we get some of the figures that your Honor has seen in the technical tutorial and we'll see on the slides today.

Without belaboring material that's in the technical tutorial, the notion in the '019 and '568 patents are that as you change the kind of data you're sending, the characteristics of how you want to send that data may change, too.  What was depicted on this slide which we just pulled from our tutorial was essentially if a wireless base station or router or what have you is sending to two devices, two cell phones or two computers, and they're really getting the same sort of -- they're both browsing the web, for example.  Based on the content, there's not really a reason to preference one over the other.  The available time slots for sending

data might be shared equally, depicted by the alternating blue and red in these slides.

But on the other hand, if the content changed where one of them is receiving material such as video or one of the devices is engaged in a live phone conversation, you may have different transmission characteristics as you change types of data. And the patent tells us -- I believe it's in the background of the patent -- that there are -- it gives us some exemplary transmission characteristics that you might want to change as you change types of information that you're submitting. For example, you might want to change the bandwidth; i.e., how much data that you're sending. So, for example, if you're sending video, maybe that consumes an awful lot of information on your wireless channel in order to be able to send all the video and have it be high-definition, the video is not breaking up, things like that. So, bandwidth is one transmission characteristic.

On the other hand, you might want to change the degrees of error protection. And an example is in an email, you wouldn't really tolerate errors in the transmission. You expect when you get -- when you open your email, it's not going to have the letter "S" changed to the letter "X" or there would just be, you know, a

104

percent sign or something that didn't make sense.  You expect it to come through verbatim how it was sent.

But on the other hand, if the content that you're sending is, for example, a voice conversation -- we've all had the cell phone kind of break up a little bit when you're on a phone call or same thing if you're streaming video, if you have a satellite TV, maybe it flickers for a second, things of that nature.  You tolerate less error correction in those kinds of real-time services because you can't have the other end of your voice call just interrupted for a second or two while you try and re-transmit packets over and over and over again until you patch all the holes.  So, for different types, there might be different error protection and again, as I mentioned, different levels of delay tolerance.  Whereas you can't really tolerate delay in your phone call, it's okay if your email shows up a millisecond later.

So, these differences in transmission characteristics are something that the inventors of the '019 and the '568 patents observed and realized that they may want to on-the-fly change the transmission characteristics as the content would change.

Now, this notion is captured in the claims.  And the claim that I'd like to focus on for purposes of

this discussion, we'll talk about claim 19 of the '019 patent.  This claim is -- it's one of the asserted claims, obviously; but this claim is comparable to claim 1 of the '568 patent.  They're not identical; but for purposes of the disputes in this case, the same phraseology is at issue.  The fundamental difference between the '568 and the '019 is that the '019 is essentially a method claim whereas the '568 is re-packaging these notions in a system claim.  I think the parties agree that we can focus on claim 19 of the '019 for your Honor's purposes.

At a fundamental level, the parts of this method are, first, providing a first field with payload information.

Second, providing a second field that's separate from the first field, including a service type identifier which identifies a type of payload information back up in that first field.

And then you transmit the first and second field on the radio channel.

It doesn't contain any further restrictions of how or when you transmit them respectively on the radio channel.  It's just that you have these fields, and you transmit them on the radio channel.  And that leads to the first dispute between the parties.

So, there are two terms at issue.  Following the protocol that we have been using so far today, I presume I'll address the first term and we'll knock that one out and then we'll go to the second one.

THE COURT:  Right.

MR. CALDWELL:  So, the first term that's up for dispute are the words "separate from said first field."

Now, Ericsson's construction on this is there are no words there that need to be construed.  The plain meaning is fine, and the Federal Circuit has approved your Honor issuing a plain meaning construction if those words do not require construction.

The defendants' construction of "separate from said first field," it doesn't construe the last 80 percent of it; it doesn't construe "from said first field."  Those words are the same right there in the defendants' construction.  But what happens is for the first 20 percent, the word "separate," defendants have re-written that to be "in a different portion of a radio channel," whatever that might mean.  That limitation clearly is not present in the claims, and there's nothing in the rest of the intrinsic evidence that compels your Honor to change what actually is recited in the claims to have this additional limitation.

Now, so, in attempting to discern what it is that the defendants believe, first of all, introduces this concept of "portion of a radio channel" and then requires that the two fields be in different portions of them. You know, we've looked at the preferred embodiment; we've looked at the briefs. But we start, as the Federal Circuit says, with the claims. And again, I don't want to belabor it; but the point is this claim requires a first field and second field that are transmitted on said radio channel. No restrictions about spread apart on the radio channel, adjacent on the radio channel, interleaved, not interleaved, next to each other. There are no restrictions, just on the radio channel.

There are other claims that might introduce something that would align with the defendants' new limitation of portions or separate portions of a radio channel, and we'll take a look. One is this dependent claim 20, wherein that radio channel has a plurality of time slots on a pair of radio frequencies. Even that claim, even the narrower dependent claim 20, does not specify that the first field and the second field are in different time slots or that they are on different ones of a pair of radio frequencies. Those just aren't requirements of these claims. But it's not even until

the dependent claim where these distinct radio frequencies and time slots are introduced.  They're certainly not inherent in the broader independent claim 19 or claim 1 of the '568.

Now, in terms of figuring out what the word "portion" means -- I'd like to look at the document camera here briefly, if we can.

What's on the screen is the bottom of page 16 of the defendants' brief.  The best we can tell, the defendants are implying that the "portion of a radio channel" in their construction are, at least for the preferred TMA embodiment, distinct time slots, suggesting that you have to send the field with the service type identifier in one time slot and you have to send the payload in another time slot.

But what defendants argue is, importantly, the claim service type identifier is encoded and transmitted separately from the payload information; and they quote this portion of the specification, "bandwidth in the second (or third) time slot can be used to carry information in a fast out-of-band channel" which can be "used by the receiving equipment to aid in processing the information conveyed in the payload."  And it seems we're supposed to infer from that that the specification somehow requires that the service type identifier in that

109

FOC channel arrives in a separate time slot from the actual payload.

Now, defendants, they do acknowledge that time division multiple access, where you have different time slots, isn't the only way to practice the invention. So, at the end of their -- this section of their brief, on page 20, defendants argue, well, okay. Fine. You can use it in other environments, not just TDMA. You can use it in frequency division multiplexing or code division multiplexing. But if you implement it in a time division multiple access system, the service type identifier would be using a different time slot. In frequency division, it would be using a different frequency band; or in CDMA it would be encoded with a different code, none of which are requirements of any of the claims.

Now, we know, actually, from looking at the patent that, in fact, even in the preferred time slot or TDMA embodiment, the service type identifier which can be in that FOC, the out-of-band channel, that can be sent in the same time slot as the data that it relates to.

Right here we're citing the '019 patent, column 3 at lines 9 through 16. And one of the things it describes is "The FOC may provide information relating to the same connection as the payload or data field in that time slot." Well, what would this mean?

What I've pasted here is a little bit of text out of the '019 patent, column 7, lines 9 through 11.  In a given time slot, there are different fields of data.  This gets to that word "fields" that's in the claim.  There are different fields of data.  And I don't want to belabor the long acronyms that are here; but long story short, you can take one of the fields that would have been the SACCH field and replace that with the FOC information, send it in a series of bits that's adjacent to the data.  That's one of the preferred embodiments there.  And in any event, there's nothing in the claims or anywhere else in the intrinsic record that somehow says you have to pull those things apart, send them in separate time slots or keep them in a different portion of a radio channel as the defendants would like to have the court construe the term.

We also know that although there are some instances in the patent about -- there are some instances in the patent specification where the FOC information is transmitted at different time slots -- so, for example, maybe information in an FOC time slot going from a transmitter down to a receiver will define something about the characteristics of how that information will come back to the receiver -- those are definitely embodiments of the patent.  We're not saying otherwise.

111

The point is the patent always describes each of these teachings as exemplary embodiments of the present invention or preferred embodiments.  Repeatedly this patent over and over and over again introduces each scheme that's described in there as an exemplary embodiment or a preferred embodiment.  None of them introduce limitations into the claims.

And this is, in a way, repetitive of something I pointed out earlier.  Even in the preferred TDMA embodiments, you might have this FOC information in each time slot.  Now, admittedly, my slide sort of proves this in the reverse.  There's a sentence in the specification in column 3 that says there may not be FOC information provided in each time slot.  The obvious implication being that there could.  You could actually put your FOC information in every single time slot.

Finally, as I mentioned, the patent, although describing a TDMA embodiment predominantly, isn't even limited just to TDMA embodiments.  It isn't even limited just to cellular.  The idea behind the invention was to be very flexible in having a service type identifier in a field.  It's not the same field as the payload.  They're distinct fields.

So, then the question comes:  What does it mean for the service type identifier to be separate from

the payload?  I think the answer to that is it means exactly what it says.  It's a field that's separate from the payload.

And when we looked at -- let me see which one of my slides this one -- okay.  Slide 36 of my slides, where I've excerpted part of figure 7B -- I could have picked one of three or four different figures.

Fields may be adjacent bits in some data structure.  It doesn't mean they're separate time slots. What you see right there as time slot 2 from Exhibit 7B would constitute FOC data that is, quote, separate from the payload data, even if they're adjacent fields.

Now, if the defendants think the word "separate" is too confusing to where the jury can't understand it and your Honor is inclined to resolve what does "separate" mean, the answer is not it means "a different portion of a radio channel."  That's reading in limitations that aren't present.

If we wanted to say that the definition of that term is "different from said first field," I don't think Ericsson has a problem with that.  The point is there's no reason to introduce this new limitation of portions of a radio channel that are not actually in the claims.

What's shown here on the screen on Slide 40 is

an excerpt from the defendants' brief.  They say that (reading) the crux of the "separate field" requirement is by transmitting the service type identifier separately from the payload information, the receiver can be informed of how to decode different service types having varying transmission characteristics without knowing what those transmission characteristics are.  And I -- at least as to a large portion of this, I think the parties are in agreement.  It's not an issue of how far spread apart the FOC information and the payload are or how far spread apart the service type identifier and the payload data are.  That's not the dispute.  The point is however it's packaged, is that service type identifier able to provide information to the receiver that can tell the receiver here's how we're transmitting this stuff? Distance or how -- the degree to which they have been separated is not the issue.  And this so-called "crux" of the invention can be accomplished with, for example, the preferred embodiment that I've illustrated, with two adjacent fields in that time slot; one has FOC or service type identifier and the bits right next to it have the payload data.

And just to cut to the chase -- I realize your Honor is not construing the claims in terms of looking at the accused products and deciding does that tell us how

114

to construe the claims.  But, you know, some courts now require that you do your summary judgment of noninfringement with your claim construction so that they don't end up finding out later how their construction is used against them.

Just to cut to the chase, the IEEE 802.11n standard has in it fields in a header.  So, it's got a packet of data.  A packet of data.  And at the beginning of the packet of data, it's got all these fields that are header information.  It could be things like the sequence numbers we've talked about, things like that.  It also has settings that tell you about the types and subtypes and contents of the data.  They can be set.  The receiver can interpret those bits in the header and know transmission characteristics or what we're going to do with the payload part of that packet.

The best I can figure -- since it's not really from the intrinsic record, the best I can figure about the requirement of trying to put the service identifier in a different portion of a radio channel is to create some argument that these bits, these bits that constitute the types and subtypes and whatnot in the 802.11, can't possibly describe anything about the transmission characteristics of the payload that's there; and we submit that that's completely incorrect and certainly not

supported by the intrinsic record.

And that's all I have on the first term, the "separate" term, your Honor.

THE COURT:  Thank you, sir.

MR. AROVAS:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. AROVAS:  Greg Arovas, and I'm going to be addressing the first term in these two patents and then Mr. Bovich is going to be addressing the second one.

THE COURT:  Okay.

MR. AROVAS:  If we can switch over to the other slides.

If we could jump actually to Slide 12, what I'd like to do is start by maybe focusing a little bit more on exactly what is the real dispute here.  We just heard for a long time from plaintiffs' counsel about TDMA and how this can't be restricted to TDMA.  We agree with that.  In fact, there was a little inconsistency in the argument.  On the one hand, they said they think we're trying to restrict it to TDMA; and on the other hand they said, well, look at their brief.  They said it can be used for FDMA, it can be used for CDMA, it can be used for TDMA.  See, they're -- now they're saying it can be all these other things.

I think the point here, and the key point

116

here, is we're not saying it's restricted to any particular one of those protocols or those transmission approaches.  The construction that we're actually proposing is agnostic to that.  It doesn't talk about time slots.  You don't see that in there.  It doesn't talk about frequency slots.  It doesn't talk about codes for code division multiplexing.  Okay?  What it's talking about is separate.  So, what I really think is going on here is that the plaintiffs would like to read an expressed phrase in the claims out of the claims.  They would like to render it superfluous based on other limitations that are already included in the claims.

And when we go through the evidence, we're going to see that that phrase -- expressed claim limitation -- it was put in by the drafter for a purpose that is very clearly explained in the intrinsic evidence.

