IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| **ERICSSON INC., et al.,** § | |
| § | |
| Plaintiffs, § | |
| § | |
| vs. § | CASE NO. 6:10-CV-473 |
| § | |
| **D-LINK CORPORATION, et al.,** § | |
| § | |
| Defendants. § | |
| § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants'[1] Motion to Exclude the Opinions of Mr. John R. Bone Regarding Issues Related to Damages (Docket No. 364) ("Motion"). The Court heard oral argument on May 9, 2013. For the reasons set forth below, the Motion is **DENIED**.

## BACKGROUND

This is a standards case. The Plaintiff Ericsson[2] contends its asserted patents cover two features of the IEEE 802.11n standard. Ericsson's damages expert, John Bone, relied on previous Ericsson 802.11 licenses to determine a per unit royalty for each licensed product. Bone then applied his per unit royalty to the accused products to calculate a reasonable royalty. Defendants contend Bone's analysis violates the entire market value rule because Ericsson did not prove that the patented features were the basis for customer demand of the accused products.

---

[1] "Defendants" refers to D-Link Systems, Inc., Netgear, Inc., Acer, Inc., Acer America Corporation, Gateway, Inc., Dell, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation, Belkin International, Inc., and Intel Corporation.

[2] "Ericsson" refers to Ericsson Inc. and Telefonaktiebolaget LM Ericsson.

Bone's damage model is based on eight previous Ericsson licenses involving the asserted patents. From the previous licenses, Bone established a per unit royalty. Bone applied his per unit royalty to Defendants' accused products to determine his reasonable royalty. Defendants' objection is predominately with Bone's per unit royalty. Defendants contend Bone's royalty includes revenues associated with non-infringing features.

## APPLICABLE LAW

Federal Rule of Evidence 702 allows a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion or otherwise if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As a preliminary matter, district courts are asked to act as gatekeepers and exclude expert testimony from trial that is irrelevant or unreliable. FED. R. EVID. 104(a); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (discussing *Daubert v. Merrell Dow Pharm.* 509 U.S. 579, 593–94 (1993)). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 351 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93).

Courts will consider a nonexclusive list of factors to determine whether scientific expert testimony is reliable. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593–94 (1993). These factors include: (1) whether others can or have objectively tested the expert's technique or theory; (2) whether the technique or theory has been subject of peer review and publication; (3) the known or potential error rate of the technique or theory when applied; (4) the existence and

maintenance of standards and controls; and (5) whether the scientific community has generally accepted the technique or theory. FED. R. EVID. 702 (advisory committee notes, 2000 amendments); *Daubert*, 509 U.S. at 593–94.

However, the district courts are not "intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir. 1996); FED. R. EVID. 702 (advisory committee notes, 2000 amendments). "Vigorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Accordingly, if a party offering expert testimony can prove by a preponderance of the evidence that the expert is qualified, the expert's testimony is relevant, and the testimony is reliable, a court should not exclude it. *Id.* at 590–91.

## ANALYSIS

Defendants argue Mr. Bone's report should be excluded because he fails to apportion his royalty base between accused features and non-accused features. Motion at 10. Defendants contend Bone's lack of apportionment is in essence an attempt to side-step the requirements of the entire market value rule. *Id*. Defendants also argue Bone's report squarely violates the entire market value rule because he impermissibly uses the value of end products in his royalty base. *Id*. at 1. Defendants contend the accused features are found entirely within the chipset, one of many components in the larger end products. *Id*. at 2. However, the patented features within the chipset do not form the basis for customer demand of the end products. *Id*. at 8. Thus, Bone cannot use the value of the end products in his royalty analysis. *Id*. Instead, Bone's royalty base must be limited to the value of the chipsets, which Defendants contend are the smallest salable patent-practicing units. *Id*. at 5.

Ericsson makes two major arguments in support of Bone's report. First, Ericsson argues Bone's report does not implicate the entire market value rule. Docket No. 378 ("Response") at 9. Ericsson contends Bone's analysis is based purely on the number of units sold, not the price of the units sold. *Id*. Second, Ericsson contends Bone's report is consistent with other standards-based licenses of the same patents. *Id*. at 6. Ericsson asserts that a per unit royalty based on the number of products sold is common in standards licensing. *Id*. Further, Ericsson argues Bone's damages model ties the hypothetical negotiation to real world evidence. *Id*. at 8.

Defendants' apportionment argument ignores two different levels of apportionment in Bone's analysis. At the first level, Bone only considered revenue from the licensing of Ericsson's 802.11 portfolio. At the second level, Bone apportioned the 802.11 licensing revenue to extract the value attributed to non-asserted patents. Combined, these two levels limit the revenue pool to the market value of the asserted patents' contribution to the 802.11 standard.

