IN THE UNITED STATES DISTRICT COURT

                  FOR THE EASTERN DISTRICT OF TEXAS

                            TYLER DIVISION

ERICSSON, INC., ET AL.   )(

                         )(   CIVIL DOCKET NO.

                         )(   6:10-CV-473-LED-KFG

VS.                      )(   Tyler, TEXAS

                         )(

D-LINK CORPORATION,      )(   MAY 23, 2013

ET AL.                   )(   9:00 A.M.

                      PRE-TRIAL CONFERENCE

          BEFORE THE HONORABLE JUDGE LEONARD E. DAVIS

                  UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFFS:  (See attached sign-in sheet.)


FOR THE DEFENDANTS:  (See attached sign-in sheet.)


COURT REPORTER:        MS. SHELLY HOLMES, CSR
                       Deputy Official Court Reporter
                       2593 Myrtle Road
                       Diana, Texas 75640
                       (903) 663-5082


(Proceedings recorded by mechanical stenography,
transcript produced on a CAT system.)

                        I N D E X

May 23, 2013

                                        Page

Appearances                              1

Hearing                                  3

Court Reporter's Certificate            136

COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated.

All right. Ms. King, if you'll call the case, please.

COURTROOM DEPUTY: The Court calls Case No. 6:10-CV-473, Ericsson, Inc., et al., versus D-Link Corporation, et al.

THE COURT: Okay. Announcements?

MR. STEVENSON: Good morning, Your Honor. Ted Stevenson with McKool Smith for Ericsson, Inc., and LM Ericsson. With me here today are Justin Nemunaitis, Warren Lipschitz, John Campbell, Sam Baxter, and Ashley Moore, and we're ready to proceed.

THE COURT: All right.

MR. JONES: Your Honor, for Intel, Mike Jones, Greg Arovas, Luke Dauchot, Tim Majors, Adam Alper, Sarah Piepmeier, Michael DeVries, and also Mr. Ben Ostapuk from Intel.

THE COURT: Okay.

MR. JONES: Thank you, Your Honor. We're ready to proceed.

THE COURT: Okay. Thank you.

MR. VAN NEST: Your Honor, Bob Van Nest, Keker & Van Nest, for Defendants Acer, D-Link, and NETGEAR. Good morning, Your Honor.

THE COURT: Good morning.

MR. YAGURA: Good morning, Your Honor. Ryan Yagura with O'Melveny & Myers on behalf of Belkin, and with me are Dawn Sestito and Kevin Murray.

THE COURT: Okay.

MS. DACUS: Good morning, Judge. Shannon Dacus here on behalf of Dell. I have with me at counsel table Frank Smith. Also with me are Mike Newton, Brady Cox, and Lauren Hoffer. We're ready to proceed.

THE COURT: Thank you.

MR. HARRISON: Your Honor, Guy Harrison on behalf of Toshiba. I'm with John Feldhaus and Kevin Malaney from Foley and Lardner.

THE COURT: Thank you. Is that it?

All right. A good looking jury over there this morning.

All right. We've got our pre-trial this morning. We have quite a few things.

Did the -- have the parties discussed how they'd like to proceed? Maybe what's most important first or --

MR. STEVENSON: Yes, Your Honor. From the Plaintiffs' perspective, we have four things on the agenda that we'd like to request the Court take up.

The first is there's a partial summary

judgment motion on Dell's license defense.

Secondly, there's the resumption of the Daubert motion on -- I think Mr. Cabello, the defense expert on willfulness, that was partially argued at the motions hearing.

The third is there's an issue regarding source code availability during trial under the Court's protective order.

And then, lastly, of course, motions in limine. I'm pleased to announce we've reached agreement on several more of the motions in limine that we can present to the Court when we get there.

THE COURT: All right.

MR. STEVENSON: And in addition, a couple other agreement I just wanted to inform the Court of. The first is we've reached agreement on narrowing claims and prior art. The Plaintiff has narrowed down to 15 claims to present, and the Defendants have agreed to narrow it down to four discreet prior art theories per reference by this Saturday at 5:00 p.m.

THE COURT: Is that correct? Anybody disagree with that from the Defendants?

MR. VAN NEST: No, Your Honor. It's four references per claim, just to be clear.

MR. STEVENSON: Right.

MR. VAN NEST: But, no, we agree with that.

THE COURT: Okay.

MR. STEVENSON: And there -- we've also reached an agreement on trial disclosure between the parties with regard to demonstratives, exhibits, and that's memorialized in writings between the parties. If the Court would like to hear it, I can read it, but if the Court would like to dispense, it's the typical agreement we have in these sorts of cases.

THE COURT: I'm glad you agree. That's fine.

MR. STEVENSON: Thank you.

THE COURT: Okay. Defendants have any particular order or anything they -- is the order that Mr. Stevenson outlined satisfactory to Defendants?

MR. VAN NEST: I think the order that counsel's outlined is fine, Your Honor.

THE COURT: Okay. Well, let's start with Ericsson's motion for partial summary judgment and/or to exclude Dell's license defenses, Docket No. 431.

MR. STEVENSON: The basis of this partial summary judgment and the crux of it is basically that Dell found a clause in an old purchase agreement between a Dell subsidiary and an Ericsson subsidiary, neither of whom are parties to this case that Dell claims gives

them a license defense.

Now, that clause has nothing to do with patents. It's not a license at all. And neither of the two Ericsson party Plaintiffs, LM Ericsson or Ericsson, Inc., are signatories or parties to that purchase agreement.

So let me start with the relevant timeline which begins in February of 2008. Back in February of 2008, Dell Products LP, the subsidiary of Dell, Inc., wanted to buy cellular modules to put in its computers, and these have nothing to do with 802.11. They're cellular modules. And Dell Products LP has nothing to do with this case. It's not a party, and there's no allegations of infringement against it.

The products Dell Products LP selected were from Ericsson AB, as its supplier. And Ericsson AB is not a party here either. It doesn't own and has never had any ownership interest in the patents-in-suit. The patents-in-suit were directly assigned by the employees at Ericsson who invented them to LM Ericsson, publicly traded company, that is the parent corporation within the Ericsson affiliates.

THE COURT: They didn't go through AB?

MR. STEVENSON: No, the employees -- some of the employees work for AB, some of the employees work

for Ericsson, Inc., some of the employees work for other -- Ericsson Germany and other Ericsson companies, but they executed assignments direct to LM Ericsson, not -- it wasn't Ericsson AB and then Ericsson AB to LM Ericsson.

And the parent, LM Ericsson, at all relevant times has owned the patents-in-suit and really virtually all the patents owned by Ericsson as a result of its activities.

Now, when the parties agreed Dell Products LP and Ericsson AB on this purchase agreement for cellular modules, Dell Products sent one of its standard form master purchase agreements to Ericsson AB.

THE COURT: I was going to ask, who -- who drafted that master agreement?

MR. STEVENSON: It's a -- it's a Dell form. And you can tell by looking at the bottom, it's Dell confidential, and then it says, template revision 12/14/2005 on the bottom footer.

THE COURT: Is there any evidence of negotiation, or was it just the form sent and signed?

MR. STEVENSON: No evidence of negotiation in the record.

THE COURT: Okay. All right.

MR. STEVENSON: This was signed by a

business person for Ericsson AB who was not involved in patent licensing or patent assertion, as you would expect in a deal such as this.

Now, after the ink was dry on this deal, the parties went about their business and Dell Products LP brought cellular modules from Ericsson AB. And then we fast forward to where Dell's involvement in this lawsuit begins, and that's two years later, in March of 2000 --

THE COURT: And let me be sure this purchase agreement, it was just for products, it did not involve patents at all?

MR. STEVENSON: Correct. There wasn't any patent license in this. There were some indemnity provisions -- to be very complete in answer to your question, there were some indemnity provisions in here that provide if Ericsson's products that they're selling to Dell infringe somebody else's patents, there may be an indemnity to that, but there's -- there's no discussion of, you know, patent licenses or a patent agreement from Ericsson to Dell.

THE COURT: All right.

MR. STEVENSON: Now, two years after the ink is dry on this, March of 2010, Dell's involvement in this lawsuit began. It started out when Ericsson, Inc., a subsidiary of LM Ericsson, and a completely separate

company from Ericsson AB, sent Dell, Inc., the parent company, a demand letter for patents involved in this lawsuit.

Several months later, in September of 2010, we filed this lawsuit, but because -- and LM Ericsson and Ericsson, Inc., were the Plaintiffs -- but because Ericsson was still negotiating with Dell over a potential resolution, they weren't included in the original filing. When the negotiations reached impasse, in June of 2011, we amended this complaint to add Dell, Inc., to the lawsuit as a Defendant and Dell answered but said nothing about this February 2008 agreement. So it's completely silent on it.

Now, if we fast forward to a year later -- more than a year later, August 13, 2012, after Dell had been in this suit for 14 months, it sent a letter to Ericsson attaching a copy of this February 2008 master purchase agreement and suggesting that it barred Ericsson from pursuing its claims in this matter. So when we got that letter, we, of course, quickly looked at this document. The first thing that jumped out was it's an agreement between Dell Products LP -- LP and Ericsson AB, neither of which are parties to this suit.

The other thing that jumped out was the -- and -- and Dell directed our attention to the portion

that it claims is the promise that bars the suit, and that's on Page 3 at Paragraph 12.

And this is a dispute resolution clause. Dell points to 12.1(a), which says, supplier will not commence any lawsuit -- and supplier is Ericsson AB, and it is defined as Ericsson AB and does not include any affiliates. It's just Ericsson AB. It says, supplier will not commence any lawsuit or seek judicial order affecting Dell. And Dell in this agreement, Your Honor, is defined as Dell Products LP, plus its affiliates.

THE COURT: And that's in Paragraph 1.0?

MR. STEVENSON: Yes, exactly.

So that -- that's the -- the -- the distinction. Dell was described as affiliates. Ericsson AB is never -- as supplier is never defined as including affiliates.

So it says, supplier will not commence any lawsuit or seek any judicial order affecting Dell or add Dell as a party to any pending legal or administrative proceeding that is not directly related to Dell's purchase of products or that may prevent Dell from shipping any Dell or third-party products.

And Dell's position in the letter was this is a broad covenant not to sue. In other words, AB can't sue any Dell company for anything that isn't the

purchase of products, which presumably would include if somebody at Dell hacked into Ericsson's computers and stole a bunch of trade secret information. And I think it's an overbroad reading, but that's the reading they put in their letter.

I'll also observe that Paragraph D on the next column contains an arbitration provision that says, any breaches of this agreement should be resolved by arbitration.

And then 12.2 contains a survival clause which purportedly states that these promises, including the one in Paragraph 12, will survive any termination or expiration of this agreement. And I would suggest that Dell may be taking the position that this is a perpetual deal.

Now, eight days after receiving the letter from Dell, Ericsson responded, and we sent them back a letter saying, this MPA, master purchase agreement, it only applies to AB, it doesn't apply to Ericsson, Inc. It doesn't apply to LM Ericsson. They're not signatories, and it has no bearing on this case.

And then we heard nothing from Dell for over four months, while this case was going on, nothing. And then in December 20th, 2012, after the close of discovery, Dell filed a motion for leave to amend its

answer to assert this master purchase agreement as a defense in this case. And at the motion hearing, the Court granted that and we filed this summary judgment motion.

There were five grounds, Your Honor, that I think independently compel a grant of summary judgment here.

THE COURT: Before -- before you leave the facts --

MR. STEVENSON: Yes.

THE COURT: -- explain to me basically the relationship between Ericsson AB and Ericsson LM and in what ways they operate separately or jointly.

MR. STEVENSON: LM Ericsson is the publicly traded parent corporation.

THE COURT: It's what?

MR. STEVENSON: The publicly traded parent corporation.

THE COURT: All right.

MR. STEVENSON: LM Ericsson owns virtually all the patents that the Ericsson activities generate. They're assigned directly to LM Ericsson. Ericsson, Inc., is the United States sales subsidiary of LM Ericsson. It also has an exclusive enforcement rights regarding in the United States the patents in this suit.

Ericsson AB is a Swedish company that is a subsidiary of LM Ericsson. And -- and when I say, subsidiary, it may be through intermediate subsidiaries, but, ultimately, it's underneath LM Ericsson in the chain of command.

THE COURT: Okay. Thank you.

Do -- do -- I mean, can you expand on what ways they operate separately or jointly?

MR. STEVENSON: They operate separately in terms of LM Ericsson owns the patents. It has the right to sue and bring suit under the patents. There are employees of Ericsson AB, as well as other companies within Ericsson who have assigned patents to LME. In addition, some of the witnesses in this case who have been deposed by the Defendants are Ericsson AB employees. They're involved in licensing. They're involved in patent assertion. In other words, preparing the letters and the assertions for patent rights across the whole portfolio that go out. Some of them are Ericsson AB employees that they go in and do patent assertions for the patents that are owned by LM Ericsson.

THE COURT: And what -- where are these corporate entities located?

MR. STEVENSON: Eric -- LM Ericsson is

headquartered in Sweden. Ericsson, Inc., is headquartered in Plano, in the United States. Ericsson AB, I believe, is headquartered in Sweden. I'll check that, but I -- they're a Swedish company.

THE COURT: All right. Okay. Go ahead.

MR. STEVENSON: So there -- there's five, I think, independent grounds for summary judgment here.

The first is -- and -- and it's the rather clear one which is neither LM Ericsson nor Ericsson, Inc., are signatories to this contract. Neither one of them, the party Plaintiffs, have ever contracted not to file a suit against Dell. And so they can't be bound to this covenant as a non-signatory.

Now, secondly, Dell asserts an agency theory as a way of binding or attempting to bind LM Ericsson, the parent. And the agency theory they assert is basically that -- and it's -- they're very pointed about it in their papers, and it's actually I think a little bit backwards from what you would expect.

They assert that LM Ericsson, the parent, is actually the agent of the subsidiary Ericsson AB. And they assert that because LM Ericsson is the agent of the subsidiary Ericsson AB for purposes of asserting patents, that a LM -- LM Ericsson is a non-signatory because they're -- the agent can be bound by this

contract. That's their theory.

But the problem with that theory is it fails as a matter of law because Ericsson AB never had the authority to file a lawsuit on these patents. It doesn't -- it doesn't own the patents. It wouldn't have standing to bring a suit. So the question is how can Ericsson AB, as the principal, possibly have authorized LM Ericsson, as the agent, to do something that AB never had the authority to do? I mean, a principal can't vest an agent with power that the principal has never possessed.

Third, even if we could get over that legal problem, the Plaintiffs -- excuse me, the Defendants have got to come forward with proof of agency. Agency is a contract. It's an agreement between two people to have a principal-agent relationship, and there's no evidence of any such contract or agreement by which Ericsson AB appointed LM Ericsson as its agent. There's nothing in the record about that.

What the Defendants would do -- what Dell would do was infer that agency is premised on a parent-subsidiary relationship, the fact that some employees of Ericsson AB are involved in licensing and enforcement activities for patents owned by LM Ericsson, and that some employees have appeared as witnesses in

this suit.

But that doesn't make LM Ericsson an agent of Ericsson AB, and there's no proof of any agreement. And we've cited a case that's right on point here, Your Honor. It's the Merrill Lynch versus Optibase case. That's a Second Circuit case arising from New York. New York law governs this agreement. And that was a case where there was a disgruntled investor of Merrill Lynch who filed an arbitration against several Merrill Lynch affiliates, and one of those affiliates actually went into District Court and tried to get an injunction and succeeded in getting an injunction that it didn't have to participate and go forward in the arbitration because it wasn't a signatory to the arbitration agreement.

