IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL                )
                                      )    DOCKET NO. 6:10cv473
     -vs-                            )
                                      )    Tyler, Texas
                                      )    9:05 a.m.
D-LINK CORPORATION, ET AL            May 9, 2013


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE


A P P E A R A N C E S




(SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES OF THE HEARING.)






COURT REPORTER:         MS. SHEA SLOAN
                        shea_sloan@txed.uscourts.gov



Proceedings taken by Machine Stenotype; transcript was produced by a Computer.

PROCEEDINGS

THE COURT: Please be seated.

All right. Ms. Ferguson, if you will call the case, please.

THE COURT: Court calls Case No. 6:10cv473, Ericsson, Inc. v. D-Link Corporation.

THE COURT: All right. Announcements.

MR. STEVENSON: Good morning, Your Honor, Ted Stevenson with McKool Smith for Ericsson. Also at Counsel table that will be presenting is Justin Nemunaitis and Warren Lipschitz. We are ready to proceed.

THE COURT: Very good.

MR. JONES: Your Honor, for Defendant Intel, Mike Jones and John Bufe. Presenting for Intel will be Mr. Greg Arovas, Mr. Luke Dauchot, and Mr. Adam Alper. Also here on behalf of Intel Mr. Allan Stabinsky and Mr. Ben Ostapuk.

THE COURT: Okay.

MR. JONES: Thank you, Your Honor.

MR. DACUS: Good morning, Judge. Deron Dacus on behalf of Dell, here with Mike Newton and Frank Smith of Alston & Bird and also with Lauren Hoffer for Dell. We are ready to proceed.

THE COURT: Okay. Thank you.

MR. VAN NEST: Good morning, Your Honor. Bob Van Nest from Keker & Van Nest here on behalf of Acer, D-Link,

and NETGEAR. Along with me at Counsel table is Jonah Mitchell from Reed Smith, who will be presenting on behalf of our clients and the Defense Group, and here from Keker & Van Nest also is Eugene Paige and Matan Shacham.

MR. SHACHAM: Good morning.

THE COURT: Thank you, good morning.

All right. I appreciate everyone coming in this morning. I noticed we had quite a few motions, so I thought we would get as many of those prior to the actual pretrial as we can with this case set in June.

So let's start with -- well, let me just start, I will invite both sides to give me any kind of brief five-minute opening, if you would like to, as far as what you think is important and what you think I need to do about this case and trial, that type of thing.

Do you have anything you wish to say, Mr. Stevenson?

MR. STEVENSON: Nothing prepared, Your Honor, other than this is a case that involves six patents that are essential to the 802.11 Wi-Fi standard.

THE COURT: Is it a meritorious case?

MR. STEVENSON: A very meritorious case, yes.

THE COURT: I thought you might say that.

MR. STEVENSON: And we are asserting those patents against a number of providers of laptops that have

Wi-Fi capability, as well as routers that have Wi-Fi capability.

In the middle of this case, or early in the case, Intel, one of the chipset providers to these customers moved to intervene, and the Court allowed that intervention as to the devices in this case.

Currently before the Court are seven motions. There are two summary judgment motions; one filed by Ericsson that deals with summary judgment that certain prior art references are not -- do not qualify as 102 publications, and one by the defendants dealing with non-infringement of two of the six patents.

There are two Daubert motions, one dealing with -- our Daubert motion dealing with the willfulness expert of the defendants, and one defense Daubert dealing with our damages expert and application of the EMVR. And then there are three motions to strike; two filed by the defendants and one filed by Ericsson.

Our suggestion was going to be -- we are happy to take these up, obviously in any order that suits the Court, but we had conferred in advance and thought if we could present the summary judgments first, followed by the Dauberts and followed by the strikes and knock them out in that order; we do one, they do one, that might may be a good way to proceed. But happy to yield to however the Court wants to do them.

THE COURT: Thank you.

Defendants?

MR. AROVAS: Good morning, Your Honor, Greg Arovas. I can just make a couple preliminary comments on behalf of the Defense Group. Obviously, we don't have the same view on the merits of the case, although the parameters we certainly do agree with.

There are six patents. They are alleged standards essential patents to the IEEE Wi-Fi standards. I know Your Honor has had previous Wi-Fi cases. There are different letters that go along with them; a, b, g, n. This case relates to "n," the most recent of the Wi-Fi standards.

And I think what you will hear over the course of this case is that the defendants have a different view of the technology, where it came from, how it works; and do not believe that these patents have anything to do with the Wi-Fi standard.

You are also going to hear, obviously because there are allegations that these patents are standards essential, a lot of issues that I think will be familiar to the Court, maybe not exactly in this context but about RAND promises that Ericsson made to the community, although they did not, in fact, unlike many of the standards essential patent cases, they didn't make any contributions to the standard that were accepted. In fact, they made some contributions that were

rejected; the technology went in a different direction, but they did make a letter of assurance while they were a spectator in the IEEE standards process.

So you are going to hear some issues, and, in fact, some of the motions that you are going to hear about today do touch on those issues as well, so you are going to hear in the case about the RAND issues and how those issues play into the overall case.

I think -- we talked to Mr. Stevenson before the hearing. Of course, we would take the motions up in whatever order is most interesting to the Court and where the Court thinks we can be the most helpful, but by default if the Court doesn't have a pre-set preference, we had discussed doing summary judgment first, Daubert second, and then motions to strike third.

THE COURT: Okay. Well, let's start with -- I guess this would be Ericsson's motion for partial summary judgment regarding prior art, Docket No. 362.

MR. STEVENSON: May I approach to hand slides to the Court?

THE COURT: Yes, you may.

(Slides given to the Court.)

MR. STEVENSON: Thank you, Your Honor. In this motion for partial summary judgment, Ericsson seeks a ruling that certain references asserted by the defendants, all of

which were authored outside of the United States, do not qualify as prior art because they are not 102 publications.

And the standard here is a standard where the Court as a matter of law makes a determination as to whether something qualifies with 35 USC 102, and that is based on the underlying facts that are in the record.

There are three categories of documents that we raise in our motion that we feel are not proper 102 references.

The first is a book by a student named Dietmar Petras.

The second are two master's theses named the Hettich and the Vornefeld Theses.

And the third are some ETSI contributions, six ETSI contributions.

And if it is acceptable to the Court, I would like to just, in the interest of time, confine my argument to the Petras book and the two master's theses and submit the ETSI contribution motion on the papers.

THE COURT: All right.

MR. STEVENSON: Let's start with the Petras book. And before I go into that, the critical date that we are working against here is the filing date of the '435 patent which was March 18, 1999. So that is the date to keep in mind here that we are going to be comparing against.

The Petras book was a book authored in Germany

by a PhD student at Aachen University.  The book on its first or second page has a copyright notice that bears 1999.

MR. AROVAS:  Your Honor, I hate to interrupt; but I think, in the interest of time, I can actually speed this up a little bit.  When looking at the issues and streamlining things for trial, we don't intend to present the Petras book as prior art.  We have other pieces of prior art.  It hate to interrupt, but under those circumstances --

THE COURT:  It is a compelling argument anyway. It persuaded Counsel.

MR. STEVENSON:  Maybe the first time that has ever happened to me in a summary judgment motion.

THE COURT:  All right.  They are withdrawing the Petras book, so we can move on to the next.

MR. STEVENSON:  The next category are the Hettich and Vornefeld Theses.  These are two master's theses from two students at Aachen University.  They arose during the course of a research project within the university that was called the ComNets.  It was involved in wireless networking research.

These two theses were never published as books. And interestingly both theses bear a legend on the front that says -- and it is on the slide -- that says this paper is for internal use only.  All copyrights reserved by the mentoring department.  We give no warranty for content.  Reproduction and

publication of any kind are subject to the department's permission.

So according to the legend, it is an internal document, and reproduction of any kind must be under the permission of the department.

Now, one of the reasons that the internal use designation may be in place is because the students were working on this ComNets project and the post-grads were also in some instances applying for patents on the work.

Naturally, as a result, because of the absolute novelty requirement in Europe, you would want to keep your work and publications, if you had any, internal so as not to create a bar for a patent.

The testimony in the record is that the professor who was in charge of this ComNets group at one point got angry when a copy of the thesis was provided to someone. That is in the Petras deposition at Page 120, Line 24 to Page 121, Line 7.

There is no evidence in the record that permission was ever given to anybody to reproduce or publish this article. We don't have any documents or anything from the university saying there was a grant of permission. And these two theses were filed in the Aachen library.

So that raises the question for the Court, does the mere filing of a thesis in a library make it a publication

under 35 USC 102?  The answer is no.  And, interestingly, there are a number of cases on point from the Federal Circuit, and two in particular I would like to direct the Court's attention to.

The first is the In re Cronyn case that is cited in our brief.  This was a case out of this Federal Circuit from 1989.  In that case it dealt with some thesis papers at Reed College in the United States.  The thesis papers were filed in two different libraries, the main library as well as the departmental library, such as the chemistry department.

Each thesis was essentially cataloged on a card.  That card had the student name on it.  It had the title of the thesis, which in many cases was the descriptive title of what the thesis was about.  And those cards were then filed alphabetically by author within the college.

The cards were available for public search and public review, and the theses, unlike the ones at Aachen, were available for public search and review.  There was no internal use distinction in the In re Cronyn case.

Under those facts, though, the Federal Circuit found that these theses were not 102 publications because they were not sufficiently cataloged and they weren't sufficiently indexed and searchable that a person of ordinary skill in the art could reasonably find them.

A second case we cite is the In re Bayer case,

similarly deals with student theses this time in the University of Toledo. The theses were in the library collated and assigned a library call number. And after they were delivered to the library they would be sent out for binding.

While they were out for binding, the theses would be assigned an author slip which would be put in the public card catalog while at the book bindery. Again, these theses didn't have an internal use designation.

The authors of the theses and the author of the thesis in question in In re Bayer actually presented his theses before a faculty committee. But nonetheless the Federal Circuit again held that these theses were not a 102 publication.

So what that tells the Court is that the test for something being a 102 publication is not whether it is merely publicly available. It is not whether if you hunt long enough, can you find it somewhere. It is not even enough for it to be in the card catalog of a library.

Rather, to be a 102 publication, it has to be reasonably accessible to those of skill in the art without undue searching. Something people of skill in the art that may be interested can reasonably find. And that is the test the Court should applying.

So with that in mind, let's go to the facts of the theses that are before the Court. As we noted, the theses

were marked for internal use only.  And there is no evidence in the record that the department actually gave permission for copies of these to be sent out.  There are some references in the record from the author of the thesis -- or excuse me, from Mr. Petras talking about his thesis; that he would occasionally send his out to people.  But from Hettich and Vornefeld there is no evidence that they actually -- with regard to their thesis that the department ever gave permission to send out.

Next, the Aachen library was not public.  The record on this shows -- and this is from the testimony of the librarian, that the Aachen library and its card catalog was only available to enrolled students, university assistants, and employees; and then during conferences, attendees of the conference could visit the library if they chose to.  But there is no evidence on when that actually happened or if in this case any conference attendees actually attended -- actually tried to go in and look for conference papers by Hettich and Vornefeld.

Now, the librarian of the Aachen library that was deposed, testified that it was standard practice for her to create a card for these Aachen student theses with the author and the title on it.

Now, so far we are not any different than Cornyn.  In fact, we are less public than Cornyn because we have the internal use designation and the library isn't public.

And in addition, there is no testimony in this case or no proof in this case that her practice was actually followed for these particular theses.

Notoriously missing from this case is the actual card. We don't have the card itself that would have been in the Aachen library showing that the librarian followed her policy for these particular references.

But, in addition, the librarian testified that it was her practice to index by using keywords, some of the theses. But, again, it wasn't 100 percent practice. She did not know how often it was done, and she was unable to testify that the theses in this case were ever actually indexed by keyword or not.

Moreover, because we don't have any corroborating information, we don't have the card or any of the entries, we can't tell whether keywords were actually applied.

And then, finally, there was an Allegro system. That was a computer system that was pretty -- at least from the testimony -- fairly rudimentary back in the time that would allow some search capability. That search capability would have been limited to what was on the card. So if it is just author and title that is all that could have been searched, although there was some testimony that you could get on the Allegro system via the Internet.

The testimony -- and there is no evidence that

people outside of the university could get on via the Internet to the Allegro system or whether it was just limited to people in the university.

So as a result of this, I think if the Court compares the facts of the Aachen theses to Cornyn, Cornyn is much more public and much more accessible than Aachen, and the Court should find that the two references Hettich and Vornefeld are not 102 references. Thank you.

MR. AROVAS: Your Honor, I also have a set of slides. May I approach?

THE COURT: Yes, you may.

MR. AROVAS: Would you like one copy or two?

THE COURT: You can give us two.

(Slides given to the Court.)

MR. AROVAS: Thank you, Your Honor. So let me start by what we are trying to do here. This is a motion for summary judgment. As the Court knows the issue is on this type of motion, is there a genuine issue of material fact resolving all of the inferences in the favor of the defendants?

Now, here we actually have an extensive record, and we will take a look at some of the key pieces of testimony, but we have an extensive record developed from percipient fact witnesses about exactly what was done to make the various prior art references accessible to the public.

