1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


ERICSSON, INC., ET AL          )
                               DOCKET NO. 6:10cv473
     -vs-                       )
                               Tyler, Texas
                               )  8:57 a.m.
D-LINK CORPORATION, ET AL       June 3, 2013


TRANSCRIPT OF PRE-TRIAL, VOIR DIRE OF THE JURY PANEL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE


A P P E A R A N C E S


FOR THE PLAINTIFFS:


MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201


MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701


COURT REPORTERS:        MS. JUDITH WERLINGER
                        MS. SHEA SLOAN
                        shea_sloan@txed.uscourts.gov


Proceedings taken by Machine Stenotype; transcript was produced by a Computer.

2

FOR THE DEFENDANT:


MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022


MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071


MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104


MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359


MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

3

                    P R O C E E D I N G S

            (Jury Panel out.)

            COURT SECURITY OFFICER:  All rise.

            THE COURT:  Please be seated.

            All right.  I understand the parties have a matter before the jury comes up; is that correct? Some matters to take up?

            MR. VAN NEST:  Your Honor, we simply have some agreed-upon exhibits, I think, that could be read into the record.  That could be done now or --

            THE COURT:  Okay.  We'll do that in front of the jury.

            MR. VAN NEST:  -- whenever you want to do it.

            THE COURT:  Uh-huh.

            MR. VAN NEST:  Mr. De Vries is here, and I think we have an agreement on a number of exhibits.

            THE COURT:  This is your normal tender of exhibits?

            MR. VAN NEST:  That's right.

            MR. JONES:  Yes, Your Honor.

            THE COURT:  Okay.  All right.  We'll do that when we start the evidence.

            MR. VAN NEST:  That's fine.

            THE COURT:  Okay.

4

MR. VAN NEST:  I think that's all we have this morning.

THE COURT:  Was there anything else?  I understood --

MR. CAWLEY:  We do.  We have a few objections to the exhibits that will come through -- well, actually, we won't come to them today, but we do have some issues that have been joined on exhibits --

THE COURT:  Okay.  Well, anything that needs to be taken up this morning then?

MR. CAWLEY:  No.  No.

THE COURT:  Okay.  All right.

MR. VAN NEST:  The only other thing, Your Honor, I just might mention --

THE COURT:  Okay.

MR. VAN NEST:  -- excuse me -- is that we have an agreement with respect to the openings.  We've looked at each other's slides, and we're not going to make any objections, but no one is waiving any objection to evidence based on slides.

If Mr. Stevenson shows a slide, we'll maintain our objection later on.  And likewise, if I show a slide, he maintains his objection.  But the slides will be fine, and they're agreed to.

THE COURT:  Okay.  Let me make sure I

5

understand.  The slides are agreed to; but if he puts up a slide that's not agreed to, then you can object to it?

MR. VAN NEST:  No, no.  It's simply I'm not waiving any objections to the underlying evidence that's on the slides --

THE COURT:  I see.

MR. VAN NEST:  -- just because he shows the slides.

THE COURT:  Okay.

MR. VAN NEST:  We thought that would make the openings go a lot more smoothly.

THE COURT:  All right.  Okay.

MR. STEVENSON:  Agreed.

THE COURT:  All right.  Very well.

Anything further?

MR. VAN NEST:  I don't think so, Your Honor.

THE COURT:  Be in recess until the jury comes up.

COURT SECURITY OFFICER:  All rise.

(Jury Panel in.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  Ms. Ferguson, if you will call the case.

6

COURTROOM DEPUTY:  The Court calls Case No. 6:10-cv-473, Ericsson, Inc., et al, versus D-Link Corporation, et al.

THE COURT:  All right.  Announcements.

MR. STEVENSON:  Thank you, Your Honor. For Ericsson, Ted Stevenson.  And with me are Doug Cawley, John Campbell, and our client representative Gustav Brismark.  And we're ready to proceed.

THE COURT:  Okay.  Thank you.

Defendants?

MR. JONES:  Your Honor, Mike Jones for the Defendants.  We're ready to proceed.  Also here at counsel table with me is Mr. Robert Van Nest and Mr. Greg Arovas; the corporate representative for Intel, Mr. James Johnson; and the corporate representative for NETGEAR, Mr. Brian Busse.

Thank you, Your Honor.  We're ready to proceed.

THE COURT:  All right.  Good morning, Ladies and Gentlemen of the Jury.  Little quiet this morning already.  Well, welcome to jury service in the Eastern District of Texas.  I'm United States District Judge Leonard Davis.  You've already met a lot of our Court personnel, and you see that we have a courtroom full of people.

7

We're about to begin the trial of a patent case.  This is a patent case where the Plaintiff, Ericsson, accuses the Defendant Intel, D-Link Systems, NETGEAR, Acer, Gateway, Dell, Toshiba, and Belkin of infringing its patents.

The Defendants deny that they infringe the patents-in-suit and contend the patents are invalid.

The patents generally relate to various Wi-Fi technologies.  I and the parties will have much more to say to you about what this case involves; but for now, I just wanted you to have this basic knowledge of what the case is about.  And you probably figured that out because I believe you've already seen the patent video downstairs, did you not?

Okay.  Very good.

Now, I anticipate that the presentation of evidence in this case will probably take seven to eight days.  We're going to start today with jury selection, proceed with eight of you that are selected on the jury.  We will then -- we normally will start the evidence about 9:00 in the morning, go till 4:00 in the afternoon.  We will go Monday through Thursday of this week.  We will not go on Friday unless things should change, and everything is always subject to change.  But that's the plan right now.

8

Then we would come back early next week, start on Monday again, and continue until -- we should finish mid-week, sometime next week.  So I wanted you to just be aware of that.

Let me give you an overview of what will be happening over the next several days.

We are beginning the first stage of the trial, which is what we call Voir Dire Examination of the Jury Panel.  This is where the Court and the attorneys will be asking you some questions to allow us to get to know you a little better and evaluate your qualifications as jurors in this case.  This will probably take about an hour, maybe an hour and a half. We should be through with this process by 11:00, 11:30.

Each side is then allowed a certain number of -- to strike a certain number of jurors.  And the first remaining eight jurors will be sworn in as the jury which will decide this case.

After that jury is selected, you will then hear opening statements by the attorneys on both sides.  That's where they explain to you what they expect the evidence will show.

Following that, you will hear a detailed presentation of evidence, direct examination, cross-examination, redirect examination of the various

9

witnesses on both sides that each side wishes to call.

After that has been concluded, I will then have a written charge that I will present to you orally.  You will be allowed to take it to the jury room, as well.  But it would contain all of the instructions you would need to follow in applying the law to the facts as you may find them from having heard the evidence.

After I have done that, the parties will then present their closing arguments, and that's where they will sum up for you -- each side -- what they believe the evidence has shown and what they believe your burden should be.  Then and only then will you begin for the first time to discuss the case among yourselves, deliberate, and reach a verdict in the case.

Now, that's an overview of what will be happening over the -- the rest of today and the course of this trial, but now we're doing voir dire examination.

And the purposes of voir dire is to enable the Court to determine whether or not any prospective juror should be excused from jury service, either by the Court for what we call cause, or by the attorneys for the parties by way of what we call a peremptory challenge -- that is a challenge for which no

10

reason need be given.

Voir dire is a Latin phrase which means to speak the truth, which I know each of you will do when answering my questions and the questions of the attorney -- of the attorneys.

Please listen carefully to the questions that I will be asking you and that the attorneys ask you, and then do not be timid about speaking up if they apply to you. The worst thing you can do in this process is not to speak up. If you're sitting there and someone asks a question -- let's say have -- have you ever worked for Intel, and you're sitting there thinking, well, I did when I was in junior high school for part-time as a -- as a gopher, you know, with the company, but that couldn't be important enough. That would be the worst thing you could do.

You would need to go ahead and raise your hand and let the attorney evaluate the importance. Just listen carefully to the questions; and if anything relates to you or to a family member, even remotely, please be sure to go ahead and speak up.

As you can tell, the attorneys have been working on this case for a couple of years now. There's a lot involved, a lot at stake. A lot has been put into it, and the last thing we would want would be for us to

11

get halfway through this trial and then something come up and we had to start all over.  So please listen very carefully to the questions and answer.

To get you in the -- sort of break the ice and let you get used to how you answer questions -- and when you answer questions, I will ask you to stand, state your name, and a microphone will be brought to you so everyone can hear.

And to let you get comfortable with that, I'm going to start with Juror No. 1, Ms. Mangrum, and I'm going to give you the microphone and if you will, just please state your name and that will get you through that, then tell us what your favorite thing to do in your spare time is.

JUROR MANGRUM:  Donna Mangrum, Lindale, Texas, and my favorite thing to do is to relax.

THE COURT:  All right.

JUROR CAMERON:  Cammie Cameron, Whitehouse, Texas.  Favorite thing, work in the yard and just spending time around the house.

THE COURT:  Very well.  Thank you.

JUROR SPEIGHTS:  Deborah Speights, Mineola, Texas, and I like to work in the garden.

THE COURT:  Thank you.

JUROR BILLINGSLEY:  My name is John

12

Billingsley from Tyler, Texas, and I'm trying to learn how to play golf.

THE COURT:  Okay.

JUROR VRNAK:  Serena Vrnak, Tyler, Texas, and I am a quilt show judge.

THE COURT:  Okay.

JUROR TRAVIS:  Rebecca Travis, Wills Point, Texas, and I like to just stay around the house and relax.

THE COURT:  Okay.  Thank you.

JUROR FORBIS:  James Forbis, Longview, Texas, and I like to go camping.

JUROR AUSTIN:  Frank Austin, Bullard, Texas, and I like to play golf.

THE COURT:  Maybe you and Mr. Billingsley can get together.

JUROR KILLYON:  Melba Killyon, Longview, Texas.  I like to listen to music.

THE COURT:  Thank you.

JUROR GRUBBS:  Michael Grubbs, Kilgore, Texas, and I enjoy playing guitar.

THE COURT:  Okay.

JUROR BRANHAM:  Benita Branham, Flint, Texas, and I like to spend time with family and friends.

THE COURT:  Thank you, Ms. Branham.

13

JUROR HOWARD:  Rebecca Howard, Longview, Texas, and I also like working in the yard.

THE COURT:  Okay.  Thank you.

JUROR ARNOLD:  Stephanie Arnold, Gun Barrel City, and I enjoy working with Special Olympics.

JUROR WILLIAMSON:  Serena Williamson. Whitehouse, Texas, and I enjoy listening to light music.

JUROR HENRY:  Donald Henry.  I also enjoy playing golf.

THE COURT:  Okay.  We're about to have enough for a foursome in here, I think.

JUROR BUCK:  Mark Buck, Longview, Texas, and I enjoy playing with my granddaughter.

THE COURT:  Okay.  Thank you.

JUROR McGAUGHEY:  Levin McGaughey, and I, too, have grandbabies.

THE COURT:  Okay.  Thank you.

JUROR RICHARDSON:  David Richardson.  Do carpenter work, photography, work around the house, do a few odd jobs; just enjoying life.

JUROR VANDENBURG:  James Vandenburg, Athens, Texas, and I love to barbecue.

THE COURT:  Thank you.

JUROR HERMAN:  Kim Herman, Tyler, Texas, and just spending time with my family is very much

14

enjoyed.

JUROR REYNA:  Debbie Reyna, Longview, Texas.  I like to read.

THE COURT:  Thank you.

JUROR KELLEY:  Cherie Kelley, Flint, Texas.  I also like to read.

