1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


ERICSSON, INC., ET AL           )
                                          DOCKET NO. 6:10cv473
    -vs-                         )
                                    Tyler, Texas
                                )   12:21 p.m.
D-LINK CORPORATION, ET AL           June 3, 2013


                    TRANSCRIPT OF TRIAL
                    AFTERNOON SESSION
        BEFORE THE HONORABLE LEONARD DAVIS,
     UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY


                    A P P E A R A N C E S


FOR THE PLAINTIFFS:


MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas   75201


MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas   78701


COURT REPORTERS:        MS. JUDITH WERLINGER
                        MS. SHEA SLOAN
                        shea_sloan@txed.uscourts.gov


Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

2

FOR THE DEFENDANT:


MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022


MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071


MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104


MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359


MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

3

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated.

All right.  Members of the Jury, I hope you had a good lunch.

I'm going to give you some preliminary jury instructions at this time I'll just ask you to please pay attention to, and realize you're welcome to take notes.  Realize, though, that all of these will be given to you again at the end of the case in much greater detail, but this is just -- just to help you get started and kind of understand some of the terminology and things we'll be dealing with.  Some of it has been covered in the patent video, but this may be in a little bit greater detail.

Ladies and Gentlemen of the Jury, congratulations.  You have now been sworn as the jury who will hear and decide this case.

You're role as the jury is to decide all disputed questions of fact, and it is my role as the Judge to decide all questions of law and procedure.

I will provide you with instructions on the rules of law and procedure that you must follow in making your decision.  I am now giving you some

4

preliminary instructions; and at the end of the trial I will give you more detailed, final instructions on the law and procedure you must follow in reaching a verdict in this case.

I will give you my preliminary instructions, and then you will hear the attorneys' opening statements.  An opening statement is an overview of what each side expects the evidence to show.  But what the attorneys say is not evidence.  It is only intended as a road map or an overview to help you understand the evidence as you hear it during the course of the trial.

After we have completed opening statements, the Plaintiff will then begin presentation of its evidence.  And then after that, the Defendants will present their evidence.  And then finally, the Plaintiff will present any rebuttal evidence near the end of the case.

Once all of the evidence is in, I will then give you my final instructions, after which both -- both sides will then present their closing arguments.

And, finally, you will then retire to the jury room to begin your deliberations and reach your verdict.

During the course of the trial, you

5

should keep an open mind until you've heard all of the evidence, my final instructions, which is called the Court's charge, and the attorneys' closing arguments.

Be sure to pay close attention to all of the testimony and evidence. To help you, you may take notes during the trial, if you wish to. A juror notebook has been provided for your convenience. If you've not written your name on it, please do so. On the front -- take that front sheet on the front hard-back cover, and just pull it out and write your name up at the top so that we can identify your notebook.

At the end -- when we break at the end of each day, you will turn your notebook in to the Court Security Officer, and it will be returned to you the following day. Everything you write in it will be confidential, and it will be shredded at the end of the case.

You do not have to take notes, but if you do, do not get so involved in your note-taking that you become distracted and miss part of the testimony.

Until this trial is over, do not discuss this case with anyone and do not permit anyone to discuss this case in your presence. This includes your family, friends, and even your fellow jurors.

6

When you go home this evening, your spouse may say, well, what happened?  You can say, well, I got picked for jury duty.  Well, what kind of case?  Well, it's a patent case.  Well, what's it about?  Stop right there.  Say, I'm sorry, I can't -- I am under Court instructions.  I can't discuss anything else about the case until it's over.

The very first time you should ever discuss this case with anyone is at the end of the case when you and your fellow jurors retire to the jury room and actually begin deliberating on your verdict.

If anyone should attempt to discuss this case with you or to approach you concerning this case, you should form -- inform me immediately through the Court Security Officer.

During this trial, you should not -- during this trial, you should hold yourself completely apart from the people involved in the case:  The parties, the witnesses, the attorneys, and the persons associated with them.

It is important not only that you be fair and impartial, but also that you appear to be fair and impartial.  And that is why you should not have any contact with any of them.

And you might be talking about gardening

7

with somebody that's on one side or the other associated with the case and not doing anything wrong, but if somebody from the other side were to see that, it would cause uneasiness and that's -- that's where I'm saying you not only need to be fair and impartial, but you need to give that appearance, as well.

Also, if any of you happen to have a social networking Internet site or tool -- tool, such as Facebook, MySpace, or Twitter, you should not discuss, mention, or post any updates of any kind or in any manner about this case or this trial.

Likewise, do not send or receive text messages about this case.

Also, do not make any independent investigation of any fact or matter in this case.  Do not learn anything about the case from any other outside source.  Do not watch television or read the newspaper about this case.  I don't think you'll see anything, but if you did, just flip to another channel.

Do not use the Internet or Google to find out more information about the case, the parties, or the attorneys.  For example, if you have a home computer, during this case do not go home and get on your home computer and start trying to figure things out or do any kind of independent research.

8

And the reason for this is very important.  Cases in a court of law are decided on one thing, and that is the evidence that is legally admissible.  And that evidence you'll hear from the witness stand and from the documents that are admitted into evidence.

But all of that evidence, one, it's legally admissible; and, secondly, it has to stand up under cross-examination by the other side.  And that's one of the greatest truth-finding tools in our justice system is the examination of witnesses on both direct and cross-examination where both sides get to ask probing questions.

And if you were to go out and do your own research, one, it would not be -- it's not legally admissible; but, two, it's not subject to cross-examination.  So, please, do not -- and if you did any of that, it could put the whole trial in jeopardy, so please don't do any research at all about this case or the facts involving it.

Now, let me tell you a little bit about the parties and the nature of this case, a little more than I told you this morning.

As I said earlier, this is a patent case. In this case, the Plaintiff, Ericsson, alleges that the

9

Defendants infringe its patents and that it is entitled to damages for such infringement.

The Defendants, which include Intel, D-Link, NETGEAR, Acer, Gateway, Dell, Toshiba, and Belkin -- the Defendants deny that they infringe and they deny the damages and they allege that the patents are invalid.  Invalidity is a defense to infringement.

Generally, there are three questions you will be called upon to answer at the end of this case.

No. 1, is there infringement?

No. 2, are the patents valid?  Or -- or are the patents invalid?

And if they are not invalid, what are the damages?

Those are the three questions: Infringement, validity, and damages.

Now, there are five patents involved in this case, U.S. Patent Numbers -- and I'm not going to read all of the numbers.  They'll be introduced into evidence.

For example, the first one is Patent No. 6,446,568.  That's commonly referred to as the '568 patent.  It's -- you use the last three digits of the patent.  So there's the '568 patent, the '435, the '3 -- the '625, the '223, and the '215 patents.  Five patents.

10

The patents-in-suit generally relate to various Wi-Fi technologies.  You will hear more about the technology during the opening statements.

Now let me visit with you about the patent system and how it works.

Before jury selection, you saw a video that provided a good overview of the U.S. patent system and how it works.  The United States Constitution empowers the United States Government to enact patent laws and to issue patents to protect inventions.

The purpose of the patent system is to help advance science and technology.  The patent system achieves this purpose by granting to the owner of a patent the right, for the life of the patent, to exclude any other person or entity from making, using, offering for sale, or selling anywhere in the United States the invention that is covered by the patent.

A patent has a life for a limited amount of time, which for the patents involved in this case, has not yet ended.

Once a patent does expire, however, the invention then becomes part of what we call the public domain, which means that anyone is free to use it, and the patent owner may no longer exclude anyone from making use of the invention claimed in the patent.

11

However, during the term of the patent, if another person, without the patent owner's permission, makes, uses, sells, or offers to sell something that is covered by the claims of the patent, then that person or entity is said to infringe the patent.

The patent owner may enforce a patent against persons or companies it believes to be infringers in a lawsuit in federal court, as in this case.  Everyone, however, has the right to use existing knowledge and principles.  A patent cannot remove from the public the ability to use what was known or obvious before the invention was made or patent protection was sought.

Thus, to be entitled to patent protection, an invention must be new, useful, and non-obvious.

To obtain a patent, the applicant must file a patent application with the United States Patent Office.  After the Applicant files a patent application, a Patent Examiner examines the application to determine whether the invention described in the patent application meets the requirements of the patent laws for patentable inventions.

If the Patent Examiner concludes that the

12

legal requirements for a patent have all been satisfied, then the Patent Examiner is said to have allowed the claims; and the application then issues as a United States patent.

This process, from the filing of the patent application up until the time the Patent Examiner issues the patent, is what we call patent prosecution. This patent prosecution is what goes on between the filing of the application and the issuance of the patent.

The record of papers relating to the patent prosecution is sometimes referred to as the prosecution history, or file history.  And you may hear a witness referring to, well, it says on page such-and-such of the file history or the prosecution history thus and so.  And that's what they will be referring to.

The granting of a patent by the Patent Office carries with it the presumption that the patent is valid.  From the issuance of a patent, it is presumed that its subject matter is new, useful, and constitutes an advance that was not at the time the invention was made, obvious to one of ordinary skill in the art.

However, this presumption of validity may be rebutted at trial; and you, the finder of fact, may

13

find the patent to be invalid.

Now let me visit with you about the parts of a patent.

You've been provided with copies of the patents-in-suit in your notebooks.  Please take a look at the '568 patent, which is in your juror notebook at Tab 4.

Do we have an extra juror notebook for me?  Is there an extra one?  No?

Okay.  Look at the cover page of the '568 patent at Tab 4.  It provides identifying information, including in the upper right-hand corner the date of the patent, October 15, 2002; the patent number along the top.  You'll see that, U.S. 644 -- or 466,568 B1, and that's referred to as the '568 patent.

You will also see the inventors' names over in the left-hand column:  Alex Krister Raith, James Ragsdale, and John Diachina.  You also see the filing date.  You see the assignee.  That's who the patents were assigned to -- in this case, L.M. Ericsson.

And then you will see a list of prior art publications, and these are references that were considered by the Patent Office when deciding to issue the patent.

Next you'll see in the right-hand column

14

what's called the abstract, which is a brief statement about the subject matter of the invention.

If you'll flip on over, you'll then see several pages of drawings and diagrams, which appear as Figures 1 through 11.

The drawings depict various aspects or features of the invention.  They are described in words later in the patent.

If you'll turn the page after you get to Figure 11, flip to the next page, and you'll see a lot of small print.  This is what's called the written description of the invention, and it appears next.

In this portion of the patent, each page is delight -- divided into two columns, which are numbered at the top.  You'll see on the left-hand page, Column 1 and Column 2.  Then on the next page, Column 3, Column 4.

The lines on each page are also numbered, going down the middle column.  If you'll look between Column 1 and Column 2, see the little subscript numbers 5, 10, 15?  These are used to allow a quick and easy reference to any section of the patent.

For example, if I were to tell you to look in Column 1, Line 11, you would see that that's where the background section starts.

15

And if I were to tell you to look in Column 2, Line 65, way down at the bottom, you would see that that's where the summary starts.

So you may hear a witness testify that, well, on -- in Column 6, Line 15, the patent says thus and so.  This is what you'll know that they're referring to, and you can flip, when you hear that type of citation, directly to that line and page and -- and column and read it for yourself.

Now, you will then see a number of pages of this -- of these columns, all the way over through Column 14, which is on the very last page of this patent.

Now, I want to direct your attention -- if you will, look at Column 13, Line 10.  Everybody find that?  Column 13, Line 10.  And it says, "What is claimed is, colon" and then, one, a communication station comprising.  And then it lists a couple of paragraphs of what comprises that communication system.

And then, No. 2, the communication station of Claim 1 wherein, and then it goes on to have some other description.  This is what we generally call the claims of the patent.  These are in the numbered paragraphs at the end of the patent.

The claims of a patent are the main focus

16

of a patent case, because the claims are what define the patent owner's rights under the law.  That is, the claims define what the patent owner may exclude others from doing during the term of the patent.

The claims of a patent serve two purposes.  First, they set out the boundaries of the invention covered by the patent.  Second, they provide notice to the public of those boundaries.

The claims of the patent are what are infringed when patent infringement occurs because the claims define what the patent is.  Thus, when a product or a method is accused of infringing a patent, the patent claims are compared to the accused product or method to determine whether there is infringement.

And that's what you'll be doing.  You'll be comparing the claims of the patent to the accused methods or products of -- that are accused in the case.

The claims, though, are also at issue when the question of validity comes up and when validity of a patent is challenged.  In reaching your determination with respect to infringement and validity, you must consider each claim separately.

Patent claims may exist in two forms: Independent claims and dependent claims.

An independent claim does not refer to

17

any other claim of the patent.  In other words, it is not necessary to look at any other claim to determine what an independent claim covers.

For example, in the '568 patent, Claim 1 is an independent claim.  You'll see there, beginning at Line 10 what is claimed is:  Claim 1, a communication station comprising.  And then it lists the processor for arranging information for transmission, including providing at least one first field.  And it goes on to a detailed description of what comprises that communication station.  And that is what defines -- in that independent claim, what the patent covers.

If you'll look at Claim 2, though, it is what we call a dependent claim.  In other words, it depends on Claim 1.  And it starts off and says:  The communication station of Claim 1 wherein said processor is also for changing said type of payload information from a first type to a second type during a connection, et cetera.

And a dependent claim, for it to be infringed, you have to have all of the elements of the independent claim to which it refers, as well as the dependent claim.

A dependent claim includes each of the limitations of the other claim or claims to which it

18

refers, as well as the additional claims -- additional limitations recited in the dependent claim itself.

Therefore, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and the other claim or claims to which it refers.

And as I said, for example, Claim 2 of the '568 patent is a dependent claim. Claim 2 starts in Column 14, Line 1. As you can see at Line 1, it refers -- makes reference back to Claim 1. To determine what this dependent claim covers, the words of Claim 1 and the words of Claim 2 must be read together.

All right. Next let me visit with you about what various claim terms mean.

While the claims define the invention, sometimes there is a disagreement between the parties as to what certain words or terms in the claims mean. When this happens, the parties ask the Court to interpret these terms in light of the patent as a whole. This is to help resolve their disagreement and to give you, the jury, guidance in applying the claims to the facts of this case.

All right. If everybody could shift to the right over here, please, and make room for these people that are coming in. Everybody on -- on this side

19

of the courtroom please shift to your right up close to your buddy and let these other people come in and have a seat.  On the left, if you'll shift to the left, please.  There are some seats up here at the front.

All you back-row Baptists come on up if you want a seat.  Please scoot down close to each other and make room.

All right.  As I was saying, they will submit these terms to the Court to interpret these terms in light of the patent as a whole.  This is to help resolve their -- their disagreement and to give you, the jury, guidance in applying the claims to the facts of the case.

This happened in this case, and at some prior -- sometime prior to trial, we had a hearing.  I heard arguments and then rendered a claim interpretation of the disputed terms.  The Court's claim construction of these terms is set forth in the claim construction chart provided in your notebook.  This is in Tab 1 of your notebook.

And if you will click -- flip back over to Tab 1, you'll see claim construction of terms.  And there are not many; but, for example, in the '568 patent, the last one in that list, that's the one we were looking at, it says -- the term that there was

20

disagreement over is what a service type identifier

which identifies a type of payload information means.

And I construed that to mean, and I give

you this definition, that that means an identifier that

identifies the type of information conveyed in the

payload.  Examples of types of information include, but

are not limited to, video, voice, data, and multimedia.

So, as you can see, that's a more

expansive definition that I have given you in that

definition.

You must use these meanings that I've

given you when you decide the issues of infringement and

invalidity.  And you'll hear the experts that will be

testifying in this case.  They'll testify, as Judge

Davis said in his claim construction opinion, thus and

so means thus and so.

Now, let me go back to the issues to be

decided in this case.  As I mentioned earlier, there are

really three questions or issues you will be asked to

resolve by the verdict you return in this case.  Those

issues are:  Infringement, invalidity, and damages.

Ericsson has the burden of proof on the

issues of infringement and damages.  The Defendants have

the burden of proof on the issue of invalidity.

However, there are different burdens of

21

proof you must apply in answering each of these three questions.

Let me visit with you about those burdens of proof.

In any legal action, facts must be proved by a required standard of evidence, which is known as the burden of proof.  You have probably heard of the beyond a reasonable doubt standard or burden of proof, which is required in criminal cases.

This is the very highest burden of proof. It is not -- that burden of proof is not involved in this case, but there are two different burdens of proof that are involved in this case.

The first is what we call the preponderance of the evidence standard, and the second is called the clear and convincing evidence standard.

The preponderance of the evidence standard means that you must be persuaded that what the party seeks to prove is more probably true than not true.

Put -- putting it another way, if you were to put the evidence for and against the party who must prove the fact on the opposite sides of a scale, the preponderance of the evidence standard requires that the scale tip at least somewhat toward the party who has

22

the burden of proof.

The clear and convincing evidence burden of proof is a heavier burden and means that the evidence must produce in your minds a firm belief or conviction as to the matters sought to be established.

In other words, if you were to put the evidence for and against the party who must prove the fact on the opposite sides of a scale, the clear and convincing evidence standard requires that the scale tip more heavily toward the party who has that burden of proof.

In this case, Ericsson, the Plaintiff, has the burden of proving the issues of infringement and damages by the preponderance of the evidence standard, while the Defendants have the burden of proving invalidity of the patents by the higher clear and convincing evidence standard.

Now, normally during the trial of a case, only the lawyers for the parties are allowed to ask questions of the witnesses.  In this case, however, I'm going to do things a little bit different, and I'm going to permit you, the jurors, to also ask questions of the witnesses.

