1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3
    ERICSSON, INC., ET AL          )
 4                                        DOCKET NO. 6:10cv473
        -vs-                       )
 5                                        Tyler, Texas
                                   )  8:55 a.m.
 6  D-LINK CORPORATION, ET AL          June 4, 2013

 7

 8                   TRANSCRIPT OF TRIAL
                        MORNING SESSION
 9          BEFORE THE HONORABLE LEONARD DAVIS,
        UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY
10

11                   A P P E A R A N C E S

12

13  FOR THE PLAINTIFFS:

14
    MR. THEODORE STEVENSON, III
15  MR. DOUGLAS A. CAWLEY
    McKOOL SMITH
16  300 Crescent Court, Ste. 1500
    Dallas, Texas  75201
17

18  MR. JOHN B. CAMPBELL, JR.
    McKOOL SMITH
19  300 W. 6th Street, Suite 1700
    Austin, Texas  78701
20

21  COURT REPORTERS:       MS. JUDITH WERLINGER
                           MS. SHEA SLOAN
22                         shea_sloan@txed.uscourts.gov

23
    Proceedings taken by Machine Stenotype; transcript was
24  produced by a Computer.

25
```

```
 1  FOR THE DEFENDANT:

 2
    MR. GREGORY S. AROVAS
 3  KIRKLAND & ELLIS, LLP
    601 Lexington Avenue
 4  New York, New York 10022


 5


 6  MR. LUKE DAUCHOT
    KIRKLAND & ELLIS, LLP
 7  333 S. Hope Street
    29th Floor
 8  Los Angeles, California  90071


 9


10  MR. ADAM ALPER
    KIRKLAND & ELLIS, LLP
11  555 California St.
    24th Floor
12  San Francisco, California  94104


13


14  MR. MICHAEL E. JONES
    POTTER MINTON, PC
15  110 N. College, Ste. 500
    P.O. Box 359
16  Tyler, Texas  75710-0359


17


18  MR. ROBERT A. VAN NEST
    KEKER & VAN NEST, LLP
19  633 Sansome St.
    San Francisco, California 94111
20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2               (Jury out.)

 3               THE COURT:  Please be seated.

 4               All right.  I understand there's a matter

 5  before we bring the jury in.

 6               MR. JONES:  Yes, Your Honor.  The first

 7  one, I think, is really simple, a ruling to deal with 14

 8  exhibits.  And I really don't think you need to hear

 9  argument.  We --

10               THE COURT:  Is that microphone on,

11  Mr. Jones?  I think it's the little button at the base

12  of the microphone.

13               MR. JONES:  Is it on, Your Honor?

14               THE COURT:  That's good.

15               MR. JONES:  Thank you.  Thank you.

16  Somehow I'll learn to operate something.

17               Anyway, I think you can make one ruling

18  to deal with 14 exhibits.  There are certain licenses

19  that the Defendants have argued on Daubert motions and

20  motions in limines that they are not comparable and,

21  therefore, should not come into evidence.

22               We want to preserve our objection and

23  object to them coming into evidence for the reasons that

24  we've stated in those arguments due to the fact they're

25  not comparable.
```

1              But in light of the Court's prior

2  rulings, it seems to be obvious what the ruling of the

3  Court will be on that.  If I could, I would read those

4  exhibits into the record.

5              THE COURT:  All right.

6              MR. JONES:  They are Exhibits 26, 27, 28,

7  29, 30, 32, 31, 33, 37, 307, 308, 309, 310, and 469.

8              THE COURT:  Are those Plaintiffs' exhibit

9  numbers?

10              MR. JONES:  Those are Plaintiffs'

11  exhibits, yes, Your Honor.

12              THE COURT:  Okay.  Your objection's

13  overruled.

14              MR. JONES:  Thank you, Your Honor.

15              THE COURT:  Anything further before we

16  bring the jury in?

17              MR. DE VRIES:  Your Honor, just briefly,

18  this is Mike De Vries.

19              There are certain exhibits that are

20  related to the examination of Ms. Petersson today.  One

21  of them is the document that was discussed on the record

22  yesterday.  It was a notice letter to HP.  There are

23  some other related documents.  If it would please the

24  Court, we could take those up -- up now briefly.

25              THE COURT:  All right.  Uh-huh.

1                    MR. DE VRIES:  There are -- there are

2    essentially five documents that are at issue.

3    Document PX 238 is -- we believe it's an internal

4    calculation that was created by Ericsson for purposes

5    of -- in connection with this lawsuit, we believe.  And

6    our objection is that it is hearsay.

7                    It purports to be a calculation of a --

8    of the royalties underlying the HP license that was

9    discussed today in the objections to which were

10   overruled.  This is, to our understanding, not a

11   document created in the ordinary course of business,

12   but, again, was an internal document that was created

13   for purposes of analyzing the effective royalty rate of

14   the HP license.  It was created by Ericsson, and we

15   believe it's improper for that reason.

16                   THE COURT:  All right.  Response?

17                   MR. CAWLEY:  It is a business record,

18   Your Honor.  It was prepared in the course of Ericsson's

19   normal licensing business.  They have to do calculations

20   to determine what they think an appropriate rate is to a

21   particular party.  It was not prepared in anticipation

22   of this litigation.  The witness will testify that it's

23   their normal business practice to do this and maintain

24   it.

25                   THE COURT:  Okay.  Well, the witness lays

1  the predicate, I'll -- I mean, I haven't heard -- heard

2  the predicate yet.  But assuming that they can lay the

3  appropriate business record credit -- predicate, your

4  objection will be overruled.

5          MR. DE VRIES:  Yes, sir.  We'd -- we'd

6  understood that the document was not created by the

7  witness today, but we'll listen for the foundation, as

8  well.

9          THE COURT:  All right.

10          MR. DE VRIES:  The next document is PX

11  240.  It's an e-mail exchange between Ericsson and HP.

12  It relates, again, to that HP license, Your Honor, and

13  it includes statements by HP about it's -- about its

14  business.  We object on the grounds that this is -- is

15  hearsay.

16          MR. CAWLEY:  We don't -- we don't plan to

17  use this document, Your Honor.

18          THE COURT:  All right.  Objection

19  sustained.

20          MR. DE VRIES:  PX 242 and 243 are some --

21  we're not exactly sure what the source of these

22  documents are, but they appear to be --

23          MR. CAWLEY:  I apologize for this

24  exercise, Your Honor.  We don't plan to use those two

25  either.

1                    THE COURT:  All right.  They're not going

2    to offer those.

3                    MR. DE VRIES:  That -- that's easy.

4    Thank you very much.

5                    THE COURT:  Uh-huh.

6                    MR. DE VRIES:  Then lastly on 240, I -- I

7    suspect that Your Honor's earlier rulings already will

8    account for this.  This appears to be another internal

9    estimate at Ericsson relating to the HP license.

10                   THE COURT:  I -- I believe he said they

11   weren't going to offer 240.

12                   MR. DE VRIES:  Oh, I'm sorry, this is

13   244, Your Honor.

14                   THE COURT:  244.

15                   MR. DE VRIES:  And I may have misspoke,

16   and I apologize.

17                   THE COURT:  Uh-huh.

18                   MR. DE VRIES:  244 appears to be another

19   Ericsson internal calculation.  We don't think it was

20   written by Ms. Petersson.  And in light of Your Honor's

21   earlier ruling, I suppose we'll wait to hear the

22   foundation.  We don't think it's been established.

23                   THE COURT:  All right.  Okay.

24                   MR. DE VRIES:  And then finally, Your

25   Honor, there's the document PX 250.  That's the notice

1  letter that was sent to HP.  My colleague Mr. Dauchot

2  yesterday described it to Your Honor.  It's the initial

3  notice letter that was provided to HP.

4           We have concerns for the reason that Mr.

5  Dauchot stated yesterday, namely that -- that it will

6  appear that that document was sent to all of the

7  Defendants, when we have the stipulation to take the 408

8  correspondence out.  And we don't think it's necessary.

9  We don't think it's necessary to interpret the license.

10          THE COURT:  All right.  Response?

11          MR. CAWLEY:  Well, Your Honor, all I'm

12  going to ask the witness about that document is, did you

13  send a notice to HP?  And is this a copy of it?  I'm not

14  going to ask her, is this a form letter you always send?

15  Is this similar to what you sent to the Defendants in

16  this case?

17          So I'm not going to ask her any questions

18  that are going to begin to encroach on Your Honor's

19  concern about our discussing --

20          THE COURT:  All right.

21          MR. CAWLEY:  -- the content of settlement

22  negotiations.

23          MR. DAUCHOT:  Your Honor, if I could --

24  I'm sorry, Luke Dauchot.

25          With that document, Your Honor, and it is

1   irrelevant.  I don't know -- I mean, I understand the HP

2   license, and we had that discussion in the Daubert

3   context and all.  But to start introducing what are --

4   amount to Rule 408 settlement discussions with HP and

5   just pick the first one out of the box, without dragging

6   in the entire Rule 408 history between the parties and

7   the back and forth and the discussions, strikes me as --

8   as -- as, one, irrelevant, Your Honor, under 402, but

9   certainly under 403, unfairly prejudiced, even assuming

10  a Rule 408 letter to HP before the license agreement

11  that they intend to rely on was entered into.  You know,

12  it's -- it's just not relevant.  I'm not sure what --

13  what's that probative to.

14              THE COURT:  Let me see a copy of the

15  letter, please.

16              And, Mr. Cawley, what is this probative

17  of -- the contents of the letter, what is that probative

18  of?

19              MR. CAWLEY:  It's probative of their

20  licensing practice and the notice.  It's not within Rule

21  408 because it was offered to show notice.

22              THE COURT:  Well --

23              MR. DAUCHOT:  Your Honor, notice to whom?

24  I mean, and the fact that HP got notice of anything

25  is -- is not relevant under 402 because HP comes in as

1  a -- as the license agreement over our objection.  When

2  they got notice, how they got notice, what was said in

3  the context of the notice really has nothing to do

4  with -- with this case.

5             THE COURT:  All right.  I'm going to

6  withhold ruling on it until I hear the testimony; but

7  before you actually go into it, approach the bench after

8  you've laid your predicate, and I'll hear objections

9  again.

10             MR. DAUCHOT:  Thank you, Your Honor.

11             MR. DE VRIES:  Your Honor, finally, there

12  is an exhibit -- it's PX 71.  I imagine that it's within

13  the scope of Your Honor's ruling yesterday, but you'll

14  recall that there was a stipulation between the parties

15  about the date on which the Defendants received notice

16  of infringement.  Part of that stipulation refers to a

17  document.

18             It's this document, PX 71, which was,

19  according to the stipulation, provided to Toshiba -- at

20  least this is what Ericsson contends -- during a

21  meeting.

22             I think the only question is whether that

23  document ought to come in through Ms. Petersson or be

24  admitted into the record without that testimony, and we

25  would appreciate Your Honor's guidance.

1                    THE COURT:  You'd like my guidance about

2   whether it should be put in through Ms. Petersson or

3   through someone else?

4                    MR. DE VRIES:  Our belief is that it

5   should not come in through Ms. Petersson, but I want to

6   recognize that Your Honor's ruling yesterday may have

7   overruled what I just said.

8                    THE COURT:  All right.  Response?

9                    MR. CAWLEY:  Well, it's a business

10  record, Your Honor.  There's no requirement that anyone

11  with personal knowledge of what is depicted in the

12  business record qualifies.  They simply have to say

13  they're the appropriate custodian.

14                    THE COURT:  All right.  Objection's

15  overruled.

16                    All right.  Anything further?

17                    MR. DE VRIES:  Your Honor, we have a list

18  of agreed upon pre-admitted exhibits.  I -- I can bring

19  them up now if it pleases the Court.

20                    THE COURT:  We'll do that in front of the

21  jury --

22                    MR. DE VRIES:  Yes, sir.

23                    THE COURT:  -- as we bring them in.

24                    MR. CAWLEY:  We -- we do have one -- one

25  matter, Your Honor.

1              THE COURT:  Okay.

2              MR. CAWLEY:  In Ms. Petersson's

3   testimony, which I anticipate will probably begin later

4   this morning or early this afternoon, she is going to

5   get into the content, as Your Honor just heard, of these

6   license agreements.  These agreements are attorneys'

7   eyes only under the protective order.  They contain

8   highly-sensitive financial information, and many of them

9   contain obligations that Ericsson has undertaken to seek

10  to protect the confidentiality of what's in those

11  license agreements.

12              So we're going to request, during about

13  the 15 to 20 minutes as Ms. Petersson testifies about

14  the contents of those license agreements, that the Court

15  clear the courtroom of anyone not bound by the

16  protective order.

17              THE COURT:  Okay.  All right.  Just for

18  the audience's information, when that happens -- and

19  I'll make this instruction on the record -- it will be a

20  sealed courtroom.

21              So unless you are an attorney that is

22  subject to the protective order that's been entered in

23  this case, when we get to that testimony, you'll need to

24  leave the courtroom.  We will let you back in just as

25  soon as that's over with.

1          So, anything else before --

2          MR. DAUCHOT:  Your Honor, if I could --

3  just one point.  The concern on the part of the

4  Defendants, of course, is that we have a whole lot of

5  drama surrounding these license agreements which, as

6  Your Honor knows, is a -- is a hot-button issue in this

7  case.

8          In order to -- to tamp that -- that

9  appearance down and -- and take out some of the

10  potentially prejudicial effect, would it make sense to

11  have -- if they get into the licenses, have that done

12  after a break and so that when -- when the -- these

13  exhibits are introduced, that we don't have the jury

14  thinking that this is some real important matter here

15  that the courtroom needs to be cleared for?  Just to --

16  to tamp that appearance down a bit and --

17          THE COURT:  Response?

18          MR. DAUCHOT:  -- and mitigate the

19  prejudice.

20          MR. CAWLEY:  Well, Your Honor, like --

21  like all lawyers who prepare witnesses, there's a

22  certain sequence that I think helps the jury understand

23  Ms. Petersson's testimony.  I'd be glad to ask the Court

24  or notify the Court; and if the Court wants to take a

25  break at the point when we reach this, I don't have any

```
 1  objection.
 2              THE COURT:  All right.  I'm going to deny
 3  that request.  I just -- I think it would leave more
 4  questions in the jury's mind if they take a break and
 5  they come back and the courtroom is empty than it would
 6  if we -- if I explain it to them.  I do this in cases
 7  all the time when we get to this type of information.
 8  So I don't think it's going to create a great problem.
 9              All right.  Bring the jury in, please.
10              COURT SECURITY OFFICER:  All rise for the
11  jury.
12              (Jury in.)
13              THE COURT:  Please be seated.
14              All right.  Good morning, Ladies and
15  Gentleman of the Jury.
16              JURORS:  Good morning.
17              THE COURT:  Welcome back.  Day two.
18  We're about to begin.  And you look bright-eyed and a
19  lot more rested than you did at the end of the day
20  yesterday, so I hope you got a good night's sleep and
21  are ready to go again.
22              Mr. Cawley, if you'd like to put your
23  witness back on the stand.
24              MR. CAWLEY:  Thank you, Your Honor.
25  Mr. Brismark, would you take the stand again, please?
```

1          THE WITNESS:  Does this work?

2   GUSTAV BRISMARK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

3          DIRECT EXAMINATION (CONTINUED)

4   BY MR. CAWLEY:

5       Q.   Good morning, Mr. Brismark.

6       A.   Good morning.

7       Q.   Yesterday you told us, I believe, that there

8   is a group of people within Ericsson that are

9   responsible for managing Ericsson's patents.  Is that --

10  do I remember that correctly?

11      A.   Yes, that's correct.

12      Q.   And you're a member of that group?

13      A.   Yes.

14      Q.   And have been for roughly the past 10 years?

15      A.   That's correct.

16      Q.   I think --

17      A.   Since 2004.

18      Q.   I think I may have misspoken yesterday, and I

19  think I -- the reason I think this, is because you told

20  me so last night.  But I may have referred to you

21  yesterday as the head of that group, but that's not --

22  you're not the head of the group, are you?

23      A.   I'm head of the portfolio management group,

24  yes.

25      Q.   Okay.  But -- but there's a larger group

1  within Ericsson that is also responsible for the

2  protection of Ericsson's patent portfolio.

3       A.   Yes.

4       Q.   And just so we understand, this group of

5  people, how many people are we talking about?

6       A.   We talk about roughly 200 people.

7       Q.   200 people.

8            This -- this group of people, these are not

9  the engineers we talked about yesterday that are doing

10 research and development?

11      A.   That's correct, yes.

12      Q.   These are not people who themselves are -- are

13 getting -- inventing things that become patented?

14      A.   Correct.

15      Q.   These are people who are responsible for

16 managing Ericsson's thousands of patent assets, fair?

17      A.   Yes.

18      Q.   Okay.  And that's part of your job.

19      A.   That's part of my job, yes.

20      Q.   You used to work in research and development,

21 but for the last 10 years, you haven't been doing that.

22 You have 10 patents to your name that came from your

23 years doing research and development, but for the past

24 10 years, you've been sort of not working in the -- in

25 the fields of technology, but working in an office

1  helping to take care of Ericsson's patents?

2      A.   Correct.

3      Q.   Okay.  Now, in that capacity, do you have

4  responsibility for -- how many patents, would you say?

5      A.   Ericsson today has 33,000 granted patents, and

6  it's been growing over the past years.  So in the

7  beginning of 2004, it was less.  Maybe twenty-five or

8  so.  But it's been growing since then.

9      Q.   Okay.  So -- so it's thousands of patents?

10     A.   Yes.

11     Q.   Now, given that you're responsible for the

12  management of thousands of patents, I assume that it's

13  not really part of your job to become highly

14  knowledgeable about any one of them; is that a fair

15  statement?

16     A.   Yes, that's fair, and it would be impossible

17  to have detailed knowledge on all of them.

18     Q.   Okay.  So -- but what I'd like to ask you to

19  do this morning is, we've heard something about the five

20  patents in this case from lawyers in opening statement;

21  but since you're the first witness, I'd like to ask you

22  to give us just a very high-level introduction to the

23  patents in this case.

24          We've heard that later in the trial we'll hear

25  from a professor at the University of Texas who has

1  studied these patents and studied the Defendants'

2  products; and that that testimony is going to be very

3  detailed and probably will take several hours.

4          But I'm not going to ask you to do that.  What

5  I'm going to ask you to do is just to introduce us to

6  the patents and to tell us a little bit about them and

7  how they came about, and very generally, what they

8  relate to.

9          And let's start with Plaintiff's Exhibit 4,

10 which is the '625 patent.

11      A.   Yes.

12      Q.   Who invented the idea in the '625 patent?

13      A.   It was two guys named Peter Larsson and Mikael

14 Larsson.

15      Q.   Do you know Peter Larsson?

16      A.   I do know Peter Larsson, yes.

17      Q.   Can you show us a picture of him?

18      A.   I can do that.  So this would be Peter Larsson

19 in person.

20      Q.   Tell us about him.  What's Peter Larsson like?

21      A.   We worked at Ericsson research, both of us,

22 and I know him from there.  And Peter is also one of the

23 persons within Ericsson who has been named inventor of

24 the year, which is an award given to inventors having

25 outstanding performance.

19

