1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION

 3
    ERICSSON, INC., ET AL         )
 4                                    DOCKET NO. 6:10cv473
        -vs-                      )
 5                                    Tyler, Texas
                                 )    12:53 p.m.
 6  D-LINK CORPORATION, ET AL          June 4, 2013

 7

 8                      TRANSCRIPT OF TRIAL
                        AFTERNOON SESSION
 9         BEFORE THE HONORABLE LEONARD DAVIS,
        UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY
10

11

12                   A P P E A R A N C E S

13

14  FOR THE PLAINTIFFS:

15
    MR. THEODORE STEVENSON, III
16  MR. DOUGLAS A. CAWLEY
    McKOOL SMITH
17  300 Crescent Court, Ste. 1500
    Dallas, Texas  75201
18

19  MR. JOHN B. CAMPBELL, JR.
    McKOOL SMITH
20  300 W. 6th Street, Suite 1700
    Austin, Texas  78701
21

22  COURT REPORTERS:       MS. JUDITH WERLINGER
                           MS. SHEA SLOAN
23                         shea_sloan@txed.uscourts.gov

24
    Proceedings taken by Machine Stenotype; transcript was
25  produced by a Computer.
```

2

```
 1  FOR THE DEFENDANT:

 2
    MR. GREGORY S. AROVAS
 3  KIRKLAND & ELLIS, LLP
    601 Lexington Avenue
 4  New York, New York 10022

 5

 6  MR. LUKE DAUCHOT
    KIRKLAND & ELLIS, LLP
 7  333 S. Hope Street
    29th Floor
 8  Los Angeles, California  90071

 9

10  MR. ADAM ALPER
    KIRKLAND & ELLIS, LLP
11  555 California St.
    24th Floor
12  San Francisco, California  94104

13

14  MR. MICHAEL E. JONES
    POTTER MINTON, PC
15  110 N. College, Ste. 500
    P.O. Box 359
16  Tyler, Texas  75710-0359

17

18  MR. ROBERT A. VAN NEST
    KEKER & VAN NEST, LLP
19  633 Sansome St.
    San Francisco, California 94111
20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S
 2                 (Jury out.)
 3                 COURT SECURITY OFFICER:  All rise.
 4                 THE COURT:  All right.  You may bring the
 5   jury in.
 6                 (Jury in.)
 7                 THE COURT:  Please be seated.
 8                 All right, Mr. Cawley.
 9                 MR. CAWLEY:  Thank you, Your Honor.
10           CHRISTINA PETERSSON, PLAINTIFFS' WITNESS,
11                      PREVIOUSLY SWORN
12              DIRECT EXAMINATION (CONTINUED)
13   BY MR. CAWLEY:
14      Q.   Ms. Petersson, before the lunch break, you had
15   just told us about a number of license agreements that
16   Ericsson entered into for its Wi-Fi patents.
17              Were the licenses that you just told us about,
18   for companies that sold end products to users?
19      A.   Yes, they were.  They were what we called
20   ready-to-use devices, which is a device that can
21   actually be used by a consumer directly when it's sold.
22      Q.   And were the amounts that these companies paid
23   as royalties based, at least in part, on the prices of
24   the products that they sold to the end users?
25      A.   Yes, that's correct.
```

1      Q.    Were any of the companies that you told us

2  about chip makers?

3      A.    No, they were not.

4      Q.    Has Ericsson licensed any chip makers to its

5  Wi-Fi patents?

6      A.    No.  It has happened that we have -- we have

7  license agreement from the '90s, one agreement from the

8  beginning of 2000, as well.

9      Q.    Okay.

10      A.    But they would usually cover our entire

11  portfolio, so it wouldn't be Wi-Fi specific, no.

12      Q.    Okay.  Since 2003, when -- when you told us

13  you -- Ericsson began this licensing effort, has it

14  licensed any chip makers to its Wi-Fi patents?

15      A.    No, we have not.

16      Q.    Why not?

17      A.    Because if you license the chipset

18  manufacturer, you cannot use the same patent against its

19  customers.  So you can only license once in the value

20  chain, is the way we call it.

21      Q.    Uh-huh.

22      A.    So you have to elect to either license on the

23  chipset level --

24      Q.    Uh-huh.

25      A.    -- or you license on the ready-to-use device

1  level.  And the reason why we do it on the ready-to-use

2  device product is that that's where you actually see the

3  use of the technology.

4      Q.   So is -- in your experience is a computer chip

5  that we saw yesterday very useful to most consumers?

6      A.   No, at least not to me.

7      Q.   Okay.  Now, let's make sure this -- this is an

8  important concept, so I want to make sure we understand.

9           If, in this case, Ericsson were to have

10 licensed Intel that makes Wi-Fi chips, could Ericsson

11 also ask for a license from Intel's customers who buy

12 Intel chips and put it into their products?

13     A.   No, we could not.  Provided that our invention

14 is used by the chipset, we say that the rights are

15 exhausted when the chips are sold.  So that you can no

16 longer sign a cross-license in between us and the

17 chipset manufacturers' customer which is in standard

18 environments the -- the usual proceeding is that you

19 sign cross-licenses that covers both companies' patent

20 portfolios.

21     Q.   Okay.  Thank you.

22          And let's reduce this down to dollars and

23 cents -- mostly from Intel's perspective, cents, I

24 think, because I have a feeling that later on in this

25 trial we're going to hear someone hired by Intel say

1  that the reasonable royalty for the chip should be 1 or

2  2 cents?

3      A.   Yes.

4      Q.   Okay.  Now, if that happened, if Ericsson

5  entered into an agreement with Intel to license them to

6  use Ericsson's Wi-Fi patents for 1 cent -- 1 penny, how

7  much would Ericsson be able to recover from the other

8  Defendants that buy Intel's chip and put it in their

9  products?

10     A.   The -- the most likely answer is zero.

11     Q.   Zero?

12     A.   Yes.

13     Q.   Okay.  And why has Ericsson decided that it

14 would rather license the end users than the chip makers?

15     A.   First -- first of all, it's because we enter

16 into cross-licenses.  We are ourselves a maker of

17 ready-to-use products, so we enter into cross-license

18 agreements with those type of -- of companies.  And

19 also, because we feel that we are entitled to the value

20 of the technology, and the value of the technology you

21 see in the end product.

22     Q.   Okay.  Thank you, ma'am.

23          Now, let's talk a little bit more about

24 Ericsson's relationship with the Defendants in this

25 case.

1          Did Ericsson contact each of the Defendants in

2    this case about taking a license to Ericsson's Wi-Fi

3    patents?

4          A.   Yes, we did.

5                    MR. CAWLEY:  Now, Your Honor, at this

6    time, I must ask the Court's permission to read a boring

7    document into the record that has been agreed to.

8                    THE COURT:  All right.  You may proceed.

9                    MR. CAWLEY:  Thank you, Your Honor.

10                    This is a stipulation regarding notice

11    dates, and it's about two pages long.

12                    Plaintiffs Ericsson, Inc. -- and, Your

13    Honor, could -- could I explain to the jury, or ask the

14    Court, what a stipulation is?

15                    THE COURT:  Yes.  Ladies and Gentleman of

16    the Jury, a stipulation is an agreement entered into

17    between the parties as to what certain facts in the case

18    are.

19                    So these facts are not going to be

20    disputed facts.  The parties have gotten together and

21    agreed to these facts, and it saves time with proof and

22    that type of thing.  And you'll be bound by their

23    stipulation.

24                    MR. CAWLEY:  Thank you, Your Honor.

25                    Plaintiffs Ericsson, Inc. and

1  Telefonaktiebolaget LM Ericsson, collectively the

2  Plaintiffs, and Defendants, D-Link Systems, Inc.;

3  NETGEAR, Inc.; Acer, Inc.; Acer America Corporation;

4  Gateway, Inc.; Dell, Inc.; Toshiba Corporation; Toshiba

5  America Information Services, Inc.; and Belkin

6  International; and Intervenor, Intel Corporation,

7  collectively the Defendants, hereby stipulate to the

8  following facts:

9            1.  The following patents are at issue in

10  this suit.  United States Patent No. 6,330,435, the '435

11  patent; United States Patent No. 6,424,625, the '625

12  patent; United States Patent 6,466,568, the '568 patent;

13  United States Patent No. 6,519,223, the '223 patent; and

14  the United States Patent No. 6,772,215, the '215 patent.

15  These patents are collectively known as the

16  patents-in-suit.

17            Ericsson has asserted that each of the

18  Defendants infringe the '568, '625, '435, and '215

19  patents, and that Intel and those Defendants using

20  Intel-supplied chipsets, infringe the '223 patent.

21  Defendants deny that they infringe any valid claim of

22  the patents-in-suit.

23            On March 22nd, 2004, Ericsson identified

24  the '435 patent and '625 patent to D-Link's parent

25  company as relevant to earlier versions of the 802.11

1  standards.  At that time Ericsson did not make the

2  infringement allegations that it makes in this case.

3            Ericsson informed D-Link of its

4  infringement allegations in this case for all of the

5  patents-in-suit on September 14th, 2010.

6            Ericsson and D-Link discussed Ericsson's

7  claims, but they could not reach an agreement.

8            On September 21st, 2004, Ericsson

9  identified the '435 patent, the '625 patent, and the

10  '568 patent to NETGEAR as relevant to earlier versions

11  of the 802.11 standards.  At that time Ericsson did not

12  make the infringement allegations that it makes in this

13  case.  Ericsson informed NETGEAR of its infringement

14  allegations in this case for all of the patents-in-suit

15  on October 2, 2008.

16            Ericsson and NETGEAR discussed Ericsson's

17  claims, but they could not reach an agreement.

18            On November 13th, 2009, Ericsson informed

19  Acer and Gateway of its infringement allegations for all

20  of the patents-in-suit.

21            Ericsson and Acer and Gateway discussed

22  Ericsson's claims, but they could not reach an

23  agreement.

24            On March 21, 2010, Ericsson informed Dell

25  of its infringement allegations for all of the

1  patents-in-suit.

2              Ericsson and Dell discussed Ericsson's

3  claims, but they could not reach an agreement.

4              On December 13, 2010, Ericsson informed

5  Belkin of its infringement allegations for all of the

6  patents-in-suit.

7              Ericsson and Belkin discussed Ericsson's

8  claims, but they could not reach an agreement.

9              On November 11, 2009, Ericsson provided

10  Plaintiffs' Exhibit 71 to Toshiba during a meeting.

11  Ericsson contends that it provided notice of its

12  infringement allegations on that date.  Toshiba contends

13  that Plaintiffs' Exhibit 71 did not provide Toshiba

14  notice of infringement of the patents-in-suit because it

15  did not communicate to Toshiba a specific charge of

16  infringement of the patents-in-suit by the accused

17  products.

18              Instead, Toshiba contends that it

19  received notice of Ericsson's infringement allegations

20  on May 21, 2010.

21     Q.    (By Mr. Cawley)  Now, Ms. Petersson, what is

22  Ericsson asking for in this case?

23     A.    We are asking for fair compensation from the

24  companies making these ready-to-use devices.

25     Q.    And what's your view and Ericsson's view of a

1  fair rate for that compensation?

2      A.   That would be 50 cents per unit in relation to

3  phones.  For instance, it would be half a percent capped

4  at 50 cents, and with a floor at 25 cents.

5      Q.   Okay.  Let -- let me make sure that I

6  understand all that.

7           Let's start with the last thing you said.

8  There's a rate of one-half of 1 percent; is that

9  correct?

10     A.   Yes.

11     Q.   And this is the price of the end product,

12  things that are sold to consumers?

13     A.   Yes.

14     Q.   One-half of one percent.  But there's a

15  maximum of 50 cents?

16     A.   Yes, there is.

17     Q.   And also a minimum?

18     A.   Yes, of 25 cents.

19     Q.   25 cents minimum?

20     A.   Yes.

21     Q.   Okay.  And that applies to some things you

22  told us like handsets or other things?

23     A.   Yes, it does.

24     Q.   Effectively under that formula, what is the

25  rate for laptop computers?

1      A.    The rate for laptop computer would be 50

2   cents.

3      Q.    And why is that?

4      A.    Because the laptop is so high-priced that the

5   half percent would -- would hit the cap of the 50 cents.

6      Q.    Would always be up to the cap of 50 cents?

7      A.    Yes, it would.

8      Q.    What's the rate for routers?

9      A.    The rate for routers is 50 cents.

10      Q.    Also 50 cents.  Why is that?

11      A.    In comparison to the laptop, which has a

12   number of uses, we have concluded that since the router

13   only has the use for Wi-Fi, they should be paying the

14   higher rate, the 50 cents.

15      Q.    Okay.  So the -- you're telling us the laptop

16   can be used for writing letters and watching movies and

17   a whole host of things besides Wi-Fi?

18      A.    Yes.

19      Q.    And that's why 50 cents is a relatively small

20   price of a thousand-dollar laptop, for example?

21      A.    Yes.

22      Q.    The router, on the other hand, might cost $50?

23      A.    Yes.

24      Q.    But you're saying that there's -- that the

25   rate -- Ericsson's rate that it asks for -- for routers

1   is still 50 cents because basically Wi-Fi is all that

2   the router does?

3        A.   Yeah, that's correct.

4        Q.   Okay.  Now, are these rates that you've just

5   described to us, part of Ericsson's RAND commitment?

6        A.   They are, yes.

7        Q.   Does Ericsson believe that they're reasonable?

8        A.   We do believe they're reasonable, yes.

9        Q.   And does Ericsson at least try hard to enter

10  into licenses that are non-discriminatory, no special

11  deals?

12       A.   Yes, that's correct.

13       Q.   Now, you'd agree with me, wouldn't you, that

14  these -- some of these license agreements are pretty

15  complicated?

16       A.   They are, yes.

17       Q.   And there's a number of parts to them, as

18  we've heard.  There's the Wi-Fi license, but there also

19  may be licenses to other technology that's not Wi-Fi.

20       A.   Correct.

21       Q.   And sometimes Ericsson gets a cross-license,

22  right?

23       A.   Yes.

24       Q.   It -- it gets a license back from the company

25  that it's negotiating with?

1     A.   Yes.

2     Q.   We've even seen some instances where Ericsson

3  bought some patents in connection with the agreement?

4     A.   Yes.

5     Q.   So is it -- is it sometimes difficult either

6  to make sure or even to figure out if the agreement that

7  you finally negotiate is exactly 50 cents?

8     A.   Yes, that's correct.

9     Q.   So --

10    A.   That would be hard, yes.

11    Q.   So since -- since Ericsson has -- has made

12  this commitment that it will be -- it will not

13  discriminate, it will not give special deals, and

14  even -- even though that's hard to accomplish, how does

15  Ericsson try to accomplish it?

16    A.   We try to do that by -- by making it our --

17  our own internal analysis, of course, to see what in the

18  end the -- the user will pay.

19         However, we also have to acknowledge that

20  FRAND or RAND is a range.  It will never be an exact

21  figure, because this is subject to discussions between

22  us and the licensee, and many times the licensees have

23  particular requests on how to structure the -- the

24  royalty clause, and we consider whether that -- we still

25  find that this is within the same ballpark range.

1     Q.    Okay.  And Ericsson is -- is willing to

2  negotiate with the parties to try and find an agreement

3  that works for everybody?

4     A.    Yes, we are.

5     Q.    But let's suppose someone comes to Ericsson

6  and says, well, we want a license to your Wi-Fi patents,

7  but we want a special deal.  We're big, we're a powerful

8  company, whatever reason, we want a special deal, what

9  does Ericsson do about that?

10     A.    Then we would have concern around our

11  commitment, because part of RAND is to act

12  non-discriminatory.  And since we have already entered

13  into agreements with many companies, it -- that would

14  risk them being discriminated, because they would have a

15  different position on the market since they would be

16  paying a higher fee.

17     Q.    Right.  And so Ericsson is committed it won't

18  do that?

19     A.    Yes.

20     Q.    All right.  Now, finally, let me ask you just

21  a couple of questions about Intel.

22          Has -- before this lawsuit began, did -- was

23  Intel one of the companies that Ericsson contacted about

24  taking a license to Wi-Fi?

25     A.    No, it was not.

1      Q.   Why not?

2      A.   Because Intel is a component manufacturer, and

3  we started discussing with Intel's customer.

4      Q.   With the customers?

5      A.   Yes.

6      Q.   With -- with the end users?  And let's be

7  sure.  The customers don't -- don't just buy chips --

8  Wi-Fi chips from Intel, they buy it from many other

9  companies, as well; is that fair?

10     A.   Yes, that's fair.  So the customer would be

11 the laptop manufacturer.

12     Q.   Okay.  Now, when Ericsson decided, for the

13 reasons that Mr. Brismark told us about earlier this

14 morning, that it had to file this suit, did it sue

15 Intel?

16     A.   No, we did not.

17     Q.   Why not?

18     A.   Because, again, we were not trying to collect

19 any fee from Intel, but we were aiming at or trying to

20 discuss with its customer.

21     Q.   Okay.  Thank you, Ms. Petersson.

22            MR. CAWLEY:  Your Honor, I'll pass the

23 witness.

24            THE COURT:  Thank you.

25            Cross-examination.

```
 1                    CROSS-EXAMINATION

 2   BY MR. DAUCHOT:

 3        Q.   Ms. Petersson --

 4        A.   Yes.

 5        Q.   -- good afternoon.

 6        A.   Good afternoon.

 7        Q.   I'm going to give you some documents --

 8        A.   Yes.

 9        Q.   -- and here's your binder.

10             MR. DAUCHOT:  And here's your binder,

11   Your Honor.

12        Q.   (By Mr. Dauchot)  All right.  Well, let me

13   introduce myself first.  I'm -- I'm Luke Dauchot.

14        A.   Hello.

15        Q.   I'm an attorney here, along with the others --

16   for the Defendants who's going to be speaking here on

17   behalf of the Defendants.

18             First off, we've met before, right?

19        A.   Yes, we have.

20        Q.   And that was in Stockholm, Sweden?

21        A.   Yes, it was, and it was a lot of snow.

22        Q.   A lot of snow, indeed.

23             And I took some sworn testimony from you at

24   that point in time, right?

