1

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                        TYLER DIVISION

3
    ERICSSON, INC., ET AL          )
4                                       DOCKET NO. 6:10cv473
        -vs-                       )
5                                       Tyler, Texas
                                   )   9:00 a.m.
6   D-LINK CORPORATION, ET AL          June 6, 2013

7

8                     TRANSCRIPT OF TRIAL
                        MORNING SESSION
9           BEFORE THE HONORABLE LEONARD DAVIS,
        UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY
10

11                    A P P E A R A N C E S

12

13  FOR THE PLAINTIFFS:

14
    MR. THEODORE STEVENSON, III
15  MR. DOUGLAS A. CAWLEY
    McKOOL SMITH
16  300 Crescent Court, Ste. 1500
    Dallas, Texas  75201
17

18  MR. JOHN B. CAMPBELL, JR.
    McKOOL SMITH
19  300 W. 6th Street, Suite 1700
    Austin, Texas  78701
20

21  COURT REPORTERS:      MS. JUDITH WERLINGER
                          MS. SHEA SLOAN
22                        shea_sloan@txed.uscourts.gov

23
    Proceedings taken by Machine Stenotype; transcript was
24  produced by a Computer.

25
```

2

1  FOR THE DEFENDANT:

2
   MR. GREGORY S. AROVAS
3  KIRKLAND & ELLIS, LLP
   601 Lexington Avenue
4  New York, New York 10022

5

6  MR. LUKE DAUCHOT
   KIRKLAND & ELLIS, LLP
7  333 S. Hope Street
   29th Floor
8  Los Angeles, California  90071

9

10 MR. ADAM ALPER
   KIRKLAND & ELLIS, LLP
11 555 California St.
   24th Floor
12 San Francisco, California  94104

13

14 MR. MICHAEL E. JONES
   POTTER MINTON, PC
15 110 N. College, Ste. 500
   P.O. Box 359
16 Tyler, Texas  75710-0359

17

18 MR. ROBERT A. VAN NEST
   KEKER & VAN NEST, LLP
19 633 Sansome St.
   San Francisco, California 94111
20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                (Jury out.)

 3                COURT SECURITY OFFICER:  All rise.

 4                THE COURT:  Please be seated.

 5                All right.  Mr. Jones, I understand

 6  there's an issue.

 7                MR. JONES:  I believe there are two

 8  issues, Your Honor.

 9                Mr. Bone -- first thing, we just need

10  some guidance from the Court.  Mr. Bone and I tried to

11  coordinate our examination, and what I believe we

12  have -- and you certainly correct me if I'm wrong -- is

13  when he gets through with the sealed portion, there will

14  be about 10 minutes for him to wrap up.  He asked me

15  about mine; and as we were coordinating, I said I have

16  about 5 to 10 minutes to introduce me getting back into

17  the sealed --

18                THE COURT:  Could you speak to the

19  microphone?

20                MR. JONES:  I'm sorry, Your Honor.  I

21  apologize.

22                Then I have about 5 to 10 minutes

23  introduction before I get into the sealed portion of

24  those license agreements.

25                THE COURT:  Oh, okay.
```

1            MR. JONES:  Our suggestion, and it's

2   merely a suggestion, was that you might want to keep it

3   sealed the entire time so we don't run in and run out.

4            But we were just wanting to inform the

5   Court of -- that we had coordinated, and that was kind

6   of the time that we were going to be looking at.

7            THE COURT:  Okay.  Well, I'm not a fan of

8   sealing the courtroom.

9            MR. JONES:  I understand, Your Honor.

10            THE COURT:  So we're not going to keep it

11   sealed when it doesn't need to be sealed.

12            MR. JONES:  Okay.  Thank you, Your Honor.

13            THE COURT:  That's how we'll deal with

14   that.

15            MR. JONES:  And -- and one other thing.

16            Obviously, we are now going into

17   testimony about the licenses that we have contended are

18   not comparable as broad general cross-licenses for the

19   reasons set out in our Motion in Limine and Dauberts --

20   further reasons besides the fact that they are broad

21   general cross-licenses.

22            We are also about to commence testimony

23   about calculations for royalty rates from these, and

24   they're based on the price of the products in total and

25   percentage royalties and caps.  And we believe that that

1   is improper for violating the entire market value rule

2   and testimony about improper apportionment.

3            For those reasons, we are going to object

4   to that testimony.

5            But instead -- and we already know Your

6   Honor's ruling -- and in light of your rulings on the

7   Dauberts and Motions in Limines, but we would ask for a

8   continuing objection so we don't have to object to all

9   those questions.

10            THE COURT:  Any objection to that?

11            MR. CAMPBELL:  No, Your Honor.

12            THE COURT:  All right.  You may have the

13   continuing objection.

14            MR. JONES:  Thank you, Your Honor.

15            THE COURT:  All right.  Anything further

16   before we bring the jury?

17            (No response.)

18            THE COURT:  All right.  Bring the jury

19   in.

20            COURT SECURITY OFFICER:  All rise.

21            (Jury in.)

22            THE COURT:  Please be seated.

23            Good morning, Ladies and Gentleman of the

24   Jury.  Y'all always look so much better in the morning

25   than you do in the afternoon, and it's understandable.

 1              All right.  You may -- may proceed,

 2   Counsel.

 3              MR. CAMPBELL:  Thank you, Your Honor.

 4      JOHN BONE, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

 5              CROSS-EXAMINATION (CONTINUED)

 6   BY MR. CAMPBELL:

 7      Q.   Mr. Bone, you might just remind the jury where

 8   we're at in terms of what we discussed yesterday and

 9   where we're headed now.

10      A.   I believe where we left off is we were just

11   about to go into the license agreements that Ericsson

12   has entered into with a number of other companies to

13   license their technology.

14      Q.   Okay.

15              MR. CAMPBELL:  And, Your Honor, at this

16   point, we need to go into the financial terms of those

17   licenses which have all been designated attorneys' eyes

18   only.

19              THE COURT:  All right.  At this time

20   we'll seal the courtroom.  If you're not an attorney or

21   an expert witness who is subject to the protective order

22   that's been entered in this case, then you need to leave

23   the courtroom at this time.  We'll let you know when you

24   can come back in.

25              So please leave the courtroom if you're

1  not covered by the Court's protective order.

2                 (Pause.)

3                 THE COURT:  I'm glad none of you jurors

4  tried to leave.

5                 [Laughter]

6                 (Courtroom sealed.)

7                 (Sealed Portion No. 4 of the Trial

8                 filed under separate cover.)

9                 (Courtroom unsealed.)

10                 THE COURT:  You may proceed.

11                 MR. CAMPBELL:  Thank you, Your Honor.

12     Q.  (By Mr. Campbell)  Okay, Mr. Bone.  So let's

13  talk about one last factor.  You talked about it

14  yesterday -- what a hypothetical negotiation entails and

15  what a real-world negotiation entails.

16           How does the differences there affect where

17  you believe the parties would settle within the range of

18  rates that you calculated?

19     A.   So in the real-world negotiations, there was

20  no assumption of validity infringement, so each of the

21  companies, Buffalo, RIM, HP, walked into the negotiation

22  not assuming that they infringed valid patents.

23           In the hypothetical negotiation, as I've said

24  earlier, they would walk into the room knowing that they

25  infringed valid patents, and that would have the effect

1  of increasing the rate.

2          An analogy?

3      Q.   Yeah.  What -- do you have an analogy to

4  explain that?

5      A.   I think a helpful analogy to think of this is

6  that right now the Defendants have said that they --

7  they don't infringe the technology.  And so if you put

8  them in a room today, they probably wouldn't agree to,

9  you know, come up with a rate, or they'd be very -- they

10  would be willing to pay only a very small amount.

11          But if you put the -- if after the trial and

12  if -- let's assume that the jury finds that the patents

13  are valid and infringed; and if you put the Defendants

14  in a room with Ericsson knowing that they infringe valid

15  patents, that would change how much they would be

16  willing to pay.  That would increase the amount that

17  they would be willing to pay for the technology.

18      Q.   Okay.  So you have these real-world licenses.

19  You took those into consideration.  You made a number of

20  adjustments for comparability.  Considered a number of

21  other factors.

22          After all that work, did you determine a

23  reasonable royalty that Ericsson and the Defendants

24  would agree to?

25      A.   I did.

1          So based on that, I concluded that a royalty

2     rate for the routers would range from 34 cents to 59

3     cents; and that the royalty rate for the computer

4     Defendants would range from 25 cents to 88 cents.

5          Q.   And did you determine where within that range

6     you believe the reasonable royalty would fall?

7          A.   Well, I believe -- anywhere within that range,

8     I think, is reasonable.  I think a reasonable

9     conclusion, though, is the 50-cent reference rate that

10     Ericsson has.  And I think -- and that's squarely within

11     the middle of the rates.

12          Q.   Okay.  Now, let's just question that for a

13     minute.  The -- the licenses we talked about, we don't

14     want to go into the financial details, but those were

15     for an entire portfolio.

16          This case has five patents-in-suit.  Does that

17     make sense that the reference rate of 50 cents for an

18     entire portfolio and the rate for five patents-in-suit

19     would be the same?

20          A.   Well, on the face it doesn't sound like it,

21     but it does when you consider the difference between the

22     assumptions you have to make in a hypothetical.  And

23     there are a number.

24          For example, as -- as you've said, you'd have

25     to make some adjustment for the fact that we're only

1  dealing with five patents, as opposed to the whole

2  portfolio.  Now, that would have a downward adjustment

3  to the rate.

4          But there are several factors that would

5  increase the rate to go up.  For example, they're only

6  getting the U.S. rights, which are the more valuable

7  rights.  That would tend to increase the rate.

8  They would not be getting grant-back, so that would have

9  to increase the rate again.

10         And -- and then the difference between the

11 hypothetical and the real world, the whole assumption

12 about walking into the room knowing that they infringe

13 valid patents, that would tend to increase the rate even

14 more.

15         So it's my opinion, based on my analysis, that

16 I think a 50-cent rate under the hypothetical is a

17 reasonable conclusion for the five patents-in-suit.

18     Q.   Okay.  Okay.  So now that we have a royalty

19 rate, we need a royalty base; is that right?

20     A.   That's correct.

21     Q.   Okay.  And what did you determine the royalty

22 base is in this case?

23     A.   So based on the records that the Defendants

24 provided, I determined the actual devices that used

25 the -- that infringed the technology, and they amount to

1  what you see here in the tables.

2         So, for example, D-Link, over the period of

3  time, sold 2.9 million routers.

4     Q.   Okay.  And is this -- is this all the Wi-Fi

5  products that the Defendants have sold?

6     A.   No.

7     Q.   Okay.  Well, when does this start?  When did

8  you start calculating the royalty base?

9     A.   So this calculation only begins when the

10  Defendants receive notice from Ericsson that they

11  infringed every single patent in this case.  So they

12  actually were selling products before then, but I've

13  only included those sales after they were informed that

14  they infringed the patents.

15     Q.   Well, can a company infringe a patent even if

16  it's not on notice of the patent?

17     A.   That's my understanding.

18     Q.   Okay.  But how many of these -- how many of

19  these devices in your list here are before the

20  Defendants had notice?

21     A.   None.

22     Q.   Okay.  Okay.  And we don't need to read this

23  into the record, but we do need to read into the record

24  the exhibits that this comes from, and this comes from

25  PX 499 to 502, 508, 510, 541, 553, 554, 557 through 561;

1  is that correct?

2      A.   That's correct.

3      Q.   Okay.  Okay.  Now, let's make sure -- you

4  talked yesterday about a number of factors that you need

5  to consider in your reasonable royalty analysis.  Do you

6  recall that?

7      A.   I do.

8      Q.   Okay.  Let's make sure we cover all of those

9  and have considered all of those.

10         Have you considered the royalty rates paid for

11  the use of the patents by other companies that have

12  permission to use Ericsson's Wi-Fi patents?

