1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


ERICSSON, INC., ET AL          )
                                    DOCKET NO. 6:10cv473
     -vs-                       )
                                    Tyler, Texas
                               )    12:41 p.m.
D-LINK CORPORATION, ET AL           June 10, 2013


                    TRANSCRIPT OF TRIAL
                    AFTERNOON SESSION
          BEFORE THE HONORABLE LEONARD DAVIS,
     UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY


                A P P E A R A N C E S


FOR THE PLAINTIFFS:


MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201


MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701


COURT REPORTERS:        MS. JUDITH WERLINGER
                        MS. SHEA SLOAN
                        shea_sloan@txed.uscourts.gov


Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

2

FOR THE DEFENDANT:


MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022


MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071


MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104


MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359


MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

3

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  All right.  Please be seated.

All right.  I hope everyone had a good lunch and a nice relaxing break.  I actually gave you 10 more minutes than I intended to, but it's okay.

All right, Mr. Stevenson.  You may proceed.

MR. STEVENSON:  Thank you, Your Honor.

JERRY GIBSON, Ph.D., DEFENDANTS' WITNESS,

PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. STEVENSON:

Q.   Good afternoon, Dr. Gibson.

Now, were you here for opening statements?

A.   Yes, I think I was.

Q.   Do you remember that in Defendants' opening, they argued that the 802.11 standard came from patented technology of companies like Intel and Atheros and Broadcom?

A.   You know, I don't remember specifically that.

Q.   You don't remember them saying that they put their patented technology into the standard to make it

4

more valuable?

A.   Well, I think I remember that, but I, obviously, don't remember the whole thing.

Q.   All right.  And the truth of the matter, sir, is, the 802.11 standard really is not innovative, is it?

A.   That's right.  It's about implementation.

Q.   Implementation means agreeing upon what to use, doesn't it?

A.   Yes.

Q.   And the 802.11 standard was about agreeing on what, from the existing technology, to use, wasn't it?

A.   Well, I mean, I wasn't on the standards body; but in general, I think all the participants have to agree.

Q.   All right.  But they didn't innovate; they agreed to use existing technologies, correct?

A.   Well, in general, I think that -- in general, that's correct.  I think that the new innovations are out there, and then the implementations are what matters when you get to actually making the product work.

Q.   And we saw a slide, didn't we, with piles of patents for each company?  You remember that slide?

A.   No, I don't remember that slide.  I'm sorry.

Q.   Well, I won't put it up, but the truth is, not much of the 802.11 standard is even patented, is it?

5

A.   Well, that's -- I mean, I'm not sure about that, right?  I really don't know that specifically.

Q.   Okay.  Well, do you remember in the past testifying to the contrary on that?

A.   I -- I guess you're talking about last fall?

Q.   Yes.  You were involved in a lawsuit involving 802.11 last fall as an expert, weren't you?

A.   That's correct.

Q.   And do you remember giving the following testimony from the transcript at Page 154/23 to 155/1?  You were asked the question in that case -- and you were under oath there, right?

A.   Oh, yes.

Q.   That was a federal trial, wasn't it?

A.   Yes.

Q.   And you were asked:  How much of the standard is actually patented today?

And you answered:  Oh, in my opinion, very little of the standard is patented.  Most of it came from the open literature because of all the research and development that had gone on before.

Is that the testimony you gave?

A.   Yes.

Q.   Now, you're aware, aren't you, Dr. Gibson, that Ericsson has been doing research and development on

6

radios for decades.

A.   Yes.

Q.   And the patents in this case were filed really a decade or more before the 802.11n standard was finally approved?

A.   I think the patents were -- yeah.  I'm glad you put that there, because I didn't remember this.

Where is -- you're talking about "n."  Okay.  The other standards aren't on here.

Q.   Okay.  What year was "n" approved in?

A.   It's shown here as 2009.

Q.   Okay.  And that's what -- that's what's at issue in this case, isn't it?

A.   Yes.

Q.   That's the standard in which Ericsson contends its patented ideas are used, right?

A.   These -- these five patents-in-suit, that's correct.

Q.   Okay.  And they were filed a decade or more before 802.11n was approved, fair?

A.   Yes.

Q.   Let's talk now about the '215 patent.  We'll start with that.

This is the patent of the group that deals with the type of acknowledgement sent by a receiver in

7

the network to the transmitter, fair?

A.   Yes.

Q.   Okay.  And I believe the argument I heard you make is that this patent doesn't infringe because there aren't multiple message types.

A.   Well, there's -- it's a little bit longer. There are not multiple message types responsive to the receiving step.

Q.   I'm just -- I'm going to put a headline down. I think that's the headline I got off the slide that you and Mr. Arovas showed at the end.

Do you remember that, the last slide?

A.   I think I do.

Q.   Okay.  Let me put up a foam board, and let me talk about things I think we might be able to agree on, all right?

MR. STEVENSON:  Mr. Diaz, can you put up this slide (indicating)?

Q.   (By Mr. Stevenson) And you're going to be able to see that a little better on the monitor in front of you, Dr. Gibson.

What we're seeing here, are we not, is a block acknowledgement frame right at the top.

A.   Yes.

Q.   And a block acknowledgement frame is what is

8

sent by the receiver of packets back to the transmitter to indicate which packets it doesn't have and which packets it does have, fair?

A. That's correct.

Q. Now, this claim requires constructing a message field for a second data unit, the message field including the type identifier field and at least one of a sequence number, a length field and content field.

Do you see that?

A. Yes.

Q. So we've got to have two fields, right?

A. Yes, that's correct.

Q. And Ericsson has identified the BA information field here as the content field. And you haven't disagreed with that, have you?

A. I don't recall.

Q. Well, the only thing you pointed to, I think, is what was in the BA control field, right?

A. Well, you're talking about in my direct. I was thinking about my reports and all that.

Q. The only thing you talked about in your direct was the BA control field, correct?

A. That's correct.

Q. Now, this BA control field, if we zoom out, has multiple compartments in it or multiple fields?

9

A.   Yes.  You're referring to the B1 and B2 locations?

Q.   Correct.

A.   Okay.

Q.   And in those fields are contained bits.

A.   One -- one in each one.  That's what the 1 under each means, yes.

Q.   There's a bit in each field, and it's a 1 or a 0, correct?

A.   That's correct.

Q.   So if you have two fields and either can each be a 1 or a 0, that's four variations you can possibly have, fair?

A.   If they could be a 1 or a 0, but they can't in the products.

Q.   Well, we're going to get to that, but you have four variations when you have 1s and 0s, right?

A.   Yes.  In the abstract, that's correct.

Q.   And then the standard provides, when you see those -- you're supposed to fill out those fields according to the chart below, which is the BlockAck, frame variant, and coding, right?

A.   And, again, you're talking about the B1 and B2 fields?

Q.   Yes.

10

A.    Okay.  Yes.

Q.    The Multi-TID and the compressed bitmap.

A.    Yes.

Q.    The two fields that are there in the blue.

A.    Yes.

Q.    Those correspond to the chart right below it. We agree on that, don't we?

A.    That's correct.

Q.    So if you're a receiver -- excuse me.

If you're a transmitter and a receiver sends you a block acknowledgement request, and you want to know what format it's in, you look at the Multi-TID and compressed bitmap values, and that ought to tell you which one of the variations is being sent to you, correct?

A.    That's correct.

Q.    Now, the standard sets out these options in the table, doesn't it?

A.    The standard -- the standard has that table in it, that's correct.

Q.    Now let's go through them.  00, the first one here, is what's called a basic block acknowledgement, right?

A.    Yes, that's correct.

Q.    Now, a basic block acknowledgement existed

11

before 802.11n, didn't it?

A.    I believe that's correct.

Q.    It can be used when the devices are in high throughput mode.

A.    Yes.

Q.    So if an end device connects with a non-end device outside of a high throughput mode, it could use the basic block acknowledgement, couldn't it?

A.    Outside of high throughput mode, it could use the basic block acknowledgement.

Q.    Now, another option on the chart is the Multi-TID BlockAck.

Do you see that?

A.    Yes.

Q.    And that's another option for 802.11 devices to use, isn't it?

A.    Yes, they can use that option.

Q.    This format is used with devices that support power save mode, isn't it?

A.    Yes, the PSMP mode.

Q.    Stands for what?

A.    Stands for power saving something.  I don't remember.

Q.    Is it power save multi-poll?

A.    No -- there you go.  Yes, I think that's true.

12

Q.   And that's, again, another mode that 802.11n devices have the option of using pursuant to the standard, isn't it?

A.   Well, as I said, I don't think any of the products support anything but the compressed block acknowledgement.  They don't support the PSMP mode.

Q.   Okay.  But they may receive bitmaps from others with those headings in them and have to deal with them, right?

A.   Can you tell me what situation you're setting up?

Q.   Well --

A.   What is the scenario that you're setting up --

Q.   Well, I'm asking --

A.   -- when you say from others?

Q.   -- I'm asking you a question.  Couldn't a device receive a Multi-TID BlockAck frame that's an 802.11n device?

A.   From some other product -- oh --

Q.   Yes.

A.   -- I see.  I didn't understand the question, so it's good I asked.

If -- if a -- if -- I don't know of any 802.11n products that support PSMP, so I don't know that you put "n" in the question, so I don't know of any

13

products that support that.

Q.    But isn't it true, sir, that if "h" -- high throughput stations -- these 802.11 devices on high throughput mode, they could receive a Multi-TID BlockAck?

A.    I guess what I said -- I don't -- in terms of the product I know, no one supports the PSMP mode.

Q.    Well, let's go through this then.

Do you remember Mr. Kitchin's testimony last Thursday?

A.    I was here.  We'll see how much I remember.

Q.    Okay.  He was the Intel engineer who testified.

A.    Yes.

Q.    And do you remember him being asked about the compressed bitmap BlockAck?

A.    I remember him being asked about it, yes.

Q.    Okay.  Do you remember him saying, in the case of the standard, 802.11n --

MR. STEVENSON:  Well, why don't we pull that up, Mr. Diaz, and we'll just look at it together.

And that's Mr. Kitchin's testimony from the afternoon of June 6th at 74/14.

Q.    (By Mr. Stevenson) Let me refresh your memory with this, Dr. Gibson.  This was questioning from

14

counsel for Intel.

And he said:  Okay.  In this case, we're talking about the standard, 802.11n, and you're explaining that HTSTA -- you understand that's high throughput stations?

A.  Yes.  I see it at the top.  I'm just catching up with you now.

Q.  Okay.  As we see in the document, it's referring to 11n.

Yes, that's correct.

So when an 11n device talks to another 11n device talking about 11n language, can you describe for the jury what type of BlockAck is it going to use?

He said:  In that case, you're going to use a compressed bitmap BlockAck.  And he goes on to say:  And that's that BlockAck we've been referring to.

And he was questioned:  Is there any choice permitted to do anything else?

And he said:  No, there is not.

A.  Yes.

Q.  He said:  There's no choice permitted.

A.  Yes.

Q.  But that's not quite true, is it, Dr. Gibson?

A.  So you -- you're asking me -- you're going back up and say, in the standard, there's no choice?

15

Q.   Correct.  That's not quite true, is there -- is it?

A.   Well, in the -- in the standard, it lists the Multi-TID code, option there.  It's just that I don't know of any products that use that mode.

Q.   Okay.  Well, do you recall writing a report in this case?

A.   Yes.  I have -- yeah, two long reports.

Q.   Do you recall talking about this Multi-TID BlockAck in your report?

A.   I'm not going to recall that, you know.  It's a long time ago and a long report, but you can show it to me if you want.

MR. STEVENSON:  Why don't we show Page 21 from Dr. Gibson's report, Mr. Diaz.  And zoom in on the top up there.

Q.   (By Mr. Stevenson) And the portion I'll direct you to is just above the highlighting where it says: The only time a compressed BlockAck would not be used is if the high throughput stations are in power save multi-poll mode pursuant to a high throughput immediate BlockAck agreement, in which case a Multi-TID BlockAck is used?

Is that correct?

A.   Yes, that's correct.

16

Q.   And is it fair to say also, sir, that even though the Defendants in this case have chosen for their particular devices the compressed BlockAck, that that device has got to be able to work with devices made by other manufacturers as well?

A.   I believe that's true.

Q.   I mean -- well, that's pretty basic, isn't it? I mean, if you're making 802.11n devices, the companies in this room aren't 100 percent of the market, their devices have to work with other companies' devices, right?

A.   Yes.  But what I wasn't sure of is that any other 802.11n devices support the PSMP mode.

Q.   Well, in fact, products made by the Defendants in this case may receive a block acknowledgement, which is in the Multi-TID mode, correct?

A.   Well, I guess we were talking about -- I don't -- I don't know of 802.11n products that operate in that mode, so I'm not sure what scenario you're talking about.

Q.   Well, have you read Mr. Kitchin's deposition in this case?

A.   I'm sure I did at one time or another.

Q.   One of the things you reviewed in this case, right?

17

A.   Pardon me?

Q.   That was one of the things you reviewed in this case, wasn't it?

A.   Yes.

Q.   Do you recall Mr. Kitchin testifying as follows at Page 171 of his deposition:  Do Intel's products receive the basic BlockAck or Multi-TID BlockAck variants.

So he's talking about these two right here, right?  Basic BlockAck and Multi-TID.  Is that what he's talking about in the question?

A.   Just let me read it here.

That's what -- yes, that's what it looks like.

Q.   Okay.  And what he says is:  So subject to the definition of receive, what happens in Intel's products, Intel's products may receive a frame, should it be transmitted to it, that BlockAck frame might contain any -- any of these variants.

A.   I --

Q.   Is that true?

A.   I see that, and when I --

Q.   Then he goes on to say:  In the event a frame, other than a compressed BlockAck is received, it would be discarded --

A.   Yes.

18

Q.   -- right?

A.   And what I was talking about, should it be transmitted to it, I don't know if it would be transmitted to it.  I don't know products that do that. So that's what I was talking about.

Q.   Well, you don't know there aren't any, do you?

A.   I mean, I don't know -- I don't know of any that do it, so I -- I haven't seen any.

Q.   You haven't done a search?

A.   No, I haven't done a search.

Q.   So you're just unaware of how many products may be out there that are currently implementing Multi-TID?

A.   That's correct.

Q.   And that's a power-saving feature, correct?

A.   That's correct.

Q.   But what has to happen in the devices, sir, is, when they receive a block acknowledgement, they have to look for these two bits every time, don't they?

A.   They receive those two bits, yes, they do.

Q.   But they have to look at them, right, to see what they're getting?

A.   Yes.

Q.   So to wrap up, would you say it's fair to say that the standard defines a number of message types for

19

block acknowledgements, specifically three?

A.   In this table, there are three message -- there are three block acknowledgement frame variants.

Q.   And each block acknowledgement that is sent contains a field that indicates which one of the three variants are being sent, correct?

A.   That's correct.

Q.   The message has to have that field, right?

A.   Yes.

Q.   It's mandatory, right?

A.   Yes.

Q.   And that field cross-references the variants that are in this table, right?

A.   Yes.

Q.   Okay.  Let's move on now to the '435 patent.

Now, this is the patent that deals with what happens in the receiver when the transmitter decides to stop retransmitting lost packets, right?

A.   Yes.

Q.   And I believe in your direct testimony, as a headline, you asserted that you don't think there's infringement because, in these cases, the receivers are not computing the packets the transmitter's discarded, right?

A.   That's correct.

20

Q.   All right.  Let's talk about that a little bit.  Now, let's first talk about computing and what computing is.

You're aware that both parties have produced a lot of graphics, animations to try to explain things.

A.   I've seen a lot of that, animations.  I've produced some myself.

Q.   You have some; we've got some; but the truth is, inside of the computer modules that are doing this, the world is not a bunch of blue squares and garbage cans; it's actually logic, right?

A.   Well, logic and processors and -- yes.  I do a lot of that.

Q.   And I remember the representative from Intel passing around some chips, some of these modules that are Wi-Fi modules?

A.   You said two things.  You're talking about the boards with the chips on it and the chips separately?

Q.   Well, I'm talking about the Wi-Fi modules that he passed around.  Remember everybody got to pass it around and look at it?

A.   You're talking about the chips themselves when you say modules?  That's what -- that's what I remember.  That's why I don't know what you're --

Q.   Well, all I'm saying is, there's a little

21

board inside the computer router that's got a computer chip on it, right?

A.   Yes.  Yes.

Q.   And that's a processor that runs computer code, right?

A.   Among other things, yes.

Q.   Okay.  And that computer programming is what's really responsible for receiving the packets, isn't it?

A.   Well, I'm not -- I'm not sure about that.  I mean, I described how the -- the packets come in. They --

Q.   Well, it's digital logic that is receiving the packets, isn't it, and keeping, for instance, the scoreboard?

A.   Well, the scoreboard is not receiving -- doesn't really have to do with the packets being received.  They're already received when you get to the scoreboard.

Q.   Okay.  Well, let's talk about the scoreboard, because I think that's what we're going to be talking about here.

The scoreboard is kept by these computer programs that run in these chips, right?

A.   Yes.  In -- in the receiver, yes.

Q.   In the receiver, right.

22

And, of course, all the chips have transmit and receive capabilities, right?

A.   That's correct.

Q.   So it would be in the receiving portion of the chip.

A.   Yes.

Q.   All right.  So let's talk about what the receiver does when these packets come in.

Now, the program running in the computer of the receiver keeps a window, doesn't it?

A.   Yes.  We talked about that.

Q.   We talked about that.  It's a receive window, isn't it?

A.   Yes.

Q.   And it basically defines a range of packets, doesn't it?

A.   A range of sequence numbers, that's correct.

Q.   Sequence numbers of packets.

A.   Right.

Q.   And this window moves from time to time, doesn't it?

A.   Yes.

Q.   And, in fact, in the programming and in the standard, there are rules for when the window moves and how much it moves, right?

23

A.   Yes.

Q.   Okay.  So let's look at some of the rules that govern the movement of the window.

MR. STEVENSON:  Can you pull up, Mr. Diaz, 9.10.7.3 from the standard, which I believe is PX 286?

