1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3
     ERICSSON, INC., ET AL        )
 4                                      DOCKET NO. 6:10cv473
          -vs-                    )
 5                                      Tyler, Texas
                                  )    12:49 p.m.
 6   D-LINK CORPORATION, ET AL         June 11, 2013

 7

 8                       TRANSCRIPT OF TRIAL
                         AFTERNOON SESSION
 9             BEFORE THE HONORABLE LEONARD DAVIS,
          UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY
10

11                   A P P E A R A N C E S

12

13   FOR THE PLAINTIFFS:

14
     MR. THEODORE STEVENSON, III
15   MR. DOUGLAS A. CAWLEY
     McKOOL SMITH
16   300 Crescent Court, Ste. 1500
     Dallas, Texas  75201
17

18   MR. JOHN B. CAMPBELL, JR.
     McKOOL SMITH
19   300 W. 6th Street, Suite 1700
     Austin, Texas  78701
20

21   COURT REPORTERS:      MS. JUDITH WERLINGER
                           MS. SHEA SLOAN
22                         shea_sloan@txed.uscourts.gov

23
     Proceedings taken by Machine Stenotype; transcript was
24   produced by a Computer.

25
```

2

```
 1   FOR THE DEFENDANT:

 2
     MR. GREGORY S. AROVAS
 3   KIRKLAND & ELLIS, LLP
     601 Lexington Avenue
 4   New York, New York 10022


 5


 6   MR. LUKE DAUCHOT
     KIRKLAND & ELLIS, LLP
 7   333 S. Hope Street
     29th Floor
 8   Los Angeles, California  90071


 9


10   MR. ADAM ALPER
     KIRKLAND & ELLIS, LLP
11   555 California St.
     24th Floor
12   San Francisco, California  94104


13


14   MR. MICHAEL E. JONES
     POTTER MINTON, PC
15   110 N. College, Ste. 500
     P.O. Box 359
16   Tyler, Texas  75710-0359


17


18   MR. ROBERT A. VAN NEST
     KEKER & VAN NEST, LLP
19   633 Sansome St.
     San Francisco, California 94111
20


21


22


23


24


25
```

3

```
 1                  P R O C E E D I N G S
 2                  COURT SECURITY OFFICER:  All rise.
 3                  (Jury in.)
 4                  THE COURT:  Please be seated.
 5                  All right, Mr. Stevenson.  You may
 6  proceed.
 7                  MR. STEVENSON:  Thank you, Your Honor.
 8           SCOTT NETTLES, Ph.D., PLAINTIFFS' WITNESS,
 9                      PREVIOUSLY SWORN
10             DIRECT EXAMINATION (CONTINUED)
11  BY MR. STEVENSON:
12      Q.   Dr. Nettles, I'd like to now talk with you
13  about the second non-infringement position for the '223
14  patent advanced by Defendants and that regards where the
15  timer begins.
16      A.   Yes, sir.
17      Q.   In Intel's products, where does the timer
18  start?
19      A.   It starts when the SDU -- the MSDU has been
20  received by the data link layer.
21      Q.   And what -- what is another word for the data
22  link layer that you've seen in the parlance of the code
23  for Intel's product?
24      A.   In Intel's products, the data link layer
25  really starts when the MAC starts.
```

4

1      Q.    MAC, M-A-C?

2      A.    Yes, sir, medium access control.

3      Q.    Okay.  So when the packet enters the MAC,

4    that's when the timestamp starts, right?

5      A.    Yes, sir, when it's received.

6      Q.    Okay.  Now, counsel for Defendants, during the

7    examination of Mr. Kitchin, created this handwritten

8    demonstrative.  Do you recall seeing it?

9      A.    I do.

10      Q.    And I believe the suggestion was that Intel

11    doesn't infringe this patent because above the MAC layer

12    where the timer starts, there's another layer in their

13    products called the logical link layer.  You remember

14    that argument in testimony?

15      A.    Yes, sir.  It's sometimes referred to as the

16    LLC.

17      Q.    LLC.  What does stand for?

18      A.    Logical link control.

19      Q.    Is this drawing an accurate representation of

20    the way Intel's products actually work?

21      A.    No, sir, it's not.

22      Q.    What have you done to confirm or disprove this

23    drawing and whether it is an accurate representation?

24      A.    Well, I looked at the code.

25      Q.    The source code for Intel's products.

1     A.   Yes, sir.

2     Q.   Did you look at the same code that Dr. Gibson

3  looked at in cross-examination?

4     A.   Yes, sir, that same code.

5          MR. STEVENSON:  I'd like to approach, if

6  I may, Your Honor, and hand the witness Exhibit 208D.

7          THE COURT:  You may.

8     Q.   (By Mr. Stevenson) Tell us what 208D is,

9  please, Dr. Nettles.

10     A.   208D is a function that is called

11  htxHandleTxPacketEventComplete.

12     Q.   And is this code part of the MAC?

13     A.   Yes, sir.  This is where the receiving of the

14  packet from the upper layer is completed and the timer

15  is set and then the various headers are started --

16  you're starting to add the various headers onto it in

17  this code.

18     Q.   So -- so what I want us to do is I want you to

19  walk us through the code and see if it's really true

20  that as we go through it, we'll see the logical link

21  layer prior to the MAC layer or if it's vice versa, all

22  right?

23     A.   Yes, sir.

24     Q.   So what I'd like to do is first put the code

25  on the ELMO.  This is the first page of it.

6

1       A.   Yes, sir.

2       Q.   Now, let's understand how this works.  These

3  are computer program instructions, right?

4       A.   Yes, sir.

5       Q.   Explain to the jury how computers go about

6  chugging through these and running them?

7       A.   By default, the way computers are going to

8  work is they're going to do one instructions and they're

9  going to do the next instruction and then they're going

10  to do the next instructions.  They're going to be

11  linear.

12          And sometimes there will be ifs and elses, so

13  there will be some things that they'll do, some things

14  they won't do.  Sometimes there will be loops, but

15  actually this code doesn't contain any loops.

16       Q.   Have you reviewed it carefully?

17       A.   Oh, yes, sir.

18       Q.   So where does the timer reside in this?

19  Where -- where do we hit it by line number?

20       A.   The timer is just a little bit below where you

21  are now, at 867 and 868.

22       Q.   And we know that by looking at the line

23  numbers on the right?

24       A.   Well, that's how we know the line numbers.  We

25  know that it's the timer because we see that there are

1  two calls here that talk about the timestamp and also

2  talk about the -- the Tx start time.

3        So we see on -- on the right-hand side, we see

4  utilGetTimeSinceRebootUseconds (sic).  That's the

5  microseconds since the machine rebooted, and that's

6  storing that into the packet info.  And then there's

7  also another timer that's getting set in the timer info.

8        Q.   I'm going to mark this timer so we can all see

9  it.

10        A.   Okay.

11        Q.   Is that fair?

12        A.   Yes, sir.

13        Q.   Okay.  Now, where does the MAC header get set?

14        A.   If we go down to Line 865 is probably the most

15  clear spot.

16        Q.   Okay.  So I'm just going to put two pages

17  together because it goes over.  And now we've reached

18  the section you're talking about.  Somebody wrote MAC

19  header on that.  When did that get written?

20        A.   I think that was yesterday during the

21  examination.  That's my recollection.

22        Q.   Dr. Gibson?

23        A.   Yes, sir.

24        Q.   And do you agree with him that this is where

25  the MAC header gets set?

8

