<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3
   ERICSSON, INC., ET AL         )
 4                                    DOCKET NO. 6:10cv473
       -vs-                       )
 5                                    Tyler, Texas
                                  )  9:03 a.m.
 6 D-LINK CORPORATION, ET AL         June 12, 2013

 7

 8                     TRANSCRIPT OF TRIAL
                        MORNING SESSION
 9            BEFORE THE HONORABLE LEONARD DAVIS,
        UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

10

11                  A P P E A R A N C E S

12

13 FOR THE PLAINTIFFS:

14
   MR. THEODORE STEVENSON, III
15 MR. DOUGLAS A. CAWLEY
   McKOOL SMITH
16 300 Crescent Court, Ste. 1500
   Dallas, Texas  75201

17

18 MR. JOHN B. CAMPBELL, JR.
   McKOOL SMITH
19 300 W. 6th Street, Suite 1700
   Austin, Texas  78701

20

21 COURT REPORTERS:      MS. JUDITH WERLINGER
                         MS. SHEA SLOAN
22                       shea_sloan@txed.uscourts.gov

23
   Proceedings taken by Machine Stenotype; transcript was
24 produced by a Computer.

25
</pre>

```
 1  FOR THE DEFENDANT:

 2
    MR. GREGORY S. AROVAS
 3  KIRKLAND & ELLIS, LLP
    601 Lexington Avenue
 4  New York, New York 10022

 5

 6  MR. LUKE DAUCHOT
    KIRKLAND & ELLIS, LLP
 7  333 S. Hope Street
    29th Floor
 8  Los Angeles, California  90071

 9

10  MR. ADAM ALPER
    KIRKLAND & ELLIS, LLP
11  555 California St.
    24th Floor
12  San Francisco, California  94104

13

14  MR. MICHAEL E. JONES
    POTTER MINTON, PC
15  110 N. College, Ste. 500
    P.O. Box 359
16  Tyler, Texas  75710-0359

17

18  MR. ROBERT A. VAN NEST
    KEKER & VAN NEST, LLP
19  633 Sansome St.
    San Francisco, California 94111
20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2               (Jury out.)

 3               COURT SECURITY OFFICER:  All rise.

 4               THE COURT:  Please be seated.

 5               All right.  Good morning.

 6               JURORS:  Good morning.

 7               THE COURT:  We are about to the end of

 8   the trial.  You've heard the Voir Dire a week ago

 9   Monday, the openings statements, you've heard all the

10   evidence, now you're about to hear the Court's charge.

11   And then immediately after that, you will hear the

12   closing arguments from the parties.

13               So, please pay attention to my jury

14   instructions.

15               Please realize that a copy -- a written

16   copy of these will be sent to -- with you to the jury

17   room, so you're welcome to take notes; but don't feel

18   like you have to write everything I say down because

19   there's quite a bit of it.

20               I would anticipate this will probably

21   take about 45 minutes for me to go through these

22   instructions.

23               We will take a short break then, let you

24   stretch your legs, then we will come back and hear the

25   closing arguments.
```

1          I've given each side I believe an hour --

2          Isn't that correct?

3          MR. CAWLEY:  That's correct.

4          THE COURT:  -- an hour per side for

5     closing arguments, so that will take about two hours.

6          All right, members of the jury, you have

7     now heard all the evidence in the case, and I am now

8     going to instruct you on the law which you must apply.

9          It is your duty to follow the law as I

10    give it to you.

11         On the other hand, you the jury are the

12    sole judges of the facts.  Do not consider any statement

13    that I have made during the trial or make in these

14    instructions as any indication that I have any opinion

15    about the facts of the case.  Again, that is your sole

16    province.

17         After I instruct you on the law, the

18    attorneys will have an opportunity to present their

19    closing arguments.  Remember that the statements and the

20    arguments of the attorneys are not evidence and are not

21    instructions on the law.  They are merely intended to

22    assist you in understanding the evidence and the

23    parties' contentions and what the parties believe the

24    evidence shows and what they believe your verdict should

25    be.  But again, they are not evidence and they are not

1 instructions on the law.

2 Now let me give you some general

3 instructions.

4 A verdict form has been prepared for you,

5 and I'm going to pass it out to you at this time.

6 If you will, please.

7 And I am going to go over it with you

8 briefly just to give you an overview of what questions

9 you will be called upon to answer as I go through these

10 instructions.

11 (Pause).

12 You will see on the first page it says

13 Final Verdict Form, and it says simply:  In answering

14 these questions, you are to follow the instructions I

15 have given you in the Court's charge, which is what I am

16 giving to you now.

17 Then again, there are really four

18 questions here -- or three questions here.  The first

19 question is dealing with infringement, then the question

20 dealing with invalidity, and the question dealing with

21 damages.

22 If you will look at Question No. 1, that

23 deals with infringement of three -- alleged infringement

24 of three of the Defendants; D-LINK, NETGEAR and Belkin.

25 And the question asks simply:  Did

1  Ericsson prove by a preponderance of the evidence that

2  Defendants, D-Link Systems, Inc., NETGEAR, Inc., and

3  Belkin International, Inc. infringe the following claims

4  of the following patents?  Answer yes or no for each

5  claim.

6              And then you'll see for the '568 patent,

7  then there's a line for Claim 1; and you will answer for

8  each Defendant, D-Link, NETGEAR and Belkin either yes or

9  no, depending upon what you find from the evidence.

10             And a similar answer for Claim 5 of the

11  '568.

12             Then it goes on to the '625 patent, Claim

13  1.

14             Then it goes to the '435 patent, Claims 1

15  and 2.

16             And the '215 patent, Claim 1 and 2.

17             Then after you have answered that

18  question, you will flip to the next page and answer

19  Question No. 2, which deals with four other Defendants;

20  acer, Gateway, Dell, Toshiba and Intel.

21             And that question asks, in the same

22  manner:  Did Ericsson prove by a preponderance of the

23  evidence -- there's that burden of proof.  We'll talk

24  more about that in a little bit -- did Ericsson prove by

25  a preponderance of the evidence that Defendants, Acer,

1 Gateway, Dell, Toshiba and Intel infringed the following

2 claims of the following patents?  And then there's a

3 place for you to answer, just as on the other one, for

4 each claim that is asserted against these Defendants of

5 each patent.  And you will answer yes or no in the

6 blanks indicated, as you find it from the evidence.

7                    Then if you'll flip to the next page,

8 Question No. 3, this deals with the question of

9 invalidity.

10                    Did Defendants prove by clear and

11 convincing evidence -- there's that burden of proof --

12 that any of the listed claims of the following patents

13 are invalid?  If you find the claim invalid, answer yes;

14 otherwise, answer no.

15                    '625 patent, Claim 1, you'll answer yes

16 or no.

17                    '435 patent, Claims 1 and 2, you'll

18 answer yes or no for each of those.

19                    Then if you flip the page to the next

20 question, No. 4, this deals with damages.

21                    What sum of money if paid now in cash, do

22 you find from a preponderance of the evidence would

23 fairly and reasonably compensate Ericsson for

24 infringement of the patents by the following Defendants

25 up to the time of trial?  And then there is a place for

1  your answer.

2          And then for any patents you found
3  infringed by that Defendant, you will answer for a
4  dollar amount in -- in that column.

5          Of course, if you find patent -- patents
6  not infringed, then your answer would be zero.

7          And then there's a place for the jury to
8  answer, and you will sign the -- jury foreperson will
9  sign the form.

10         So that's the verdict form, and I just
11  give that to you now to realize sort of what questions
12  you are going to be asked to answer.

13         Now let me go back to the instructions.

14         You will take this verdict form with you
15  to the jury room; and when you have reached a unanimous
16  agreement as to your verdict, you will have your
17  foreperson fill in the date and sign the form.

18         You should answer each question on the
19  verdict form from the facts as you find them.

20         Do not decide who you think should win
21  and then answer the questions accordingly.

22         A corporation and all other persons are
23  equal before the law and must be treated as equals in a
24  court of justice.

25         With respect to each question asked, your

1    answers and your verdict must be unanimous.

2              In determining whether any fact has been

3    proved in this case, you may, unless otherwise

4    instructed, consider the testimony of all witnesses,

5    regardless of who may have called them, and all exhibits

6    received in evidence, regardless of who may have

7    produced them.

8              Now, with regard to considering

9    witnesses' testimony, again, you the jurors are the sole

10   judges of the credibility of all witnesses and the

11   weight and effect of all evidence.

12             By the Court allowing testimony or other

13   evidence to be introduced over the objection of an

14   attorney, the Court did not indicate any opinion as to

15   the weight or effect of such evidence.

16             When the Court did sustain an objection

17   to a question addressed to a witness, then you must

18   disregard the question entirely, and may draw no

19   inference from the wording of the question or speculate

20   as to what the witness would have testified to, if he or

21   she had been permitted to answer the question.

22             At times during the trial it was

23   necessary for the Court to talk with the lawyers here at

24   the bench out of your hearing, or by calling a recess.

25   We met because often during a trial something comes up

1 that does not involve the jury. You should not

2 speculate on what was discussed during such times.

3 In determining the weight to give to the

4 testimony of a witness, you should ask yourself whether

5 there was evidence tending to prove that the witness

6 testified falsely concerning some important fact, or

7 whether there was evidence that at some other time the

8 witness said or did something, or failed to say or do

9 something, that was different from the testimony the

10 witness gave before you during the trial.

11 You should keep in mind, of course, that

12 a simple mistake by a witness does not necessarily mean

13 that the witness was not telling the truth as he or she

14 remembers it, because people sometimes forget some

15 things or remember other things inaccurately.

16 So, if a witness has made a misstatement,

17 you then need to consider whether the misstatement was

18 an intentional falsehood or simply an innocent lapse of

19 memory; and you should also consider the significance of

20 that -- and the significance of that may depend on

21 whether it has to do with an important fact in the case

22 or only with a more unimportant detail.

23 In deciding whether to accept or rely

24 upon the testimony of any witness, you may also consider

25 any bias of the witness.

1          Now with regard to how to examine the

2   evidence.

3          Certain testimony in this case has been

4   presented to you through a deposition.  Remember that a

5   deposition is the sworn, recorded answers to questions

6   asked of a witness in advance of trial.

7          Under some circumstances, if a witness

8   cannot be present to testify from the witness stand, the

9   witness's testimony may be presented, under oath, in the

10  form of a deposition.

11         Sometime before the trial, attorneys

12  representing the parties in this pace -- case questioned

13  this witness under oath.  A court reporter was present

14  and recorded the testimony.  This deposition testimony

15  is entitled to the same consideration, and it is to be

16  judged by you as to credibility and weight and otherwise

17  considered by you insofar as possible the same as if the

18  witness had been present and had testified from the

19  witness stand in court.

20         While you should consider only the

21  evidence in this case, you are permitted to draw such

22  reasonable inferences from the testimony and exhibits as

23  you feel are justified in the light of common

24  experience.

25         In other words, you may make deductions

1  and reach conclusions that reason and common sense lead

2  you to draw from the facts that have been established by

3  the testimony and evidence in the case.

4          The testimony of a single witness may be

5  sufficient to prove any fact, even if a greater number

6  of witnesses may have testified to the contrary, if,

7  after considering all the other evidence, you believe

8  that single witness.

9          Now, there are two types of evidence that

10  you may consider in properly finding the truth as to the

11  facts in this case.

12          One is what we call direct evidence, such

13  as the testimony of an eyewitness.

14          The other is what we call indirect or

15  circumstantial evidence -- that is, the proof of a chain

16  of circumstances that indicates the existence or

17  nonexistence of certain other facts.

18          As a general rule, the law makes no

19  distinction between direct and circumstantial evidence,

20  but simply requires that you find the facts from a

21  preponderance of all the evidence, both direct and

22  circumstantial.

23          The parties have stipulated, or agreed,

24  to some facts in this case.  When the lawyers on both

25  sides stipulate to the existence of a fact, you must,

1  unless otherwise instructed, accept the stipulation as

2  evidence, and regard the fact as proved.

3          Now, with regards to objections to

4  evidence, attorneys representing clients in court, such

5  as this one, have an obligation in the course of trial

6  to assert objections when they believe testimony or

7  evidence is being offered that is contrary to the Rules

8  of Evidence.

9          The essence of a fair trial is that it be

10  conducted pursuant to the Rules of Evidence and that

11  your verdict be based only on legally admissible

12  evidence.

13          So you should not be influenced by the

14  objection or by the Court's ruling on an objection.

15          If the objection is sustained, then

16  ignore the question.  If the objection is overruled,

17  then you may treat the answer to that question just as

18  you would treat the answer to any other question.

19          Now, you've also heard from expert

20  witnesses in this case.  When technical knowledge of a

21  technical -- when knowledge of a technical subject

22  matter may be of help to a jury, a person who has

23  special training or experience in that technical field

24  is what we call an expert witness; and that person is

25  permitted to state his or her opinion on those technical

1  matters.

2          However, you are not required to accept

3  that opinion.  As with any other witness, it is up to

4  you to decide whether the witness's testimony is

5  believable or not, whether it is supported by the

6  evidence, and whether or not to rely upon it.

7          In deciding whether to accept or rely

8  upon the opinion of an expert witness, you may consider

9  any bias of that witness.

10          Now, let me go over, again, with you the

11  contentions of the parties.  I believe you have a good

12  idea of these, but I will go over them again with you

13  anyway.

14          After I have done that, I will then tell

15  you what each side must prove in order to win on those

16  issues as they contend.

17          In this case, the Plaintiff --

18  Plaintiffs, Ericsson, Inc., and Telefonaktiebolaget LM

19  Ericsson (collectively Ericsson) -- thankfully --

20  contend that the Defendants, D-Link Systems (hereinafter

21  D-Link); NETGEAR, Inc. (hereinafter NETGEAR); Acer,

22  Inc., and Acer America Corp. (collectively Acer);

23  Gateway, Inc. (hereinafter Gateway); Dell, Inc.

24  (hereinafter Dell); Toshiba Corporation and Toshiba

25  America Information Systems, Inc. (collectively

1    Toshiba); Belkin International, Inc. (hereinafter

2    Belkin); and Intel Corporation (hereinafter Intel) --

3    and all of those are collectively referred to as the

4    Defendants hereinafter -- anyway, Plaintiffs Ericsson

5    contend that the Defendants make, use, sell, offer to

6    sell, and/or import into the United States accused

7    802.11n-compliant products that practice or embody one

8    or more claims of the following patents:

9            The '568 patent, Claims 1 and 5.

10           The '625 patent, Claim 1.

11           The '435 patent, Claims 1 and 2.

12           And the '215 patent, Claims 1 and 2.

13           Ericsson also contends that Defendants

14   Acer, Gateway, Dell, Toshiba, and Intel infringe certain

15   claims of the '223 patent; that is, Claim 11 of the

16   '223.

17           These claims have been referred to as the

18   asserted claims, and these patents have been referred to

19   as the patents-in-suit.

20           Ericsson also contends that Defendants

21   are inducing their customers and/or end users to

22   directly infringe certain claims of the patents-in-suit.

23   Ericsson is seeking damages for the alleged infringement

24   of the Defendant.

25           In response to Ericsson's contentions,

1 Defendants contend that neither they nor their customers

2 or end users have infringed the patents-in-suit.

3       Defendants further contend that they have

4 not induced direct infringement of the asserted claims.

5       Defendants also contend that at least

6 certain of the asserted claims of the '435 and '625

7 patents are invalid as being anticipated by the prior

8 art.

9       Defendants also contend that Ericsson is

10 not entitled to damages for any infringement.

11       Now, let me go over with you again the

12 various burdens of proof that apply in this case.

13       In any legal action, facts must be proved

14 by a required amount of evidence, which is known as the

15 burden of proof.

16       The burden of proof in this case is on

17 Ericsson for some issues and on the Defendants for other

18 issues.

19       For example, the burden of proof is on

20 Ericsson on the issues of infringement and damages, and

21 is on the Defendants on the issue of invalidity.

22       Ericsson has the burden of proving

23 infringement and damages by the preponderance of the

24 evidence standard or burden of proof.

25       Preponderance of evidence means that the

1 evidence persuades you that a claim is more likely true

2 than not true.

3          If the proof establishes that all parts

4 of one of Ericsson's infringement claims are more likely

5 true than not true, then you should find for Ericsson as

6 to that claim.

7          The Defendants have the burden of proving

8 invalidity -- that's the third question you're being

9 asked -- by the clear and convincing evidence standard.

10         The clear and convincing evidence

11 standard means that evidence produces in your mind a

12 firm belief or conviction as to the matter at issue.

13         Although proof to an absolute certainty

14 is not required, the clear and convincing evidence

15 standard requires a greater degree of persuasion than is

16 necessary for the preponderance of the evidence

17 standard.

18         If the proof establishes in your mind a

19 firm belief or conviction, then the standard has been

20 met.

21         In determining whether any fact has been

22 proved by the preponderance of the evidence standard or

23 by the clear and convincing evidence standard, you may,

24 unless otherwise instructed, consider the stipulations

25 that have been entered into, the testimony of all

1 witnesses, regardless of who may have called them, and

2 all exhibits received in evidence, regardless of who may

3 have produced them.

4                    Now let me visit with you about the

5 patent claims.