And, so, before I go back and give a little context, let me just talk about the structure of the claim and where this comes from.  I have claim 19 on the screen.  Claim 1 in the other patent has virtually identical phrasing.  I think everybody really agrees on that, that there's no real meaningful difference in terms of the dispute that we're dealing with here.

And what you see, if you look at the green --

this is Slide 14 of the deck -- it says a (reading) first field containing payload information.  Okay.  So, we've got a first field.

And then if we look at the red, it says a "second field including a service type identifier which identifies a type of payload information."  Okay.  So, you got the second field; and that second field is pointing back or telling you something about the first field.

Now, what the plaintiffs want you to do is they want the court to just say, well, either don't do anything so we can argue really when we get to the jury that this just means they're two different fields or just say they're two different fields.

But before we even get to the yellow, which is a separate limitation, we already know there are two different fields.  You don't need that limitation "separate from said first field" to know from the express claim language these are two different fields.  These fields, in terms of their data, their contents, can't be commingled.  One is a service type identifier which is telling you about the payload information.  So, we already know they're distinct.

So, the real question here is why did the drafter, why did the patentee put in this "separate from

Claim Construction Hearing

118

said first field" limitation and how do we give meaning to that?  And our belief is that the plaintiffs are trying to read that out of the claim.

And it's important, too, because it affects the essence of how the transmitting step works and how the receiver can use this information for one of the main purposes described in really every embodiment.  So, I just want to be crystal-clear.  This has nothing to do with time slots; this has nothing to do with whether it's TDMA, FDMA, CDMA.  The claim construction we're proposing would apply to any one of those approaches.

So, now if we jump back to slide -- let's go to Slide 4.

What I'd like to do, with that as an introduction, is take a step back and look at a little bit of the context of what's going on here.  And we do have a system-level picture -- it's figure 1 in the patent -- and that shows us a base station, which is a transmitter, and a mobile station, which is the receiver.

And I want to be clear.  The way they've drawn it, there's two separate boxes for the control channel and the traffic channel.  The patent is clear those could be combined.  So, I'm not suggesting they need to be separate; but that's how it was drawn in the figure.

And we have two different types of information

119

here that's going over a radio channel.  The radio channel is, you know, the channel used to communicate from the base station to the mobile station.  You have traffic information; you have control information.  And that's described in column 4 of the specification describing in general how this system works.  This is basic prior art architecture, and it exists in pretty much any type of protocol that you're going to want to use.

And then they start getting into some of the challenges that they were facing, that people in the art were facing when they wanted to try to make these systems better, faster, more flexible.  And that's that you could get different types of information that -- traffic that you might transmit.

We show in blue "voice," in green "video." You have text; it could be an email, could be a document, could be anything.  That's in orange.

And then you have hybrid, where you might have a combination of that information.  That's also discussed in column 2 of the specification which we've shown on Slide 5.

And of course you're going to need to have control information.  You're going to need synchronization signals and all sorts of other control

information to make this communication actually work between the transmitter and the receiver.

And then the patent goes on to say, well, in this world where we have different types of information, different types of payload, we may want to do different things with each of them.  So, for example, in the example they discuss in detail -- this is Slide 6, looking at column 2 of the patent -- it says you might want different coding, channel coding for each of those.  So, for example, voice you might be able to do at a half rate.  The patent actually says "112"; that's a typo.  It should be 1 slash 2, one-half rate.  Video might be at three-quarters rate.  Data may be at five-sixteenths rate.  And this is very important for the receiver when it gets that information, to know what to do with the information it's getting in the payload.

So, that really starts to set up the problem that you're going to send information over here -- I'm just showing the blue; I'm just showing the voice -- it's going to get from the transmitter to the receiver over the radio channel.  It arrives.  You have to know the characteristics -- like, for example, the channel coding -- to use to analyze, decode, and process that information.  So, that's a burden that's placed on the receiving end.

So, what happens -- what's the problem?  Well, the problem is when you start mixing all these different types of information -- and the patent says explicitly, "as the number of services expands beyond two, the complexity of discriminating between services in this manner become excessive."  It tells us the problem; it tells us what they want to do.  It says in column 2 it's "desirable to provide techniques," "flexibility for the anticipated variety of information communication services described above."  That's the voice to video, whatever you might be sending.

So, moving to Slide 9, would do they do?  They come up with the concept of this service type identifier; and they put it in the -- what they call the "fast out-of-band channel."  Now, we're going to see the word "channel" come up in a couple of places.  It's actually in the claims themselves.  They talk about the radio channel, which is the overall channel between the transmitter and the receiver.  And we're going to see that there is a concept of dividing up the information into channels as well, into different types of discrete information, the control, the data, or even different types of control.  And in the definition they use itself, it's "fast out-of-band channel (FOC)."

And this service type identifier which is

Claim Construction Hearing

122

going to be in this separate part of the radio transmission, this fast out-of-band channel, we know is going to inform the mobile or base station of the type of information -- voice, video, data -- being conveyed in the payload. That's why it's called an "identifier." That's what it does.

And this patent tells us also, in Slide 10, why do we want to do this. Well, "the FOC fields may also serve the purpose of service type identifier." And it tells us at the bottom, in column 9, what that's going to do is it's going to tell the mobile station "how to process the received information, e.g., how to decode the received bits."

And that relates to that problem that we were talking about before. If you have all these different types of commingled data that you're sending over the radio channel, you're putting a lot of burden on the receiver that it's going to have to -- it's going to get voice and then video and then data in any order and any permutation. It's going to have to switch, and it's going to have to know what to do.

So, you're going to send this separate control information -- I've just shown it as a key -- and that identifier is going to tell the receiver. So -- and we're going to see this patent talks about doing that

instantaneously.  It's going to tell that receiver, "When you get that block, when you get that data, you'll look at this service type identifier.  I'm going to tell you, without the need for any type of data decoding or analysis, what it is."  And by knowing what it is, it knows at least how to start dealing with it.  And that's in column 9.

And, so, with that as background, your Honor, let's go back to the dispute that we have here.  And the question is:  Does "separate from said first field" have any meaning in this claim beyond that the fields are just different?  Which as we talked about before, it's already in the claims.

If the inventor wanted to just say -- looking now at claim 19, Slide 14, if the inventor just wanted to say one was different than the other, the inventor already said it.  You didn't need the yellow limitation at all.  You have a first field that has payload; you have a second field that has this service type identifier which identifies the payload.  It's already communicated that those are different.  So, the question is:  What does "separate" mean?

Now, if we go and we look, the patent over and over and over again is crystal-clear on the importance -- this is a very important part of the concept of this

invention -- to keep these two things separate.  And, so, what I have at the top of Slide 15 is first the portion of the specification that we looked at earlier in column 2 talking about how one of the things you might want to do with this different types of information is to have different types of channel coding and then a portion at the bottom in 7 which is explaining exactly how this works.  So, it says "the FOC information is out-of-band," in quotes.  And then it says, "i.e., is not encoded as part of the data."  "I.e.," not "e.g."  And that's why it's important that this is in the out-of-band channel, because they're trying to create separateness so there is a lack of a dependency between those two portions of the channel so that the receiver can take this service type identifier and fast out-of-band channel, instantaneously look at it, and know what it has to do without worrying about the complexity of that payload information.

And that's what the defendants' structure is trying to get at, is it's not just they're different fields; it's that they are separate in how they are encoded or baked into that transmission.  And that's exactly what the specification tells us.  In fact, there isn't a single embodiment in the patent that does it any different way.

And this, while it certainly is described in

125

the context of time division multiplexing -- and that's not anything the defendants have to do with; that's just the context of the patent.  But this concept of the separateness does not have to be limited, and is not limited in the proposed construction, to TDMA.

And if we look at and we compare, going to the next slide, Slide 16, the problem that they were solving, "the complexity of discriminating between services" becoming excessive, that quote that we looked at earlier in column 9, and we compare that to the solution, column 7, that quote we just looked at about (reading) the fast out-of-band channel, i.e., not encoded as part of the data, we can see in the very next line it's talking about exactly this result that they get from having that limitation in the claims requiring separateness.  It says "advantageously" -- the "mobile stations 510 and 520 advantageously need not be aware of the channel coding and interleaving needed to read the data fields in time slots 2 and 3."  So, forget about time slots 2 and 3.  That's the TDMA piece of this.

The important piece here is that the receiver "need not be aware of the channel coding and interleaving needed to read the data fields."  That's the point of the separateness.  You're keeping it separate.  You're not letting it get commingled in that data part of the

126

channel with that -- for example, the channel coding that may be required for a particular payload.

And the patent goes on and on to say the same thing in many different ways.

Looking at the next slide, Slide 17, column 9, talking about the FOC, it says "so that the mobile station will know how to process the received information, e.g., how to decode the received bits." Again, the key is maintaining the separateness so you get rid of that interrelationship or the dependency that would cause the receiver to have to bear that burden.

It says it again in column 12 in yet a different way. It says "the FOC provides instantaneous service type information for that mobile station's downlink connection and should be read. The mobile then proceeds to use the FOC information in processing the payload at block 94." Now, this portion of the specification at column 12 is referring to figure 9. Figure 9 is a flowchart depiction of what's going on. But what's really important here to note, "the FOC provides instantaneous service type information" and we see that in the red and that corresponds to the red box in figure 9. So, it's doing this again by maintaining the separateness of this FOC or the service type identifier that's in FOC from the data portion of the

radio channel.

And then you can see that depicted visually in the time slots themselves.

Now, in this slide, Slide 19, what I've done is I put first prior art structure of the radio channel. Obviously you could have lots of different structures but what's important, if we look at it at a high level, you have -- at the top you have the transmitter and the receiver, same figure we looked at before, figure 1.  You look at figure 3 and you can see how the radio channel is carved up into different pieces -- the control channel, different types of control channels, the data channel. SACCH, for example, is the slow associated control channel.  We'll see later, when we get to the modification to the prior art, the -- obviously the fast out-of-band channel that we have been talking about.  But the point is that this radio channel and the overall channel that's used between the transmitter and receiver is divided up into pieces that are kept separate for different purposes.  And we're obviously only talking about one of them here, and it doesn't matter if you're talking about FDMA or CDMA.  You can divide up that channel in conceptually exactly the same way, which is why we described it the way we did in the proposed construction.

So, now let's look at how we get from the prior art to what this patent is talking about.  And we can see in figure 6 the top slot is the same structure that we just saw in the prior art and that structure is different types of information divided up into these discrete channels or portions of the radio channel.  And what they noticed in the patent is they said, well, for certain types of transmissions, we don't need to re-send the same control information over and over again.  So, for example, the SACCH, the slow associated control channel -- which is, if you look at slot 1, figure 6, it's the second box over -- they stuck an FOC in there in time slot 2 and another FOC there in time slot 3.  And they were able to do this because for this particular example, this particular transmission, they didn't need to send the SACCH over and over again in each time slot.

And depending on what channel coding you're using, whether you can use -- you know, cannibalize two of the SACCHs or just one or some other number, that's an informational detail.  It doesn't matter.  It doesn't affect the concept of what's going on here.  They are taking this discrete portion of the radio channel -- all right?  It's not contaminated in any way by the coding, let's say, the channel coding of the data -- and they are going to put this service type identifier in there.  So,

there's a discrete portion of the channel that this receiver can look at, it can know exactly what's going on, it can make instantaneous decisions on what it needs to do without worrying about any of the complex coding error protection or things like that that you may have in the data; and we see it explicitly in the figures.

Now, we're not saying this has to be in any time slot.  We're not saying it can't be in the same time slot.  In fact, if you look at time slot 2, you see the FOC is in the same slot as two different data channels.

THE COURT:  The key is it just has to be transmitted separately.

MR. AROVAS:  Separately.  That's it.  That's it.

THE COURT:  Okay.  But what about a definition that "second field separate from the first said field" means something like "the second field can be transmitted separately from the first field"?

MR. AROVAS:  So, the reason we didn't do -- it's a separate portion of the radio channel.  And, so, the reason we didn't --

I understand exactly what your Honor is suggesting --

THE COURT:  Right.

MR. AROVAS:  -- in working with that word

130

"separate."

-- is we were trying to stay away from implementational details because if you look at the third term where it talks about transmitting, it doesn't say exactly the timing sequence or -- you know, it doesn't get into the details of how the transmission occurs. So, we're trying to get away from the timing sequence of the transmission and say, well, what is the most general concept here that this is getting across with that claim limitation? It's that it is in a different portion or it's separated somehow.

And what happens here -- it's a little bit more detailed, but it kind of explains why they want to do that. This is sort of one layer of looking at the information. These things get grouped at higher and higher layers and it talks about layer 2 and you may have seen that in the patent. So, you could take vertical slices, too; and those have associations with each other. And that's why I've shown the channel -- you know, the dotted lines, which are dotted lines I added to the figure sort of grouping those two things because you have the same structure as you go from time slot to time slot. So, it's really -- whether you do it together or you do it separately, the point is it's in a separate portion of the channel; so, it's not going to be contaminated.

THE COURT:  Now, Ericsson mentioned something -- I believe it was in their reply brief -- on this issue about in a non-TDMA context, about putting a service type identifier in the header.