The first level of apportionment reduced the revenue pool to the value of Ericsson's 802.11 contributions. On eight separate occasions, Ericsson licensed its 802.11 portfolio to third parties. *See* Docket No. 378, Ex. 1 ("Bone Report") at 37–38. Each license covered only a particular portion of the 802.11 standard—namely, the portion of the 802.11 standard the third party licensees believed was covered by Ericsson's portfolio. Defendants attempt to downplay the significance of these licenses, but they reflect a real-world valuation of Ericsson's 802.11 patents. *See Monsanto Co. v. McFarling*, 488 F.3d 973, 978–79 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a "reasonable" royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree."). The licensees would not have paid value for a license unless they believed Ericsson's patents covered at least a portion of the standard. Similarly, the licensees

4

would not have paid value for the portion of the standard not covered by Ericsson's patents. Consequently, the money paid under these licenses represents the market's valuation of the 802.11 contributions of Ericsson's patents. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)) ("The trial court must carefully tie proof of damages to the claimed invention's footprint in the market place.").

The six patents asserted in this case are not the entirety of Ericsson's 802.11 portfolio—they are only a subset of it.[3] However, Bone's second level of apportionment factors this into account. Bone stated he "very conservatively assumed that the Patents-in-Suit represent at least 50 percent of the total value of the Ericsson 802.11 Portfolio," and he reduced his per unit royalty accordingly. Bone Report at 90. While Defendants are free to cross-examine Bone on his valuation of the asserted patents in relation to the non-asserted Ericsson 802.11 patents, he makes a realistic and thorough attempt to apportion revenue to only the asserted patents.[4] *Compare VirnetX Inc. v. Cisco Sys., Inc.*, 2013 WL 789288, at *2 (E.D. Tex. Mar. 1, 2013) (Davis, J.). The end result of Bone's analysis is a royalty pool comprising money paid by third party licensees for the value of the asserted patents' contributions to the 802.11 standard. *See LaserDynamics,* 694 F.3d at 68 (requiring courts to examine only revenues associated with the patented components).

Defendants also argue Mr. Bone's analysis violates the entire market value rule by using the value of end products without proving the patented feature forms the basis for customer demand of the accused product. This argument fails for many of the same reasons as Defendants' apportionment argument. Bone's revenue base is not the market value of the end products. *See* Bone Report at 101 (providing a per unit royalty). Rather, it is the market value of the

---

[3] Ericsson owns 18 standard essential patents, six of which are asserted in this lawsuit. Bone Report at 24.
[4] Bone supported his 50 percent apportionment with approximately twenty pages of analysis. *See* Bone Report at 79–99.

contribution of the asserted patents to the end products. This distinction is critical to the analysis. The licensing revenue from Ericsson's portfolio is attributable only to the value Ericsson's patents add to the licensees' end products; it is not attributable to the end products as a whole. It goes without saying that the licensees would not have paid value for portions of the 802.11 standard unrelated to Ericsson's patents. Therefore, Mr. Bone's report does not implicate the entire market value rule. *See Versata Software, Inc. v. SAP Am., Inc.*, --- F.3d ----, 2013 WL 1810957, at *12 (Fed. Cir. May 1, 2013) (finding that a plaintiff's damage model did not implicate the entire market value rule because it "merely accounted for all infringing sales"); *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 833 (E.D. Tex. 2012) (Davis, J.).

Additionally, Bone's analysis calls for a per unit royalty on all sales of accused products. Bone Report at 34. As a per unit royalty, it does not fluctuate with the price of the end product. Regardless of the ultimate sale price of the end product, the royalty rate remains constant. This further illustrates that Mr. Bone does not rely on the value of end products in his analysis. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013) (determining that a plaintiff did not invoke the entire market value rule when it "never sought to justify its damages figure based on the price of the customer end products").

Lastly, Defendants argue Mr. Bone's report should be excluded because it fails to account for Ericsson's RAND obligations. Defendants first raised this argument at the hearing, and it has not been briefed by either side.[5] Further, Defendants did not cite any authority to support their position that failing to account for RAND obligations mandates striking Bone's report. For these reasons, Defendants' RAND arguments do not justify exclusion of Bone's report.

---

[5] Defendants' Motion only referenced Ericsson's RAND obligations in a footnote and in a string citation. *See* Motion at 12 n.4, 13. Defendants' Reply only references RAND in a footnote. *See* Docket No. 393 at 1.

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Exclude the Opinions of John Bone (Docket No. 364) is **DENIED**.

**So ORDERED and SIGNED this 20th day of May, 2013.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**