The disgruntled investor tried to enforce that arbitration agreement in Court against that Merrill Lynch affiliate, and it went all the way up to the Second Circuit, and the Second Circuit held it couldn't enforce it. And the facts in that case are very similar to this one. The investor made the same arguments Dell is making here. The affiliate was an agent of other Merrill Lynch companies, that they are owned and controlled by the same parent, that they had overlapping officers, that the brokers of one affiliate offered the products and services of other affiliates, and that the

Merrill Lynch companies presented to the public the image of the single integrated firm. And the Second Circuit found that was insufficient to show an agency relationship and thereby binding on a signatory to an arbitration contract.

Fourth -- or, excuse me, the -- the fourth argument, Dell's own summary judgment response at Page 10 says that for a parent authority of an agent, they have to show that Dell reasonably believed there was no -- there was an agency relationship between the two companies, and they say that at Page 10 for parent authority. But Dell has wholly failed to come forward with any evidence showing that at the time of the 2008 deal, they believed or reasonably believed that LM Ericsson was an agent of the company they were dealing with, Ericsson AB.

The only evidence they put in is an evident -- is a declaration from their in-house counsel on patent matters saying he believed -- or people at Dell believed they were dealing with a monolithic entity. That's insufficient as a matter of law to create a parent authority. He doesn't cite any facts. And, in fact, the person who signed the declaration wasn't involved in any of the negotiations.

And, finally, fifth, this provision isn't

even a license. It doesn't raise a license defense. At most, it's a contractual promise not to sue. And at most, if you accept as true that there was an agency relationship and you can't find that from the facts, at most, it would create in Dell a breach of contract claim against Ericsson AB, but it doesn't create a license defense because this is not a license, and a covenant not to sue and a license are different. A covenant not to sue and a license are different. A covenant not to sue is personal. A license runs with products.

And, finally, in closing, lest there be -- be any doubt about whether Dell even really believes in this defense, they waited a long time to -- to raise it. And in addition, during the pendency of this lawsuit, in December 2011, Dell, Inc., signed a cellular license agreement with Ericsson -- LM Ericsson covering cellular patents that Eric -- LM Ericsson owned. There would have been no need for them to do that if they believed they already had such a license by virtue of this deal. But they signed that license anyway. They -- they paid substantial consideration, and the parties expressly carved out of that anything having to do with this case.

So as a result, I think the Court should grant partial summary judgment on this defense.

THE COURT: All right. Thank you. Response?

MR. SMITH: Yes, sir. May it please the Court. Frank Smith on behalf of Dell.

Mr. Dacus could not be here today, so he passed the baton to me for this issue.

And the issue is, is there evidence in the record from which a reasonable jury could find that LM Ericsson is the agent of Ericsson AB for purposes of Dell's defense under the master purchase agreement in that AB made LM its agent for purposes of this litigation.

Mr. Stevenson referred the Court to Section 12.1 of the master purchase agreement. His characterization, while correct, is, I think, incomplete. That document -- that clause clearly provides a covenant not to sue, running from AB to Dell, Dell being broadly defined to include all affiliates. A covenant not to sue under the law from the Federal Circuit is the equivalent of a limited license, and a license extending to Dell would preclude Ericsson, the Plaintiffs, and their agents from bringing suit against Dell.

Now --

THE COURT: Let me ask you this, counsel. How do you get around Paragraph 1.0, which, again -- and I -- I take it do you -- well, let me ask you first, do

you have any response to Ericsson's statement to me a moment ago that there is no evidence that this -- other than that this was a form contract that was sent to Ericsson and signed by an employee, as opposed to -- and that it was drafted by Dell?

MR. SMITH: Your Honor, I think it's fair to say from the record, it was drafted by Dell. There's no evidence in the record one way or another as to whether there were negotiations over the document or not. What we do know is that Ericsson AB accepted the provisions of this document in 2008.

THE COURT: Okay. Well, let me ask you then about Paragraph 1.0 where apparently Dell, the drafter of the document, defined itself, Dell, as being Dell Products LP and its affiliates, collectively Dell, but then when it gets to supplier, it -- it has no such -- it doesn't refer to Ericsson AB as -- and its affiliates. It just says, the supplier.

MR. SMITH: There's no question Your Honor's reading and Mr. Stevenson's reading of that paragraph is correct. The issue, however, is do other Ericsson entities -- in particular the ones that have brought this suit, LM, are they agents of AB under New York law? There's --

THE COURT: Okay. So -- you -- you're --

you're conceding, in essence, that the contract, as it sits, does not expressly refer to affiliates?

MR. SMITH: With regard to Ericsson's side of the equation, that's unquestionably correct.

THE COURT: All right.

MR. SMITH: Now, the parties do agree that this document is governed by New York law. Under New York law, there's a three-part test as to whether one company is the agent of another for purposes of contractual relationships and obligations that flow from those contracts. And there's no dispute between the parties about that. We both cite to the same case law.

The Second Circuit decision in Commercial Union Insurance and the Southern District of New York's decision in Allstate Insurance in that three-part test is this, first, did the principal, which is AB, manifest an intent to give authority to the agent in this case, LM?

Number two, did the agent accept that authority?

And, number three, did the principal maintain control at some level over the subsequent relationship? That's the word the Courts used. Here it means, I think, the litigation.

And the answer to each of those questions is

unquestionably yes. And while Mr. Stevenson's recitation of the facts was essentially correct, it, again, was incomplete because the part that he left out is that within AB resides a group called IPR, Intellectual Property Rights Group, and that group is responsible for all aspects of management of Ericsson, broadly defined, its IP. And that is within Ericsson AB. That group is responsible for developing the portfolio, for deciding which patents to assert and against whom, for negotiating licenses, and ultimately, for deciding whom to sue.

And the evidence here, and it's not controverted, is that the head of that group, Mr. Kasim Alfalahi, directed that this lawsuit be commenced against Dell. That testimony is clear in the record, and it is unequivocal. And that establishes the first part of a commercial union test. Did the principal direct the agent to act? And the answer, again, from the testimony in the record, and it comes from the deposition of Ms. Anna Johns and from Mr. Alfalahi, is Alfalahi, within IPR at AB, directed LM to act. And that is no dispute about that.

Did AB -- I'm sorry, did LM accept that from Mr. Alfalahi? Obviously, they did, they filed suit. Did AB continue to be involved in the relationship, that

is to say the litigation?  Again, unquestionably yes. They helped draft the complaint.  They worked with the lawyers.  They came up with the claim charts that were used to assert infringement against the Dell products. And they have provided at least 10 witnesses as 30(b)(6) designees in this case on behalf of the named Plaintiffs.

So on those facts, it is clear that a reasonable jury could find an agency relationship between AB on the one hand, which is the operating company, and LM on the other hand, which is described as the holding company, albeit the one that has the right to actually bring the lawsuit.  So AB is directing LM to act.  LM says, fine.

THE COURT:  But aren't they directing them to act as to a property right which they don't own?

MR. SMITH:  The answer to that question, Your Honor, is, yes, but I don't think that matters because it's clear, or at least can easily be inferred by a reasonable jury, that LM took action as a result of the direction of Mr. Alfalahi, and as such, satisfies the first prong of the Commercial Union test.

And it's also clear that in both Commercial Union and in Allstate Insurance that what we have are situations in which a non-signatory to a contract is

being held responsible for the actions of someone who signed the contract. In Commercial Union, it was a freight forwarder who signed the contract. The Second Circuit said on the specific facts before it that the airline that actually shipped the product was -- could be sued, even though it was no signatory for the contract.

And the Allstate Insurance case, the result was different. In other words, no agency was found on the facts before the Court, but, nonetheless, the analysis was the same. And that's what we have here. And I would respectfully submit to the Court that this is a jury issue as to whether LM was acting as AB's agent for purposes of bringing this lawsuit against Dell, and that our defense is based on the contract which was signed in 2008.

Ericsson wants to focus on the relevant timing being who's an agent of whom at this time when the contract was signed. I would submit that the relevant time frame is who was acting as whose agent when the lawsuit was filed at Mr. Alfalahi's direction. And when you focus on that time frame, it's clear that a jury could find that LM, the holding company, was the agent of AB, which is the active operating company.

And if the Court's got any questions, I'll

be glad to try and address them.  But, Your Honor, I do submit that this is clearly a jury issue.

THE COURT:  You might respond as to why Dell waited so long to assert this defense.

MR. SMITH:  Yes, sir.

The bottom line, sir, is that we really didn't.  When we filed our answer, we included within that an affirmative defense of license.  And at that point, we were aware of the MPA and put out our license defense.

Now, we were no more specific at that point in time because we hadn't had any discovery, and we didn't know what was going on within the Ericsson group of companies.  And as you've heard, Ericsson presented itself to us -- and this is, again, really not in dispute -- as sort of a monolithic entity.  And as discovery progressed, we began to see what was going on behind the scenes, who held the -- who held the intellectual property rights and that sort of thing.

And so in the summer of 2012, the correspondence that Mr. Stevenson referenced took place. As further discovery developed, we brought the motion to amend, which Your Honor granted last week -- two weeks ago.  And even after that point, we were still painting deposition discovery by agreement of the parties.  And

that's when Ms. Johns testified on January the 25th of 2013 that it was Mr. Alfalahi, the head of IP -- IPR at AB who directed LM to commence the litigation. And that's the sequence of events. I mean, we noted the issue from the beginning. And as discovery began to develop over time, concluding ultimately with Ms. Johns' deposition, we learned the full story and the full scope of the agency relationship for purposes of this motion and this defense between AB on the one hand and LM on the other.

THE COURT: Okay. Thank you.

Response?

MR. STEVENSON: Just a few responses, Your Honor.

First, I -- I don't think there is a fact issue on agency, but even if there was an agency relationship, as a matter of law, you can't bind LM Ericsson as a non-signatory because LM Ericsson always owned the patents-in-suit. AB never owned them. So AB, as the principal, could never have directed its alleged agent, LM Ericsson, and authorized them to do something that AB didn't have the power to do. That's first.

Secondly, what Dell points to as the fact issue on agency is nothing different than happened in the Merrill Lynch case before the Second Circuit where

they found no agency relationship and nothing different that happens in every corporation, probably Dell itself, that has multiple subsidiaries. And what that is, is people in one business unit make recommendations to another business unit.

In this case, Dell asserts Mr. Alfalahi directed the litigation. He didn't. What he did is as a member of AB, recommended to the patent owner, LM Ericsson, that they file suit. But it was always LM Ericsson's decision and Ericsson, Inc.'s, decision as the United States's exclusive licensee and enforcement agent to bring the suit. So there's a very big distinction there between creating an agency relationship by agreement on the one hand, and as Merrill Lynch points out in that case, the typical give and take within a company between employees who deal with employees in other companies.

And then, third, as far as the timing goes, when this got originally raised by Dell in their answer, it was a boilerplate license defense. And then they moved to amend to add these allegations about the MPA. But the MPA is not a license. At most, it's a contractual provision. And if Dell is aggrieved under this, which I don't think they are, their remedy is not to have a license. Their remedy is that Dell has a

breach of contract claim against AB that it can bring in the form of its choice, but not here because AB is not a party and because this contract doesn't give Dell a license.

THE COURT: Okay. Thank you.

MR. SMITH: Your Honor, if I may?

THE COURT: Yes, Mr. Smith.

MR. SMITH: Very, very quickly. I think Mr. Stevenson put his finger on why this is a jury issue. The jury can either choose to believe the first argument he just made about the extent of AB's authority to direct LM, or the jury can believe Ms. Johns' testimony. And the testimony which is attached as Exhibit E to our brief is only about four or five lines long, and it reads as follows:

Question: Who makes the decisions to transition from licensing discussions to assertions to litigation?

Answer: Ultimately, Mr. Alfalahi.

And so when Ericsson's discussions with Dell were escalated to litigation, Mr. Alfalahi would have made that decision to commence the litigation?

Answer: Right.

And there's your jury issue.

THE COURT: Well, respond, if you would, to

Ericsson's argument that even if you assume an agency relationship, how can one -- how can AB authorize someone to do something which it doesn't have the -- the -- the -- the power to do?

MR. SMITH: Well, respectfully, I don't --

THE COURT: It couldn't -- it couldn't have sued on its own?

MR. SMITH: Beg your pardon?

THE COURT: It could not have sued on its own?

MR. SMITH: It could not have sued on its own, but based on this testimony, it certainly had the ability, which it exercised, to direct LM to commence the litigation because the authority over Ericsson's intellectual property rights resided in this IPR group, which was within AB, which was headed by Mr. Alfalahi, and who, according to this testimony, directed that the litigation be commenced against Dell.

THE COURT: Okay. All right. Thank you.

All right. I will get you a ruling on this just as soon as possible.

All right. Next will be Ericsson's motion to strike David Cabello.

MR. NEMUNAITIS: Your Honor, Justin Nemunaitis for Ericsson.

After the last hearing, the parties conferred on this motion and narrowed it down to two discrete issues for the Court to decide.

The first issue deals with expert reports. The Defendants intend to have Mr. Cabello testify that Defendants' expert report demonstrates that there was no objectively high risk that the Defendants infringed the patents-in-suit.

This is a problem for two reasons. The first is that Mr. Cabello is not a person of ordinary skill in the art, and so he's not qualified to address the expert opinions at all.

The other issue is that he can only testify as to the subjective prong of the willfulness standard. And so that goes to what sort of actions did the Defendants take after they had the pre-suit notice of the patents and before the lawsuit was filed? Because these expert reports were prepared during the litigation, that just should have no bearing on his non-willfulness opinions, and so that's why we believe that Mr. Cabello shouldn't testify as to any of Defendants' expert reports or expert opinions.

THE COURT: Okay. Responses to that one?

MR. AROVAS: Yes, Your Honor, Greg Arovas.

As Your Honor may recall when we talked

about these issues last time, one of the points I made, I think it's very important when looking at the willfulness issue is to look at the context in which Mr. Cabello is talking about and how he is looking at the facts overall that were presented to the Defendants.

The issue here, as we discussed last time, the allegations made by Ericsson are that the Defendants -- the Defendants continued to make product, and because they continued to make product, they're therefore willful.

So the question that the jury has to decide is the reasonableness of the decision of the Defendants to continue making the products. When you look at the evidence that's going to be presented, the role that Dr. -- that Mr. Cabello is playing, and as we talked last time, he has extensive experience in negotiating, including negotiating over standards practice, is to look at the allegations made over time, the fact that these are standards essential patents, and why is it that commercially it was reasonable for these patentees to continue making product?

Now, talking about, right, the positions of the parties, what Mr. Cabello would say is because these are standards essential patents, and we can't divorce each of these facts from -- from each other, because

willfulness is kind of a totality type of analysis, is there are basically two issues that the Defendants -- Defendants are presented with.

Number one, Ericsson alleges that the patents are standards essential. If Ericsson is correct that the patents are standards essential, which the Court disputed, then there is the issue of the letters of assurance that Ericsson made and the promises they made to license those patents which would authorize the continued production of the products while those issues are resolved.

The second possibility is that the patents are, in fact, not essential and are not being used in which case the Defendants would be entitled to continue making those products. And Dr. -- and Mr. Cabello was looking at the totality of those circumstances, the fact that these were standards essential patents, the fact that one of those two facts will exist that will inform the Defendants whether they're entitled to keep making those products. And when Mr. Cabello is looking at the evidence, okay, he is looking at what are the positions that the Defendants have taken? What are the positions that the Plaintiffs have taken, as well, as to the essentiality of these patents?

Now, when Mr. Cabello was looking at the

expert reports, and this is obviously the end of the process, not the beginning of the process, what he's looking for is consistency in their positions, consistency in what the Defendants were doing, consistency in how they were analyzing the issue and comparing that against the standards or practice or commerce in this industry, how big companies dealing with allegations of standards essential patents being used by a Plaintiff, in this case allegedly to shut down the authorized use of that standard, how do they deal with that dispute?

So one of the things they obviously look at is the essentiality. Someone looks at the -- the expert reports, as well as other evidence that comes before the expert reports, to look at how they analyzed it.