And, you know, when I make that comment I want

to be very clear, you know, the law allows multiple ways to characterize documents as public for the purposes of being a public publication. It can be accessible to the public, and the law is very clear that if you prove accessibility you don't have to prove how many people read it, how many times it was downloaded, copied, things like that. Accessibility itself is sufficient evidence for something to be a printed publication or a piece of prior art.

You can also prove that something is prior art through public dissemination. Now, for different references the proof takes different forms. In some cases it takes both forms. But in each case either one of those sets of proof is sufficient.

And here what we have if you listen to Ericsson's argument I think it really says it all, it is characterization of the evidence, judging credibility of the evidence, reading inferences into the evidence.

Testimony -- I mean you heard Mr. Stevenson talk about the fact, well, one witness testified that maybe you could search by keyword, but we don't think the system is -- you know, was rudimentary.

These are all issues, judgment calls that are for the jury. It is basic summary judgment law that resolving all these inferences in the favor of the defendants, they have to show there is no issue of material fact.

In fact, if you go through a lot of the specific evidence what you see is most of it is largely unrebutted. So, for example -- and we will take a look at it in a second -- if you talk about these theses, they were indexed by keyword and by author; totally different from Cornyn. And we will compare the Cornyn case in a second. Cornyn didn't have indexing by subject matter at all. The testimony is completely unrebutted by the author of the theses as well as the librarian, that there was a computer system that indexed it by subject matter.

So what we are looking for here, to put it in its most basic terms, is could people of skill in the art who cared about this prior art, have found it? So with Cornyn the fundamental problem that the Federal Circuit found with the indexing is it was by author only. Right. So if you didn't know the author, you would have to go through every card in the card catalog to find the one on your subject matter.

What do we have here, completely unrebutted testimony from the percipient fact witnesses saying that it was actually indexed not just by author but also by subject matter and in a searchable form both in paper. You could look for the card or you could get on a computer system either at the library or via the Internet, which was one of the earliest systems allowing that back then, and you could search actually for the subject matter. So it wasn't a needle in a haystack. It was about as accessible as it gets.

THE COURT: And, again, what testimony do you have that these specific titles were so indexed by keywords?

MR. AROVAS: So we have testimony from both -- so we have testimony from the author of the theses saying that my theses were searchable by keyword.

We also have testimony from the librarian saying that her practice was to take the theses -- we know these were real theses. We know they were defended. We know they followed the normal course of how this university handled that documentation, and we have testimony from the librarian saying my normal practice is to take these documents within five days to put them in the library, put them in the card catalog, and put a matching set of information in this Allegro computer system. And that is the testimony we have from the librarian.

And the law has also been fairly clear that you can rely for proving public accessibility on the practices of the librarian or the library or whatever institution you are talking about as well. So we have to --

THE COURT: What is your response to Mr. Stevenson's argument that she testified that some she did that way and some she didn't do that way during this period of time?

MR. AROVAS: I think her testimony is she can't remember for each and every theses what, you know, she did for each individual thesis. That is actually -- so it is exactly the scenario that you have that you want to rely on practice

because we are talking about a librarian, and we are talking about Aachen University. I have a slide on the screen. It is actually one of the most renowned technical universities in Europe. It is considered the MIT of Europe. It is a massive very, very established library; 36,000 students in this group. It is a very established research group within Aachen.

So this librarian, like many librarians of large institutions, said, look, here is my general practice. Here is what I did. I have no reason to believe that these were treated any differently; but I can't tell you with every document in this enormous library that I remember individually that I did it.

THE COURT: What about the argument that it is limited to Aachen and was not accessible outside of Aachen?

MR. AROVAS: Well, if we take a look at -- and I have a summary on Slide 5 of the testimony and then I have a lot of quotes that follow.

But here is what the testimony says. This is why we think -- actually, I think it meets the burden of clear and convincing evidence, but that is not what we are here to argue about today.

We have testimony that it was non-confidential and available to anyone interested, including the general public. So to be more specific about this --

THE COURT: How does that mesh with the "for

internal use only"?

MR. AROVAS: So we asked the author about that. So not everyone -- two of the three have a designation. It is actually in German. So it translates roughly into a copyright notice.

What that copyright notice says is if you are going to copy or disseminate this, you need permission of the author. Now, of course, we know that is true of magazine articles, books, you know, they are all copyrighted materials. We also know, although there was a little bit of a competition between this university and a rival university, that the documents actually were disseminated to others at other universities as well.

The leader of this group was upset, not because the information was confidential but not -- because he didn't want to help his rival group and his researchers were doing that. But what we do have is testimony that you could search -- I will give you a couple of pieces of testimony -- that you could search online and get by title or keyword and you could find the theses through this online system or the card catalog; that these were available for order, so there were lists that went out to various technical organizations and people saying here is a list of all of our new technical publications. If you want to order a copy, let me know. And the librarian and others testified about that, that these were

available for order.

We also have testimony that the research facilities of the university were available to members of the relevant technical community at conferences, symposiums, if there were visiting professors or others from the outside who had an interest.

So if you contrast it with sort of the classic private library, the private library is for internal use only, meaning it is intended for the use of a single organization. It is not available to the outside.

These documents are the exact opposite. They were intended to be available to everybody.

Now, that doesn't mean that any human being without an invitation who is not allowed on the university grounds for one reason or another can just walk into the library and start checking things out. It is not a public library in the sense that a city public library may be, but it was available to the technical community. So they hosted, held conferences. And the attendees of the relevant technical groups in those conferences could check out materials.

They sent out mailings saying if you want to get a copy of these new documents, contact me and we can give you a copy.

It was accessible -- the card catalog -- I mean the online card catalog -- and this I think shows the intent of

accessibility -- was anybody on the Internet could search and find the article.

But then, of course, since it is copyrighted material you had to ask the author for an opportunity to make a copy. But you could view it. You could see it.

So the technology -- because we are talking about prior art here, the technology that we are talking about was accessible to the public. The public could see it was done. They could read it. They could see all of the pieces of what is Ericsson's patent in this piece of prior art.

So, for example, this is the librarian's testimony on Slide 6. It says: That the materials that you just described -- these are the theses that we are talking about here -- were those available for review and inspection by members of the university and members of the public? Yes.

She talks about the fact that they have conferences. If we look at Slide 7. During conferences also people from the outside, guests or friends had accessibility to this.

We know that the author of this thesis testifies these are accessible and searchable by keyword.

So I think we could go quote after quote, Your Honor. But I think where we end up when we go through all this evidence is that this is really two parties disputing inferences and interpretation of the evidence, which is a

classic fact issue under summary judgment.

THE COURT: Okay. Thank you.

MR. AROVAS: If I could just say a couple of words about the ETSI references?

THE COURT: Yes, uh-huh.

MR. AROVAS: I know Mr. Stevenson decided to skip those, so I will be very brief.

I think ETSI is sort of interesting in a couple senses. The ETSI organization, I will just point the Court to the Kyocera Wireless case, which is a very interesting case, it actually dealt with the public accessibility and dissemination of ETSI documents. What we have here are the classic ETSI contributions.

So ETSI is, if I back up a second, ETSI is like the IEEE. It is an organization. It is a technical organization. Its whole charter in life is to create and disseminate technical standards to the technical community for use by the whole world.

By 1998, the critical date we are talking about, 8,000 subscribers, 208 email groups and servers set up, in this case in France where it was based, servers set up to host electronic information that would be available to its membership.

Who could be a member to ETSI? Just about anybody. You apply, you get in, there is an application

process; but it is a not-for-profit organization with -- 700-member organization, 62 countries, across five different continents. It is immensely large just like the IEEE, very established organization. And its whole purpose is dissemination of the information.

That is what the Federal Circuit looked at in the Kyocera Wireless case where an argument was made very similar to what Mr. Stevenson is making here that ETSI documents are not prior art, not printed publications. And the Federal Circuit, as you saw talking about the GSM standard, which is actually relevant to some of the art that we are talking about here, the purpose of ETSI is it is crucial to grant access to interested parties. ETSI's broad membership is a testament to the fruition of this purpose. Thus, the GSM standard documents do not fall into the same confidential category as Northern Telecom, one of the other major cases that Ericsson relies on.

So we think, again, public accessibility, as well as in this case dissemination, is pretty clear. At best this is just a lot of factual issues that are raised by Ericsson.

Thank you, Your Honor.

THE COURT: Thank you.

Any response?

MR. STEVENSON: May I?

THE COURT: Uh-huh.

MR. STEVENSON: May I have the ELMO, please?

Your Honor, the thing to keep in mind is that the critical date is March 1999. So we have a very short window here from when these individuals had their theses to when the window closes. And once the window closes in March of 1999, whatever happens after that in terms of publication, showing it to the world, is irrelevant, so that is the finish line.

And the question for the Court is would somebody who is of skill in the art working at a computer company, let's say in Silicon Valley, know to go to Aachen and find in the card catalog this card and go and look at the thesis? That is the question. Is that reasonable?

Now, in response to a couple of the Court's questions about keywords, I would like to show you the testimony of the librarian. This is contained in Exhibit 10 of our summary judgment record. This is Page 39, Line 2.

Q    You testified that for some diploma papers there were no keywords assigned, right?

A    Yes.

Q    Do you know what keywords are associated with the Heddich or Vornefeld theses, Exhibits 1 and 2?

A    No, I don't, I can't remember.

Q    Did Intel's lawyers ask you to find the keywords for

Exhibits 1 and 2?

A    The keywords, no.

Q    So it's possible that there's no keywords associated with Exhibits 1 and 2, right?

A    I cannot remember whether keywords were assigned for these because it is so long ago that I entered these, I have forgotten.

Interestingly, we have not ever gotten the cards for these theses or any of the alleged database entries for them.

What is telling about that is the defendants retained Dietmar Petras as a witness in this case.  And in addition to deposing the Aachen librarian, Mr. Petras was deposed over there as the paid consultant or expert of the defendants.

And despite those people being presented for deposition, nobody ever showed up with the card or any document so we could see whether these actually were entered or if keywords were actually assigned.  And I think that failure of proof -- I mean there is no fact issue there.  There is no inference that can be drawn.  There is just a failure of proof by the defendants to show that these were actually keyword --

THE COURT:  Let me ask you to respond, Mr. Stevenson, to their argument that, look, this is a motion for summary judgment.  The facts are somewhat contested whether the

card was marked or not marked; that is a jury question.

MR. STEVENSON: Your Honor, I don't think it is a jury question because first off the question is for the Court as a matter of law, is this a 102 reference? The question then is, are there actually fact issues here? I don't think there are any fact issues; but if the Court -- which it is required to do -- indulges every inference in favor of the defendants, their proof doesn't get them there. That is what we are saying.

As a matter of law if you look at the record, you can't conclude that this is a 102 publication because there weren't any keywords that they can prove were actually typed in.

All they basically had, at most, a practice to enter author and title in a card catalog in Aachen, a library that was not open to the public; and that alone isn't any better than Cornyn, especially when you have an "internal use only" designation on the reference.

THE COURT: Okay.

MR. STEVENSON: In getting to Your Honor -- two more pieces of testimony that I would like to show Your Honor. The first is, was the library really public?

We saw a Q and A from the deposition of the librarian, but here is the full testimony not on the slide but in the deposition itself. It is Page 12 to the Rosalia Sohnen

deposition, which is Exhibit A to defendants' summary judgment briefing.

She was asked:

During the time period of 1990 until the early 2000's, who had access to the library?

And the answer is:

Essentially all of the students enrolled in the university, all assistants, all employees of the university, and during conferences also people from the outside, guests or friends

When you say people from the outside, guests or friends, I want to make sure I understand, does that mean members of the public?

A    Well, the general public it means people who were present at the conferences.

So that slide that you saw earlier about the library was open to the public, that is what she is talking about here is members of the public at conferences.

We asked:

What conferences are you referring to?

She said:

Well, for instance, we had a conference that is -- in German is called something like Friends Meeting, which took place once a year.  There were also other occasions.  For instance, when somebody finished their doctoral thesis -- and

these are doctoral theses, these are master's theses in here -- or their diploma thesis, there would be a presentation or a seminar would be held.  And on those occasions there would also be people coming in from the outside.

So this is not a general purpose public library where people can just go in.

And then, finally, with regard to -- I won't show this in the interest of time -- but with regard to the Allegro system, what Mr. Petras testified was that Allegro at -- and this is at Page 89 of his deposition.

He says:  Allegro was Internet-based system. Then he caught himself and said but Internet-based is not completely right because it was a very early version of the Internet.  He then says when asked, you said this was Internet-based -- at Page 90 of his deposition -- was it available to people outside of ComNets?  He said, yes, that is what I remember.

ComNets was the internal research group of these students who were working on this project under the supervision of a professor.  That doesn't make it a public access.  What that means is it was available outside of ComNets, perhaps at the university.  But there is no proof, the proof is absolutely devoid, that any person of skill in the art who is not affiliated with the university or not there on a conference, could get on this Allegro system.

That is why in answer to your question, I think, on the summary judgment even if the Court indulges all of the inferences in favor of defendants, they have a failure of proof to establish these are 102 references.

THE COURT: Okay. Any further response?

MR. AROVAS: Yeah, I would just like to direct the Court to a couple of pieces of evidence because I think this highlights why this is an argument over evidence and not an argument over a summary judgment -- appropriate summary judgment.

Could we jump to Slide 9? I will just jump really quickly.