JUROR CRADDOCK:  Van Craddock, Longview, reading and granddaughters.

THE COURT:  Okay.

JUROR ENAS:  Randall Enas, Tyler, Texas. Enjoy woodwork, building, refinishing furniture, and stuff.

JUROR BROWN:  Brenda Brown, Winona, Texas.  I enjoy watching and attending Texas Rangers baseball.

JUROR HAVENS:  James Havens, Reklaw.  I like to read.

JUROR ALLEN:  Nikishia Allen, Tyler, Texas, spending time with my family.

JUROR CHAMBERS:  Peggy Chambers, Longview, Texas.  I enjoy working in the yard and visiting with friends.

THE COURT:  Very well.  Thank you, Ms. Chambers.

All right.  Now, in just a moment I'm

15

going to ask counsel for both Plaintiff and the

Defendants to introduce themselves, their clients, their

co -- their co-counsel, and to identify any witnesses

from the East Texas area that they might be calling to

testify in this case.

And the reason I'm going to ask them to do that is to see if you know any of them, either directly or indirectly or through a member -- a family member, if you have any acquaintanceship with them.

So I'll be asking you that question after they have done their introductions, so please listen carefully and I'll call upon Plaintiffs to introduce their -- their people.

MR. CAWLEY:  Thank you, Your Honor.

The first person I would like to introduce you to is Mr. Gustav Brismark.

If you would stand up briefly, Mr. Brismark.

I doubt any of you know Mr. Brismark because he's from Sweden.  He did spend his entire career after college working at the Plaintiff in this case, Ericsson.

This is his first time to visit Tyler, and he will be with us throughout the trial, and you will hear his testimony.  He will be the first witness

16

in the case.

Thank you, Mr. Brismark.

Ted Stevenson will be helping to present the evidence for Ericsson, along with John Campbell. And at some point, you may also hear from Ashley Moore.

And finally, this is Ms. Tara Trask, who is a consultant, who is going to be helping us this morning.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Cawley.

Are you going to be calling any witnesses from the East Texas area?

MR. CAWLEY:  No, Your Honor.

THE COURT:  Okay.  Thank you.

All right.  Does anyone on the jury panel know Mr. Cawley or any of his associates that he's introduced to you?  If you do, would you please raise your hand or stand up?

(No response.)

THE COURT:  All right.  Counsel for the Defendant, Mr. Jones.

MR. JONES:  Thank you, Your Honor. My name is Mike Jones, and I live here in Tyler, Texas, and I'll be doing the jury selection today for the Defendants.

17

And the first thing I'd like to do is introduce you to the Defendants. There's seven of them, and the first Defendant representative I would like to introduce you to is Mr. James Johnson.

James, could you stand? Would you show your pretty face to everybody?

Mr. Johnson is the vice president of Intel Corporation. Intel Corporation is probably one of the, if not most, in the range of the most famous microchip manufacturers in the world.

Thank you, Mr. Johnson.

Also here today at counsel table, another product that will be involved in this case is routers. One of the leading makers of routers in the world is NETGEAR.

Could you stand up, Mr. Brian Busse?

Mr. Brian Busse is here as their representative and who is their senior director of global marketing for NETGEAR. And that's another Defendant in this case.

Now -- thank you, sir.

Obviously, we couldn't get all seven Defendants around counsel table, so I need to move over here with the Court's permission, and I would like to introduce you to some of the other Defendants in this

18

case.

There is a computer company that you've probably all heard of.  It's one of the largest computer companies in the world.  It's Dell.  They are located in Austin, Texas.  And here today from Dell, we have Mr. Brett McAnally, who is Dell's executive director of marketing.

Thank you, sir.  I appreciate it so much.

Now, seated next to him -- you can go ahead and stand up.

Here for Toshiba, which is one of the world-leading developers and manufacturers of electronic consumer products, is Mr. David Harshman.  And he is the vice president of Toshiba America Information Systems, and he is here today and here with us during the trial.

Thank you, sir.

Now, another laptop manufacturer, one of the leading in the world, is Acer.  And here from Acer is their director of global marketing, Ms. Kate Shang.  Everybody see her?  Great.

And then another leading router manufacturer is -- excuse me -- D-Link.  And D-Link is here represented by Ms. Mei Chou, who is their financial manager, and standing next to her is Martha Hopkins.

Okay.  And finally, last but certainly

19

not least, is the Belkin Corporation.  And they manufacture routers, as well as other computer equipment.  Here today from Belkin, which is a family-owned company that has grown to 1200 employees, is Mr. Tom Triggs, their general counsel.

Thank you, sir.

And with regard to attorneys, I've already introduced them, but here from San Francisco kind of working on this case is Bob Van Nest.

Also here from New York City is Mr. Greg Arovas.

And here representing Dell Corporation, another local Tyler attorney, Deron Dacus.

MR. DACUS:  Good morning.

MR. JONES:  Thank you, Your Honor.

THE COURT:  What about any witnesses from the East Texas area?

MR. JONES:  Oh, I forgot.  I apologize me.

Dr. Ray Perryman grew up in Lindale, Texas, Your Honor, and he will be testifying.

THE COURT:  All right.  Dr. Perryman.

All right.  Does anyone on the jury panel know Mr. Jones or any of those associated with him or that he's introduced to you?  If you will, please raise

20

your hand.

All right.  Ms. Vrnak.  And if you will, please stand.

JUROR VRNAK:  I am aware of his wife and his child.

THE COURT:  Okay.  And how do you know him?

JUROR VRNAK:  Personally.

THE COURT:  Okay.  Were you --

JUROR VRNAK:  I have not met Mr. Jones.

THE COURT:  Excuse me.

JUROR VRNAK:  I have not met Mr. Jones. I am aware of his family.

THE COURT:  Okay.  All right.  Thank you.

Anyone else on the jury panel know any of the people that were just introduced to you?

Yes, ma'am?  That would be Ms. Williamson?

JUROR WILLIAMSON:  Yes.  I'm aware of Mr. Dacus's wife.  And I'm also familiar and have listened to Dr. Ray Perryman several times.

THE COURT:  Okay.  And how are you familiar with each of those, if I might ask for a little more detail?

JUROR WILLIAMSON:  Shannon Dacus was on

21

our board that I served on where I worked at one point.

And I'm also a member of the Women's Fund with her.

THE COURT:  Okay.

JUROR WILLIAMSON:  And then Dr. Ray Perryman, I've just -- he spoke to our Leadership Tyler class, and I've just listened to him every single year he comes to do the thing in Tyler.

THE COURT:  Okay.  All right.  Thank you.

All right.  Anyone else?

THE COURT:  All right.  Thank you.

All right.  At this time, I'll allow counsel for the Plaintiff to voir dire the jury.

MR. CAWLEY:  Thank you, Your Honor. As I recall from Your Honor's order, it's 40 minutes?

THE COURT:  Yes, sir, that's correct.

MR. CAWLEY:  Good morning, Ladies and Gentlemen.

You know, I have to say, this is my favorite part of the trial, because as this case goes on, as you've heard for several days, you will hear witnesses talk and lawyers talk; but this is the only opportunity that we have to get to meet and hear from the citizens who have done their important civic duty and agreed to serve as jurors.

The United States of America is just

22

about the only company -- excuse me -- the only country left in the world that decides cases like this by juries.  And we do that because we trust you.  We trust your common sense.

And even though cases like this one may involve some complex things that people are not very familiar with, we know that you have the ability to learn about them and to make the right decision.

As Judge Davis has told you, this is when we get a chance to learn a little bit about you and to ask you some questions.

To be able to do that, I'd like you to understand that during the course of this trial, you will be hearing about some people at a company called Ericsson who did the right thing.  They and their company chose to let other companies use their ideas to help people communicate.

Now, they didn't have to make that choice.  They could have chosen to keep their ideas secret.  Because their ideas were patented and protected by United States patents, they could have chosen to be the only ones who use those ideas and to prohibit anyone else from using their patented ideas.

But they didn't do that.  Instead, they committed to let other companies use the ideas that they

23

had developed to develop products and to make a profit.

What they asked in return is that if another company used Ericsson's patented inventions to make a profit, that they pay a reasonable royalty to Ericsson for using the patent.

You'll hear, during the course of this case, that many companies around the world agreed to do that. They did the right thing, too. And they've paid millions of dollars to Ericsson for the right to use Ericsson's patents in their products.

But you'll also hear that the Defendants in this case, even though they use Ericsson's patents, have refused to pay fair value, and that's why we're here.

We're here because this is a very important case. This is a case that asks whether a company like Ericsson should be entitled to recover fair value for someone's use of their property, their patented inventions.

Now, at the very outset, let me just ask you, how many of you have heard of the company Ericsson?

Okay. Ericsson, as you may know, used to be well-known for making telephone handsets, cell phones that you could hold in your hand and put in your purse.

They stopped doing that, oh, almost 10

24

years ago.  And today, Ericsson is the world's largest provider of what's called telephone infrastructure. That's the complicated telephone equipment that most of us never see that's located inside buildings that makes the cell phone system work.  That's what Ericsson does and what they sell.

The company known as L.M. Ericsson was started in Sweden in the late 1800s, and it's been doing business continuously for more than a hundred years. They started out selling telephones.

By the 1920s, they began also to sell radios, and their research and their experience in both telephones and radios helped them to become a pioneer in combining those two things into the cellular system.

A cell phone, after all, is really just a radio that can communicate with a telephone system.  And Ericsson was a pioneer in developing some of the very earliest cell phones.

Ericsson, over the years, has spent billions of dollars in research and development and today does business all over the world.

Their United states company is called Ericsson, Inc., and its headquarters is in Plano, just north of Dallas where they employ thousands of employees in the United States.

25

Let me ask all of you here again at the outset, have any of you or your family members had any experience with patents?

Yes, ma'am.  Ms. Reyna.

JUROR REYNA:  Yes.

MR. CAWLEY:  Thank you.

JUROR REYNA:  I'm not sure.

MR. CAWLEY:  Yes, ma'am.

JUROR REYNA:  My son-in-law is a software engineer.

MR. CAWLEY:  I see.

JUROR REYNA:  Sorry.  My son-in-law is a software engineer in the Dallas area, and he does write code and work for -- he contracts with different companies.

MR. CAWLEY:  Uh-huh.

JUROR REYNA:  And he's co-authored a textbook.  So I don't know what all he has done.

MR. CAWLEY:  Okay.  Well, Ms. Reyna, thank you very much for raising your hand, and thank you for telling us that, because that's exactly -- even though you're not sure -- exactly the kind of information we need to help the parties decide, you know, who they'd like to serve as a juror on this case.

Yes, ma'am.  You are Ms. Kelley.

26

JUROR KELLEY:  I don't know any of the specific details.  I just know that my dad is in the process of applying for a patent.

MR. CAWLEY:  I see.  Do you know what kind of technology or idea he's applying for a patent for?

JUROR KELLEY:  He works for a computer company, and he has created some programs that he's in the process of patenting.

MR. CAWLEY:  Okay.  Very good.  Thank you, ma'am.

Anyone else?

Mr. Vandenburg.  Yes, sir.

JUROR VANDENBURG:  My background is construction, and I've worked with some companies in the last 20 years that have had patents and have had them expire, and I've been involved with a continuation of the patent and so forth.

MR. CAWLEY:  What do you mean by that, continuation of the patents?

JUROR VANDENBURG:  The companies that I worked with have made improvements on those patents so that they could --

MR. CAWLEY:  Okay.