And here's how we're going to do that: After the attorneys are through questioning each

23

witness, each of you will have the option of submitting a written question for that witness -- or questions, one or more.

In the back pocket of your notebooks you will find some blank question forms for your use.  If, during a particular witness's testimony, you believe that there is something important that you would like to ask that witness, you may write your question on the form after entering the name of the witness.

After the attorneys have completed their questioning of the witness, I will then ask each juror to pass their form to the Court Security Officer.  You should pass a form even if you don't have any questions and your form is blank.  By doing this, the identity of the juror asking a question will not be readily apparent.  There is no need to put your name on the form.

The Court will then take a short recess to consider whether -- to consider your questions for the witness.

During the recess, the Court will review the questions with the attorneys.  The Court will then decide whether it believes a question is appropriate or not.  Please do not be offended if I do not ask your question or if I rephrase your question to state it a

24

little differently.

After you return from your recess, the Court will then ask the witness the questions that the Court believes are appropriate, and the witness will then answer the question for the jury. After the witness has answered all of the jurors' questions, the Court will then allow the attorneys, if they desire, to ask any follow-up questions.

It is my hope that by allowing you to ask questions, you will be more engaged in the proceedings and get the information you need when you need it to reach a just verdict.

My one concern about this procedure is that it not become too time-consuming. Please do not feel compelled to ask a question if you do not feel it is necessary. At the same time, you should not be afraid to ask a question if you believe it will help you to better understand a witness's testimony.

Your questions should be limited strictly to the witness's testimony who you just heard, and you should not ask questions that are unrelated to the specific testimony of that witness.

The Court will decide whether your question is appropriate and whether it should be asked.

Again, do not draw any adverse inference

25

against any party should the Court decline to ask a question or rephrases a question that you've submitted.

We're about through.  Let me just go over with you your duties as jurors.

First, do not be concerned if you feel a little lost at this point.  I will be giving you much more detailed, written, final instructions at the end of the case and will have all of these instructions in much greater detail accompanied by a verdict form that will ask you some very simple questions dealing with these three issues of infringement, invalidity, and damages.

And you'll be allowed to take all of that, including the written instructions, with you to the jury room.

By the time you get to those questions, you will have a much greater understanding and confidence in answering -- in answering them.

Let -- also, let me reassure you, you do not need to be an expert on patent law or the field of the invention.  We have very fine attorneys on both sides of this case who will do an excellent job of simplifying and explaining all of this to you.  And they will also be calling very capable expert witnesses who will help you to understand the issues and facts of this case.

26

I have tried many of these cases; and always the first day of trial like this, the jury is kind of looking at me like you are, like a deer -- deer in the headlights; what have I gotten myself into?

But almost always, by the end of the case, when I visit with the jurors and ask them if they understood the case and felt confident that they were well-equipped to reach the verdict that they reached, they do.

So the attorneys will do a very good job of helping you -- of simplifying the case, focusing you on the issues, and providing you with the testimony and the expertise required for you to -- to decide the issues in this case.

Now, we're about to do opening statements, but I'm going to take just about a five-minute break and I'm going to let you go back to the jury room and I need to visit with the attorneys about something, then I'll have you right back in.  So you are excused to the jury room.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury out.)

THE COURT:  If I could see counsel at the bench, please.

27

(Bench conference.)

THE COURT:  Who are all these people in the courtroom?

MR. VAN NEST:  I think they're lawyers, Your Honor, lawyers and others.

THE COURT:  You know, I'm hesitant to have people standing up during the whole trial.

MR. VAN NEST:  My experience has been that once we get through today, the openings, the crowd is going to thin out.

THE COURT:  But --

MR. VAN NEST:  It looks like it's going to be thinning out now somewhat, I hope.

MR. JONES:  Your Honor, we can work on it for you this evening probably.

THE COURT:  All right.  I'll have some comments to the audience here.

Do you have anything?

MR. STEVENSON:  Yeah.  I had two things.

Would Your Honor mind just telling the jury that the video system isn't at its peak performance today?  The slides they'll be seeing are a little bit --

THE COURT:  Our video?

MR. STEVENSON:  You can still see a little bit.

28

MR. VAN NEST:  Is it -- is it back and working?

MR. JONES:  It's broken.

THE COURT:  Is it broken?

MR. VAN NEST:  Would it be possible to get -- I think it's going to be hard, in particular, with some of the animation slides that I have ready, to see anything.  I'm wondering if the Court's technical people could give us a hand.

THE COURT:  Rosa, what's wrong with the video system?

COURTROOM DEPUTY:  The resolution is kind of backing up.  I can get Joe up here, if you want to take a break.

THE COURT:  Get him up here.  We'll take a break.

MR. STEVENSON:  Thank you, Your Honor.

(End of bench conference.)

THE COURT:  Let me have your attention, please, everyone.  We have a very large crowd today, and so I'm going to ask you when we take a break or something like this, especially if I'm still here, to please hold your conversation down, No. 1.

But, No. 2, I'd really like to get everyone seated rather than having people standing up.

29

So I'm going to take about another 10-minute break. We've got some technical difficulties with the video that they're going to work on, but just see if when you come back in -- I mean, let's get cheek to cheek and get cozy out there and see if we can't get everybody a seat. And if you don't have a seat, I'm going to ask if you start standing, unless you're about to pass out, please remain there because I don't want a lot of people coming in and going out during the -- during the trial. So all right.

And if there's anybody else y'all can get at any of these chairs that you want up here over like by your technical people or something, you can try that.

We'll be in recess until 10 after.

COURT SECURITY OFFICER: All rise.

(Recess.)

(Jury out.)

COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated.

All right. Let's see who got a seat and who didn't. Even brought in more chairs. If y'all lock your knees and start to feel faint, just let me know.

If you've got a seat anywhere up by you, please raise your hand so somebody can come take it. There are a couple of seats.

30

Anybody want to sit up here with the jury?

[Laughter]

THE COURT:  All right.  Bring the jury in, please.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  All right.  Please be seated.

All right.  We're having a little trouble with our technology in the courtroom.  You'd think with all these tech companies here, we wouldn't be having trouble, but we did, so...

All right.  Now, Ladies and Gentleman of the Jury, it's time for opening statements, and the Court will recognize Mr. Stevenson --

MR. STEVENSON:  Thank you, Your Honor.

THE COURT:  -- for opening statement.

MR. STEVENSON:  May it please the Court.

THE COURT:  You may proceed.

MR. STEVENSON:  Ericsson has come to you -- before you today because the Defendants are using Ericsson's patented technology, but refuse to pay Ericsson fair compensation.  The men and women who work for Ericsson are innovators whose ideas have

31

revolutionized the way we communicate.

Ericsson invests billions of dollars each year on research into ways to improve wireless communication.  It then publishes the fruits of this research by filing patent applications, rather than keeping it a secret.

Then when its patents issue, it allows others to use its patented ideas.  In exchange for sharing its innovations through the patent system, Ericsson simply asks those who profit from their inventions to pay a small license fee.  And it's the Defendants' refusal to pay this license fee that has forced Ericsson to bring this lawsuit.

We live in a world of radios, and just look at this room.  This laptop computer contains a small radio.  It's a two-way radio that can send and receive, and it sends and receives from a router that's probably hidden around here somewhere to deliver web pages.

And we all carry two-way radios with us. The cell phone in your pocket is a two-way radio.  It communicates back and forth with an antenna on the side of the road and on a building to deliver voice and data.

And it's easy to lose sight of the wonder of being able to catch up on the news while you're at a

32

coffee shop or to watch a movie while you're sitting on your couch without any wires attached.

In this case, we're going to stop and ask a question:  How did radios get to where they are today?  It's due to hard work by a lot of engineers.  It's due to cooperation by different companies who share their ideas to make devices work together, and it's due in very large part to the patent system and the incentives that it creates.

In this case, you'll hear about the work done by 17 Ericsson engineers who devoted their professional careers to improving wireless communication.  Those engineers did their work in the mid-to-late 1990s, and they were awarded five patents for their work.

Now, Ericsson is not solely responsible for inventing wireless networks.  No one person or company is.  Rather, today's radios are the result of step-by-step advances in technology.  And Ericsson is proud to have contributed, along with other companies, to some of the steps that have made radios what they are today.

Ericsson has a long history of innovation related to radios.  Ericsson got its start in 1876 when Lars Magnus Ericsson opened a telegraph repair shop in

33

Sweden, and he was awarded his first patent nine years later.

In 1925, Ericsson introduced its first commercial radio called a Radiola.

In 1956, Ericsson introduced the first car phone.  The large metal box went in the trunk.

In 1981, after 10 years of research and development, Ericsson began selling some of the world's first mobile phones and base stations.  This one was called the Nordic Mobile Telephone.

And the next year, Ericsson began working towards the next generation cellular network.  This work resulted in the first battery-operated pocket-sized phones which we today call 2G telephones.

Six years later, Ericsson would start the European Telecommunication Standards Institute.  Through it, Ericsson would contribute hundreds of inventions to help grow the newly-formed cellular industry.

In 1995, Ericsson developed one of the first prototype 3G telephones.  It, again, contributed many of its key innovations to the 3G partnership project.

For decades, Ericsson has been at the forefront of the networks, and through every step Ericsson has shared its ideas to make this progress

34

possible.

Today, Ericsson has over 24,000 researchers and developers.  It invests over $5 billion a year on research and development.  40 percent of the world's cellular traffic is carried by Ericsson equipment, and it is the leading contributor to the new 4G cellular standard.

Ericsson has been awarded over 33,000 patents in over 30 fields, including cellular networks, Bluetooth, Voice over IP, and Wi-Fi.  And each of these inventions carries with it a choice:  Either keep it secret or make it public.

Every inventor has the right to keep their invention a secret.  For decades, the Coca-Cola Company has kept the formula for Coke secret.  But Ericsson, on the other hand, typically makes its inventions public.  It does so by applying for patents.

When Ericsson applies for a patent, it knows that its inventions will be published when the patent issues.  And as the Court's video on the patent system explained, our patent system encourages inventors to apply for patents because that results in new ideas being published, advancing the state of the art, and getting new ideas into the public domain.

And in exchange for advancing the state

35

of the art, the inventor receives the exclusive rights to his invention for a limited period of time.

In my remarks today, I would like to first give you a brief introduction to Ericsson's patents. I'm not going to go into all the detail, but enough of an introduction that -- that you'll be aware of what they're about.

And then, secondly, I'd like to talk about something called standards and what they are and why they're important.

Third, I'd like to go into the Defendants' products, what they are and why they infringe.

Next, I'd like to go into identifying other companies who have agreed to license Ericsson's patents.

And, finally, I'd like to discuss the amount of compensation due from the Defendants for infringement.

Let's first start with Ericsson's patents. And before I get into the individual patents, I'd like to give you a general introduction to the area in the field.

Ericsson's inventions have to do with the overall blueprints that govern wireless networks. Every

36

device connected to a computer network has to have a common agreement with every other device on how they're going to behave. You can think of it as a playbook or a recipe or a blueprint of the rules of order, but in this case what we call an "n" standard.

We have a copy of the standard for Wi-Fi. It's sitting on the table over here. And this is the standard that governs the devices at issue in this case.

And -- and the devices -- if you have 802.11n wireless at home, they govern that. This is a document written by engineers for engineers, and every device on a network, whether it be a computer or a TV or a game console or phone, every device is governed by the standard.

Ericsson's inventions deal with how the messages between wireless devices are created and the exact form they're in and how they're treated by the devices that receive them.

Now, these are complicated inventions, make no doubt about that. They were invented by some of the smartest engineers in the world. And we're going to do our level best in this case to present the evidence to you as clearly and directly as we possibly can so that you can reach your decision.

And at the end of this case, I'm sure

we'll all have a greater appreciation for all the work that's gone into bringing us today's wireless networks and all -- and also for the people who have made it all possible.

Let's turn now to the five patents that are going to be at issue in this case.

The first patent I'd like to discuss with you is what I call -- and we call the acknowledgement type identifier. That's the '215 patent. And as the Court told you, we will be, as a shorthand, referring to the last three digits of the patent number.

This patent was filed for in April of 1999, and it was issued to Ericsson in August of 2004. It came from work by Ericsson on the 3G cellular standards, and the ideas in this patent improved wireless networking; and once they were published, became available to engineers all over the world to read and to learn from it.

This patent teaches an idea that gives networks greater flexibility. In wireless networks, transmissions are broken into small pieces called packets.

So, for instance, if you were sending a picture over the Internet, as your computer transmitted it, that picture would be broken up into a lot of small

38

electronic pieces called packets and transmitted in individual transmissions.

And then at the receiver, those packets would be reassembled and created into the picture. And that's how wireless networks communicate, through these packets, and they're probably flying around this room as we speak.

Frequently, though, some of the packets get lost or are garbled during transmission, either interference or a lot of other packets. And when that happens, the receiver, the -- the wireless device receiving the packets has to tell the transmitter, the one that's sending them, which packets it didn't get. This is called an acknowledgement message.

And the invention in the '215 patent is permitting the generation of multiple types of acknowledgement messages and informing the sender of the type of message being sent.

The next two patents I would like to talk with you about, and I think we can talk about them together, are the '625 and '435 patents.

The '625 was filed on October 28th, 1998, and it issued in July of 2002.

The '435 was filed in March of 1999 and issued in December of 2001. Their teachings further

39

advance the state of the art.

In these patents, Ericsson published its idea for keeping transmitters and receivers in a wireless network in sync when the transmitter decides not to re-transmit a lost packet, one of those packets that gets garbled or is lost for some reason.

Now, frequently in wireless networks when a packet being sent gets lost, the transmitter of that packet might decide not to re-transmit it.  And you may wonder why.

Well, there's an example.  Let's say you're having video streamed to your laptop computer over a wireless network.  If some packets are lost, you might notice a small glitch or little, you know, artifact on your -- on your screen, but the video keeps going, and it's a mild annoyance.

But if the transmitter wanted to stop and get it just perfect and avoid the little glitch, then it would have to re-transmit, and that could cause the video to pause or stutter while the re-transmission was taking place.

So the idea is the transmitter may decide that it's better to just keep going on and avoid stuttering, as opposed to waiting and trying to get it perfect.

40

These two inventions in these two patents allow synchronization to be kept between the transmitter and receiver when the transmitter decides to stop re-translating lost packets.

The next packet -- patent I'd like to discuss is the '568 patent.  This patent was filed on October 15, 1996, and issued October 15, 2002.

In 1996, Ericsson engineers foresaw that future radio networks -- in particular the cellular networks they were working with -- would someday carry a mixture of voice and video and data on it.

And they also realized that different types of data tolerate delay differently.  You may not notice a five-second delay when you receive an e-mail; but if your video pauses for five seconds, you certainly notice it.

In this patent, Ericsson published its ideas about a way to identify the type of information to be transmitted over the network, such as voice or video. So different types of information with different tolerances for delay could be processed differently.

Now, some of you today may stream video or voice over wireless networks, either at home or at work.  And if you don't do it now, it won't be long before you do, as the ideas in this patent will become

41

more important as wireless networks carry more voice and video.

And the final package to discuss is the '223 patent.  We call this the timer patent.  It was filed in April of 1999 and issued in February of 2003.

This patent teaches an improved way for a transmitter in a wireless network to decide when to stop trying to re-transmit the lost packets.

The invention was to use a timer at a specific point in the transmission sequence within the sending device on a network, to let that device decide whether or not to try to keep re-transmitting.

These five patents, which were applied for between 1996 and 1999, were studied by a total of seven trained Examiners at the Patent Office.  And only after these Examiners confirmed it was new, useful, and not obvious were the patents awarded.

At trial, we will present the testimony of the key inventors who lived in the United States, Germany, and Sweden.  Because the Court has allowed us limited period of time to present our case, Ericsson has previously presented these inventors to testify and be questioned by the parties to the case.

That testimony was videotaped under the rules of the Court, and we will present it to you so you

42

can hear the inventors describe their inventions.

Let's talk next about standards. Not only did the Patent Office confirm the importance of Ericsson's ideas, but so has the industry. Ericsson's ideas were so important that they would go into various industry standards, including 3G, as well as the Wi-Fi standard.

What is the standard? As I mentioned before, a standard is a common specification or blueprint for products and it allows products by different manufacturers to work together.

One you may be familiar with is a DVD. A DVD is built according to a standard. It specifies the layout of the data on it. And because it's standardized, you can be assured that when you buy a DVD, you can play it in any DVD player regardless of the manufacturer.

How do standards get created? A group of companies in the industry get together and agree to come up with this common blueprint, the standard. They send their best and brightest engineers to meetings, and at those meetings, those engineers debate and discuss the various technologies that are available to use in the standard.

And then after the debate and discussion,

43

those engineers vote, and the leading technologies become part of the written standard. That group is called a standard setting organization, and participation in standard setting organizations is voluntary. Some companies choose to participate, others don't.

After all the voting is over, the final standard is published and is available for everyone to review. And then any company who chooses to build the device, according to the standard, can do so. And if a company does that, they should be assured that the devices they built, according to the standard, will work with devices built by other companies following the same standard.

All of the Defendants in this case, their routers, their laptops work together because they follow the same standard.

Now, you may ask what happens if a final standard includes in it a technology that is covered by somebody's patent? The answer is that's infringement.

If a device practicing a standard does what's in a patent claim, the device infringes. And that can cause a problem because it may -- for part of the standards body is to go back and rewrite their standard to use a different technology.