```
1       Q.    Okay.  What -- what -- tell us something else
2   about him.  What do you -- what do you know about Peter
3   Larsson based on having worked with him years ago?
4       A.    Well, I know that he -- he's a very thoughtful
5   person.  He is thinking a lot about sustainability and
6   environment; and among other things, he would, whenever
7   possible, rather take the train than an airplane, if
8   he's traveling, if that is an option --
9       Q.    Okay.
10      A.    -- and also when --
11      Q.    Okay.
12      A.    Yeah.
13      Q.    Thank you.
14      A.    Yeah.
15      Q.    So what was Peter working on back in the late
16  '90s?
17      A.    At that time, he was working at Ericsson's lab
18  in Singapore.
19      Q.    Singapore.  Okay.
20            Now, where -- is he a Swede?  Is he from
21  Sweden originally?
22      A.    He's Swedish.
23      Q.    Okay.  And he's an engineer, I guess?
24      A.    Yes.
25      Q.    And what was he working on in Singapore in the
```

1   late '90s?

2        A.   So he was in a contract.  At the time,

3   Ericsson was setting up a lab in Singapore, and the

4   objective of the project he was working on was to create

5   an office environment with computers calculating and

6   having high-performance wireless LAN in that office.

7        Q.   All right.  And in the course of doing that

8   work, working on a wireless LAN for an office, what did

9   he invent?

10       A.   He invented, in the '625 patent, a

11  synchronization technique.  It's related to

12  synchronization of networks that communicate at high

13  speed.

14            And as we talked earlier about retransmission

15  of lost packets, what he invented in this patent is a

16  way of making the transmitter work more efficiently in

17  order to stay synchronized.

18       Q.   Okay.  And when was his patent published?

19       A.   It was published on July 23rd, 2002.

20       Q.   How could his invention be important for

21  Wi-Fi?

22       A.   It's important because in a wireless LAN or

23  short-range data radio network, when you go to higher

24  speeds, his inventions will enable those higher speeds

25  by -- by having more efficient communication and better

1   throughput.

2       Q.    Okay.  Now, yesterday you were -- you were

3   sitting in the courtroom for the opening statements by

4   the lawyers, weren't you?

5       A.    Yes.

6       Q.    And the lawyer for the Defendants who gave the

7   opening statement made quite a big point of pointing out

8   that the word Wi-Fi doesn't even appear in the '625

9   patent.

10          Do you remember that?

11      A.    Yes.

12      Q.    Were you surprised to hear that?

13      A.    No.

14      Q.    Why not?

15      A.    Because to my understanding, Wi-Fi as a label

16  for the 802.11 standard was introduced in 2009.

17      Q.    You mean 1999?

18      A.    I mean 1999.  Sorry.

19      Q.    Okay.  1999.

20          And when was the filing date of this patent?

21      A.    The filing date was October 28th, 1998.

22      Q.    So this idea was conceived before the name

23  Wi-Fi was even invented; is that right?

24      A.    Yes.

25      Q.    Okay.  Now, let me ask you about the second

1  patent that we'll hear about in this case.  It's the

2  '568 patent, and it is Plaintiff's Exhibit 6.

3       A.   Yes.

4       Q.   Who invented the ideas in this patent?

5       A.   This patent was invented by Krister Raith and

6  colleagues of Krister.

7       Q.   Krister Raith is his name.  Is Mr. -- do you

8  know Mr. Raith?

9       A.   Yes, I do.

10      Q.   Would you show us his picture?

11      A.   Yeah.  This is Krister Raith, yes.

12      Q.   Okay.  Is Mr. Raith originally from Sweden?

13      A.   He is.  And he was working in the research

14  group, which I joined in 1986, and he was the guy to be

15  friends with in order to be able to get to the coffee

16  table during breaks, because he was in control of the

17  money there.

18      Q.   Okay.  He ran the coffee concession in the

19  office?

20      A.   Yes, he did.

21      Q.   All right.  And do you still know Mr. Raith?

22      A.   Yes, I do.

23      Q.   Where does he live now?

24      A.   He lives today in San Diego.

25      Q.   What did Mr. Raith and his co-inventors invent

1  that was awarded the '568 patent?

2      A.   What they invented and what the '568 patent

3  was for, was the need for having different optimization

4  for different type of services in a wireless data

5  network that offered multiple types of services going

6  over the interface.

7           So by introducing an identifier, the system

8  could optimize better and use better optimization for

9  different service types.

10     Q.   I see.  When was this patent published?

11     A.   This was published in October of 2002.

12     Q.   Is all that information on the face of the

13  patent?

14     A.   Yes.

15     Q.   Why are these ideas in -- in this patent

16  important for Wi-Fi?

17     A.   They are important, because they --

18          MR. AROVAS:  Your Honor, I object.  I

19  believe we're getting into opinion testimony.

20          May I approach?

21          THE COURT:  Yes, you may.

22          (Bench conference.)

23          MR. AROVAS:  We actually talked about

24  this this morning.  My concern of this witness is, this

25  witness is not an inventor in any of the five patents.

1  He testified he didn't even read the patents in their

2  entirety.

3             And he was not disclosed as an expert,

4  and so when he -- if he wants to challenge and say what

5  the invention is, that's one thing; but when he starts

6  to say why is it relevant to Wi-Fi, he's effectively

7  doing an infringement analysis.  He's saying his

8  invention is relevant to the accused product, and that

9  would be opinion testimony.

10            So what we discussed today is, if he

11  wants to say, at a very high level, because he's not an

12  inventor, he's not -- this is not fact testimony.  This

13  is generally what this was about, fine, we'll let that

14  go.

15            But when he starts to say, how is it

16  relevant to Wi-Fi, he's basically saying, why is this

17  invention important to be used in Wi-Fi, which is

18  effectively opinion testimony on infringement.

19            MR. CAWLEY:  Well, it's not -- it's not

20  that close to an opinion of infringement.  He's one of

21  skill in the art.  They've taken his deposition.

22  He's not talking about claims.  He's not comparing

23  claims to accused products.  He hasn't seen the accused

24  products.  He's just generally testifying as an Ericsson

25  employee, and I believe this would be relevant to Wi-Fi.

1          THE COURT:  Overruled.

2          (Bench conference concluded.)

3     Q.   (By Mr. Cawley) Mr. Brismark, let me repeat my

4  question to you.  How is this patent we were just

5  talking about, the '568 patent, important for Wi-Fi?

6     A.   It's important because Wi-Fi as developed from

7  its first release into what it is today where you have

8  the possibility and the mechanisms to support different

9  type of services with different requirements, which was

10  not the case in the beginning.

11          This is a way of making that possible in a

12  Wi-Fi system.  And the inventor foresaw that need when

13  he made this invention.

14     Q.   All right.  Thank you, sir.

15          Let's move now to the next patent of the five.

16  This is the '223 patent.  It is Plaintiffs' Exhibit 8.

17          Who invented the idea that is protected by

18  this patent?

19     A.   So the inventors of this patent is Stefan

20  Reiner (sic) and Reiner Ludwig.

21     Q.   Can you show us a picture of Mr. Wager?

22     A.   Yes, I can do that.  So we have Mr. Wager here

23  in this picture.

24     Q.   The inventors we have seen so far are Swedes.

25  Is Mr. Wager from a different country?

```
1        A.    Mr. Wager is from Germany.

2        Q.    Germany?

3        A.    Yes.

4        Q.    And does he work in -- in Germany now --

5        A.    Yes.

6        Q.    -- for Ericsson?

7        A.    He has a research lab in Aachen in Germany.

8        Q.    In Aachen.  And did -- what -- what did Mr.

9   Wager and his co-inventors invent that became the '223

10  patent?

11       A.    They invented a methodology where you would

12  introduce a timer for how long to continue doing

13  retransmissions if packets were not being acknowledged

14  by the receiver.

15       Q.    Okay.  And did Ericsson submit this idea in

16  the form of the patent to the 3G standard-setting body?

17       A.    Yes.

18       Q.    Let me show you Plaintiffs' Exhibit 204 and

19  ask you what this is.

20       A.    So this is a contribution to the working

21  group -- two of the radio access network standardization

22  activity related to 3G.

23       Q.    Okay.  In other words, this is -- this is a

24  document that Ericsson sent to the 3G standard-setting

25  body saying we want to declare our patents essential
```

1  to -- essential to the standard that you're developing?

2      A.    No.   This is a contribution which was -- is

3  more a technical contribution, describing one of the

4  solutions that Ericsson proposed to --

5      Q.    I see.

6      A.    -- the standardization activity for inclusion

7  into the standard.

8      Q.    So that Ericsson is proposing that this is

9  something that that body might want to consider adopting

10  as part of the standard?

11      A.    Correct, yes.

12      Q.    Now, we heard a little bit about this

13  yesterday, again, in the opening.   I want to make sure

14  because I'm afraid there's some terminology here that

15  may be confusing.

16           You told us that this was a contribution that

17  Ericsson made to the 3G standard.   Does that phrase, or

18  word really, a contribution, have a particular meaning

19  in this context?

20      A.    Yes.   You usually refer to -- you use the word

21  contribution when you talk about input paper or proposed

22  solution of a certain technology which you propose to be

23  included into a standard.

24      Q.    Okay.   So I want to make sure we all

25  understand that because I'm afraid there's some

1  potential confusion there about the word contribution.

2           Are you saying that usually when it's used by

3  people in this field who are knowledgeable about

4  standard-setting, it means a written proposal that

5  certain technology be adopted into a standard?  That's a

6  contribution?

7       A.  Yes.

8       Q.  But there's another way we could use the word,

9  I guess, that we normally use it, that when you

10 contribute to something, you just sort of help along the

11 way, so the person who types up the standard contributes

12 to it, right?

13          MR. AROVAS:  Objection.  I don't think

14 the witness can testify as to his opinion.

15          THE COURT:  Overruled.

16      Q.  (By Mr. Cawley) You can answer.

17      A.  Yes, I agree.

18      Q.  Okay.  So -- so when you -- when you indicate

19 that this is a contribution that Ericsson made to the

20 standard, you're using it in that specialized way of a

21 written submission of technology?

22      A.  Yes.  It doesn't say anything -- whether or

23 not a contribution would be actually included in the

24 standards, so it's mainly referring to the paper as

25 such.

1      Q.    And by making this -- this contribution, did

2    Ericsson make a commitment that it would license any

3    patents it held covering the standard on the reasonable

4    and non-discriminatory terms you explained to us

5    yesterday?

6      A.    That is something that Ericsson would do in

7    parallel; it's not done in this paper as such.   It's

8    done -- usually, you give first a blanket declaration

9    in, in essence, saying that you're willing to license

10   your patents on RAND terms.   And then in addition, in

11   ETSI, you would do so for individual patents in a later

12   stage.

13     Q.    Okay.   And -- and did this contribution become

14   a part of the 3G standard?

15     A.    Yes.

16     Q.    Is it also important for Wi-Fi?

17     A.    Yes, it is.

18     Q.    Can you tell us how?

19     A.    It's also a part of the Wi-Fi standard to do

20   in a similar way or in the same way as it's done in the

21   3G version.

22     Q.    Okay.   Let's move on to the next patent.

23   That's the '215 patent, Plaintiffs' Exhibit 10.

24           Who invented the idea that became Plaintiffs'

25   Exhibit 3?

1      A.    So this patent was invented by a team of

2  people in different locations.  Among others, Mr. Erik

3  Schön was one of the inventors.

4      Q.    Okay.  How do you pronounce his last name?

5      A.    Schön, S-c-h-ö-n.

6      Q.    Okay.  Thank you.  We -- we can't even spell

7  the same, I'm afraid S-c-h-u-n, you said is -- is an O

8  with two dots over it?

9      A.    That's correct.

10      Q.    Okay.  I'm sure the Court Reporter can handle

11  the two dots later.  But do you have a picture of him

12  you could show us?

13      A.    Yes, I do.

14      Q.    Tell us about Mr. Schön.

15      A.    So Mr. Erik Schön and I were colleagues and

16  actually at the time of this invention we were both

17  working out of the office in Tokyo, in Japan.

18      Q.    Uh-huh.

19      A.    Today we are both living in Sweden again.

20      Q.    Okay.  If we go back to the face of the patent

21  and we highlight the part that's already highlighted

22  there, but blow it up if you can, Mr. Diaz, that shows

23  us the inventors.

24             We see the first one is from Malmo.  Is that

25  in Sweden?

1      A.    Yes.

2      Q.    And the second one is from Aachen.  That's in

3 Germany?

4      A.    Yes.

5      Q.    And so is the third one, from Aachen?

6      A.    Yes.

7      Q.    And then from Stockholm?

8      A.    Yes.

9      Q.    And another town in Sweden, right?

10     A.    Sollentuna, yes.

11     Q.    And another Swedish town?

12     A.    Yes.

13     Q.    And then finally, two inventors from Tokyo?

14     A.    Correct.

15     Q.    So is this literally an example of Ericsson

16 inventors around the world collaborating to develop this

17 invention?

18     A.    Yes, absolutely.  We hired research labs

19 collaborating on the 3G development throughout the world

20 at the time when this was being invented.

21     Q.    And what did they invent that became this --

22 this patent?

23     A.    This specific invention is related to how you

24 can minimize the overhead of the -- the feedback in a --

25 in acknowledgement messages.  That's important if you

1  want to have a really high throughput network.  You need

2  to make the control overhead more efficient, so to

3  speak, in order to get all the focus on getting data

4  through the network.

5      Q.   Okay.  Mr. Brismark, you used some words in

6  that answer like overhead and throughput, and I'm not

7  going to take the time to ask you about those things

8  now.  I'm just going to move on --

9      A.   Okay.

10      Q.   -- and ask Professor Nettles to explain that

11  to us when he's giving us more detail about this patent.

12           Were these ideas that became the '215 patent

13  also submitted to the 3G standard-setting body?

14      A.   Yes, they were.

15      Q.   Let me show you Plaintiffs' Exhibit 515.  What

16  is this document?

17      A.   It's, again, a contribution document with a

18  technical solution which was suggested to the same

19  working group 2 we talked about earlier.

20      Q.   Uh-huh.  And did they also agree to license

21  this patent on RAND terms?

22      A.   Yes.

23      Q.   You know, I am going to ask you about that

24  phrase because it is potentially confusing, and I know

25  it's part of your job to -- to know about these things.

1          Yesterday we explained this idea, a commitment

2    that companies can make and that Ericsson in this case

3    has made to license the patents to people who need to

4    use them on reasonable and non-discriminatory terms.

5          A.   Yes.

6          Q.   You just used, though, and then I followed

7    your lead and also used, an expression, FRAND, which

8    would be spelled F-R-A-N-D.  What does that mean?

9          A.   That's the term that is used in ETSI, the

10   other standardization body we talked about.  And the F

11   stands for fair.

12         Q.   Fair, reasonable, and non-discriminatory?

13         A.   Yes.

14         Q.   So is it -- is it typical that in -- people --

15   when people in Europe where ETSI is located are

16   licensing patents, they talk about FRAND, with an F in

17   front of it, and people in the United States have

18   traditionally talked about RAND?

19         A.   That's my understanding, yes.

20         Q.   But are they really significantly different

21   commitments?

22         A.   No.  I actually use FRAND and RAND commitments

23   being the same.

24         Q.   Okay.  Great.

25              Now, back to the '215 patent.  You said

1  that -- that Ericsson agreed to license that patent on

2  FRAND terms?

3       A.   Yes.

4       Q.   And was it voted into the standard -- 3G

5  standard?

6       A.   Yes, it was.

7       Q.   Is it also important for Wi-Fi?

8       A.   Yes.

9       Q.   Why do you say that?

10       A.   Because Wi-Fi has also developed, since its

11  first release up until the release 11n, and today has

12  similar type of -- of performance which means that this

13  invention is -- is used and -- and has -- is benefit to

14  the Wi-Fi standard.

15       Q.   All right, sir.  Now, the last patent is the

16  '435 patent -- that is Plaintiffs' Exhibit 3.  Who

17  invented this idea?

18       A.   This was invented by Mr. Lazraq and Mr. Khan,

19  both from Sweden.

20       Q.   They're both from Sweden?  What did Mr. Lazraq

21  and Mr. Khan invent?

22       A.   They invented an invention which is also

23  related to -- to synchronization of sender and receiver

24  in a situation where you have lost packets and

25  confirmations and so forth where the -- it would help

1   the receiver to work more efficiently.

2        Q.   And when was the patent published?

3        A.   It was published in 2001, December.

4        Q.   December 2001.

5             And is this idea, the idea that is in this

6   patent, also important for Wi-Fi?

7        A.   Yes, it is.

8        Q.   And why is that?

9        A.   It's also providing means for -- for better

10  throughput in a high throughput network.

11       Q.   Okay.  Now, thank you for -- for introducing

12  us to those patents, Mr. Brismark.  I know we'll hear a

13  lot more about them in -- in the days to come.

14            On the patent video that the jurors heard

15  yesterday morning before they came up to the courtroom,

16  there was some discussion about something called the

17  state of the art.  Are you familiar with that term?

18       A.   Yes.

19       Q.   I guess most of us -- we hear it sometimes

20  when someone says, wow, that stereo system is the state

21  of the art or that jet plane is the state of the art.

22            What do you understand that to mean?

23       A.   I understand it to mean the level where the

24  technology at this point in time, the best solution you

25  can find for solving a certain problem at this point in

1  time.

2      Q.    Okay.  Now, when were the five patents -- the

3  five Ericsson patents you just described to us that are

4  in this case, when were they the state of the art?

5      A.    They were state of the art in -- in the late

6  '90s -- mid-to-late '90s.

7      Q.    Okay.  Can we see that if we look at the face

8  of the patents, that all of them were filed with the

9  Patent Office in the late '90s?

10     A.    Yes, by looking at the filing dates, you will

11  see that.

12     Q.    Now, does Ericsson enter into agreements with

13  its employees, you and all its other employees, that if

14  the employee invents something while they're working for

15  Ericsson, that the employee will agree to assign their

16  patent rights to the company Ericsson?

17     A.    Yes.

18     Q.    Is that -- is that in your understanding a

19  pretty typical agreement for people who work for

20  technology companies and are paid to develop things?

21     A.    Absolutely.  That's my understanding.

22     Q.    And have the inventors -- all of the inventors

23  of the five patents in this case assigned their patent

24  rights to Ericsson?

25     A.    Yes, they have.

1    Q.   And are those assignments found in Plaintiffs'

2  Exhibits 408 through 412?

3    A.   Yes, you can find it there.  Those are the

4  assignments.

5    Q.   Now, Mr. Brismark, in 2003 did Ericsson

6  analyze which of its patents it felt were important for

7  and even essential for Wi-Fi standards?

8    A.   Yes.

9    Q.   And did some of the people in the group you

10  worked for begin to study products that were made by

11  companies that offer Wi-Fi?

12    A.   Yes.

13    Q.   And did Ericsson contact some of the companies

14  who used the Wi-Fi standard about the possibility of

15  taking a license?

16    A.   Yes, we did.

17    Q.   And were you successful -- I don't mean you

18  personally.  Was Ericsson successful in entering into

19  license agreements with some of those companies for your

20  Wi-Fi patents?

21    A.   Yes, in some cases, but not in all.

22    Q.   Okay.  So there were other companies that even

23  though you contacted them, you were not successful to

24  entering into an agreement with them?

25    A.   Yes.

1      Q.    Is that accurate?

2      A.    Yes, that's correct.

3      Q.    Why did Ericsson file this suit?

4      A.    We filed this lawsuit because we saw no other

5  possibility to resolve this conflict we have and where

6  some companies have actually taken a license to

7  Ericsson's patents, when others -- others have refused

8  to do so.

9      Q.    Were you involved in the decision to file this

10  case?

11      A.    Yes, I was.

12      Q.    Who else was involved at Ericsson?

13      A.    My manager, Kasim Alfalahi, also head of IP

14  licensing was involved, and so was the CEO of the

15  company.

16      Q.    The head of the entire company participated in

17  the decision to file this suit?

18      A.    Yes, he was.

19      Q.    Now, has Ericsson often had to file suit in

20  the U.S. to collect a reasonable royalty for the use of

21  its patents?

22      A.    No.

23      Q.    Is that a rare thing for Ericsson?

24      A.    Yes, it's very rare.  Yeah.

25      Q.    Okay.