25        A.   Correct.
```

1      Q.   And you were under oath then?

2      A.   Yes, correct.

3      Q.   So on occasion, we may be referring to that

4  testimony; and so the jury understands, that dates back

5  to when we were in Stockholm.

6           So welcome to Tyler.

7      A.   Thank you.

8      Q.   I bet you can't think of a better welcome?

9      A.   No.

10      Q.   All right.  I want to focus for a moment on

11  the -- on all the license agreements that have -- that

12  have been raised in this court -- actually a handful of

13  them and try to make something clear.  And, that is, you

14  understand that the patents that Ericsson maintains here

15  to be 802.11-standard essential have never been

16  determined to be so by a jury or a court?  Do you

17  understand that?

18      A.   I understand that, yes.

19      Q.   All right.  Now, you're not suggesting that

20  because a handful of companies involved in Wi-Fi -- and

21  we'll get to how involved in a little bit down the road

22  here -- but you're not suggesting that because a handful

23  of companies did agree to a license, that the jurors

24  here and the Court here should just pack up their bags

25  and leave, and there's really nothing to decide on the

1  infringement issue, are you?

2      A.    No.  I don't expect anyone to pack up their

3  bag and leave, no.

4      Q.    All right.  Now -- and the same is true on the

5  damages issue, right?  I mean, the damages is something

6  that's been studied internally at Ericsson, correct?

7      A.    Correct.

8      Q.    All right.  Now, you're not suggesting that

9  because Ericsson's concluded what's fair, reasonable,

10  and non-discriminatory, that's necessarily something

11  that our Members of the Jury, or for that matter the

12  Court, needs to take at face value, right?

13      A.    Well, the rates have been accepted by the

14  opposite party, so I think it's an important part --

15      Q.    Fair point.

16      A.    -- to consider.

17      Q.    But it's certainly not something that binds --

18  you're not suggesting that that binds the Members of the

19  Jury, or for that matter, the Court, are you?

20      A.    I don't think that's for me to -- to judge

21  whether it binds or not binds.

22      Q.    All right.  Now, you testified a bit earlier

23  to the subject of -- of sanity checks and getting sanity

24  checks on whether or not these rates made sense.

25      A.    Yes.

```
 1      Q.   And as I think you just testified, you never

 2   went to the chipset makers to get sanity checks on

 3   whether or not the pricing made any sense; am I right?

 4      A.   That's correct, we did not, no.

 5      Q.   And the chip -- chipset makers, you've heard

 6   from Mr. Brismark that the -- that the 802.11 technology

 7   at issue here in this case actually sits on the chip?

 8      A.   Well, I did not hear Mr. Brismark's testimony.

 9      Q.   You weren't here.  Fair point.

10      A.   No.

11      Q.   But, indeed, that has been the testimony?

12      A.   Okay.

13      Q.   And -- and you've seen one of these -- these

14   chips?

15      A.   I did see that at the opening, yes.

16      Q.   All right.  So they're tiny?

17      A.   Yes.

18      Q.   My point here is, though, wouldn't you want a

19   sanity check from the chipset maker who actually

20   developed the technology, spent the R&D on the Wi-Fi

21   technology, spent the cost manufacturing the chips,

22   wouldn't you want a sanity check from them as to whether

23   or not your FRAND rate makes sense?

24      A.   I don't think so, no.  We have been discussing

25   with the customer, and I'm not aware of the R&D spent
```

 1  by -- by the chipset manufacturers --

 2       Q.   All right.  And so from your --

 3       A.   -- at least not personally, no.

 4       Q.   So from your perspective, the R&D spent by the

 5  Defendants on the chipsets or by Intel on the chipsets

 6  and the other chipset makers is really neither here nor

 7  there when it comes to the type of royalty rate that's

 8  going to attach to the Wi-Fi technology?  Is that your

 9  testimony?

10       A.   No.  We are, of course, taking into

11  consideration that there are other patent holders in the

12  standard when we set our rate.

13       Q.   All right.  In fact, none of the licenses that

14  you testified to this morning, with the exception of the

15  2002 reference you made, were with chipset makers; am I

16  correct?

17       A.   That's correct.

18       Q.   These were all with customers?

19       A.   Yes.

20       Q.   Of chips?

21       A.   Yes.

22       Q.   All right.  And just so we're clear here,

23  you're not suggesting, again, that the -- you know, that

24  the jury and the Court should just, you know, "go past

25  Go and straight to jail," as they put it in the Monopoly

1  game here, because you've had licenses taken on your

2  technology; am I right?

3      A.    Yes.

4      Q.    All right.

5      A.    In the way I understand the question, yes.

6      Q.    Now, you talked about licenses that Ericsson

7  entered into, and I think you -- you mentioned to the

8  jury some of these broad cross-licenses where there's

9  just really a ton of patents on one side being licensed

10  to the other side and then the other side's patents,

11  just a very broad cross-license, right?

12      A.    Yes, that's correct.

13      Q.    Now, I take it that in those situations,

14  Ericsson doesn't go through each and every single patent

15  that it gets, to make sure there's not infringement;

16  fair point?

17      A.    Very fair point, yes.

18      Q.    All right.  So parties get into licensing

19  reasons -- licensing negotiations and licenses for

20  reasons that may not really be tied to the subject of

21  infringement; fair point?

22      A.    I don't agree to that.  Maybe you don't

23  consider infringement in each and every patent.  Let's

24  say we have a situation where we license our entire

25  portfolio to the opposite party's entire portfolio.  You

1  don't establish infringement in all of those patents.

2           We have 33 (sic) patents, but I don't think

3  that you would enter into a license agreement if you

4  don't establish infringement at all.  I don't see the

5  need for that.

6      Q.   All right.  But the fact of the matter is,

7  though, Ericsson does license patents where it has not

8  undertaken an infringement analysis.  You do agree with

9  that part, correct?

10     A.   Yes.

11     Q.   All right.

12     A.   But then it would be known to us that we are

13  actually practicing certain patents of the other party.

14     Q.   All right.  So it's your testimony for the

15  thousands and thousands and thousands of licenses

16  that --

17              MR. DAUCHOT:  Strike the question.

18     Q.   (By Mr. Dauchot) Let's move to the standard

19  essential issue.

20           You understand that having to clear some of

21  its patents to be standard essential, Ericsson has taken

22  on a responsibility to the industry and to Wi-Fi

23  technology consumers, such as the members of the jury

24  here.  Agree?

25     A.   Agree.

1      Q.   All right.  Now -- and once Ericsson decided

2  to declare its patents to be standard essential, you

3  understand that that doesn't mean the patents are, in

4  fact, standard essential?

5      A.   Yes.

6      Q.   All right.  Now, once Ericsson decides to

7  declare its patent as standard essential, it waives some

8  rights that are normally associated with -- with

9  patents, correct?

10     A.   Under certain circumstances, yes.

11     Q.   All right.  And part of the waiver is a

12  promise to license the essential parts -- the patents

13  that it claims to be essential on fair, reasonable, and

14  non-discriminatory terms, correct?

15     A.   That's correct.  If you elect to license on --

16  on RAND terms.

17     Q.   Now, the --

18          MR. DAUCHOT:  Let's put up Exhibit 294

19  for a moment.

20     Q.   (By Mr. Dauchot)  And I think that this has

21  already been introduced.

22          Now, this is an example of a letter of

23  assurance that Ericsson has signed, correct?

24     A.   Yes, that's correct.

25     Q.   All right.  Now, what I'd like to do is focus

1  on the bottom part of it.  One, here.

2             MR. DAUCHOT:  And actually let's go to

3  Page 2, David.  We've covered the other language.  I'll

4  get right to the -- all right.

5      Q.  (By Mr. Dauchot)  Now, it states here the

6  submitter, and that's Ericsson, correct?

7      A.  Yes, that's correct.

8      Q.  Will grant a license under reasonable rates to

9  an unrestricted number of applicants --

10     A.  Correct.

11     Q.  -- on a worldwide basis with reasonable terms

12  and conditions that are demonstrably free of unfair

13  discrimination?

14     A.  Yes.

15     Q.  Do you see that?

16     A.  Yes, I do.

17     Q.  All right.  Now, that doesn't say that the

18  submitter will grant a license under unreasonable rates

19  to an unrestricted number of applicants, except for

20  chipset makers, does it?

21     A.  No.  It doesn't say that, no --

22     Q.  All right.

23     A.  -- explicitly.

24     Q.  Now -- well, did the -- does that language

25  appear in here, ma'am?

1      A.    No.

2      Q.    It does not?  Now, it's Ericsson's position

3  today that 50 cents per unit per laptop is a -- is a

4  reasonable rate to pay, correct?

5      A.    Yes, that's correct.

6      Q.    And as your -- and as Ericsson's counsel

7  mentioned, that will be subject of expert testimony on

8  the part of Mr. Bone --

9      A.    Yes.

10      Q.    -- correct?

11          Now, you understand that when Mr. Bone

12  calculated the RAND rate, that his calculation came out

13  exactly to what Ericsson figured out internally back

14  in -- I think as early as, what, 2009, correct?  The

15  50-cent rate?

16      A.    Yes, I think -- I believe that's correct.  I

17  haven't seen that report, though, so...

18      Q.    You referred to it -- that's what your

19  expert's --

20      A.    Yes.

21      Q.    -- going to be testifying to?

22      A.    Yes.

23      Q.    Fair point.

24          All right.  Now, in arriving at the 50-cent

25  rate, do you understand that Mr. Bone assumed that the

1  negotiation for the 50-cent rate, the chipset maker

2  would not be in the negotiation room.  Do you understand

3  that?

4       A.   Yes, I understand that.

5       Q.   All right.  And, in fact, that's because

6  Ericsson, as I think you alluded to earlier, had a

7  policy of licensing the OE -- licensing at the OEM

8  level, licensing at the customer level, but not at the

9  Intel level, correct?

10      A.   Yes.  The customer being the ready-to-use

11 device -- again, the laptop manufacturer.

12      Q.   Correct.  And that's even though Ericsson

13 signed a letter of assurance along the lines of what the

14 Members of the Jury are looking at, right --

15      A.   Yes.

16      Q.   -- an unrestricted number of applicants?

17      A.   That's correct.

18      Q.   All right.  Now, in fact, Ericsson has

19 internally recommended against licensing chip makers

20 because that would jeopardize its licensing program.  Do

21 you understand that?

22      A.   I understand that it has multiple reasons, but

23 that is one of the reasons.

24      Q.   All right.  Now, it wasn't always the case

25 that Ericsson had a policy against licensing chipset

1  makers; am I right about that?

2      A.   That's hard for me to respond to because I --

3  I know that we have entered into a very few number of

4  licenses for chipsets, so I don't think you can say that

5  it was ever our policy to license on the chipset level.

6      Q.   Well, you're not doing that today, correct?

7      A.   Correct.

8      Q.   All right.  But there was a time when you did,

9  correct?

10     A.   There was a time when we entered into a couple

11  of agreements.

12     Q.   That's right.  And let's go back to that time.

13  That was back in 2002, correct?

14     A.   That was -- was back in 2002, yes.

15     Q.   And back --

16     A.   We entered into one agreement.

17     Q.   Correct.  And that agreement was with a

18  company called Infineon, correct?

19     A.   Yes.  Originally it was with one of our

20  subsidiaries because we sold off our own component

21  business.  In those days, Ericsson sold components

22  themselves, and we sold that business to the company

23  called Infineon.

24     Q.   All right.  So the -- the rate went to

25  Infineon, correct?

1       A.   It did.

2       Q.   All right.

3       A.   Because that's part of the -- the selling off

4  the assets, our component business --

5       Q.   And that rate would --

6       A.   The --

7       Q.   Oh, sorry.

8       A.   -- the opposite party asked us for a license,

9  of course.

10       Q.   Okay.  Now, that rate was 2 percent per end

11  product, correct?

12       A.   I'm not sure I understand that question, no.

13       Q.   All right.  So we had the -- an agreement --

14            MR. DAUCHOT:  Well, actually strike that.

15  Strike the question.

16       Q.   (By Mr. Dauchot) That agreement with Infineon

17  was for a lump sum, correct?  I have my agreements mixed

18  up.

19       A.   In fact, that agreement was sales of our

20  component business for a sum of 3.6 billion Swedish

21  crowns --

22       Q.   And the actual patent --

23       A.   -- which is 600 million U.S. dollars.

24       Q.   All right.  And the actual patent license

25  agreement with Infineon was for 100 -- 120,000 Euros.

1          Do I have that right?

2      A.   I don't know.  I would have to see the

3   agreement to know.

4      Q.   Okay.

5      A.   I just know that it was part of selling off

6   the business.

7      Q.   All right.

8              MR. DAUCHOT:  Why don't we put up DX 101

9   for a moment.

10     Q.   (By Mr. Dauchot)  And that's in your book,

11  Ms. Petersson.

12         Now, if we look at -- are you there or not

13  there?

14     A.   Huh-uh, but I can see the screen.

15     Q.   Okay.  And if you need the book, take your

16  time.  Look at Page 2, the license grant.

17         Now, the license grant is for the -- the

18  acquirer of the patent rights to -- to make WLAN

19  products, right?

20     A.   Correct.

21     Q.   And WLAN products include chipsets -- wireless

22  chipsets, correct?

23     A.   Correct, and there's a list of patents that

24  were licensed.

25     Q.   Precisely.  And if we go to page -- or

1  actually Section 4 -- Section 7.1 of the agreement under

2  royalty payment, it's actually for 100,000 Euros, right?

3      A.   Correct.

4      Q.   Now, 100,000 Euros back in 2002 equaled, what?

5  Roughly -- I'm going to guess, $120,000, rough?

6      A.   Something like that, yes.

7      Q.   All right.  And that was per year, correct?

8      A.   Yes.

9      Q.   All right.  Now, certainly as of 2002,

10 Ericsson felt it appropriate to license to a maker of

11 chipsets, correct?

12     A.   Correct, as part of them buying our component

13 business.

14     Q.   Now, in 2003 -- actually let me -- let me take

15 a step back.

16          In 2004, Ericsson was considering also

17 licensing the chipset manufacturers.  Do you remember

18 that?

19     A.   No, I do not.  You have to --

20          MR. DAUCHOT:  All right.  Let's put --

21 let's put up DX 21 up.

22     Q.   (By Mr. Dauchot)  And what we have is

23 suggested -- we have WLAN licensing:  Business case

24 2004.  And if we turn to Page 12, we see here the

25 last -- the last bullet point suggested market

1    segmentation/targeting:  Chipset manufacturers

2    (essential patents).  Do you see that?

3         A.    Yes.

4         Q.    Okay.  So that was the thinking back then,

5    correct?

6         A.    I don't know because I have never seen this

7    document before, so I don't know.

8         Q.    All right.  But you're not disputing that it's

9    an Ericsson document, are you?

10        A.    It looks like an Ericsson document, yes.

11        Q.    All right.  Fair point.

12              The -- the rate that was being considered --

13   and I think it was explained through Mr. Brismark this

14   morning.  I know you weren't here.  There is a

15   difference between the essential and -- and

16   non-essential implementation patents.  You understand

17   that?

18        A.    Yes.

19        Q.    And what we're talking about here are the

20   essential patents, right, in this case?

21        A.    Since I haven't seen the document, I don't

22   know -- you mean in this case?

23        Q.    Yes.

24        A.    Yes.

25        Q.    All right.  Now, if you could turn to Page 17.

1          All right?

2     A.    Yes.

3     Q.    Now, to suggest a target royalty on the chips

4  was 2 percent of sales revenue.  Do you see that?

5     A.    Yes.

6     Q.    All right.  So if we take that on a per unit

7  basis, what's the -- the average price of today's

8  chipsets, roughly 2.50 -- $2.50?

9     A.    If you say so.

10    Q.    All right.  And 2 percent of that is, what, 5

11 cents?

12    A.    If you say so.

13    Q.    All right.

14    A.    I would need a calculator, I think.

15    Q.    You could -- I think you could take my word

16 for it on that math.  Anyway, that was the mind-set back

17 in 2004.  But as you understand, the price of a chipset

18 since back then has dropped dramatically, correct?

19    A.    That's my understanding, yes.

20    Q.    All right.  So chipsets have -- over the

21 course of time, the prices on a chipset have fallen,

22 fallen, fallen?

23    A.    Yes, they have.

24    Q.    All right.  So that if you stuck with your

25 policy back then of licensing the chipset maker and you

1  stuck to that today, you'd be making a lot less money

2  than you may have been making back in 2002 and 2004; am

3  I correct?

4      A.   If this was our policy, yes.

5      Q.   All right.  So -- and back then you also had

6  the letters of assurance where you promised to

7  unrestricted members in the industry, including chipset

8  makers, to license your patents on a RAND basis,

9  correct?

10     A.   Correct.

11     Q.   All right.  Now, let's look at Exhibit 104 --

12  DX 104.

13          MR. DAUCHOT:  Now, could we turn to Page

14  10, please, David?

15          When I refer to David, I'm speaking to my

16  colleague here, David.  He's -- he's always with me

17  helping here with the exhibits.  Okay.  We have it up

18  there.

19     Q.   (By Mr. Dauchot)  And let's take a step back.

20          MR. DAUCHOT:  David, can you go back to

21  Page 8 for me?  Thanks.

22     Q.   (By Mr. Dauchot)  All right.  So part of this

23  presentation is called Licensing the Value-Chain, right?

24     A.   Yes.

25     Q.   All right.  And then the next page, what we

1  see at the top of the value-chain, if you will, is the

2  chip.  Do you see that?

3      A.   Yes, I see that.

4      Q.   All right.  And at the bottom of it we have

5  the OEM, right?

6      A.   Yes, correct.

7      Q.   And OEMs mean that the NETGEARs, the Dells,

8  and -- and the D-Links and other Defendants like that in

9  this case, correct?

10      A.   Yes, that's correct.  I see you have HP and

11  Dell in there as examples.

12      Q.   The chip is Intel?

13      A.   Yes.

14      Q.   And companies like Broadcom?

15      A.   Yes.

16      Q.   And companies like Qualcomm?

17      A.   Yes.

18      Q.   All right.  Now, if we flip to the next page,

19  what Ericsson's concluded as part of its licensing

20  strategy and its policy not to license the chipset

21  makers is that if you license the chipset makers, you

22  stand to make a little dollar?

23      A.   Yes.

24      Q.   And if you license the OEMs, the Dells, the

25  NETGEARs, the D-Links, and the like, we're talking

1  bigger dollars, correct?

2      A.    Correct.

3      Q.    Now, did the letter of assurance that Ericsson

4  signed twice, in 2003, I believe, and then again in

5  2010, state -- or 11 --

6              MR. DAUCHOT:  Thanks, Justin.

7      Q.    (By Mr. Dauchot)  -- 2011, state that Ericsson

8  need only license an unrestricted number of industry

9  members if -- if it suits them from a -- from a dollar

10  standpoint, that -- that they have the authority just to

11  target the -- the parties out there where they stand to

12  make the bigger dollars?  Does that say that in that

13  letter of assurance, yes or no, ma'am?

14      A.    It says that we will license fully compliant

15  products.

16      Q.    And it states that you will license to

17  unrestricted?

18      A.    Numbers to fully compliant products, yes.

19      Q.    All right.  Now, you won't deny, will you,

20  Ms. Petersson, that your patenting group adopted this

21  strategy to maximize profits -- namely, the strategy of

22  not going to chipset makers for a license; am I correct?

23      A.    Yes, you're correct.  You can see on the slide

24  at the bottom, it says license to OEM.  It has two

25  reasons.  No. 2, which is our main reason, to secure

```
 1  cross-license for Ericsson products.  That would be the

 2  cross-license for our own products.  And, 2, of course,

 3  to maximize our return on investment in these ideas.