13     A.   I have.  That's a lot of what we've been

14  talking about.

15     Q.   Okay.  What about royalty rates for comparable

16  patents paid by the infringer, have you considered that?

17     A.   Yes, I did.  The Defendants produced 400

18  agreements -- license agreements, and there were license

19  agreements with a handful of companies that licensed

20  Wi-Fi technology.  And based on my review of those

21  license agreements, I did not find those to be

22  comparable.

23     Q.   Okay.  What about the nature and the scope of

24  the license, did you consider that factor?

25     A.   Yes.  So we've talked about that to some

13

1  extent.  This is going to be a non-exclusive license,

2  and it would only be for world -- excuse me, U.S.

3  rights.

4       Q.   Okay.  How about Ericsson's licensing

5  policies, did you consider that?

6       A.   Yep, we talked about that.  We talked about

7  the fact that they have a RAND commitment, and we also

8  talked about the reference rate.

9       Q.   Okay.  What about the commercial relationship

10 between Ericsson and the infringer Defendants?

11      A.   Well, we haven't talked about that

12 specifically, but that's something I considered.

13 Ericsson and the Defendants do not compete and -- but --

14 but the -- Ericsson's licensees, the companies that

15 entered into the license agreements do -- do compete

16 with the -- with the Defendants.

17      Q.   Okay.  How about the profitability, success,

18 and popularity of the products covered by the patents?

19      A.   Yes, I have considered that.  That -- this

20 factor is accounted for when you look at the market

21 rates.  The market rates consider this factor.

22      Q.   Okay.  What about the advantages over prior

23 devices and benefits of the patented invention?

24      A.   Yes.  In the same way, the market rates

25 account for these very factors.

14

1    Q.   Okay.  What about the extent of use of the

2  patents by the infringer?

3    A.   So we just talked about that.  That would be

4  the royalty base with the number of infringing units

5  that the Defendants sold.

6    Q.   Okay.  And what about the portion of the

7  profit due to the invention?

8    A.   That would also be accounted for in the market

9  rates.

10   Q.   Okay.  And what about the duration of the

11 patents?

12   A.   So patents generally have a 20-year life, and

13 based on the date of filing, they expire between 2016

14 and 2020.

15   Q.   Okay.  Okay.  So let's wrap it up.  You

16 calculated a reasonable royalty rate, you've calculated

17 a royalty base.  How do we determine the total

18 reasonable royalty?

19   A.   So in this example, we have -- or in this

20 slide we have a calculation where we've applied the

21 50-cent rate to the infringing sales.  So in this case,

22 let's use D-Link as an example.  You take 2.9 million

23 routers -- infringing routers that were sold, multiply

24 it by the 50 cents per unit to get 1.4 million in

25 royalties due -- or damages.

1     Q.    Okay.  And this might be a little bit tedious,

2    but we need a clear record.  How does that work out for

3    the rest of the Defendants?  Can you go through that for

4    me?

5     A.    Sure.

6           So for Belkin, if you take the 4 million

7    routers -- infringing routers multiplied by the 50

8    cents, you get $2 million.

9           For NETGEAR, if you take the 23.7 million

10    routers, multiply it by 50 cents, you get 11.8 million.

11           For Acer/Gateway, if you take the 7.8 million

12    computers that infringe, multiply it by 50 cents, you

13    get $3.9 million.

14           For Dell, if you take 12.8 million computers,

15    multiply it by 50 cents, you get 6.4 million.

16           And for Toshiba, if you take the 16.3 million

17    computers, multiplied by 50 cents per unit, you get 8.1

18    million.

19     Q.    Thank you, Mr. Bone.

20     A.    Thank you.

21           THE COURT:  All right.

22           Cross-examination.

23           MR. JONES:  Thank you, Your Honor.

24           Here, you wanted another notebook, didn't

25    you?

```
1                THE WITNESS:  Yeah.  Thank you.

2                MR. JONES:  There you go.

3                Your Honor, for the Court.

4                THE COURT:  Thank you.

5                MR. JONES:  Mr. Campbell.

6                      CROSS-EXAMINATION

7  BY MR. JONES:

8      Q.   Good morning, Mr. Bone.  Welcome to Texas.

9      A.   Thank you.  Good morning.

10     Q.   I'd like to just first start out with kind of

11 making sure we talk about the process we've been through

12 and make sure the jury understand it.

13          You were hired by the Plaintiffs to be their

14 expert in this case, right?

15     A.   That's correct.

16     Q.   Then you do a lot of work, look at thousands

17 of documents, right, sir?

18     A.   That's correct.

19     Q.   Then you form your opinions, right, sir?

20     A.   Yes, sir.

21     Q.   And then the next step is you write reports,

22 and I think it happened in the early part of this year.

23 You write reports that fully and accurately set forth

24 your opinions and the basis therefor, right, sir?

25     A.   That's correct.
```

1      Q.    So when I refer to your reports, that's what

2   I'm referring to; fair enough?

3      A.    Fair enough.

4      Q.    Okay.  And then after that, you give a

5   deposition and you were kind enough -- you hosted me in

6   Chicago like I'm hosting you in Tyler today, right, sir?

7      A.    Yes, sir.

8      Q.    It was colder then, wasn't it?

9      A.    It was.

10      Q.    And I took your deposition, and I was given

11   the opportunity to ask you questions about your

12   opinions, right, sir?

13      A.    Yes, sir.

14      Q.    And we -- and when we refer to your

15   deposition, that's what we're talking about, right?

16      A.    Correct.

17      Q.    Okay.  Great.  Now, another kind of

18   housekeeping deal.  Make sure we all understand it.

19            You've assumed that the patents are valid and

20   infringed, right?

21      A.    That's correct.

22      Q.    You have no dog in that fight, no opinion on

23   that, right, sir?

24      A.    That's correct.

25      Q.    Okay.  But you've assumed that.

1          And you would agree with me that if a patent's

2  invalid, then damages are zero, right, sir?

3      A.   That's correct.

4      Q.   And if a patent is not infringed, then damages

5  for that patent are zero, right, sir?

6      A.   That's correct.

7      Q.   Thank you, sir.

8          Now, you have talked about your rates.  And in

9  your report you stated a range of rates, right?

10     A.   That's correct.

11     Q.   And in your report, you said that for Belkin,

12 NETGEAR, and D-Link -- and those are those router

13 Defendants, right, sir?

14     A.   That's correct.

15     Q.   -- that the lowest of the range of reasonable

16 royalty rates would be 34 cents.  Do I have that right?

17     A.   That's correct.

18     Q.   Okay.  Now, with regard to the computer

19 Defendants, Acer, Dell, and Toshiba, you told us in

20 their reports that the lowest royalty -- reasonable

21 royalty that you saw in that range would be 25 cents per

22 unit, right, sir?

23     A.   That's correct.

24     Q.   Thank you, sir.

25         Now, this chipset right here, this is a Wi-Fi

1   chip.  You've seen these before.  You've been in the

2   courtroom, right, sir?

3       A.   I have, yes.

4       Q.   This is one made by Intel, and it costs about

5   $2.50, right, sir.

6       A.   That's my understanding.

7       Q.   Okay.  Thank you, sir.

8            Now, Dr. Nettles yesterday, he told us, did he

9   not, that it was the chips that were at issue in this

10  case, right, sir?

11      A.   I believe that was his testimony.

12      Q.   And he also told us that when you want to

13  decide whether or not these patents that you're talking

14  about, these five patents are infringed, it was the

15  chips that he tested, right, sir?

16      A.   I believe that's correct, yes.

17      Q.   And with regard to 802.11n Wi-Fi, that's where

18  all the magic takes place.  I don't understand it all;

19  maybe you do.  But that's where the magic takes place

20  for 802.11n Wi-Fi; it's on this chip, right, sir?

21      A.   I'm not a technical person, but that is my

22  understanding.

23      Q.   Okay.  So if we want that laptop, like the one

24  you got in front of you right here, to do Wi-Fi, it's

25  got to have one of these chips in it --

1      A.   That's --

2      Q.   -- fair enough?

3      A.   Fair enough.

4      Q.   Okay, great.

5           Now, with regard to this particular chip, in

6  your deposition, you told me that the lowest possible

7  reasonable royalty for it could be as low as 25 cents,

8  right, sir?

9      A.   That's correct.

10     Q.   Thank you, sir.

11          Now, at this point in time, are you telling me

12 that the reasonable royalty for this chip should be 50

13 cents?

14     A.   Yes.

15     Q.   So your -- your position is that the

16 reasonable royalty for this chip that costs $2.50, it

17 should be 50 cents, right, sir?

18     A.   It's within my range, yes.

19     Q.   Okay.  And, in fact, you're also saying --

20 because there's -- you know, again, about procedures in

21 this case, there's another expert that's going to

22 testify in this case, Dr. Perryman, right?

23     A.   Correct.

24     Q.   And he's an economist, right, sir?

25     A.   I don't recall his credentials.

1    Q.   Okay.  Great.  No problem.  We'll let him do

2  that.

3         Okay.  But his royalty rate for this chip is

4  around a penny, right, sir?

5    A.   That's what I understand, yes.

6    Q.   So your royalty rate is 50 times his royalty

7  rate; is that correct?

8    A.   I'll trust your math.

9    Q.   Okay.  Great.

10        Now, did you do any analysis of the gross

11  profit margin concerning this chip?

12   A.   No, sir.

13   Q.   Did you do any analysis of the net profit

14  margin concerning this chip?

15   A.   No, I did not.

16   Q.   Now, at the time of your deposition, did you

17  tell me that you had not determined the highest royalty

18  rate that could be charged by Ericsson that would meet

19  its RAND obligations?

20   A.   I think that's correct.

21   Q.   Okay.  You've made no determination like that,

22  right, sir?

23   A.   No.

24   Q.   Thank you.

25             MR. JONES:  Now, Your Honor, I need to go

1    into the license agreements at this time and would

2    request that the courtroom be sealed.

3               THE COURT:  We'll seal the courtroom

4    again, with the Court's apologies.  If you're not

5    covered by the protective order that's been entered in

6    this case, you need to leave the courtroom at this time.

7               (Pause.)

8               (Courtroom sealed.)

9               (Sealed Portion No. 5 of the Trial

10              filed under separate cover.)

11              (Courtroom unsealed.)

12              MR. JONES:  May I begin, Your Honor?

13              THE COURT:  Yes, you may.

14              MR. JONES:  Thank you, sir.

15    Q.   (By Mr. Jones) Now, the next issue I'd like to

16    talk about just a little bit is a royalty stacking.

17              When we talk about royalty stacking, what are

18    we talking about?

19    A.   Royalty stacking is an issue -- or can be an

20    issue if there are numerous companies that have patents

21    on a particular technology and a company has to take

22    licenses from everybody that has patents on that

23    technology.

24    Q.   Thank you, sir.

25              Now, in your report, you conclude that with

1  regard to this matter, royalty stacking is a

2  theoretical, not an actual issue; is that right?

3      A.   That is correct.

4      Q.   Now, let's talk about that just for a second.

5  You know that in the 802.11 standard process -- you've

6  heard the testimony, as the jury -- that certain

7  companies, during the process, will give letters of

8  assurances that say:  We will license our patents.

9          You know that, don't you, sir?

10     A.   Yes.

11     Q.   How many companies wrote letters of assurance

12  concerning 802.11-compliant chips?

13     A.   A lot.  I don't remember the number offhand.

14     Q.   Okay.  In Dr. Perryman's report -- again, he's

15  the economic expert for the Defendants.  You know Dr.

16  Perryman.  You've seen his reports, right?

17     A.   Yes, I have.

18     Q.   Okay.  He said that there were 121 companies

19  that wrote 274 letters of assurance.  Does that sound

20  right?

21     A.   I'll take your word for it.

22     Q.   Thank you.

23          Now, how many wrote letters of assurances for

24  802.11n?