Q.   (By Mr. Stevenson) You talked about this on your direct, didn't you?

A.   Yes, I did.

Q.   So this -- this section is entitled: Scoreboard context control during full-state operation, right?

A.   Yes.

Q.   And full-state operation is the operation that all the Defendants' products utilize, right?

A.   That's my impression, yes.

Q.   They don't use partial-state.

A.   Yes.

Q.   Yes, they do, or --

A.   No, no, no.  I'm sorry.  They don't use partial-state.

Q.   All right.  And the scoreboard is how the receiver keeps track of what packets it's received, right?

A.   Yes.  It keeps -- yes.  Excuse me.  Yes.

24

Q.   As well as which ones are still to come.

A.   Could you repeat that?

Q.   Yeah.  It keeps -- the scoreboard keeps track of the packets that it's received, as well as which ones are still to come.

A.   Yes.

Q.   Now, the computer keeps the scoreboard in something called a bitmap, doesn't it?

A.   Yes.

Q.   And a bitmap is basically sort of a map of 1s and 0s, isn't it?

A.   Yes.

Q.   So -- so, basically, what you can do is, if you want to know on this list of 1s and 0s if a packet has been received or not, you sort of count down the list to whatever 1 or 0 is supposed to represent for that packet and look it up.  And if it's a 1, it's received; if it's 0, it's not received.  Right?

A.   Yes.

Q.   That's how the bitmap works as a list of received or not received packets, right?

A.   In the scoreboard, yes.

Q.   And the rules here for whether you -- how you -- how you deal with the windows and how you deal with the scoreboard are defined in this part of the

25

standard, right?

A.   Yes.  Yes.

Q.   And the products work according to this, right?

A.   Yes.

Q.   So let's look at part of the standard, Part B, and I think this is similar to what you looked at.

Might be the same.

This section defines a number of what I'll call logical cases, fair?

A.   Okay.

Q.   I mean, basically, we have -- if a package is received, it's going to fall into one of these cases, isn't it?

A.   You're talking about 1, 2, or 3?

Q.   1, 2, and 3 all taken together sort of define the universe of what might happen to a packet when it comes in, right?

A.   I think that's all.  I might have to look below there to make sure.

Q.   Do you want to -- do you want to look at the copy?

A.   No, no.  If you represent that, I'll trust you on that.

Q.   Well, you talked about this on direct, too.

26

A.    I know, but I don't remember off -- you know.

Q.    All right.  Fair enough.

Let's walk through them, and if you think there's a missing case, we'll go back and deal with it.

A.    Okay.

Q.    But the first case here, isn't it, is where the packet comes in -- this is case 1 -- and it's inside the window, right?

A.    That's correct.

Q.    And then so what happens is, they put a 1 on the scoreboard for that packet because it's come in.

A.    Yes.

Q.    The receiver does that.

A.    Yes.

Q.    Now, case 2 is -- excuse me.  Yes.  Case 2 is, if the packet comes in and it's after the end of the window, it's beyond the window.  You remember testifying about that on direct --

A.    Yes.

Q.    -- and then what happens in that case is, the window moves to include the packet and a 1 gets put on the scoreboard; is that right?

A.    That's correct.

Q.    Okay.  Let me go to the foam board -- foam board.  Let's draw this visually.

27

A.    Okay.

Q.    I'm making -- these are just sort of imaginary slots with packets to fall in.  You may have seen the animations we had earlier.

A.    Yes.

Q.    And I'm going to call that green box a window of 4, all right?

A.    All right.

Q.    In reality, they're bigger than 4.

A.    Yes.

Q.    Now, what we just said is, if a packet comes in and it's inside of the window -- see, it's right here -- a 1 gets put on the scoreboard, right?

A.    That's correct.

Q.    So there's a little scoreboard up here with a list of 1s and 0s.  There.  Put that 1 up there.

A.    Okay.

Q.    Okay.  Now, the other case was, if a packet comes in, let's say right here, beyond the window -- you with me?

A.    You're talking about 2 now.

Q.    This 2.

A.    Yes.

Q.    Packet comes in.  It's beyond the window.

A.    Yes.

28

Q.   Then what happens in this scoreboard is, the window moves, doesn't it?

A.   Yes.

Q.   So now the packet is in the window, right?

A.   Yes.

Q.   And that's the receiver shifting its window over to cover the packet?

A.   Yes.

Q.   Okay.  And then it updates the scoreboard --

A.   Yes.

Q.   -- right?

A.   Yes.

Q.   So that's how the window works in the scoreboard that's going on in the eye of the receiver, right?

A.   Yes.

Q.   Okay.  Now, let me stop right here.  Talk about computing.

Will you agree with me, Dr. Gibson, that what we've talked about so far, these steps of going through these logical decisions about whether a packet is in or out of the window, updating the scoreboard, and also moving the window, is computing?

A.   Well, I -- I mean, there's -- I guess there's a lot of computing.  That's not much computing.  I mean,

29

you know, in what we -- in what we do, if that's

computing, there's not much there.

Q.   Okay.  Well, what we're talking about here,
Dr. Gibson, is a computer processor in these devices,
right?

A.   That's correct.

Q.   Running computer code that we looked at some,
and we're going to look at some more, right?

A.   I don't know about what we're going to do, but
we have looked at some.

Q.   Well, it's running computer code, right?

A.   Yes.

Q.   And it's going through the logic of that
computer code that implements this logic in the
standard, right?

A.   Yes.

Q.   And it's making decisions about -- and
calculations about how much to move a window?

A.   Yes.

Q.   And it's making if-then decisions about
whether something is in or out of the window, right?

A.   Yes.

Q.   And then it's updating a logic structure,
which is a bitmap, right?

A.   It's updating the bitmap.

30

Q.   Are you telling us, none of that is computing?

A.   You know, I -- I -- no, I'm not going to tell you that none of that is computing.

Q.   All right.  Fair enough.  Thank you.

A.   Uh-huh.

Q.   Now, let's talk about these computations and how they relate to packets that the transmitter has discarded.

Now, sir, isn't it true that in addition to the receiver keeping a window, the transmitter also keeps a window?

A.   It does keep a window.

Q.   And the transmitter window, when the receiver window moves, also moves, doesn't it?

A.   I don't think that's accurate, at least as far as I know.

MR. STEVENSON:  Well, let's look at Page 280 -- excuse me -- Plaintiff's Exhibit 286, which is the standard, at Page 139.

And if you'll zoom in on the third paragraph, Mr. Diaz.

Q.   (By Mr. Stevenson) The second sentence here says:  The originator -- that's the transmitter, right?

A.   Yes.

Q.   You agree that's the transmitter when it says

31

originator, don't you, Dr. Gibson?

A.    Yes, I think so.

Q.    Okay.  May transmit an MPDU.  That's a packet, right?

A.    Yes.

Q.    With a sequence number beyond the current transmission window; is that right?

A.    Yes.

Q.    That's the example I just showed right there, isn't it?

A.    Well, you showed the example at the receiver. It's received the packet --

Q.    Right.

A.    -- with that sequence number.

Q.    Yeah.  The transmitter has transmitted a packet outside the window, beyond the window, and the receiver has received it.

A.    That's correct.

Q.    And then it says:  In which case the originator's transmission window and the recipient's window will be moved forward.

       Did I read that correctly?

A.    Yes.

Q.    Now, I wanted to ask you a question about a slide that you showed.  Do you remember showing that

32

slide in your direct?

A.   Yes.

Q.   And in that slide, the example that was given is a block acknowledgement going back from the receiver to the transmitter.

Do you see that?

A.   Yes.

Q.   And the example that the lawyer for the Defendants gave is:  Well, what if that block acknowledgement isn't received, what happens then? Right?

A.   Yes.

Q.   And then the suggestion was that you're going to have different packet numbers in memory of each transmitter and receiver.

Do you remember that?

A.   Yes.

Q.   But you hit the pause button at just the right time here, didn't you?

A.   I'm -- I'm not sure what you're referring to.

Q.   Well, let's talk about what happens when the block acknowledgement isn't received.

When a block acknowledgement isn't received after a transmitter is expecting one, it's going to do one of two things, isn't it?

33

A.   I -- I know of two things it would do.

Q.   It's either going to send out an express block acknowledgement request or it's going to send out an A-MPDU, right?

A.   Are you talking about retransmit the --

Q.   Yes.

A.   -- the packets --

Q.   Yes.

A.   -- for the A-MPDU?

Q.   Yes.

A.   Yes.

Q.   It's going to do one of those two things, right?

A.   Well, yes, I think so.

Q.   And an A-MPDU is also called, in the standard, an implicit block acknowledgment request, right?

A.   It is called that in the standard.

Q.   And finally, Dr. Gibson, am I correct that if you abide by the standard, the transmitter will not transmit any packets that are behind its current transmission window?

A.   The transmission window at the transmitter, that's correct.

Q.   And in Intel's products, those packets are no longer going to be transmitted or discarded, correct?

34

A.   They're no longer -- I'm not sure what that sentence means.  They're no longer going to be transmitted, so you're saying that must mean they're discarded.

Q.   They're released, aren't they?

A.   Yes.

Q.   Okay.  Same -- same is true of the other Defendants' products, as well, right?

A.   As I understand it.

Q.   Okay.  Let's talk next about the four -- excuse me, the '625 patent.

Now, the '625 patent is the patent that speaks to the transmitter side of not -- not retransmitting packets, right?

A.   Yes.

Q.   Yes.  That -- that's the claim written from the transmitter perspective?

A.   That's correct.

Q.   Okay.  And you've asserted that that claim is not infringed -- that patent is infringed (sic) because there's no command to receive, right?

A.   Yes.

Q.   So let's talk about how 802.11n networks are actually set up.

Is it fair to say that the base stations and

35

the terminals in an 802.11n network are all set up to play by the same set of rules?

A.   You're talking about the routers and the devices --

Q.   Yes.

A.   Yes.

Q.   Yes.

A.   Yes.

Q.   And those rules are in the standard, right?

A.   Well, as we've seen, some of the -- some of the products don't implement each and every portion of the standard.  And, of course, there's also optional portions of the standard.  I mean, so to be clear, there are rules in the standard, and the products try to meet those rules if they implement those modes.

Q.   And the rules, at least the ones that the Defendants are using, are coded into the products, aren't they?  That's the -- the code we've looked at?

A.   Yes.

Q.   Okay.  And the rule in 802.11n that's coded into these products is that all arriving packets within the window or above the window, beyond it, must be received, correct?

A.   That's correct.

Q.   So you've given us and the Defendants have

36

given us in the case an animation of a green light.  Do
you remember that?

A.   I do.

Q.   The green light's on.  But the truth is in the
real computer world, the green light has to be
programmed in, doesn't it?

A.   What are you referring to in particular?

Q.   The green light is digital logic in each one
of these devices that is set up to accept and receive
packets if they comply with the rules of the window,
right?

A.   Well, there's no green light, it just accepts
packets.

Q.   Yes.  And to do that, the devices have to be
programmed to do it, right?

A.   Anything within or above the window is
accepted.  I've made that clear.

Q.   They have to be programmed to do it, right?

A.   To accept packets?

Q.   Yes.

A.   They accept packets, I agree, yes.

Q.   And all of the devices on the network need to
know the common rule, the common agreement about whether
you're going to accept packets outside the window,
right?

37

A.  Yes.

Q.  You can't have a system where one guy thinks I'm not taking packets outside the window and the other guys thinks, well, I'm going to send packets outside the window.  That's not going to work, is it?

A.  And -- yes, and that doesn't occur in these products.

Q.  Because they all perform by the same set of rules with regard to that, right?

A.  That's correct.

Q.  Okay.  Now, let me ask you a question about something you said in your direct.  I think you told the jury that this patent was designed for systems in which packets are received in order?

A.  Say that again.

Q.  I thought I heard you say to the jury that this '625 patent was designed for systems in which packets are received in order.  Did I hear that correctly?

A.  Well, can you show me the claim?  Because I think I was referring to an element in the claim.

Q.  Sure.  I'll just use Mr. Arovas's.

A.  Yes.

Q.  Okay.

A.  So I wasn't answering your question.  What I'm

38

saying is -- is that --

Q.   Let me --

A.   Yeah -- yeah --

Q.   -- let me --

A.   -- hold it up while we answer the question, and we'll know what we're talking about.

Q.   All right.  Let me ask my question again.

I thought I heard you tell the jury that the '625 patent was designed for systems in which packets are not received in order -- or excuse me, packets are only received in order -- in sequential order?

A.   Yes, that's -- and that's what it's trying to do in that claim element.

Q.   Now, am I correct that 802.11n is a selective reject protocol?

A.   I -- let's see -- I'm not sure.

Q.   Have you ever heard of it referred to as a selective repeat, selective reject protocol?

A.   I haven't heard of 802.11 referred to as select or reject, so that's why I'm not sure.

Q.   Okay.  Well, let me ask you this generally about the '625 patent.  Are you aware that there's a statement inside the '625 patent that says it can be used in a selective reject protocol?

A.   I don't remember that off the top of my head.

39

Q.   Okay.  Well, let's refresh your memory and show you Column 7, Lines 34 to 38.

MR. STEVENSON:  And will you zoom in to Column 7, Mr. Diaz?

Q.   (By Mr. Stevenson)  So they're talking about exemplary embodiments in this part of the patent, and it says:  An embodiment of the invention illustrated, for example, a selective reject type packet exchange.

Do you see that?

A.   Yes.

Q.   Does that refresh your recollection that this patent can be used with selective reject?

A.   I see that.  I'm going to go ahead and read the rest of the paragraph.

Okay.

Q.   And isn't it true that a selective reject protocol, in fact, allows packets to be received out of order within the window?

A.   I think that the selective reject here in the specification is being used to describe the RPEB use that I talked about earlier.

Q.   Well, let me ask my question again.  Isn't it true that a selective reject protocol actually allows packets to be received out of sequence within the window?

40

A.   Yes, that's correct.

Q.   So this patent was for use in systems that allow packets to be received out of sequence in the window; fair?

A.   I think that's what the RPEB was about, command or receive.

Q.   This patent was designed for use in systems, among others, that already allowed packets to be received out of sequence; fair?

A.   I don't know that from -- from the specification here.  I'm not sure -- what -- tell me -- just elaborate on this a little bit.  So -- repeat that question.

Q.   Okay.  Let me go back.

We're now looking at Column 7.  It says:  An exemplary embodiment of the invention illustrated.  For example, in Figure 12, a selective reject type of packet exchange is used that relies on the same basic principles... you see that?

A.   Yes.

Q.   The inventors are describing their invention for improving and for use with a selective reject type of packet exchange, right?

A.   You're saying that's an exemplary embodiment.

Q.   Right.

41

A.   Yes.

Q.   And then I asked you, isn't it true a selective reject packet exchange allows packets to be received out of sequence within the window, and I thought you said yes?

A.   I did.  I said, yes.

Q.   So as a result, this '625 patent was solving problems in systems not just where packets were only allowed to be received in order, but also where they could be received out of sequence.  Fair?

A.   Well, I guess I'm confused.  I thought -- the way I'm reading this paragraph is the invention is to implement a selective reject protocol.  An exemplary -- exemplary embodiment is what they're claiming as an example of their invention.  That's -- that's the way I'm reading this, so that's --

Q.   Well, let's talk next about the command to receive.  This patent discloses a command to receive, doesn't it?

A.   Yes.

Q.   And that disclosure -- well, let me -- let me -- before I do that, let me show you a document you created and used on your direct.  And it was this.

Do you remember talking about this slide?

A.   I do.

42

Q.   And so what we have on here are these rectangles with numbers on them that are packets, right?

A.   Yes.

Q.   And you're -- you're trying to describe for the jury the '625 and how it works, aren't you?

A.   Yes, the -- illustrate the solution of the problem that the '625 was trying to work on.

Q.   And -- and you showed packets going across, and then you, in this slide, showed what the command to receive would look like, right?

A.   Well, this is illustrative.  I guess the command to receive is in Figure 8, the example from the patent.  I mean, I didn't invent something from the patent.

Q.   The truth is, the command to receive is really a packet with an embedded bit, isn't it?

A.   It has -- it has -- in -- the one example given in the patent is -- is the Figure 8, and it has that extra bit at the front of the sequence.

Q.   Okay.  So the example in the patent isn't a separate command to receive sent separately from any other packets; it's actually a packet with one embedded bit, right?

A.   It's at -- it's at the front of a transmitted packet, that's correct, yes.

43

Q.   Okay.  So it's a packet with an embedded bit, right?

A.   For the one example in the patent, that's correct.

Q.   It's not a completely separate message that isn't involved with the packet?

A.   Yes, I guess I didn't mean to indicate that, so --

Q.   Okay.  So let's talk about that patent.  What the invention is basically saying is you take a packet and you put one bit in it.  It's either a 1 or a 0, and then you send it on its way to a receiver, correct?

A.   That's correct.

Q.   Then when that receiver gets that packet, it's either going to -- it's going to apply its logic rules and it is either going to accept it or not accept it, right?

A.   It's going to look at that command to receive and -- and make that decision.

Q.   Right.  It's going to look at the one bit and make a logical decision about it, right?

A.   And we're talking about the Figure 8 example, that's correct.

Q.   But isn't it true, sir, that that one bit necessarily relies on programming that's embedded into

44

the receiver with the logical rules about what to do with the one bit and the packet when it gets it?

A.   It has to know what to do with the one bit that's been added, that's correct.

Q.   The receiver has to have logical rules programmed into it to be able to interpret the one bit and decide what to do with the packet, right?

A.   That's correct.

Q.   And if you set the bit to 1 every time, it would just accept every single packet, right?

A.   Yes, I think so.

Q.   Just like the Defendants' products?

A.   No, I don't think the Defendants' products have that extra bit.  They just have a sequence number.

Q.   Right.  But the Defendants' products have rules programmed into all the receivers for what to do when packets come in, right?

A.   Accept them.

Q.   It has rules programmed into all the receivers, right?

A.   Yes.

Q.   And they need those rules in the receivers to be able to deal with packets as they come in, don't they?

A.   Yes.

45

Q.   Just like the '625 needs rules programmed into all the receivers to know what to do when the packets come in and whether or not to accept or reject them, right?

A.   No, it's not like the '625 because there's no extra bit.  I mean, the patent itself contrasted itself from a regular packet in Figure 5.

Q.   Now, let me ask you this, Dr. Gibson:  Is it true that in the standard, receivers are required to accept incoming packets because of the rules that are precoded into all the devices on the network?  Will you agree with that?