```
1       A.   Yes, sir.  It's really that and the subsequent
2  code is creating the event that will create the MAC
3  header, and you can see that from the -- easily from the
4  comment and also on 8 -- 885, you see Create Transmit
5  MAC Header Phase 1.
6       Q.   Okay.  Now, after the MAC header is created,
7  is there an LLC or logical link layer header created?
8       A.   Yes, sir, there is.  It's a little further
9  along.
10      Q.   We're on Page 3 of the code now.  How many
11 pages do we have to go until we get to the logical link
12 layer?
13      A.   I think it's about a page and a half.  Maybe
14 it's two pages.
15      Q.   I'm going through it.  And I believe we marked
16 it yesterday with Dr. Gibson, and it may be coming up
17 here.
18      A.   Oh, yes, sir, here it is.  I guess it's more
19 like three pages.
20      Q.   Okay.  And these -- these lines are -- of code
21 are all consecutive, so if we're on Line 1047, that's
22 going to occur after the 800s that you identified?
23      A.   Yes, sir, that's correct.
24      Q.   What is this at 1047 that Dr. Gibson
25 identified as the LLC header?
```

9

1    A.   This is creating the event that will

2  eventually put on the LLC header.

3    Q.   So does this -- when you say creates an event,

4  does the header get put on later?

5    A.   Yes, sir.  This whole system is event-driven.

6  So certain things are going to happen by creating

7  events.

8    Q.   Okay.  So now let's go back to the diagram.

9  Now that we understand we have the timer, shortly

10 afterwards the MAC layer, and then -- MAC header, then

11 the LLC header.

12   A.   Yes, sir.

13   Q.   What does that sequence of events tell you

14 about the demonstrative that was created?

15   A.   Well, really there's a part of the MAC which

16 is above the -- what's called LL layer here, and there's

17 still a part of the MAC which is below it.

18   Q.   Okay.  Is this accurate?

19   A.   Oh, is this accurate?  No, sir, it's not

20 accurate.

21   Q.   Can we, right now, revise it to make it more

22 accurate?

23   A.   Yes, sir, we can.

24   Q.   Can we put some correction tape over this?

25 How would we change it to make it more accurate?

1      A.    Well, at the bottom I would draw the same

2  thing -- I'd say MAC layer.

3      Q.    Where does the MAC layer go?

4      A.    Well, I was going to go from bottom to top.

5      Q.    Right here?

6      A.    So right there.  That's -- that's the low MAC,

7  the -- in the Intel products, the MAC is actually

8  divided into a low MAC and a high MAC.

9      Q.    Okay.  What's above the low MAC?

10     A.    That would be the -- the LLC.  And then above

11 that would be more MAC layer.  For example, the code

12 here is from the high MAC.

13     Q.    Is that accurate now?

14     A.    Yes, sir.  I mean --

15     Q.    Is this - is the data link layer, these three

16 layers that we've pointed to right here?

17     A.    Yes, sir.  The -- the network layer and the

18 operating system are just above the routines that we've

19 been talking about.

20     Q.    Okay.  Where does the timer start?

21     A.    Basically when the packet is received by the

22 data link layer, at the very sort of top of that MAC

23 layer we've -- we've drawn.

24     Q.    Have you verified this operation in the code?

25     A.    Yes, sir, I have.

1      Q.    Is the '222 -- is the '223 patent infringed,

2  in your opinion?

3      A.    Yes, sir, it is, by the -- by the Intel chips

4  and by the Defendants' products that use Intel chips.

5      Q.    Dr. Nettles, a couple of wrap-ups.

6            In doing your work, were you careful to

7  compare the language in the four corners of the claims,

8  as defined by the Court, to the Defendants' products and

9  to the standard?

10     A.    Yes, sir, I was.

11     Q.    Did you find infringement of all the asserted

12  claims?

13     A.    I did.

14     Q.    Let me ask you finally, in doing your work of

15  comparing claims to accused products, does it matter

16  whether Ericsson was in attendance at 802.11n meetings

17  during creation of the standard?

18     A.    Not at all.  I mean, the whole point is that

19  you compare the claims to the products.

20     Q.    Thank you, Dr. Nettles.

21                MR. STEVENSON:  I'll pass the witness.

22                THE COURT:  All right.  Cross-exam?

23                MR. VAN NEST:  It will take me a moment

24  to set up, Your Honor.

25                THE COURT:  All right.

12

1                    (Pause in proceedings.)

2                    MR. STEVENSON:  Your Honor, may I -- Your

3    Honor, I will sticker the document that I used on the

4    ELMO as Plaintiff's Exhibit Demonstrative 19.

5                    THE COURT:  All right.  So marked.

6                    MR. STEVENSON:  And I also tender to the

7    Court Plaintiff's Exhibits Demonstratives 13 through 18,

8    as well.

9                    THE COURT:  All right.

10                   COURT REPORTER:  I didn't hear you, Mr.

11   Stevenson.  Through what?

12                   MR. STEVENSON:  13 through 18.

13                   THE COURT:  So tendered.

14                   MR. VAN NEST:  Good afternoon.  We have

15   to have a few props.

16                   Good afternoon, Ladies and Gentleman.

17                        CROSS-EXAMINATION

18   BY MR. VAN NEST:

19     Q.   Good afternoon, Dr. Nettles.  Welcome back.

20     A.   Good afternoon.

21     Q.   I'd like to start where you did and talk a

22   little about the reference that Dr. Heegard discussed

23   yesterday, the -- the ETSI reference.

24     A.   Yes.

25     Q.   And that's -- that's a reference that was

13

1  discussed in connection with the '625 patent, correct?

2      A.   Yes, sir, it was.

3      Q.   Now, the ETSI reference that Dr. Heegard

4  talked about, the Patent Office was not aware of that

5  reference, was it?

6      A.   That's my understanding, yes.

7      Q.   It was not presented to the Patent Office

8  during the examination of the patent, right?

9      A.   That's my understanding, yes, sir.

10     Q.   So the first fact-finder to evaluate that

11  reference in connection with this particular patent,

12  that's our jury right here today, right?

13     A.   Yes.

14          THE COURT:   Counsel?  Counsel, I

15  apologize, but I have to take a very important

16  conference call, so we'll have to be in recess for about

17  15 minutes.

18          MR. VAN NEST:   Thank you, Your Honor.

19          COURT SECURITY OFFICER:   All rise.

20          (Jury out.)

21          (Recess.)

22          COURT SECURITY OFFICER:   All rise for the

23  jury.

24          (Jury in.)

25          THE COURT:   All right.  Please be seated.

14

1          All right.  You may proceed.

2          MR. VAN NEST:  Thank you, Your Honor.

3     Q.  (By Mr. Van Nest) Dr. Nettles, before we took

4  a short break there, I think we established that no one

5  in the Patent Office saw the ETSI reference before this

6  '625 patent issued, correct?

7     A.  Yes, sir, that's my understanding.

8     Q.  And the first fact-finder to look at it in

9  connection with the patent is our jurors here in this

10  trial, right?

11     A.  Yes, sir, that's to my understanding.

12     Q.  And you know that a printed publication is

13  just as good as a patent in terms of evaluating it as

14  prior art, right?

15     A.  Oh, yes, sir, I do.

16     Q.  You don't have to have a patent as prior art;

17  a publication will be good enough, right?

18     A.  Absolutely.

19     Q.  In some cases a presentation will be good

20  enough?

21     A.  In some cases.

22     Q.  In some cases a product would be good enough?

23     A.  Yes, sir.

24     Q.  But certainly the ETSI reference, that's a

25  publication, right?

15

1       A.    That's my understanding, yes, sir.

2       Q.    Okay.  And I think you mentioned this, but in

3    evaluating invalidity, it's sort of the flip side of

4    infringement.  You have to compare the reference against

5    all the claims of the patent, correct?

6       A.    Yes, sir.

7       Q.    And you're looking to see if the reference

8    discloses each and every element -- for example, here,

9    of Claim 1, right?

10      A.    Yes, sir, that's correct.

11      Q.    And we've -- we've gone over this before?

12            MR. VAN NEST:  May I approach the board,

13    Your Honor?

14            THE COURT:  Yes, you may.

15      Q.    (By Mr. Van Nest) We've gone over this before,

16    but obviously these are the elements of Claim 1 that

17    have to be met to establish infringement, right?

18      A.    Yes, sir, that's correct.

19      Q.    And the same would be true on invalidity.

20    These elements have to be met to establish invalidity in

21    a prior art reference?

22      A.    Yes, sir, that's correct.

23      Q.    Now, the only element that you talked about

24    during your direct exam was this commanding step, right?

25    That's the one that you identified as missing from ETSI?

16

1      A.   Yes, sir, that's correct.

2      Q.   And I know that you studied the figure that

3  Dr. Heegard talked about yesterday, correct?

4      A.   I did.

5      Q.   This is the ETSI figure from DX 120 that Dr.

6  Heegard showed the jurors yesterday, right?

7      A.   Yes, sir, that's correct.

8      Q.   And the '625 patent, as we've already

9  established, involved an effort to overcome deadlock,

10  right?

11      A.   Yes, sir, that's correct.

12      Q.   And the ETSI reference was also an effort by

13  the ETSI inventors over in Aachen to overcome deadlock,

14  right?

15      A.   Yes, sir, I would agree with that.

16      Q.   And one of the ways in which they did it was

17  to disclose a discard notice, right?

18      A.   Yes, sir, that's correct.

19      Q.   And this discard notice is a packet with a

20  sequence number with a discard notice attached.  I think

21  you used the word piggybacked, right?

22      A.   Yes, sir, that's what's disclosed here.

23      Q.   And just so our jurors have it, this -- this

24  discard notice is actually depicted on the ETSI

25  reference here in Figure 11, right?

17

1       A.   Yes, sir, it is.

2       Q.   And it's it in the context of an ARQ system

3    with a transmitter and a receiver, right?

4       A.   Absolutely.

5       Q.   And it's sending data packets from the

6    transmitter to the receiver?

7       A.   That's right.

8       Q.   And then there are acknowledgement messages

9    back from the receiver to the transmitter?

10      A.   Yes, sir.

11      Q.   And then in ETSI, the Aachen folks, they said,

12   a way to force the system to move on would be to send a

13   regular data packet -- this happens to be data packet

14   with Sequence No. 5 and discard notice along with it,

15   right?

16      A.   Yes, sir, they said that the discard notice

17   would be piggybacked -- this discloses that the discard

18   notice is piggybacked on the fifth sequence number data

19   frame.

20      Q.   And that's what they said -- and that's what

21   Dr. Heegard said represented a command to receive,

22   right?

23      A.   That's what he identified.  I don't agree with

24   him.

25      Q.   Okay.  I just want to be sure.  I think what

1   you told our jurors this morning was that in your

2   opinion, a regular data packet with a sequence number

3   and a discard notice that does nothing more than move

4   the window, that's not a command to receive.

5           Isn't that what you said this morning?

6       A.   The point I'm making here is that there's no

7   disclosure in this reference of a command to receive.

8       Q.   You said, I believe, Dr. Nettles, that a

9   discard notice piggybacked onto a normal packet with a

10  sequence number, in your view, that's not a command to

11  receive, right?

12      A.   In this context, yes, sir, right.

13      Q.   And you said you agreed with Dr. Gibson, who

14  also says that a regular data packet with a discard

15  notice is not a command to receive, right?

16      A.   No, sir, I don't think I can agree with that.

17      Q.   I believe you referenced Dr. Gibson in your

18  testimony this morning, did you not?

19      A.   I did.

20      Q.   And what you said was you agree with him, that

21  a discard notice on a regular data packet with a

22  sequence number that only moves the window, that's not a

23  command to receive, right?

24      A.   No, sir, I can't agree with that.

25      Q.   In any event that's your view?

1      A.   Yes, sir.

2      Q.   Okay.  Now, you showed us some testimony this

3  morning from Dr. Larsson.  He's one of the inventors,

4  right?

5      A.   He is, yes.

6           MR. VAN NEST:   Could we put that

7  testimony up, please, Jeff?

8      Q.   (By Mr. Van Nest)  And this is the testimony

9  that you showed the jury in which he said if you had a

10 system where you could send regular data packets and all

11 you were doing is move the window, you wouldn't need a

12 command to receive, right?  That's what he said?

13     A.   He said some additional things, but, yes, sir,

14 this is what he said.

15     Q.   Now, doesn't Mr. Larsson still --

16          MR. VAN NEST:   Withdraw that.

17     Q.   (By Mr. Van Nest)  You said you thought he was

18 mistaken or wrong, right?

19     A.   No, sir.  I -- I said I thought that the

20 question was phrased in an ambiguous way and that he

21 answered what he thought the question was.

22     Q.   Now, you know, having given depositions, that

23 if the witness feels that he misunderstood the question

24 or he got the answer wrong, he has the right to correct

25 it in writing in the transcript, right?

1        A.    Yes, sir, that's correct.

2        Q.    And that was never done by Mr. Larsson, was

3   it?

4        A.    No, sir, it wasn't.

5        Q.    And Mr. Larsson never came here to testify,

6   did he?

7        A.    No, sir, he didn't.

8        Q.    And he's not coming either, is he?

9        A.    Not to the best of my knowledge.