6                    Before you can decide any of the issues

7 in this case, you will need to understand the role of

8 patent claims.

9                    The patent claims are the numbered

10 sentences at the end of each patent.  The claims are

11 important because it is the words of the claim that

12 define what a patent covers.

13                    The figures and text in the rest of the

14 patent provide a description and/or examples of the

15 invention and provide a context for the claims, but it

16 is the claims that define the breadth of the patent's

17 coverage.

18                    Each claim is effectively treated as if

19 it was a separate patent, and each claim may cover more

20 or less than another claim.  Therefore, what a patent

21 covers depends, in turn, on what each of its claims

22 covers.

23                    You will first need to understand what

24 each claim covers in order to decide whether or not

25 there is infringement of the claim and to decide whether

1 or not the claim is invalid.

2             The law says that it is the Court's role

3 to define the terms of the claims, and it is your role

4 to apply these definitions to the issues that you are

5 asked in order to decide this case.

6             Therefore, as I explained to you at the

7 start of the case, the Court has determined the meaning

8 of the claims, and I will provide you with the

9 definitions of certain claim terms.

10             Those are included in your juror

11 notebook, and I think you've made reference to them

12 several times.  They are included at Tab 1.

13             The definitions that I have provided to

14 these words in the claims, you must accept as being

15 correct.  It is your job to take these definitions and

16 apply them to the issues that you are deciding,

17 including the issues of infringement and invalidity.

18             How a claim defines what it covers.

19             I will now explain that to you.

20             A claim sets forth in words a set of

21 requirements.  Each claim sets forth its requirements in

22 a single sentence.  If a device or a method satisfies

23 each of these requirements, then it is covered by the

24 claim.

25             There can be several claims in a patent.

1  Each claim may be narrower or broader than another claim

2  by setting forth more or fewer requirements.

3           The coverage of a patent is assessed

4  claim by claim.  In patent law, the requirements of a

5  claim are often referred to as claim elements or as

6  claim limitations.

7           When a thing, such as a product or a

8  process, meets all of the requirements of the claim, the

9  claim is said to cover that thing; and that thing is

10 said to fall within the scope of that claim.

11          In other words, a claim covers a product

12 or process where each of the claim elements or

13 limitations is present in that product or process.

14          Sometimes the words in a patent claim are

15 difficult to understand; and therefore, it is difficult

16 to understand what requirements these words impose.  It

17 is my job to explain to you the meaning of the words in

18 the claims and the requirements these words impose.

19          As I instructed you, there are certain

20 specific terms that the Court has defined, and you are

21 to apply those definitions.

22          By understanding the meaning of the words

23 in a claim and by understanding that the words in a

24 claim set forth the requirements that a product or

25 process must meet in order to be covered by that claim,

1  you will be able to understand the scope of coverage for

2  each claim.

3            Once you understand what each claim

4  covers, you are prepared to decide the issues that you

5  will need -- that you will be asked to decide, such as

6  infringement and invalidity.

7            I will now explain to you the meaning of

8  some of the words of the claims in this case.  In doing

9  so, I will explain some of the requirements of the

10 claims.

11           As I have previously instructed you, you

12 must accept the definition of these words in the claims

13 as correct.  For any words in the claim for which you

14 have not been provided with a definition, you should

15 apply their common meaning.

16           You should not take the definition of the

17 language of the claims as an indication that I have a

18 view regarding how you should decide the issues that you

19 are being asked to decide, such as infringement and

20 invalidity.  These issues are yours to decide.

21           Now, at Tab 2, you'll see the

22 construction that the Court has given for those three

23 terms.  I'm not going to read those to you at this time.

24 They will be included in your charge as well.

25           Now let me instruct you about direct

 1  infringement.

 2              There are specific rules you must follow

 3  to determine whether Ericsson has proven that the

 4  Defendants have infringed one or more of the asserted

 5  claims of one or more of the patents-in-suit involved in

 6  this case.

 7              First, let me visit with you about what

 8  we call literal infringement.

 9              If any person makes, uses, or offers to

10  sell or sells in the United States or imports into the

11  United States what is covered by the claims of a patent

12  without the patent owner's permission, that person is

13  said to infringe the patent.

14              This type of infringement is called

15  direct infringement.  To determine direct infringement,

16  you must compare the accused products or methods with

17  each of the asserted claims of the asserted patents

18  using my instructions as to the meaning of the patent

19  claims.

20              A patent claim is directly infringed only

21  if the accused product or method includes each and every

22  element or steps in the patent claim.

23              If the accused product or method does not

24  contain one or more of the limitations recited in the

25  claim, then that product or method does not directly

1    infringe that claim.

2              If you find that the accused product or

3    method includes each element or step of the claim, then

4    that product or method infringes the claim even if such

5    product or use contains additional elements or steps

6    that are not recited in the claim.

7              An accused system or product directly

8    infringe -- infringes a claim if -- if it is reasonably

9    capable of satisfying the claim elements, even though it

10   may also be capable of non-infringing modes of

11   operation.

12             If a claim requires only that the system

13   or product have the capacity to perform a function, one

14   who makes a system or product with the capability

15   without the patent owners' authority is a direct

16   infringer even though the maker's customers do not use

17   the capacity.

18             A patent claim is directly infringed only

19   if the accused product or method includes each and every

20   element in that patent claim, as I will instruct you

21   shortly.

22             If the accused product or method does not

23   contain one or more of the limitations recited in a

24   claim, then that product or method does not directly

25   infringe that claim.

1          A person may directly infringe a patent

2     even though, in good faith, the person believes that

3     what it is doing is not an infringement of any patent

4     and even if it did not know of the patent.

5          Direct infringement does not require

6     proof that the person copied a product or the patent.

7     You must consider each of the asserted claims of the

8     patents-in-suit individually.

9          You must be certain to compare such

10    accused product or method with each claim that such

11    product or method is alleged to infringe.

12         Such accused product or method should be

13    compared to the limitations recited in the patent claims

14    and not to any preferred or commercial embodiment of the

15    claimed invention.

16         Taking each asserted claim of the

17    asserted patents separately.  If you find that Ericsson

18    has proved by a preponderance of the evidence that each

19    and every limitation of that claim is present in the

20    Defendants' accused products or methods, then you must

21    find that such product or method infringes that claim.

22         A claim limitation is literally met if it

23    exists in the accused product or method just as it is

24    described in the claim language, either as I have

25    explained that language to you; or, if I did not explain

1  it, as the language would be understood by one of skill

2  in the art.

3           You must determine separately for each

4  asserted claim whether or not there is infringement.

5           Now, what about infringement of dependent

6  claims?

7           So far, my instructions on infringement

8  have applied to what are known as independent claims.

9           The patents-in-suit also contain some

10 dependent claims.  Each dependent claim refers to an

11 independent claim.  A dependent claim includes each of

12 the requirements of the independent claim to which it

13 refers and one or more additional requirements recited

14 in the dependent claim.

15          In order to find infringement of a

16 dependent claim of any of the patents-in-suit, you must

17 first determine whether any of the independent claims

18 have been infringed.

19          If you decide that the independent claim

20 has not been infringed, then the dependent claim cannot

21 have been infringed.

22          But if you decide that the independent

23 claim has been infringed, then you must separately

24 determine whether each additional requirement of the

25 dependent claim has also been included in the accused

1  product or method.

2              If each additional requirement has been

3  included, then the dependent claim has been infringed.

4              Conversely, if the Defendants' products

5  or conduct omit any additional requirement recited in

6  Ericsson's asserted patent claims, then the Defendants

7  do not infringe that claim.

8              Ericsson must prove that it is more

9  likely than not that a patent claim has been infringed.

10             Now, indirect infringement.

11             A party induces patent infringement if it

12  purposefully causes, urges, or encourages another to

13  infringe the claims of a patent.  Inducing infringement

14  cannot occur un -- unintentionally.  This is different

15  from direct infringement, which can occur

16  unintentionally.

17             Ericsson has alleged that the Defendants

18  have also induced infringement by their customers.  To

19  prove that these Defendants induced patent infringement,

20  Ericsson must prove that it is more likely than not

21  that, No. 1, customers or end users of Defendants have

22  directly infringed the asserted patent claims; and, 2,

23  that the Defendants have actively and knowingly aided

24  and abetted that direct infringement.

25             A Defendant is liable for active

1  inducement of infringement if a patent -- of a patent

2  claim if, one, the particular Defendant takes action

3  during the time the patent is in force which encourages

4  acts by someone else;

5           Two, the encouraged acts constitute

6  direct infringement of that claim;

7           And, three, the particular Defendant, A,

8  was aware of the patent, and knew that the encouraged

9  acts constitute infringement of the patent; or, B, was

10 willfully blind to the infringement of the patent.

11          Willful blindness requires that the

12 Defendant subjectively believed there was a high

13 probability that the encouraged acts constituted

14 infringement of the patent and took deliberate actions

15 to avoid learning of the infringement;

16          Four, the particular Defendant had the

17 intent to encourage infringement by someone else.

18          And, five, the encouraged acts are

19 actually carried out by someone else.

20          In order to prove active inducement,

21 Ericsson must prove that each of the above requirements

22 is met.

23          Further, proof of each element must be by

24 a preponderance of the evidence, that is, that it is

25 more likely than not that each of the above requirements

1 have been met.

2        In considering whether a Defendant has

3 induced infringement by others, you may consider all of

4 the circumstances, including whether or not it obtained

5 the advice of a competent lawyer, whether or not it knew

6 of the patents when designing and manufacturing its

7 products, and whether or not it removed or diminished

8 the allegedly infringing features.  You may not assume

9 that merely because they did not obtain an opinion of

10 counsel, the opinion would have been unfavorable.

11        Intent to cause a third party to perform

12 acts which result in direct infringement may be

13 demonstrated by evidence of active steps taken to

14 encourage the third party to do so, such as advertising

15 an infringing use or instructing how to engage in an

16 infringing use.

17        It is not sufficient that a Defendant was

18 aware of the acts that allegedly result in direct

19 infringement of the patent claim or merely encouraged

20 the acts themselves.

21        Rather, you must find that the particular

22 Defendant specifically intended to cause its customers

23 to engage in the acts that constitute direct

24 infringement, and the Defendant knew or was willfully

25 blind that the action would cause direct infringement.

1    If you do not find that the accused

2 infringer specifically meets these intent requirements

3 by a preponderance of the evidence, then you must find

4 that the accused infringer has not actively induced the

5 alleged infringement.

6    All right.  Now we turn to the question

7 of invalidity, which is the third question on your

8 verdict form.

9    In this case, the Defendants have

10 challenged the validity of the asserted patent claims of

11 the '435 and '625 patents.  The Defendants must prove

12 that a patent claim is invalid by the clear and

13 convincing evidence standard.

14    Evidence of material prior art which is

15 not cumulative of prior art cited to or by the PTO, may

16 be more probative in meeting this standard than the

17 prior art that was cited to or reviewed by the PTO.

18    An issued patent is accorded a

19 presumption of validity based on the presumption that

20 the United States Patent & Trademark Office acted

21 correctly in the issuance of that patent.

22    From the issuance of the patent, it is

23 presumed that a claimed invention is new, useful, and

24 not obvious, and satisfies the other legal requirements

25 for a valid U.S. patent.

1          Each claim of a patent is presumed valid

2  independently of the validity of the other claims.  The

3  presumption of validity remains intact and the burden of

4  proof remains on the Defendants throughout this

5  litigation.  In other words, the burden never shifts to

6  Ericsson to prove that its patents are valid.

7          For a patent to be valid, the invention

8  claimed in the patent must be new, useful, and not

9  obvious.  A patent cannot take away from the people

10  their right to use what was known when the invention was

11  made.

12          In addition, the patent must comply with

13  certain statutory requirements of disclosure.

14          I will now explain to you the Defendants'

15  grounds for invalidity, in detail.

16          In making your determination as to

17  invalidity, you should consider each claim and each

18  ground for invalidity separately.

19          First is anticipation by a publicly used

20  or known, or previously published.

21          The Defendants contend that the asserted

22  claims of the '435 and '625 patents are invalid because

23  the claimed invention is not new.

24          For a claim to be invalid because it is

25  not new, all of its requirements must have been

1 described in a single previous publication or patent

2 that predates -- predates the claimed invention.  In

3 patent law, such previous publication or patent is

4 called a prior art reference.

5          If a patent claim is not new, we say it

6 is anticipated by a prior art reference.  The Defendants

7 must prove a claim is anticipated by the clear and

8 convincing evidence standard.

9          The disclosure in the prior art reference

10 does not have to be the same words as the claim; but all

11 of the requirements of the claim must be there, either

12 stated or necessarily implied, so that someone of

13 ordinary skill in the field of the claimed invention

14 looking at that one reference would be able to make and

15 use at least one embodiment of the claimed invention.

16          Anticipation also occurs when the claimed

17 invention inherently, or necessarily, results from

18 practice of what is disclosed in the written reference,

19 even if the inherent disclosure was unrecognized or

20 unappreciated by one of ordinary skill in the field of

21 the invention.

22          The Defendants can show that a patent

23 claim was not new if the claimed invention was already

24 patented or described in a printed publication anywhere

25 in the world before the date of the invention of the

1  asserted claim.

2          The Defendants can also show that a

3  patent claim was not new if the claimed invention was

4  already described in another published U.S. patent

5  application or issued U.S. patent that was based on a

6  patent application filed before the date of the patent

7  holder's application filing date, or, the date of the

8  invention.

9          The dates of the invention for the

10  patents-in-suit are as follows:

11          For the '435 patent -- March 18, 1999.

12          For the '625 -- October 28, 1998.

13          Defendants contend that the '435 and '625

14  patents are invalid.  If a patent claim is not new as

15  explained above, then you must find that claim invalid.

16          Next is anticipation by a printed

17  publication.

18          A patent claim is invalid if the

19  invention defined by that claim was described in a

20  printed publication anywhere in the world before it was

21  invented by the patent applicant.

22          Printed publications may include issued

23  patents as well as articles, treatises, and other

24  written materials.  A reference is a printed publication

25  if it is reasonably accessible to those interested in

1 the field, even if it is difficult to find.

2           An electronic publication, included --
3 including an online or Internet publication, is a
4 printed publication if it is at least reasonably
5 accessible to those interested in the field, even if it
6 is difficult to find.

7           A printed publication must be reasonably
8 accessible to those members of the public who would be
9 interested in its contents.  It is not necessary that
10 the printed publication be available to every member of
11 the public.  The date that a printed publication becomes
12 prior art is the date that it becomes reasonably
13 accessible to the public.

14           So long as the printed publication was
15 available to the public, the form in which the
16 information was recorded is unimportant.  The
17 information must, however, have been maintained in some
18 permanent form, such as printed or typewritten pages,
19 magnetic tape, microfilm, photographs, or photocopies.

20           For a claim to be anticipated by a prior
21 art publication, all of the claim's requirements must
22 have been either:  One, disclosed in a single prior art
23 reference.  Or, two, implicitly disclosed in a single
24 prior art reference as viewed by one of ordinary skill
25 in the field of the invention.

1        The disclosure in a reference does not

2   have to be in the same words as the claim, but all of

3   the requirements of the claim must be described in

4   enough detail, or necessarily implied by or inherent in

5   the reference, to enable someone of ordinary skill in

6   the field of the invention looking at the reference to

7   make and use at least one embodiment of the claimed

8   invention.

9        A prior art publication also invalidates

10  a patent claim when the claimed invention necessarily

11  results from practice of the subject of the publication,

12  even if the result was unrecognized and unappreciated by

13  one of ordinary skill in the field of the invention.

14       A printed publication will anticipate if

15  it contains a description of the invention covered by

16  the patent claims that is sufficiently detailed to teach

17  a skilled person how to make and use the invention

18  without undue experimentation.

19       Factors to be considered in determining

20  whether a disclosure would require undue experimentation

21  would include:

22            (1) the quantity of the experimentation

23  necessary;

24            (2) the amount of direction or guidance

25  disclosed in the printed publication or patent;

1          (3) the presence or absence of working

2 examples in the printed publication or patent;

3          (4) the nature of the invention;

4          (5) the state of the prior art;

5          (6) the relative skill of those in the

6 art;

7          And (7) the predictability of the art;

8          And No. (8) the breadth of the claims.

9          Now, that concludes my instructions on

10 invalidity.

11          We next turn to the question of damages,

12 which is the fourth question you will answer in the

13 verdict form.

14          If you find that the Defendants have

15 infringed one or more valid claims of the

16 patents-in-suit, then you must determine the amount of

17 money damages to which Ericsson is entitled.

18          By instructing you on damages, I do not

19 suggest that one or the other party should prevail.

20          These instructions are provided to guide

21 you on the calculation of damages in the event you find

22 infringement of a valid patent claim and thus must

23 address the damages issue.

24          In this case, Ericsson has sued D-Link,

25 NETGEAR, Belkin, Acer, Gateway, Dell, and Toshiba.

1          Intel has intervened in this case to deny

2    its chips used by some of its customer defendants.

3          Accordingly, in answering Question No. 4,

4    you will be determining what amount of money would

5    fairly and reasonably compensate Ericsson for

6    infringement, if any, by each Defendant, except Intel.

7          Any damages for Intel's infringement, if

8    any, will be included in whatever damages, if any, you

9    find for each of the customer defendants.