MR. AROVAS:  Right.

THE COURT:  Could be in the header if it's in non-TDMA context.

MR. AROVAS:  Right.  So, let me talk a little bit about that.

So, first of all, that's coming from the accused standard.  The accused standard is a packetized standard.  And actually the patent talks about you can have packetized or unpacketized.  So, from -- the first instance, you would never take a purely packetized structure and try to read it to this claim where the patent explicitly says that it can be nonpacketized, like a connection based, which is where a traditional voice -- kind of voice type of structure.  It's just an example of them trying to take the accused products and restructure it into the claims.

But there's kind of a more fundamental issue I think there, is that if you have a packet and you have a header and you have a payload, that doesn't say anything about the separateness of how they are treated in the radio channel and whether you will be able to read that

header separately from the payload or not.  You have...

THE REPORTER:  I'm sorry.  Could you talk into the microphone, please?

MR. AROVAS:  I'm sorry.

You have all the time communication protocols where you can treat a packet as a single entity.  So, you could channel code, for example, in a complete packet; and then that wouldn't get any of the -- get you anywhere in terms of what this patent is trying to accomplish.

You could take a packet and put it in another packet as you go from layer 2 to layer 3 or you go to these different layers.  So, you're not even restricted to a single packet.  You could take a packet and put a new header on it and create a new packet.

And the point is those are all taking implementational details of a particular protocol, the exact same thing they're trying to say we shouldn't be doing -- which I, by the way, agree we shouldn't be doing -- and reading that into these claims.  And we really have no basis in the intrinsic evidence to do any of that.  So, those comments really -- I think are really beside the point.

THE COURT:  Okay.

MR. AROVAS:  One more thing I'd just like to show, because I think it's interesting to show the

correlation between some of the language in the specification and the express claim language. What I've done in Slide 21 is I've put claim 19 on the same slide with an excerpt from the patent specification column 6 and then figure 6 which is what we were looking at before.

You'll notice that the language of the claim -- it talks about a radio channel in the preamble. I didn't highlight that; but it's going from the first line to the second line, radio channel. And then it talks about fields that are going to be in that channel. So, there's a first field and a second field.

But if you go to the patent specification, you'll find that's exactly the language we see in the specification. It talks about CDL fields; it talks about the fast out-of-band channel field. So, when it's using "fields," it's talking again about these separate portions of the radio channel; and we see that's exactly how it's being described in the specification.

So, where does that leave us? I mean, I think the two main complaints that the plaintiff had with the proposed construction is, one, that it's limited to a transmission scheme. I frankly can't see any way, shape, or form that this construction which I have put on the screen is limited to TDMA. It doesn't say TDMA; it

doesn't say time slots.  It has nothing to do with claim 20, which is specific to TDMA.  This is completely agnostic to what's being construed -- I mean, what protocol is being used.

And then it gets down to the bottom line that we have to give meaning to that phrase.  That phrase is -- it's in the express claim language, and it is really emphasized throughout this patent.

Thank you, your Honor.

THE COURT:  Thank you, counsel.

Mr. Caldwell, can you -- about five minutes?  That give you enough time?

MR. CALDWELL:  I hope it's less than that.

THE COURT:  Okay.

MR. CALDWELL:  I think it will be.

THE COURT:  Okay.

MR. CALDWELL:  For starters, your Honor, I think your proposed construction is fine.  All these concepts of contamination, discrete portions, instantaneous decisions, and vertical slices, which seem to bring you back to the TDMA environment, none of that is captured in the claim or recited in the claim as a limitation.

You know, I just want to ask the fundamental question -- I guess it's rhetorical -- how is Ericsson --

Claims Construction Hearing

135

on the one hand, he said we're reading a limitation into the claim; and then he said we're reading a limitation out of the claim.  I don't understand how Ericsson is reading something in or out of the claim if our construction is plain meaning or the construction that your Honor has proposed.  I think those are correct.

And when you get down to it, we spent a lot of time looking at things in the specification.  What we never looked at was a definition or a disclaimer or anything else that the Federal Circuit tells us is a reason to change the scope of the claim.  So, then you're back up to the first step of claim construction which is looking at the claim.  This is where Mr. Arovas started.

He started by saying, "Well, your Honor" and mentioned a first field and a second field, that already implies separate; so, we're not giving meaning to "separate" if we don't do something else and change the words that are in the claim.  And I think that's completely wrong.

For example, I believe the point that's captured there is simply that it's not the case that the second field is subsumed within the first field or that the first field is subsumed within the second.  That doesn't mean they can't be adjacent.  They're still separate.  That's why we think the plain meaning or your

Honor's proposed construction are correct.

Thank you.

THE COURT:  Thank you.  Mr. Arovas.

MR. AROVAS:  Very, very briefly.

I find it interesting that, you know, what the plaintiff says is, well, there's no reason to have a construction because unless there's a disclaimer or there is an express definition in the specification, we can just leave the claim language as it is.  I mean, we all know claim construction is when there's a disagreement between the parties over the meaning of a phrase that you can construe it and we construe it according to the normal principles.  In fact, you don't have to go very far -- look to any one of the other patents -- where the plaintiffs are proposing constructions of words and the -- you know, in the claims based on intrinsic evidence; and that's what we're talking about here today.

And, so, the issue is and the reason why we're asking for the construction is we want it to be clear that these are not in the same part of the radio channel. The construction is simple, "separate part of a radio channel."  The only thing that wouldn't be covered by that is if it's in the same part, and that is what the plaintiffs are going to try to do with this patent.

There is an express claim limitation on it

137

that has to be given meaning.  The reason they want to say just don't give it a construction or give it a construction -- sort of this secondary argument they have that's redundant with other parts, "the first and second field," which are already different, is precisely because they don't want it to be clear that these are different portions of the radio channel.  And that's the issue that we're trying to resolve, and we want to make sure that this separate requirement is given meaning.

If these things were not -- if they're not separate and they're put together, it raises the exact problem that the patent is trying to solve.

THE COURT:  Would that -- "a different portion of a radio channel from said first field" -- "in a different portion of radio channel from said first field," would that give a jury some type of implication that it has to be distanced, the first and second field have to be distanced from one another?

MR. AROVAS:  I'm not saying they can't be adjacent.  In fact, the example that we showed, they were, in fact, adjacent.  The portion -- "different portion" is because the different portions, as we saw you slice up the radio channel, are being treated differently.  Whether they're close together or far together is really immaterial.  The point is that they're

being treated differently.

THE COURT:  Right.

MR. AROVAS:  So as long as there's a sufficient difference that they're recognized as being treated differently, that would be fine.  Adjacent doesn't matter.

THE COURT:  Okay.  Let's go to the next term.

MR. AROVAS:  Thank you, your Honor.

THE COURT:  You're welcome.

MR. CALDWELL:  The second and final term from the '019 and '568 patent is the "service type identifier" term.

If we can get our slides.  It's No. 41.

So, the phrase actually being construed is "a service type identifier which identifies a type of payload information."  Fundamentally, the dispute between the parties is what does it mean for something to be a service type identifier in the context of these patents.

Now, in view of the patent and the purpose accomplished by the claim, Ericsson believes a service type identifier must inform the receiver about the transmission characteristics of the payload information it is receiving.

Now, defendants seem to contend that the service type identifier essentially must signal the type

139

of application that will ultimately use the content that's transmitted.  And I can see where they get it, by taking various snippets out of the specification about services such as video and voice and whatnot; but the purpose in terms of what the transmitter and the receiver care about of informing the receiver with a service type identifier, what you're sending, is so that the receiving hardware in the receiver knows what to do with it; knows how it's being transmitted; knows how frequently the information is coming, that bandwidth issue that we talked about earlier; knows what kind of error tolerance it has, that error tolerance issue we mentioned earlier; and knows what kind of delays it can tolerate.  So, for example, maybe the voice cannot tolerate delays like the email can; but on the other hand, the video might require more data than the email does.

THE COURT:  Isn't your construction -- and I'm just looking at the claim term -- it specifically says it identifies a type of payload information; and the key to it is that your construction has transmission -- "which identifies transmission characteristics."  Isn't that fundamentally two different things?

MR. CALDWELL:  Well, I guess you could say that.  I don't think that that's really what -- in the context of the invention that they're fundamentally two

140

different things.  I think in the context of the invention, the point is you have two different boxes.

THE COURT:  Right.

MR. CALDWELL:  One is a transmitter, and one is a receiver.  And they're not different concepts in the context of this invention because the receiver, the antenna that's there and the first little parts of software and chips that are going to decode what you receive and buffer it or maybe not buffer it, things like that, they don't literally care that that content is a football game being streamed or is a phone call.  What they literally care about, that receiver literally cares about, how is this being sent to me so I read it the right way.

THE COURT:  Right.  What are the characteristics of it, the rate, baud rate or whatever it is.

MR. CALDWELL:  Exactly.  So, while I understand the -- I understand what the defendants are using to get there, and I understand what's prompting the court's question in view of the way the claims are written.  But as a person of ordinary skill in the art reading this patent, you understand that the physical layer of the receiver and the data link layers and whatnot, all using these network models that your Honor

has probably heard about in various cases, they don't really care that the content happens to be video or voice.  It's just tell me how to receive it correctly, how long I can wait to try and fill my buffer and correct the holes and whatnot.  I think, honestly, that's really the fundamental dispute between the parties.

Without belaboring it, because I know you've seen it, I go back to the background of the invention; and, again, the background of the invention does say "these various types," also called "services."  The point is, though, that they have different optimal transmission characteristics.  So, for example, some may benefit from providing a greater bandwidth, in the downlink than in the uplink.  And this is a very long passage; it's in column 2.  I'm kind of jumping to the new ones that are introduced.

(Reading) In addition to bandwidth, other transmission characteristics may be impacted.  They may require different degrees of error protection.

And, finally, another transmission characteristic, (reading) the ability to tolerate delay may vary between the services.

This is actually different than the last construction where this notion of a "portion of a radio channel" isn't -- that's not pulled from the

142

specification and then put in the claims, per se.  This specification specifically tells us what we are trying to accomplish is to allow for different transmission characteristics.

THE COURT:  Sure.

MR. CALDWELL:  That could be set by a flag so that the receiver says, oh, this is what I'm receiving. I know how to handle that.  I can't wait to fix these holes because the voice conversation won't get messed up or I need to fix all these so that email doesn't have letters swapped.  And that's really the purpose of this service type identifier in this instance.

Now, Ericsson's construction that the service type identifier identifies transmission characteristics also aligns perfectly with the file history.  During the '568 prosecution history, the applicants explained to the examiner "Due to the different transmission characteristics" -- we see those same words again -- "associated with the different types of information, it would be desirable to provide an ability for a transmitter to be able to inform a receiver of the type of information in a transmission payload."  In other words, it's not just because the receiver is going to be interested am I receiving parts of a football game.  It's because the receiver needs to know there are different

transmission characteristics associated with that different type of data.

And then a slide that I believe I've shown you before, the defendants don't fundamentally dispute this. Now, remember there's two terms being argued for the '019 and '568 patents; and we're talking about the second one now, the "service type identifier."  But when arguing about that "separate" and trying to get their construction on "separate," the defendants had this explanation of the "crux" of what's going on in this patent.  And that is transmit -- again they say transmit it separately -- "the receiver can be informed of how to decode different service types having varying transmission characteristics without knowing what those transmission characteristics are."  It's the same thing we see in the patent, the file history, our brief, defendants' brief.  That's how a person of ordinary skill in the art would understand what the service type identifier is doing.

And one other brief issue.  Let me flip back to the defendants' construction.  We've taken issue in the brief with this notion that the defendants have -- you're right, they have this suggestion that the type of information is something such as video, voice, or data; and they actually included the "e.g." -- or for

example -- "video, voice or data" in their construction.

I would submit to your Honor that the e.g. could be misleading. There's an awful lot of lawyers in this room today, and we write a lot of sentences that use e.g. From Ericsson's perspective, we're a little bit concerned that if you put something in there that's essentially a nonexhaustive list and explain, oh, e.g., it's video, voice, or data, if the accused product identifies something that might literally fall within the e.g. -- i.e., it's not limited to video, voice, or data but it's not one of precisely video, voice, or data -- that could lead to confusion for the jury.

THE COURT: I believe that came out of the abstract, the e.g. What if I were to put something like "examples of types of information include, but are not limited to, video, voice, or data"?

MR. CALDWELL: I think that's helpful.

I want to make one more point on this. Just obviously at some point we intend to be presenting this to a lay jury, and we're going to have accused products and be comparing them. I just would hate to have the jury fixated on some example that could suggest noninfringement that would be misleading. So, let me clarify one other point.

Video, voice, and data are examples; and, in

fact, there are some claims that say "wherein the type is video, voice, or data" or something to that effect.  I would like to point out to your Honor that another type of information that should be included, if there is a for example or an e.g., is simply what I would think is a slightly broader name of "multimedia."

There is a dependent claim 24 that depends from claim 19 that says "wherein said information is multimedia information."  There's a similar claim to that in the '568 apparatus patent.  I believe it is '568 claim 3.