Now, I think it's important to keep in mind he is not giving the ultimate decision or opinion as to whether they are right or whether they are wrong, right? That's the technical experts that are going to ultimately give the opinions as to why they think these patents are not, in fact, essential, don't cover the standard.

What he is doing is he is looking at -- so the -- the opinions that were generated by these parties, in the context of the positions that were taken

over time and looking at whether those reasonably relate to how companies in this industry would resolve this issue of whether they, in fact, had to stop making products, basically whether they were there essential and therefore obligated to the license or non-essential and therefore not used, and therefore it would be permissible to continue.

And I would add just one additional fact is that we're not just talking about the period of time, Your Honor, before the lawsuit. Some of the parties were put on notice before the lawsuit, some of the parties were not. For example, Your Honor may recall Intel actually had to intervene in this case. And as we talked about last time, there were some discussions between Intel and Ericsson early on where Ericsson informed Intel that, in fact, this case did not involve issues relating to Intel's products. Once Intel learned through its customers what the allegations were in the -- in this case, Intel promptly intervened in the case.

And so Intel is also in the position that the period of time that they're really looking at is largely speaking of the period that they were in this suit because they had to move to add themselves to this case. They were not sued by Ericsson.

And so that is the role that Mr. Cabello is going to play. He will not speak to the ultimate issue, whether right or wrong, the technical positions, but will look at the standards of commerce, the standards of practice in this industry, and the compliance with those standards by the Defendants to explain why in context of all of these facts that it was reasonable for them to continue making product.

THE COURT: Okay. Response?

MR. NEMUNAITIS: Well, getting to the first point of Intel's notice, in Intel's rog response in this case, they wrote, Intel learned that Ericsson alleged infringement or one of both -- one or more of the patents-in-suit against one of its customers upon receiving an indemnification tender in April 2010. So that was before this suit was filed.

The real issue here is were any of the Defendants subjectively reasonable in continuing to sell their products before suit was filed? If that's the issue Mr. Cabello needs to opine on, anything that happened after suit was filed, expert reports, expert opinions is irrelevant. He shouldn't go into that at all.

And our real concern here is that he's going to be a patent lawyer. He's going to try and present

himself as an expert on something, and he's basically just going to tell the jury, well, I listened to the Defendants' experts, they wrote their reports, therefore, they have credible non-infringement or invalidity arguments, and that's -- that's from an opinion as -- something that only a person of ordinary skill in the art can do, which he's not qualified to do, and it's going to be misleading to the jury.

THE COURT: All right. What I'm going to do with regard to that one, I'm going to deny your motion to strike, but I'm going to grant a motion in limine as to any testimony occurring at -- relating to events that occurred after the lawsuit was filed and ask you to approach the bench before you get into that, and I will perhaps excuse the jury, hear what he has to say, and hear objections. I think this is something I really need to consider more in context of the whole testimony rather than what both sides are telling me he's probably going to say.

What's next?

MR. NEMUNAITIS: The next issue is this commercial story. So the Defendants intend on Mr. Cabello testify that because Intel participated in the 802.11 standardization process and because Intel built 802.11 products but Ericsson didn't do those

things, that Defendants could reasonably conclude that don't infringe Ericsson's patents. And that's just a -- a misstatement of the law.

When you get to the question of infringement, all that matters is do Ericsson's claims match up with the accused products, or in this case because they're standards essential, do they match up with those parts of the standards and do the accused products implement those parts of the standard?

Nowhere in that analysis do you need to consider, well, does Ericsson practice these patents? Does Ericsson sell products that practice this standard? That's totally irrelevant to that inquiry. So we think it's inappropriate for Mr. Cabello to tell the jury that it should infer that the Defendants don't infringe just because Ericsson didn't participate in the standardization efforts or just because Ericsson didn't release its own 802.11 products at the same time the -- the Defendants had their products on the market.

THE COURT: Response?

MR. AROVAS: Yes, Your Honor.

I -- I think the argument that's being made is basically saying that the willfulness inquiry is the same thing as the infringement inquiry, which is, of course, it isn't. Those are two separate questions.

In fact, the Seagate court really expressly addressed that when noting the importance of industry practices. And as we've been saying with a lot of these issues, Your Honor, that's really the role that Mr. Cabello plays here. And I think there's kind of two areas that I'd like to focus on that I think explain how Mr. Cabello's testimony will connect up with the issues in this case.

First is the issue of copying, okay, in that that is always been a very central issue in dealing with the reasonableness of parties and the willfulness inquiry and the showing of the independent development, the effort, the -- where the technology came from shows not only the contribution to the technology and innovativeness of the parties but shows the lack of copying that the -- the technology was actually developed and came from a different place.

Now, that does not -- and we agree, does not resolve the issue of whether or not there can be infringement. You can, of course, have infringement whether you know about the patent or not, whether you independently develop or not. So we're not introducing this evidence to suggest that there cannot be infringement, but we are introducing it to suggest that these parties acted in a reasonable way using and

implementing technology that was developed by -- by them, by their own engineers, that the standards were created by them, and that there was no copying or conduct like that.

And I think there's a second area that matters here. And, again, this goes to the overall context of the case and the testimony, which is the credibility of the claims that were being made by Ericsson over time, including pre-suit and how would the parties have evaluated those claims and those allegations that these parties are, in fact, essential?

So, for example, just to give Your Honor one sense of some of the evidence that would come in related to this, last time when we talked about this issue, we talked about the fact that Ericsson only approached the parties that had nothing to do with the chips or the -- the products. The chips are the ones that actually implement the standard. The circuits -- the implementation of the standard is very detailed. The chip makers are the ones who know how the circuits are actually implemented. And as we've seen in this case and as we've seen over the course of the negotiations from Ericsson, Ericsson has been proven wrong over and over again on whether and how that standard was implemented on the chips.

So one of the things that came up in the negotiations was that the Defendants said, okay, you're saying that the chips I buy from somebody else are, in fact, using the standard and infringing your patents. I don't have access to the circuits or the implementations. I would like to take those claim charts, that information you're giving me, your allegations, and I would like to go to the chip makers, show it to them, and get a substantive response on whether or not that is, in fact -- the patents are, in fact, essential, and, in fact, that is how the standard is implemented in the chip. They refused.

They also had shifting positions on patents, what they were essential to and how they were essential, how they were being read on the standards. And so in the context of the -- what I would consider facially or sort of fundamentally flawed allegations made by Ericsson in the negotiations, the refusal by Ericsson to allow the accused party at the time in the negotiations to go to the actual source of the information, combined with the fact that those Defendants knew where the technology was developed, they knew who contributed it, they knew it came from the chip makers, can reasonably be taken into account by those companies to conclude that the allegations by Ericsson are not being credibly

made.  They're not based firmly in fact.  And that any opportunity they had to test those with the parties who actually developed the technology, actually implemented the technology to test the credibility was denied to them by Ericsson.

And so when you take those facts together, the lack of copying, the independent development, the history of the interactions between the parties, Mr. Cabello should be entitled to testify about how parties in this industry would respond to allegations such as that.

THE COURT:  Response?

MR. NEMUNAITIS:  As to the first issue on copying and independent development, Intel's going to have its own fact witness.  They can try to tell that story.  If I understand correctly from counsel, he's not alleging that any of this commercial story is relevant to whether or not the party infringes or not, so there's really nothing for Mr. Cabello to testify on with regard to -- to this topic.

As far as the credibility of Ericsson's claim, because it went to the OEM Defendants, as opposed to the chip makers, I think this is actually a separate issue.  But that also is just wrong.  I mean, there's -- there's nothing in the law that states that if a patent

owner doesn't try to enforce its patents against every possible infringer that somehow its claims are not credible. I think those are two separate issues, both of them are inappropriate for Mr. Cabello to go into.

THE COURT: Okay. I'm going to deny your motion to strike as to that one, but that does not mean that I'm prohibiting you from objecting to it at the time that -- that it is offered, and it does not mean on any of these if you feel a limiting instruction of some sort is necessary that I would entertain that.

MR. AROVAS: And, Your Honor, I could add because we've reached agreement on disclosure, exchange of exhibits in advance, we will try to flesh out some of these issues before Mr. Cabello takes the stand and hopefully be able to raise them so it doesn't have to be done real-time.

THE COURT: All right. And what about the other issues? What's -- do you wish to announce an agreement on -- as to the other issues in this motion?

MR. NEMUNAITIS: There were a few other issues that overlap with motions in limine, and the parties have agreed that whatever Your Honor rules on motions in limine will control that issue.

THE COURT: Okay. All right. Okay.

All right. Very well. That brings us to

the source code issue.

MR. NEMUNAITIS:  Your Honor, the protective order in this case allows any party to ask the Court to order the owners of source code to make it available in Tyler, Texas, a week before trial begins, and we just ask to invoke that part of the protective order and order that Intel, Qualcomm, and Broadcom make their source code available in Tyler, Texas, a week before trial begins and throughout trial.

THE COURT:  Any objection?

MR. VAN NEST:  Yes, Your Honor.  Good morning.  Bob Van Nest for Acer, D-Link, and NETGEAR.

I don't think there's any objection with respect to Intel, which is a party.  But with respect to Broadcom and Qualcomm, they are not parties here.  They make the chips -- the Wi-Fi chips that go into many of the Defendants' products, and they have been fully cooperative throughout discovery.  So, for example, on this issue, Ericsson asked to see the source code for the Qualcomm products, that's Atheros, and for the Broadcom products, and both Atheros, Qualcomm, and Broadcom made that source code available.

In the case of -- of Broadcom, Ericsson went down nine separate times, looked at the source code. And Your Honor knows from having many of these cases

that the source code is the crown jewels. It's highly confidential. You view it on a protected monitor under protected conditions because here we have all competitors.

Now, Broadcom, Qualcomm, and Intel are conductors. So they went down nine times. They asked to copy what they thought was relevant. They did. They copied 476 pages of Broadcom code. They put it in their expert report, whatever they thought was relevant. It's in the reports.

And the same was true for Qualcomm. With Qualcomm, I don't know how many times they viewed the source code, but they asked to copy and copied 3,500 pages of it, which they have in their possession and they can bring to trial. Whatever they thought was relevant is in the expert reports. The expert reports, of course, are done, discovery is closed, experts are done. Again, these are non-parties. They've cooperated fully. We knew nothing about this until a day or two ago when Ericsson raised it for the first time, and it's just not reasonable to ask a non-party to bring its highly confidential code down here on that kind of notice when they've had access to it throughout the case, they've reviewed it multiple times, they've copied what they need and they have it, and that will be here

and available for trial, and they've put in the expert report whatever they think is relevant.

So the idea that they should now be allowed to fish through this source code for something that they don't now have is -- is -- is out of line because expert reports are done, and whatever's relevant is in there. And believe me, there's plenty of source code quoted for Qualcomm and for Broadcom in their expert report. So I don't think it's -- I think it's beyond Your Honor's rules.

THE COURT: Response?

MR. NEMUNAITIS: As to notice, the protective order spells out this procedure. They were given the protective order a year ago. I reached out to the Defendants over a week ago when we were negotiating depositions of Broadcom and Qualcomm. And after they told me that I should contact them directly, I contacted them directly.

As far as the relevance of this source code, both Qualcomm and Broadcom are sending their own fact witnesses to this case. Defendants' experts will rely on the source code from those witnesses. We can't anticipate everything that's going to come up at trial, so we need to have that computer searchable code available to us and available to our expert to make sure

that we're on an even playing field with the Defendants and Broadcom and Qualcomm witnesses that are going to be testifying.

As far as the procedural issue as far -- as to whether or not the Court can order this, those companies didn't just voluntarily give us their code. We subpoenaed them. They're still subject to the Court's subpoena jurisdiction, and so it would still be appropriate for Your Honor to -- to invoke this part of the protective order.

And, finally, as to safety, you know, Intel has worked out a situation where they can make their code safely available in Tyler, Texas. There's no reason why Qualcomm and Broadcom can't do the same thing.

THE COURT: Go ahead.

MR. VAN NEST: Your Honor, I still didn't hear a good reason for this. Nobody can now introduce source code that hasn't been disclosed to each other in our reports. We can't do it. Certainly the OEMs don't have it. They can't do it. It's in their expert report. Everything that is in the case source code wise is now in the case. And they have copies of every page of that that they think is relevant. These are non-parties.

THE COURT: I believe he said -- I believe he said, Mr. Van Nest, that they can't anticipate everything that may come up in these fact witnesses and experts, and they don't want to be caught in the position of having to respond to it and not having the source code available to -- to -- to address.

MR. VAN NEST: My -- my point, Your Honor, is simply that we are not going to be allowed on the defense side to present source code that hasn't already been presented through an expert and discussed.

THE COURT: Well, let me ask you this. I mean, what -- if -- if Intel can bring theirs, I mean, what hardship does this put on Qualcomm or Broadcom?

MR. VAN NEST: For Qualcomm and Broadcom, Your Honor, who are not parties, let's remember the source code is what defines their product.

THE COURT: Well, I understand that.

MR. VAN NEST: And so -- so asking a non-party who's been completely cooperative throughout discovery --

THE COURT: Are they going to have representatives here at trial?

MR. VAN NEST: We are hoping to call -- we, the Defendants, the OEMs, are hoping to call witnesses --

THE COURT: No, I'm saying will they have counsel here monitoring these proceedings? I would take they would --

MR. VAN NEST: I -- I assume they will.

THE COURT: Excuse me, I would take it they have an interest in the outcome of this trial.

MR. VAN NEST: I -- I assume they will, Your Honor.

THE COURT: All right. That section of the protective order is invoked. Okay.

All right. Motions in limine.

I will caution McKool in this case, though, I'm -- I'm having them bring this here based upon your representation that you believe you may need it. If I ever get the hint that this was done for any reason other than that, just to run up expenses or, you know, cause hardship on the Defendants, I will be very displeased with that, so --

MR. STEVENSON: I -- I can assure you personally we are not doing it for that reason, and I'll be personally responsible for making sure that it is for good cause.

THE COURT: Okay. And, likewise, if you see a need that you don't need it, please deal properly with the Defendants to relieve them of that responsibility.

MR. STEVENSON: We will do that immediately if we don't need the code after all.

THE COURT: Okay. All right. All right. Motions in limine.

We'll take up Ericsson's first. Okay.

MR. STEVENSON: Ericsson's Motion in Limine No. 1 is to preclude any testimony or argument regarding patents no longer asserted or claims that have been withdrawn from the case. Three of the patents originally filed suit on have been dropped, and we've obviously dropped a large number of claims to be able to present 15, or hopefully fewer, at the time of trial.

This came up actually at the prior motion hearing. The Court denied the motion to strike the Cabello report in -- in terms of talking about the fact that Ericsson has dropped patents and claims, but the Court did grant essentially a motion in limine precluding the parties from mentioning that and stated that it wanted to wait to hear the context at the trial.

So I know the Defendants have opposed this, but this may be one that's already been resolved.

THE COURT: Okay. What's the Defendants' position?

MR. AROVAS: You know, I -- I think this comes up largely in the context of really one -- one

patent, the '516 patent, and this was discussed in the context of Mr. Cabello. And, you know, we will certainly raise any issues and meet and confer before he takes the stand, as I mentioned before, to try to flesh any of these issues out to the extent we can.

But let me address the -- the one issue that -- the '516 that I do think is relevant, and we certainly can discuss it now or in the context of the trial again.

As we've talked about it over and over again with respect to the willfulness allegations, they were basically boilerplate notice followed by allegations that the standard was continued to be used by the Defendants. This goes to this issue of the credibility of the allegations that were made and whether a reasonable party -- were -- of this position that -- that the standards of commerce would dictate that they would -- particularly with standards essential patents, stop making the product.