If we look at Slide 9, this is the librarian:

Following the procedures that you identified earlier, when would the Hettich thesis -- and there is testimony on each of the relevant pieces here, so we are talking about the specific references at issue -- have been available at the ComNets library.

A   Maybe 4 or 5 days later.

Q   When would the thesis have been in Allegro?

A   At the same time.

So as far as the timing, we have the practice. We have the librarian saying what would have been done.

Let's look at Slide 11.

This is Petras, one of the authors. And he is

asked about the theses again, the specific theses we have been talking about. The student theses such as these could be located using the ComNets library card catalog or by using Allegro terminal and searching by author, title, or keyword. Allegro was also accessible from outside the library via the Internet by anyone.

Now, of course, in 1997 and 1998 the Internet is not what it is today. It wasn't ubiquitous. Everybody couldn't access it at a Starbuck's. But that doesn't mean that the relevant technical community couldn't do exactly the same. That is all we need to prove to meet clear and convincing evidence and is far beyond what we need to do under summary judgment.

If we look at Slide 12.

You heard Mr. Stevenson say there is no evidence that anybody really believed this was accessible. Well, here again the author saying I am very sure it was possible to look up for the concrete title or for keywords in the title.

The last remark I would like to make is we do not need to prove that somebody actually did the search. Those electronic records of the Internet searches from 1998 don't exist anymore. The point is accessibility, and I think on this record at the minimum there is a large dispute over facts, and it is not appropriate for summary judgment.

Thank you, Your Honor.

THE COURT: Thank you.

All right. Ericsson's motion for partial summary judgment regarding the prior art references, Docket No. 362 is denied.

We will turn to defendants' motion for summary judgment of non-infringement, Docket No. 371.

MR. VAN NEST: Good morning, Your Honor. I want to cure an oversight while we hand the slides up. I failed to introduce Mr. Trey Yarbrough who is also here on behalf of Acer, NETGEAR, and D-Link. I apologize to the Court for not doing that sooner.

Your Honor, may I approach?

THE COURT: Yes, you may.

MR. VAN NEST: This is the defendants' motion for summary judgment, Your Honor, and I am speaking on behalf of all defendants this morning.

As Your Honor heard earlier, there are six patents remaining in the case. Five of those are asserted against all defendants, and one is asserted only against Intel and its customers. This motion addresses two of the patents that are asserted against all defendants, the '019 and the '568, which we refer to as service identifier patents.

Let's go back, James.

These are asserted against everyone. They are related patents. They both flow from the same specification.

And if this motion is granted, Your Honor, which obviously we believe it should be, it would eliminate all claims of both patents from trial.

So before I get into the slides, I just want to make three points that are the highlights of our position.

Point one is that I know Your Honor is the reigning federal expert on wireless and you know we are talking here about packets that are transmitted through a system, your claim construction makes absolutely clear that these claims require a service type identifier that actually identifies the type of information in the packet, not just how the packet is to be treated or the transmission characteristics or priority designations.

The claim construction is crystal clear that you have to be identifying what is inside the packet, not simply how to treat it.

THE COURT: Let me ask you this: Can a type of information be essentially the same as a transmission characteristic?

MR. VAN NEST: No. And I will indicate that was litigated in front of Judge Giblin, Your Honor. There is a clear distinction. Those are two fundamentally different things. The type of information is, what is inside the packet? Is it video? Is it data? Is it voice? Is it maps?

Transmission characteristics was litigated

thoroughly during the Markman, and Judge Giblin drew a clear distinction, as I will get to in just a moment. It can't be. Those are two fundamentally different things. How you treat it is different from identifying what it is. There is no dispute --

THE COURT: But what it is can determine how you treat it, right?

MR. VAN NEST: It can, certainly. It can determine how you treat it. That is not how our system works, as I will get to in a minute.

THE COURT: All right.

MR. VAN NEST: But there is no dispute about how the system works. There is no dispute about how defendants' products operate. They do not use a service type identifier that identifies the type of information. Instead of that, they enable use of a priority designation, an access category it is called, that only determines how the information is to be treated --

THE COURT: But is that access category based upon the type of information being transmitted?

MR. VAN NEST: No, it is not, Your Honor. You can use any setting you wish. You can designate any access category for any type of information, and most importantly you cannot determine in defendants' system looking at what they accuse as a service type identifier, you can't determine -- and

this is conceded -- what kind of information that is.  The user get's to set that.  The system doesn't care.  The determination is made based on an access category, regardless of what is in the package.

And my third point is that what Ericsson is now attempting to do is to ignore Your Honor's claim construction. What they are now saying is -- there is no dispute about how this works.  What they are saying is, it doesn't matter.  You don't have to prove whether or not the service identifier identifies the type of data.  It is good enough to identify a priority category.  Well, that is precisely the distinction that Judge Giblin rejected during the Markman Hearing, and they want to proceed on a theory that ignores the claim construction.

So let's get into the slides here, Your Honor. The first one just simply indicates that the motion is brought on behalf of everyone.

This next slide shows is that the service type identifier is required by all of the asserted claims.  What I am showing here is that in the '019 patent, Claim 19 is asserted; and the only other claims asserted are dependent on that.

So as you can see there from the highlighting, service type identifier which identifies a type of payload information, is one of the key limitations.

And the same is true of the '568, which is an apparatus claim. Claim 1 requires the service type identifier which identifies a type of payload information. And the dependent claims, all of the other claims asserted on '568 are dependent on them.

Now, let's go to the next slide.

Knowing how the system works, Ericsson attempted in the Markman to avoid any requirement that the service identifier actually identify content or identify the type of information. So as you can see, their proposal was, an identifier which identifies transmission characteristics.

What they told Judge Giblin was, the system doesn't care. You see in the bracket down below. This is from the dialog at the Markman. One is a transmitter, one is a receiver, and they don't literally care that the content is a football game being streamed or is a phone call.

Now, Judge Giblin at that point asked him point blank, wait a minute, isn't type of information and transmission characteristic, aren't those two fundamentally different things? Of course, they are. One describes the content, and the other ignores the content and determines how transmission is to be affected.

And as the next slide shows, Judge Giblin dismissed this. He rejected Ericsson's argument. He said the language of the claim is clear in that the service type

identifiers identifies the type of payload information not the transmission characteristics of that information, and the examples which he drew right on the specification were the type of information, for example, voice, video, or data.

So he found, based not only on the claim but on the specification and the file history, that the service type identifier had to identify the type of information.

Our next slide gives us the claim construction which I know Your Honor is familiar with. Again, an identifier that identifies the type of information conveyed in the payload, and there is a series of examples.

Now, I know Judge Giblin gave both parties an opportunity, Your Honor, to add to these examples. The specification describes video, voice, and data; but he said point blank to Ericsson: What other examples would you like to have included? They didn't say priority designations or transmission characteristics or access categories. All they said was multi-media.

Multi-media is a type of information; and, as Your Honor can see, Judge Giblin added that. They had a full opportunity to ask --

THE COURT: He also says, though, but are not limited to. So that could be some other type.

MR. VAN NEST: Absolutely. A map would be another type. An image, a photo would be another type. A fax

would be another type. But it has got to be information that describes the content of what is in that packet.

Now, what are they accusing? The next slide shows us they are only accusing one thing. They are accusing the TID subfield, as the top quote is from Ericsson's expert report.

They say: The TID subfield acts as a service type identifier. TID stands for traffic identifier. And there is no dispute -- I'm going to go through this chart in a minute -- that that subfield does not identify the type of information in the packet. It only identifies a priority category, a so-called access category.

So you see here on the left-hand side there is indicated a priority from lowest to highest. And the TID subfield is expressed as a value, a number. It is in the second column, from 0 to 7.

THE COURT: Counsel, let me ask you though, it seems as though I read something about the standard has a TID identifier of I think it was 6 and 7 for voice, for example. So if it is a 6 and a 7, it would always be voice.

MR. VAN NEST: Wrong.

THE COURT: Is that not true?

MR. VAN NEST: That is not true, and there is no dispute about that. What you see on this chart, Your Honor, in the second column from the left it says UP user priority.

Those are the TID values.  Those only correspond to the AC categories in the fourth column.  AC_BE, AC_BK.

So all they designate is how the packet is to be treated.  Now, you see on the right-hand side, the far right there is an indication of background, best effort, video, and voice.

That column is actually not part of the standard.  When they set it up, they gave examples of how one might want to treat data.  But these aren't required by the standard, and they haven't been implemented by any of the accused features.  All the accused features do is allow the use of a TID value, which is then assigned a priority.

So if you think about a packet, Your Honor, as a truck; and you think about the payload in the packet as the cargo in the truck, all these categories assign is what lane is that truck going to be in?  Does it get to go in the fast lane?  Does it go in the middle lane?  Or is he stuck in the slow lane?  There is never an identification of what is actually in the cargo.

And you can assign any value you want to voice, any value you want to video, any value you want to data or photos.  There is no correspondence in the system.  And it is not required.  There is no dispute about that as the next slide shows.

Let's go forward two, James.  Next one.

This is their expert Dr. Nettles, and we asked him a whole series of questions.

A TID subfield value of 4 or 5 represents a type of access category which might be appropriate for video, but it is not telling us that it is literally video data -- it might be appropriate for video but is not telling us it is literally video data.

Again, we asked again. He said:

A subfield value of 6 or 7 means that the type is AC_VO, but it doesn't mean it's necessarily a voice field.

He concedes.

There may be other kinds of packets that also have this AC_VO designation besides those containing voice.

He makes a more dramatic admission in the next slide, Your Honor, which relates directly to the chart we were looking at.

We asked him:

These access categories relating to the designations in Table 91 -- that is what we saw earlier -- do not necessarily reflect the type of information in the payload of the packets?

A    Right. What they reflect is how 802.11 is going to treat that data.

That is exactly the distinction that Judge Giblin made. They determine a transmission category, a

priority, not the type of data.

And their briefing--

THE COURT:  Counsel, I understand your argument, and I find it somewhat persuasive; but I bet you plaintiffs have an equally persuasive argument that this is a type of data.  I want to hear that.

But my question before I let them respond is, why isn't this just a fact issue?  It sounds like this is smelling an awful lot like you both have completely different spins from your experts on whether this qualifies as type of information or not.

MR. VAN NEST:  I don't think it is, Your Honor, because, again, their expert concedes that the TID value does not identify the type of data in the packet.  What they are arguing is that a priority category itself, fast, faster, fastest, that is a type of data.  That is what they are arguing.  They make no bones about it.

If I could have Slide 11 -- excuse me, Slide 12 up.

What they are saying is proof of whether the subfield matches the format of the data in the packet -- voice, video, or data -- is inapposite.  They are not saying there is a question of fact.  They are saying the mere use of a priority designation is a type of a data.  But, again, Judge Giblin in the claim order rejected that.  That is a transmission

characteristic or a way of treating the data.

The bottom slide -- the bottom quotes makes it even more clear. They say it is not required by the claims that the data type contain voice and that the subfield is used to identify that.

THE COURT: Okay. Thank you.

Let me hear a response from the other side.

MR. VAN NEST: Thank you, Your Honor.

MR. STEVENSON: Your Honor, starting in Claim 19 -- let me orient the Court --

THE COURT: Let me ask you first, Mr. Stevenson, are you asking the Court to construe type of information to necessarily include access category?

MR. STEVENSON: No. We don't need a re-construction. We don't need a construction of a construction. And the reason is, as the Court saw in this case, the access codes that are listed in the standard -- let me go forward to them -- all are designated as applying to -- or at least four of them are designated as applying to voice or video.

THE COURT: What is your response to Mr. Van Nest's argument that is just an example, and that is not always the case?

MR. STEVENSON: Well, first off, Mr. Van Nest said that this isn't in the standard. That is wrong. This is

a chart that we copied directly out of the 802.11n standard, the entirety of the chart. That is number one.

Number two, you are supposed to use the video for video and the voice for voice. That is a reasonable inference. In fact, it is not just me saying this about the standard. It is Intel saying this.

We included in our summary judgment record this document as well. This is Intel's Wi-Fi programmers reference manual. It tells their programmers how to program for their chips. It says again the access category if it is VO it is voice. If it is VI it is video.

If we turn back, that matches up to the designations here in the 802.11 standard. So what you have got is a situation that the standard tells you when you have got video you have got essentially two numbers you can use 4 or 5. When you have got voice, you have got two numbers you can use, 6 or 7.

THE COURT: Let me stop you just a moment.

Mr. Van Nest, what is your response to Mr. Stevenson's argument that the chart was listed straight from the standard and is part of the standard?

MR. VAN NEST: Do we have the chart up?

Your Honor, the chart is from the standard, but what I said was that column on the right, note that it says informative. That is simply illustration. That chart, that

column is not required. And the definitions in IEEE indicate that if it is informative, it is not part of the standard that you have to implement, and none of the defendants have implemented it. It is illustrative. That is what it says, informative.

The chart comes from the standard, but that column illustrates the types of things that you could do with those categories. In fact, as I pointed out, their expert admits that you can't determine in any of the defendants' systems what is in the packet just from the TID subfield. All you can determine is what is the priority category. That is in the column just to the left --

THE COURT: Will you have evidence that the TID subfield when it is labeled as 6 or 7 is something other than voice?

MR. VAN NEST: Sure.

THE COURT: For example.

MR. VAN NEST: Absolutely. They concede that. The best evidence is their own expert. He can't tell and he has admitted repeatedly, as I have showed -- I have got another one, too, he has admitted that you can't tell what is in the packet just from looking at the TID subfield.