JUROR VANDENBURG:  -- increase the

27

lifetime of the patent.

MR. CAWLEY:  I see.  I see.

What kind of patents are you talking about?  Software again?

JUROR VANDENBURG:  No, no, no.  This is construction.

MR. CAWLEY:  Construction.  That's right.  Okay.

JUROR VANDENBURG:  Construction products.

MR. CAWLEY:  Okay.  Very good.

Now, are -- are patents important in your business?

JUROR VANDENBURG:  Absolutely.

MR. CAWLEY:  Why do you say that?

JUROR VANDENBURG:  Because they improve technology for what we're doing in our business with construction.

MR. CAWLEY:  I see.  So do you think that the ability for people to get patents has encouraged people in your industry to come up with new and better ideas?

JUROR VANDENBURG:  I think it's what business and our lives are all around, absolutely.

MR. CAWLEY:  Thank you, sir.  I appreciate that.

28

Anyone that I missed who has any experience with patents?

Yes, ma'am.  Ms. Arnold.

JUROR ARNOLD:  Yes.  I'm just curious about previously serving on a patent trial.

MR. CAWLEY:  Well, let me ask you about that.  You filled out a questionnaire, like everyone did --

And we thank all of you for that.  It makes our job here a lot easier.

-- and one of the things you indicated, Ms. Arnold, was that you have already served as a juror in a patent case.  So you're being asked to go above and beyond the call of duty here.  Tell us about that case.

JUROR ARNOLD:  It was a wastewater treatment chemical patent case.

MR. CAWLEY:  Okay.  And where was the trial?

JUROR ARNOLD:  Here in Tyler.

MR. CAWLEY:  Was it before Judge Davis?

JUROR ARNOLD:  I believe so.

MR. CAWLEY:  You believe so?

JUROR ARNOLD:  Uh-huh.

MR. CAWLEY:  Okay.  He's a pretty memorable man.  I imagine if it was him, you would

29

remember.

How long ago was it, Ms. Arnold?

JUROR ARNOLD: I'm not sure.

MR. CAWLEY: Okay.

JUROR ARNOLD: It was three or four years ago.

MR. CAWLEY: What -- what -- did you reach a verdict in that case?

JUROR ARNOLD: No. It was considered a mistrial, I believe.

MR. CAWLEY: A mistrial.

JUROR ARNOLD: I believe so.

MR. CAWLEY: Okay. Well, thank you very much for letting us know that.

And while we're on the subject of Judge Davis, Ms. Vrnak, you're a quilt judge. Do you think there's room for two judges in this courtroom?

[Laughter]

JUROR VRNAK: Yes. Yes, I do.

MR. CAWLEY: Okay. Thank you very much.

JUROR VRNAK: Thank you.

MR. CAWLEY: Now, has anyone -- even if you weren't involved with patents, been involved in the development of a new product, even if that product did not become patented? Has it ever been part of your

30

responsibility to develop a new product?

MR. CAWLEY:  Okay.  Now, we've heard a little bit about patents already while I've been asking people questions.

It seems as though there are sort of two camps of people who have different attitudes about patents.  One group of people is sort of like Mr. Vandenburg who -- who believes that patents are important and that they encourage people to invent new things.

Other people, though, may have a little bit of a different view.  They may believe that patents can harm competition and that there are too many patents these days and it's too easy to get a patent.

We heard what Mr. Vandenburg thinks about the construction business.  Does anyone disagree with him?  Is anyone of the view that, you know, I'm skeptical about the value of patents; I think they're too easy to get there; there's too many silly things that are patented by the Patent Office; and -- and patents hurt competition?  Anybody feel like that?

Does -- do any of you have any legal education or any member of your family have legal education or work in the legal field?

Yes, ma'am, Ms. Herman?

31

JUROR HERMAN:  My dad in Tyler is an attorney, Leonard Craig.

MR. CAWLEY:  What's his name?

JUROR HERMAN:  Leonard Craig.

MR. CAWLEY:  Leonard Craig.  What -- what kind of law does he practice?

JUROR HERMAN:  General practice.

MR. CAWLEY:  General practice.  Okay.  Great.  Thank you very much.

Anyone else?

Yes, sir, Mr. Forbis?

JUROR FORBIS:  My sister is an attorney in Philadelphia, Pennsylvania.  She's a corporate lawyer.

MR. CAWLEY:  Corporate lawyer.  Okay.  Very good.

Anyone else?

Okay.  Yes, sir?

JUROR GRUBBS:  My mom is a court reporter in Gregg County.

MR. CAWLEY:  Okay.  Very good.

Anyone else?

Yes, sir, Mr. Henry?

JUROR HENRY:  My brother-in-law in Houston, he is an oil and gas attorney.

32

MR. CAWLEY:  Okay.  Great.

Have I missed anyone?

Yes, ma'am?  I did miss someone.  You are Ms. Travis.

JUROR TRAVIS:  I just had some law courses in college.

MR. CAWLEY:  Okay.  What college was that?

JUROR TRAVIS:  Texas A&M.

MR. CAWLEY:  Okay.  And is this undergraduate school?

JUROR TRAVIS:  Yes.

MR. CAWLEY:  What kind of -- business law?

JUROR TRAVIS:  Business.

MR. CAWLEY:  Okay.  Great.  Good.  Thank you very much for letting us know that.

Anyone else?

Does anyone here have any education or training in engineering or science?  And I guess I'm not -- I'm not talking about the science that we all had in high school so much, but do you have any higher education, whether or not you got a degree in engineering or science?

Yes, sir, Mr. Vandenburg?

33

JUROR VANDENBURG:  MY degree is in polymer science.

MR. CAWLEY:  Polymer science.  Okay. Thank you very much, sir.

And all the way over on the other end, Mr. Austin.

JUROR AUSTIN:  I studied biological science and chemistry at Stephen F. Austin University.

MR. CAWLEY:  Okay.  Great.  And how long did you study that?

JUROR AUSTIN:  For four years.

MR. CAWLEY:  Four years.  Okay.  Good. Thank you very much, Mr. Austin.

Anyone else?

Yes?  Yes, sir, Mr. Henry again.

JUROR HENRY:  I was a -- I have had some training in computer science at The University of Texas.

MR. CAWLEY:  Okay.  Tell me about that.

JUROR HENRY:  I was a computer science major for one year, and then I switched.

MR. CAWLEY:  Okay.  Switched to what?

JUROR HENRY:  Business.

MR. CAWLEY:  Okay.  Where did you study computer science?

JUROR HENRY:  University of Texas at

34

Austin.

MR. CAWLEY:  Great.  Okay.  Thank you very much.

Anyone else?

Okay.  You know, like I said -- yes, sir, I'm sorry, I didn't mean to leave you out.  Mr. --

JUROR HAVENS:  Havens.

MR. CAWLEY:  Yeah, I'm on the wrong page. Okay.  Mr. Havens?

JUROR HAVENS:  I studied some computer science at TJC --

MR. CAWLEY:  Okay.

JUROR HAVENS:  -- some programming classes and some microcomputer hardware classes.

MR. CAWLEY:  Okay.  Good.  Thank you. Thank you very much.

Anyone else?

You know, like I said, this is my favorite part of the trial when we get to find out about you.

We already found out that just on the back row here we have two music lovers and a guitar player, and then Judge Davis has already observed we've almost got a golfing foursome.  And I would say that all of you people who like to do yard work and barbecue, I

35

wish I had friends like you to come over to my house.

Let me move on, though, and -- and ask you, has anyone here ever worked in information technology, ever been an IT worker?  Okay.  Good.

Mr. Henry, I don't even think -- go ahead.

JUROR HENRY:  I did not work in information technology, but I do a lot of work in information security for a hospital.

MR. CAWLEY:  Okay.  Great.  Thank you.

Anyone else?

Has anyone here ever had a dispute with a government agency?  And -- and let me say -- I should have said before -- I hope that's not a sensitive subject.  I guess in some instances it might be if somebody had a dispute with a government agency.

If I ask you any questions here today that -- that you are really reluctant to talk about in public, I'm sure Judge Davis would let us go up to his bench and talk about it in private.

But has anyone had a dispute with a government agency?  Okay.

Has anyone here -- can anyone here remember a particular instance when you were accused of taking someone else's idea?  Could have happened in

36

school.  Could have happened on the job.  Certainly might not have been true, might have been a misunderstanding.

But does anyone have -- when I ask that question, a particular memory that that sort of rings a bell with you that you were accused, falsely or otherwise, of taking someone else's idea?  No?

Has anyone here ever been involved in a dispute about property?  A property, as you know, could be land.  Property could be a house on land.  Property could be a car or a physical thing that you own.  Property, as we'll learn about in this case, could be intellectual property in the form of a patent or a copyright.

Yes, sir, Mr. Austin.  And I saw Ms. Mangrum raise her hand, as well.

JUROR AUSTIN:  Yes, the land that I own right now the county has paved over part of my property, and we're going through the right-of-way --

MR. CAWLEY:  Yes, sir.

JUROR AUSTIN:  -- who owns what.

MR. CAWLEY:  Okay.

JUROR AUSTIN:  Who pays taxes under what.

MR. CAWLEY:  Okay.  Is that in some kind of administrative proceeding or a lawsuit?

37

JUROR AUSTIN:  We're proceeding with them right now.  We haven't really started anything yet, but, yes, we're in a dispute --

MR. CAWLEY:  Okay.

JUROR AUSTIN:  -- and Cherokee County knows it.

MR. CAWLEY:  Okay.  Thank you -- thank you for letting us know about that.

Ms. Mangrum, you raised your hand.

JUROR MANGRUM:  I had a personal property dispute with my family over some family land that my grandparents had left.

MR. CAWLEY:  I see.  Okay.  Thank you very much.

Anyone else ever been involved in a dispute about property?

Okay.  Now, let me change the subject a little bit and let me ask all of you just as a group: Who knows what Wi-Fi is?  Okay.  Okay.  Most everybody it seems -- knows what Wi-Fi is.

For any of you who didn't raise your hand, it's -- it's the -- it's the ability of a device, typically like a laptop computer, to communicate wirelessly with another device, something, for example, that's frequently called a router or a hotspot.  And it

38

means that you can send data wirelessly without having to wire up.

Typically people use that to go on the Internet so that you have a laptop somewhere and you can -- you can communicate and get on the Internet without having to have it connected by a wire.

Who of you have Internet access in your home?  If you would just raise your hands.  Okay.  Lot of people.

Which ones of you have ever had occasion to communicate with Wi-Fi away from home?  In other words, you may have been traveling.  Maybe you've done -- I don't know where -- Ms. Speights, where -- where were you when you did that?

JUROR SPEIGHTS:  I was in the hospital when I used my Nook --

MR. CAWLEY:  Okay.

JUROR SPEIGHTS:  -- and different places like McDonald's or somewhere like that.

MR. CAWLEY:  Sure.

Now, who -- who else raised their hand that I saw?

Let me just pick on Mr. Forbis.  Where -- where have you used Wi-Fi to get on the Internet other than your home?

39

JUROR FORBIS:  Just my iPhone.

MR. CAWLEY:  Sure.

JUROR FORBIS:  You can do it at Sonic, any restaurant.

MR. CAWLEY:  Okay.  Okay.  Let me ask you this question:  Which of you have ever paid for Internet access over Wi-Fi?  In other words, that often happens in a hotel, sometimes you'll be in a business of some kind.

Ms. Williamson, where have you paid to be able to connect Wi-Fi?

JUROR WILLIAMSON:  In a hotel.

MR. CAWLEY:  In a hotel?