44

So to avoid these types of problems, Ericsson has told the relevant standards bodies it will permit its patented ideas to be used in the standard.

And in return, it would request that any company that sells equipment built according to the standard agree to pay Ericsson a reasonable and non-discriminatory royalty or a payment for permission to use Ericsson's patented ideas.

Ericsson has made similar promises to many standard setting organizations, including the one responsible for 2G, 3G, and 4G cellular telephones.

Now, the standard we'll be talking about in this case is set by a standard setting body called the IEEE.  That stands for the Institute of Electrical and Electronics Engineers.  Many of the Defendants in this case are members, so is Ericsson.

The standard that uses Ericsson's ideas is called the 802.11n standard.  You may know it as Wi-Fi, and you may, in fact, even have 802.11n routers or laptops that you use at home or at work.

802.11n was officially tasked by the IEEE in 2009, and it resulted in a big jump in speed and longer range than prior wireless networking standards. 802.11n is the version of the standard that contains Ericsson's patented ideas.  Devices that practice the

45

802.11n standard infringe Ericsson's patents if the sellers of those devices have not agreed to pay Ericsson a reasonable royalty.

Some, but not all, of the patents that are at issue in this case came out of Ericsson's work in cellular products; and years later when the companies working on the 802.11n standard chose which technologies to include, it included a number of Ericsson's patented ideas.

As early as 2003, Ericsson informed the IEEE and its members through a letter of assurance that it had patents related to the progression of the standard.  And that letter, which was public, assured all the members of the IEEE that Ericsson would permit its patents to be used by the standard and all they asked for was a reasonable and non-discriminatory royalty.  Ericsson then reaffirmed its commitment to the IEEE as recently as 2011.

Now, I expect the Defendants will tell you that they shouldn't have to pay a royalty in this case.  And one reason they will give is that Ericsson didn't participate in IEEE meetings related to the 802.11n standard.  But the companies who did participate included Ericsson's patented technology, and it doesn't matter for patent infringement whether Ericsson attended

the meetings when the standard was voted on.

Let's talk next about licenses. I mentioned a reasonable royalty a couple of times, and I'm sure you're probably wondering how much is that? The standard rate that Ericsson charges for a license to its essential 802.11n patents is 50 cents per device for laptops and routers. That's a one-time payment. It's good for the lifetime of the device, regardless of how often it's used, and the price is the same regardless of whether it's a 100-dollar router or 1,000-dollar laptop.

A number of companies that make 802.11n wireless equipment have already accepted and agreed to pay Ericsson a royalty, and let me give you some examples.

One company is Buffalo Technologies. Buffalo Technologies is a maker of wireless routers and access cards, and they compete with some of the Defendants in this case. They're sold at Best Buys, Walmart, several other stores. Buffalo Technology has licensed Ericsson's 801.11n patents.

Another licensee is RIM, now known as BlackBerry -- maker of the BlackBerry phones. Those phones contain both cellular radios and 802.11n Wi-Fi radios. And BlackBerry has licensed Ericsson patents for both cellular, as well as 802.11n radio

47

transmissions.

And Hewlett-Packard, one of the largest computer and laptop companies in the world, has also licensed Ericsson's 802.11n essential patents to cover that feature in the laptop and desktop computers. And there are other licensees that you will hear about in this case.

All of these companies sell devices that practice the 802.11n standard. And these licenses followed long negotiations. During the negotiations, Ericsson presented and explained why its patents were essential for compliance with the standards. And the companies with whom Ericsson negotiated concluded that selling devices that operate under the 802.11n standard would require a license, and they agreed to pay Ericsson a royalty.

Now, the calculations for the payments of each one of these licenses vary. Some licenses are calculated on a percentage of the sales price. Other licenses are calculated as a lump-sum payment at the time of signing, based on projected sales. And some are a mixture of both methods. But all of them work out to be an effective royalty rate of around 50 cents per unit.

Christina Petersson, an Ericsson employee

48

involved in negotiation of these license agreements, will testify in this case; and she'll explain those terms to you.

Let's talk now about the Defendants, their products, and proof we will submit of infringement.

Three of the Defendants in this case make routers:  NETGEAR, D-Link, and Belkin.  You probably have a wireless router in your house or apartment.

A wireless router is basically a conductor of the band; and it's the device that you take and plug into your Internet connection, put the Internet wire in the back of wireless router, and then it's what sends out the wireless Internet out of your house or apartment.

Three of the Defendants in this case make computers:  Toshiba, Dell, and Acer.  And all of these products have 802.11n radios in them, and all are capable of working on -- working with any of the routers.

To conduct an analysis of infringement by the Defendants, Ericsson retained the services of a professor of electrical engineering from the University of Texas.  His name is Dr. Scott Nettles.

Dr. Nettles performed an analysis, and he

49

started by comparing the 802.11n standard to the claims of Ericsson's patents.

He found from that review that devices practicing the 802.11n standard would infringe the claims.

But he didn't stop there.  To double-check his work, Dr. Nettles also analyzed technical documentation from Defendants' products to verify they infringe.

And he didn't stop there.  As a further check on his work, he analyzed the component parts inside the computers and routers that are involved in 802.11n.  And Dr. Nettles also tested some specific features to confirm the accused products were as advertised.

We will present Dr. Nettles as a witness, and he will testify about his analysis.

Now, I'll warn you in advance, the work he did was very technically detailed.  And even presenting the high points of his work to you will take several hours of testimony.  But I think in the end, you'll see why Dr. Nettles concluded that all five of the patents asserted by Ericsson in this case are essential to the standard and are infringed.

I think the Defendants will argue that

50

even though their products operate under the 802.11n, that they don't owe Ericsson a royalty because their products don't infringe.  Dr. Nettles has considered the arguments that have been made by Defendants and has found them without merit.

I think the Defendants will also tell you that if you buy our non-infringement argument, we still don't owe a royalty because some of the patents are invalid.  In other words, the Patent Office made a mistake in issuing them.  Dr. Nettles also analyzed that assertion and found it to be without merit.

And at the end of the day, I don't think the Defendants will be able to answer the following question:  If the arguments they're making are right, why did some of the industry leaders like Hewlett-Packard and Buffalo and BlackBerry agree to pay Ericsson a royalty for doing the same thing that the Defendants do?

Let's move on now to the amount of compensation in this case.  The Court will ask you to determine the amount of compensation due to Ericsson for past infringing sales.  And I believe the Court will instruct you that the compensation to Ericsson can be measured by a reasonable royalty.  A reasonable royalty in this case is 50 cents per infringing device.

51

The amount that the Defendants owe Ericsson for past infringement over the years was determined by an accountant retained by Ericsson.  The way he did his work was he obtained the actual sales data, through the work discovery process, from each of the Defendants, looked at their past sales of 802.11n infringing products and multiplied it by 50 cents.

Now, the time period for which compensation is due varies from Defendant to Defendant.  But most of the Defendants began to owe compensation in 2008 to 2010.  And based on that work, here are the results.

Acer owes $3.9 million.  Toshiba owes $8.1 million.  Dell owes $6.4 million.  D-Link owes $1.4 million.  Belkin owes $2 million.  And NETGEAR owes $11.8 million.  And together those total approximately $33 million.

Now, one Defendant that we haven't talked about yet who is involved in this is Intel.  Ericsson did not sue Intel in this case because Intel doesn't make routers or desktop or laptop computers.  Rather, Intel just makes the component parts for these devices.

Those parts, which are the integrated circuit chips you saw that were held up in voir dire, perform 802.11n functions.

52

Now, Intel's parts are included in about 9 percent of the infringing devices that are at issue in this case.  And other companies' chipsets comprise the remaining 91 percent of the Defendants' products.

And you may ask how did Intel get into this lawsuit?  Well, Intel asked the Court to let it join the case.

Now, Intel will say that it asked to join this case to protect its customers.  But I think the truth is that Intel asked to join this case because it sees a chance to get something for nothing.  And if you follow the money, you'll see that.

In its supply contracts with its customers, Intel agrees to reimburse them if the customers are required to pay royalties through patent infringement for Intel's products.  So Intel would be on the hook for 9 percent of the overall damages, or $3 million.

But Intel wants a special deal for itself and for its customers in this case.  Intel will ask you to award 1 or 2 pennies per infringing device as the royalty.  And it wants that special deal to cover both itself and the Defendants who have purchased its components.

So if Intel can talk you into that

53

special deal, it saves money.

Now, I think Intel will try to justify its request for a special deal by telling you that it sells its chips for a few dollars apiece. And obviously, Intel is going to tell you that because they want to invite you to make the comparison of 50 cents versus a 3-dollar chip.

But that's not the right comparison because Intel's chips are worthless if they're not used in a computer. And the real comparison is 50 cents in light of the importance of Wi-Fi functionality to a laptop or a router, the ability to take the end user product and set it up in your house and surf the web or watch movies or get sports scores.

And Intel's request that it and its customers pay less than a penny isn't fair to Buffalo, Hewlett-Packard, BlackBerry, the other companies who have already agreed to license Ericsson's patents. And it's not fair to Ericsson.

As I told you at the beginning of my remarks, this is a case about a company and its people who have revolutionized the way we communicate. On behalf of Ericsson, we look forward to presenting our case to you, and we thank you in advance for your consideration.

54

THE COURT:  Thank you, Mr. Stevenson.

All right.  The Court will recognize Mr. Van Nest for purposes of opening statement.

Mr. Van Nest.

MR. VAN NEST:  Thank you, Your Honor.

And, good afternoon, Ladies and Gentleman.

My name is Bob Van Nest, and I am very proud to be here today speaking on behalf of all of the Defendants that were introduced to you this morning.

They are, as you probably know, some of the most innovative, creative, and successful technology companies in the world today.

Now, I've got an especially hard task because we're in that mid-afternoon pocket after a nice big lunch and a long day and a lot of sitting on the benches, so I'm going to try to move through this with some slides and have some animations.  We're really going to try to get into the technology and give you a preview of what's to come.

The first thing I want to say, though, is thank you very much for being here.  We really appreciate your service as jurors.  We understand you have busy lives.  And you can see from our full courtroom today, this is a very important dispute for

55

everyone here.  And, again, we appreciate your helping us to resolve it.

Ericsson's technology had nothing to do with the success of Wi-Fi; nothing at all.  And they're here claiming credit for work they never did.  None of the Defendants' Wi-Fi products are using Ericsson's patents or technology.  And there hasn't been any infringement of a single Ericsson patent.

We're going to show you, when we get into the technology, how those Wi-Fi products work.  And they work in a fundamentally different way than the technology claimed in Ericsson's patents.

Now, the standard that Mr. Stevenson talked about, the Wi-Fi standard, the 802.11, that came out of an effort by the whole Wi-Fi industry to create a standard for Wi-Fi products that could be simple, fast, and affordable for everybody, the idea was, whether you were using a laptop by Dell or laptop by Toshiba or an iPhone or an Android phone, that everybody could communicate together on the same standard.

And the folks that did that were the people that make the chips for these products; companies like Intel, companies like Broadcom, companies like Atheros.  They are the ones that came together in the IEEE and contributed their engineers, their idea --

56

their ideas, their know-how, their hard work.  They're the ones that put all these things together and created the standard.  And they did it without any contribution whatsoever from Ericsson.

Now, what has it enabled us to do?

Mr. Jones held up some chips this morning that were in a -- in a package.  I'm holding up -- you can barely see it -- most of us need glasses to see this far.  That chip, believe it or not, performs all the functions of Wi-Fi, all of them, and that's because based on the standard, all of these companies:  Intel Broadcom, and Atheros have been able to make these so that they are simple, fast, and affordable.

This chip costs an average of about $2.40.  Many of them cost less than $2.  And these are the chips that Dell, Toshiba, Acer, NETGEAR put in their devices to run all the Wi-Fi.

Now, that has enabled us to create a world where we often get Wi-Fi for free, anywhere from McDonald's to Motel 6 because these chips have become so inexpensive and so available to all the companies that want to incorporate them and put Wi-Fi in their products.

Now, I say Ericsson played no role.  What I mean is Ericsson's technology is not in the standard.

57

They contributed nothing to the 802.11n standard.  Yes, they're a good company.  Yes, they were good in cellular.  They contributed nothing.  They actually were there at the IEEE, and they proposed technology that was rejected -- rejected by the IEEE as too complicated, too complex, and too time-consuming; just not right for Wi-Fi.

And now that Wi-Fi has become a big, big success, Ericsson's here asking for a whole lot of money and trying to take credit for something they never did.

So we actually welcome the opportunity, which we'll have starting this week, to show you for each patent and each claim that they're asserting, the Defendants' technology, our products are different.  We're not using what's claimed in the patents, and that means there's no patent infringement.

Now, I have three key points of evidence that I'm going to walk through this afternoon.  We're going to start with a little background, which is to say that the standard was created by Intel, Broadcom, and the other Wi-Fi folks; not by Ericsson.  No contribution by Ericsson to the standard.

Then we're going to walk through the claims.  I'm going to take you through very briefly a little tutorial on how these protocols work and what

58

your job is going to be at the end of the day in comparing the claims to the products. And you'll conclude that there is no infringement because our products are not using Ericsson's technology.

Then we'll spend a little bit of time on the fact that with respect to two of these patents, not all five, but with respect to two of them, the ideas they claim were already out there in the public before Ericsson applied; and that means they should never have had a patent in the first place.

So let's start in with a little background. Obviously, Intel created really the personal computer industry. They invented the microprocessor 30, 40 years ago. All of our personal computers really flow from that one invention. That's why we're enjoying them today.

And Dell and Toshiba, obviously, they make among the most popular and successful laptops available in the world.

And we also have some other Defendants here, equally good technologists, many of whom you know. Acer makes laptops. NETGEAR, D-Link, and Belkin all make routers; and their products are all accused and all here in the case.

All of these companies have patents.

59

Many have thousands of patents.  All of these companies respect intellectual property because they create patented intellectual property themselves.

They're here today because they don't want to pay for something that they don't need and that they're not using and that was rejected for inclusion in the standard.  That's why they're here.

Now, you're also going to be hearing during the trial about the folks that actually make the Wi-Fi.  Not just Intel, but Broadcom, Atheros, RealTek.  They're other chip makers.  They make chips like the one I held up and compete with Intel, and they're the ones working on the standard that build the products that make Wi-Fi available to all of us.

Now, how did the standard come to be?  Well, the IEEE, as you can see here, it's been around a long time.  This is all the best engineers in the world, 400,000 members.  It's an international group based here in the U.S., but anybody can be a member.  Ericsson is a member.  All the Defendants are members.  Most of the engineers in this room are members.

Their goal is to create standards to advance technology and make technology more available and make it more affordable.  Well, why do we want to do that?

60

Let's look at our next slide.

What's the standard.  We have standards all around us.  Obviously, you don't want to have a different plug for each appliance in your home.  We have a standard wall outlet that we all use as a standard.

Wi-Fi's the same way.  In Wi-Fi, all these devices are speaking a language, in effect.  And the only way they'll all work together is if they're speaking the same language.  That language is 802.11n.  That's the language that was created by the standard so that all these products can work together.

Now, what were the goals of 802.11n, and what were they trying to do?  You see it here.  Make a product that's simple, fast, and affordable for everyone, not just people with a lot of money.

Let's make this available uniformly, universal, and so it's got to be very simple.  It can't be complex, and it can't be expensive.

And so this what it appears to do: Companies like Intel, Texas Instruments, Broadcom, Atheros, they had engineers contribute their technology, lots of money, lots of time, lots of work.  There were more than a thousand proposals made before this standard was adopted.  And that's where the standard came from.

Now, in this case, the particular

61

functionality that's accused arises from an old protocol called ARQ, automatic repeat request. You're going to be hearing about ARQ when we get into the evidence.

And the features in Wi-Fi that are ARQ were contributed by a group of Wi-Fi companies led by Intel, RealTek, Atheros, and others. They are the ones that put their technology in. They're the ones that were voted the best.

And that approach, which you're going to see in a minute, is very simple and straightforward. That's the approach that 802.11 took.

Now, all of the companies that contributed have lots of patents. Intel, Broadcom, Atheros, these are some of the most inventive companies in the United States, in fact, in the world.

And the value in this standard comes from the patented technology that companies like Atheros, Broadcom, and Intel contributed to the standard. That's where it's coming from. They're giving up, they're putting in their patented technology to make this standard valuable. And then it's the same folks that actually build the products.

Now, the 802.11n standard that we're talking about, that's just the latest and greatest. It's the current standard, but it builds on years of

62

earlier standards.

Wi-Fi started in the early '90s, was first approved in the late '90s, and we've had a bunch of Wi-Fi standards ever since. All these standards build one on the other to make it what it is today.

Ericsson is best known, as Mr. Stevenson said, as a cell phone company. They made radio and cell phones. They're no longer in that business. But they were never a significant player in Wi-Fi.

You'll learn that they attempted to build their own Wi-Fi product and simply gave up. No one in the world, including Ericsson, has ever developed a Wi-Fi product using the patents that they are presenting in this trial.

Those patents don't even mention the word Wi-Fi. They were not developed in connection with Wi-Fi. They are not part of the standard, and no one has ever used them to build a working Wi-Fi product.

Now, this next slide is one of the key admissions from one of Ericsson's senior executives. And these people are all asked to testify under oath.

And we asked him:

So when Ericsson submitted its one contribution to 802.11, its one proposal, the engineers and members thought it was complex; it was a complex

63

idea that wasn't needed?

Right.  Correct.