```
 1                    MR. CAWLEY:  Thank you, Your Honor.  I
 2  pass the witness.
 3                    THE COURT:  All right.
 4                    Cross-examination.
 5                        CROSS-EXAMINATION
 6  BY MR. AROVAS:
 7       Q.   Good morning, Mr. Brismark.
 8       A.   Good morning.
 9       Q.   And so since we haven't met before, let me
10  introduce myself.  My name is Greg Arovas.
11       A.   Good morning, Greg.
12       Q.   Pleasure to meet you.
13       A.   Pleasure to meet you.
14       Q.   So where I'd like to start, you talked quite a
15  bit about the IEEE.
16       A.   Yes.
17       Q.   Do you recall that?
18            So I'd like to talk about -- or start with
19  your experience and exposure to the IEEE.  Okay?
20       A.   Okay.
21       Q.   Now, it's a fact, isn't it, that you've never
22  attended an 802.11 IEEE meeting, right?
23       A.   That's correct.
24       Q.   It's a fact that you've never worked on any
25  technical projects directed to 802.11, right?
```

1     A.    Not directly directed to 802.11, that's

2  correct.

3     Q.    Right.  And, in fact, you were deposed and you

4  explained that, although you are an engineer by

5  background, you can't identify any projects that you

6  were personally involved in at Ericsson that were

7  specifically focused on local area network technologies,

8  right?

9     A.    Correct.

10     Q.    And, in fact, when you were deposed, you

11  explained you hadn't even read the 802.11 standard;

12  isn't that right?

13     A.    I hadn't personally read it, that's correct.

14     Q.    That's right.  And that's in this case, and

15  the Wi-Fi that we're talking about is 802.11 Wi-Fi,

16  right?

17     A.    That's correct, yes.

18     Q.    And in addition to not attending any meetings,

19  you've never made any proposals, contributions, or

20  submissions to the 802.11, right?

21     A.    That is right.

22     Q.    You've never commented on any draft 802.11

23  standards, right?

24     A.    No, I haven't done that.

25     Q.    And, in fact, broadening this beyond just

1  802.11, you've never made any presentations to any IEEE

2  groups at all for any IEEE standard, right?

3       A.   I have not presented in IEEE, that's correct,

4  yes.

5       Q.   Okay.  So now, what I would like to do is take

6  a step back and talk about wireless communications more

7  generally.

8            And you talked about different types of

9  wireless communications:  Cellular, wireless LANs, I

10  think you talked about Bluetooth.  Those are all

11  different types of wireless communications, right?

12       A.   Yes.

13       Q.   And you would agree with me that -- let's just

14  talk about cellular first, and cellular is the core of

15  Ericsson's business, right?

16       A.   Sorry.  Yes, it's the core of our business.

17       Q.   Okay.  And so let's start by talking about

18  cellular standards.  And you would agree with me that

19  there's many, many different cellular standards that

20  have been developed over the years, right?

21       A.   There are quite a few, yes.

22       Q.   Okay.  And so -- and they all have usually

23  acronyms or names that go along with them, right?

24       A.   Yes.

25       Q.   For example, they have names like EVDO, right?

1       A.    That would be a name, yes.

2       Q.    UMTS, WCDMA, GSN, GPRS, IS-54, IS-36, EDGE,

3   CDMA2000, LTE, Wi-MAX, HSDPA, HSUPA.   Those are all

4   different standards, right?

5       A.    Well, some of them relate actually to the same

6   thing, among the ones you talked about; but they may be

7   different variations of standards.

8       Q.    Right.   And so there are many different

9   standards.   So let's take, for example, CDMA2000, all

10   right?

11       A.    Okay.

12       Q.    Okay.   That's different than GSN, right?

13       A.    It's different, yes.

14       Q.    Yeah.   And the reason -- or take EVDO, that's

15   different than WCDMA, right?   Different standards,

16   right?

17       A.    Those are different standards, that is

18   correct.

19       Q.    And, in fact, as you explained on your direct,

20   the way these different standards work is they have a

21   complex set of rules that describe how devices using

22   that standard will communicate, right?

23       A.    They consist of several specifications that

24   would describe how they would interoperate; that is

25   correct, yes.

1      Q.    Right.  And those specifications can be

2  thousands of pages long, right?

3      A.    Correct.

4      Q.    Okay.  And you compared, I think, to -- to a

5  language, right, in your direct?

6      A.    I made such a parallel, yes, that's correct.

7      Q.    Right.  And so one way we could think about it

8  is that you have, let's say a CDMA2000 or an EVDO

9  standards based product that might speak one language

10 and you have a GSM product who would speak a different

11 language, right?

12     A.    I think on Layer 1, the physical layer, that's

13 absolutely true --

14     Q.    Right.

15     A.    -- but the higher up you come in -- in the

16 layers, they will be more common, I would say.

17     Q.    Okay.  But the point is the two couldn't speak

18 to each other.  So if I had a device only doing

19 CDMA2000, let's say, it can't speak to a device speaking

20 only GSM, right?

21     A.    Correct.

22     Q.    Okay.  And those standards, I think, as you

23 explained, right, come out of different standards or

24 come out of standards-setting groups, right?

25     A.    Yes.

1    Q.   And the way those standard-setting groups work

2  is they'll figure out what they want to do and then try

3  to come up with technology that will achieve what they

4  want to accomplish, right?

5    A.   That is correct.

6    Q.   Okay.  And you could have two standards that

7  may let's say have the same data rate or throughput, but

8  they could do it in different ways, right?

9    A.   Absolutely.

10    Q.   Right.  And, in fact, that's a fundamental

11  principle of how all this engineering works is that

12  there's often different ways to get the same

13  performance, right?

14    A.   I don't know if it's a fundamental principle,

15  but it's usually possible to find different solutions.

16    Q.   Right.  And so we could have at one point in

17  time one device using one standard, another device using

18  another standard.  They could have the same high speed,

19  but they may speak different languages and do it

20  differently, right?

21    A.   That is correct.

22    Q.   Now, let's move on to, you know, talking about

23  wireless LANs.  You spoke about wireless LANs in your

24  direct, right?

25    A.   Yes, I did.

1      Q.   Okay.  And wireless LAN, the -- the L -- the

2  LAN part of wireless LAN stands for local area network,

3  right?

4      A.   That's correct.

5      Q.   All right.  And that's a computer network,

6  right?

7      A.   It's a local area network.

8      Q.   Right.  And the wireless piece means it does

9  it without wires, right?

10     A.   Yes.

11     Q.   And just like the -- you know, when we're

12  talking about cellular standards, there are different

13  standards for wireless LANs, right?

14     A.   Different standards for wireless LANs?

15     Q.   Yes.

16     A.   I suppose there are, yes.

17     Q.   Well, of course, you know there are, right?

18     A.   I know a couple, yes.

19     Q.   Yeah.  Okay.  And so, for example, the one

20  that we're talking about in this case for wireless LANs

21  is 802.11, right?

22     A.   Yes.

23     Q.   And that's a standard that was created by a

24  group called the IEEE, right?

25     A.   Yes, that's correct.

1    Q.    And the IEEE is one of the leading engineering

2  professional organizations in the world, right?

3    A.    It's one of several leading organizations,

4  yes.

5    Q.    All right.  And that's based here in the

6  United States, right?

7    A.    It is, yes.

8    Q.    Okay.  And the IEEE is, in fact, responsible

9  for hundreds, if not more, of computer and electronic

10  standards, right?

11    A.    I don't have a detailed number, but I'm aware

12  of several standards they have developed.

13    Q.    Okay.  And they have developed many, many

14  standards; you'd agree with that, right?

15    A.    Yes, I would agree with that.

16    Q.    Okay.  And as we were talking about before,

17  there are different -- some other wireless LAN standards

18  that come from different places, right?

19    A.    Yes.

20    Q.    Like, for example, one that you know about is

21  hyperlink, right?

22    A.    That is correct.

23    Q.    And HiperLAN wasn't developed as part of the

24  IEEE, right?

25    A.    No, it was developed by -- by ETSI.

1      Q.    Right.   And ETSI is the European

2   Telecommunications Standard Institute, right?

3      A.    Yes.

4      Q.    Right.   Based in Europe, right?

5      A.    That's correct.

6      Q.    Okay.   And it's a fact, isn't it, that

7   HiperLAN devices are incompatible with the 802.11

8   devices in the sense if I built the HiperLAN device and

9   I built a 802.11 device, they're not going to be able to

10   talk to each other, right?

11      A.    Yes, that's correct.

12      Q.    Okay.   And that's because they use different

13   standards that set different rules for how they

14   communicate, so if one tries to talk to the other,

15   they're not going to be able to communicate, right?

16      A.    Yes.

17      Q.    Okay.   So what I'd like to do is show you one

18   of the internal Ericsson documents that were provided to

19   us in this case.   And to do that, I'm going to need to

20   use the ELMO.

21            MR. AROVAS:   And do I need to do anything

22   else to get this going?   That's it?   Thank you.

23      Q.    (By Mr. Arovas)   Okay.   And so what I'm going

24   to show you, it's Exhibit DX 51.   And the -- I'm going

25   to show you first -- there we go.

1          I want to first show you a clear page of the

2    exhibit.  This doesn't have the exhibit sticker on it.

3    But this is for the LPD All Staff meeting in February of

4    2010; is that right?

5         A.   That appears to be right, yes.

6         Q.   Right.  Then the official exhibit copy is not

7    quite so clear --

8         A.   Okay.

9         Q.   -- but it's Exhibit DX 51.  That's the same

10   thing, right?

11        A.   I couldn't say, but I believe you.

12        Q.   Okay.  And let's take a look inside that

13   document at one of the pages, and I am going to blow it

14   up so everybody can see it a little bit better, but let

15   me start with, you know, the whole page.

16          And this relates to wireless LAN standards,

17   right?

18        A.   Yes.

19        Q.   Let's make it a little bigger.

20          Okay.  And when we're talking about different

21   kinds of standards for wireless LANs, we see that this

22   one actually talks about a couple of different ones.  It

23   talks about HiperLAN over here.  That's what we were

24   talking about first, right?

25        A.   Yes.

1      Q.    And it talks about the 802.11 standards,

2  right?

3      A.    Yes.

4      Q.    And there are a lot of different 802.11

5  standards listed there, right?

6      A.    Yes, there are.

7      Q.    Right?  802.11 from 1990; b for '99; a, 2000;

8  g, 2003; n, 2009, right?  Is that right?

9      A.    That's correct.

10     Q.    And those are all different 802.11 standards,

11 right?

12     A.    They are different releases, yeah.

13     Q.    Okay.  And on the other side, we have a

14 different standard called HiperLAN, right?

15     A.    Correct.

16     Q.    Okay.  And that has H1 and H2, and they go

17 from 1990 to 2000, right?

18     A.    That's correct.

19     Q.    Okay.  And what Ericsson's doing in this

20 internal document is comparing the 802.11 standards to

21 HiperLAN, right?

22     A.    I cannot answer that question.  I haven't seen

23 the document in its entirety.

24     Q.    Okay.  Well, you agree with me that, as you

25 explained in your deposition, that this is a

1   presentation to Ericsson's staff in the licensing of

2   patent developmental organizations, right?  And that's

3   your group?

4       A.   That is correct, yes.

5            MR. CAWLEY:  Your Honor, may we request

6   that if the witness is going to be examined about this

7   document, that he be provided with a copy of it?

8            MR. AROVAS:  Certainly.  We have a binder

9   we can hand out.

10           THE COURT:  Please.  Please provide him

11   with one.

12           MR. AROVAS:  Would the Court like a set,

13   as well?

14           THE COURT:  Yes, that will be fine.

15           THE WITNESS:  Thank you very much.

16           MR. AROVAS:  Would you like a set?

17           MR. CAWLEY:  Please.  Thank you.

18      Q.   (By Mr. Arovas)  And you'll find this is

19   Exhibit DX 51 in the binder?

20           THE COURT:  Counsel, mine says Brismark

21   deposition transcript.

22           MR. AROVAS:  Sorry about that.  My

23   apologies, Your Honor.

24           THE COURT:  Thank you.

25      Q.   (By Mr. Arovas) Okay.  Mr. Brismark, do you

1  have the document?

2      A.   Now I have the document, yes.

3      Q.   Okay.  And you -- as you testified in your

4  deposition, this is a presentation from an important

5  meeting that you would have attended, right?

6      A.   Yes, I attended this meeting.

7      Q.   Okay.  Good.  So now let's go back to the

8  document.

9           So we have 802.11 on one side.  We have

10  HiperLAN on the other side.  And the document describes

11  and contrasts each of the two standards; isn't that

12  right?

13      A.   I think the document describes our activities

14  to build a portfolio relevant for the 802.11 standards.

15      Q.   Okay.  And it says that the focus of HiperLAN

16  was a complete technical solution, right?

17      A.   Yes, that's what it says.

18      Q.   Yes.  And, in fact, it says HiperLAN had a

19  high-price level strategy, right?

20      A.   Yes, that's what it says.

21      Q.   Okay.  And we see a different description of

22  the 802.11 standards; is that right?

23      A.   We see bullets on the other column, if that's

24  what you're referring to... I agree, yes.

25      Q.   Right.  And the focus of 802.11 was the

1  market, right?

2       A.   That's what it says, yes.

3       Q.   Yes.  And the way it did it was simple

4  technical solutions, right?

5       A.   Yes, I can read that, too.

6       Q.   And it had a low-price strategy in contrast

7  with the HiperLAN high-price strategy, right?

8       A.   Correct, that's what the document says.

9       Q.   Okay.  So let's continue on.  And what

10  eventually happened to HiperLAN?  It was discontinued,

11  right?

12      A.   Yes, it discontinued.

13      Q.   And no commercial products were ever made from

14  HiperLAN, right?

15      A.   To my understanding, I don't know of any

16  commercial products.

17      Q.   Okay.  But the 802.11 were continued, correct?

18      A.   Yes, it did.

19      Q.   And, in fact, the 802.11 has become, you know,

20  probably the most successful wireless LAN standard in

21  the world, right?

22      A.   That's my understanding, yes.

23      Q.   Okay.  And let's take a look at another one of

24  your documents, and this is going to be in your binder.

25           It's DX 98.

1          Do you have that?

2     A.   Yes.

3     Q.   Okay.  And DX 98 is all staff meeting from May

4  2005 on wireless LANs, right?

5     A.   Yes, it's from 2005.

6     Q.   Right.

7     A.   Correct.

8     Q.   One of the authors is -- I might get this

9  wrong -- Nhils Forslund; is that right?

10    A.   That is correct.

11    Q.   And he works for you, right?

12    A.   He works for me, yes.

13    Q.   Okay.  And so actually this document has a

14 chronology of what Ericsson was doing in the area of

15 wireless LANs, right?

16    A.   Could you repeat the question?

17    Q.   Well, let's take a look at it.  If you look at

18 the second page of the document, you'll see that there's

19 a chronology -- and I'll put it on the screen -- of what

20 Ericsson -- here's the top of the page.  And we look

21 down a little bit, and we see there's a chronology of

22 what Ericsson was doing in wireless LANs, right?

23    A.   Yes.

24    Q.   Okay.  And what we see is, if we want to know

25 what Ericsson was up to back then -- the H2 project,

1   that refers to HiperLAN, right?

2       A.   Yes, that's correct.

3       Q.   Okay.  That was closed when 802.11 succeeded,

4   right?

5       A.   That is most likely the timing when -- when

6   ETSI decided to discontinue the standardization, yes.

7       Q.   Okay.  And you testified on direct that

8   Ericsson wasn't really interested in making an 802.11

9   product, right?

10      A.   We had noted that as part of our core strategy

11  in -- in the late '90s, early 2000s; that's correct.

12      Q.   In fact, this is early 2000.  So what we can

13  see in the internal Ericsson document, when H2, the

14  European WLAN stan -- wireless LAN standard was closed

15  down, right, the R&D project team started to focus on

16  developing 802.11a equipment, right?

17      A.   Yes, that's correct.  Around 2002, 2003, I

18  think Ericsson had a unit which was focusing on wireless

19  LAN for enterprise use.

20      Q.   Right.  And so actually what really happened

21  is the European standard went nowhere.  Ericsson went to

22  802.11, and Ericsson moved its development to try to

23  make 802.11a equipment, right?

24      A.   For a limited period of time, we had an

25  activity focusing on -- on finding a market for products

1  on 802.11 in the enterprise area, yes.

2      Q.   Okay.  And so what happened to that project,

3  though, is that was shut down, too, right?

4      A.   That was discontinued later on, yes.

5      Q.   Right.  And, in fact, we see that in the

6  chronology laid out in the document that -- but this R&D

7  project was also closed down sometime around 2001 to

8  2002 and -- when the profit seemed too small, right?

9      A.   Yes.  I think that refers to the internal

10  Ericsson R&D project.  However, the program on

11  investigating being on the market continued a bit longer

12  than that.

13      Q.   Okay.  And it was shut down, right?

14      A.   Excuse me?

15      Q.   And it was eventually shut down, right?

16      A.   Yes, it was discontinued.

17      Q.   Right.  And, in fact, the document says that

18  the WLAN R&D within Ericsson stopped, as is explained

19  here, right?

20      A.   Yes.

21      Q.   Okay.  And so where we are in the chronology

22  is HiperLAN ends, Ericsson goes to 802.11, Ericsson's

23  interested in making a 802.11 product, and Ericsson

24  starts attending 802.11 meetings, right?

25      A.   That would be a correct description of the

1  chronology.  I agree, yes.

2      Q.   Okay.  And it's a fact, isn't it, that when

3  Ericsson decided to put their focus in 802.11, Ericsson

4  started sending engineers to the 802.11 meetings, right?

5      A.   We did.  However, it was a very limited

6  effort, I would say, compared to other efforts within

7  Ericsson.

8      Q.   Okay.  And the 802.11 -- you talked about

9  standards.  The 802.11 standards are a collaborative

10  process, right?

11      A.   It is, yes.

12      Q.   Yeah.  And anybody who wants, can join and

13  come to the 802.11 meetings, right?

14      A.   Yes.

15      Q.   And the way it works is that when you want to

16  build a standard, you want to pick the best technology

17  for what you're trying to do, right?

18      A.   That's the methodology I -- I talked about

19  yesterday, yes.

20      Q.   Right?

21      A.   That's the way you make decisions.

22      Q.   And all the engineers from all these different

23  companies, they can contribute whatever technology they

24  think is going to be best for that standard, right?

25      A.   Yes.

1     Q.    And then the engineers vote on it, right?

2     A.    They do.

3     Q.    And they decide what they think is right for

4  the standard they want to build, right?

5     A.    Yes.

6     Q.    And sometimes there's very vigorous debate

7  comparing all the different alternatives, right?

8     A.    That may be the case.  That's correct, yes.

9     Q.    Right.  And, in fact, Ericsson, when they were

10  asked, 802.11 made a proposal of technology of what they

11  thought should go into 802.11, right?

12     A.    Yes, that's right.  Ericsson proposed to take

13  in the entire Layer 2 of -- of HiperLAN 2 into Wi-Fi as

14  a proposal.

15     Q.    Right.  Exactly.  And that's DX 58 in your

16  binder.  I'll put it on the screen so you can see it.

17  DX 58.  And we can look at the cover.

18          And what DX 58 is, is the Ericsson proposal to

19  the IEEE, right?  Is that right?