 4                MR. DAUCHOT:  And can we go back to DX

 5  537, please, David?  And can we go to Page 22?  And can

 6  we blow up the --

 7       Q.   (By Mr. Dauchot)  Again, the issue is where to

 8  license.  Do you go to Intel, the folks who actually

 9  make the chipsets on which the 802.11 technology sits,

10  or do you go to the customers, right?

11       A.   Yes.

12       Q.   That's the question.

13            And then at the bottom of the page --

14                MR. DAUCHOT:  Can you blow that up for

15  me, David?  Thank you.

16       Q.   (By Mr. Dauchot)  It says:  One big

17  advantage -- and that's the last line -- one big

18  advantage with this strategy is also that it is likely

19  that the royalty income will be higher since we

20  calculate the royalty on a more expensive product.

21       A.   Correct, that's what it says there.

22       Q.   And I believe -- I think your counsel referred

23  to a thousand-dollar laptop, right?

24       A.   Yes, correct.

25       Q.   And we can all agree that a thousand-dollar
```

1  laptop is more expensive than a two-and-a-half-dollar

2  chip?

3      A.   That we can agree.

4      Q.   And when we look at the 50-cent royalty that

5  Ericsson is trying to impose on the cost of Wi-Fi

6  technology, it's fair to say that the 50 cents looks a

7  whole lot better in the context of the thousand-dollar

8  laptop than it does in the context of the

9  two-and-a-half-dollar chip.  Can we say that?

10     A.   I -- I don't want to judge on that

11  necessarily.

12     Q.   Okay.  Now, you referred the members of the

13  jury to this concept of patent exhaustion.

14     A.   Yes --

15     Q.   Right?

16     A.   -- I did.

17     Q.   Okay.  And as you mentioned, the patent

18  exhaustion concept is if you -- if you -- once you

19  license the chipset makers, those licenses extend down

20  to the customers.  The customers get the benefit of

21  those licenses, right?

22     A.   Yes, correct.

23     Q.   Okay.  Now -- so that if -- if you make a deal

24  with Intel or a Broadcom or a Qualcomm or anybody who

25  makes a chipset and you have them in that negotiation

1  room, that deal is going to mean that it goes downstream

2  to the customers, as well, correct?

3      A.   Yes.  For the inventions being implemented

4  into that chip, yes.

5      Q.   All right.  Now, when Ericsson does that, from

6  Ericsson's perspective, it loses, right?

7      A.   It loses from two perspectives.

8      Q.   Could you answer my question?  It loses,

9  correct?

10     A.   Correct.

11          MR. DAUCHOT:  All right.  Now, can we put

12  up Exhibit 104, please?  I'm sorry, David.  I meant

13  Exhibit 104.  Yep, there you go.  And can you go to Page

14  14 for me?  All right.

15     Q.   (By Mr. Dauchot)  So let's take --

16          MR. DAUCHOT:  Again, go back one page,

17  David.  There you go.

18     Q.   (By Mr. Dauchot)  So this is a part of the

19  presentation that deals with patent exhaustion, right?

20     A.   Right.

21     Q.   And if we go to the next page at Page 14.  All

22  right.  You see that?  As an infrastructure player,

23  Ericsson loses if licensing on the chip level.  Do you

24  see that?

25     A.   Yes.

```
1        Q.   All right.

2        A.   That is the cross-license that we are

3   concerned about in relation to our own products.

4             MR. DAUCHOT:  Well, can we go back to

5   Exhibit 537, please, David?  Can we go back to Exhibit

6   537, David?  Thanks.  And Page 22.  The bottom of the

7   page, can we blow up that sentence beginning with "one

8   big advantage"?

9        Q.   (By Mr. Dauchot)  All right.  You're not

10  denying that, are you, Ms. Petersson?

11       A.   No.  I'm saying that there are two reasons.

12  You were showing me one reason here, and you just showed

13  me the other reason.

14       Q.   All right.  But you're not denying that one

15  big advantage, from Ericsson's perspective, is that if

16  its chipset maker stays out of the negotiation room

17  policy will make it likely that the royalty will be

18  higher since you're dealing with folks who make a more

19  expensive product?  You're not denying that, are you?

20       A.   No, correct.  Because it's the -- the product

21  that can be used that we see the value of our

22  technology.

23       Q.   Okay.  And the LOA, Ms. Petersson, again, the

24  promise that you made to the industry doesn't state,

25  does it, that you're only required to license folks if
```

1  they make the very expensive product; am I right?

2      A.   It doesn't say when they make the very

3  expensive products, but it states that we make the

4  obligation to license fully compliant products.

5      Q.   Okay.  And you're not taking the position that

6  the chipset at issue here, that the 802.11 standard --

7  that the chipset that's being accused in this case as

8  being part of what's in the -- the OEM products is not

9  compliant with 802.11, are you?

10      A.   It is compliant.

11      Q.   All right.  So just -- we're clear?

12      A.   Yes, it is compliant.

13      Q.   It is compliant?

14      A.   It cannot be used, though --

15      Q.   But it is fully --

16      A.   -- in the context of being a consumer.

17      Q.   But it is fully compliant, correct, ma'am?

18      A.   It is compliant.

19      Q.   All right.

20      A.   It is maybe not fully complaint.

21      Q.   Now, let's --

22      A.   Fully compliant for me is when a product can

23  actually be used.

24      Q.   Okay.  For you?

25      A.   Yes.

1      Q.    Personally?

2      A.    No.   That's -- that's our commitment, that we

3    have to license fully compliant products.   And fully

4    compliant products are products that can actually be

5    used by the consumer.

6      Q.    And the Intel chipset is fully compliant with

7    the 802.11 standard, correct?

8      A.    Not correct.

9      Q.    So you're taking the position that the Intel

10   chipset that is in the products being sold here by the

11   Defendants does not comply with 802.11n?

12     A.    It complies.

13     Q.    Okay.

14     A.    It is not fully compliant.

15     Q.    All right.   Let's look at the aggregation

16   issue.   You understand that from a standard essential

17   patent perspective, Ericsson has the responsibility to

18   consumers and the industry to not block the 802.11

19   standard, correct?

20     A.    Correct.

21     Q.    All right.   Now, part of that responsibility

22   means that the rate you actually impose on the 802.11

23   technology has to be such that it considers all of the

24   other patents associated with that technology, correct?

25     A.    The way we phrase it is that we believe that a

1  patent holder who has a FRAND or RAND commitment has to

2  take into consideration when it sets its rate that there

3  are also other patent holders in the same area.

4      Q.   All right.  Now, there are, in fact, other

5  patent holders in this same area, correct?

6      A.   That's my understanding, yes.

7      Q.   And from -- Ericsson -- Ericsson understands

8  that most of the 802.11-related patents are going to be

9  with the chipset makers.  Ericsson knows that, correct?

10     A.   That is not known to me, I'm afraid.

11     Q.   To you personally?

12     A.   I -- yes.

13     Q.   Okay.

14     A.   It's not known to me.

15     Q.   All right.  You're not denying that WLAN

16  patents are mainly held by chipset suppliers, are you?

17     A.   I don't know.

18     Q.   You don't know?

19     A.   No.

20     Q.   Okay.

21          MR. DAUCHOT:  Can you put up DX 81 at

22  Page 6, please?

23     Q.   (By Mr. Dauchot) And you see the third bullet

24  point?

25     A.   Yes, I do.

1      Q.    All right.  You don't have an opinion about

2  that, one way or the other?

3      A.    No.  I'm afraid not.  I don't.

4      Q.    All right.  And that's an Ericsson document,

5  correct?

6      A.    Yes.

7      Q.    All right.  Now, in trying to figure out

8  whether or not your 50-cent rate complies with this

9  aggregation concept, Ericsson did take into account the

10  other parties out there in the market who might have

11  patents, correct?

12      A.    Correct.

13      Q.    And part of that policy, again, was before you

14  set the 50-cent rate, you want to make sure you take

15  into account others out there who might have licenses to

16  this technology.

17      A.    That's our belief, yes, that you need to do

18  that.

19      Q.    The point is -- the point being that if you

20  just consider your own patents, if you will, the patents

21  that you think are compliant and you ignore everything

22  else, next thing you know you have somebody trying to

23  practice the standard and you -- you have stacking.  You

24  have patent on top of patent on top of patent with

25  royalty rates that aren't going to allow the Wi-Fi

1   standard to get practiced.

2         A.   Yes, exactly.

3         Q.   All right.

4         A.   You cannot fully ignore that there are other

5   patent holders in the same area.

6         Q.   All right.

7              MR. DAUCHOT:  Now, David, can you put up

8   Exhibit 65, DX 65, at Page 2, please?

9         Q.   (By Mr. Dauchot) All right.  Now, when we were

10  together in Stockholm, I think you told me that this was

11  the analysis on the stacking issue, right?

12        A.   Yes.

13        Q.   Now, if we look at the -- and this is the

14  analysis that Ericsson used, to arrive at its 50-cent

15  rate, correct?

16        A.   Correct.

17        Q.   All right.  Now, if we look -- and there's a

18  pie chart here where Ericsson tried to consider who else

19  in the business was -- may have had patents associated

20  with the 802.11 technology, correct?

21        A.   Correct.

22        Q.   All right.  And this analysis was done in

23  2000 and -- was it '9?

24        A.   (Pause) Yes, correct.

25        Q.   You were prompted.

1      A.    (Laughed)

2      Q.    In 2009.

3            Now, again, this is to make sure that whatever

4  rate you come up with, that when you stack the numbers

5  up, it doesn't get too expensive, correct?

6      A.    That's a best-effort thing that we do

7  internally to make sure that we do consider that there

8  are other patent holders in the same area.

9      Q.    All right.  Now, in 2009, Ericsson knew that

10 Intel manufactured Wi-Fi chips, correct?

11     A.    I don't know, but I would -- I would -- that's

12 my guess; but I don't know, I'm afraid.

13     Q.    And Intel knew -- or I'm sorry -- Ericsson

14 knew that Broadcom made chips, right?

15     A.    I don't know.

16     Q.    But you would suppose?

17     A.    Yes.

18     Q.    I mean, it wasn't a secret that Broadcom --

19     A.    No, no.

20     Q.    -- was out there making a lot of --

21     A.    No, no.  It's just not known to me personally.

22     Q.    Fair point.

23           Qualcomm as well?

24     A.    Yes.

25     Q.    All right.  And none of these major chipset

1  makers are included in your chart, correct?

2      A.   I believe -- actually, it's my belief that

3  Qualcomm were not making chips in the Wi-Fi area in

4  2009.

5      Q.   Okay.  But certainly, Intel and Broadcom.

6      A.   Yes.

7      Q.   All right.  And they're not on this pie chart,

8  correct?

9      A.   No.  Correct.

10      Q.   All right.  Now, Panasonic is not a Wi-Fi chip

11  supplier; am I correct?

12      A.   Correct.

13      Q.   Nor is Nortel, correct?

14      A.   I think not, no.

15      Q.   All right.  And AT&T -- nor is AT&T, right?

16      A.   No, definitely not.

17      Q.   All right.  Nor is anybody else on this pie

18  chart, correct?

19      A.   Correct.

20      Q.   All right.  Let's focus for a moment on the

21  licenses that you -- that you referenced earlier today.

22          One thing I'd like to make clear, though, is

23  that when these licenses were entered into, these are

24  licenses that are entered into -- into after Ericsson

25  started adopting its policy of not licensing chipset

1  makers, correct?

2      A.   Correct.

3      Q.   All right.  So none of the licenses that you

4  mentioned were licenses with chipset makers -- with the

5  chipset maker in the negotiation room, correct?

6      A.   Correct.

7      Q.   All right.  Now, from Ericsson's perspective,

8  if you did allow the chipset makers into the negotiation

9  room, you would come out with a lower dollar number,

10  right?

11      A.   I cannot answer that because I don't know.

12      Q.   Well, let's look at DX 104 again at Page 10.

13  The small dollar is with the chipset manufacturer; the

14  big dollar is with the OEM, right?

15      A.   Yes.

16      Q.   Okay.  Let's turn to the HP license about

17  which you testified.  And in particular, let's talk

18  first about the three or so documents that you talked

19  about, the internal analyses.

20          You with me?

21      A.   Yes.

22      Q.   Okay.  And I think we referred -- actually, I

23  want to focus in on two of them, PX 238, which was the

24  internal numbers, right?

25      A.   (No response.)

1      Q.    And then there was PX 244.

2             MR. CAWLEY:  Your Honor, I apologize for

3  interrupting, but I think that Counsel is about to get

4  into the same confidential information that we had to

5  ask the Court to clear the courtroom before.  So if

6  that's the case...

7             THE COURT:  All right.  Do you intend to

8  go into that?

9             MR. DAUCHOT:  I do, Your Honor.  And I

10  thank Counsel for reminding me.

11             THE COURT:  All right.  Very well.

12             Ladies and gentlemen, I am hereby sealing

13  the courtroom again, so if you're -- as earlier, if

14  you're not an attorney or expert witness or party

15  covered by the protective order in this case, you will

16  need to leave the courtroom at this time.  We'll let you

17  back in just as soon as they finish with this part of

18  the testimony.

19             And, Counsel, I'd ask you to advise me

20  when we get to that point.

21             (Courtroom sealed.)

22             (This portion of the proceedings is

23             SEALED and filed under separate cover.)

24             (Courtroom unsealed.)

25             THE COURT:  All right, Mr. Cawley.

```
 1                    MR. CAWLEY:  Thank you, Your Honor.

 2                    THE COURT:  You may proceed.

 3                       REDIRECT EXAMINATION

 4   BY MR. CAWLEY:

 5        Q.   Ms. Petersson, I just have a few matters that

 6   I'd like to clear up.

 7        A.   Okay.

 8        Q.   First of all, I want to understand and make

 9   sure that the jury understands the whole story --

10        A.   Yes.

11        Q.   -- about Ericsson's policy of licensing chip

12   makers.

13        A.   Yes.

14        Q.   Now, you've told us that for many years

15   Ericsson had a policy that it wouldn't license chip

16   makers, correct?

17        A.   Correct.

18        Q.   And told us why.  I have not asked you again.

19   You told us why, right?

20        A.   Yes, I did.

21        Q.   And when this lawsuit began, Ericsson didn't

22   sue Intel, correct?