25     A.   I don't recall offhand.

1    Q.    Okay.  He said in his report 32 companies with

2    32 letters of assurance.  Does that sound right -- about

3    right?

4    A.    That sounds -- that sounds about right.

5    Q.    How many -- let me ask you this:  How many

6    patents were declared essential in that process to

7    802.11 through those letters?  Do you know that figure?

8    A.    Some are blanket, so you can't really tell,

9    but there were a lot.

10    Q.    Okay.  He said at least 977.  Do you disagree

11    with that?

12    A.    No.

13    Q.    Okay.  Then how many patents were declared

14    essential to the 802.11n standard in those letters of

15    assurance?

16    A.    A lot were declared by the companies, yes.

17    Q.    He said at least 233.  Would you agree with

18    that?

19    A.    I'm trying to recall his analysis, but I

20    believe that's what he said.

21    Q.    Okay.  Now, with regard to -- and do you

22    disagree with that figure?  Do you contest that figure,

23    that there are 233 patents that have been declared -- at

24    least that have been declared essential to 802.11n?

25    A.    Again, I'd have to see his analysis to confirm

1  that.  I know he had -- he made some estimates, and

2  without seeing it, it's hard for me to say.

3       Q.   Is that -- is that figure in the ballpark?

4       A.   I don't know.

5       Q.   Okay.  All right.  Fair enough.

6            Well, let's move on then.  Let me -- let me

7  ask you this:  You would agree with me, when we look at

8  the standard, we don't see in the standard a list of all

9  the patents that apply, right?

10      A.   That's correct.

11      Q.   And you would also agree with me that we can't

12 go to any minute of a committee meeting of the 802.11

13 where they list all the patents that apply to their

14 standards, right?

15      A.   That's correct.

16      Q.   Okay.  Now, did you -- in all of your work on

17 damages and the aspects of these products, did you

18 determine the Defendants' contribution to 802.11?

19      A.   In part, through the analysis of the rates

20 that other companies were willing to pay.

21      Q.   Well --

22      A.   So to some extent, yes.

23      Q.   Well, let's go -- let's -- do you remember we

24 talked about that on your deposition?

25      A.   Vaguely.

1      Q.    Okay.  Great.  Well, let's try to remind you.

2                   MR. JONES:  Let's go to Slide 2?

3      Q.    (By Mr. Jones) And if go to Slide 2, during

4  your deposition, I asked you:  Were any of the

5  Defendants involved in the 802.11 standard-making

6  process before the IEEE?

7            And I'm saying -- I'm just trying to think

8  through what I recall from that.  Does your report

9  discuss that at all?

10            And you said:  I don't believe it does, right?

11      A.    That's correct.

12      Q.    All right.  Thank you, sir.

13            Do you know what standard essential patents

14  were declared by the Defendants during this process?

15      A.    During which process?

16      Q.    802.11 -- 802.11n.  Let's go to it

17  specifically, since that's what we're dealing with in

18  this case.

19      A.    I believe it was a blanket -- blanket

20  disclosure.

21      Q.    And do you know which Defendants made that?

22      A.    I'm sorry.  I may have misunderstood your

23  previous question.

24      Q.    Do you know which Defendants declared certain

25  essential patents and wrote letters of assurance?

1      A.   I believe all of them did.

2      Q.   Thank you, sir.

3            THE COURT:  Mr. Jones, let me ask you,

4  how much longer you would anticipate?

5            MR. JONES:  Well, a little bit, Your

6  Honor.

7            THE COURT:  All right.  Why don't we go

8  ahead and take our morning break at this time then.

9            We'll be in recess until 10:35.

10           COURT SECURITY OFFICER:  All rise.

11           (Jury out.)

12           (Recess.)

13           COURT SECURITY OFFICER:  All rise for the

14  jury.

15           (Jury in.)

16           THE COURT:  Please be seated.

17           All right.  You may proceed, Mr. Jones.

18           MR. JONES:  May it please the Court.

19     Q.   (By Mr. Jones) We were talking about 802.11n

20  essential patents.  You do not have an opinion on

21  Ericsson's actual share of 802.11n patents, right, sir?

22     A.   That's correct.

23     Q.   And you also have expressed no opinion in your

24  report or your deposition about the actual share of the

25  patents on 802.11n that are owned by the Defendants,

1  right, sir?

2      A.   That's correct.

3      Q.   Now, we do know --

4           MR. JONES:  Could we bring up Slide 6?

5      Q.   (By Mr. Jones) This is a document -- it's

6  Defendant's Exhibit 81.  And it's from a presentation

7  that was made by Ericsson.  It's called their WLAN

8  Licensing Strategy, and it's dated May the 13th, 2012.

9           And you've looked at these documents of

10  Ericsson, right, sir?

11      A.   I have.

12      Q.   Okay.  And it says that wireless local area

13  network patents are mainly held by chipset suppliers,

14  right?

15      A.   That's what it says, yes.

16      Q.   So expressed in this document, that's their

17  view, right, sir?

18      A.   That's correct.

19      Q.   Thank you, sir.

20           MR. JONES:  And you can take that down.

21      Q.   (By Mr. Jones) Now, if we assume that there

22  are five patent holders that have patents applicable to

23  this chip, and they all get a 50-cent rate, like you're

24  calculating for Ericsson, that would come out to be

25  collective royalties of $2.50, right, sir?

1    A.    If they each got 50 cents, yes.

2    Q.    Okay.  Great.

3          And if we were to assume that there are 32

4    companies that gave letters of assurance, and each of

5    those companies got a 50-cent rate for their patents,

6    then the royalties from those patents collectively would

7    be $16 on this chip, right?

8    A.    If those assumptions held --

9    Q.    Yeah.

10   A.    -- that would be true.

11   Q.    Sure.

12         And if we were to assume that there are 233

13   patents and they each get 10 cents per patent per unit

14   royalty rate, then on this particular chip, those

15   royalties total -- total -- totally would be $23.30,

16   right?

17   A.    If those assumptions held, that would be the

18   case, yes.

19   Q.    And this chip, as we've already established,

20   costs $2.50, right, sir?

21   A.    At the current price, I think that's correct.

22   Q.    Thank you, sir.  I appreciate it.

23         Now, you looked at 400 licenses from the

24   Defendants; and you, as the Plaintiffs' expert, found

25   none of them instructive to you on your rate, right,

1  sir?

2      A.   That's right.

3      Q.   Thank you, sir.

4           Now, you've read the depositions of the

5  inventors, right, sir?

6      A.   Yes, sir.

7      Q.   Okay.  You've also heard their testimony,

8  correct?

9      A.   Yes.

10     Q.   Okay.  Now, in all of the documents that you

11  reviewed, you've not cited to anything in your report

12  where the inventors valued their patents, right, sir?

13     A.   That's correct.

14     Q.   Thank you, sir.

15          Now, there's another expert that's going to

16  testify in this case, a Mr. Matthew Shoemake.  And

17  you've read his reports, right?

18     A.   I have.

19     Q.   And he has extensive experience with regard to

20  IEEE committee meetings and things like that, right,

21  sir?

22     A.   I think that's fair to say.

23     Q.   Thank you, sir.

24          At your deposition, you could tell me nothing

25  in his report that was factually incorrect about how he

1  said the IEEE viewed RAND, right, sir?

2      A.   That's correct.

3      Q.   Thank you, sir.

4           Now, finally, laptops have many components and

5  many features, right, sir?

6      A.   Yes.  I said that earlier, yes.

7      Q.   Right.  Thank you, sir.

8           And you've done no survey-type analysis to

9  show us which of those components or which of those

10  features drive sales, right, sir?

11      A.   That is correct.

12      Q.   Okay.  Same thing's true about routers.  They

13  have numerous features, correct?  I think you and I, at

14  your deposition, agreed there were lots of features;

15  fair enough?

16      A.   We did agree to that, yes.

17      Q.   And you've done no survey work or that type of

18  analysis to determine what drives sales for routers,

19  right, sir?

20      A.   That's correct, because I didn't need to.

21      Q.   And then finally, you agree with me that these

22  chips, they have features beyond the patented features,

23  correct?

24      A.   I agree.

25      Q.   Okay.  And you've done no survey work or other

32

1  type of analysis to determine what drives sales of these

2  chips, right, sir?

3       A.   That's correct.

4       Q.   Thank you, sir.

5            MR. JONES:  Your Honor, I pass the

6  witness.

7            THE COURT:  All right.  Redirect?

8            MR. CAMPBELL:  Thank you, Your Honor.

9            Mr. Jones, can I borrow your exhibit?

10           MR. JONES:  You sure can.

11           If you lose it, you owe me $2.50.

12           MR. CAMPBELL:  $2.50.  All right.

13                 REDIRECT EXAMINATION

14  BY MR. CAMPBELL:

15      Q.   $2.50, Mr. Jones says I would owe him for

16  this.  Let's say I don't lose it, and he sells me this

17  chip for $2.50, what can I do with this?

18      A.   Not much, unless you put it in something.

19      Q.   Need to build a computer or a router, don't I?

20      A.   That's correct.

21      Q.   I -- well, what -- well, if I just put this on

22  this table, take it home, what's it going to do for me?

23      A.   Not much.

24      Q.   $2.50.

25           Remind me, when does the hypothetical

1 negotiation take place?

2     A.   It would have occurred in 2007 when the

3 Defendants first started using the products that

4 infringe the patents.

5     Q.   2007.

6          And what did Intel sell an 802.11n chip for in

7 2007?

8     A.   $29.

9     Q.   $29?

10    A.   Yes.

11    Q.   Not $2.50?

12    A.   No.

13    Q.   HP, do they use some of Intel's chips?

14    A.   Yes, they do.

15    Q.   Okay.  I want to go back to following the

16 money.

17    A.   Uh-huh.

18          MR. CAMPBELL:  Unfortunately, Your Honor,

19 to follow the money, we have to get into the

20 confidential information of the licenses.  I apologize.

21          THE COURT:  All right.  We'll seal the

22 courtroom again.  And if you're not covered by the

23 protective order that's been entered in this case, you

24 will need to leave the courtroom again during this

25 testimony.

```
 1                    (Pause.)

 2                    (Courtroom sealed.)

 3                    (Sealed Portion No. 6 of the Trial

 4                    filed under separate cover.)

 5                    (Courtroom unsealed.)

 6                    THE COURT:  All right.  Counsel, if you

 7   would please approach.

 8                    (Bench conference.)

 9                    THE COURT:  I have a question that's

10   crossed out.  I won't read it, but the one that's not

11   crossed out is:  Not the chip hardware, but the software

12   is the issue, correct?

13                    MR. JONES:  I don't think he knows that.

14                    MR. CAMPBELL:  It's more of a technical

15   question.

16                    THE COURT:  Huh?

17                    MR. CAMPBELL:  It's more of a technical

18   question.  He's not going to know the answer to that.

19                    (Bench conference concluded.)

20                    THE COURT:  Ladies and Gentleman of the

21   Jury, excuse -- let me excuse you for just a moment

22   while I visit with the witness about something.

23                    COURT SECURITY OFFICER:  All rise for the

24   jury.

25                    (Jury out.)
```

1                THE COURT:  Please be seated.

2                All right.  There is a -- there are some

3    questions listed, but they are marked through, and then

4    there's a question that's asked at the end.  And I'll

5    first read the questions that are marked through, and I

6    think it will perhaps give some context.

7                And the questions that are marked through

8    are as follows:  I have a Samsung tablet with Wi-Fi.

9    Why not list it?  And the other companies not listed.

10   TVs with Wi-Fi, question mark.  Not the Intel chip, but

11   the technology Wi-Fi is 50 cents.

12               That's all marked through, so I don't

13   propose to ask any of that.

14               Then the question that they have not

15   marked through is:  Not the chip hardware, but the

16   software is the issue, correct?