A.   I do.

Q.   And the '625 patent tells us that the packet itself can contain the command to receive?

A.   Yes.  It has an extra command to receive.

Q.   Now, let me ask you a question about the Intel patent.  Do you remember on Thursday Mr. Kitchin talking about an Intel patent and moving that into evidence?

A.   I remember him talking about an Intel patent. I didn't see the patent at that time, what he was talking about.

Q.   Do you remember hearing him say that that patent was only related to partial-state operation?

A.   I don't remember that.

46

Q.   Okay.  Would you like to see his testimony on that --

MR. STEVENSON:  Transcript 77, Line 20.

Q.   (By Mr. Stevenson)  That was the '858 patent, Dr. Gibson.  Do you remember him saying that this is referred to as a partial-state block acknowledgement?  Essentially it's a way of allowing Wi-Fi routers that have 802.11 to work with a large number of client devices?

A.   Like I said, I didn't -- I mean, I was in the audience, but I didn't -- I didn't hear that.

Q.   All right.  But Intel doesn't implement partial-state block acknowledgement, do they?

A.   Not that I know of.

Q.   So that patent doesn't have any bearing on this case, does it?

A.   Well, I don't know about the rest of the patent.  I -- the answer to your first question, as far as I know.  The second question, I don't know.

Q.   Okay.  Let's talk about the '568 patent.  That's the service type identifier patent, right?

A.   That's correct.

Q.   And that -- you've asserted that you picked the service type identifier as missing from that -- from the Defendants' products and that's why there's no

47

infringement?

A.   That's correct.

(Pause in proceedings.)

Q.   (By Mr. Stevenson)  Now, the '568 patent claim is an apparatus claim, right?

A.   I believe that's true.  You would have to show it to me for me to recall that.  I mean, if you want me to draw a conclusion from that, it's useful.

Q.   Be happy to.

MR. STEVENSON:  You want to put that slide up, Mr. Diaz, the '568?

A.   I see what -- yeah, I see what you're -- I see what you're referring to.

Q.   (By Mr. Stevenson)  Communication station comprising a processor and a transmitter?

A.   Yes.

Q.   Do you understand that to be an apparatus claim?

A.   Yes.

Q.   And you -- you've testified before in patent cases, right?

A.   I have.

Q.   And so you know how to at least interpret apparatus claims with functional limitations in there, don't you?

48

A.   I think so.

Q.   You understand that in an apparatus claim, if there are functional limitations, the apparatus that's accused infringes if it's capable in its ordinary use of performing those functional limitations?

A.   Can you say that just one more time?

Q.   Sure.  You understand, don't you, that an apparatus claim that contains functional limitations, like this one does, is infringed if an apparatus -- an accused device is capable -- has the structures and is capable of performing the functional limitations in its ordinary use?

A.   That's my understanding.

Q.   And you've identified some of the functional limitations as identifying the type of information, as in your opinion, missing from this, correct?

A.   Yes.

Q.   Now, let's go back to this chart we talked about, and I want to talk about the frame format a little bit.

This right here (indicating) at the very top is a packet layer.

A.   What -- that's the -- yes, the whole thing is a packet with a MAC header in front, that's correct.

Q.   These are the data packets we've been talking

49

about?

A.   Yes.

Q.   And the frame body would be the payload, that's where the voice, video data, whatever, would be stuck in?

A.   Yes.

Q.   And then this patent has a QoS control field, right?

A.   Yes.

Q.   You agree with me, don't you, that if you blow out this QoS control field, one of these seven numbers -- excuse me, eight numbers is going to be in it?

A.   Yes.

Q.   Those are the type identifiers or the traffic identifiers?

A.   Traffic identifiers.

Q.   And those numbers have to be in every packet that goes out, don't they?

A.   Yes.

Q.   That field has to be populated, doesn't it?

A.   It does.

Q.   Now, do you recall last week there was a question from the jury about whether there's criteria available for developers and programmers on how to use

50

this?

A.    I don't recall that.

Q.    Okay.

A.    Yeah.

Q.    Can we answer that question anyway?

A.    Let's -- let's try.

Q.    Let's try.

Are you aware that Intel has created documents that actually advise programmers who program for Intel wireless modules, how to implement these fields?

A.    I don't remember that.

Q.    Okay.  Would you like to see that document and we can discuss it?

A.    If you're going to ask me about it, let's -- let's look at it.

Q.    That's Plaintiffs' Exhibit 514.  You may have it in your binder, or we can look at it on the screen.

A.    Okay.  There we go.

Q.    It's called an Intel Wi-Fi adapters system developer kit.  You've heard of system developer kits before, haven't you?

A.    Yes, I have.

Q.    It's what a manufacturer will create and provide to the market so they can program for the devices that the manufacturer makes?

51

A.   Yes.

Q.   And this is a document where Intel actually is intending others to use it and read what's in it so they can program drivers or other things for their products; fair?

A.   Yes.

Q.   Okay.

MR. STEVENSON:   Let's look at Page 9.

And just to clarify, would you zoom in, Mr. Diaz, on the second paragraph?  It's a small one, just that sentence.

Q.   (By Mr. Stevenson)  It says:  Unsurprisingly, this document prepares you to create a device driver for the Wi-Fi adapter.

And describes some flows, doesn't it?

A.   It says it describes four major flows, yes.

MR. STEVENSON:   And I think below that a little bit, Mr. Diaz, there's another section that plains -- if you'll go down.

Q.   (By Mr. Stevenson)  As you follow the steps through the manual, right under all the chapters, it's basically saying if you read this and you follow the steps, you'll get all the information you need to write and verify the operation of your device driver.

A.   Yes.

52

Q.   Now, let's go to Page 65.

MR. STEVENSON:  And will you zoom in on the first -- thank you.

Q.   (By Mr. Stevenson)  Here we have a discussion about quality of service mapping, don't we?

A.   Yes.  Let me look at it here a little bit.

Q.   Sure.  Tell me when you're ready to answer questions.

A.   Okay.  You tell me the question first, and then I'll...

Q.   I will tell you the question first.

A.   Okay.

Q.   Intel, in this document, is explaining the four access categories, isn't it?

A.   Yes.

Q.   And it's describing them as voice, video, as well as best effort and background, isn't it?

A.   Now, what you're referring to is -- yes, you're referring to the BK, BE, VI, and VO as access categories that you're then going to map to another -- to the table -- I guess we've already seen the table.

Q.   Yes.  And, in fact, we can go down a little bit in this document and see what Intel tells people about the table.  And don't they tell people in the quality of service mappings right beneath it -- in the

53

table right under it, don't they tell people, the developers, that if you have VO, that that's -- VO stands for voice, right?

A.   In this table.

Q.   That would be a TID of 7 or 6?

A.   Either one of them, that's correct.

Q.   And if it's VI for video, it's a 4 or a 5, isn't it?

A.   Well, that -- that's what they have in this table, that's correct.

Q.   Now, let me ask you some questions about your quality of service testing.  You did some testing in this case, and you talked about it, didn't you?

A.   Yes.

Q.   And that testing was relevant to this particular patent?

A.   Yes.

Q.   And the frequency with which applications use this feature?

A.   Pardon me.  Say that again.  I interrupted.

Q.   No, that's okay.  I may have talked over you. I apologize for that.

A.   Okay.

Q.   You -- you did some testing into the frequency which with -- with which applications utilize this

54

feature, didn't you?

A.    What I tested was to put in -- if we're -- if we're talking about the same experiments, I put in various applications like Skype and audio streaming and -- and searching the web and so on.  Is that what we're talking about?  And looked for the traffic identifier number.

Q.    I'll show you --

A.    Yeah.

Q.    -- what the --

A.    Uh-huh, that's the one.  Yes.

Q.    Right.  And you showed that slide, didn't you?

A.    Yes, I did.

Q.    Now -- and I think you said this -- this was the case for everything, didn't you?

A.    In all the tests I ran, that's what I got.

Q.    Do you recall, sir, running an Ekiga video call?

A.    I may have run an Ekiga video call.  I don't remember.  I remember I tried to use Ekiga that time for video and voice.  I don't remember exactly if it connected or not, but I may have tried to do that.

Q.    Well, you -- you installed -- don't you remember setting up a network?  You installed two computers with a router?

55

A.    Yes, I installed eight computers and a tablet with three routers, so --

Q.    I'm talking --

A.    -- I'm just trying to narrow it down a little bit.

Q.    All right.  Well, I'm talking about a particular test where you ran the Ekiga video conferencing program.  Do you remember doing that?

A.    As I said, I think I remember doing that, but I'm not totally clear.  It was a few months ago.

Q.    Well, let's set up -- let me jog your memory. We'll set up the test setup.  When I read your report, you had a Toshiba computer -- Toshiba laptop and a Dell laptop and a Belkin wireless router, and you were trying to do a video conference between them.  Do you remember that?

A.    That makes sense.

Q.    Okay.  And -- and you -- what you did is, you got an application that actually snips the packets in the air and records them and you can look at data for them, right?

A.    You're talking about the wire -- Wireshark application, right?

Q.    Wireshark?

A.    Yes.

56

Q.   You did a Wireshark on it?

A.   I did.

Q.   And you -- you turned over to us your Wireshark data.  Do you remember that?

A.   Yes, all of it.

Q.   Let's look at your Wireshark data, and this is actually in your report?

A.   Well, we'll see.

Q.   Page 794 --

A.   Yeah.

Q.   Excuse me, yes, Page 794 at 7-172.

     MR. STEVENSON:  And can you zoom in on the highlighting?

     Thank you.

Q.   (By Mr. Stevenson)  What you wrote here is for Ekiga, a video call produced packets with a TID subfield of 5, which corresponds to the video access category, right?

A.   That's correct.

Q.   So what you said before, that it was -- everything had a 0, that isn't true?

A.   Can I -- can you -- I guess you don't have the rest.  I was going to scan down and just look at the frame check sequence and stuff like that, to make sure the frame was correct.

57

Q.   Sure.  We'll get you a copy of your report.

A.   Okay.

Q.   But while we're doing that, do you see the blowout -- I mean, this is -- this is actually from your report, right?

A.   Right.

Q.   This is your -- this is your work, isn't it?

A.   Yes.

Q.   And you said that video call-produced packets with the TID subfield of 5, which corresponds to the video access category.

MR. STEVENSON:  Your Honor, may Mr. Lipschitz approach the witness to give him a copy?

THE COURT:  You may.

MR. STEVENSON:  Thank you.

Q.   (By Mr. Stevenson)  And then before you look at your report, I'd just like to ask you, in your report, don't you zoom in on the actual packet where it says QoS control TID 5, Priority:  5 (video) (video)?

A.   Yes.

Q.   And -- and if we go back to the chart we've been looking at, 5 is video, isn't it?

A.   Yes.

Q.   So that's just dead wrong, right?

A.   Yes.

58

Q.   Ekiga is using this invention, isn't it?

A.   In this -- in this call, Ekiga assigned a TID of 5.

Q.   It's using the invention, right?

A.   Ekiga is using the invention, you said?

Q.   Yes.  That's what you tested, right?

A.   Yes.

Q.   Okay.  Now, do you need to look at the rest of your report to --

A.   I was just going to verify if the frame check sequence was -- said the packet was correct.  That's all because I just -- you know, a long time ago and I don't remember, but I don't -- I can't read it.  It's too small.

Q.   Okay.

A.   I can't --

Q.   Do you want to change any of your testimony?

A.   No.  No.  No.

Q.   Okay.  Let's go on to the '223 patent, and I think finished with that.

Now, in this patent -- this is a patent -- the '223, that deals with the timer to -- to -- what I call the discard timer, and you've identified two elements.

One is the notes -- you say there was no segmenting, and the other, the timer doesn't start when

59

the packet's received by the data link layer?

A.   That's correct.

Q.   I'll write both of those down.

Let's talk first about the timer.

During your direct testimony, I think you made the point that there's got to be a specific spot where the timer starts, right?

A.   Yes.

Q.   And you identified that as when the data link layer is entered, right?

A.   That's what the claim said.

Q.   Okay.  And you said that the timer is actually started, I believe when the -- when it enters the MAC layer, right?

A.   Well, what I said was if -- if the claim refers to a timer in the 802.11 chip, it can't be before the MAC layer.

Q.   How do you know, to be able to give sworn testimony, exactly where the timer's initialized?

A.   You're talking about in the chip?

Q.   Yes.

A.   The chip only covers the MAC layer below the first entry into the data link layer.

Q.   Well, my question is -- to be able to give sworn testimony about where the timer starts, what did

60

you do to review how the chip actually works and where the timer is?  For instance, did you look at source code?

A.    Well, let me go back.

The -- the Wi-Fi chip only covers the MAC layer and the file layer, and the -- and the patent requires as soon as you go from the network layer to the data link layer, at that moment the timer has to be set.

Q.    Okay.  Did you review source code to verify whether your testimony's accurate?

A.    I -- what -- what would be inaccurate about that?

Q.    Well, we will talk about that.  But my question is, did you review source code before testifying to make sure what you're swearing to is accurate?

A.    Well, I looked at source code.  I'm not sure what you're going to show me, so...

Q.    Okay.  Well, may I show you the source code and get you to show us where in the code certain things happen?

A.    Sure.

MR. STEVENSON:  May I approach, Your Honor?

THE COURT:  Yes, you may.

61

MR. STEVENSON:  I'm going to provide the witness with PX 208D that's been previously provided to defense counsel.

Q.   (By Mr. Stevenson)  When a packet enters a layer, Dr. Gibson, isn't it true that a label is put on it?

MR. AROVAS:  Do you have a copy?

MR. STEVENSON:  It was provided to you last night.

MR. AROVAS:  If you did --

MR. STEVENSON:  -- pursuant to the agreement.

MR. AROVAS:  -- I've gone through the documents you've given to us, and I didn't find it.

MR. STEVENSON:  I think it was -- we -- we have a limited -- as you know, we're only permitted to have three copies, Mr. Arovas.  We gave you ours last night.

Q.   (By Mr. Stevenson) And I apologize, Dr. Gibson.  We're permitted to only have a limited number of copies of this under the Rules.

While you're looking at that, here's my question for you, sir.

A.   Okay.

Q.   And I'll do a lead-in, then I'm going to ask

62

you to look in the code.

As you know, when packets go to different layers in the protocol stack, headers get applied to them, right?

A.   Yes.

Q.   Can you show us in the code, please -- just tell us the line -- where the MAC header gets put on the packet when it enters the MAC?

MR. STEVENSON:  And for the record, this is function htxHandleTxPacketEventComplete, which I believe you cited in your report, Dr. Gibson.

(Pause in proceedings.)

A.   So what I see here -- or if I didn't lose it when I went by... there's a place where the MAC header starts, and I've lost it now.  And there's a place where the LLC header is added.

Q.   (By Mr. Stevenson)  Okay.  Well, let's talk about the MAC header.  Do you know where is that?

A.   That's what I was -- I saw it, but now I've gone past it and I've lost it.

Q.   Would you -- why don't you turn to page -- Line 883.  That may be where it is.

A.   Yes.

Q.   And I'm just going to put a couple of lines of this up very quickly, 883.  Is this the MAC header?

63

A.   Yes.

Q.   I'm going to call that the MAC header.

And where was the LLC, the logical link control header first applied?

A.   It's over at 1045.

Q.   You anticipated my next question, Dr. Gibson. That's a comment you pointed to, though, sir, isn't it?

A.   Yes.

Q.   Okay.  Well, where is the actual computer instruction that applies to the header?  Comments aren't run by the computer, right?

A.   That's correct.

Q.   Is it at 1047?

A.   Well, 10 -- yeah, 1047 is the -- it says:  The PLL -- PLLC, logical link control header event data.

Q.   Okay.  LLC header.  And that's after the MAC header, correct?

A.   In this list, that's correct.

Q.   Let's go on to the next issue you raised, and that's segmenting.

We've heard the word fragmenting a number of times, haven't we?

A.   Yes.

Q.   Fragmenting, of course, is a different word than segmenting, isn't it?

64

A.   It is a different word, that's correct.

Q.   And I'd like to walk through the claim language with you.

A.   Okay.

Q.   Let me get my board.

I'll put it over where we can both see it and talk about it.  I don't want you to have to --

A.   That would be good.

Q.   All right.  How's that?

A.   Good.

Q.   Now, you understand that a patent is the legal description of the invention, right?

A.   You talking about the claim?

Q.   Excuse me, the claim.

A.   Yeah, right.

Q.   Thank you.  A claim is the legal description of the invention, right?

A.   That's what I understand.

Q.   And claims are carefully worded and negotiated with the Patent Office during prosecution, aren't they?

A.   Yes, they are.

Q.   Every word is important in a claim?

A.   I believe so.

Q.   And after it's issued, we can't change the meaning or change the words in it; we have to abide by

65

what it says, don't we?

A.    Yes.

Q.    And you agree with me that the words, at least one, mean one or more?

A.    Let's just point to that in that claim. Where -- where in one of these elements?  The second one?  No, that's the discard timer.

There it is.

Q.    At least one.

A.    Yeah.  Yes.

Q.    Do you agree with me the words, at least one, mean one or more?

A.    I think I said that in my direct.

Q.    Okay.  And you agree with that, don't you?

A.    Yes.

Q.    Now, if, hypothetically, the accused devices took a service data unit and turned it into two protocol data units -- you with me?

A.    Segmenting into -- sorry.

Q.    Took one service data unit and put it into two protocol data units, you would agree with me that this claim -- this element would be met, right?

A.    That's correct.

Q.    Now, let me ask you this:

If you take one service data unit and transfer

it or convert it into one protocol data unit, that is at least one, correct?

A.   Yes.  But I think you said earlier -- and I've tried to do this -- is that every word in the claim has meaning.  And segmenting means segmenting.  So segmenting means to split in some way.  I don't know of another definition for it.

Q.   And if the patent owner had meant two or more, he could have written two or more instead of at least one, correct?

A.   Yes.

Q.   Okay.  Thank you, Dr. Gibson.  I don't believe I have any further questions.  Thank you for your time.

A.   Thank you.

THE COURT:  Redirect?

MR. AROVAS:  They're all mixed up.  I'll find the right one.

REDIRECT EXAMINATION

BY MR. AROVAS:

Q.   Let's just -- might as well start where we left off, if we could, Dr. Gibson.  And what I want to do is I want to make sure that we're keeping our eye on what matters -- on what we're supposed to do here.