10        Q.    And he still works for Ericsson, doesn't he?

11        A.    I think that's correct.

12        Q.    Now, as a matter of fact, last week you agreed

13   with his statement in your testimony under oath when you

14   and I were having a discussion, didn't you?

15        A.    I think I agreed that Mr. Larsson said this.

16        Q.    Well, let's look at it.

17              MR. VAN NEST:  Can we get Dr. Nettles'

18   transcript, Page 66, line 7 through 10 up, please.

19        Q.    (By Mr. Van Nest)  I asked you just last

20   Wednesday:  Okay.  And you also said that if a receiver

21   could already receive a packet, you wouldn't need a

22   command to receive it, right?

23              Answer.  Yes, sir.

24              You gave that testimony didn't you?

25        A.    Yes, sir.  I think this is in reference to

1  some of my deposition testimony, but that's correct.

2      Q.   Now, you gave us an analogy of a grocery store

3  door, that if you stand on the pad and the door opens,

4  that's a command to open the door?  Is that what you

5  said this morning?

6      A.   Actually I think the grocery store had an

7  electric eye; but, yes, sir, that's basically what I

8  said.

9      Q.   So you -- you walk in the door, you hit the

10 electric eye, the door opens, and in your view, in your

11 world, in your testimony, that's a command to receive --

12 a command to open, right?

13     A.   Yes, sir, because the door is designed and

14 programmed that way.

15     Q.   Now, I take it if the door is always open, you

16 don't need a command to open it, do you?

17     A.   I would agree with that.

18     Q.   Now, you've identified again today a standard

19 data packet that -- with a sequence number as something

20 that infringes the '625 patent, right?

21     A.   Yes, sir, that's correct.

22     Q.   Now, as a matter of fact, in the '625 patent

23 itself, the inventors describe exactly that thing as

24 prior art that they did not invent, right?

25     A.   No, sir, I can't agree with that.

1              MR. VAN NEST:   Could we have Figure 5

2   from the '625 patent up, please?

3       Q.   (By Mr. Van Nest) I've -- I've correctly

4   displayed Figure 5 from the patent, right?

5       A.   Yes, sir.

6       Q.   This is the '625 patent, right?

7       A.   Yes, sir.

8       Q.   Written by the inventors and approved by the

9   Patent Office, right?

10      A.   Yes, sir.

11      Q.   And what's being depicted here is a data

12  packet with data, a header, and a sequence number,

13  right?

14      A.   That's correct.

15      Q.   And the inventors of the '625 patent said

16  that's in the prior art.  We didn't invent that.  Didn't

17  they?

18      A.   Yes, sir, that's correct.

19      Q.   All right.  Let's turn to the '435 patent.

20  That's the one that requires a computation -- and I just

21  want to be sure that -- whoops, I'm sorry, Dr. Nettles.

22      A.   Okay.

23      Q.   You all right?

24      A.   It didn't hit me.

25      Q.   Good.  Lucky these are light, or we would all

1  be in trouble.

2          Now, the '435 patent, this is the one that

3  requires computing which data packets have been

4  discarded by the transmitter, right?

5      A.   Yes, sir, that's correct.

6      Q.   We had some discussion about that also on

7  Wednesday.  I want to put my animation board up here.

8              MR. VAN NEST:  May I approach here, Your

9  Honor?

10             THE COURT:  Yes, you may.

11     Q.   (By Mr. Van Nest) Just to be clear, what's

12  required by this claim is that the receiver on the right

13  compute the packets that have been discarded at the

14  transmitter, right?

15     A.   Yes, sir, that's correct.

16     Q.   And as I think you said last week, if the

17  receiver cannot compute all of the packets that were

18  discarded by the transmitter, there's no infringement,

19  correct?

20     A.   Yes, sir, that's correct.

21     Q.   You also testified that when a BlockAck

22  request is sent from the transmitter to the receiver,

23  that request will not allow a receiver to identify which

24  of the previously acknowledged packets have been

25  discarded.  Didn't you give that testimony just on

1   Wednesday?

2        A.   Yes, sir, I did.

3        Q.   And you further said the same is true when you

4   send an A-MPDU.  When that message is sent from the

5   transmitter to the receiver, that message will not allow

6   the receiver to determine or identify which of the

7   previously acknowledged packets have been discarded.

8             You gave that testimony, as well?

9        A.   Yes, sir.  I think that was in reference to

10   packets that had actually been discarded because of

11   time-outs, not because of receiving ACKs.

12        Q.   But you're standing on that testimony from

13   last week right, Dr. Nettles, right?

14        A.   Oh, yes, sir.

15        Q.   Now, you were here when Dr. Kitchin was

16   examined, were you not?

17        A.   Yes, sir.  I think it's Mr. Kitchin.

18        Q.   Mr. Kitchin, from Intel?

19        A.   Yes, sir.

20        Q.   And he was asked whether or not the Intel

21   chips performed this computation, and he said no, right?

22        A.   Yes, sir, I believe that's correct.

23        Q.   He denied that the Intel chips performed a

24   computation in the receiver of packets discarded in the

25   transmitter, right?

1      A.    That's my recollection, yes, sir.

2      Q.    And then he was asked:  As a computer

3  engineer, hey, if there were such a computation,

4  wouldn't it be reflected in the source code?

5            And he said, yes, didn't he?

6      A.    That's what I remember, yes, sir.

7      Q.    And he was asked:  Well, you weren't shown any

8  source code.  Is there any source code that performs

9  this computation?

10           He said:  No.  I wasn't shown any, and there

11 isn't any.  It doesn't exist.

12           Right?

13     A.    That's what he said, yes, sir.

14     Q.    Now, that happened on Thursday morning of June

15 the 7th, right -- June the 6th?

16     A.    I -- I don't remember the dates exactly, but I

17 take your word for it.

18     Q.    And you and your team spent all weekend

19 looking at source code from Intel, Atheros, and

20 Broadcom, right?

21     A.    We looked at source code this weekend, yes,

22 sir.

23     Q.    As a matter of fact, you went straight from

24 here over to Mr. Jones's office and spent all day Friday

25 looking at the Intel source code, right?

1      A.    We looked at Intel source code on Friday, yes,

2  sir.

3      Q.    You had -- Mr. Jones was serving you coffee.

4  You were in his office.  The source code was there, and

5  you reviewed it?

6      A.    Absolutely.

7      Q.    And then your team reviewed Atheros source

8  code, Broadcom source code.  All weekend long your team

9  was analyzing source code from Intel, Broadcom, and

10  Atheros, right?

11      A.    Oh, yes, sir.

12      Q.    The total amount of time you spent on the

13  Intel code was 15 hours, roughly?

14      A.    Roughly, yes, sir.

15      Q.    All right.  And another eight on the Atheros

16  code, approximately?

17      A.    Yes, sir.

18      Q.    And probably five or six on Broadcom, right?

19      A.    Yes, sir.

20      Q.    You had a team of yourself and how many other

21  people looking at source code?

22      A.    Two other people.

23      Q.    And I take it you've elected not to show our

24  jury today any source code from Intel, Atheros, or

25  Broadcom that reflects any computation that the receiver

1  of all of the packets discarded at the transmitter,

2  right?

3      A.   We haven't shown source code concerning that,

4  that's correct.

5      Q.   Now, let's turn to the '215 patent.  That's

6  the one that requires multiple feedback types, right?

7      A.   Yes, sir.

8           MR. VAN NEST:  I'll try to move this

9  board before I get the other one up.

10     Q.   (By Mr. Van Nest) Now, the '215, that is a

11  method claim, right?

12     A.   Yes, sir, it is.

13     Q.   There are method claims and there are

14  apparatus claims, but this one is a method claim,

15  correct?

16     A.   It is.

17     Q.   And with a method claim, Ericsson has the

18  burden to prove that each step in the method is being

19  performed, right?

20     A.   That's correct.

21     Q.   Because if even one step is missing, there's

22  no infringement, as I think we established last week,

23  right?

24     A.   That's correct.

25     Q.   And so let's review these steps.  First of

1  all, this is a method for minimizing feedback in an ARQ

2  protocol, correct?

3       A.   Yes, sir, that's the preamble.

4       Q.   And Step 1 requires sending a plurality of

5  first data units over a communication link, right?

6       A.   Yes, sir, that's correct.

7       Q.   So that means sending packets from a

8  transmitter probably to a receiver, right?

9       A.   Yes, sir.

10       Q.   And -- and in the language we've been using,

11  these data units, they're packets, right?

12       A.   Yes, sir.

13       Q.   So Step 1, you have to send it from the

14  transmitter to the receiver, right?

15       A.   Yes, sir.

16       Q.   Step 2, it has to be received by the receiver.

17            So the data packets have to be received by a

18  receiver, right?

19       A.   Yes, sir, that's correct.

20       Q.   That's step 2.

21            Then Step 3 in this method claim, is that

22  something has to be done in response to receiving those

23  packets, right?

24       A.   Yes, sir, that's correct.

25       Q.   And that something has to be, as the Court has

1 defined it, constructing a message field for a second

2 data unit, right?

3      A.   That's correct.

4      Q.   So Step 3, which can't happen until there's

5 been data received in Step 2, is I construct a message

6 field in response to that, right?

7      A.   Yes, sir, that's correct.

8      Q.   So the way this claim is laid out, Step 3

9 happened after Step 2 because it has to respond to Step

10 2, right?

11      A.   Oh, absolutely, yes, sir.

12      Q.   And you said that this patent requires

13 generating a message from among a number of different

14 message types, right, as part of that third step?

15      A.   Well, yes, sir, that's part of the claim

16 construction.

17      Q.   That's right.  And you -- you accept that and

18 you acknowledge that, right?

19      A.   Well, I applied the claim construction,

20 absolutely.

21      Q.   And so what must happen in order for this

22 claim to be infringed is that after a packet is received

23 by the receiver, the receiver has to generate a message

24 field which identifies a type from a number of different

25 message types, right?

1       A.   Yes, sir, that's exactly correct.

2       Q.   Now, in the products that you reviewed of

3   Intel, Atheros, Broadcom, and everybody else, the

4   receiver is only capable of generating one message type,

5   a compressed BlockAck, right?

6       A.   Well, yes, sir.  But that compressed

7   BlockAck -- the Multi-TID and compressed BlockAck field

8   identifies the message type or the feedback response.

9   That's what's required.

10      Q.   Dr. Nettles, the devices you analyzed and

11  tested over and over and over again, only generated one

12  message type, right?

13      A.   Oh, yes, sir.

14      Q.   They didn't generate more than one; they

15  generated only one, right?

16      A.   That's correct.

17      Q.   And that only one was a compressed BlockAck,

18  which is the only one those receivers are capable of

19  generating, right?

20      A.   Oh, yes, sir.  I agree with that completely.

21      Q.   All right.  Let's talk about the '568.  I

22  thought I heard Mr. Stevenson state -- say that somehow

23  Mr. Gibson had admitted that Ekiga was using the

24  invention.  Did you hear that?

25      A.   That was my understanding of Dr. Gibson's

1  testimony, yes, sir.

2      Q.   But that's not what he said, is it?

3      A.   Well, that was my understanding.

4      Q.   Dr. Gibson was here all day -- seemed like all

5  day to me -- testifying that there is no infringement of

6  this claim or any other, right?

7      A.   He did testify to that, yes, sir.

8      Q.   Just so we get on the same page, we're now

9  talking about the '568, the service type identifier

10 patent, right, identifying the type of data conveyed in

11 the payload, correct?

12     A.   Yes, sir.

13     Q.   You know that's not what Dr. Gibson said,

14 don't you?

15     A.   Well, my understanding is that he explained

16 that when he tested Ekiga -- and we saw evidence to this

17 effect -- that it generated a TID of 5 which

18 corresponded to video.

19     Q.   Let's actually --

20          MR. VAN NEST:  Can we put up Dr. Gibson's

21 testimony from yesterday?

22     Q.   (By Mr. Van Nest) Mr. Stevenson asked him:

23 Ekiga is using this invention, isn't it?

24          And the answer was:  In this call, Ekiga

25 assigned a TID of 5.

1          Question:  It's using the invention, right?

2          Answer -- he's asking back if he heard it

3  right.

4          Ekiga is using the invention, you said?

5          Question:  Yes.  That's what you tested,

6  right?

7          Yes.

8          That was the testimony that Dr. Gibson gave

9  yesterday here in court, right?

10     A.   Yes, sir.

11     Q.   Now, as a matter of fact, you also tested

12  Ekiga as part of your work in preparing to offer

13  opinions in this case, right?

14     A.   I did.

15     Q.   And you -- you set up a -- let's back up a

16  minute.  Ekiga is a video conferencing system like

17  Skype?

18     A.   Yes, sir, that's correct.

19     Q.   You can use video or voice or both, right?

20     A.   That's correct.

21     Q.   And you set it up to use both.  Is that what

22  was in your experiment?

23     A.   I think we experimented with both, but

24  primarily video.

25     Q.   Primarily video.  So you were running video?