10         The amount of damages must be adequate to

11   compensate Ericsson for the infringement, but it may not

12   be less than a reasonable royalty.

13         At the same time, your damages

14   determination must not include additional sums to punish

15   the Defendants or to set an example.  You may award

16   compensatory damages only for the loss that Ericsson

17   proves was more likely than not caused by the

18   Defendants' infringement.

19         Moreover, because Ericsson has agreed

20   that it is under an obligation to license the

21   patents-in-suit on reasonable and non-discriminatory

22   terms, what are referred to as RAND terms, you must

23   ensure that any damages award is consistent with and

24   does not exceed the amounts permitted under Ericsson's

25   RAND obligations.

1    Now, first with regard to the burden of

2 proof with damages.

3    Where the parties dispute a matter

4 concerning damages, it is Ericsson's burden to prove by

5 a preponderance of the evidence that it is more probable

6 than not that Ericsson's version is incorrect.

7    Ericsson -- excuse me -- that Ericsson's

8 version is correct.

9    Ericsson must prove the amount of damages

10 with reasonable certainty but need not prove the amount

11 of damages with mathematical precision.

12    However, Ericsson is not entitled to

13 damages that are too remote or speculative.

14    Now, with regard to when damages begin,

15 the amount of damages Ericsson can recover is limited to

16 those acts of infringement that occurred after Ericsson

17 gave each Defendant notice that it infringed the patent.

18    Actual notice means that Ericsson

19 communicated to the Defendants a specific charge of

20 infringement of the patent by the accused products.

21 This notice is effective as of the date given.

22    Your job is to calculate damages from the

23 date that each Defendant received actual notice.  You

24 should not award damages for Ericsson against any

25 infringement by a Defendant occurring before that

1  Defendant first received actual notice.

2         Now let me define reasonable royalty for

3  you.

4         If you find that any claim of the

5  asserted patents is both valid and infringed, then

6  Ericsson is entitled to damages adequate to compensate

7  for the infringement of that patent; but in no event

8  less than a reasonable royalty for the use made of the

9  invention by the Defendant.

10        A royalty is the amount of money a

11  licensee pays to a patent owner to make, use, or sell

12  the patented invention.

13        A reasonable royalty is the amount of

14  money a willing patent holder and a willing prospective

15  licensee would have agreed upon at the time of the

16  infringement for a license to make the invention.

17        This is what you've heard referred to as

18  the hypothetical negotiation.

19        It is the royalty that would have

20  resulted from an arms-length negotiation between a

21  willing licensor and a willing licensee, assuming that

22  both parties understood the patent to be valid and to be

23  infringed and that the licensee would respect the

24  patent.

25        Unlike a real-world negotiation, in the

1  hypothetical negotiation, all parties are presumed to

2  know that the patent is infringed and is valid.

3           The reasonable royalty you determine must

4  be a royalty that would have resulted from this

5  hypothetical negotiation and not simply a royalty either

6  party would have preferred.

7           Evidence of things that happened after

8  the infringement first began may be considered in

9  evaluating the reasonable royalty only to the extent

10  that the evidence aids in assessing what royalty would

11  have resulted from a hypothetical negotiation.

12           In making your determination of the

13  amount of a reasonable royalty, it is important that you

14  focus on the time period when the Defendant first

15  infringed the patent and the facts that existed at that

16  time.

17           Your determination does not depend on the

18  actual willingness of the parties to this lawsuit to

19  engage in such negotiations.  Your focus should be on

20  what the parties' expectations would have been had they

21  entered a negotiation for royalties at the time of the

22  infringing activity.

23           The Defendants' actual profits may or may

24  not bear on the reasonableness of an award based on a

25  reasonable royalty.

1          In deciding what is a reasonable royalty

2   that would have resulted from the hypothetical

3   negotiation, you may consider the factors that the

4   patent owner and the alleged infringer would consider in

5   setting the amount the alleged infringer should pay.

6          I am now going to list for you a number

7   of factors which you may consider.  This is not an

8   exhaustive list, and it doesn't list every possible

9   factor, but it will give you an idea of the kinds of

10  things you can use to consider in setting a reasonable

11  royalty.

12         No. 1.  The royalties received by the

13  patentee for licensing of the patents-in-suit,

14  providing -- proving or tending to prove an established

15  royalty.

16         No. 2.  Royalties paid for other patents

17  comparable to the asserted patents.

18         No. 3.  The nature and scope of the

19  license, as to whether it's exclusive or non-exclusive;

20  or restricted or nonrestricted in terms of its

21  territory; or with respect to the parties to whom the

22  product may be sold.

23         No. 4.  Whether or not the licensor had

24  an established policy and marketing program to maintain

25  its patent exclusivity by not licensing others to use

1  the invention or by granting licenses under special

2  conditions designed to preserve that exclusivity.

3            No. 5.  The commercial relationship

4  between the licensor and the licensee, such as whether

5  they are competitors in the same territory and the same

6  line of business or whether they are inventor and

7  promoter.

8            No. 6.  Whether being able to use the

9  patented invention helps in making sales of other

10 products or services.

11           No. 7.  The duration of the patent and

12 the term of the license.

13           No. 8.  The profitability of the patented

14 invention and whether or not it is commercially

15 successful or popular.

16           No. 9.  The utility and advantages of the

17 patented invention over the old modes or devices, if

18 any, that had been used for achieving similar results.

19           No. 10.  The nature of the patented

20 invention, the character of the commercial embodiment of

21 it as owned and produced by the licensor, and the

22 benefits to those who have used the invention.

23           No. 11.  The extent of the licensee's use

24 of the patented invention and any evidence probative of

25 that use.

1          No. 12.  The portion of the profit or of

2   the selling price that may be customary in the

3   particular business or in comparable businesses to allow

4   for the use of the invention or analogous inventions.

5          No. 13.  The portion of the profits that

6   is due to the patented invention, as compared to the

7   portion of the profit due to other factors, such as

8   unpatented elements or unpatented manufacturing

9   processes or features or improvements developed by the

10  licensee.

11         No. 14.  Expert opinions as to what would

12  be a reasonable royalty.

13         No. 15.  The amount that a licensor and a

14  licensee would have agreed upon if both sides had been

15  reasonably and voluntarily trying to reach an agreement;

16  that is, the amount which an accused infringer would

17  have been willing to pay as a royalty and yet be able to

18  make a reasonable profit and which amount would have

19  been acceptable to a patent owner if it would have been

20  willing to create a license.

21         No. 16.  Ericsson's obligation to license

22  its technology on RAND terms.

23         No one factor is dispositive, and you can

24  and should consider the evidence that has been presented

25  to you in this case on each of these factors.

1          The framework which you should use in

2   determining a reasonable royalty is the hypothetical

3   negotiation between normally prudent business people.

4          Next, a second way to calculate a royalty

5   is to determine a one-time lump-sum payment that the

6   infringer would have paid at the time of the

7   hypothetical negotiation for a license covering all

8   sales of the licensed product both past and future.

9          This differs from payment of an ongoing

10  royalty where a royalty rate is applied against future

11  sales as they occur.  When a one-one -- one-time lump

12  sum is paid, an infringer pays a single price for a

13  license covering both past and estimated future

14  infringing sales.

15         It is up to you to decide -- based on the

16  evidence, to decide what type of royalty is appropriate

17  in this case.

18         An infringer's net profit margin is not

19  the ceiling by which a reasonable royalty is capped.

20         The infringer's selling price can be

21  raised, if necessary, to accommodate a higher royalty

22  rate.  Requiring the infringer to do so, may be the only

23  way to adequately compensate the patentee for the use of

24  its technology.

25                    Now, you must not award Ericsson more

1 damages than are adequate to compensate for the

2 infringement, nor shall you include any additional

3 amount for the purpose of punishing a defendant or for

4 setting an example.  Nor may you include damages that

5 are speculative, damages that are only possible, or

6 damages that may be based -- based upon guesswork.

7 Now, that concludes my instructions with

8 regard to the fourth issue, damages.

9 Now let my give you some general

10 instructions regarding your deliberations, and we're

11 about through.

12 You should perform your duties as jurors

13 without bias or prejudices as to any party.  The law

14 does not permit you to be controlled by sympathy,

15 prejudice, or public opinion.

16 All parties expect that you will

17 carefully and impartially consider all of the evidence,

18 follow the law as it is now being given to you, and

19 reach a just verdict, regardless of the consequences.

20 You should consider and decide this case

21 as a dispute between persons of equal standing in the

22 community, of equal worth, and holding the same or

23 similar stations in life.

24 A corporation is entitled to the same

25 fair trial as a private individual.  All persons,

1   including corporations and other organizations, stand

2   equal before the law, regardless of size or who owns

3   them, and are to be treated as equals.

4           When you retire to the jury room to

5   deliberate on your verdict, you may take this charge

6   with you, as well as all of the exhibits which the Court

7   has admitted into evidence.  In fact, all of that will

8   be sent to you, a copy of the charge and all the

9   exhibits.

10          You should first select your foreperson

11  and then begin conducting your deliberations.  If you

12  recess during your deliberations, please follow all the

13  instructions the Court has given you about your conduct

14  during the trial of this case.

15          After you have reached your verdict --

16  let me add one comment to -- a couple of comments to you

17  on that.

18          When you're deliberating, be sure that

19  all eight of you are in the room.  For example, if you

20  take a break and somebody maybe goes outside to smoke or

21  whatever, stop deliberating until all eight of you are

22  together.

23          If someone needs to go to the restroom,

24  stop deliberating until all eight of you are together.

25  You shouldn't get two or three people that are having

1  one conversation and another two or three over here.

2            Everybody -- it's the collective wisdom

3  of the jury that makes the system work, so everybody

4  needs to hear everything that everybody else has to say,

5  and you need to deliberate as one body.

6            Now, if you should recess during your

7  deliberations, follow all the instructions that I've

8  given you about your conduct during the trial.

9            After you have reached your verdict, your

10 foreperson is to fill in on the form your answers to the

11 questions.  Do not reveal your answers until such time

12 as you are discharged, unless otherwise directed by me.

13            You must never disclose to anyone, not

14 even to me, your numerical division on any question that

15 that you have not reached a verdict on.

16            Any notes that you have taken during this

17 trial are available to you but only as aids to your

18 memory.  If your memory should differ from your notes,

19 then you should rely on your memory and not on your

20 notes.  The notes are not evidence.

21            A juror who has not taken notes should

22 rely on his or her independent recollection of the

23 evidence and should not be unduly influenced by the

24 notes of other jurors.  Notes are not entitled to any

25 greater weight than the recollection or impression of

1 each juror about the testimony.

2          If you wish to communicate with me at any
3 time, please give a written message or question to the
4 Court Security Officer, who will bring it to me.  Forms
5 will be provided to you for that purpose.

6          I will then respond as promptly as
7 possible either in writing or by having you brought into
8 the courtroom so that I can address you orally.  I will
9 always first disclose to the attorneys your question and
10 my response before I answer your question.

11          Once you have reached a verdict in this
12 case, you will not be required to talk with anyone about
13 the case unless the Court orders otherwise.

14          You may discuss it with other people, but
15 it will be your decision, but all -- because someone was
16 to contact you and say, I want to talk to you, you're
17 not required to unless the Court should order you to,
18 which I have never had happen.

19          All right.  That concludes my
20 instructions to you.  It took a little longer than I
21 thought.  It took about an hour.  You've been very
22 patient.

23          We're going to take about a 15-minute
24 break.  We'll come back at 10:20, at which time you'll
25 hear the closing arguments.

1          Please continue to follow my

2    instructions, though, even at this late stage.  Don't

3    start discussing the case yet.  You'll have an

4    opportunity to do that after closing argument.

5          So we'll be in recess until 20 after.

6          COURT SECURITY OFFICER:  All rise.

7          (Recess.)

8          COURT SECURITY OFFICER:  All rise.

9          (Jury in.)

10         THE COURT:  Please be seated.

11         All right.  The Court will recognize

12   Mr. Cawley for purposes of closing argument.

13         Mr. Cawley.

14         MR. CAWLEY:  Thank you, Your Honor.

15         For more than 100 years the people at

16   Ericsson have helped people communicate.  You've learned

17   that the company began in the late 1800s when a young

18   man named Lars Magnus Ericsson opened up a shop in

19   Stockholm, Sweden, to repair the brand new invention

20   called a telephone.

21         But he was a very creative young man, and

22   he wasn't satisfied for long with repairing other

23   people's telephones, and he began to invent improvements

24   to the telephone.

25         And over the decades, the company that he

1 founded has spent billions of dollars in research and

2 development finding ways to help people communicate.

3              First it involved simply old-fashioned

4 telephones connected by wires like the kind we grew up

5 with, but in the 1920s the company began to sell radios.

6              And the combination of those two areas of

7 expertise -- telephones and radios -- were brought

8 together by Ericsson in the 1970s when they became the

9 pioneer of the cell phone system that we all know and

10 use today.

11             For the last few decades of the 20th

12 century, scientists and engineers at Ericsson devoted

13 thousands of hours and Ericsson spent, on average, 5

14 billion dollars a year in research and development to

15 improve wireless digital communication.  That included

16 relatively long distance communications, like cell

17 phones.

18             It included very short wireless

19 communications like BlueTooth, which you have learned

20 during this case, was invented by Ericsson.

21             In the late 1990s, these scientists and

22 engineers at Ericsson, most of whom you've heard by

23 video deposition -- and others that you didn't hear

24 from -- all around the world, from Sweden to Japan to

25 the United States to Singapore to Germany and elsewhere

1  were all working together on ways to improve wireless

2  communications.

3              Their work led to the five United States

4  patents that are at issue in this case, that you've

5  learned about over the last week or so.

6              The timing of these patents in connection

7  with a new kind of wireless communication is very

8  important for you, to completely understand what

9  happened in this case and the evidence that you've

10  heard.

11              The five patents you see depicted on this

12  timeline to the left, they were filed for, beginning in

13  1997 through 1999, as Ericsson was actively involved in

14  perfecting digital communications for the cellular

15  system and for BlueTooth.

16              You've heard that Ericsson was a very

17  active participant, in fact a founding member of

18  standards setting organizations that dealt with the

19  cellular standards, things like GSM, 3G, organizations

20  like ETSI that you heard about in Europe, that was the

21  pioneer in developing standards for cellular

22  communications.

23              As I already mentioned, Ericsson also

24  invented standards for very short distance wireless

25  communications called BlueTooth.

1          Around 2000, for the first time, products

2    began to be offered and standards began to actively be

3    developed for a medium-range form of wireless

4    communication called Wi-Fi.  It wouldn't go as far as

5    cellular, it wasn't as short as BlueTooth, but it would

6    cover a building or someone's house.

7          That got underway in the 1990s.

8          Standards began to issue in 2000.

9          But you've learned in this case that the

10   first really sophisticated, the first really

11   high-quality Wi-Fi standards were in 802.11e in 2005,

12   and then there was a significant revision or improvement

13   to that standard in 2009 in 802.11n.

14         Now, what happened in the Wi-Fi standard

15   setting is essential for us to remember when we

16   understand the context of the patents in this case.

17         We heard about the Wi-Fi standard setting

18   from Dr. Jerry Gibson, the Defendants' expert.  And

19   you'll remember that he gave this testimony about

20   802.11.  He was asked was this standard about pushing

21   the envelope of innovation, or was it just about

22   reaching agreement on what to use?  And he explained to

23   us the 802.11 standard was about implementation.  It

24   wasn't about innovation.

25         What he told us is that the people who

1  worked on the 802.11 standard weren't sitting around in

2  big meetings trying to invent new ways to do things;

3  instead, they were taking ideas in wireless

4  communication that had already been invented in other

5  contexts like cellular, and implementing them for a

6  method of medium distance communication.

7           That's how the patents in this case that

8  Ericsson owns, that were developed by Ericsson in

9  connection with the wireless data communication in the

10 cellular system, were imported by the people who drafted

11 the 802.11 standard into the Wi-Fi standard.  That's the

12 implementation Dr. Gibson told us about.

13          So the ideas of the patents that you've

14 learned about over the past week were imported into the

15 802.11 standard; things like BlockAck request,

16 BlockAck, TID subfield, and others.

17          And then 802.11n in 2009, things like

18 A-MPDU, BlockAck frame variants and other features of

19 the Ericsson inventions that you've heard about.

20          Now, in this case, Judge Davis has just

21 told you that he's going to ask you four questions, and

22 your deliberations, by the time you get to the end of

23 them, will consist of figuring out how to answer all the

24 parts of those four questions.

25          Unfortunately, I'll suggest to you that

1  what you've heard a lot of from the Defendants in this

2  case is not evidence that will help you answer those

3  questions, but are instead a whole series of

4  distractions that are designed to avert your attention

5  away from the core issues that Judge Davis will ask you

6  about.

7           I like to think of that as -- as being

8  like a signpost, but they're not trying to help you get

9  to the true destination.  They're trying to throw up any

10  distraction that may cause you to ignore the facts that

11  justify Ericsson recovering a royalty in this case.

12           One we heard was that the 802 standard

13  was created mostly by chip makers.  Well, that may be

14  true.  It was the chip makers who stood to benefit from

15  having a new product to offer that would do this Wi-Fi

16  communication.