And then, also, in the file history -- now, what's been excerpted here is actually, I believe, Exhibit J to the defendants' brief -- the highlighting is theirs, not mine -- citing a portion of the file history in the first patent, the '019 patent, where the examiner rejected the claims based on a Raith patent.  And you've probably heard of the Raith patents.  Actually, there were two different Raith patents that were applied at different times in prosecution.  This was the first one.  And ironically, that same Raith is the first named inventor in these patents.  He obviously has lots of patents in this particular area of technology.

In any event, when the examiner in the '019 prosecution was first applying a rejection to these

claims, the examiner said, well, the other Raith patent can identify the type of payload information; and his i.e. or e.g. is voice, data, or multimedia. That aspect of the rejection was never traversed that multimedia could constitute a type of information. And I think in order to avoid confusion for what would be at issue in this case, if your Honor is inclined to have an e.g. list or a for example list, Ericsson submits that your Honor should include "multimedia" in that list consistent with both claims and the file history.

And that's all I've got on that.

THE COURT: Thank you, counsel.

Mr. Alper.

MR. BOVICH: John Bovich for the defendants, your Honor.

THE COURT: Mr. Bovich. I'm sorry.

MR. BOVICH: Slide 12, please.

Let me start by answering one of your Honor's questions and then swing back to the presentation about what this claim is about.

Your Honor asked the question is there a difference between the type of services and how it is transmitted. I don't think we got an answer. The answer is absolutely there is a difference. One tells you what it is, and the other tells you how it was sent.

What I'm looking at here on Slide 12 is a portion of the file history. I'll circle back to this later. But in the bottom box, you've got a position that was taken by Ericsson during prosecution in order to distinguish the patent over the Raith reference, the '813 Raith reference, which disclosed using channel coding. And the examiner rejected the claim based on Raith '813 and essentially said, "Well, I find that if you're telling the receiver about the channel coding, that's the same thing as telling the receiver what the type of information is; and I even find, upon reading the spec" -- and that's the blue box above -- "that the FOC can provide information regarding a number of different transmission characteristics, such as channel coding and/or the interleaving. What do you think about that?"

And Ericsson came back and said, "No. The FOC field can provide information regarding three different aspects of the transmission."

That's the answer to your Honor's question. They are different.

So, three items were presented on this menu here by Ericsson -- the type of service, the channel coding, or the interleaving -- and even a fourth option in the next sentence they say (reading) these options can be alternatives or they could all be indicated by the FOC

field.  Ericsson went on, and it selected one item from the menu and one item only.  It says, "Our claim 45" -- that became ultimately claim 1 of the '568 -- "identifies the type of payload information.  Accordingly, the plain language makes clear that applicants are claiming the use of a field to identify the type of payload information" -- that's the type of service circled in the green box -- "and not the type of channel coding."

So, this distinction was recognized by Ericsson.  What it is is different from how it was sent.  And I will show you at least five instances during prosecution where Ericsson consistently adhered to the position that what we're talking about with the service type identifier is what it is and not how it was sent.

Can we go to Slide 2, please?

Here are the competing constructions.  The claim requires a type of payload information to be identified by the service type identifier.  On the right side, you'll see that the type of information is in the defendants' construction.  And we provided examples, and we agree that it is not limited to these types and it is not exhaustive.  We're simply trying to provide some example so the jury will understand what a type of information is.

The plaintiffs' construction is the middle,

149

and you can see that.  Instead of identifying the type of information, they're trying to identify something else, something different, according to them, in the file history.  That different thing is the "transmission characteristics."  Well, there's no support in the claim for this at all.  The claim really, service type identifier, its goals are not nearly as lofty as portrayed by the plaintiffs in this case.  It's not trying to identify in and of itself the full gamut of all the transmission characteristics.  I'll concede that if you knew the type of information, you might be able to figure that out in a system; but the claims don't care about that.  The service type identifier is only trying to do one thing; it's trying to tell you what type of information I have and not the transmission characteristics.

So, this attempt to inject this phrase "transmission characteristics" into the claim completely strips the claim of its meaning.  They're not trying to broaden the claim.  They're simply trying to rewrite it to mean something else.  And by trying to inject "transmission characteristics" back in -- I showed you that disavowal slide a second ago -- they're trying to recapture that which they disavowed expressly during prosecution.

150

Another problem with the construction you have, I -- I thought it was interesting.  Counsel said that they're a little bit concerned that if we provide these examples, the jury will get confused.  Well, we're very clear that our examples are not exhaustive.  Your Honor asked that question, and that's right.  They are simply examples.

We are more than a little bit concerned about a construction which just has a generic phrase "transmission characteristics."  What transmission characteristics?  Are there five of them?  Are there six of them?  Do I have to get two out of six to come within the boundary of the claim?  They haven't told us what they are; and, in fact, it's been a moving target during the course of this briefing.

So, if we're here to try to figure out what it is the claims mean and try to define the boundary of what's in the claim and what's outside of the claim, we're not going to get there by using this phrase "transmission characteristics."  I'm afraid that's going to be a very viable term, and it's not going to give us a clear boundary.  The patent tells us very clearly that what we're trying to do is identify the types of services, and the examples that we've provided make it clear.

Another problem with this phrase "transmission characteristics" is it is so vague it might read back on that which was disavowed.  I'll explain the disavowal in more detail in a minute; but, again, during prosecution, the examiner rejected the claims on the basis that the Raith patent disclosed channel coding; that's a transmission characteristic.  And Ericsson disavowed and said, "Absolutely not.  We are not -- in the service type identifier, we are not trying to identify that characteristic."

Well, now we have a proposed construction which has "transmission characteristics."  Well, could that mean channel coding?  Is this an attempt to read the claim back on that which was disavowed?  It's unclear.

So, it's only making things a lot murkier to try to take this phrase and inject it into the claim. The plain meaning in the claim is we have to identify the type of information, and that's what is said over and over again in the specification.  That's what was embraced by Ericsson during the prosecution, and anything to do with transmission characteristics was disavowed.

I want to start with Slide 3, please.

The service type identifier, as it says, it tries to do one thing.  It just tries to tell you what the payload information is.  Do I have voice?  Do I have

video?  Do I have some other type of payload?  And as we mentioned, that's the crux of the invention, so that you can receive the service type identifier and know what it is we're dealing with without having to try to actually get into the actual information and decode it.  That's why we can have an instantaneous decoding procedure in a multimedia environment.

Let's go to Slide 4, please.

Counsel said he can understand why we're providing these examples from the specification; and yes, that's exactly right, because the service type identifier needs to identify a type of payload information and the examples are voice, video, and data.  And it is a service type identifier, and these are described as the different services.  So, that's why our construction maps to the specification.

Let's jump to Slide 6, please.

The purpose of the service type identifier is so we can decode the received bits.  This is from column 9, lines 32 to 38.  And, again, we've got a figure down from the tutorial to show you what we're talking about here.  This is a multimedia environment (indicating).  Different types of services are coming into the decoder and they're coming in at a very rapid rate and they're changing and the decoder needs to know

how to keep it.  So, it reads the service type identifier and then it knows I am dealing with video and it might know in the next instance I'm dealing with data, such as a fax, and it may know in the next instance that I'm dealing with voice.

So, the purpose is so we can know what it is we're dealing with.  It's simple.  It tries to do one thing.  It does not try to identify the full range of transmission characteristics, whatever they are in the plaintiffs' construction.

Let's go to Slide 7, please.

Figure 9 shows us the use of the service type identifier in a multimedia environment.  Data comes in. The question is asked is it multimedia?  I read the service type identifier, and I understand what the data is going to be.

Let's go to the next slide, please.

This is consistent with the dependent claims, by the way.  We've got claim 22 which depends on claim 19.  It captures all the steps of method claim 19, and it adds some.  In claim 22 I'm going to change the type of information from a first type to a second type. So, that's the difference between claim 22 and claim 19. Claim 19 requires only one type of information, and claim 22 we change it.  And since we're changing the

154

service, we're also going to change our service type identifier to make sure that the receiver knows what we're doing.  So, we correspond to the second type of information.

Next slide, please.

And claim 23 tells you exactly what those types are.  In claim 23 we follow the method of claim 22. We change our type of information; and then claim 23 says one of those types is video, voice, and data and the other type is obviously one of the other two that's not used in the first type because we changed.

So, the point of claim 23 is that it is consistent with claim number 19 and claim 1 of the '568. When we're talking about types of services, we're talking about these types.

Now, if in claim 19 the service type identifier really meant "transmission characteristics," then by the time we get to claim 23, the service type identifier is going to mean something completely different.  It's going to mean the type of data, which is our construction.

So, if we adopt the plaintiffs' construction, we're going to have this problem where this one term, "service type identifier," type of information, the identical term means one thing in the independent claim

and the same exact term means something totally different in the dependent claim.  That's why we're saying it means the same thing throughout.  That's a consistent reading.

Slide 10.

This is from Ericsson's tutorial.  There's a lot I don't agree with in this, especially where they put it; but I will just say simply that when you look at what the service type identifier is, as defended by the plaintiffs, it's what we say it is.  Service type identifier is video, or the service type identifier might be voice.  Now, notice there is not a long list of transmission characteristics there because the transmission characteristics may or may not tell you what type of information you have.  The only thing that tells you what type of information you have is to simply specify it in the service type identifier.

Let's go to Slide 21, please.

I'm going to talk a little bit about the prosecution and jump around a little bit; but let me summarize, at a very high level, what happened during prosecution.  First of all, there was a rejection on the Raith '813 patent which disclosed identifying the channel coding.  The examiner said, "Essentially that's the same thing as the service type identifier.  I think 'service type identifier' means 'transmission characteristics';

156

and, therefore, your claim is anticipated."

Ericsson came back and said, "No, that is not -- they're not the same thing."  And I'll get to that distinction in a minute.

Then there was a second rejection, and what we're looking at here on Slide 21 is the second rejection from February 6th, 2002.  The examiner stuck to his guns; and he said, "In the specification you identify that the FOC may serve the purpose of a service type identifier. It can provide information regarding the channel coding." Then he goes on, "Since Raith provides information regarding the channel coding, then I'm going to reject the claim."

And then the examiner gives Ericsson an opportunity -- and that's underlined in red -- "Unless the applicants amend the claim, I'm going to stick to my rejection."  In other words, "Unless you use some different words to tell me what the claim really means, I'm going to stick to my position that 'service type identifier' means 'transmission characteristics.'"

Let's go to Slide 11, please.

Ericsson responds.  This is the slide I showed you earlier.  Ericsson did not amend.  Ericsson did not amend the claim language whatsoever.  It merely provided arguments because it felt so strongly that the plain

157

language of "service type identifier" means something different than "transmission characteristics," such as channel coding, it didn't need to amend its claim.  And it worked.  The examiner agreed.  That is classic, unmistakable disavowel.  And I think they're trying to recapture it today.

At the top of the slide, you can see the spec language.  This is from the specification of the '019, column 9.  "The FOC can provide information regarding the type of service which the associated payload is currently supporting, the channel coding and/or the interleaving."

At the bottom of the slide we have that section of the prosecution history where Ericsson explains that language.  I've underlined in blue the language because it's the same.

Next slide, please.

Again Ericsson says what this language means is we've got several different options.  We could identify the type of service, or we could identify some transmission characteristics -- and channel coding and interleaving are an example -- or we can do it all.  Ericsson selected one item off of this menu, the type of service which identifies the type of payload; and it disavowed channel loading and interleaving.

Now, this is the best it gets in terms of any

type of connection whatsoever between the service type identifier and transmission characteristics.  This is the best it gets.  And at that moment during prosecution when the examiner said, "They're the same thing and I want you to amend," Ericsson said, "No.  The language itself makes the distinction.  We are disavowing these other two types."

Next slide, please.

So, what I've done on this Slide 13 is listed out that language, Ericsson's position where it selected one of these options and disavowed the other; and then I've mapped it to the proposed claim construction.  "The 'type of service' is what our claim is about," that's what Ericsson said.  So, that's why defendants' construction requires you to use the "type of information" -- for example, video, voice, or data -- that's conveyed in the payload.

What's disavowed are "transmission characteristics."  These are the only particular transmission characteristics that were talked about at the time.  So, if there's some other type of transmission characteristics in the plaintiffs' construction, I haven't heard it.  All I know is anytime it came up at all, it was disavowed, channel coding and interleaving.  So, today, in red, you've got an attempt to recapture

that which was disavowed.  But the plain meaning of the term is that it identifies the type of service.

Let me go to Slide 24, please.

Last point on this.  This is the reason why, see, Ericsson wants to tell you that you need to know the transmission characteristics in order to figure out and decode payload.  And in a system you do, but in the claims it doesn't matter.  Claim 19 doesn't care about informing you of the transmission characteristics.  It only cares about informing you of one thing, and that's the type of information.  And what is especially true is there is absolutely no teaching in the specification that you could divine the type of information from receiving the transmission characteristics.  It's simply not taught in reverse whatsoever.