And so the general criticism -- and I understand it, and I think it actually applies in many situations of why dropped patents are not -- or dropped claims are not appropriate to come into evidence is because there's many reasons why tactical and otherwise, including to save the resources of the Courts, why

claims of patents might be dropped.

With the '516, we really have a -- a different situation. We have a patent that was alleged to be fundamental to a number of the standards, was alleged to be a blocking patent, was used by Ericsson to try to stop the Defendants from making the products. And we had continual reinvention, including before the lawsuit, of what this patent was all about.

And now with -- so first, it was -- I think it was A, B, G, and N, that it was all the standards, but not N, which by the way is the only one we're talking about now. And then it was non-essential to anything. And why this is different -- this patent is different is because we have a 30(b)(6) witness testifying factually why it is that they are no longer asserting that patent against the Defendants. So we don't have the situation where there's speculation about the motives for dropping it.

We can introduce the actual testimony of -- of the 30(b)(6) of the company saying that they had come to the conclusion --

THE COURT: Okay. I -- counsel, I think that's enough. I'm going to grant the motion in limine, but with regard to this motion in limine and all of my rulings, this does not mean that you cannot offer it,

you just need to approach the -- the bench first and not bring it up in -- in the presence of the jury. And I think you may have a good argument on '516. I don't know. We'll address it when -- when we get to it.

Let me ask this question, this question of -- just seems like willfulness is -- is such a thorny issue in this case. I have done this before, and that is to just bifurcate the issue of willfulness until -- and submit it to the same jury with additional testimony dealing with willfulness after we get a verdict as to infringement and validity and damages.

Do the parties have any interest in that type of approach in this case? Would it simplify the -- the trial of the case?

MR. STEVENSON: You know, Your Honor, actually I think it could simplify things. The -- the patents here are going to take a lot of teaching to the jury. They get into the details of 802.11, and naturally, there's a lot of commercial side activities going on and the negotiation activities going on.

And if the jury is trying to think about what is the history of negotiations between the parties, because Ericsson with -- with all these parties, presented claim charts, they had technical negotiations, that sort of thing, and that's a big issue in this case.

If that becomes the focal point of a lot of testimony about you said this, we responded to that, you dropped this allegation, you know, that sort of thing, we're really deflecting the jury away from what they ought to be doing, which is comparing the claims to the prior art and to the accused devices.

So I think bifurcating willfulness may get us a better ability to get right to the jury on the -- on the most important issues in the case and focus us all in.

MR. AROVAS: So we -- we have not conferred on this, although I just very quickly talked to some of my colleagues. Our belief is it's better kept together. There's really a lot of overlap witnesses. I don't think that the willfulness -- although we've talked a lot about it, I think the willfulness piece of the -- the presentations will be pretty narrow. And as we've said before, you know, certainly if there are any of these issues that are framed, we can bring them up in advance, but it would be much more efficient to bring in all the evidence together.

THE COURT: How -- what -- what witnesses will be addressing willfulness?

MR. AROVAS: So certainly --

THE COURT: Mr. Cabello?

MR. AROVAS: -- Mr. -- Mr. Cabello or Cabello. There will be, you know, other witnesses that I think we'll talk about, certainly many of the factual issues that overlap willfulness questions. So, for example, the fact that these are standards essential patents is a central issue in this case. It comes up in the damages part of the case. It comes up in the technical part of the case. You know, what do the standards say? How are they read? How are they implemented, that sort of thing.

And so given that one of the willfulness arguments we're presenting is how the standards work, what the obligations are of the standards, and the -- the fact that those are open standards, and entitled to practice those and entitled to license, those kinds of issues, I think, are all very integrated.

I think if you were to say, what is the discrete, you know, sort of willfulness part, I don't think it really adds a lot on top of that, and I think we could very easily, you know, incorporate it into the jury trial -- the jury trial without a lot of additional testimony. But it will be related certainly to some of those -- those other issues.

THE COURT: Response?

MR. STEVENSON: A very brief one, Your

Honor.

Frequently in these cases, willfulness gets used as a hook to pull in a lot of facts that are typically limined out because they're prejudicial, irrelevant, or otherwise aren't fair to put before the jury in an infringement case. And, moreover, what Mr. Cabello does really is -- and I've been in trial with Mr. Cabello before, recently this year, it gives the Defendants a chance to put up a witness who's a lawyer and essentially give a bit of a closing argument during their case-in-chief that we don't get.

And that's why I think in fairness -- I understand Mr. Cabello is going to testify, and it's probably going to be a lot of approaching the bench, trying to reign in what he's going to be saying. That's why I think really it's probably better to do it as a bifurcated verdict after the original verdict. And if there's a verdict of infringement and validity, we can hear Mr. Cabello and take it back up, and that will mitigate a little bit of the prejudice to us of -- of them getting a bite of the apple we don't get.

MR. AROVAS: And, Your Honor, if I could say -- you know, what I'm concerned about here if we bifurcate this is because the willfulness issues touch on issues of RAND, they touch on the issues of the

standards essentiality of the patents, they touch on the issues of how the -- the technology was adopted, we're going to end up in a position where we're going to have to recall a lot of witnesses.

Now, I have no idea what Mr. Cabello did in the last trial. I wasn't involved in that trial. I can tell you that our intent is not to do what Mr. --

THE COURT: I will tell you that he's not going to present a closing argument from the witness stand.

MR. AROVAS: And, Your Honor, was very clear about that, and that was never the intent from the beginning. And certainly we talked about the issue of standards of commerce, and that's really what he's talking about, and it's a narrow issue.

MR. VAN NEST: Could I have a moment with counsel, Your Honor?

THE COURT: Excuse me?

MR. VAN NEST: Could I have a moment with counsel, please?

THE COURT: Yes, you may.

MR. AROVAS: Your Honor, we -- we can actually make this even simpler. We can withdraw Mr. Cabello as a witness. I think we can accomplish by and large what we need to do through the fact witnesses.

THE COURT: All right. Do you withdraw him as a witness?

MR. AROVAS: Yes, Your Honor.

THE COURT: All right. Well, we spent a lot of time on this today and now have withdrawn him, but -- all right. Where does that leave us then with the willfulness issue? Does that change Plaintiffs' opinion as to whether it's going to bog down the trial or not?

MR. STEVENSON: I -- I still think that willfulness bifurcation is a good idea because it will streamline out of the trial a lot of the back and forth of fact witnesses commenting on Ericsson's claim charts that they sent during the negotiation process. That's a subject of a lot of motions in limine in here, how much of that gets to be gone into.

There's that whole historical story where they're going to accuse Ericsson of during the negotiation process changing positions or shifting positions, all of which has really no relevance to applying the claim of the patent to the prior art and to the accused devices and to the standard. And the whole color of shifting positions is really just a try to -- attempted attack on the credibility of not the experts in this case and not the lawyers in this case but just people who were involved in doing good faith

negotiations before filing the lawsuit.

And so for that reason, I think that entire story at which -- which gets dressed up as the commercial reasonable objective facts, what that becomes is through a defense to willfulness, an attempt to say, well, Ericsson didn't do a real good job in its claim charts back then five years ago, don't believe what they're telling you today. And that's why I think it's a lot better to put willfulness right after the verdict. If we have to make arguments or if there's more evidence to call, we can go ahead and do that and focus the case on the real jury decision issue, infringement, validity, damages.

THE COURT: Response?

MR. AROVAS: Your Honor, I thought I was simplifying the issue by -- by trying to streamline the evidence. Our -- our concern is this is a very integrated case. We're going to be in a position of having to recall a number of witnesses to tell -- you know, to add to the testimony about the standards, the standards process. You know, we have, I thought, by trying to withdraw Cabello, gotten rid of the -- you know, the source of the real objections. I think now what we're doing is we're just taking what can be a very integrated case, it can be done at one time without

recalling witnesses multiple times and just breaking it up unnecessarily into --

THE COURT: And what witnesses are you concerned about having to call multiple times?

MR. AROVAS: So we have -- it's a number of them. So we have a number of fact witnesses who will talk about the IEEE process, the fact witnesses from Intel. Two of them are fact witnesses from Broadcom, and potentially fact witnesses from Qualcomm, as well.

There's an IEEE fact witness who's not affiliated with any of the -- any of the suppliers. His name is Mr. Shoemake. He is also testifying, as well, about the IEEE process. And so --

THE COURT: Is the IEEE process relevant to issues other than willfulness?

MR. AROVAS: Yes, I -- I believe it is.

THE COURT: Okay. Well, I -- I -- what I'm going to do, I'm going to go ahead and bifurcate the willfulness issue, just because -- well, the times I've done this, quite often, it just goes away by the time everybody's through fighting all week. It just makes for a much cleaner trial from both sides, but I will allow you some latitude with your witnesses if there are facts that may just go to willfulness, but it would be helpful for you to go ahead and put it in with -- during

your case-in-chief, before we get to the -- to the bifurcate willfulness issue, I'll give you some latitude in that regard just for scheduling purposes.

MR. AROVAS: Okay. Your Honor, may I just ask -- I mean, the -- the offer to withdraw Cabello was, you know, an attempt to try to keep this streamlined and together. After we're done with this, I think there could be discrete issues where his testimony will be useful. You know, may we raise that with the issue at the time -- with the Court at the time?

THE COURT: Yes. What are you asking for specifically? Are you asking me can -- can you withdraw your withdrawal of Cabello?

MR. AROVAS: That is -- that is effectively what I'm asking. But what I'm saying is that, you know, since Your Honor's vision of how this would go, where we see where we are at the time, I don't know that necessarily he would have to testify. Maybe we could do it without him, but just to alert the Court that we'd like at least leave to re-raise it with the Court if we believe there -- there's some area of testimony that we think would be helpful to discreet willfulness --

THE COURT: Hear a response?

MR. STEVENSON: I don't -- if it's just for the purposes of the willfulness trial, I don't object to

the -- to the withdrawal of the withdrawal.  So it's their time.

THE COURT:  With respect to the willfulness trial?

MR. AROVAS:  Yes.

THE COURT:  Okay.  All right.  The Court will allow the withdrawal of the withdrawal with regard to the willfulness trial, sometimes referred to as www.

All right.  Does that resolve hopefully some more of our motions in limine or --

MR. STEVENSON:  I -- I think it might.  The next one is No. 3, and this was --

THE COURT:  What about No. 2?

MR. STEVENSON:  That -- that, I believe -- oh, excuse me, No. 2 is agreed.

THE COURT:  All right.

MR. STEVENSON:  And the --

THE COURT:  Agreed that it's granted?

MR. STEVENSON:  Well, yes, agreed as -- as follows, the agreement is that -- as the Court knows, Intel intervened in this case, and its intervention was limited to the products Intel makes that are used by the Defendants who are in this case, and they make other products that are used by non-Defendants.  That was the scope of the intervention.

We wanted to have a motion in limine that I believe the Defendants agree to, that no one would bring up as a criticism of Ericsson the fact that the intervention was limited to the -- the scope of the products that are at issue in this case and would not mention, for instance, that Ericsson did not sue other products of these Defendants that are used by -- excuse me, other products of Intel or other chip makers that are not used by these Defendants. And I think that's the agreement part of it.

Ericsson agrees with Defendants that the fact that Intel intervened in the case can be brought up and the -- the parties can discuss and debate the merits of why they did that, but --

THE COURT: But it's limited to the -- the parties to this case?

MR. STEVENSON: Yes.

THE COURT: Right. Is that the agreement?

MR. DEVRIES: Yes, Your Honor, it is.

THE COURT: Okay.

MR. DEVRIES: The only other clarification I -- I would make, and I think this was included in counsel's statement, is that there's an agreement that this motion in limine does not cover a situation where we're talking about the fact that intervention was done

in order to protect the customers or its Wi-Fi product line. With that clarification, we are agreed.

MR. STEVENSON: Yeah, I think Intel is going to say we intervened because we wanted to protect our customers, and we're going to say, no, that -- we don't think that's why you did it, and that's a fair fight.

THE COURT: All right. Okay. Next, No. 3?

MR. STEVENSON: This is a Rule 408 motion in limine, and there's actually a defense motion in limine that is the counterpart of this, so we may be able kill two birds with one stone here.

The Rule 408 part of it is as follows -- I'll just give you a -- a typical scenario. Years before the suit is filed, Ericsson sends a letter to a Defendant. It has, you know, listing the patents. It may have claim terms on it. It -- it -- you know, typical demand letter sent to invoke licensing discussions.

Those typically resulted in months of back and forth licensing discussions where there's technical discussions and the parties exchange positions and argue non-infringement and validity and just everything that the licensing folks do to have technical discussions, and there'd be business discussions where Ericsson would have given an initial demand, but then they'd go back

and forth on the amount.  And -- and in these cases, we would reach an impasse.  That's why we filed suit.

We want to put in the letters that we initially set out and -- and the demand as our initial notice for purposes of notice of infringement and starting the Qualcomm damages rolling, but we believe that that's where it ought to stop.  And Rule 408 is going to govern the subsequent negotiations which are designed to result in hopefully a settlement of a disputed claim, and we shouldn't be going into what offers and counteroffers were made or what arguments were made and weren't made in the discussions about the -- the assertion.

MR. DAUCHOT:  Good morning, Your Honor, Luke Dauchot on behalf of Intel, and I speak for all the Defendants on this issue.

A couple points, Your Honor.  First -- and this was briefed, and in the briefing, Ericsson's position was on this issue that -- essentially that the letters and the substance ought to stay out, that really the only issue that ought to come up was the fact that there was notice given, there were discussions had, and that the parties couldn't reach an agreement and so decided to submit it to the Court.

In fact, it's -- it's pretty close to -- to

Ericsson's -- I think I'm basically reciting Ericsson's positions in its papers. We had a stipulation worked out exactly to that effect. The day on which the Defendants received notice, the -- the question to -- and by the way, on the question of when we received notice, that -- we're prepared to stipulate to that. So the stipulation would say, on such and such a date, we were given notice, discussions were had or correspondence exchanged, and parties couldn't reach an agreement, submitted it to the Court.

I don't know why we need to go further than that. In fact, Ericsson's position all over the papers on this issue. The -- Mr. Stevenson's proposal that we just put the letter in and stop it at that, of course, you know, the jury now only gets half the picture. And, of course, then we're on a slippery slope.

So our position is let's leave all that stuff out and stick to what Ericsson had proposed on the papers and what we are prepared to stipulate to.

THE COURT: Okay. What's wrong with that?

MR. STEVENSON: Well, first of all, we didn't reach agreement on any of the dates or the number of the dates in the stipulation because it was back and forth over is this adequate, is it that not adequate, and I had a call with Toshiba's counsel last night

trying to, you know, work out dates, and we just didn't work that out.

Secondly, really what Defendants are trying to do is put in a stipulation that is a way to preclude us putting in the notice letters that we sent out. And I think in every patent case, the notice letter is admitted. It stands for notice of the -- the claim of infringement.

So if -- if we can work out a -- the wording of the stipulation between the parties that meets all, you know, my concerns about dates, I'm happy to do that. We haven't been able to get that agreement done yet. So until we get an agreement, we've got to be able to put the notice letters in.

MR. DAUCHOT: Well --

THE COURT: All right.

MR. DAUCHOT: I'm sorry, Your Honor, I didn't mean to cut you off.

THE COURT: No. Go ahead.

MR. DAUCHOT: Thank you. I -- I think -- since the Court's decided to bifurcate the -- the -- the issue of willfulness out, I think that there is time for the parties to try to -- to come to a stipulation. And if by the time we get to willfulness, should we get to willfulness, at that point, if we hadn't resolved it,

maybe we can revisit it.

THE COURT: All right. I will go ahead and grant the motion in limine, but I will state my preference is for you to work it out and have a stipulation rather than putting the letters in. So get them the dates. See if y'all can work out the dates, and we'll go through the stipulation.

MR. DAUCHOT: Will do, Your Honor. Thank you.