Our expert says of course. And the defendants say, okay, I am not relying on that. This is summary judgment. There is no dispute. There expert is not saying and has never

said that when you get a category of 4, you know exactly what is in the packet.

THE COURT: So you are saying, in essence, that your clients don't necessarily use the standard in the, quote, informative way that it is listed in Table 91?

MR. VAN NEST: Right. That informative way is not even part of the standard. That is an example they give. The only thing the standard requires is that you correspond a TID value, a number to the access category. What lane is it going to be in? What category is it going to be in? They don't correspond to voice, to video, or any other sort of data. They are open to determining because the system is simple. Our system works in a much more simple fashion.

You don't need to know what is inside the packet. All the system wants to know is how do I treat it? Do I put it in the fast lane? Do I put it in the middle lane? Or do I put it in the slow lane? That is all the system is intended to do.

THE COURT: Okay. Thank you.

MR. VAN NEST: Can't determine anything else --

THE COURT: Thank you.

MR. STEVENSON: I disagree, Your Honor. Here is the issue: Intel in its programmer's reference manual tells the programmers for voice -- for VO -- for voice use VO, for video use VI. That corresponds back to the standard.

Clearly, all that gets put in the packet is that number 1, 2, 3, 4, 5, 6, 7 and 0.

However, our expert did tests on Intel's chips and all of the defendants' chips. Here is the test he did. He set up a laptop with a Skype, which is a voice over Internet, voice call; and he ran that Skype. And then he sniffed the packets that were coming out of there.

For voice they had the code in there in the headers which corresponds to voice, which is No. 6. That is in his report. He did that test across all of the defendants' products. They all do it, and they all support it.

Now, interestingly, what defendants' experts did is he got in there, and he said, well, I am going to take some voice but I'm going to override that number. I'm just going to put a different number in there after the -- whatever the application said.

Sure that will go through, and sure the chips themselves won't sniff the content of the payload and change it, but that is not required by the claim. The claim requires the type identifier field that identifies the type of content. And if somebody essentially overrides what has been said, that doesn't eliminate infringement.

We have met the claims and apparatus claims. For the method claims if it is done, they are infringed and our expert proved it is done. For apparatus claims if they are

capable in the reasonable and ordinary use of putting in a type identifier field that corresponds to voice or video, they infringe. Our expert proved that in ordinary use.

He then went on to do the same thing for video. He set up an Ekiga call. E-X-I-G-A (sic). It's a web conferencing service. And those populated with the video code. And it went all the way through the Intel chip through all of the other chips. That is the infringement that we are pointing to. Now, sometimes with some operating systems, depending on how it is configured, the application that sets the actual code, right, that may get stripped out.

So, for instance, Linux passes it through. If it goes through Windows, Windows 7 may strip that out. But if you are running Windows Media Center, it puts it in. So what you have is sometimes depending on the application and the operating system and how you have got it configured, you are going to be passing through the code through the chips. Other times you won't.

Again, that is not a question of infringement or no infringement. That is merely a question of the extent and the value, not whether there is infringement.

And then a final point, these codes do not represent the transmission characteristics. What they represent is how you are going to treat them in the queue before they are transmitted. So, in other words, if you have a

laptop that is trying to send your VoIP call, there is a queue that builds up prior to transmission.

What these codes say is if you are a higher priority, we are going to put you in the front of the queue or we are going to put you in a faster queue; but the actual transmission characteristics, the channel coding, it is the same for all these packets.

So that is a rejection that defendants' point that these apply to the transmission characteristics and not the type of information. That is absolutely wrong. These don't apply the transmission characteristics; and, in fact, there is an entirely separate section of the standard in which the transmission -- of the packet in which the transmission characteristics, the channel coding, is designated.

THE COURT: Thank you.

Final word.

MR. VAN NEST: May I respond very briefly, Your Honor?

THE COURT: Yes.

MR. VAN NEST: Could I have Slide 9?

I think Mr. Stevenson made the point I am trying to make. He just said it. These TID values, they only relate to the priority of the data, how it is to be treated. That is not good enough. The claim requires that you identify what is in the patent. And when we asked their expert, Your Honor, he

said the same thing Mr. Stevenson just said.  Do these designations reflect the type of information in the payload or not?  They don't.

They reflect -- and this is what he says -- how 802.11 is going to treat the data.  I don't care whether you call that a transmission characteristic or a priority designation or an access category.  It is not a description of what is in the cargo.  It is not a description of the type of information in the packet.

Let's look at Slide 11.

He mentioned testing.  Even the testing confirms what we are saying.  What -- this is their test, and this is what Dr. Nettles did.  He tested a Skype operation. As Your Honor knows, Skype you can make a phone call over the Internet.  It has video and it has voice.  He never identified whether he was testing data that had video or voice or both.

But as you can see here on the right in the column in the category that he has highlighted up top, he gets a priority category 6.  Right above it and right below it running the same application he gets a priority TID of 0. There is a 0 right above the 6 and right below it.  We asked him point blank, which is reflected on the right-hand side, what type of information was carried in the payload that you intercepted and is displayed?

He doesn't say it is video, it is voice, it is

data. What he says is it is a priority 0, and that is associated with an access category. And then we asked him again, from the TID field having that value of 0 can you tell me what the underlying type of application information was for that packet? No.

And that is the key issue. The key issue that is teed up in the claim construction and is now clear based on the specification and the claim and the file history is this identifier has to identify what is in the packet, the type of information, the cargo, the content. It doesn't.

And there is no fact dispute about that, Your Honor, to go to the jury because all of the parties concede that the only thing this TID value does is tell you what lane the truck is in, what priority, not what is the type of information in the data.

THE COURT: Okay. Thank you, Mr. Van Nest.

All right. Defendants' motion for summary judgment of non-infringement, Docket No. 371 is denied.

All right. We will go to Ericsson's motion to strike the testimony of undisclosed non-infringing alternatives, Docket No. 363. And defendants' motion to strike Nettles' supplemental report, 392; and we will take those two up together.

So I will begin with Ericsson's motion to strike expert testimony.

MR. LIPSCHITZ: Your Honor, Ericsson seeks to strike four non-infringing alternatives that the defendants fail to properly disclose in their interrogatory responses.

Now, since September of 2011 Ericsson has been asking the defendants to identify their alleged non-infringing alternatives. Ericsson has served interrogatories on all defendants to that end, including Intel and has repeatedly requested that they supplement their inadequate interrogatory responses.

Now, in January of this year, in good-faith reliance on the defendant's interrogatory responses, Ericsson served its opening expert report.

Now, a month later, which is 17 months after Ericsson served its non-infringing alternative interrogatory, the defendants identified for the first time a number of non-infringing alternatives.

Now, because of the defendants' delay, Ericsson has been unable to collect any evidence during the fact discovery period on these non-infringing alternatives. And Ericsson's expert could not analyze or opine on these non-infringing alternatives.

Now, Ericsson has taken steps to try to correct this issue without the Court's intervention. We have requested depositions with technical employees of Qualcomm and Intel. I believe we have at least one of these depositions scheduled

already.

Ericsson has also served a short 9-page supplemental expert report which directly addresses these non-infringing alternatives. I should note that the defendants have moved to strike that supplemental report.

Now, it is our view that if we get the depositions with the technical representatives and the defendants withdraw their motion to strike our supplemental report, that this motion is moot.

THE COURT: Let me hear a response to that proposal? What is wrong with that?

MR. MITCHELL: So on the -- co-Counsel will address the motion to strike the supplemental report and the point --

THE COURT: No, I'm saying what is the matter with their proposal that you give us some depositions for these late-identified non-infringing alternatives and withdraw your motion to strike, and we will do business with you?

MR. MITCHELL: So taking up the deposition issue, they already took the depositions and addressed non-infringing alternatives. If Your Honor wants me to get my slides up, I can show you where that was done. These alternatives were actually already addressed. There is no unfair prejudice.

In fact, they actually forego taking the

deposition of the expert that actually introduced the non-infringing alternatives.  But prior to that they did have the opportunity and did take depositions of Intel and other chip makers and explore non-infringing alternatives.

THE COURT:  I am talking about in regard to the specific non-infringing alternatives.

MR. MITCHELL:  Yeah, so that's the point.  These were already disclosed during the discovery period.  This is not a surprise issue.

Now, there is other depositions that are coming up.  But that is not for the purposes of these non-infringing alternative issues.  I don't know if for some reason they think if we do that we can get rid of it, and that is fine.

Then the second piece of it, the motion to strike the supplemental report, now co-Counsel will address that issue; but that argument that those -- that supplemental report came in to address the non-infringing alternatives, total pretext.  I'm happy to have Counsel address that now --

THE COURT:  In a moment.  I thought maybe we might work something out here, but I'll let Counsel for Ericsson proceed.

MR. LIPSCHITZ:  Well, in response to that point, we have taken the depositions of the experts; but the non-infringing alternatives were identified for the first time -- either -- the last day -- one of them was identified at

9:00 p.m. the last day of fact discovery.

The remaining three were identified for the first time in the expert reports served in February. So even if we could depose the expert, we have not had the opportunity to depose the technical representatives from the chip makers on these non-infringing alternatives. That is what we would like to do.

We just want to make sure that we have an opportunity to address the non-infringing alternatives, which for the first time were presented in February and one of them on the last day of fact discovery. So I can talk a little bit about what these non-infringing alternatives are. Two of them relate to the '568 and '019 patents, which is what we were just discussing. And two relate to the '625 and '435 patents.

So as we just heard, the '568 and '019 patents relate to quality of service and prioritization. So if you are sending voice, video, and data the quality of service parameters allow you to assign highest priority to voice, next highest to video, lowest to data.

Now, the two non-infringing alternatives related to the TID subfield that we were also just discussing. Now, the defendants essentially acknowledged in their briefing that these non-infringing alternatives were not in their interrogatory responses. They stated in their brief that they were addressed in general terms.

But, in fact, the interrogatory responses make no mention of the TID subfield, and these specific non-infringing alternatives relate directly to the TID subfield.

So as a result, our expert Dr. Nettles never had the opportunity to opine on these two non-infringing alternatives relating to the '568 and '019 patents.

Now, one of those non-infringing alternatives is supported by testing, which we heard about for the first time in February when the defendants served their expert reports. Our supplemental expert report is intended directly to rebut that testing and that non-infringing alternative.

Now, the other two non-infringing alternatives relate to the '625 and '435 patents, specifically to the implicit and explicit Block Acknowledgment Requests.

Now, a Block Acknowledgment Request serves two purposes. Let me back up a little bit actually. In an 802.11 system, in a wireless system, a transmitter sends data from the transmitter to the receiver. Periodically, the transmitter needs the receiver to acknowledge that it has received those packets.

In order to get an acknowledgment, the transmitter needs to send what is called a Block Acknowledgement Request, a request of acknowledgment of those packets.

And when it sends a Block Acknowledgement Request, the receiver will send back a Block Acknowledgment or an acknowledgment of the packets it has received, and it will also shift its window forward.

So the Block Acknowledgement Request has a starting sequence number. The window will shift forward to that starting sequence number.

Now, one of these alternatives relates to window shifting, which is essentially what the receiver does, it shifts its window forward.

Now, the window shifting non-infringing alternatives were not disclosed in the defendants' interrogatory responses.

In their briefing they have come back and they have pointed to what is called an A-MSDU and transmit frame bursting, and I won't go into all of the details of what that is, but for the first time they have identified those as windowless protocols. And so they say, well, we identified that windowless protocol. That means that all windowless protocols are all fair game and they have all been disclosed. That is simply not true. So our defendant never had the opportunity to address these windowless protocols.

The final non-infringing alternative at issue is to eliminate -- it is called an explicit Block Acknowledgment Request. That non-infringing alternative was vaguely disclosed

on the last day of discovery. There were no details given as to how it would be implemented, what the cost would be.

And once again Dr. Nettles couldn't address that non-infringing alternative in the requisite level of detail.

So -- let's see. So Ericsson requests that the Court deny the defendants' motion.

THE COURT: Thank you.

Response?

MR. ALPER: Your Honor, before we respond specifically to the non-infringing alternatives positions without conceding those portions, as a possible proposal to move us through this issue, we would offer to withdraw the non-infringing alternatives if Ericsson were to withdraw the supplemental expert report.

THE COURT: Your response to that proposal, or do you need to confer with Counsel?

MR. LIPSCHITZ: May I confer with Counsel?

THE COURT: Yes, you may.

MR. ALPER: And we can present our argument on this while they think about that --

THE COURT: Let's take about a five-minute break. I need to stretch my legs.

(Recess was taken at this time.)

THE COURT: Please be seated.

All right. Did we work anything out?

MR. LIPSCHITZ: Your Honor, the tests that Ericsson ran were in direct response to two of the tests that the defendants ran which were run to support the non-infringing alternatives that are at issue here.

So basically what we did is we took their tests and they had some flawed methodology. We made some minor modifications to correct the flawed methodology and ran essentially the same tests.

Now, if the defendants are willing to withdraw their tests relating to the non-infringing alternatives, then we would be willing to withdraw our tests as well.

MR. ALPER: Your Honor, what Counsel is calling tests relating to non-infringing alternatives are tests that relate to non-infringement responsive to the plaintiff's test in his opening report. If I may speak to that --

THE COURT: So that is not acceptable?