JUROR WILLIAMSON:  Uh-huh.

MR. CAWLEY:  How much did you pay?

JUROR WILLIAMSON:  Well, it was -- in the early days, I mean, I think at one point I paid like 14.95.

MR. CAWLEY:  Yeah, so you were willing to pay $15 to be able to use your Wi-Fi?

JUROR WILLIAMSON:  So I could work while I was away from home.

MR. CAWLEY:  Just -- just for what, 24 hours, couple of days?

JUROR WILLIAMSON:  Couple of days, yes.

40

MR. CAWLEY:  Okay.  Who -- who else indicated that they had used -- that they have paid to -- to get Wi-Fi access?

Yes, ma'am, Ms. Arnold?  Same thing, same kind of money?  You've been willing to pay?  Maybe you didn't like it, but -- but none of us like it, but it's been important enough that you paid $15 to have Wi-Fi for -- for a couple of days?

Anyone else?

Yes, sir, Mr. Henry?

JUROR HENRY:  I've used it -- paid for it at hotels, as well.

MR. CAWLEY:  Okay.  So same kind of -- same kind of money?  Used to be $15, sometimes more. Now it seems like it's usually more like 10.

JUROR HENRY:  I think that's about right. Sounds about right.

MR. CAWLEY:  Okay.  So you've -- you found it necessary to actually pay that amount to be able to get a day's worth of -- of Wi-Fi access?

JUROR HENRY:  Yes, sir.

MR. CAWLEY:  Okay.  Well, let me - let me ask you-all a little bit more about Wi-Fi.  And -- and it's sort of more of a question of its value to you.

Ms. Howard, did you indicate that you

41

used Wi-Fi?

JUROR HOWARD:  Yes.

MR. CAWLEY:  You do?  What do you use it for?

JUROR HOWARD:  Use it for my iPhone.

MR. CAWLEY:  Your iPhone.  Okay.

JUROR HOWARD:  Sorry.

MR. CAWLEY:  Okay.  And how about you, Ms. Branham?

JUROR BRANHAM:  I use it just to search entertainment, just to look up -- just to look up --

MR. CAWLEY:  Okay.  Sure.

JUROR BRANHAM:  -- information.

MR. CAWLEY:  Okay.  Sure.  Do you have a -- what kind of computer do you use?

JUROR BRANHAM:  We use Dell, but I mostly use my iPhone --

MR. CAWLEY:  Okay.

JUROR BRANHAM:  -- to search.

MR. CAWLEY:  Okay.

JUROR BRANHAM:  I'm not a computer --

MR. CAWLEY:  Okay.  Let me ask you -- let me ask you this question:  I want you to -- do you have a laptop computer?

JUROR BRANHAM:  Yes, we do.

42

MR. CAWLEY:  Does it have Wi-Fi?

JUROR BRANHAM:  Yes.

MR. CAWLEY:  All right.  Let me ask you to suppose that for whatever reason you're in the market for a new laptop.  Maybe you spilled coffee on your old one or maybe you've got someone that you want to give it away to and you're ready for a new one.

JUROR BRANHAM:  Uh-huh.

MR. CAWLEY:  So you shop around wherever you -- you would like to shop for a laptop and you find a laptop and it's got everything you want.  It's got memory you want and the size of screen you want.  It's got all the features you want, including Wi-Fi, and it cost a thousand dollars.  And we can get laptops cheaper these days, but let's just say that that one with everything you want on it is going to cost a thousand dollars.

But you also learn that there's another laptop, the same maker, same features, everything about it is exactly the same, except it doesn't have Wi-Fi and it cost $900.

JUROR BRANHAM:  I would have to take the Wi-Fi.

MR. CAWLEY:  Would you pay an extra hundred dollars to get Wi-Fi?

43

JUROR BRANHAM:  Yes.

MR. CAWLEY:  Okay.

JUROR BRANHAM:  Uh-huh.

MR. CAWLEY:  Who agrees with Ms. Branham? Who -- who would be willing to pay another hundred dollars to get Wi-Fi in their laptop computer?

Is there anyone who disagrees?  Anyone who says, you know, Wi-Fi's okay, but for a hundred dollars, I'll do without it?

No hands raised?  Okay.

Have any of -- thank you, Ms. Branham. I'm sorry.

Have any of you worked for a company that makes wireless equipment, or have any of your family members -- and wireless is a pretty broad term these days.  It can include things like cell phones, Wi-Fi, Bluetooth.

Yes, ma'am, thank you for raising your hand, Ms. Chambers.

JUROR CHAMBERS:  I worked for 28 years for AT&T.

MR. CAWLEY:  Oh.

JUROR CHAMBERS:  I didn't actually assemble telephones, but I did --

MR. CAWLEY:  Sure.

44

JUROR CHAMBERS:  -- operation works and testing --

MR. CAWLEY:  Okay.  Testing.

JUROR CHAMBERS:  -- when they would test new equipment.

MR. CAWLEY:  Great, yeah.

JUROR CHAMBERS:  Like when they had the war in Iran --

MR. CAWLEY:  Yes, ma'am.

JUROR CHAMBERS:  -- they tested new equipment for people to call from there --

MR. CAWLEY:  Right.

JUROR CHAMBERS:  -- into the states.

MR. CAWLEY:  Right.  Okay.  Great.

JUROR CHAMBERS:  I did that type thing, but I had never, like, assembled a phone.

MR. CAWLEY:  Yeah.  Yeah.  Okay.  Thank you for letting us know about that.

Anybody else worked for a company that has been in the wireless business?

Yes, ma'am?  That's Ms. Williamson.

JUROR WILLIAMSON:  I worked for Cox Communication.  I was director of marketing.

MR. CAWLEY:  Okay.

JUROR WILLIAMSON:  We did telephony.

45

MR. CAWLEY:  Sure.

JUROR WILLIAMSON:  And obviously all the other stuff.

MR. CAWLEY:  Okay.  When did you do that?

JUROR WILLIAMSON:  I worked for Cox from 2001 to 2006.

MR. CAWLEY:  Okay.  Thank you, ma'am.

Anyone else?

Yes, ma'am?  Someday I'll try and get organized and then get it all -- all in one place at one time and then move to another, instead of this tennis match, but this is -- this is fine.

Yes, ma'am, you're Ms. Allen?

JUROR ALLEN:  Yes, sir.  Suddenlink Communications --

MR. CAWLEY:  Okay.

JUROR ALLEN:  -- Internet and telephone.

MR. CAWLEY:  Sure.  Great.  Okay.  And do you work there now?  Is that where you're -- is that what you do?

JUROR ALLEN:  No, sir.  I -- I did it from 2008 to 2011.

MR. CAWLEY:  And now you're a communications supervisor?

JUROR ALLEN:  Yes, sir.

46

MR. CAWLEY:  What do you as a communications supervisor?

JUROR ALLEN:  9-1-1 emergencies.

MR. CAWLEY:  I see.  Okay.  Good.  Thank you.  Thank you very much.

And I saw a hand here.  Yes, sir?  Thank you.

JUROR ENAS:  Yeah, I worked for a placed called F3 Technology Group.

MR. CAWLEY:  Okay.

JUROR ENAS:  We're -- we have some IT people Cisco dealers, IBM, so we work with it.  We don't manufacture it.

MR. CAWLEY:  Okay.  I understand.  What do you do there?

JUROR ENAS:  I'm a service tech.  I can do from phone systems --

MR. CAWLEY:  Sure.

JUROR ENAS:  -- trouble calls, to the hard wiring --

MR. CAWLEY:  Right.

JUROR ENAS:  -- setting up switches --

MR. CAWLEY:  Right.

JUROR ENAS:  -- patch panels, and all that type of stuff.

47

MR. CAWLEY:  Good.  Sure.  Thank you. Thank you very much.

Anyone I missed?

Yes, sir?

Anybody over here that I missed, first of all?  No?

Okay.  So let's move the microphone back here, and we will ask Mr. Billingsley about his communication -- his connection with wireless.

JUROR BILLINGSLEY:  I'm retired, so I manage my money.  I own stock in Intel, Vodafone, AT&T, and Verizon.

MR. CAWLEY:  Okay.  So you own stock in Intel?

JUROR BILLINGSLEY:  Yes, sir.

MR. CAWLEY:  Would -- would your ownership of stock in Intel influence the decision you might make in this case?

JUROR BILLINGSLEY:  Well, perhaps.

MR. CAWLEY:  Okay.

JUROR BILLINGSLEY:  Probably own over -- about a hundred thousand dollars worth.

MR. CAWLEY:  Okay.  Well, under the circumstances, you -- you understand, Mr. Billingsley, or Mr. -- yeah, Mr. Billingsley, that even though you

48

might try to be as objective as you can, that if you have a financial interest in one of the parties, that -- that the people at Ericsson might feel more comfortable if you served on some other jury?

JUROR BILLINGSLEY:  I understand.

MR. CAWLEY:  Okay.  Thank you, sir, for -- for letting us know that.

Anyone else own stock in any of the companies here:  Ericsson, Intel, NETGEAR, Belkin, Dell, D-Link?  Thank you.  Don't want to forget them.

Now, let me ask you a pretty fundamental question.  We're here about a lawsuit, of course.  This is -- this is a lawsuit to resolve the dispute about the use of Ericsson's patents.  And it seems as though there are sort of two camps of people these days when it comes to thinking about lawsuits.

One camp of people is of the view that, you know, law -- lawsuits are unfortunate, but -- but we have to have them.  We have disputes.  They need to be resolved.  And juries generally work hard and do a good job and reach the right decision.  That's one view.

But there are other people who have a different view.  And their view is that there are too many crazy lawsuits; that juries frequently run away and award all kinds of money for things that don't make any

49

sense at all.

Ms. Speights, what's your view about that?

JUROR SPEIGHTS:  Patents?

MR. CAWLEY:  No, about lawsuits.

JUROR SPEIGHTS:  Well, I believe if you have a valid case, I would -- I would fight for it --

MR. CAWLEY:  Okay.

JUROR SPEIGHTS:  -- if you think you're right.

MR. CAWLEY:  Is there anyone who disagrees with Ms. Speights, who feels as though there -- there are just way too many lawsuits and -- and, you know, really people shouldn't file lawsuits and they're really not the right way?

Yes, sir, Mr. -- you're Mr. Buck?

JUROR BUCK:  I think suing for spilling hot coffee on you and getting a million dollars --

MR. CAWLEY:  Okay.

JUROR BUCK:  -- is frivolous.

MR. CAWLEY:  Sure, sure.  And, Mr. Buck, I thank you for telling us your opinion because I should have said earlier than I did, but I hope it's obvious. There are no right or wrong answers here.  People -- people have different views, and we're here to find out

50

your views.

Thank you.  Thank you for sharing that. Anyone else who -- who would say -- I mean, we all agree that you could have a lawsuit that's -- that's silly. But does anyone else have a problem with a company like Ericsson coming to court and filing a lawsuit to try to recover fair value for the use of its property?

Does anyone here have any moral or religious reason why they feel uncomfortable to serve on a jury?

Now, you've heard a little bit about Ericsson already, and you'll hear more as the trial progresses.  You've heard that Mr. Brismark here is from Sweden.  The next live witness you'll hear in the case is Ms. Christina Petersson.

Stand up if you would, Ms. Petersson. Ms. Petersson is also from Sweden.

Even though Ericsson started as a Swedish company, it on now does business all over the world. Its second largest headquarters is actually in Plano. But is there anyone here who feels, you know, some of those -- Intel is an American company and some of the other Defendants are American companies.