They were there.  Ericsson had a right to participate in the IEEE.  They made a proposal, and it was rejected as too complex.  And this next one says it all.

We asked Mr. Iwerback again:

Did Ericsson make any contributions to the 802.11n standard?

No, not to my knowledge.

That's the standard they now are trying to take credit for and say that the Defendants are using it without permission.  They were there.  They participated.  They had their chance.  They made their proposal.  Their technology is simply too complex.

Now, I want to dig into the claims of the patent.  Judge Davis explained to you that your job at the end of the day is going to be to look at the claims that Ericsson says are infringed and compare them to the products.

And that's a really important task.  And that comparison is made based on the claims themselves. We're going to look and see how that pans out.

Let's look at the next slide.

The claims are important because, as

64

Judge Davis said and the patent video said, they define Ericsson's property.

And our next slide shows that it's the claim language that defines what they have, just like the fence around your property defines what you own.

And you compare those claims to what's in the Defendants' products to make your analysis of infringement.

Now, how does that go?

Let's look at this next slide.

Hypothetical.  Let's just assume I have a patent on a soccer ball, and the elements of my claim are, it's got to be made of leather, stitched together, filled with compressed air and, round.  I have to prove that your product is using every single one of those elements, each and every limitation, is what Judge Davis will tell you.

Now, if you're selling a football, I come to you and say:  You're infringing my soccer patent. You're made of leather.  You're stitched together. You're filled with compressed air.

Oops.  You're oblong, not round.  No infringement.  A football doesn't infringe a soccer patent, because three out of four elements is not good enough.  Nine out of ten is not good enough.  Ten out of

65

fifteen is not good enough.  They all have to be met.

So now what I'm going to do -- and I apologize, because we do want to get into the technology and provide a little bit of tutorial to help understand why our products are so fundamentally different from what's in these claims.

I've put up here on the screen one of the patents.  There are four of the five patents that involve this one technology called automatic repeat request, ARQ.  So we're going to start there.

And Ericsson didn't invent it.  They admit right in their patents that you have in your notebook that ARQ techniques are commonly used in data networks to ensure reliable transmission.  So that's been around.  They're claiming they invented an addition to that, an improvement.

So let's go to our next slide, which is going to be our first two points.  So let me back up a moment.

ARQ is a system for correcting errors in radio transmission.  And as I said, it's been around a long time.

Wi-Fi works on radio waves, just like radios and old walkie-talkies.  And those radio waves send data -- electronic data -- your video data, if

66

you're watching a video; your Internet data, if you're taking something off the Internet; voice data, if you're doing a Skype call -- and they put that data in packets. Packets you can think of like a package.

If you're typing an e-mail, a packet might be a word.  If you're doing a phone call, a packet might be a couple of words.

But those packets go from the transmitter to the receiver through the air.  And in all systems, as you can see here on the left, the packets are numbered to keep track of them.

Now, in a perfect world, all the packets would go from the transmitter to the receiver through video; it would be clear as a bell; your voice call would be clear; your website would open up, and all the ads and stuff would come out.  But we all know the world's not perfect.

In radio transmission, the signals bounce all over the place.  They get interfered with.  They fade, and so packets are lost.

All this technology does really is say if we lose a packet, we're going to try to resend it.  Logical, right?  You lose a packet, let's try to resend it.  That's what ARQ was all about.  It's a system of resending packets that have been lost.

67

And we're going to watch our first animation now.  We're going to be sending packets from the transmitter to the receiver.

Let's start sending them.  Packet 1 goes across and is successfully received and acknowledged by the receiver.  Packet 2 goes across, and it makes it.  It's acknowledged.

Let's stop it right there.

That acknowledgment is important.  You're going to her the word AC.  That's just short for acknowledgment.  That's the receiver saying:  I got it.  I got packet 1.  I got packet 2.  It's an acknowledgment.

And the transmitter knows, if you got packet 1 and you got packet 2, I'm not going to resend those because you got those.  Don't need to.

Let's watch it again and keep it going.

So the acknowledgment keeps going.  Packet 3 goes across, successfully received, packet 4 and so on and so forth.  That is simply basic transmission of packets in the very simplest form of ARQ.  Simple single acknowledgment one packet at a time.

Now let's see what happens when a packet gets lost.  Because that's the key here.  This packet gets retransmitted.  Send it again.  Didn't get it

68

through the first time.  Send it again.

Let's watch this one.

So packet 1 goes, and it makes it, and the acknowledgment comes across.

Packet 2 is sent and it makes it fine, and that's acknowledged.  No problem.

Packet 3 is sent.  Whoops, interference.  Interference.  It faded out.  It didn't make it.  So notice, no acknowledgment across.  He didn't get it, so he's not sending an acknowledgment.  The transmitter tries to send it again.

So the transmitter sends it again.  It's lost again.  So what happens?  There's no acknowledgment.  The receiver doesn't say, I got it, because he didn't get it.

Transmitter keeps going, and eventually, it gets across.  That's ARQ.

Now, one thing to note, you can't keep retransmitting forever or the system just slows down terribly.  So in most of these old systems, there was a timer on the transmitter.

And very often, that timer ran, it would discard a packet, discard out of the transmitter site before it got across because it had to move on.  That was the way it kept the thing going.  So sometimes

69

packets are discarded.

Now, let's look at the next one.  Now, we're going into the little more modern time.  Let's go to the next -- this is block acknowledgment.

Now, again, Ericsson did not invent block acknowledgment either.  They didn't invent that.  That's been around.

Block acknowledgment, real simple concept.  Remember, we saw those packets going one at a time?  It's faster to four at a time rather than just each one, because you get more data across each time.  If you send four instead of one, you got four across.

Let's open it up.

So now, I'm sending packets 1 through 4, and they're successfully received and up they go.

Now, notice here, the receiver has to move these packets back up into the system to be processed.  The receiver gets it, but it doesn't appear automatically on the screen of your laptop or any other type of system.  There's other processing that has to take place.  And so the receiver passes those packets out for further processing.  That's what you see on the right.

Now, notice we're sending block packets across, and the acknowledgments are called block

acknowledgment.

Stop it right there, Jeff.

I'm acknowledging four at a time, too. That speeds things up. I don't have to acknowledge 1, 2, 3, 4. Four at a time.

Okay. Let's run it.

So this system, just like the basic system, a little bit faster, I'm sending four at a time, and that's a big improvement. And so I can move more data through.

Again, not Ericsson's invention. We haven't even gotten there yet.

Now, there's a big, big problem with these old systems that we're going to look at next, and that problem is called deadlock. Deadlock is a deadly thing. You've probably all experienced it. Your computer freezes up.

You're watching a video, (claps hands), bang, it's stops. You can't get the website panel open. It just stops. Deadlock.

Now, how does deadlock work? In these old systems, the receiver was told do not pass data along until all the packets are across. We can't leave until everyone is there.

I think of it in a simple way. You're in

71

the pool.  The kids are in the pool.  You want to leave, but you can't leave till they're all in the car, right?  Let's get all the kids in the car before we leave.

Common sense.  These old systems were like this.  They couldn't leave until they had everything.  And that caused a big problem as we'll see in a minute.  Because if the transmitter couldn't get the data across, the receiver froze up.  Stopped.  Can't move on.  I don't have these packets.

But by then, the transmitter had moved on, given up, discarded the packets that were needed, and we're going to see how it works right now.

So here's my packets in one of those blocks.  And so my receiver only acknowledges 2, 3, and 4.  It didn't get packet 1.  So the transmitter knows I'm going to send it again.

Okay.  Now, watch this.  The 1 doesn't get across, and the receiver won't take 5, 6, or 7, because it's saying:  I can't leave until I get 1.  I've got that hole there.  Can't leave, can't move on.

So the transmitter tries again.  The stop sign is still up, though, until the 1 gets through.  If the 1 doesn't get through, no can do.  You can't leave.  You can't leave.

And now what's happened is the

72

transmitter has moved on.  It's discarded packet 1.  He can't resend it.  And it keeps trying to send higher levels, 5, 6, 7, 8.  5, 6, 7, 8, and the receiver holds up a stop sign.

Stop.  I can't take it.  I don't have 1.  I'm in deadlock.  I'm in deadlock because the receiver can't take packets that are coming and the transmitter has given up.  That's a condition in which your system stops.

That was a big problem.  And when the IEEE got together on 802.11, they said:  Wait a minute.  We can't possibly afford that kind of a problem.

So they designed around it, and they came up with the simplest, least expensive, easiest to run system.

They said:  We're going to change the rule on you, Mr. Receiver.  You don't have to wait.  You wait a short time to see if you get the packet, but then move on.  You can take packets in any order, out of order or in order.  You can take them at any time.  Whatever is sent, you take.

So what I'm going to show next is, take a look on the right.  The green light is always on, in an 802.11 receiver.  The green light is on.  It's going to take packets no matter what.

73

Let's run this, Jeff, and we'll see what happens.

We lose the 1.  The receiver only acknowledges 2, 3, and 4 because it didn't get 1.  1 is sent again and is lost again, but guess what?  The receiver keeps moving.  It passes the data up, and the data keeps moving, even though it didn't get the 1.

And so now we've got another group of packets, 8, 9, 10, and 11.  They go across.  They're received.  The system is moving.

Now they're going to send another set, and we're going to have another packet lost.  12 is lost.  But, again, in the old days, this could result in deadlock, but not in 802.11.  No deadlock because we're moving.  The green light is on.  The receiver takes it off.  It's not going to wait.

Now, I don't want you to think that we left the kids at the pool.  That wouldn't be good.  The reason that 802.11 can do this is that there is very sophisticated software in your laptop that minimizes the fact that you've lost a packet or two.  You don't even see it with the naked eye.

These systems are so much faster and better that if you miss a packet or two, you won't even see it.  You will run your video.  You'll run your data.

74

No problem.

Now, that's simple. 802.11n. Keep thinking about it. Simple, fast, affordable. That was the idea. Ericsson's patents are inconsistent with that. They are completely inconsistent. They were created for a system where there was deadlock.

And so they do things that 802.11 doesn't need. And I'm going to review them very briefly here, and we're going to look at a couple. Because, again, your job is to see whether all the elements in their patent are found in the Defendants' products. So these are the four ARQ patents.

The first one is the '625. We're going to be calling that the "command to receive" patent. It features a very complicated feature called a command to receive.

Instead of having a receiver take everything all the time like the Defendants' do, this thing actually forces the receiver to take a packet it wouldn't otherwise take. It forces a receiver to do something that it wouldn't otherwise do. It's a command to do it. Not needed in 802.11n.

Computing discarded packets, that's the '435 patent. Now, that's a similar situation. They're doing a different way of getting around deadlock.

75

Not a command.  This time, they send a discard notice that says, okay, receiver.  We've gotten rid of some packets here on the transmission side.  You're not going to get them.  Would you please compute what they are and move on?  Compute what they are and move on.

Different feedback types.  That's a system in which there are different types of acknowledgments.  Not just one.

And the Ericsson inventors thought that would be a good thing, but, again, 802.11n, very simple.  There isn't a choice among feedback types.  The one I showed you is the one they always use.  There's only one.

And segmenting.  Segmenting involves chopping up the packets and reassembling them.  That's actually forbidden in 802.11.  The packet requires it.  It's forbidden in 802.11.

Now, let's take a couple of examples.  I don't think we'll be able to go through all of the patents, but let's look at the '625.

This is the claim that they're asserting.  And you can see the colored language.  There's a command to receive that's a required part of this claim.  That has to exist in a product in order for infringement to occur.

76

Doesn't exist in 802.11.  Doesn't exist in 802.11 because, as I said, the receiver doesn't need a command.  It will take signals anytime.

Let's look just briefly at what this patent involves.  The '625 Ericsson patent is created to for a world of deadlock that doesn't exist in 802.11 now.

When you approach a deadlock condition, there's a command, and that command says to the receiver:  I don't care if you didn't get 1 or 4.  I don't care.  I'm commanding you to take it anyway.  Not needed in 802.11.  Not needed in our products.  That's why.

Similar analysis you would have on the '435, the discard notice.  There you can see -- I've got them in a pink color -- you have to show that the Defendants' product transmits a data packet discard notice and that the receiver does the computation of which packets have been thrown away by the transmitter.

Again, not used in the Defendants' products.  Not used.  They're missing.  That's just like the oblong versus the round in the soccer example.  If it's not there, there's no infringement.

Now, let's skip forward just to move on just a little more quickly.  I want to move on to the

77

'215.

Now, the '215 I mentioned, we've been talking about these acknowledgments, the ACs that go back, the green arrow acknowledging 2, 3, and 4.  There are lots of different ways that a system can acknowledge getting a packet.  And this packet requires that the receiver make a choice of which type of feedback it's going to send.

There is no choice in 802.11.  That's why this particular limitation, that element, is not met.  Just like the oblong -- the round isn't met by a football.  Because in 802.11, the designers said you don't need it.

We don't want more than one time.  We're hardwired to send only one.  So there's no choice at all for the receiver in that instance.

And the final ARQ patent is the '223.  Mr. Stevenson called it a timing patent, but he left out the most important element of it.  It requires segmenting the packets.

The packets we've been looking at, 1, 2, 3, 4, 5, this patent says the system will run better if you chop them up into smaller pieces.  The 802.11n designers said:  That makes no sense.  We're trying to send more data each time, not smaller packets.

78

And so 802.11 actually forbids you from segmenting. Forbids it. Does not allow it. So their patent requires it. It's not allowed in 802.11.

Final patent I'm going to mention is the '568. Let's move on to that one.

Now, the '568 calls for a very specific type of signal. And we've been talking about packets. Every packet has a header, which has routing information in it and a payload, which from the name, you can guess is the data that you're sending.

So if you're sending video, the payload is video. If you're sending a phone call, the payload is phoning. If you're sending an Internet site, the payload is Internet data. If you're sending multimedia, the payload is multimedia. That's true of every packet system.

Now, this packet requires -- and actually, Judge Davis read this one. He read -- let's look at the next slide.

He read that this patent requires an identifier that identifies the type of information conveyed in the payload. And examples are video, voice, data, and multimedia. Those are the examples, and the identifier has to identify those.

So let's imagine that our path is a

79

truck.  The cab is the header, and the body of the truck is the payload.  So if I have payload -- if I have video in my payload, my cab has to say video as this one does.  If I have multimedia in the payload, the cab has to say multimedia.  If I have voice in the body -- in the payload, it has to say voice.

802.11n thinks that's too complicated.  We're much more simple.  The packet -- the patent requires that the cab label the payload, as it does on the left.

But in 802.11 there is no such thing.  All they do is label priority.  They don't care what's in the payload.  You're either fast lane, middle lane, slow lane.  All these packets are trying to get out at the same time.

THE COURT:  Mr. Van Nest, you have about three more minutes.

MR. VAN NEST:  I actually have a few more on my note, Your Honor, but I'll move it up.

THE COURT:  Well, let me double-check.

MR. VAN NEST:  Well --

THE COURT:  Oh, you're right.  You do.  Excuse me.  My mistake.  You have about eight more minutes.

MR. VAN NEST:  Thank you, Your Honor.

80

Eight is a lot better than three.

Depends on who you are, right?  You guys might not agree with that.

[Laughter]

MR. VAN NEST:  Now, how are we going to prove that our products are different from what's called for in the patents?

We're bringing witnesses here live. We're bringing the engineers.  And they're going to bring the source code.  They're going to bring the product descriptions.  They're going to bring the 802.11 standard.  They're going to testify from this witness stand as to how our products work and why they are different.

And in addition to that, we asked Dr. Jerry Gibson, one of the pioneers in Wi-Fi, to analyze this issue.  He was educated here in Texas at AMI and SMU.

And Dr. Gibson will be here to testify that in 802.11, there is no command to receive.  There is no computation of discarded packets.  There is no multiple type of feedback.  There is no segmenting.  And there's nothing that identifies the payload. He has analyzed the source code, the product descriptions.  He's talked to the engineers.  He's done

81

everything he could.

Now, let me move on to my third point, and I'll be more brief on this one; and that is that with respect to two of these patents, they -- the information they contain was already known to the public before Ericsson even applied.

You heard the patent video this morning, and Judge Davis said it again, you can't claim something that the public already knows.

And when you're analyzing patent validity, the relevant public is the experts, not you and me or those of us here at the table. It's people like Mr. Johnson, Mr. Busse. It's people that are members of IEEE.

And we're going to show -- let's move forward, if we can, Jeff, to our picture of Aachen.

We're going to present a submission from engineers at a university in Germany to the European version of IEEE. They wrote a 26-page paper that's more detailed than the patents themselves that with respect to the discord notice and the command to receive, it's all in here, and long before Ericsson applied for a patent.

Now, why are we asking you to do that? This document was never shown to the Patent Office. It

82

was never known by the Patent Office.

So that's nobody's fault.  That's nobody's fault.  But the Patent Office can't know everything.  And we will present to you this reference and some related reference -- references that disclose all the elements of the discard patent and the "command to receive" patent, long before Ericsson applied.

And now my last point.  I have an obligation, because I'm speaking for all of the Defendants, to cover all the points that Mr. Stevenson did.

You know from what I said, I don't think that the Defendants owe Ericsson a penny, because we're not using their technology.  We don't need it.  But even if we did, the request they're making is completely excessive.  Why?  All they're even claiming is a minor improvement to Wi-Fi, which is a minor part of a laptop or a router.

Let's go to the next slide.