20     A.    Yes.  And this was very early on in the Wi-Fi

21  development --

22     Q.    If --

23     A.    -- if I recall it right.

24     Q.    -- if you'd just stick to the questions, Mr.

25  Brismark, please?

1        A.    I'm sorry.

2        Q.    This is the Ericsson contribution to the Wi-Fi

3   standard, right?

4        A.    That is my understanding, yes.

5        Q.    Right?  And we can tell.  It actually -- right

6   up here in the top has an IEEE 802.11 document number,

7   right?

8        A.    Yes.

9        Q.    And it was made by an Ericsson engineer,

10  Gunnar Rydnell, right?

11       A.    Yes.

12       Q.    All right.  And we can see it's got an

13  Ericsson e-mail address, right?

14       A.    Correct.

15       Q.    And this is Ericsson proposing HiperLAN

16  technology to the 802.11, right?

17       A.    Yes.

18       Q.    Okay.  And isn't it a fact that this

19  contribution was rejected by the members of 802.11

20  because the engineers thought it was complex and not

21  needed for what they wanted to do, right?

22       A.    I don't know their rationale for rejection,

23  but it was rejected.  That's my understanding.

24       Q.    Okay.  Well, you obviously testified a lot

25  about the IEEE.  You're aware that Ericsson put up a

1  corporate designee, a representative to speak about

2  exactly what happened at the development at IEEE, right?

3      A.   Yes.

4      Q.   And that's a gentleman by the name of

5  Iwerback, right?

6      A.   That's correct, yes.

7      Q.   Okay.  And he was put up by Ericsson to

8  explain what happened with this, right?

9      A.   Yes, that's my understanding.

10      Q.   Okay.  And he testified on behalf of Ericsson,

11  as you know, that the engineers at the IEEE rejected the

12  sole Ericsson proposal because they thought it was too

13  complex and wasn't needed, right?

14      A.   Yes.  But if you ask me, I cannot testify on

15  that because I don't know the rationale for rejecting

16  the proposal.

17      Q.   Okay.  Well, you certainly wouldn't disagree

18  with the corporate representative of Ericsson who

19  explained why Ericsson's proposal was rejected by the

20  IEEE, right?

21      A.   No.

22      Q.   Okay.  And, in fact, you have never even gone

23  to an IEEE meeting, right?

24      A.   That's correct.

25      Q.   And never even read the IEEE 802.11 standard,

1   right?

2        A.   I haven't personally read the specification,

3   that's correct.

4        Q.   Okay.  And, in fact, this case we've been

5   talking about 802.11n, in particular, right?  Is that

6   right?

7        A.   Could you repeat the question?

8        Q.   In this case, we've been focused on 802.11n,

9   right?

10       A.   Yes.

11       Q.   And, in fact, if we look at all of 802.11n,

12   it's a fact that Ericsson has never made a single

13   contribution to the 802.11n standard?

14       A.   I believe that's correct.

15       Q.   That was accepted into the standard, correct?

16       A.   I believe that's correct, yes.

17       Q.   Okay.  And just so we have the timing down,

18   you talked about the five patents-in-suit and you told

19   us when they were filed, right?

20       A.   I did.

21       Q.   All right.  And, in fact, those patents are

22   filed in different dates, '97, '98, '99.  But every one

23   of those patents was filed and on the shelf at Ericsson

24   at the time they went to the 802.11 meetings and made

25   the proposal; isn't that right?

1     A.   Could you specify the question, please?

2     Q.   Isn't it a fact that every one of the patents

3 in this case that we're talking about had already been

4 filed and were on the shelf at Ericsson before Ericsson

5 went to the 802.11 meetings and made its rejected

6 proposal, right?

7     A.   Well, I don't know the meaning of "on the

8 shelf."  But as I explained earlier, some of them were

9 actually used in 3G, so they were --

10    Q.   Can you please, Mr. Brismark -- Mr. Brismark,

11 can you please answer my questions?

12    A.   And it will be nice --

13    Q.   I'm asking about the IEEE.  I'm not asking

14 about the ETSI cellular standards.

15         It is a fact, Mr. Brismark -- and we can go

16 through every one of the patents and we can look at the

17 filing dates -- every one of the patents was filed with

18 the Patent Office by Ericsson before Ericsson attended

19 the 802.11 meetings, right?

20    A.   That is correct.

21    Q.   All right.  And so Ericsson had those

22 patent app -- filed applications submitted with the

23 Patent Office, they had them in Ericsson's offices when

24 they were going to the IEEE to propose whatever they

25 wanted to propose for the IEEE standards.   Right?

1      A.   That is correct, yes.

2      Q.   Okay.  And Ericsson -- it was an open

3  standard, and Ericsson could have proposed whatever it

4  wanted, right?

5      A.   Absolutely.

6      Q.   And Ericsson did propose what it wanted to see

7  in that standard, right?

8      A.   We made one proposal, yes, that's right.

9      Q.   And that was rejected, right?

10     A.   That's my understanding, yes.

11     Q.   And as we sit here today, there isn't a single

12 Ericsson contribution proposal of technology that was

13 accepted into the IEEE 802.11n standard, right?

14     A.   I believe that to be correct, yes.

15     Q.   Okay.  Now, let's talk very quickly -- the

16 Wi-Fi standard and where it goes, right?

17     A.   Okay.

18     Q.   Now, as you've explained, wireless standards

19 can be very complicated, right?

20     A.   Yes, they are.

21     Q.   Okay.  And they can have hundreds of

22 technologies in them, right?

23     A.   That's correct, yes.

24     Q.   And they can, in fact, have thousands of sub

25 technologies, right?

1      A.   I would agree to that, as well, yes.

2      Q.   Okay.  And so when we think about the Wi-Fi

3  standard, I think you saw it -- if I can just grab my

4  chips over here.  Yeah.  We saw earlier in the case what

5  a Wi-Fi chip looks like.

6           I'll put it on the ELMO so we can see it.

7  I'll put my thumb next to it so we can get a sense of

8  size, right?

9           And this little black square in the middle,

10  that's a Wi-Fi chip, right?

11      A.   I wouldn't know, but I believe you that it is.

12      Q.   Okay.  So that's been identified as one of the

13  Intel Wi-Fi cards; and that's -- assuming that's

14  correct, that's what a Wi-Fi chip would look like,

15  right?

16      A.   Assuming that's correct, then I would agree,

17  yes.

18      Q.   Okay.  And what happens is the 802.11

19  standards that we're talking about here are actually

20  implemented in this chip, right?

21      A.   Yes, they are, to a large extent.  That's what

22  I understand.

23      Q.   Right.  And so that's what happens.  So all

24  these hundreds of technologies get shrunk down and put

25  into that one little chip, right?

1       A.   Yes.

2       Q.   Okay.  And, in fact, the Wi-Fi companies

3  themselves have hundreds, if not thousands, of

4  engineers; is that right?

5       A.   I believe I'm not the right person to testify

6  on that.

7       Q.   Do you have any doubt that Intel, for example,

8  has hundreds, if not thousands, of engineers?

9       A.   No, I don't.

10      Q.   Okay.  And Intel is just one of the Wi-Fi

11 companies making the Wi-Fi chips, right?

12      A.   That's my understanding, yes.

13      Q.   Right.  And, in fact, those Wi-Fi chip

14 companies put billions of dollars of their own R&D into

15 developing their products and technologies, right?

16      A.   I don't know the amount of money that is put

17 into R&D.

18      Q.   Do you have any doubt that Intel spends

19 billions of dollars in R&D?

20      A.   I would not have a doubt, no, that's correct.

21      Q.   Okay.  And Intel is just one of the many Wi-Fi

22 chip companies, right?

23      A.   Yes.

24      Q.   Okay.  And so we know that these -- the Wi-Fi

25 standard goes into this chip, right?

1     A.   Yes.

2     Q.   And we saw in the opening a bunch of licenses,

3 right?  You were here for the opening?

4     A.   I was here at the opening, yes.

5     Q.   Okay.  And at the opening we saw a slide -- a

6 slide that looked like this?

7     A.   Yes.

8     Q.   Right?  And it listed Ericsson 802.11n

9 licenses?

10     A.   Yes, that's some of them.

11     Q.   All right.  And, in fact, there's not a single

12 chip maker listed on that list of licensees, right?

13     A.   Correct.

14     Q.   And, in fact, there's lots of chip makers that

15 make the chips that make all these Wi-Fi products

16 actually do Wi-Fi, right?

17     A.   Yes.

18     Q.   Okay.  There's Broadcom, right, chip maker,

19 right?

20     A.   Correct.

21     Q.   Qualcomm, Atheros, right?

22     A.   Correct.

23     Q.   Ralink, right?

24     A.   Yes.

25     Q.   Realtek, right?

1       A.    Yes.

2       Q.    And there are more, right?

3       A.    Excuse me?

4       Q.    And there are more, right?

5       A.    I don't know them.

6       Q.    Okay.  And none of those, Qualcomm, Broadcom,

7    Atheros, Ralink, Realtek, Intel have agreed to take a

8    license of these patents, right?

9       A.    That is correct.

10      Q.    Okay.  And, in fact, Intel, one of the chip

11   makers of the Wi-Fi chips, had to ask to get into this

12   case, right?

13      A.    My understanding is that Intel intervened

14   this --

15      Q.    Yes.

16      A.    -- process.

17      Q.    So you put the lawsuit together.  You're one

18   of the people who said you approved the lawsuit, right?

19      A.    Yes.

20      Q.    Okay.  And you didn't sue Intel, did you?

21      A.    No, we sued the end user product.

22      Q.    Right.  You sued Intel's customers, right?

23   You sued Intel's customers, among other customers,

24   right?

25      A.    We sued the end user product manufacturers.

1      Q.   That use Intel parts, right?

2      A.   Some of them do.  I don't know if all of them

3 do.

4      Q.   You have no doubt you sued Intel's customers,

5 right?

6      A.   Some of the companies that we sued are

7 customers of Intel.  I have no doubt of that.

8      Q.   Okay.  And Intel -- but you didn't sue Intel,

9 right?

10      A.   Excuse me?

11      Q.   You didn't sue Intel, right?

12      A.   No, we did not.

13      Q.   All right.  And Intel is the company that

14 makes the chip that the Wi-Fi standard actually goes on,

15 right?

16      A.   Correct.

17      Q.   And Intel had to ask and voluntarily come into

18 this case, right?

19      A.   I don't think they had to.

20      Q.   Well --

21      A.   My understanding is they voluntarily did so.

22      Q.   Intel decided to put itself in the line of

23 fire in this case and subject itself to all the issues

24 that are being decided in this case voluntarily.  It

25 wasn't sued, right?

1     A.   Yes, my understanding they did so voluntarily.

2     Q.   Okay.  And it's a fact, isn't it, right,

3  Intel -- what Intel came here to say, what Intel is

4  saying in this case, as one of the designers of the

5  actual products, the chips, that In -- that Wi-Fi --

6  that, in fact, these five Ericsson patents are not

7  essential at all and that the Wi-Fi standard is

8  different; isn't that correct?

9     A.   I believe Intel is claiming that, yes.

10    Q.   Okay.  So now while we're talking about

11 patents, I want to stick with this issue of essential

12 patents and go into that in a little bit more detail.

13 Okay?

14    A.   Okay.

15    Q.   Now, just so we have the terminology right,

16 generally speaking, when we're talking about an

17 essential patent, we're talking about a patent that

18 covers the standard, meaning that you can't practice the

19 standard without infringing the patents, right?

20    A.   That is correct, yes.

21    Q.   Okay.  Now, you'd agree with me just calling a

22 patent essential doesn't make it essential?  You

23 actually have to take that patent and do a detailed

24 analysis against the standard, right?

25    A.   Correct.

1     Q.    Right.  So you basically have to show that

2   it's actually in there, right?

3     A.    Yes.

4     Q.    Okay.  And since you haven't even read the

5   Wi-Fi standard, you can't do that analysis of taking the

6   patents and comparing them and saying that they're in

7   the Wi-Fi standard, right?

8     A.    I haven't personally read the standards, so --

9     Q.    And so --

10    A.    -- it wasn't me doing that analysis.  That's

11  correct, yes.

12    Q.    Right.  Okay.  And so that's not what you're

13  here to talk about, right?  That's for other witnesses,

14  right?

15    A.    Yes.

16    Q.    Okay.  Good.

17          And, you know, it's a fact actually, though,

18  that many times companies will say their patents are

19  essential and they're actually not, right?

20    A.    If it's a fact, it's -- it's my view that that

21  is often the case, that companies who have declared

22  patents being standard essential also can be proven

23  wrong in that case, yes.

24    Q.    All right.  And, in fact, you made a

25  presentation to that effect, right, in 2009 -- you

1  recognize this document?

2       A.    Is that another exhibit or --

3       Q.    Yes, it's Exhibit 85.

4       A.    DX 85?

5       Q.    Yes.

6       A.    Thank you.  Yes, I recognize this.

7       Q.    Right.  That was written by Gustav Brismark.

8             That's -- that's you, right?

9       A.    That would be me, yes.

10      Q.    Yeah.  It was written in January of 2009 and

11  presented to a European government agency, right?

12      A.    Yes, that's correct.

13      Q.    Okay.  And let's take a look at what you said

14  in there.

15            I'm going to go to Page 11 in the document.

16  I'll put it on the screen for everybody to see.  I'll

17  make it a little bigger.

18            You have Page 11?

19      A.    Yes, I do.

20      Q.    Okay.  And you can see here what it says is:

21  Many of the patents and patent applications declared to

22  be essential to a standard are not essential.

23            Right?

24      A.    That is correct, yes.

25      Q.    Right.  And that's actually a pretty important

1   distinction, isn't it, between essential and not

2   essential?

3       A.   Is that a question?

4       Q.   It's a question.  It's a pretty important

5   distinction between a patent being essential and not

6   essential, right?

7       A.   What is distinction?

8       Q.   Whether the patent is essential or not

9   essential is an important distinction, right?

10      A.   Yes, it is.

11      Q.   Okay.  And, in fact, some people in this

12  industry have said over-declaration of essential patents

13  is actually a big problem, right?

14      A.   It's a problem in -- in ETSI, I would agree to

15  that.

16      Q.   Yeah.

17      A.   Because there you make detailed declarations

18  of individual patents.

19      Q.   Right.  And so there's actually -- the reason

20  is that there's an interest for companies to say they

21  have lots of essential patents because then they can say

22  they have lots of patents covering the standard, right?

23      A.   I would agree, yes.

24      Q.   Right.

25      A.   A general statement, yes.

1      Q.   But what happens actually is when you dig down

2  deep and you look at what all -- a lot of these

3  companies are saying that they're essential patents, you

4  find out those patents, when you compare them to the

5  standard, actually aren't being used as a standard at

6  all and are not essential?

7      A.   Are you talking about all the declared patents

8  in ETSI now?

9      Q.   I'm talking about, generally speaking, when

10  companies say they're essential patents, you often

11  find -- if you want to talk about ETSI, that's fine.

12  Because many companies have declared patents essential

13  in ETSI, right?

14      A.   That's correct, yes.

15      Q.   Including Ericsson, right?

16      A.   Including Ericsson, yes.

17      Q.   Right.  And it's a fact when you dig down into

18  all those declarations, you find that many of the

19  patents are, in fact, not used in the standard at all,

20  right?

21      A.   Correct.

22      Q.   And what I found interesting about some of

23  your testimony yesterday is how you characterized the

24  IEEE letters.  And so let's talk about the IEEE process

25  of dealing with declarations or claims by companies to

1  have essential patents, okay?

2      A.    Okay.

3      Q.    And I think you showed us one of the letters

4  of assurance.  And this is actually your exhibit.  It's

5  PX 294.

6          You know this document, right?

7      A.    Yes.

8      Q.    Okay.  And it's a letter of assurance for

9  essential patent claims, and you pointed it out and this

10 is to the Institute of Electronic -- Electrical and

11 Electronic Engineers.  That's the IEEE, right?

12     A.    That is correct, yes.

13     Q.    Right.  And this is from Ericsson, right?

14     A.    Yes.

15     Q.    Okay.  And let's look at what -- this is

16 actually a form that the IEEE has.  I'm going to blow up

17 the language I want to focus on, see if I can make it

18 any bigger.  There we go.

19          And the fact is that these are declarations by

20 the company, but the IEEE doesn't, in fact, do anything

21 to determine whether these are declarations of patents

22 that are really essential or declarations of patents

23 that are going to turn out to be non-essential, right?

24     A.    That's correct.

25     Q.    And, in fact, we see that in the language, and

1  it's very important language that is in every letter of

2  assurance in the IEEE.

3           And it says:  The IEEE takes no position with

4  respect to the validity or essentiality of patent

5  claims.

6           Right?

7     A.   Correct.

8     Q.   Okay.  And so we know that this is just a

9  submission of a form from a company like Ericsson to the

10 IEEE saying Ericsson believes it may have essential

11 patents, but the IEEE is not doing any analysis or

12 agreeing with Ericsson that any of those patents are

13 actually used in the standard, right?

14    A.   That is correct.

15    Q.   Okay.  And you showed us a letter from the

16 IEEE to Ericsson as Exhibit 511.  You talked about that

17 in your direct, as well, right?

18    A.   I did, yes.

19    Q.   Okay.  And if we look at that letter from the

20 IEEE, it has a date -- I'll make this again bigger --

21 March 30th, 2011, right?

22    A.   Yes.

23    Q.   Okay.  When was this case filed, what year?

24    A.   This case we talk about here?

25    Q.   Yes.

1      A.   Was filed in 2010.

2      Q.   Right.  So this letter is almost a -- a year

3 after this case was filed, right?

4      A.   That is correct.

5      Q.   Right.  And what the IEEE actually says in its

6 letter to Ericsson is:  It has been brought to my

7 attention that Ericsson may have essential patent

8 claims.

9           Right?

10     A.   Correct, yes.

11     Q.   So the IEEE wasn't making any determination

12 that the Ericsson patents in this case were, in fact,

13 essential, right?

14     A.   That's correct.

15     Q.   In fact, the IEEE never even looked at the

16 issue, right?

17     A.   The IEEE didn't do any analysis of patents.

18 That's my understanding, yes.

19     Q.   Right.  And, in fact, the reason this was sent

20 is because Ericsson filed this lawsuit claiming it had

21 essential patents; and the IEEE said, you claim you may

22 have some essential patents, we're not dealing with that

23 issue at all, but if you end up being right, we want to

24 make sure there's an obligation to license.  Right?

25     A.   I don't know -- that was a very long statement

1  or question, so could you please repeat your question?

2      Q.   You would agree with me the letter was sent

3  after this lawsuit, right?

4      A.   Yes.

5      Q.   Okay.  And the letter was sent actually

6  because somebody raised, with the IEEE, the fact that

7  Ericsson had filed a case where Ericsson said the

8  patents were essential, right?

9      A.   I don't know who writes within IEEE, so I

10  couldn't answer that question.

11      Q.   Okay.  So you have no idea why this letter was

12  sent then, right?

13      A.   I know we received it.  I don't -- don't know

14  why it was sent.

15      Q.   Okay.  So you would agree with me that after

16  the -- before the letter was sent, this case had been

17  filed and Ericsson said it had essential patents, right?

18      A.   Yes.

19      Q.   The five patents in this case, right?

20      A.   Correct.

21      Q.   Okay.  And before it was sent, the Defendants

22  actually said:  You're wrong.  We believe that we

23  designed our own technology, and, in fact, those patents

24  are not essential.  Right?

25      A.   I don't know that.

1      Q.    Okay.  You don't know that in this case every