23        A.   Correct.

24        Q.   And you told us that's because of -- you

25   didn't -- didn't seek a license from them?
```

1       A.    Correct.

2       Q.    Okay.  But isn't it true that the whole story

3  is that recently Ericsson has offered a license to

4  Intel?

5       A.    That's also correct, yes.

6       Q.    What terms has Ericsson offered to license

7  Intel?

8       A.    For 50 cents.

9       Q.    Per chip -- per chipset?

10       A.    Yes.

11       Q.    For 50 cents per chipset?

12       A.    Yes.

13       Q.    Why has Ericsson made that exception to its

14  policy not to license chip makers?

15       A.    In an effort to try and settle this lawsuit.

16       Q.    Okay.  Now, let's talk about that commitment,

17  as well.

18            MR. CAWLEY:  If you would, please, pull

19  up Plaintiffs' Exhibit 293.

20       Q.    (By Mr. Cawley)  Now, do you recognize this as

21  the first letter of assurance that Ericsson sent in

22  2003?

23       A.    Yes, I do.

24       Q.    And you tried to give some explanation about

25  this on cross-examination, and I want to -- I want to

1  give you a little bit fuller opportunity to do so.

2      A.   Yes.

3      Q.   Attached to the letter that we see right

4  here --

5      A.   Yes.

6      Q.   -- was there another -- it's not really

7  another letter, but -- but a third page of this letter.

8  Lets go to that third page.

9           Did Ericsson send this, along with its letter

10 of assurance?

11     A.   We did, yes.

12     Q.   Let me just read part of it.  Ericsson will,

13 upon written request of any Applicant, grant such

14 Applicant a personal, non-exclusive license on fair,

15 reasonable, and non-discriminatory terms for only that

16 portion of any product that is fully compliant with the

17 IEEE 802.11 standards.

18          What does that mean, Ms. Petersson?

19     A.   That means that we committed to license

20 products that actually uses the standard in the sense

21 that it can be used for Wi-Fi transfer.

22     Q.   All right.  So when you said on

23 cross-examination several times that a chip may comply

24 with the standard but not fully comply, could you

25 explain to us what you mean?

1      A.   I mean that the chip itself can comply in the

2  sense that the functionality is incorporated into the

3  chip.  But as a user -- as a consumer, the chip has no

4  use for me.  So to be fully compliant, it has to be

5  integrated into the final product to be used.

6      Q.   Okay.  Let's move on to Defendant's Exhibit

7  65.  You were asked about this Ericsson document.

8           MR. CAWLEY:  And if we can go to the next

9  page, please.

10      Q.   (By Mr. Cawley)  Do you remember this

11  discussion?

12      A.   Yes, I do.

13      Q.   Tell us what this is.

14      A.   That is our internal effort to try and check

15  if our rate is in accordance with RAND, which for us

16  means that we need to take into consideration that there

17  are other patent holders in the industry.  That's what

18  we do at the outset.  Then we go out and we try to

19  negotiate this rate and we learn, of course, in the

20  process of meeting with potential users who then enter

21  into agreements with us.

22      Q.   Okay.  Why did Ericsson create this document,

23  again?

24      A.   That was for our internal purposes, to make

25  sure that we actually had considered that there were

1  other patent holders in the industry.

2      Q.   Okay.  Is this Ericsson's effort, among

3  others, to try and be sure that it did the right thing

4  and complied with its RAND commitment by considering not

5  only its own patents but others?

6      A.   Yes, it is.

7      Q.   Okay.  And, finally, let's talk briefly about

8  Defendant's Exhibit 62.  This is the McKinsey report.

9      A.   Yes.

10     Q.   First of all, who is -- this is not an

11 Ericsson document, right?

12     A.   No.  No, it's not.

13     Q.   It was prepared by a company called McKinsey.

14          What is McKinsey?

15     A.   They are a consultant firm --

16     Q.   Okay.

17     A.   -- who makes analysis of -- of businesses.

18     Q.   So a company can hire McKinsey and ask them,

19 why don't you give us some advice and suggestions about

20 things we might do to be more profitable, to make a

21 better business?

22     A.   Yes, correct.

23     Q.   And Ericsson -- apparently someone hired

24 McKinsey to do that for Ericsson?

25     A.   Yes, we did.  We did that to have them go

1   through our entire business, in fact, not only the

2   business of IPR, but also in other areas within

3   Ericsson.

4       Q.    Okay.  And one of the recommendations that we

5   saw that McKinsey made was that Ericsson should, if it

6   has to, be more aggressive about filing lawsuits to

7   recover fair value for others who use their patents; is

8   that fair?

9       A.    That's fair.

10      Q.    Has Ericsson adopted or followed all of

11  McKinsey's recommendations?

12      A.    To some extent, yes.  And that has to do with

13  the fact that we have a licensing program.  And if you

14  have a licensing program so that you have licensees who

15  are paying, you are treating them discriminatory if you

16  simply ignore the ones who are not paying.  So if

17  companies elect not to enter into license agreements

18  with Ericsson, we might have to take action.

19      Q.    Now, Ms. Petersson, is Ericsson a

20  publicly-traded company?

21      A.    Yes, we are.

22      Q.    So anyone who wants to -- anyone around the

23  world could buy stock in Ericsson?

24      A.    Yes.

25      Q.    What kind of people own stock in Ericsson?

1      A.   I would guess everyone around.

2      Q.   Okay.  All kinds of people?

3      A.   Yes.

4      Q.   Are the patents that Ericsson holds, like the

5 patents in this lawsuit, assets of the company?

6      A.   They are, of course.

7      Q.   What responsibility do you feel, Christina

8 Petersson, to recover fair value for Ericsson and its

9 shareholders for the use of Ericsson's assets?

10      A.   I feel a huge responsibility, especially since

11 the licensing income that we make -- the fair

12 compensation for the use of our patented ideas, they are

13 being fed back into further R&D investments in Ericsson.

14      Q.   Thank you, Ms. Petersson.

15           MR. CAWLEY:  Pass the witness, Your

16 Honor.

17           THE COURT:  Any further recross?

18                RECROSS-EXAMINATION

19 BY MR. DAUCHOT:

20      Q.   Ms. Petersson, two points -- one on the

21 50-cent issue that you -- that you raised.  It's a fact,

22 though, that that offer came roughly, what, eight weeks

23 ago, just before the trial?

24      A.   I believe so, yes.

25      Q.   All right.  And before then, that's when it

1  came, eight weeks -- eight weeks ago, right?

2      A.   If it's eight weeks or nine week -- nine

3  weeks, I'm not sure, but roughly that time frame.

4      Q.   All right.  And that proposal that a chipset

5  maker pay a total of 50 cents per chip that sells for on

6  average 2.40 -- $2.40 on the market, that was rejected,

7  correct, by Intel?

8      A.   Okay.  If you say so.

9      Q.   Well, we're here, right?

10     A.   Yes.

11     Q.   Okay.  Intel did not want to pay that much on

12  a $2.40 chip?

13     A.   At least it hasn't been accepted so far.

14     Q.   All right.

15     A.   Let me put it that way.

16     Q.   And as you understand from this litigation,

17  Intel is denying -- has taken the position and standing

18  by its customers that there is no infringement here of

19  the Ericsson patents being asserted.  You understand

20  that?

21     A.   I understand that, yes.

22     Q.   All right.  Thank you, Ms. Petersson.

23              THE COURT:  Thank you.

24              MR. CAWLEY:  No further questions, Your

25  Honor.

1                    THE COURT:  All right.  If the jury would

2  pass down their question sheets for Ms. Petersson,

3  please.

4                    (Pause.)

5                    THE COURT:  All right.  We'll take a

6  short break, Ladies and Gentlemen of the Jury.  Let's

7  see, it's 2 o'clock now.  We've been going for about an

8  hour and 15 minutes.  I think we'll go ahead and take

9  our afternoon break at this time.  We'll be in recess

10  for 15 minutes, and then we'll come back and proceed.

11                    COURT SECURITY OFFICER:  All rise.

12                    (Jury out.)

13                    THE COURT:  Please be seated.  Well, we

14  have a very attentive jury here.

15                    This person asked:  Has any chipset maker

16  been denied licensing of Ericsson's Wi-Fi patents,

17  question mark?  And then it's marked out and said

18  answered in redirect.  So, again, they were anticipating

19  what y'all -- what the able lawyers have done both in

20  cross and redirect.

21                    Then we have another question:  Who are

22  Defendants paying their license fee to for Wi-Fi, if not

23  Ericsson?

24                    So are there any objections to that

25  question?

1          MR. CAWLEY:  No objection from the

2  Plaintiff, Your Honor.

3          MR. VAN NEST:  Could you read that second

4  question again?

5          THE COURT:  Who are Defendants paying

6  their license fee to for Wi-Fi, if not Ericsson?

7          MR. VAN NEST:  I don't understand that

8  question.  I'm not sure it's proper either.  There's

9  been no evidence that Defendants are paying any Wi-Fi

10 fee.

11         THE COURT:  I think that's what they're

12 asking, whether they are or not would be how I would

13 read it.

14         MR. VAN NEST:  I mean, I think this --

15 this goes into the area we discussed earlier, Your

16 Honor.  We have other licenses, but they're outside the

17 scope of this case.  I think you issued an order --

18         THE COURT:  We have other -- other

19 licenses, what do you mean?

20         MR. JONES:  We have other licenses, Your

21 Honor, such as the CSIRO license would be a Wi-Fi

22 license.  The Wi-LAN license would be a Wi-Fi license.

23 None of those licenses have been relied upon by any

24 expert in this case.

25         The only issue that I think is opened

1  with regard to them is the fact they want to

2  cross-examine our expert on that issue, but there's --

3  you know, at the end, there's no evidence of that.

4              And secondly, I think it would be

5  improper at this time to bring it in.

6              MR. CAWLEY:  Well, Your Honor, I

7  fundamentally disagree that that's what's going on with

8  the question.  The question, to me, reflects a

9  misunderstanding that they -- that the Defendant is --

10 is paying someone else instead of Ericsson, and I think

11 that it's entirely proper to straighten that out and

12 have the witness explain that if they're not paying us,

13 they may not be paying anybody.

14             THE COURT:  All right.  Let me ask the

15 witness, do you -- do you know the answer to that

16 question?

17             THE WITNESS:  I don't know the answer to

18 the question, whether they have other licenses.  That

19 would be -- not something I could see.  What I could

20 explain is that there's no other access to Ericsson's

21 portfolio than through us.  It doesn't mean that you can

22 take a license from another party and get access to our

23 portfolio if that's the question.

24             THE COURT:  All right.  Okay.  I think

25 that would be an appropriate answer that would clarify

1  it, and I'll allow the question.

2                    We'll be in recess until 2:30.

3                    MR. JONES:  Thank you, Your Honor.

4                    COURT SECURITY OFFICER:  All rise.

5                    (Recess.)

6                    COURT SECURITY OFFICER:  All rise.

7                    (Jury in.)

8                    THE COURT:  All right.  Please be seated.

9                    All right.  Ms. Petersson, we have one

10  question for you from the jury, and that is this:

11                    Who are Defendants paying their license

12  fee to for Wi-Fi, if not Ericsson?

13                    THE WITNESS:  Yes.  And I think the

14  question is this:  Can you, instead of buying the Wi-Fi

15  from Ericsson, buy from a different supplier or from a

16  different patent holder?

17                    However, since this is a standard, you

18  need access to everyone's patents in order to sell a

19  Wi-Fi-compliant product.  So it's not like in the normal

20  world where you can choose between buying an Apple phone

21  or a Samsung phone.

22                    In this case, these patents are all

23  applicable to the standard.  So you will need a license

24  from multiple companies.  You cannot elect to not take a

25  license from Ericsson and instead take a license from

1  somebody else.

2                   THE COURT:  Thank you.

3                   THE WITNESS:  I hope that was the

4  question.

5                   THE COURT:  All right.  Any follow-up

6  questions?

7                   MR. CAWLEY:  No, Your Honor.

8                   THE COURT:  All right.  From the

9  Defendants?

10                  MR. DAUCHOT:  No, Your Honor.

11                  THE COURT:  All right.  You may step

12  down, Ms. Petersson.

13                  MR. CAWLEY:  Your Honor, may this witness

14  be excused?

15                  THE COURT:  May she be excused from the

16  Rule?

17                  MR. DAUCHOT:  She may.

18                  THE COURT:  All right.  You are excused.

19                  THE WITNESS:  Thank you.

20                  THE COURT:  Thank you.

21                  Who is your next witness?

22                  MR. CAWLEY:  We would like to play two

23  more video depositions --

24                  THE COURT:  All right.

25                  MR. CAWLEY:  -- with the Court's

1  permission.

2           May I read the same --

3           THE COURT:  Yes, you may.

4           MR. CAWLEY:  Ladies and Gentleman, next

5  you will see the video deposition of Mr. Eric Schon.

6           Mr. Schon is an engineer at Ericsson and

7  a named inventor on the '215 patent.

8           Ericsson has designated 10 minutes and 11

9  seconds of testimony, and the Defendants have designated

10  58 seconds, which means this deposition will be about 11

11  minutes long.

12           THE COURT:  All right.  You may proceed.

13           (Video playing.)

14           QUESTION:  I want to shift gears --

15           ANSWER:  Okay.

16           QUESTION:  -- and ask if you could just

17  introduce yourself to the jury.

18           ANSWER:  My name is Erik Schon.  Born and

19  raised in Stockholm, Sweden.  Went to -- to college here

20  in Stockholm at the Royal Institute of Technology.

21  Studied engineering, physics.  Majored in engineering,

22  physics, and computer science.

23           Spent six months in the University of

24  Hamburg doing physics and computer science.  Did my

25  Master's thesis in the Swedish Institute of Computer

1  Science.  Graduated in 1995.

2             QUESTION:  And, sir, are you an inventor

3  on the '215 patent?

4             ANSWER:  I am.

5             QUESTION:  Are there other inventors?

6             ANSWER:  There are.

7             QUESTION:  Do you remember their names?

8             ANSWER:  Yeah.  There were several.

9  Kazuhiko Inoue, Mathias Johansson or Mathias Cramby, as

10 he's now called, Per Beming, Christiaan Roobol, Michael

11 Meyer, Joachim Sachs, Bela Rathonyl.

12            QUESTION:  And were you at Ericsson when

13 you came up with your invention?

14            ANSWER:  I was.

15            QUESTION:  And when did you join

16 Ericsson?

17            ANSWER:  I joined Ericsson in 1995.

18            QUESTION:  And you discussed a little bit

19 about your educational background.  What were you doing

20 before you joined Ericsson?

21            ANSWER:  I just graduated from -- from

22 college from the Royal Institute of Technology in

23 Stockholm, Sweden.

24            QUESTION:  How did you get a job at

25 Ericsson?

1                    ANSWER:  I -- I applied for -- for two

2  jobs at Ericsson, actually, and I got both.  And I

3  picked the one that was the most interesting, which was

4  cellular technology/mobile telephony, and I -- I -- I

5  had the great honor to transfer to Ericsson as a

6  trainee, which is quite fulfilling, something I'm proud

7  of.

8                    QUESTION:  And where do you work now?

9                    ANSWER:  I work in Ericsson.

10                   QUESTION:  And where is that?

11                   ANSWER:  Ericsson in Kista; Stockholm,

12  Sweden.

13                   QUESTION:  And where is that in relation

14  to us?

15                   ANSWER:  Do you mean -- relation to what?

16                   QUESTION:  Well, we're at the Sheraton

17  Stockholm.

18                   ANSWER:  Aha.  Yeah.  Yeah.

19                   QUESTION:  Where is it in relation to us?

20                   ANSWER:  It's -- it's a couple of

21  kilometers north -- north of Stockholm.

22                   QUESTION:  And where do you live?

23                   ANSWER:  I live further north of

24  Stockholm, a few more kilometers.

25                   QUESTION:  Is that a big commute to work?