17               And that would be the question to the

18   witness.

19               And do you know the answer to that

20   question, first, or could you answer that question in a

21   meaningful way?

22               THE WITNESS:  Well, what I could say

23   about that is, again, going back to the market rates.

24               So there's these -- in the real-world

25   negotiations they have these technical discussions, and

1  so the parties would have understood what the patents

2  relate to.  And so that's what they were willing to pay

3  for, based on their understanding of where the

4  technology was embodied, in the source code or the chip.

5             THE COURT:  Okay.  All right.  Do

6  Plaintiffs have an objection to the question?

7             MR. CAWLEY:  No.

8             THE COURT:  Does Defendant?

9             MR. JONES:  Yeah, we do, Your Honor.

10            No. 1, I don't think it answers the

11 question.

12            No. 2, it's clearly outside the scope of

13 this particular witness's expertise.

14            And No. 3, you know, we get these reports

15 where experts, you know, give us their opinions.  This

16 would be an opinion that's totally outside the scope of

17 his report and something we couldn't prepare rebuttal

18 for.

19            MR. CAWLEY:  Your Honor, here's my one

20 person's view of what that question gets to.  My opinion

21 is that it gets to a misunderstanding that the chip is

22 simply a bare piece of hardware that has no software in

23 it or associated with it; when, in fact, we all know

24 that there's firmware or -- or software in the chip.

25            And I think that this witness could

1  productively tell this -- tell the jurors the chip

2  includes both, and his opinion is based on both.

3            MR. JONES:  Your Honor, could I speak to

4  that?

5            THE COURT:  Yes, uh-huh.

6            MR. JONES:  Your Honor, my point is this:

7  I think this question is going to be answered when we

8  have witnesses up there that testify about the products,

9  the chips, and how they work.  It's clearly outside the

10  scope of this expert's knowledge and his opinions, and

11  for that reason should not be asked.

12            THE COURT:  All right.  Let me ask the

13  witness.

14            Do you -- tell me again -- if you would,

15  speak into the microphone, what your answer to that

16  question would be:  Not the chip hardware, but the

17  software is the issue, correct?

18            Do you feel that you can answer that

19  question?  And if not, that's fine; but if you do, then

20  how?

21            THE WITNESS:  So my response to that

22  would be while I'm not a technical person, I can't speak

23  directly to the software and the hardware aspect of it,

24  what we can say in the context of damages is through the

25  technical discussions, regardless of where it's

1  embodied, the market rates indicate the value of that,

2  whether it's in the source code or the chip.

3            MR. JONES:  Your Honor, I think he just

4  said he didn't know the answer to the question.

5            No. 2, I would just point out that there

6  have been technical experts that testified on this very

7  issue.

8            THE COURT:  All right.  The Court will

9  overrule the objection.

10           I -- what I want to do, I've -- we've

11 invited the jury to ask questions, and they're not

12 always going to artfully draft their question, but I

13 think they give enough of an indication and I think his

14 answer is consistent with -- with damages, as he

15 annunciated it.  And you're correct, that you'll have

16 other witnesses that can expand on this later.  But I'm

17 going to allow that jury question.

18           So bring the jury in, please.

19           MR. JONES:  Thank you, Your Honor.

20           COURT SECURITY OFFICER:  All rise for the

21 jury.

22           (Jury in.)

23           THE COURT:  All right.  Please be seated.

24           All right.  Mr. Bone, we have a question

25 for you from the jury, and the question is this:

1                    Not the chip hardware, but the software

2    is the issue, correct?

3                    THE WITNESS:  So -- so while I'm not a

4    technical expert, so I can't specifically address the

5    software versus the hardware issue in terms of where it

6    is; what I can tell you, from the con -- from the -- in

7    the discussion of damages, as we've heard before, there

8    are -- in the actual real-world negotiations, there were

9    technical discussions that addressed Ericsson's patents

10   and where they relate to the software and the chip.  And

11   their understanding of where it was, that's what the

12   companies were willing to pay for, in terms of the

13   market rates.

14                   THE COURT:  All right.  Thank you.

15                   All right.  Any follow-up questions from

16   the Plaintiffs?

17                   MR. CAMPBELL:  No, Your Honor.

18                   THE COURT:  From the Defendants?

19                   MR. JONES:  Yes, just one, Your Honor.

20                   THE COURT:  All right.

21                    FURTHER CROSS-EXAMINATION

22   BY MR. JONES:

23       Q.   When we first started your testimony, we

24   talked about the fact that you had listened to the

25   testimony of the Plaintiffs' liability expert in this

1  case, Dr. Nettles, right, sir?

2      A.   Yes, sir.

3      Q.   Okay.  Thank you, sir.

4           And he said -- he said that it's the Wi-Fi

5  chips that are at issue in this case, right, sir?

6      A.   That's my understanding.

7      Q.   Thank you, sir.

8                MR. JONES:  I pass the witness, Your

9  Honor.

10               THE COURT:  All right.  Any redirect?

11               MR. CAMPBELL:  No, Your Honor.

12               THE COURT:  All right.  Thank you.  You

13 may step down, Mr. Bone.

14               All right.  Who will Plaintiffs' next

15 witness be?

16               MR. CAWLEY:  Your Honor, at this time

17 we've got a few exhibit issues to finalize.

18               THE COURT:  All right.  You have some

19 exhibits you wish to -- and I apologize, I failed to ask

20 both parties this morning.  So do you have an exhibit

21 list for today?

22               MS. MOORE:  Yes, Your Honor, we have a

23 pre-admit exhibit list for today.  It's got about 10

24 items on it.  The first six are agreed, and I don't

25 believe we have a position yet on the last four, which

1  are PX 562 through PX 565.

2                 MR. DE VRIES:  I was able to obtain

3  copies of these, and we have no objections to any of

4  those on that list.

5                 THE COURT:  All right.  So the title of

6  that list is what?

7                 MS. MOORE:  Yes, Your Honor.  It's

8  Plaintiffs' Pre-admitted Exhibit List for June 6th,

9  2013.

10                THE COURT:  All right.  That will be

11  marked as Plaintiffs' Exhibit List No. 4.

12                And are -- there are no objections; is

13  that correct?

14                MR. DE VRIES:  That's correct, Your

15  Honor.

16                THE COURT:  All right.  The exhibits on

17  that list are admitted.

18                Do Defendants have a similar list?

19                MR. DE VRIES:  We do, Your Honor.  It's

20  entitled Defendants' List of Pre-admitted Exhibits for

21  June 6th, 2013.

22                THE COURT:  All right.  That will be

23  marked as Defendant's Exhibit List No. 5 -- excuse me,

24  No. 4.

25                Are there any objections to the exhibits

1  contained on that list?

2                 MS. MOORE:  No, Your Honor.

3                 THE COURT:  All right.  Those exhibits

4  are admitted.

5                 All right.  Who will Plaintiffs' next

6  witness be?

7                 MR. CAWLEY:  Your Honor, at this time the

8  Plaintiff Ericsson rests.

9                 THE COURT:  All right.  Plaintiff rests.

10                 All right.  Who will Defendants' first

11  witness be?

12                 MR. VAN NEST:  Excuse me, Your Honor.  We

13  would like to speak briefly with the Court on motions.

14                 THE COURT:  All right.

15                 (Bench conference.)

16                 THE COURT:  Speak up a little louder.

17                 MR. VAN NEST:  I'm sorry.

18                 THE COURT:  Speak in a normal, quiet

19  voice.  If you whisper, she doesn't hear it; but if you

20  can just talk in a low regular voice.

21                 MR. VAN NEST:  This is about JMOLs.

22                 THE COURT:  Yeah.  We can do that on a

23  break.

24                 Any objection to that procedure on the

25  JMOLs?

1            MR. STEVENSON:  No objection.

2            THE COURT:  We'll do them at the noon

3    break.

4            MR. VAN NEST:  Thank you, Your Honor.

5            (End of bench conference.)

6            THE COURT:  Who will Defendants' first

7    witness be?

8            MR. VAN NEST:  Your Honor, Defendants

9    call Mr. James Johnson.

10           THE COURT:  All right.  Mr. Johnson.

11           MR. DAUCHOT:  Your Honor, may we proceed?

12           THE COURT:  Yes, you may.

13        JAMES JOHNSON, DEFENDANTS' WITNESS,

14               PREVIOUSLY SWORN

15               DIRECT EXAMINATION

16   BY MR. DAUCHOT:

17      Q.   Good morning.

18      A.   Good morning.

19      Q.   Please introduce yourself to the members of

20   the jury.

21      A.   Hi, I'm Jim Johnson.

22      Q.   All right.  Mr. Johnson, you were introduced

23   earlier as James.  Is it James or Jim?

24      A.   I prefer Jim.

25      Q.   All right, sir.  Where do you work?

44

1       A.   I work at Intel Corporation.

2       Q.   And how long have you worked at Intel?

3       A.   Just over 29 years.

4       Q.   All right.  And we'll get into a bit more

5  detail, but just at a very high level, what is Intel or

6  who is Intel?

7       A.   Intel's now the largest chip company in the

8  world.

9       Q.   And when was the company founded?

10      A.   It was founded in 1968.

11      Q.   And where was it founded?

12      A.   It was founded in a -- in an area of Santa

13  Clara, California, just south of San Francisco, if you

14  haven't been there.

15      Q.   All right.  And who started Intel?  Who are

16  the founders?

17      A.   Three men named Robert Noyce, Gordon Moore,

18  and Andy Grove.

19      Q.   All right.  What were their accomplishments

20  through Intel?  Can you explain that to the jurors?

21      A.   Well, I joined somewhat after -- after they

22  founded the company, but they were pretty fantastic.

23           They -- they had innovations and -- and

24  developed a semiconductor which we call chip in this --

25  in this case, but semiconductor products and

1  manufacturing processes that really revolutionized, in

2  my tenure at Intel, what the computer industry has

3  become.  I mean, there wasn't a -- really a phrase

4  coined personal computer that many people knew, but now

5  we all have one.

6      Q.   All right, sir.  Have the founders of Intel

7  been honored in any way for their accomplishments?

8      A.   Yes, they've -- they've been honored in -- in

9  many, many ways, nationally and internationally.  I've

10  actually brought a couple of pictures just to kind of

11  personalize it, if I could.

12      Q.   All right.  And let's put up the first one

13  that you put together, Slide 1.  I think it's --

14          MR. DAUCHOT:  Your Honor, just for the

15  record, it's Defendants' Demonstrative 1.

16          THE COURT:  All right.

17      Q.   (By Mr. Dauchot)  Here we go.

18      A.   Yeah, so here's the picture.  It's a slide of

19  three pictures actually.  So on the left, you see Robert

20  Noyce, and so first you see him receiving one of the

21  national medals.  One's for science, and one's for

22  technology -- I can't remember which order is which --

23  from Jimmy Carter.

24          And then on the lower left, you see him

25  receiving a similar award from Ronald Reagan.  So

1  there's Robert Noyce.

2          And then on the right is Gordon Moore -- also

3  known for Moore's Law.  He predicted over 30 or 40 years

4  ago what would happen to semiconductor manufacturing,

5  and he was right -- getting it from George Bush.

6      Q.   All right.  How about -- I think we leave one

7  of the inventors out, right?

8      A.   Yes.  On the next slide, if you don't mind

9  forwarding it.  And this was in my tenure there.  Andy

10  Grove, and we were -- we were quite pleased as a company

11  when he was awarded Man -- Time -- of the Year for his

12  innovation.

13      Q.   Have you personally worked with any of these

14  individuals?

15      A.   Andy was the hands-on President and CEO during

16  my tenure when he was leading the company, so I spent a

17  lot of time with him.

18      Q.   All right, sir.  And we'll get into a bit more

19  what you've -- you've done at Intel.  But just from a --

20  from a big-picture standpoint, how many employees does

21  Intel have?

22      A.   We have -- we have about 110,000 worldwide,

23  with over half here in the U.S.