MR. AROVAS:  You got this?  Thank you.  Thank you so much.

67

Q.   (By Mr. Arovas)  I'll use the board again, and let's -- I'm going to put the claim on.  And can you see this, Dr. Gibson?

A.   I think I can.

Q.   I think we also have a slide that we could put up.

But I want to focus -- since we talked last about segmenting, and we'll talk about the initialization right here, okay?

So segmenting -- the phrase that we're looking at is segmenting said service data unit into at least one protocol data unit.  We heard that that can be one or more than one, right?

A.   Yes.

Q.   So is segmenting part of the claim?

A.   Yes.

Q.   And one -- or one or more than one or into at least one is also part of the claim?

A.   Yes.

Q.   Right.  And so we have to give meaning to all of that, right?

A.   Yes.

Q.   And in the patent we looked at an example where you might have a segmenter.  It's going along, and it's segmenting.  And you might segment it into chunks

68

that don't evenly divide into the size that you start

with, right?  I think it was -- you had a --

A.    PDU into the --

Q.    A PDU of 1500 bytes --

A.    That's the SDU.

Q.    Sorry.

A.    Yeah.

Q.    SDU of 1500 bytes --

A.    PDU of 4 --

Q.    And you broke it into four chunks of 40?

A.    In the spec, that's correct.

Q.    Okay.  And so you would take off 40, right?

A.    Yes.

Q.    And then you'd have 1,460 left, right?

A.    That's correct.

Q.    Segment -- you take out another 40, right?

A.    Yes.

Q.    And then you have -- I've got to get the math

right, but you have 1420 left, right?

A.    Yes.

Q.    And you do another 40, and then you get 1380

left, right?

A.    Yes.

Q.    Okay.  And eventually you're going to get to

the point where you can't segment into more than one,

69

you can only do one, right?

A. That's right. You get down in that case to a 20-byte --

Q. Right. So eventually when you took those 40 -- chunks of 40 off at a time, you get to 60, and then you take your last 40 off and you have 20 left and your segmenter won't be able to break it up into more than one part, right?

A. That's correct.

Q. And so in that case, you're segmenting and you're also doing into one or more, correct?

A. That's correct.

Q. And do you recall the inventors testifying in this case about segmenting, as well?

A. Yes.

Q. And let me show some of that testimony and see if that's consistent with this segmenting into more than one -- or one or more.

Let's go to the document camera. And I'm going to put on the screen one of the -- the testimony of Mr. Stefan Wager, one of the inventors in this case, played -- played to the jury earlier in this case. And look at what he had to say.

And he was asked: The segmenting or segmentation that you're talking about in your patent,

70

that is splitting up the SDU into multiple PDUs, right?

A.   Yes.

Q.   And he says:  Yes.

Now, when we look at the claim, we looked at the problem, we looked at the solution, we looked at the claim, we looked at the specification, we looked at the example.

Is that testimony consistent with your understanding of segmenting, and segmenting is breaking it up into multiple PDUs?

A.   Yes, it's consistent with my understanding.

Q.   And is it consistent with what we see in the claims?

A.   Yes.

Q.   And is it consistent with what would happen in the real world when you take that big frame of data and you chop it up into pieces and eventually you're going to have a little fragment or a little piece left over that can't be segmented any further?

A.   That's correct.

Q.   Okay.  Now, when we talk about the infringement case that Ericsson is trying to make here, if all you did is you took the data and you just put it in a packet and you didn't change it in any way, you just added a header to a packet, is that segmenting?

A.   It's not segmenting.  That's what's always been done is making packets.

Q.   So then is this element met in the 802.11 products?

A.   Pardon me.  Say that again.

Q.   Is the segmenting element met in the 802.11 products?

A.   No, it's not.

Q.   And for that reason alone, would there be no infringement?

A.   That's correct.

Q.   And now let's go back to the timer.  I have to grab something from over here.  But do you recall Mr. Kitchin was here, and he was testifying about how the timer was initializing?

A.   Yes.

Q.   And Mr. Kitchin explained that the timer was initialized at the beginning of the MAC layer; is that right?

A.   Well, he -- the timer in the Wi-Fi products -- 802.11n products.

Q.   In the Wi-Fi products.

So let's take a look at what we're talking about here, and I'm going to throw a couple of things up on the screen.  I'll just stick with the document camera

72

because it will be easy.

And so let's orient ourselves.  Let's bring that back.  And this is one of the slides that you used on your direct, right?

A.  That's correct.

Q.  And as we see over here, we have something called the OSI reference model.  And that's not something you invented.  It's not something Dr. Nettles invented.  That goes way back?

A.  I think it goes back to the '70s.

Q.  And you teach that in some of your textbooks?

A.  Yes, I do.

Q.  Okay.  And so we have -- right over here is where the data link layer begins, right?

A.  That's correct.

Q.  In fact, the data link layer is No. 2?

A.  Yes.

Q.  Okay.  And I'm just going to keep it big for a second, and then we're going to zoom in so everybody can see it better, but if we look over here, 802.11 wireless LAN is in blue, right?

A.  That's correct.

Q.  If we flow that line across, we're going to see that that line is up with the MAC?

A.  It's in the MAC.

73

Q.   Okay.  So there's a separate layer -- 802.2 with a separate specification, a separate set of rules, a separate set of procedures that's going to exist over and above the 802.11, right?

A.   Yes.

Q.   Okay.  And that logical link layer, that's going to be where the -- the top of the data link layer?

A.   That's the beginning of the data link layer.

Q.   Okay.  And so if we see, the timer or the timestamp that was pointed to was actually in the 802.11 wireless LAN product, right?

A.   Yes.

Q.   And as we saw from Mr. Kitchin's testimony, that that is initiated at the top of the MAC layer, not the top of the data link?

A.   That's correct.

Q.   And so let's move on to some of the other patents now, and we'll just go in reverse order.  So let's take the '568 patent.  I'm going to get the claim out; and I want to talk to you about, again, what is the question we're trying to answer here.

MR. AROVAS:  Let's put the claim on the board.

Q.   (By Mr. Arovas)  And actually, Mr. Stevenson's questions confused me a little bit because actually I

74

thought -- it seemed to be proving the point that we were trying to make, but let's go through it and try to understand.

First, every one of the -- these questions we have to answer, you take the claims and you compare them against the products, right?

A.   That's correct.

Q.   And that's how you get the answer.

And so we know from the claims that they have to have the service type identifier, and that identifier, it has to be an identifier that identifies the type of information conveyed in the payload.  And that's the test that we have to use.

A.   Yes, that's correct.

Q.   Okay.  And when we looked at the board that Mr. Kitchin has used -- and I'll grab that so we can look at that at the same time.  We were trying to answer the question -- because this is the test that we have to use -- about whether from that identifier you can tell the type of information that's in the payload.

And I asked you a question, when we were talking about your testing, where you had taken a standard configuration and gotten all 0s, whether other software products could also give you other TID values.

Do you remember talking about that?

75

A.    Yes, I said that.

Q.    And what did you explain to me there?

A.    Well, the user priority comes in with the MSDU, and -- and there's no hard-and-fast rule about whether or not voice, video, data, background information goes into one of these user priority locations.

So what can happen is, voice can appear in any one of these queues.  It can -- it can have any one of these user priorities, and by just looking at the TID field, you don't know.

Q.    And so the issue here is not whether you can get different TID numbers.  The question is whether the TID, or the identifier that they're pointing to, is telling you the type of information?

A.    That's correct.

Q.    And so when we were talking on direct examination, we looked at you could do -- run some software and you could get a TID value of 0, right?

A.    Yes.  And I think that was -- yes.

Q.    Okay.  And that's -- this is actually a copy of your report?

A.    Yes.

Q.    And there's no secret about this thing.  This is a report you prepared and you gave to -- to Ericsson,

76

right?

A.    That's correct.

Q.    Okay.  And you showed your results and you said, well, I can do a test and I can send voice, video -- I think it was -- you did YouTube, Pandora. YouTube was video, and Pandora was audio.  Internet Explorer and Skype, right?

A.    That's correct.

Q.    And they could all come out, if the software chose, as a TID of 0?

A.    Yes.

Q.    And that TID of 0 would go in here up at the top, and it would be treated as a priority, right?

A.    Yes.

Q.    Because what is the TID?  Is it describing the type, or is it describing the priority?

A.    It's describing the priority.

Q.    Now, you also could get the software to give you different numbers.  And if we just flip it over, some of the other results -- and this is right in your own materials you gave to Ericsson -- you can get a TID of 5, as well?

A.    That's correct.

Q.    Okay.  But what is that TID?  If I cover up everything else, I say you just know the TID, can you

77

tell me anything about the content --

A.   No.  Especially not on my testing because for video, I got a 5 and I got a TID of 0 for video.

Q.   And so did you find that you could put any type of information with any type of traffic identifier?

A.   Yes.

Q.   So you could have a 1, and it could be video, voice, or anything, right?

A.   Yes.  The way to say it would be any one of those user priorities could be assigned to any of the different types of information.

Q.   Right.  Now, the example that Mr. Stevenson mentioned, he didn't bring up the fact that it was running something called Fedora 16?

A.   Yes.

Q.   And Fedora 16 -- can you tell us what Fedora 16 is?

A.   Yes.  Fedora 16 was an operating system that I didn't really know about before I saw Dr. Nettles' testing.  And so it's an operating system running on a laptop here.

Q.   Okay.  And is that used on any of the accused products in this case?

A.   No.

Q.   So does that actually have any relevance to

78

whether the accused -- how the accused products are operated?

A.    No, it does not.

Q.    Okay.  But even if you take that and you take the -- and you look at the various TID numbers, traffic identifier numbers, whether it's a 0, whether -- whether it's a 0, 1, a 2, a 3, 4, 5, 6, 7, would it give you any information about the type of information required?

A.    No.

Q.    And for every one of those numbers, can it have voice, video data, any type?

A.    In every one of those queues, every one of those priorities.

Q.    So when we go back to the question that we have to answer here, which is, is this claim element met, meaning is there an identifier that identifies the type of information conveyed in the payload, does that identifier exist in 802.11?

A.    No, it does not.

Q.    Okay.  So now, let's go on to the next patent and look at the questions that you got on the '625.

And the '625 is the command to receive patent, right?

A.    Yes.

Q.    So let's take a look at the claim there, as

79

well.  I'll put it up so we can refer to it.

And you got a lot of questions about in sequence or out of sequence packets.  And I'm going to start by just understanding why the out of sequence packets matter.

And so if we look at the claims themselves, do the claims themselves and the language you're supposed to use for this comparison talk about a command to receive for packets that are not consecutive?

A.    Yes.

Q.    And when you do your comparison, is this the language you use when you look at the products to say is it the same or is it different?

A.    Yes.

Q.    Okay.  And so let's take a look at some of what we saw.  I want -- what I really want to focus on here, okay, because I want to make sure that the record is clear and you have an opportunity to explain to the jury, this issue of programming.  Now, everything a computer system does is programmed, right?

A.    That's right.

Q.    And that's been true for every computer system since the very first one to -- to any one that exists today, right?

A.    That's correct.

80

Q.    Okay.  So the question we have to answer is are they set up in a way where it will need something called a command to receive to deal with packets that are not consecutive, right?

A.    Yes.

Q.    So we have to see if that particular programming exists in the computer.

A.    Yes.

Q.    Now, we know, because we saw Mr. Stevenson show this on the -- some of the questions he was asking you, that you were shown a command to receive, and that can be included in a packet or it could be separate, right?

A.    Yes.

Q.    And the patent says you can do it either way?

A.    Yes.

Q.    But we know that in the example in the patent, it's a bit that is added to the normal data packet, right?

A.    In this example, that's correct.

Q.    So is that in addition to the sequence number, or is it the sequence number itself?

A.    It's in addition to the sequence number.

Q.    Okay.  And that's actually described -- that's the RPEB that's described in this specification of the

81

patent, right?

A.   That's correct.

Q.   Okay.  So that's the example -- an example of the command to receive provided in the patent?

A.   Yes.

Q.   Now, does the patent contrast that with the ordinary sequence-based patent?

A.   Yes, it does.

Q.   And let's take a look at that.  And if you could remind us what's the difference between the packet that the patent shows us with the command to receive and the -- what we would call the prior art data packet?

A.   Right.  So these are both from the patent.

And the one on the left shows the prior art data packet, and it has no RPEB.  It has no command to receive.  That's the standard conventional way to do things.  And so the '625 patent added the command to receive at the front of the sequence number.

Q.   Okay.  So they both have the sequence number. That's in the blue.  And what was added is this command to receive?

A.   That's correct, right.

Q.   Now -- so we have to answer this question that is the system -- this is the question for -- for -- to figure out if this claim is covering the 802.11.  Is the

82

system programmed in a way that it has a command to receive to deal with packets that are not consecutive?

A.   That's the question, yes.

Q.   All right.  And what Ericsson keeps trying to suggest is just because you take all the packets, you must have a reason to take all the packets, therefore you need a command to receive.  Does that logic make any sense?

A.   That's what I hear them saying, but it doesn't make any sense to me.  If you receive a packet, you receive a packet.

Q.   And let's take a look at that very issue that came up in the depositions in this case.

And is this one of the slides you used when we went through the material together?

A.   Yes, it is.

Q.   Okay.  And over on the right, there's a quote.

And who's that from?

A.   That's from Peter Larsson, one of the inventors of the '625 patent.

Q.   And was he being asked about this very situation, the inventor of the '62 (sic) patent, that if you had a system that was just programmed to accept all the time, would you need a command to receive as required by the claims?

83

A.   And that's what he was asked, and he said, no, you would not.

Q.   So can you explain to us, using the picture of the normal data packet, what Mr. Larsson is explaining about why you wouldn't need a command to receive?

A.   Well, if your system would just accept the packet with the sequence number in front of it and nothing else, then there's no need for the command to receive.  The system would just continue to operate normally.

Q.   Right.  And so if we contrast that with the '625 solution, right, you had a situation where there was a stop sign and you needed a command to receive, right?

A.   That's correct.

Q.   So the stop sign would also -- if you're going to use the '625, the stop sign would also have to be programmed into the system?

A.   That's correct.

Q.   Okay.  And is there any stop sign programmed into the 802.11 products?

A.   Well, in the claim, it is.

Q.   In the claim it is, but in the 802.11 products, is there a stop sign programmed in?

A.   Not in the 802.11n products, no, there's no

84

stop sign.

Q.   And without the stop sign, is there even a need for a command to receive?

A.   No, there's not.

Q.   And so let's go back to the diagram that we looked at before.  I'll put it up --

A.   Yeah.

Q.   -- on the board over here.  Can you see that, Dr. Gibson?

A.   I can.

Q.   You know, I can actually put -- I can put a copy on the screen, as well, so we can all see.

And this is the -- a diagram of the internals of what one of these Wi-Fi chips might look like?

A.   Yes.

Q.   Okay.  And what we were trying to figure out is what is it that you need to receive packets when they're out of sequence, and did you look at that question?

A.   Yes, I did.

Q.   And when you look at how the chip was actually set up and how the boxes were connected together, did you see something that was instructive about whether it would need to be a command to receive or whether this was programmed to have a stop sign where you would need

85

a command to receive to actually take those packets in?

A.   Well, it never has a stop sign because the packets just follow this fat arrow all the way through the buffer and are received.

And because they're just received, there's no stop sign.  It doesn't need a command to receive.

Q.   And so those fat arrows, right, this -- so this is -- where does it come in?  It comes in over here?

A.   Where I have the blue -- the Rx, yes.

Q.   Okay.  So this is the -- over on this side right over here?

A.   Yes.

Q.   And then it will follow these fat arrows -- this arrow --

A.   Yes.

Q.   -- and this arrow and this arrow and this arrow and this arrow?

A.   Yes.

Q.   And this is a memory which stores packets?

A.   It's a buffer that stores the patents.

Q.   And there's actually some memory here, the Rx E?

A.   That's correct.

Q.   And the Rx stands for received, right?

86

A.   That's correct.

Q.   So this is actually how the chip takes in, off the air, the packets?

A.   Yes.

Q.   And as Mr. Larsson was explaining, the inventor of the '625, is this a system that is just set up to take packets all the time, regardless of whether the sequence number is in sequence or out of sequence?

A.   Yes.  It's just set up to take packets no matter what.

Q.   So can you describe for the jury whether there would ever be a situation where it would need or even could use a command to receive to do that?

A.   Well, it would never need the command to receive.  We've seen it just receives packets in sequence, out of sequence, just continues to receive packets.

(Pause in proceedings.)

Q.   Okay.  So now let me move on to the '435 patent, and let's start where we start with all the others, with the claims.  I want to be very careful here to make sure we're talking about the right functionality when we're trying to figure out whether there is -- the requirements of the claim are actually met.  Okay?

So let's start with where I started last time

and figure out what the question is.  And we saw from Dr. Nettles that in the '435 patent, if the receiver cannot compute all of the packets -- all of the packets that were discarded by the transmitter, then there's no infringement.

And you agree with that, that there would be no infringement if the receiver can't calculate all of the packets discarded by the transmitter; is that correct?

A.  I agree.  Yeah, I do agree.

Q.  And so obviously, these are computer systems, right?

A.  Yes.

Q.  And computer systems will do various computations as they do their business, right?

A.  Yes.

Q.  Now, what I want to do is I want to focus on what the claim is talking about.  And keep in mind that you have the receiver computing the packets that have been discarded by not anybody, but the transmitter, right?

A.  Yes.

Q.  Okay.  So does that require the receiver to make a specific type of computation about what is being discarded in the transmitter?

88

A.   Yes, it does.

Q.   And those are two devices at opposite ends of the system, right?

A.   That's correct.

Q.   Now, let's look at the situation where you've talked about where this block acknowledgement is being sent from the receiver to the transmitter and a block acknowledgement is lost?

A.   Yes.

Q.   Okay.  If that doesn't get there and the system times out, will the transmitter then discard the packets?

A.   Yes.

Q.   And can you tell us, is there anything in the receiver, programming or code, that has the receiver calculating all these different packets that are discarded by the transmitter?

A.   No, there's nothing in the receiver that's trying to calculate what's been discarded by the transmitter.

Q.   And so I want to be very clear about this, because Mr. Stevenson asked about, well, you could get another A-MPDU -- and I want to make sure we're not just throwing words around.  If you had another A-MPDU, that would be another block of data going from here to here,

89

right?