```
 1        A.    Yes, sir.

 2        Q.    And you ran a series of packets which you

 3   knew, because you set the thing up, had video data in

 4   them, right?

 5        A.    Yes.

 6        Q.    You knew that ahead of time?

 7        A.    Yes, sir.

 8        Q.    You set it up that way to see how the test

 9   would come out, right?

10        A.    Yes, sir.

11        Q.    And you ran it with this Wireshark or some

12   other technique that would detect what the TID value was

13   in the packets, right?

14        A.    Yes, sir.

15        Q.    And the results showed that you got different

16   TID values for the same type of data, right?

17        A.    I think for Ekiga it was consistent; but yes,

18   sir, that's correct in general.

19        Q.    In general, with your Ekiga testing -- let's

20   stick right on Ekiga -- sometimes the TID value was 5

21   and sometimes it was 0, right?

22        A.    Yes, sir.

23        Q.    So for the same type of packet that you knew

24   was video, sometimes the TID value was 5 and sometimes

25   the TID value was 0.  That's what your tests showed,
```

34

1  right?

2      A.   Yes, sir.

3      Q.   And doesn't that just prove what you told me

4  last week, which is that an application can assign any

5  TID value it wants to any kind of data, right?

6      A.   Yes, sir.

7      Q.   If the application is running video, it

8  doesn't have to use a 4.  It can use a 0 or a 1, right?

9      A.   Yes, sir.

10     Q.   And someone running voice, they can assign a

11  7, a 5, a 1, a 2, or a 3; anything they want, right?

12     A.   Yes, sir.

13     Q.   And the system will run those packets,

14  whatever TID value they have, regardless of what's

15  inside the packet, right?

16     A.   Yes, sir, that's correct.

17     Q.   And as you told me last week point-blank,

18  that's why an 802.11n system cannot determine from the

19  TID value whether the data in the payload is video,

20  voice, Internet, or multimedia, right?

21     A.   Yes, sir.

22     Q.   Now, let's turn to the '223.  Last patent.

23          Now, I thought I heard you testify just a

24  little while ago that you think fragmenting and

25  segmenting are two different things.  Is that what I

1  heard you say?

2      A.   Yes, sir, they're related, but they're

3  different.

4      Q.   Now, last week you said they both involve --

5  they both involve breaking things down into smaller

6  units and reassembling them, right?  Didn't you tell me

7  that?

8      A.   In general, that's correct.

9      Q.   And you're standing by that testimony, too?

10      A.   I am.

11      Q.   And you know full well that the inventors of

12  the '223, when they used the word segmenting, they meant

13  splitting up data packets into smaller units, right?

14      A.   That's not my understanding from reading the

15  claims.

16      Q.   Let's take a look at the deposition of Mr.

17  Wager at Page 107, Line 22 through 108, Line 2.

18           Mr. Wager is one of the inventors of the '223,

19  correct?

20      A.   Yes, sir, that's correct.

21      Q.   He also didn't show up to testify, right?

22      A.   That's correct.

23      Q.   What he says, though, is that:  The

24  transmitter would take the service data unit at the data

25  link layer and package it in PDUs, or protocol data

1  units, for transmission out to the receiver; is that

2  correct?

3          Answer:  It segments the SDU, so it splits it

4  up in smaller parts.

5          That's what the inventor thought he invented

6  in the '223, right?

7      A.   That's what he says in this testimony, yes,

8  sir.

9      Q.   And he gives additional testimony --

10  additional testimony in which he confirms, looking at

11  the patent itself, that segmenting means splitting PDUs

12  up, right?

13      A.   Yes, sir.

14      Q.   Let's take a look at the Wager depo, Page 114,

15  Lines 13 through 19.

16          Now he's looking at the patent, Figure 2.

17          The question is:  All right.  So now the SDU

18  in Figure 2, what we see is that the SDU is split up

19  into multiple PDUs?

20          Yes.

21          Okay.  And that's what we referred to as

22  segmenting.

23          Answer:  Yes.

24          Right?

25      A.   Yes, sir, that's what he says here.

1      Q.   Now, you know that one of the other inventors

2  says fragmenting and segmenting, they're the same thing,

3  right?

4      A.   Yes, sir.

5      Q.   As a matter of fact, he says they are

6  interchangeable, right?  Interchangeable?

7      A.   I don't remember that specific word, but I

8  believe you.

9      Q.   Well, let's put --

10          MR. VAN NEST:  Do we actually have Mr.

11 Ludwig's testimony from his deposition at Page 49, Lines

12 4 through 10?

13          (Video clip playing.)

14          QUESTION:  And I believe you used the

15 term fragmentation for this.  Is another word for that

16 segmentation?

17          ANSWER:  Correct.

18          QUESTION:  And do you see those as

19 interchangeable?

20          ANSWER:  In my definition of the terms, I

21 would say they're interchangeable.

22          (End of video clip.)

23     Q.   (By Mr. Van Nest) So Dr. Ludwig -- Mr.

24 Ludwig -- this is another inventor on the '223, right?

25     A.   Yes, sir.

1      Q.    He also did not come and testify?

2      A.    That's correct.

3      Q.    Do you know whether he's still employed at

4   Ericsson?

5      A.    No, I don't.

6      Q.    You don't?

7   Both he and Wager have the same view, that segmenting

8   means splitting up smaller pieces, fragmenting, correct?

9      A.    That's my understanding, yes, sir.

10     Q.    Now, you are accusing something in the

11  devices -- the products that isn't called fragmentation

12  or segmentation, right?

13     A.    It's not called that, that's correct?

14     Q.    Speaking of a different word, it's called

15  encapsulation, right?

16     A.    Well, not in the code; but, yes, sir.

17     Q.    And encapsul -- that's what you call it,

18  encapsulation, right?

19     A.    That would be one description, yes, sir.

20     Q.    Well, that's the description you used, isn't

21  it?

22     A.    Yes, sir.

23     Q.    Last week that's what we agreed on?

24     A.    Yes, sir.

25     Q.    Okay.  So you would agree with me,

1   encapsulation -- that's a really different word from

2   segmentation, right?

3        A.    They're both different words, yes, sir.

4        Q.    Yes, they are.

5              And I think you said that what fundamentally

6   happens in encapsulation is you take a packet, you don't

7   split it up, you don't cut it into smaller pieces, you

8   just put a header around it, you put it in a box.

9              Right?

10       A.    Yes, sir.

11       Q.    And you confirmed that this morning.  In your

12  view, segmentation, fragmentation, they all mean taking

13  a packet, not splitting it, not cutting it, not making

14  it smaller, but just dropping it in a box.  Right?

15       A.    I'm afraid I didn't quite follow your

16  question.  It seemed like you talked about segmentation

17  and fragmentation at the same time.

18       Q.    Now, with respect to the source code that you

19  showed the jurors this morning -- by the way, is this

20  something that you identified this weekend, or did you

21  have this before you went out on your -- your source

22  code adventure?

23       A.    Well, that's discussed in my report, sir.

24       Q.    Now, you've actually changed your testimony

25  from last week on whether or not the logical link layer

1  is above or below the MAC, haven't you?

2      A.   Not to the best of my recollection, no, sir.

3      Q.   I think the drawing you put before the jurors

4  today showed the MAC layer and then the logical link

5  layer and then you drew another MAC layer on top of it,

6  right?

7      A.   I did, yes, sir.

8      Q.   Now, last week when we were discussing this

9  very same subject, on Wednesday afternoon, you said:

10         After the packets arrive at the logical link

11 layer, after that, they then go into the MAC layer.

12         Right?

13     A.   Yes, sir.

14     Q.   That was testimony that you gave on the record

15 under oath last week?

16     A.   Yes, sir.

17              MR. VAN NEST:  Could we take a look at

18 that?  It's actually Page -- it's the afternoon of June

19 5th, Page 85, 25 through 86, Line 3.  I'm showing 85 at

20 25 to 86, Line 3.  Is that not right?

21     Q.   (By Mr. Van Nest) In any event, you recall the

22 testimony.  It was just a few days ago, and that's what

23 you said, right?

24     A.   That's my recollection.

25     Q.   Okay.  Now, you then identified in the source

41

1  code a line that you say shows where the headers for the

2  MAC layer are placed -- where the timer is initialized,

3  right?

4      A.  Yes, sir, I did.

5      Q.  That's what you showed us.

6          MR. VAN NEST:  Could I have the -- the

7  document control here?  Let's see, I can actually do it

8  myself.  There we go.

9      Q.  (By Mr. Van Nest)  I think you said -- it's

10  down there around Line 868 or 867, somewhere in there,

11  that's what you called the point at which the timer was

12  initialized, right?

13      A.  Yes, sir, that's correct.

14      Q.  Now, in this particular -- and then you said,

15  well, the logical link layer header comes on later --

16  further down in the code, right?

17      A.  Yes, sir.

18      Q.  Actually there's a reference to getting the

19  pointers for the logical link layer before this

20  reference in the source code, correct?

21      A.  Yes, sir.  There's some discussion of the LLC

22  above that.

23      Q.  Above that.  Now, you didn't show this to the

24  jury, right?

25      A.  No, sir, we didn't.

 1      Q.   No.  And this says get the first buffer from

 2    the packet and set the pointers to the MAC header and

 3    the LLC header.  Do you see that?

 4      A.   Yes, sir, I do.

 5      Q.   That occurs at Line 844 and 845?

 6      A.   It does.

 7      Q.   And according to you, that's earlier in time

 8    than what happens further -- further down the page,

 9    correct?

10      A.   That's correct.

11      Q.   And I think you testified last week, in

12    connection with this same issue, that the way the

13    packets operate and move through the system, they come

14    from above to the logical link layer first and then to

15    the MAC, right?

16      A.   I think I was referring to the model at that

17    point; but, yes, sir.

18              MR. VAN NEST:  I have nothing further

19    Your Honor.  Pass the witness.

20              THE COURT:  All right.  Redirect?

21              REDIRECT EXAMINATION

22    BY MR. STEVENSON:

23      Q.   Dr. Nettles, let's leave off with -- or start

24    off with where we left off, and that's with the code.

25    I've highlighted the lines Mr. Van Nest talked to you

 1  about.

 2           First question:  What kind of lines are those

 3  of code?

 4       A.   Well, those specific lines are comments.

 5       Q.   Comments?

 6       A.   Yes, sir.

 7       Q.   Okay.  Read the comments and explain what they

 8  mean.

 9       A.   It says:  At sign ipeer -- get the first

10  buffer from the -- excuse me, I can't -- let me read

11  from my -- my version.  Get the first buffer from the

12  packet and set the pointers to the MAC header and the

13  LLC header (LLC - for NDIS 6.0 only).

14       Q.   Okay.  How does that affect your testimony, if

15  at all?

16       A.   It doesn't.  This isn't really talking about

17  the LLC header itself.  It's talking about getting a

18  buffer where we're going to create some space for the

19  LLC header, and that -- that's what's happening here.

20           We're going to set the pointer to where in

21  this chunk of data we're going to put the MAC header and

22  the LLC header.

23       Q.   Okay.  Does this have any impact on your

24  testimony showing the actual executing lines of code;

25  that first the MAC header goes on, then the LLC header

44

1   goes on?

2        A.   No, sir, it doesn't.

3        Q.   Do you stand by your testimony about the data

4   link layers and the MAC layers as you drew them out

5   here -- or I drew them out, upon your testimony, on the

6   ELMO?

7        A.   I do.

8        Q.   Next question, the testimony of Mr. Wager.  Do

9   you remember seeing that with Mr. Van Nest just now?

10       A.   Yes, sir, I do.

11       Q.   And there was some testimony about the size of

12   SDUs and protocol data units.  Do you remember that?

13       A.   That's correct.

14       Q.   I'd like to show you the rest of that

15   testimony that he didn't show you.  It's at 107:22 to

16   108:12.

17            MR. STEVENSON:  Will you zoom in on that,

18   please, Mr. Diaz?  See if we can arrange those so

19   they're visible.

20       Q.   (By Mr. Stevenson) All right.  So what he read

21   you was:  Then the transmitter would take the service

22   data unit at the data link layer and package it into

23   PDUs or protocol data units for transmission out to the

24   receiver.

25            He answered:  It segments the SDU, so it

1  splits it up in smaller parts.

2          Then he rephrases it using it the way you put

3  it.

4          And the attorney for the Defendants then asked

5  Mr. Wager:  In connection with your patent and the

6  cellular systems you were working on, the transmitter

7  will take the service data unit, or SDU, and segment it;

8  or, in other words, split it up into smaller parts to be

9  placed into smaller protocol data units or PDUs.  Is

10 that correct?

11         And he said:  It's correct, but they may also

12 be bigger.

13     A.   Yes, sir.

14     Q.   How does that affect your view of the way the

15 invention should be interpreted?

16     A.   It doesn't change -- none of his testimony

17 changes my view of how the -- the invention should be

18 interpreted.  That's very clear from the claims.

19     Q.   Does it mean a PDU, a protocol data unit can

20 be bigger than that service data unit, or SDU, that goes

21 into it?

22     A.   Oh, yes, sir.  The -- you add headers, so it

23 definitely can be bigger.

24     Q.   Is that what would happen if you had a

25 one-to-one segmentation?

1        A.   Yes, sir.

2        Q.   Okay.  Lastly, on the source code, do you

3   recall during Dr. Gibson's testimony him going through

4   the rules and the standard?  --

5        A.   Yes, sir.

6        Q.   -- about window shifting at the receiver.  Do

7   you remember that?

8        A.   I do.

9        Q.   And did you disagree with his conclusions at

10  all about how windows shift at the receiver according to

11  the rules in the standard?

12       A.   No, sir, I don't remember having any

13  disagreement with him about that.

14       Q.   I mean, the -- the accused devices apply the

15  rules, don't they?

16       A.   Oh, yes, sir.

17       Q.   Okay.  Have you also seen and shown the jury

18  today technical documentation for the products

19  themselves that show how they implement those rules?

20       A.   Yes, sir.

21       Q.   That was the Intel Kedron data sheet we saw,

22  wasn't it?

23       A.   It was.

24       Q.   Now, have you seen source code corresponding

25  to all this?