17           But just because it was created by chip

18  makers has nothing to do with whether or not the

19  patents, the patent claims that you've heard described

20  in this case, describe what's in the standard and in

21  what the chip makers produce and the other Defendants

22  use.

23           You heard that Ericsson didn't attend the

24  802.11 standards.  Now, in fairness, you've also heard

25  that Ericsson was not only an active participant in many

1  other kind of standard setting organizations but

2  actually founded many of them.

3         But Ericsson didn't plan in the early

4  2000s to produce a Wi-Fi product, even though they do

5  today, so they didn't attend the standards; others did,

6  and used Ericsson's ideas.

7         But, again, that's got nothing to do with

8  your job of comparing the language of the claims in the

9  patents to the accused products.

10        You heard from the Defendants, well,

11  Ericsson made a proposal to the 802 Wi-Fi standard and

12  it got rejected.  That's got nothing to do with the task

13  Judge Davis has asked you to perform in this case.

14        Ericsson made a proposal in the year

15  2000.  It was long before the versions of the 802.11

16  standard we're talking about in this case.  It was

17  rejected in the year 2000, but it wasn't until 2007 that

18  the Wi-Fi standard setting body even began to work on

19  802.11n.

20        You heard that cellular is not Wi-Fi.

21  That's true.  You also heard that they are both wireless

22  digital communications, so they have an enormous amount

23  in common.  But, again, your job in this case is to

24  compare the language of Ericsson's patents to the

25  standards and to the products.

1    You heard that the standard-setting body
2  didn't know about Ericsson's patents; and yet Judge
3  Davis in his instructions just told you, it's not
4  necessary that anyone know about a patent in order to
5  infringe.
6    You heard that there are many patents in
7  the standard, not just Ericsson's.  What's that got to
8  do with the job Judge Davis has asked you to do of
9  comparing the claims to the products?
10   You heard that Intel has patents; and yet
11  Judge Davis, after he heard that suggestion, interrupted
12  the evidence to give you a special instruction last
13  week, telling you the fact that Intel has patents of its
14  own is no defense to Intel's infringement of Ericsson's
15  patents.
16   You heard that most of the standards in
17  the patents are from chip makers.  Again, completely
18  irrelevant to your comparison of the claims of
19  Ericsson's patents to the product.
20   You've heard repeatedly Ericsson's
21  inventors are not here.  They didn't come to the trial.
22   Well, Ladies and Gentleman, they didn't
23  come to the trial because there's a whole lot of them,
24  and we had a limited amount of time from Judge Davis to
25  present testimony to you.

1           The fact of the matter is that once the

2    inventors come up with their invention and get a patent,

3    then from that point forward, it's the patent that is

4    the relevant explanation of the invention.

5           The inventors can't properly come into

6    court and tell you, well, here's what I meant to invent.

7    Here's what the patent really means.  The inventor can

8    neither expand the coverage of the patent nor reduce the

9    coverage of the patent.  And telling you what the patent

10   means, what the words and phrases mean is exclusively

11   Judge Davis's job, not the job of the inventors.

12          And, finally, we heard what may be the

13   most disingenuous statement at all repeatedly by Intel:

14   We're here to stand by our customers.

15          Ladies and Gentlemen, I'll suggest to you

16   that Intel, the largest chip maker in the world, is here

17   in its own financial best interest, because the fact of

18   the matter is, you've heard through the testimony, when

19   Intel sells its chips to the consumers, to the

20   customers, Belkin and D-Link and -- and Dell, it gives

21   them an indemnity.  And that indemnity says if you,

22   Dell, get accused of patent infringement for using our

23   chips, we, Intel, will pick up the tab for that.

24          That's why they're here, is because they

25   are financially responsible at the end of the day for

the results of their own infringement of Ericsson's patents.

Not only that, but you've heard Intel's witnesses suggest that the royalty they should have to pay for using Ericsson's patents is a penny; not 50 cents, but one cent. Actually a little less than one cent.

And you've also heard, if they can succeed in convincing you that a reasonable royalty is only one cent, Intel can pay that cent and then sell the chip to their customers who can then use Ericsson's patents for nothing.

That, Ladies and Gentleman, is why Intel is here. But again, none of these distractions are really evidence that will help you answer any of the questions that Judge Davis has asked you and you'll be considering during your deliberations.

So let's turn instead to the relevant questions in this case and talk about the relevant evidence that will help you in your deliberations.

There really are three of them, although Judge Davis has broken one of them out. The three are, first, do the Defendants infringe? Second, are two of the patents invalid? And, third, how much is a reasonable royalty?

1          Now, what we'd like to do with the

2    remainder of our evidence is not to talk about

3    distractions but to talk one at a time about these

4    questions that you'll be responsible for answering and

5    to remind you of some of the evidence, both the

6    testimony and the documents that you've heard that will

7    help you answer these questions.

8          The first is, do the Defendants infringe?

9          And to help remind us of the evidence

10   we've heard, at this time I'm going to ask Ted Stevenson

11   to go through that.

12         MR. STEVENSON:  Well, thank you.

13         And as Mr. Cawley stated, the central

14   question is the legal definition of the invention.

15   That's how you guys will be doing your jobs.

16         You will be taking the legal definition

17   of the invention and applying it to the accused

18   technology, and you'll find the legal definitions in the

19   claim language first but also in the Court's claim

20   constructions.  And these are the legal, binding

21   definitions of what Ericsson invented and has the rights

22   to.

23         And you will also be receiving -- and

24   you've received jury instructions on how to apply the

25   law.  And I'd like to refer to, through my remarks,

1  those legal definitions and the jury instructions.

2           Let me begin with the '215 patent.  You

3  will remember that's the patent that deals with the

4  variations in message types of the block

5  acknowledgements that we've been talking about.

6           And in this case, the format and the

7  structure of the block acknowledgement is really not in

8  dispute.  It's prescribed by the standard and all the

9  Defendants follow it.

10          This is one of those block

11 acknowledgement frames, and the block acknowledgement

12 has a compartment in there called the BA control.  We

13 talked about that.

14          Within that there are two fields, a

15 Multi-TID and a compressed bitmap field.  Those are just

16 a 1 and a 0 apiece.  And those two numbers in tandem

17 correlate to a chart where there are variations, three

18 variants that are defined.  The basic, the compressed,

19 and the Multi-TID.

20          The Defendants use the compressed block

21 acknowledgement, and I think their argument in this case

22 is they don't infringe because their products transmit

23 the compressed block acknowledgement.

24          However, they must comply with the format

25 of this message.  They must have the type identifier,

1 and the type identifier when it is sent out is received

2 by other units, and it's checked so that those units and

3 the Defendants' own devices can verify what type of

4 message they're receiving.

5         So the question to you is, does the

6 Defendants' argument rise to the level of a

7 non-infringement argument?  And it doesn't, because of

8 the Court's claim construction.

9         You have this in your jury notebooks, but

10 the Court has given a definition, after hearing

11 arguments from the parties and having a hearing, to this

12 element.

13         And the Court defined it as:  Responsive

14 to the receiving step, generating a message field

15 including a field that identifies the message type of

16 the feedback response from a number of different message

17 types.

18         This is the legal definition, and the way

19 to apply it is to go through it step by step and see if

20 it's true as to this accused function.

21         The accused devices do have a field that

22 identifies the message type.  It's this field right here

23 (gestures).  And the -- the field relates to a number of

24 different message types which are contained in the

25 chart.

 1                  That's infringement, Ladies and

 2     Gentleman, because it meets directly all the elements of

 3     the claim.

 4                  And we asked Dr. Gibson about that, and

 5     Dr. Gibson testified that -- under the following

 6     question:  And each block acknowledgement that is sent

 7     contains a field that indicates which one of the three

 8     variants are being sent, correct?

 9                  He said, That's correct.

10                  That message has to have that field,

11     right?

12                  Yes.

13                  It's mandatory, right?

14                  Yes.

15                  So he's admitted that there is a field

16     that indicates which of the three variants are being

17     sent.

18                  Now, the Defendants' argument is really

19     an attempt to narrow or to change the definition that

20     the Court has already given you, and they can't do that.

21                  What they want to argue is that the field

22     should identify the message type of the feedback

23     response message from a number of different message

24     types that are contained in the product.

25                  But that's not the legal scope of the

1  invention as has been defined by the Court.

2              The variants are in the standard that are

3  used by the Defendants for compressed block

4  acknowledgement.  Defendants can receive messages with

5  other variants that they then have to deal with.  And

6  this infringes.

7              Moreover, Claim 2 specifically applies to

8  the compressed bitmap variant that is being used by the

9  Defendant -- or the Defendants.  And as a result, this

10 claim -- and these two claims are infringed.

11             Let's now turn to the '435.  This patent

12 deals with coordination between a transmitter and a

13 receiver in a wireless network.

14             The issue here that's been raised by

15 Defendants is they assert that their receivers do not

16 compute the data packets that have been discarded by the

17 transmitter.  And as a result, they don't infringe.  And

18 that's an element of the claim.  We've proved it is met

19 in the devices and that there is infringement.  And I'd

20 like to go through the proof.

21             To be coordinated with the transmitter,

22 the receiver has to, absolutely has to compute the

23 packets that the transmitter has discarded, and it does

24 it in two-ways.  Or in two steps I should say.

25             The first is the transmitter and the

1 receiver are in tandem, and then windows which are the

2 windows of packets they're expecting to receive, or in

3 the transmitter's case it's expecting to transmit, those

4 windows move in tandem together.

5                    In addition, the transmitter discards

6 packets that are before its window.

7                    So it was a necessary and logical result,

8 whenever the receiver computes where its window is and

9 what packets are behind it, which it does every time it

10 moves, it is necessarily also determining and

11 calculating and computing what packets the transmitter

12 has discarded.

13                    Dr. Nettles confirmed that that's the

14 operation.  We asked him the question:  Do the receivers

15 that are at issue in this case make that computation of

16 packets the transmitter has discarded?

17                    Answer:  Oh, yes, sir, they have to.

18                    Question:  Will you please explain to us

19 how they do that?

20                    And the answer was:  In these systems,

21 there's both a receive window and a transmit window, and

22 those two windows are coordinated.  And when the receive

23 window shifts, the receiver's actually, in addition to

24 calculating what packets are below its window, it's also

25 calculating what packets are below the transmitter's

1  window.

2          And Dr. Nettles presented an animation to

3  illustrate the coordination that occurs between the

4  transmitter and the receiver.

5          You may recall seeing this.  The

6  transmitter is on the top, and the receiver is on the

7  bottom.

8          What happens is when the transmitter, in

9  this case, decides that it's not going to retransmit

10  packet 2 that was lost, it's just going to move on and

11  tolerate a little glitch in the video, its window

12  shifts, and then it either sends a block -- it sends a

13  block acknowledgement response, either implicit or

14  explicit; and as soon as that's received by the

15  receiver, the receiver window shifts.  That operation

16  occurs over and over again, thousands of times a minute.

17          The receiver knows where its window is

18  and it knows it doesn't expect to receive packets 1

19  through 4.  And because it's coordinated with the

20  transmitter by the rules of the standard, it also has

21  computed that packets 1, 2, 3 and 4 have been discarded

22  by the transmitter.

23          The process then continues, goes on and

24  on and on, and basically, as I said during the evidence,

25  these two windows stream down the line like -- like drag

1  racing against each other; and they're always neck and
2  neck, and that's how this coordination occurs.
3            And that's why, when the receiver is
4  calculating and computing what packets are behind its
5  window, it's doing that so it knows what not to expect
6  from the transmitter anymore and what the transmitter
7  has discarded.
8            Let's turn to some of the proof of that.
9  This is a rule in the standard.  It's in Plaintiffs'
10 Exhibit 286, which is available to you during your
11 deliberations at 9.10.7.7.
12           And that says:  The originator may
13 transmit an MPDU, a packet, with a sequence number
14 beyond the current transmission window -- that's past
15 the window -- in which case the originator's
16 transmission window (and the recipient's window) will be
17 moved forward.
18           We also presented proof that the
19 transmitters do discard packets that are behind their
20 windows.  This proof is from a datasheet for an Intel
21 chip, and it says that MPDUs, or again packets, which
22 proceed BlockAck window start; in other words, those
23 would be in the animation, the 1, 2, 3, 4 packets that
24 are in front of the window, are released by the driver.
25 This situation occurs when block acknowledgement frame

1  moves, the windows start.

2           In addition, Dr. Gibson testified about

3  that and he admitted this happens.

4           Question:  And finally, Dr. Gibson, am I

5  correct that if you abide by the standard, the

6  transmitter will not transmit any packets that are

7  behind its current transmission window?

8           Answer:  The transmission window at that

9  transmitter, that's correct.

10           He went on to say:  They're released,

11 aren't they?

12           Yes.

13           Okay.  Same is true of the other

14 Defendants' products as well, right?

15           As I understand it.

16           And the Defendants then argued in

17 response, well, this isn't computing.

18           And you remember -- may remember me going

19 back and forth with Dr. Gibson and asking him, you know,

20 Dr. Gibson, we've seen all these rules and we've seen

21 the logical math, and we've seen the source code and the

22 programs that are in there, and we know these -- these

23 have chips in them that are running computer processes.

24 That's computing, isn't it?

25           And you remember he hemmed and hawed

1   around a little bit, and he didn't want to admit it at

2   first; and then he finally said:  You know, I -- I --

3   no, I'm not going to tell you that's not computing.

4                   It is computing.  And when the receiver

5   computes what is behind its window, it is necessarily

6   also computing what's behind the transmitter window and

7   discarded because they move in a coordinated fashion.

8   And that's the whole point of the invention.

9                   Let's go to the '625 patent next, and

10  this is the patent that deals with a command to receive,

11  and specifically a command to receive a packet that is

12  out of sequence.

13                  And the theme of this patent is and the

14  idea of it is that programming the receivers,

15  programming the devices with commands can make the

16  packets act as commands to receive out of sequence.  And

17  let's talk about how that works and how this solves the

18  problem of deadlock.

19                  We talked a lot in the case about the old

20  systems, and the old systems would not receive out of

21  sequence packets.  So what would happen is, if a

22  transmitter were to decide to stop transmitting a packet

23  and then try to move on, if the receiver didn't know,

24  the receiver would just let them pile up and -- and

25  we've seen all the deadlock slides that the Defendants

1  provided.  That was the deadlock problem.

2              The '625 patent came along and it put

3  logic, it put rules in the receiver through programming.

4  And what the logic and rules did is basically define a

5  packet as a command, and here's how it worked.

6              You can see in the -- in the bubble,

7  which is what the receiver is supposedly running in its

8  brain or thinking about, some of the program commands;

9  and there's a lot of disclosure in the patent about

10  different algorithms for doing it.

11              And what happens is, that causes this

12  packet to now be defined as a command.  And the packet

13  has a little bit in there, a 1, and it can either be a 1

14  or a 0, depending on if it's in this trip going to be

15  the command to receive or if it's not.

16              When that packet is received by the

17  receiver, that triggers the program logic; and the

18  program logic in there, which has defined this packet as

19  the command, takes over and decides how to treat the

20  packet, whether to receive it or not.  That's what

21  defines the command.

22              Now, this is the preferred embodiment of

23  the patent.  And you guys have seen the video and you

24  understand that in the patent, a patent inventor writes

25  about his best way of doing something, his preferred way

1  that -- that the way -- the example.

2              But then the claims come out and the

3  claims, of course, are granted by the Patent Office and

4  they can be broader -- broader than the actual preferred

5  embodiment.

6              And in this case, the claims of the '625

7  require a command but they don't require that it be

8  actually in an enforcement bit that's open to the

9  implementer of the system.

10             The way the Defendants in this case have

11 implemented the system through the standard is to

12 program the receivers to define packets as commands.

13             And that's basically the green light they

14 keep talking about, that's how that programming does it.

15             What they do is, they put programming in

16 there, and we saw the programming.  We saw the

17 programming in the form of the standard.  We've also

18 seen technical documents, we've seen code.  The packets

19 now of the Defendants are received as a command anytime

20 they arrive out of sequence in the window or above it.

21             And that's how the Defendants have used

22 the '625 patent to avoid this deadlock problem.

23             Now, the Defendants have suggested that,

24 no, we don't really infringe because we don't need a

25 command.  They've told you that our light is always

1  green.  We don't have to have a command because anything

2  that wants to come in, it can just come in and

3  there's -- there's no brains or logic or anything that

4  has to deal with it.  And that's not right.  And I'm

5  going to show you why it's not right.

6              You will recall that Defendants' expert,

7  Dr. Gibson, had a slide and he showed you the slide, and

8  I've got it here reprinted from the Defendants'

9  slide show on the left of the screen.  And he was

10 showing you 9.10.7.6.2 of the standard.

11             What he told you was there are two cases.

12 The first case is when the packet comes in and it's

13 within the window, that's case one; and he says, well,

14 that will be received.

15             The second case is when a packet comes in

16 and it's above the window.  And he told you, well, that

17 will be received too and the window will shift, and

18 that's that green light.

19             But what they didn't tell you about was

20 the third condition that is also in the standard; and

21 the third condition is if the packet shows up at the

22 receiver and it's below the window, it won't be

23 received.  It will be discarded.  That's the red light.