There's one point during the prosecution where the possibility came up, and it's here (indicating). This is Slide 24.  The patentee was distinguishing the claim over Raith.  And what the patentee said was "In Raith, they identify the type of channel coding.  The problem is if you know the type of channel coding, you may not necessarily know the type of payload information because two different types of payload might have the same channel coding."  So, that's what I've set forth up here, "the type of channel coding may not necessarily

160

identify the type of payload information"; and at the bottom there's a graphic.

We've got voice which has a channel coding rate of a half and video at a channel coding rate of a half; and the patentee said, "That's not enough.  If I just inform the receiver of that transmission characteristic, I haven't done what the service type identifier requires which is to inform it of the type of information."  So, that's why transmission characteristics, whatever they are in plaintiffs' construction, can't be the proper construction of this term.

THE COURT:  How does the receiver know the transmission characteristics of how to open the file and process it if it just knows it's a video file or an audio file or a fax or whatever?  How does it know?

MR. BOVICH:  Two responses.  No. 1, that can be done elsewhere in the system in a situation that -- frankly that the service type identifier is not concerned with; it's not trying to solve that problem.

Secondly, the service type identifier could -- you could extrapolate those characteristics from the service type identifier.  There is an indication that there might be a relationship between the two.  You could have, for example, a lookup table where you could map the

161

two together.

But what is crucial is that the service type -- what we're focusing on is what the service type identifier is.  What it is is the type of information.  What it is not is the transmission characteristics in and of itself.

Thank you, your Honor.

THE COURT:  Thank you.

Mr. Caldwell.

MR. CALDWELL:  Yes, sir.

THE COURT:  Five minutes?

MR. CALDWELL:  I'll do my best to keep it less than that.

THE COURT:  Okay.

MR. CALDWELL:  I think my last rebuttal was under --

THE COURT:  You did well.  I timed you.

MR. CALDWELL:  I'm taking it seriously.  I know we haven't had lunch.

Okay.  Just at the outset, I'll note that the defendants, to the extent there's going to be a for example or an e.g., do not dispute that multimedia could properly be included in that list based on the claims and the intrinsic record.  So, I want to make that one observation.

162

Second, Mr. Bovich spent some time talking about the Raith distinction; and, you know, candidly, I think the defendants have overplayed their hand on Raith a little bit with this "it doesn't get any better than that" and so on and so forth.

If I can have the document camera.

Really this is how the argument over Raith concluded.

It's a little unfocused.  You know what?  I'll just read it.

The distinction over Raith concluded with (reading) the argument is intended to illustrate that the identification of the type of channel coding in Raith does not inherently identify the type of payload information because the identification of channel coding does not necessarily identify the type of payload information as would be required for a rejection based upon inherency.

And the point that the applicants were making in the distinction over Raith was in Raith you might vary your channel coding but that has no correlation to varying types of information.

And the defendants think that we're trying to recapture some sort of a ground that was given up in overcoming the Raith rejection, and I submit to your

Honor that that's not true.  Ericsson is not trying to recapture anything in its construction.  Our point I think is elucidated by your Honor's questions of how are you going to know what to do with the data and who is going to play it and whatnot.  I think that's really the concern that defendants' construction invites, is it suggests that what you're talking about with a service type identifier is not at this low level of this part of the transmitter sends data to this part of the receiver and it knows how that information is going to be received and error control and delay characteristics.  That's what we're talking about in this patent, and that's what a person of ordinary sill in the art understands upon reading the patent.  We're not talking about after all the chunks are re-assembled and all the error control processes have been completed and you've put up with whatever delay you can tolerate and then you kick it further up in the networking stack on the receiving side and it happens to get played by Windows Media Player or whatnot.  We're not talking about an application level. We're talking about the transmission characteristics between the transmitter and the receiver.

Now, to address the question that Ericsson is trying to recapture some sort of subject matter, I wrote down basically what I think is perhaps a proposed

compromise because I think, as I gleaned defendants' argument, defendants are just suggesting, well, "transmission characteristics" is loose enough that if you cut out this notion of type such as video, voice, data, multimedia, you're back into something that's vague enough to look like what you said about Raith.

And, so, I'm going to read -- I'll try and read it slow, but I think this might be a proposal that actually addresses our concern that we're really talking about how things transmit and receive data, not the applications that play it, but also addressing the defendants' concerns about types.  And what I would suggest is this "service type identifier" term is "an identifier that signals the transmission characteristics of payload information by identifying the type of information (for example, video, voice, data or multimedia) conveyed in the payload."

Did I say it slow enough for your Honor to write it down?

THE COURT:  I got it.

MR. CALDWELL:  And what I think that construction does is it addresses all of Mr. Bovich's concerns that basically now all we're covering is something that loops back in Raith.  We've got in there what they want to say about type is video, voice, data.

It gets in there my concern about multimedia based upon another claim in the file history.  But it tells the jury and tells the parties we're really talking about -- by signaling types of data, it's going to affect the characteristics of how you transmit it that we saw in the background of delay and bandwidth and error correction, not telling it, "Hey, once you get this and fix it, kick it up to Windows Media Player to display the video," which is really not what we're getting at here; and I don't think there's really any dispute about that.

Thank you, your Honor.

THE COURT:  Thank you.

Mr. Bovich.

MR. BOVICH:  Your Honor, it looks like the construction they're offering is basically kind of another version of what I asked of you.  If this is an appropriate time to take a break, we can consider it and then we'll --

THE COURT:  Okay.  Do you have any other comments besides -- I was going to give you the last word on this term.  Do you have any other comments besides your consideration of the stipulated construction?

MR. BOVICH:  That's it, your Honor.

THE COURT:  Okay.  All right.  We'll take a rest room break, a five-minute rest room break, and then

I'll see if you guys can agree and if you can't, then I'll construe it and we'll go to the '516.

MR. BOVICH:  Thank you, your Honor.

(Recess, 2:13 p.m. to 2:20 p.m.)

THE COURT:  Okay.  Before we turn our attention to the '516, was there any type of stipulation on the meaning of that last term?

MR. BOVICH:  There's not, your Honor.  If I could just explain it.  I think the proposal is really the plaintiffs' construction re-packaged again.  The problem is they're still trying to inject this notion that the service type identifier itself must contain the transmission characteristics.  We'll admit that the service type identifier could be used for a lot of different purposes and one of the purposes of knowing that type ID could be to divine the transmission characteristics, but you can't change what it fundamentally is.  What it fundamentally is is the type of service, and what it fundamentally is not in and of itself is the transmission characteristics.

THE COURT:  All right.  Thank you, sir.

Let's go to the '516.

MR. CALDWELL:  Your Honor, if I might clarify something in case it gets rid of the dispute.

THE COURT:  Sure.

MR. CALDWELL:  We're not contending that the service type identifier has to recite in itself all of the transmission characteristics, which seem to be his one complaint.  The proposal that I articulated says that the identifier signals the transmission characteristics; and that could be it's 1-1-0, which the receiver knows how to interpret in a certain way.  So, we're not trying to say it literally has to have them.  I think if that's their concern, it's really not well-founded.

THE COURT:  Okay.  Well, let me just -- just keep working on it, and just notify the court if you do come to an agreement on it.

There's just one term, right, in -- two terms in the '516.  Okay.  Let's go ahead and begin.  All right.

MR. STEVENSON:  Thank you, your Honor.  The '516 patent, our last one, is a patent that was filed in July, 1995, on a technique for pulse shaping; and the main dispute in the case is regarding the term "pulse shaping" and what it means.  And unlike many of the other disputes that we've had leading up to this one that involve words like "separate" or "identify" or "constructing," the word "pulse shaping" is actually a term of art that has a fairly specific meaning in the electrical arts.  And we are going to propose a

definition for it that we think is in keeping with how it is understood and how it's defined in the patent.

To get us to the point of understanding our definition, I'd like to go through a little bit of pulse shaping -- what it is, why it's done -- and then I'll show you the support for a definition.  So, with that introduction, what is pulse shaping?

To understand pulse shaping in the context of this patent and the next term, which is "inverse fast fourier transform," I wanted to take one slide to explain the difference between the time domain and frequency domain.  This is the time domain (indicating); and this is basically a graph showing the amplitude of the signal, how loud or strong it is, on the up-and-down axis.  And on the right-to-left axis, the X axis, it shows time as it goes by from, for instance, 0 to 1 second.  So, as we can see, we have two different waveforms here which are different frequencies and different amplitudes.  The one on the left is a lower frequency than the one on the right; and it's louder, or higher amplitude, than the one on the right.  So, if they were sound, you'd have two different notes being played, a lower one and a louder one on the left.

In addition, these can be combined.  Waves can be combined or multiplied together.  And when you do so,

169

you get the waveform on the bottom which if it were a sound or a guitar, it would be a two-string chord; but that basically shows the waveform that results when two dissimilar waves are combined together to form essentially a chord.  And this is all under the time domain.

Now, what the patent talks about is the frequency domain and transferring these mathematical or the graphical representations of waves from time into frequency.  On the upper part -- I'll just go back to show you.  We've got essentially the additive result on the bottom that we have from the prior slide.  It's the same thing we just talked about.  That's the chord.

By applying mathematical techniques, we can change over to the frequency domain.  So, the chart on the bottom shows that.  And the difference there is instead of the -- the Y axis is the same; that's amplitude.  But now the bottom axis, the axis that goes right to left, no longer is time; it's frequencies.  So, what we've established is a bunch of frequency buckets. And this displays the two prior pure frequency curves as two lines, a line at the 4 hertz and a line at the 12 hertz, which if I go back are the two constituent parts which made up that waveform that was the chord. And of course you're not limited to 2.  You might have 6

or 10 or 100 different frequencies that you can divine out of a waveform, and that's called the "frequency domain."  And the way you can go back and forth between the frequency and the time domain is through a number of mathematical techniques, one of which is discussed in the patent and is I think the best for this, fast fourier transform.

Now, with that time versus frequency idea in mind, let me show you a waveform from the patent.  This is in the frequency domain.  You can tell by the "f" on the X axis.  And this shows a pulse that is being transmitted without any pulse shaping involved.  This is just the raw to-be-transmitted pulse.  The top shows k equals 0, 1, 2, 3, 4, 5, 6, 7; and those are essentially the frequency buckets that have been established which in the future could correspond to something called "subcarriers."  And I'll explain about those in a minute.

Under the patent, figure 5 shows the result of pulse shaping.  What you can notice is that the individual pulses or the individual frequencies, which are not straight lines like in my early example with the blue lines because they're not as pure -- right?  So, you've got a little bit of time shift due to Doppler effects and, so, don't have everything purely aligned among a frequency axis.

171

But what you'll see is we have fewer pulses. Instead of 7, we have 3 -- well, actually 4. We've gone from 8 to 4; and they're cleaner. We don't have the noise effects or the harmonic effects at the bottom, and that's what pulse shaping has done.

Now, here's why that's important. The four frequency buckets can each separately and individually be used to convey information. So, instead of having a -- one wire where we send just a bunch of 1s and 0s between each other and they come in serially and we have one stream of 1s and 0s, here what you have is four streams which can convey information in parallel; and that, of course, improves throughput. This is essentially the fundamental issue.

The goal of pulse shaping is to strike a balance. The balance being struck is taking something here in which the eight buckets of frequency are closer together and can bleed over into another and have intersymbol interference and therefore require more frequent error re-transmission, to take that and clean it up into what is here which doesn't have as much potential for error. And the trade-off is how much do you do that. Because the more you pulse shape, the fewer individual pulses you actually get down to and, so, you lose channels. And that's the entire trade-off of the patent

and what it discusses.

All right.  So, that is the fundamental on pulse shaping.

Here is the waveform that actually accomplishes that.  What you can see on figure 3B is no pulse shaping; and we just, you know, made that a solid line that describes the frequency bands.  What are shown here are two different waveforms, $w_1(t)$ and $w_2(t)$, that could be used to actually accomplish the pulse shaping. And what you see for $w_1(t)$ and for $w_2(t)$ are dotted lines that reflect the result after pulse shaping, and you can see now you have fewer discrete frequencies to deal with but they tend to be better spaced and much more susceptible to transmission without interference.  These end up getting called "subcarriers" in the patent, and that's the result of, after pulse shaping, how many usable frequency buckets or subcarriers do you have to convey your information.  And that's how the patent describes it works.

Let's go to the dispute.  The dispute is over the term "pulse shaping waveform."  Ericsson's construction is "a waveform that lessens the effects of both time dispersion and intersymbol interference of an OFDM signal."  And this is all within the OFDM, or Orthogonal Frequency Division Multiplexing, realm.

173

Defendants call it "a waveform that changes the shape of said first data signal."  So, the dispute here is, as used in the art, the term "pulse shaping," is that merely something that changes the shape of a data signal or does it actually have to shape it?  In other words, shape it in a direction to lessen the effect of time dispersion and intersymbol interference.