THE COURT: Okay. What's next?

MR. STEVENSON: Your Honor, as a clarification to your prior ruling, even if the letters don't come in, may -- may we have a witness testify that we provided notice to them on this?

THE COURT: Yes.

MR. STEVENSON: Yes.

THE COURT: Yeah.

MR. STEVENSON: Ericsson's Motion in Limine No. 4.

MR. VAN NEST: Excuse me, Your Honor, I'm sorry to interrupt. I just heard counsel say he wants a witness to testify --

THE COURT: Yes.

MR. VAN NEST: -- to notice? We -- I thought that's the whole point of the stipulation.

THE COURT: No, the point of the stipulation is just to keep the verbiage of the letter -- the self-serving verbiage of the letters out.

MR. VAN NEST: So -- but if we're stipulating to the fact that we received notice on X date, what is the witness going to say? That's my -- that's my concern.

MR. STEVENSON: We're going to try to stipulate to all the dates. We don't have agreement on all the dates, so if we don't reach agreement on the stipulation, we have to put on evidence.

MR. VAN NEST: Fine. Understood.

MR. STEVENSON: Okay.

MR. VAN NEST: I understand the Court to address --

THE COURT: All right. Thank you. The Court's going to take a 20-minute recess and urges the parties to get together and work on their motions in limine.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated.

All right. Give me some good news.

MR. STEVENSON: A lot of progress, Judge.

THE COURT: Good. Good. Okay.

MR. STEVENSON: It's -- it's amazing what can happen when you're motivated. All right. We made a lot of agreements. I think we're down to maybe four or five things remaining.

THE COURT: Okay.

MR. STEVENSON: And probably the best thing for me to do is go through the ones that are agreed --

THE COURT: Okay.

MR. STEVENSON: -- and list them off for you what I think the agreement is, and if the Defendants will confirm that, we can just go right to the ones that are still in dispute.

THE COURT: All right. Okay.

MR. STEVENSON: We left off on No. 3. That's already been dealt with by the Court.

Moving to Ericsson No. 4, that was -- that is agreed to. That's an expert that we called to try to hire named Chris Heegard. He ended up working for the Defendants, and they're not going to raise that.

THE COURT: Okay. I'm going to expect the Defendants to speak up if you don't agree.

MR. DEVRIES: We agree with that, Your Honor.

MR. JONES: I think with all of these,

though, it's subject to approach, right?

MR. STEVENSON: Yes.

MR. JONES: Yes. Yeah, we -- if -- if the door gets open, we can approach the bench. We're not agreeing it's inadmissible under --

THE COURT: It's just a motion in limine. It doesn't mean it's not going to be admissible. It just means don't bring it up --

MR. JONES: Thank you.

THE COURT: -- without approaching the bench.

MR. JONES: Thank you, Your Honor.

MR. STEVENSON: Correct.

5 and 6 are still outstanding.

7, can't go into the win-loss record of experts. That's agreed.

8 --

MR. DEVRIES: And, Your Honor, if I may, I understand that that's a two-way motion in limine. In other words, that will bind both parties.

MR. STEVENSON: It is goose and gander, yes.

THE COURT: All right.

MR. STEVENSON: 8, reference to the Microsoft versus Motorola case. That's agreed that -- won't be brought up again, subject to opening the door.

THE COURT: Okay.

MR. STEVENSON: 9, reference to other litigation where Ericsson is a party. That's agreed.

10, reference to the possibility of an injunction, treble damage, and/or attorney fees. That's agreed.

MR. DEVRIES: And, Your Honor, on -- on No. 10, I -- and I know this goes without saying, of course, some of this evidence relates to issues to be tried to the bench, and this motion in limine, of course, does not impact that.

THE COURT: All right. Okay.

MR. STEVENSON: On Defendants' motions in limine, 1 and 2 are open.

3, the -- Qualcomm's licensing positions regarding end products, that's agreed to approach.

4 is open.

5 is the 408 settlement negotiations. That's part and parcel of what Your Honor took up right before the break, and I think the same ruling would be applicable there. We're -- we're going to try to work on a stipulation, and failing that, we'll put on a witness, and we'll just approach in the event we want to try and put on the actual letters that were sent out.

No. 6, this is the testing that our expert

did regarding products. The Defendants are dropping that. They agree that can come in. And I've agreed that the Defendants can submit a short rebuttal report from a single expert, and they've agreed to get that to us by Monday.

THE COURT: Okay.

MR. STEVENSON: And then, finally, No. 7 is agreed. That's unrelated legal proceedings, including Germany. That's agreed in limine.

THE COURT: All right. Good job. So we're back to No. 5.

MR. STEVENSON: Back to No. 5. This motion in limine is intended to preclude Defendants from arguing to the jury that they have patents that cover the accused products and, therefore, don't infringe.

The Defendants have raised as one justification for essentially going into specific patents -- and let me back up before I go into the merits. We don't object to the Defendants putting on evidence that they have patents. You know, we have a lot of patents, and we're an innovator, and both sides in patent cases always do that. We don't even have an objection to them saying, we have a number of patents in the 802.11 field.

What this goes to is specific patents that

they would show the jury to say, well, these cover the features that are being accused of infringement, which, of course, suggests that that's a defense to patent infringement, which it's not.

The Defendants have advanced several rationales for why they think they should be able to do that. The first is the separate patentability doctrine. That's a doctrine that says, in response to a DOE assertion, separate patentability may be relevant. We're not asserting Doctrine of Equivalents in this case. We're not going to assert it at trial, so that rationale goes away.

The second is Defendants want to have the right to assert their own patents as prior art. I don't dispute that, so if they have them in the invalidity contentions and they disclose those as one of the four theories of infringe -- invalidity, the Defendants can put on their own patents as prior art. That's perfectly fine. And as long as they don't argue or suggest to the jury that having a patent that covers what's being accused resolves -- absolves them of infringement, there's no problem with that.

Third, the Defendants want to argue that the standard and rates for royalties pursuant to the standards should be determined by looking at overall how

many patents that are standard essential different companies have. They call that proportionality. I don't object to the Defendants going into how many patents they have that they believe pertain to the standard for purposes of making the proportionality argument, as long as they don't then single out specific patents and say, oh, and by the way, here's one that covers exactly what's being accused in this case to assert non-infringement.

And then the final hook for these was willfulness, and that's being bifurcated to a -- a separate proceeding, won't be the first trial, but I will also observe that just because you have a patent that covers purportedly some feature of a product that's being accused of infringement, that is a matter of law that can't be an objectively reasonable justification for thinking you don't infringe because a patent is a right to exclude, and we all know there are thousands of patents that can cover a product.

THE COURT: Okay. Thank you.

Response?

MR. AROVAS: Yes, Your Honor. So I -- I think with the dropping of bifurcation of willfulness and dropping of Doctrine of Equivalents, there are two independent additional bases that we think are -- are

relevant. And first is the issue of damages and apportionment, and I'd like to -- to dig into that in a little bit more detail, but before I do that, I'd like to say that, you know, we have no objection -- we're not arguing we don't infringe because we have separate patents or separate patentability, and we have no objection to a limiting instruction on that, which is I think the way often these sorts of concerns are addressed.

The issue on apportionment of damages is value. What the Plaintiffs would like to do is basically gut any of the content of the case about apportionment to show what's important, what's not important. What we'd like to show, and, obviously, we've talked about this before in other context, is that a tremendous amount of value -- what was contributed to this standard from the innovations of the patents -- patented technology, patented and unpatented, by the Defendants and others, and that when the jury is considering what the contribution of the Ericsson patents are to these standards, they need to look at the contributions of others and do an apportionment and deal with the royalty stacking and other related damages issues to try to figure out what is the right number, what is the real set of economic contribution.

Now, to just generically say, we've got lots of patents, and to have that being the noise of this case, deprives the jury of any appreciation of the significance of the contributions of the other parties. In fact, you know, what we expect to see from the Plaintiffs are really a sort of broad discussion of what they believe their contributions are and even on those very features to show that there are contributions by others, some patented, that go to those very features that are directly tied to the standards.

And so this is really about showing apportionment. It's about the royalty stacking issue, and it's about getting the jury some really solid factual basis for where the value is coming and where the contributions are coming from. And we believe that's essential evidence for the jury to be able to properly assess where the Ericsson patents, even if they do cover the standard, fit in terms of the contribution to the -- the value of the standard and the damages claims that are being made.

There is a second reason that this evidence should come in, and it's on the issue of indirect infringement or inducement. And it is appropriate evidence to show separate patentability to go to the intent --

THE COURT: I think you're getting a little too close to that perhaps.

MR. AROVAS: I'm -- I'm sorry, Your Honor.

THE COURT: It -- it tends to pop when you get close.

MR. AROVAS: I'll -- I'll watch out for that, Your Honor. My apologies.

So the -- the second point I was making was -- without the popping hopefully -- is inducement, and inducement has an intent component, and the patents and the contributions of the parties is relevant to that intent component of inducement, as well.

THE COURT: Okay. Response?

MR. STEVENSON: Well, on -- on the damages issue, and -- and I think we're mixing it around a little bit, if the Defendants wish to argue that -- and this came up in the -- in the Daubert over Mr. Bone. If the Defendants wish to argue that the royalty base should be the chip, as opposed to the overall device, that -- that's a -- a perfectly fair fight to have, and we disagree over it, but you don't have to go into and here's a patent we have that covers exactly what's being accused of infringement. And there's no reason for that.

If the Defendants wish to argue that

standard essential patentholders may end up essentially stacking up, and so there should be a proportionality -- in other words, if you have a lot of standard essential patents, you should have a -- be able to charge a higher rate than somebody with just a few standard essential patents, again, that's an argument they can make, but what they've done in their expert report is they've singled out of their however many hundreds of standard essential patents Intel is alleged to have in total and singled out five or four patents that they say cover exactly what we're accusing. We disagree with that, but the whole point of doing that and going into that level of detail is to suggest to the jury that if you have a patent on a feature that's accused, you don't infringe. And I just think that's incorrect.

MR. AROVAS: And, Your Honor, I think that the fundamental problem with what Mr. Stevenson is saying is the patent stacking or royalty stacking isn't just you take a number of patents and you divide it out. It's a question of technical contribution and value.

So certainly it's a case -- and we -- we believe it would be appropriate to present to the jury that some patents are more important than others, some features are more important to the standards than others. Certainly I expect Mr. Stevenson to tell the

jury that they believe that their patents are very important and enable all sorts of great things in the standards. And what we would like to do when we're sort of assessing value, you know, whether it's on the chip or it's on the laptop, I mean, these are all issues that we're going to debate, but show the relative value contribution of those, the different technologies. And if we are deprived of the ability to actually describe in any level what those technologies are, what those contributions are, we can't show the relative value of the other contributions, and that has a directed path on what's appropriate to award Ericsson damages if they were correct.

THE COURT: Final word.

MR. STEVENSON: Final word is there's a fine line between talking about damages and going into, as their expert does, a level of detail that suggests Intel patented this, it's a separate patent, and, therefore, they can't infringe.

THE COURT: Okay. Here's my ruling. You -- I don't want any argument or testimony that the -- that Defendants' own patents in any way prove that Ericsson's patents do not infringe or any arguments along that line. I will allow you to talk about your patents and talk about contribution with regard to damages, but,

again, the devil may be in the details, so avoid any, you know, specific claim comparison. Keep it on a fairly high level. This is certainly subject to objection if you think they're going too far from the Plaintiffs' standpoint and certainly subject to limiting instructions if either side believes some would be -- be appropriate.

MR. AROVAS: Thank you, Your Honor.

THE COURT: Thank you. All right.

MR. STEVENSON: The --

THE COURT: What's next?

MR. STEVENSON: Well, the -- No. 6 is next. I misspoke. That actually isn't contested anymore. I think we have an agreement. This was a reference that came up in an expert report, a prior art reference related to the Internet protocol that was not in the invalidity contentions. We objected to it.

The Defendants have represented that they are going to talk about this strictly as background art, and they're not going to suggest that it's prior art that the jury could rely upon for invalidity, and they're not going to compare it to the claims to suggest that, you know, there's a -- it -- it's fair to make a claim comparison.

THE COURT: Okay.

MR. STEVENSON:  If that happens, then I don't have an objection to them talking about it.

THE COURT:  Okay.  All right.  All right.  Defendants No. 1.

MR. DAUCHOT:  Your Honor, Defendants' No. 1 pertains to the damage model, and some of this is -- is obviously related to the EMV apportionment issues that the Court has ruled on in the -- in the Daubert context.

The in limine issue specifically, Your Honor, at least as to the first one, turns on the question of overall end product revenues coming into the record, as well as profit margins on net revenue.  And we -- I'll put, Your Honor, the EMV issues and the apportionment issues aside because that -- that -- we're not going to revisit that.  The Court has ruled, and -- and so our objections to that are obviously preserved.

But I do want to note that they have -- Ericsson, in -- in getting the Court to rule as -- as Ericsson viewed things, made a representation that the -- that the proverbial cat would not come out of the bag, so to speak, that large numbers would not see the light of day in the courtroom, that Mr. Bone didn't need those numbers.  And -- and, you know, that appears now to have resurfaced with the Court having seen things -- Ericsson's -- Ericsson's way at least in -- in part.

So that's our -- our principal issue, Your Honor. The overall revenues, the profit margins on the end products should stay out.

Now, that said, and I do want to make clear for the record, you know, our position all along when we went down the EMV apportionment issues, the Daubert issues, is that the actual price of the end product shouldn't come in here, as well, because all the jury needs to do is multiply number of units by price, and, boom, they have gross revenue. But -- but that ship sailed with the Court's ruling, so that we have to now defend ourselves and really take Mr. Bone on on his per unit calculation, and taking Mr. Bone on will require us to delve into the actual per laptop, per router price.

So for purposes of this motion, given where we are, it's really the -- the overall revenues and -- and profits.

MR. CAMPBELL: Good morning, Your Honor, John Campbell on behalf of Ericsson.

I think if what counsel means by overall is adding up Intel made X millions of dollars last year, we don't have an issue with that.

So what we talked about during the break is because Defendants want to raise the price of the

chipset, the profit on the chipset, the profit margin on the chipset, we need to be able to raise the price of the actually accused product, the router, the PC, including the profit and the margin. And so I think they -- what they had said was that was fine, that the individual price we could do. We're not going into the overall revenues.

Where we got to an impasse is that we need to be able to say, because they want to put this all on a chipset and focus on the two-dollar chipset -- they say it's two dollars. We don't believe it's two dollars. But they want to focus there, we need to talk about the price of the router and the price of the PC and also be able to say that, look, they can raise the price of the chipset to accommodate this royalty, and that's just true as a matter of law.

Just this week, Chief Judge Rader said in the Douglas Dynamics opinion that the infringer's selling price can be raised, if necessary, to accommodate a higher royalty rate, and, indeed, requiring the infringer to do so may be the only way to adequately compensate the patentee for the use of its technology. Thus the District Court clearly erred by ensuring that the ongoing royalty rate it awarded would, quote, leave some room for profit by buyers -- buyers is

a Defendant, the infringer in this -- in this case -- at its current prices.

So I think we're in agreement that you can raise the price of -- or you can bring up the price, the margin, the profit on the individually accused products, whether it be the chipset or the PC or the router. We should be able to, as a matter of law, say that they can raise the price on the chipset, and we will not bring up the overall revenues of any Defendant in total years or total over the infringing period.

MR. DAUCHOT: All right. Your Honor, I think this has spilled over into the second motion in limine, and that's fine if Your Honor is prepared to take both of them.

THE COURT: Well, let's finish the first one first because it doesn't sound to me like y'all are really in disagreement. Am I missing something?