MR. ALPER: That is not acceptable.

THE COURT: Okay. All right. Let me tell you what I am going to do, I am going to deny both motions. I am going to grant plaintiffs an opportunity for further discovery with regard to the non-infringing alternatives.

So I am going to grant plaintiffs one hour of -- or, excuse me, grant defendants -- wait a minute grant plaintiffs one hour for each expert, including damage experts and one hour for a corporate representative of each defendant

asserting one of the new theories; and then allow Ericsson to supplement its expert reports in regard to the new non-infringing alternatives.

And I do want to encourage defendants to have corporate reps there that will be prepared to fully testify regarding the non-infringing alternatives.

Then with regard to -- I will grant defendants a one-hour additional deposition with Dr. Nettles.

All right. Does that solve everybody's problems to some extent?

MR. LIPSCHITZ: Yes.

MR. MITCHELL: The only thing, Your Honor, with respect to the corporate designee depositions, you do have different categories of defendants here. And there are Intel who is a chip maker and then you have OEM defendants who make laptops and routers.

We are not planning on introducing any testimony through any of the laptop or router defendants as to non-infringing alternatives. They are not the ones we are relying on on experts. And then the chip makers may also support those theories as well.

So I don't know that a deposition of the OEM defendants --

THE COURT: Let's ask the plaintiffs. Do you need a deposition of those --

MR. LIPSCHITZ: No, that's acceptable.

THE COURT: All right. Very well.

MR. ALPER: Your Honor, if I may, before we leave this topic. In addition to the hour of deposition testimony of Dr. Nettles on his supplementary expert report, we would request an opportunity to put in a supplemental expert report of our own with responses to his testing for when he testifies about that at trial.

MR. LIPSCHITZ: Your Honor, it seems like at some point we are just going to be going back and forth forever with these supplemental reports. Our supplemental expert report was in response to their testing. They are going to have an opportunity to depose Dr. Nettles and their experts can opine on those reports at trial.

THE COURT: I will deny that at this time, but without prejudice if you want to file a motion in that regard if you can persuade me that it is necessary. But I sort of agree, that at some time, at some point we need to wind this down.

MR. ALPER: Okay.

THE COURT: Okay. All right. That brings us then to Defendant Dell's motion for leave to file second amended answer, Docket No. 301.

MR. DACUS: Good morning, Your Honor. As the Court noted, this is Dell's motion for leave to file the second

amended answer.

The brief background here is this, Judge: Dell has a contract known as a master purchase agreement with Ericsson. And the particular signatory to that agreement is Ericsson AB -- A as in apple; B as in boy.

Within that contract, it is a contract that covers purchases by Dell of certain products from Ericsson, specifically broadband cards. Those cards are not part of this lawsuit.

Within that contract there is a covenant not to sue, essentially a license, that basically says for products that are not a part of that contract, Ericsson agrees not to file suit against Dell. So that is how we find ourselves here.

When Dell originally answered this lawsuit, they put in their original answer a license defense. They pled it in the original answer. In June of 2012 Ericsson sent interrogatories related to that license defense.

In August of 2012 Dell responded to those interrogatories and specifically noted in the interrogatory that the license defense was based on this master purchase agreement.

In response to that Ericsson then took a 30(b)(6) deposition of a Dell witness in October of 2012. Specifically asked that witness about the license defense,

about the master purchase agreement, and about the details.

So, of course, on the timeline we are nine months -- eight-and-a-half, nine months before trial at that point in time.

The wrinkle here and Ericsson's position is that this license defense, this covenant not to sue is based on a contract with Ericsson AB rather than the plaintiff in this lawsuit, which is Ericsson LM.

What we found out from discovery which was taken basically from July of 2012 up through January of this year, from the Ericsson employees, is that LM is an agent and perhaps an alter ego of AB.

What we know from the depositions and what we have submitted to the Court is that the AB employees conducted the pre-suit investigation here. The AB employees are the ones who negotiated with Dell pre-lawsuit. The AB employees are the ones who authorized this lawsuit to be filed. Many of the AB employees are actually inventors on the patents-in-suit.

AB, we know, runs and controls the licensing program and the patent development program at Ericsson. And, finally, we know from the privilege log that Ericsson AB is running and controlling this litigation.

There are dozens of alleged privileged communications -- and I am not contesting that -- but there are privileged communications between the outside lawyers and AB

which certainly give the appearance that AB is running and controlling this litigation.

So what you are left with is the fact that LM, the actual plaintiff in the lawsuit, is nothing more than the agent or the alter ego.

So in the final sum, where we find ourselves is we have a license defense that was pled in the original answer. We have the fact that Ericsson has conducted discovery, written discovery and depositions on the license defense, including this master purchase agreement covenant not to sue issue.

Dell has conducted discovery. Dell has been to Europe to Sweden to take those depositions. This amendment does nothing more than add factual allegations -- and by the way the amendment was filed in December of last year -- but adds factual allegations related to the license defense that was originally pled.

And the reason we are here, Your Honor, is because it became clear last fall, particularly towards the end of the year, that Ericsson was going to contest whether or not this license defense was actually in the case. So out of an abundance of caution we filed this motion for leave to add the factual allegations to the answer and to ensure that it is in the case. We would ask the Court to grant the motion for leave.

THE COURT: Response?

MR. STEVENSON:  Your Honor, Dell was on notice of these patents in as early as March of 2010 when we sent them to them.  And in their answer in August of 2011, never mentioned this master purchase agreement.

What this pertains to is Dell purchasing some cellular modules, not 802.11 equipment, from Ericsson AB. The way the corporations are set up is LM Ericsson that owns the patents is the parent corporation.  AB is one of its subsidiaries.  It has a number of subsidiaries that are in different business areas.

And then Ericsson, Inc. is its U.S. sales arm and it is also involved in the patent licensing, and the two parties in this case are LM Ericsson and Ericsson, Inc.

But Ericsson AB doesn't own the patents.  It doesn't have the right to grant licenses under these patents, and it isn't an agent.  It has never been an agent of LME for this purpose.

There is some language in the purchase agreement for these modules that Dell asserts, and we disagree with, that establishes some broad covenant not to sue.  And commercially I don't think that it makes much sense that there would be such a broad omnibus covenant not to sue, especially given that there is this assertion of infringement against 802.11.

But nonetheless, opportunistically they are trying to raise this.  The issue is I think Dell probably

tacitly admits that the entity AB doesn't own the patents, and they want to go into either an agency or an alter ego theory to argue that it is the agent and, therefore, has authority to grant a covenant not to sue.

I think we are late in the game to be doing alter ego discovery of a large multi-national corporation in order to try to bootstrap in a covenant-not-to-sue type of defense --

THE COURT:  So when did you become aware of this specific claim that they were claiming under this AB?

MR. STEVENSON:  We got a letter in either late July or August of 2012.

THE COURT:  Okay.  All right.  What additional discovery would you need to address this -- at this point we are just talking about alleged defense.  Whether it is valid or subject to summary judgment or not, we are not at that stage. What additional discovery would you need in order to respond to the allegation?

MR. STEVENSON:  I don't think we need discovery. In other words, the real sidelight issue is whether Dell has an opportunity to come into court and try to put on an alter ego case.  I mean from the Ericsson perspective we know our own internal facts.

THE COURT:  All right.  Well, I will grant the motion for leave to amend, but then if defendants want to

assert on some legal basis whether it is viable or not to move forward in trial, I will grant you leave to file such a motion if you wish to.

MR. STEVENSON: Thank you.

THE COURT: When can -- if you intend to file that, let's do so promptly. What's today? Say by Tuesday of next week.

MR. STEVENSON: Yes, Your Honor.

THE COURT: Very well.

All right. Let's see. That brings us to Ericsson's motion to strike David Cabello, Docket No. 361.

MR. NEMUNAITIS: Thank you, Your Honor. Justin Nemunaitis.

David Cabello is defendants' willfulness expert in this case. He has prepared a report that has basically put together a bullet point list of various facts that he has identified; that he goes through and describes; and then he relates them back to the willfulness standard in this case.

I have got here just as a quick review the Federal Circuit's willfulness standard from Seagate. It states: To establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted, despite an objectively high likelihood, that its actions constituted infringement of a valid patent.

Now, in the briefing we focused a lot on the

fact that many of these opinions in his report are of the sort that are typically kept away from the jury in motions in limine. But I believe that it is still helpful to go through some of these facts at the Daubert stage to analyze whether or not the defendants have actually qualified Mr. Cabello to testify on these topics.

So what I have done is collected some bullet point statements from his reports -- these are quotes -- to go through these arguments.

So the first quote is: The decisions in the Mannheim cases are objective evidence that defendants did not infringe at least the '625 and '435 patents.

Now, what he is referring to here is ongoing litigation between Ericsson and Acer in Germany over foreign equivalents to some of the patents-in-suit.

The reason this is a problem at the Daubert stage is that no reasonable person with a knowledge of patent law would look at what is happening in German litigation and conclude that the results or non-final results from that litigation should carry over into the U.S. and establish an objective defense with the U.S. litigation.

MR. AROVAS: Your Honor, I can, again, short-circuit this. I think if they do not -- obviously, we don't know what is going to happen in the trial -- to be more responsive in this case; but if they don't bring up the foreign

litigations, we don't intend to independently bring up --

THE COURT:  Is that agreeable, Counsel?

MR. NEMUNAITIS:  It is.

THE COURT:  Okay.  So agreed on that then.  So that solves -- the German proceedings will be stricken, and --

All right.  What is next?

MR. NEMUNAITIS:  The next one is the topic of Ericsson dropping patents in this case.  The statement from Mr. Cabello's report is -- in referring to Mr. Ericsson's dropping of three patents he states:  These facts would tend to support a belief that even Ericsson had difficulty applying its own patents to the accused standards during its pre-filing investigation.

Now, there are two problems with this statement here.  The first is he is referring to our pre-filing investigation and basically accusing us of doing something wrong with pre-filing investigation based on the fact that later in the case we dropped the patents.

There is a complete disconnect between those two occurrences.  No person with an understanding of patent law would conclude that because you drop a patent case for whatever reason later in the case --

THE COURT:  All right.  Response?

MR. AROVAS:  Your Honor, with regard to that, I would like to give a little bit of context and when I get up

there I can do it in a more fulsome way.

But what David Cabello is doing is testifying about the standards of commerce in the industry exactly as Seagate talks about in giving context to a number of facts that came up over the course of the litigation as well as during the course of the negotiations, some of which were before the suit.

What he is doing in part -- and when I go through it I will try to put the pieces together -- is looking at the allegations that Ericsson has made over time and trying to give a benchmark to say based on the standards of commerce that exist in this industry, okay, would it have been objectively reasonable or objectively reckless -- and also there is the subjective prong, of course -- for the defendants to have continued to sell their products?

And what we will do when I show you my materials is we will look at what is the specific allegation of willfulness that is being brought up by the plaintiff?

The plaintiffs base that we have almost no discovery on this. They claimed they were going to put in an expert report which never came. They didn't give us the contention -- responses on the contentions. They claimed it was subject to expert testimony.

So what we have to work with in terms of what we are responding is basically a couple of lines in the interrogatory.

Here is what they say: They say number one you had notice. Number two you continued to sell product and you didn't stop. Number three, therefore, you are a willful infringer.

So what Mr. Cabello does is he says, okay, well, we know that the standards of commerce, the way people engage in negotiations, the way people resolve these issues and in particular with regard to the standards patents where there is a RAND obligation, what is it, is it really evidence based on those standards that the defendants didn't stop making these standards compliant products? Is that evidence that they were unreasonable? And then he goes through a variety of things.

One of the factors that he goes through -- and the intent is not to deal with dropped patents generally; but there is one particular patent that when he does go through, he has changed positions where they say at the one point this one patent, they say, okay, well that covers a, b, g, and n. Remember, I mentioned before the different flavors of the standard. There are 802.11a, b, g, and n.

At one point in time they said it applies to all of them. Because of this patent, you can't use any of their standards. So under their willfulness case what they are saying is, okay, defendants, you should have stopped selling products from clients with those four standards.

Then a little while later they say, oh, wait a

second, no, that is just a, b, g; not n. So you can sell "n" products would be the logical conclusion of their analysis. You can't sell a, b, and g.

THE COURT: All right.

MR. AROVAS: Get a little deeper --

THE COURT: Excuse me. Excuse me.

Let me ask this question: How serious is plaintiff about your willfulness case in this deal? What evidence do you have of willfulness, and what -- sometimes I bifurcate these willfulness -- and it just kind of goes away.

MR. STEVENSON: Well, in this case actually it is a fairly strong willfulness case because there were extensive negotiations with a number of the defendants for years before filing of suit. Therefore, notice and basically no change in conduct or product. That is the essence of our willfulness case. I would categorize that as a serious willfulness case.

THE COURT: All right. Okay. Thank you.

Well, what is your response specifically to the item that Counsel for Ericsson is dealing with, regarding the dropped patents or claims in this case?

MR. AROVAS: We believe that it is appropriate to show the changed positions that ultimately lead to the dropping of the patent to show that in normal -- and what Cabello would testify -- in normal negotiations, normal

companies when you have a plaintiff that is changing its positions about what the patent covers and telling you at first you can't do this it is essential to this part of the standard, it is essential to that part of the standard, then ultimately they say it is not essential to anything.