Is there anyone who would feel that they could not be fair to a company like Ericsson that

51

started in another country -- Sweden, that you'd just tend to say, you know, this is complicated and I'm not sure; but I think I'm going to go with the American company in making my decision?  Anyone feel like that?

Mr. Brismark and Ms. Petersson, since they're from Sweden, they grew up speaking Swedish. They studied English in school, so you'll hear that they have a little bit of an accent, but they speak English quite well and you'll be able to understand them.

But is there anyone who would feel, you know, we've got a lot of witnesses in this case and most of them are American, but some of them come from foreign countries.  And -- and I think -- knowing myself, I would just be a little bit inclined to go with the American witnesses rather than the witnesses from another country?  Anyone feel like that?

One of the Defendants you've heard, Dell, is a company in Texas -- started in Texas.  Its headquarters is in Texas.  Anyone feel that they would be in favor of a Texas company, as opposed to a company like Ericsson, if all things were equal?

All right.  Who are the people here who have owned a business?

Yes, sir, we heard from you.

And, Mr. Forbis, tell us about your

52

business.

JUROR FORBIS:  I have a public account -- accountancy business, and we have a medical billing business.

MR. CAWLEY:  Thank you very much.

And, Ms. Arnold, what business did you own?

JUROR ARNOLD:  I currently own a third-party administration services firm.  We do retirement plan administration.

MR. CAWLEY:  Great.  Okay.

Anyone else?

Yes, ma'am, Ms. Williamson.

JUROR WILLIAMSON:  I'm a -- I'm a consultant, and I work --

MR. CAWLEY:  Okay.

JUROR WILLIAMSON:  -- for myself.

MR. CAWLEY:  Sure, sure.  Thank you.

And Ms. Travis?

JUROR TRAVIS:  We just had a cattle business awhile back.

MR. CAWLEY:  Okay.  Great.  Thank you very much.

Now, the evidence -- I've already told you that Ericsson is here in court seeking to recover

53

fair value for the use of its patents, and the evidence you will hear is that there's a different amount that Ericsson is seeking from each one of these companies that you've heard use their patents and refuse to pay fair value.

The lowest of the amounts that you'll hear about is just about $1 million, and the highest amount is a little over $11 million.

Now, I recognize that you haven't heard any of the evidence about that yet; but is there anyone here who hears those numbers and feels, you know, $11 million, I don't think a patent could ever be worth that? I just think that's -- that's way too much money and I don't see how I could ever award $11 million for the infringement of a patent? Anyone feel that way?

All right. I'm almost finished here. But I'm going to ask you to think about something that we're going to do very quickly at the very end of the questions I'm asking you. If we have time, I want to go down the row and ask you one at a time to answer this question. I'm going to tell it to you now so you can think about it for just a few minutes.

I'm going to ask you, what public figure -- public figure, somebody we all know, alive or dead, doesn't matter, do you admire most and why? Okay.

54

Now, the Defendants in this case will claim that two of the Ericsson patents in this case are invalid. Judge Davis will tell you that to prove that the Patent Office made a mistake, you have to prove that by a higher burden of proof than normal. You have to prove it by clear and convincing evidence, and that's because the Patent Office has already done their job. They've already decided that the patents are good. And if the Defendants want you to decide that two of them are not and that the Patent Office got it wrong, they have to prove that to you by a higher burden: Clear and convincing evidence.

Is there any one who just feels like that's not fair? It's not fair that the Defendants should have a higher burden of proving the patent invalid? No? Okay.

You've got the microphone over there, ma'am. If you'll just hand it to -- to Mr. Henry. Real quick, Mr. Henry, what public figure do you admire the most and why?

JUROR HENRY: I always liked Thomas Jefferson.

MR. CAWLEY: Thomas Jefferson. Why is that?

JUROR HENRY: Well, he was one of the

55

authors of the Declaration of Independence.  He's a renaissance man, in my opinion.

MR. CAWLEY:  Absolutely.

Mr. Buck?

JUROR BUCK:  Will Rogers.  He told it like it was or -- or said things that a lot of people wouldn't say, but he did it with humor.

MR. CAWLEY:  Never met a man he didn't like.

Mr. McGaughey?

JUROR McGAUGHEY:  It's McGaughey (different pronunciation).

MR. CAWLEY:  McGaughey.  Sorry.

JUROR McGAUGHEY:  President Ronald Reagan.

MR. CAWLEY:  Okay.

JUROR McGAUGHEY:  He -- he just set this country on a path that I thought we needed to be on, and we've kind of strayed from that.

MR. CAWLEY:  Thank you.

Mr. Richardson?

JUROR RICHARDSON:  Yes, sir, Abraham Lincoln.  Equality for all.

MR. CAWLEY:  Yes, sir.  Thank you very much.

56

Mr. Vandenburg?

JUROR VANDENBURG:  Jesus Christ, our Lord and Savior.

MR. CAWLEY:  All right.  I'm sure we'd all agree with that.

How about you, Ms. Herman?

JUROR HERMAN:  Ronald Reagan.

MR. CAWLEY:  Ronald Reagan.  All right.

What -- where did you paint murals, by the way?

JUROR HERMAN:  Homes and churches.

MR. CAWLEY:  Okay.  Great.  Thank you very much.

Ms. Reyna, how about you, public figure you most admire and why?

JUROR REYNA:  Billy Graham, probably.

MR. CAWLEY:  Billy Graham.  Okay.  Thank you very much.  If you'd just pass the microphone straight back to -- we'll ask Ms. Chambers to tell us.

JUROR CHAMBERS:  Abraham Lincoln because of his righteousness and -- and his belief in everybody having their rights.

MR. CAWLEY:  Yes, ma'am.  Thank you very much.

Ms. Allen, how about you?

57

JUROR ALLEN:  Martin Luther King because of what he stood for.

MR. CAWLEY:  Sure.  Okay.  Thanks very much.

Mr. Havens?

JUROR HAVENS:  Benjamin Franklin; inventor, statesman, and philosopher.

MR. CAWLEY:  He was an inventor, wasn't he?  Yes, sir.  Thank you very much.

Ms. Brown?

JUROR BROWN:  Billy Graham for his conviction and always being very confident and walking a straight line and sharing --

MR. CAWLEY:  Sure.

JUROR BROWN:  -- his convictions.

MR. CAWLEY:  Thank you for that.

Mr. Enas?

JUROR ENAS:  I'm going to go with someone that's still living local, Kevin Eltife.  He's from Tyler.  Started out, you know, as just a good old boy.

MR. CAWLEY:  Great.

JUROR ENAS:  City -- worked for the City, became Mayor, and now he's a U.S. -- or State Senator, so --

MR. CAWLEY:  Excellent.

58

JUROR ENAS:  -- I think he's going to go far.

MR. CAWLEY:  Excellent.  Well, we'll - we'll have to tell him you said so.

Okay.  Mr. -- Mr. Craddock?

JUROR CRADDOCK:  Another vote for Dr. Billy Graham --

MR. CAWLEY:  All right.

JUROR CRADDOCK:  -- for preaching the Gospel --

MR. CAWLEY:  Yes, sir.

JUROR CRADDOCK:  -- all those years.

MR. CAWLEY:  Okay.  Very good.

Ms. Kelley?

JUROR KELLEY:  Margaret Thatcher for her strong leadership.

MR. CAWLEY:  Interesting.  Okay.  Thanks very much.

Now, if you could just hand the microphone to Mr. Forbis.  What do you think, Mr. Forbis?

JUROR FORBIS:  I'll have to go with Ronald Reagan and his -- the way he changed -- the way government works.

MR. CAWLEY:  Right.  Okay.  Good.  Thank

59

you.

Ms. Travis?

JUROR TRAVIS:  Ronald Reagan.

MR. CAWLEY:  Okay.  Popular president in this crowd.

Yes, ma'am?

JUROR VRNAK:  Ex-President George W. Bush.

MR. CAWLEY:  George W. Bush.  Okay.

JUROR VRNAK:  I believe he did the job to the best of his abilities and was honest.

MR. CAWLEY:  Thank you very much.

Mr. Billingsley, what do you think?

JUROR BILLINGSLEY:  Ronald Reagan.  He fundamentally changed the direction of the country.

MR. CAWLEY:  Okay.  Ms. Speights?

JUROR SPEIGHTS:  Billy Graham again.

MR. CAWLEY:  Okay.  Great.

Ms. Cameron?

JUROR CAMERON:  I'm going to have to go with Reagan, as well.

MR. CAWLEY:  I'm sorry?

JUROR CAMERON:  I said, I'm going to have to go with Ronald Reagan, as well.

MR. CAWLEY:  Okay.  Okay.  Good.  Thank

you.  I didn't -- I didn't understand you, but thank you very much.

Ms. Mangrum?

JUROR MANGRUM:  And I'd like to say something political, but I'm not a political person.

MR. CAWLEY:  Okay.

JUROR MANGRUM:  First person that came to my mind was Elvis Presley.  He makes the world a better place.  I'm sorry.

MR. CAWLEY:  All right.

JUROR AUSTIN:  President Barak Obama because I believe he wants to unify the country.

MR. CAWLEY:  Okay.  Thank you very much.

Ms. Killyon?

JUROR KILLYON:  Oprah Winfrey because she's a self-starter and she gives back.

MR. CAWLEY:  Well, thank you.  I'm surprised we haven't heard Oprah Winfrey from anybody before you, because people -- people love Oprah and -- and we all know why.

Mr. Grubbs, Jimmy Hendrix, right?

JUROR GRUBBS:  Yeah, I was actually thinking about it.

MR. CAWLEY:  Okay.

JUROR GRUBBS:  I'll probably say Timothy

61

Keller.

MR. CAWLEY:  Who?

JUROR GRUBBS:  Timothy Keller.  He's a pastor of a Presbyterian church --

MR. CAWLEY:  Oh, I'm sorry.

JUROR GRUBBS:  -- in New York City.

MR. CAWLEY:  Okay.

JUROR GRUBBS:  He's written quite a few books.

MR. CAWLEY:  Okay.  Presbyterian church?

JUROR GRUBBS:  Uh-huh.

MR. CAWLEY:  Okay.  Great.  Thank you very much, sir.

And Ms. Branham?

JUROR BRANHAM:  I'm going to say Joel Osteen.  He's a very inspirational --

MR. CAWLEY:  Sure.

JUROR BRANHAM:  -- speaker.

MR. CAWLEY:  Right.  Right.  Okay.  Thank you very much.

Ms. Howard?

JUROR HOWARD:  I'm going to have to say Billy Graham, also.  I think he's set a great example for people.

MR. CAWLEY:  Sure.  Sure he has.  Okay.

62

Ms. Arnold?

JUROR ARNOLD:  I'm going to mention a different religious icon, Pope Francis for his humble leadership.

MR. CAWLEY:  Okay.  Thank you very much.

And finally, Ms. Williamson?

JUROR WILLIAMSON:  Martin Luther King because he had a dream and he pursued it.

MR. CAWLEY:  Thank you very much.  Well, that's -- that's, again, wonderful to hear from all of you and to hear -- hear those opinions and those values that we've come to expect from the people in this part of the country.

Now, I got about one minute left and I'm going to ask -- take that one minute to ask you this question:  Is anyone sitting there and thinking to themselves, you know, I wish he'd ask me about this?  There's something that I'm thinking about.  There's something that I'm concerned about, and I didn't know if I should bring it up; but -- but I really think he'd want to know about this if -- if he knew?