If I invent an improvement to an antenna, I don't get to ask for money based on the price of the truck, right?  If all I've got is an improvement on one small feature, I can't come in and say:  I want to be paid based on the price of the Ford F-250.  That's unreasonable.

That's what's going on here.  You heard him talk about a thousand-dollar laptop or a 900-dollar router or a hundred-dollar router.  The chips cost $2.30 on average.

Next slide, please.

And they want to add a 50-cent tax on top of that.  And you all know there are thousands of components in a laptop.  And if everybody wanted to add a 50-cent tax on a 2-dollar component, pretty soon nobody could afford laptops or smartphones or routers or Wi-Fi.

And I don't care what other companies did.  I don't know why they're talking about HP or RIM.  RIM makes cell phones, so, of course, they want to license Ericsson's cell paths.  HP doesn't make Wi-Fi chips.  What they did is what they did.

These Defendants are saying:  We are not using this technology.  We don't want to pay for it.  No.  Period.  And that's the position that they've taken consistently, and that's the position that we'll be taking in this trial.

And we'll back it up with proof from the engineers that designed the products, the engineers that know the products, Dr. Gibson, and the documents that describe the products themselves.

And my last point is simply to make a request.  As Defendants, we go second.  The Plaintiff has the burden of proving their case, so they are going to begin first.

And so I am asking all of you to keep an open mind as you hear the Plaintiff's evidence, because we will have our opportunity later in the week to present our evidence; and that evidence will show for each patent and each claim that our products were developed by our engineers and our people with years and years of hard work and plenty of money with no contribution whatsoever from Ericsson.

And, Ladies and Gentleman, that's the evidence that we will submit and present, and I will be back in closing to say it again.

Thank you very much.

THE COURT:  Thank you, Mr. Van Nest.

All right, Ladies and Gentleman of the Jury, that concludes the opening statements from both sides.

We're going to take our afternoon break at this time.  We're going to be in recess until 2:40.  And then we'll come back at 2:40, and go from then until 4:00 o'clock.

So enjoy your break.  Please remember my

85

instructions.  Don't discuss the case among yourselves or with anyone else, and we'll see you back here in about 15 minutes.

Be in recess.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

(Recess.)

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Bring the jury in, please.

(Jury in.)

THE COURT:  Please be seated.

All right.  Ladies and Gentleman of the Jury, we're about to begin the evidence phase of the case, and the first thing that we do each day is allow the parties to offer any exhibits that are not objected to by the -- by the other side.

So does Plaintiff have any exhibits that it wishes to offer at this time?

MS. MOORE:  Yes, Your Honor, we have a pre-admit exhibit list that we have conferred with the other side they approved last night.  I can read them into the record or I can hand them up.

THE COURT:  You can -- what is that titled?

86

MS. MOORE:  It is titled:  Plaintiff's Pre-admitted Exhibit List for June 3rd, 2013.

THE COURT:  All right.  Just hand that up, and we'll mark that as Plaintiff's Exhibit List No. 1.

Are there any objection to the exhibits listed on Plaintiff's Exhibit List No. 1?

MR. DE VRIES:  No, there are not, Your Honor.

THE COURT:  All right.  Those are admitted.

Do Defendants have a similar list?

MR. DE VRIES:  We certainly do, Your Honor.  It's the Defendants' List of Pre-admitted Exhibit List for June 3rd, 2013.

THE COURT:  Okay.  If you'll hand that up to Ms. Ferguson, we'll mark that as Defendants' Exhibit List No. 3 -- No. 1 and ask the Plaintiffs if they have any objection to the exhibits listed thereon.

MS. MOORE:  No objection.

THE COURT:  All right.  Those exhibits are -- on Defendants' Exhibit List No. 1 are admitted.

All right.  Thank you.

The Plaintiffs may call their first witness.

87

MR. CAWLEY:  Thank you, Your Honor.

At this time the Plaintiff would invoke the Rule.

THE COURT:  All right.  The Rule has been invoked.  And Ladies and Gentleman of the Jury and members of the audience, what the Rule means is that if you're a witness in this case and you're not a party or an expert or you're a party representative, then you have to be excluded from the courtroom during the testimony of the case.  You can't discuss the case with anyone else other than the attorneys that are involved in this case.

So at this time, if you're going to be a witness in this case, please stand to be sworn.  If you're going to be testifying in this case, please stand.

Now, starting up here, if you would, please state your name for the record.

WITNESS:  My name is Gustav Brismark.

THE COURT:  All right.

WITNESS:  James Johnson.

THE COURT:  All right.

WITNESS:  Brett McAnally.

THE COURT:  All right.

WITNESS:  David Cabello.

88

WITNESS:  Matthew Shoemake.

WITNESS:  John Bone.

WITNESS:  Ray Perryman.

WITNESS:  Christina Petersson.

WITNESS:  Joel Williams.

THE COURT:  Very loud, please.

WITNESS:  Joel Williams.

THE COURT:  Okay.

WITNESS:  Chris Heegard.

THE COURT:  All right.  Did you get all those, Judy?

COURT REPORTER:  I'll get the last one, Judge.

THE COURT:  Okay.  All right.  We'll get the other one.

All right.  If you will please raise your right hand to be sworn.

(Witnesses sworn.)

THE COURT:  All right.  Now, if you're an expert witness and you're also a party representative, you may be seated.

No, only if you're a party representative -- I'm sorry, if you're an expert witness, also, you may be seated.

All right.  And I guess you're the only

89

one that would be underneath the Rule; is that correct?

All right.  Well, you'll need to leave the courtroom at this time, and we will call you when it's time for you to testify.

All right.  Plaintiff may call their first witness.

MR. CAWLEY:  Thank you, Your Honor.  As our first witness, we will call to the stand Mr. Gustav Brismark.

THE COURT:  All right.  Mr. Brismark.

MR. CAWLEY:  May we proceed, Your Honor?

THE COURT:  Yes, you may.

MR. CAWLEY:  Thank you.

GUSTAV BRISMARK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN,

                DIRECT EXAMINATION

BY MR. CAWLEY:

Q.   Would you please introduce yourself to the jury?

A.   My name is Gustav Brismark.

Q.   Why are you here, Mr. Brismark?

A.   I'm here as a representative of Ericsson in this case.

Q.   Where do you live?

A.   I live in Sollentuna, which is a suburb of Stockholm --

90

Q.   Okay.

A.   -- in Sweden.

Q.   So the court -- the Court Reporter is very curious about how the name of your town is spelled, but maybe we can straighten that out with her later and for now say you live in a suburb of Stockholm, Sweden; is that right?

A.   Yes, that's correct.

Q.   Did you grow up in Sweden?

A.   Yes, I did.

Q.   Where is Sweden?

A.   Sweden is in Europe, in the northern parts of Europe.

Q.   Northern part of Europe.  Is -- is English your native language, Mr. Brismark?

A.   No, it's not.  It's Swedish.

Q.   I notice you have a little bit of an accent, at least to us.  I'm sure if you're talking to somebody like me who -- who is from Texas, we -- we have a little bit of an accent, too, I bet?

A.   Yeah.  And I have a little bit of a cold, too, so --

Q.   Okay.  Sorry to hear that.

A.   -- hurts my voice, I apologize.

Q.   Okay.  That's fine.  But even though you --

91

you didn't learn to speak English growing up as your first language, are you comfortable testifying in English in court today?

A.   Yes, I am.

Q.   Is this your first time to come to Texas?

A.   No, it's not.  I've been here before.

Q.   Why?

A.   Doing business.  I'm with Ericsson, and we have an office in Texas.

Q.   Okay.  And is it your first time to come to Tyler?

A.   Yes, it is.

Q.   Okay.  Well, welcome -- welcome to Tyler. Before we ask you to tell the jury a little bit more about the company -- your company Ericsson, let's find out at least just a little bit more about you.  Can you tell us about your family?

A.   Sure.  I have a wife and two daughters -- twin daughters, age 19.

Q.   Twin daughters, age 19.  Wow.  Okay.

A.   Yes.

Q.   And where did you go to school?

A.   I went to school in -- in my hometown, Sandviken, north of Stockholm and -- and to the University in Uppsala and actually in the U.S., as well.

92

Q.   Okay.  You went to university in another Swedish town called Uppsala?

A.   Correct.  Yes.

Q.   Okay.  And part of your university education was in the United states?

A.   Yes.  I had a scholarship my last year of -- of my university studies.

Q.   Where was that?

A.   That was in Cleveland, Ohio, at the Case Western Reserve.

Q.   Case Western Reserve in Cleveland?

A.   Yes.

Q.   Okay.  And what did you receive a degree in?

A.   I have a Master of Science in physics engineering.

Q.   Okay.  So you have a Master's degree in physics engineering; is that -- is that right?

A.   Yes.

Q.   Okay.  Do you have any patents in your name?

A.   I do.

Q.   Okay.  And more than one?

A.   Yeah.  I have slightly more than ten, I think.

Q.   More than ten patents have been issued in your name?

Have you also written technical articles in

93

the field of electronic communication?

A.    Yes.

Q.    Now, you've already told us that you work at Ericsson.  How long have you worked at Ericsson?

A.    A long time.  I have worked at Ericsson my whole career and started in 1986.

Q.    1986.  And what is your job at Ericsson today and for the last few years?

A.    So today, since 2004, I am in charge of what is called patent portfolio management and strategy.

Q.    Patent portfolio management and strategy.

A.    Yes.

Q.    Now, let's -- let's -- just as a little more background, when you began your career at Ericsson, were you working as an engineer?

A.    Yes, a research engineer.

Q.    Were you helping to do research and development for Ericsson?

A.    Yes.  Actually my first assignment was to take part in a project developing a prototype for what would become the GSM system receiver.

Q.    Okay.  Early -- early cell phone prototype?

A.    Yes.

Q.    Okay.  And for a number of years is it fair to say that you worked at Ericsson as an engineer doing

94

actual research and development for new products and new inventions; is that accurate?

A.   Yes, that's very accurate.

Q.   But then in 2004, even though you continued to work for Ericsson, you sort of changed careers a little bit; is that fair?

A.   Yes.

Q.   And -- and you began to help Ericsson to manage its intellectual property?

A.   Yes, that's true.

Q.   And tell us what you mean by that phrase, "intellectual property"?

A.   It stands for intellectual property rights, and it's the asset Ericsson has which proves we have many inventions which we have brought to -- to the industry and which we share with others.

Q.   Okay.  So we -- we have an expression in English that we sometimes here call real property, which means land or personal property which means televisions and cars.  Is intellectual property things like copyrights and patents?

A.   Yes.

Q.   And -- and are Ericsson's patents something that you help to manage as part of your job?

A.   Yes, that's correct.

Q.    Okay.  Before we find out a little bit more about that, let -- let's ask you, as the first witness, the first person we've met who works at Ericsson, to tell us a little bit more about the company itself.

What is the business of Ericsson?

A.    Ericsson is a -- you could say a telecommunications company.

Q.    Okay.  And over its history has -- has Ericsson been involved in basically all aspects of the telecommunications business?

A.    I would say so, yes.

Q.    And is Ericsson in particular these days in what is sometimes called the wireless business?

A.    That's correct.  I think telecommunication is, today, more or less wireless in some way in all of the industry.

Q.    Okay.  What -- what do you mean in this context by wireless?

A.    I mean in this context, the main area of business would be cellular telephony.

Q.    Cellular means our cell phones and -- and how they work, right?

A.    Yes.

Q.    And what other kinds of wireless communications are there?

96

A.   There are many other -- others.  But if we talk about two-way communication, which -- which we heard about earlier, you could mention technologies like Bluetooth --

Q.   Bluetooth?

A.   -- or short range or Wi-Fi for that matter.

Q.   Okay.  Or Wi-Fi.  And then all of these are -- are different kinds of wireless communications technology; is that what you're telling us?

A.   Yes.

Q.   Now, who -- who today are Ericsson's customers?

A.   Our customers would be the carriers or -- or operators that provide services to end users, so companies like Sprint or AT&T or Verizon in the U.S.

Q.   Now, we're liable to hear those words a little bit during the trial, so let's make sure we understand what they mean.  You -- you mentioned the -- the word carrier or operator?

A.   Yes.

Q.   And do both of those things refer to companies that we're all familiar with like AT&T and Verizon and Sprint?

A.   Yes.

Q.   Okay.  And you're telling us that those

97

companies buy equipment from Ericsson?

A.   Yes, they do.

Q.   What -- what kind of equipment does Ericsson sell to those, what we usually would call, cell phone companies?

A.   Ericsson sells all of the equipment that is needed in order for our phones to connect to each other via Ericsson equipment, so to speak.

Q.   Okay.  So -- so Ericsson no longer makes the cell phone that we hold in our hand, right?

A.   Right.

Q.   But where is the equipment that Ericsson makes and sells to the cell phone companies?  Where is it located?

A.   Well, what you see is what's on top of the masts along the highway and so forth, but it's also the nodes or the boxes that stand below the mast and -- and all the networks that would connect these masts together and -- and make sure the call ends up where it should end up, with your friend.

Q.   Okay.  When you -- when say mast, are you referring to an antenna?

A.   Yes.

Q.   That's one of those things we often see by the -- by the highway, antenna with some bars around it?

98

A.   Yeah, that's right.

Q.   So Ericsson makes that?

A.   Ericsson makes that.

Q.   And does Ericsson make the -- basically computer equipment that's in the little building at the base of the antenna?

A.   Yes.

Q.   And does Ericsson make the equipment that the telephone company has in a building somewhere that helps to manage those phone calls?

A.   Yes.  That's correct.

Q.   Okay.  Who benefits from Ericsson's products?

A.   Ultimately, it's the end user -- the user of the phone that benefits because of the fact that we can actually talk to each other and talk to anybody you want to talk to.

But the direct beneficiary would be the carrier then who would be able to offer this service to end users.

Q.   Okay.  How much of the world's cell phone traffic is carried or handled by Ericsson equipment?

A.   Around 40 percent of all the traffic worldwide goes through an Ericsson network.

Q.   Okay.  How many employees work for your company?

99

A.    On a global basis, we are around 110,000 employees.

Q.    Okay.  And in how many countries does your company Ericsson do business?

A.    Ericsson is present in around 180 countries.

Q.    A hundred and 80 countries around the world?

What areas of the world?

A.    All of the continents, all -- all parts of the world would have Ericsson presence.

Q.    I see.  Now, where is Ericsson's U.S. headquarters?

A.    Our headquarters here in the U.S. is located in Texas -- in Plano, just north of Dallas.

Q.    Uh-huh.  And I -- I mentioned earlier that Ericsson actually began in Sweden, but today where is Ericsson's second largest presence?

A.    It's here in the U.S., and we have around 12,000 employees working for Ericsson.

Q.    In Plano or in the United States anyway?

A.    In the United States --

Q.    Okay.

A.    -- yes.

Q.    Now, who started this company that is today called Ericsson?

A.    It was a fellow called Ericsson.  His first

100

name was Lars Magnus.

Q.   First name was Lars Magnus Ericsson?

A.   Yes.

Q.   Do you have a picture of him you can show us?

A.   I do.

Q.   Okay.  Is that -- is that Mr. Ericsson?

A.   That would be him, yes.

Q.   And -- and when did he start this company?

A.   He started Ericsson in 1876.

Q.   And what -- what did he start it to do?

A.   In the beginning he was working repairing telephones for -- which were branded by other companies, but very soon he started understanding that he could make improvements on these telephones, so he started producing telephones for himself and selling them.

Q.   I see.  Has Ericsson, the company, kept some of those very early telephones made by a Lars Magnus Ericsson?

A.   Yes.

Q.   Do you have a picture of one you can show us?

A.   Yes.

Q.   Is that one?

A.   That's an early phone from the 1800s, yes.

Q.   That's actually a telephone?

A.   Yeah.  It's mainly made out of wood, but it

101

contains some metal also; otherwise, it wouldn't work.

Q.   Okay.  Now, Mr. Brismark, of course, the case we're talking about today involves patents -- Ericsson patents.  Were patents important to Ericsson even as far back as the late 1800s?

A.   Yes, indeed it was.

Q.   Can you tell us about that?

A.   Well, Lars Magnus Ericsson, as I said, he found ways of improving the telephone very early on, and -- and he started filing patents on his inventions. And that made him also grow in business.

Q.   Okay.  And let me -- let me show you a picture and ask you, tell us -- tell us what this next picture is?

A.   This picture would be a -- a drawing out of the patent which Mr. Ericsson filed for.

Q.   All the way back to 1880?

A.   Yes.

Q.   Not one of the patents in this lawsuit, I guess, right?

A.   I think it has expired.

Q.   It's probably expired.  Since they only last 17 years, I guess so.

Now, in addition to telephones -- and I guess -- I guess these old telephones that -- that

102

you've told us about all worked with wires, right?

A.   Yes.

Q.   A wire that connected one telephone to another or maybe went through a switchboard, I suppose, correct?

A.   Correct, yes.

Q.   But did Ericsson also fairly early on get into the business of -- of developing and designing and selling radios?

A.   Yes, we did.  We went into radio as early as 1920 -- in the '20s.

Q.   In the '20s?

A.   Yeah.

Q.   Do you have any pictures of early radios that were designed and sold by Ericsson?

A.   Yes, we have one here --

Q.   Okay.

A.   -- which is the one Mr. Stevenson showed earlier was maybe -- or to say it's radio, but this is also radio from 1924.

Q.   Okay.  This is one of the earliest radios that Ericsson developed?

A.   Yes.

Q.   Now, did Ericsson's experience in telephones on the one hand and radios like this and the one that Mr. Stevenson showed on the other, help it to become a

103

pioneer in what we now call wireless communications?