2  one of the Defendants has said that the IEEE standard is

3  different than Ericsson patents?

4      A.    No, I don't know if they stated that as

5  clearly.  I don't think they admitted -- admitted in our

6  negotiations, but --

7      Q.    Do you have any doubt that the whole reason

8  we're here is that the Defendants are saying that the

9  standard is different and they designed their own

10  technology, after hearing Mr. Van Nest's opening?

11      A.    I think there are multiple areas where there's

12  disagreement.

13      Q.    Do you have any -- would you please answer my

14  question?

15          Do you have any doubt, after hearing Mr. Van

16  Nest's opening, that the reason the Defendants are here

17  is they're saying they designed their own technology,

18  their own standard; and, in fact, the Ericsson patents

19  are not essential to and do not cover the 802.11

20  standards?

21      A.    Yes, I have doubts regarding that.

22      Q.    Okay.  Well, we'll let the defense witnesses

23  explain that, okay?

24      A.    Okay.

25      Q.    But let's take a look at your testimony about

1  this letter.  And I want to be very clear.

2          So you were asked:  And now -- they're talking

3  about this letter from IEEE that we were just looking

4  at.  And now the IEEE --

5              MR. AROVAS:  Make it even a little

6  bigger.

7      Q.   (By Mr. Arovas) And now the IEEE is telling

8  Ericsson:  Gosh, we've come up with this new standard,

9  and you have some essential patent claims.  Will you

10  give us another letter of assurance and let us tell

11  everybody that you're willing to license those essential

12  patents and RAND terms?

13          And you said yes, right?

14      A.   Yes.

15      Q.   So the fact is -- this is -- and this is your

16  trial testimony from yesterday, right?

17      A.   That is correct.

18      Q.   Okay.  The fact is, the IEEE wasn't saying

19  anything of the sort; isn't that right?

20      A.   They did not say that we have essential

21  patent, that is correct.

22      Q.   All right.  So when you testified under oath

23  yesterday that the IEEE in this letter was saying that

24  Ericsson had essential patents, that is completely

25  wrong, right?

1        A.    I would agree to that, yes.

2        Q.    All right.  So the IEEE wasn't saying anything

3   of the sort.  What the IEEE was saying:  You say you

4   have some essential patents; we're not going to analyze

5   the issue to figure it out.  Right?

6        A.    Correct.

7        Q.    Okay.  And, in fact, the very first time that

8   we're going to have an opportunity in a court to figure

9   out the answer to that question about whether these

10  patents are essential or not, is right here in this

11  trial, right?

12       A.    Yes.

13       Q.    Okay.  Let me ask you just a few more

14  questions about patents while we're on that topic.

15            You would agree with me that one of the ways

16  to figure out who has the essential patents in a

17  particular standard is who has been active in making

18  contributions to that standard, right?

19       A.    Sometimes, yes.

20       Q.    Okay.  And that's actually something that you

21  explained in your deposition, that that's one of the

22  ways to figure out who may have essential patents,

23  right?

24       A.    In some standardization activities, that would

25  be true, yes.

1     Q.    Right.  And, in fact, in the 802.11 standards

2  themselves, there have been over 35,000 technical

3  contributions to make up those standards, right?

4     A.    I don't know.

5     Q.    And there's been over 2,000 technical

6  contributions to 802.11n, right?

7     A.    I don't know that either.

8     Q.    Okay.  And it's a fact, isn't it, that the

9  chip makers are the major contributors of technology to

10 the 802.11 standard, right?

11    A.    I wouldn't be able to answer that question

12 either.  I'm sorry.

13    Q.    Well, you would certainly know that the chip

14 makers are Broadcom, Qualcomm, Intel, companies like

15 that, right?

16    A.    Yes.  I know they participate.

17    Q.    Okay.  And certainly the people who are

18 familiar with the IEEE can tell us much better than you

19 can who was making the technical contributions that made

20 up the standards that we care about in this case, right?

21    A.    I would agree to that, yes.

22    Q.    Okay.  But you will agree with me that you do

23 know that component suppliers like the chip makers have

24 essential patents, right, to the 802.11 standards,

25 right?

1  A. Could you repeat the question?

2  Q. You would agree with me, wouldn't you, that

3 component suppliers are holders of essential patents in

4 the wireless LAN space, right?

5  A. I wouldn't know that for sure as I haven't

6 been part of investigating that or analyzing that or

7 neither has my company.

8    MR. AROVAS:  Actually, let's play Clip LB

9 4, if we could.

10  Q. (By Mr. Arovas) And I'm going to just play for

11 you a question and answer that you were asked in your

12 deposition under oath, right?

13    (Video clip playing.)

14    QUESTION:  Are any component suppliers

15 major holders of patents in the wireless LAN space?

16    ANSWER:  I do believe that there are

17 companies in the component space who have essential

18 patents, yes.

19    (End of video clip.)

20  Q. (By Mr. Arovas) Okay.  And it's a fact -- that

21 that was your testimony, right?

22  A. Yes.

23  Q. Under oath, right?

24  A. Yes.

25  Q. Okay.  And it's a fact, isn't it, that Intel

1  is one of the companies that's been quite active in the

2  802.11 standardization; is that right?

3       A.    That's my understanding, yes.

4       Q.    And you believe that Intel actually has a

5  position -- is in a position to have a large number of

6  essential patents to the 802.11 standards, right?

7       A.    I believe, but I don't know.

8       Q.    Okay.  And, of course, this isn't just a

9  discussion that we're having here; this issue of who has

10 the essential patents in the wireless LAN space is

11 something that's been discussed internally at Ericsson,

12 right?

13      A.    Yes.

14      Q.    Right?

15      A.    Yes.

16      Q.    In fact, if we look at Defendants'

17 Exhibit 81 -- and I'll put it on the screen and make it

18 smaller again, so we can see what document we're talking

19 about.

20            You should have it in your binder,

21 Mr. Brismark.

22      A.    Yes, I have.

23      Q.    Okay.  You see Defendants' Exhibit 81.  And

24 that's an Ericsson internal document that was produced

25 for the first time in this case, right?

1       A.   Yes.

2       Q.   Okay.  And if we look inside that document to

3  try to figure out what was discussed, we'll see a page

4  called:  Situation analysis:  Exposure.  Right?

5       A.   Yes.

6       Q.   And this is actually a page where Ericsson's

7  talking about, well, hey, wait a second; we may be

8  worried about other people's essential patents, right?

9       A.    It discusses to which extent Ericsson's sales

10  of wireless LAN products is exposed to different

11  companies' products, yes.

12       Q.   Well, right.  And that's because, when

13  Ericsson decided it wanted to get back in the Wi-Fi

14  business, it actually bought a company called BelAir to

15  get the products and expertise to enter -- or re-enter

16  Wi-Fi, right?

17       A.   That's correct.

18       Q.   Okay.  And what we can see here, if we look at

19  what Ericsson said in its internal documents, actually,

20  the wireless LAN patents are mainly held by chipset

21  suppliers.  That's what it says, right?

22       A.   Yes, that's what it says.

23       Q.   Thank you.

24            MR. AROVAS:  No further questions.

25            MR. CAWLEY:  Redirect, Your Honor?

1                    THE COURT:  Yes, you may.

2                    REDIRECT EXAMINATION

3  BY MR. CAWLEY:

4       Q.   Mr. Brismark, I just want to ask you a few

5  questions to clarify some of the things you've just been

6  asked about.

7            Why haven't you personally spent time reading

8  the 802.11 standard?

9       A.   I haven't done it personally because of the

10  fact that we have -- well, I have an organization of

11  portfolio managers and technical experts, and the

12  analysis has been done by the experts and the teams that

13  I -- which I manage.

14       Q.   All right.  So are there people on your team

15  that you're responsible for managing who divide up

16  responsibility for various standards that they are going

17  to become familiar with?

18       A.   Yes, that's the situation we're in.

19       Q.   And if you need to know what's in those

20  standards, can you talk to basically an expert in-house

21  whose job it is to know about those standards?

22       A.   Yes.

23       Q.   And in addition to the standards that we

24  already talked about on your direct examination, do you

25  remember when Intel's lawyers just rattled off -- I

1  don't know -- probably a dozen different

2  standard-setting bodies?

3       A.   Yes.

4       Q.   And is it the case that many of those

5  standard-setting bodies might have many standards that

6  that body produces?

7       A.   Absolutely, yes.

8       Q.   And is it the case that for many of those

9  standards, such as we've seen with 802.11, there may be

10  many different varieties and amendments to those

11  standards?

12       A.   Yes.

13       Q.   Is it even possible, in your judgment, that a

14  single person could be technically familiar with all of

15  those relevant standards?

16       A.   No, it's not possible.

17       Q.   Earlier in your career, did you personally

18  participate in standard-setting organizations?

19       A.   Yes, I did.

20       Q.   Did you personally attend some meetings, for

21  example, where different standards were discussed and

22  the standard-setting process was carried out?

23       A.   Yes.  I've been participating in ETSI meetings

24  in the early standardization of 3G.  I also participated

25  in Japan in the corresponding standardization bodies.

 1            And upon occasion, in a 3GPP meeting when that

 2    was --

 3        Q.   So that's -- that's -- that and your other

 4    work in this field is the basis for your testimony to

 5    the jury about how standard setting works, even though

 6    you personally haven't attended any 802.11 standards

 7    meetings?

 8        A.   Yes, that would be correct.

 9        Q.   Now, let me ask you a couple of questions

10    about Defendants' Exhibit 98.

11            MR. CAWLEY:  If we could see it.

12        Q.   (By Mr. Cawley) Do you remember this document,

13    and you were asked some questions about it?

14            MR. CAWLEY:  If we could go to Page 2 of

15    it.

16        A.   Yes.

17        Q.   (By Mr. Cawley) Do you remember this, and

18    Intel's lawyers showed you a chronology, and I think

19    that he finally was attempting to make the point that

20    Ericsson had abandoned its work in WLAN activity?

21        A.   Yes.  That was my understanding, yes.

22        Q.   All right.  Let's go to the next page that

23    Mr. -- that Intel's lawyers did not show you.

24            MR. CAWLEY:  And let's -- let's enlarge

25    that language at the very top.

1    Q.   (By Mr. Cawley) What does the last line said

2  (sic)?

3    A.   It reads R&D in the wireless LAN area have

4  been restarted again -- within Ericsson again, but this

5  time as a part of the coming 4G.

6    Q.   Despite the language that Intel's lawyers led

7  you through, does this part that he didn't show the jury

8  say that Ericsson has restarted its research and

9  development in the WLAN area?

10    A.   Correct.  That's what it says.

11    Q.   Now, let's turn quickly to another document

12  you were asked about, and that's Plaintiffs' Exhibit 58.

13    A.   Yes.

14    Q.   That's Defendants' Exhibit 58.  Apologize.

15         Do you have that in front of you?

16    A.   I do.

17    Q.   We'll get it up on the screen here.

18         Now, this is, if I'm correct, the contribution

19  that Ericsson made to the 802.11 standard-setting body

20  that was rejected as too complicated.

21    A.   Yes.

22    Q.   Now, help -- help orient us, something here,

23  because a big point was made of this by the Defendants'

24  lawyers in opening yesterday about this rejected

25  contribution, and Intel's lawyer has just done the same

1  thing, taking you through this contribution that was

2  rejected.

3           What version of 802.11 are we talking about in

4  this case of the Ericsson patents being standard

5  essential to?

6       A.   I would have to look through, but I believe

7  it --

8       Q.   No.  In this case.  Not in that document, but

9  in this case.  What is -- what version of 802.11 is

10 Ericsson saying these five patents are essential to?

11      A.   In this case, we talk about 802.11n.

12      Q.   802.11n as in November?

13      A.   Correct.

14      Q.   Look at the last page of this document, if you

15 would.

16      A.   Yes.

17      Q.   Does this tell us which version of 802.11 was

18 being discussed when Ericsson made this submission?

19      A.   Yes.  At the time of this submission, I

20 typically was discussing the 11e version.

21      Q.   This is a different version of 802.11 that

22 we're talking about in this case?

23      A.   Yes.

24      Q.   And that's what was rejected?

25      A.   Yes.

1       Q.    Not a contribution for 802.11n as in November?

2       A.    Correct.

3       Q.    What was the date of this document, this

4  submission, this contribution that was rejected?

5       A.    The date of the contribution was May 8th in

6  the year of 2000.

7       Q.    2000.

8             What is your understanding of when IEEE first

9  began working on 802.11n?

10      A.    They started working on "n," in my

11  understanding, three to four years after this

12  contribution.

13      Q.    Three to four years after --

14      A.    Yes.

15      Q.    -- this contribution was rejected?

16      A.    Yes.

17      Q.    Okay.  Let's look at, quickly, Defendants'

18  Exhibit 85.  This is a document -- or something you

19  prepared, wrote for a presentation within Ericsson?

20      A.    Yes.

21      Q.    And on Page 11, let's remember, that you

22  stated at the bottom there that:  Many of the patents

23  and patent applications declared to be essential to a

24  standard are not essential.

25      A.    Yes.

1      Q.   When you wrote that, were you referring to the

2   industry practice as a whole or to Ericsson in

3   particular?

4      A.   I was referring to the industry's practice as

5   a whole.  And in particular, some companies, we believe,

6   have different practices.

7      Q.   Okay.  Other companies that you believe have

8   taken advantage of the standard-setting process, or at

9   least been careless?

10      A.   Yes.

11      Q.   Okay.  Finally, let's turn to Plaintiffs'

12   Exhibit 294.

13      A.   249?

14      Q.   294.

15      A.   Plaintiffs'.  Okay.

16      Q.   You were asked some questions about this both

17   on your direct and cross-examination.  Tell us what this

18   document is again.

19      A.   This document is a letter of assurance from

20   Ericsson to the IEEE where we commit to license our

21   essential patents to 802.11n under RAND conditions.

22      Q.   And did this assurance -- this is the second

23   letter of assurance, right?  There was one originally in

24   2003?

25      A.   Yes.

1       Q.   And this is the letter of assurance that

2  Ericsson gave in response to the request that we saw

3  from the IEEE saying:  It's come to our attention that

4  you may have standard essential patent claims?

5       A.   Correct.

6       Q.   Was this letter of assurance limited to

7  certain patents?

8       A.   No.

9       Q.   It didn't identify any specific patents at

10  all, did it?

11       A.   No, it did not.

12       Q.   What was the nature of the assurance in this

13  letter?

14       A.   The nature of this assurance is that Ericsson

15  is willing to license any patent we may own now or in

16  the future which is essential to the 802.11n standard.

17       Q.   Thank you, Mr. Brismark.

18            MR. CAWLEY:  I'll pass the witness, Your

19  Honor.

20            THE COURT:  All right.  Any recross?

21            MR. AROVAS:  Yes.  Just very, very

22  briefly, Your Honor.

23            THE COURT:  All right.

24                 RECROSS-EXAMINATION

25  BY MR. AROVAS:

1       Q.    Let's go back very quickly -- let me get the

2  camera up -- to this document.

3       A.    Yes.

4       Q.    Okay.  The Ericsson contribution to 802.11.

5             Now, this case, we're talking about --

6       A.    Excuse me.  Could you help me with the exhibit

7  number?

8       Q.    Oh, Exhibit 58.  It's the one that you just

9  discussed with Mr. Cawley a few seconds ago?

10      A.    Yes, I know.  I just didn't remember the

11 reference number.

12      Q.    Okay.

13      A.    I'm sorry.

14      Q.    And it's a fact that in this case, Ericsson's

15 accusing two features QoS and block acknowledgment in

16 the 802.11 standards, right?

17      A.    Those are important features which our patents

18 relate to, yes.

19      Q.    That's -- that's -- that's what Ericsson is

20 accusing in this case.  Those are the two specific

21 technologies we're going to talk about in this case,

22 right?

23      A.    That may be the case.

24      Q.    You understand that, right?

25      A.    I understand that our patents are related to

1  those features, yes.

2      Q.    Okay.  Okay.  And so it's a fact, isn't it,

3  that the technology, okay, for 802.11n, for those two

4  features comes out of 802.11e, the very standard that

5  Ericsson made a proposal to, right?

6      A.    That's not clear to me.

7      Q.    So you wouldn't know -- you wouldn't know one

8  way or the other, right?

9      A.    I don't know whether it was included -- what

10  was included in 11e, no.

11      Q.    Okay.

12      A.    That's correct.

13      Q.    But certainly we're going to have a lot of

14  IEEE witnesses coming to this case, and they would know

15  better than you, right?

16      A.    I think they know better than me on this

17  question, absolutely.

18      Q.    Okay.  But the fact is that what we do know is

19  Ericsson was -- knew how to make proposals to the IEEE,

20  right?

21      A.    I apologize.  Could you repeat the question?

22      Q.    It's a fact Ericsson knew how to make

23  proposals to the IEEE, right?

24      A.    Yes, we did.

25      Q.    Ericsson could have proposed whatever

1  technology it wanted, right?

2       A.   Yes, we could do that.

3       Q.   Okay.  And at the end of the day, for all of

4  the IEEE standards -- they build one on top of

5  another -- there isn't a single contribution, either

6  directly or indirectly, that's used in 802.11n --

7  contribution from Ericsson that was accepted by the

8  IEEE, right?

9       A.   Correct.

10      Q.   Thank you.

11              MR. AROVAS:  No further questions.

12              THE COURT:  Any further redirect?

13              MR. CAWLEY:  No further questions, Your

14  Honor.

15              THE COURT:  All right.  Thank you.

16              All right, Ladies and Gentleman of the

17  Jury, if you would, pass down your witness sheet for

18  the -- any questions you might have for the witness.

19              (Pause in proceedings.)

20              THE COURT:  All right, Ladies and

21  Gentleman.  We're going to take our morning break at

22  this time, and so I'm going to -- we're going to be in

23  recess until five minutes till 11:00.

24              So enjoy your morning break.  Please

25  remember my instructions.  Don't discuss this case among

1  yourselves or with anyone else, and we'll see you back

2  here at five till 11:00.

3                    COURT SECURITY OFFICER:  All rise.

4                    (Jury out.)

5                    THE COURT:  All right.  Please be seated.

6                    We had one question for the witness,

7  which reads:  At the time the IEEE received Ericsson's

8  letter of assurance, did the IEEE double-check/verify

9  that Ericsson actually had a valid claim, question mark?

10                    And then that is X'd out, and then

11 further it says:  Answered in cross.  Thank you.

12                    So I think that question was answered,

13 but I wanted to share it with the parties.

14                    All right.  We'll be in recess until five

15 till.

16                    COURT SECURITY OFFICER:  All rise.

17                    (Recess.)

18                    COURT SECURITY OFFICER:  All rise for the

19 jury.

20                    (Jury in.)

21                    THE COURT:  Please be seated.

22                    All right.  We didn't have -- we had one