1                    ANSWER:  It depends on traffic.  I mean,

2    sometimes it's 15 minutes; sometimes it's an hour.

3    Depends on the -- the amount of traffic.

4                    QUESTION:  And do you live there with

5    your family?

6                    ANSWER:  I do, yes.

7                    QUESTION:  And how many -- can you tell

8    us about your family members?

9                    ANSWER:  I have a wife, two kids, 5 and 7

10   years old, daughter and son.  I'm really happy and

11   proud.

12                   QUESTION:  Tell me about the -- going

13   back to your work at Ericsson, can you tell me about

14   what work you were doing before the work that led to the

15   '215 patent?

16                   ANSWER:  I worked on -- on 2G and 3G

17   cellular technologies as a system engineer.

18                   QUESTION:  And can you tell us about the

19   work that you were doing in particular when you came up

20   with the '215 patent with your co-inventors?

21                   ANSWER:  At the time of the -- of the

22   patent, we were a team in Ericsson working in -- in

23   standardization in 3GPP.

24                   All the companies of the world, from --

25   from North America, from Asia, from Europe, sent

1  their -- their best and brightest to the 3GPP meetings

2  to come up with a global standard, the first global

3  mobile telephony standard ever.

4              So that was -- was a great time.  A lot

5  of great people, skilled people, experienced people

6  with -- with a lot of bright ideas and a lot of

7  contributions.

8              And it was a true meritocracy.  I mean,

9  the best ideas -- we'd sort of compete, and the best

10  ideas would win and get it into the spec, so we could

11  get a really good specification with a great performance

12  for -- for you and me as -- as users of -- of cell

13  phones.

14              QUESTION:  And did you meet your

15  co-inventors in connection with that work?

16              ANSWER:  I did.

17              QUESTION:  And how long did it take for

18  you and your co-inventors to arrive at the invention?

19              ANSWER:  I think we worked over a long

20  period of time with various aspects of the

21  retransmission protocol in 3GPP.  This particular

22  invention, I think it was maybe a month, maybe two.  So

23  gradually growing.

24              I remember several workshops and work

25  meetings and phone conferences and e-mails going around,

1  ultimately leading us to -- to the ideas in the -- in

2  the '215 patent.

3                QUESTION:  And were you excited when you

4  came upon your invention?

5                ANSWER:  Yeah, it was really exciting

6  to -- to -- to come up with a -- with a patent.  And

7  that's something I'm -- I'm proud to tell my kids that.

8  And it's not something anyone can do.  So I'm really

9  proud of it.

10                And -- and being an inventor, being --

11  coming up with innovations, that's -- that's so

12  fulfilling and so energizing.  So it means a lot to me.

13                QUESTION:  So you could you please

14  summarize for the jury your invention?

15                ATTORNEY:  Objection to form.

16                ANSWER:  I think that what our invention

17  does will help you and me when we use the cell phone

18  system to -- to get better quality.  I mean, fewer

19  dropped calls, better voice quality.

20                If you have a video call, you would have

21  a -- it would look nicer, not so many blurry images.  If

22  you have a packet data transmission or downloading an

23  app on your smartphone, it would -- would go quicker.

24                And for -- for our customers, the

25  operators of the world, the benefit for them is, of

1  course, that they can get more -- more users into the

2  system.  They're paying a lot for -- for their Spectrum,

3  a lot for -- for their -- their -- several billion U.S.

4  dollars to -- to get the Spectrum.

5           And, of course, we want to use that very

6  efficiently and help our -- our customers to use that

7  very efficiently, so -- to get many users in there.  And

8  every bit counts.

9           It's so important that -- that you try to

10  minimize the number of bits transmitted over the radio

11  interface between the -- the cell phone and the radio

12  tower and the -- and the switches in the network.

13           QUESTION:  Was there something new about

14  your approach?

15           ANSWER:  Definitely.  I mean, we -- we

16  could give the -- the choice on what content to send

17  in -- in -- in this retransmission protocol that

18  would -- would lead to fewer bits being transmitted.

19           And that was something new.  And that's

20  why we got the patents.  And that helps you and me and

21  our customers today to have a better quality and better

22  performance of the -- the cell -- cellular systems

23  and -- and the cell phones we use.

24           QUESTION:  Is there a particular

25  technique that permits the choice?

1                    ANSWER:  Yeah.  I think we talked about

2    that a lot.  And -- and -- we talked about this -- this

3    type identifier field.  That's really the -- the -- the

4    key element here, giving you the choice of -- of using a

5    bit map or a list or a -- or a combination thereof.

6                    And that would -- would ultimately lead

7    to -- to less bits being transmitted, more capacity,

8    more users simultaneously using the -- the -- the system

9    we're building and better quality, better performance

10   for -- for you and me as users of -- of the system.

11                   QUESTION:  Had anybody used a type

12   identifier field before you?

13                   ANSWER:  No.

14                   ATTORNEY:  Objection to form.

15                   QUESTION:  And what did you do to see

16   that your invention would work?

17                   ANSWER:  I think we -- we tried the

18   approach out on different scenarios and -- and different

19   types of -- of cases.  We -- we looked at it

20   theoretically and potentially also using advanced

21   simulations.

22                   We -- we submitted parts of the invention

23   to -- to 3GPP, the standardization community, to get --

24   to get feedback from -- from other companies and -- and

25   it proved to be a very popular idea that ultimately made

1   it into the standards specification.

2               QUESTION:  Can you tell me about the

3   process of submitting a proposal to 3GPP and how that

4   gets put into a standard?

5               ANSWER:  Yeah.  There -- at the time,

6   there were very many companies -- I think it was on the

7   order of 50 or more -- from all over the world.  As I

8   told, the global -- first global standard.  A lot of

9   delegates going, on the order of hundreds of people from

10  all these companies.

11              And all companies submit contributions.

12  It's about the best ideas winning.  And the best ideas

13  go -- go into the spec.  And it's -- it's a lot of

14  discussions, a lot of debate about the merits of the

15  different contributions and proposals, and ultimately,

16  the best proposals go into the specs.

17              So we're really proud of -- of our -- our

18  idea ultimately ending up in the global 3GPP

19  specification.  That -- that helps us all to communicate

20  using our cell phones.

21              QUESTION:  And are you proud of your

22  invention?

23              ANSWER:  I'm -- I'm really proud.  And

24  this is -- this is something I -- I -- I'm happy to tell

25  my kids about.  And -- and -- being an inventor and

1  getting a patent, that's -- yeah, it's really, really

2  fantastic.

3              QUESTION:  Do you know what a block

4  acknowledgment message is --

5              ANSWER:  No.

6              QUESTION:  -- in the context of 802.11?

7              ANSWER:  No, I don't.

8              QUESTION:  Do you know who contributed

9  the block acknowledgment technique in the 802.11 --

10             ANSWER:  No.

11             QUESTION:  -- standard?

12             ANSWER:  No, I don't.

13             QUESTION:  Do you have sufficient

14 knowledge of the 802.11 standard to testify as to

15 whether the 802.11 standard infringes the '215 patent?

16             ANSWER:  No, I don't.

17             QUESTION:  Have you ever read the --

18             ANSWER:  No, I don't.

19             QUESTION:  Have you ever read the 802.11

20 standards?

21             ANSWER:  No, I have not.

22             QUESTION:  Have you ever attended an

23 802.11 standards meeting?

24             ANSWER:  No, I have not.

25             QUESTION:  Have you ever submitted a

1  contribution to the 802.11 standard?

2                  ANSWER:  I have not.

3                  (End of video clip.)

4                  THE COURT:  All right.  Who will be next?

5                  MR. CAWLEY:  One more deposition, Your

6  Honor.

7                  Next you will see the video deposition of

8  Stefan Wager.  Mr. Wager is an engineer at Ericsson and

9  a named inventor on the '223 patent.

10                  Ericsson has designated 10 minutes,

11  42 seconds of testimony, and Defendants have designated

12  6 minutes and 11 seconds for about a 15-minute

13  deposition.

14                  THE COURT:  All right.  Thank you.  You

15  may proceed.

16                  (Video playing.)

17                  QUESTION:  Good afternoon, Mr. Wager.

18                  ANSWER:  Good afternoon.

19                  QUESTION:  Can you introduce yourself to

20  the jury today?

21                  ANSWER:  Sure.  So my name is Stefan

22  Wager.  I was born in Oslo.  I grew up in Sweden.  And

23  since I was eight years old, I've been living in

24  Finland.

25                  I graduated from the University of

1  Finland.  That was the technical university of Helsinki.

2  And I started electrical engineering there.  And I got a

3  Master's of Science degree from there with the highest

4  note, and the topic was on MAC protocols for a

5  second-generation mobile system.

6          QUESTION:  Highest note, what does that

7  mean?

8          ANSWER:  Well, we get the notes for the

9  thesis that we write, and I got a 5 for that one, which

10  was the highest note.

11          QUESTION:  So that's like an A plus in

12  the United States.

13          ANSWER:  Yes.

14          ATTORNEY:  Object to form.

15          QUESTION:  Out of curiosity, how many

16  languages do you speak?

17          ANSWER:  I speak Swedish -- that's my

18  mother tongue -- Finnish, English, and German, and a

19  little bit of French.

20          QUESTION:  That's a lot more than me.

21          What do you do at Ericsson?

22          ANSWER:  I joined Ericsson in 1996,

23  directly after my thesis.  And in Ericsson, I have

24  worked since then in different positions.  I started out

25  with product development.  Then I joined Ericsson

1  research.  And in research, I've been working with 3G

2  and 4G systems, all-in-one systems.

3            QUESTION:  Can you set the stage for how

4  you came up with your invention?

5            ANSWER:  Yes.  So Reiner Ludwig was

6  working on different transport layer protocols, and he

7  was looking into realtime applications.  And I can give

8  an example of a realtime application so you can relate

9  to something.  For instance, Skype or doing it --

10 telephone service.  That's one -- one example.

11            And we realized that the radio link layer

12 was not really optimized for these kind of services.  So

13 on the one hand, you had a mode where you do no

14 transmissions -- retransmissions at all.  And on the

15 other hand, you have the mode where you do

16 retransmissions until the link fails.

17            So we started looking to what could we do

18 somewhere in between a bit smarter.  And that's when we

19 came up with this having a timer to monitor this

20 retransmission process.

21            QUESTION:  So what specifically was the

22 problem you were trying to solve between those existing

23 systems and your invention?

24            ANSWER:  Yeah.  Let me try to illustrate.

25 In mobile communications, we have a wireless link, and

1  it's the property of the wireless link that can --

2  sometimes you can break up.

3              For instance, you go through a tunnel or

4  something, and you lose your connection.  And what

5  happens typically when that occurs is the data will

6  start piling up in the network as the connection has

7  gone.

8              And then when the connection comes up

9  again, then that data is going to play out, and it's

10  going to be late, and your application is going to

11  (noise), and then you're going to see too late

12  information displayed to you.

13              So it's going to take a long time until

14  the connection recovers.  Sometimes you'll have to

15  redial.

16              QUESTION:  So I think you mentioned

17  Skype.  Can you give me a couple of other real-life

18  examples where your invention would come in handy?

19              ANSWER:  Video gaming, online gaming,

20  video conferencing, all kinds of services where realtime

21  information is important.

22              THE REPORTER:  What was after realtime?

23              ANSWER:  Realtime information is

24  important.

25              QUESTION:  How would a user perceive the

 1  benefit of your invention in one of those real-life

 2  examples?

 3                  ANSWER:  Well, in the example of the

 4  tunnel.  As soon as you come out of the tunnel and you

 5  get the connection up again, you will be ready to go;

 6  instead of having a long series of (noise), it will just

 7  be a bleep, and then you're up and running again.

 8                  QUESTION:  How about a video example?

 9                  What would a user perceive as the benefit

10  of your invention?

11                  ANSWER:  A shorter delay after the link

12  has been up and running again.

13                  QUESTION:  So what would a user see if

14  they were looking at that video?

15                  ANSWER:  In our case?

16                  QUESTION:  Yeah.

17                  ANSWER:  The screen would have gone black

18  when you have no connection, right?  Because you don't

19  have any connection.  But as soon as the connection

20  comes up again, the picture is back.

21                  QUESTION:  And what would the existing

22  solutions have done at the time?

23                  ANSWER:  Picture would go when you go

24  into the tunnel, and then when you come out of the

25  tunnel again, you see the old picture that was a couple

1  of seconds old, and you would have this delay on the

2  link, and the conversation would be pretty hard.

3           QUESTION:  Let's go back to when you

4  first finalized the idea that became your invention.  Do

5  you remember when that was and what you were doing?

6           ANSWER:  Yes.  This was a long time ago,

7  so it's hard to give an exact date, but it was in the

8  autumn of '98.

9           Reiner Ludwig came to Ericsson research

10 here in Stockholm.  I was working here at the time.  And

11 he gave a presentation on TCP.  And after this

12 presentation, he came to my office and we started to

13 talk about this realtime application, how we could

14 optimize a link layer for these applications.  And that

15 is when this work started.

16          QUESTION:  Do you remember where you were

17 when you finished thinking up the full idea that became

18 the patent invention in the '223 patent?

19          ANSWER:  Yeah.  This being a long time

20 ago, I only have certain memory, glimpses of it, like is

21 usually the case, but I have one clear memory, and that

22 was, I think, the final piece of the invention that we

23 had been working on.  Because we had this idea of having

24 a timer for each SDU.

25          But when I discussed with my development

1  guys, they were saying:  Ah, that's going to be tough to

2  implement.  We have a lot of these packets in the

3  buffer, and we have the timer running for each one of

4  them.  That's not nice.

5                    So then we had to think of something.

6  And I was working from home, and I was sitting at the

7  kitchen table, and I was drawing and trying to see the

8  timers, could we do it somehow differently.  And that is

9  when I come up with this two-timer solution that we

10  have -- that we have in the invention.

11                    THE REPORTER:  That we have what?

12                    ANSWER:  That we have in the invention.

13                    QUESTION:  You said you were drawing.

14                    Did I hear that correctly?

15                    ANSWER:  Yes.

16                    QUESTION:  What did you draw?

17                    ANSWER:  Just a figure on that -- just

18  Figure 5 in the patent application.

19                    QUESTION:  Were you excited when you --

20                    ANSWER:  Yes.  I was really excited,

21  because this -- as I said, this was the final objection

22  that I had from my colleagues doing an implementation.

23                    And when I finally solved it, I went back

24  the next day and said:  Hey, I solved it.  Here, we can

25  do it.  They were all happy.