24      Q.   All right, sir.

25          And just to give the jury a feel for what --

1  what Intel does or who it is, where in the United States

2  does Intel have facilities?

3       A.    I -- I won't go through the -- I won't go

4  through the whole U.S., but the primary state -- some of

5  the primary states are Oregon, which is our largest

6  facility; California; and we have a big facility in

7  Arizona; we have a facility in New Mexico; and we have a

8  facility here in Texas, too.

9       Q.    All right.  So we're in Texas.  Where in Texas

10 is the facility?

11      A.    It's in Austin.

12      Q.    All right.  Just very briefly, what does Intel

13 do in Austin?

14      A.    They make chips primarily for the tablet and

15 the SmartPhone devices.

16      Q.    And how many employees at that facility?

17      A.    There's about a thousand.

18      Q.    All right.  And I just want to focus a bit on

19 Intel's relationship with some of the higher education

20 facilities that we have here in the states.  Any

21 relationship with the University of Texas?

22      A.    Yes.  So every state where we have -- have

23 facilities, we tend to do this.  And so I'll focus on

24 Austin where we'll -- in that thousand -- I said make,

25 they really design the products, not make them.  And we

1  hire about a hundred engineers -- hundred interns,

2  largely engineers, largely from the University of Texas,

3  not only.

4           And we kind of do that in each state we live.

5  We try and hire local interns because it's -- it's good

6  for them because they get experience, but it's great for

7  Intel because we have a pipeline of new engineers coming

8  into the company.

9       Q.   Now, does Intel exclusively focus on higher

10  education?

11      A.   No.  We have local programs and national

12  programs.  Kindergarten through 12 is -- is -- is one.

13      Q.   And tell us a little bit about that.

14      A.   Yeah, well, I'll -- I'll just stay with the

15  local theme since we're here, but it applies nationally.

16           We have something called the Intel Teach

17  Program.  And it's a 40-hour -- 40-hour curriculum that

18  we offer teachers in K through 12 education, and we give

19  them computer skills and training.  And when they

20  complete that 40 hours, then we help them take that back

21  into their classroom and curriculum.  And I mention that

22  one, because we've had the highest participation rate of

23  any state here in Texas, with over 28,000 teachers that

24  have been through that program.

25      Q.   All right.  Now, any school here in Texas,

1  particularly near and dear to your heart?

2      A.   Well, recently, yes, my son just graduated

3  from the Ranch Management Program at TCU, Texas

4  Christian in Ft. Worth.

5      Q.   All right, sir.  How many kids do you have?

6      A.   I'm blessed with three sons.

7      Q.   And you're married, sir?

8      A.   Yes, I -- yes, I am.  I met my wife at Intel a

9  couple of years in, and we've been married ever since.

10     Q.   I take it that wasn't the reason you chose to

11 join Intel?

12     A.   I was there before her.

13     Q.   All right, sir.  And explain to our jurors why

14 you decided to join Intel.

15     A.   I was fortunate enough, when I was getting out

16 of college, to have a few other offers.  And the last

17 company I interviewed with was with a company named

18 Intel.  It was like one-fiftieth the size it is now in

19 terms of revenue.  And what impressed me with that

20 company, they gave me the most grueling interview I'd

21 ever experienced, 10 hours, 30-minute sections and --

22     Q.   You haven't had your cross-examination yet, so

23 we'll see if it's the most grueling.

24     A.   Second most, maybe.

25          But what I was impressed with is their

1  discipline and organization.  You could really tell it

2  was a company going somewhere; focused on innovation and

3  the customer.

4       Q.   All right.  Mr. Johnson, what is it that you

5  do at Intel today?

6       A.   I'm a vice president of the Intel Architecture

7  Group.

8       Q.   And what is the Architecture Group?

9       A.   The Intel Architecture Group is Intel's

10  largest business, and it's comprised of primarily

11  computer chips and communications chips; not solely, but

12  that's how it characterizes its -- its biggest

13  businesses.

14       Q.   All right.  And I think you told us a little

15  bit about the computer chips earlier.  Let's -- let's

16  focus on the communication chips.  What are those?

17       A.   The communications chips are largely what

18  we've been talking about today.  There's communications

19  chips for wired communication, like many of these

20  computers that the -- is wired up in the courtroom uses,

21  something called Ethernet.  We haven't been talking

22  about.  And then there's a communications chip for

23  wireless called Wi-Fi, and there are many others that

24  have been mentioned by other testifiers.

25       Q.   All right.  As between the two chips, the

1 computer chips that actually run the computers, if you

2 will, and the communication chips, which type of chip is

3 your work focused on at Intel?

4      A.   Primarily it's been communications chips for

5 computers.

6      Q.   All right.  And explain to us how you were

7 involved in the communication chip site?

8      A.   In -- prior to 2002, I was involved on the

9 wired communications chip side; but in 2002 through late

10 2005, I was the general manager of our wireless

11 networking group, solely focused on Wi-Fi products.

12     Q.   And, generally speaking, what did that group

13 do, sir?

14     A.   That group really had two fundamental

15 responsibilities.  At the highest level was a product

16 group, so we delivered products like we've been holding

17 up here.  And, really, one part of my job was working

18 with the business side to define what we needed from the

19 standard and what type of product feature sets we needed

20 when.

21          And then I led the engineering side that would

22 develop the hardware and software to deliver those

23 products.  They worked for me through my management

24 team.

25     Q.   All right, sir.  Are you an electrical

1  engineer?

2      A.  No, sir, I'm not.

3      Q.  All right.  And so as far as the -- the detail

4  behind the chips and the -- you know, the brains on the

5  chip and that sort of stuff, should we look to you for

6  that information, sir?

7      A.  I depend on my team, as we should all depend

8  on the technical team here.

9      Q.  All right, sir.

10      Now, can you give us a sense of what Intel was

11  trying to accomplish through its work in Wi-Fi?

12      A.  Yes.  So the -- the big thing that was going

13  on, if I just step back one step, is most of us had been

14  using desktop computers.  And a new thing was happening

15  called the notebook computer.  And we were coming to the

16  conclusion that we needed another way to hook up to

17  local area networks, other than carrying a wire around,

18  which we literally did.  And so we started to focus on

19  Wi-Fi as an alternative to hook up these notebooks.

20      Q.  All right.  Now, was -- you mentioned Wi-Fi as

21  a wireless communication.  Was that the only type of

22  wireless around that day?

23      A.  Oh, no.  There -- there were other

24  alternatives.  The primary alternative that -- that was

25  being considered or was being used were cellular cards,

1  usually attached to the outside of a -- a notebook, but

2  some were trying to put them inside a notebook, too,

3  some -- some of our customers.

4       Q.   All right.  Now, if you had cellular wireless

5  communication, why Wi-Fi?

6       A.   We really had two things we wanted to

7  accomplish that was different -- different.  Is we

8  wanted to get on a trajectory of very low cost, so we

9  could have high -- high -- high attach rates of -- of

10 wireless to a notebook, and we wanted universal access,

11 so wherever you went for that network, you could attach.

12          So we called it interoperability.  Here, we

13 wanted every Wi-Fi network to be interoperable.

14      Q.   And when you speak about universal access, can

15 you explain to the jurors what that -- what that would

16 mean to them?

17      A.   Yes.  So I guess I'll -- I'll -- what it means

18 for me, especially being here, is I can go to a

19 Starbucks coffee shop; and if I see Wi-Fi advertised and

20 I open my notebook, I can connect to that Wi-Fi.  I

21 don't care whose chip or whose router -- now that we all

22 know what routers are -- in Starbucks.

23          Or actually, I go to Einstein Bagels for my

24 breakfast in the morning.  They have free Wi-Fi.  I

25 don't know whose Wi-Fi's chip.  I don't know who --

1   whose Wi-Fi system, but it just works.

2       Q.   All right, sir.  What was -- can you explain

3   what -- what Intel's ultimate goal was, at least when

4   you were there, with respect to the Wi-Fi -- the Wi-Fi

5   chips?

6       A.   Well, a handful of us were trying to

7   communicate what we were trying to accomplish, so we

8   came up with something we coined, the five-minute rule.

9            Wasn't a marketing campaign or anything.  It

10  was just something we were trying to accomplish.  And

11  the five-minute rule is simply if you're walking in a

12  city, we wanted Wi-Fi to be something that you could

13  walk five minutes and get connected.

14           Or if you're in a suburb like a few blocks out

15  of this city, within five minutes you could drive to a

16  coffee shop or a diner and get a Wi-Fi connection.

17      Q.   Now, Dr. Nettles, yesterday in his testimony,

18  testified about Wi-Fi being available to our -- to our

19  soldiers in Afghanistan.  Do you remember that

20  testimony?

21      A.   Yes, I do, sir.

22      Q.   Do you have any familiarity with that, sir?

23      A.   Some good and some bad.

24      Q.   All right, sir.  Is -- does the five-minute

25  rule apply out there?

1      A.    Not quite.

2      Q.    How do you know that?

3      A.    I know that because my son served -- my oldest

4  son served in Afghanistan, and I had no connection.  If

5  he was on a major base, which we couldn't get Wi-Fi

6  connections in Afghanistan during his tenure a few years

7  ago, it didn't work.  The only way I could communicate

8  with him was through satellite, so we still have a lot

9  of work left to do.

10     Q.    Now, who is the person at Intel who decided to

11 place the Wi-Fi technology on the Intel chips?

12     A.    As the general manager of the group, it was my

13 responsibility.

14     Q.    All right, sir.

15           What I'd like to do is focus a little bit on

16 the chip.  We've heard quite a bit about it, and I think

17 that Mr. Jones was referring to it.

18           MR. DAUCHOT:  And, Your Honor, the chip

19 has been marked as Exhibit 528.  It's on the exhibit

20 list, and with the Court's permission, could I

21 distribute that chip to the members of the jury so they

22 could just hold it in their hands?

23           THE COURT:  Excuse me?

24           MR. DAUCHOT:  Would it be okay if I have

25 the Court's permission to distribute the chip to the

1   jurors so they can hold it in their hands?

2                  THE COURT:  Yes, you may.

3                  MR. DAUCHOT:  All right.  Thanks.

4                  I'm going to take two out.  You can pass

5   it down.

6                  THE COURT:  I'll just caution the jury,

7   please don't eat any of those chips.

8                  [Laughter]

9                  MR. VAN NEST:  That's the ultimate free

10  Wi-Fi.

11     Q.   (By Mr. Dauchot)  Here, Mr. Johnson, I'll hand

12  you a copy.

13     A.   Yeah.

14                 MR. DAUCHOT:  I think I have an extra

15  copy for the Court.

16                 Your Honor, are you interested in having

17  one or --

18                 THE COURT:  I'm fine.  Thank you.

19     A.   Yes, sir --

20     Q.   (By Mr. Dauchot)  All right.  Hold on.  Let's

21  make sure everyone has them.

22                 All right, sir.  So we have distributed

23  Exhibit 528 -- or copies of it to the Members of the

24  Jury.  And you have one in your hands.

25                 What are we looking at?

1    A.   Well, so -- just so we're all on the same

2  orientation, if you could put it so the little gold edge

3  is facing down, and I'll start at the top.

4        If you go to the very top, you're going to see

5  two little round buttons or little round circles.

6  That's where the antennas from the notebook connect, so

7  they're often in the screen.  And then the wires have to

8  come through the hinge and they hook it up to those

9  round buttons.  That's how you get the signal into the

10 notebook.

11       And then the center of this, the big black --

12 big black component, that's the chip that Intel designs,

13 and is where the majority of the engineering goes into.

14    Q.   Now, Mr. Johnson, if I could interrupt you one

15 second.

16       There's a question from the jurors on the

17 question of where of the -- if the software is actually

18 on the chip.  And if you could just explain that to us.