A.   Yes.

Q.   And that could act as an implicit BlockAck, right?

A.   Yes.

Q.   But that new piece of data is just going to move the window in the receiver, right?

A.   Yes.

Q.   Is that going to trigger a computation of what was discarded in the transmitter?

A.   No, there's no computation, after you receive an A-MPDU, to try to figure out what was discarded at the transmitter.

Q.   So when we look at the sequence numbers in the windows, are the sequence numbers and windows just telling you where you are in the sequence of transmitting data, or is it triggering some sort of computation over on this device on what this device is discarding?

A.   At the receiver, the packets in the window are just telling you the sequence numbers of the packets that are received.  It's not trying to calculate what's been discarded at the transmitter.

Q.   And so is there anything in the receiver, whether it's through an implicit block acknowledgement

90

or any of the other messages, that causes or requires the receiver to calculate the discards that are being done by a different device, the transmitter?

A.   No, there's not.

Q.   And have you seen anything in this case shown to you by anybody that shows that?

A.   No, I have not.

Q.   And so let me go to the last patent, and that's the '215.

Let's take a look at the requirements of this claim.

Okay.  And so we know that there's a requirement that you had in red, and we talked before that the Court's definition required generating a message field, right, from a number of different message types?

A.   Yes.

Q.   Right?  So we know we have to generate a message from a different -- a number of different message types, and we know that you actually have to create something, right?

A.   Yes.

Q.   Okay.  That's what this generating a message field is.  You're actually creating a message?

A.   That's correct.

91

Q.   Okay.  And this is actually responsive to the receiving step, so we know -- so you see that up here in the claim.  So let's -- let's figure out where we are.

We know we're in the receiver, right, because we know we're responsive to the receiving type; is that correct?

A.   That's correct.

Q.   Okay.  And we know that we're going to have to generate -- we're going to have to create a message field, so we're going to have to do something in the receiver, right?

A.   Yes.

Q.   And then that's going to have to be chosen from a number of different message types?

A.   That's correct.

Q.   Okay.  And that's all -- is that all required by the claims?

A.   Yes.

Q.   Okay.  Now, Mr. Stevenson was asking you: Isn't it possible that maybe we have a device -- let me back up a second.

So we talked about the devices in this case. And, in fact, nobody has -- nobody has contested this, that all of the products in this case are programmed to do one and only one message type; is that right?

92

A.   That's correct.

Q.   And what is that message type that's supported?

A.   It's the compressed BlockAck.

Q.   And so you can look at the standard and say there's all sorts of other options in the standard that we see -- there's actually two other options.  But are any of those found in the products?

A.   No.

Q.   And so when you do the analysis that we have to do to figure out the right answer in this case, you compare the claims to the products?

A.   Yes.

Q.   And how many of these modes are supported in the products?

A.   Just the compressed BlockAck.

Q.   Okay.  Now, I want to go a little bit further with this and really get an understanding and have you explain to the jury whether, even if you had one of these products that only did this one mode and it got hypothetically from some other device, a packet that it didn't support, what would happen.

And so if we look at the requirement, right, could this requirement of generating a message field in the receiver from a number of different messages happen,

93

if it got a packet using -- using technology it didn't support?

A.   No.  It couldn't satisfy the generating step.

Q.   Right.  And so what it would actually do if it got one of these packets is it would throw it away?

A.   It would throw it away.

Q.   And so even in that -- now, I know that -- that in this case we don't have any products that support the other modes, but even with that hypothetical packet and that hypothetical product, if they did connect, would it meet the limitations of the claim?

A.   No, it would not.

Q.   And the last thing I want to ask you about, Dr. Gibson, is this issue of patents on the standard.

And I don't know if you were here for the testimony or not, but we looked at some Ericsson documents where Ericsson talked about how the majority of the patents on 802.11 were held by the chip makers.

Now, let's talk about the standards making process.

You're aware that in the standards making process, that the way technology gets into the standard is engineers come with proposals and they propose it, it's voted on, and then the winning technology gets adopted?

94

A.   Yes.

Q.   And are those proposals -- you know, if they propose patented technology, are they free to patent their -- their technology that they propose?

A.   Yes, they are.

Q.   Now, have you done any analysis of taking the hundreds of thousands of proposals to look at each one to see if there is a patent that covers it?

A.   No.

Q.   Okay.  But would you disagree with Ericsson's internal documents saying that, in fact, the majority of the patents are held by the chip makers on the standard?

A.   I wouldn't disagree.

Q.   Thank you.

MR. AROVAS:  No further questions, Your Honor.

THE COURT:  All right.  Recross?

RECROSS-EXAMINATION

BY MR. STEVENSON:

Q.   Dr. Gibson, I thought I heard you say that these devices take all the packets coming in, no matter what, they just come flooding in and they don't get stopped?

A.   Yes, they just receive packets.

Q.   And I noticed -- I remembered you put up this

95

chart in your direct, and this is -- this is those
operations you went through for the MPDUs for the
packets that came in, right?

A.   Yes.

Q.   And the first one you quote -- this is from
9.10.7.6.2.  This is the slide that you and Mr. Arovas
talked about, right?

A.   Yes.

Q.   Is this your slide?

A.   Yes.

Q.   Okay.  And from that section, there's a
condition where if a packet comes in the window, it's
stored and received, right?

A.   That's correct.

Q.   That's all received.  Then there's a B case
where the packet comes outside the window, and it's
stored and received, right?

A.   That's correct.

Q.   Well, I was looking at 902 -- excuse me,
9.10.7.6.2 from the actual standard.  Let's look at
that.

Now, if you compare it, it's got more text
than you put on your slide, doesn't it?

A.   That's correct.

Q.   But this is the first case you talked about.

96

This is if a packet comes in and it's within the window, right?

A.    That's correct.

Q.    And it's received?

A.    Yes.

Q.    And let's go to the next page -- we'll flip it right over.  And then we see the second scenario, which is if the packet comes in and it's above the end of the window, it's beyond the window and it's stored and received, right?

A.    That's correct.

Q.    But -- and those are the two -- two conditions you had on your slide?

A.    That's correct.

Q.    But there's a third condition that wasn't on your slide, isn't there?

A.    I think so.

Q.    If a packet comes in and it's before the start of the window, it gets discarded, do not store the MPDU in the buffer, and do not pass the MSDU or A-MSDU up to the next math process, right?

A.    That's what that says.

Q.    It's not always a green light?

A.    Well, I think that's usually assumed to be an error condition.

97

Q.   It's not always a green light, is it?

A.   Not when there's an error.

Q.   And sometimes a transmittal will transmit something and it's below the window, so there's got to be logic in there to ferret that out, right?

A.   The logic wouldn't fix that.

Q.   It's not always a green light, is it, sir?

A.   All the packets that are in an error condition, as I understand it, are received.

Q.   This is -- this is a red light right here, isn't it?

A.   No, I don't agree.

Q.   Now, let me ask you one last question -- or a couple.

Now, sir, you know, if you go to the supermarket, right, as you walk up to the front door, they've got an electric eye or some kind of motion detector that's programmed that when you arrive, the doors open, right?

A.   The doors -- the door will open, yes, usually.

Q.   And so as -- as you step up to the door, you're in a sense commanding that door to open, aren't you?

A.   I've never thought about it that way.  I remember walking into the store and the door opens.

98

Q.   And if you program a receiver in a wireless network to say that under certain conditions when a packet arrives, let it through the door, that can be a command, too, can't it?

A.   No, I don't believe that.

Q.   And that packet can be a command, can't it, sir?

A.   I don't believe that.

Q.   That may be where we disagree.

A.   Yes.

Q.   Thank you, sir.

THE COURT:  All right.  Thank you.

Any further questions?

MR. AROVAS:  Yes, I just have one, Your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. AROVAS:

Q.   So I want to finish by just making sure it's perfectly clear how packets are actually received in the process, okay?  So the packets come in here.  Whether a packet is an error, not in error -- in fact, if it's even -- not even addressed to this chip, will it come in?

A.   Oh, yes.  Yes.  I hope I didn't mislead on

99

that point.

Q.   Okay.

A.   Right.

Q.   And so when we think about the claims, whether you're distinguishing between in sequence and out of sequence packets, right, which is -- the claim you're talking about, they go straight through?

A.   It goes straight through.

Q.   You get a packet that is in error -- let's say it's sent to the wrong place --

A.   Yes.

Q.   -- will the logic go through?

A.   Yes, the L2Parser.

Q.   But it will take it in?

A.   It will come to this Rx E buffer.

Q.   Okay.  But when we're talking about whether there's any need for a command to receive an out of sequence packet, when you have this type of receiver flow, would there be any reason you would have it?

A.   There's no need for a command to receive.

Q.   Thank you.

MR. AROVAS:  No further questions.

THE COURT:  Thank you.

Anything further?

MR. STEVENSON:  No, sir.

100

THE COURT:  All right.  Very well.

Ladies and Gentleman of the Jury, if you will, please pass your questions down for this witness.

All right.  We're going to take our afternoon break at this time.  We're going to be in recess for 15 minutes until 2:45.  So enjoy your break.  Please remember my instructions.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  Please be seated.

Let me inquire of the parties where you are with your time estimates.  I believe one of my staff told me earlier this morning that y'all might have a revised estimate to give me today.

MR. VAN NEST:  Yes, Your Honor.  We worked hard over the weekend to kind of trim things down.  I think we have -- of course, Dr. Gibson is done.

We have two or possibly three additional live witnesses, and then a couple of probably three short videos, possibly four.  So we'll certainly -- we were hoping to rest today.  We obviously won't do that, but we'll rest sometime in the morning.  And I would expect that to be, you know, mid-to-late morning we'll be able to rest.

THE COURT:  Okay.  All right.

101

MR. CAWLEY:  We'll have about an hour of rebuttal, Your Honor.

THE COURT:  Okay.  Good.

MR. CAWLEY:  And whatever cross there is on that, so I would guess that the parties will be finished with the evidence by early tomorrow afternoon.

THE COURT:  Okay.  Very good.

Well, I note Plaintiff has used 11 hours and 55 minutes, and the Defendant has used 10 hours and 2 minutes.

The -- which leaves us with -- if you used it all, I believe that would be a total of eight more hours of testimony.  We can get in about another hour and a half this afternoon which would still leave us with six and a half tomorrow.  So if I'm hearing you right, though, you don't think it's going to take that full eight hours?

MR. CAWLEY:  Your Honor may recall there are some matters to be tried to the bench --

THE COURT:  Right.

MR. CAWLEY:  -- included in that time.

THE COURT:  Oh, okay.

MR. CAWLEY:  So I think that we ought to get to the jury -- or not the jury, but --

THE COURT:  But finish the evidence?

102

MR. CAWLEY:  -- probably pass the jury the evidence by early mid-afternoon.

THE COURT:  Okay.  Well, then that will work well then.

Do you agree, Mr. Van Nest?

MR. VAN NEST:  I do, Your Honor.  I just want to echo we have probably on our side an hour to an hour and a half of bench testimony.  But, obviously, we can do that at any time, including after the jury is out and retired.  But I'm with Mr. Cawley, I think optimistically we will be done with the evidence by -- by noon and possibly early afternoon --

THE COURT:  Okay.  Very good.

MR. VAN NEST:  -- jury evidence.

THE COURT:  We'll see what time tomorrow, but I would -- would -- my tentative plans are then to let the jury go whenever we finish the evidence tomorrow.  I'll hear objections to the Court's charge.  Then we'll bring them back and I'll charge them.  We'll argue and get it to the jury then on Wednesday morning.

MR. VAN NEST:  You -- you would consider -- you would charge them tomorrow; is that what you said?

THE COURT:  No.  No, I said that we would deal with the charge, objections to the charge tomorrow

103

afternoon.

MR. VAN NEST:  Then charge them Wednesday?

THE COURT:  Then I'll charge the jury on Wednesday morning.

MR. VAN NEST:  I think we'll be in a position to do, yes.

MR. CAWLEY:  Is it Your Honor's intention to start the bench trial once the jury begins its deliberations?

THE COURT:  Yes, uh-huh, uh-huh.

MR. CAWLEY:  Okay.

THE COURT:  Yeah, and we'll need to finish that Wednesday afternoon.

I have a Markman hearing tentatively scheduled for Thursday morning, but it would be my intention, if we go to the willfulness second case, hopefully to get to that Thursday.

I'm going to be out of town on Friday, so hopefully we can get it to the jury on Thursday on whatever issues we have.  So okay.

Let me give you -- go over the questions with you.

First question is:  How many patents have you been awarded?

104

Any objection to that question?

MR. STEVENSON:  Irrelevant.

THE COURT:  Okay.  Anything else?

That objection's overruled.

Next one:  Can you give an example of how a type identifier would work in the payload?

Any objections?

MR. STEVENSON:  No objection.

THE COURT:  Defendant?

MR. VAN NEST:  No objection, Your Honor.

THE COURT:  Next question:  Regarding the '215 patent, does the term of choice of acknowledgement, ACK, apply only to the time of response or also, quote, choice, end quote, of ACK type from standard at time of product programming?

MR. STEVENSON:  I think that's lapsing into claim construction from an expert witness, you know, at trial.  So I would object to that as something that is outside the jury's purview.

MR. AROVAS:  Could you -- Your Honor, could you read it again?  It was a long one.

THE COURT:  Yes.  Does the term choice of acknowledgement, ACK, apply only to the time of response or also choice of ACK type from standard at time of product programming?

105

MR. AROVAS:  I think that's appropriate, if it's a little -- the question is a little confusing, but if the question is really when -- with the product and how the products work, when does it make the decision of what message type to use or make a determination of the message type, then that makes sense to me.

THE COURT:  Response.

MR. AROVAS:  I believe that's what this is getting at.

MR. STEVENSON:  Yeah, I think that is what it's getting at, but I think that also goes to the Court's claim construction.  And I think the answer has got to be that the jurors have got to apply the Court's claim construction as written.

THE COURT:  Okay.  Let me hear from the witness.

Do you think you can add anything in answering that, other than what's covered in the Court's claim construction?

THE WITNESS:  And -- and -- I've testified with respect to the Court's claim construction that -- and with respect to the claim that it -- it -- the patent is only infringed if this choice is made after the design phase, that's available while the

106

patent is being -- while the system is being practiced.

THE COURT:  All right.  Objection's overruled.

No. '435, is the listing of received and non-received packets in the scoreboard the same as the computing of which packets were actually discarded by the transmitter?

MR. STEVENSON:  No objection.

MR. AROVAS:  No objection, Your Honor.

THE COURT:  All right.  That's all the questions.  Well, enjoy what's left of your break, and we'll come back and do this next.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  Please be seated.

All right.  Dr. Gibson, here are some questions for you from the jury.

First, how many patents have you been awarded?

THE WITNESS:  I have one patent.

THE COURT:  All right.  Can you give an example of how a type identifier would work in the

107

payload?

THE WITNESS:  Well, the type identifier is a -- is appended in the header to go with the payload.

So according to the claim, the requirement is that the type identifier, traffic identifier, tell you what's in the payload.  And so that TID field is just the number.  It's a user priority, so it doesn't tell you what's in the payload.

THE COURT:  All right.  Regarding the '215 patent, does the term choice of acknowledgement, ACK, apply only to the time of response or also choice of ACK type from a standard at time of product programming?

THE WITNESS:  And I have testified that based on the claims, it's -- multiple ACKs have to be available at the time of response.

THE COURT:  All right.  With regard to the '435 patent, is the listing of received and not received packets in the scoreboard the same as the computing of which packets were actually discarded by the transmitter?

THE WITNESS:  No, it's not.  The scoreboard only keeps track of what's received at the receiver, and the receiver doesn't know what's happened

108

at the transmitter in terms of discarding.

THE COURT:  Okay.  Thank you.

Follow-up questions from Defendant first, I guess?

MR. AROVAS:  No questions.

THE COURT:  All right.  Plaintiff?

MR. STEVENSON:  No questions.

THE COURT:  Thank you.  You may step down.

All right.  Who will Defendants' next witness be?

MR. VAN NEST:  Your Honor, Defense will call Dr. Chris Heegard, and Mr. Gene Paige will be conducting the examination.

THE COURT:  All right.  Thank you.

MR. VAN NEST:  I have some witness notebooks I'll hand out.

THE COURT:  All right.

COURT SECURITY OFFICER:  Have you been sworn?

THE WITNESS:  I have been.

MR. PAIGE:  Your Honor, may I proceed?

THE COURT:  Yes, you may.

CHRIS HEEGARD, Ph.D., DEFENDANTS' WITNESS,

PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. PAIGE:

Q. Good afternoon, Dr. Heegard.

Can you introduce yourself to the jury --

A. Sure.

Q. -- and tell them why you're here today?

A. My name is Dr. Chris Heegard, and I'm here to discuss the invalidity of two of the Ericsson patents that are a subject of this lawsuit, two of the five patents.

Q. Well, let's walk briefly through your professional background, Dr. Heegard.

Where did you go to school?

A. I received a Ph.D. in electrical engineering from Stanford University. And before that, I received a Bachelor's and Master's degree from the University of Massachusetts in electrical and computer engineering.

Q. And can you tell the jury a little bit about your work experience since you obtained your Ph.D.

A. After I -- right after I had received the Ph.D. at Stanford, I took a job as a professor at Cornell University in Ithaca, New York. I was in the school of electrical engineering.

Q. And what did you teach at Cornell?

A. I taught digital communications and

110

networking, coding, information theory, signal processing, things like that.

Q.   Did there come a time you took a leave of absence from your position as a professor at Cornell?

A.   Yeah.  I was at the -- I was on the faculty for 19 years, but the last two years of my being a professor at Cornell, I was on leave of absence.

Q.   And what were you doing during that time, sir?

A.   One of my students and I and another fellow started a company in California.

Q.   What was the name of that company?

A.   The company was called Alantro Communications.

Q.   And what did that company do, Dr. Heegard?

A.   Alantro Communications was one of the first companies to build a chip, these little ICs that did 802.11.

Q.   And so we've heard a lot about the 802.11 working group here.  Were you part of that?

A.   I was.

Q.   And were you a voting member of the 802.11?

A.   I was.

In the fall of 1997, the 802.11 set the very first standard, and I was at that -- that was the first meeting that I went to.