```
1      A.   Yes, sir, I have.

2      Q.   Have you seen it for the accused devices?

3      A.   Yes, sir, I have.

4      Q.   And Mr. Van Nest said, well, you haven't shown

5 any source code.  Do you have source code available to

6 look at and introduce that corresponds to what you saw

7 and did as far as the receiver window goes and how it

8 computes?

9      A.   Yes, sir.

10     Q.   Okay.  I'm going to hand you PX 207A.

11          Is that source code that you reviewed in

12 connection with your engagement?

13     A.   Yes, sir, it is.

14     Q.   For who is it -- for which -- for which

15 product?

16     A.   This is for the Atherion products -- Atheros

17 products, sorry.  Atherion is a different company.

18     Q.   Does that source code correspond with the

19 window-shifting that occurs in the cases identified by

20 Dr. Gibson?

21     A.   Yes, sir.  This is the code for Atheros

22 manipulating the window of its scoreboard.

23     Q.   Okay.  Are there computations in there?

24     A.   Yes, sir.

25     Q.   Are there commands in there?
```

1        A.    Yes, sir.

2                    MR. STEVENSON:  Nothing further.

3                    Thank you, Dr. Gibson -- Dr. Nettles.

4                    THE COURT:  All right.  Any further

5    recross?

6                    MR. VAN NEST:  Just one, Your Honor.

7                    RECROSS-EXAMINATION

8    BY MR. VAN NEST:

9        Q.    Dr. Nettles, the source code you just referred

10   to, all that does is shift the window when a packet

11   comes in that's outside the window, right?

12       A.    No, sir, that's not correct.

13       Q.    It's the window-shifting algorithm we've

14   looked at in the standard, right, that corresponds to

15   that?

16       A.    No, sir.  Actually this includes the

17   window-shifting because of getting an implicit BlockAck

18   and because of getting an explicit BlockAck; both of

19   those.

20       Q.    And as we established last week, an 802.11

21   receiver will take a packet in any order, inside or

22   outside the window, at any time, right?

23       A.    On, yes, sir, and this code shows that.

24       Q.    Thank you.

25                    MR. VAN NEST:  I have nothing further,

1  Your Honor.

2                    THE COURT:  Thank you.

3                    Anything further?

4                    MR. STEVENSON:  Nothing further.

5                    THE COURT:  All right.  If the jury will

6  pass down their questions for this witness, please.

7                    (Pause in proceedings.)

8                    THE COURT:  All right.  We are going to

9  take about a five-minute break and I'll visit with the

10 attorneys about these questions and we'll come back.

11                   Please remember my instructions.

12                   Be in recess.

13                   COURT SECURITY OFFICER:  All rise for the

14 jury.

15                   (Jury out.)

16                   THE COURT:  Please be seated.

17                   All right.  The first question is:

18 Regarding the '223 patents, are the terms high MAC and

19 low MAC in a standard?  Would all of the products in

20 question be set up that way?

21                   Does the Plaintiff have any objection to

22 the question?

23                   MR. STEVENSON:  No objection.

24                   THE COURT:  Defendants?

25                   MR. VAN NEST:  I'm not sure it has

1  anything to do with the issues in the case, Your Honor,

2  but I don't have any objection to it.

3              THE COURT:  All right.  Very well.

4              And the next question is:  With regard to

5  the '568 patent service type identifier and traffic

6  identifier, are they the same?

7              Any objection to that question?

8              MR. STEVENSON:  No objection.

9              THE COURT:  Any objection?

10             MR. VAN NEST:  Could you read the

11 question again, Your Honor?

12             THE COURT:  With regard to the '568

13 patent service type identifier and traffic identifier,

14 are they the same?

15             MR. VAN NEST:  I don't have objection to

16 that.

17             THE COURT:  All right.  Next is:  Why is

18 there a chart for identifying -- I believe it says --

19 yeah, TID -- identifying TID value if all types can fall

20 anywhere?

21             MR. STEVENSON:  No objection.

22             MR. VAN NEST:  No objection, Your Honor.

23             THE COURT:  And next one:  Prior art.  So

24 patents are not necessary, question mark?  Without

25 patents, who owns the rights?

1            MR. STEVENSON:  I think that calls for

2  speculation on the part of the witness, and it's

3  probably irrelevant.

4            MR. VAN NEST:  I don't think so, Your

5  Honor.  We went over that in cross, and I think it's

6  directly pertinent.

7            THE COURT:  All right.  I'll overrule the

8  objection, and the witness can answer.

9            Can you answer that question?

10           THE WITNESS:  Yes, Your Honor.  I think

11 that the context was -- in the context of prior art,

12 making it clear that patents -- you didn't have to use

13 only patents as prior art.  It's not about patents in

14 general.

15           Is that your understanding?

16           THE COURT:  I think that's the first part

17 of the question, and then they ask the question:

18 Without patents, who owns the rights?

19           THE WITNESS:  I think I'm not really

20 qualified to answer that question.

21           THE COURT:  Okay.  I think I'll sustain

22 the objection as to that second part because I think

23 that is -- gets into something that's not appropriate.

24           So okay.

25           MR. VAN NEST:  Your Honor, we have one

1    matter I'd like to approach on before the jury comes

2    back in.

3                    THE COURT:  All right.

4                    (Bench conference.)

5                    MR. VAN NEST:  We'd like to request the

6    right to a very brief surrebuttal on this source code

7    issue that he testified about.  He did not have the

8    source code in his opening testimony at all.  We didn't

9    raise -- it was raised by him on the cross of Gibson.

10                   We haven't had a chance to -- to analyze

11   it carefully, but we have Duncan Kitchin here, who

12   understands the code and wrote the code.  I can

13   represent to the Court that what they have said in the

14   evidence is absolutely flat wrong, and I don't want the

15   jury to have a misimpression.

16                   So we would request at this time, or

17   whenever Your Honor wants it, a very brief surrebuttal

18   from Mr. Kitchin just on this issue of code drivers on

19   the '223 as to where the header goes on and when the

20   timer starts.  And it will be very brief.

21                   THE COURT:  Response?

22                   MR. STEVENSON:  Your Honor, I object to

23   that, because they brought Mr. Kitchin here.  They knew

24   our theory.  It was expressed in the direct examination.

25                   Why didn't Mr. Kitchin go through the

1    code and say:  They're wrong about this?

2                   All they did is, they asked him very

3    generally, and in the demonstrative, if it was wrong,

4    that was the chance to do it.  And I think a surrebuttal

5    coming on now is inappropriate because we -- we didn't

6    surprise them with something.  We responded to their

7    layer diagram, which was incorrect.

8                   MR. VAN NEST:  He's changed his

9    testimony.  In his direct, he said the logical link

10   layer starts here, and then the MAC layer starts below.

11                  He has now gotten up and looked at some

12   code and misinterpreted it or misrepresented it and put

13   the MAC layer above.

14                  That's not something that was in his

15   report.  That's not something that was in his direct.

16   He's changed his testimony, and we ought to have a right

17   to rebut it with someone that knows what's in that code.

18                  MR. AROVAS:  If I can add something, the

19   direct -- because I did a lot of these witnesses -- the

20   direct of Nettles had a very standard diagram of the

21   different layers.  Mr. Kitchin responded to that.

22                  That was the opinion where the timer

23   started, and the standard -- it's a standardized,

24   actually, protocol, okay?

25                  What we saw here with the code, it's a

1  suggestion that -- which is directly contrary to what

2  happened on the direct -- was that actually the Intel

3  products don't follow that standardized protocol, which

4  was the only layered structure that was shown by

5  Nettles.

6            Now, what they did is, they looked at the

7  code and said:  Look at this.  Doesn't this work

8  differently?  You actually have MAC/LLC as opposed to

9  LLC/MAC, which was the testimony from Nettles on direct.

10           So all we would do with Kitchin is say:

11  Okay.  We want to just deal with the structure.  Is the

12  code using this structure from the standardized --

13           THE COURT:  All right.  I'll allow brief

14  surrebuttal.

15           MR. VAN NEST:  Thank you, Your Honor.

16           (Bench conference concluded.)

17           THE COURT:  All right.  Bring the jury

18  in.

19           COURT SECURITY OFFICER:  All rise.

20           (Jury in.)

21           THE COURT:  All right.  Please be seated.

22           All right, Dr. Nettles.  The jury has a

23  few questions for you.

24           First, regarding the '223 patent, are the

25  terms high MAC and low MAC in a standard?

1           And then follow-up:  Would all the

2  products in question be set up that way?

3           THE WITNESS:  So, no, they're not part of

4  the standard.  That's part of how Intel implements their

5  products.  The '223 is only accused against Intel and

6  the Defendants that use Intel chips when they use Intel

7  chips.

8           So the high MAC and low MAC issue really

9  doesn't apply to the other chip makers or to the

10  Defendants when they're using the other chips.

11           THE COURT:  All right.  Thank you.

12           Next is:  With regard to the '568 patent,

13  are service type identifier and traffic identifier the

14  same?

15           THE WITNESS:  Well, that's my testimony.

16  I've identified the service type identifier of the

17  patent with the -- the TID of the product is actually

18  the traffic identifier.

19           So I've identified those two things to be

20  the same, so I believe they are.

21           THE COURT:  All right.  Next:  Why is

22  there a chart for identifying TID value if all types can

23  fall anywhere?

24           THE WITNESS:  Well, my understanding is

25  that that chart has those identifications because that's

1  what the standard is suggesting that applications and

2  programmers use for their video or voice data; that they

3  use those categories.

4              So it's a suggestion as to how the

5  standard in the product should be used.

6              THE COURT:  All right.  Thank you.

7              All right.  Any follow-up questions from

8  the Plaintiffs' counsel?

9              MR. STEVENSON:  No follow-ups, Your

10  Honor.

11              THE COURT:  Any from the Defendant?

12              MR. VAN NEST:  Just one, Your Honor.

13              THE COURT:  All right.

14                  RECROSS-EXAMINATION

15  BY MR. VAN NEST:

16      Q.    The suggestion you referred to, Dr. Nettles,

17  is only a suggestion; it's certainly not a requirement,

18  right?

19      A.    I agree with that.

20              THE COURT:  All right.

21              MR. VAN NEST:  Nothing further, Your

22  Honor.

23              THE COURT:  Anything further?

24              MR. STEVENSON:  Nothing further.

25              THE COURT:  All right, Dr. Nettles.  You

1  may step down.

2              All right.  Who will Plaintiffs' next

3  witness be?

4              MR. CAWLEY:  Your Honor, the Plaintiff

5  will rest at this time.

6              THE COURT:  All right.  Very well.

7              Does Defendant have any additional

8  witnesses to call?

9              MR. VAN NEST:  We do, Your Honor.

10             THE COURT:  All right.

11             MR. VAN NEST:  Just one.  The Defendants

12  call -- recall to the stand Duncan Kitchin.

13             THE COURT:  All right.  Mr. Kitchin.

14             MR. AROVAS:  Your Honor, since

15  Mr. Kitchin is a fact witness and was sequestered, we

16  just have him outside --

17             THE COURT:  All right.

18             MR. AROVAS:  -- and he'll be in here

19  momentarily.

20             THE COURT:  All right.  You may have a

21  seat.

22             You may proceed.

23             MR. AROVAS:  Thank you, Your Honor.

24   DUNCAN KITCHIN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

25                  DIRECT EXAMINATION

58

1  BY MR. AROVAS:

2      Q.   Welcome back, Mr. Kitchin.

3      A.   Thank you.

4      Q.   Did you have a chance to go home over the

5  weekend?

6      A.   I did.

7      Q.   All right.  Well, I'd like to ask you just a

8  very few questions on a very narrow topic.  And just to

9  be clear, I'm not going to be asking you about other

10 people's testimony.  As a fact witness, you haven't been

11 in the courtroom and haven't heard the testimony of the

12 other witnesses; is that right?

13     A.   Yes, that's correct.

14     Q.   Okay.  And that's because the Court has a rule

15 for fact witnesses.  That's not your choice, right?

16     A.   That -- that's what I understand, yes.

17     Q.   Okay.  And I'm also not going to -- I'm going

18 to just talk about one piece of source code.  And I'm

19 not going to go in and go through the other topics that

20 you talked about in your first testimony.

21          So we're just going to stay focused on one new

22 piece of evidence that was introduced recently in the

23 trial, okay?

24     A.   Okay.

25               MR. AROVAS:  And let me put on the screen

1  what has been marked as PX 0208D, excerpt pages from

2  Intel source code.  And let me hand up a copy as well.

3              Your Honor, may I approach?

4              THE COURT:  Yes, you may.

5      A.   All right.  Thanks.

6      Q.   (By Mr. Arovas) Okay.  The first thing I'd

7  like to do, Mr. Kitchin, is if you could take a look at

8  the source code and see if it's source code you're

9  familiar with from the Intel products.

10     A.   Sure.  Sure.  I'm familiar with this.

11     Q.   Is this source code you're familiar with?

12     A.   Yes, it is.

13     Q.   Okay.  And so just so we have a frame of

14  reference, I want to make sure we know what we're

15  talking about.

16          And when you were here last time, you

17  testified about the architecture of the Intel products

18  and how it had a logical link layer -- that's right over

19  here at the top (indicating) -- a MAC layer in the

20  middle, and a physical layer at the bottom.

21          Do you recall that?

22     A.   Right.  Just to be clear, the logical link

23  layer that's shown here, that's not inside our product.