24             So the light is not always green.

25             What's the significance of that to your

1    decision?  The significance is that the Defendants'

2    products aren't just a wide-open door.  Wrong.  The

3    Defendants' products use the '625 patent.  They encode

4    in the receiver instructions to define a packet as a

5    command.

6                  And the fact that they can distinguish

7    between receiving packets above and below the window,

8    proves that those commands are in their product; and

9    that those commands are responsible for this operation.

10                 There's also proof, in addition to the

11   standard, in the product documentation.

12                 This is Plaintiff's Exhibit 443.  It's a

13   technical document on the Intel Kedron processor.  And

14   this document says if a sequence number of a packet is

15   before WinStart, that's the start of the window, this is

16   an old or duplicated MPDU packet which is dropped by the

17   driver.  That's the red light.

18                 Ladies and Gentleman, the Defendants have

19   solved the deadlock problem using Ericsson's patented

20   invention, and the '625 patent is infringed.

21                 Let's turn next to the '223 patent.  This

22   patent dealt with the issue of timing out patents by

23   starting a timer.  And in particular, there are two

24   issues that have arisen in this patent.  One is the

25   issue of segmenting and the other is whether the timer

1 starts at the data link layer.  And let me deal with

2 them both.

3            Let's first talk about segmenting.  And

4 this is another example of where the legal definition of

5 the claim and the way it's written is dispositive of the

6 issue.

7            The claim states that a service data

8 unit, it's called an SDU, needs to be put into a

9 protocol data unit, a PDU.  Okay.  So SDU into PDU,

10 that's what the claim says.

11           And a PDU is -- is like a container.  So

12 what you're basically doing is you're taking one of

13 these packets and putting it into another packet.  All

14 right?  Sort of like putting a box inside of a box.

15           The claim says segmenting into at least

16 one.  And you heard that the term "segmenting" means to

17 create a PDU segment.

18           The patent provides at least one.  And

19 why it does that is, if the SDU to be put inside of the

20 PDU is too big, you might have to split it up, 1, 2, 3,

21 multiple times; whereas, maybe Defendants suggested 38

22 times.

23           However, to cover the case in the claims

24 of the patent where the SDU completely fits into the

25 PDU, a one-to-one, the inventors put in the words "into

1  at least one."  And that is the legal definition of the

2  Ericsson patent and is the definition you should be

3  using in your deliberations.

4            Now, there was a second issue that arose

5  in this case and it reaches to when did -- when does the

6  timer start?  And the patent requires that a timer start

7  at the data link layer.  You may recall I handed the

8  source code to Dr. Gibson and I asked him to look at it

9  and circle where the MAC header got put on, because the

10  MAC, media access control, that's the beginning of the

11  data link layer.

12            And he went through the source code and

13  you saw me write on the board -- write on the ELMO when

14  he did it, and he found the MAC header.  And then he

15  also, under his own volition -- I didn't even ask him --

16  went down later, about three or four pages, and circled

17  the logical link control header, after the MAC header.

18            Now, the problem with that is, from the

19  Defendants' standpoint, it contradicts their argument,

20  because their argument was that the logical link layer

21  is actually above the MAC layer; and so the timer

22  doesn't really start when the packet hits the data

23  layer.

24            But this source code, which by the way

25  Dr. Nettles agrees with in terms of how it was circled,

1  is at odds with the Defendants' assertion.

2          So what they did is they -- they brought

3  a witness from Intel, who's an employee who works in the

4  legal department.  He's not an attorney, but all his

5  work is done at the direction of attorneys.

6          And he argued that there's another

7  program out there, and it -- it sits above all this as

8  well.  And that's really the logical link layer.  It's a

9  Microsoft program, but he never showed you the program.

10          In fact, he testified he never even

11  reviewed that program.  And, moreover, he had taken a

12  contrary position in his deposition.

13          So when you're analyzing -- and it's a

14  tough issue to get your heads around -- is that MAC

15  layer first or the logical link layer first?  I would

16  suggest that the most reliable source of proof is PX

17  208-D, which is the source code that actually sets out

18  the sequence of events.

19          Let me turn finally to the '568 patent.

20  This is the service type identifier patent.  And the

21  theme of this patent is that the accused devices can

22  and, in fact, do infringe it.

23          Critical in this patent is the fact that

24  every single packet -- and this is the packet format --

25  again, has the same set, and there is no dispute over

1  this.  This is the standard; it's mandated.  You can't

2  be interoperable without it; you have to do it.

3            This is a packet, this is the payload,

4  the information, and then there's a control field,

5  quality of service control, and then it necks down into

6  eight options, 0 through 7.  And those are what are

7  called the TID values, we've called them the TIDs

8  throughout the case, and those correlate to voice and

9  video as well as others.

10           And so the question is, is this

11 infringement and how often is it used?

12           Now, the Defendants have suggested that

13 not everybody uses this; that some people, some

14 applications choose to send information that's video,

15 but they just -- they don't want to use this and they

16 send it as background, and, therefore, they don't

17 infringe.

18           But that's not the law.  Because each one

19 of these devices can, and as I will show you, does

20 support this and send this out.

21           So let's first talk about the law.  I've

22 copied Judge Davis's instruction over into a slide and

23 it's very informative about how the law deals with this

24 apparatus.

25           An accused system or product directly

1 infringes a claim if it is reasonably capable of

2 satisfying the claim elements even though it may be

3 capable -- also may be capable of non-infringing modes

4 of operation.

5          That was just read to you an hour ago.

6          If a claim requires only that the system

7 or product have the capacity to perform a function, one

8 who makes a system or product with that capability

9 without the patent owner's authority is a direct

10 infringer -- and here's the key part -- even though the

11 maker's customers do not use the capacity.

12          So what does that tell you?  It tells

13 you, number one, a device that is capable of meeting the

14 functional elements or the modes of operation described

15 in the claim, it's capable of doing it, it infringes.

16          And it tells you, secondly, that it

17 infringes regardless of whether the customers, the

18 people who use it, actually use the capacity.  That's

19 what it tells you.

20          So let's go into the evidence.

21          Dr. Nettles provided you testimony about

22 a number of products that actually do use this

23 invention; Ekiga, Skype, CSipSimple.  And these run on

24 operating systems such as Android or Linux or Windows

25 with the QWave functionality.

1          And these are programs that are actually

2     taking advantage of this.  And, in fact, he told you

3     that they do use the TID, they use it properly for voice

4     and video, and it gets transmitted out by the

5     Defendants' devices.

6          What that tells you is not only is it

7     being used; but all the devices are capable, as the

8     Court has instructed you, of doing this.

9          You also saw that this is the ordinary

10    and recommended use of these TID values.  This is from

11    the standard, and you've seen this a number of times.

12         And the Defendants are going to tell you

13    and have told you:  Oh, well, this is just informative.

14    This doesn't really mean anything.

15         Well, if it's informative, who are they

16    informing?  Why bother informing someone of something if

17    it doesn't mean anything?

18         It does mean something.  It means that if

19    you have video, you should use 5 or 4 as your access

20    category.  If you have voice, you should use 7 or 6.

21    And it's not just the standard telling people that.

22    It's Intel as well.

23         PX 514 is an Intel developer's guide for

24    software developers.  This is how they make

25    recommendations to people who are software developers to

1  use their wireless modules.

2            What does Intel tell people?  They tell,

3  as you -- as you follow the steps from this manual,

4  you'll be given the information you need to write and

5  verify the operation of your device driver.  And that's

6  at Page 9.

7            If you then turn into the details at Page

8  65, there it is, the quality of service mappings.  This

9  is how they advise their users or developers for drivers

10 of wireless modules to implement this by using video and

11 voice.

12           But in addition, it's not just Dr.

13 Nettles who's verified this capability, it's also

14 Defendants' expert.

15           You may recall me asking him about his

16 tests, and he admitted that he did do a test running

17 Ekiga, a video conferencing program, in which he found

18 that this TID was being supported and used.

19           Question:  What you wrote here is for

20 Ekiga, a video call produced packets with a TID subfield

21 of 5 --

22           5 is video.

23           -- which corresponds to the video access

24 category, right?

25           That's correct.

```
 1                  I went on to ask him:  Ekiga is using
 2   this invention, isn't it?
 3                  In this call, Ekiga assigned a TID of 5.
 4                  It's using the invention, right?
 5                  Ekiga is using the invention, you said?
 6                  Yes.  That's what you tested, right?
 7                  Yes.
 8                  Now the Defendants want to parse that and
 9   say, well, Dr. Gibson didn't really admit infringement
10   there.  But that's really not the point because while he
11   was doing these -- giving this testimony, he was looking
12   at his report; and his report, which I put up on the
13   screen, showed that indeed he had captured packets using
14   Ekiga that had a video control of 5, which is this TID
15   value.
16                  So at the end of the day, Ladies and
17   Gentleman, we don't have just proof that the accused
18   devices are merely capable -- although that's enough to
19   infringe -- we have proof that they're actually doing
20   this.
21                  Now, Ladies and Gentleman, if you agree
22   with Ericsson's position in this case regarding
23   infringement, when you get to the verdict form, I would
24   respectfully request that you answer yes to the
25   questions regarding all claims of the patents for all
```

1  the Defendants.

2           I thank you for your attention and again

3  for your consideration in this case.  I'd like to now

4  turn it back over to Mr. Cawley to talk about the other

5  issues that will be before you.

6           MR. CAWLEY:  The second question that

7  Judge Davis will ask you to answer in the verdict is,

8  are two of the patents invalid.

9           Now, in considering the evidence about

10  the validity of the patent, it's critically important

11  that you keep in mind Judge Davis's instructions about

12  who bears the burden of proving that the patent is

13  invalid and how high that burden is.  It's so important,

14  that he's actually told you about it twice.

15           On the first day of the trial, he told

16  you that an issued patent is accorded a presumption of

17  validity based on the presumption that the USPTO acted

18  correctly in issuing the patent.

19           Then again today, he told you -- and you

20  can read for yourselves if you -- if you open the jury

21  form or the instructions back in the jury room -- the

22  Defendants must prove that a patent claim is invalid by

23  clear and convincing evidence, because an issued patent

24  is accorded a presumption of validity.

25           Now, what evidence have you heard that

1  the Defendants' claim meets this extraordinarily high

2  burden of clear and convincing evidence?

3                It is one thing and one thing only.

4  Defendants' Exhibit 120 has variously been called the

5  Petras submission to ETSI or sometimes the Aachen

6  reference.  It was a student thesis that was put in this

7  form of a submission to the ETSI standards setting body.

8                This is the only thing that the

9  Defendants claim meet their burden of proof that the two

10 claims -- three claims of the two patents are invalid.

11               In order for this to prove that the

12 patents are invalid, Judge Davis has told you it has to

13 do two things.

14               First, this reference, Defendants'

15 Exhibit 120, must be enabling.  Judge Davis explained to

16 you that means that a person of skill in the art,

17 someone like the engineers you've heard testify in this

18 case, must be able to read this paper, this paper alone,

19 and build the system.  It's not good enough that this

20 paper just talks about a piece of it and that the

21 engineers kind of know the rest of it on their own.  No.

22 It all has to be here.

23               The second requirement is, it must

24 specifically say everything that is in the claim of the

25 patent must be in this paper.  If one thing in the claim

1   is missing, this paper does not invalidate the patent.

2               All of this concept is called

3   anticipation.  That's a word that we use in ordinary

4   language when we say, well, I anticipated that question,

5   oh, I anticipated this might happen.  In ordinary life,

6   that means you thought of it ahead of time.

7               But Judge Davis has told you it has a

8   special meaning in the patent law.  It's not good enough

9   to think of it, you have to write it in Defendants'

10  Exhibit 120.

11              First of all, have the Defendants showed

12  you that this is enabling?  They didn't offer you one

13  bit of evidence from any engineer or any expert that

14  they could pick up this reference and learn how to build

15  a system.  The only evidence you heard was from Dr.

16  Nettles who said you couldn't.

17              Claim 1 has this language:  Commanding a

18  receiver in the data network to receive a packet.

19              Here you saw this figure which you can

20  find in Defendants' Exhibit 120.  And this piece at the

21  end that says discard, that's -- you heard the

22  evidence -- that's a message from the transmitter to the

23  receiver saying stop asking me for this transmission No.

24  2.  I don't have it anymore.  Discard it.

25              But, Ladies and Gentleman, what they have

1    to show is present here is not a message to discard but

2    a command to receive, and it's not there.  It's not in

3    that transmission.  And if you care to read 180 -- 120,

4    you won't find it anywhere.

5              In fact, Dr. Gibson said that an alleged

6    message that informs a receiver that the transmitter has

7    discarded packets, does not command the receiver to

8    receive any packets.  Because that's missing from

9    Exhibit 120, Claim 1 of the '625 patent is not invalid.

10             Next we go to the '435 patent, Claim 1

11   again.  This requires removing entries from a list.

12             Now, Dr. Heegard on his testimony was

13   asked about this list.  Is there a list from which

14   entries are removed?  And he did point to a list that is

15   in Exhibit 120.  Here's a picture of it.  It's Figure

16   17.

17             The problem, though, is, he didn't go on

18   to say that this document says anything is ever removed

19   from the list.  And that's what the claim requires.

20             Ladies and Gentlemen, I urge you if you

21   have any question about that, find Defendants' Exhibit

22   120 when you go back to the jury room, find this Figure

23   17 and read the document, what it says about it, and you

24   won't find any reference to removing anything from this

25   list as the claim requires.  In fact, Dr. Nettles

1 explained if you remove something from the list, it

2 won't work anymore.

3             Ladies and Gentleman, if you find that

4 the Defendants have failed to prove by clear and

5 convincing evidence that these claims of the Ericsson

6 patents are invalid, then you should answer no.

7             Now, the final question you're going to

8 be asked about is how much is a reasonable royalty?

9             You've heard that some of the major

10 companies in technology in the United States and around

11 the world have agreed to license Ericsson's Wi-Fi

12 patents.

13             And at this point, Your Honor, I have to

14 say I'm going to go into some confidential information,

15 so I'm going to have to ask the Court to clear the

16 courtroom.

17             THE COURT:  All right.  At this time if

18 you're not covered by the protective order that's been

19 entered in this case -- you would know if you have -- if

20 you're not covered or you don't know, then you need to

21 leave the courtroom at this time.

22             (Courtroom sealed.)

23             (This is Sealed Portion No. 8 and filed

24             under separate cover.)

25             (Courtroom unsealed.)

1          MR. VAN NEST:  Good morning, Ladies and

2   Gentleman.

3          And I'm very proud to be here speaking to

4   you this morning on behalf of all of the Defendants; the

5   laptop makers, the router makers, the chip makers.

6          I know you've heard a lot of testimony

7   from the chip makers because they make chips, but

8   everyone has been here together, and it's been a real

9   privilege for me to represent the whole group throughout

10  our trial.

11         I want to begin by thanking you for your

12  service as jurors.  You have been a model jury, on time

13  every morning, taking a lot of notes, asking a lot of

14  questions that have been good questions; and we are

15  very, very grateful for that because, as I said a week

16  ago, this is a very important case for our clients and

17  for Wi-Fi in general.

18         And now, as Judge Davis indicated, I have

19  about an hour to sum up the evidence, and I want to

20  really focus hard on what the evidence presented in the

21  trial shows.  Because I think it shows the following

22  things.

23         One, Ericsson's technology had absolutely

24  nothing to do with the success of Wi-Fi.  They're here

25  long after the fact taking credit for the work of

 1  others.

 2              You know from having heard Mr. Kitchin

 3  and Mr. McFarland and Jim Johnson, how Wi-Fi came about,

 4  it was the chip makers coming together with their own

 5  technology, their own ideas, their own engineers; and

 6  they are the ones that first created the standard,

 7  802.11, and then they built the products.

 8              And they did it with their own

 9  technology.  There was no contribution of any technology

10  by Ericsson to the standard, and that's now been

11  conceded, absolutely conceded.

12              And we've proved, we've proved, with the

13  evidence both in our case and cross-examining their

14  case, that there has been no infringement of any one of

15  these five Ericsson patents.  I'm going to go through

16  those in great detail in just a few minutes.

17              There's been no infringement because our

18  products are fundamentally different from what's in

19  these patents.  As I've been saying, Wi-Fi is all about

20  being simple and fast and affordable for everybody.

21              Their technology is complex, complicated,

22  has all these extra steps, like commands and computing

23  and extra feedback messages and all this stuff that

24  Wi-Fi doesn't need and is not using.

25              And we showed that just the same way I

1   promised we would in the opening.  We brought the

2   engineers here that built the products; Mr. McFarland,

3   Mr. Kitchin, they're the ones that built them.  They

4   know them.  They explained why they work, how they work,

5   and why they're different.

6                  And in addition to them, just to make

7   sure we had everything, we brought the source code here,

8   product documents, product testing, and we presented two

9   experts who are real Wi-Fi experts.

10                 Heegard -- Dr. Heegard was one of the

11  first people to invent an 802.11 chip and get it to

12  work, and Jerry Gibson has been teaching in this area

13  for many, many, many years.  That's what we brought to

14  prove every element of our case.

15                 Now, what did Ericsson prove?  They have

16  the burden.  They're the ones that have to prove

17  infringement, but they came in here with a very nice

18  story but no real evidence.