The patent defines this term of art in the specification; and we've taken our construction directly out of the specification at column 3, line 65, through column 4, line 2.  It says (reading) the present invention provides a method and system of pulse shaping for data transmission in an OFDM multiplexed system that lessens the effects of both time dispersion and Doppler spread intersymbol interference on the received OFDM signal.  The reason we have drawn a distinction between actually shaping a signal to reduce intersymbol interference or time dispersion effects and, on the other hand, just changing it is there are a lot of things that can change a signal that aren't pulse shapers and have nothing to do with pulse shapers; for instance, low pass phrasers or impedence magic.  Even noise can change signals.

And I think the goal of the defendants here is to broaden out the scope of the claim and to get away

from a strict reading of what pulse shaping is so that they can bring to bear, in an attempt to invalidate the patent, prior art that really wouldn't be correctly considered pulse shaping. I think that's what's going on here. That's why we would like to stick to the definition of this term of art and how it is portrayed in the specification. We've tried to pay fidelity to that.

THE COURT: Thank you, counsel.

MR. AROVAS: Your Honor, there are two disputed terms in this patent. I'm going to be arguing both of these. What I'd like to do first is for a little context, and then I'm going to jump to what the dispute is. But there's three kind of key parts of this claim -- actually two claims, and they relate together. So, we have three interacting elements; and you heard a lot about them in the plaintiffs' comments.

First you have these "plurality of subcarriers." That's the blue element that I have that's the first main element in claim 1. So, basically you have a transmitter and you have a receiver and you're going to use this plurality of subcarriers or plurality of these channels to get rid of those bumps that are transmitted that are going to carry the data from the transmitter to the receiver. And the patent does address a problem, problems of interference of various kinds as

well as other channel distortions that it tries to mitigate or reduce by using something called "pulse shaping."  And that is the second element, the element that's in brown or yellow or -- I'm not so great with colors, but the middle one.

Then you have claim 6 which adds something called an "N' point-IFFT."  An IFFT we'll talk about later, but it's actually the way you go between the time and the frequency domain that was just explained to you. That's actually in the dependent claim.  When the invention was being described, it sounded like, from the comments, that they were reading that into the independent claim; but that's actually something that just appears in the dependent claim.  And that is what relates to going from the 4 bumps to the 2 -- I'm sorry -- the 8 to the 4, and that's something that really comes up in the dependent claim 6.

So, let's jump ahead and just take a look at the first dispute; and then we'll go back with some context.

Let's look at Slide 11.

And what Slide 11 has is the dispute over the "pulse shaping waveform" term.  There's two constructions.  The basic difference between the two constructions is that if you look at the plaintiffs

176

'construction, it says "a waveform that lessens the effects of both time dispersion and intersymbol interference of an OFDM signal," compared to the defendants' construction "that changes the shape of said first data signal."

Now, what's interesting about the plaintiffs' construction is they are taking a couple potential consequences -- and by the way, both of these things do not necessarily have to happen.  It depends on how you set up your system.  But they take a couple of potential consequences of pulse shaping and read those into the claims.  Whether you want to call them "goals" or "results" or "effects" or whatever, it doesn't really much matter.  The point is they aren't a definition of pulse shaping.  They are certain consequences in the right system in the right embodiment that may result from pulse shaping.  Pulse shaping itself, a pulse shaping waveform, is just something that is going to shape that wave.  We're going to see that in the intrinsic evidence. You're actually going to see it in the dictionary definitions as well.

And what I find interesting is if you look at the claim, going one more slide forward to Slide 12, you'll see that the term "pulse shaping" actually comes up twice, "multiplying said first data signal by a pulse

shaping waveform."  That's the first yellow language in the second element of claim 1.  So, that is taking the original signal and modifying it or re-shaping it by multiplying it by this pulse shaping signal; and, so, that's what creates the change in the shape.

But then it has a second use of pulse shaping, "said pulse shaping waveform comprising a function having at least one first and second amplitude wherein said first amplitude is greater than said second amplitude." So, what that's telling us now with the express claim language is not only are you going to multiply these two things together that's going to create this change in the shape; but the claim language is explicitly telling us, the claim language itself, that there are going to be these differences in amplitude.  That's the only requirement it has.

Now, those differences in amplitude are going to cause differential effects at different parts of the signal.  But what's interesting here is it doesn't do what the plaintiffs would like it to do which is to say you must choose a pulse shaping waveform that will produce the following results.  If you were to construe it that way, you would be construing it so that you would be requiring a particular shape to have a particular result.  And as we just heard from the plaintiffs, there

are many different types of techniques that can be used collectively. In fact, if you use some of these other techniques, like, for example -- I'll just use one that's in the patent as opposed to one that isn't -- like a guard band. The patent talks about dealing with time dispersion effects. Well, you can combine a guard band in a particular system; and you can take away the issues of time dispersion by spacing out the signals far enough apart so you don't have time dispersion issues. That's just one example of the type of thing where if you had a real-world system, you may not need to use pulse shaping to correct for that time dispersion that's explicitly being read into the claims by the plaintiffs at all. And the reality is this is a general claim that requires shaping with at least a two-amplitude signal, and there's nothing else that it requires.

And the patent itself, when we look through the intrinsic evidence -- you don't need to go as deep as the plaintiffs do to find out what pulse shaping is generally trying to do. The patent in the more general descriptions don't have the specific limitations at all that the plaintiffs are trying to read in.

So, with that as an introduction of where I think the dispute lies that we need to resolve, let's go back to Slide 2.

I'll take it from here.

So, we looked at the claims.  We said we had three basic areas of technology, plurality of subcarriers, we're going to shape those subcarriers in the dependent claim, we're going to shrink the number with using N' instead of N.  So, let's take a look at this at a system level to understand how these pieces go together.

You have the transmitter on the left, the receiver on the right -- Slide 4 -- you have in the middle the N subchannels.  Okay?  So, those are the channels of information.  One of the great things about OFDM is you can transmit a lot of information with a reasonable level of noise because you have these orthogonal channels, multiple channels, and they're somewhat independent.  That's what the orthogonality is about.  It's about trying to space them in a way so they're not overlapping in a way that causes errors.

And then you have the IFFT on the left that takes you from time to frequency, and actually it's an FFT takes you in the other direction.  So, the bottom line is you got to get data in, data out; and this is a way of getting that data, modulating it over the radio waves.

What's the problem?  The problem is it's a

real-world problem, and I think the plaintiff was exactly right in how they described it. In the real world, nothing operates like the ideal. Signals bounce off walls; all sorts of things could cause different shifts in the signal. So, where you start in the idea where these nice lined-up little, you know, bumps, right, where the peak of one is in the zero of the other -- so, they're orthogonal or not. I think orthogonal is being, you know, X, Y, and Z, right? They're not interfering with each other. But in the real world, they all shift. All sorts of things can happen. It can cause interference, it can cause errors, or it can just cause you to have to slow down your data rate so that you can correct for those errors.

And, so, what's basically happening is you're seeing shifting of signals to ruin the purity of what you were trying to set up to have no interference. So, in Slide 6, this is trying to depict that in a little simpler way, where I'm just picking one of the bumps, not all eight of them together. If you look at, for example, the top left, that's symbol 1; top right is symbol 2. Those harmonics or bumps on the side are just a function of waves and waveforms. They don't have to be caused by noise or interference, but they are there. All right? They're not going to go away.

And, so, when you combined them together, if you lined them up perfectly, you could have the zero point of one be with the high point of the other, minimum interference.  In the real world, you may see certain shifts, which is what I'm trying to depict at the bottom, where you see symbol 1 and symbol 2 overlapping a little and you can see if you take the red one on the left, you look at the peak and you go from the peak of the red to the peak of the blue, it's a lot less than it would be if you had no interference or no shifting at all.  So, that's the basic issue.  Things shift around.  It makes your tolerances less, which leads to errors or forces you to slow the data rate.

Now let's start looking at this in a more real-world example.  You're not going to just have one subcarrier in a -- and, in fact, the claim requires multiple subcarriers.  You're going to have a lot of them.  So, I've shown eight because that's what's in the patent.  There's no magic to the number eight.

So, we see in the top without pulse shaping you may have this shifting and you get this big mess at the bottom; and what that does, all that shifting makes it harder to discern the data in each of those subchannels.

So, what do you do with pulse shaping?  Well,

182

pulse shaping, you re-shape the pulses. One of the things you want to do -- and the patent talks about it -- is you want to flatten out those little bumps over at the side. All right? So, you're going to make them interfere less. You're also going to deal with the spacing. So, you have a couple consequences of the pulse shaping. You're going to re-shape the pulse. You'll notice it's wider. The spacing is different. You know, the sidewalls are smaller. So, you've gotten a different shape. So, that is an advantage that's also, by the way, completely in the prior art. Pulse shaping was very well-known.

What else happens? Well, as you widen and spread these signals out, they take up more space. So, what I was trying to show in this slide -- I think it's Slide 8 -- you have a channel at the top which is basically the aggregate width that you took from your eight subchannels up at the top. If you look at that and you transfer that same width down to the bottom, what you see there, they don't all fit. Right? Because they don't all fit, you're faced with a choice. You're going to either take up more space, make it wider -- which is, of course, a possibility -- or you're going to have to lose a couple of those subcarriers if you want to fit it into the same space. So, it is a trade-off. It's not a

trade-off that comes up in claim 1.  It's a trade-off that comes up in claim 6, but certainly related in the embodiments of the patent.

So, let's say you're going to decide to keep the channel with the same.  What do you do?  You go from eight to four.  That's shown in figures 2 and 5 of the patent.  That's exactly what was described by the plaintiffs.

Now, let's get back to -- now that we have that background of how these different pieces fit together, try to understand what's going on with these two constructions.  The term in the patent is "pulse shaping waveform."  The issue is are we going to construe it based on the results that may or may not happen in a particular implementation, or are we going to deal with what the pulse shaping waveform itself is.  Since we're defining that term, we should have a definition of what a pulse shaping waveform is, not the results that it may cause in certain embodiments.

As I mentioned before, we looked at the claim, Slide 12.  We'll see that the shape of the waveform, which is what causes whatever result you're going to get, is explicitly described in the claim language itself. There's no reason for the plaintiffs to re-write that. They're not entitled to re-write that.  The only

184

requirement of this pulse shaping waveform is that it has two amplitudes.  And if the patentee had wanted to claim this differently, if they wanted to say "a shape sufficient to reduce intersymbol interference," "a shape sufficient to reduce time dispersion in a system," you know, which has time dispersion -- because there's not necessarily going to be significant time dispersion problems if you use other techniques or use it in certain environments -- they could have claimed it that way. They didn't.  This is what they claimed, and this is what we're construing.

So, now let's take a look at the specification.  We looked at the claims.  Let's go to the next level of the intrinsic evidence.

And I think you'll see when you read the patent that there is a general description of pulse shaping which is parallel to the level of specificity we see in the claims that does not in any way, shape, or form read in the specifics that the plaintiffs would like to read into the claims.

So, looking here at column 9, the specification tells us "The critical factor is that the pulse shaping function have a portion of its amplitude less than its maximum amplitude" -- those are those two levels that we saw in the claim language -- "so that the

185

transmitted waveform is shaped by the pulse shaping." All right?  That's exactly consistent with the construction that the defendants are proposing.  It's also what we see in the specific examples, that it is producing a change in the shape; and that is, in fact, the critical factor.

How does this happen?  There's a figure of the patent, figure 3A, which is interesting because it shows no pulse shaping and pulse shaping on the same figure. And, so, over on the left of Slide 14 is -- it's figure 3A, the entire figure.  I've just color-coded the no pulse shaping.  So, it's just the blue that there's no pulse shaping; and you can see that's a flat line.  So, it doesn't have the at least two amplitudes that we saw were required by the claims.  And that's no pulse shaping.  So, it's not going to change the shape of the pulse.

Now, you could increase the amplitude.  You could decrease the amplitude with a flat signal.  You could still do some things, but you're not changing the shape of the pulse itself.  You don't have these differential amplitudes so that different parts of the signal are affected differently than others.

And then they show two exemplary pulse shaping waveforms -- that's $w_1(t)$ and $w_2(t)$ -- and those are the

Claim Construction Hearing

186

two dashed lines, the curves that you see right underneath the "no pulse shaping" line.  And I've highlighted those separately over on the right-hand side of Slide 14 so we can see them.  And you'll see that they have different shapes.  And depending on the system you have, depending on the other techniques you're using, you may want to produce any number of different changes to the shape of the pulse.

And they show us here two examples that would have a very different impact.  For example, $w_1(t)$, we notice it's flat in the center and it has rolloff on the sides, whereas $w_2(t)$, the red at the bottom, has a rolloff starting almost immediately.  Doesn't look like it maybe has any flat portion at all.  And that's to produce different results in different environments.  And the whole point of this claim in this patent is that it's going to pulse shaping.  How you pulse shape, the shape you use will depend on particular embodiments and the specifics of what you're trying to accomplish.