MR. DAUCHOT: There's -- well, yes or no. I think on the overall numbers, we're in -- we're in violent agreement. I think we all agree that that stays out. On the individual numbers, we -- we do believe that we're going to have to deal with the individual end product values, because to deal with Mr. Bone's per unit rate, we do disagree on an individual basis with the margin. We still don't think that the margin on an

individual basis should come in, just the revenue number.

THE COURT: Okay. Do you want to just put in the revenue number or the margin number, as well?

MR. CAMPBELL: Your Honor, we want to be able to respond to whatever they're going to do. As long as they're going to leave it at the revenue, and I guess the profit but not the margin of the chipset, we'll leave it to the revenue on the profit on the router or the PC. If they want to get into the margin, we want to get into that. If they want to get in the overall, we want to get into that. We're just trying to match what they --

THE COURT: Is that agreeable, counsel?

MR. DAUCHOT: Well -- and I don't mean to sound disagreeable. I'm afraid I will. But the -- the -- the issue on the margin is -- is apples and oranges.

But -- but I think we can perhaps deal with it this way, Your Honor. If I understand counsel correctly, much of whether or not they get into the individual revenue and the individual margin is going to depend on -- on what we bring out. And my -- my suggestion, Your Honor, would just be to take it up at that point, that we don't get into it in openings, that

type of thing. And as the evidence evolves during the course of trial, Your Honor can -- can deal with the issue -- with the question in the context of a -- of a better evidentiary record.

THE COURT: Okay. Do you intend to get into this during opening or --

MR. CAMPBELL: Not during opening, but, of course, our damages expert goes up before theirs, so it's hard for us -- if they don't tell us what they're going to do, it's hard for us to know what do we need to raise with our damages expert.

THE COURT: Okay. I'm going to deny the motion in limine, but, again, I'm going to expect you to -- to -- as you represented, keep it in sync with what their defense is, and maybe you'll know from their opening statement or whatever that -- or -- or consult with them and let them know where you're going, counsel, with yours, and -- and we'll try to keep y'all in sync in that regard.

All right. Next is No. 2.

MR. DAUCHOT: And I think No. 2, is that the -- the pass through?

MR. CAMPBELL: No, that's the CSIRO. We can jump to --

MR. DAUCHOT: If we can jump to No. 4, I

think it's related to No. 1, Your Honor, if that's all right with you.

THE COURT: All right. All right.

MR. DAUCHOT: So the question here, Your Honor, is as follows, Ericsson would like to make the argument that its -- its number, which I think is 50 cents per unit, it can -- can rather easily be dealt with by the chipset makers by simply passing that cost on to the end product users.

And a couple of problems with that, Your Honor, but the first issue being it's -- it's an end round the entire market value rule, but, again, I think that ship sailed, the Court has ruled, and -- and we certainly respect what that ruling -- albeit differ with it. But there is an evidentiary -- there's another issue here, and that is the -- the -- the evidentiary basis for it.

The fact of the matter is, is that Mr. Bone, neither in his opening report, nor in his rebuttal report, made that argument. There is -- there is no analysis on that issue whatsoever. The first time this came up was during Mr. Bone's deposition where he mused that the 50 cents could after all be passed on by Intel and other chipset makers to their -- to the -- their customers.

THE COURT: Well, let me ask you this, is Intel going to make the argument that their -- they will have to internalize the royalty on the chipsets?

MR. DAUCHOT: The argument will be made that the 50-cent royalty is unreasonable given the pricing on the chipsets. So I think --

THE COURT: But you want them to not be able to argue that that could be passed on and subsumed by the OEMs?

MR. DAUCHOT: Fair point. It -- it's -- it's not that -- that we don't want them to argue it, Your Honor. I think it's just that they have -- that they have passed on that argument. I mean, that is expert opinion testimony. You get into the questions of what the market will bear. You get into the question of pricing. You get into the question of relationships with customers. You get into the question of -- of -- of competitors out there. And -- and so there are a whole host of variables tied into the question of whether or not, in fact, a cost like that can be past on. And all of that -- none of that's been addressed.

THE COURT: Okay. Excuse me, excuse me, let me get a response to that that you've in essence waived it because it's not raised in your expert report.

MR. CAMPBELL: Well, Your Honor, so two

points. And I can hand up the Douglas Dynamics opinion if -- if it would help Your Honor, but as a matter of law, Chief Judge Rader says that that can be done. So there ought to be a jury instruction that says, the prices can be raised, if necessary, to accommodate the royalty.

The second point is Mr. Bone in his expert report calculated damages for the -- the individual entit -- entities, the Ericsson suit, which is not among -- which Intel was not amongst those. He didn't calculate a damages number for Intel specifically. He was asked in his deposition: How would Intel able to afford this on a $2.00 chip? And he said: What as a matter of law is true, you just pass that cost through to the OEM. You can, of course, afford a 50-cent royalty on that chip. That's -- that's not a problem.

So they've -- they've opened the door to that by trying to focus on what -- what would be Intel's damages. How would they -- how would they afford this? How can they internalize this on a chip --

THE COURT: Okay. Thank you. No. 4 is denied.

Is that all of our motions in limine?

MR. DAUCHOT: There is at least one more, Your Honor.

THE COURT: All right. Which one is that?

MR. MAJORS: Yes, No. 2. Your Honor, may I approach?

THE COURT: Yes, you may.

MR. MAJORS: Good morning, Your Honor. Tim Majors on behalf of Intel and the other Defendants.

The subject matter for Motion in Limine 2 is Ericsson's desire to introduce the CSIRO and WiLAN settlement agreements, and Defendants object to that for a number of reasons.

The first reason is Ericsson's cites no law that would support the introduction of the CSIRO and WiLAN agreements.

Now, Your Honor is familiar with the law and familiar in all likelihood with the ResQNet decision, but if you look at LaserDynamics, I think the situation is appropriate and analogous there. In that case, the District Court had allowed a settlement agreement for the patents-in-suit with a third party to come into evidence. The situation there was the settlement agreement was executed on the eve of trial. There were a number of procedural things that had gone against the Defendant. The -- the settlement agreement was years after the hypothetical negotiation. And as the Federal Circuit found, there was substantially more reliable

evidence in the record to make out the reasonable royalty analysis. And on that basis, the Federal Circuit said, no, the District Court should have precluded the Plaintiff from introducing that evidence.

So here we have a situation where we're even further afield. These are the Defendants and a settlement agreement that they executed. It doesn't pertain to the patents that are at issue in this suit.

Issue No. 2 is the settlement agreements are irrelevant, Your Honor. Neither their expert, Mr. Bone, nor our expert, Dr. Perryman, relies on those settlement agreements for purposes of coming up with their hypothetical negotiation and their reasonable royalty analysis. The only -- the only situation in which Dr. Perryman talks about the -- the CSIRO and the WiLAN settlement agreements is in rebuttal because Mr. Bone makes a very passing reference to them in his opening report.

And if you'll -- if you'll turn, Your Honor, to the slide that I've prepared, you'll see that, you know, if we need to get into these other settlement agreements, there's just a whole host of other issues that are going to need to be explored, and this is going to take us off on a path that we don't need to go. A lot of this is confidential information, but as Your

Honor can see in the -- in the graphs that I've provided, all the distinctions between the issues in those cases and the issues that we're going to be dealing with here. And both of those settlement agreements -- I know Your Honor is familiar with the CSIRO matter. The settlement was actually executed during trial much, much we saw in LaserDynamics with the exclusion of the BenQ settlement.

The final point that I -- that I want to make, Your Honor, is on the point of prejudice. These settlement agreements reflect large damage -- large -- large amounts, partly because they were involved in litigation right on the eve of trial. A lot of other things were going on. But a more fundamental point, Your Honor, to introduce two settlement agreements, one from 2009, one from 2011, for several of the Defendants in this case, it's going to leave the impression with the jury that some of these Defendants are some sort of serial infringers or they're bad actors, and we're going to just again get on off on a detour where we're having to explain everything that was going on in -- in those other matters, and -- and for that reason is why we think that it's prejudicial.

THE COURT: Okay. Response?

MR. CAMPBELL: Your Honor, first of all,

Ericsson doesn't want to get into these licenses.  The problem is that Defendants want to take us on two detours that require these licenses to rebut their expert's position.

The first is they want to argue that there's this royalty stacking, and they want to keep that in the hypothetical.  Hypothetically, we can have this royalty stacking problem, and their expert wants to opine that in this hypothetical world, the royalty stacking should never exceed five cents in aggregate.

Well, first of all, we have a number of Defendants here.  If royalty stacking was a real problem, they should be able to show it through their licenses or demands for licenses from -- from other people.  They shouldn't need to make it a hypothetical.  But if they're going to make it a hypothetical, then we need to be able to go to real world evidence.  And the real world evidence shows that Intel paid more than the aggregate that their expert wants to say is allowable or available to be paid in a royalty -- hypothetical royalty stacking issue.  So this rebuts that very clearly, shows he's wrong on that.

The second problem is in -- in doing this apportionment, I guess, is -- is what you call it, he wants to take and estimate how many standard essential

patents are out there and then divide it up evenly amongst how many patents he thinks are out there and say, okay, everybody can only get 3 percent of either the five cents, or there's a theory of, oh, the chip involves 17 percent standard essential patents, so you can only get your little portion of that by estimating. He doesn't know how many standard essential patents are out there because letters of assurance don't require you to say what your standard essential patents are. So he's got to use these numbers and extrapolate and -- and say what it is.

Well, as the slide shows, CSIRO had one patent and -- and got substantial value for it. So it shows that that analysis is the wrong way to look -- look at it, because as the Defendants' counsel admitted just a little bit earlier, you -- you have to look at what the value of the patent is. So it's not a desire to go into these agreements. It's a -- a need to show that the -- the two of the theories that they advance, a hypothetical royalty stacking and a divide the world up based on an estimated number of standard essential patents hasn't been the case in the real world. In the real world, those issues -- those theories have -- have not borne out.

THE COURT: What about your response to

their argument that this will lead -- lead into a series of mini trials on the issues in those other cases?

MR. CAMPBELL: Well, again, we don't need to go to a series of mini trials because the point would be to have their -- show their expert that, look, if -- if the royalty stacking really can only be five cents a unit, then this license could have never been entered into because their expert them -- himself calculates the per unit rate for these -- for these licenses. And it -- and it far exceeds that five cents. So we don't have to go into any sort of mini litigation on it. It's -- it's there on the facts of the case.

And -- and, secondly, the -- we're going to divide this up into these estimate -- he's going to divide this up into this estimate of how many standard essential patents there are and say, oh, you can only get, you know, a few percent here. Again, you don't have to go into mini litigation. It's -- it's clear, as -- as is put on this slide, there was one patent, and it, again, far exceeds what he says can be divided up on a per patent basis. We don't need to go into mini trials for that. There's -- there's very minimal facts that need to be introduced to rebut those positions and show those positions are wrong when you look at the real world.

THE COURT: What -- what is your response to his argument that this was -- has not been relied on by your experts?

MR. CAMPBELL: And it has not been relied on by our expert, and our expert won't intend to use it, but we want to be able to cross examine their expert on it.

THE COURT: Cross examine. Okay. Okay. All right.

Response?

MR. MAJORS: Yes, Your Honor, thank you.

Again, I think to the point that you -- the question that you raise about the mini trials is very much appropriate because in order to explain -- let's -- let's take one big step back. Both of these agreements were lump sum agreements -- settlement agreements for the entire case, settled worldwide litigation, and he's correct that there was one patent at issue in the CSIRO litigation, but as Your Honor well knows, there was a prior summary judgment of infringement and validity, albeit upon a third party, and Your Honor had held an opinion that that was a core patent to the entire 802.11 standard.

So we will need to explore that to say, this is -- this is a reason why the value was paid for the

CSIRO agreement. And, again, it's just going to get far afield from the issues in this case. As counsel for the Plaintiff has said several times, we need to focus on the patents, the claims, and the accused products here. Getting off on a tangent about CSIRO and WiLAN and amounts of money that were paid there, it just seems to take us -- take us to a direction that we don't need to go.

THE COURT: Okay. Thank you.

I will allow you to go in, you know, on -- to -- to the differences. I mean, we face this every time we admit settlement licenses, and sometimes the Defendants want them and sometimes the Plaintiffs want them. I will allow them, and -- and you can go into the differences, so -- and -- and I will allow them on cross examinations as rebuttal to your -- your expert -- Defendants' expert's testimony.

Okay. Any other motions in limine?

All right. I've looked at your juror questionnaire, and it -- it is fine.

The -- no one has said anything about the claw back. Has that been resolved, Docket No. 402?

MR. STEVENSON: It has not been resolved. We were willing to submit it on the papers, but if Your Honor would like to hear argument, we are prepared right

now to argue it.

MR. DEVRIES: And -- and if I may -- may, Your Honor, where we're at in the briefing process is that the motion has been filed, the response has been submitted. We've not had a reply and a sur-reply. There are four documents at issue. We've had agreement on one. For the remaining three, those are documents that we'd like to use as part of Ericsson's case-in-chief. We're prepared to make a brief presentation to Your Honor. If Your Honor would prefer, we could finish the briefing. We would like an opportunity to be heard at some point, however.

THE COURT: So the briefing is not complete yet?

MR. DEVRIES: That's correct.

THE COURT: All right.

MR. DEVRIES: But the -- but both the -- the motion and the response briefing is in.

THE COURT: Okay. So do you wish to file a reply?

MR. DEVRIES: We do. Alternatively, we could just go ahead and take care of it now.

THE COURT: Let's take care of it. Go.

MR. DEVRIES: Thank you, Your Honor.

Your Honor, may I approach?

THE COURT: Yes, you may.

MR. DEVRIES: Your Honor, Defendants' motion to compel seeks production or reproduction of three documents that are still in dispute. And we believe that the evidence that's been submitted clearly establishes that these documents are not privileged, and as a result, we think that they ought to be reproduced.

I'd like to walk through the key evidence for each document, and I've handed you up a set of slides. And I'm not going to read all of it into the record out of respect to confidentiality, but with respect to the first disputed document, this is a document that has been reproduced in redacted form, and it relates to Ericsson's licensing business. It does not relate to privileged matters. And you can see that from the page that I'm showing you on Slide 2.

We have some recommendations here that relate to Ericsson's licensing business, and not all of them have been redacted. There's one that you can see that has not been redacted, and as -- as I understand it, there's a recommendation that has been. These are not legal recommendations made by counsel, rather these are Ericsson's licensing personnel who are making statements about Ericsson's licensing business. And as clear from the production of the document, Ericsson

itself agrees that the vast majority of the document is not privileged.

Turning to the next slide, let's talk about who authored this document, what the testimony shows. Ericsson claims in its response brief at Page 4 that a Mr. Forslund and Mr. Iwerback offered the document. They use the word "create." During Mr. Iwerback's deposition, he was asked who the author of the document was, and he said, Mr. Forslund. He didn't identify himself as an author.

Turning to the next slide, with respect to Mr. Forslund's deposition testimony, we asked him at deposition, was this document prepared at the request of Ericsson's counsel? And he says, I don't think so, no. Ericsson now claims -- and this is at the top of the slide -- that the document was created at their -- at the request of in-house counsel, Mr. John Han. And, Your Honor, that is just inconsistent with the testimony of the witness at the -- at the deposition.

The witness has put in a declaration now saying that it was prepared at the direction of counsel. There's no further explanation given, and we would submit that declaration that contradicts deposition testimony should not be credited and is not sufficient to meet Ericsson's burden of proving privilege.

Ericsson says that -- that it was created at the request of -- of Mr. Han. And if you look at my Slide 5, you'll see what Mr. Forslund puts in his declaration in support of the motion. He says, at in-house counsel, John Han's, request, I created the first document.

Now, you'll recall, he already testified during deposition that he didn't create it at the -- at the request of counsel, but we asked him further at his deposition whether he had worked with John Han on a Wi-Fi project. That's the subject of this document, as Your Honor can see from Slide 2, and -- and we said, you don't recall ever having worked with him on any project or project about 802.11. And he said, no. So, again, his deposition testimony contradicts the current position that's being taken.