That is the key. It is not just that they drop it, but that their 30(b)(6) witness on this admitted that, in fact, that patent that they told us blocked us from using the standard was, in fact, not essential to any of the relevant standards; and that ultimately the patent goes away.

So this is not a case where you just have a strategic decision by a party to pull the patent out with a 30(b)(6) witness testifying; in fact, it is not essential to anything after the pre-suit and other negotiations saying it was essential and we had to stop.

That is part of what we believe is the benchmark that the jury is -- some facts that the jury can consider when parties are deciding do we have to stop or not have to stop when we are looking at the conduct and saying does that arise to the level of recklessness when you are dealing with a party constantly changing --

THE COURT: Are you talking about dropped patents that were dropped as the case progresses to trial that you are wanting him to testify about?

MR. AROVAS: There is one patent.

THE COURT: Which one is that?

MR. AROVAS: Ultimately, it was the '516 patent.

THE COURT: Okay.

MR. AROVAS: That was ultimately -- in fact, Your Honor has papers in front of you now where we are negotiating the scope of the covenant that goes along with dropping that.

It is not just -- that is what I want to emphasize -- it is not really -- the dropping is the end of the story. What is critical to the story is over the course of the negotiations, over the course of the assertions, when they were taking that patent and applying it against the various products was the constantly shifting positions of how they were applying the product and how a reasonable company would look at that when they are making a commercial decision do I stop selling a product while they are in negotiations over standards essential patents -- with this particular patent --

THE COURT: All right. Response?

MR. NEMUNAITIS: Two responses to that. First, willfulness is decided on a patent-by-patent basis. So regardless of what Ericsson does with this patent or that patent, the fact is that has no bearing under the patent law as to -- with regard to whether or not the defendants were willful with regard to the other patents that are in this case.

Now, the patents that are going to be remaining in this case are Ericsson's 802.11n Wi-Fi portfolio. What Ericsson has done with the '516 patent has no bearing on the defendants' willful infringement with regard to those 802.11n patents.

One other point that I would like to briefly mention is that I believe Counsel is going into potentially 408 privilege communications, and so to some extent I believe we will have to take that up at exhibit objections. Some of that story may be inappropriate for the jury to hear.

THE COURT: Okay. I am going to deny it as to the dropped patents, but I am going to grant a motion in limine as to that because I want to hear this in the context of the testimony if we get to this.

I am not sure that I will allow it. But at least as far as striking it from his report, I am going to deny that at this time.

What is next?

MR. NEMUNAITIS: The next statement, Your Honor, is to a reasonable person in this industry the absence of evidence of copying would tend to support a belief that the accused 802.11 technologies do not use Ericsson's patents.

This is a statement that is just wrong on the law. Ericsson does not have to prove copying to prove infringement. Making this sort of statement to the jury would

be very misleading.  And to a reasonable person with a knowledge of patent law, this statement does not negate Ericsson's infringement case.

THE COURT:  All right.  Response?  And you might want to go to this other podium, Counsel, and we will go through these one at a time.

MR. AROVAS:  Thank you, Your Honor.

So, again, what I think is going on here is we are having one comment taken out of context of what the overall opinion is.  We are not saying that the fact that there may have been independent development means that there cannot be infringement.

Okay.  What we are doing is again -- this expert -- and willfulness experts have been allowed in a lot of contexts to testify about standards of commerce -- is going to go back and go through the interactions between the parties.  And willfulness, by the way, Your Honor, is alleged both before the filing of the lawsuit and after the filing of the lawsuit.

In fact, that is the very first time Intel actually got a specific accusation of infringement was when we intervened in this case, and they brought cross-claims against us.

So with regard to, again, the standards of commerce and how would these defendants have reacted, would they have done what Mr. Stevenson and what the interrogatories

say, should they have stopped selling standards compliant products because of these allegations? We are going to go through the quality of the claim charts that were exchanged. We are going to look at testimony from their witnesses saying that those claim charts don't even make out a prima facie case of their own 30(b)(6) witnesses; that they can't even understand how those relate to the standards.

We are going to go through, you know, what would a reasonable company do when getting claim charts of that quality? We are also going to tell -- this is -- obviously, there are other reasons some of this evidence might be relevant; but for the willfulness context solely, we are going to say, and do those parties that were accused of infringement know where that technology came from?

So you combine the different factors; and, again, it is a question was it reckless, was it reasonable for these parties to continue selling standards essential patents when they know where the technology came from, they looked at the Ericsson claim charts, they did not make out a prima facie case --

THE COURT: Okay. Thank you. I am going to go ahead -- I am not going to make any further rulings on this motion. I am going to direct y'all to get together and meet and confer and see if you can't narrow this down. If not I will take this one back up at the pretrial.

I really think this is -- I will give you these general comments. I have some concern about an attorney testifying about a lot of the issues that I know that are being raised in here. You know, I think you have got to tread on some very -- carefully that you are not invading the province of the jury or that you are arguing your case through your expert.

I mean, if he can tie together some facts and express a limited opinion, I will probably allow it. But he is not going to be just a way of arguing what you can argue in closing argument from the facts of the case. So I will ask y'all to meet and confer, and we are getting way down in the weeds on this, and I think our time would be better spent on something else today.

MR. AROVAS: Thank you, Your Honor.

MR. NEMUNAITIS: Yes, Your Honor.

THE COURT: All right. Next is defendants' motion to exclude John Bone, Docket No. 364.

MR. NEMUNAITIS: Your Honor, I have a brief comment I would like to make about this motion.

THE COURT: All right.

MR. NEMUNAITIS: In some of the briefing we went into Ericsson's confidential licensing information. If during the argument today we go into the details of that information, I would just request that we be able to seal the transcript and

ask people in the audience to leave if they are not qualified under the protective order.

THE COURT: Any objection to that?

MR. DAUCHOT: I have no objection to that.

THE COURT: Well, if you get into any of that, please call it to the Court's attention and request that the courtroom be sealed, either side. It will be your responsibility to notify me.

MR. DAUCHOT: Yeah, I will rely on Counsel to do that since you raised the question.

MR. NEMUNAITIS: Of course. Thank you, Your Honor.

THE COURT: All right. You may proceed.

(Slides given to the Court and Counsel.)

MR. DAUCHOT: Your Honor, good morning. I'm Luke Dauchot. I'm here on behalf of Intel but speaking on behalf of the entire group of defendants, as well.

And the issue here, Your Honor, is Mr. Bone, who is an expert for the plaintiff, and intends to testify at trial that Ericsson is entitled to a royalty rate of fifty cents per device sold that includes Wi-Fi chips, be it from Intel or other chip manufacturers.

THE COURT: What does that relate to? What is his damage model; basically, how much?

MR. DAUCHOT: The damage model comes from

essentially a number of licenses out there.

THE COURT: No, I say how much damages are they seeking under their damage model? What does it add up to?

MR. DAUCHOT: Total dollars?

(Attorney discussion off the record.)

MR. DAUCHOT: 45 million, something like that.

Here is the problem, Your Honor. And if you can put up the next slide. There are three issues. The first one is a question of apportionment or lack of it.

And on that point, Your Honor, it was interesting. I heard Mr. Stevenson in one of his arguments, it was when he was dealing with Mr. Van Nest, pointing out that, look, the question of whether or not the code is actually used is ultimately one of valuation. And so how much this technology is actually used, ties into that issue.

Well, it is an interesting point. But on the subject of apportionment, as I will get into in a second, there is basically zero -- not even basically, there was zero, zero effort to take the specific 802.11n technology that is at issue here in this case and try to value that separate and apart from, first of all, 802.11n generally and much less so 802.11 generally. As Mr. Arovas pointed out, 802.11 captures a number of different standards, if you will, or sub standards a, b, et cetera. There is just zero effort to take that specific technology. That is point number one.

Point number two is we do have an entire market value rule problem in that what Mr. Bone ultimately relies on to come up with his unit rate is, in fact, "n" product values.

And the last problem here, Your Honor, and it is a significant one, is RAND. As Mr. Arovas noted, we are talking about alleged standards essential patents which, of course, invokes RAND.

Intel did receive two letters of assurance from Ericsson that Ericsson would go ahead and license to Intel the patents that Ericsson deemed standards essential under 802.11. And according to Mr. Bone in this hypothetical negotiation of his, the chip makers would not be permitted in the hypothetical negotiation. Ericsson would propose this under Mr. Bone's model that at the hypothetical negotiation table the only people there are the end-product manufacturers.

And, Your Honor, that is a fundamental problem, a fundamental flaw that is just inherently inconsistent and we believe can be dealt with as a matter of law.

Let's quickly go to apportionment. Your Honor, I know that you have issued a number of opinions in this area, so I am going to walk through this relatively quickly, given the background that the Court already has on this.

But we do know, but we do know it is fundamental black letter law, particularly as emphasized by the Federal Circuit recently, that a plaintiff must, must apportion the

defendants' profits and the patentee's damages between the patented feature and the unpatented features. That is Uniloc, and Your Honor has pointed to Uniloc in a number of Your Honor's decisions, including Fractus. And that simply hasn't been done.

Next slide, please.

Now, is that a problem? Well, of course, it is. If we just look at 802.11n, which is the standard that the plaintiffs invoke here as capturing their inventions, that standard in and of itself 802.11n captures a wealth, a wealth of technology, including BlockAck technology, including quality of service technology that their patents have nothing to do with. Nothing.

There is absolutely zero effort on the part of Mr. Bone to drill down to what exactly it is Ericsson is bringing to the table here from an 802.11n standpoint and segregate that apart from the rest of the 802.11n standard, much less, Your Honor, the 802.11 standard in general.

Next slide, please.

THE COURT: Let me hear plaintiff's response to that, because I think that is a fundamental point. Let me hear plaintiff's response to that.

MR. NEMUNAITIS: Your Honor, Mr. Bone's analysis is apportioned. Mr. Bone relied on licenses signed for Ericsson's 802.11n portfolios with --

THE COURT: I am sorry. I couldn't understand you.

MR. NEMUNAITIS: Mr. Bone relies on licenses signed for Ericsson's 802.11n portfolio. Those licenses are signed by companies like HP, RIM, Buffalo a large router maker. They indicate that those companies did an analysis to determine what is the value of Ericsson's patents to our products. In that sense those licenses inherently apportion and drill down to the value of Ericsson's patents to the products at issue.

THE COURT: What is your response to that?

MR. DAUCHOT: It is an easy response, Your Honor. The HP analysis that Counsel is referring to was an analysis done internally by Ericsson after the negotiations with HP. It had nothing to do with HP. This isn't HP deciding what value to attribute. This is basically Ericsson coming in after the fact and internally basically creating numbers that make it seem as though 802.11, their particular technology bears some particular weight.

It had zero to do with the actual negotiation. It had zero to do with the actual license. You are not going to find any of this in the license. You are not going to find any discussion between HP and Ericsson about this. This is something that Ericsson jer -- jimmied up after the fact internally.

THE COURT: Response, Counsel?

MR. NEMUNAITIS: The internal analysis he is talking about was done during the licensing negotiation process. And let me back up for a minute and talk about that license.

When Ericsson was negotiating with HP, HP shared sales projections, information on the products that it intended to sell, and the types of standards that it wanted to use for those products. So in that way Ericsson could tell, okay, here is how many Wi-Fi products HP intends to sell, here is how many cellular products they intend to sell; and when they negotiated the license, they agreed on a lump sum deal that would apply to Wi-Fi and cellular patents, but they put a limit on the number of cellular patents that HP could sell.

The reason why that is important is because when you look back at the actual information that HP shared with Ericsson, you can take that lump sum amount, divide it by the number of products that HP expected to sell under the license, and determine what is the per unit rate that is devoted to those Wi-Fi products.

That is what Ericsson did. That is what Mr. Bone looked at. That is why that information shows the value that HP placed on Ericsson's Wi-Fi patents.

MR. DAUCHOT: Your Honor, if I may, it is the last part, right. That is why HP -- it is an internal analysis by Ericsson. And if I said after the license was signed, I may

have misspoken about that.  But the fact is, and there is no dispute about this, that this was something done internally at Ericsson.  And I might add the date is 2012.

So this lawsuit is ongoing.  Ericsson is acutely aware of what is going on in this lawsuit, so that analysis and to suggest that analysis reflects what HP was thinking much less what the actual license shows, it is just not factual.

And I submit, Your Honor, that if any plaintiff can go ahead and create -- and by the way, the apportionment I might add doesn't drill down to the specific technologies that we have at issue at this point.  We are still talking about generally 802.11n at best, at best.

But, again, let's take a step back.  Let's put that aside as to whether or not this is even an actual apportionment.  If any plaintiff is allowed -- think about it, Your Honor, during a negotiation, there is a lawsuit, we are going to get into a negotiation, we are going to get into a license, and then what we are going to do is internally create these records to basically suggest how much value we are placing on particular technologies and then come into other litigation and say, see, that is what the market thinks.

It is not what the market thinks.  It is what Ericsson does internally.  I mean, Your Honor, that is not what the case law is talking about in terms of an apportionment.  I mean, if that is what apportionment is about, you would have

every plaintiff in this country in every single patent lawsuit, go ahead, you can meet apportionment by simply creating a little chart internally and there you go. We have our apportionment, and we are going to take it up to the jury.