Is anyone thinking about any issue, anything in your background, anything else?  Okay.  I have one hand up.  Is that all?

And, again, that's Ms. Arnold.

63

JUROR ARNOLD:  I'm just curious if you would want to know what our favorite computer products are, if we used that in our business or our home?

MR. CAWLEY:  Why don't you tell us yours?

JUROR ARNOLD:  Dell is our favorite type of computer.  We use NETGEAR.

MR. CAWLEY:  Okay.

JUROR ARNOLD:  Most of these products that you've listed on the side are things that we used.

MR. CAWLEY:  Thank you.  Thank you for raising that because I should have and you did.  So let me -- let me follow that up a minute.

Probably a lot of people here use Dell. Maybe a lot of people use NETGEAR or Belkin.  All of the -- all of the companies that -- that are the Defendants in this lawsuit are things that they make and they make good products and people like to use them.

Is there anyone here who likes those products so well, who loves their Dell computer so much, who really thinks that their NETGEAR router is just the best thing in their house, or -- or otherwise would be influenced by that experience in reaching a verdict in this case?

Ms. Arnold, you think that -- you think that because of your personal experience, you would go

64

into the case a little bit biased?

JUROR ARNOLD:  I'm afraid so.

MR. CAWLEY:  Okay.  Thank you for your honesty, ma'am.  We appreciate that.

Anyone else agree with Ms. Arnold about that?  Is anyone else of the view that even if you've used these products, even if you like these products, that you could decide this case fairly on the evidence?  Everyone else able to commit to that?

Ladies and Gentlemen, I thank you very much.

THE COURT:  Thank you, Mr. Cawley.

Mr. Jones?

MR. JONES:  Thank you, Your Honor.

Can everybody see that?

All right.  I have it so you all can see it?

Obviously, I just had to help my good friend, Mr. Cawley, remind him of the seventh Defendant, D-Link.  And in order to save a little time today when I talk about all the Defendants, I'll talk about them collectively.

But when I do, I'm referring to Intel, Acer, Dell, Toshiba, NETGEAR, D-Link, and Belkin, and maybe that will save us a little time.

65

Again, my name is Mike Jones, and I am the attorney that's been requested to do jury selection for the Defendants in this case.

And the first thing I want to do is to do something that Mr. Cawley just did. And I totally agree with him. I want to thank you for your service today. This is an important case to these Defendants. Let me assure you of that. It's an important case for many reasons other than money. It's a case that needs to be resolved. And without your time and without your attention and without your efforts, we cannot get it resolved.

And on behalf of each of these Defendants, I want to thank you for your service today on the jury panel and then the service of those of you who are ultimately selected as jurors.

The second thing I would like to do is ask you a procedural question. It's basically a question about the procedures that the Defendants will follow in this case.

Now, we can't get all the client representatives of the Defendants around this table. You just saw that. It would be impossible to do. We have seven different Defendants.

Now, you can imagine, it would take a

66

long time if all seven attorneys for the Defendants did jury selection. And the good news is, they're not going to. They want to; they know they could do it better than I do it; but they're not going to do it because we're going to try to be very efficient with your time.

The same thing will be true about various aspects of the case. Only one lawyer for all will speak at various times during this case.

The same thing will be true about evidence. This case involves common issues; and because of that, some of the Defendants won't present employees to testify.

For example, Intel, Mr. Johnson here will testify, as well as another individual.

With regard to Belkin, the last client I introduced, they won't have any employees testify, which leads me to this question: Does anybody think that a Defendant in this case that doesn't even present one employee to testify has somehow done less than it should? Anybody feel that way?

And if you do, I'd just appreciate you telling me that. Anybody feel that, you know, if you're taking this case seriously enough, you ought to at least have one of your employees come testify about it? Anybody feel that way?

The same question about attorneys. Some of the attorneys representing some of these Defendants will not be speaking.

Does anybody think, you know, look, if you're sued in federal court, you ought to at least have your attorney speak; you know, you ought to take it that seriously?

Anybody see anything wrong with that? If you do, just please let me know.

And, again, you may think that's a silly question, but all of these Defendants each and every one of them, take this case very seriously.

They think it's a very important case, and they don't want you to think, by the fact that their employees might be silent here today in the interest of efficiency, that somehow they don't think it's a very important case.

Thank you.

The next question I'd like to talk to you a little bit about is probably the most important question that I will ask you today, and that is this: Mr. Cawley spoke very eloquently, and he told you in no uncertain terms that the Defendants in this case use Ericsson's patents.

He also told you in no uncertain terms

68

that the Defendants in this case owe millions of dollars because they use Ericsson's patents.

Now, as we move forward, after you've heard Mr. Cawley's presentation, is anybody sitting there and going: You know, to be honest with you, the Defendants are already behind? Anybody feel like that?

Anybody feel like, you know, we wouldn't be in federal court, Judge Davis wouldn't be here, this panel wouldn't be here, all of these people wouldn't be here if there wasn't something to this? Anybody feel like that?

And don't worry about hurting my feelings; but if you do feel that way, please let me know. Anybody? Anybody feel like where there's smoke, there's got to be fire? Anybody?

Well, let me ask it just a little bit more positively. Would everybody agree with the statement that I have no idea who's right in this case right now; I need to see the evidence before I can make any decisions?

Would everybody agree with that statement? If you would, would you raise your hand? Is that everybody? Yeah. I think everybody agrees with that statement.

I'll tell you why this is the most

69

important question that I'm going to ask you. It's the most important question because the evidence is going to show you that these Defendants' designers, these Defendants' engineers, these Defendants' employees, and these Defendants' suppliers designed and created the products that are accused of infringement in this case.

The evidence will show you that these patents are not used in these products. The evidence will show you that these products are built in accordance with IEEE standards, particularly the 802.11n standard that you'll hear a lot about in this case; and that standard does not use Ericsson's patents. That's what the evidence is going to show.

So it is very important that you wait until you hear all the evidence before you make a decision. Can all of you agree to do that?

Is there anybody that says: I can't wait; I've got a decision?

Can everybody wait till they hear the evidence? If you can't, let me know.

Thank you so much.

Now, Ms. Speights, if I could pick on you just for a second. Mr. Cawley picked on you.

If you could give her the microphone.

You just said that if a plaintiff had a

70

case and they had a good case, you thought they ought to fight for it.

JUROR SPEIGHTS:  True.

MR. JONES:  Remember that?

JUROR SPEIGHTS:  Yes, sir.

MR. JONES:  Let me ask you the opposite side of that question.

If a company such an Intel, Mr. Johnson's company, is sued, do you think, if Mr. Johnson believes he doesn't infringe and that his company created his products, do you think he ought to fight for his company?

JUROR SPEIGHTS:  Yes, sir, I do.

MR. JONES:  Okay.  So it goes both ways?

JUROR SPEIGHTS:  Yeah.

MR. JONES:  Fair enough.  Thank you so much.

Anybody disagree with Ms. Speights?  And if you do, again, tell me.  That's fine.

Thank you.

Now, with regard to patents, Mr. Cawley talked about patents.  I don't know, but I've been told that the first patent on this paperclip was in about 1896.

Can y'all see the paperclip?  Everybody's

71

familiar with a paperclip.  And it puts paper together. I've also been told that there are at least 200, if not more, patents concerning paperclips after the one in 1896 that does this.

And the reason for that is pretty simple. This paperclip concerns one way to clip paper.  But if you clip paper using another way, such as this clip (indicating), then that's a different patent and different patents issued.

Now, the principle is this, and I think it's a principle of patent law, and that is that you don't have a patent on clipping paper; you have a patent on a particular way to clip paper.

In this case, Ericsson claims that its patents concern a specific way to transfer data using Wi-Fi.  They don't claim to have invented Wi-Fi, but they claim to have invented a certain narrow way to transmit data over Wi-Fi.

Now, these products of these Defendants, they transmit data over Wi-Fi, but they do it in a different way.

Does anybody think that just because we transmit data over Wi-Fi, that we must infringe these patents?  Anybody think that?  Anybody think that should be the case?  Anybody at all?

72

Thank you.

Now, these -- this particular case is going to concern Wi-Fi chips.  And these are Wi-Fi chips right here (indicating) I'm holding in my hand, if you can see them.

And these Wi-Fi chips are made by Intel.

This Wi-Fi chip right here is the crane peak chip.  You can buy it for about $2.50.

This particular Wi-Fi chip is made by Intel.  It's the Taylor peak chip.  It has different features.  You can buy it for about $8.79.

Now, these whole things -- you see the whole green thing I'm holding up?  They're referred to as Wi-Fi cards or Wi-Fi chipsets.  And the little black things you see in the middle of them, those are the actual chips.

Can everybody see that?

And there are different versions of these Wi-Fi cards, and this is the base version, and it costs about $2.50 right now.  I think that the average price, when this lawsuit was filed, for all Wi-Fi chips across the industry in 2010 when this case was filed was about $2.41.

My question to you is:  Before today, before I pointed these out to you, did anybody have any

73

knowledge of Wi-Fi chips?  Anybody?  Had anybody ever seen these chips before?

Before I talked about it, did anybody know anything about the price of these chips?

Thank you.

Now, going back to my paperclip analogy, the contention of Ericsson is that for these products, such as the laptops like you see over here and routers, when they have these Wi-Fi chips, that they infringe these patents because they do data transmitting their particular way as set forth in their patents.  In fact, the evidence is going to show you that we do data transmitting in a different way.

Does anybody have any knowledge, prior to today, about how data is transmitted wirelessly? Anybody know anything about that?

Yes, sir.  And that's Mr. Henry, right?

JUROR HENRY:  Yes, sir.

MR. JONES:  And what knowledge do you have of that, sir?

JUROR HENRY:  Not a lot, but I do some work in the secure transmission of data across wireless.

MR. JONES:  Thank you, sir.

In doing that, have you ever purchased any of these Wi-Fi chips individually?

74

JUROR HENRY:  No.

MR. JONES:  Thank you, sir.  I appreciate it.  Thank you so much.

With regard to patents, does anybody think that merely because a patent is issued by the Patent Office that somebody must be practicing that patent?  Anybody feel that way?

It's not a requirement, to get a patent, that a product actually use your ideas or that anybody actually use your ideas; but does anybody think that should be a requirement?

Thank you.

Now, in this particular case, you've already seen the film of the federal judiciary about patent cases.

And in that film, they told you that patents had claims, and those claims described what was invented.  Those claims described what the patent owner owned.  Those claims described what the patent owner could exclude others from doing.

Now, I believe Judge Davis will instruct you, if you are chosen as a juror, at the end of this case, that in order to infringe, a product must practice each and every element of a claim that describes the invention.

I think he will instruct you, it has to be -- every element of the claim must be practiced or must be done by the product. Nine out of ten isn't good enough; 99 percent isn't good enough. It has to be -- 100 percent of the elements must be practiced.

Now, does anyone disagree with that concept? If he instructs you and if I'm right and he gives you that instruction, does anybody say: You know, I would disagree with that; 99 percent, that ought to be good enough? Anybody feel that way?

MR. JONES: Anybody feel like that's nitpicking to require every element of the claim to be practiced? Anybody feel like that?

I mean, going back -- the reason for this is pretty simple. Going back to my analogy here, the reason you do that is because you're encouraging innovation. Even if you improve just one element, it improves the innovation of the particular device. So that's why we have it.

But does anybody have a problem with that?

Can anybody -- and let my address this just in one other way and bring it more down to the specifics of our case.