A.   Yes.  I would absolutely say that Ericsson's pioneering in mobile phones and cellular.

Q.   Okay.  Explain to us how those things came together.

A.   Well, Ericsson had a very strong R&D in -- in telephony and switching, and I think combining that with our wireless capabilities made us think of -- of the possibility of providing phone service, maybe not by phones having in your pockets initially, but at least movable, in cars.

Q.   Okay. You used a phrase there.  I want to make sure we all understand.  You said R&D.  That's a -- that's a phrase we hear from time to time -- some of us anyway, but what does R&D stand for?

A.   It stands for research and development.

Q.   Okay.  So if during the trial we hear various people referring to R&D, they're talking about research and development?

A.   Yes.

Q.   Okay.  You -- you've described to us some of the early cell phones that Ericsson pioneered that we all enjoy now.

Do you have any pictures of -- of some early Ericsson cell phones?

104

A.   Yes, I do.

So what we see on this picture here would be on the upper left is a phone which is intended to be installed into a car.

While in the lower right we see one of the early portable phones, even though not as small as today, still portable, running on a battery.

Q.   Okay.  Now, has Ericsson developed other wireless communication systems besides the cellular phones you just told us about?

A.   Yes, Ericsson has.  And -- and one example of that would be the Bluetooth technology which was developed by Ericsson.

Q.   Bluetooth?  What is Bluetooth?

A.   Bluetooth is a technology which I think most of us have used because it's in more or less every mobile phone and -- and in many other devices, as well.

Q.   Okay.  Sometimes if we're on a computer, we're on a cell phone, we may see a little indicator that says Bluetooth.  What -- what does Bluetooth do?

A.   Bluetooth was originally intended to be a way of replacing the wire or the cord between a hands-free operated airplane and phone, so it's intended for short range radio, but it's also intended for -- for speech.

So it was initially optimized for that

105

purpose, to operate maybe a meter or two and to be very reliable so that you wouldn't lose the voice while still being able to have your phone in your pocket and maybe something connected to your -- your ears with a plug and so forth.

Q.    Okay.  Or maybe connected to your car if you're driving?

A.    Yes.

Q.    And can it also be used, for example, to connect a -- a laptop computer to a printer or some other device?

A.    Yes.  That's one of the further developments of the Bluetooth standard.  It developed to be more capable of other type of data communication, as well.

Q.    Who invented Bluetooth?

A.    It was a team of engineers working for Ericsson, mainly in -- in Lund and in Research Triangle Park in the U.S. --

Q.    Okay.

A.    -- on a device side.

Q.    Ericsson engineers working in a Swedish town called Lund?  I actually know how to spell that. L-u-n-d, right?

A.    Yes, that's correct.

Q.    Okay.  Working in Lund and in North

106

Carolina --

A.   Yes.

Q.   -- invented Bluetooth?

A.   That's correct.

Q.   This is a great opportunity.  I have someone from Ericsson on the stand, and I get to ask this question:  How in the world did you come up with the name Bluetooth?

A.   Well, I wasn't part of it, but I heard it sideways.  And Bluetooth is the name of a Viking king who was uniting countries in Scandinavia, so I think the idea of uniting companies or countries around things would -- would be the micron to the name of this.

Q.   Okay.  Now, a minute ago, we -- we discussed R&D, this concept of doing research and development.

How does Ericsson go about developing the ideas that you've just told us about?

A.   We have a central research organization which have as their main responsibility to look into the future and research on -- on technologies that will be part of our future wireless industry.

Q.   Are many of these people who do research and development at Ericsson engineers?

A.   Yes.

Q.   About how many?

107

A.   Ericsson has today around 24,000 R&D engineers.

Q.   24,000.  And do they also have scientists?

A.   Yes.

Q.   So how many people in total are occupied at Ericsson doing research and development for the future?

A.   It's 24,000 who have that as their main duty.

Q.   You used to be one of those people until you moved into patent management?

A.   Yeah, I'm no longer an R&D engineer, that's correct.  I used to be.

Q.   Has -- has Ericsson always made substantial investments in research and development?

A.   Yes.  That's clearly part of our history, and -- and it's still true today.

Q.   How much money does Ericsson spend on doing research and development?

A.   On a yearly basis we spend around 5 billion U.S. dollars on R&D.

Q.   5 billion -- 5 billion U.S. dollars every year?

A.   5 billion U.S. dollars, yes.

Q.   Now, does some of this research and development lead to new and better Ericsson products?

A.   Yes, it does.

108

Q. But does Ericsson know that some of its inventions will never end up in an actual Ericsson product?

A. We do, absolutely, and that's part of what we expect also in the industry where we are acting.

Q. Why -- why do you say that?

A. Because telecommunication and -- and communication as such is an industry where it's built on sharing ideas within the industry and -- and moving the state of the art forward, I would say, joint effort you could say.

Q. Okay. Well, tell us a little bit more about that. Let me make sure that I understand.

If Ericsson is -- is spending this money on doing research and development and it comes up with an idea that for whatever reason it doesn't use in an Ericsson product, is it Ericsson's policy to keep those ideas secret?

A. No, it's not.

Q. What does it do instead?

A. Ericsson would file for patents and -- and disclose our ideas to -- to the public that way.

Q. And when -- among other things, when you file for a patent, eventually does that information about the patent become available for the whole world to read and

109

learn from?

A.    Yes.

Q.    Why does Ericsson choose to freely disclose its inventions?

A.    Because being one of the main players in -- in telecommunication and -- and wireless communication, we need to operate like that, and the whole industry operates like that.  Would we not, we would have a situation with a number of proprietary solutions and not have today's situation with interoperability between different manufacturers and -- and where you're able to connect in between different brands, so to speak.

Q.    Okay.  You've told us about an enormous amount of money that Ericsson spends on research and development.  How -- how does Ericsson pay for this research and development?

A.    We pay for the R&D partly by selling products and services where we make a profit.

Q.    Okay.

A.    And partly also from revenues which we generate by doing licensing of our technology to others.

Q.    What do you mean by that, licensing your technology to others?

A.    As Ericsson has an extensive R&D and a very significant patent portfolio which we offer to others to

110

use, it means we also get a fair return on -- on those patents when they are licensed to other players.

Q.   Okay.  So you -- Ericsson expects that for some of its ideas, it will get patents and it will offer to let others use those patents, not try and stop them, but ask for a fair payment for that so that it can fund more research and development to help it come up with new inventions.  Is that all accurate?

A.   That's all accurate, yes.

Q.   How many agreements does Ericsson have today licensing its patents to others?

A.   Ericsson has today more than 100 agreements in place, based on licenses to other companies in our industry.

Q.   So that's at least a hundred instances in which other companies have -- have taken licenses to Ericsson patents?

A.   Yes.

Q.   And that's all Ericsson patents, right?  You're not just talking about the five patents that are in this lawsuit?

A.   No, that's -- that would be all of our portfolio.

Q.   Okay.  And is this a two-way street?  Does it sometimes happen that if Ericsson wants to make a

111

product and it learns that it needs to license a patent from another company to be able to make that product, does Ericsson sometimes enter into agreements to pay royalties to others?

A.   Yes, and that -- that is usually an important part of our agreements, to ensure that also Ericsson gets a license for our product sales.

Q.   Now, Mr. Brismark, I want to change the subject a little bit and talk about something that we heard about a bit in the opening and I'm sure we're going to hear some testimony about, and that's a subject called standards.

Are you familiar with standards in the technology field?

A.   Yes, I am.

Q.   Now, I guess standards is a word that a lot of use in ordinary life.  We talk about people who have high standards or maybe people who have low standards, but this is something a little different, isn't it?

A.   Yes.

Q.   Tell us what a standard is in -- in the world of technology.

A.   A standard is you could say an agreement on how to solve a communication solution so that in order to make the communication efficient for everybody, you

112

agree on how to do it and that is standard.

Q.   Okay.  Give us an example, if you can, of a technology standard that most of us would be familiar with that illustrates what you're talking about.

A.   So from your ordinary daily life, maybe in your home, I think we all have the possibility to watch a film on TV at home, and there are multiple standards involved in that process, one being a standard in between the companies that develop the film and want to store it.  Then you store it so it can be later on played on your TV screen, and that's a standard, so that everybody can do it the same way and make it more efficient for us.

The DVD is also a standard in such, which is more the standard on how to put this format onto a disk and then to play it from the disk onto your TV screen.

Both of those examples are standards, and it makes it possible for us to buy a film without thinking of which type of disk it is or which type of box I have at home and -- and it's going to work anyways.

Q.   Tell us now, how are standards important in the field we're talking about in this case of -- of electronic or digital communications wirelessly?

A.   Well, Ericsson started its business by selling phones in pairs.  And what standards does is that we,

113

today, don't even think about the brand of the other phone or -- or who you want to call.  You can call anyone.  And if I have a Sony phone and I want to connect to my AT&T carrier while talking to my friend who is maybe having an iPhone and -- and connected via Sprint, it all works.  So we have solved that level of complexity and made it simple for the last two to communicate.

Q.   Okay.  So even though we're talking about different companies, different makers, it's the standard that they all -- someone has all agreed on and that they all practice that lets all that work together; is that what you're telling us?

A.   Yes.

Q.   Now, there's more than one standard, right?

A.   Yes, there is.

Q.   I mean, you've told us about DVDs.  I guess that's a completely different standard than cell phones, right?

A.   Yes.

Q.   And even within the field of wireless communications, are there various standards?

A.   Yes.

Q.   And do some of these standards have names?

A.   Yes.  It would be 2G, we talked about that

114

earlier, or GSM as it's also called.

Q.   Uh-huh.

A.   Or we have 3G or WCDMA, and the latest technology which is now being deployed on the market would be a 4G standard, which is also called LTE.

Q.   Okay.  So if we're watching TV and we see a commercial for Verizon, let's say, and they say on TV we have the nation's largest 3G network, that -- that name 3G is actually referring to a certain standard?

A.   Yes.

Q.   And that's different than 2G?

A.   Exactly.

Q.   It's different than 4G?

A.   And 4G would be the latest evolution and -- and the reason for this evolution also within 3G is that you want to provide high bit rates and higher speeds to the end user, so to speak.

Q.   Okay.  What -- what standard in cellular communication is Ericsson working on now?

A.   Of course, we are -- are looking ahead and -- and starting to -- to research on what we call 5G, but Ericsson also spends significant effort into improving existing standards, like improving 4G and also improving 3G today.

Q.   How long will it be before we see 5G phones?

115

A.    I think it will not be on the market the coming five years at least, but maybe when we're approaching 2020.

Q.    Now, explain to us, if you would, why do companies, some of which must be competitors, work together to agree on standards?

A.    I think we do so because we as an industry have realized that our whole industry is based on interoperability and by agreeing, we make the pie larger and it will benefit all the players, including the end user to get a bigger choice.  And I think also lower cost in -- in the process.

Q.    Now, you used a word there, and you've used it on -- a couple of times -- forgive me for asking you about it -- interoperability.  What does that mean?

A.    Interoperability would mean that two things work together.  They can talk, and they com -- can communicate, as opposed to not understanding each other, as if I would be -- start speaking Swedish here, I think that would not be interoperable.

Q.    Probably you're not very -- not very interoperable in this courtroom.  We -- we already kicked out Ms. Petersson.  She was the only other person here who could understand it.

A.    That's right.

Q.    Now, you've told us there are different kinds of standards, and you've told us some of their names.

Are there different groups that develop standards?

A.    Yes, there are.

Q.    And are there many different groups that work on standards in the field of wireless networking?

A.    Yeah, there are plenty of groups.

Q.    Which groups, in particular, has Ericsson been most active participating in?

A.    Our main focus has been in the cellular field, and there we work in standardization bodies like ETSI and 3GPP -- or 3G Partnership Project would be one of the major activities where we have our focus.

Q.    Okay.  The first thing you said was ETSI.  Is that E-T-S-I?

A.    Correct, yes.

Q.    What does that stand for?

A.    Stands for the European Telecommunications Standards Institute.

Q.    And -- and are these two groups you've just given us examples of where Ericsson has spent a lot of time and energy in helping to develop cellular standards?

A.    Yes.

117

Q.   And do some of the Defendants in this case, like Intel and Acer and Toshiba, participate in some of these standard-setting bodies, like, for example, ETSI?

A.   Yes, they do.

Q.   Now, are the standards that you're talking about written down?

A.   Yes.

Q.   And in what form could we find them?

A.   We would find them -- they are written into -- to computers, of course.  So they are in soft format.  But it's obviously possible to print out them, as well, and have them in paper, so to speak.

Q.   Okay.  So if we -- if we wanted to, we could find these standards.  Let's say we're -- we're thinking about making a product that practices a standard so that it will work with other things in the system.  We could go with a computer online and find the standard and read it?

A.   Yes.  They are possible to find, and they are available online for anyone to download in order to take advantage of -- of specification and -- and to take part of -- of developing products for these standards.

Q.   Okay.  And -- and just to give us an idea, Mr. Stevenson held up a stack of paper that looked like it was about three inches thick that was the standard

118

that's most relevant to this case --

A.   Yes.

Q.   -- the Wi-Fi standard.  Are there other standards that if they were printed off on paper, would be much more elaborate than that?

A.   The other ones I talked about in -- in 3GPP which relate to 2G, 3G, and -- and 4G specifications are significantly more extensive.  So if you took those standards, which consist of roughly 8,000 different specifications, I think if we print them and put them in folders, we would have quite a significant pile of -- of folders maybe around here.

Q.   Okay.  Boxes and boxes full of paper?

A.   Yes.

Q.   Well, help us to understand a little bit more about how these very elaborate technical documents called standards are created.

Do -- do engineers create them?

A.   Yes, they get together and -- and work out the standards together.

Q.   And who do these engineers work for?

A.   They work for Ericsson, and they work for -- for other companies in the industry that all get together to -- to develop these standards together.

Q.   Can -- can basically any company who wants to,

119

send its engineers to a standard-setting meeting to help write the standard?

A.    Yes, that's correct.  Standards development organizations are open to anybody to join.

Q.    Okay.  And is it typical that companies will choose which standard-setting bodies they can most productively participate in and which they may not participate in as actively?

A.    Yes.

Q.    Okay.  Now, are the engineers who are employed by the companies who are going to participate in this, is this sometimes their full-time job to help develop standards?

A.    Yes, absolutely.

Q.    How many engineers at Ericsson, for example, have it as their full-time job helping to write different kinds of standards?

A.    Today, there are several hundred engineers who work full time on -- on participating in standardization organizations throughout the world working for Ericsson --

Q.    They're not just writing a standard for Ericsson, right, they're -- they're participating in meetings with other companies to develop a standard for everybody?

A.    Yeah.

Q.    Okay.  Now, how many engineers would get together in one of the meetings you're telling us about?

A.    So in the 3GPP standardization effort, any meeting or any working group would consist of somewhere between 50 and 250 engineers getting together, and there are several of these groups that -- that meet in parallel.

Q.    And so I guess for some organizations it's more that, and some it's less?

A.    Yes.

Q.    Where do they meet?

A.    They would meet -- if it's a global organization, you would have meetings arranged taking turns -- Europe, Asia, North America.

Q.    So they meet all over the world?

A.    Yeah.

Q.    And how long do they meet?

A.    Roughly two or three days, up to a week, would be the -- the normal length of a standardization meeting.

Q.    And how often?

A.    When -- well, it depends on the phase, but if you're in the phase of -- of doing development or getting close to a release, the standards party would

121

meet maybe bi-monthly or monthly towards the end of these releases.

Q.   How long does it take?

A.   For LTE, the 4G standard, I would say it took in active standardization actually writing the specifications, around three years to -- to do that work.

Q.   Okay.  So some -- some standardization efforts may take less than that and some may take long, but they all involve a lot of people and a lot of meetings, sounds like?

A.   Yes.

Q.   What do the engineers talk about when they're in these meetings?

A.   The standardization work starts by engineers getting together and -- and agreeing on the objectives, what you want to solve, what you want to provide to -- to the market with your standard and your standardization activity.

So basically what you do, you -- you create your objectives, which means that you have a certain set of requirements you have to meet.  And then you start developing solutions that would meet these requirements.

And what the engineers do is they get together and they share their solutions to certain problems and

122

you discuss and compare solutions being offered from different companies or different groups of companies and you select based on -- on which solution is technically the best.

Q.    Can everyone who attends the meeting share ideas?

A.    Yes.

Q.    And you say they try and pick the best idea. How are the best ideas chosen?

A.    Those are the main principles of any standardization effort, and it's -- when you get together and -- and you're doing this together, you have some -- some rules on how to work.  And the two simple rules are that you only discuss technical merit or performance of different technical solutions in order to find the technically best solution.

And decisions are taken by consensus, meaning you only decide when you have a consensus in the group and then you move on.  And until you have consensus, companies may be asked to go back and -- and elaborate more on their solution and -- and so you have full evidence of which solution the group as -- as a whole would accept as the best one.

Q.    And once the best ideas are identified in this process of discussion and evaluation, what happens then?

123

A.    What happens next?  I mean, you do that until you have a complete solution which -- which fully describes the product you want to make.  And when that's done, you go into an approval process and you -- and you approve and release the whole specification.

Q.    And then it's available for anybody to use and to read?

A.    Yes.

Q.    Okay.  Now, just -- just to make sure, I think we understand this, but I just want to make sure there's not any confusion about this.