23 question for that witness, but it was answered on

24 cross-examination, the person said, so we don't have any

25 further questions for the witness.

1              Let me ask -- I failed to ask at the

2    beginning of the day, does either side have any exhibits

3    that they wish to offer for today that are unobjected

4    to?

5              MS. MOORE:  Yes, Your Honor, we do.

6    However, we had a number of objections for a significant

7    number of exhibits dropped this morning right before

8    trial, so we'd like to put together a final list and

9    give it to Your Honor perhaps right after lunch.

10             THE COURT:  Okay.  That will be fine.

11             MS. MOORE:  Thank you.

12             THE COURT:  All right.  Thank you.

13             MR. DE VRIES:  And good morning, Your

14   Honor.  We do have a list on behalf of the Defendants of

15   preadmitted exhibits that have been agreed to.

16             THE COURT:  All right.  And what is that

17   titled?

18             MR. DE VRIES:  Defendants' List of

19   Preadmitted Exhibits for June 4th, 2013.

20             THE COURT:  All right.  We'll mark that

21   as Defendants' Exhibit List No. 2.  Are there any

22   objections to the exhibits contained on that list?

23             MS. MOORE:  No, Your Honor.

24             THE COURT:  All right.  They're admitted.

25             All right.  You may call your next

1  witness.

2              MR. CAWLEY:  Thank you, Your Honor.

3              At this time, we'd like to play two video

4  depositions, and the parties have agreed to a very brief

5  introduction to be read to the jury, with the Court's

6  permission, about what these depositions are.

7              THE COURT:  All right.  Very well.

8              Let me -- before you do that, though, Mr.

9  Cawley, let me give the jury this instruction just

10 regarding depositions.

11             Certain testimony in this case is going

12 to be presented to you in the form of a deposition.  And

13 in, I believe, almost every case, it will be a video

14 deposition.

15             And video depositions are where it's

16 taken in video, and you'll watch the actual testimony.

17 A deposition is the sworn recorded answers to questions

18 asked a witness in advance of trial.

19             Under some circumstances, if a witness

20 cannot be present to testify from the witness stand,

21 then the witness's testimony may be presented under oath

22 in the form of a deposition.

23             Sometime before this trial, attorneys

24 representing the parties in this case questioned this

25 witness under oath.  A court reporter was present and

1  recorded the testimony.

2           This deposition testimony is entitled to

3  the same consideration and is to be judged by you as to

4  credibility and weight and otherwise considered by you,

5  insofar as possible, the same as if the witness had been

6  present and had testified from the witness stand in

7  court.

8           Now, as I said, these depositions can

9  either be in typed form, where you may see an attorney

10 ask -- in cross-examining a witness, may say:  Well,

11 didn't you say on your deposition thus and so, and

12 they'll show them the page on the overhead or -- most of

13 the depositions today are videotaped as well.

14          And then when the attorneys get ready for

15 trial, they will get together, and the Plaintiff will

16 say, I want these pages and line numbers, and the

17 Defendant will say, I want these pages and line numbers,

18 and they edit it down.

19          So a deposition that may take two or

20 three hours, you may hear a 10- or 15-minute excerpt

21 from it.  And that's to say you -- save you time and to

22 just play what the parties believe is relevant for the

23 jury to hear with regard to the issues in the case at

24 this time.

25          So Mr. Cawley will introduce the video

1  and tell you a little bit about who the witness is, and

2  then we'll play the deposition.

3              MR. CAWLEY:  Thank you, Your Honor.

4              Ladies and Gentleman, next you will hear

5  the video or -- and see the video deposition of Mikael

6  Larsson.  Mr. Larsson is an engineer at Ericsson and is

7  a named inventor on the '625 patent.

8              Your Honor, Ericsson has designated

9  11 minutes and 10 seconds of this testimony, and

10  Defendants have designated 4 minutes and 20 seconds.  So

11  the whole deposition lasts 15 minutes.

12             THE COURT:  Thank you.  You may proceed.

13             (Video playing.)

14             QUESTION:  Okay.  I'd like to shift

15  gears.  Could you please introduce yourself for the

16  jury?

17             ANSWER:  Okay.  So I'm Mikael Larsson, or

18  Michael, if you want to pronounce it that way.  I'm 47.

19  Will be 48 this year.

20             I'm married with Jenny.  We live up north

21  of Stockholm.  And we have a detached house together,

22  and we live there together with our three kids.  We

23  have -- the youngest is 7, and the middle one is 12, and

24  the oldest is 15.

25             QUESTION:  And are you one of the

1  inventors on the '625 patent?

2              ANSWER:  Yes.

3              QUESTION:  Are you the only inventor?

4              ANSWER:  No.  We also have Peter.

5              QUESTION:  And were you at Ericsson when

6  you came up with your invention?

7              ANSWER:  Yes.

8              QUESTION:  Can you tell us what you did

9  before you joined Ericsson?

10             ANSWER:  Before Ericsson, I went to the

11 university.  And after that, I went to the service in

12 the Army.

13             QUESTION:  What did you study at

14 university?

15             ANSWER:  I studied electrotechnical,

16 Master of Science for that.

17             QUESTION:  And you said, after that, you

18 joined the military for one year of service?

19             ANSWER:  Yes.

20             QUESTION:  And what did that entail?

21             ANSWER:  That is something that is

22 mandatory within Sweden to do that.  So everyone has to

23 make almost a year or more within the service.  At least

24 that was -- at that time, it was mandatory.

25             QUESTION:  They don't do that anymore?

1                    ANSWER:  No.  Now it's optional,

2   actually.

3                    QUESTION:  And when did you join

4   Ericsson?

5                    ANSWER:  '89.

6                    QUESTION:  How did that happen?

7                    ANSWER:  I applied for a job as a

8   hardware designer directly after the military service.

9                    QUESTION:  And what were you doing -- at

10  Ericsson before the work that led to your patent?

11                   ANSWER:  I've been working with the ATM

12  and building ATM switches for quite some years.  And,

13  also, I had worked with a similar system, which was NTT

14  DOCOMO.

15                   And so the combination of ATM as a

16  background and experience of wireless made a good

17  starting point.

18                   QUESTION:  And what work were you doing

19  when you arrived at your invention?

20                   ANSWER:  Sorry.

21                   QUESTION:  What work were you doing when

22  you arrived at your invention?

23                   ANSWER:  We were working with medium

24  access control layer of this prototype of wireless ATM.

25                   And Peter was the one that come up with

1  the problem.  I think he was listening to some multicast

2  presentation of one of the institutes where he -- I

3  think he thought that presentation was extremely boring,

4  so his mind was wandering off to something else.

5              And then he come up with the problem that

6  discarding -- or that discarding packets when we have

7  ARQ might be a problem.  And then we were starting to

8  work on the solution for that.

9              QUESTION:  And you mentioned Peter.  At

10  what point, did you meet Peter Larsson?

11             ANSWER:  I met him just before we went

12  down to Singapore.  That was '9 -- probably -- probably

13  the beginning of '97.

14             QUESTION:  So the work on your patent was

15  done in Singapore?

16             ANSWER:  Yes, it was.

17             QUESTION:  How did it -- how did it come

18  to pass that you went to Singapore?

19             ANSWER:  I think Ericsson had an interest

20  to try to institute --

21             THE REPORTER:  Try to institute...

22             ANSWER:  -- institute a Singapore list of

23  universities to see if they were good to cooperate with.

24             QUESTION:  How was your experience in

25  Singapore?

1                    ANSWER:  Very good.  It was a very nice

2    stay there.  It's warm, a bit humid, but very easy

3    living, actually.

4                    QUESTION:  So you met Mr. Larsson when

5    you went down to Singapore.  And how long did it take

6    for the two of you to come up with the invention?

7                    ANSWER:  You mean after we have

8    understood the problem?

9                    QUESTION:  Yes.

10                   ANSWER:  I'm not really sure.  But I

11   guess it took a few months at least.  So we spent a

12   number of days, weeks even, I would say, in front of a

13   whiteboard going back and forth with scenarios and

14   alternatives and trying to understand how it should

15   be -- behave, the mechanism, in order to make it

16   bulletproof when it comes to fault situations and so on.

17                   QUESTION:  And could you summarize what

18   it was that you two arrived at as the invention?

19                   ANSWER:  What we did was a mechanism that

20   allows an ARQ mechanism to discard packets and still

21   move on forward without having to retransmit everything

22   in case it's outdated.

23                   QUESTION:  And at what point in your

24   collaboration did you decide that you had something

25   worth patenting?

1                    ANSWER:  I think we understood that right

2   away; that the problem as such is worth taking a patent

3   on.

4                    QUESTION:  And what did you do to see

5   that your solution would work?

6                    ANSWER:  How it worked?

7                    QUESTION:  Uh-huh.

8                    ANSWER:  We -- we went through it on

9   the -- on the whiteboard.  I think Peter even made an

10  SDL diagram on the solution.

11                   QUESTION:  How?

12                   ANSWER:  An SDL.  That's kind of a shot

13  where you go through it in details, the step next to the

14  actual code.  Sometimes you even can compile an SDL

15  diagram to code.  So you actually -- you build it.

16                   QUESTION:  And was there anything unique

17  about the way that you used ARQ discard as opposed to

18  what had been done before?

19                   ANSWER:  Yes.  Actually -- actually, the

20  extra thing is that they can force the receiver to move

21  on and change the window -- reception window and don't

22  expect (sic) packets that have been discarded.  That's

23  what's new.

24                   QUESTION:  And you talked about reception

25  windows and packets.  And I was wondering if you could

1  give me an example for a user -- just an average user of

2  a wireless device, how does your invention, if at all,

3  improve their experience?

4          ANSWER:  For the end user, it will have a

5  realtime application, that is, voice or

6  teleconferencing, Skype, for instance, or a gaming

7  application, where you actually have a bigger need for

8  fresh data than to get all data.  Then you don't have to

9  wait for discarded packets to be retransmitted if

10  they're updated.

11          So if you don't have this mechanism, then

12  you get -- can get stalled, and you have to wait for

13  retransmission, which are unnecessary.

14          QUESTION:  So if you were on a video

15  call, what would that look like?

16          ANSWER:  Then it would be that you get an

17  interrupt in that communication.

18          QUESTION:  And your invention solves

19  this?

20          ANSWER:  Our invention makes it possible

21  for the application to move on, even though it hasn't

22  got all the packets, which prevents it to get stalled.

23          QUESTION:  And are you proud of your

24  invention?

25          ANSWER:  Yes.

1                    (End of video clip for Plaintiff.)

2                    (Video clip playing.)

3                    QUESTION:   And you don't claim to have

4    invented ARQ?

5                    ANSWER:  No.

6                    QUESTION:   Selective reject?

7                    ANSWER:  No.

8                    QUESTION:   Those pre-existed your alleged

9    invention by many years?

10                   ANSWER:  Yes.

11                   QUESTION:  Discard.  The concept of

12   discarding packets is one that is much older than your

13   patent, correct?

14                   ANSWER:  Yes.

15                   QUESTION:   It's been around for quite a

16   while?

17                   ANSWER:  Yes.

18                   QUESTION:   Did the wireless ATM prototype

19   that you prepared use the solution that you believe you

20   and Peter came up with to this problem?

21                   ANSWER:  No.

22                   QUESTION:   What part of the solution did

23   it not use?

24                   ANSWER:   It didn't use the solution at

25   all.

1             QUESTION:  Why didn't it use the

2  solution?

3             ANSWER:  They considered it a bit too

4  complicated to implement.  That's quite common when

5  you're -- firstly, you make a prototype.  And then the

6  prototype has an aiming for certain purpose.

7             And also when you're starting up

8  something, you are trying to build a base of the product

9  or the prototype.  There you're not really open to add

10 on complexity stuff.

11            QUESTION:  Are you aware of any Ericsson

12 product that ultimately did incorporate the solution

13 that you and Peter believe you came up with?

14            ANSWER:  I'm not sure about that.

15            QUESTION:  Sitting here today, you can't

16 name a product that incorporated it?

17            ANSWER:  No.

18            QUESTION:  Is it fair to say then, using

19 the words of the patent, that it commands the receiver

20 to receive this packet, which -- in the example we're

21 talking about of 7 and also to release expectations of

22 packets before 7?

23            ANSWER:  Yes.  At least it informs him

24 that you can't expect anymore, and what you can expect

25 is higher than this.

1                QUESTION:  And also it commands the

2   receiver to receive 7.  It has both of those functions.

3                ANSWER:  Yeah, you can say that, or at

4   least that you can't get anything less.  If it

5   doesn't -- if it doesn't -- doesn't accept, I mean,

6   there's no one that can do something much about it.  So

7   I'm not sure if it command is the right word.

8                QUESTION:  Okay.  Well, let's take a

9   look, just so we're on the same page, at Column 10 of

10  the patent.  And if we start at Line 12 in Column 10.

11               You believe that the solution that you

12  testified earlier is covered or embodied in Claim 1 of

13  this patent, correct?

14               ANSWER:  Yes.

15               QUESTION:  And if you look at Line 16, it

16  says:  A transmitter in the data network commanding a

17  receiver in the data network to (a) receive at least one

18  packet having a sequence number that is not consecutive

19  with a sequence number of a previously received packet;

20  and (b) release any expectation of receiving outstanding

21  packets having sequence numbers prior to the -- at least

22  one packet.

23               Do you see that?

24               ANSWER:  Yeah.

25               QUESTION:  Okay.

1                    ANSWER:  I see it.

2                    QUESTION:  And so you would agree that

3   what's being talked about here is a command to receive a

4   packet and a command to release expectations of

5   receiving prior packets?

6                    ANSWER:  Yeah.  For me, command is that

7   their transmitter tells the other side that they can't

8   accept anything else than the number that is in the

9   packet.

10                   QUESTION:  You would agree that the

11  command here is stated in two separate parts, right, the

12  (a) and the (b) that we just read?

13                   ANSWER:  Yes.

14                   QUESTION:  So there's a command to

15  receive one packet, and then there's a command to

16  release expectation of receiving, prior to that one

17  packet?

18                   ANSWER:  Yes.

19                   QUESTION:  Okay.  And you -- you believe

20  that that -- in addition to discarding packets of which

21  acknowledgment has not been received and which have

22  sequence numbers prior to at least one packet, that that

23  constitutes the solution that you were talking about

24  earlier?

25                   ANSWER:  Claim 1 is according to the

1  solution that we talked about.

2          QUESTION:  And so is the command to

3  receive and release expectations a solution to that

4  situation where the window is stuck because there's a

5  packet that keeps needing to get retransmitted?

6          ANSWER:  Yes.

7          QUESTION:  So looking at Figure 2 again,

8  if you had a system that was designed where you could

9  receive a packet, let's say Sequence No. 7, beyond TSN

10  Max and shift the window automatically with just a

11  regular packet, you wouldn't need the command that

12  you're talking about in Claim 1, correct?

13          ANSWER:  Yes.  If you had that, then you

14  wouldn't need it.

15          QUESTION:  Are you aware of any products

16  that Ericsson sells today that embody or practice the

17  '625 patent.

18          ANSWER:  No.

19          QUESTION:  Are you aware of any products

20  sold in the past that embody or practice the '625

21  patent?

22          ANSWER:  No.

23          QUESTION:  You don't believe you invented

24  BlockAck?

25          ANSWER:  No.

1                    QUESTION:  Do you know what BlockAck is?

2                    ANSWER:  Not really.  But I know that I

3  didn't patent it.

4                    QUESTION:  Do you have an understanding

5  of what segmentation is?

6                    ANSWER:  Yes.

7                    QUESTION:  What is it?

8                    ANSWER:  You get longer masses and break

9  it into smaller masses.  Or smaller packets.  That's the

10  correct term.

11                    QUESTION:  Have you ever received any

12  other kind of honor or recognition for your work as an

13  inventor at Ericsson?

14                    ANSWER:  No.

15                    QUESTION:  Are you aware of any standards

16  that embody or practice the '625 patent?

17                    ANSWER:  I don't know.

18                    QUESTION:  You're not aware of any?

19                    ANSWER:  I'm not aware.  I haven't read

20  it.

21                    QUESTION:  Have you heard of any praise

22  for the '625 patent or the invention of the '625 patent

23  outside of Ericsson?

24                    ANSWER:  I haven't heard any.

25                    QUESTION:  Okay.  That's -- that's not my

1  question.  My question is, sitting here today, can you

2  identify an Ericsson product that uses what you believe

3  is the '625 invention?

4            ANSWER:  No.  I don't know any product

5  that implemented that.

6            QUESTION:  You testified that you can't

7  point to a single product that you have ever used that

8  embodies your invention, correct?

9            ANSWER:  Yes.  I don't know of any

10  product using the patent.

11           QUESTION:  And you've never read all of

12  802.11?

13           ANSWER:  No.

14           QUESTION:  So sitting here today, you are

15  not qualified to provide any kind of testimony on what

16  it discloses and how it relates to your patent, correct?

17           ANSWER:  Correct.

18           (End of video clip for Defendants.)

19           THE COURT:  All right.

20           MR. CAWLEY:  Ladies and Gentleman, next

21  you will see the video deposition of Alex Krister Raith.

22  Mr. Raith is an engineer at Ericsson and a named

23  inventor on the '568 patent.

24           Ericsson's designated 7 minutes and

25  29 seconds of testimony.  Defendants have designated

1  5 minutes and 4 seconds.  So that's about a -- just a

2  little over 10 minutes.

3                    THE COURT:  All right.  You may proceed.

4                    (Video playing.)

5                    QUESTION:  Hi, Mr. Raith.

6                    ANSWER:  Hi.

7                    QUESTION:  Can you please introduce

8  yourself to the jury?

9                    ANSWER:  My name is Krister Raith.  I

10  started to work after I got my Master of Electrical

11  Engineering degree in Sweden.  I started work for

12  Ericsson in Sweden in 1993.