```
 1                    QUESTION:  Have you applied for many

 2  patents since the '223 patent?

 3                    ANSWER:  Yes.

 4                    QUESTION:  Approximately how many?

 5                    ANSWER:  I don't have the exact figure,

 6  but between 80 and 100.

 7                    QUESTION:  Do you recall where the '223

 8  patent falls in that 80 to 100?

 9                    ANSWER:  Yeah.  That's the interesting

10  part.  This was actually my first patent.

11                    QUESTION:  Your very first experience?

12                    ANSWER:  Yes.

13                    QUESTION:  All right.  So if I just look

14  back here, since joining Ericsson, your work has focused

15  on 3G or 4G cellular research; is that right?

16                    ANSWER:  Yes.

17                    QUESTION:  Okay.  Did you -- have you

18  ever done any work on 802.11?

19                    ANSWER:  No.

20                    QUESTION:  Okay.  And when -- what is

21  unique about -- what -- in your patent about the

22  initial -- the timing of -- the initialization of the

23  timer or when the timer's initialized?  What is unique

24  about that?

25                    ANSWER:  It was that we had the timers
```

1  started when the data enters the data link layer.

2              QUESTION:  Has Ericsson ever honored you

3  or Mr. Ludwig for your contributions in the '223 patent?

4              ANSWER:  On this specific patent?

5              QUESTION:  Yes.

6              ANSWER:  Not that I recall, no.

7              QUESTION:  Okay.  And has anyone outside

8  of Ericsson ever praised you or Mr. Ludwig for the ideas

9  of the '223 patent?

10             ANSWER:  No.  Not that I remember, no.

11             QUESTION:  Okay.  And then the

12  transmitter would take the service data unit at the data

13  link layer and package it in PDUs, or protocol data

14  units, for transmission out to the receiver; is that

15  correct?

16             ANSWER:  It segments the SDU.  So it

17  splits it up in smaller parts.

18             QUESTION:  Okay.  So I'll rephrase that

19  using your -- the way that you put it.

20             In connection with your patent and the

21  cellular systems that you were working on, the

22  transmitter will take the service data unit, or SDU, and

23  segment it or, in other words, split it up into smaller

24  parts to be placed into smaller packet data units, or

25  PDUs; is that correct?

1                    ANSWER:  It's correct, but they may also

2  be bigger.

3                    QUESTION:  Okay.  Which may be bigger?

4                    ANSWER:  PDUs.

5                    QUESTION:  Okay.

6                    ANSWER:  It's not restricted to -- to the

7  situation that they are smaller.

8                    QUESTION:  Okay.

9                    ANSWER:  They can also be bigger.

10                   QUESTION:  Okay.  So let me do that again

11 then.

12                   In your patent and in the cellular

13 systems that you were working on at the time, the

14 transmitter takes the service data unit, or SDU, and

15 segments it or, in other words, splits it up into

16 smaller parts to be placed into packet data units or

17 PDUs; is that correct?

18                   ANSWER:  Yeah.  The PDU doesn't have to

19 be smaller than the SDU.

20                   QUESTION:  Right.

21                   ANSWER:  Also -- you can also concatenate

22 several SDUs into one PDU --

23                   THE REPORTER:  I'm sorry.  Would you

24 repeat that?

25                   ANSWER:  You can also concatenate several

1  SDUs into one PDU so that the PDU becomes larger than

2  the SDU.

3              QUESTION:  So let's put concatenation

4  aside and focus on segmentation.

5              The segmenting or segmentation that we

6  were -- that you're talking about in your patent, that's

7  splitting up the SDU into multiple PDUs, right?

8              ANSWER:  Yes.

9              QUESTION:  Okay.  Do -- do you have a

10  belief as to whether your patent is infringed by any

11  802.11 products?

12              ANSWER:  No.

13              QUESTION:  Are you familiar with the --

14  an 802.11n technology called BlockAck?

15              ANSWER:  No.

16              QUESTION:  Do you know who contributed

17  the timer in 802.11 to the 802.11 standard?

18              ANSWER:  No.

19              QUESTION:  Do you know who contributed

20  the discard functionality in 802.11 to the 802.11

21  standard?

22              ANSWER:  No.

23              QUESTION:  The selective repeat ARQ

24  protocol we talked about earlier, that -- that came

25  before your patent, right?

1                ANSWER:  Yes.

2                QUESTION:  And that involves use -- usage

3  of a transmit window and a receive window for the

4  selective repeat ARQ protocol?

5                ANSWER:  Yes.

6                QUESTION:  Okay.  So -- so the use of

7  windows for transmitting and receiving data packets in

8  connection with ARQ, that was known before your patent?

9                ANSWER:  Correct.

10               QUESTION:  Segmenting, the concept of

11  segmentation, that technique, as it's used in

12  telecommunications, did that come before your patent,

13  your '223 patent?

14               ANSWER:  Yes.

15               QUESTION:  We talked a little bit earlier

16  about 3G.  Do you remember discussing that?

17               ANSWER:  Yes.

18               QUESTION:  Do you think your '223 patent

19  would be beneficial to other wireless technologies

20  outside of 3G?

21               ANSWER:  Yes.

22               QUESTION:  Do you think your patent could

23  apply to wireless technologies outside of 3G?

24               ANSWER:  Yes.

25               QUESTION:  Mr. Wager, a few moments ago

1  when you were answering questions from your counsel, you

2  talked about how --

3                    ANSWER:  Uh-huh.

4                    QUESTION:  -- you talked about how the --

5  you talked about the benefit of the invention of your

6  patent in connection with driving through a tunnel.

7                    Do you recall that?

8                    ANSWER:  Uh-huh.

9                    QUESTION:  And the example -- is that a

10  yes?  Sorry.  You have to answer.

11                    ANSWER:  Yes.

12                    QUESTION:  And the example you gave to

13  demonstrate the benefit of your patent was, if you're --

14  as a result of your invention, if you're driving through

15  a tunnel and you're receiving -- when you go into the

16  tunnel, you're receiving data wirelessly; when you come

17  out of the tunnel, you would -- you would continue to

18  receive data wirelessly, and it would pick that data

19  back up more quickly; is that correct?

20                    ANSWER:  Correct.

21                    QUESTION:  Okay.  And that's the example

22  you gave to describe the benefits of your patent.

23                    ANSWER:  Correct.

24                    QUESTION:  How many times have you used

25  Wi-Fi when driving through a tunnel to receive data?

1                  ANSWER:  I don't believe I have done

2   that.

3                  THE REPORTER:  I didn't hear you, sir.

4                  THE WITNESS:  I don't believe I have done

5   that.

6                  QUESTION:  You've never heard of anyone

7   using Wi-Fi to receive data when driving a car down the

8   road, especially through a tunnel?

9                  ANSWER:  No, not that I recall.

10                  QUESTION:  And it's correct that you have

11   no idea of how the technologies in 802.11 work; is that

12   correct?

13                  ANSWER:  I know it only to a very basic

14   level.

15                  QUESTION:  Right.  You don't know any of

16   the details of the many specifications that are involved

17   in 802.11, right?

18                  ANSWER:  No.

19                  QUESTION:  As you said earlier, you've

20   never even -- you've never even read them?

21                  ANSWER:  Not that I recall, no.

22                  QUESTION:  And you certainly don't know

23   how -- the details of the ARQ protocols in Wi-Fi; isn't

24   that correct?

25                  ANSWER:  That's correct.

1                    (End of video clip.)

2                    THE COURT:  All right.  Does that

3  conclude the offer?

4                    MR. CAWLEY:  Yes, Your Honor.

5                    THE COURT:  All right.  Who will be your

6  next witness?

7                    MR. STEVENSON:  Ericsson calls Dr. Scott

8  Nettles.

9                    THE COURT:  All right.  Dr. Nettles.

10                    Dr. Nettles, were you sworn the other

11  day?

12                    THE WITNESS:  No, Your Honor, I was not.

13                    THE COURT:  All right.  If you will,

14  raise your right hand to be sworn.

15                    (Witness sworn.)

16                    THE COURT:  All right.  You may be

17  seated.

18     SCOTT NETTLES, Ph.D., PLAINTIFFS' WITNESS, SWORN

19                      DIRECT EXAMINATION

20  BY MR. STEVENSON:

21     Q.   Good afternoon, Dr. Nettles.

22     A.   Good afternoon.

23     Q.   Would you please introduce yourself to the

24  jury.

25     A.   I'm Dr. Scott McBride Nettles.

1     Q.    And can you tell us what you do for a living,

2  sir.

3     A.    Well, until very recently, I was an associate

4  professor of electrical and computer engineering at The

5  University of Texas at Austin.  I recently have become

6  an adjunct professor, and I spend most of time as a

7  consultant.

8     Q.    Okay.  Would you tell us a little bit about

9  what you liked about being a professor?

10     A.    Well, I guess the thing I most liked about

11  being a professor was my students.  So as part of your

12  research as a university professor, you -- you mentor

13  Ph.D. students.  You -- they help you do your research,

14  and eventually, they do a doctoral dissertation under

15  your supervision.  And I don't know.  I don't have any

16  children, but it's kind of like having 11 children.

17     Q.    Okay.  What was the focus of your research at

18  UT?

19     A.    Most recently, it's been wireless networking

20  and specifically building experimental systems, which

21  really they're 802.11n systems that work very much like

22  the systems we're going to talk about in this court

23  case.

24     Q.    Can you tell us just briefly a little bit

25  about the experimental systems that are like the 802.11

1  ones that you've built?

2      A.    Yes, sir.  We've been interested -- along --

3  my colleagues and I have been interested in the question

4  of if you -- if you're interested in the question of how

5  certain parts of the network interact.

6          So in particular, the physical layer, which is

7  the radio part, and then the MAC layer, which is really

8  what we're mostly going to talk about here in the next

9  week or so, how they interact.

10          And so what we've done is, we've built an

11  experimental system where we've implemented both the

12  physical layer and the MAC layer in software, and we can

13  study what happens when we implement protocols where the

14  physical layer and the MAC layer work together very

15  closely.

16          And I think part of what's interesting about

17  what we've done is that we built a real system that

18  actually has radios in it.  It really transmits over the

19  air.  And we were able to build whole networks of

20  these -- of these nodes and do real-world experiments

21  instead of just simulations.

22      Q.    Well, in awhile, I'm going to ask you to teach

23  us about physical layers and MAC layers, but I'll hold

24  off on that for now and move on to a little bit about

25  you.

1          Have you written any books on networks?

2     A.   Yes, sir.  I've been involved in editing books

3   on networks.

4     Q.   And have you written professional papers?

5     A.   Yes, sir.  That's an important part of my --

6   my -- been an important part of my job.

7     Q.   And ballpark, about how many?

8     A.   65, 70 professional papers.

9     Q.   Your research that you do on wireless

10  networks, is that typically funded by outside interests?

11    A.   Yes, sir.  It's funded both by industry and

12  also by the National Science Foundation and sometimes by

13  DARPA.

14    Q.   Okay.  Well, take me back to how you first

15  became interested in being a computer engineer.

16    A.   Originally, I studied chemistry.  That was my

17  interest.  And when I went to graduate school in

18  chemistry, I was studying theoretical chemistry.  And

19  that involved doing a lot of computer programming,

20  working with computers a lot.  And I found that I

21  enjoyed the computer part more than I enjoyed the

22  chemistry part.

23          And so at a certain point, I decided to quit

24  graduate school in chemistry and become a computer

25  programmer.

1      Q.   Okay.  Well, tell us where you grew up,

2   Dr. Nettles.

3      A.   I grew up in a small town in South Alabama

4   called Andalusia, Alabama.

5      Q.   And what did your parents do?

6      A.   My parents are teachers.  My father was the

7   local band director.  And when I was little, my mother

8   taught high school English.  But most of my life, she

9   was the local dance teacher.  So she had a dance school.

10      Q.   Okay.  Can you go through for us your

11   educational background, please.

12      A.   I went to high -- well, actually, to all

13   schools, but including high school in Andalusia.  And

14   then I went to Michigan State University as an

15   undergraduate where I studied chemistry.

16           Then I went to Stanford as a Ph.D. student in

17   chemistry for three years.  Then I worked for about four

18   years, and then I went to Carnegie Mellon University

19   where I earned my Master's degree and my Ph.D.

20      Q.   In what -- what --

21      A.   In computer science.

22      Q.   Okay.  And then after you got out of Carnegie

23   Mellon with your Ph.D., what kind of work experience did

24   you have?

25      A.   Well, after that, I became a college

1  professor.

2      Q.   Okay.

3      A.   I first worked at the University of

4  Pennsylvania.

5      Q.   All right.  And when did you start doing

6  expert consulting work?

7      A.   Well, the first time I was retained was in

8  2005, but I think the first time I was ever seriously

9  involved in a case was in 2007.

10     Q.   Was that involving patent cases?

11     A.   Yes, sir.

12     Q.   Computer stuff, technology?

13     A.   Yes, sir.  The -- the -- the first big case

14  actually involved cable modems.

15     Q.   Okay.  And would you explain to us what it

16  entails for you to be retained as an expert in a patent

17  case and how you go about doing your work.

18     A.   Well, when you're retained in a patent case,

19  you're retained either by the plaintiff or the

20  defendant, and they want you to analyze the patents and

21  the products that are involved in the lawsuit for --

22  both for infringement and also to figure out whether or

23  not the patents are valid.

24     Q.   Okay.  Have you testified in court in patent

25  trials before?

1  A. I have.

2  Q. Are you always retained by plaintiffs?

3  A. No, sir.  I work for both the plaintiffs and

4 the defendants.

5  Q. And what conclusions did you reach in this

6 case?

7  A. In this case, I reached the conclusion that

8 the five patents-in-suit are infringed and also that

9 they're valid.

10  Q. And are you going to explain, over the course

11 of the next several hours, how you reached your

12 conclusions and walk us through your analysis?

13  A. Yes, sir.  That's exactly what I'm going to

14 do.

15  Q. And before we get into that, I'd -- just so

16 it's clear, are you being retained and compensated for

17 your time in this case?

18  A. Oh, yes, sir, absolutely.

19  Q. At what rate?

20  A. $450 an hour.

21  Q. Before we get into the details of the patents,

22 I'd like to ask you to give us a tutorial, please, on

23 wireless networks.

24  A. Okay.  I can do that.

25  Q. And I understand that you've put together a

1   video animation that might help us understand some of

2   the concepts that we're going to need to know to then

3   get into the patents and understand the patents.

4        A.   Yes, sir, that's correct.

5        Q.   All right.

6             MR. STEVENSON:  So can we please bring up

7   that tutorial?

8        Q.   (By Mr. Stevenson) All right.  Tell us what

9   we're seeing here, Dr. Nettles.

10       A.   Well, this is a picture of a wireless network.

11  And in the upper left-hand corner, we see something

12  called a base station.

13       Q.   What is -- what is that base station?

14       A.   Well, the base station is the device that

15  forms the wireless network but also connects to the

16  wired network.

17            So the most familiar kind of base station to

18  most people would be a router, and it would typically

19  connect to your cable modem or your DSL connection.  And

20  you can see the little wire that's connects to the wired

21  network there.

22       Q.   So that would be like one of these type of

23  routers that you would buy?

24       A.   Yes, sir, exactly.

25       Q.   Okay.  Like a NETGEAR or a D-Link or a Belkin?

1     A.    Those are all good examples of router vendors,

2  yes, sir.

3     Q.    And so when you get it out of the box, what's

4  that little wire you plug it into in the back?

5     A.    Well, that would typically be your cable modem

6  or your DSL connection.

7     Q.    Okay.  And many of us probably have done that.

8  You plug your Internet into the back of your wireless

9  router and that lets it go around your house wirelessly?

10     A.    Exactly.

11     Q.    Now let's look at the terminals at the bottom.

12           What are those?

13     A.    Well, those are the devices that the base

14  station is going to communicate with.  So those would be

15  laptops or even desktops.  They might be phones.  They

16  might be tablets.

17           These days other devices are connecting

18  wirelessly.  So televisions, thermostats.  I've even

19  seen a scale like you weigh yourself on that connects

20  wirelessly.

21     Q.    All right.  And the base station, does it have

22  a radio unit in it?

23     A.    Yes, sir.  Both the base station and the

24  terminals are two-way radios.

25     Q.    And those black things, I assume, are the

1  antennas for the radio?

2      A.   Yes, sir, they are exactly that.

3      Q.   And let me ask you this:  Are there any

4  comparisons you can draw between this type of network,

5  which we've characterized as being a home wireless

6  network, and a cellular network?

7      A.   Yes, sir.  The architectures are slightly

8  different; but as we've depicted it here, quite similar.

9  But because they're going to be communicating data

10 across the -- the radio waves, a lot of the problems are

11 very similar.

12          So the problems that we see in cell networks

13 for communicating data are often the same problems that

14 we see in -- in wireless LANs.

15     Q.   Let's start the animation sequence, and I

16 think this plays -- yes, it does.  I'm assuming these

17 are radio waves?

18     A.   Yes, sir.  They're an animation of radio

19 waves.

20     Q.   I'm curious.  When -- let's go back to the

21 home network example when you've got your NETGEAR router

22 or your D-Link router or your Belkin router sitting in

23 your closet, let's say, and you might have several

24 computers, or if you're at my house, you know, the kids

25 with a tablet.

1          Do -- does everything have to talk to the

2     router, or can the terminals talk in between each other

3     and just have a private conversation?

4          A.   In the architectures that we're using right

5     now, the conversations go from the terminals to the

6     router and from the router to the terminals.

7          Q.   And what happens if people talk at the same

8     time on this network -- the -- the devices?

9          A.   Well, that creates radio interference; and as

10    everyone knows, when radios interfere, it's hard to

11    understand.  So that would typically create errors if

12    they were talking simultaneously.

13         Q.   So everybody has to take a little turn?

14         A.   That's exactly correct.

15         Q.   Now, we've been talking a lot in this case so

16    far about -- or at least a little bit about packets.

17    Remember, I talked about them in opening.

18          Can you tell us what a packet is?

19         A.   A packet is really just a fixed quantity of

20    information that computer networks use to communicate

21    with.

22         Q.   Is it just these kind of computer networks

23    that use packets, or is it other kinds of computer

24    networks?

25         A.   Well, they're the fundamental basis of the

1  entire Internet and of computer networking in general.

2        Q.    Cellular, too?

3        A.    Cellular, too, yes, sir.

4        Q.    Why?

5        A.    One of the easy-to-understand reasons is that

6  if you break the information up into relatively small

7  pieces, it makes it easier to share.

8              Remember, we talked about how things could

9  interfere with each other.  If we break it up, then it's

10 easy to allow, for example, terminal 1 to speak for a

11 little while, then terminal 2, then terminal 3, then

12 maybe the base station.  It makes it easy to share this

13 communication mechanism.

14             And that's really one of the fundamental

15 reasons for using packets.

16       Q.    So -- so one of these terminals that has a lot

17 to send can't hog it all?

18       A.    That's exactly right.

19       Q.    Try to spread it around?

20       A.    Yes, sir.

21       Q.    Well, what -- what happens if, let's say, one

22 of these terminals has a lot of information to send,

23 like, let's say, it's a picture?

24       A.    Okay.

25       Q.    You know, like a big high-resolution picture

1  you took of, you know, your kids, and you're trying to

2  send it out over the Internet.  How does that happen

3  without the terminal doing it, hogging all the airwaves?

4       A.   Well, if we had a picture that had a lot more

5  information in it than would fit in one packet -- let's

6  actually just think about it as being a real picture.

7            What we would literally do is, we would tear

8  that real picture into pieces, say nine pieces, and we

9  would label those pieces, upper left-hand corner, upper

10 middle, and then we'd put each piece of the picture into

11 its own individual envelope, and we would address that

12 individual envelope.

13      Q.   And then who do you -- who do you send the

14 nine envelopes to?

15      A.   Well, you send -- you send the nine envelopes

16 to whoever the receiver is.  And when they get the nine

17 envelopes, they open the envelopes, and they take out

18 the piece of the picture, and they put the one that's

19 labeled upper left-hand corner in the upper left-hand

20 corner and upper -- middle upper in the upper, and they

21 reassemble the picture.

22      Q.   And so does that carry over into the

23 electronic world where this tearing up of large chunks

24 of data into packets happens electronically?

25      A.   Yes, sir, except you might tear it up into

1  thousands or millions of packets.

2       Q.    Okay.  Can we show some packets on your

3  animation?

4       A.    We can.

5       Q.    Okay.  What are the blue dashes that are now

6  replacing the radio waves?

7       A.    Well, they're our visual representation of

8  packets.

9       Q.    Are these packets -- are they actually carried

10 on the radio waves?

11      A.    Yes, sir.  The radio waves actually digital --

12 the digital information is encoded into radio, and

13 that's what the radio part of these networks do, is to

14 send the packets digi -- by radio.

15      Q.    These aren't replacing radio waves; they're

16 just sort of a logical way we can think about how the

17 information is going along?

18      A.    Yes, sir.  There's really radio waves

19 underneath all of this.

20      Q.    Okay.  Are packets different sizes?

21      A.    Typically, yes, sir, they are.

22      Q.    What's inside a packet?

23      A.    Well, there's a lot of different information

24 inside of packets, but remember I mentioned this idea

25 that we would put an address on the envelope.

1        So packets invariably have addresses, and then

2   they invariably have -- well, they typically have data,

3   so...

4        I think we have a blow-up of this maybe.

5   Q.   Right.   That's the one that's been flashing.

6        All right.   Just so we know what we're looking

7   at, what is the zoom-out that's in the blue box?

8   A.   It's showing us that one of these packets has

9   two compartments.   One compartment holds the address.

10  And in this case, it's video data that's being held

11  there.   We call these compartments typically fields

12  rather than compartments.

13  Q.   And in the real world -- I know this is a

14  simplification as we're going to get into the case -- do

15  packets have more than one or two fields?

16  A.   Yes, sir.   They have many fields, typically.

17  Q.   Now, if we looked at that packet that says

18  video data, would we expect to get the whole video or

19  just a piece of it?

20  A.   For a video, it would be typically a very

21  small piece.

22  Q.   And how -- how fast are these packets going?

23  A.   Well, conservatively, hundreds of times a

24  minute.   In practice, maybe thousands or tens of

25  thousands times a minute.

1     Q.    And then they get transmitted at the speed of

2   light, obviously.

3     A.    They're on the radio, so that's how fast they

4   move through the radiofrequency, yes, sir.

5     Q.    Now, we hear a lot today about bandwidth.  Can

6   you explain to us about bandwidth and what it is?

7     A.    Bandwidth is just the amount of information

8   that can be transmitted at any one time.  So how many

9   words can people say a minute?  How many packets can be

10  sent a second?  It's usually expressed in terms like

11  bits per second or bytes per second or packets per

12  second.

13    Q.    What -- what limits bandwidth?

14    A.    Well, ultimately, in a -- in a radio-based

15  network like this, the laws of physics limit the amount

16  of bandwidth that's available.

17    Q.    What law of physics is it that limits

18  bandwidth?

19    A.    Well, it has to do with the number of bits

20  that you can transmit per hertz of frequency.  It's a

21  little complicated.

22    Q.    Well, I mean, if that's the case, why have

23  cell phones and home networks gotten faster over the

24  years?

25    A.    That's because we're just really learning how

1  to build these kind of radio-based networks.  And so we

2  haven't approached the limits that physics imposes.

3        Instead, what's happening is, every -- well,

4  really probably even every month, engineers and

5  physicists and computer scientists are learning how to

6  build these networks better and better so that they come

7  closer and closer to the physical limits.

8       Q.   Do those have to do with the rules of the

9  networks and the protocols that you use?

10      A.   Ultimately, improving the rules can definitely

11  improve the utilization and how close we get to those

12  limits, yes, sir.

13      Q.   Let's keep going with the animation.

14           And now we see some red packets that have

15  gotten introduced.  What are those?

16      A.   Well, those are control packets.  So in

17  addition to the packets that carry the actual real data,

18  we have to send some packets back and forth just to make

19  the network work; information that the sender and

20  receiver needs to send back and forth to keep in sync.

21      Q.   And the first part of the animation that was

22  all just blue packets, now red packets have come in, but

23  in the real world, are there always these red packets

24  with control information being sent around?

25      A.   Yes, sir, there are.

1    Q.   But the data, the stuff you really want, is

2  that in the red packets, or is that in the blue packets?

3    A.   It's in the blue packets.

4    Q.   So to get better network performance, what is

5  your goal, as far as the size of the red packets and how

6  often you send them out?

7    A.   You'd like to make the red packets as small as

8  possible, and you'd like to send them out as

9  infrequently as possible.

10    Q.   Now, how does this all stay organized?  How do

11  all the receivers and the transmitters know when to talk

12  and what to send and how to interpret what they're

13  getting?

14    A.   Well, there's -- there's a rule book, as we've

15  been discussing.

16    Q.   Is that the standard?

17    A.   Yes, sir, that's the standard.  That's

18  basically a blueprint for how this kind of network is

19  going to work.

20    Q.   Do all the devices have to have the same

21  blueprint or rule book?

22    A.   Yes, sir, they do.

23    Q.   And what if they don't?

24    A.   Well, they -- they won't be able to

25  communicate successfully.

1    Q.   How do the devices on the network know the

2  rules?

3    A.   Well, I mean, these aren't people.  They can't

4  really know anything.  So really the engineers and

5  computer scientists that work for the companies have to

6  build them so that they follow the rules.  So they're

7  programmed really to follow the rules.

8    Q.   So we saw that standard before.  Is drafting

9  the standard the end of it, or do you then have to

10  program the standard into the devices?

11    A.   Drafting the standard is the beginning of it.

12  Putting them into the devices is perhaps the hard part.

13    Q.   Do the inventions in this case deal with what

14  the rules should be for a network?

15    A.   Yes, sir, they do.

16    Q.   And how detailed are those rules?

17    A.   The -- the rules have to be detailed enough

18  that if you follow them and someone else builds a system

19  that also follows them, they'll be able to communicate

20  successfully.  They'll have to be using the rules in the

21  same way.  So they're -- they're quite detailed.

22    Q.   I've got here the 802.11n 2007 standard

23  version.

24    A.   Yes, sir.

25    Q.   It's --

```
 1      A.    I have one here, too.  This is the 2007 one.

 2      Q.    And I was going to ask you -- I forgot --

 3 you've got some binders in front of you in a cart.  What

 4 are those?

 5      A.    Those are the reports that I've written in

 6 this case.

 7      Q.    You -- the reports about infringement and the

 8 patents?

 9      A.    Yes, sir, they are.

10      Q.    So that's -- that's your work, so you have it

11 to refer to during the questioning?

12      A.    That's correct.

13      Q.    And then you've got a copy, I assume, of the

14 802.11 standard in front of you?

15      A.    Yes, sir, both the 2009 and then the -- and

16 the 2007 version.

17      Q.    Why -- and this may be a very obvious

18 question, but why does this need to be so long and

19 elaborate?

20      A.    Well, it has to specify everything about these

21 systems so that you can build one and so that they can

22 interoperate.