19    A.   Yeah.  And so there's -- there's many types of

20 software, but there's really, really critical software

21 that we write that sits on the chip.

22    Q.   And where is that on the chip, as the jurors

23 are looking at it?

24    A.   Oh, it is inside the chip, and there's a

25 portion of the chip that's memory.  Just like our brain

58

1  has memory, there's a little bit of memory on the chip

2  so the software can sit inside that.

3      Q.   All right.  And you were going to explain the

4  black center?

5      A.   Yeah, so the black center is how we manifest

6  our product.  That's -- that's the core of the Wi-Fi

7  product that we sell.

8          However, to put it in -- to put it into a --

9      Q.   You just need to back away from --

10     A.   I'm sorry.  I'm sorry.  Can you guys hear me

11  okay?

12          Okay.  So -- so then the reason we put on this

13  green -- I'll call it a green carrier or a module -- and

14  now if you look at the very bottom, you see these

15  gold -- we call them gold fingers.  Those snap into a

16  socket on the board of a notebook or tablet.

17          And so there's two reasons for that.  Reason 1

18  is these computer OEMs we've been talking about,

19  unfortunately don't only -- only want to buy from one

20  supplier.  They want a choice from several suppliers,

21  and that's how they get best pricing and best features.

22          And then the second thing is the standards are

23  evolving, and they may choose to put a different

24  versions of the standard in at different times,

25  especially during transitions.  So that's why it's on a

1  module.

2      Q.   All right.  And just to give the jurors a

3  sense -- I mean, so these chips wind up on the circuitry

4  of computers.

5          And I remember during opening statement -- or

6  I'm sorry -- during voir dire, I think counsel for

7  Ericsson proposed to the jury, you go to a store, and

8  you get a laptop with a chip, and you get a laptop

9  without a chip, which one would be more appealing to

10 you.

11     A.   Yes.

12     Q.   Do you remember that line of questioning?

13     A.   Yes, sir.

14     Q.   Did that question strike you as odd at all?

15     A.   Yes, because --

16     Q.   Why so?

17     A.   Because if not every, virtually every notebook

18 has Wi-Fi.  People don't buy notebooks without Wi-Fi

19 anymore.

20     Q.   All right.  And why is that?

21     A.   Because it's at extremely low cost, so you can

22 have -- basically, the computer OEMs don't even think

23 about including it anymore.

24          And then, secondly, for all of us, if it says

25 Wi-Fi, you can connect.  So you don't have to know it's

1   a Wi-Fi from Company A or a Wi-Fi from Company B.   If

2   it's Wi-Fi, it's Wi-Fi.  So you can just use it.

3   Those are the two fundamental reasons in my view.

4        Q.   All right.  Now, Mr. Johnson, you introduced

5   us to the notion of what Intel, and for that matter,

6   other chip makers were trying to accomplish, and this is

7   the low-cost interoperability.

8             What did it take to achieve that?

9        A.   It takes really -- I guess I would summarize

10  it in two things, is we, as a company, have to

11  independently design and innovate what we want to

12  accomplish in Wi-Fi.

13            So when we're going from this generation to

14  the next, it takes some of our best engineers'

15  hard-working innovation to create that next technology

16  of Wi-Fi.

17       Q.   And what else does it take?

18       A.   The second thing, which is very critical, is

19  they have a process -- we've been calling it IEEE.  They

20  are members of a standards body where they can go

21  together to share their ideas and innovations with the

22  other engineers from other companies to come up and

23  conclude an interoperable standard for the next version.

24       Q.   All right.  How much has Intel spent on R&D

25  just -- just for the Wi-Fi part?

1     A.   Yes.  So --

2     Q.   Not total, because we've heard total R&D

3   numbers from Ericsson, and I just want to focus strictly

4   on the -- on the Wi-Fi.

5     A.   Yeah.  So for the group I manage and then

6   continued on after me, it's approaching $2 billion --

7     Q.   All right.

8     A.   -- for R&D.

9     Q.   Okay.  Now, how many engineers does Intel have

10   working or has had -- has Intel had working on Wi-Fi

11   over the years?

12     A.   Well, under -- under my watch, we were at

13   about 650 engineers plus or minus 25, based on when you

14   would have looked at the group.

15     Q.   Now has Intel been awarded patents for the

16   tech -- for the Wi-Fi technologies that it has

17   developed?

18     A.   Yes.  We've had -- we have patents for Wi-Fi.

19     Q.   All right.  Mr. Johnson, I want to focus a

20   little bit on the second prong of it.

21         So you have the -- the innovation that happens

22   inside the shop, and then you mentioned the

23   collaboration.

24         Can we focus on that?  Just generally, what's

25   the process?  Because we're going to hear more from --

1  from others as well.  But just very generally, high

2  level.

3      A.   I'll stay at the general level because there's

4  experts coming that live this day to day.

5           But they're -- they're -- IEEE has a great

6  process, with a lot of discipline, on how to gather

7  people's inputs; people's inputs being engineers from

8  each of the companies.

9           And then they have a process for making

10 selections down to a recommendation that eventually they

11 all ratify as the standard.  And so everyone has to

12 listen to each other's ideas and then compromise.

13     Q.   All right.  So what do we -- what we have on

14 the one hand is, we have the in-house innovation -- and

15 against your competitors, right?

16     A.   Yes.  We are competitors at the end of the

17 day.

18     Q.   And then on the other hand, you have this

19 collaborative step that's required to achieve the

20 low-cost interoperability.

21          Can you generally describe for the jurors how

22 those two competing interests get harmonized?  How do

23 you -- how do those competing interests get resolved, at

24 least from your experience?

25     A.   From my experience, I guess I would say it's a

1  balanced approach.  You -- you absolutely want your

2  ideas to be accepted because then you might have a

3  little bit of a lead on the next product but not a

4  lot -- not a big lead, but a little bit of a lead.

5          And so what typically happens is, these things

6  start coming together.  We start having some log jams.

7  And so let's say the chipset companies can't quite agree

8  on the approach to take, but then we could escalate it

9  to me, and my counterparts at, say, Atheros, or someone

10 like that, and we would talk and say:  Hey, we've got to

11 resolve the log jam.

12         Or an equipment manufacturer may want their

13 proprietary features that only they support in our

14 components.  And we would have to explain to them, no,

15 we're an open standard; we collaborate.

16         So I guess at the end -- I'm going too long.

17 Q.    No, no, no.  That's all right.

18 A.    I guess my summary is, it's tough for

19 engineers to give up their ideas, but we always have to

20 come back to interoperability trumps self-interest.

21 Q.    All right, sir.  I want to shift back to the

22 standard-setting groups.

23         And did Intel have any formal leadership roles

24 in those standard-setting organizations, any particular

25 802.11, the stuff you worked on?

1      A.   Yeah, I'll focus on 802.11, or, again, I'll

2 state general.

3           You know, there are chairmanships of

4 standards.  There are authors of specific parts of the

5 standards.  There's -- people read and ratify those

6 parts.  And then there's people that agree to adopt

7 them.

8           And so Intel had several different leadership

9 positions throughout the history of 802.11n.  And, in

10 fact, we have one of those folks that have been

11 extremely involved coming here to testify this week.

12     Q.   Who's that?

13     A.   This is Duncan Kitchin.

14     Q.   All right.  There was a little bit of

15 discussion over the price of Wi-Fi, and I think that was

16 the unsealed portion, so I don't know if you were seated

17 here when that was discussed, the price of Wi-Fi chips

18 dropping.

19     A.   Yes, I did.  I heard that.

20     Q.   Can you -- do you have any experience with

21 that?  First from the business perspective.

22     A.   Yeah.  I'll give -- I'll just give you the

23 experience I had when I was running the Wi-Fi group.

24           In 2002, before we launched the first Wi-Fi

25 product with our chip -- and these are general.  I don't

1   have the specific.  But the general attach rate to

2   notebooks by computer manufacturers of Wi-Fi was

3   20 percent or less, meaning if they shipped a hundred

4   computers, only 20 would go with Wi-Fi.

5            And by the time I left, you know, to my next

6   job in late '05, the attach rates were growing like

7   60 or 70 percent, if I remember the ballpark number

8   right.

9       Q.   And when -- when you say attach rates, what is

10  that?

11      A.   That means that -- can you -- back to the

12  question, do you buy a notebook with Wi-Fi or without

13  Wi-Fi?  When I say attach, it means Wi-Fi is in there.

14           So two out of ten notebooks when I started,

15  approaching six or seven, and I would say now, if it's

16  not a hundred percent, it's a virtual -- virtually a

17  hundred percent as the prices -- as and because the

18  prices have dropped about tenfold.

19      Q.   And you started back in 2000, you were saying?

20      A.   Yeah.  2002 is when I focused solely on Wi-Fi.

21      Q.   All right, sir.  Just to conclude here, how

22  would you describe the success or lack of it -- I think

23  I know where you stand on it -- but of the 802.11 Wi-Fi

24  standard?

25      A.   It's on one hand and the other.

1          On one hand, it's exceeded, at least, what my

2    expectations were when we started the Wi-Fi project.

3          But on the other hand, there's a lot of people

4    in the world yet that don't have notebook computers.

5    They can't afford notebook computers.  So we must keep

6    innovating and delivering more capability for lower

7    price.

8        Q.   All right.  Thank you, sir.

9        A.   You're welcome.

10              MR. DAUCHOT:  Your Honor, that's all I

11   have on direct.

12              THE COURT:  All right.

13              Cross-examination.

14              MR. CAWLEY:  Thank you, Your Honor.

15                 CROSS-EXAMINATION

16   BY MR. CAWLEY:

17       Q.   Good morning, Mr. Johnson.

18       A.   Good morning, Mr. Cawley.

19       Q.   You know, I hope this cross-examination won't

20   be grueling.  I guess I can't guarantee you that, but I

21   can guarantee you it won't last 10 hours, if that's any

22   reassurance.

23       A.   Thanks.

24       Q.   Now, let's -- let's start our -- our

25   discussion at Einstein's Bagel Shop.  You say you get

1  free Wi-Fi there, right?

2      A.   Yes, I did.

3      Q.   And I think you also told us that when you

4  take your laptop or maybe you turn on your smartphone

5  and you're connecting to that free Wi-Fi by your device,

6  you don't even know whose chip is actually managing that

7  Wi-Fi within the router, do you?

8      A.   Correct.

9      Q.   You don't really care.  I mean, I guess you

10  care, or you hope it's Intel's chip; but in terms of

11  being able to get connected, you don't care, right?

12      A.   Correct.

13      Q.   And that's because these devices are

14  interoperable.  You're familiar with that word, aren't

15  you?

16      A.   Yes.

17      Q.   And the interoperability that lets you connect

18  your device to any Wi-Fi router in Einstein's Bagel or

19  somewhere else is all due to the fact that those devices

20  comply with a standard.

21          Do you agree with that?

22      A.   Agree.

23      Q.   In this case, the standard is some -- some

24  flavor of 802.11, right?

25      A.   Right.

1      Q.   And Intel, in order to be interoperable, must

2  make its products compliant with that standard, correct?

3      A.   Yes.

4      Q.   So wouldn't you agree that if someone has

5  intellectual property, a patent, that is necessary to

6  practice a standard, that someone who wants to make an

7  interoperable product is going to need a license for

8  that intellectual property?

9      A.   They -- they need to have an agreement that

10  they can use it for sure.  I'm not -- I'm not on license

11  expert, so I'm hesitating --

12      Q.   Okay.

13      A.   -- not to use the word license.  But, yeah, we

14  have to -- we have to, through the standard, agree that

15  we can use each other's technology.

16      Q.   And if there is a patent that is necessary to

17  practice the standard, one way or another, whether -- I

18  guess you're suggesting them not give it to you for

19  free; but if they expect to be paid for the use of their

20  patent, then someone who -- who wants to practice the

21  standard is going to need to come to an agreement with

22  them, correct?