And at that meeting, there was a lot of

111

discussion about making a higher performance/lower cost follow-on to that; and so in January of 1998, there was -- that's when what's called 11a and 11b were started, and I participated from that point forward for a number of years.

Q.   Okay.   And what became of Alantro eventually, Dr. Heegard?

A.   Well, Alantro developed one of the first chips that did 11b, and it had some proprietary extensions that we had developed, and then the company was sold. We sold the company to Texas Instruments out of Dallas, Texas.

Q.   And what did you do after the sale to Texas Instruments, Dr. Heegard?

A.   After the company was sold to Texas Instruments, I became an employee of Texas Instruments, and I was, for a couple of years, the CTO of the wireless networking division, and I was a Texas Instruments fellow, which was an honorary position.

Q.   What do you currently do?

A.   Well, I retired.   And on the technical side, I do occasional technical consulting and some expert witnessing.

Q.   Now, as with any expert witness, you're being compensated for your time, correct?

112

A.    That's right.

Q.    How much are you being paid for your time?

A.    480 an hour.

Q.    Okay.  And do you remain involved with the IEEE to this day?

A.    Yes, I do.  I'm still involved to some limited degree in the Information Theory Society, and I occasionally go to meetings, technical meetings.

Q.    Do you have any honors within the IEEE?

A.    I do.  Someone asked me the other day how long had I been a member of the IEEE, and I couldn't actually recall, so I pulled the card out; and apparently, I've been a member for 39 years.

In 1995, I was made a fellow of the IEEE, which is a big honor.

Q.    Okay.  Well, let's get right to it.  Have you reached some opinions regarding the '435 and '625 patents?

A.    I have.

Q.    What, in general terms, are your opinions as to those patents?

A.    I find that both of those two patents, which are sort of related patents, are invalid.

Q.    And what's the basis for that opinion, Dr. Heegard?

113

A.    So in studying the issue of invalidity of the patents, I discovered a single prior art reference.

That means an art -- a publication that was known to the public well before the application of these patents; and that that publication demonstrates that the ideas of those patents, at least with respect to the claims that are being discussed, were contained in that prior art reference.

Q.    So what is prior art, Dr. Heegard?

A.    So prior art, you can't invent -- you can't get a patent on something that's known to the public, because otherwise people would be filing patents all the time for things that they didn't invent.

A prior art patent reference can be -- take lots of forms, and some examples of that would be, for example, a publication in a journal or a magazine.  That would be a prior art reference.

It could be someone giving a talk in a meeting, like a conference or some kind of public discussion of the idea.

It could be a product that someone developed that contained the idea, or it could be a patent that someone else had that was -- that they got before the patent in question.

Q.    And when you say available to the public, you

114

mean available to everyone?

A.    Available to anyone that really wants it. Available to the public is kind of with respect to who would want to look at it.  I mean, I -- a lot of people wouldn't want to look at these materials, but available to the public means people like myself and others who would be interested in it had availability of it.

Q.    Now, did Examiners of the United States Patent and Trademark Office review Ericsson's patent applications before any of those patents were granted?

A.    They reviewed the -- every -- every patent that's applied for is -- there's an application process which involves the Patent Office reviewing the patent and trying to determine whether it's -- whether it's a new invention or not.

Q.    And do you know whether the Examiners of Ericsson's patent applications took into consideration the prior art that you're going to describe to the jury?

A.    The Patent Office, people call the PTO, did not look at this prior art reference.

Q.    How do you know that?

A.    When a patent is granted, they list on the cover page references of what material was considered in the granting of the patent, and the reference that I'm going to talk about was not listed on the cover of

115

either of those two patents.

Q.    Now, the '435 and the '625 patents, those contain -- concern ARQ technology, correct?

A.    That's right.  They both concern a very similar problem that arises under certain types of ARQ protocol.

Q.    And we've heard a lot about that from many witnesses in this case already, so there's no reason for us to explain it again here, right?

A.    I'm sure we all completely understand what ARQ is at this point.

Q.    So what is the prior art that you believe disclosed each and every element of the asserted claims to the public?

A.    Well, there was a submission to the ETSI standards group.  There's a -- I think I -- we talked about the ETSI a little bit.  There was a submission of a proposal to the ETSI standards body that was made previous, well ahead of the application of these patents, and that public --

THE WITNESS:  Is this thing going in and out, or is that just me?

MR. VAN NEST:  Let me move it back a little bit.  That's fine.

THE WITNESS:  Okay.

116

A.    That publication in the -- in the -- that was a proposal in the ETSI contains the ideas that show that if -- it practices the patents, and since it would be available before the patent was applied for, that means that the invention wasn't new.

Q.    Who put together the ETSI submission, Dr. Heegard?

A.    The ETSI submission came out of a group in Germany.  There's a city in Germany called Aachen, and there's a famous technical university there, the University of Aachen, I think it is, or Aachen University.

And within that university, there is an institute called the ComNets Institute.  I think it stands for Communication Networks.  And that group had been working on wireless networking and had developed their own method of doing the -- what the MAC layer protocol calls for, wireless networking.

Q.    And I believe we have a slide of that.  Could you tell the jury about the researchers who were involved in this research?

A.    Sure.  The -- the institute was -- at the time was run by a Dr. Walke or Professor Walke.  He was the professor in charge of the institute.

Dr. Walke had a number of researchers, mostly

117

graduate students, working on projects in that institute. And of particular interest was, he had a Ph.D. student, Dr. Petras, who worked with him on the wireless protocol that they had developed.

And also there was a student, a Dr. Walke (sic), who at the time was working on his Master's degree, and he wrote a thesis describing this protocol.

Q. So you mean Dr. Vornefeld?

A. Sorry. Dr. Vornefeld.

Q. Yes.

MR. PAIGE: And if we could look at Defendants' 449, please.

Q. (By Mr. Paige) Can you tell the jury what this is?

A. This is the front page of -- there was a patent applied for by Dr. Walke and Dr. Petras, and this is the cover page of the publication of that patent.

Q. And when was that patent publication published, Dr. Heegard?

A. It was published in May 22nd of 1997. You have to look up there, and it's -- the date is in European style, so you read the day, month, year.

Q. And how does that compare to the filing dates of the '435 and '625 patents?

A. That's well over a year before the application

118

of those two patents.

Q.    Okay.

MR. PAIGE:  And if we could see Defendants' Exhibit 281, please.

Q.    (By Mr. Paige) What do you understand this document to be, Dr. Heegard?

A.    This is the cover page of the Master's thesis of Dr. Vornefeld.

Q.    And why did Dr. Vornefeld write this thesis, to your understanding?

A.    To do his Master's degree, he was looking at this protocol that the -- that the ComNets people had developed, and he wrote a description of what the -- how the protocol worked, and then he studied how well it worked and tried to find out how -- the performance and any problems of it.  So he wrote a lot of simulations and analysis of the protocol.

Q.    And what's the date on this thesis?

A.    The thesis is dated April 1997.

Q.    How does that compare to the filing dates of both patents?

A.    Again, that's well before the application for those two patents.

Q.    Now, is there any language in the Vornefeld thesis that you found particularly instructive for this

119

case?

A.   Yes.  The problem that both of the patents worked -- tried to solve is commonly known as deadlock, and he used that specific term in the thesis.

MR. PAIGE:  If we could have Page 40 of the thesis.

Q.   (By Mr. Paige) Could you point to where he's discussing deadlock, Dr. Heegard?

A.   He's talking about the problem of -- in the original patents that we're discussing and in the work of the ComNets group, they were talking about what's called ATM networks.

ATM, by the way, is not automatic teller machine, which we all know; it's a network that the telephone companies uses.  When you make a phone call, it's the network that your phone call goes over when it's being routed around the country.

And they use the use the term "cell" instead of "packet."  So this section of the thesis is discussing the problem of discarding ATM cells, and he talks about -- or talks about the problem of deadlock and how they solved that.

Q.   Okay.  Now let's talk a bit about the Petras ETSI submission.  What was that document?

A.   So this is a document -- this is the -- the

120

prior art document that I'm -- I would point to you to say that this shows that in the public, there was a description of the ideas of those claims of the patent well before the patent was being applied for by the Ericsson inventors.

Q.    And to whom was the Petras ETSI submission submitted?

A.    So ETSI is a group in Europe that sets standards.  It's similar to -- well, in the United states, we have a group called ANSI, and we have the IEEE.  There's a lot of standards bodies.

ETSI is based in France.  It's sort of European-based, but it's actually an international organization.

And at the time that this proposal was submitted, the ETSI group had standardized something called HiperLAN/1, which is a first generation of wireless network.  And so they were taking in proposals for HiperLAN/2.  It was the second generation.

And this is a proposal that the ComNets folks -- they took their -- their protocol, their procedures that they had developed over the years, and they put it together in a package and made it a suggested proposal for the -- doing the MAC in the HiperLAN/2 system.

121

Q.   Okay.  And what we're looking at now is Defendants' Exhibit 120, correct?

A.   Right.

Q.   What's the date of that submission?

A.   So, again, it's in European style, so the date of this is October 13th of 1997.

Q.   How does it compare, the filing dates of both the patents?

A.   That date is earlier than -- than -- more than a year from the earliest of those two.

Q.   And why would this submission have been disclosed publicly?

A.   If you're submitting proposals to -- to an international standards body, that is -- would be considered a public disclosure, because the whole purpose of writing standards and sub -- well, the first step is to solicit -- the first step is to actually make requirements.  This is what we want to do.

The second step is to ask for proposals. These proposals are distributed among the users and among anybody interested to try to decide if what they're proposing would -- would meet the requirements and be the best solutions.

So when you -- when you're submitting something to a standards body, an international

122

standards body like ETSI, it's a public disclosure,

because everybody that wants to can read it and study it

and try to decide whether it should be accepted for the

standard or not.

Q.   What did the submission describe that's

relevant to the patents in this case?

A.   Well, the submission is fairly long.  I think

it's about 26 pages, and it describes their complete MAC

solution.

But with respect to the patents we're

discussing, there's about, I'd say, three pages that are

interesting, mostly Page 14 with a little from Page 13

and Page 15.

Q.   Okay.  If you could look at Page 14.  Could

you describe to the jury what that's telling you about

the problem they were trying to solve?

A.   So in -- this part of the proposal is

discussing this deadlocking problem.  It tells you that

there's a problem that could arise and how it is solved

in their -- the way that they put their system together.

Q.   And if you could look at the paragraph just

above the figure there.

A.   Right.  This figure is -- is a pretty

important figure in the sense that if you understand

this figure, you can kind of understand how it works, or

123

it at least gives you an example of how it would work.

If you look in the text just above this figure, it's talking about -- the problem is -- is the following: There are certain situations where in an ARQ protocol base with selective reject, that the transmitters send some packets, and some of them don't get through.

So the receiver is expecting to get those packets later. And the way that they get those packets is, it sends a request. It says: I'm missing certain packets. Please send them to me.

Now, that's fine. The transmitter can send those packets, if it still has them. But the way a lot of networks, in particular this network, worked is that packets would expire and be discarded.

So you can get a situation where the receiver is expecting to receive some packets; it's requesting them; yet the transmitter can't fulfill that request because it's discarded the packets.

And so you would get into this deadlock situation, which is an infinite loop where the receiver is requesting information, and the transmitter can't serve that request.

Q. And where does it mention that in the paper, Dr. Heegard?

124

A.   It says:  If the receiver is not informed by the discarding of the cell, it will request the retransmission of this cell by sending selective reject acknowledgements infinitely; and the operation of the protocol fails.

Q.   And what was the solution they came up with for that problem?

A.   The solution they came up with was to send a packet with a discard message attached -- attached to it.

Q.   Okay.

MR. PAIGE:  Your Honor, we have a demonstrative made of Figure 11 to allow Dr. Heegard to explain to the jury how it works.

May I approach the witness and the easel?

THE COURT:  Yes, you may.

THE WITNESS:  Is it working?

All right.  Can you hear me?

All right.  Good.

Q.   (By Mr. Paige) So, Dr. Heegard, this is Figure 11 from Defendants' Exhibit 120, correct?

A.   That's right.  This figure comes from the ETSI brand submission.

Q.   And if you could just explain to the jury, what is happening on the top and bottom lines?

125

A.    So let me orient you to this picture before we start trying to explain what all the arrows mean and everything else.  There's a lot in here.

Let me caution one thing, is that I've been sitting in on the trial, and most of the time, they put the sender on the left, and they put the receiver on the right, and the packets go from the left and the right and back and forth.

In this explanation of how it works, they chose the sender to be on the top and the receiver to be on the bottom.  So the sender that's trying to send information starts at the top and sends it to the bottom.

It's obviously an ARQ protocol, because it's called an ARQ sender.  And to add a little more confusion, the patent talks about a transmitter.  So when it says transmitter, it has the role of the sender.

They use receiver.  So they have a transmitter and a receiver.  This is a sender and a receiver.  So this is a transmitter.  This is a receiver.

Furthermore, this is showing some transactions going back and forth between the sender and the receiver.  And, of course, sometimes the receiver is sending, and the sender is receiving, and you can tell by the direction of the arrow.

126

Furthermore --

Q.   What are the first four arrows doing?

A.   -- time --

Q.   I'm sorry.

A.   What?

Q.   What are the first four arrows doing there, Dr. Heegard?

A.   So one last thing before we do that.  There is time associated with this picture.  Time starts on the left and goes to the right.

So let's start with the first transmission. The sender is sending a packet from the sender to the receiver.  It starts at this time, and it takes a little time to get across the channel, so it ends at this time.

And what he's trying to do is send what they call I packet (0), the first packet, the information packet (0), and they show an X here, and so I'm going to put a red X here because it's hard to see.

And what that indicates is that the sender was sending I(0) to the receiver, but the receiver failed to get it for whatever reason, like there's noise on the channel or whatever.  Something happened, and I(0) didn't get through.

The sender keeps going.  It sends I(1).  In this case, a little while later, it sends I(1), and I(1)

127

is successfully received, because there is no X in it.

So the receiver has a picture like this.  Here is (0), (1), (2).  It didn't get (0), but it managed to get (1).  This transmission, I(1), came through.

Then in this example that they show here, the sender sends I(2), and, again, there is an X here indicating it's missing.  So I(2) is not received.  Let's continue.  I(0) was sent.  I(1) was sent.  I(2) was sent.  I(3) is sent.  I(3) is also in this picture received correctly, so there's a check.

So at this time -- at this point in time, the sender sends -- tried to send four messages.  Two of them have been received, (1) and (3), and two are missing, (0) and (2).  And actually, the sender doesn't know this yet, because it's selective reject.

So --

Q.    What are the three dots there after the --

A.    Right.

Q.    -- four arrows, Dr. Heegard?

A.    So one thing you've got to remember is, this is a network.  So there's a lot of transactions going on.  So at some -- you get opportunities to send, and others times you have to be quiet.  Otherwise, only one user could hog the channel.

So the way they indicate that is they put

128

three dots here, which means the channel gets busy for a while, and then you get an opportunity to send.

So the channel gets busy for a while, and finally, the receiver gets a chance to ask for the missing pieces.  So it asks for a (0) here, tells the sender:  I didn't get (0).  Then it sends another message:  I didn't get (2).  It's just trying to say, I'm trying to fill these two in; however, (2) is not received.

Q.   And so what happens?

A.   So the problem is, is that -- what happens?

The receiver is receiving, and it's trying to keep track of what it has and what it's missing.

And the way this protocol works is, the receiver is now going to insist on trying to get (0) and (1) or (0) and (2) by sending requests.  And as long as the sender responds, you can eventually fill these in.

But the -- the -- this example shows that there -- how this deadlock arises.

When -- in this proposal, the way it works, is, when a packet comes in to the sender, it's given an expiration time.  And it expires a fixed amount of time after it comes into the system.  Every packet that comes in is given an expiration time.  And so these expiration times align with the order that they're sent.

129

So when -- there's a comment here -- or an event. ATM cell of I(2) is discarded, and then he puts an arrow here.

So what -- what the -- the folks that wrote this are trying to tell us is that in this system, what happens is, because there was a lot of dots on the channel, it's -- it's like yogurt.

When you look at the yogurt package, when it's expired, you throw it out. Same thing happens. It happens in the order that the packets came in. So it happens in the same order as the sequence number.

So the author shows, oh, at some point (2) expires, but that actually means that sometime earlier, (1) expired, and sometime earlier (0) expired.

Q. And I see an arrow going from top to bottom with I(0). What does that tell you, right after those three dots?

A. So after the sender -- the receiver asks for (0) and asks for (2), but that didn't get through, some time went by, the sender tries to service the request for (0) and it sends (0), which is shown successfully being received.

So at this point...

Q. And then there's an I(4) next to that. What does that mean?

130

A.   So the sender doesn't know that you are missing (2) because it didn't get through.  And so now that it's -- thinks it's satisfied you with (0), it goes back and says, okay, well, I'm going to send you the next one, so it sends you (4).  So (4) gets sent.

Q.   And then what are the next three dots after the I(4), Dr. Heegard?

A.   So this is where you have a potential for deadlock.  Some time goes by, and finally, the receiver is given the opportunity to send another request.  It's asking for a second time for (2).

Unfortunately, it expired at the transmitter, so the transmitter doesn't have (2) anymore.  So it needs to resolve that problem.

If there wasn't the solution that they propose and you just kept to this kind of basic protocol, then it would never -- this receiver would get stuck and couldn't get past (2), because it would continue to ask for (2); yet the sender doesn't have (2) to send it.

Q.   And so what happens to solve that deadlock problem, Dr. Heegard?

A.   So until this occurs, the sender doesn't even know there's a problem, but he knows there's a problem when the receiver says:  Please send me (2).  It receives that.  It says:  Uh-oh, there's a problem.  (2)

131

is unavailable.

So some time later when he gets a chance to send, what he does is, he sends the next packet that he wants to send, I(5), with -- with what -- they use the term piggyback. They put another piece -- this is one packet that's composed of the I(5) packet of information, plus a discard notification with a number in it, a single number; in this case, (2).

What that packet means is that it tells the receiver that the transmitter has discarded (2), and it also tells the receiver that it could figure out by some computation that not only is (2) gone but (1) and (0) are gone, because they expire in order.