24  The top of our product is at the top of that MAC layer

25  that's shown there.

60

1    Q.   Okay.  Right.  So the logical link layer is,

2  in fact, not even in the Intel products, right?

3    A.   That's correct.

4    Q.   Okay.  And so you also testified that -- just

5  so we have background -- that when a packet would come

6  in, it would first go through the logical link layer,

7  then to the MAC layer, and then go down this stack?

8    A.   Yes, that's correct.

9    Q.   Okay.  And the top, the data link layer, is

10 right up over here (indicating), right?

11   A.   Yes, that's correct.  The data link layer

12 includes the logical link layer and the MAC layer.

13   Q.   Okay.  And the timestamp that we talked about

14 was initialized at the top of the MAC layer; is that

15 right --

16   A.   Yes, that's correct.

17   Q.   -- in the Intel products?

18        And is that different than the top of the data

19 link layer?

20   A.   Yes.  Yes.  That's a different thing.

21   Q.   And this structure that we're looking at, just

22 so we understand, is that a standardized structure that

23 applies generally?

24   A.   Yes, that's correct.  This -- this comes from

25 the OSI model.  It comes from the 802 specifications

1  that defines all of this.

2      Q.   Okay.  And so, actually, if we look right over

3  here (indicating), you mentioned the OSI model.  We have

4  802.11 and OSI model, and we have all these different

5  layers, 1 to 7; is that right?

6      A.   That's correct.

7      Q.   Okay.  And that's a standardized, accepted

8  structure for the architecture of the products?

9      A.   Yes, that's correct.

10      Q.   And this is actually put out by Microsoft, is

11  that right, describing how their products will interact

12  on that?

13      A.   Microsoft uses it.  I think this document is a

14  Microsoft document.  But this is a -- the OSI model is

15  a -- is a -- is a standard that's used by every

16  networking system.

17      Q.   Okay.  And so just so we know where the pieces

18  fit together, and then I want to take a look at the

19  source code and see how that works, where does 802.11

20  fit in this structure?

21      A.   Okay.  So it actually shows it right here on

22  the right.  There's a shaded box that says 802.11.

23      Q.   That's right over here (indicating)?

24      A.   Yes.

25      Q.   And where is the logical link control layer?

1          A.     So that's the narrow box just above that.

2          Q.     Okay.  So that's the logical link layer.  And

3     that logical link layer corresponds with the top of the

4     data link layer; is that right?

5          A.     Yes, that's correct.

6          Q.     All right.  And the MAC layer is 100 percent

7     completely below the top of the data link layer; is that

8     right?

9          A.     Yes, that's correct.

10          Q.     Okay.  Now, if someone were to come into court

11     and say, actually, this logical link layer is also in

12     the middle of that MAC layer, would that be right?

13          A.     No, that's not correct.  They're two separate

14     things.

15          Q.     Okay.  And would we see that in the Intel code

16     as well?

17          A.     That the LC isn't there?

18          Q.     Yes.

19          A.     Yes.  Yes.  The Intel code is only about the

20     MAC functionality.  That's the -- that's the part of the

21     function that's implemented there.

22          Q.     Okay.  So let's take a look at the Intel code,

23     and I'm going to put it on the screen.  And the first

24     thing I'm going to do, just so we know what we're

25     looking at, is show you the first page of the exhibit

1  that was used here in court.

2          And if you can tell us what we're looking at

3  up at the top, the header.  If it's not big enough, I

4  can make it a little bigger for you.

5      A.   That's okay.

6          So this is a function that's called -- this is

7  one of the first pieces of code that runs when a new

8  packet comes into the system, into the MAC.

9          So this is after Microsoft Windows gives the

10  MAC a packet to be transmitted.  It gives it a bundle of

11  information.

12     Q.   Okay.  So this is a function, so this is a

13  section of code that will execute when that packet comes

14  in?

15     A.   That's correct.

16     Q.   And is this all in the MAC layer?

17     A.   Yes, it is.

18     Q.   Is this in the logical link layer?

19     A.   No.

20     Q.   Okay.  So now let's step through the lines of

21  code, and what I'd first like to look at is Lines 867

22  and 868, and I want to make sure we're very careful so

23  everybody understands how the product really works.

24  Make it a little bit bigger.

25          So we see two lines, 867 and 868.  And can you

1  tell us what's going on in those lines of code?

2      A.   So what it's doing here is, it's recording

3  what the current time is.  It's marking a timestamp.

4          So this -- you see at 867, it says

5  ndisGetCurrentSystemTime.  That's basically a call to

6  Windows to say tell me what the time is.  And it's

7  putting that information into this thing, pPacketInfo,

8  and there's a little arrow liTimeStamp.

9      Q.   Okay.  And is that where the timestamp is

10 initialized?

11     A.   Yes, that's correct.

12     Q.   Okay.  Now let's go a little bit further down

13 into the code to some other lines that we saw, and I

14 want to make sure we understand what they're doing, and

15 then I want to get the big picture.

16         So let's go to Line 1045.

17     A.   Okay.

18     Q.   So that's later in the document.  Much later

19 in the document.

20     A.   Uh-huh.

21     Q.   And I want to look at the Line 1045 and look

22 at -46 and -47, okay?

23     A.   Okay.

24     Q.   And can you tell me what's going on there?

25     A.   All right.  So what's happening here -- and

1    you have -- to understand what's going on here, you have

2    to look at the way that Microsoft Windows hands data to

3    the MAC.

4            So if you go back to the early days of Wi-Fi,

5    as far as Windows is concerned, the only kind of network

6    connection, the only way you connect to the Internet

7    that it knows is a wired network.  There was no such

8    thing as wireless.

9            So you have this LLC that does the functions

10   that it has to do; and then when it hands off the

11   information, the results from that LLC processing, to

12   the MAC, it hands it off in a format that was designed

13   for a wired network.  It's called Ethernet format.

14           And when we started doing Wi-Fi, we needed a

15   different format.  But Microsoft isn't going to rewrite

16   Windows just for us.  Back then Wi-Fi was this really

17   strange, unusual thing.

18           So the very first thing we have to do at the

19   top of the MAC is take all that information and we have

20   to translate it into the format that we need for Wi-Fi.

21           And some of this information, like the LLC

22   header, is generated by Windows; but they put it in this

23   data structure in the wrong place, because it's in the

24   right place for a wired network.  So we had to shuffle

25   it around.

1        So that's what this is doing.  It's taking

2   that information, the LLC output that comes from the LLC

3   function, and copying it from the bunch of data that

4   Windows gave us into the right place so that we can send

5   it out.

6        Q.   Okay.  So if we -- just to understand where

7   all of this is happening, so is that code saying that

8   this logical link layer is actually in the middle and

9   that there is an upper MAC and a lower MAC with a

10  logical link layer in between?

11       A.   No, that's not right.

12       Q.   Okay.  So is this header information that's

13  coming from the logical link layer at the top, has it

14  already been sent to the MAC and the MAC is just

15  reformatting that information?

16       A.   Right.  So it's -- the logical link layer has

17  done the functions it has to do and calculated its

18  results.  It turns it over to this LLC header, and it

19  hands it to the MAC in a format that was designed for a

20  wired network.

21       The first thing the MAC has to do is do a

22  translation from wired format to wireless format before

23  it can do anything else.

24       Q.   Okay.  So when we go back to the code and we

25  try to understand what's going on in these lines over

1  here, is that the MAC layer, or is that the logical link

2  layer?

3       A.   This is the MAC layer.  This is the MAC layer

4  translating that information that was given to it into a

5  wireless format.

6       Q.   And so all of this code and all of these

7  operations are 100 percent in the MAC layer?

8       A.   Yes, that's correct.

9       Q.   And so let me show you a diagram that was

10 created.  It's actually a modification of something you

11 created in your direct testimony.

12           And what was done here, just so -- I know you

13 weren't in the courtroom -- a piece of white tape was

14 put over where you had the logical link layer and the

15 MAC layer, and one of the witnesses drew in MAC layer

16 high LLC layer, MAC layer low, putting the LLC layer in

17 the beginning.

18           Is that in any way a correct description of

19 the architecture or operation of the Intel chips or the

20 Intel software?

21      A.   No, that's not correct.

22      Q.   And if you correctly read the software, can

23 you tell from the software that the logical link layer

24 is, in fact, not at all in the middle of the MAC layer?

25      A.   Yes.  Yes, we can.

1      Q.    So where does the logical link layer really

2  go?

3      A.    It goes above the MAC.

4      Q.    So this is wrong?

5      A.    Yes, that's correct.

6      Q.    And this logical link layer actually goes

7  above it?

8      A.    Yes, that's correct.

9      Q.    There (drawing).

10          So if we go back to how the product actually

11  works, which is very important to get right in this

12  case, because the test is comparing patents to a

13  product, I want to make sure that we focus on the key

14  feature.

15          Where in the Intel products is the timestamp

16  initialized?

17     A.    It's set -- it's one of the first things that

18  happens at the top of a MAC layer.

19     Q.    And that's up here (indicating)?

20     A.    That's correct.

21     Q.    And is that at the start of the data link

22  layer?

23     A.    No.  The data link layer is at the top of the

24  LLC.

25     Q.    And let's look at that standard that we saw

 1  earlier for the 802.11 protocol, this standardized

 2  architecture.

 3          Is Intel trying to do anything different than

 4  the standard architecture?

 5      A.   No.

 6      Q.   Thank you.

 7              MR. AROVAS:  No further questions.

 8              THE COURT:  All right.  Cross-exam.

 9                  CROSS-EXAMINATION

10  BY MR. STEVENSON:

11      Q.   Mr. Kitchin, I thought I heard you say that

12  what you're calling the LLC isn't in the Intel code,

13  that it's Microsoft code.

14          Did I hear that correctly?

15      A.   Yes, that's correct.

16      Q.   Is that -- also referred to the NDIS?

17      A.   It's related to that.  I don't know for sure

18  exactly what the structure of the -- that Windows,

19  Microsoft uses in terms of its operations.  What I know

20  is what the interface is, the API that comes from --

21  from Microsoft to the MAC.

22      Q.   That's called the N-D-I-S, right?

23      A.   It's part of the NDIS, yes, that's correct.

24      Q.   And you didn't review any of that Microsoft

25  code before coming in here to testify, did you?

1      A.   No, I didn't.

2      Q.   And isn't it true what sits right above the

3 MAC is the NDIS?

4      A.   That's the interface we get, yes, that's

5 correct.

6      Q.   And the NDIS is not a logical link layer, is

7 it?

8      A.   The logical link layer is contained in that

9 code.

10      Q.   The NDIS is not a logical link layer; it's

11 just an API, correct?

12      A.   From our point of view, sure.  The LLC is the

13 other side of this NDIS API.

14      Q.   Were you -- were you deposed on this topic?

15      A.   Yes, I was.

16           MR. STEVENSON:  Mr. Diaz, would you play

17 Page 21, Line 10 through 22, Line 1, of Mr. Kitchin's

18 deposition.

19           (Video playing.)

20           QUESTION:  What is NDIS?

21           ANSWER:  It's a Microsoft term.  It

22 relates to the way the operating system talks to -- to

23 network cards.

24           QUESTION:  And are you familiar with the

25 OSI model?

1                    ANSWER:  Yes, I'm familiar with the OSI

2   model.

3                    QUESTION:  The NDIS sits above the MAC

4   layer, right?

5                    ANSWER:  NDIS is an interface to -- it

6   doesn't really exactly correspond to anything in the OSI

7   layer.  It's, I think, approximately above the MAC

8   layer.  It's about -- right.  It's the interface to the

9   MAC.

10                   QUESTION:  Well, it corresponds to the

11  LLC, doesn't it?

12                   ANSWER:  No, that's not correct.  NDIS

13  is, to my understanding -- I mean, this speaks to, you

14  know, the way that Microsoft has defined it, but it's --

15  I believe it's correct to describe it as an API that

16  interfaces to the MAC.

17                   MR. STEVENSON:  Nothing further.

18                   THE COURT:  All right.  Thank you.

19                   Any further redirect?

20                   MR. AROVAS:  No, Your Honor.

21                   THE COURT:  If the jury would pass down

22  any questions for this witness, please.

23                   (Pause in proceedings.)

24                   THE COURT:  All right.  We'll take about

25  a five-minute break.

1                    COURT SECURITY OFFICER:  All rise for the

2   jury.

3                    (Jury out.)

4                    THE COURT:  Please be seated.

5                    All right.  The first question for the

6   witness is:  The logical link layer and the MAC layer

7   are within the data link layer, aren't they?

8                    I'll add the question mark.

9                    Defendant have any objection to that?

10                   MR. VAN NEST:  No.  No, Your Honor.

11                   THE COURT:  Plaintiff have any objection?

12                   MR. STEVENSON:  No objection.

13                   THE COURT:  The next question:  In the

14  OSI reference model, the description below the picture

15  states the MAC is a sublayer of the data link layer.

16                   Does the 802.11n standard state the timer

17  starts in a sublayer in the data link layer -- or in the

18  data link layer?

19                   MR. STEVENSON:  No objection.

20                   MR. VAN NEST:  No objection, Your Honor.

21                   THE COURT:  All right.  You may bring the

22  jury in.

23                   COURT SECURITY OFFICER:  All rise.

24                   Judge --

25                   THE COURT:  Okay.