19                 Their story was:  We've got these

20  patents, folks, that are standard essential.  They're

21  essential for the standard.  You folks are practicing

22  the standard.  Therefore, you owe us money, and there's

23  a going rate.  It's 50 cents.

24                 It turns out none of that is true.  None

25  of it is true.  We presented our engineers and our

1  experts first to demonstrate that these products are
2  different.
3            What did they bring to the table?  I
4  heard Mr. Stevenson mention 17 inventors; 17.  Not a
5  single one showed up here to testify about what he had
6  invented, how it worked, or why it was even relevant to
7  Wi-Fi.  Not one.
8            We heard video snippets from four or five
9  inventors; but nobody came here to answer questions --
10 like Kitchin, McFarland, or Johnson did -- from you or
11 me or anybody else.
12            And with respect to infringement, what
13 did they present?  They presented Dr. Nettles.
14            Now, Dr. Nettles, I will submit, is
15 simply not qualified to talk about IEEE products and the
16 IEEE 802.11 standard, and he showed that over and over
17 in his testimony.
18            He doesn't have experience with the IEEE.
19 He's never worked on any IEEE 802.11n products.  He
20 repeatedly changed his testimony.  He changed his
21 opinions on important issues, sometimes in the middle of
22 the trial.  We would be talking about this MAC layer and
23 where it is.
24            And the only time he actually tried to
25 show you source code, he got it wrong.  He got the

1  source code in the MAC layer wrong, and we had to ask
2  Mr. Kitchin to come in and clear that up.
3           And he went so far as to join the IEEE
4  three weeks ago just to pump up his credentials for this
5  trial.  That is not the kind of reliable testimony that
6  you can rest anything on.
7           Their damage story is just as bad.
8  Nobody has filed these patents essential.  The IEEE
9  didn't.  The industry hasn't.  Nobody has done that.
10 They have a license with one laptop maker in the world.
11 One laptop maker in the world.
12          Nobody is paying 50 cents to Ericsson for
13 anything.  They've got a couple of lump-sum licenses
14 from people who bought all their patents.  That part of
15 their case is no better.
16          So let's start off with our key points of
17 evidence.  And these haven't changed since we started.
18 These are the same points I outlined in the opening.
19          One, the standard comes from the Wi-Fi
20 chip makers.  They did it, not Ericsson.
21          Two, the products are different.  That's
22 what we're going to be spending most of our morning on.
23          And, three, Ericsson is overreaching.  On
24 two of the patents, they weren't first.  Dr. Heegard
25 proved that in spades yesterday.

1          So let me get into just a little
2   background, and then we'll go to the claims and the
3   products, and we'll review the evidence on each one.
4          Let's go to the next slide.
5          So we proved, I think to a tee, that the
6   source of the 802.11 standard was the chip makers.  It
7   was Mr. Kitchin.  He's showing one of his proposal,
8   DX 198.
9          By the way, just a heads up, in the jury
10  room, you will have the exhibits but not our slides, so
11  I'm going to be putting up some boards with exhibit
12  numbers on them that you can copy down, because I'm very
13  interested in you having all of the evidence.
14         These are two proposals testified to by
15  Kitchin and McFarland that went into the standard.
16         And you saw from Mr. Kitchin in the next
17  slide that one of the things that he proposed, actually
18  came out of an Intel patent.  DX 479 is an Intel patent.
19  That's one of the things that went into the standard.
20         You can see the pictures on the left and
21  the right.  This technology came from Intel, Broadcom,
22  Atheros.  They all put it together.
23         And I don't think Ericsson really
24  disputes that.  This next slide comes right from an
25  Ericsson document.  The WLAN patents are mainly held by

1  the chipset suppliers.  That's us.  That's Intel,

2  Broadcom, Atheros.  That's Ericsson.

3               Now, you heard -- I think we had some

4  questions.  Well, who's paying who for Wi-Fi?

5               You heard from Mr. Perryman that all the

6  chip makers, they're cross-licensing each other.

7  They're sharing their technology.  All the folks that

8  participated are sharing their technology and

9  cross-licensing and making balancing payments and the

10 like.

11              And you also heard from Bone that there

12 are five or six other licenses that are being paid by

13 the chip makers.  None of them are at 50 cents.

14              But these people, because they have so

15 much technology, respect intellectual property rights.

16              If they're using someone's technology,

17 they pay, or they have a cross-license allowing them to

18 use each other's technology.

19              If they're not using and don't need the

20 technology, they don't pay.  And that's why we're here

21 today.

22              Let's look at our next slide.

23              This next point I've made over and

24 over -- and I don't think it's in dispute -- the whole

25 point of Wi-Fi was to be simple, fast, and affordable.

1  And when we get into the products, we'll see that we

2  made a receiver that will take anything in the window,

3  out the window, in any order.  That's one of the things

4  that makes this so simple.

5           Now, what did Ericsson contribute?  You

6  heard testimony from Mr. Iwerback that we presented

7  yesterday when they submitted their one contribution,

8  the engineers flatly rejected it as too complex, too

9  complicated, and not right for Wi-Fi.

10          That's what we've been saying.  This

11  technology is too complex and too complicated.  The

12  standard folks flatly turned it down.

13          And the next slide shows something -- I

14  don't have a picture, because it's Mr. Brismark, and

15  he's sitting right here.  I don't want to be impolite

16  and throw a picture up there.

17          But what Mr. Brismark said under

18  examination was:  There isn't a single contribution,

19  directly or indirectly, used in 802.11 from Ericsson.

20          After all you heard about what a great

21  company they are -- and no one's disputing that -- they

22  didn't contribute anything to Wi-Fi, and yet they're

23  here now wanting credit and a bunch of money.

24          Can I have the next slide, please?

25          And I think we know why.  This was an

1   exhibit discussed with Mr. Brismark.  It shows what

2   happened.  They gave up on Wi-Fi.  They tried to build

3   an 802.11a device early on, one of the standard devices.

4             They gave up.  Not enough profit in

5   Wi-Fi.  Not enough profit.  They closed it down, shut it

6   down, went away.

7             If these were such great patents and such

8   great technology, boom, why wouldn't we have an Ericsson

9   Wi-Fi chip?  We don't.  No one is using these patents to

10   build 802.11 products.  Nobody.

11            Okay.  Your job, as you know, is to

12   compare the claims to the patents -- to the products,

13   and that's what we're going to do now.

14            I have a couple of jury instructions.  I

15   just want to remind you.  They're all important.  This

16   is one where Ericsson has the burden of proof.  They

17   have to prove that there's infringement.  If it's a tie,

18   it goes to the Defendants.

19            That's the way our patent system works.

20   If it's too confusing or they haven't presented enough

21   evidence or just can't come to it, verdict for

22   Defendants.

23            Now, I think, in this case, that's not

24   going to happen because the evidence on our side is

25   absolutely overwhelming of non-infringement on every one

1  of these patents.

2              The next slide is simply what I've been

3  saying with the witnesses.  Each and every element of

4  the claim has to be there.  Not -- not enough to have

5  three out of four.  Every element of the claim has to be

6  in the product.

7              You remember the football that we showed

8  in the opening and -- and the soccer ball?  If I have a

9  soccer patent and my elements of my claim are leather

10 stitched together, filled with air, and round, your

11 football doesn't infringe it.

12             It is made of leather; it's stitched

13 together; it's filled with air; but it's oblong.  Every

14 limitation must be present.

15             So let's get started on the '568, which

16 is the so-called service identifier patent.

17             Let me see if I can get that to stand up

18 there.

19             And this -- this is the one that requires

20 there to be a service identifier, which identifies a

21 type of payload information.  That's the key to this

22 invention.

23             And that service type identifier has to,

24 as the Court has defined, identify the type of

25 information of what's in the payload.  What's in the

1  payload?  Is this a milk truck?  Is it a bread truck?

2  What kind of -- what's in the payload?  It's got to

3  identify that.

4              And the examples given by Judge Davis are

5  video, voice, data -- video, voice, data, and

6  multimedia.  Those are the examples.

7              Now, Dr. Nettles came in here and said:

8  Aha, Defendants use a traffic identifier, traffic

9  identifier.  That traffic identifier, which the products

10  do use, he says that is the service type identifier.

11  That's it.

12             Why is that wrong?  That's wrong because

13  you know, and it's undisputed, that the traffic

14  identifier in the Defendants' products never identifies

15  the type of data conveyed in the payload.  It only

16  establishes the priority of the packets, what lane do

17  they go in.  It never identifies what's in the payload.

18             Let me get up my first -- other slide.

19             Now, I mentioned exhibits are important,

20  and witnesses are important.  I have one board for each

21  patent.  The boards you don't get, but the exhibits you

22  do.  We're going to be talking about these exhibits and

23  these witnesses on '568, just to keep a little roadmap

24  of what we're going to talk about.

25             So the key here to this patent and the

1  key to non-infringement is, they haven't proven that the
2  traffic identifier identifies the type of information in
3  the payload.
4              And you know what?  We proved that it
5  doesn't, because Dr. Nettles admitted it, and you heard
6  it from Kitchin, McFarland, Gibson.  So every witness in
7  the case is on the same page here.
8              Could I go to the next slide, please?
9              You remember this drawing from
10 Mr. Kitchin, and the drawing shows the lanes of traffic
11 in a transmitter in an 802.11.
12             And you remember Mr. Kitchin explaining
13 that if you're a 6 or a 7, you're in the fast lane.  If
14 you're in the 0 or 1, you're in the slower lane.  Those
15 values are the traffic identifiers, those numbers.  It's
16 a range of numbers from 0 to 7.
17             The key is, those numbers in the receiver
18 and the transmitter never identify.  They don't identify
19 the type of information in the payload in the product.
20             Let's look at the next slide.
21             This is an admission from Dr. Nettles,
22 and it's critical.  This is from their witness.  This is
23 their witness saying:  TID values determine how the data
24 should be treated.  They don't necessarily reflect the
25 type of data in the payload.

1          He agrees.  That's what's required.  It's

2  got to identify the type of information.

3          Next one.

4          Here's another admission from

5  Dr. Nettles.  Critical.  Someone running voice data,

6  Ekiga let's say, or Skype, they can assign any number

7  they want, 7, 5, 1, 2, and the device will process their

8  packet.

9          And as you told me last week pointblank,

10  he said:  That's why an 802.11 system cannot determine

11  from the TID value whether the data in the payload is

12  video, voice, Internet, or multimedia.

13          Because the TID value, the traffic

14  identifier, it simply routes the traffic.  That's what

15  Mr. Kitchin said.  That's what Mr. McFarland said.

16          Let's look at the next -- there's

17  Mr. Kitchin.  This is a question from one of you.  Can

18  other types of data, other than voice, other than video,

19  be in Category 6?

20          Absolutely.  As I said before, the

21  application software can decide to mark the packets

22  however it wants.  So direct the packets into whatever

23  queue it wants.

24          So, again, this is a question one of you

25  asked.  And Kitchin said:  There is no fixed

1  relationship between these TID values and different

2  types of data, voice, video.  It's up to the person

3  building the application as to what they want to use.

4              And the device is not capable ever of

5  identifying what's in the packet, because as Kitchin and

6  McFarland said, they don't need to.

7              Let's look at the next slide.

8              Here's McFarland.  In Atheros's chips,

9  does the TID subvalue field tell you the data type

10 that's in the packet?

11             It does not.  Any type of content can be

12 placed at any priority level.  There is no fixed

13 relationship.

14             Now, let's look at the slide they have

15 talked about, which is in the standards, 9-1.  It shows

16 the TID values there in the second column under user

17 priority, and they are associated with an access

18 category, AC, in the fourth Column; but there is no

19 fixed relationship between those numbers and either

20 video, voice, or multimedia.

21             And we now have proof of that.

22 Dr. Nettles admitted yesterday, these categories are

23 suggestive.

24             Now, it's not enough to infringe to have

25 someone like Ekiga deciding they want all their data

1  going at Category 5 or putting all their voice of

2  Category 7.  That's not the invention.

3           The invention is that in the product, in

4  the device, in the chip, the Wi-Fi chip, there has to be

5  a service type identifier which identifies what's in

6  that packet.

7           So no one is infringing when they simply

8  send data through a chip however they've labeled it.

9  The chip itself has to have a service type identifier

10  which identifies to the chip what is in the packet.  And

11  that doesn't happen.

12           It -- it -- now, the other proof of it

13  is, yesterday, again with Dr. Nettles, he tested Ekiga

14  himself and admitted on the stand yesterday:  I was

15  running video.  One time I got a TID value of 0; another

16  time I got a 5.

17           That proves there's no fixed

18  relationship.  He was running the same type of packet

19  through, and yet he got different TID values, which

20  demonstrates that in an 802.11 receiver, there is no

21  service type identifier, because the TID value, which is

22  all he's pointing to, does not identify what's in the

23  packet.  It just identifies how the packet should be

24  treated and where it goes.

25           Let's talk about the '215.  I think we

1  have some very critical admissions from Dr. Nettles on

2  this one as well.

3          The point of the '215 is that it requires

4  in the product -- it requires that you be able to

5  generate a message type from among different message

6  types.  That's the whole point of this.

7          Remember we talked about acknowledgements

8  going back from the receiver to the transmitter,

9  acknowledgements from one side to the other.  We looked

10  at a block acknowledgement.  And early on, we looked at

11  a very simple packet acknowledgement.

12          This patent requires, as one of the steps

13  in the method, that you generate a feedback message from

14  among a number of different messages.

15          And in the 802.11n products, again, the

16  facts here are undisputed, because Nettles admitted

17  this, too, there's only one type of feedback message

18  available.  The system is not capable of sending

19  anything other than a compressed BlockAck.  And that is

20  undisputed, as we'll see in just a moment.

21          Let me put my board up.

22          I'm going to review the testimony of all

23  these witnesses.  Got the patent and the product

24  testing.  So let's look at our next slide.  This is what

25  Dr. Nettles says is required.

1          The patent requires that you have the

2   capability to generate multiple types of acknowledgement

3   messages.

4          Yes, sir.  That's what it is.

5          And the inventor said the same thing.

6          Let's go to the next slide.

7          The -- oh, excuse me.  This is -- this is

8   another admission from Dr. Nettles.

9          What must happen in order for this claim

10  to be infringed is that after a packet is received by

11  the receiver, the receiver has to generate a message

12  field which identifies a type from a number of different

13  message types, right?

14          I think we had a jury question:  Does it

15  have to be in the product?

16          Yes, it has to be in the product.

17          I walked through this with Dr. Nettles

18  yesterday.  There has to be the sending of data,

19  receiving of data, and then the response is generated

20  after the data's received.  It's got to be in the

21  product, and that's what he's admitting.

22          Well, as you now know, the Defendants'

23  products do not allow this.

24          Here's the inventor, Erik Schon, whose

25  video was played.  He says:  The key to this invention

1  is giving you a choice of using a bitmap or a list or a

2  combination.

3           That's the whole point.  He's talking

4  about the different message types.  You get a choice of

5  different message types.  He's the inventor.  He ought

6  to know.

7           Now, all the evidence on this from

8  Dr. Nettles, Dr. Gibson, Mr. McFarland, and Mr. Kitchin

9  is all the same and is not a fact issue really to

10  resolve at all.  They all admit, in these devices,

11  there's only one kind of message they're even capable of

12  sending.

13           That chart that Mr. -- Mr. Stevenson

14  showed you, that's a chart from the standard.  I mean,

15  the standard makes other types of messages available.

16           Maybe some day in the future people will

17  use them.  As of now, nobody is using any other than the

18  compressed BlockAck, as every witness in the case has

19  admitted.

20           Here is the admission from Dr. Nettles,

21  clear as a bell.

22           The receiver in the products you're

23  accusing, it doesn't have a choice from among a number

24  of different message types.  It must send the one it

25  has, right?

1                    Yes.  It will always send a compressed

2   BlockAck, yes, sir.

3                    That's important.  That's their witness.

4   Not mine.  That's out of their evidence.  On

5   cross-examination, he's admitted that this device is not

6   capable of doing it.

7                    Next slide, please.

8                    And remember he said:  I've tested all

9   these.  And Gibson -- Dr. Gibson tested it.  They both

10  tested them.

11                   Dr. Gibson said he tested -- he tested

12  400,000 packets he sent through it.  Dr. Nettles

13  confirmed, through all his testing, his examinations,

14  his review, the products he's accusing, they only send

15  one kind of acknowledgement.

16                   That's correct.

17                   Believe me, Ladies and Gentleman, if

18  there were more than one and they could find it in

19  source code or product documentations, we'd have it

20  here.  There's only one.  The experts have all confirmed

21  it.

22                   And there's more.  I mean, Mr. Kitchin

23  confirms it.

24                   If you were to run these things, would

25  you see anything other than that?

1              No.  They just don't have the capability
2  to do it.
3              That's the designer of the product at
4  Intel.  Don't have the capability.  And you heard
5  Dr. Gibson say the same thing.
6              We had another juror question for
7  Dr. Gibson:  Does the choice have to be at the time of
8  response?
9              Yes.  The multiple ACKs have to be
10 available at the time of response.
11             It's a method claim, and the generation
12 of the message occurs in the operation of the device
13 after a packet has been received.
14             So here, no fact question; multiple types
15 required; only one type.  There's no infringement of
16 '215.  None at all.
17             '625.  Now, this one, I would say, the
18 Plaintiffs are playing a switcheroo on us.  They changed
19 their story, and I'll explain why that is in a minute.
20 I call this the patent that requires a command.
21             Now, notice, they started in opening
22 talking about it as synchronization or coordination,
23 words that don't appear anywhere in the patent at all.
24             A command to receive is something that
25 was necessary in the days when receivers could get

1   deadlocked.  That's what this was created for.