So, how does all this add together, all these different figures, the specification?  How does it relate to the defendants' construction?  Well, you see on the left of Slide 16 -- how does pulse shaping work?  Well, you take figure 3A, for example.  I have $w_2$ -- so, the second waveform -- highlighted.  You multiply it by your

187

multiple subcarriers which we see in figure 2.  And the result of that is you get figure 5, which is also modified by N' in this particular example, but you get figure 5 which is these changed shapes.  And that really tracks exactly what you see in the claims, that you have multiple subcarriers.  That was the blue.  You had a pulse shaping waveform that you multiplied times the multiple subcarriers.  That's expressly in the claims. That's why the time signal is over there, right?  And then you get this result which is your modified shaping. And the only requirement of the pulse shaping waveform is it has two amplitudes.

And then we can see over on the right-hand side the specification talks exactly about that, that the pulse shaping waveform -- "pulse shaping by multiplying x(t) by the pulse shaping function" w of t -- that's just taking the eight bumps and multiplying it by the red line in 3A -- "will attenuate the first and last portions of the signal."  That's flattening out those side bumps.

And as it explains in column 9, "The critical factor is that the pulse shaping function have a portion of its amplitude less than its maximum amplitude so that the transmitted waveform is shaped by the pulse shaping." That's tracking the exact language that we see in the claim.  And that's why the defendants' construction that

188

we're proposing is it's "a waveform that changes the shape of said first data signal."  First data signal is basically what you see in figure 2, the multiple subcarriers.

I mentioned before that -- and we heard from the plaintiffs -- this is a term of art.  It is a term of art, but it's also a well-known term of art.  And you can go to dictionary after dictionary in the field, and you'll see it explains exactly what pulse shaping is.

The McGraw-Hill Illustrated Dictionary of Personal Computers, 1995, pulse shaping is "intentionally changing the shape of a pulse."

The IEEE Standard Dictionary of Electrical and Electronics Terms, 1996, pulse shaping, "intentionally changing the shape of a pulse."

Modern Dictionary of Electronics, 1997, 6th Edition, pulse shaping, "intentionally changing the shape of a pulse."

So, you see in the extrinsic evidence consistency in how people in the art are looking at pulse shaping.

And, by the way, let's go back two slides and look at column 9 in the specification.  That's also what they said in the patent itself.  They're not using any different notion of pulse shaping here.  "The critical

factor is that the pulse shaping function have a portion of its amplitude less than its maximum amplitude so that the transmitted waveform is shaped by the pulse shaping." The evidence is very consistent here.

So, what's really going on when we return to the Ericsson construction? What are they trying to do here? Well, I have the Ericsson construction on the left of Slide 19, the specification on the right. What they have done is they have given a construction that reads in two of many potential results of pulse shaping explicitly into this term to read it into the claims, "time dispersion" and "intersymbol interference." If we look at the patent, you'll see that, in fact, not only should we not be reading any of the specific results, I think, into it because it's not required by the claim, it's not required by anything, any specification, it's just exemplary results; but they have also been selective in what they picked.

So, there is time dispersion discussed in the specification, column 3, lines 50 to 62. It talks about "Doppler spread effects"; so, frequency-based factor. They talk about "reducing out of band interference"; that's the second red highlighted portion. They talk about correcting for "frequency synchronization errors." To be quite honest, there's a lot of other things you

could do with pulse shaping.  These are all just examples, and they have no business being read into the claims.

The other thing that I would just mention, the last point I'll make, is, again, what you correct for, which of these four specific things or any of the other channel impairments you can correct for depends on your system.  So, for example, the patent talks about something called "guard bands."  Now, they actually use this to distinguish it from the invention.  So, I'm not suggesting guard bands are a result or a technique of multiplying by a pulse shaping function.  But what's interesting is the patent specifically notes that you can use guard bands to solve for the time dispersion problem.  Right?  And guard bands are, in very simple terms, space stuff out more.  If you have more space, you don't have as much interference between the successive transmissions.

So, if you had a system that used, let's say, guard bands and pulse shaping, you may not need to solve for time dispersion at all.  And that's why really when you start reading in these specific examples, you're basically reading in particular implementations that happen to be of interest to the plaintiff into the claims; and there's no basis in the intrinsic record to

191

do that.

Thank you, your Honor.

THE COURT:  Thank you.

Counsel.

MR. STEVENSON:  Short response?

THE COURT:  Yes, please.

MR. STEVENSON:  Thank you.

Boiled down to a nutshell, the parties agree that pulse shaping is a term of art, the parties agree that it needs to be defined.  It is a technical term. And what you've seen on the one hand are definitions proposed by the defendants which come out of general purpose electrical engineering dictionaries for pulse shaping.  You saw three definitions.

On the other hand, Ericsson has proposed the definition from the specification of the patent.  We took it almost verbatim.  I think any perusal of Federal Circuit case law will show you that dictionaries are extrinsic evidence and they fall, in the claim construction hierarchy, far below the intrinsic evidence in the specification.  So, if we both agree we need a definition, let's take the definition that is context specific out of the patent specification.

THE COURT:  Any response to that?

MR. AROVAS:  Yeah.  Actually we can leave this

up on the screen.  You know, first of all, this quote that you're looking at from column 3 isn't purporting to define pulse shaping at all.  It's purporting to describe the general result of the overall invention which is a product of all the different steps put together.

I'm a little perplexed by the argument being made by the plaintiff.  Because something is a technical term or a term of art doesn't mean that it's explicitly defined in the specification.  So, I'm not sure if they're arguing there is an express definition and therefore you have to go to the specification and you have to use one quote as opposed to another quote.  It doesn't seem to be what's in the briefing.  In any event, it is a term of art.  It's a technical term.  We understand it in the context of the specification, of course, in addition to the claims.

I am not suggesting and have never suggested and we don't suggest in the briefs that you would elevate the dictionary definitions over the intrinsic evidence in any way, shape, or form.  Those are cited merely as additional evidence to show that in fact the definition put forward by the defendants and in fact the description of the critical factor of pulse shaping as opposed to the invention is in fact all consistent, but I'm not suggesting we start with the dictionary definitions at

all.

We start with the claim.  We see that the claim says what shape we need.  The shape will define the results.

We go to the specification.  Okay.  The specification tells us the critical factor is the pulse shaping, change the shape with these two amplitudes, directly tracks the claims.  So, that is the specification lining up exactly with the claims.

And we know that there are many different techniques that can be used.  In fact, we heard in the opening comments by the plaintiff that there are many. There are different filters.  There are all sorts of different techniques that can be used in combination to create a system.  There is absolutely no evidence in this patent, nothing in the intrinsic evidence, that would suggest you take this one quote that the plaintiffs have provided you and use that as an express definition for the term "pulse shaping," particularly when you have other portions specifically talking about the critical facts about pulse shaping that don't have any of these limitations.

THE COURT:  Thank you, counsel.

Let's go on to the next term.

MR. STEVENSON:  The next and final term is

"performing an N'-point inverse fast fourier transform." And I'll be fairly brief about this.

We have construed this as "performing an N'-point IFFT such that N' refers to the number of IFFT points that are required as a result of the pulse shaping waveform used," and that's really just straight out of the specification.

The defendants define it as "performing an N'-point IFFT such that N' refers" -- and here's the disputed part -- "refers to an adjusted number of subcarriers depending on the pulse shaping waveform used."  So, they put in the phrase "adjusted number of subcarriers."

My dispute over this relates to a special case that I think they are reading out and I want to make sure it doesn't get read out and that is the following: You're not always going to have an adjusted number of subcarriers.  In the patent -- I believe it's at the top of column 9 -- there is a discussion about an example using a -- I think it's the Hanning function where they apply a rolloff factor which they term "B."

THE COURT:  The spec just says it may apply. It doesn't make it mandatory.

MR. STEVENSON:  Right, exactly.

And what will happen is depending on the

aggressiveness of your rolloff on your pulse shaping waveform, that's going to then result in fewer subcarriers after you apply.  So, in other words, if you have a very aggressive rolloff, a very aggressive pulse shape, you get many fewer subcarriers but you have better isolation and you have better error resistance because they're further apart, essentially.

On the other hand, you could go with a much milder pulse shaping waveform.  It's still pulse shaping, but you haven't affected the number of subcarriers.  So, there's a spectrum there.  The more aggressive, the more rolloff you have in the way you apply to your group of subcarriers, the more isolation you get from noise effects and the fewer subcarriers you get and vice versa. If you're at the other end of the spectrum, you may do a little bit of pulse shaping and not really affect your number of subcarriers; and that's where I quibble with the point "adjusted."

So, if "adjusted" can mean that the number of subcarriers hasn't dropped from, you know, when you -- before you did the IFFT to after you did the IFFT, I don't have a problem.  If, however, this requires a drop, I think they're reading out one end of the spectrum, which is not fair because we shouldn't be reading out embodiments.  And that's my issue.

THE COURT:  Counsel.

Does -- your proposal seems to suggest that adjustment is always necessary.

MR. AROVAS:  I think it is, your Honor.

THE COURT:  You think it is?

MR. AROVAS:  Yeah, I do think it is.

If we could switch the decks, that would be great.  Thank you very much.

First of all, I think it's important to keep in mind where we are in the claims.  We're at a dependent claim.  Okay?  So, I don't believe in claim 1, the independent claim, that an adjustment is necessarily required.  In fact, it's not required at all.  And that was actually the point I made in my opening comments when we were talking about that term.  We're talking here about a dependent claim that uses N' IFFT.  So, when you look at the patent and you say there are embodiments that don't have an adjustment and there are embodiments that do have an adjustment, I agree with that.  It's covered in the claims and, in fact, it's not so atypical that you'll have a dependent claim that will go to one approach whereas the more general claims might cover multiple embodiments.  So, claim 6 using an N'-point inverse fast fourier transform is referring to the situation or the embodiment where you are making the

adjustment.

And I think one thing that's important to keep in mind here with N', because I think it's a little different than the other terms we've talked about today, there is no ordinary meaning of N'. All right? There is no -- the normal formula for OFDM uses N, and it's just a variable. It's the number of subcarriers you have. They have a specific embodiment to N' where they are deviating from the normal approach and they're using N'. If you go to the literature and say "What's N'," there's no ordinary meaning of that term. The only meaning we're going to get from that term, or that variable N' as opposed to N, is from this patent.

So, what is the real difference? There's the difference between the two constructions that they say the number of "points that are required as a result of the pulse shaping waveform" -- so, seeming to impose some requirement which could be driven by bandwidth, it could be driven by all sorts of other facts -- or versus "adjusted" which is actually the term used by the patent in the express definitions of N' over and over again.

And then there's a second point that comes up in the briefing that wasn't raised in argument -- I'm not sure if it's no longer an issue -- but whether the defendants' construction is using "subcarriers" instead

of "IFFT points" is correct.  They're mathematically identical; so, that's why in our construction I put in brackets "IFFT points," because it doesn't really matter. They're the same.  Use a five-point IFFT, you get five subcarriers; six gives you six.  They're identical.

So, I think in terms of substance, what this dispute really comes down to is using the word "adjusted" versus using the word "required."  So, let's take a look at it.

Starting point is always the claims. "N'-point inverse fast fourier transform," the main point here is N' is a variable specifically used in this patent.  Has no ordinary meaning outside the context of this patent.

What does it do?  Well, the patent itself -- I'm glad we talked about the multiple embodiments because the patent tolerates all sorts of different types of pulse shaping waveforms.  You could very mildly shape it and fit everything potentially in the same channel.  You could have a wide channel and have lots of extra room in the sides that you're not using that you could then spread and take.  Right?

THE COURT:  Right.

MR. AROVAS:  So, the issue -- these claims are agnostic to the particular bandwidth of your channel.

Claim Construction Hearing

199

Right?  They're dealing with how are you dealing with the subcarrier.  So, there's lots of situations where you could use even a more aggressive pulse shaping if you have the extra room in your bandwidth and not need to cut it down.  That's just not what this dependent claim is talking about.  So, the patent does contrast N' with N.

And I think it's interesting to look at the formulas in the patent.  I'm on Slide 26.  And what I've done in Slide 26, I've done a side-by-side of what the patent says about N versus what the patent says about N'.

So, first, looking at the left, you have conventional OFDM.  That's what's out there in the art.  That formula right there is as old as the hills.  "The sum of all N signals is called an OFDM signal," and then it obviously gives the formula below.  You can see I circled the "N" in the formula at the bottom.  It actually goes to N minus 1 because it starts at zero instead of 1.  But it's N subcarrier.  So, if N is 8, there's 8 columns, 8 subcarriers.  If N is 4, there's 4 bumps, four subcarriers.  And that's how OFDM works.

Then if you look at the right and say, well, what do they say about N', this variable that they're defining in this patent?  In the invention the transmitted OFDM signal -- so, where you're going to be constrained because of whatever pulse shaping waveform

you use -- x(t) for each time period is given by this different formula.  It's a little hard to read; but if you look at the patent, you'll see there's a little "prime" by that N; and I circled that in red.  Okay?

So, they're saying in this embodiment, the N' dependent claim, that we're now going to take the exact same formula from the left, the conventional of the N, we're going to use N'.  Because if you'll notice, right after the equal sign there's that w(t).  That's that pulse shaping waveform.  So, now you're going to pulse shape; and now you're going to go to N' instead of N. And that's -- but the OFDM formula itself is identical. So, it's conventional at the N, modified to use N' instead of N.