And then, finally, with respect to this document, Slide 6 addresses a speculation, I would call it, that Ericsson makes in its response brief. It says, well, Mr. Forslund also worked with others in Mr. Han's group. So he -- he refers to Mr. Iwerback, we've already discussed, and Mr. Delgado. But, again, during his deposition, we asked whether Mr. Forslund, the author, ever worked with Patricia Delgado. Again, the answer was no. We sought so clarify. The answer was

no. So we're left in a situation where there's a claim of privilege, a claim that this document was made at the request of counsel. The deposition testimony contradicts that. But I think more importantly, when you look at the document itself, this is a document that does not go to legal issues. It goes to the core of -- of -- of Ericsson's licensing business, and there's broad agreement that most of this document is not privileged.

I'll more briefly address the remaining two documents, Your Honor --

THE COURT: Well, let's -- let me get -- let's take them one at a time --

MR. DEVRIES: Yes, Your Honor.

THE COURT: -- and get a response on the first one.

MS. MOORE: Your Honor, Ashley Moore for Ericsson.

I believe the two arguments we heard were that the depo testimony was contradictory as to whether the document was created for the purpose of in-house counsel or not and who the author of the document was, as well as whether the document contains business advice or legal advice. I'll start with the deposition testimony.

Mr. Forslund, as -- as counsel read off, Mr. Forslund -- Forslund said, I don't think so. I don't think that I created this at the request of in-house counsel. It's an older document. There -- a significant period of time had elapsed, approximately a year or so between the document's creation and his depo testimony. So his ability to recall who requested the document or being unsure of that fact is not contradictory. He simply was able to go back later after the deposition was over, talk with counsel, talk with his in-house counsel, John Han, who did request that this document be created for the purpose of legal advice. He was able to go back and actually do some research and figure that out. So that's why his declaration in -- that was submitted with this motion or our response to this motion clarifies what actually did happen as --

THE COURT: Well, counsel, his declaration is very conclusory. He did not -- did he ever go back and amend the answers in his deposition?

MS. MOORE: No, Your Honor.

THE COURT: Okay. And I believe he -- that this document was produced multiple times, was it not?

MS. MOORE: It was produced twice. The first time originally on August 23rd, 2012.

THE COURT: Without anyone claiming privilege?

MS. MOORE: Correct. And then when it came up in depositions and we were able to see the content of that document, we snapped it back during the deposition, and then we later, I believe within 24 hours, produced a redacted copy. The vast majority of the content is still available to the Defendants. We have redacted some portions of this PowerPoint.

THE COURT: All right. The -- the motion to compel is granted as to Document No. 1.

All right. What's next?

MR. DEVRIES: Thank you, Your Honor.

I'll more briefly address the second disputed document. The second disputed document is a text file. It was authored by Mr. Iwerback, and at a general level, I won't go into specifics, of course, it concerns a proposal that Ericsson made to an 802.11 standards body. And it doesn't have any indication on it that it's privileged.

If you look at my Slide 7, this is what I'd like to focus the Court's attention on, if I may. This document does not relate to the privileged matters. This document is a recitation of what Mr. Rydnell told Mr. Iwerback about a presentation that Mr. Rydnell made.

Now, if -- if you look at the -- Slide 7 in the middle, in Ericsson's brief, Ericsson says that the facts contained in this document have been recounted in their -- in one of their interrogatory response -- responses, Common Interrogatory No. 9.

Now, our position is that they've been recounted in part, but not fully. But the case that Ericsson cites in its brief -- this is the Burroughs case -- v. Barr, and I've included the cite here. That case holds, with respect to certain documents, that the information that was contained in those documents was not privileged because it was intended to be disclosed. And so we don't have, again, any -- really any detail in these declarations. But what I surmise, from what's been said in the response brief, is that this information was provided and then subsequently found, at least in part, its way into an interrogatory response. And in that circumstance, the case that they cite holds that that's not privileged.

And then, finally, if you look at Slide 8, this document is necessary, Your Honor, to resolve a little bit of a dispute in testimony. And it's not a dispute between what Ericsson says and what we say, but it's a dispute about what Mr. Iwerback says and Mr. -- what Mr. Rydnell says about what happened in this

standards submission.

Now, Mr. Iwerback relates, and I won't read the whole thing here, but he says that he was told by Gunnar -- Mr. Rydnell, that the Ericsson contribution was laughed at.

Now, Mr. Rydnell was asked the same question. He was asked: Was it your impression during the meeting that the proposal was laughed at by attendees at the meeting? No, I didn't see anybody laughing. And this was a -- a straightforward example. There are others of a dispute in testimony between Mr. Iwerback and Mr. Rydnell. But the factual content of this document, which is really all that it is, goes to this very issue. And so we just don't think it's privileged in the first instance and also it -- it's necessary.

THE COURT: Okay. Response?

MS. MOORE: Yes, Your Honor. Mr. Iwerback created this document as a text file and then took that content and copied and pasted it into an e-mail to both in-house counsel and outside lawyers at McKool Smith for the purpose of seeking legal advice.

The problem was during Mr. Iwerback's deposition, this text file doesn't claim -- doesn't contain the e-mail header or signature line that would

have indicated to him that it was, in fact, privileged information that was created at the request of counsel. So that's why during the deposition it was not clear at that point that it was privileged information.

Then once it -- we were able to go back and look at the e-mail that contained it, we determined that it was, in fact, privileged information that was created during this litigation for the purpose of seeking legal advice.

And the case on point here is actually the In re: Grand Jury Proceedings case that says, documents summarizing factual information are attorney-client privileged if it is sufficiently clear that the documents would not have been created had Plaintiff not needed the assistance of counsel. And then there are a series of parentheticals for different cases that state a factual chronology can be privileged if it meets that test. Factual investigations can be privileged if you meet that test, and factual background that is provided to attorneys for rendering legal advice can be privileged in this particular case.

And that's exactly what happened here. Andreas was asked to create some information about 802.11 and Ericsson's thoughts on -- on the 802.11 process. It was created for that purpose for

Mr. Stevenson, Mr. Caldwell, and Mr. Frank Vecella -- Vecella, all attorneys for Ericsson who needed that advice or needed that factual information to render legal advice for this litigation.

THE COURT: All right. The motion to compel as to the second document is denied.

What's next?

MR. DEVRIES: Your Honor, finally, the third and last disputed document, I'd like to make two points about this document, and they're found at Slides 11 and 12 that I handed up to Your Honor.

This document is another text file, and it essentially -- I won't, again, go into the details -- relates to licensing issues and Wi-Fi standards. The document was authored by Ms. Gedda, Marie Gedda, G-e-d-d-a, who is not a lawyer. And if -- and so let's talk about first the contents of the document at a high level.

These -- the contents of the document relate to licensing. Specifically, if you look at the bottom of Page 11 -- of Slide 11, Ms. Gedda explains in her declaration that the document contains some draft technical responses that were being used in connection with licensing negotiations. And at the top of that slide, you see that in her deposition, she confirms that

she's not an attorney. She -- she, in fact, stressed that during her deposition. And so we have a non-attorney who's preparing some technical responses in the course not of litigation but in licensing negotiations, and I think as is clear by looking at the second slide in my presentation, Ericsson concedes that some vast majority of its licensing business is not shrouded within the secrecy of attorney-client privilege, that the -- its regular licensing business is not privileged. And this kind of a document goes directly to that. Ms. Gedda is not providing legal advice. She is talking about technical issues. And so it's simply not privileged.

And then second and finally, we have the record of -- of whether or not this document was prepared at the direction of counsel. And I would submit to Your Honor that the record is certainly unclear, at best, and Ericsson has not met its burden of proving privilege. At her deposition, Ms. Gedda was asked whether the document was prepared at the request of an attorney, and she says, I don't know the document is such or recall it, so I can't be sure. So she didn't say there that it was prepared at the request of an attorney.

Now, Ericsson's position is, well, she went

back and looked at it, and now she believes it was prepared at the request of an attorney. But let's look at what she says in her declaration, Your Honor. She says, in particular -- I'm reading the highlighted section -- the third disputed document would have been communicated to Richard Harris acting in his capacity as an attorney. And we don't even have a declaration from Mr. Harris, who I understand is no longer at Ericsson, and that may be the explanation. But the point is she has not unequivocally said, yes, I remember, this has been prepared at the request for an attorney. She said something very equivocal, and that simply isn't enough to meet Ericsson's burden.

THE COURT: This was back in 2005, though, wasn't it, that this document was prepared?

MR. DEVRIES: Yes, sir.

THE COURT: Okay. All right. Response?

MS. MOORE: Our response is twofold. One, this document, I believe, is probably subsumed in these agreed motions in limine where settlement negotiations are not going to be admissible and used in this case. This particular document was created by Marie Gedda at the request of Richard Harris, in-house counsel, who counsel correctly points out is no longer with Ericsson and therefore was unavailable for declaration to -- to

help in this matter, but it was for the specific purpose of responding to NETGEAR's technical distinctions during settlement negotiations for the patents-in-suit in this case regarding a Defendant in this case.

And, Your Honor, as previously similarly ruled in the Mondis case that was from 2011, that it is one thing to allow discovery of settlement negotiations where the negotiations ultimately resulted in a license, but it is another thing to allow discovery of settlement or licensing negotiations where a license has not been adopted. The Court refuses to allow discovery to go that far for two reasons. And the two reasons were that it was not reliable, and it has a chilling effect on settlement. That's precisely what this document is here.

THE COURT: Okay. Thank you.

The -- Document No. 3, the motion is denied -- motion to compel is denied.

Now, finally, I note that Defendants have just filed a motion for confirmation of Court's claim construction. I take it Plaintiffs have not had an opportunity to respond to that yet?

MR. STEVENSON: We haven't. Mr. Jones and I talked about it for -- I mean, five minutes in the hallway at the mediation. And some of our team members

have talked about it.  I got it last night when I got into Tyler about 9:00 o'clock.  I'd like to have -- have an opportunity to digest it and --

THE COURT:  All right.  When can you have a response filed?

MR. STEVENSON:  Whenever the Court would like one.

THE COURT:  See, what's today, Thursday? Let's say Monday by 5:00.

MR. STEVENSON:  Yes, sir.

THE COURT:  Okay.  And then if there's any reply, say by Tuesday at 5:00?

MR. JONES:  Yes, Your Honor.

THE COURT:  And then Wednesday at 5:00? That will be all the briefing.  Okay.  All right.  Then I'll take a -- take a look at it.

MR. JONES:  Thank you, Your Honor.

THE COURT:  Okay.  Are there any other motions?  We still need to talk about trial times, I know.  Any other motions?

MR. VAN NEST:  No motions, Your Honor.  I have one comment.  I think it's related to trial time. It has to do with one of the claims --

THE COURT:  Okay.

MR. VAN NEST:  -- that they are now

indicating they're going to assert.  Would you like me to address that --

THE COURT:  Sure.

MR. VAN NEST:  -- briefly now?

THE COURT:  Okay.

MR. VAN NEST:  As -- as Your Honor knows, we've been meeting and conferring on claims and defenses.  And last night, we got from Ericsson their list of claims they want to present.  One of the claims is Claim 5 of the '568 patent.

And the objection we have been making to that is that there wasn't an expert report submitted on Claim 5, and there wasn't any attempt by their expert to line up evidence responding to Claim 5.  And so our expert did not present any detailed analysis of Claim 5.  We understood Claim 5 had been withdrawn.  It was not in the original -- it was in and then out and in and out.  In the final pre-trial order we submitted, it was out.

And when I say, the experts didn't address it, what I mean is this, in the general statement of what's infringing, their expert did say, I think some of the Defendants' products, namely the routers, infringe Claims 1 through 5 of the '568, a very general statement.  But as to every other claim, their expert lined up by claim element-by-element, here's the

evidence, here's where I find this element in the product, here's where I find this element, here's where I find this element.  There was a very detailed set of appendices for each one of these, but nothing on Claim 5.

So our experts were in the position of saying, well, I see that he mentions in passing Claim 5, but he has marshaled any evidence.  He hasn't provided a -- a claim chart as to Claim 5.  He hasn't gone element-by-element, so I can't do that either.  I reserve the right.

There was then nothing in the deposition because there was nothing to go on.  He hasn't submitted anything.  And now at the eleventh hour, they want Claim 5 back in, which is -- is outside the rules, prejudicial.  The experts haven't prepared on it.  No deposition testimony has been elicited on it, and we don't think Claim 5 should remain in the case.

THE COURT:  Okay.  Response?

MR. STEVENSON:  Your Honor, Claim 5 has never been out of the case.  It's in our infringement contentions.  Claim 5 is a dependent claim.  The claim, one, that it depends from claims a transmitter with all the elements.  Claim 5, I think from memory -- I don't have the patent in front me -- says, wherein the

transmitter is a base station, period.  I think it's literally that long.  And that's all it is.  And in our infringement contentions, we show base station examples which are, you know, the routers.  We assert this against the router manufacturers, and that's just, I think, a -- a clear indication that a router is a base station, and it's not asserted against the laptop.

As far as the charts go, the expert had charts for -- in his report for all the infringement bases.  This one claim, for some reason, isn't in his chart.  I will say that.  But there's no question based on what I think is fair parlance and infringement contentions that we can very easily conclude that a router, for instance, a wireless router is a base station.  And that just narrows the claim down from asserting against --

THE COURT:  So it's just one element that the Dependent Claim 5 changes?

MR. STEVENSON:  Yes, it says, wherein the transmitter is a base station.

THE COURT:  How -- how is that -- how is that prejudicial to --

MR. VAN NEST:  Your Honor, the -- it's -- it's like anything else.  Under -- under our rules we've been operating under, if you're going to assert a claim,

you provide a detailed chart. There was no chart at all on Claim 5. I -- I appreciate counsel's attorney argument that there's only one additional element, but that's all it is. It's attorney argument. They didn't present that in their expert report as to any element in Claim 5, just not there. It was mentioned in passing in a summary of all the claims that their expert says are infringed. But with respect to Claims 1, 2, 3, and 4, we have charts. We never had a chart on Claim 5, and so our experts presented no information on it either.

THE COURT: Was he questioned about where the chart is in his deposition?

MR. VAN NEST: No. We assumed it was pulled. He wasn't questioned about anything that was not in his report. We ques -- questioned him on what was in his report, and no one ever said, oh, this is inadvertent or this is out. As a matter of fact, we've been back and forth -- the pre-trial order we submitted a week ago, there's no Claim 5. It was just the last couple days that they've said, well, wait a minute, we want Claim 5 in now, even though they never complied with any of the rules.

THE COURT: Okay. Well, I don't have a pleading in front of me. If you want to file a motion, I will take it up. My suggestion to the parties would

be to get together, do a -- give both sides a chance to -- to chart it and both sides a chance for a one-page supplemental report. And if you feel like you need a deposition on this particular deal, do a short deposition of your experts.

MR. STEVENSON: Yes, Your Honor. Our expert, in fact, is being put up for deposition on the non-infringing alternatives, I believe, on Monday. And we will -- we'll do a one-page for them prior to Monday, and they can ask him all about this.

THE COURT: All right. And then you do -- do likewise if you wish to supplemental your --

MR. VAN NEST: Thank -- thank you, Your Honor.

THE COURT: Okay. Let's just do it that way. If you want to file a motion to exclude, I'll take it up, but just based on what I've heard, I think this would be the best real solution for both sides.

MR. VAN NEST: Fair enough, Your Honor.

THE COURT: All right. With regard to timing, someone tell me -- I know Plaintiff is asking for 15 hours, and Defendants asked for 20 hours. Why can't this case be tried in 12 hours? Every time I give 15 or more hours, when 12 hours rolls around, I'm kicking myself for having done it because I think it's

been well presented to the jury by that time, and the jury usually feels likewise, so...