That is not, Your Honor, what the law requires. And that is -- they really do have zero here. I mean, there was no technical analysis done to strip out the particular functionality at issue in this case and compare that to the rest of 802.11n. Certainly not 802.11. In fact, when you look at some of these licenses on which Mr. Bone relies to get at his 50-cent-per-unit rate -- and, by the way, the figure I gave you, Your Honor --

THE COURT: Well, Counsel, I mean it sounds like you have some challenges and arguments you would want to present to the jury regarding the bases of Dr. Bone's opinions that may or may not be persuasive -- I am not going to express an opinion on that -- but I don't know that rises to the level of excluding his testimony. What else do you have?

MR. DAUCHOT: Fair question. A fair jury issue, Your Honor, a fair jury issue is whether or not Mr. Bone's apportionment is legit or not. So what we have is we have an actual apportionment along the lines of what we had in your Fractus case where somebody tries to apportion the value of the internal antenna in a cellular phone; and the expert stood up and said, you know what, we have looked at it, we believe that

internal antenna accounts for 10 percent of the value of the cell phone. And the entire base -- and basically he concluded that ten percent of that ten percent was the appropriate royalty.

So you had an initial apportionment to take out the value of the internal antenna.

So, Your Honor, it raises a good point. If we are going to have a debate with Mr. Bone about whether or not that is appropriate, whether or not technically speaking it is legit to attribute the functionality at issue in this case and attribute a percentage to that in terms of the technical value, absolutely. Absolutely. When he can have a debate about that in front of a jury, and the jury can decide whether or not the apportionment is appropriate.

But we are not there. We are not there. Instead, we are now, as the defendants, put in a position where we have to deal with the 50-cent number -- and, by the way, the notion that the end product values aren't going to come out, I mean that is just -- they will come out because the 50-cent unit is a conversion based on the end product price; and if we have to challenge the conversion, which we intend to do, we are necessarily going to be talking about thousand dollar laptops.

All the jury needs to do is do the math, right? Take the total number of units, multiply by a thousand. The next thing you know we have the jury thinking, huh, 50 cents

for one, thousand-dollar laptop. That is a spit in the ocean. That is nothing. What are they complaining about? That is exactly, that is exactly what the apportionment law tries to prevent on top, of course, of the entire market value rule. That is exactly what we have here.

So to Your Honor's point, yes, can we have a debate with Mr. Bone if he had apportioned -- if I were here and saying, you know what, the apportionment wasn't any good, when Mr. Bone tried to calculate the value that the specific functionality in this case brings to the chip, okay, and I tried to challenge that with Your Honor and say, you know what, Mr. Bone is off, he is relying on Mr. Nettles and Mr. Nettles is wrong because, in fact, it should be this and not that, absolutely jury question. We are not there. We are not there. There is just no apportionment to begin with.

And so to try to have this debate in front of the jury brings us spot on to what Uniloc and LaserDynamics -- the Federal Circuit was trying to avoid.

So if we shift now to --

Next slide, please. Next slide.

Oh, some of this stuff has been redacted, Your Honor, but what else do we hear Mr. Bone say? I have engaged in an implicit apportionment. The point here is the argument is, well, when I am looking at these licenses involving cellular technology, involving the combination of cellular and

Wi-Fi and all of this stuff, I can assume that the rate, that the figures, you know, is tantamount to an implicit apportionment by the parties.

Your Honor, that is just not factual. It is just not there.

You know, and you see in your binder, Your Honor, I am pointing to Slide 7 which has been redacted, so I am -- for confidentiality reasons we are not going to put it up, and I won't refer to it specifically here on the record to avoid some of the problems. But you see what is going on. This is the apportionment we are talking about.

It is not an apportionment. It is basically somebody taking -- you have that one license agreement, right? You have a total 1.7 percent of end product price, maximum royalty of a certain number for modems compliant with a bunch of cellular technology, maximum royalty -- another max for modems compliant with cellular and 802.11, what does he do? Takes the difference 30 cents, boom, there is my apportioned rate.

Really? I mean, that is not an apportionment. I mean, that is not even a technical apportionment. It is basically taking that license; and if you look at this stuff, Your Honor, it is not even logically coherent. Right? Because if you look at the differences he is making, it just falls apart.

But the point is, the point is that when we are engaging in this sort of issue in front of the jury, Your Honor, we are necessarily letting, so to speak, the cat out of the bag. We are not talking about laptops. We are talking about routers. We are talking about end products that have exponentially greater value, if you will, the sales price, than a two-buck chip on which all of the 802.11n technology at issue in this case sits. So we are now having a debate in front of the jury about laptops.

Which brings me to EMV. Here is another problem. There is not a shred of evidence in this record; and, in fact, Ericsson doesn't even try to make the case, they don't even try it, Your Honor, to make the case that there is EMV here; that they are entitled to go after EMV, based on that rule. Namely, that their specific functionality at issue in this case drives the sale of the laptops and the routers. They don't even try it.

So what do they say? Well, we have a bunch of licenses out there, cellular licenses. We have got a bunch -- and they include the 802.11 standard as well; but by and large if you look at these licenses, they are cellular, which that is Ericsson's bread and butter.

You know, and then they say there you go. These are end product licenses. Therefore, we have a standard in the market where this is all end product, and so we get a pass on

EMV.

Your Honor, the Federal Circuit, LaserDynamics says, no, no, if you are going to try to deal with this issue in the context of the value of the end product, you must, you must demonstrate that what you are bringing to the table in terms of patent technology at issue in the case drives demand for the end product because if you don't, if you don't, first of all, you have got an apportionment problem; and, moreover, second, you run right into the situation where you are inviting these jurors automatically, merely by virtue of the context, merely by virtue of the context of the discussion, we are inviting the jury to look at this in the context of the laptop.

If you could flip to Slide 10, please.

THE COURT: All right. Counsel, we are about to run out of time here today. So let me hear a response from plaintiff, and then I will take this under advisement.

MR. NEMUNAITIS: Quick response, Your Honor. On the apportionment issue, Mr. Bone is apportioned. The only way that Counsel has tried to distinguish that is by trying to say, well, look, some of these licenses don't really add up. There is some problems with them. He talks about the HP license. Doesn't mention RIM. Doesn't mention Buffalo. Doesn't mention Ascom. Doesn't mention some of the other licenses that are in the record before Your Honor.

And just to back up a little bit on this, we

talked about that HP license. The way that Ericsson starts out these licensing discussions is it provides a reference rate. It uses that reference rate to ensure that it complies with its RAND obligations to make sure it is offering a reasonable range of rates for all of the companies that it deals with.

Ericsson's rate is half a percent capped at 50 cents. So if you sell a laptop for $500, your rate is 50 cents. If you sell a laptop for a thousand dollars, your rate is 50 cents. If you sell a laptop for a hundred dollars, your rate is 50 cents. So that reference rate, that is the starting point for these negotiations, doesn't rely on the entire market value of the products. It just relies on that initial part of the value.

HP's license per unit rate is consistent with that. The other licenses that Mr. Bone relies on is consistent with that, so there is no risk here that we are accounting for the entire market value in an inappropriate sort of way.

On the entire market value issue, the only case that Counsel talked about was LaserDynamics read a quick quote from that case because it did not address this issue.

What LaserDynamics said about licenses is that actual licensing evidence is highly probative of the patented invention's economic value in the marketplace and the form that a hypothetical license agreement would have taken. In that case the Court criticized the expert for ignoring the entire

market value rule and for ignoring the licenses that were consistent with those problems that the Court raised discussing the entire market value rule.

When you look at the cases that address this issue of the potential conflict between the entire market value rule and the importance of licenses, the parties have only found three that attack it head on. They all say that when there is this potential for conflict, the importance of the licenses has to trump the entire market value rule.

One of those cases is from this district. It is a Judge Everingham opinion. It is the Mondis opinion that is cited in the brief. The reason he explained for why that licensing evidence has to trump the entire market value rule concern is that these licenses provide direct evidence of the value that other companies put on the patents at issue, and that is the best evidence for determining what the value of a reasonable royalty should be in a patent case.

THE COURT: All right. Thank you.

MR. DAUCHOT: Your Honor, if I could just add one point if the Court would indulge me.

THE COURT: All right. Uh-huh.

MR. DAUCHOT: Can you put Slide 15 up, please?

And this is a key distinction --

Or 16.

Key distinction --

16, please.

Key distinction between the cases that Counsel is pointing to. For example, this case is a RAND case, Your Honor. And so if you look at the licenses on which they are relying, none of them, none of them are with a chip maker.

Mr. Bone affirmatively in his report states that the hypothetical negotiation keeps Intel out of the room. What happens if Intel is in the room? And that is why we have the anomalous, to say the least, Your Honor, situation where Intel here is a defendant in this case, and there is no damage claim against Intel.

They are not asserting a damage claim against Intel. Why? If you look at Exhibit C to the reply, it is Mr. Major's declaration Exhibit C, there is an internal Ericsson document where they say exactly what is going on here. That is, keep the chip maker out of the equation because once you bring the chip maker to the table, here is what happens.

Next slide, please.

What happens is -- oh, that has been redacted, too.

Actually next two slides, please. That one.

Here is what happens, Intel is at the table. Intel sells a two-buck chip, or for that matter any chip maker, and they are negotiating on the two or three-dollar price of the chip.

So what happens if the chip maker gets a license? If the chip maker gets a license, we have this thing called patent exhaustion. Ericsson doesn't much care for it; but with all due respect to Ericsson, that is something they should have considered before they declared a bunch of their patents to be standard essential and before they submitted a letter of assurance to Intel.

Mr. Bone's entire damage model crumbles, crumbles if you accept the proposition that Intel is allowed into the negotiation room. They are. RAND requires it. The IEEE, LOA requires it. The whole thing falls apart. They don't want us in there. In fact, they are not asserting damages against us in this case because they do not want to deal in the world where the technology at issue actually sits. That is what is going on here.

And if you do look at where the technology actually sits and if you acknowledge the market for that technology -- and there is a market; these chips are commercially sold -- if you take that market head on and look at it and you try to impose on that a 50-cent rate, it is unsustainable. How do you sustain a 50-cent rate on a two-dollar chip, three-dollar chip?

In fact, you will see from the slides which Your Honor has, we put the question to Ericsson's licensing, the man in charge of all licensing for Ericsson. I am not going to say

his answer here on the record, but his answer speaks volumes. And, in fact, what it does is it tells us what any rational human being would say. A 50-cent tax on a three-buck product is -- it is absurd. It is absurd.

THE COURT: Okay. Thank you.

MR. DAUCHOT: Thank you, Your Honor.

THE COURT: All right. Let me hear some argument on defendants' motion to exclude Scott Nettles, Docket No. 365.

MR. ALPER: Good morning, Your Honor. Adam Alper for defendants.

If we could put the slides up.

Let me actually -- may I approach, Your Honor, and hand up a couple of binders for this?

(Documents given to the Court.)

MR. ALPER: If we can go to Slide 2. Can we go to the other motion on Dr. Nettles, please?

The thrust of this motion, Your Honor -- I am going to put up a slide in a moment -- the thrust of this motion is based on the fact that Ericsson's technical expert put in opinions on new functionalities that weren't previously disclosed in the infringement contentions. So what I would like to do --

If we could go to Slide 2, please.

There are three patents that are at issue here,

and what we see is that Ericsson's infringement contentions were served in June of 2011. They included a particular functionality. In two of the patents it is called the BlockAckReq message. And once we get their expert report of Dr. Nettles in January of 2013, about a year and a half later, we have an additional functionality that wasn't previously in the original infringement contentions.

So what I would like to talk about today is why these are two very different technologies and why we are prejudiced by that delay.

If we go to the next slide.

Let's start with the '435 patent. It is fairly representative of the other two patents. I think we will hit most of the major issues.

So the claim element we will focus on is the requirement of a discard notification message in the '435 patent.

And what Ericsson said in their infringement contentions which they served in 2011 was that a 802.11n BlockAckReq message was the claim discard notification message.

And about a year and a half later when we got their expert report, Dr. Nettles added a new functionality called an A-MPDU. And at that point he said the A-MPDU was the claim discard notification message.

Now, let me tell you there are some things we

agree on here and then there is a dispute. The things that we agree on, or that there is no dispute, that in the infringement contentions there is no mention of A-MPDU's with respect to the '435 patent. It just refers to BlockAckReq messages. And that once we get to the expert report a year and a half later we have this new functionality, an A-MPDU that shows up.

The dispute is over Ericsson's argument that by telling us in the infringement contentions that a BlockAckReq message is a discard notification message in the '435 patent, that that was sufficient to put us on notice that an A-MPDU is also a discard notification message.

But the fact is, and I am going to talk to this a little bit, these are two very different functionalities such that you can't reasonably conclude that an A-MPDU is also a discard notification message just because they tell you about this BlockAckReq message. And the fact is, Your Honor, we didn't conclude that.

Based on what they put in their infringement contentions, which we are entitled to rely on, we concluded that they were actually accusing the BlockAckReq message. And for 18 months we prepared our case on that basis all the way through the close of discovery, and it wasn't until after the close of the discovery that they tell us that the A-MPDU is also a discard notification message.

If we go to the next slide.

Before I talk about the differences, let me just show you, this is an excerpt from Ericsson's infringement contentions from 2011. The only thing we see in there is BlockAckReq message. Over and over and over again they tell us in text. They put in an excerpt from the standard. BlockAckReq message. BlockAckReq message. BlockAckReq message.