In this particular case, the patents that

76

are involved have some claim elements that are so basic, everybody does them.  There's going to be no question about it.

We're going to admit that some of the elements, sure, we do those.  Those are basic elements in the industry.  Everybody does them.

There are other elements, though, that we're going to say, no, we don't do.  We are different.

Now, does anyone think, because we say, yeah, we do some of the elements, that, therefore, we must infringe?  Anybody?

Thank you so much.

Will each of you -- can every one of you promise me that you'll require each and every element to be proven before you find a product infringing?  Anybody can't?

Yes, sir.  I appreciate it.

Mr. Vandenburg?  Thank you, sir.

JUROR VANDENBURG:  My experience has been that companies will go beyond their way to take the patent right and alter it just enough to make it to where it benefits them and not the party involved with the patent.

MR. JONES:  Okay.  So could you follow Judge Davis's instructions in that regard --

JUROR VANDENBURG:  Absolutely.

MR. JONES:  -- if some element was changed?

JUROR VANDENBURG:  Yes, sir.

MR. JONES:  Okay.  Okay.  So you would require every element to be practiced by the product?

JUROR VANDENBURG:  No.  I would follow the Judge's direction.

MR. JONES:  Okay.  Thank you, sir.  I sure do appreciate it.

Now, Mr. Cawley mentioned that the Plaintiffs in this case were claiming damages of millions of dollars.  And he has told you that that will be an issue that will be addressed in this trial.  The Defendants in this case will submit evidence on all the issues that the jury will be asked about.  And damages is certainly one of them.

Do any of you think that because the Defendants will present evidence that these claims of damages are vastly excessive, that because we do that, we are somehow admitting that we must owe something?  Anybody think that?

I was in a state court case once.  I talked to a juror after I tried the case, and they told me, they said, when you, as the Defendant, talked about

78

damages, we thought you were kind of admitting you must have done something wrong.

Does anybody feel that way?  Anybody at all?

Thank you so much.

In this case, as Mr. Cawley stated, we contend that two of the patents, the '435 patent and the '625 patent, are invalid.

The federal judiciary film said, and I quote, that in order to be valid, a patent must enhance public knowledge by adding something new and useful to it.

And it further said that a person may challenge whether a patent is valid and may say that this is not a new idea; this is not a new invention.

Now, does anybody have a problem with us doing that?  We're going to present evidence to you that somebody thought of the ideas of these patents at a prior time and published those ideas, put it into public knowledge what those ideas were.

Does anybody have a problem with that concept?

Can they follow that concept?

Thank you.

Does anybody feel, as you sit here today,

79

uncomfortable with your role of deciding whether or not the United States Patent and Trademark Office did the right thing in issuing these patents?

Anybody say:  You know, those guys are the experts; I just don't feel comfortable getting into that?  Anyone feel that way?

Thank you.

The film also said and it described a reason why you will be asked as jurors to consider the validity of a patent.

It said first that you may see new evidence that the Patent Office didn't see.

It said, secondly, that the Patent Office's procedure is a procedure where they only hear from one party.  They only hear from the Applicant. And here you will hear from people in the industry that want to present evidence about this patent who have never had an opportunity before, to speak on whether the patent should be issued.

Now, my question to you is this:  Do any of you feel like there's any impediment to you, for the first time, giving the Defendants their opportunity to present evidence on this issue?  Does anybody see any impediment?

Ms. Speights, I'll pick on you one more

80

time, if you don't mind.  You seem to be everybody's favorite.

If we started the trial in this case this afternoon with the jurors and only the Plaintiff showed up, the Defendants didn't show up, who do you think would win?

JUROR SPEIGHTS:  The Plaintiff.

MR. JONES:  Okay.  And do you see why -- do you see why it's important that the Defendants have this -- their first opportunity to present evidence on the invalidity issue?

JUROR SPEIGHTS:  Yes, sir.

MR. JONES:  Thank you so much.

Now, I'd like to ask you next just a few questions about the parties.

Before today, had anyone ever had any relationship with Ericsson?

We've asked you whether you had heard of them, Mr. Cawley did, and I think nearly the whole group had heard of Ericsson.  But have you had any relationship with Ericsson at all?  Anybody?

Before today, had you had any relationship, friendships, knowledge of, employees of Ericsson where you've had interactions with them? Anybody?

Now, Mr. Cawley introduced some of the attorneys that have worked on this case.  He is a member of a firm -- a law firm, McKool Smith, that has offices in Dallas, New York, and other places.

Does anybody have any relationships or interaction with that firm, McKool Smith?

Some other attorneys that have worked on this case that he didn't introduce are Justin Nemunaitis, Sam Baxter, Brandon Jordan, and Ada Brown.

Does anybody know those attorneys?

Thank you so much.

Now, these are the Defendants.  I'll turn my attention next to the Defendants.  These are the seven Defendants in this case.

Now, we've already heard -- and I really want to thank you, Ms. Arnold, on behalf of Dell.  We appreciate it that you like our products.  Thank you so much.  And I hope somebody else does, too.

But with regard to any of these Defendants, how many of you have used products from some of these Defendants, whether it be Dell or others?

Yes.  That's everybody on the jury panel.  Okay.

Well, I won't go one by one because we probably don't have time, but let me ask you this:  And,

82

again, I can take it.  You won't hurt my feelings, because I've already heard something good from Ms. Arnold.

Has anybody had any problems with any of the products of any of these Defendants?  Anybody?  Golly.  That's wonderful.  Thank you so much.

Besides using their products, does anybody have any knowledge of these companies whatsoever before you got here today?  Anybody?

Anybody seen articles in the press that you've read that's given you opinions about them?

Yes.  Yes, ma'am.  Yes, sir.

Excuse me.  If you could, I believe it's -- yeah -- Mr. Billingsley.  Thank you.  Yes, sir.

JUROR BILLINGSLEY:  I've read various research reports on Intel and Dell.

MR. JONES:  All right.  Thank you so much, sir.

Is there anything about that that would affect your service in this case?

JUROR BILLINGSLEY:  No.

MR. JONES:  Thank you, sir.

Now, let me ask the question generally, just -- because that's the place I'm going to go with

83

this question.

To those of you that raised your hand, has anyone formed any opinions that might affect your decision in this case based upon those articles?

Has anyone formed any negative opinions about any of the products based upon those articles?  If so, raise your hand.

Mr. Vrnak?

JUROR VRNAK:  (Nods head negatively.)

MR. JONES:  Thank you so much.  I appreciate it.

Is there any reason whatsoever that anybody on the panel would have a negative feeling about any of these companies?

And if you don't want to tell me about it in public, we can do it in private.  Anything?

Thank you so much.

Does anyone have any knowledge about the way the United Patent and Trademark Office -- Patent and Trademark Office works besides what you heard in the film or besides what you've heard today?  Any knowledge about their inner workings?

Does anyone know a Patent Examiner?  Anybody?

Does anyone know what qualifications you

84

have to have to be a Patent Examiner?  Anybody?

Does anyone know what the error rate is on the approval of patents by Patent Examiners?  Anybody know that?

Thank you so much.

Now, all of these companies are big.  You know, in fact, Ericsson may be bigger than some of the Defendants, and some of the Defendants may be bigger than Ericsson; but I do want to ask you a couple of questions about big corporations.

Have any of you had a large significant dispute with a major corporation, a big corporation like we have in this lawsuit?  Anybody?

Thank you.

Is there anybody on the panel that would agree -- yes, ma'am.  I appreciate it.  That would be Ms. Travis, right?

JUROR TRAVIS:  Yes.

MR. JONES:  Thank you.

JUROR TRAVIS:  I was involved in a lawsuit with Ford.

MR. JONES:  Ford.  Okay.  Was it over a car you owned?

JUROR TRAVIS:  Yes.

MR. JONES:  Thank you very much.  I

85

appreciate it.

Anybody else that I missed?

Thank you so much.

I'm going to -- I'm going to make a statement, and I'll ask any of you who agree with it to raise your hand.

Do any of you agree with this statement: The only way to control large corporations is by having juries award large verdicts against them?

Does anybody agree with that statement? If you would, raise your hand.

First row?

Second row?

Third row?

Fourth row?

Thank you.

Now -- and -- and I won't address this question to -- excuse me.  My notes here are making my slow down, and I apologize.

I want to ask this question.  I know one of you -- and I appreciate everybody filling out the questionnaire, but I can't find it on my notes real quickly -- answered the question that you had been involved in a wrongful termination lawsuit.  And I don't -- and I think it's -- and I don't want to ask

86

that person.  I know what you've stated in your questionnaire, and that's great, and I really appreciate it.  Thank you very much.

I would ask -- I would like to ask the rest of the panel, besides that individual, have you ever been involved in a significant dispute with your employer that caused you to think about, you know, hiring legal counsel?

Has anybody but that person that mentioned the wrongful termination lawsuit been involved in something like that?  Anybody?

Thank you so much.

Has anybody ever wanted to file a lawsuit?  Like Ms. Speights said, you know, you felt like you had good grounds to file a lawsuit and you wanted to do so; but you couldn't do so for some reason or another?

Has anybody ever been in that situation? Anybody?

Thank you.

How many of you have written a letter to the editor or called in on a radio show?  How many have done that?

I'll raise my hand.  I've done it.

Anybody on the front row?

Yes, ma'am.  Ms. Mangrum, you've done it?

JUROR MANGRUM:  I couldn't tell you when.

MR. JONES:  I understand.  I couldn't tell you when either.

JUROR MANGRUM:  But I have.

MR. JONES:  Great.  I appreciate it.

Anybody else on the front row?

I think we got a lot of takers on the second row.

Mr. Austin?

JUROR AUSTIN:  Yes.

MR. JONES:  Have you done it?

Great.  I'm not going to even ask you about it.  I just wanted to know you've done it.

Who else has done it?

Ms. Jordan.  Great.

Anybody else?

Ms. Arnold.  Excuse me.  Ms. Arnold.

Anybody else?

Over here, anybody -- yes, sir.  And that would be Mr. McGaughey?

JUROR McGAUGHEY:  That's close enough.

MR. JONES:  Oh.  Well, tell it to me right, and I'll try --

JUROR McGAUGHEY:  McGaughey

(pronouncing).

MR. JONES:  Mr. McGaughey, I sure do appreciate it.  Thank you.  Sorry to make you do that twice.

Who else on the front row there?

And then on the second row, we have

Mr. Enas.

Anybody else?

Thank you so much.

Now, besides those that told us in the questionnaire they're teaching right now, besides those, who has taught in the past?  Anybody?

Ms. Vrnak?  Thank you, ma'am.

Anybody else?

Second row?

Have I missed anybody?

Thank you.  I appreciate it.

Now, another question I -- just a simple yes or no answer to.  How many of you think it's more important to satisfy the spirit of the law than the letter of the law?  A simple yes or no question.

How many of you think it's more important to satisfy the spirit of the law as opposed to the letter of the law?

On the first row?

89

Nobody?

Second row?

Third row?

Fourth row?

Thank you so much.

How many of you have signed a confidentiality agreement or a non-disclosure agreement with the company you worked for?

Thank you.

Well, I tell you what.  Let's take it kind of one row at a time then and make sure I get everybody down.

That would be -- Ms. Speights, you've done that.

Mr. BILLINGSLEY, you've done that.

Who else on the first row?

Thank you.

Ms. Travis, you've done that.

And we go to the second row.  Who's done that?

Ms. Killyon has done that.  Thank you so much.

Ms. Branham.  Thank you.

And Ms. Williamson.

All right.  Thank you.

90

Over here?