These standard-setting bodies, the -- the ETSI that you told us about and in particular the IEEE that we're going to be hearing a lot about in this case, these aren't government agencies or government bodies, are they?

A.    No.

Q.    No?  They're private organizations usually made up of engineers in a certain field?

A.    Yeah.

Q.    Professional organization?

A.    Yes.

Q.    Okay.  So they don't have the power, do they, to make anyone use the standards or do anything else, do they?

124

A.   That's correct.

Q.   And you talk about the rules of some of the organizations.

When you are talking about rules, you're talking about their own internal rules of -- of what they say they will do, not some kind of law that anybody is required to follow; is that accurate?

A.   Yeah.  That's -- that's the way it is, yeah.

Q.   And is anyone required to follow the standards?

A.   No.

Q.   Are the standards that these companies develop changed from time to time?

A.   Yes.  And that's very important.  If -- if you want to meet the needs of the market it's necessary to always further develop your standard.  If you're not doing that and if you don't provide what is state of the art, I would say that inevitably a standard would become redundant and replaced by something else.

Q.   Okay.  All right.  Mr. Brismark, thank you for explaining this process of how standards come about.  I think you've -- you've helped us to understand that better.  But now I want to move on to -- to a feature of it that you haven't discussed yet that is very important for this case, and it is this question that I'd like you

125

to explain to us.

You've told us about how the standard-setting body, the engineers meet and they come up with the best ideas that they put into the standard.  My question is: What happens if one of those best ideas is patented?

A.    That's a very common situation.  And for that to be a workable situation, you also have this part of the standardization agreement, you could say, that you have the -- a policy related to -- to patents where companies can declare that they're willing to share their patented ideas.

Q.    Okay.  Before we get to that, again, let's just make sure we understand basically how it all fits together.

If the IEEE decides to put an idea into the standard and that idea is patented, can the IEEE use it for free?

A.    No.

Q.    Okay.  If a company like one of the Defendants in this lawsuit decide they want to practice an IEEE standard, they want to make a product like a Wi-Fi product that does what the IEEE has decided is the best way of doing it, do they get to do it for free if it's patented?

A.    No.

126

Q.    All right.  So does the patent holder still retain their rights in a patent even if that patented idea has been chosen to go into the standard?

A.    Yes.  The commitment would be to offer a license, but with a fair return.

Q.    Well, let's talk about the commitment now.

First of all, are all patent owners obligated to make any commitment to the standard-setting body?

A.    No.  Well, if you're a member, you're obligated to -- to give a commitment.  But you don't -- you're not obligated to give a commitment to license.

Q.    Okay.  So but let's make sure we understand.  Thank you for that clarification.  Let's suppose we're talking about somebody who's not a member of the IEEE, for example.  They don't come to the meetings.  They don't participate, but they do have a patented idea; and the IEEE chooses that idea to put in the standard.

Is the person who owns that patent obligated to do anything about the standard?

A.    In that scenario, there's no obligation whatsoever.

Q.    Okay.  But you're telling us that for people who choose to participate in the IEEE, they're expected to make some further commitment than that?

A.    Yes.

127

Q.   And Ericsson is a member of the IEEE, correct?

A.   Yes.

Q.   And has Ericsson agreed, along with a lot of other companies, that it will make certain commitments not only to the IEEE, but to the whole world --

A.   Yes, we have.

Q.   -- about how it will treat Ericsson's own patents if those ideas are put into the standard?

A.   Yes, we have.

Q.   Can you explain to us what that commitment is?

A.   That commitment which Ericsson has made is -- is called a RAND commitment, and it stands for reasonable and non-discriminatory terms and conditions. That's a commitment to -- to offer a license to the market.

Q.   Okay.  This is something we're liable to hear a lot about in this case, so I'm going to take a minute.

Did you say RAND, R-A-N-D?

A.   Yes, I did.

Q.   All right.  I'll write that on this board, R-A-N-D.

So is this shorthand for the companies -- for the commitment that companies like Ericsson make about their patents if they end up in the standard?

A.   Yes.

128

Q.    What do these letters stand for in R-A-N-D?

A.    It stands for reasonable and non-discriminatory.

Q.    Reasonable and non-discriminatory.  So in this case, if we hear about RAND, that's what we're talking about is the commitment that the licenses for patents be reasonable and non-discriminatory?

A.    Correct.

Q.    All right.  Let's take them one at a time, and I would like you to explain what it means.

Reasonable.  What does reasonable -- we know what the word reasonable means, but what does it mean in the context of licensing patents that may be in a standard?

A.    Well, it means that -- as Ericsson, giving such a commitment, we commit to offer a license at a price which is reasonable in light of the contribution our technology gives to the end user who is using that standard.  And also acknowledging the fact that there may be other patent holders out there who have patents on the same standard.

So it needs to be reasonable for a user who wants to put a product on the market to have them collect not only Ericsson's license, but also from the other companies.

129

Q.   So you told us reasonable means at least two things.  It's -- it's reasonable and fair in consideration of what the patent -- Ericsson's patent contributes to the standard and the product, correct?

A.   Yes.

Q.   And, second, it has to take into account others who may have patents who might also want to charge a royalty in the same product?

A.   Yes.

Q.   Okay.  That's reasonable.

And -- I think we can probably handle "and" on our own, so I will skip over it.

The next two words are non-discriminatory. What does that mean in this context?

A.   That means that when Ericsson offers licenses to users of their technology, we will treat everybody in a similar way, and nobody should be discriminated against anyone else.

Q.   In other words, no special deals?

A.   That's correct.

Q.   So that anybody who competes with someone else who -- who needs a license can come to Ericsson, and they're going to get basically the same deal as anybody else who they're competing with?

A.   That is correct.  Knowing, however, that any

130

deal is -- is different from another.  One may contain many different terms.  So reasonable and non-discriminatory needs to -- look up on all the terms that are part of the deal.

Q.   Okay.  So a lot of these -- you're telling us a lot of these agreements that we'll probably hear about more tomorrow are pretty complicated?

A.   Yes.

Q.   So it's -- it's not -- it doesn't mean -- non-discriminatory doesn't mean that they're identical down to the penny, I suppose?

A.   Exactly.

Q.   But basically there's no special deals, and everybody's paying more or less the same?

A.   Yes, that's correct.

Q.   Now, is there a process amongst standard-setting bodies where companies like Ericsson can say:  We have patents that are needed for this standard, and we want to let you know that we have them?

A.   Yes, there is.

Q.   Okay.  Is that -- is that sometimes called declaring a patent essential to a standard?

A.   Correct.  Yes.

Q.   Okay.  And declaring, I guess, just means saying it, right?  Publicly, putting it in writing so

131

people know it?

A.   Yeah.

Q.   And to declare a patent essential to the standard means what?

A.   It means that you inform in writing the standardization body in question that you believe that you have patents which users of the standard will need.

And if you, as Ericsson has done, permit for RAND purposes or RAND terms, then the organization would also know that they are available to license.

Q.   So that the people working on the standards will know, well, the idea we're putting in may be patented; but the good news is that the owner of the patent, Ericsson, has given the whole world a commitment that they can license this and use it on reasonable and non-discriminatory terms.  Is that fair?

A.   Yes, that's fair.

Q.   Now, about how many of Ericsson's patents has it declared essential to some standard?

A.   All in all, if you look at all different standards, it's around 1,000 patents have been declared.

Q.   Okay.  And has Ericsson agreed to let others use those patents for the standard RAND license fee?

A.   Yes, we have, for the purpose we discussed.

Q.   And tell us again, who is supposed to pay that

132

fee?

A.    The company that puts the product on the market for the end user.  And it's the company that would usually pay for this.

Q.    It's not the standards-setting body, like IEEE or others, right?

A.    No, it's not.

Q.    It's the companies who decide, yes, I want to make a product that uses the idea, and, oh, by the way, there's an Ericsson patented feature in the standard, so they are the ones who are obligated to pay the fee.  Is that correct?

A.    That's right.

Q.    Now, does Ericsson have a fee that it charges typically for its patents that are essential to the cellular standard?

A.    Yes.

Q.    And what's that fee approximately?

A.    It's -- for typical standard, depending on the situation, it's around 2 percent.

Q.    Around 2 percent?

A.    Of whatever the product is.

Q.    Whatever the product is?  Okay.

      But --

A.    And it's --

133

Q.   -- cellular standards are not what we're talking about in this case, correct?

A.   No.  That's correct.

Q.   Okay.  In this case, we're talking about the Wi-Fi standard.  Does Ericsson have a standard RAND licensing fee for Wi-Fi products?

A.   Yes.

Q.   What is that?

A.   It's one-half of a percent capped at 50 cents for a phone product.  For other products, like routers or laptops, we have a fixed fee of 50 cents.

Q.   50 cents.

And just to skip ahead, the vast majority of the products that are involved in this lawsuit are laptops and routers.  So tell us again, what is Ericsson's standard RAND rate that it agrees it will let anyone use its Wi-Fi patents for that rate?

A.   Yes.  50 cents.

Q.   50 cents?

A.   Yeah.

Q.   Per device?

A.   Per device.

Q.   Is that 50 cents a month or 50 cents a year or what?

A.   It's a one-time payment for that device.

134

Q.   Okay.  One-time payment of 50 cents per laptop, for example, to be able to use Ericsson's Wi-Fi patents?

A.   Yes.

Q.   Now, how did Ericsson arrive at that rate?

A.   We do an assessment where we initially try to understand Ericsson's patented technology and the value of this technology for the end product, and we also try to understand the landscape of patents from all the others in order to come up with an initial rate, which we then use in our negotiations with other companies.

And based on the feedback in this process and what the market accepts in terms of signing deals on, we may adjust our rate to make sure it's indeed in line with our RAND commitment.

Q.   How many people at Ericsson work on the process of trying to make sure that your Wi-Fi rate, for example, is fair and non-discriminatory?

A.   It's a group of five to seven people, me included.

Q.   And how long have they worked on and paid attention to trying to make sure that the Wi-Fi rate is reasonable?

A.   We first started our licensing program for Wi-Fi in 2003.  So since then, this has been a

135

talked-about process.  I was not involved myself at the beginning, but I am today.

Q.    Now, I noticed when you told us about Ericsson's standard rate for cellular patents versus Wi-Fi patents, Wi-Fi was cheaper.  Why is that?

A.    Because Ericsson has a significantly larger portfolio for cellular, and that's why we also charge a higher rate there.

Q.    You told us a few minutes ago, Mr. Brismark, that part of the reasonable feature of this RAND commitment is that you have to consider the fact that others may also have patents that would also be applicable to the product that a license fee would have to be paid for.

Does Ericsson attempt to keep track of that in setting a reasonable rate?

A.    Yes.  We try to keep track of others, and especially, again, by negotiating with other players in the industry gives us a good understanding of who has essential patents that would be relevant to the same technologies that Ericsson is also licensing out rights to.

Q.    All right.  And have other companies agreed -- not all companies, but many, agreed to pay these rates for using Ericsson's Wi-Fi patents?

136

A.   Yes, indeed.

Q.   Okay.  Well, we'll learn more about that tomorrow and in the days to come.

Let me get a little more specific now and talk to you about -- I've been asking you some questions about all kinds of standards, different standards that Ericsson is familiar with and that we may be familiar with, but many of them are not involved in this case.

And now I want to focus on the Wi-Fi standard, the standard that is particularly involved in this case.

A.   Yes.

Q.   Now, we've heard an explanation of this, and I hate to repeat ourselves; but if we all don't understand what you mean by Wi-Fi, we are really missing the boat.

So tell us, what is Wi-Fi?

A.   Wi-Fi is a short range radio technology, which was developed late '90s, early '200s (sic), and which was intended for communication between computers initially and computer communicating with a router and so forth, short range.

Q.   Okay.  Are there Wi-Fi standards?

A.   Yes, there are.

Q.   What organization conducted the meetings that you've described to us to develop the Wi-Fi standards?

A.   It's the IEEE organization.

137

Q.    Okay.  What is -- tell us again, what does IEEE stand for?

A.    It stands for the Institute for Electronic and Electrical Engineers.

Q.    Okay.  And that's a professional organization of engineers and companies that employ engineers?

A.    Yes.

Q.    Ericsson is a member of IEEE?

A.    Yes, Ericsson is.

Q.    And all the Defendants are members of the IEEE?

A.    Yes.

Q.    Okay.  And when the IEEE decided to develop a standard for Wi-Fi, did it give what would become that standard, a name or a number to identify it?

A.    Yes.  So the project name within IEEE is 802.11.

Q.    802.11.

A.    Yes.

Q.    So is it fair to say that throughout this case, when we talk about Wi-Fi and we talk about 802.11, it's basically the same thing?

A.    Yes, I would say so.

Q.    Now, did Ericsson learn that there were going to be meetings to develop a Wi-Fi standard?

A.   Yes.

Q.   At that time, though, did Ericsson make any products, or plan at that time to make any products that would use the Wi-Fi standard?

A.   At that time, we did not.

Q.   Okay.  So this is something Ericsson learned would be happening; but at least in terms of your products and your plans for products back then -- this is 10 years ago or more -- it wasn't something that was, at least on the horizon, for Ericsson to actually be making products for.  Is that accurate?

A.   That's correct.

Q.   But even though Ericsson didn't have plans to make Wi-Fi products, did it have patents that it thought would be useful for the Wi-Fi standards?

A.   Yes.  Since we had already researched similar types of problems or requirements in 3G and -- or 3G and 2G standardization activities before, we had solutions which we believed would also be preferred solutions in a Wi-Fi network.

Q.   Okay.  I think I understood that, but explain it again.  Explain it a little more.

And, again, the problem I want to make sure we understand is, Ericsson didn't plan to make any Wi-Fi products as we'll hear in a minute.  Ericsson didn't

139

plan to send people very often to the meetings on Wi-Fi.

Why would Ericsson have patents that would be useful for Wi-Fi?

A.   Because the technologies which you perform research on are not standard-specific.  They are specific to certain problems you need to solve in order to make efficient networks.  And Ericsson had conducted such research in various different projects at the time.

Q.   So had Ericsson been doing research and development for years in how the radio and the cell phone handset would communicate with the phone company's equipment --

A.   Yes.

Q.   -- and back?

A.   Yes.

Q.   And was that problem, Ericsson thought, similar to how the radio and a laptop would communicate with a router and back?

A.   Yes.  For -- for all of the research related to introducing data communication into cellular had relevance for the type of problems you would also meet in Wi-Fi, especially when you want to go to higher data rights.

Q.   Okay.  Now, did Ericsson participate in the Wi-Fi standards meetings?

140

A.   Not regularly, no.

Q.   Did it occasionally?

A.   It happened, yes.

Q.   Why didn't it participate regularly?

A.   Because Wi-Fi was not the strategic choice or the strategic area of development for Ericsson at the time.

Q.   You weren't planning on making a Wi-Fi product at that time?

A.   Correct.

Q.   Okay.  Now, even though Ericsson didn't regularly participate in the Wi-Fi meetings, did Ericsson tell the people working on the Wi-Fi standards that it had essential Wi-Fi patents?

A.   Yes, we did.

Q.   Let me ask you to look now, please, at Plaintiff's Exhibit 293.

          MR. CAWLEY:  Let's blow up about the first third of it, so we can all read it.

Q.   (By Mr. Cawley) Do you recognize this?

A.   Yes.

Q.   What is this that we're looking at?

A.   This is a letter of assurance to the IEEE.

Q.   Okay.  You used a phrase -- we'll probably hear it several times in the case -- a letter of

141

assurance.  What is a letter of assurance?

A.  It's the commitment we talked about earlier, the commitment or the letter where you are first informed that you have patents that are essential to the standard, and they also inform on which terms you're willing to make them available to others.

Q.  Okay.  You're assuring people at the IEEE that you'll abide by this commitment for your patents that are essential to the standard; is that right?

A.  Yes, we did.

Q.  Now, I see in the letter under C:  IEEE standards are proposed.  IEEE standards.

The first thing I see is 802.11.  We've talked about that, about what that means, but it's followed by an "a," and then there's one that says "b" and "c" and "f" and "g" and "h" and "i."  What do those letters mean?

A.  They stand for different releases of the 802.11 specification.

Q.  So there's different versions or amendments to the specification that are worked on at different times?

A.  Yes.  The earlier versions, like "a," had much lower throughput and also capabilities in terms of providing certain type of services compared to the later versions, and especially "n," which we'll talk about

142

later.

Q.   Okay.  But this letter of assurance -- and what was the -- what year was this letter sent?

A.   It was sent in 2003.

Q.   2003.

Did this letter of assurance from 2003, Plaintiff's Exhibit 293, assure everyone, the IEEE and anyone who wanted to make a product compliant with these standards, that all of these standards would get the same RAND commitment?

A.   Yes, that's correct.

Q.   Now, if we scroll down a little bit in this document under Section D --

MR. CAWLEY:  And I'm sorry.  I need to go back to the previous page, the first page and I want to highlight now the bottom half of the document that starts with D.

Q.   (By Mr. Cawley) All right.  This was a part of the document that Ericsson sent to the IEEE, correct?

A.   Correct.

Q.   And you see that it has four numbered sentences or paragraphs with little check boxes by them, right?

A.   Yes.

Q.   Box No. 1, for example, if you check it, means

143

that the patent holder -- and that would be Ericsson here -- is prepared to grant a free license.

A.   Yes.

Q.   But that didn't get checked, did it?  Ericsson didn't agree that it would provide a free license.

A.   Correct.

Q.   And No. 4, on the other hand, says:  I don't know that there are any patents that may be relevant to the standard.  And Ericsson didn't check that box, did it?