13                    I worked with the 1G and 2G systems, for

14  example, development of what was to be known as GSM; and

15  during the '80s and later on in the end of '80s, I

16  worked with corresponding technology directed for United

17  States Digital Cellular Systems at --

18                    QUESTION:  Go ahead.  I'm sorry.

19                    ANSWER:  -- that was subsequently

20  deployed by Bell South, Southwestern Bell, and AT&T.

21                    All of them may have changed name over

22  the years here.

23                    In '90, I decided to move to North

24  Carolina where Ericsson had developed -- initiated

25  research development in North Carolina since I was

1  traveling so much, to participate in the standards

2  organizations devoted for U.S. Digital Cellular.

3               So from 1990 to '99, I worked in

4  developing standards and technology directed for the --

5  what was known to be the TDMA technology.

6               In 1999, I decided to move to another

7  business unit in -- within Ericsson located in San Diego

8  where we developed products for the CDMA2000, which is

9  technology currently used by Verizon and Sprint, for

10 example.  And I participated -- I continued to

11 participate in the standards development but now, in

12 this case, directed to CDMA2000.

13              And in CDMA -- in 2005, about that time,

14 Ericsson closed that business unit in San Diego.  I was

15 offered to continue my employment, for example, in

16 Dallas, but I decided to stay in San Diego, so I left

17 Ericsson.

18              I became semi-retired or -- and started

19 consulting, and I've been consulting in the area of

20 patents, essentially since 2006 or 2007 until current

21 time.

22              QUESTION:  How long did you work for

23 Ericsson?

24              ANSWER:  From early '93 to -- given some

25 evidence that was presented in this discussion, I may

1  have ended my employment with Ericsson early 2006 and

2  not 2005.

3                   QUESTION:  Were you doing research that

4  entire time?

5                   ANSWER:  From a broad perspective, yes.

6  It would be fit into a research and development

7  organization, yes.

8                   QUESTION:  Okay.  Are you the named

9  inventor on any patents?

10                  ANSWER:  Yes.  I have 101 issued U.S.

11 patents.

12                  QUESTION:  Okay.  And are you the named

13 inventor on the '019 and '568 patents at issue here?

14                  ANSWER:  Yes, I am.

15                  QUESTION:  Okay.  Are you the only

16 inventor?

17                  ANSWER:  No, I'm not.

18                  QUESTION:  Who are your co-inventors?

19                  ANSWER:  John Diachina and Jim Ragsdale.

20                  QUESTION:  How did you come to know

21 Mr. Diachina and Mr. Ragsdale?

22                  ANSWER:  John Diachina was employed right

23 after -- right -- right about when I came to North

24 Carolina, very similar timeframe.  Jim Ragsdale was

25 employed about two, three years later.

1                     QUESTION:  So were all three of you at

2      Ericsson when you came up with the idea for the '019 and

3      568 patents?

4                     ANSWER:  That's correct.

5                     QUESTION:  Okay.  With regard to the '019

6      and '568 patents, what work were you doing generally at

7      Ericsson that led to the ideas in those patents?

8                     ANSWER:  In general, we were fostering --

9      there was competition among the various kind of

10     technologies existing on the marketplace.  And, of

11     course, our objective was to try to improve on the

12     technology, to improve it such that it provided more

13     features and functionality to the end users in an

14     efficient way.

15                    QUESTION:  Okay.  So what's the specific

16     problem that you were trying to address with the '019

17     patent?

18                    ANSWER:  That was to provide a multimedia

19     solution where you could provide voice and video or

20     voice and whiteboard applications -- a concurrent voice

21     and video, for example, or concurrent voice and

22     whiteboard -- or basically graph to the seller

23     telephone.

24                    QUESTION:  And what was the solution that

25     you came up with?

1          ANSWER:  Well, in order to be efficient,

2   we needed to provide mechanisms such that one uses the

3   existing bandwidth or existing radio channels in the

4   most efficient way.  And one way to accomplish that is

5   to prioritize among the different data and not -- not

6   waste resources.  So we did it in the most efficient

7   way.

8          QUESTION:  So can you explain how your

9   invention would affect, you know, the everyday users of

10  a cell phone, for example?

11          ANSWER:  With the invention a user at

12  that time -- or, you know, given it would take some

13  years to develop product, would be able to, for example,

14  have a speech connection and perhaps a whiteboard

15  application or a map or a graph on the display so you

16  can give direction and speak about the direction and

17  then maybe have a little map in front of you.

18          QUESTION:  All right.  So in 2005 or

19  2006, you opened your own consulting business?

20          ANSWER:  Yeah.  Yes.

21          QUESTION:  Okay.  And what type of

22  consulting do you do?

23          ANSWER:  I consult regarding IPRs.

24          QUESTION:  Okay.  And what does that

25  mean?  What's an IPR?

1                    ANSWER:  Basically, I consult regarding

2  patents.

3                    QUESTION:  Okay.  And is Ericsson one of

4  your clients?

5                    ANSWER:  That's correct.

6                    QUESTION:  And what's your rate now?

7                    ANSWER:  220.

8                    QUESTION:  Does your rate -- is that --

9  is your rate the same for all work that you do?

10                   ANSWER:  No, it's not.

11                   QUESTION:  Okay.  So for different types

12  of work, it's -- could be more expensive or less

13  expensive?

14                   ANSWER:  That's correct.

15                   QUESTION:  So I'll rephrase it.

16                   When -- for depositions, when you have to

17  work on depositions, you -- your rate is double?

18                   ANSWER:  Yes.

19                   QUESTION:  When did the issue of charging

20  more for a deposition, when did that first come up?

21                   ANSWER:  It came up related to this case.

22                   QUESTION:  So in this case -- explain to

23  me, how did it come up?

24                   ANSWER:  I stated my rate.

25                   QUESTION:  Since you graduated from the

1 university, your work has exclusively focused on

2 research in the -- in cellular technologies; is that

3 correct?

4                    ANSWER:  That's correct.

5                    QUESTION:  Okay.  While you were at

6 Ericsson, did you ever do research on wireless local

7 area network technologies?

8                    ANSWER:  No, I did not.

9                    QUESTION:  Would you consider yourself an

10 expert in 802.11?

11                    ANSWER:  No.

12                    QUESTION:  Okay.  Have you -- have you

13 ever attended any 802.11 meetings?

14                    ANSWER:  No, I have not.

15                    QUESTION:  Did you ever make any

16 contributions to 802.11?

17                    ANSWER:  No, I haven't -- I have not.

18                    QUESTION:  Did you ever comment on -- on

19 any contributions to 802.11?

20                    ANSWER:  No, I have not.

21                    QUESTION:  Did you -- have you ever had

22 any involvement in the 802.11 standard-setting process?

23                    ANSWER:  No, I have not.

24                    QUESTION:  Okay.  You've never voted on

25 an 802.11 issue or contribution?

1                    ANSWER:  That's correct.

2                    QUESTION:  Okay.  Have you ever held a

3  position at the IEEE?

4                    ANSWER:  No, I have not.

5                    QUESTION:  So you've never been an

6  officer, for instance, in any 802.11 working group or

7  task group?

8                    ANSWER:  That's correct.

9                    QUESTION:  And none of your work at

10  Ericsson related to 802.11?

11                    ANSWER:  That's correct.

12                    QUESTION:  Did you ever create a

13  prototype that incorporated the idea for the '019 patent

14  and '568 patents?

15                    ANSWER:  No, we did not.

16                    QUESTION:  Okay.  So you never created a

17  physical product that incorporated the idea of the '019

18  patent and '568 patents?

19                    ANSWER:  That's correct.

20                    QUESTION:  And so what you came up with

21  in the '019 patent and '568 patents is the idea of using

22  something called a service type identifier to inform a

23  receiver about the type of information that's being

24  transmitted at a given point in time on a traffic

25  channel.  Is that right?

1          ANSWER:  Including characteristics of

2  those services, that's the term you used before, yeah.

3          QUESTION:  How much are you being paid

4  for your testimony here today?

5          ANSWER:  As indicated previously, I am

6  paid $400 per hour.

7          QUESTION:  Did you consider the type of

8  payload information referenced in the '019 patent to be

9  information such as voice, video, and data.

10          ANSWER:  Without re-reading everything

11  again, yes, I think that seems to make sense.

12          QUESTION:  Are you aware of any physical

13  embodiments or products for the '019 and '568 patents?

14          ANSWER:  As I testified earlier today, I

15  said I have not examined these two patents versus, for

16  example, the broadband CDMA or BlueTooth, for example.

17  So there may or may not be such products.

18          QUESTION:  So I'll ask again.  Are you

19  aware of any physical or commercial embodiments of the

20  '019 and '568 patents?

21          ANSWER:  No, I'm not.

22          QUESTION:  When you presented to the

23  Ericsson Patent Department the ideas for the '019 and

24  '568 patents, were you compensated?

25          ANSWER:  With an extreme high likelihood,

1  yes.

2                    QUESTION:  Right.  It is traditional

3  practices at Ericsson for Ericsson to reward inventors

4  with some financial compensation for a patent?

5                    ANSWER:  That's correct.

6                    QUESTION:  Did you receive any honors,

7  awards, or other recognition for the ideas of the '019

8  and '568 patents?

9                    ANSWER:  For these patents specifically?

10                    QUESTION:  Yes.

11                    ANSWER:  No.

12                    QUESTION:  Okay.  And are you aware of

13  any honors or awards or recognition being bestowed upon

14  the '019 and '568 patents?

15                    ANSWER:  No.  Not specifically with those

16  patents, no.

17                    QUESTION:  Ericsson never bestowed any

18  sort of honor, awards, or recognition upon the '019 or

19  '568 patents?

20                    ANSWER:  Not specifically for these two

21  patents, yes.

22                    QUESTION:  Okay.  You're familiar with

23  the concept of quality of services or QoS, right?

24                    ANSWER:  To some extent, yes.

25                    QUESTION:  Did you invent the concept of

1  quality of service or QoS?

2                ANSWER:  Probably not.

3                QUESTION:  Okay.  The idea or concept of

4  quality of service came before the '019 and '568

5  patents?

6                ANSWER:  I think that's fair to say.

7                QUESTION:  The idea or concept of

8  prioritization, that was around before your '019 and

9  '568 patents, right?

10                ANSWER:  Yeah, I think so.

11                QUESTION:  Did you invent 802.11?

12                ANSWER:  No, I did not invent 802.11.

13                QUESTION:  Did you invent 802.11n?

14                ANSWER:  No, I did not.

15                (End of video clip.)

16                THE COURT:  All right.  Anything further?

17                MR. CAWLEY:  Not from the video

18  depositions, Your Honor.

19                THE COURT:  All right.  Who will your

20  next witness be?

21                MR. CAWLEY:  Your Honor, we call to the

22  stand Christina Petersson.

23                THE COURT:  All right.  Ms. Petersson.

24                Is she outside the courtroom?

25                MR. CAWLEY:  Out in the hall, Your Honor.

1                    THE COURT:  All right.  Could someone go

2  get her, please?

3                    (Pause in proceedings.)

4                    THE COURT:  You can just come forward

5  here, Ms. Petersson.  Welcome back to the courtroom.

6                    THE WITNESS:  Thank you.

7                    THE COURT:  All right.  You may proceed,

8  Mr. Cawley.

9                    MR. CAWLEY:  Thank you, Your Honor.

10              CHRISTINA PETERSSON, PLAINTIFFS' WITNESS,

11                         PREVIOUSLY SWORN

12                       DIRECT EXAMINATION

13  BY MR. CAWLEY:

14        Q.   Would you tell us your name, please?

15        A.   Yes.  My name is Christina Petersson.

16        Q.   Why are you here, Ms. Petersson?

17        A.   I am here to testify on behalf of my employer,

18  Ericsson.

19        Q.   Where do you live?

20        A.   I live in a suburb outside of Stockholm in

21  Sweden.

22        Q.   Did you grow up in Sweden?

23        A.   Yes, I did, in a small city about 200

24  kilometers outside of Stockholm.

25        Q.   I see.

1          Is English your native language?

2     A.    No, it is not.  It's Swedish.

3     Q.    I guess you grew up speaking Swedish.

4     A.    Yes.

5     Q.    Where did you learn to speak English?

6     A.    I learned English in school, just as any

7 children in Sweden, since it's a small country.

8     Q.    Okay.  And do you speak English frequently in

9 connection with your job at Ericsson?

10     A.    Yes, I do.  As a matter of fact, English is

11 the corporate language of Ericsson.

12     Q.    Okay.  Now, is this your first time to come to

13 Texas, Ms. Petersson?

14     A.    It's not.  Our headquarters here in the U.S.

15 is in Plano in Dallas, so I visit frequently Plano.

16     Q.    Okay.  How about Tyler?

17     A.    I've never been to Tyler before in my life,

18 no.

19     Q.    Okay.  Well, welcome to Tyler.

20          Tell us a little bit about yourself before we

21 learn more about your job at Ericsson.

22     A.    My job at Ericsson, I'm a lawyer, a business

23 lawyer.  I have a small group of lawyers in my team who

24 report to me, and we provide legal services to the

25 group, the IPR group, who are doing the license

1  agreements.  So we're basically drafting license

2  agreements.

3       Q.   Okay.  Tell -- tell us about your family back

4  in Sweden.

5       A.   I have a husband, and I have a six-year-old

6  son who is about to start to school this autumn.

7       Q.   Okay.  Where did you go to school,

8  Ms. Petersson?

9       A.   I went to school, obviously, in the small city

10  where I grew up, and I went to the university in

11  Uppsala, a city outside of Stockholm.

12       Q.   Okay.  And what degree did you get at the

13  university?

14       A.   I got a law degree at that university.

15       Q.   How long have you worked for Ericsson?

16       A.   I have worked for Ericsson since January of

17  1998.

18       Q.   Now, you already told us that you're a lawyer

19  working within Ericsson?

20       A.   Yes.

21       Q.   Do you have -- do you have a law degree from a

22  Swedish university?

23       A.   Yes, I do.

24       Q.   Are you a trial lawyer, a lawyer like the ones

25  here who go into court and try cases?

1      A.    No, not at all.  As a matter of fact, the only

2  time I've been in a courtroom was during my law school.

3      Q.    Okay.

4      A.    So, no.

5      Q.    Okay.  So you haven't been in a courtroom

6  since law school --

7      A.    No.

8      Q.    -- until today -- or yesterday, I guess?

9      A.    Yes.

10      Q.    Okay.  Now, what is it that you do a little

11  more specifically for Ericsson?

12      A.    I participate with legal support, drafting the

13  different license agreements that we have.  We do also

14  do trademarks and copyrights.  So we have IPR legal

15  support --

16      Q.    Okay.

17      A.    -- to Ericsson.

18      Q.    And IPR is a word -- or some letters that we

19  heard yesterday, and tell us again what that stands for.

20      A.    That stands for trademarks, brands, copyright,

21  and patents.

22      Q.    Okay.  IPR means intellectual property rights?

23      A.    Yes.

24      Q.    Now, are you a person -- in addition to

25  writing the written license agreements, do you negotiate

1  patent license agreements for Ericsson?

2      A.   Yes, I do.  I don't participate, just to be

3  honest, in the entire face of the negotiations.  They

4  usually start out by technical discussions where --

5  since I don't have a technical background, I don't

6  participate.  Then they move over to the business phase

7  where I sometimes participate, sometimes not.  And I do

8  participate in -- in the actual conclusion of the -- the

9  agreement.

10     Q.   Okay.  You sort of told us a little bit about

11 the process there, but since -- since most of us don't

12 have much reason to ever get involved in the licensing

13 of a patent, let me -- let me ask you about it a little

14 more specifically.

15          If a company wants to make a product, let's

16 say, that practices a standard that uses an Ericsson

17 patent, how does Ericsson go about negotiating a license

18 for a fair rate?

19     A.   Like I said, we would start out by the

20 technical discussions.  We, of course, look at the

21 standard.  We look at our portfolio.  We look at the

22 portfolio of other parties.  We come up with a rate.  We

23 go out and we discuss that rate with potential

24 licensees -- that would be the potential companies who

25 are using our technology.  And by doing so, we learn a

1   lot of information from these licensees.  And that's

2   kind of a sanity check that the rate we're discussing

3   is -- is appropriate.

4        Q.   Okay.  So let me -- let me make sure that I

5   kind of understand the process.

6             First of all, how do you even get in contact

7   with another company who might need to take a license to

8   Ericsson's patents?

9        A.   We send them a letter, usually, pointing out

10  that we have patented ideas in the area where they are

11  conducting business.  That's the way it starts.  And

12  then we would have meetings to follow up.

13       Q.   Okay.  And what -- what kind -- what are those

14  meetings typically like at the beginning?

15       A.   At the beginning, most of the times they start

16  out by technical discussions where our technical people

17  explain our patented ideas to the user.  And usually the

18  user explains his product.  This can be a tough fight in

19  between the two.  When we have concluded that there is a

20  use in the product, we discuss the potential royalty --

21  the potential payment or compensation to Ericsson that

22  would be paid.

23       Q.   Where do these meetings usually take place?

24             MR. DAUCHOT:  Excuse me, Your Honor.

25  Objection on 402 grounds and hearsay, as well.  May we

1    approach for side-bar?

2                    THE COURT:  All right.

3                    (Bench conference.)

4                    MR. DAUCHOT:  Your Honor, on behalf of

5    the Defendants, these discussions with other parties in

6    the context of these negotiations is hearsay.  These are

7    out-of-court statements offered for the truth of the

8    matter asserted, and so it's classic hearsay to which I

9    don't see an exception.  That's Point No. 1.

10                   Point No. 2, for 402 grounds on I don't

11   see what those discussions -- they are any relevance to

12   what's going on in this case along the lines of what I

13   discussed this morning with Your Honor, relative to HP

14   in particular.

15                   And No. 3, we are getting into 403, which

16   is clearly unfair prejudice.  Given Your Honor's rulings

17   on Daubert or in limine -- I'm sorry, under Rule 408 --

18   I mean, this is unfairly prejudicial for those reasons.

19                   MR. CAWLEY:  Well, Your Honor, first of

20   all, it's not hearsay.  It's not being offered for the

21   truth of what's asserted.  It's being offered to the

22   jury about what a licensing discussion is like.  We

23   haven't tied it to any particular Defendant or any

24   party.  She's just giving a general discussion of how

25   licensing works.