23            So this standard, for example, contains

24 everything about how the radios have to work and then

25 also everything about how -- what I've referred to as
```

1  the MAC layer, the media access control layer, how it

2  has to work.

3           So there's just a lot of details to build a

4  very complicated engineering system like this.

5       Q.   Is that standard publicly available?

6       A.   Yes, sir.

7       Q.   Anybody can download it?

8       A.   Yes, sir.

9       Q.   And if you're a company and you download that

10  and build a device according to it, follow it, what

11  should your expectation be?

12      A.   If you follow it faithfully, you should be

13  expected -- you should expect to be able to interoperate

14  with other people who have built -- who have built

15  devices that follow the standard faithfully.

16      Q.   Now, I want to talk a little bit about -- now

17  that we've gotten the concepts out, I want to put

18  Ericsson's inventions into this concept of these.

19      A.   Okay.

20      Q.   I want to talk about the patents in the case

21  and what aspects of the network they touch upon.

22           Can you tell us at a -- just a high level, and

23  then we'll get into specifics, what aspects of the

24  network Ericsson's patents pertain to?

25      A.   Well, they -- they touch really eventually on

1  every aspect of the media access control levels, so both

2  the sending and receiving of data, how we make the data

3  reliable, how we deal with data which needs to have

4  different characteristics with respect to delay.  All of

5  those aspects are part of the patents.

6      Q.   What I'd like to ask you to do is, let's go

7  through a -- let's make up a hypothetical transmission

8  from a base station to a terminal, terminal 4, and walk

9  through that, and let's just talk about where Ericsson's

10  inventions come into the mix.

11     A.   Okay.

12     Q.   And then we'll use that as a -- segue later to

13  go on when we talk about the patents as a reminder

14  for -- for -- to keep us oriented on what we're doing.

15          So let's pretend we're streaming video from

16  the Internet to a terminal.

17     A.   Okay.

18     Q.   So let's just start at the beginning.

19          Where is the Internet coming into the system?

20     A.   It's coming in through the little black wire

21  that we see attached to the base station.

22     Q.   All right.  And -- and is it coming in as

23  packets there, too, or is it something different?

24     A.   It's going to be packets.

25     Q.   Okay.  When it gets to the base station, what

1  does the base station do?

2      A.   It's going to transmit those packets to

3  wherever they eventually go to; in this case, to

4  terminal 4.

5      Q.   Does it just pass them right through, or does

6  it rearrange them somehow?

7      A.   It depends a little bit.  They could do either

8  one of those two things.

9      Q.   Okay.  Then the base station converts them

10  into radio?

11      A.   Yes, sir.

12      Q.   And then when the radio waves get sent out,

13  are they just heard by terminal 4 or all the terminals

14  hear?

15      A.   So they're -- because it's radio, it's

16  broadcast.  And so, in fact, all the terminals will hear

17  the broadcast from the base station.

18      Q.   Now, how does the base station -- so we're

19  pretending the base station is sending video to the

20  terminal?

21      A.   Yes, sir.

22      Q.   And then the terminal is, let's say, you know,

23  you're sitting at your kitchen table having a video

24  stream to you.

25      A.   Okay.

1      Q.    Sitting there, video streaming to you, coming

2   from the router that's maybe two moves away.

3      A.    Okay.

4      Q.    We talked in opening a little about lost

5   packets and that sort of thing.  Does that happen in

6   these sort of systems?

7      A.    Oh, yes, sir.  Losing packets is common.

8      Q.    What causes packets to get lost?

9      A.    Well, there could be interference.  You might

10  turn on your microwave oven.  Maybe you've got your base

11  station too far away from where you're trying to watch

12  the video.  All of those things could cause packets to

13  be lost.

14     Q.    Bouncing off walls and that kind of thing?

15     A.    Yes, sir.

16     Q.    Okay.  And how does the base station then,

17  who's sending the video to the terminal, know if packets

18  are getting lost and which ones they are?

19     A.    Well, it asks the terminal which packets it's

20  received.

21     Q.    Okay.  Can we show that on the...

22     A.    We can.  It's one of these are control

23  packets.

24     Q.    One of the red ones that carries the question?

25     A.    That's right.  So if we --

1     Q.   It stopped, and it's flashing.

2     A.   That's right.  So the one that's flashing is

3 the questioner of which ones did you get?

4     Q.   Okay.  So basically what we're talking about

5 here is, this red packet isn't actually carrying the

6 data; it's a way for the base station and terminal to

7 talk to each other about how things are going?

8     A.   Exactly.

9     Q.   Okay.  Now, what is the base station sending

10 the video asking the terminal?

11     A.   It's asking, did you get everything that I

12 sent to you since the last time I asked you what you --

13 what you received.

14     Q.   Okay.  Let me ask you about this question

15 before we move on.  It asks:  Did you get all the

16 packets in the last group I sent?

17     So can this question be asked about a group of

18 packets?

19     A.   Yes, sir.  And in the case that we're looking

20 at here, that will typically be what will happen.  We'll

21 ask about a bunch of packets all at once.

22     Q.   And is the goal of that to have fewer of these

23 control red packets?

24     A.   Yes, sir.  Rather than answering for each

25 packet, we're going to answer for a group of packets at

1  once.

2      Q.    All right.  Let's go on and see -- does the

3  terminal answer?

4      A.    Yes, sir.  It's required to answer by the

5  rules.

6      Q.    And so it doesn't have a choice.

7      A.    No, sir, it doesn't.

8      Q.    Okay.  Let's look at what the answer might be.

9  What's he responding with?

10     A.    Well, in this case, the response says, which

11 packets were received.  But it also tells which packets

12 weren't received.

13     Q.    He got 1, 2, 4, 7, 8, but missed 3, 5, and 6.

14     A.    That's right.

15     Q.    When we get into the patents, is there -- and

16 the infringement stuff in the standard, is there a word

17 that we're going to use to describe this sort of

18 response message?

19     A.    There is.  We're going to call it a block

20 acknowledgment, because it's acknowledging the receipt

21 of messages, and it's acknowledging the receipt of a

22 group or block of messages.  That's why it's called

23 block acknowledgment.

24     Q.    So what now can the base station now do that

25 it's learned three of its packets got dropped?

1     A.   Well, it could potentially retransmit those

2  three packets, so send them again so that the terminal

3  would -- would receive them.  But that's not always the

4  best thing to do.

5     Q.   Why not?

6     A.   Because in some cases, resending the data

7  isn't as desirable as just dropping it.

8     Q.   Okay.  Will you explain to us, because that

9  seems a little bit counterintuitive, why that is?

10     A.   Yes, sir.  Well, there are certainly some

11  kinds of data that you want to resend, like things about

12  your bank statement.  But if you're watching a movie --

13     Q.   Not always.

14     A.   Well, okay.  But if you're, for example,

15  watching a movie or having a phone conversation,

16  resending the packets might cause the movie to pause or

17  the phone conversation to have a gap in it; whereas, if

18  you just drop those packets and you didn't resend them,

19  then all that might happen is, there might be one of

20  those little kind of glitches you see in the movie.  But

21  that would be a lot better than having a pause.

22     Q.   Is there an Ericsson invention related to

23  this?

24     A.   Yes, sir.  There are two, actually.

25     Q.   And what is -- explain to us the Ericsson

1  invention, how it factors into this.  What inventions, I

2  should say.

3       A.   Yes, sir.  The inventions really work hand in

4  hand.  They had to do with how the receiver and the

5  transmitter stay in sync when the transmitter decides

6  it's going to just drop a packet rather than retransmit

7  it.

8            So one of the patents has to do with what the

9  receiver does when the transmitter decides to drop a

10  packet, and the other one really focuses on what the

11  transmitter does when it decides to drop a packet.

12       Q.   Okay.  And what happens if they don't stay in

13  sync or stay coordinated together?

14       A.   Well, the system breaks.  For example, I think

15  we talked about deadlock.  That's an example of where it

16  might dead -- that's the kind of thing that could happen

17  if they got out of sync, is deadlock.

18       Q.   All right.  And I don't think anybody thinks

19  that's a good idea.

20       A.   No, sir.  We try to avoid deadlock in computer

21  systems at all cost.

22       Q.   So do you -- do there need to be some rules in

23  this system for how the base station and terminal

24  coordinate when whichever one is transmitting decides

25  not to send or retransmit lost packets?

1    A.   Yes, sir, absolutely.

2    Q.   And, you know, I've been switching back and

3  forth, and it may be confusing.  I've been -- we've been

4  talking about base stations and terminals, and then I'd

5  switch over and I talk about transmitter and receiver.

6         Let me just be real clear.  All of these

7  devices can transmit, as well as receive, right?

8    A.   Yes, sir.  They both play both roles.

9    Q.   Okay.  So if you're talking about the

10  transmitter, that's not always the base station.

11    A.   No, sir, not at all.

12    Q.   I mean, it is in our example.

13    A.   In this example that we're looking at, yes,

14  sir.

15    Q.   But it just -- it just depends.

16         I mean, for instance, the terminal may be

17  streaming video back up to the base station to go out to

18  the Internet, and then that one is the transmitter.

19    A.   Yes, sir, that happens.

20    Q.   So what did Ericsson invent in terms of a way

21  for the base station or, let's say, transmitter,

22  whichever one it is, and the receiver to stay

23  coordinated if whoever's transmitting the packets

24  decides not to retry a dropped packet?

25    A.   So let's look at the invention that involves

1  the receiver first.

2      Q.   Okay.

3      A.   The receiver is keeping a list of packets that

4  it's expecting to receive, and it's doing that because

5  sometimes it has to send back those messages that say --

6  says, I received these, and I didn't receive -- and I

7  didn't receive these others so that then they can be

8  retransmitted.

9          And when the transmitter decides to drop a

10  packet, that list needs to be updated.  And so the way

11  that works is that the transmitter sends a message to

12  the receiver that contains information about what things

13  have been dropped.

14          The receiver does a computation to figure out

15  exactly what's been dropped.  And then it releases the

16  expectation that it's going to ever receive those.

17  It -- it forgets about those packets, essentially.

18          And now it's never -- once that's happened,

19  it's never going to ask for them again, because it knows

20  that the transmitter's never going to send it again.

21      Q.   And -- and what you talked about there, this

22  keeping a list and computing and releasing expectations,

23  are those things left up to the whim of whoever's

24  building the terminal, or are they part of that standard

25  book and part of the blueprint for the devices?

1      A.    They're part of the blueprint.

2      Q.    So we said there were two Ericsson inventions

3 related to this -- you know, keeping the receiver and

4 transmitter coordinated or in sync.  I'm using those

5 synonymously.  You just told us what the receiver is

6 doing on its side.  What does the other invention

7 pertain to?

8      A.    The other invention is focused on the

9 transmitter and on the kind of messages that the

10 transmitter sends to the receiver.

11           And in that invention, when the transmitter

12 decides that it's going to drop a packet rather than

13 retransmit it, it needs to do two things.

14           It needs to send a command to the receiver to

15 receive a packet that's out of order, and it also has to

16 send a command to the receiver to -- well, it's similar

17 to this release expectations idea; basically to move the

18 set of frame -- the set of packets it's expecting so

19 that it's no longer expecting the ones that are before

20 the one that's out of order.

21           So that's the ones that haven't been received.

22 The whole point is to deal with the fact that certain

23 ones haven't been received without forcing the system to

24 continue to wait for that one to be retransmitted, to --

25 to move along.

1    Q.   Okay.  And I know these are hard concepts to

2  explain.  We're going to get, I think, a little bit of

3  repetition here.  As we go into the patents, I think

4  we'll talk about this again on each individual patent.

5  So this isn't our only chance to learn all this.  But

6  let me go back to your last answer.

7        Basically, the transmitter has got to go ahead

8  and tell the receiver what it's doing so the receiver

9  can deal with its list and computations.

10           MR. VAN NEST:  Objection.  This is

11 leading, Your Honor, with an expert, and that's not

12 appropriate.

13           THE COURT:  Overruled.

14   A.   Yes, sir, exactly.  In fact, in the patent we

15 were just talking about, it just -- it doesn't just tell

16 the receiver; it actually sends commands.

17   Q.   (By Mr. Stevenson) Okay.  Now, can these

18 packets in the network carry different types of

19 information?

20   A.   Yes, sir.

21   Q.   What types of information might they carry?

22   A.   Well, we've been talking a lot about video,

23 but we've also talked some about voice, and obviously,

24 they're going to carry just regular data:  Web pages,

25 your e-mail, that kind of information.

1          So those are three sort of especially

2    important kinds of information.

3          Q.    Does having three different types of

4    information, or maybe even more, cause any additional

5    issues in the rules of the network?

6          A.    Well, yes, sir.  These different kinds of

7    information might tolerate delay differently, and you'd

8    really like to set up the rules of the network so that

9    you can accommodate that.

10         Q.    What do you mean when you say tolerate delay

11   differently?

12         A.    Well, let me give an example.

13         If you think about your e-mail, doesn't really

14   matter if your e-mail comes this instant or in

15   10 seconds or in 30 seconds or even a minute later.

16   It's not very sensitive to mail -- to delay.

17         But imagine having a phone conversation where

18   every time someone says a word, there's a delay of even

19   half a second.  It would be almost impossible to have a

20   phone conversation under that circumstance.

21         And so for phone conversations, delay is very

22   important.  For video, it's not quite as important as

23   for phones.  And for a lot of data, you know, you don't

24   want your e-mail to be two days late, but two seconds

25   late is fine.

1    Q.   What kind of things can cause delays like that

2  in a network?

3    A.   Imagine -- we talked a little bit about

4  bandwidth.   Imagine that one of these terminals wants to

5  send more information per minute than there is bandwidth

6  to do it.

7         Then, you know, just like in the grocery store

8  where there's a line and a queue, and you have to wait

9  for the checker; there are queues in these terminals and

10  base stations, and things have to wait in those queues,

11  and that can cause delays.

12    Q.   Is there an Ericsson invention related to

13  dealing with different types of data on the network?

14    A.   Yes, sir, there is.

15    Q.   What's that invention?

16    A.   That involves -- the key invention there is a

17  service type identifier which gives the network a way of

18  labeling the packets so that we can say what kind of

19  data they have in them so that the network can then

20  treat the different kinds of data differently in an

21  appropriate manner.

22    Q.   So how many patents is Ericsson asserting in

23  this case that relate to these concepts that you've

24  discussed?

25    A.   In total, there are five patents-in-suit.

1      Q.    And have you analyzed all five patents, and

2   are you prepared to offer opinions on them?

3      A.    Yes, sir, I am.

4      Q.    Let's now shift gears and talk about the

5   Defendants and their products.  And we have a -- I think

6   we're going to be using this through your testimony as

7   our menu or our table of contents.

8      A.    Yes, sir.

9      Q.    Something I created.

10           So let's talk about the Defendants.

11           Have you analyzed the Defendants' products for

12   purposes of determining whether they infringe?

13      A.    Yes, sir, I have.

14      Q.    How many different types of products are made

15   by the Defendants?

16      A.    There are two main kinds.  There are routers,

17   and then there are computers, both desktops and laptops.

18      Q.    Let's talk about the individual Defendants.

19           Are these the Defendants that make the

20   routers?

21      A.    Yes, sir.  Belkin, D-Link, and NETGEAR make

22   routers.

23      Q.    And which Defendants make personal computers?

24      A.    Acer, Dell, and Toshiba.

25      Q.    And is it just laptops at issue here, or is it

1  also desktop computers?

2      A.   It's also desktops.

3      Q.   Are all the devices, the laptops, desktops,

4  routers, that you analyzed 802.11n compliant?

5      A.   Yes, sir, they are.

6      Q.   And do your opinions in this case extend to

7  all the 802.11n routers, computers of the Defendants?

8      A.   In general, I think there's one opinion that

9  has to do just with the routers.

10     Q.   Okay.  Now, what products does Intel make?

11     A.   They don't make any of the products that you

12  actually buy and use, but they make the chips that go

13  inside of those products.

14     Q.   Is Intel the only manufacturer of chips for

15  these devices in this case?

16     A.   Oh, no, sir, not at all.

17     Q.   So who are some other companies whose chipsets

18  may be found in the accused products?

19     A.   Broadcom; Atheros, which sometimes has been

20  referred to as Qualcomm; Realtek; and Ralink are the

21  chip manufacturers that are involved in this case.

22     Q.   So let's talk about these chips.  If I was to

23  tear open this router --

24     A.   Yes, sir.

25     Q.   -- take the cover off, would I be able to see

1  the chips?

2      A.   Yes, sir, you should be able to.

3      Q.   And is it one manufacturer per device,

4  typically, or might you have an Atheros and a Broadcom

5  and an Intel in the same device?

6      A.   Typically, it would be one manufacturer per

7  device.

8      Q.   Can all the devices we've talked about, the

9  routers and the access points and the computers, be used

10  together interoperably?

11      A.   Yes, sir.  I mean, that's really the point of

12  having a standard, is so that everything can

13  interoperate, and you can buy different manufacturers'

14  devices and have them work together.

15      Q.   Okay.  All the devices in this case advertise

16  as being and practicing the 802.11n standard?

17      A.   Yes, sir, they are.

18      Q.   And are these devices certified as Wi-Fi

19  compliant?

20      A.   Yes, sir, they are.  Just to be clear, not

21  every single device is certified, but a great many of

22  them are certified.

23      Q.   Okay.  And I want to talk with you a little

24  bit more about that in a second.

25      A.   Yes, sir.

1      Q.    Let's turn now to the 802.11n standards.

2      A.    Okay.

3      Q.    First, I want to understand the numbering

4   convention a little better.  Why couldn't they call it

5   something simpler than 802.11?

6      A.    Well, you'd have to ask the IEEE for a

7   definitive answer, but 802 actually refers to a whole

8   group of standards that all involve something called

9   Ethernet, and 802.11 is called wireless Ethernet.

10      Q.    Let me ask you -- stop you there.

11            So there's -- so a standard related to -- you

12   called it Ethernet.  That's some other data standards,

13   right?

14      A.    Well, all the ones that say 802 dot are -- all

15   have to do with Ethernet in various forms.

16      Q.    And that -- so there's -- there's other

17   numbers, dot numbers?

18      A.    Yes, sir.

19      Q.    Okay.  We're -- we're talking about dot 11.

20      A.    That's right.

21      Q.    Is that a specific flavor or a subset of all

22   the other 802 data standards?

23      A.    Yes, sir.  That's -- that's wireless Ethernet,

24   and the marketing term for that is Wi-Fi.

25      Q.    And who is responsible for the 802.11

1  standard?

2      A.   The IEEE.

3      Q.   And tell us what the IEEE is.

4      A.   Well, the IEEE is a professional organization

5  of electrical engineers and electronics engineers

6  that -- actually, they cover all sorts of areas of

7  technology, but in particular, they create standards in

8  this particular area of computer networking and wireless

9  computer networking.

10     Q.   How many -- how many members are there in the

11 IEEE?

12     A.   There are over 400,000.  They claim to be the

13 largest professional organization in the world.

14     Q.   Are you a member?

15     A.   Yes, sir.

16     Q.   Now, 802.11n is the flavor or type of 802.11