23      A.   I -- I don't -- that's not any experience.  I

24  don't totally agree with that.

25      Q.   Well, you do agree that there may be patents

1   that are essential to standards, including 802.11,

2   right?

3        A.   Absolutely.

4        Q.   Okay.  And you do agree that it is essential

5   for your business that you be able to make a product

6   that is compliant with that standard?

7        A.   I agree.

8        Q.   All right, sir.  Now, you pointed out to us, I

9   think, an interesting history that back in 2002 -- I

10  think was the first year you used -- what percentage of

11  inclusion was there of 802.11?

12       A.   Into notebooks?

13       Q.   Yes, sir.

14       A.   As I recall, less than 20 percent.

15       Q.   So less than 20 percent.

16            So you would agree with me that 10, 11 years

17  ago, Wi-Fi was something that people made choices about.

18  Do I want to buy a laptop with Wi-Fi or do I not?

19       A.   Yes.

20       Q.   And then now, you -- you pointed out to us,

21  Wi-Fi is so common and so readily available that people

22  pretty well just assume that their notebook computer is

23  going to have Wi-Fi in it.

24       A.   Yes.

25       Q.   You'd agree with that?

1        A.   I agree.

2        Q.   And you would agree that, in part, that's

3   because of the popularity of Wi-Fi and because it's

4   something that people want.

5        A.   In part.

6        Q.   Well, there's a lot of things, for example,

7   that were common in computers in 2002 that have pretty

8   well disappeared out of notebooks.  Wouldn't you agree

9   with that?

10       A.   I'm not sure.

11       Q.   Well, certain kind of drives; floppy disk

12   drive -- do you have a floppy disk drive in your

13   notebook computer?

14       A.   I don't think I ever did, but no, I don't.

15       Q.   All right.  But those are gone, right?

16       A.   They are as far as --

17       Q.   Once upon a time, virtually every notebook

18   computer came with that kind of drive, didn't they?

19       A.   I -- I never had a floppy drive on my

20   notebook.

21       Q.   Okay.  You know what a PC MCIA connection slot

22   is, don't you?

23       A.   Yes, I do.

24       Q.   That was a technology that was certainly

25   around and pretty popular in 2002.

71

```
 1      A.   Yeah, I agree.

 2      Q.   Don't see many of those anymore, do you?

 3      A.   No, I don't.

 4      Q.   But you do see 802.11, you've told us, not

 5 only in some laptops, but in virtually all of them.

 6      A.   Yes.

 7      Q.   You've told us also about the -- at least

 8 something about the pricing of your chip.  This thing

 9 that we heard cost $2.50 today, more or less, and is it

10 fair to say it cost a lot more than that only a few

11 years ago, fair?

12      A.   It cost more than that a few years ago.  I

13 don't have the exact number, but, yeah, I agree with

14 that.

15      Q.   Okay.  But what goes into the pricing of this

16 chip?  Are you -- are you -- are you now or have you

17 been in some ways responsible for helping to price these

18 chips?

19      A.   During my tenure as the GM, I did.

20      Q.   Okay.  So what kind of factors did you have to

21 consideration (sic) in arriving at the price Intel was

22 going to charge for chips like this?

23      A.   The -- the feature set, the performance, the

24 cost of the product, things like that.

25      Q.   Okay.  Let's start with that last one.
```

1       A.   Okay.

2       Q.   The cost of the product.  What kind of things

3  are included in the cost of a product like this?

4       A.   Well, the things you have to consider in

5  pricing is how much it costs to develop it and then how

6  much the chip costs and how much the components around

7  it to make the chip costs and the software we developed

8  on top of it, things like that.

9       Q.   How about the cost of any rights you have to

10 have to be able to practice the technology?

11      A.   Yes.  If we had -- if we had had to license

12 technology, it would be part of the cost of that.

13      Q.   So if this jury believes that Intel is using

14 Ericsson's patents without permission and without paying

15 anything for them, you haven't included that in the

16 cost, have you?

17      A.   If -- if the Court finds that there's some

18 royalties that we haven't accounted for, yeah, that

19 needs to be included in the cost.

20      Q.   But right now it's not, is it?

21      A.   If there's -- if there's not a paid-for

22 license for -- it's not included, correct.

23      Q.   And Intel today is able to offer this chip for

24 $2.50, in part, because it pays nothing for the right to

25 use Ericsson's patents, correct?

1     A.    We -- we don't -- we don't pay for patents to

2  Ericsson.  I agree.

3     Q.    Okay.  You told us about Intel, your company,

4  and its locations.  I was reading a little bit about

5  Intel last night, and I -- I happened to notice that

6  within the last fairly recent time, Intel spent

7  $2 billion to open a facility in India; is that right?

8     A.    I -- I'm not familiar with that facility.

9     Q.    You don't know if Intel has a facility in

10 India in Bangalore?

11    A.    Oh, I know we have a facility in Bangalore.

12 I'm just not aware of the 2-billion-dollar announcement.

13    Q.    It cost $2 billion.

14          How many people work there?

15    A.    I'm not sure.

16    Q.    Have you ever worked with any of them?

17    A.    A handful, yes.

18    Q.    Have you been there?

19    A.    No, I have not.

20    Q.    So you were able to work with -- I assume,

21 were they engineers?

22    A.    Yes.

23    Q.    With engineers, with technical people in

24 India, even though you didn't go there yourself

25 personally?

1      A.    Yes.

2      Q.    Okay.  Didn't have any problem with that?

3      A.    It's never as good as face to face, but we

4  made it work.

5      Q.    Okay.  You made it work.

6            And you'd agree with me, wouldn't you, that

7  over the past decade or more, it's become pretty common

8  for technology companies and others in the high-tech

9  space to have a lot of interaction with technicians in

10  India.

11      A.    I -- I guess, yeah.

12      Q.    Well, you don't -- you don't find it unusual

13  that many high-tech companies have major facilities in

14  India, do you?

15      A.    No.

16      Q.    You don't think there's anything unusual about

17  hearing that a person involved in the high-tech field is

18  dealing with people in India.

19      A.    No, I don't.

20      Q.    Okay.  When did you first read the Ericsson

21  patents in this case, Mr. Johnson?

22      A.    End of last week.

23      Q.    End of last week?

24      A.    Yes, sir.

25      Q.    You had never read them before then?

1      A.   No, I haven't.

2      Q.   I see.

3           Well, you're -- you're the Intel

4   representative who's sitting here in the courtroom

5   through the whole trial, right?

6      A.   Yes, I am.

7      Q.   When were you first asked to be the person

8   that did that?

9      A.   The -- the discussion started about a year ago

10  as me potentially being that person.

11     Q.   Okay.  Now, let me ask you a few questions

12  about Intel and the IEEE.

13          Have you ever attended any IEEE

14  standard-setting meetings?

15     A.   Personally, no.

16     Q.   Okay.  Well, I won't ask you about that.

17          You're aware, though, aren't you, that just

18  like Ericsson did -- not just like, I shouldn't say

19  that; but as Ericsson did, Intel has made some

20  assurances to the IEEE about Intel's patents relating to

21  802.11?

22     A.   Yes, I'm generally aware.

23     Q.   Okay.  Well, let's get a little more specific

24  about it.

25               MR. CAWLEY:  Let's look at Plaintiffs'

1  Exhibit 507.  Let's go ahead and enlarge, say, the first

2  half of this document.

3      Q.   (By Mr. Cawley) You see that this is a

4  situation to the secretary of the IEEE?

5      A.   Yes.

6      Q.   And it comes from Intel?

7      A.   Yes, sir.

8      Q.   Okay.  Now, if we look at the bottom part of

9  the document --

10          MR. CAWLEY:  If you'll -- if you'll

11  enlarge -- there we go.

12      Q.   (By Mr. Cawley) And you see from the four

13  boxes there, four different choices, that this sets out

14  what Intel's position is about its 802.11 patents to the

15  IEEE?

16      A.   Yes, I do.

17      Q.   And you see the first choice was, under No. 1,

18  that the patent holder -- that's Intel -- is prepared to

19  grant a free license.

20          You see that?

21      A.   Yes.

22      Q.   But that's not checked, is it?

23      A.   No, sir.

24      Q.   And then there's some other choices, 3 and 4,

25  either that Intel is not aware of any patents -- that's

1  No. 4 -- and No. 3, that it's unwilling to grant

2  licenses.

3          You see that?

4      A.   Yes, sir.

5      Q.   That's not checked either.

6      A.   Correct.

7      Q.   What is checked is No. 2 that says that Intel

8  is prepared to grant a license on a worldwide

9  non-discriminatory basis among reasonable terms and

10 conditions; accurate?

11     A.   Yes, sir.

12     Q.   So Intel itself has told the IEEE not that it

13 will give away its 802.11 patents for free; but that it

14 will be prepared to license them on a reasonable basis.

15         Do you agree with that?

16     A.   I agree.

17     Q.   Okay.  And they also agreed to do it on a

18 non-discriminatory.  Do you understand what that means?

19     A.   Yes.  And I learned a lot about it this week,

20 too.

21     Q.   Okay.  But in shorthand, it means no special

22 deals.

23     A.   Yes, sir.  And I learned a lot about that the

24 last couple of days.

25     Q.   Okay.  Why do you understand that's important?

1    A.   So if you -- I guess I'd just say, so if you

2  develop for the standard, everyone can use that

3  standard.

4    Q.   And they can all be on the same playing

5  ground, right?

6    A.   I don't totally agree with that, because this

7  isn't my area of expertise.  I'd really defer to my

8  technical team on the specifics of these terms.

9    Q.   Okay.  Well, let me just ask you about your

10  understanding and not the -- not the terms themselves.

11       You understand that part of the basis for

12  people making a commitment like this through a

13  standard-setting body is that people who are considering

14  adopting the technology will know, first of all, they

15  can get a license, right?

16    A.   Sure.  Yeah.

17    Q.   Not going to discover that they've been

18  blocked somehow.

19       Okay.  So they can get a license, and that it

20  will be on reasonable terms, right?

21    A.   Are you asking, based on my experience with

22  licensing, or actually building products and IEEE?

23    Q.   I'm asking you your understanding of why these

24  agreements like this are important.

25    A.   Okay.  I'm -- I'm not -- I'm not technically

1   deep on these agreements, so --

2       Q.   Okay.

3       A.   -- we can keep going, but I just don't want

4   set any expectation that --

5       Q.   Do you have any understanding, just in

6   general, about why people who are considering building a

7   product compliant with the standard, find it important

8   that they can get a license without being discriminated

9   against?

10      A.   Sure.

11      Q.   What's your understanding?

12      A.   So when we're building a product per the

13  standard that we've all agreed to, we're not going to

14  have a -- we're not going to have a lost of costs come

15  in later and then have some people have to pay the cost

16  and others not pay.  That's just my --

17      Q.   Right.

18      A.   -- that's my experience --

19      Q.   Sure.

20      A.   -- building products.

21      Q.   Okay.  It's logical.  Common sense, isn't it?

22      A.   I don't know.

23      Q.   People want to know that -- that they're not

24  going to have to pay a higher rate than their

25  competitors, for example.

1          You agree with that?

2      A.   I don't totally agree with that because I

3  don't have experience here.

4      Q.   Okay.  Let me -- let me ask you a little bit

5  more about 802.11 since you've built products compliant

6  with that standard.

7          Is 802.11 a wireless standard?  You'd agree

8  with that, wouldn't you?

9      A.   Yes, sir.

10

11     Q.   But there are a lot of other wireless

12  standards, too, aren't they?

13     A.   Yes.

14     Q.   GSM is a wireless standard?

15     A.   Yes.

16     Q.   3G?

17     A.   Sure.

18     Q.   4G?

19     A.   Sure.

20     Q.   TDMA and the CDMA?

21     A.   Sure.

22     Q.   All of those are wireless standards.

23          Now, for GSM and 3G and 4G and TDMA and CDMA,

24  those wireless standards, you can make phone calls using

25  those standards, correct?