Q. And so once it receives that packet with the discard message, what does the receiver do?

A. At this point, the receiver now accepts (5). It always -- whenever there's a discard message, it always accepts the message.

Q. And why is that?

A. In the -- in the language of the patent, it's a command to receive. When the sender sends this message to the receiver, it's forcing it to accept I(5).

And, furthermore, it knows that there's room for it, because by sending a discard message, it knows that it's going to free up some space. Because when it

132

requested (2), there was -- it's like a reservation for -- when you're trying to fill seats at the table, you have five seats at a table, you have some people sitting in three of the seats, and you have two seats that are empty, and those two are reserved for people to show up, that's the situation you've gotten yourself into.  You continue to try to wait for those people to fill those seats.

This is telling you, number (2) is not coming. That means that seat is going to be free.

Q.  And does that relate to any kind of reception window, the idea that there's only so many seats there?

A.  It's the fact that the -- in these selective reject protocols, the basic idea is to have a window, and if it's -- if an I frame comes in and it's within the window, you receive it, you accept it; if it's outside the window, say it's past, then you would reject it because you don't have any room for it.

Q.  That's called a fixed reception window, Dr. Heegard?

A.  That is a fixed reception window.

Q.  Thank you for that explanation.  Let me -- let you go back to your seat, and we can discuss the patents now.

A.  Okay.  (Complies.)

133

Q.   Now, Dr. Heegard, I'm going to put up Claims 1 and 2 of the '134 patent --

A.   Okay.

Q.   -- and ask you to discuss how the Petras ETSI submission discloses all elements of those.  Let's talk a little background first.

What was the problem the inventors were trying to solve with the '435 patent?

A.   The problem is, this deadlock condition where the -- the receiver -- this -- the receiver is waiting to fill a slot with a packet of information that the sender has discarded.

Q.   And excuse me.  Could you tell us when the date of the filing of the '435 patent was?

A.   Sure.  The patent is titled Data Packet Discard Notification, and it was filed in March 18th of 1999.

Q.   So how does that compare with the date of the Petras ETSI submission?

A.   It's about a year-and-a-half after the submission to ETSI of that proposal.

Q.   Okay.  Now, how did the inventors attempt to solve the problem with deadlock?

A.   They -- by using a -- they call it a data packet discard notification message.

134

Q.   And was the data packet discard notification

message technique of the '435 patent known to the public

before the patents were applied for?

A.   Yes, it was known to the public.

Q.   Why do you say that?

A.   Because it's -- you can find it here in the

Petras ETSI submission.

Q.   So using the claim board here, can you compare

the Petras ETSI submission, Defendants' Exhibit 120, to

the elements of Claim 1 of the '435 patent?

Let's start with that preamble:  A method for

discarding data packets in a system having a transmitter

and a receiver wherein the method is complementary to

the selective repeat automatic repeat request protocol?

Where do you find that in the Petras ETSI

submission?

A.   Well, you can see it in the writing, but the

figure is the easiest place to see it.  It's talking

about a sender and a receiver and an ARQ.

Q.   Okay.  And where do you see the step of

transmitting a data packet discard notification message

from the transmitter to the receiver indicating data

packets the transmitter has discarded?

A.   It's that last transmission -- this is an

example of it.  It's the last transmission where you're

135

sending an I packet and you've tacked on to it a disc --

an explicit discard notification.

Q.    What do they call that discard notification in the Petras ETSI submission?

A.    I think they call it a discard message.

Q.    Okay.  And then the step of receiving the data packet discard notification message, where -- where is that found in the Petras ETSI submission?

A.    Well, in the example, the sending begins at the top, which is a little bit to the left, and the receiving is where the black arrow is when it's received.  There's no X in it.

Q.    Okay.  And then the steps of computing which data packets have been discarded by the transmitter based on a data packet discard notification message and removing entries from a first list indicating data packets expected to be received from the transmitter, wherein the entries correspond to data packets identified in the computing step, where can you find that in the Petras ETSI submission?

A.    When the discard message comes across, it tells you discard -- in this example, discard (2).  It always tells you to discard -- it tells you one packet that got discarded; but, actually, if you look at the -- the -- the ETSI proposal, it -- it points out the fact

136

that by sending that one number, you can figure out that the other numbers have been -- can we see that?

Q.    Yeah.  And is that found on Page 15 of the Petras ETSI submission?

A.    I think so.

Q.    And can you point out to the jury where that is.

A.    It's in the middle of this paragraph that's highlighted.  It says:  If the receiver requests the retransmission of several cells which have been discarded in the meantime, it is sufficient to -- to signal only the discarding of the cell with the highest sequence number by sending a discard message containing the corresponding sequence number.  The receiver concludes from this message that the other cells have also been discarded, too.

Q.    And where are the cells discarded in this message?

A.    They're discarded at the transmitter.

Q.    Okay.  So you can compute what happened at the transmitter from the message?

A.    Right.  When you see it -- a message that says:  Here's a packet of information with a discard, and the discard says discard N, then that tells the receiver that starting at N and anything beforehand, so

137

N minus 1, N minus 2, and so forth have been discarded by the transmitter.

Q.   How does it keep track of these packets that it's received and expects to receive?

A.   So the submission talks about a buffer.

Q.   Uh-huh.

A.   And so the buffer is where -- I don't know if we can look at that.  I think it's in -- there it is.

So as I mentioned, this analogy before where you have chairs to fill, there's a buffer.  And the buffer -- the point of the buffer is to hold the messages that have been received.

And so the receiver must keep track of what those packets are.  So it keeps track of which packets are -- have been received and are sitting in the buffer, and it also must keep track of which packets it is expecting to receive.

So in the example, for a while it was expecting (0) and (2).  So it's keeping track of two things.  It's got to keep track of what things are received and they're sitting in the buffer, and it's got to keep track of what things it expects to receive.

Q.   Okay.  So, in your opinion, Dr. Heegard, does the Petras ETSI submission disclose all elements of Claim 1 of the '435 patent?

138

A.   Yes, it does.

Q.   Now, Ericsson's also asserted Claim 2 of the '435 patent.  And could you tell me whether the Petras ETSI submission also discloses that further limitation of the data packet discard notification message contains a field indicating a format of the message?

A.   Right.  To practice -- this is called a dependent claim.  To practice Claim 2, you have to do everything in 1, and you also have to do 2.

So 2 just says that there is a -- the method of Claim 1 whereas the data packet of the discard notification message contains a field indicating the format of the message.

So if you look at these packets in the figure, they all have the form of there's a message, an I frame, and then there's something that could be piggybacked on to it.  And the receiver knows the difference between, for example, a discard packet or a selective reject packet.

And so there is something in the packet that tells it it's a discard packet.

Q.   And is there any figure in the Petras ETSI submission that's informative of that?

A.   Yeah.  There's a figure that shows the general format.  I think -- can we look at that?  There we go.

139

Jumps ahead of me.

The -- they show us different kinds of packets and how they would be distinguished at the receiver. They all have a type.

So they chose different kinds of packets.

They show the type, and the receiver would see the type, and that would tell what kind of packet it is and tells it the format, like how many frame -- how many fields there are and so forth.

Q.    So based on your analysis, does the Petras ETSI submission disclose all of the elements of Claim 2 of the '435 patent?

A.    Yes.

Q.    Okay.  Let's talk about the '625 patent now, Dr. Heegard.

A.    Okay.

Q.    Put this up for you here.

Now, when -- when was the application for the '625 patent filed?

A.    The '625 patent, which is titled Method and Apparatus for Discarding Packets in a Data Network Having Automatic Repeat Request, was filed in October 28th in 1998.

Q.    And what does the -- how does that compare to the data on which the Petras ETSI submission was

140

submitted?

A.    It's a little over a year past the date of the ETSI submission.

Q.    Okay.  What does the '625 patent, Claim 1, describe as the solution to the problem the inventors were trying to solve?

A.    So the problem that they're addressing is the same problem, and they give a -- what they consider a different way to deal with that problem.

Q.    Okay.  And what is that solution they claim is a problem?

A.    So in this situation where you have a receive window and you have some packets you've received and some are missing and you're expecting to receive them, if the transmitter is unaware of what you're doing, it can send you a packet that might fall in that range, in which case you would fill in the missing slot; or it might send you a packet out of the range, in which case you'll reject it.

So a normal operation, the transmitter doesn't know whether you'll take it or not, depending -- it just depends on whether your window is -- it falls within the window or outside the window.

Q.    And what do they call the thing they said would make it take the packet?

141

A.   So when they realized that the receiver is in a situation that it's requesting information that has been expired at the transmitter, what it does is, it sends an I frame of data with a discard notification on it with the understanding that when a discard message is -- is attacked -- tacked on to an I frame, that the receiver will be forced to receive that particular packet.

Q.   And in the patent itself, the '625 patent, Claim 1, how does it describe the thing that solves this problem?

A.   They call that commanding a receiver to receive.

Q.   And the example of the command to receive or to receive in the patent, just an example is the enforcement that we've heard about earlier today, right?

A.   Right.  In the patent, they talk about an enforcement bit.  So the one example in the patent, they have a bit and it's -- I think it's an E -- or -- I don't know.  It's an acronym they made up.  They call it an enforcement bit.  It's one bit that comes along.

And -- and when the bit is, that tells the receiver that you can take the packet or not, depending upon whether it's inside or outside the window.  But when the bit is set to be 1, the receiver is forced to

142

always take the packet, and --

Q.    Okay.  And this command to receive that you're talking about, was it new at the time of the filing for the patent?

A.    No, it wasn't.

Q.    Why do you say that?

A.    Because the ETSI -- Petras ETSI submission, the discard message acts just like that enforcement bit.

Q.    Okay.  Well, let's go through it element by element using the claim board.

And where do you find the first -- the preamble:  A method for discarding packets in a data network employing a packet transfer protocol, including an automatic repeat request scheme?

A.    Well, again, if you look at, say, the figure, it's clearly an ARQ system with a sender and a receiver, and there is discarding of packets because there's a message called a discard packet.

Q.    And when you say ARQ, you mean automatic repeat request?

A.    Right.

Q.    Okay.  Now, the first part of that, a transmitter in the data network commanding a receiver in the data network to receive at least one packet having a sequence number that's not consecutive with a sequence

143

number of a previously received packet, where can that be found in the system of the Petras ETSI submission?

A.   So the submission describes in sufficient detail that you could implement this protocol, and they give this example.  And there are many examples that you could -- you could -- could come out of this.

So when the discard message -- it has a particular form, and the form is, when the discard message says accept packet -- if it says, discard N, so if -- so like 2, and if the message that's at -- that it's piggybacked on is N plus 1, say 3, if the -- if the message is one up from the discard message and it turns outline -- and if it happened to be that the previous transmission, which was I(5), N failed to get through, then you'll practice exactly that -- that condition.

Q.   In other words, when the discard message being sent across is right after the one that didn't get received, that would be nonconsecutive?

A.   Right.  When it happens at the end.

Q.   Okay.  And then the second step of a transmitter on a data network commanding a receiver to release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet, where do you find that in the Petras ETSI submission?

144

A.   So when you were in this submission where the I frame you're sending is N plus 1 and you're discarding N, then the receiver has just discarded N, which is the one before N plus 1 and everything before it.

Q.   Why is it discarding everything before it necessarily, Dr. Heegard?

A.   Because they expire in the same order that the sequence number.  So if someone tells me that N is expired, then I know from that protocol that all the previous ones, N minus 1 and so forth were also discarded.

Q.   So they live in the same order.  So if you discard 2, you would also know that 1 and 0 had been discarded as well?

A.   That's right.

Q.   Okay.  And where do you find the last element of the transmitter discarding all packets for which acknowledgement has not been received and which have sequence numbers prior to the at least one packet?

A.   So in that case, when the message that you're sending is -- is one more than the discard, then you've just discarded everything before that one message.

Q.   Okay.  So based on your analysis, Dr. Heegard, does the Petras ETSI submission disclose to the public all elements of Claim 1 of the '625 patent?

145

A.    Yes, it does.

Q.    Thank you, Dr. Heegard.

MR. PAIGE:  I have no further questions.

THE COURT:  All right.

Cross-examination.

CROSS-EXAMINATION

BY MR. STEVENSON:

Q.    Good afternoon, Dr. Heegard.

A.    Good afternoon.

Q.    Now, you understand that the two patents that you're asserting are invalid, were awarded after years of examination at the Patent Office, right?

A.    They were examined by the Patent Office, yes.

Q.    And they were studied by trained Examiners?

A.    All branded patents have been studied by Patent Examiners, sure.

Q.    And because of that, the patents are presumed in this matter to be valid?

A.    A patent is presumed to be valid if it's been granted, sure.

Q.    It's presumed to be valid, right?

A.    Sure.

Q.    And that means that the Defendants in this case bear the burden of proof in asserting invalidity, right?

146

A.    I agree with that, yes.

Q.    It means the Defendants have to come forward and prove the patent is invalid in order to prevail on their defense, right?

A.    That's right.

Q.    And if the Defendants don't put on any evidence of invalidity, the presumption carries, and the patent is considered valid, right?

A.    If you don't -- if you don't make an argument that a patent is invalid, then it's valid.

Q.    And the burden on the Defendants for showing invalidity, you understand, is clear and convincing evidence, right?

A.    Right.

Q.    So as you know in this case, Ericsson bears the burden of showing infringement, right?

A.    Yes.

Q.    And Ericsson's burden of showing infringement is by a standard called a preponderance of the evidence.

A.    Right.  That's a -- that's a little lower bar.

Q.    Right.  Lower bar; more likely than not.

A.    Right.

Q.    But because of the presumption of validity, the Defendants' burden in this case to show the patent is invalid is by a higher standard, isn't it?

147

A.    It is a higher standard.

Q.    And it's clear and convincing evidence, right?

A.    Clear and convincing.

Q.    And the Defendants have to show by clear and convincing evidence that every single element in every asserted claim of those two patents is literally present in this reference, don't they?

A.    When you're trying to show infringement, if you're trying to argue that you don't infringe, you just have to show you don't do one of the steps; whereas, if you're trying to show that something is invalid, the way I like to think about it is, you try to convince yourself that if you practice what the art did, you would be infringing the patent.  That means you do all the steps.

And if it happened to be publicly available before the patents were applied for, then the patent would be invalid.

Q.    Well, sir, you mentioned infringement.  This isn't an infringement analysis; you're asserting invalidity.

Do you understand that?

A.    In my opinion, this -- this prior art reference, if it was later in time, would be infringing the patent.

148

Q.   Okay.  But you understand, there's a different burden of proof for infringement and invalidity in a federal lawsuit?

A.   I totally agree with that.

Q.   Are you trying to get out of the burden of proof?

A.   Not at all.

Q.   All right.  The question, though, is whether every element in the claims, every single element, is present in the accused publications, right?

A.   That is the question.

Q.   And you mentioned one of the theses, in your examination, I think DX 281.  Do you remember referring to that?

A.   It's Dr. Vornefeld's thesis?

Q.   Yes.

A.   Master's thesis?

Q.   Yes.

A.   Sure.

Q.   And that's not even a publication, is it?

A.   Yes, it is a publication.

        MR. STEVENSON:  Well, let's look at the first page of it, and let's zoom in at the bottom.

Q.   (By Mr. Stevenson) It says:  This paper is for internal use only.  All copyrights reserved by the

149

mentoring department.  We give no warranty for its content.  Reproduction and publication of any kind are subject to the Department's permission.

Q.    Did I read that correctly, sir?

A.    Okay.  Sure.  Yeah.

Q.    So in order to be a prior art reference, a piece of paper, a publication needs to be actually published, doesn't it?

A.    This one was published.

Q.    It has to be published and publicly available, doesn't it, sir?

A.    It's -- first off, let's be clear.  I'm not saying this is the prior art reference, right?  So --

Q.    My question is:  Does it have to be publicly available?  Yes or no.

A.    Does what have to be?

Q.    To be a prior art reference, doesn't a document have to be publicly available?

A.    Certainly.

Q.    And this document you're pointing to, DX 281, that you talked about with counsel for the Defendants was a student diploma paper, wasn't it?

A.    That's my understanding, yes.

Q.    And it was presented to teachers at Aachen University.

150

A.   I don't know who it was presented to.  I -- when I was a professor at Cornell, we would -- and we had some thesis defense, we published it, and anyone from the public could come to it.  I don't know if that's the way they do it in Germany or not.  But generally speaking, a thesis defense is open to the public.

Q.   Okay.  So, basically, whether this was published or not in this -- as a -- as a presentation, you would just be guessing about that, right?

A.   I think it was available to the public.

Q.   You would be guessing if this were presented to the public, right?

A.   I don't know.

Q.   You'd be guessing.

A.   I guess so.

Q.   Okay.  Now, are you asserting in this case that the two patents of Ericsson are anticipated or they're obvious or both?

A.   Anticipated.

Q.   So you're not -- you're not asserting they're obvious to anyone of skill in the art?

A.   I think they're anticipated.

Q.   Okay.  I understand.  But you're not asserting these patents are obvious, correct?

151

A.   I think certain parts of them are obvious, but that's not the argument I'm making here.

Q.   Okay.  Well, you said you think some of them -- some parts of them are obvious?  Is that what you told us?

A.   Yeah.  Some -- so --

Q.   Do you?

A.   So -- can we -- first off, the jury -- I'm not sure the jury's aware that when lawyers talk about patents, certain terms have strict legal meaning.

So when you ask me, is it obvious from a -- as a professor or a person that does engineering, I would say they were obvious.

Now, whether they are obvious with respect to the legal standard of what is obvious is a different question.

So let's be clear.  Are you asking me, is it obvious -- as an engineer practicing, is it obvious, or are you asking me to draw a legal conclusion about it being obvious?

Q.   I believe the Court is going to instruct the jury as to what it means for a patent to be obvious, if this ends up being a defense asserted at the end by the Defendants.

A.   Okay.

152

Q.   Do you also understand, though, that in analyzing the obviousness of a patent, there are certain things called objective indicia that must be considered?

A.   Okay.

Q.   Have you ever heard of that?

A.   I think I have.  I'm not sure what the Latin means.

Q.   Well, it's objective indications.

A.   Okay.

Q.   And what that means is that, you know, it's easy to go back and use hindsight sometimes, isn't it, Dr. Heegard?

A.   I don't know if it's easy or not.

Q.   Okay.  And sometimes you can look at something, the solution to a problem in hindsight, and it's probably a little bit easier when you -- when you see the answer than if you're trying to figure it out, fair?