```
 1                  (Pause in proceedings.)

 2                  (Jury in.)

 3                  THE COURT:  Please be seated.

 4                  All right, Mr. Kitchin.  The first

 5  question is:  Are the logical link layer and the MAC

 6  layer within the data link layer?

 7                  THE WITNESS:  Yes, that's correct.

 8                  So the data link layer consists of two

 9  sublayers, as they're referred to.  The upper one is the

10  logical link layer, and the lower one is the MAC.  So

11  those two things are entirely within the data link

12  layer.

13                  THE COURT:  All right.  The next

14  question:  In the OSI reference model, the description

15  below the picture states the MAC is a sublayer of the

16  data link layer.  Does the 802.11n standard state the

17  timer starts in a sublayer of the data link layer?

18                  THE WITNESS:  So I don't know if it

19  actually uses that language in the 802.11n spec itself.

20                  What it does say is, it specifies that

21  the scope of the 802.11n standard is the MAC, plus a

22  physical layer.

23                  And if you go to -- I think it's the 802

24  document, which is the kind of overall standard that

25  tells you where the others fit, it then explains that
```

1   the MAC is a sublayer of the data link layer.  And it

2   has a picture very similar to that one we were looking

3   at.

4                   So I don't know whether it actually says

5   it's in a sublayer of the data link layer in the 11n

6   spec without looking, but it says quite clearly it's

7   within the MAC.

8                   And then you have this other document

9   802, which describes those sublayers and uses that

10  language.  There may be some repetition of that, like in

11  the introductory section in the 11n standard, but the

12  primary source of that is the overall 802 document.

13                  THE COURT:  All right.  Thank you.

14                  Any follow-up questions from the

15  Defendant?

16                  MR. AROVAS:  I have one, Your Honor.

17                  THE COURT:  All right.  You may proceed.

18                      REDIRECT EXAMINATION

19  BY MR. AROVAS:

20      Q.   So, Mr. Kitchin, I just have one question for

21  you, and it's a question on the operation of the

22  product.

23                  If a question we had to answer in this case

24  were, does the timestamp in the Intel -- does the

25  timestamp in the Intel products initialize when the data

1  unit is received by the data link layer, does that

2  happen or not?

3      A.   No, it doesn't.  It happens at the top of the

4  MAC.

5      Q.   And so if the question is, does the timestamp

6  get initialized when the data unit is received by the

7  data link layer, the answer to that would be no, that's

8  incorrect?

9      A.   That's correct.  That is incorrect.

10     Q.   Thank you.

11              MR. AROVAS:  No further questions.

12              THE COURT:  All right.  Thank you.

13              Follow-up questions by Plaintiffs'

14  counsel?

15              MR. STEVENSON:  Nothing further.

16              THE COURT:  All right.  Thank you.  You

17  may step down.

18              All right.  Does Defendant have any other

19  witnesses?

20              MR. VAN NEST:  No, we do not, Your Honor.

21              THE COURT:  Plaintiff have any further

22  witnesses?

23              MR. CAWLEY:  No, Your Honor.

24              THE COURT:  All right.  Both sides close,

25  finally close?

1                   MR. VAN NEST:  Again, Your Honor, subject

2    to getting -- making sure we have our demonstratives

3    marked and our exhibits in, Defendants close.

4                   MR. CAWLEY:  That's also for the

5    Plaintiffs, Your Honor.

6                   THE COURT:  All right.  Very well.

7                   All right.  Thank you.  You may be

8    seated.

9                   All right, Ladies and Gentleman of the

10   Jury, we started a week ago Monday with Voir Dire

11   Examination.  You've heard -- then heard opening

12   statements.  You've heard -- now heard all of the

13   testimony.

14                   We're about to adjourn for the day.  When

15   you come back tomorrow morning, you will hear the

16   Court's charge, and then you will hear closing argument

17   by counsel for both parties, and then and only then will

18   be the first time that you will begin your

19   deliberations.

20                   So I anticipate that will take up most of

21   the morning, so you should get the case about noon

22   tomorrow, and we'll have lunch, and you can begin your

23   deliberations.

24                   You've been an excellent jury.  You've

25   paid questions -- paid close attention.  You've asked

 1  very good questions.  I commend you on your hard work

 2  over the last week.

 3              So please follow all of my instructions.

 4  I know you have been.  Please continue to do so this

 5  evening.  Don't discuss the case amongst yourselves or

 6  with anyone else.  Don't make any independent

 7  investigation or inquiry.

 8              Have a good night's sleep, and we'll see

 9  you back here in the morning at 9:00 o'clock ready to

10  go.

11              The jury is excused.

12              COURT SECURITY OFFICER:  All rise.

13              (Jury out.)

14              THE COURT:  All right.  Please be seated.

15              All right.  Does Plaintiff have any

16  objections to the Court's charge?

17              MR. VAN NEST:  Excuse me, Your Honor.

18              Could -- some of us would like to ask for

19  Your Honor to excuse us so we may begin preparing for

20  closing arguments.

21              THE COURT:  You're not interested in the

22  objections to the Court's charge?

23              MR. VAN NEST:  I am.  I am, I assure you,

24  but we have so much to do.

25              THE COURT:  All right.  That will be

 1  fine.

 2                    MR. VAN NEST:  If we may be excused.

 3                    THE COURT:  Anyone that would like to

 4  leave may do so quickly and quietly.

 5                    MR. VAN NEST:  Thank you, Your Honor.

 6                    Well, Your Honor, let me do one other

 7  thing.

 8                    THE COURT:  Do you have any objection to

 9  me leaving and --

10                    [Laughter]

11                    THE COURT:  Go ahead, Counsel.

12                    MR. VAN NEST:  May we have permission --

13  we'd like to make our own JMOL motions.  Also, as

14  Plaintiffs did, we will be filing them tonight.  Would

15  they be timely if we did that?

16                    THE COURT:  By 7:00 p.m. tonight.

17                    MR. VAN NEST:  Filed by 7:00 p.m.

18  tonight.

19                    THE COURT:  Uh-huh.

20                    MR. VAN NEST:  Thank you, Your Honor.

21                    THE COURT:  All right, Mr. Campbell.

22                    MR. CAMPBELL:  I guess just to follow up

23  on that point, to preserve any rights we need to, we

24  will renew our JMOL motions that we've already filed,

25  now that all the evidence is in.

1              THE COURT:  By 7:00 p.m. tonight.

2              MR. CAMPBELL:  Do we need to file -- it

3   would be the same thing.  You want us to file it again?

4              THE COURT:  Not necessary.

5              MR. CAMPBELL:  Okay.  Thank you, Your

6   Honor.

7              On the charge, just a couple of things.

8   I'm not even sure it's necessary, and I don't want to

9   reargue it; but, of course, the claim construction,

10  anything that the Court did not adopt that we proposed,

11  we want to preserve any arguments -- and the briefing

12  and the arguments that were made, for appeals purposes.

13             THE COURT:  All right.

14             MR. CAMPBELL:  So I guess we have to

15  object for that basis.

16             THE COURT:  All right.  So noted.  That

17  objection is overruled.

18             MR. CAMPBELL:  Understood.

19             On the verdict form, a couple of

20  things -- just one thing.  The chart on Page 3, it's for

21  Question 2.

22             THE COURT:  Okay.

23             MR. CAMPBELL:  The case was pared down,

24  and on the chart on Page 2 on the '223 patent, Claim 14

25  should be removed.

1                     THE COURT:  All right.

2                     MR. CAMPBELL:  And on the '568 patent,

3    Claim 5 should be removed.

4                     THE COURT:  All right.

5                     MR. CAMPBELL:  That's just for

6    Question 2.

7                     Question 1 was correct.

8                     THE COURT:  All right.  Very well.

9                     MR. CAMPBELL:  And then the final

10   objection is, the Plaintiffs offered a construction --

11   or -- sorry -- an instruction that the infringers profit

12   margin is not a ceiling on damages, based that on a

13   recent case out of the Federal Circuit, Douglas

14   Dynamics, taking the language straight from the opinion

15   there.  The Court did not adopt that instruction.

16                    THE COURT:  Where would that have fallen?

17                    MR. CAMPBELL:  That was in Final

18   Instruction No. 33 in the proposal.

19                    THE COURT:  All right.  Go ahead and --

20   where in the existing charge would this be inserted?

21                    MR. CAMPBELL:  Oh, where would it -- it

22   would be part of damages.  So it could probably go

23   within the damages instruction with 8.3 or immediately

24   after 8.3.

25                    THE COURT:  All right.  And what is the

1  instruction that you're requesting?

2              MR. CAMPBELL:  The instruction is:  An

3  infringer's net profit margin is not the ceiling by

4  which a reasonable royalty is capped.  The infringer's

5  selling price can be raised, if necessary, to

6  accommodate a higher royalty rate.  Requiring the

7  infringer to do so may be the only way to adequately

8  compensate the patentee for the use of its technology.

9              THE COURT:  Okay.  Response?

10             MR. DE VRIES:  We object to that

11  instruction, Your Honor.  It's an incomplete statement

12  of the law.

13             At a minimum, Rite-Hite -- the Fifth

14  Circuit's decision in Rite-Hite makes clear that it is

15  only in very unusual circumstances that the reasonable

16  royalty would exceed the profit margin of the alleged

17  infringer; and, frankly, only in a circumstance where

18  there is evidence, which there is not here, that the

19  accused infringer had an expectation to receive a profit

20  higher than they did here.

21             The only evidence we have is Ericsson

22  actually getting out of the Wi-Fi market, finding it to

23  be unprofitable.

24             So we object to that instruction.  If the

25  Court is inclined to adopt that, we would ask for a

1  brief opportunity to provide an alternative instruction.

2              MR. CAMPBELL:  Your Honor, if I may

3  respond?

4              THE COURT:  Uh-huh.

5              MR. CAMPBELL:  The Rite-Hite opinion that

6  they're citing to, that's the dissent.  The Rite-Hite

7  opinion stands for the opposite.  It's the -- it's an en

8  banc opinion from the Federal Circuit, and their

9  citation here objecting to this instruction is part of

10 the dissent.

11             MR. DE VRIES:  The point, Your Honor, is

12 that the discussion in Rite-Hite, which does recognize

13 the rule that is being articulated here, which is that

14 in certain circumstances, the -- the reasonable royalty

15 can exceed the profit margin, does not -- does not mean

16 that that is right in every circumstance; and there is

17 discussion in, my understanding, the majority opinion in

18 the case to that effect.

19             And as I said, if Your Honor's inclined

20 to do that, I would request an opportunity to provide,

21 within the next matter of minutes, an alternative

22 instruction.

23             THE COURT:  Okay.  I'll take that under

24 advisement.  You can submit your instruction, and then

25 it will either be in there in the morning or not.  If

1  it's not in there, I overrule your objection.  If it is,

2  I grant it.

3              MR. CAMPBELL:  Okay.  The en banc opinion

4  does make it clear, Your Honor.

5              THE COURT:  All right.  Please provide

6  that opinion to my staff, if you would.

7              MR. CAMPBELL:  I gladly will do so.

8              Do we have three copies of that?

9              We'll provide copies, Your Honor.

10             That is all from the Plaintiffs.

11             THE COURT:  All right.  Do Defendants

12  have any objections?

13             MS. PIEPMEIER:  Yes, Your Honor.  This is

14  Sarah Piepmeier for Defendants.

15             First, we have -- just as counsel for

16  Plaintiffs noted, on Section 4.2, claim interpretation,

17  we don't have an objection; but we obviously note that

18  this is subject to and preserving all of our points and

19  positions raised at Markman and objections and so forth.

20             THE COURT:  All right.  So noted, and

21  objections are overruled.

22             MS. PIEPMEIER:  On Section 5.1, literal

23  infringement, I have one very, very minor correction,

24  which is within the third line.  It says:  Infringe the

25  parent, and I believe that's supposed to be patent.

1                    THE COURT:  All right.  Thank you.

2      That's on Line 3.  Last word of that sentence should be

3      "patent" instead of "parent."

4                    MS. PIEPMEIER:  That's correct, Your

5      Honor.

6                    THE COURT:  All right.

7                    MS. PIEPMEIER:  In addition, on that same

8      section, I would note a few things.

9                    We submitted a proposal, which was

10     Defendants' proposal for No. 13, jury instruction, and

11     that proposal did not include a reference to the

12     doctrine of equivalents, which we believe should be

13     removed here, because Plaintiff agreed not to make any

14     argument on doctrine of equivalents.

15                   And the reference is on Page 13.  In the

16     second paragraph up, it says:  In that patent claim or

17     its equivalent.  And we would request that that -- those

18     three words be struck.

19                   THE COURT:  Response?

20                   MR. CAMPBELL:  No objection, Your Honor.

21                   THE COURT:  All right.  That objection is

22     sustained.

23                   MS. PIEPMEIER:  In addition, Your Honor,

24     I would note just a couple of other things.

25                   Our Proposed Instruction No. 13 separated

1  out method and system claims, and that is because, as

2  Your Honor knows, the proof required for each of those

3  is slightly different.

4            And in our version, which we would --

5  obviously, which we submitted and requested would be

6  adopted, we believe that it would be appropriate to

7  instruct the jury that for the method claims that are at

8  issue here, which is Claim 1 of the '625, Claims 1 and 2

9  of the '435 and Claim 1 of the '215, that there should

10  be an instruction that each step is performed in the

11  United States by one person or by someone else who is

12  acting under the direction and control of that person.

13            THE COURT:  Okay.

14            MS. PIEPMEIER:  That was included in our

15  proposal, and we would request that it be adopted.

16            THE COURT:  All right.  Response?

17            MR. CAMPBELL:  Your Honor, I think your

18  proposed construction -- or proposed instructions make

19  clear how the jury is supposed to compare the claims to

20  the accused product for both system and method claims.

21            I'm not sure that there's any confusion

22  within what the Court's instructions have or what's

23  being proposed to be changed, but I think it's proper

24  the way that it is.

25            THE COURT:  All right.  Objection is

1  overruled.

2            MS. PIEPMEIER:  One final objection, Your

3  Honor, on this instruction.  We would -- our original

4  proposal did not include the language regarding a patent

5  being infringed if -- if the product is reasonably

6  capable of infringing.  We believe that that instruction

7  is -- would not be proper, especially for the method

8  claims, but for both the method and the system claims.

9            THE COURT:  And where is that?

10           MS. PIEPMEIER:  That is in the first full

11 paragraph on Page 13, an accused system or product

12 directly infringes a claim if it is reasonably capable

13 of satisfying the claim elements even though it may also

14 be capable of non-infringing modes of operation.  And

15 then it continues for that paragraph.

16           THE COURT:  Response?

17           MR. CAMPBELL:  Your Honor, that's an

18 accurate statement of law under the Federal Circuit law.

19           We can pull the law if Your Honor wants.

20 I believe that's the Spalding case, but that's an

21 accurate statement of law and should be part of the

22 instructions.

23           THE COURT:  All right.  Objection is

24 overruled.

25           Response -- or next?

1          MS. PIEPMEIER:  Thank you, Your Honor.

2          On No. 6, indirect infringement, inducing

3  patent infringement.  This was originally submitted, I

4  believe, as agreed; but Defendants would like to raise

5  an objection because there's been a failure of proof on

6  indirect infringement, and we believe it would be

7  improper to put that issue before the jury.

8          THE COURT:  Okay.  What is your

9  objection, specifically?

10         MS. PIEPMEIER:  Specifically, the only

11  evidence that has come into the record at all that could

12  potentially be related to inducing is the date of

13  notice; and also a few lines from Dr. Nettles that are

14  extremely cursory, which I can read if Your Honor would

15  like to hear them, but do not set forth any of the

16  elements that are required to demonstrate induced

17  infringement.

18         And there has been -- because there has

19  been such a failure of proof on that issue, we believe

20  it would be improper to include an instruction on it.

21         THE COURT:  Okay.  Response?

22         MR. CAMPBELL:  Your Honor, I disagree.

23  There's been plenty of evidence for a jury to find

24  inducement.  There's been a stipulation on the notice

25  dates of when the Defendants knew of these patents.

1         There's been testimony from Mr. Bone on

2    advertising of these products as complying with the

3    standard and how to use these products to support Wi-Fi.

4         There's more than enough evidence in the

5    record to support a jury verdict of inducement.

6         THE COURT:  All right.  I'm going to take

7    that one under advisement.  If it's not in there, I

8    sustain the objection; if it is in there, I overrule the

9    objection.

10        MS. PIEPMEIER:  Thank you, Your Honor.

11        May I add one more thing on that?  If

12   Your Honor is inclined to keep the instruction, we would

13   request that Intel not be included because that was not

14   within the scope of Dr. Nettles' report or presumably

15   his testimony since I understand that to be based on his

16   report.

17        THE COURT:  Response?

18        MR. CAMPBELL:  Your Honor, again, I think

19   there's plenty of evidence in the record that Intel

20   was -- was provided notice, as well as that they intend

21   people to use these to connect to Wi-Fi.  They advertise

22   them in that way.  They know that that's the way that

23   this is going to occur.

24        THE COURT:  All right.  That objection

25   will be overruled, if I keep it in.

1              MS. PIEPMEIER:  Thank you, Your Honor.

2              I have just two more points on the

3  liability issues.  On No. 7, invalidity, we are fine

4  with the charge as stated, but would request that four

5  words be removed from the third sentence in order to

6  take it more closely to the VirnetX instruction that we

7  believe is -- is proper.

8              And the sentence that I'm referring to

9  under No. 7 is:  Evidence of material prior art which is

10 not cumulative of prior art cited to or by the PTO may

11 be more probative -- and then it continues.

12             We would respectfully request that the