2   Dr. Nettles admitted that.

3                When you have deadlock and somehow the

4   receiver is waiting, because not all the spots in the

5   car are full, you need a command to get it to move on.

6                Now, in 802.11, as we've explained many

7   times, we have created a different type of receiver.  It

8   will accept packets at any time, inside or outside the

9   window, the window will shift automatically; and that's

10  how we avoided the deadlock problem once -- altogether.

11               Now, they're now claiming that somehow

12  the fact that your receiver accepts everything, that's

13  their invention.

14               You remember he put up a slide this

15  morning:  Programming the receiver to take all packets

16  means every ordinary packet is a command.  That is

17  nonsense, because the patent is not about the receiver.

18               Dr. Nettles testified and Mr. Brismark

19  testified, this patent is about what the transmitter

20  does.  The transmitter sends a command, and there's no

21  command in the 802.11n system to command the receiver to

22  take a packet out of order because the receivers are

23  designed to take anything at any time.  And you know

24  that, too, because that's also undisputed in the

25  evidence.

1          This one -- we have a few more exhibits

2    that I want you to take a look at.  We're going to talk

3    about Nettles -- Dr. Nettles, Larsson, Gibson,

4    McFarland, Mr. Kitchin, because here again, there is

5    general agreement, I think, on how the system works.

6          First of all, let's see what the inventor

7    says.

8          We're the ones that played this.  What he

9    said was:  What's unique is, they can force the receiver

10   to move on and change the window.  Force the receiver to

11   move on and change the window.  That's a special

12   command, something that forces a receiver that's stuck

13   to move on.

14         Now, the patent itself describes -- I'm

15   showing here from the figures of the patent.  Now, the

16   patent is at Tab 3 in your notebook, and we've got the

17   picture right up here.

18         The patent says:  An ordinary old packet,

19   which is on the left, that's prior art.  We didn't

20   invent that.  That's not a command to receive.  An

21   ordinary packet, according to the patent, can't be --

22   can't be a command to receive because it's already

23   there.

24         The example they give -- and it's the

25   only example -- is using a special enforcement bit.

1              That's the command.  The enforcement bit
2   forces the receiver to take a packet it wouldn't
3   otherwise take.  So it's something special.
4              Now, Dr. Nettles has abandoned any effort
5   to show there's really a command.  Did you see any
6   document that said command, any source code that said
7   command?  Did you see any product documentation that
8   said command?
9              There's no evidence anywhere in the
10  system that these ordinary packets are a command.
11  Instead, he's arguing:  Oh, no.  You guys changed the
12  receiver and took our invention.
13             No.  That receiver was created by the
14  802.11n folks with no contribution whatsoever from
15  Ericsson.  And they didn't invent an open receiver.
16             They invented a command from a
17  transmitter, and they're trying to run as far away from
18  that as they possibly, possibly can.
19             That's why they want to use the word
20  coordination and synchronization and all this stuff.
21  They don't want to talk about command because it's not
22  there in the product.
23             And how do we know it's not there?  We
24  know it's not there because Dr. Nettles has given us all
25  the admissions we need.

1          When he was talking yesterday about the

2   prior art, he took the position that even a discard

3   notice piggybacked onto a normal packet with a sequence

4   number, that's not a command to receive, he said.

5          If that's not a command to receive, then

6   how can an ordinary data packet, which is how the system

7   moves data from one side to the other, possibly be a

8   command?

9          You remember I asked him yesterday -- he

10  gave us a little example.  Every time you walk in the

11  door of the supermarket and step on the pad, the door

12  opens.  That's a command to open the door.

13          Well, if the door is always open, like an

14  802.11 receiver, you don't need a command.  He

15  absolutely agreed to that.  You don't need a command if

16  the receiver is always open and willing to take packets,

17  and ours is.

18          Here's another admission from

19  Dr. Nettles.

20          Would you agree with the statement that

21  an 802.11n device is always ready to go?

22          Yes.

23          That's because it's got the green light

24  to take packets in any order inside or outside the

25  window, right?

1          That's correct.

2          It wasn't until after he made those

3  admissions that we started hearing that, oh, okay, it's

4  because of the receiver that you infringe this claim.

5          The claim is not about a receiver.  It's

6  about a transmitter sending a command.

7          Now, what did the engineer say?

8  McFarland said -- he was asked pointblank:  Does sending

9  an aggregated packet, transmitting it, does that command

10 the receiver to move on?

11          No, it doesn't.  Our receiver is

12 always -- is kind of always open for business.  So

13 whenever a packet arrives, we receive it, and do the

14 best we can.

15          I think Mr. Kitchin said the same thing.

16 In fact, do we have another slide with...

17          We heard this from -- Mr. Gibson --

18 Dr. Gibson.  This is the -- a picture of the inside of

19 the receiver in an Intel chip.  And you see those fat

20 arrows at the bottom?  Those arrows show that the -- the

21 packets always come in; they're always received, except

22 in one case.

23          And Mr. Stevenson made reference to it

24 this morning.  There's an error condition.  There's an

25 error condition.  But even then, the packet is received

1  and discarded, and there's no command needed to deal

2  with it.  No command.

3           Even in the case of the error condition,

4  they didn't show you a command, and there is no command,

5  because there is no command whatsoever in any of these

6  devices.  They're always open and taking packets.

7           Now, with respect to the '625, I think

8  the evidence on it -- again, there's not a debate about

9  what happens.  Everyone is in agreement that when the

10 packet comes in, it's received, whether it's in the

11 window, whether it's out of the window; and the window

12 automatically shifts.

13          And that's how the devices work.  That's

14 not a command.  You can't turn an ordinary data packet

15 that is the routine manner in which data is transmitted,

16 into a command just by saying it's so, particularly when

17 your patent requires that you show a command.

18          And the patent itself is not a patent on

19 creating an open receiver.  Open receivers have been

20 around for years, and 802.11n used it because it's

21 simple, fast, and affordable.

22          Now, there's a second related patent,

23 which is the '435.  And I would say there, that one is

24 even easier because they are required to show that the

25 receiver is computing what's been discarded by the

1  transmitter.

2          We went over this a number of times.

3  This is a related -- and, again, here, they don't want

4  to talk about this as a patent requiring a discard

5  notice and computing; they want to talk about this as

6  the coordination patent and the window moving.

7          Okay.  This requires -- as you saw the

8  other day from the -- our animation on the receiver,

9  this requires that the receiver compute what's been

10 discarded over here at the transmitter.  That's what it

11 requires.

12         It says:  Computing which data packets

13 have been discarded by the transmitter.

14         Now, in the old days of deadlock, the

15 only way to get the receiver to move on was to tell it:

16 You're not going to get these two packets that you're

17 missing, so you need to look at what you have, clear out

18 your buffer, and move on.

19         That was the old days of deadlock.  And

20 if it -- if it didn't get that message, if it didn't get

21 that message, it would freeze, because it would wait for

22 the packets to get there; and if the transmitter had

23 gotten rid of them, they would never come.

24         That was the old days.  We're through

25 with those old days.  802.11n doesn't work that way.

1 The receivers aren't waiting for that.  They don't have

2 to wait for a packet to come.

3          You saw the animation.  When the packet

4 arrives, it's received and moved on through the system.

5 And there's no one to dispute among the experts about

6 that.

7          So what is the evidence on this

8 particular patent?  Where is the computation that they

9 say exists?

10          I listened very carefully to

11 Mr. Stevenson this morning.  He didn't actually identify

12 any source code, any product documentation, any evidence

13 that this computation occurs.  He said:  It must occur.

14 It must necessarily and logically occur because the

15 receiver moves the window.

16          That doesn't follow.  The receiver moves

17 the window anyway.  It's trained that if you get a

18 packet outside the window, you automatically move.

19 That's what it does.

20          And the idea that it necessarily

21 computes, that's not good enough as proof.  There has to

22 be evidence of a computation, something -- you heard

23 Mr. Kitchin.

24          Would there be evidence in the source

25 code if there were a computation?

1              Absolutely.

2              Does the computer do anything on its own?

3              No.

4              Where's the source code?

5              There isn't any source code, because

6   there isn't any computation.

7              And they have had months and months to

8   look at our source code, and Dr. Nettles didn't produce

9   any to prove this computation happens, because it

10  doesn't happen.

11             Now, let's walk through the evidence on

12  this particular claim.  I've got one more board for this

13  one.  Here are the exhibits that we think -- and the

14  witnesses that are relevant to it.

15             Okay.  Let's look at our first slide.

16             This is what Dr. Nettles says is

17  required, and it's the same thing that I've been saying.

18             In any event, in connection with the

19  '435, if the receiver can't compute all of the packets

20  that were discarded by the transmitter, then there's no

21  infringement, right?

22             Right.

23             So the receiver on the receive side has

24  got to compute all of the packets that were discarded by

25  the transmitter.

1               Next slide, please.

2               Here's Mr. Kitchin.

3               Can you tell us, starting at a high

4    level, does the receiver do this?

5               It does not do it.

6               Why?

7               There's no reason for it to do that.

8               It's not necessary.

9               Here, the window is moving automatically.

10   The receiver is moving on.  It doesn't need this

11   information.

12              I think Mr. McFarland said the same

13   thing.  We asked him:  Does a -- does a standard

14   aggregated packet allow the receiver to compute which

15   packets the transmitter has discarded?

16              No.  We don't have any computation about

17   that.  No computation about that.

18              I'm not sure he was even cross-examined

19   on that point.

20              He also said the BAR -- Mr. McFarland

21   did.  He's talking here about an aggregated packet.

22   He's saying the block acknowledgement request, that

23   doesn't do it either.

24              And guess what?  We had two admissions

25   from Dr. Nettles on this very same point.

1          When a BlockAck request is sent from the

2  transmitter to the receiver in an 802.11 system, that

3  request will not allow the receiver to identify which of

4  the previously acknowledged packets the transmitter has

5  discarded, will it?

6          No.

7          That is a pointblank clear admission that

8  in an 802.11n system, this limitation isn't met, because

9  the receiver is not able to make that calculation and

10  never does.  And if it did, show me the source code.

11  Show me the product documentation.  Show me where it is.

12          This is what they showed you, and we

13  established with both Dr. Nettles and every other

14  witness, this is simply the rules for the receiver

15  moving and shifting the window.

16          That's not what they invented.  They

17  didn't invent that.  That's been around forever.  This

18  window-shifting idea has been around in receivers.  It's

19  the choice that the 802.11n engineers made for their

20  receiver, and it's the type of receiver that all the

21  products have.

22          This doesn't compute anything about what

23  packets have been discarded by the transmitter.  It's

24  simply the rules in the 802.11n standard for moving the

25  window.

1          They didn't invent moving a window,

2   Ladies and Gentleman.  They want to show you these

3   animations and call it a coordination patent and call it

4   a synchronization patent.

5          They admitted -- the inventors admitted

6   under oath they didn't invent this stuff.  They didn't

7   invent ARQ.  They didn't invent block acknowledgement.

8   They didn't invent window shifting.  That's not the

9   invention.

10          The invention here requires a

11   computation, which is absolutely absent in the evidence

12   before you.  It wasn't presented.  And Dr. Nettles

13   finally admitted this.

14          I showed him this set of rules right out

15   of the PX 286.  That's where these rules are.  They're

16   in PX 286.

17          And I showed it to him, and I said:  That

18   so-called calculation that you showed us this morning

19   and went through, that is simply the basis upon which

20   the window moves automatically when it gets a regular

21   group of packets, right?

22          Yes, sir, that's correct.

23          Don't you think, if there were some sort

24   of computation, we would see it?  They would bring it?

25          Obviously, computers don't go off and do

1  stuff on their own.  They have -- the source code

2  determines what they do.  And they haven't shown you

3  anything anywhere that computes this element.  And

4  that's what's required by the patent.

5            Let's look at our last patent, which is

6  the '223.

7            This one, remember, is not asserted

8  against Broadcom, Atheros, or any other chips.  This

9  just concerns the Intel chips.  But we're all here

10  together, so we're all talking about all of the claims.

11            Now, this one is one in which we have a

12  number of witnesses that addressed it:  Mr. Kitchin,

13  Dr. Gibson, Dr. Nettles.  There was some product testing

14  that's relevant to this.

15            PX 286 is the standard.  DX 233, DX 520,

16  those are both Intel product documents that show that

17  Intel's chips do not fragment.  And fragmenting,

18  segmenting, is what is required on this one.

19            So remember, this is the patent that has

20  two limitations that aren't met.  Any -- any single

21  limitation alone that's missing means no infringement.

22  That means no infringement.  And here, there are two.

23  There's the timer we talked about, and there's

24  segmenting.

25            Let me start with the timer.  I think

1  that one's pretty easy.

2            This is one where Dr. Nettles changed his

3  opinion in the middle of the case. He changed his

4  opinion in the middle of the case.

5            This timing element requires that the

6  discard timer start -- it has to start when the data

7  unit -- that's the packet -- is received by the data

8  link layer.

9            So it has to start then. If it starts

10  later than that, there's no infringement. Because they

11  didn't invent timers, Ericsson. They didn't invent

12  discard timers. What they say they invented was a timer

13  that starts at a specific time.

14            So this was the testimony of Mr. Kitchin.

15  He explained that in the Intel system the packet goes to

16  the logical link layer first, and only after that does

17  it go to the MAC layer; and that it isn't until the MAC

18  layer that the timer is initiated.

19            That's non-infringement because,

20  according to the patent, the timer has to start when the

21  packet is received by the data link layer. That's there

22  at the top. You can see it on the right.

23            Now, guess what? Last week when

24  Dr. Nettles was here, he admitted that the packets go to

25  the logical link layer first. That's what he said. He

1  drew a two-layer cake.  Logical link layer.

2              He said, after the packets arrive at that

3  logical link layer -- this was on cross-examination --

4  after that, they go to the MAC layer, right?

5              Yes, sir.  That's what's shown here.

6  That's what's shown here.

7              Logical link layer -- now, what did he do

8  yesterday?  He came in here yesterday and drew a

9  three-layer cake.  He suddenly throws a MAC layer on top

10 of a logical link layer and claims he's found this in

11 the source code, after telling us just last Wednesday,

12 no, the MAC layer is below the logical link layer.

13             So he came in and changed his testimony,

14 and he pretended that this was all found in the source

15 code.  That's when we had to call Duncan Kitchin back to

16 the stand and clean this up.

17             And he testified that this is the way the

18 Intel products work.  The data link layer first, the

19 logical link layer as part of that top layer, and only

20 then do you get to the MAC layer.  That's what Duncan

21 Kitchin said.  He's the one that wrote the code and is

22 responsible for it.

23             And Dr. Nettles completely changed his

24 story in the middle of the case.  That's not reliable.

25 You can't rely on that.

1          And he was shown wrong when we asked

2   Judge Davis for permission to bring Dr. Kitchin back;

3   and we got it, and we cleared it up, and we showed that

4   the one time, the only time that Dr. Nettles even tried

5   to show you source code, he got it wrong.  He got it

6   completely wrong.

7          Now, the other element of this -- other

8   requirement of this claim is that there be segmenting.

9   Segmenting.  And we talked a little bit about

10  segmenting.

11         And what Dr. Nettles told me last week

12  was that segmenting and fragmenting are related, and

13  they both involve breaking things into pieces and

14  putting them back together.

15         And they're right.  What you put back

16  together could be bigger or smaller.  That's a fair

17  point.  That's okay.

18         But as he said again during my

19  examination of him last week:  These concepts are

20  related, in that they both talk about breaking things

21  into pieces and then reassembling them.  You have to

22  break them up and then reassemble them.

23         That never happens in 802.11.  It never

24  happens in 802.11.  Never happens in the Intel chips.

25  It is prohibited to fragment.

1            There's the standard right here.

2    Fragmentation shall -- in -- in an MSDU -- that's a

3    packet -- shall not be fragmented.  An aggregated packet

4    shall not be fragmented.

5            And Mr. Kitchin gave you all the evidence

6    you need that there is no fragmentation.  He brought

7    this document, which is from the Intel source code, that

8    indicates there is no fragmenting.

9            This document is DX 520.  DX 520.  I've

10   got it right here.

11           And he brought a specific example of

12   Kedron, which is one of the chips Intel makes.  That's

13   on our next slide.  That says the same thing.  No

14   fragmentation.  Packets are converted without

15   fragmentation -- that's DX 233 -- testified to by

16   Mr. Kitchin when he was here last week.

17           So with respect to these five patents,

18   let me just say again, Wi-Fi is simple and fast.  It

19   doesn't need a command.  That's extra work and extra

20   time.  It doesn't need to have the receiver compute

21   discarded packets.  That's extra work and extra time.

22           There's only one form of feedback message

23   it can ever send these chips, and that's the block

24   acknowledgement.  That's all they ever do.  And there's

25   no segmentation.