The patent tells us exactly what they mean by N', (reading) the number N' of data symbols $C_k$ transmitted equals the number N' of subcarriers used and is defined as N' equals N divided by alpha -- all right -- this factor.  And it says (reading) where alpha is a frequency adjustment factor that depends on the pulse shaping waveform w(t) used.

So, the word "adjustment" is coming from the express definition of N' that we see in the patent where they're telling you how is our formula with N' different from the conventional formula known in the art for OFDM.

Well, here's the difference.  It's N, which is the conventional, divided by an adjustment factor.  So, there clearly is an adjustment happening; and "adjustment" is the word used in their definition.

THE COURT:  Could alpha have any type of -- well, go ahead.  I'm sorry.

I was -- could alpha have any type of -- well, there's always going to be -- according to the formula, there's always going to be a frequency adjustment factor for N'.  That's what you're saying?

MR. AROVAS:  That's what I'm saying.  That's where the term "adjustment" comes in the defense construction, is from here we can see that the specification couldn't be any clearer on -- in this embodiment, the embodiment where you're going to use N' instead of N, because keep in mind claim 1 allows you to use N.  In that embodiment it says (reading) N' of subcarriers used and is defined as N' equals N over alpha.  Right?  That's the express definition of a term that had no ordinary meaning in the art.

And then we can still -- so, slide -- Slide 28 we see the correlation between the language used in the defendants' construction and the express intrinsic evidence.  It's directly tracking it.

THE COURT:  Why am I not -- I'm looking at

column 6, lines 5 through 8, is where I got my language. And I may not -- "therefore, using a particular pulse shaping function may require adjustment in the choice of subcarriers."

MR. AROVAS:  Yeah.  I actually have a slide on that later, but let me just talk about it generally. That's the difference between 6 and 1.  So, they're really saying that you could have a very modest pulse shaping function, w(t), which let's say it doesn't expand enough, that has very slight changes where you may not need to reduce the number of subcarriers.  You could have extra room in your channel so that you can tolerate whatever level of expansion you get through pulse shaping.  Those are just examples of embodiments, and those are covered by claim 1.

All right.  The issue is when you use N' -- I mean, every one of these functions is going to have a rolloff of some sort, right?  Because if it doesn't have any rolloff, if it's flat, that goes back to the term we were just talking about before.

THE COURT:  Right.

MR. AROVAS:  It's not going to do -- it's not going to pulse shape.  Right?  So, the rolloff and the effect of the rolloff exists independent of whether or not you're going to use this technique by using N'.

203

THE COURT:  Okay.

MR. AROVAS:  So, just because you see rolloff, you see w(t), that doesn't mean you're in claim 6 land as opposed to claim 1.  It just means that you're using a pulse shaping function which is going to have some rolloff.

Now, the rolloff is used in the equations to calculate if you are going to make an adjustment, if you are going to be in the world of claim 6, how you do that.  All right?  So, there certainly is a relationship between those that you'll see in the intrinsic evidence; but that doesn't mean that N' is not defined as N over alpha.

THE COURT:  Okay.  One further step when you go further in column 6, it defines the frequency adjustment factor as 2 minus -- is that -- I can't read that.

MR. AROVAS:  Which line are you on?

THE COURT:  Column 6 of the '516, lines 11 and 12.  It actually defines the frequency adjustment factor.

MR. AROVAS:  You know what?  I have that on a slide.  Let's jump to Slide 31, and that way we can get it on the screen.

THE COURT:  Okay.

MR. AROVAS:  I was going to talk about that a little later.  And this is what I was trying to explain

more generally.  There is a relationship between the shape of a pulse shaping waveform and alpha, the adjustment factor.  Right?  So, the B is describing -- remembering when we were looking at that picture 3A?  We saw one that was kind of flat and then had a more gentle curve at the end and then one that had a more aggressive curve.  So, this factor B is describing how is this thing -- how fast is it running off or how aggressive is that shape.

THE COURT:  Right.

MR. AROVAS:  And as you change that shape, you're going to change the -- how the OFDM signal expands.  Right?  So, the N' you're going to use is going to depend -- if you have a very modest adjustment, you may only lose one -- for example, you know, one subcarrier.  If you have an aggressive one, maybe lose four.  I'm sure you could lose even more.  And that's just relating the shape to the adjustment.  Okay?

THE COURT:  But mathematically speaking, though, since we're dealing with N' and we've got a formula for the frequency adjustment factor, could that ever numerically come to zero and therefore there be no adjustment in that particular -- or am I just completely off base?

MR. AROVAS:  I know what you're getting at,

your Honor.

THE COURT:  Yeah.

MR. AROVAS:  So, could you have -- the question is, I think, could you have a rolloff factor that makes alpha 1 which -- if you put 1 into the equation --

THE COURT:  Right.

MR. AROVAS:  -- then N equals N' and then you have no adjustment.

THE COURT:  Right.

MR. AROVAS:  Okay.  Yes.  I think the answer is yes, you could of course have that.

THE COURT:  I said zero, but I meant 1.

MR. AROVAS:  Yes.  So, that would happen in the situation where B equals zero.

If I could just have the Elmo for a second.

Actually it's specifically discussed in the patent; so, I'll just point you to one spot.

THE COURT:  Yeah, but got to the top of column 6.

MR. AROVAS:  Right.  So, the top of column 6 (reading) setting B equal to zero is equivalent to using no pulse shaping at all and results in the spectra shown for no pulse shaping.

So, it's really not a situation that --

certainly you can do it in the system.  It's not a situation that is, I think, within the scope of what we're talking about in these claims.  This is a dependent claim off an independent claim that's requiring pulse shaping and explicitly requiring those two different amplitudes.  So, you're not going to be in the world of B equals zero; but I want to be clear that certainly it's possible to do it mathematically.

THE COURT:  Mathematically possible.  Okay.  Thank you.

Counsel.

MR. STEVENSON:  Will you leave those slides up?

Thank you.  Perfect.

So, here's the issue.  Can the adjustment factor alpha be 1?  Yes, it can.  There's nothing in the patent that says it can't.  And if it's 1, N' equals N.

Now, if we go back one more slide in Mr. Arovas' deck and -- maybe two.

There we go.

Here's really the issue on the rolloff B. What happens is if B is non-zero -- and, in fact, before I get into this, let me set the stage and invite the court, if you have a copy of the patent, to look at column 9.

THE COURT:  Uh-huh.

MR. STEVENSON:  Right at the beginning of column 9 -- I think this is a good lead-in for my argument and explanation -- it says, "As the rolloff factor B of the pulse shaping function chosen moves from 1 toward 0, the number of usable frequencies increases while the spectral decay rate and ISI immunity decreases."  Okay.  That's the trade-off I talked about before.

So, if you have the maximum rolloff, which is B equals 1, you're being as aggressive as possible with your waveform; and that gives you the reduction -- maximum reduction you're going to get from the N to N' world.  All right?  So, B equals 1 maximizes the aggressiveness.  It maximizes your isolation, but it also minimizes the number of subcarriers you end up with at the end of the IFFT.  Let's say B equals 1 here.  You've gone from eight to four.

It goes on and says, "By choosing a particular pulse shaping function, the number of usable frequencies can be increased by trading off speed in the rate of spectral decay.  The particular pulse shaping function used may be chosen according to the requirements of the particular system in which the invention is implemented. For example, figures 3B and 3C show for the pulse shaping

function given by $w_1(t)$, which has a rolloff factor B of ½, the number of usable frequencies decreases by a factor of one and a half, as opposed to a factor of two when B equals one.  However, the lower B results in less ISI immunity."

What happens, though, is as the rolloff factor increases more and more, the effect on the number of usual frequencies you get is sort of a discrete quantum jump.  Right?  So, in other words, what happens is you're not going to have half a frequency.  If you start out with 8, you're going to go -- your first step point is going to go to 7, then down to 6, then to 5, then to 4, then to 3, then 2, then 1.  So, what happens is if B is zero, you're not going to have any change.  8 in, 8 out. If B is small enough, you're still getting pulse shaping; but you still may end up with 8 frequencies left at the end of the day.  In that case you would not have the adjustment but you would still have pulse shaping and that is what they're trying to read out.  That's why I think their construction is incorrect.

There is nothing in the patent that says N' cannot equal N, the number of subcarriers before and after the IFFT cannot be the same.  And Mr. Arovas is not going to be able to show you anywhere in the patent where it says N' cannot equal N; and in that case the alpha,

which is just, you know, the divisional product, equals 1.  And that is not precluded by the patent.

THE COURT:  Stay right there.  Let me think of something.

MR. STEVENSON:  Okay.

THE COURT:  Okay.

MR. STEVENSON:  And the final comment is the court identified column 6 where it says "using a particular pulse shaping function may require adjustment in the choice of subcarriers" and you asked Mr. Arovas about that and he said, "Yes, I can see a situation where you have the same number of subcarriers before and after."  That is the admission I think that proves my point, which is N' doesn't necessarily always have to be an adjustment.  Therefore, the word "adjustment," which doesn't appear anywhere in the claims, shouldn't be read in because what that does is it reads out the situation where there is mild pulse shaping that doesn't result in a decrease in the number of subcarriers; and that's exactly the point that the patent is getting to in column 6.

THE COURT:  Okay.  Mr. Arovas, you get the last thought.

MR. AROVAS:  All right.  Thank you.

THE COURT:  You're welcome.

MR. AROVAS:  Well, I can't miss that opportunity to show you something in the patent that says exactly what I'm supposed to not be able to show.

THE COURT:  Show me.

MR. AROVAS:  Let me start with the claim, and then I'm going to show you why that portion of the patent matters.

Let's go to Slide 23, if we could.

Okay.  We're dealing with two claims here, right?  The claims and requirements.  The N' comes up in dependent claim claim 6.  So, that is going to have each and every one of the limitations of claim 1.

What do we know about claim 1?  Well, claim 1 says you're going to modulate a plurality of data symbols onto these subcarriers and then you're going to multiply that data symbol by a pulse shaping waveform -- okay -- and that pulse shaping waveform must have these two amplitudes.  6 depends on that.  So, you already know you're using pulse shaping, you're using a pulse shaping waveform before you get to 6.  Okay?

What do we know about the example that Mr. Stevenson is telling you about?  It's no pulse shaping.  That was column 6.  We looked at it at the top where it says where alpha is 1 or B equals zero -- if we go to column 6.

THE COURT:  No pulse shaping occurs.

MR. AROVAS:  Right.  The top of column 6, first line, "Setting B equal 0 is equivalent to using no pulse shaping at all and results in the spectra shown for no pulse shaping."

What is that?  That's not within the scope of claim 1; it's not within the scope of claim 6 because it's not -- because it's a dependent claim to 1.

So, the patent is in fact explicitly telling us that in the N' situation of claim 6, we are using pulse shaping and B does not equal zero because it couldn't fall within that claim.  And, so, the patent has specifically, in fact, told us that.

What's also interesting, I think, about what the plaintiff wants to rely on is if we look at -- in fact, if we can just have the Elmo for a second.  If we look at the bottom of column 8.

THE COURT:  Column 8?

MR. AROVAS:  Column 8, second-to-last line.

It says, "Using the Hanning function for pulse shaping reduces the number of usable subcarrier frequencies by a factor of 2."

And then if we continue on to 9, "As the rolloff factor B of the pulse shaping function chosen moves from 1 toward 0, the number of usable frequencies

212

increases while the spectral decay rate and ISI immunity decreases."  So, that's the part of the spec that the plaintiff wants to keep coming back to.

And what's interesting is that is a different dependent claim.  As we just saw, that is the situation where you're using a Hanning function specifically, a specific type of situation; and that is dependent claim 5, a different claim, dependent claim.  So, we shouldn't be using the Hanning function to interpret claim 6 which is just generally N', not to mention the fact that we already know from the independent claim that we're going to be using pulse shaping, not a situation where B equals zero.

So, starting the way we have to with the claim, we know we don't have B equals zero.  We go to the definition of N'.  It's an express definition of a term that has no meaning in the art other than that definition in the specification.  It specifically has an adjustment factor.  We know the adjustment factor can't be 1.  We know that.  So, N is not going to equal N'; and the word used in the definition is it is an "adjustment," which is exactly what we put in our construction.  So, it's from the claims and the express definition.

THE COURT:  Okay.  Thank you, counsel.

Okay.  I think that wraps it up.  What I'd

like from the parties is just as soon as possible, I'd like three copies of your slides.  I don't know if you have them with you.  I'd love to have them if you have them with you; and if you don't, send them to me as soon as possible.  I'm going to try to get something out just as quickly as I possibly can.

Anything else we need to do?

MR. AROVAS:  No.  Thank you, your Honor.

We have the slides.

THE COURT:  Okay.  Thank you.  We'll be in recess.

MR. STEVENSON:  Thank you, your Honor.

THE COURT:  Sorry to keep you during lunch.

Thank you.

(Proceedings adjourned, 3:26 p.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, JULY 13, 2012, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.


                          /s/
                         _____
                          TONYA JACKSON, RPR-CRR