MR. STEVENSON: I'm --

THE COURT: But I don't want to rush you. I mean, I know it's an important case and --

MR. STEVENSON: I'm thinking on the fly, Judge, and -- and I -- as -- as my wheels turn, I'm thinking maybe we could, but there -- there -- basically, the way that the case breaks down is there's three primary chipsets involved, Ather -- Atheros, Broadcom, and Intel, and so what we do is when we do the infringement, we refer to those three chipsets.

Really what happens is you read the claims against the standard, and then you go to the chipset level, and then you go into some testing and other technical documents.

I think our infringement expert will probably be on the stand a little over three hours. So if we had to do it in 12, we could -- we could maybe do it, but I think we would be rushing. I think 15 is comfortable and lets, you know, everybody get their best couple or three issues out per patent that they want the jury to listen to technically.

THE COURT: Okay. And you've -- tell me who your expert -- or how many experts you have.

MR. STEVENSON:  We have --

THE COURT:  One on infringement?

MR. STEVENSON:  We have one technical expert.  His name is Dr. Scott Nettles who will be both infringement and validity.  One damages expert.

THE COURT:  And what about Defendants?

MR. VAN NEST:  Your Honor --

THE COURT:  Response and --

MR. VAN NEST:  I've -- I've -- I've been in your court in trial before, so I know we -- we move quickly, but I would -- I would say, I didn't ask for 20 hours lightly, and -- and this is what I mean.  It is really unusual to attempt to try a six-patent case with 15 separate claims.  Eight of those are independent claims, so we're not talking about two independent claims and a trail of dependent ones that get short shrift.  We're talking about eight separate, independent claims.  They're asserted against seven Defendants.  They're asserted against three different sets of chips, one set by Atheros, one set by Broadcom, and another set by Intel.  And we're talking about very complicated technical stuff where I don't see any way -- if -- if we're going to present non-infringement on every claim and invalidity as to some or all claims, I -- I don't see any way that we can do that in 15 hours.

If you think about it, I've got three different chip makers, and we'll probably hear from all three. We have only two experts on liability and a third on testing. We have potentially two damages experts because we have seven Defendants. And, you know, their numbers stack up differently, and they're in slightly different areas. So, to me, it -- it -- again, I -- I try a lot of cases, and I've tried cases here, and I've tried them everywhere else, and I'm a big proponent of doing things in a coordinated way.

And we've worked really hard on the defense side to get this coordinated so we're going to present one trial, unitary, cooperation, divide the work up. We're not going to duplicate it, but when you sue seven different Defendants and you've got 15 -- 15 claims you want to present and eight of those are independent, I honestly think that 20 hours is a stretch, given what I think I've got to present in order to provide defenses on each of these claims.

Now, we've been asking them, hey, you guys really need 15 claims? Do you really need all six patents? Can we cut this down?

THE COURT: Good -- good question.

MR. VAN NEST: And -- and -- and it seems to me that if -- if -- if we can cut it down, great, but --

but when I got the list last night, nothing was cut down.  All six patents are in.  They've got one or two independent claims from each patent and then a bunch of dependent claims.  I almost fell down when you said 12 hours, Your Honor, but it's a daunting task to be able to defend this many clients on this many different technologies in even a 20-hour per side presentation.

And believe me, if we don't need it all, we won't take it.  I think Your Honor knows that.  If we don't need it, we'll move on, but -- but I can't -- I can't tell -- stand here and tell you that we can present a coherent, understandable, well taught case with -- with less than 20 hours on all these patents, six of them and eight independent claims and 15 claims overall asserted against three different sets of chips.

THE COURT:  Mr. Stevenson, let me ask you, do you anticipate that there's a possibility you can further reduce your number of patents or number of claims?

MR. STEVENSON:  Yes.  We're -- when we get the prior art, four references per claim, we're going to take another look at it.  And another thing that would, of course, factor into that is what -- what is my time budget?  I realize that --

THE COURT:  What is your what?

MR. STEVENSON: What is my time budget. In other words, if -- if -- whatever the Court gives me as a time budget, I'm going to go carefully allocate to how much time am I going to have my infringement expert on the stand, what do I have to do to cut down, and, you know, it -- it's probably -- that's probably the governor right now in my view, which is how much time do I have? How much can I put on?

THE COURT: Well, I mean, there is just a real effort, as I think most of you know, to -- to even earlier in a case to reduce number of claims and number of patents and number of prior art references to simplify these cases. That does seem like a large number of -- of patents and claims to be going to a jury on, so I would hope that you can narrow it down.

Let me ask you, when are you supposed to get their prior art references?

MR. STEVENSON: Saturday.

THE COURT: Saturday. So when can you make a further reduction in your number of claims by?

MR. STEVENSON: Tuesday.

THE COURT: All right. Tuesday at noon?

MR. STEVENSON: Tuesday at noon.

THE COURT: Okay. All right. I will encourage you to do that, and then ask both sides to

file a revised trial estimate time after that reduction has been made.

MR. VAN NEST: That -- that's fair, Your Honor, and we'll do that.

THE COURT: And I've heard what you say, and I do appreciate the defense team working together, and I want to give every consideration to -- to that fact that we're getting this all -- all wrapped up at one time. But at the same time, I -- I know how hard these days are on the attorneys, on the jury, and I've -- every time I try one of these cases, even when it's 11 or 12 hours, I go back and ask the jury and say, do you feel like you needed more information to make this decision? And they say, no.

You know, they -- they -- they get it a lot quicker than we lawyers sometimes think they do. So anyway, I don't want to hamstring you, but I -- I do want to try to get this narrowed down, so let's see where we can go on the -- on the claims, and I'll get you your final time estimates.

MR. VAN NEST: Your Honor, thank you very much. And I guess if -- if they submit their final claims noon on Tuesday, when would you like our time estimates?

THE COURT: When can you get them to me?

MR. VAN NEST: Well, I think we can get them to you either by the end of the day or first thing Wednesday.

THE COURT: Yeah. Let's say Wednesday morning will be fine.

MR. VAN NEST: Yes, Wednesday morning, first thing.

Could I mention two other trial management points?

THE COURT: Yes. There was one other thing first I was just thinking of -- I may have lost it -- about the timing, but anyway go ahead, and I'll come back to it.

MR. VAN NEST: I would like to request -- I know Your Honor has under submission the motion related to Dell's license defense.

THE COURT: Right.

MR. VAN NEST: I think that I'm speaking on behalf of all of the Defendants, if -- if Your Honor determines that that claim should be tried, we'd request that it be severed and tried maybe with the willfulness trial or some -- somewhere. It -- it's not fair to the rest of us to have to spend time in an already tough trial dealing with a separate defense that only affects one party that's a complete and separate issue and which

is going to potentially prejudice the rest of us.

You know, where's -- where's the Toshiba license? Where is the Acer license? You know, license agreements and license defenses can be extremely difficult to understand. They can play into a trial in ways we don't anticipate. And I really think if that claim is going to be tried, that we would request -- and I -- and I don't -- I'll invite Dell to comment. I don't think Dell disagreed that -- that it ought to be tried in a separate phase from our main trial where we're already trying --

THE COURT: Does Dell disagree with that?

MR. SMITH: No, sir, to this extent. We do believe we are entitled to a jury trial on that issue, and we would accept a bifurcation of that defense to be tried later, preferably by a separate jury.

THE COURT: Okay. By a separate jury?

MR. SMITH: Yes, sir, that would be our presence because obviously the first jury would have determined, if we're going to have that trial, that liability has been found. And the defense is, of course, independent of any finding of liability.

THE COURT: Okay. Response?

MR. STEVENSON: I agree that bifurcation makes sense. I would leave it to the Court's discretion

about whether keeping the same jury or have -- have a different one.

THE COURT: All right. Okay. I -- I think the -- let me -- I'm going to look at the summary judgment. I'll figure out something on bifurcation. I think the parties can be assured in doing your time estimates that the license defense will not be part of your time estimate.

MR. VAN NEST: That would be great, Your Honor. We appreciate it.

The only other question that I want to just put on the Court's desk is that it's been mentioned a couple of times this morning that there are equitable issues pertaining to promissory estoppel and the like. I -- I think those are -- our contemplation of both parties is those would be tried to Your Honor at the bench, if necessary, following the outcome of the jury trial.

I don't know whether there would be additional evidence or if so, how much, but I know there are a number of issues that would be left potentially if there's a favorable verdict for Plaintiff in the jury trial phase.

MR. STEVENSON: Agreed. And there may not be any more evidence to put on. There may be --

obviously, we're going to use what's been adduced in trial and not repeat that. And then if we have anything additional, we'll just do that.

THE COURT: My normal practice is that your -- I will hear whatever evidence is also relevant to the jury during the course of the trial. Then at breaks, while the jury's out, I will hear your -- your evidence to the Court on the equitable defenses, and that time is normally counted as part of your full time in the case. So you need to reserve whatever -- how much time you need for those issues.

MR. VAN NEST: So as I understand Your Honor's ruling, our -- when we give you our time estimate, it doesn't have to account for the Dell license defense because that will sever. It doesn't have to account for the willfulness --

THE COURT: It does have to account for the willfulness, yes.

MR. VAN NEST: All right. So -- so what -- what would be -- and the Dell license defense, that would not be counted as part of our time?

THE COURT: I tell you what I'll let you do. I'll let you break out your time estimate for the infringement, validity, and --

MR. VAN NEST: Damages.

THE COURT: -- damages, and then a separate time for the willfulness part.

MR. VAN NEST: And -- fair. And -- and -- and should -- and the bench trial, we'll -- we'll lump with that willfulness part?

THE COURT: Well, the bench trial would be included with the -- with the first trial.

MR. VAN NEST: Okay.

THE COURT: Okay.

MR. VAN NEST: Okay. So -- so we'll do it that way. That's fine.

Do -- has Your Honor determined yet which day we will begin trial? I know we're picking a jury on the 3rd.

THE COURT: We will start on the 3rd.

MR. VAN NEST: Okay.

THE COURT: We'll proceed straight into evidence on the 3rd and --

MR. BAXTER: Your Honor?

THE COURT: Yes.

MR. BAXTER: Just one second. I know that the Court wants to get started right away. I had originally indicated to Mr. Stevenson that I could help him with this case. Judge Gilstrap had changed my mind about this and set the TiVo case for the 10th, which is

going to take me to Texarkana.  And I have imposed upon Mr. Cawley to come and take my place, a much better lawyer, a much better option for the Court.

THE COURT:  Definitely better looking.

MR. BAXTER:  Absolutely, Your Honor.  He -- he has a health issue with his wife, Your Honor, and she has some radiation treatments that are going to be that first week.  Certainly the jury could be picked on the 3rd because Mr. Stevenson is going to pick it, but I was wondering if there's any way the Court could start the trial on the 10th?  I'll be in Texarkana, but Mr. Cawley -- the treatments with his wife will be through by then.

THE COURT:  Can everybody hear back there? Can you hear?

MR. VAN NEST:  Yes.

THE COURT:  Mr. Van Nest?

MR. VAN NEST:  Oh, I can hear, Your Honor, yes.

THE COURT:  Okay.

MR. VAN NEST:  I can hear fine.

MR. BAXTER:  If it would be possible to start on the 10th, it would certainly be a great benefit to Mr. Cawley.

THE COURT:  What's Defendants' -- do you

have a preference?

MR. VAN NEST:  Given the health issue, Your Honor, if I can have just a moment with co-counsel.

THE COURT:  Right.  And I need to look at my schedule -- let's take about a five-minute recess and let me take a look at my schedule.  I was really planning on trying to get this wrapped up the first two weeks --

MR. BAXTER:  I know, Your Honor, and I hate to interject that, but given -- given the -- the TiVo trial, and Judge Gilstrap said it can't be moved, and I have to be there, and I hate to leave you alone with Mr. Stevenson.

THE COURT:  All right.  We'll be in recess for about five minutes.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  Mr. Baxter, while the Court would -- would like to accommodate you on this, I have some real problems in that I have prior commitments at the Federal Circuit bench/bar on a couple of panels the week -- starting on the 17th, that next week.  So I'm just concerned that we can't get through with the case

if we wait to start it on the -- on the 10th instead of the 3rd.

Would it -- what -- what are Mr. Cawley's -- his wife, is she having radiation all that week or --

MR. BAXTER: He -- I just talked to Mr. Stevenson, and here's the situation as I understand it, Your Honor, she had thyroid cancer, and they have -- they've done surgery. And she's now taking some sort of -- I don't want to call it experimental, but it's -- it's medication, it's a pill, but it's radiation type stuff.

THE COURT: All right.

MR. BAXTER: That actually happened -- they had it moved up, Your Honor, actually in anticipation of this trial, and it was done yesterday.

Now, my understanding is that once that happens, she's prescribed bed rest. Because of the effects of the pill, he has to kind of -- he can stay in the house, but he has to stay away. They don't know quite what the debilitating effects of that -- that's going to be. We'll know in the next few days.

If it goes well, and the doctor hopes that it will, then by the 3rd, he -- he can be here and pick the jury and proceed. If it doesn't go well, then that's a little bit of a problem, and we'd have to make

some alternative care treatments, I suppose, Your Honor. But if the Court needs to start on the 3rd, we'll start on the 3rd.

THE COURT: Okay. What's Defendants' position?

MR. VAN NEST: It's whatever the Court wishes to do.

THE COURT: All right. Let's leave it -- Mr. Baxter, we'll plan to start on the 3rd, but tell Mr. Cawley, that if he runs into a problem and -- and it would be helpful to him, I would see where we could start, you know, pick the jury on -- on the 3rd, but if we need to come back on Wednesday or if he needs a day or two off in there, I think everybody would be willing to -- to try to accommodate that.

MR. BAXTER: I will, Your Honor. And I appreciate that.

THE COURT: And I -- I hope she does -- does well. I know people who have had that procedure that have done quite well, so I hope that she does.

MR. BAXTER: Thank you, Your Honor.

THE COURT: Very well.

Anything -- oh, a couple of other things, just to remind the parties. My new normal practice is to start at 9:00 and quit at 4:00, instead of 5:00 or

6:00 or 7:00 or whenever, so the newer, more gentle trial approach, and to also go Monday through Thursday. So that will be my plan. That, though, is subject to change, depending upon our schedule, depending upon our time estimates. I've got to be through with the case prior to the 17th. So we will proceed in that manner, but -- and I'll try to give you advance notice if it looks like we're going to go on Friday. I just want to tell you what the Plan A is, and if we end up having to go to Plan B, we will.

I guess y'all have got -- both sides are aware of do -- do the jury's lunch and got that taken care of.

Let's see, the -- how we do the exhibits at the beginning of each day, have those marked and agreed to. And the 7:00 o'clock rule, nothing filed after 7:00 p.m. in the evenings, okay?

All right. Anything further? Oh, where are you on settlement? Have y'all been back to mediation? Are you going back or --

MR. BAXTER: We went -- went back this week, Your Honor, and we -- talks continue, Your Honor.

THE COURT: Talks continue.

MR. BAXTER: Yes, they do.

THE COURT: Okay. All right.

MR. BAXTER:  Could I ask one question, Your Honor, about the questionnaires?

THE COURT:  Yes.

MR. BAXTER:  Do you know when we'll be getting those?

THE COURT:  You'll be getting those the morning of jury selection.

MR. BAXTER:  Thank you, Your Honor.

THE COURT:  Okay.  Anything further?

MR. VAN NEST:  No, Your Honor.

THE COURT:  We'll be adjourned.  Thank you.

COURT SECURITY OFFICER:  All rise.

(Hearing concluded.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

SHELLY HOLMES                                    Date
Deputy Official Reporter
State of Texas No.: 7804
Expiration Date: 12/31/14