If we go to the next slide.

Once we get to their expert report they still have the BlockAckReq message in there, but now they add this new functionality in A-MPDU.

So let's talk about the differences between BlockAckReq messages and A-MPDUs.

Well, if we go to the next slide.

The standard refers to them in very different contexts. So in the standard they are described in two totally different sections. The BlockAckReq message, as you can see from the slide, is in Section 7.2. It is a control frame. Whereas, the A-MPDU is a different type of packet.

If you go to the next slide I can tell you what some of those differences are.

BlockAckReq message is a specialized control package for the purpose, as you get from its name, of requesting a Block Acknowledgement Message. The control message is for administrative purposes. No user data in the

BlockAckReq message.

An A-MPDU is an aggregated MPDU. This is 802.11's word for an ordinary data packet. You can see from the briefing the parties agree about that. An A-MPDU is just an ordinary data packet that is 802.11's word for that. Its primary purpose is to carry user data, and it is a completely different function than the BlockAckReq message described in separate sections.

Now, what Ericsson says is that -- so what is the relationship and why are you even talking about this? What Ericsson says is that because both the BlockAckReq message and the A-MPDU when they get sent from a transmitter to a receiver, they cause a similar effect, which Ericsson describes in its brief called "window shifting"; that things are the same thing. Right?

But they are not the same thing. They are described separately. And certainly just because something may have a similar effect as another thing, doesn't mean by telling us -- that telling us that a BlockAckReq message is the claim discard notification message that we should divine that an A-MPDU or an ordinary data packet, an 802.11 also meets that claim limitation because they didn't say that in their claim limitations.

Even when it comes to the this accused functionality, this window shifting, the standard describes

these things in two totally different senses.

If we go the next slide.

What I am showing here is on the left the section in the standard that talks about this window shifting with respect to the BlockAckReq message. And on the right side of the slide we have the section in the standard that talks about this window shifting effect for the A-MPDUs and MPDUs.

And as you can see, these are in two totally different sections, and the functionality -- it is not just form over substance. The functionality is different. They do different things, and I won't go through the details because they say different things.

But you don't have to take it from us. Ericsson makes this same exact distinction in their infringement contentions.

So if we go to the next slide.

When you look at their contentions for the '435 patent they excerpt the portion of the standard that talks about the BlockAckReq message in terms of this window shifting. And when you look at their contentions for the '625 patent, they put the A-MPDU section in but not the BlockAckReq section.

So when they want -- if we look at the top of the slide -- when they want to talk about -- point to the BlockAckReq message, they know how to do that. And when they want to point to the A-MPDU message, they know how to do that.

What this is showing us and the only reasonable conclusion that we can take away from this when we look at their contentions as a whole is that Ericsson is distinguishing between these two items.

Now, after distinguishing between these two items in their own infringement contentions which they leave us for the entirety of the case all the way through the close of discovery after we have prepared our entire case based on these things, they are asking us to draw a conclusion that they didn't even draw in the first place that these things are the same.

So these are the choices that they made when they put their case together, and we have the right to rely on these same choices, especially given how different these things are. And that is not even a dispute.

If we go to the next slide.

We look at Ericsson's surreply brief. They say the same thing. A-MPDUs are very different types of packets from explicit BAR frames.

So let me just touch very briefly -- so it is not even in dispute that these things are different. So let me touch briefly on their arguments, why they say this should be accepted that Dr. Nettles put this new A-MPDU theory in there.

The first thing they say is in their contentions they disclosed a theory based on Doctrine of Equivalents. That

was sufficient to put us on notice that they some day may be pointing to A-MPDUs for this claim limitation.

If we go to the next slide, the fact is that when you look at the disclosure on Doctrine of Equivalents in their contentions -- this is their infringement contentions now -- the only thing they point to is the BlockAckReq message.

So they say:  To the extent Intel and/or the defendants argue that sending a BlockAckReq message to a receiver does not literally meet this claim element, this claim element is met under the Doctrine of Equivalents.

So their argument here -- so in their contentions they refer to the BlockAckReq message, not the A-MPDU when it comes to the DOE.  What they are trying to do here is they are turning the DOE arguments on its head.

See, the DOE says that if the BlockAckReq message doesn't literally meet the elements, then that item meets the elements by way of equivalents.  What they want to say is if the BlockAckReq message doesn't literally meet the elements, then something we never told you about that you have to basically guess some day, also should.  And that is just not the point of the Doctrine of Equivalents, and that is the not the disclosure they gave.

The one other argument they make on the '435 patent, Your Honor, is they say that under Patent Rule 3-6 because of the Markman they have the right to amend their

contentions to add the A-MPDU, and that I can deal with pretty quickly.

So the Markman came out in March of this year. Ericsson served its expert report in January, three months earlier -- a little bit more than three months earlier with these new theories.

And what Patent Rule 3-6 says is that it says in response to a Markman Order you can amend your contentions to add new theories. They had already done that three months before. So Patent Rule 3-6 doesn't even apply and it doesn't make sense in this context.

Now, they have a little bit of an explanation about that. They say when we had the Markman Hearing -- on the far left of the slide -- in June that they came on notice that we were arguing an application of the claims or for a construction, potential construction that would have allowed them to read the claims on this A-MPDU; and that when their expert reports came around, they decided to include it at that point.

But if that was the case, six months went by between the June Markman and the time that they added this thing in in their expert reports. All that while we had been asking them to supplement their contentions with more detail, and they refused. They told us to pound sand the entire time.

During that period of time discovery comes and

goes. We make substantial investments in discovery based on the theories that they gave us at the time, took a bunch of inventor depositions. We took discovery and prior art. As Your Honor saw, we took depositions based on prior art.

Based on these contentions that they gave us, it is the only thing we had to go on and we asked for more and they didn't tell us about it. So that just doesn't make sense. That is just not an excuse to tell us that they wait until after six months after discovery to for the first time give us this theory, and that was giving us the benefit of their thinking.

THE COURT: All right. Let me hear a response, please.

MR. LIPSCHITZ: Your Honor, defendants are seeking to exclude much of Dr. Nettles' expert report because they claim these theories are new, but they are not. I am going to talk about these theories in a minute, but I want to make a couple of notes, you know, just as an initial matter.

The defendants have delayed this issue to the last possible moment. They didn't complain to Ericsson about these allegedly new theories when Ericsson served an expert report on January 4th. They didn't complain a month later when they served their rebuttal reports which addressed each and every one of these theories.

They didn't complain in March when they took Dr.

Nettles' deposition and they asked him and questioned him about each and every one of these theories. Rather, they waited until the last possible day to file a letter brief to raise this issue for the first time.

Now, as we see most of the defendants' complaints relate to BlockAckReqs or BARs, so I think a little background might be helpful here.

THE COURT: Let me stop right there and ask Counsel for defendant to respond to that point. Why did you wait until April 2nd to file this motion?

MR. ALPER: Your Honor, I can explain that. So back in May of last year while we were in discovery we asked Ericsson to supplement their contentions with more detail that would have clarified this and ultimately actually filed a motion to strike/compel asking for that relief.

They opposed that motion. The motion was pending when they served their expert reports. At that point they gave us a bunch of detail and obviously we saw they were adding these new theories at that point in time.

The next relevant -- and it mooted our motion, right, because now we had the details, so compelling them to give us more detail at that point didn't matter.

The next relevant juncture in time was the deadline to file letter briefs, which included summary judgment and motions to strike, like this one. And that is what we did.

So it is the next opportunity for us to raise this.

Also, Your Honor, we didn't take their expert's deposition to confirm these theories until about -- until March 20th or 21st. Then we filed our letter brief almost immediately after that.

THE COURT: Go ahead.

MR. LIPSCHITZ: First of all, in response to that, Your Honor, we were never approached by the defendants in January, February, March, or April until they filed their letter brief to discuss this issue. So as I mentioned, that was the first time we had ever heard of it.

Now, going back to the technology at issue, there are two types of Block Acknowledgement Requests, explicit and implicit, but they are both BlockAckReqs, and they both work not similar but exactly the same way and have the exact same effect on the receiver.

Now, you will note there is going to be some different terminology that I am using from what Mr. Alper was using. Mr. Alper was comparing BlockAckReqs to A-MPDUs. Now, the standard has another name for A-MPDUs. This is not a name that we created. This is in the standard.

The standard says that an A-MPDU when you set a bit in the header, can be called an implicit BlockAckReq. So you have an explicit BlockAckReq and an implicit BlockAckReq. The fact that they are in different sections I don't think that

tells us much about how they actually act and the effect they have on the system.

Now, in an 802.11 system, a transmitter sends data packets to a receiver and occasionally needs an acknowledgment from the receiver that has received the packets.

Rather than have the receiver send an acknowledgment for each and every packet that was sent, the standard provides a block acknowledgement which acknowledges a bunch of packets all at once.

So in order to receive a block acknowledgment, the transmitter has to request, needs to request the block acknowledgment with either an explicit or an implicit BlockAckReq.

So let's start with what is an explicit BlockAckReq or an explicit BAR. The standard provides that a transmitter can send individual data packets, or what are referred to as MPDUs, to a receiver.

So to request an acknowledgment of those packets, a transmitter can send a separate message after those MPDUs, which is an explicit request for acknowledgment of those messages, an explicit BAR. So an explicit BAR is a separate message which is sent after the data packets, to request a Block Acknowledgement.

And implicit BAR performs the exact same function. It requests a Block Acknowledgement. Now, if you

recall, an explicit BAR is sent after a bunch of packets which were individually sent.

An implicit BAR is used when you aggregate a bunch of packets together and you send them all at once. So the individual packets are called MPDUs. The aggregated packets is called an aggregated MPDU or an A-MPDU.

So the standard provides that instead of sending an A-MPDU and then a separate explicit BlockAckReq, you can set a bit in the header of the A-MPDU to tell the receiver to treat this A-MPDU just like you would treat an explicit BlockAckReq.

So when the receiver receives the aggregated MPDU, it sends back a Block Acknowledgement just like it would do if you sent an A-MPDU and then you sent an explicit BlockAckReq afterwards.

It just eliminates having to send an additional message. That is it. That is the difference between explicit and implicit BlockAckReq.

And the important thing to note is that both of these BARs work the exact same way, have the exact same effect on the receiver. They both solicit a Block Acknowledgement Response.

So as an initial matter, the defendants couldn't have suffered any prejudice because these functions work the exact same thing.

Now, Ericsson didn't limit its infringement

contentions to implicit or explicit BARs. It accused BARs generally for both the '435 and the '625 patents in their infringement contentions.

The defendants tried to argue that Ericsson only accused implicit BARs for the '625 and explicit BARs for the '435. Now, this doesn't really make any sense. There is no good reason for Ericsson to only accuse one type of BAR for one of the patents and a different type of BAR for the other patents.

Ericsson didn't subdivide the BARs for the '435 and '625. It has been completely consistent from the beginning in the infringement contentions when we refer to BARs generally which encompasses both explicit and implicit.

And the defendants have failed to point to any language in the '435 or '625 which would limit them to one of the BARs.

Let's look at an example from the '625 infringement contentions.

THE COURT: Okay. That's fine, Counsel. I think we are out of time on that.

The Court is going to deny defendants' motion to exclude Scott Nettles, Docket No. 365.

All right. I believe that is all of the motions that we had set for today. Is there anything further the Court can help you with?

MR. STEVENSON: Nothing from the plaintiff, Your Honor. Thank you for your time today.

THE COURT: Defendants?

MR. AROVAS: Nothing from the defendants, Your Honor.

THE COURT: All right. Let me just mention to you, I think we are set for jury selection on June 3rd and trial to begin the week after that. But everybody be aware that I oftentimes will start the trial on the day I pick the jury. So I think everybody is aware of that. So we could start on the 3rd. We will discuss that when we do the pretrial later this month.

Oh, where are you on mediation? Are y'all still talking or everybody bound and determined they would like a jury to decide this case for you?

MR. STEVENSON: We would love, of course, to enter into licenses with all of the defendants; and we have been with -- mediation with Judge Faulkner. We reached impasse unfortunately, but are naturally willing to continue talking if any or all of the defendants would care to continue as well.

THE COURT: What about defendants?

MR. AROVAS: The defendants are also always willing to talk. I think that Mr. Stevenson's explanation was accurate. The parties did put a lot of effort and reached an impasse. But, of course, if there is a way to break through

that, I think I can probably speak on behalf of everybody that we would always love to resolve the case if possible.

THE COURT: When was the last time that you had a sit-down mediation with Judge Faulkner?

MR. STEVENSON: I think that was about six or eight weeks ago approximately.

THE COURT: Well, let me --

MR. AROVAS: I'm sorry. I don't know if I know the dates. Some of the mediations were done separately.

THE COURT: I think it would be worthwhile. I have hopefully resolved some questions for you today that may help give both sides some guidance. Let me order you back to mediation before Judge Faulkner between now and the pretrial. See if you can make any progress.

MR. STEVENSON: Thank you, Your Honor.

THE COURT: Anything further?

MR. STEVENSON: Nothing from the plaintiff.

THE COURT: Good to see everyone today. We will be adjourned.

(Hearing adjourned.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/ Shea Sloan
SHEA SLOAN, CSR, RPR
Official Court Reporter
State of Texas No.:  3081
Expiration Date:  12/31/14