We have a bunch.

So, Mr. Henry, you've done that.

And Mr. McGaughey has done that.

Did I get it right that time?

JUROR McGAUGHEY:  (Nods head affirmatively.)

MR. JONES:  Great.

And Mr. Vandenburg has done that.

And then on the final row?  Anybody?

That would be -- Ms. Brown's done that.

Thank you so much.  I appreciate it.

How many of you work for a company that has -- and I'm not asking about patents now; I'm talking about trademarks or copyrights -- anybody work for a company that has trademarks or copyrights?

Thank you.

Nobody over here?

Yes, sir.  Mr. BILLINGSLEY does.  Thank you, sir.

And then over here, we had Mr. Henry and Mr. Buck and Mr. McGaughey.

Anybody else?

Yes.  And Ms. Herman.

And then we also have Ms. Chambers.

91

Thank you so much.  I appreciate it.

How many of you regularly make purchases over the Internet?  If you could, raise your hands.

I think the easiest way to go about this, if you don't make purchases over the Internet, could you raise your hand?  Anybody not make purchases?

Thank you, sir.  I appreciate that.

How many of you have seen someone take credit for an original idea that you had in any circumstance you recall?  Just something as -- you remember it.  Yeah, it sticks in my craw.  They stole my idea.  Maybe a co-employee, maybe another student. Anybody been in that situation?

Thank you so much.

How many of you have worked in research and development?  How many of you have done that?

Yes, sir.  And that would be Mr. Vandenburg.  And that would be in the construction industry; is that correct?

JUROR VANDENBURG:  Chemical industry.

MR. JONES:  The chemical industry? Can you describe that work to us, Mr. Vandenburg?

JUROR VANDENBURG:  When I got out of college, I went to work for Mobil Oil, and so I did R&D for them.

92

MR. JONES:  Great.  And Mobil Oil had patents, I bet.

JUROR VANDENBURG:  Plenty.

MR. JONES:  Thank you, sir.

Anyone else that's worked in research and development?

Yes, sir.  Mr. Buck?

JUROR VANDENBURG:  Not directly, but I have worked doing maintenance.  We try to find better ways, processes, and equipment to do our work.

MR. JONES:  Thank you, sir.  Thank you, sir.

Well, let me -- you've been asked a whole lot of questions, and you have been very patient with myself and Mr. Cawley.  I must say I really enjoyed finding out who your favorite people were.  I love Joel Osteen, so I was amazed that he came up.

But, anyway, as we reach the end of this process, I think you all would agree with me that Mr. Cawley and I could ask questions forever and maybe not ask the right question.  So I'd like to conclude with two general questions.

The first question is this:  Has anybody received any knowledge whatsoever about this case before today, had any knowledge from any source that says:  You

93

know, I knew this case was going on or knew something about it?

Anybody have any knowledge from any source prior to today?

Does anybody think they have knowledge that bears on this case that they got prior to today, starting here; Mr. Cawley talked about it and myself talked about it?

Thank you.

And the final one is:  Obviously, it's my responsibility to try to be as fair as I can to Intel, Acer, Dell, Toshiba, NETGEAR, D-Link, and Belkin.  And whether I've asked the question or not, let me ask you to probe your own mind and to please tell me if any of you -- you know, there's a reason why I am just not a good juror on a case involving those Defendants?

If anyone feels that way -- if it's a private reason, you know, then we can take it up with the Judge at the bench, but just let me know about it.

Anybody know any reason whatsoever they can't be fair to these people that I am speaking for, have the great honor to speak for?  Anybody?

Thank you so much for your time and your attention.  I really appreciate it, and I look forward to exploring this case with those of you who are

94

selected as jurors.

THE COURT:  Thank you, Mr. Jones.

All right, Ladies and Gentlemen of the Jury, we're just about through with the voir dire examination.  In a moment, I'm going to allow you to take a break for about 15 minutes.

And you can go through those rear doors and up and down the hallway.  There are restrooms.  Walk outside, if you wish to.

When you come back in, you can just have a seat on the right-hand side of the courtroom in any order.  You don't need to be in your particular order. And at that time, we will call the eight jurors that are selected on the jury.

I, again, want to thank all of you for being here today and for your service, even those of you who are not selected on the jury.

You know, lots of times, people complain and grumble about jury service; and as I think one of the attorneys mentioned, this is a right guaranteed to us by the Constitution.

It's a right that in other areas of the world -- I think we all see on the evening news how disputes sometimes get settled in a not very friendly way, and we're fortunate to have our court system and

95

the right for people who cannot resolve their dispute to come and have ordinary citizens from the community decide those.

So I just want you to know that this is indeed a high calling, and I know it's an inconvenience, but I hope you will consider -- consider your service here today in that vein.

Let me just visit with the attorneys here at the bench for a moment.

(Bench conference.)

THE COURT:  Anyone you need to visit with?  Anyone afterwards?

MR. CAWLEY:  I don't think so.

MR. JONES:  (Nods head negatively.)

THE COURT:  I'm going to excuse No. 4, Mr. BILLINGSLEY for cause; No. 13, Ms. Arnold, for cause.

I did not hear Mr. Buck's answer to the question about -- I think it was too many lawsuits.

MR. CAWLEY:  Coffee.  He said, you know, he thinks that things like spilled coffee lawsuits are silly.

THE COURT:  All right.  Any other challenges for cause?

MR. CAWLEY:  Well, I would like to talk

to you about Juror No. 5.  He knows Mr. Jones' wife and children.  You know, I just -- and Juror No. 14 knows Mr. Dacus's wife, Shannon, who appeared as counsel in this case.

MR. JONES:  Can I speak to that?

THE COURT:  Uh-huh.

MR. JONES:  There is no showing.  Ms. Vrnak said she didn't even know me, which kind of hurt my feelings, but she didn't even know me.  She knows my wife and son just because they went to the same school 10 years ago.  There is no showing that Ms. Vrnak couldn't be fair.

With regard to Ms. Williamson, she does know Ms. Dacus; but, again, there is no indication it would it any way affect her jury service.  And Mr. Dacus was introduced.

THE COURT:  Well, Ms. Dacus is counsel.

MR. CAWLEY:  Counsel of record.

THE COURT:  I'll excuse Ms. Williamson for cause and deny the challenge as to Ms. Vrnak.

(Bench conference concluded.)

THE COURT:  All right, Ladies and Gentlemen.  At this time I'm going to give you a recess until 25 minutes after 11:00.  Be about a 20-minute break.  So enjoy your recess.

97

I do need to give you one instruction. Please do not discuss this case among yourselves or with anyone else. There are a lot of interested parties here. They will see your juror badge. They will respect that. They won't be coming up and chatting with you, and you please do likewise. But please don't even discuss it among yourselves.

And those of you who are selected on the jury, that's an instruction that I will give you each day, and I'll have more to say about that later. But for this break, just be sure and talk about, you know, the weekend, golf, guitars, whatever, but please do not discuss this case at this time.

So at this time, the jury panel is excused. If you will exit through the back doors as quickly and quietly as possible.

And if I can see the attorneys at the bench again, please.

COURT SECURITY OFFICER: All rise.

(Jury Panel leaves the courtroom.)

(Bench conference.)

THE COURT: All right. According to me, we should have 28 jurors; 3 for cause, 8 for the jury, that leaves us with 17. So you will each get 8 peremptory strikes.

98

MR. CAWLEY:  Okay.

MR. JONES:  Your Honor, I would just make one request.  I am answering to seven different in-house counsel.  If you could give me as long as possible.

THE COURT:  How long do you need?

MR. JONES:  If I could get 30 minutes, it would be wonderful.  But whatever you need to do, I understand.  It's just a request.

THE COURT:  Okay.  How about 11:30?

MR. JONES:  Thank you, sir.  That's perfect.  Thank you.

(Bench conference concluded.)

THE COURT:  All right.  We'll be in recess.

(Recess for strikes.)

COURT SECURITY OFFICER:  All rise.

(Jury Panel in.)

THE COURT:  Please be seated.

All right, Ladies and Gentlemen of the Jury.  If you'll pay attention, please.  If your name is called, if you will, please rise and come forward, and the Court Security Officer will show you where to be seated.

Ms. Ferguson, if you'll call the names of the jury, please.

99

COURTROOM DEPUTY:  Yes, Your Honor.

Juror No. 1, Donna Mangrum.

THE COURT:  Ms. Mangrum.

COURTROOM DEPUTY:  Juror No. 2, Cammie Cameron.  Juror No. 3, Deborah Speights.  Juror No. 4, Rebecca Travis.  Juror No. 5, David Richardson.  Juror No. 6, Debbie Reyna.  Juror No. 7, Cherie Kelley.  And Juror No. 8, Brenda Brown.

THE COURT:  All right.  Please raise your right hand to be sworn.

(Jury sworn.)

THE COURT:  Please be seated.

All right.  Congratulations to you, Ladies and Gentleman.  You've got a lot of awfully nice-looking ladies there to serve with you this week, sir.

We're -- rather than starting into anything further, we're going to go ahead and break for lunch in just a moment.

And I've got good news for those of you who are selected.  The parties for both sides have agreed to provide your lunch this week, as well as your snacks.  And so they'll be provided.

We normally do that when we try these cases because it just makes it easier on the jury and

100

everybody else.  We can take a shorter lunch break.  We have a lot of testimony we have to go through over the coming days, and it works really well.  And they do a good job of giving you some variety, and I think you'll enjoy the food.

If any of you have any dietary restrictions, if you'll just write a note and give it to the Court Security Officer, we'll try to get that taken care of for you on future days.

Hopefully, there will be something there -- I think we're having chicken spaghetti today for you, so I hope that will work.

But during your lunch break, again, please follow my instructions and do not discuss this case among yourselves or with anyone else for that matter.

The jury room is right through this door over here, and you'll follow the Court Security Officer there for lunch today.

There's also a doorway that opens out on to the hallway.  And when you come and go from the jury room before court or during a break, if you want -- I don't know if any of you are smokers; but if you want to smoke, you're welcome to go outside.

But just use that side door and go out

101

through the hallway.  And that's where you'll come in in the mornings and where you'll leave from in the evenings.

So are there any questions from any members of the jury?

All right.  Very well.

Well, again, let me thank not only you for your service, but, again, all of you who came and were not chosen for being here.  This process would not work without your presence as well.

So we're going to -- those of you who were not selected, you are excused.  You can turn in your juror badges down -- downstairs or you're welcome to come back and observe and stay, if you'd like to.

So if -- I don't believe there's anything else.

Anything else from the Plaintiff or the Defendant before we break for lunch?

MR. CAWLEY:  No, Your Honor.

THE COURT:  All right.  Let me just tell you what we'll do as soon as we come back from lunch. I'll have some preliminary instructions to give you that will take maybe 20 minutes, maybe a little longer, and then we'll go right into opening statements by the attorneys for both sides.

102

So I'm going to give you until 12:20. That's 40 minutes.  Should be more than enough time for your lunch.

So enjoy your lunch.  Please remember my instructions.  The jury is excused, and we are in recess.

COURT SECURITY OFFICER:  All rise.

(Unselected Jury Panel Members excused.)

(Jury out.)

(Lunch recess.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of our abilities.

/s/ Shea Sloan
SHEA SLOAN, CSR
Official Court Reporter
State of Texas No.:  3081
Expiration Date:  12/31/14

/s/ Judith Werlinger
JUDITH WERLINGER, CSR
Deputy Official Court Reporter
State of Texas No.:  731
Expiration Date  12/31/14