A.   Correct.

Q.   And No. 3 says that the patent holder -- that would be Ericsson -- is unwilling to grant a license.

We're just going to stay out of this progress -- and do whatever we want with our patents, right?

A.   Correct.

Q.   But Ericsson didn't check that one.

A.   That's correct.

Q.   What did they check?

A.   So we checked No. 2, which is the box you check if you're willing to offer a license on RAND terms, reasonable and non-discriminatory.

Q.   Yes, sir.

Now, tell us again, why was Ericsson willing

144

to make this commitment?  After all, it owned the patents.  It had the right to stand completely outside of this process and say:  We're going to take anything we can get.  We don't have to be reasonable.  We can discriminate and make special deals all over the place.

Why did Ericsson choose to make this commitment that it would license on reasonable and non-discriminatory terms?

A.   Because Ericsson believes in the standardization process as such and the related open innovation around it.  And we also believe that it's important to have an incentive for the innovators to share their technology with others and get a fair return.

Q.   Yes, sir.  Thank you.

Now, after a few years, did the Wi-Fi standard continue to change?

A.   Yes.

Q.   And are you aware that the IEEE began to work on a new version of the 802.11 called 802.11n?

A.   Yes.

Q.   And what is your understanding of when that process began?

A.   That process began around '04, '05, '06, that timeframe, and continued until 2009 when the "n"

145

standard was finally adopted.

Q.   And eventually, after the new "n" standard was adopted, did the IEEE send an e-mail to Ericsson asking for another letter of assurance?

A.   Yes.

MR. CAWLEY:  Let's take a look, please, at Plaintiff's Exhibit 511.

And let's highlight again -- there we go. That's good.

Q.   (By Mr. Cawley) You see this is an e-mail from a man named Bruce Kraemer?

A.   Yes.

Q.   And was he involved in the 802.11 standard setting at IEEE?

A.   Yes, he was.  He was a German.

Q.   And he sent this e-mail to woman named Anna Johns.  Do you know her?

A.   Yes, I do.

Q.   Does she work at Ericsson?

A.   She does.  She's here in this courtroom today.

Q.   Well, she was.  We asked her to leave when everybody was sworn in.

A.   Ah.

Q.   But she's available.

Now, Mr. Kraemer, writing from the IEEE, says:

146

As chair of the IEEE Standards Association Working Group 802.11, it has been brought to my attention that Ericsson may have essential patent claims that may be relevant to the published amendment 802.11n.

Do you see that?

A.   Yes, I do.

Q.   Did you understand that Mr. Kraemer, on behalf of the IEEE, was saying to Ericsson, we understand you have essential patent claims for the standard that we've already written and finalized?

A.   Yes.

Q.   And remember -- I won't go back to it, but in that first letter of assurance that went out in 2003, that named off a bunch of different letters after the 802.11, but it didn't include "n," did it?

A.   That's correct, yes.

Q.   "n" didn't exist back in 2003, did it?

A.   No, it did not.

Q.   And now the IEEE is telling Ericsson, gosh, we've come up with this new standard, and you have some essential patent claims.  Will you give us another letter of assurance and let us tell everybody that you'll be willing to license those essential patents on RAND terms?

A.   Yes.

147

Q.   What did Ericsson do when it got that request?

A.   We gave a letter of assurance also including "n."

Q.   Okay.

MR. CAWLEY:   Let's look at Plaintiff's Exhibit 294.   And let's take a look at the top half of it again.

Q.   (By Mr. Cawley) Is this a letter sent in 2011 in which Ericsson agreed to extend its assurance to 802.11n that it would continue to offer to license its essential patents on reasonable and non-discriminatory terms?

A.   Yes, that's correct.

Q.   All right.   Mr. Brismark, how many Ericsson patents will we be talking about in this case?

A.   In this case, we talk about five patents.

Q.   Five patents.

And are all of them inventions of Ericsson's engineers?

A.   Yes.

Q.   And I guess since Ericsson has patents, Ericsson applied for patents on these inventions in the United States?

A.   Yes, we did.

Q.   And the jury saw earlier this morning a patent

148

video that explains that process.  But is it fair to say that for all five, Ericsson submitted a written application to the United States Patent and Trademark Office?

A.   Yes, I would say so.

Q.   And was it your understanding that the Patent Office studied all of those materials?

A.   Absolutely, yes.

Q.   And eventually decided that each of these five patents was an invention worthy of a United States patent?

A.   Yes.

Q.   And Ericsson has agreed publicly that it will license each of these five patents on RAND, reasonable and non-discriminatory, terms, correct?

A.   Yes.

Q.   Now you're not an inventor on any of these five patents, right?

A.   No, I'm not.

Q.   And we've heard that we'll hear from the inventors by videotape later in the trial, but are these patents at least in the entire group of thousands of Ericsson patents that your group at Ericsson is responsible for managing?

A.   Yes, they are.

149

Q.    Okay.  We've heard the lawyers for both sides of the case give us a brief description of these patents, and we've heard that later a professor from the University of Texas named Professor Scott Nettles is going to give us a detailed description of these patents; and that it's going to take three hours or so to get that detailed description.

But you're the first actual witness, and I know you're at least familiar with these patents.

You've read them, haven't you?

A.    Yes, I have.

Q.    So I want you, if you would, please, to kind of introduce us to these patents to give us an idea, in very high-level terms, of what the inventions are.

A.    I could do that.

Q.    Let's start with Plaintiff's Exhibit No. 4, which is the --

THE COURT:  Mr. Cawley, let me ask you about how much longer you anticipate.

MR. CAWLEY:  I think it will be another 20 minutes, Your Honor.

THE COURT:  All right.  I think we'll leave this for tomorrow.  It sounds like you're about to get into a fairly detailed area.  I had told the jury we would try to quit at 4:00 each day, and we're going to

150

try to hold to that.

We used to go till 5:30 or 6:00, and everybody's pretty glazed over by that time of the day, so we started stopping a little earlier, and I think the jury appreciates it and the lawyers do, too.  So we're going to go ahead and recess for today.

Now, please remember my instructions when you leave here today.  You'll reconvene in the jury room in the morning.  We'll start back at 9:00 o'clock.  So try to be there 10 or 15 minutes early.  We'll have some coffee and snacks for you and get settled in.  Then we'll start back at 9:00 o'clock.

Please remember my instructions.  Don't discuss this case among yourselves.  Don't discuss it with anybody else at home or friends or whatever and no independent investigation.  So just please follow those instructions.

Thank you for your attention today.  You've been a very good jury, and we'll see you back here at 9:00 o'clock in the morning.  The jury is excused.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury out.)

THE COURT:  Please be seated.

151

All right.  Let me give the parties their times.  The Plaintiff has used 1 hour and 13 minutes, and Defendants have not used any time yet.  So got a lot of time left.

So I'm going to see whether I made a mistake in giving y'all so much time on this case or not.

All right.  Is there any other matters that -- from the Plaintiff before we --

MR. CAWLEY:  There are a couple of issues, Your Honor.  And they won't come up until tomorrow.  We'll be glad to raise them first thing in the morning or now, whatever the Court's pleasure.

THE COURT:  What are they?  Do they deal with exhibits or --

MR. CAWLEY:  One of them has to do with how we're going to play depositions.

THE COURT:  Okay.

MR. CAWLEY:  The other has to do with how we're going to handle the stipulation the parties have reached on those --

THE COURT:  All right.  Well, let's go ahead and do those right quick.  I don't think that will take long.

MR. CAWLEY:  First of all, I can describe

152

both of them for Your Honor very quickly.

THE COURT:  All right.

MR. CAWLEY:  A number of Ericsson witnesses, this Court has heard, we'll be presenting by videotape.

What happened is, the Defendants wanted their deposition.  They went and took their deposition. At the conclusion of their deposition, we did a 15- to 30-minute direct examination, which is what we want to play.

The Defendants, of course, have designated numerous excerpts from the body of the deposition.  It's our position that we should be able, in essence, to put on our direct testimony first and that then they should be able to designate whatever they want and cross.

It's the Defendants' position that they should play -- we should have to play the deposition sequentially, which means that their cross-examination really comes before the direct examination.

THE COURT:  All right.  Response?

MR. DE VRIES:  Your Honor, our concern is that by playing the depositions essentially out of order sequentially, it will jump around to an extent.  We think a more natural way to do it is to play it in the

153

order that it happened during the deposition.  We think that's the less confusing way to do it.

THE COURT:  Do you disagree with Mr. Cawley's characterization, they did a short direct examination at the end?

MR. DE VRIES:  We do not disagree with that, Your Honor.

THE COURT:  All right.  We will -- you can play the direct examination, and then you can play sequentially the -- whatever parts you wish to intersperse.

And if Plaintiff wishes to intersperse any parts within that sequential part -- but let's do the direct first.  I think that will be more meaningful to the jury, and then we'll do the individual questions and answers.

All right.  What's the next question?

MR. CAWLEY:  The second issue relates to the stipulation that the Court encouraged the parties to reach on notice.  The Court will recall there is an order in limine in place that we can't get into settlement negotiations between the Plaintiff and the Defendants.

We have to prove notice for a number of reasons that the Court is familiar with, but, of course,

154

the notice letters that we sent are sort of first step down the road to negotiations.  So the Court encouraged the parties to try and reach a stipulation about notice. The parties have been able to reach, and we have filed late last night, a stipulation on notice.  So that's done.

The remaining issue is, we want to be able to have the Ericsson witness on the stand respond to the question, did you give notice to these Defendants, and to say yes -- not a date, not any content, just to say, so the jury can understand what the significance of this is:  Yes, we gave notice, and then ask the Court to read the stipulation.

MR. DE VRIES:  And, Your Honor, our primary concern here is prejudice to our clients.  As it stands, we have agreed to a stipulation which was submitted as Docket No. 474.  It lays out for the jury the facts concerning notice.

We think it's appropriate for the Court to read that stipulation to the jury, as opposed to one of Ericsson's witnesses for this very simple reason: We're concerned that the jury will hear from Ericsson, have a witness testify about these facts.

By virtue of our agreement, we will not be bringing a witness here to respond to that testimony,

155

and we think that it is unfairly prejudicial because it will leave in the jury's mind an impression that we haven't responded to Ericsson's witness's testimony.

And, on the other hand, having the Court read in these agreed-upon facts will satisfy everything that it is that Ericsson hopes to get from this information.

And so we've worked very hard to come up with a stipulation that satisfies Ericsson and gives it what it needs; and we think that the added step of having its witness read the stipulation into the record, or at least a part of it, is unduly prejudicial.

MR. CAWLEY:  Well, we're not suggesting that the witness read any part of the stipulation.  My concern is that we want to do everything we can to make sure the jury actually understands what happened here.

This is an area that they're not at all familiar with.  The witness is going to be talking about licensing efforts, licenses that Ericsson has been able to enter into; and I want the witness to explain to the jury, did you contact the Defendants to let them know that you thought they needed a license?  And have her say, yes, and that's it.

Have the Court read the stipulation. She's not going to testify about what she said in the

156

context.  She's not going to testify about meetings that there were with them.  She's not going to testify about anything other than that notice was given.

THE COURT:  Okay.  Could I see a copy of the stipulation, please?

MR. CAWLEY:  Yes, sir.

MR. DAUCHOT:  Your Honor, if I could interject something.

THE REPORTER:  Can I get your name, please, sir?

THE COURT:  Just a moment.

MR. DAUCHOT:  All right.

THE REPORTER:  Can I get your name, please, sir?

MR. DAUCHOT:  Oh, sure.  I haven't been ---

THE COURT:  What is your name?

MR. DAUCHOT:  Luke Dauchot, D-A-U-C-H-O-T.

THE COURT:  All right.

MR. DAUCHOT:  I'll be dealing with the cross-examination of Ms. Petersson tomorrow, and there's an additional wrinkle, I think, to the notice issue, and it's as follows, Your Honor, that ties into the prejudice question.

157

One of the exhibits that the Plaintiffs hope to use with Ms. Petersson is a notice letter that was sent to HP, Hewlett-Packard, one of the companies to whom they licensed some patents.

And the concern from a prejudicial impact is as follows, Your Honor:  That if we tie in the notice stipulation, along with the testimony, along with the HP letter, that the implication -- the very strong implication to the jury will be that every single Defendant in this courtroom got the same sort of letter; and rather than do what HP did, they decided to take this on in a courtroom.

That's the -- I think that's the fundamental issue.

THE COURT:  All right.  Response?

MR. CAWLEY:  Well, there's no question that one way or another, we're going to be telling the jury through this stipulation that the Defendants received notice.

So if they're going to draw the inference that the notice must have been the same as the HP letter, that's really irrelevant to the issue that I'm talking about, which is, for the purposes of understandability and continuity, I'd just like the witness, as a predicate to getting into the stipulation,

158

to say, yes, we sent notice.  And then the jury understands why they're hearing the stipulation.

THE COURT:  This letter to HP, do you intend to introduce that?

MR. CAWLEY:  That's -- that's an -- HP is not a defendant here.  But, yes, I do intend to introduce it --

THE COURT:  Okay.

MR. CAWLEY:  -- as part of the negotiation between Ericsson and HP that led up to the license agreement, which is part of our damages comparable --

THE COURT:  Okay.  And is there an objection to that exhibit?

MR. DAUCHOT:  Absolutely, Your Honor, and for the reasons that we've stated.

And if I could just add one more point about the notice.  If Your Honor will recall, the notice stipulation came up in the context of the in limine hearing.  And at that point, the issue was really, look, willfulness has even been bifurcated out.

We'll deal with the willfulness issues in a separate -- in a separate proceeding; and for purposes of the liability proceeding, we are going to leave the point of notice strictly to a benign stipulation that

159

will be read by the attorneys so that the jurors don't draw one inference or another from it.

THE COURT:  Okay.  Response?

MR. CAWLEY:  Your Honor, willful -- or excuse me -- notice, of course, is relevant to a number of issues.  In general, the Court is very familiar with the importance of being able to tell the jury, you gave somebody notice before you sued them.

We see constantly defendants who are beating up in the NPE saying you didn't even tell us before you sued us.  We need to be able to show that. It's essential now for proving inducing infringement, which is one of the allegations in this case, and it's also relevant if the facts develop -- we hope it won't, but if there's any failure of marking, it's relevant to that.

THE COURT:  All right.  Just a moment. Let me -- give me a moment to review this.

(Pause in proceedings.)

THE COURT:  Now, which part of this stipulation -- do you intend to read the entire stipulation in?

MR. CAWLEY:  Yes, Your Honor.

THE COURT:  Okay.

MR. CAWLEY:  I mean, I think -- I think

160

it's the Defendants' preference that the Court read the stipulation.

Is that right?

MR. DAUCHOT: Your Honor, we have no preference. It can be the attorneys or the Court for that matter. It's just weaving it into the direct testimony with all the implications that that carries.

THE COURT: All right. And you just want to ask the witness: Did you give notice to the Defendants?

MR. CAWLEY: Correct.

THE COURT: And then you're not going to ask them anything else about notice?

MR. CAWLEY: No.

THE COURT: And then you just want to read the stipulation.

MR. CAWLEY: Not going to ask them the date; not going to ask them the content; not going to ask them anything. What I would like to do is ask the question: Did you give notice to the Defendants? Get the answer, yes. And then either the Court or I, either one, would read that stipulation to the jury.

THE COURT: Okay. And, again, your objection for the record?

MR. DAUCHOT: The objection is, Your

161

Honor, that this is going to be weaving this into the witness's testimony, particularly in combination with the HP document.

THE COURT:  Well, now, when does that come up?

MR. DAUCHOT:  When does the HP document come up?

THE COURT:  Uh-huh.

MR. DAUCHOT:  Well, I'm not -- I know that it's been -- it's been identified as an exhibit that the Plaintiffs intend to use through Ms. Petersson.

And so from our perspective, we think that the aim behind the document is to have the jury believe that HP got exactly the same sort of notice that the Defendants gave and that the witness testified; that the Defendants got the exact type of letter that was sent to HP and that the Defendants said no.

THE COURT:  Is that true or not true?

MR. DAUCHOT:  Well, the '408 letters, of course, are -- are staying out.  But from our perspective, this is just a way to backdoor in the '408 issues and make this case really one about willfulness on the -- at the liability --

THE COURT:  All right.  I'm going to overrule the objection and allow you to ask the one

162

general question about did you give notice, and then you can read the stipulation.

MR. CAWLEY:  You want me to read it?

Thank you, Your Honor.

THE COURT:  All right.

MR. DAUCHOT:  Can we take up tomorrow the HP document, Your Honor?

THE COURT:  Oh, we'll take that up when it comes up, yes.

MR. DAUCHOT:  Okay.

MR. CAWLEY:  That's all the Plaintiff has, Your Honor.

THE COURT:  All right.  Defendants have anything?

MR. VAN NEST:  I don't believe so, Your Honor.

THE COURT:  All right.  Everyone, thank you for a very good day, and we'll be adjourned until tomorrow.

COURT SECURITY OFFICER:  All rise.

(Court adjourned.)

163

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of our abilities.


/s/ Shea Sloan
SHEA SLOAN, CSR
Official Court Reporter
State of Texas No.:  3081
Expiration Date:  12/31/14


/s/ Judith Werlinger
JUDITH WERLINGER, CSR
Deputy Official Court Reporter
State of Texas No.:  731
Expiration Date  12/31/14