```
 1                  THE COURT:  Okay.  Keep it general --
 2  general discussion.
 3                  (End of bench conference.)
 4      Q.   (By Mr. Cawley)  Ms. Petersson, you were
 5  explaining to us how the licensing process typically
 6  works, and I think you just told us that typically it
 7  starts with technical meetings between Ericsson and the
 8  company that you're talking to?
 9      A.   Yes.
10      Q.   Where do meetings like that typically take
11  place?
12      A.   Usually they take place at the office -- head
13  office of the potential user.  So it's us having to
14  travel to their offices usually.  It sometimes happens
15  that they come to Stockholm, as well.
16      Q.   Okay.  And so do you -- do those kind of
17  meetings take place all over the world?
18      A.   They do, yes.
19      Q.   And I think you told us that once there --
20  there have been some meetings on the technical terms,
21  then there may be some additional meetings on the
22  business terms?
23      A.   Yes, that would -- after the conclusion that
24  the user is actually using -- using our patented idea,
25  it moves on into the -- what we call the business
```

1   discussions where the potential compensation that is

2   supposed to be paid to Ericsson are discussed.

3       Q.   Okay.  And then there -- there finally, I

4   guess, would be maybe meetings or at least an exchange

5   of -- of written documents?

6       A.   Yes, there would be.

7       Q.   Okay.

8       A.   Not always, but most of the times, yes.

9       Q.   And -- and those written documents are usually

10  referred to as a license agreement?

11      A.   Yes.  The license agreement is always

12  concluded in writing.

13      Q.   Now, how long -- you've told us about quite a

14  few discussions that might take place, quite a few

15  meetings that might take place to negotiate a license

16  agreement.

17           How long does that usually take?

18      A.   It might go very quickly.  Sometimes it can

19  take years.

20      Q.   Years?

21      A.   I would say approximately around a year is

22  the -- the -- perhaps the average.

23      Q.   Okay.  How many license -- excuse me, patent

24  license agreements does Ericsson have?

25      A.   We have today around 100 license agreements.

1       Q.    100 license agreements.  Covering how many

2  Ericsson patents?

3       A.    Some of the agreements cover our entire patent

4  portfolio, the entire 33,000 patents that we own.  Some

5  of them just cover a specific number that is listed in

6  the agreement.  Some of them cover what we call a

7  portfolio of patents which would be a subset of our --

8  of our entire portfolio --

9       Q.    Okay.

10       A.    -- in -- in relation to specific technology.

11       Q.    Good.  You know, Mr. Brismark used that word

12  yesterday, and I meant to ask him about it and forgot,

13  so I want to ask you.  What does a portfolio mean when

14  you're talking about it in terms of patents?

15       A.    We mean a portfolio -- more or less like

16  saying it's more than one patent.  If -- if you have --

17  see, because all our patents in 2G, you can say that's

18  our 2G portfolio of patents.

19       Q.    Okay.  So sometimes you use it to refer to a

20  smaller set of Ericsson's patents that relate to a

21  particular thing?

22       A.    Yes, that's correct.

23       Q.    For example, in this case we're talking about

24  Ericsson -- at least some of the patents in Ericsson's

25  Wi-Fi portfolio?

1       A.   Yes, correct.

2       Q.   But -- but sometimes do you also talk just

3    about Ericsson's patent portfolio which means all their

4    patents?

5       A.   Yes.

6       Q.   Okay.  And let me ask you about this.  You --

7    you've described for us a process that you have

8    participated in that sometimes results in the entry into

9    a license agreement for the use of Ericsson's patents.

10           Does it sometimes happen in your experience

11   that a company may insist that even though they

12   acknowledge that they need to license Ericsson's

13   patents, nevertheless insist on being sued by Ericsson

14   first?

15      A.   Yes, that happens.

16      Q.   Why would that happen?

17      A.   Sometimes the -- to start with, the company

18   that we are having discussions with would be the company

19   who are making the -- what we call ready-to-use

20   products.  That is products that the consumer can

21   actually use.

22           Sometimes when they buy components from a

23   component manufacturer, that component manufacturer

24   might have in its sales agreement stated that if you are

25   infringing upon a third-party patent --

1          MR. DAUCHOT:  Your Honor, objection.

2          May we approach?

3          THE COURT:  Yes, you may.

4          MR. DAUCHOT:  Thank you.

5          (Bench conference.)

6          MR. DAUCHOT:  Your Honor, we have the

7   witness speculating about what some agreements have

8   been.  They are not in evidence.  Might say, with

9   respect to some hypothetical.  It's absolute rank

10  speculation and speculation along the lines that the

11  Plaintiffs think will convince the jury to steer away

12  specifically to -- so to have a jury sitting here and

13  thinking about hypothetical agreements, as she did, "may

14  be" this and then rank speculation, it's -- it's

15  inappropriate here under 402, certainly under 403.

16          And here we go again with her talking

17  about companies making -- she's talking about what kind

18  of users and manufacturers -- what their discussions are

19  with chipset manufacturers.

20          Those are conversations between two

21  people who aren't even in this case.  So it's just

22  hearsay on top of hearsay on top of hearsay, according

23  to 402, and it's prejudicial, Your Honor.

24          MR. CAWLEY:  It's not hearsay.  It's not

25  being offered for the truth of any matter asserted.

1  It's not speculation.  She's testifying that she has

2  seen this exact situation in licensing discussions.

3               THE COURT:  Isn't that exactly what we

4  have in this situation?

5               MR. DAUCHOT:  Here's the other -- maybe

6  yes, maybe no.  All of this stuff has been kept under

7  Rule 408.  And it's also willfulness, since this has

8  just turned -- all of this stuff is bifurcated, Your

9  Honor, at the Plaintiffs' request.

10              THE COURT:  Objection's overruled, but

11 move on.

12              MR. CAWLEY:  Can she finish her answer?

13 She's still --

14              THE COURT:  Yes.

15              (Bench conference concluded.)

16     Q.   (By Mr. Cawley) Ms. Petersson, you remember

17 what you were -- you were saying in your answer?

18     A.   I think so, yes.

19     Q.   Would you go ahead and complete your answer?

20     A.   Yes.  In the sales agreement between the

21 component manufacturer and its customer, there could be

22 a clause, a writing saying that the component

23 manufacturer will be responsible for making payments or

24 paying the potential royalty payment that its customer

25 has to make in case of a patent infringement.

1    Q.   Okay.  And that's the circumstances that might

2  lead to a company saying, sorry, we may need a license,

3  but you have to sue us first?

4    A.   Yes, it might be.  Because the clause might

5  say that I will only pay this amount provided that a

6  court has established the rate that you are supposed to

7  pay.

8    Q.   Okay.  Thank you, ma'am.

9         Let's move on now and talk specifically about

10  Ericsson's licenses for its Wi-Fi patent.

11         Have -- have some companies licensed

12  Ericsson's Wi-Fi patents?

13    A.   Yes, they have.

14    Q.   When did Ericsson first start discussing with

15  other companies licensing its patents to Wi-Fi?

16    A.   In the time frame of 2003 and 2004.

17    Q.   Okay.

18         MR. CAWLEY:  Your Honor, at this time

19  we're going to inquire into some confidential financial

20  information, and we would request that the Court seal

21  the courtroom.

22         THE COURT:  All right.  Let me explain to

23  the jury and to the audience what Mr. Cawley is about to

24  go into is confidential information that the parties on

25  either side in a case can designate certain information

1  as confidential, attorneys' eyes only, which means that

2  only the attorneys in the case can see it.

3           And then that's covered by what we call a

4  protective order which means that those attorneys cannot

5  disclose this information to anyone else.

6           So Mr. Cawley has indicated that he's

7  about to go into some material that has been so

8  designated by one party or another in this case and,

9  therefore, at this time, unless you are an attorney of

10  record in this case and subject to the protective order

11  in this case, you will need to leave the courtroom.

12          How long do you anticipate this testimony

13  will take?

14          MR. CAWLEY:  15 to 20 minutes.

15          THE COURT:  All right.  We'll probably go

16  and -- if you want to go on and go to lunch, we'll plan

17  to recess for lunch probably immediately after that.  So

18  you can just take an early lunch break if you'd like to.

19  But if you're not an attorney covered by the protective

20  order, then you are excluded from the courtroom at this

21  time.

22          (Pause while courtroom cleared.)

23          MR. JONES:  Your Honor, the experts

24  signed a protective order so they can stay, too.

25          THE COURT:  Is there any objection to

1  experts staying that have signed on under the protective

2  order from any party?

3              MR. CAWLEY:  No objection from the

4  Plaintiff, Your Honor.

5              THE COURT:  All right.  Experts who

6  have -- know that they have signed the protective order

7  may stay, as well.

8              (Courtroom sealed.)

9              (This portion of the proceedings is

10             SEALED and filed under separate cover.)

11             (Courtroom unsealed.)

12             THE COURT:  Let me ask you, how much

13  longer you probably have with this witness?

14             MR. CAWLEY:  Oh, I think that I have

15  another 10 minutes.

16             THE COURT:  Okay.  I think we'll go ahead

17  and break for lunch at this time, Ladies and Gentleman.

18             We'll be in recess until 10 minutes until

19  1:00.

20             Please remember my instructions, and we

21  will see you back here in about 30 minutes.  Be in

22  recess.

23             COURT SECURITY OFFICER:  All rise.

24             (Jury out.)

25             (Lunch recess.)

1                       CERTIFICATION

2

3                  I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of our abilities.

7

8

9    /s/ Shea Sloan
     SHEA SLOAN, CSR
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/14

12

13
     /s/ Judith Werlinger
14   JUDITH WERLINGER, CSR
     Deputy Official Court Reporter
15   State of Texas No.:  731
     Expiration Date  12/31/14
16

17

18

19

20

21

22

23

24

25