17 we're talking about in this case.  Can you explain to us

18 how that last letter -- what that represents, the "n"?

19     A.   Originally, there was 802.11 without any

20 letters, and that evolved into 802.11d.  And then that

21 actually also evolved into 802.11a.  I don't know why

22 they didn't keep things in order.  Then there was

23 802.11g.  Now there's 802.11n.

24          And then there are other letters, which they

25 don't really -- they're not whole networks.  They don't

1  work independently.  But I think we heard about 802.11e

2  earlier today.

3           So there are other letters which are sort

4  of -- sort of add-ons to the letters that I just

5  mentioned.

6      Q.   And in general, as the letters go on, are

7  we -- is that going along in time?

8      A.   Yes, sir.  As technology advances, we add to

9  the standard, we improve the standard, and we give it a

10 new name.

11     Q.   And how does 802.11n compare to the prior

12 versions of standard before it?

13     A.   Well, the most important difference to you and

14 me is that it's a lot faster.

15     Q.   Does it have a longer range, too?

16     A.   Yes, sir, it does.

17     Q.   So you could basically put your router further

18 away in your house and still get signal than you could

19 previously with the other versions?

20     A.   Yes, sir, that's correct.

21     Q.   And when you say faster, what does faster mean

22 just from the user experience?

23     A.   Well, 802.11 might not be able to even support

24 voice; certainly not video.  Faster means that we can

25 have video -- maybe we can stream video, which is

1  hi-def.  Maybe it's 60 frames per minute.  Basically,

2  faster means more bandwidth in this context, a better --

3  and therefore, a better user experience.

4       Q.   When was 802.11n officially approved?

5       A.   In 2009.

6       Q.   And are the Ericsson patents at issue here

7  essential to the 802.11 standard?

8       A.   Yes, sir, they are.

9       Q.   Let's now turn to how you conducted your

10  infringement analysis in this case.

11            What was your first step?

12       A.   My first step was -- I guess the obvious

13  one -- to read the patents.  And eventually what you

14  need to do is, you need to read the patents, and in

15  particular, you need to read the claims of the patents.

16            And each one of the claims -- and we're going

17  to talk about this a lot -- has a series of sentences or

18  paragraphs that are called limitations.  We'll call them

19  elements sometimes.

20            And to infringe the patent, you have to meet

21  each one of these limitations.  And so that's one of the

22  next steps.  Once you read the patent, you start

23  thinking about whether or not the accused products meet

24  each of these limitations.

25            There's another important part, which is that

1  certain terms that are in the patent are defined by the

2  Court, and it's important that you apply those terms

3  when you're trying to understand what these claim

4  limitations mean.

5     Q.   And so I'm going to give everybody a preview

6  of the future to come, and is this something you used in

7  your work?

8     A.   Yes, sir.  That's Claim 1 of the '215

9  patent -- well, actually, Claim 1 and 2 of the '215

10  patent.

11     Q.   So what we're going to be doing, I think, over

12  the remainder of your examination is talking with you

13  about the evidence and walking the jury through each one

14  of the claim elements.

15     A.   That's exactly correct.

16     Q.   And the boxes are there to check them off as

17  we do the --

18     A.   That's right, because we want to make sure

19  that we meet every one of the limitations, and we want

20  to make sure we explain to the jury carefully why each

21  one is met.  Because, otherwise, if -- if not each one

22  of them is met, there's no infringement.

23     Q.   Okay.  And in determining whether there's

24  infringement of a patent, do you need proof the

25  Defendants copied it?

1      A.   No, sir.  There's no requirement of copying at

2  all.

3      Q.   Or stole anything?

4      A.   No, sir.  There's no -- no -- no stealing is

5  required.  I have never been in a patent case, I don't

6  think, where stealing was even accused -- was suggested.

7      Q.   So at the rock bottom, what is it that

8  determines infringement?

9      A.   Does the system either do or is it a machine

10  that does the individual limitations of a single claim.

11     Q.   Okay.  Approximately how many hours did you

12  spend analyzing the standard and the evidence and the

13  claims in this case?

14     A.   For infringement, around 500 hours is a good

15  estimate.

16     Q.   Okay.  What was your primary source of proof

17  about how the -- about the infringement analysis for

18  what you compared to the claims?

19     A.   Well, in this case, we have the fact that the

20  Defendants all practice the 802.11 standard.  And we

21  have the standard, and the standard is very detailed

22  about how it works.

23          And so for this case, my most -- I wouldn't

24  say important, but the first place I looked for for

25  proof is the standard.

1      Q.    And that's my question.  Is the standard

2  written in sufficient detail that you could read it and

3  apply it to the claims for your infringement analysis?

4      A.    For almost all of the limitations, yes, sir.

5      Q.    In addition to looking at the standard, did

6  you do a specific product analysis for the individual

7  Defendants?

8      A.    Yes, sir, I did.

9            As part of the discovery process, I was given

10  access to the Defendants' technical documents, and also,

11  we've seen some depositions today; also, the depositions

12  that have been taken in this case.

13            And so in essentially every patent case,

14  that's one of the important sources of evidence:

15  Technical documentation and deposition testimony of --

16  from the parties.  And so I looked at both of those

17  kinds of evidence.

18      Q.    Now, did you also look at any information from

19  organizations that do compliance testing for Wi-Fi?

20      A.    Yes, I did.  There's a group called the Wi-Fi

21  Alliance that tests to see -- it tests for just

22  interoperability issues.

23            So it actually takes different Wi-Fi products

24  and tests to see if they work together.

25      Q.    Can you tell us what the Wi-Fi Alliance does?

1    A.    Well, it -- it takes -- takes Wi-Fi products

2  and -- and tests to see if they -- if -- if they work

3  together, and it tests specific -- specific aspects of

4  those products.

5         So, for example, there's a whole set of tests

6  called WMM that had to do with quality of service.

7    Q.    Does the Wi-Fi Alliance test for compliance of

8  products with the 802.11n standard?

9    A.    I think it's more correct to say that they --

10  that they test for interoperability.  But

11  interoperability is very strong evidence that they

12  comply with the standard.  Because if they don't comply

13  with the standard, there's no way they can -- they can

14  work together.

15    Q.    All right.  And does the Wi-Fi alliance issue

16  a certificate at the conclusion of the testing?

17    A.    Yes, sir, they do.

18         MR. STEVENSON:  And I believe we have one

19  that we've uploaded, and it hasn't been objected to,

20  into evidence, PX 549.  May we see that, please?

21    Q.    (By Mr. Stevenson) Is this one of the

22  interoperability testing certificates?

23    A.    Yes, sir.  This tells us that it's been tested

24  for a, b, g, n, also for WMM, and also some optional

25  capabilities, as well.

1    Q.   And have you looked at a number of these in

2  this case?

3    A.   Yes, sir.  I looked at tens or hundreds.

4         MR. STEVENS:  And I have a list of ones

5  we've put into evidence just as exemplars of these.

6         They are PX 103 through 117, PX 121, PX

7  130, PX 136 to 142, PX 156 to 162, and PX 548 through

8  549, if the jury would later like to see them.

9    Q.   (By Mr. Stevens)  Have you seen evidence that

10  the Defendants in this case have participated in Wi-Fi

11  certification?

12    A.   Well, yes, sir.  The products that are being

13  certified are from the Defendants -- I mean, not all --

14  I mean, there are other products, too, but the

15  Defendants -- the ones that you just mentioned are going

16  to be the Defendants' products.

17    Q.   And as part of doing your report and your

18  analysis, have you seen deposition testimony from

19  representatives of the Defendants where they talk about

20  interoperability testing?

21    A.   Yes, sir.

22    Q.   And I'd like to show you some of that just so

23  we can have you look at what you reviewed in putting

24  your report together.

25    A.   Okay.

1     Q.   And just, you know, read the -- read it and

2   just explain to us what it means.  I'll try to move fast

3   because it may get a little redundant.

4          This is the Defendants -- the deposition of

5   A. J. Wang.  And it's -- although it was a video

6   deposition, we also have a reported transcript, so just

7   in the interest of time, I'm going to use that.  It's

8   from November 14th, 2002.  I'm going to show you Page

9   36.  And I've highlighted a bit of it.

10          Would you go ahead and read that and tell us

11   what it means?

12     A.   Yes, sir.  So this is a representative from

13   D-Link, and he's explaining that the Wi-Fi Alliance

14   takes their products and either the Wi-Fi Alliance

15   itself tests them or it contracts with a lab to test

16   them.  And D-Link would submit a product to the Wi-Fi

17   Alliance to test for compliance, and if the products

18   passed these tests, then they'll become certified.

19     Q.   Let me show you another part of this.  It's

20   from Page 119.  Is D-Link saying that it generally sends

21   all of its products to get certification from the Wi-Fi

22   Alliance?

23     A.   Yes, sir, that's exactly what D-Link is

24   saying.

25     Q.   Now, we also had a deposition of NETGEAR on

1  a -- on the same topic.  This is the deposition of

2  Bhavani Ganesan.  I'm going to show you Page 63.  Is

3  this about the same question and answer about

4  certification, the interoperability value?

5      A.  Yes, sir.  It's going into a little more

6  detail about how the Wi-Fi Alliance operates, but it's

7  saying the same basic idea.

8      Q.  And frequently is it the chipsets that get

9  interoperability tested?

10      A.  Well, no, sir.  The chipsets have to be in a

11  product to really be able to be tested for

12  interoperability.

13      Q.  Okay.

14      A.  So these are -- these are actually the -- in

15  this case, these are the routers.

16      Q.  All right.  And does the Wi-Fi Alliance -- as

17  he says, do you agree they come up with test plans and

18  interoperability programs and the certification program?

19      A.  Yes, sir, that's exactly what they did.

20      Q.  And did the NETGEAR representative say most of

21  their products go through that certification?

22      A.  Yes, sir, that's exactly what he said.

23      Q.  We'll turn next to Belkin, and this is the

24  deposition from November 16th, 2012, of Li-Ter Mike

25  Chen.

1          And was he asked about why do they include a

2    Wi-Fi certification on the package of the product?

3          A.    Yes, sir.  He's explaining that it says that

4    they're certified and, therefore, the product is

5    interoperable.

6          Q.    Let's turn to some of the computer makers.

7    The deposition of Toshiba was taken October 26th, 2012,

8    and the representative was Masa Okumura.

9          A.    Yes, sir.

10         Q.    I believe that this witness was asked:  For

11   all the products you sell in the U.S. with 802.11n

12   functionality, do you make sure they're all certified by

13   the Wi-Fi Alliance?  And what was the response to that?

14         A.    He said for the products that are sold today,

15   that that's exactly what they do.

16         Q.    And that's driven by customer demand?

17         A.    Exactly.

18         Q.    Two more to go.  Let's look at Acer.  This is

19   the November 6th, 2012, deposition of Yung-Sen Lin.

20         The question asked here is:  If Acer products

21   specified 802.11n functionality, wouldn't Acer expect

22   for its manufacturers to provide a chip that conforms

23   with those standards?

24         And the witness said:  We'd require a solution

25   that passes Wi-Fi Alliance testing.

1        A.    Yes, sir, that's what he said.

2        Q.    And then the witness gives a description

3  similar to the other ones about Wi-Fi Alliance has a

4  testing plan.

5        A.    Exactly.

6        Q.    And the last one is Dell.  This is the October

7  18, 2012, deposition of Scott Bamford.  He mentions,

8  doesn't he, that it's an important factor when Dell

9  considers buying chipsets is -- that they're Wi-Fi

10 Alliance certified.

11       A.    Yes, sir.  He's says he's got to have that.

12       Q.    Then at the bottom of Page 37, he says:

13             There's some requirements that 802.11 chipsets

14 have to meet in order for Dell to even consider using

15 them.  And one of them is what?

16       A.    One of them is that they have to be Wi-Fi

17 Alliance certified.

18       Q.    Now, in addition to looking at the Wi-Fi

19 certification testing reports, did you perform testing

20 of the individual chip components for each of the

21 manufacturers in this case that are involved in selling

22 802.11n chipsets?

23       A.    Yes, sir, I did.

24       Q.    Did you test chips from each manufacturer?

25       A.    Yes, sir.

1      Q.   And how many chips approximately did you test

2   per manufacturer?

3      A.   Between two and six.

4      Q.   Did you use an engineering company to perform

5   that work?

6      A.   Yes, sir, I did.

7      Q.   Were the chips tested in a controlled

8   environment?

9      A.   Yes, sir.  That was an important aspect of the

10  testing.

11     Q.   And explain why control -- a controlled

12  environment is an important aspect of the testing.

13     A.   Well, I mean, I'm a scientist.  That's just

14  how you do experiments.  You try to control the

15  variables to the extent that you can, so that your

16  answers aren't dependent on things that you haven't

17  chosen to vary.  And here what I wanted to vary was

18  which chip I was testing, rather than the details of the

19  computer system around that chip.

20     Q.   And so how did you maintain a controlled

21  environment?

22     A.   Many of these chips can be bought in a form

23  that allows you to plug them into something called a

24  mini PCI slot, and so I equipped two desktop computers

25  with an adapter that lets you plug these particular

1  kinds of chips into it.

2          It lets you change the Wi-Fi interface on your

3  laptop.  That's the reason the chip makers package them

4  this way.  And so then I was able to plug the individual

5  chips into exactly the same kind of test arrangement for

6  every chip and run the same tests.

7      Q.   Did you do something to verify that the models

8  of chips you were testing were representative across

9  the -- that manufacturer?

10     A.   Yes, sir.  Besides testing multiple models for

11  a manufacturer, I also had deposition testimony that

12  said that they were representative and that they worked

13  in the same manner.  And I also looked at the source

14  code for the systems.

15     Q.   Okay.  And tell us briefly what the source

16  code is?

17     A.   Source code is the language that human

18  computer programmers write down to create the computer

19  instructions that will be executed inside of these

20  devices.

21          So source code is really what programmers

22  write and read to implement the rule set.  So the way

23  that the rule set really gets into these products is

24  through source code that's then processed to become the

25  actual code inside the machines.

1      Q.   Is the source code anything that we would

2  likely be able, if we looked at it, to understand?

3      A.   If you're a computer programmer.

4      Q.   I'm going to take that as a no.

5      A.   Sorry.

6      Q.   You can read source code, I take it, right?

7      A.   Yes, sir.  I am a very experienced computer

8  programmer.

9      Q.   How long have you been reading source code and

10 programming computers?

11     A.   Well, let's see, I started doing it a few

12 weeks before I turned 18.  I'm 53 so, it's 35 years.

13     Q.   And how many languages do you program in?

14     A.   Over my lifetime, I have programmed in 35 or

15 40 different computer languages.

16     Q.   Is -- was the source code reviewed -- was

17 there -- were there a lot of pages to that?

18     A.   Oh, yes, sir.  Tens of thousands maybe -- I

19 mean, I didn't count them, but maybe even a hundred

20 thousand or 200,000 pages.

21     Q.   I mean, so obviously, that's a huge task.  How

22 did you organize your review?

23     A.   Well, I had a group of computer scientists and

24 programmers who helped me review the source code.

25     Q.   And did they bring you portions for you to

1  analyze that might be relevant to different features?

2      A.   Yes, sir.  They would go and look at -- the

3  source code itself is provided on locked-up machines.

4  They had -- you have to go visit a certain spot and look

5  at it, but they would -- they would print parts of the

6  source code and I would look at it and, you know, they

7  would go -- we would go back and forth about it.

8      Q.   And one wrap-up before we move on to the first

9  patent, and that is do you feel you had sufficient

10  information and data upon which to form your opinions in

11  this case?

12      A.   Oh, yes, sir.  I mean, I think that in this

13  analysis, especially since I was able to start with the

14  standard as the basis, I was able to double-check and

15  even triple-check my conclusions.

16              THE COURT:  All right.  Mr. Stevenson,

17  it's a little past 4:00.  If you're at a stopping place,

18  I think we'll quit for the day.

19              MR. STEVENSON:  I am, Your Honor.

20              THE COURT:  All right.  Very well.

21              Let me ask before we recess, this morning

22  Plaintiffs had an exhibit list.  Would you like to get

23  that taken care of before we adjourn?

24              MS. MOORE:  I have for you an exhibit

25  list titled:  Plaintiffs' Pre-admitted Exhibit List for

1  June 4th, 2013.  I believe we have given a copy to

2  Defendants' counsel who has been able to look over it

3  since lunch.

4              THE COURT:  All right.  That will be

5  marked as Plaintiffs' Exhibit List No. 2.

6              Are there any objections to the exhibits

7  listed on that list?

8              MR. DE VRIES:  There are not, Your Honor.

9              THE COURT:  All right.  Those exhibits

10 are admitted.

11             Do Defendants have any other exhibits to

12 offer at this time?

13             MR. DE VRIES:  We do not, Your Honor.

14             THE COURT:  All right.  Very well.

15             All right.  Ladies and Gentleman of the

16 Jury, thank you very much for your attention today.

17 You've been a very attentive jury.  You've been taking

18 notes and paying attention, and I know both parties and

19 the Court greatly appreciates that.

20             It's been a long day.  You're not quite

21 as bright-eyed as you were at 9 o'clock this morning,

22 but that's understandable.  So I hope you'll have a

23 restful evening.  Get a good night's sleep.  Don't think

24 about this case.  Don't talk about it.  Don't do any

25 research and follow my instructions and we'll see you

1  back here at 9 o'clock in the morning.

2                    The jury is excused.

3                    COURT SECURITY OFFICER:  All rise.

4                    (Jury out.)

5                    THE COURT:  All right.  Please be seated.

6                    All right.  Let me give the parties their

7  time.

8                    The Plaintiff has expended 4 hours and 35

9  minutes, and Defendants have expended 2 hours and 5

10  minutes.

11                   Are there any other matters from the

12  Plaintiff before we adjourn?

13                   MR. CAWLEY:  No, Your Honor.

14                   THE COURT:  From the Defendants?

15                   MR. VAN NEST:  Your Honor, I just have

16  one question.  We're looking forward to the start of our

17  case and trying to plan for witnesses.  Is it Your

18  Honor's intention to be off on Friday?

19                   THE COURT:  Yes, uh-huh.

20                   MR. VAN NEST:  So we will not be putting

21  any testimony on on Friday?

22                   THE COURT:  That's correct.

23                   MR. VAN NEST:  Thank you, Your Honor.

24                   THE COURT:  Okay.  All right.  Unless

25  anybody wants to work on Friday.

1                    MR. VAN NEST:  I'll be working.

2                    THE COURT:  No.  I think we'll do that.

3    We've done that the last few cases, and I think the

4    feedback I've gotten from the attorneys, they appreciate

5    a little abbreviated week.  And I know the jury does.

6    And so we'll try that again this time.

7                    All right.  Very well.  We'll be

8    adjourned till tomorrow morning.

9                    COURT SECURITY OFFICER:  All rise.

10                   (Court adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144

```
 1                    CERTIFICATION

 2

 3              I HEREBY CERTIFY that the foregoing is a

 4    true and correct transcript from the stenographic notes

 5    of the proceedings in the above-entitled matter to the

 6    best of our abilities.

 7

 8

 9    /s/ Shea Sloan
      SHEA SLOAN, CSR
10    Official Court Reporter
      State of Texas No.:  3081
11    Expiration Date:  12/31/14

12

13

14    /s/ Judith Werlinger
      JUDITH WERLINGER, CSR
15    Deputy Official Court Reporter
      State of Texas No.:  731
16    Expiration Date  12/31/14

17

18

19

20

21

22

23

24

25
```