1     A.   Sure.

2     Q.   But you can use phone calls using 802.11, too,

3  can't you?

4     A.   Yes, you can.

5     Q.   Do you think that ideas in one wireless

6  standard could be useful in another wireless standard?

7     A.   Yes.

8     Q.   All right.  Now, I know that -- that you've

9  told us that you're not -- you weren't personally a

10  participant in IEEE meetings, but I want to ask you this

11  question, and you -- you tell me if you think it's

12  fairly within your knowledge of this industry as a

13  person who supervised these products and their

14  development and to some extent, people's participation

15  in standards.

16        When the IEEE develops a new standard, do they

17  ever include any pre-existing technology in the new

18  standard?

19     A.   Yes.

20     Q.   Okay.  If that pre-existing technology is

21  covered by a patent, then that patent would cover the

22  new standard, wouldn't it?

23     A.   I don't know.

24     Q.   Well, it's kind of a matter of logic.  If --

25  if there's a piece of technology and it's covered by a

1   patent and it pre-exists the standard and the people

2   setting up the new standard decide, yeah, we're going to

3   put that in the new standard, too, you'd expect that

4   that patent, for the pre-existing technology, would now

5   cover the new standard into which that technology had

6   been adopted, wouldn't you?

7        A.   I'm sorry, I don't know.

8        Q.   Okay.  Does Intel sell 802.11 chips to

9   Hewlett-Packard?

10       A.   As far as -- when I was there, we did, and I

11  have no reason to believe we don't -- still don't, yes.

12       Q.   When you were selling the chips, did Intel

13  indemnify Hewlett-Packard?

14       A.   I can't remember what our agreement said back

15  then, but generally, we entered into agreements where we

16  would indemnify companies.  And I entered into some of

17  those agreements, but I can't speak for Hewlett-Packard.

18       Q.   Okay.  How about Dell?  Does Intel indemnify

19  Dell in this suit?

20       A.   I can't speak to the specific agreements, but

21  I have general experience that we do offer

22  indemnification to our customers.

23       Q.   How about Toshiba and Acer?

24       A.   I don't know.

25       Q.   Okay.  Well, if there's -- if there's a

1  pleading in this case in which I could show you -- and

2  I'll be glad to if you feel more comfortable if I did --

3  but if there's a pleading in this case in which Intel

4  asks to join this lawsuit because, among other reasons,

5  it indemnified Toshiba and Acer, you wouldn't be

6  surprised, would you?

7      A.   If -- if we have agreements with our -- with

8  our customers like that, we would stand behind those

9  agreements.

10     Q.   Okay.  And what that indemnity means -- what

11 does that indemnify mean when you say you have -- you

12 give them indemnity?

13     A.   In my experience, where -- if something

14 happened in the agreement where they were sued, then

15 if -- if there was a specific in the agreement, we'd

16 stand behind that customer.

17     Q.   What do you mean, stand behind them?

18     A.   We'd -- we'd pay whatever the agreement said

19 we'd pay.

20     Q.   Okay.  You'd -- you'd be responsible for

21 paying for their infringement?

22     A.   Well, there can be lots of terms around it,

23 limitations.  But generally speaking, we'd stand behind

24 our -- we always stand behind our agreement.

25     Q.   You'd come into court and defend them; is that

84

1  accurate?

2      A.   I -- I don't -- I wouldn't totally agree with

3  that.

4      Q.   You don't agree with that?

5      A.   No, I said I wouldn't totally agree with that.

6      Q.   Okay.  Would you partially agree with it?

7      A.   I guess, yeah.

8      Q.   Okay.  Now, let me ask you finally about the

9  relationship between patent holders and Intel and its

10  customer.

11          Let's suppose that Intel could get a license

12  from Ericsson for its patents in this lawsuit for a

13  penny.  You with me?

14      A.   I'll try.  I'm not sure.

15      Q.   Okay.

16      A.   I mean, I understand what you're saying, but I

17  don't know where you're going.

18      Q.   Well, that's because I haven't gone there yet.

19      A.   Okay.

20      Q.   But so far, I'm only this far.

21      A.   Okay.

22      Q.   I'm asking you to assume that Intel gets a

23  license from Ericsson, either because Ericsson agrees or

24  because the jury finds --

25      A.   Okay.

1    Q.   -- that it's only worth a penny to Intel, and

2    Intel gets a license now for one penny.  What's your

3    understanding of how much Ericsson can collect, under

4    those circumstances, from your customers, the other

5    Defendants in this lawsuit?

6    A.   I don't know.

7    Q.   Okay.  You know, don't you, that you can only

8    collect once for the patent?  If you collect from Intel,

9    you can't collect any additional royalty from the

10   customers.

11   A.   I've heard that in testimony this week, but I

12   don't know that.

13   Q.   Okay.  Well, you're not a lawyer, and I'm not

14   asking you to give a legal opinion.

15        But what you understand, and we certainly

16   haven't heard anybody suggest to the contrary, is, if

17   Intel can convince the jury to give a one-penny royalty

18   to Intel, then Ericsson gets one penny from Intel and

19   zero from the customers.  You've heard that, haven't

20   you?

21   A.   I've heard that, yes.

22   Q.   Okay.  And Intel is not the only chip maker

23   that these companies buy 802.11 chips from, are they?

24   A.   No, sir.

25   Q.   Intel competes with other companies.  You've

1   named some of them:  Atheros and Broadcom, right?

2       A.   Yes.

3       Q.   And you know that Intel is in some pretty

4   fierce competition with them, right?

5       A.   Yeah, we compete vigorously.

6       Q.   Okay.  So if what you've heard in the

7   courtroom is true, if Intel can get a license for a

8   penny, couldn't it go to its prospective customers and

9   say, hey, if you buy Broadcom or Atheros, you may have

10  to pay Ericsson 50 cents?  But if you buy from us, you

11  don't have to pay anything.  That could happen, couldn't

12  it?

13      A.   I don't know.

14      Q.   Okay.

15           MR. CAWLEY:  I'll pass the witness, Your

16  Honor.

17           THE COURT:  All right.  Redirect?

18           MR. DAUCHOT:  Briefly, Your Honor.

19               REDIRECT EXAMINATION

20  BY MR. DAUCHOT:

21      Q.   The -- so was this as bad as your interview?

22      A.   I don't know.  I don't feel like I did so

23  good.

24      Q.   All right.  Let's -- I want to focus on just

25  one part of the cross-examination, and, that is the

1  50-cent issue.  And there was some discussion back and

2  forth about, you know, what would happen if -- if Intel

3  had to pay 50 cents today on the Ericsson patents, et

4  cetera.

5          And -- and you testified something about

6  the -- on the question of discrimination, something

7  about, you know, folks working on the 802.11 standard

8  having an issue with costs coming in later.  Do you

9  remember that testimony?

10     A.   I think so.

11     Q.   All right.  So -- so let's focus -- we're

12  during the standard setting process, right?  You folks

13  are sitting here trying to figure out what technology

14  we're going to put in, what technology are we not going

15  to put in, right?

16     A.   Right.

17     Q.   And during your experience back in the 2000

18  time frame, you remember from time-to-time issues coming

19  up about, hey, are we going to go this route or this

20  route?

21     A.   Yes, I remember that.

22     Q.   And costs, I would assume, came into the

23  equation, as well?

24     A.   It never happened.  But if -- if -- if one of

25  our competitors had brought in a proposal that was going

88

1  to put a cost on our product of 50 cents, it would have

2  been escalated to me.

3      Q.   Okay.  It would have been escalated to you.

4  Why does it get escalated to you?

5      A.   Because I end up owning the business statement

6  and the commitments we've made.

7      Q.   All right.  And how do you react to 50 cents,

8  given what you all were trying to accomplish in terms of

9  low-cost interoperability?

10     A.   Inconsistent with what we were trying to

11 achieve.

12     Q.   And how so?  Why does the 50 cents create a

13 problem?

14     A.   Well, if you look at where we're at today,

15 which was, you know, what we strive to and what we

16 have -- kind of what we had achieved on the Ethernet

17 standards, 50 cents on 2.50 ends up being a big problem.

18     Q.   And so the proposition was that it would just

19 be a -- quite a simple matter, just tack the 50 cents on

20 to the 2.50, and, hey, pass it on to the OEMs.  Did you

21 get that -- did you hear that suggestion?

22     A.   I don't remember hearing that, but it -- it

23 would have been a problem as we were trying to develop

24 products for the standard.

25     Q.   All right.  And why so?

1        A.    Because we were trying to -- we were trying to

2   drive the cost down so every laptop and device could

3   include Wi-Fi and then use it anywhere.  And driving

4   prices up is exactly in the face of what we were trying

5   to achieve.

6        Q.    All right.  Now, one final question.  There

7   was a question as to whether or not the chip price of

8   Intel includes a cost in there for Ericsson's licenses.

9              Do you remember that question?

10       A.    Yes, sir.

11       Q.    And I think you testified no.  Correct?

12       A.    Yes, I did.

13       Q.    And why not?

14       A.    Because we don't use it.

15       Q.    All right.  Thank you, sir.

16             MR. DAUCHOT:  That's all I have.

17             THE COURT:  Any recross?

18             MR. CAWLEY:  No, Your Honor.

19             THE COURT:  All right.  Thank you.

20             All right.  If the Members of the Jury

21   will pass down your witness questions.

22             (Pause in proceedings.)

23             MR. DAUCHOT:  Your Honor, just for the

24   record, may this witness be excused?

25             THE COURT:  Not yet.

1                MR. DAUCHOT:  Oh, I'm sorry.

2                (Pause in proceedings.)

3                THE COURT:  All right.  Ladies and

4    Gentleman of the Jury, we're going to go ahead and take

5    our lunch break at this time, and we'll be in recess

6    until 12:30.

7                Please follow the Court's instructions

8    and don't discuss the case among yourselves, and enjoy

9    your lunch.  We'll see you back here at 12:30.

10               COURT SECURITY OFFICER:  All rise.

11               (Jury out.)

12               THE COURT:  Please be seated.

13               All right.  We have a question from the

14   jury that says:  Can we see copies of patents that Intel

15   uses for their chips?  Patent numbers or licenses from

16   other inventors' patents.

17               MR. CAWLEY:  If that's -- that's outside

18   the evidence, Your Honor.  I guess it's outside the

19   evidence.  I'm not aware that there is such evidence in

20   the case at this point.  I think that it would be

21   improper to go into that with this witness.

22               THE COURT:  Okay.  All right.

23               MR. DAUCHOT:  Your Honor, we agree, at

24   least at this juncture.

25               THE COURT:  All right.  The Court will

1  not ask that question.  I think it -- it really

2  violates -- they're supposed to ask questions relating

3  to this witness's testimony, and this is just more of a

4  general -- general request.  But that will -- anything

5  further before we adjourn for lunch?

6              MR. CAWLEY:  Nothing from Plaintiff.

7              THE COURT:  All right.  We'll --

8              Excuse me?

9              MR. DAUCHOT:  I'm sorry, Your Honor.  Is

10  that the only question of the witness?

11              THE COURT:  Yes, he may be excused.

12              MR. DAUCHOT:  May he now be excused?

13              THE COURT:  Yes.

14              MR. DAUCHOT:  Thank you.

15              THE COURT:  All right.  Be in recess.

16              (Lunch recess.)

17

18

19

20

21

22

23

24

25

92

```
1                    CERTIFICATION

2

3              I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of our abilities.

7

8

9    /s/ Shea Sloan
     SHEA SLOAN, CSR
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/14

12

13
     /s/ Judith Werlinger
14   JUDITH WERLINGER, CSR
     Deputy Official Court Reporter
15   State of Texas No.:  731
     Expiration Date  12/31/14
16

17

18

19

20

21

22

23

24

25
```