A.   That's often the case, sure.

Q.   And one thing that the law does -- and you've testified before in patent cases, haven't you?

A.   I have testified.

Q.   You've testified about validity before, haven't you?

A.   I have.

153

Q.   And one thing you know is that you can look at certain objective things that have happened in determining whether a patent is likely to be obvious, right?

A.   I think so, yeah.

Q.   One of the inject -- objective indications is whether others have a license to the patent, fair?

A.   If you say so.  I don't really know.

Q.   You've never encountered that in your prior work?

A.   Whether that affects whether something's obvious or not?

Q.   Yes.

A.   Can you repeat the question so I can make sure I understand?

Q.   Aren't you aware that one of the factors you look at in determining whether a patent -- whether it's obvious or not is whether it's been licensed in the field, whether people have -- companies have come up and taken a license for it?

A.   I suppose that would affect whether it was obvious or not.

Q.   Okay.  And you're aware in this case that a number of companies have licensed the '625 patent and the '435 patent, aren't you?

154

A.    I've heard that in court here.

Q.    Have you analyzed those licenses before testifying today?

A.    No.  That's not my role here.

Q.    Is -- your role is to express opinions on validity, isn't it?

A.    Yes.

Q.    Isn't part of doing a complete validity analysis considering all the objective indicia?

A.    I don't think that I need to look at the terms of all the licenses to determine whether that -- you know, if -- if they told me that they're licensed, I believe them, and I don't really need to know.

Q.    Who told you that?

A.    Ericsson did.

Q.    Okay.  Were you here for the testimony about the licenses?

A.    Some of it.

Q.    One of the licensee is Hewlett-Packard, right?

A.    Right.

Q.    Hewlett-Packard is a fairly large company, isn't it?

A.    It's a very large company.

Q.    Have a large patent department, don't they?

A.    I assume they do.

155

Q.   They own a lot of patents themselves.

A.   Again, I assume they do.  I don't really know. But I would think they would.

Q.   And you're aware, aren't you, that Intel (sic) signed a license with Ericsson in July of 2012?

MR. VAN NEST:  You misspoke.

Q.   (By Mr. Stevenson) Oh, I'm sorry.  Excuse me. I misspoke.

Hewlett-Packard signed a license with Ericsson in July of 2012; isn't that right?

A.   Right.  So you threw me there.

Q.   I did throw you.

A.   I did hear that in court, yeah.

Q.   Okay.  And companies really don't go ahead and license things that they don't need to license, do they?

A.   They license things for a lot of different reasons.

Q.   Well, if a patent is invalid, as you say, there's no need to license it, right?  Because it -- it's not enforceable anymore.

A.   You could license a package of patents that included invalid patents and get a license for it.

Q.   Understood.  But if a patent is invalid, as you say it is, then if someone brings it to you, you don't need to license it; it's unenforceable against

156

you, right?

A.    So I -- I think the patent wouldn't be invalid until it goes through a court and someone points out that it's invalid and proves that it's invalid.  And that's what we're trying to do here.

So those patents haven't been proven in court, as far as I know, to be invalid yet; although I think that maybe after this court, they will be.  I don't know.

Q.    Well, we'll -- obviously, the jury will consider your testimony.

Now, Dr. Heegard, though, it's true that Hewlett-Packard paid substantial amounts to license these two patents, correct?

A.    I don't know that.

Q.    So did Research in Motion and BlackBerry, correct?

A.    My understanding is, they licensed a lot of patents at once, which included this.  So I don't know what weight they put on these particular patents.  I don't.

Q.    So did Buffalo, correct?

A.    I was told Buffalo took a license.

Q.    And is it -- am I correct that at the time that Hewlett-Packard entered into the license, they were

157

a chipset customer of Intel?

A.    I heard that.

Q.    Okay.  Let's turn to the claims.

A.    Of?

Q.    And let's go first to the '625 -- excuse me -- the '435 -- I'm sorry.  Let's go first to the '625 patent that you have up in front of you.

Now, this patent requires a command to receive; is that right?

A.    That's right.

Q.    And really, Dr. Heegard, to be invalid, every single element of that claim has got to be met in this accused device, doesn't it?

A.    That's my understanding, yes.

Q.    So I'm going to focus on command receive just briefly.

A.    Right.

Q.    Now, you've claimed that the discard message in the Petras reference is that command.

A.    When it -- yes.

Q.    And a discard message is basically a message that notifies a receiver that the transmitter has discarded packets, fair?

A.    That's right.

Q.    Now, you are aware that Dr. Gibson is also an

158

expert in this case, right?

A.   Yes.

Q.   And, in fact, you probably -- I assume you talked with him and collaborated with him before trial on your reports?

A.   Not really.

Q.   Have you worked with Dr. Gibson in the past?

A.   I do -- I have, yeah.  I know him quite well, actually.

Q.   How frequently do you and Dr. Gibson work together?

A.   We've never really worked together.  We know each other from conferences or friendly.  I might have -- might have -- I can't remember.  I might have written something in one of the books or -- I'm not sure if I did or not.  I don't think I did.

Q.   Are y'all friends?

A.   We're friendly, yeah.

Q.   Well, are you aware that Dr. Gibson has stated in his expert report in this case that a packet discard message is not a command to receive packets?

A.   I would have to see that, because I would be surprised if that's the case.

Q.   Well, let's put it up.

        MR. STEVENSON:  Would you pull up PX 492

159

at 192?

Q.   (By Mr. Stevenson) This is from Dr. Gibson's report.  He says:  Other Ericsson witnesses confirmed that, contrary to Dr. Nettles conclusion, an alleged message that informs a receiver that the transmitter has discarded packets, does not command the receiver to receive any packets.

Do you see that?

A.   I do see that.

Q.   And do you understand that in this case, on the non-infringement side of it, Dr. Gibson has argued that, for instance, a block acknowledgement request is not a command to receive packets?

A.   So --

Q.   Are you aware of that, sir?

A.   That's fine.  I don't have a problem with that.

Q.   And let me ask you about your latter diagram.

A.   Sure.

Q.   And as I understand it, what happens is in this the sender sends the first packet to the receiver, right?

A.   Tries to.

Q.   And it's lost?

A.   Right.

160

Q.   Okay.   Then the sender sends a second packet to the receiver?

A.   Right.

Q.   That's an out of sequence packet, right?

A.   It sends -- it was sent in sequence.

Q.   But from the receiver's standpoint, it's missing 0, now it gets 1.   It's out of sequence, isn't it?

A.   Right.

Q.   There's no packet discard notification being sent prior to this packet, is there?

A.   Not in this example.

Q.   What's the command to accept No. 1?

A.   This example doesn't have a command to accept 1.

Q.   Isn't the packet itself the command?

A.   No.   There's no -- there's no delete -- so you're asking me if a discard message is a command to receive, and generally speaking it's not.   But in this particular scheme, this system, which has a discard message, it is, because this discard message is tacked on to a message and it's -- and when this system is working and there's a discard message, it is a command to receive.

So generally is a discard message a command to

161

receive, no.  In this system, this message is a command to receive.

Q.    Dr. Heegard --

A.    And there's --

Q.    -- it's an out of sequence packet, isn't it?

A.    One is out of sequence.

Q.    There's no discard message before 1, and it gets received, correct?

A.    If you don't have a discard -- if you don't have a command to receive, the receiver may or may not receive it.

Q.    Well, it received it in this case?

A.    If the ER -- if the ER bit in that patent was 0, it may or may not be received.  If it's 1, it's forced to receive.  A command to receive says you must receive it.  You are forced to receive it.  Not that under other circumstances you will never receive.

Command to receive doesn't mean you only receive when you're commanded to.  It means if you're commanded to receive, you will receive.

Q.    In this example, Dr. Heegard, what's the command for Packet No. 1?  Is it the packet itself?

A.    You don't -- you don't need a command to receive.

Q.    Because it's a selective reject repeat, right?

162

A.    Because there is room in the receiver to store 1.  That's how it received it.

Q.    This is a selective reject repeat, isn't it?

A.    Yes, it is.

Q.    So is 802.11, isn't it?

A.    No.

Q.    You disagree?

A.    It's not.

Q.    Let's go back now to the list.

Now, the '435 patent requires a list, doesn't it?

MR. VAN NEST:  Excuse me.

A.    We switched patents now?

Q.    (By Mr. Stevenson)  Yes, sir.

A.    Okay.

MR. STEVENSON:  Thank you, Mr. Van Nest --

MR. VAN NEST:  You're welcome.

MR. STEVENSON:  -- for risking yourself.

Q.    (By Mr. Stevenson)  Now, what you pointed to in this patent, Dr. Heegard, is the list as a buffer, right?

A.    The buffer's not the list.

Q.    What have you pointed to as the list?

A.    The list is the mechanism that an engineer

163

would know you would have to keep track of what's in the buffer and what's missing.

Q.   Okay.  Well, have you pointed to a list in this reference, or is that something that's missing?

A.   It's not missing.  It's in there.

Q.   What's it called in this reference?

A.   He doesn't -- he doesn't use the word list, but he talks about a buffer.

Q.   Ah.

A.   And one skilled in the art would know that when you have packets coming in and some of them are missing and the protocol is such that when you have a window, you need to know what you received and what you're going to expect, that you have to have a list that keeps track of that.

Q.   Okay.  Well, I may be confused, Dr. Heegard.

Are you -- when you're applying this patent against the claim, are you saying that there's something missing, but they probably would have had a list; or are you pointing to a buffer and saying that's the list or something altogether different?

A.   An engineer or a person in the art would know that when you have the situation where you have a window and you're keeping track of what you received, that what you received would be in a buffer, which is explicitly

164

described there; and that you would keep track of what's in the buffer and what am I expecting that, for example, I didn't get 2, so I'm expecting 2.

So somewhere I'm keeping track that 2 -- that earlier in this scheme or in this example, 0 and 2 are missing.  And so at some point I was keeping track of 0 and 2 as missing pieces and I need to know, those are the two that I'm going to ask for a request.  Because at some -- in fact, I do, I send the request for 0, and then I send a request for 2.  That's the list I keep track, 0 and 2 is missing.  I have 1 and 3.  That's the list.

Q.    Inside the buffer?

A.    The buffer has 1 and 3 in it.  So I know, okay, 1 and 3 sitting in the buffer, 0 and 2 is missing.  I keep track.  0 and 2 is missing.  1 and 3 is in the buffer.  That's the list.

Q.    Okay.  So are you aware that Dr. Gibson has taken the position in this case that a buffer is not a list?

A.    I didn't -- I just -- I agree with that, a buffer isn't a list.  A list keeps track of a buffer.

Q.    Thank you.

MR. STEVENSON:  No further questions.

THE COURT:  Thank you.

165

Redirect?

MR. PAIGE:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. PAIGE:

Q.   Dr. Heegard, at the beginning of his questions, counsel for Ericsson asked you a number of questions about Defendants' Exhibit 281, the Vornefeld thesis.

A.   Okay.

Q.   Is that the piece of prior art you're relying on in this case to say the patents are invalid?

A.   No, it isn't.

Q.   What is the piece of prior art we're talking about?

A.   It's the ETSI submission that was submitted to the ETSI group in October of '97.

Q.   And he didn't ask any questions about whether that was a publication, did he?

A.   No, he didn't.

Q.   Okay.  Now, we also heard some questions about whether the HP license shows that these patents are valid.  Do you have an understanding as to how many patents were licensed in the HP license?

A.   I don't know the number.  I think it was a cross-license on a number of patents.

166

Q.   Was it Ericsson's entire portfolio?

A.   I think I heard that.

Q.   Are you aware of any evidence that HP took into account these two patents in deciding to enter into that license?

A.   I haven't heard anything to that effect.

Q.   Okay.  Now, I've heard a lot of questions about whether or not there was a list in the Petras ETSI submission.

Are you -- are you aware of anything in that paper that points to a list?

A.   There is in the submission a list that's demonstrated -- that's shown.

Q.   And where is that found, sir?

A.   If you look at the ETSI -- Petras ETSI submission on one of the last pages.  Maybe we can put it on the screen.

So as I mentioned, I think this is like a 26-page document.  I think this is Page 24.

Q.   And that's Figure 17 of Defendants' Exhibit 120?

A.   Right.  In Figure 17, they show a buffer and with a list keeping track of it.

Q.   Okay.  And we talked a little bit about -- or counsel talked a little bit about the fact that 1 was

167

received and then 3 was received out -- you know, out of sequence.

Why does that happen in the Petras ETSI submission?

A.   Well, when the -- the window is such that there are missing slots and you receive a packet that would fit in the window, you receive it.  So when you -- if you think of starting out with five empty chairs and people come in and you seat them, but at some point all the chairs are filled or there could be reserved chairs.

So the problem occurs when there's no chairs left.

But when -- when you're trying to fill the five chairs, you don't -- you'll take things out of order, you just start filling the chairs.

Q.   So if the chairs were full, would 3 have been able to come into the receive window?

A.   If the chairs were full, then -- and it was sent without a discard message attached to it, it would -- the receiver would reject it.

Q.   Thank you, Dr. Heegard.

MR. PAIGE:  No further questions.

THE COURT:  All right.  Thank you.

MR. STEVENSON:  Nothing further.

THE COURT:  All right.  If the jury would

please pass down their questions for this witness.

(Pause.)

THE COURT:  All right.  Ladies and Gentleman of the Jury, let me take just a short five-minute break and we'll come back and I'll give you your further instructions for the day and we'll wrap it up.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  Please be seated.

All right.  The question for Dr. Heegard is:  Were Dr. Peters' (sic) submissions granted a patent, question mark?  If not, what does it matter to the issue at hand, period.  Ericsson did receive a patent.

Plaintiff have any objections to the question?

MR. STEVENSON:  I'm not sure this witness has the foundation to answer the first one, whether this was actually patented or not.

THE COURT:  Do you -- do you know the answer?

THE WITNESS:  I don't know the answer to that.

MR. STEVENSON:  Then the second and third

169

are legal issues for the Court to instruct the jury on.

MR. VAN NEST:  Could the question be read it again?

THE COURT:  Were Dr. Peters' (sic) submissions granted a patent?  Petras, I'm sorry.

THE WITNESS:  Petras, yeah.

THE COURT:  Were Dr. Petras' submissions granted a patent, question mark?  If not, what does it matter to the issue at hand?  Ericsson did receive a patent.

MR. VAN NEST:  I think he knows the answer to the first question.  The second and third are legal issues.

THE COURT:  Right.  But his answer to the first one, I believe, was that you don't know; is that right?

THE WITNESS:  I'm not exactly sure what the question is.  Is it asking --

THE COURT:  Were Dr. Petras' submissions granted a patent?

THE WITNESS:  I don't really -- I can't give a complete answer to that because there's a lot of stuff, and I don't know what patents he applied for or whatever.  There was one patent he applied for.

THE COURT:  All right.  I think I will

170

ask the first question, and you can just say you don't know as -- as you've just indicated.  And then I'm not going to -- the other, I think, is just more argument rather than question.

So -- all right.  Bring the jury in, please.

COURT SECURITY OFFICER:  All rise for the jury.

Judge --

THE COURT:  Okay.

(Pause.)

THE COURT:  All right.  You may be seated.  I think we caught one juror in a -- indisposed at the moment.

(Jury in.)

THE COURT:  All right.  Please be seated.

All right, Dr. Heegard.  Here's the question:  Were Dr. Petras' submissions granted a patent?

THE WITNESS:  I don't really know the answer -- I don't know what patents he applied -- you know, there's a whole system.  I don't know what patents he applied for, and I don't know whether he got patents or not.

THE COURT:  All right.  Thank you.

All right.  Is there any follow-up questions by the Plaintiff?

MR. STEVENSON:  No, Your Honor.

THE COURT:  Defendant?

MR. PAIGE:  One, Your Honor.

REDIRECT EXAMINATION

BY MR. PAIGE:

Q.   Dr. Heegard, does a publication that gives something to the public so they know about it, need to be patented in order to be prior art?

A.   No, not at all.  It just has to be a public disclosure.  It would be -- as I mentioned, there's lots of things.  Some people think that only patents invalidate patents, but actually any description in the public would -- would invalidate a patent.

Q.   Thank you, Dr. Heegard.

A.   Thank you.

THE COURT:  Okay.  Any further examination?

MR. STEVENSON:  Nothing further.

THE COURT:  All right.  You may step down.

All right.  Ladies and Gentleman of the Jury, it's 4 o'clock.  We're going to call it a day.

I've got some good news for you.  I

172

visited with the attorneys, and we should finish the evidence tomorrow and probably a little early.  So I would hope if we can stay on schedule that by lunchtime or early afternoon, we should be able to let you go for the day tomorrow.

My plan would be -- I have matters I have to deal with the attorneys on regarding the Court's charge, and we'll work on that tomorrow afternoon after I let you go.  And then when you come back on Wednesday morning would be when I would give you the Court's charge and the closing -- you'd hear the closing arguments, then begin deliberating a verdict.

So that's a -- that's what our schedule is for now, and please remember my instructions.  You have paid very good attention again today.  Go home and get a good night's rest.  Please don't discuss the case among yourselves or with anyone else.  Don't make any independent investigation, and we'll see you back here tomorrow and we'll finish the evidence.

So the jury is excused.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  All right.  Please be seated.

All right.  Let me give the parties their time.  Plaintiff has used 12 hours and 15 minutes, and

173

Defendant has used 10 hours and 50 minutes.

So, all right.  Is there anything further that the Court can help you with before we adjourn for the day?

MR. STEVENSON:  Nothing from Plaintiff, Your Honor.

THE COURT:  Okay.

MR. VAN NEST:  No, Your Honor.  Thank you.

THE COURT:  All right.  Very well.  We'll see you in the morning.  Be in recess.

MR. STEVENSON:  Thank you.

COURT SECURITY OFFICER:  All rise.

(Court adjourned.)

174

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of our abilities.

/s/ Shea Sloan
SHEA SLOAN, CSR
Official Court Reporter
State of Texas No.:  3081
Expiration Date:  12/31/14

/s/ Judith Werlinger
JUDITH WERLINGER, CSR
Deputy Official Court Reporter
State of Texas No.:  731
Expiration Date  12/31/14