13 words "cumulative of prior art" be struck, as we don't

14 think it's relevant here.  We think it could be

15 confusing to the jury, and it's prejudicial.

16             THE COURT:  All right.  Objection is

17 overruled.

18             MS. PIEPMEIER:  Finally, Your Honor, on

19 7.2, top of Page 21, we're fine with the instruction

20 generally; but we would, respectfully, request that the

21 first two paragraphs on Page 21, which begin "a printed

22 publication must be reasonably accessible to those

23 members of the public who would be interested in its

24 contents," and then continues for that paragraph and the

25 following paragraph, we would request that those be

1  removed because the issue of public availability doesn't

2  appear to be questioned; and that may simply confuse the

3  jury.

4              THE COURT:  Response?

5              MR. CAMPBELL:  It's an accurate statement

6  of law, Your Honor.  That's what a printed publication

7  must be in order for it to be prior art.  I think the

8  jury needs to be instructed on what it takes for a

9  printed publication to be prior art.

10             There was even a publication shown to the

11  jury by Dr. Heegard where Mr. Stevenson made the point

12  that it was not a printed publication.  It was not

13  reasonably accessible to members of the public who would

14  be interested in its contents.  The jury needs to

15  understand what it takes to be a printed publication.

16             THE COURT:  All right.  Objection is

17  overruled.

18             MS. PIEPMEIER:  Your Honor, I'm sorry.

19             May I make one more point, if I -- if I

20  may on that?

21             We -- I understand that there was

22  actually an agreement with counsel for Plaintiffs that

23  they would not challenge this issue.  And in reliance on

24  that agreement, we actually withdrew deposition

25  testimony that would have come in on this issue of

1   public availability.

2              So in our view it would be prejudicial to

3   put that issue back before the jury when there was an

4   agreement among counsel to streamline the issues that

5   went into the -- into the record.

6              THE COURT:  Response?

7              MR. CAMPBELL:  The agreement, Your Honor,

8   was that we would not have Dr. Nettles testify that it

9   was not publicly available.  It doesn't change the law.

10  The law is still what it is.  There's still a burden to

11  prove that it's a printed publication.

12             THE COURT:  Okay.  Objection is

13  overruled.

14             MS. PIEPMEIER:  Thank you, Your Honor.

15             MR. DE VRIES:  Your Honor, with your

16  permission, my colleague, Ms. Piepmeier, and I have

17  split these up.  I have just a very few.

18             THE COURT:  Okay.

19             MR. DE VRIES:  Mostly in the nature of

20  some, I think, typo or very small corrections.

21             THE COURT:  All right.

22             MR. DE VRIES:  So, Your Honor, on Page 6,

23  contentions of the parties.  The one thing that I would

24  suggest with opposing counsel's permission and, of

25  course, Your Honor's is at the very bottom of that page

1  we refer to the accused 802.11-compliant products, and

2  it continues on to the next page.  I wonder if it might

3  be helpful to "n" there, so it's 802.11n.

4            THE COURT:  Any objection?

5            MR. CAMPBELL:  No, Your Honor.

6            THE COURT:  All right.  We'll add "n" to

7  802.11 at the bottom of Page 6.  Okay.

8            MR. DE VRIES:  Thank you, Your Honor.

9            THE COURT:  Is that all?

10           MR. DE VRIES:  Skipping ahead now to Page

11 22, there's a damages section that begins damages.  And

12 we have some concerns about the second paragraph there.

13           Again, these are in the nature of, sort

14 of, line edits.

15           The first sentence begins, "In this case,

16 Ericsson has sued D-Link, NETGEAR, Belkin, Acer,

17 Gateway, Dell, and Toshiba, but it has not sued Intel."

18           And in the case, there has been a

19 counterclaim of infringement that Ericsson has asserted

20 against Intel, and I think that that language, the --

21 specifically, "but it has not sued Intel," could be

22 confusing to the jury, and we recommend deleting it.

23           THE COURT:  Deleting that sentence?

24           MR. DE VRIES:  No, sir.  Just that

25 language, "But it has not sued Intel."

1              THE COURT:  All right.  I have no problem

2    with that.  We'll strike that last clause, "but it has

3    not sued Intel."

4              MR. DE VRIES:  And then, Your Honor, on

5    the very same point, at the end of the next section, we

6    would suggest adding the following language:

7              And Ericsson has counterclaimed against

8    Intel for alleged infringement, period.  Ericsson has

9    not, however, sought separate damages from Intel.

10             We think that's a more correct

11   description of where we're at.

12             THE COURT:  Now, where are you saying

13   that should go?

14             MR. DE VRIES:  Sorry, Your Honor.  At the

15   very end of the next sentence.  The next sentence

16   begins, "Intel has intervened in this case to defend its

17   chips used by some of its customer Defendants."

18             THE COURT:  Uh-huh.

19             MR. DE VRIES:  Then the language I

20   proposed would be inserted right there.

21             THE COURT:  And give me that language

22   again.

23             MR. DE VRIES:  Yes, sir.

24             And Ericsson has counterclaimed against

25   Intel for alleged infringement, period.  Ericsson has

1   not, however, sought separate damages from Intel.

2                   THE COURT:  Response?

3                   MR. CAMPBELL:  Your Honor, I think that

4   would be confusing to the jury.  There's no context of

5   what counterclaim means or why -- what that means, so a

6   jury -- it's a legal issue of a counterclaim.

7                   It's already been made clear by the

8   Court's instruction here that Intel has intervened, and

9   it's also been made clear that there is no need to

10  assess damages for Intel's infringement.

11                  So to add to the instruction and use the

12  word "counterclaim" and -- I think only adds confusion

13  to what is already a clear statement by the Court.

14                  THE COURT:  All right.  The Court's going

15  to deny that objection and request.

16                  All right.  What's next?

17                  MR. DE VRIES:  Thank you, Your Honor.

18                  In 8.2, I think there's some -- a

19  clarification that needs to be made to that section to

20  make it factually accurate.  And in short, let me

21  describe it at a high level, and then I'm prepared to

22  give Your Honor exact language.

23                  We right now have a statement that

24  Ericsson filed a complaint against the Defendants on

25  September 14th, 2010.  I understand that the facts are

1  that Ericsson filed a complaint against -- I'm sorry --

2  D-Link, NETGEAR, Acer, and Gateway on September 14th,

3  2010.

4              Then Ericsson filed a complaint against

5  Dell, Toshiba, and Belkin on June 8th, 2011.

6              And, finally, Ericsson counterclaimed --

7  and we could use the word "claimed" -- claimed for

8  infringement against Intel on July 3rd, 2012.  And I

9  think these corrections are necessary because there's a

10 suggestion here that that date otherwise provided,

11 September 14th, 2010, applies to everyone.

12             THE COURT:  Okay.  Response?

13             MR. CAMPBELL:  Well, Your Honor, if we're

14 going to -- if we're going to suggest what dates are

15 relevant -- there's a stipulation to Your Honor.  Your

16 Honor pushed the parties to enter into a stipulation,

17 which they did.  There's a stipulation on the date that

18 Ericsson gave notice to the Defendants.

19             So if we're going to put dates in, the

20 date ought to come straight from the stipulation as to

21 when the Defendants knew of these patents.  That's what

22 we're talking about here.  The dates of the complaint

23 end up being irrelevant based on the dates of the

24 stipulation.

25             So that would be very confusing to the

1  jury to include the dates complaints were filed, but the

2  relevant dates are the dates of the stipulation.

3         MR. DE VRIES:  Your Honor, one potential

4  solution -- and I don't mean to speak out of turn, but

5  in case this aids us in resolving this -- we could

6  strike the entire paragraph.

7         THE COURT:  Any objection to that,

8  Counsel?

9         MR. CAMPBELL:  No.  I think that would be

10 fine.  I think what would be most helpful to the jury is

11 to put in the stipulated dates, but striking that

12 paragraph would also be fine.

13        THE COURT:  All right.  We'll strike out

14 that paragraph.

15        What's next, Counsel?

16        MR. DE VRIES:  Your Honor, in our

17 proposed instructions, immediately following this

18 instruction when damages began, we had a section -- an

19 instruction, rather, that included some important

20 limitations on damages in the indirect infringement

21 context, specifically the rule that damages are limited

22 to proven instances, or in some cases, categories of

23 direct infringement on an indirect infringement claim.

24        And also in our version of the

25 when-damages-begin section, we included an important

1   limitation on the damages for direct infringement of a

2   method claim; namely, that damages are only available,

3   for instance, as a direct infringement occurring in the

4   United States.

5            We object that these are not included;

6   and if it's Your Honor's pleasure, I have a proposed

7   instruction that include those issues that I could pass

8   up to the Court.

9            THE COURT:  All right.  If you would hand

10  it up, please.

11           All right.  Response?

12           MR. CAMPBELL:  Your Honor, I haven't had

13  a chance to read this; but if it's similar to what was

14  proposed before, it really goes to, you know, what it

15  takes to infringe, which the instructions already deal

16  with quite well, as to what it takes to infringe a

17  patent; and that damages begin once infringement begins.

18           I think it's only confusing to break this

19  out into direct and indirect infringement and talk about

20  method claims and apparatus claims when the instructions

21  already make it clear what needs to be found for

22  infringement.  We don't need to do that again in the

23  damages section.

24           THE COURT:  All right.  Response to that?

25           MR. DE VRIES:  We think that it --

1   there's a separate damages-related point, Your Honor.  I

2   think that the jury will misunderstand that if it finds

3   even one instance of direct infringement, which,

4   frankly, we don't believe is there; but putting that

5   aside, that it should -- that it will believe that it

6   should award all -- damages on all sales.

7              That's just not the law.  The law

8   requires proof of actual instances of direct

9   infringement, or in some circumstances, categories.  We

10  think it's necessary to have this instruction to avoid

11  that error.

12             THE COURT:  All right.  I'm going to

13  overrule the objection.  I believe it's covered by the

14  infringement instructions.

15             What's next?

16             MR. DE VRIES:  Your Honor, this is in the

17  nature of making sure that we've adequately preserved

18  our objections.

19             For the reasonable royalty definition,

20  Defendants had submitted a proposed instruction on

21  reasonable royalty.  We believe that our proposed

22  instruction is more consistent with Ericsson's admitted

23  RAND obligations.

24             We understand that the Court has not

25  adopted that, and we just wanted to note for the record

1  that we object to what was adopted for that reason.

2             THE COURT:  All right.  The objection is

3  noted.

4             MR. DE VRIES:  And then without waiving

5  those objections, Your Honor, on Page 25 of that

6  reasonable royalty objection, in the first full

7  paragraph at the very bottom of that page that begins

8  "in making your determination," I think there's a

9  minor -- maybe perhaps a typo in the second line.

10            It says:  When the Defendant infringer

11 first infringed the patent.

12            I think perhaps that should say:  When

13 the Defendants first or when the Defendant first

14 infringed the patent.

15            THE COURT:  Yes.  Okay.  I'll strike the

16 word "infringer."

17            MR. DE VRIES:  I think -- just two more

18 things, Your Honor, and then a quick note on the verdict

19 form.

20            The first is that we submitted a proposed

21 instruction for the entire market value rule.  We

22 recognize that Your Honor has previously ruled on

23 related issues.

24            We do think here it's important that the

25 jury be presented with the law that says that the entire

1   market value rule does not apply unless certain types of

2   evidence have been -- has been shown.  We don't think

3   that's been shown here, and we would propose that the

4   Court adopt our instruction.

5                   I, again, have a copy of that, if it

6   would please Your Honor, for me to bring it up.

7                   THE COURT:  All right.  The objection is

8   overruled.

9                   MR. DE VRIES:  Okay.  And then, finally,

10  on the instructions, Your Honor, you'll recall that

11  during trial we handed up to the Court and also to

12  opposing counsel a proposed limiting instruction about

13  licenses.

14                  I think this is a very important one,

15  Your Honor.  Throughout this trial, we have heard an

16  awful lot about the licenses that the -- that Ericsson

17  has signed with other companies.

18                  I think given the way that that's been

19  presented to the jury and the repetition with which it's

20  been presented to the jury, it's very important that the

21  jury be instructed that that -- that those facts are in

22  no way relevant to the infringement determination.

23                  I have more copies of what we handed up

24  earlier, but we would ask Your Honor to please include

25  that instruction.

1                    THE COURT:  All right.  Response?

2                    MR. CAMPBELL:  Your Honor, your

3   instructions make clear what is required for

4   infringement.  It doesn't talk about the licenses.

5                    If we're going to start to bring in

6   everything that is irrelevant, then we need an

7   instruction that the Defendants' patents are irrelevant

8   to this determination, even though those have come in

9   and I'm sure a number of other things.

10                   This is an accurate statement of the law,

11  what it takes to infringe, and there's no reason to

12  start reciting what is -- what is irrelevant in that

13  determination.

14                   THE COURT:  All right.  Your request is

15  denied.

16                   What's next?

17                   MR. DE VRIES:  So, finally, Your Honor,

18  with respect to the final verdict form, I'd like to

19  note, we don't have any objection to the changes that

20  Plaintiff made with respect to the liability questions.

21                   The only point that we wanted to raise --

22  and I understand that Your Honor has likely overruled

23  this suggestion, so I'll be brief.

24                   We think that the verdict form, the final

25  question, No. 4, needs to -- should be altered in order

1  to reflect the possibility that a -- that the jury

2  awards a lump sum.

3              I think that there are two changes that

4  need to be made.  First, the -- at the end of the first

5  sentence, it -- the question at the top in No. 4, it

6  says "up to the time of trial."

7              We've had testimony from both

8  witnesses -- damages witness in this case about lump

9  sum, and I think that the jury's been presented with the

10 issue of whether a lump-sum royalty is appropriate.

11             We would respectfully suggest striking

12 out the words "up to the time of trial" in the verdict

13 form.

14             THE COURT:  All right.  Objection is

15 overruled.

16             MR. DE VRIES:  And then I won't -- I

17 won't continue, but just to preserve it for the record

18 then, Your Honor, we think that also the sections that

19 relate to filling out damages amounts for the -- for the

20 Defendants should also include a lump-sum category.

21             And also, we think it would be helpful

22 ultimately to have a running royalty line item with a

23 rate.

24             THE COURT:  All right.  That request is

25 denied.

1            MR. DE VRIES:  We have one other

2  unrelated question, but we have no other comments, Your

3  Honor, with respect to the jury instructions or the

4  verdict form.

5            THE COURT:  Okay.  Thank you.

6            All right.  That concludes the -- your

7  opportunity to object to the charge, and we'll get you a

8  final copy first thing in the morning, so...

9            Let's see.  I'm told to remind the

10 parties to get all of your exhibits and all inclusive

11 lists of admitted exhibits in for tomorrow.  Have them

12 in shape to go to the jury room.

13            Okay.  Anything further from the

14 Plaintiff?

15            MR. CAMPBELL:  No, Your Honor.

16            THE COURT:  Anything further from the

17 Defendant?

18            MR. DE VRIES:  Your Honor, may we get the

19 official time that each side has used from Your Honor?

20            THE COURT:  Yes.  Plaintiff has used 1

21 hour and -- I'm sorry -- that would be 12 -- 13 hours

22 and 45 minutes.  Defendant has used 12 hours and 57

23 minutes.

24            MR. DE VRIES:  Thank you, Your Honor.

25            May I confer with my counsel for one

1  moment, if you don't mind?

2                 THE COURT:  Uh-huh.

3                 MR. CAMPBELL:  Just to be clear, Your

4  Honor intends to go into the RAND trial tomorrow after

5  the jury --

6                 THE COURT:  Into the what?

7                 MR. CAMPBELL:  Into the RAND trial, the

8  bench trial portion of the phase --

9                 THE COURT:  Yes, uh-huh.

10                MR. CAMPBELL:  -- once the jury starts to

11 deliberate?

12                THE COURT:  I think we'll do that

13 tomorrow --

14                MR. CAMPBELL:  Okay.

15                THE COURT:  -- unless you want to do it

16 today.

17                How long will that take?

18                MR. CAMPBELL:  Your Honor, Defendants

19 will go first.  I don't think Plaintiffs are going to

20 have a whole lot.

21                THE COURT:  How long will your --

22 Counsel, how long do you anticipate taking with the

23 evidence to the Court?

24                MR. DE VRIES:  We anticipate

25 approximately 90 minutes, give and take -- give or take

1  about, you know, 15 minutes, Your Honor.

2                THE COURT:  Okay.  All right.  Well,

3  we'll do that while the jury's out tomorrow.

4                And you'll have how much for --

5                MR. CAMPBELL:  I'm going to say about an

6  hour.

7                THE COURT:  Okay.  All right.  We'll do

8  that tomorrow afternoon.  It will make for a good

9  afternoon.

10                All right.  Anything further?

11                MR. DE VRIES:  Nothing further, Your

12  Honor.

13                THE COURT:  All right.

14                MR. CAMPBELL:  I'm going to hand up the

15  Rite-Hite case.

16                THE COURT:  All right.  Very well.

17                MR. CAMPBELL:  Thank you.

18                THE COURT:  All right.  Thank you.  And

19  we will see you in the morning.

20                COURT SECURITY OFFICER:  All rise.

21                (Court adjourned.)

22

23

24

25

1                          CERTIFICATION

2

3                  I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of our abilities.

7

8

9    /s/ Shea Sloan
     SHEA SLOAN, CSR
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/14

12

13
     /s/ Judith Werlinger
14   JUDITH WERLINGER, CSR
     Deputy Official Court Reporter
15   State of Texas No.:  731
     Expiration Date  12/31/14
16

17

18

19

20

21

22

23

24

25