1          None of those -- none of those
2    features -- those are all features of their patents that
3    are too complex, too complicated, and unnecessary.  Not
4    right for Wi-Fi.  And we proved it with Mr. Kitchin,
5    Mr. McFarland, Dr. Gibson, the product documents, the
6    source code.
7          And I haven't mentioned product testing,
8    but in virtually every one of these areas you saw on
9    Monday that Dr. Gibson repeatedly tested to see what was
10   there.  He tested to see, is there more than one
11   feedback response?  No.  He tested to see, does the TID
12   value disclose what is in the data packet?  No.
13         He tested to see whether there's a
14   command?  No.
15         Is there fragmenting?  No.
16         In all of these, Dr. Gibson sat down and
17   did the tests himself and testified under oath as to
18   what -- what was going on.
19         Let me say one thing now about witnesses.
20   I think that Mike -- or Mr. Jones mentioned this at the
21   top of the hour.  We haven't presented a witness from
22   every one of the good companies we represent:  Dell,
23   Belkin, Acer, D-Link, Toshiba and so on, because those
24   are the product manufacturers that make the laptops, not
25   the chips.

 1              They don't know how these chips work.

 2   They're here.  They're in attendance.  They're

 3   interested.  But I don't want you to hold it against

 4   them because I decided we had enough evidence and not --

 5   no need to call a witness from every one of these

 6   Defendants.  Not necessary; not needed.

 7              Let's talk for a minute or two about my

 8   third bullet, which is Ericsson was not first.

 9   You heard Dr. Heegard testify yesterday that to get a

10   patent, you have to have something new.

11              If what you're trying to patent is

12   already in the public domain, is already known to the

13   public, you can't get a patent.

14              He came in -- and Dr. Heegard is a true

15   Wi-Fi expert, right?  He's one of the people that

16   created some of the early Wi-Fi chips.  He came in and

17   laid out for you the same document that Counsel showed

18   you this morning, the elements of the ETSI reference.

19              Now, let me say something about

20   invalidity.  This is a second and additional defense.

21              If you find there's no infringement,

22   which we think you should, based on the evidence, of

23   '625 and '435 -- I think you still have to answer

24   this -- but if there's no infringement, it doesn't

25   really matter whether the patent is valid or not.

1          My point is, this is in addition, an

2   additional defense to non-infringement itself.  And what

3   has to be shown here on our part is that every element

4   of the claim is present.

5          May I have the next slide?

6          It's clear that the Petras submission is

7   public.  It was presented to a standards body.  It's

8   clear that it's earlier in time than the '435 and the

9   '625.  Very clear.

10          So it's prior art.  And Dr. Heegard

11  walked you through the analysis yesterday and showed you

12  where everything was, whether it was a discard notice,

13  whether it was a command.  This drawing, which we saw a

14  couple of times, is a drawing of an ARQ system sending

15  and receiving data.

16          And Dr. Heegard testified that this

17  disclosed all the elements and was sufficiently detailed

18  to allow a product to be built.

19          Now, it turns out that ETSI never built

20  this.  ETSI created a different standard, and that

21  product never hit the market.  But this reference shows

22  computing discarded packets, and it shows a command to

23  receive and that discard notice on the right.

24          Now, I want to spend a couple of moments

25  on damages, not because I think any are owed.  I think

1  you can tell from what I've said, there isn't a shred of

2  evidence of infringement of any of these five patents.

3          By the way, why are we dealing with five

4  of these?  Don't you think, if there were one or two

5  really good ones, that's all we'd need?

6          And the sense that I have is, we're

7  throwing stuff against the wall that's not even close,

8  to see if you will award one.  That's what's going on

9  here.  If there was something really good and really

10  close, I think we'd see it.  We don't need five; one or

11  two will do.

12          But I want to talk about damages for a

13  moment, even though, if there's no infringement or the

14  patents are invalid, no damages are owed.

15          And the first thing I want to say in this

16  first slide is, the Defendants respect IP.  They respect

17  intellectual property of others.

18          Here's a question to Mr. Bone:  How many

19  licensors have Defendants -- that's our group -- taken a

20  license that might relate to 802.11?

21          They've taken a license from five

22  important -- six companies that had patents to cover

23  Wi-Fi.

24          So I've been saying all along, all of the

25  technology really comes from the chip makers; but to the

1  extent they're using anyone else's, they're paying.

2  They pay royalties.  Not to Ericsson, because Ericsson's

3  patents aren't being used.

4              Now, what are they saying on damages?

5  They want to take credit for the entirety of 802.11

6  chips.

7              Can I have the next slide, please?

8              It's the chip.  It's the chip that

9  matters.  And Dr. Nettles conceded that.  We're not

10 talking about anything else.  That's what he tested.

11             And those chips sell for a dollar or two,

12 and they want 50 cents for each one.

13             And Mr. Cawley told you this morning that

14 Intel is going to pay.  Well, whether Intel is going to

15 pay or not is beside the point.  Intel is the one that

16 sells these chips for 2.50, 3 bucks.  That's where they

17 want this 50 cents to come from.

18             So if Intel is going to pay, why would

19 you put a 50-cent tax on a product that sells for $2 or

20 $3, or in some cases $1?

21             Next slide.

22             You know from Mr. McFarland, there's a

23 ton of technology on the chips that has nothing to do

24 with Wi-Fi.  These chips do a lot of other things.  They

25 have a lot of other features.  He told you that.

1  Ericsson wants credit for all that, too.

2                  Even within 802.11, there's a ton of

3  other technology.  This is something Mr. Kitchin

4  presented.  A ton of technology.

5                  The only two things they're taking credit

6  for are block acknowledgement treatment and QoS.  Those

7  are two of about 50 technologies just with 802.11n, and

8  they want credit for the whole thing, even though what

9  they're accusing is a tiny piece.

10                  Next slide.

11                  They say they have a standard rate.

12  There is one laptop maker in the world that's taken a

13  license, and they took a license to all 33,000 of

14  Ericsson's patents.  They're not paying 50 cents.

15                  The 50 cents comes from an internal

16  evaluation that Ericsson did after this lawsuit started.

17  They've been parading that around the courtroom as

18  though it's something sacrosanct and independent.

19                  No.  They generated that number

20  themselves after they sued these Defendants.  Only one

21  laptop maker in the world, and we know who that is.

22                  Next slide.

23                  That license, by the way -- that license

24  is irrelevant.  I'm not sure why they're talking about

25  it.  That license is a big cross-license between two big

1  companies for 33,000 patents.

2                As our next slide shows, it's a broad

3  cross-license that includes all of the cellular.  And

4  you heard testimony that this outfit wanted to build a

5  smartphone, and it was done at a time when the company

6  entering into the license wanted to have a good

7  cooperative relationship with Ericsson.

8                This has nothing to do with a case where

9  they have five patents on a tiny, tiny, tiny piece of

10 technology, not an entire portfolio.

11               So I would remind you that Mr. Bone, he

12 wants 10 -- 5 to 10 cents a patent; 25 cents on the low

13 end; 50 cents on the high end; 5 patents, 25 cents, 50

14 cents.  That's 5 cents to 10 cents a patent.

15               Now, we say that's too high.

16               Dr. Perryman proved that when you have a

17 product like this that sells for only a buck, if

18 everybody gets 50 cents, 40 cents, 30 cents, 20 cents,

19 pretty soon it goes away.

20               But in your deliberations, bear in mind

21 that what Bone is asking for, what Ericsson is asking

22 for is a nickel a patent, depending on your

23 deliberations.

24               Now, if you get to my next slide.

25               This is particularly galling when they

1 didn't contribute anything whatsoever to Wi-Fi.

2          You heard this testimony yesterday.  We

3 presented it ourselves from Mr. Iwerback.  He didn't

4 come to testify either, but we played his deposition.

5          Has Ericsson had any involvement in the

6 development of the standard?

7          No.

8          Did they make any contribution to the

9 802.11n standard?

10         No, not to my knowledge.

11         And yet here they are with their hand in

12 the air asking for credit for all of Wi-Fi, all of these

13 chips and the laptops and routers they go in.

14         Could I have my next slide?

15         Now, my point here is real simple.  There

16 is an enormous imbalance in the evidence in this case.

17         We're the ones that brought the engineers

18 that know the products and designed the standard and

19 created Wi-Fi and the exhibits, the product documents,

20 the source code, and the test results to prove that our

21 products don't use Ericsson's technology.

22         What they presented was Dr. Nettles.

23 That's it.  No inventor came.  No engineers came.

24 Nobody but Dr. Nettles came.

25         And as I pointed out and made clear, Dr.

1  Nettles' testimony is not a reliable basis for any kind

2  of a verdict, particularly where here we have a group of

3  very specific patents with specific requirements that

4  they have simply failed to meet.

5          Now, Ladies and Gentleman, I am going to

6  ask for your verdict.  I'm not going to show you the

7  verdict form.  You've seen it.  It's pretty simple.

8          You know that what we want is a verdict

9  of non-infringement on all these patents.  And I think

10 we've earned it in the evidence, because they have the

11 burden of proof.  That burden wasn't met.

12         We brought the testimony and the exhibits

13 and the evidence that proves that we're not using these

14 patents and haven't used them and don't need them, given

15 the way that Wi-Fi works.

16         And the one last favor I need to ask is

17 that I'm going to sit down now, and I don't get to get

18 up again.  That may be cause for celebration for some of

19 you, but it means that they get the last word, because

20 they have the burden of proof.

21         Now, you know how I feel about the

22 evidence; and in many respects, the evidence in this

23 case speaks for itself.

24         So they're going to make some comments

25 about what I've just said, and I know for sure that I

1   forgot something.  I know for sure I left something out.

2   I know for sure that something is wrong in one of my

3   slides.  I'm sure of that.

4                   And so I ask you to keep in mind, the

5   evidence itself is what's important; comparing the

6   claims to the patents -- to the products in this case

7   ends up no contest, no infringement, no use of any

8   Ericsson technology.

9                   Thank you very much, Ladies and

10  Gentleman.  You've been a great, wonderful, patient

11  jury.

12                  THE COURT:  Okay.  Thank you, Mr. Van

13  Nest.

14                  All right.  The Court will recognize

15  Mr. Cawley for rebuttal.

16                  MR. CAWLEY:  Well, I have some more good

17  news.  I only have two minutes left to conclude my

18  remarks to you.

19                  THE COURT:  Actually, you have four.

20                  MR. CAWLEY:  Four.  Well, that's even

21  better.

22                  You know, in four minutes, I can't

23  realistically review an hour's worth of discussion that

24  you've heard from the Defendants' lawyer, so I won't try

25  to do that.

1          Mr. Stevenson and I made it a point to

2   try to thoroughly review with you the evidence in this

3   case that you've heard over the last week or so.

4          We talked about the four questions that

5   Judge Davis will ask you.  And we reviewed with you the

6   evidence that shows that the Defendants infringe; that

7   the patents are not invalid; and the amount of a

8   reasonable royalty.

9          What you heard from the Defendants'

10  lawyer is, to some extent, they did discuss that; but

11  mostly they made it a point to go back through all of

12  those irrelevant factors that Ericsson didn't anticipate

13  in the standard setting:  That Ericsson's contribution

14  was rejected; that the patents came and the ideas came

15  from the chip makers; all of those concepts; all of

16  those arguments; all of those distractions that have

17  nothing to do with your job of trying to decide this

18  case.

19         So, finally, Ladies and Gentleman, I just

20  want to leave you with two questions.

21              (This portion of the record Sealed by

22              Order of the Court and filed under

23              separate cover as Sealed Portion No. 11.)

24         Ladies and Gentleman, on behalf of Gustav

25  Brismark and Christina Petersson and all of the other

1  people at Ericsson, we thank you for your attention, we

2  thank you for your service in this case, and we look

3  forward to your verdict.

4           THE COURT:  All right.  Thank you,

5  Mr. Cawley.

6           All right, Ladies and Gentleman of the

7  Jury:  It's about time for you to go to work.  Not that

8  you've not been working the last two weeks by sitting

9  there so attentively.  You've done a great job.  You've

10  really paid attention.  You've asked great questions.

11  You've been an outstanding jury.

12           I am about to -- I've told you not to

13  discuss this case among yourselves, I think every other

14  time we took a break the last week or so.  But I am

15  going to instruct you now to go and discuss the case

16  among yourselves.

17           When you retire to the jury room, lunch

18  should be there waiting on you.  I would suggest that

19  the first thing you might do is select your foreperson,

20  so that you sort of know who's going to be overseeing

21  your deliberations; and then decide whether you'd like

22  to just eat lunch first and then start deliberations or

23  whether you want to start deliberations while you're

24  eating or however you want to do it.

25           The Court and the lawyers have been

1 mainly in the driver's seat for the last 10 days, and

2 you're in the driver's seat now.  So you will deliberate

3 as you -- as you see fit.

4 If you wish to take a break -- do we have

5 any people on the jury that need to go outside during

6 the noon hour, that would like to go outside and take a

7 break and walk around outside?

8 If you do, just let me -- let me know,

9 and I'll try to clear the hallways for you, so you won't

10 have to run the gauntlet of spectators and lawyers that

11 will be in the hallways.  Just have your foreperson send

12 a note out anytime you want to take a break outside the

13 jury room.

14 Feel free to deliberate.  Take whatever

15 breaks you need.  If you have any questions, just fill

16 out the question form and send it to me.

17 Again, remember, all of you need to be in

18 the jury room when you are deliberating.

19 So any questions from the jury at this

20 point on the procedure?

21 All right.  Well, good luck.  You are now

22 excused to the jury room to begin your deliberations.

23 COURT SECURITY OFFICER:  All rise.

24 (Jury out.)

25 THE COURT:  Please be seated.

1          Let me first express to the attorneys in

2  this case, this has been, I think, one of the most

3  professional, well-tried, zealously-tried cases -- I've

4  had patent cases I've tried, and I've tried quite a few

5  of them, so I commend the counsel on both sides for a

6  very well-done case.

7          Y'all really stuck to the issues and a

8  very, very well -- well-tried case.  So it's a pleasure

9  to see lawyers of this caliber in a trial like this.

10         So with that said, we're about to break

11  for lunch.  I have a meeting at 1:30 regarding a hearing

12  that I have tomorrow.  I don't know how long that will

13  last; but as soon as I'm through with that -- I would

14  expect probably around 2:15, something like that,

15  2:30 -- I'll come back.  And at that time, we'll hear

16  whatever equitable evidence or evidence to the Court

17  that the parties wish to -- wish to offer.

18         How long do Defendants anticipate their

19  testimony will take?

20         MR. VAN NEST:  I think it will be about

21  90 minutes, Your Honor.

22         THE COURT:  All right.  And Plaintiffs?

23         MR. CAWLEY:  Including cross-examination,

24  an hour.

25         THE COURT:  Okay.  All right.  So we

1 should be able to get through with that.

2          MR. VAN NEST:  What time would you like

3 us back in the courtroom, Your Honor?

4          THE COURT:  I would say at -- I mean,

5 it's 12:30 now.  If you would be back by 2:00.

6          MR. VAN NEST:  Okay.

7          THE COURT:  And if I get through a little

8 early, we'll try to start a little early where we can be

9 sure to get through with that.

10          Also, just regarding the schedule, who

11 knows when we'll get a verdict.  It may be quick; it may

12 be this afternoon; it may be tonight; it may be

13 tomorrow.

14          But it would be my intention, if we get a

15 verdict that necessitates us going into the second

16 phase, that we would go into that either this afternoon

17 or in the morning.

18          So be prepared on that, depending upon

19 the timing, okay?

20          Now, let me give you your times.

21          Plaintiff has used 1 (sic) hour and 45

22 minutes, and Defendant has used 12 hours and 55 minutes.

23 That's direct and cross-examination, not counting

24 closing arguments or jury question time or leaving the

25 courtroom time.

1                    You got an extra two minutes because I

2    didn't charge you for while you were clearing the

3    courtroom.

4                    MR. CAWLEY:  Thank you, Your Honor.

5                    What was our time again?

6                    MR. VAN NEST:  What were those again,

7    Your Honor?

8                    THE COURT:  1/45 -- I'm sorry.  I said

9    1/45.  That would be 12 -- 13/45 and 12/55.

10                   MR. CAWLEY:  Thank you, Your Honor.

11                   THE COURT:  12/57 actually.

12                   All right.  Anything further from the

13   parties?

14                   MR. CAWLEY:  Not from Plaintiff, Your

15   Honor.

16                   THE COURT:  Defendants?

17                   MR. VAN NEST:  No, Your Honor.

18                   THE COURT:  All right.  We'll be in

19   recess.

20                   COURT SECURITY OFFICER:  All rise.

21                   (Lunch recess.)

22                   (Jury deliberations.)

23                        CERTIFICATION

24

25                   I HEREBY CERTIFY that the foregoing is a

1  true and correct transcript from the stenographic notes

2  of the proceedings in the above-entitled matter to the

3  best of our abilities.

4

5

6  /s/ Shea Sloan
   SHEA SLOAN, CSR
7  Official Court Reporter
   State of Texas No.:  3081
8  Expiration Date:  12/31/14

9

10
   /s/ Judith Werlinger
11 JUDITH WERLINGER, CSR
   Deputy Official Court Reporter
12 State of Texas No.:  731
   Expiration Date  12/31/14
13

14

15

16

17

18

19

20

21

22

23

24

25