1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


ERICSSON, INC., ET AL            )
                                     DOCKET NO. 6:10cv473
    -vs-                          )
                                     Tyler, Texas
                                 )   12:55 p.m.
D-LINK CORPORATION, ET AL            June 13, 2013


TRANSCRIPT OF TRIAL
ALL DAY
VERDICT AND WILLFULNESS PHASE TO CONCLUSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY


A P P E A R A N C E S


FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas   75201


MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas   78701


COURT REPORTERS:        MS. JUDITH WERLINGER
                        MS. SHEA SLOAN
                        shea_sloan@txed.uscourts.gov


Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

2

FOR THE DEFENDANT:


MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022


MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071


MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104


MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359


MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

3

P R O C E E D I N G S

(Jury out - Back to deliberations

starting at 9:00 a.m.)

(12:55 p.m. - Proceedings begin.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  I'm advised that the jury has reached a verdict, and we're about to bring them in.

I don't think I need to do this; but let me just caution, there are a lot of people in the audience and in the courtroom.  Whatever the verdict is, there will be no audible or visual response from anyone with regard to it.

Depending upon what the verdict is, we'll either go into the willfulness or we won't.  But there may be more to try, so please -- I know everyone will act in a professional manner.

So is there anything before I bring the jury in?

MR. CAWLEY:  Not from the Plaintiff, Your Honor.

MR. VAN NEST:  I don't believe so, Your Honor.

THE COURT:  All right.  Thank you.

Bring the jury in, please.

4

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  Please be seated.

All right, Madam Foreperson, do I understand you've reached a verdict?

THE FOREPERSON:  Yes, sir.

THE COURT:  All right.  If you'll hand it to the Court Security Officer, please.

All right, Ms. Ferguson, if you will, please read the verdict.

COURTROOM DEPUTY:  Yes, Your Honor.

In Case No. 6:10-cv-473, Ericsson versus D-Link, Et Al.  Final verdict.

As to Question No. 1:  Did Ericsson prove by a preponderance of the evidence that Defendants D-Link Systems, NETGEAR, Inc., Belkin International infringed the following claims of the following patents?

As to the '568 patent, the answer is yes as to Claim 1 and 5 as to all Defendants before listed.

As to patent '625, Claim 1 the answer is yes.

As to the '435 patent, Claim 1 and 2 the answers are no.

As to the '215 patent, Claims 1 and 2,

5

the answers are yes.

Question No. 2:  Did Ericsson prove by a preponderance of the evidence that Defendants Acer/Gateway, Dell, Toshiba, and Intel infringed the following claims of the following patents?

As to the '568 patent, Claim 1, answer is yes as to those Defendants.

As to the '625 patent, Claim 1 the answer is yes as to those Defendants.

As to the '435 patent, Claims 1 and 2, the answer is no as to those Defendants.

As to patent '215, Claims 1 and 2, the answers are yes.

As to the '223 patent, Claim 11, the answers are no.

Question No. 3:  Did Defendants prove by clear and convincing evidence that any of the listed claims of the following patents are invalid?

As to the '625 patent, Claim 1, the answer is no.

As to the '435 patent, Claims 1 and 2, the answer is no.

Answer to Question No. 4:  As to the sum of money.

Answer as to D-Link is 435,000.

6

As to NETGEAR is 3,555,000.

Acer/Gateway, the answer is 1,170,000.

As to Dell is 1,920,000.

As to Toshiba, the answer is 2,445,000.

And as to Belkin, the answer is 600,000.

Signed by the Jury Foreperson.

THE COURT:  All right.  Thank you.

Is there any request to poll the jury?

MR. CAWLEY:  Not from the Plaintiff, Your Honor.

MR. VAN NEST:  Yes, from the Defense, Your Honor.

THE COURT:  All right.  Ladies and Gentleman of the Jury:  If the verdict as read by Ms. Ferguson accurately reflects your verdict, would you please stand?

(Jurors stand.)

THE COURT:  All right.  Thank you.

Please be seated.

Let the record reflect that all eight members of the jury stood.

All right, Ladies and Gentleman, you have worked very hard the last eight days, and you've continued to work hard.  I want to thank you for your service thus far.

7

I have some not too bad news to give you. We're not quite through yet.

There is one other question that you're going to need to answer, and you're going to have to hear a little more testimony on it.  And that question deals with whether or not the infringement which you have found by the Defendants was willful or not.  That's going to be an additional issue.  It's going to be some very abbreviated testimony.

What's going to happen, the attorneys are going to each have 10 minutes to give an opening statement.  Then each side will have up to an hour to present testimony, both direct and cross-examination. So the testimony won't take any longer than an hour to two hours.

And then after that, each side will have 10 minutes to give you further closing argument as to this issue of willfulness.

And then you will return to the jury room and deliberate on a verdict on that; and when we get that done, then you'll be through.

So please listen as I give you instructions regarding the issue of willfulness.

Let me give those to you, and then we will hear the opening statements of counsel.

8

Ladies and Gentleman of the Jury, the Court and the parties thank for your service in the case thus far and your careful attention to the issues put before you during the first phase of this case.

This is the final phase of the case and deals with the issue of willfulness.

Ericsson contends that the Defendants have willfully infringed the patents-in-suit.

Defendants contend that they have not willfully infringed the patents-in-suit.

Because you have found that one or more Defendants infringed one or more of Ericsson's patents, you must now decide whether that infringement by the Defendants that you have found of the claim or claims you have found valid and infringed, whether or not that infringement was willful.

Now with regard to willful infringement.

Ericsson claims that the Defendants willfully infringed the patent claims you have found valid and infringed.

Why don't you go ahead and pass their notebooks back out to them, if you would, please.

In case y'all want to make any notes.

All right.  Everybody have a pen?  No?

Need some pens, please, Gail.

9

And again, as my other instructions, I'm giving you these preliminary instructions. I'll give you the instructions again, the final instructions after the evidence but before the argument and you'll have a copy of those final instructions to take with you to the jury room.

Now, to prove willful infringement, Ericsson must prove that the Defendants acted with reckless disregard of the patents. To prove that the Defendants acted recklessly, Ericsson must prove by clear and convincing evidence -- there's that burden of proof -- must prove by clear and convincing evidence that the Defendants actually knew or should have known that their actions constituted an unjustifiably high risk of infringement of a valid patent.

Ericsson's willful infringement claim requires a higher burden of proof, the clear and convincing evidence standard, than Ericsson's other claims did which required only proof by a preponderance of the evidence.

This clearing and convincing is the same standard, you'll remember, that you applied in the invalidity issue.

I will explain in more detail at the end of this phase of the case how you will decide the

10

allegations of willful infringement; and I'll have final, more detailed instructions for you after the testimony.

But at this time the Court will recognize Mr. Cawley for purposes of opening statement with regard to the willfulness issue.

MR. CAWLEY:  Thank you, Your Honor.

May we approach on a matter in limine?

THE COURT:  Yes, you may.

(Bench conference.)

MR. CAWLEY:  Your Honor, I think that there is an outstanding order in limine directing us to approach before we refer to the fact that there is no opinion of counsel.

As the Court is aware, of course, the Seagate case held that it is error to instruct the jury that there is a necessary inference of willfulness for failure to obtain an opinion of counsel.

In several cases since then, including the Broadcom versus Qualcomm case in the Federal Circuit, in this district, who created Internet, and a type of healthcare case, have all held that, although there's not a necessary inference from failure to obtain opinion of counsel, it is a factor that can be considered by the finder of fact.  So we should be able

11

to tell the jury about that.

THE COURT:  Okay.

MR. VAN NEST:  I think that'd be improper in this case, Your Honor.  We've got seven Defendants all in different situations.  Some are chip -- one is a chip maker -- one is a chip maker.  I think that'd be improper in this case.

We've got seven different Defendants. We've got a very limited amount of time to deal with the evidence, one hour per side.  We've got Defendants in very different situations.

We have a chip maker that actually made the chips.  We have six co-defendants who don't make the chips at all and buy them as a -- as a component.

It would be one thing if this were, say, an Intel-only trial or a Broadcom-only trial or a chip-maker-only trial, that they make the technology. That's quite different from what we're talking about as a component.

And I think in light of the fact that we've got a limited amount of time to deal with this issue, it would be improper, prejudicial, and unfair to the Defendants to allow that kind of testimony in.

MR. CAWLEY:  With respect to Mr. Van Nest, the evidence is proper evidence.  The fact

12

that it's proper against seven Defendants is no less compelling than the fact that it's proper against one Defendant.

MR. VAN NEST:  I don't -- I don't concede that it's proper evidence against any of the Defendants under any of these cases, Your Honor.  And after Seagate, the old question of opinions of counsel is essentially out.

THE COURT:  Objection's overruled.

(Bench conference concluded.)

THE COURT:  All right.  Mr. Cawley, you may proceed with your opening statement.

MR. CAWLEY:  Ladies and Gentleman, we apologize for keeping you this little bit of extra time, but the reason -- and if I can presume to explain -- that Judge Davis, I understand, chose to proceed this way is, is that it simplified the main part of the trial a lot by using this one single issue to the jury.

So what we commit to you -- what we commit to you is that we will not use one more minute of your time than is absolutely necessary.  So even though Judge Davis has told you that I have 10 minutes now to open this, I'm not going to take 10 minutes.

Even though we have a certain amount of time to present additional evidence to you, I don't

13

think that Ericsson will use more than another five or 10 minutes of additional evidence.

The issue that Judge Davis has brought to your attention is the question:  Have the Defendants not just infringed the patents that you have found that they have infringed, but have they done so willfully?  Have they failed to behave with the proper respect and care that you would expect and the law requires a business or businesses like these to treat the issue of patent infringement?

You'll recall that early in the trial you heard a stipulation that I read from the podium over there that told you that the parties all agree that Ericsson gave notice to every one of the Defendants, long before the lawsuit began, with Ericsson's accusation that they infringed the patent.

The question is:  What did the Defendants do then?  How did they behave in response to that accusation?

The evidence you're about to hear will tell you that no decision maker within any of those Defendants made a responsible assessment of why they believed either that they did not infringe the patents you have found infringed or that those patents were invalid.

14

You will hear none of the Defendants offer to show you an opinion they got from a lawyer telling them:  We don't believe you infringe these patents.

Now, think about that.  Wouldn't you expect a company like Intel, like Dell, like NETGEAR, like any of these Defendants, if they are accused by a company like Ericsson of infringing an important patent, to at least go to legal counsel to obtain an opinion from that legal counsel; I think we're okay; I don't think we infringe; I don't think that the patent is valid?

But, Ladies and Gentleman, we don't believe you'll hear that in the next hour or so.

What you will hear is that the manufacturers, the computer makers, and the router makers, will likely tell you, well, we couldn't figure it out.  We didn't know what the chip did.

Ladies and Gentleman, over the last week, you figured it out.  Do you really believe that Dell Computer lacks the engineering talent to figure it out for themselves?  Do you really believe that, for any of these Defendants?

You'll also hear, we believe, not only did they not make an effort to figure it out themselves,

15

they didn't contact Intel, the people who made the chip to ask them.

In short, Ladies and Gentleman, we believe, after you've heard the remaining evidence, we believe you will find that these Defendants have not behaved in a responsible way; and that their infringement was willful.

Thank you.

THE COURT:  Thank you, Mr. Cawley.

Mr. Van Nest.

MR. VAN NEST:  Good afternoon, Your Honor.

Good afternoon, Ladies and Gentleman.

And the first thing I want to tell you is that we -- whoops, I'm going to put my mic on first.

The first thing I want to say is thank you for your service as jurors.  We respect your verdict.  We appreciate how much information you've had to assimilate, and we appreciate how hard it was to help us resolve our dispute.  But we very much appreciate that and respect your verdict on all five of the patents.

So this is a different phase.  It's also very important.  The question here is were the Defendants, our entire group, reckless or willful in

16

defending these claims?  That's the real issue.

And as Judge Davis just told you, it's a very high burden of proof.  It's the clear and convincing evidence standard like the standard you were given with respect to invalidity.

So I want to make just a few remarks now to start, and then we're going to hear from witnesses; and I'll be back, hopefully, in less than a couple of hours to address you again.

Some important things.

One, this standard comes out of a standard setting body, the standard that the Defendants are all practicing, 802.11e, and Ericsson made a promise to that body to license the patents at a reasonable rate.

Now, you have found that the rate they were asking for, the 50-cent rate, was not reasonable. Your award is something less than half of that amount, as I quickly calculated on a -- on a pad; and you heard that the only amount that they were demanding from all the Defendants was 50 cents.  You've already determined that wasn't a reasonable royalty.  The reasonable royalty is lower.

So, to a large degree, these Defendants said that's simply too much to pay in a standard setting

17

environment and you -- you have agreed with us with respect to that point.

Point two.  You're going to hear some testimony from Matthew Shoemake, from the IEEE.  In an IEEE in a standard setting context, the rules of the game are as follows:

Everybody agrees that folks can make the chips or make the products.  If there's -- if there's a dispute and you can't resolve it, you bring it to court.

But nobody stops making products because Ericsson agrees and anyone that submits a letter of agreement, letter of assurance, agrees, yes, you can proceed; I'm going to give you a license; I'm not going to block you from making your product.  So you can proceed.

And what you'll hear in the evidence is the parties ultimately were unable to agree; they came to court; they presented the dispute to you; and you resolved it.

Now, you're also going to hear from Duncan Kitchin who felt, after he reviewed the patents, which were provided when Intel's customers were threatened, that there was no infringement.

He looked at the patents.  He was -- had been a member of the 802.11 process.  He had been one of

18

the people that proposed the technology that went into the standard.

As you heard, Intel and the other chip makers were the major players with respect to that standard. And Duncan concluded that there was no infringement and the dispute proceeded.

As soon as that happened and as soon as Intel got notice that there was a dispute, it came into court with its customers to back them up; and as you know, you heard from Mr. Johnson, you heard from Mr. Kitchin, and they were here on behalf of their customers, backing them up.

Third point in -- in thinking about recklessness is were the defenses that we presented throughout this week and last week reckless, or did we have legitimate, strong, solid, non-infringement and invalidity positions.

Now, I know that on three of the patents you have rejected our defenses; on two of the patents, you agreed with us. And I think it's fair to say that given the amount of time you spent deliberating, I think it's extremely hard to say that these defenses were completely unreasonable or were reckless in light of all the evidence that you evaluated and that was presented over the course of the trial.

So, with respect to that, looking at the IEEE situation and the promise Ericsson made to allow the Defendants to go forward and make products, the defenses that we've presented, the fact that the 50-cent rate was not a reasonable royalty and that, in fact, a far lower number was determined by -- by you-all to be reasonable, those are really critical factors.

The other thing that I would say is that with respect to infringement, no other court, jury, or body has resolved that issue before you folks did.  In other words, this is the place where everyone agreed the issue would be resolved.

And as the Defendants understood it, if they were wrong, they would pay whatever rate the jury reasonably awarded; and if they were right, they were right and they wouldn't be paying any rate.

So that was the understanding.  That's how a standard setting body works.  That's how the Defendants understood it.  And what we're going to be presenting this afternoon is some videotape testimony from various individual Defendant witnesses.

You'll be hearing live from Mr. Kitchin.  We'll be presenting Mr. Shoemake.  And one other thing I'll mention is that with the limited time we have, we can't cover every Defendant individually.

20

You're going to be hearing about how some of the Defendant -- Defendants reacted and not about others.  And that's not because not everybody has something to say, it's because I'm sort of the ring-leader of the group and we only have an hour; and so we have to make some decisions about what we can present and how much time we have to present it.

So I don't want you to think that because you're not hearing from every individual Defendant that every individual Defendant doesn't have something to say.  They do.  We're going to try to focus our discussion this afternoon on factors that apply to the group as a whole.

The RAND and -- factor applies to everyone.  The defenses we presented applies to everyone.  The fact that the reasonable royalty you determined was much lower than 50 cents, that applies to everyone.

Obviously, the clear and convincing standard of proof applies to everyone, and so we're going to try to keep -- keep our focus on the group as a whole.

And again, we look forward to your deliberations, and thank you again for your service as jurors.

21

THE COURT:  Okay.  Thank you, Mr. Van Nest.

All right.  Who will Plaintiffs' first witness be?

MR. CAWLEY:  Your Honor, Plaintiffs' evidence will consist of several very short deposition clips.  Each of those depositions, in the video, the witness identifies himself, so we would like to just play those at this time.

THE COURT:  All right.

MR. CAWLEY:  What's the -- what's the time of those total?

MR. ALPER:  Your Honor, there are three clips.  Mr. Anson, the Plaintiffs' time is 2 minutes and 3 seconds.  The Defendants' time is 3 minutes and 3 seconds.

For Mr. Okumura, the Plaintiffs' time is 1 minute and 14 seconds.  The Defendants' time is 48 seconds.

For Mr. Wang, the Plaintiffs' time is 48 seconds.  The Defendants' time is 43 seconds.

THE COURT:  All right.  Thank you.

MR. CAWLEY:  May we just play those?

THE COURT:  Yes, you may.  You may proceed.  Uh-huh.

22

(Video playing.)

QUESTION:  Could you please introduce yourself?

ANSWER:  My name is Chad Anson.  I'm a legal director for Dell, Inc.

QUESTION:  Are you a lawyer?

ANSWER:  I am a lawyer.

QUESTION:  As a legal director of Dell, what -- what sort of work do you do?

ANSWER:  I'm on the patent and legal team.  My current responsibilities include management of Dell's patent portfolio, also licensing -- patent licensing and IP licensing opportunities and business advice, assistance with patent litigation, and M&A integration.

QUESTION:  Do you participate in Dell's licensing negotiations for patent licenses?

ANSWER:  (No answer.)

QUESTION:  It's now October 2012, you know, a little over two years after Ericsson made Dell aware of the patents in this lawsuit.

What has Dell done to change its products to avoid infringing Ericsson's patents?

ANSWER:  There have -- so Dell has done several things in talking with Ericsson.  We engaged

23

with Ericsson to understand, essentially, the scope of what their assertion was.

And you have to understand that this technology, 802.11n, and, in fact, any of the wireless 802.11 Wi-Fi technologies, are technologies that we, you know, procure from our supplier partners with an understanding that those suppliers are going to provide us, you know, with the documents and the technologies free from any encumbrances.

They're also the ones that have the wherewithal to -- you know, to do the real assessment of the technology. We get them. We put them into our products based upon guidance from our suppliers. They're the ones who know, you know, essentially how that technology works.

So we -- you know, after we received this -- this letter from Ericsson, we, you know, have been -- over the course of -- you know, the time period that you referenced, you know, engaged with Ericsson.

We've talked with them, tried to understand exactly what it is they were saying, what -- you know, what assertions they were making with respect to their patents so that we could engage our suppliers to, you know, help us assess Ericsson -- you know, the strength of Ericsson's claims.

24

As -- as -- as Dell, we have not made a decision one way or the other to change our products based upon the -- the -- the assertions that Ericsson has made.

I don't -- you know, I can't say one way or the other whether our suppliers have or not, because, again, we get these components from our suppliers to provide the functionality that's listed.  I don't know, you know, whether they've done anything.

QUESTION:  I don't want to get into any privileged reasoning behind why you took certain actions, but I just want to confirm that after Ericsson made Dell aware of its 802.11 patents --

ANSWER:  Uh-huh.

QUESTION:  -- Dell made no changes to its product lines, correct?

ANSWER:  Yeah.  I don't -- I can't answer that question.  I'm sure that Dell has made changes to its product lines, as we do, over the course of any time period.

QUESTION:  After Ericsson made Dell aware of its 802.11 patents, Dell made no changes to its product lines in response to Ericsson's patents, right?

ANSWER:  I -- I just -- I don't know that I can -- again, I don't know that I can answer that

25

question, because we did put our suppliers on notice.

And we got permission from Ericsson to be able to share information about the -- the -- about the -- you know, the -- the parameters of their -- their patent assertion against 802.11.

So I don't know that they didn't do anything else.  They may have.  I don't know.

QUESTION:  I understand you're saying the chipset suppliers may have made some changes in response to Ericsson's patents.  You're not aware one way or the other if that happened?

ANSWER:  Right.

QUESTION:  But Dell itself has made no changes to its product line in response to Ericsson's 802.11 patents, right?

ANSWER:  Dell itself -- I'm not aware of Dell making any specific changes to its product lines as a result of Ericsson's 802.11 assertions.

(End of video clip.)

(Video playing.)

QUESTION:  Could you please introduce yourself?

ANSWER:  Sure.  My name is Masa Okumura, and I work for Toshiba America Information Systems, Inc.

QUESTION:  What's your current job title

at Toshiba?

ANSWER:  My current job title is director of product development and planning.

QUESTION:  What do you do in your role as director?

ANSWER:  We -- our team works on planning a different PC laptop, as well as all-in-ones and tablet products that will come to market in the U.S.

QUESTION:  As a part of your job, do you decide whether or not a computer made by Toshiba will include 802.11 functionality?

ANSWER:  Yes.

QUESTION:  Do you understand in this case that Ericsson contends that Toshiba is infringing some of its patents?

ANSWER:  Yes.

QUESTION:  As a part of your job, have you done anything to try to remove the functionality that Ericsson has identified in this case?

ANSWER:  No.

QUESTION:  Have you contacted any of Toshiba's suppliers to ask them to remove any 802.11 functionality from the chipsets that they provide to Toshiba?

ANSWER:  No.

27

(End of video clip.)

(Video playing.)

QUESTION: Good morning.

Could you please introduce yourself to the jury?

ANSWER: My name is A. J. Wang.

QUESTION: And what is your position at D-Link?

ANSWER: CTO.

QUESTION: So whether a chip is certified to be 802.11 compliant is something that the chipset supplier is responsible for, correct?

ANSWER: Yes.

QUESTION: The manufacturer does not do any kind of certification testing?

ANSWER: No.

QUESTION: And D-Link does not do any certification testing?

ANSWER: No.

QUESTION: Has D-Link instructed its manufacturer to purchase chips that would not be covered by Ericsson's 802.11 standard essential patents?

ANSWER: No.

QUESTION: Since this lawsuit was filed, has D-Link instructed its chip manufacturer to use

28

different chipsets?

ANSWER:  No.

QUESTION:  Who would know whether D-Link's 802.11n products comply with any of these clauses?

ANSWER:  No one at D-Link.

QUESTION:  Would a chipset supplier know?

ANSWER:  I would think the chipset supplier would know.

(End of video clip.)

MR. CAWLEY:  Thank you, Your Honor.

That concludes Ericsson's evidence.

THE COURT:  Ericsson rests on the willfulness issue?

MR. CAWLEY:  Yes, Your Honor.

THE COURT:  All right.  Who will Defendants' first witness be?

MR. VAN NEST:  Your Honor, Defendants call Duncan Kitchin.

THE COURT:  All right.  Mr. Kitchin.

MR. AROVAS:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

MR. AROVAS:  Thank you, Your Honor.

DUNCAN KITCHIN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

29

BY MR. AROVAS:

Q.   Welcome back, Mr. Kitchin.

THE COURT:   You need to turn your microphone on, Counsel.

There you go.

MR. AROVAS:   Is that it?

Yes, that's it.

I apologize, Your Honor.

Q.   (By Mr. Arovas) Mr. Kitchin, welcome back.

A.   Thank you.

Q.   Now, you were here a few days ago, and you've actually testified twice in this trial.

A.   Yes, that's correct.

Q.   And are you aware that the jury has now deliberated and reached a verdict; out of the five patents, that three of them are infringed and two of them are not?

A.   Yes, that's my understanding.

Q.   Now, are you disappointed?

A.   Yes, of course, I am disappointed; but I accept and respect the decision of the jury.  And I would like to thank the jury for their -- for their time and their work in helping us to resolve this dispute. There was a lot of work involved to work through all these issues, so I appreciate the time spent on it.

30

Q.   Now, I'd like to cover just a couple of points in this -- you know, we'll be reasonably short.

First, I'd like to talk about the Ericsson patents.  And we know that in this case that Intel intervened in the case, but was there some time before intervening in the case that you personally learned about the Ericsson patents?

A.   Yes.  I became aware of the patents sometime, I think, early 2010.

Q.   And how was it that you first became aware of those patents?

A.   So I understand that our customers came to us, and I was asked for my -- for my advice on those patents.

Q.   Okay.  Now, at the time, did you know which customers had gone to Intel?

A.   No.  I don't think I was made aware of that at the time.

Q.   Now, do you today know whether that includes any of the Defendants in this case?

A.   I -- I -- I don't know exactly who was involved at that time.

Q.   Okay.  Is there a technical reason why customers would turn to Intel when patents are raised as being potentially relevant to the IEEE 802.11 standards?

31

A. Sure. Well, generally, our customers do not have access to our technical documentation. They don't know exactly how the -- how the products work, so they will come to us to -- to -- to ask for -- for advice on those kinds of issues.

Q. Okay. So now in this case, we did see a variety of documents, including some internal schematics and software code with regard to the internal -- internal schematics and software code.

Is that something that's shared with customers when they buy chips?

A. No. That's generally not made available to our customers.

Q. And why is that?

A. Well, this is generally very confidential information, and it's just something that they don't really need to know in order to -- to make use of our products.

Q. Okay. Now, let's go back to that first time when -- when you learned about the Ericsson patents.

Did you review them at that time?

A. Yes, I did.

Q. Okay. And as a product engineer and a participant in the 802.11 development, did you have a personal view at that time as to whether the five

32

patents in this case covered the 802.11n technologies that we've been talking about?

A.   Yes.  So my view at that time was that the patents did not cover the 802.11n technologies.

Q.   And that was several years ago.  Obviously, you've come here and testified, and now the jury has rendered its verdict on those five patents.

Did anything happen between that original review and before the jury's verdict that changed your view as to whether those patents were applicable to the 802.11 standards?

A.   No, it didn't.

Q.   Okay.  So now what I'd like to do is go back in time and understand whether there are any Ericsson materials used in coming up with the technologies that we're talking about in this case.  And we're talking about the QoS functionality, as well as the BlockAck functionality.

And if I could just remind us, when did you first get involved in the 802.11 standards?

A.   So I first became involved in 802.11 standards back in 1994.

Q.   And how long have you been involved since?

A.   Well, most of the time since that time, I've had some involvement at one time or another.

33

Q.   Okay.  And just so we have a -- a sense of where we are in time, when did the substantive work on the QoS features that we've been talking about in this case begin?

A.   So there were some of the early ideas which were discussed around about 1993.  So that was already being discussed when I started to become involved.

And it first started to become integrated into the standards, something that was published starting around about 1999 or 2000?

Q.   Okay.  And then when was the work substantially complete?

A.   Around about 2004.

Q.   And was that part of the 802.11e standard that we've been talking about?

A.   Yes, that's correct.

Q.   And was that then carried over into 802.11n?

A.   Yes.  So the 802.11n standard builds on the work from all the standards prior, including 11e.

Q.   Okay.  So let's take a look at just a couple of these proposals again.

MR. AROVAS:  And if we could pull up DX 193, please.

Okay.  Got it?

Q.   (By Mr. Arovas) Can you tell us what DX 193

34

is?

A.   So this is a proposal that was presented to the 802.11e task group.

Q.   Okay.  And is this something that you were involved in personally?

A.   Yes.  I was heavily involved with this.  I wrote the original draft of this proposal, and then I went to ask for essentially co-sponsors to sign on to it, and those -- those other people, over a period of time, then made additional contributions and changes to it before it was finally proposed.

Q.   Okay.  And can you give us a sense of who were the major companies that were participating in actually developing at the IEEE this particular technology for -- to propose to include in the standard?

A.   Well, the people who contributed to this are specifically listed here, so you can see that Atheros, Agere, Microsoft, Cisco, and Intersil are listed here besides -- besides Intel, yes.

Q.   And those are other IEEE members?

A.   Yes, that's correct.

Q.   And if we look at Page -- I think it's the 14th page of the document, there's a figure that says Figure 7.

And so in this proposal that these various

35

companies were working on to develop the technology for

the IEEE, is that the -- that queue architecture that we

saw when we were going through the technology relevant

to this case?

A.    Yes, that's -- that's correct.

Q.    Okay.  And if we look at Table 9 in the

document, is that also the table of the various user

priorities that we've been talking about?

A.    Yes, that's correct.

So this -- this table underwent some minor

changes, but this is essentially what was incorporated

into the standard.

Q.    Okay.  And can you tell us, you know, what was

the general process by which these engineers would come

together and create these proposals to put into the

standard?

A.    So there were a lot of proposals and

presentations; people brought a lot of data with them

from simulation results from -- from experiments they

had been doing.

And then we had a lot of these people who

would sit down and kind of discuss these results and,

you know, sketch things out on pieces of paper

sometimes.

And then eventually, for this -- this

36

proposal, we would kind of edit this -- this document.

We had a whole bunch of people sitting in a room with laptops, editing this document before it was finally proposed.

Q.   And can you tell us, in the process of creating this, did you rely on any material from Ericsson?

A.   No, not that I'm aware of.

Q.   Okay.  When this was all happening, were there any Ericsson articles, you know, publications, Ericsson products that were analyzed, Ericsson's papers used or discussed in the process?

A.   No, none that I know of.

Q.   And were any Ericsson patents knowingly used or discussed?

A.   No, none that I know of.

Q.   And how about when you were creating this technology for the standard?  Were any cellular standards that may have had Ericsson technology embodied in it used as a model or a source of ideas for these proposals?

A.   No, not that I know of.

Q.   Okay.  So now, you had mentioned that this work had gone back to the early 1990s.  And did you have something particular in mind that you were referring to?

37

A.   Sure.  So there were actually a number of proposals that were submitted, like I said, around about '93, I think the dates were.  So it was already under discussion when I -- I became involved.

And there was -- some of that was for a time incorporated into one of the early drafts of the 802.11 standard.

Q.   Okay.  So let's take a look at one of your proposals that we saw before, Exhibit DX 356.

MR. AROVAS:  If we could put that on the screen.

Q.   (By Mr. Arovas) And is this the QoS proposal that you made around March of 2000?

A.   Yes.  This is -- this was presented very early on in the 802.11e standardization process.  This was a presentation, setting out some broad principles for directions that I thought the -- the group should go in.

Q.   Okay.  So if we go to the third slide in the deck, and there's something called a proposed solution.

A.   Uh-huh.

Q.   And the first bullet point says:  MAC provides statistical prioritization based on 802.11p tags.  Is that a reference to any Ericsson technology that was being used or referenced?

A.   No, it's not.  This is something that was used

38

in wired networks at that time for prioritization of packets.

Q.    Okay.  And what is an 802.11p tag?

A.    It's -- it's a priority identifier that's attached to each of the packets.

Q.    Okay.  And if we look at the -- two slides forward, if we look at Slide No. 5, there's a summary, and you refer to this as an extension of 802.11.

Does that refer to any pre-existing 802.11 work as the source of the ideas and approach here?

A.    So it was really referencing at this time the 1997 standard and just adding in some additional features to that.

Q.    Okay.  So if we look at DX 37 --

MR. AROVAS:  If we could pull that up.

Q.    (By Mr. Arovas) All right.  Can you tell us what Defendants' Exhibit 37 is.

A.    Yes.  This is an early draft of the -- of the standard from 1994.  So this is sometime before the 1997 standard was -- was published.

Q.    Okay.  And is there anywhere in this document you can show us where this idea of user priorities for prioritization of traffic was discussed in this standard -- draft standard all the way back in 1994?

A.    Yes.  I believe there is -- there is something

39

in here in this standard that talks about that.

MR. AROVAS: So if you could -- let's put up Section 5.2.13.1.3. Sorry for the long number.

Q. (By Mr. Arovas) But can you describe what we see here?

A. So this is a reference to user priority. So this is a very early idea for how this kind of prioritization would work. It's not exactly the same as what we ended up doing in 802.11e, but it's a very similar kind of concept. The basic idea is approximately the same.

Q. Okay. And this idea that we saw where you had those multiple queues where the different traffic would go, is that also something that was done by the IEEE as early as 1994?

A. Yes, that was also discussed. I think there is a figure in here that shows something quite similar to what we ended up doing. And, again, it's not exactly the same; but the general concepts of the kind of direction we went in is actually in here.

MR. AROVAS: So let's put up one of the figures, Figure 7.7. And if we could blow up the box on the top.

Q. (By Mr. Arovas) And can you describe what we're looking at in -- actually, it looks like in this

40

figure, question mark dot question mark.

A.    That's right.

Q.    I guess that's because it's a draft.

A.    That's right.  I don't think we decided on what the section numbers were at the time.

Q.    But can you tell us how that relates to what we ultimately see in the standard?

A.    So as I was describing, this shows something that has, you know, multiple queues.  It's not exactly what we ended up doing, but you can see that the general concepts here are approximately the same.

Q.    Okay.  So now let's move on to the block acknowledgement technology.  And can you tell us -- let's start by understanding the chronology here.

Can you describe when the discussions in the IEEE started approximately with block technology or block acknowledgements?

A.    So there were some discussions starting in 1999.  It was one of the first things that got talked about for 802.11e, and that was pursued all the way through.

And there were various different versions of it, and new ideas got -- got incorporated into it as we -- we worked out new ways of refining it, but it started around about 1999, 2000.

41

Q.   Okay.  And if we were to look at the IEEE documents to see the lineage of these ideas and where they came from, would we see different names being used to describe the concept as it evolved over time?

A.   Yes.  It appears under three different names.

When it was first introduced, it appeared as something called delayed acknowledgement.  And then that was -- the concepts from that were taken forwards into a different -- slightly different proposal, which was called burst acknowledgement.  And then eventually we renamed it as block acknowledgement.

Q.   Okay.  And who were the major players who were involved in creating that technology for IEEE?

A.   There were a large number of participants.  Certainly, all of the -- I remember that Sharewave -- there was a -- a company called Sharewave was one of the original participants in the delayed ACK.

And then as we developed it, Intel was heavily involved, as was Sharp Labs and Intersil and Cisco, and Atheros was certainly involved substantially.

Q.   Okay.  I don't want to go through the whole history, but let's just take a look at one of those proposals that we haven't seen yet in this case.

MR. AROVAS:  If we could pull up DX 355.

Q.   (By Mr. Arovas) And can you tell us what this

42

document is and what it relates to?

A.   So this is a joint proposal for -- for BurstAck that eventually became BlockAck.  And this took a number of ideas from different people and came up with this -- this burst acknowledgement proposal, which is very similar to what eventually ended up as block acknowledgement.

Q.   Okay.  And so at this point in time, it was called BurstAck, and we see that at the top.  And is that one of those names that was used in the process of the development?

A.   Yes, that's correct.

Q.   Okay.  So now let's take a look at some of the pictures in this proposal to see how it relates to what we ultimately see in the final standard.

MR. AROVAS:  If you could go to Figure 62.3 on Page 5, and let's blow up that top one, if we could.

Thank you very much.

Q.   (By Mr. Arovas) Can you describe, Mr. Kitchin, what we see in Figure 62.3?

A.   So this is showing the general sequence of packets that are used in the burst acknowledgement proposal at this time.

Q.   And we talked -- when you and I spoke first

43

last week, I asked you questions about the basic sort of parts of this technology.  Can you describe, do we see acknowledgements of multiple data packets like we ultimately see in block acknowledgement here?

A.  Yes, it's very similar.  So you see -- here, it's called BurstAck request and BurstAck.  But these are actually very similar to what was in the block acknowledgement.

Q.  Okay.  So if we looked at the middle, you would see three different data packets, the burst data; is that correct?

A.  That's correct.  So those are data packets.

Q.  And then you would see an acknowledgement request for those three, and that's just to the right?

A.  That's correct.

Q.  And then on the next line under the recipient, the BurstAck, that's an acknowledgement for all those multiple data packets?

A.  Yes, that's correct.

Q.  Okay.  And we heard in this case a lot of testimony about windowing.  Did this approach use windowing as well?

A.  Yes, it does.

Q.  And did it use sequence numbers in the transmitter and the receiver as well?

44

A.   Yes, it does.

Q.   And it had acknowledgements for multiple data packets?

A.   Yes, it does.

Q.   Okay.  Now, was the process of developing this technology, you know, the collaboration work, the drawing of designs on napkins and papers and things like that, the same for the block acknowledgement technology as you described for the quality of service or QoS technology?

A.   Yes.  It was the same -- the same kind of process was used for developing this.

Q.   Okay.  And so I have the same questions that I had with regard to quality of service.

When this was being developed at the IEEE, did you use or rely on any material from Ericsson?

A.   No, not that I'm aware of.

Q.   And were any Ericsson articles, publications, products, papers of any kind from Ericsson used?

A.   No, none that I aware of.

Q.   And were any Ericsson patents knowingly used or discussed when this technology was being developed?

A.   No, none that I'm aware of.

Q.   How about cellular standards?  Were they used as a model, a source of ideas or technology to develop

45

this?

A.   No, none that I'm aware of.

Q.   Okay.  Now, last week you also testified about one of Intel's patents, the '858 patent.

MR. AROVAS:  And let's pull that up.  It's DX 479.  I think we have that on the screen.

Q.   (By Mr. Arovas) And can you tell us -- very quickly, remind us what this patent -- this '858 patent from Intel is?

A.   So this is -- this is a feature in the -- in the 802.11n standard for block acknowledgements.

Specifically, it's a -- it's a way for routers to efficiently handle a very large number of client devices while doing block acknowledgements.

Q.   Okay.  And this is in the 802.11n standard?

A.   Yes, it is.

Q.   And it relates to block acknowledgement or the block acknowledgement process?

A.   Yes, it does.

Q.   And this would go in the routers, because it would be a functionality used in the routers?

A.   Yes.  That's -- that's where -- where it would be useful.

Q.   Okay.  And so this -- does this patent disclose and improve upon the basic block

46

acknowledgement scheme?

A.   Yes.  That's what it does.

Q.   Okay.  And let's take a look at just one of the figures in the patent.  I won't go through it in detail, but let's look at Figure 3.

And can you describe at a high level what we're seeing in Figure 3?

A.   So what this is showing is an example of a sequence under block acknowledgement showing -- in this case, there are four QoS data packets that are being sent from the transmitter to the receiver followed by a block acknowledgement request.  And then you see right after that, coming back from the other end, a block acknowledgement.

Q.   Okay.  And how does this compare to what ultimately made it in the standard?

A.   So I think this figure or something very similar to this is actually in the standard.

Q.   Okay.  And is the TID or traffic identifier also discussed?

A.   Yes, it is discussed in this -- in this patent.

Q.   Okay.

MR. AROVAS:  If we look at Column 5, Lines 5 to 15.  If we could pull that up.

47

Q.    (By Mr. Arovas) And does this also discuss the traffic identifier?

A.    Yes.  Yes.  It mentions it right here.

Q.    Okay.

MR. AROVAS:  So let's go to the front of the patent.

Q.    (By Mr. Arovas) And is there a section where the Patent Office lists relevant -- other patents and articles that are relevant to the technology disclosed in this patent?

A.    Yes.  It's at the bottom of the first column here and then other publications in the other column.

Q.    And are any Ericsson patents or the patents-in-suit identified by the Examiner as relevant to the Intel patent?

A.    No.

Q.    Okay.  Thank you, Mr. Kitchin.

MR. AROVAS:  No further questions.

THE COURT:  All right.

Cross-examination.

MR. STEVENSON:  Thank you, Your Honor.

THE COURT:  Mr. Stevenson.

CROSS-EXAMINATION

BY MR. STEVENSON:

Q.    Good afternoon, Mr. Kitchin.

48

Do you understand this proceeding is one in which the relevant issue is whether the Defendants in this case acted reasonably after learning of Ericsson's patents and the assertion?

A.   Yes, I understand that's one of the issues.

Q.   And are you aware there's a stipulation entered into in this case that provides the dates upon which the various Defendants learned of Ericsson's patent assertion?

A.   I'm not aware of that stipulation, I don't think, no.

MR. STEVENSON:  May I approach, Your Honor, to hand the witness a copy of the stipulation?

THE COURT:  Yes, you may.

MR. STEVENSON:  This is PX 554.

Q.   (By Mr. Stevenson) I would like to go through some of the Defendants with you and ask you to verify from reference to the stipulation, some of the dates.

Do you understand, sir, that it's been stipulated that D-Link -- Ericsson identified to D-Link the '625 patent on March 22nd, 2004?

A.   Could I identify where in this I should look?  I haven't seen this document before.

Q.   Yes.  It's Paragraph 3.

A.   Okay.

49

Q.   You understand what a stipulation is, Mr. Kitchin?

A.   Yes, I broadly understand what that means.

Q.   You understand this is a agreement or a statement of facts among all the parties that are true and that are not contested?

A.   I -- I understand that to be correct, yes.

Q.   So do you understand that D-Link was informed by Ericsson of its '625 patent in March of 2004?

A.   I see that's what it says here in the document, yes.

Q.   Do you also understand from this document it's stipulated that D-Link was informed of the rest of the patents-in-suit that have been found infringed, in September of 2010?

A.   Yes.  Again, I can see that's what it says in this document.

Q.   Let's move on to NETGEAR.  That's Paragraph 4.

Do you understand that NETGEAR was informed by Ericsson of the '625 and '568 patents in September of 2004?

A.   Yes, I see that here as well.

Q.   And do you understand that NETGEAR was made aware of the remaining patents that have been found infringed, in October of 2008?

50

A.   Yes, I see that, too.

Q.   Let's move on to Acer.

Do you understand that Acer was informed of all the patents-in-suit by Ericsson in November of 2009?

A.   Yes, I see that here.

Q.   Let's move on to Dell.

Do you understand that Ericsson informed Dell of its infringement allegations on March -- in March of 2010?

A.   Yes, I see that here.

Q.   And do you understand with regard to Toshiba, which is Paragraph 8, that Ericsson contends that it informed Toshiba of the allegations in November of 2009? Toshiba contends it's May of 2010.

But at least somewhere in that time frame is when the notice of infringement would have been provided to Toshiba; is that correct?

A.   Yes, that's what I think this says.

Q.   Okay.  And you understand that these companies are all IEEE members?

A.   Yes, I believe that to be correct.

Q.   Okay.  Do you know whether any of them informed the IEEE any time after March 2004, which was the earliest allegation that has been stipulated, of Ericsson's patents?

51

A.  No, I -- I wouldn't be aware of any such communication.

Q.  Well, you've talked a lot about IEEE meetings and -- and chronicled your attendance there.  You never heard of Ericsson's patents, and nobody brought these allegations to the IEEE's attention, as far as you're aware, during this time period?

A.  Not that I know of.

Q.  You're aware, though, aren't you, that the IEEE sent a communication to Ericsson asking it to renew its notice of assurance?

A.  I -- I don't think I've seen such a communication.

MR. STEVENSON:  I was wondering if we could pull that up.  Let's pull up PX 511, please.  And will you zoom in on the first third of this, please, Mr. Diaz in.

Q.  (By Mr. Stevenson) Do you see this is a letter from Bruce Kraemer of the IEEE to Anna Johns of Ericsson, copying D. Ringle of the IEEE?

A.  Yes, I see that.

Q.  Do you know Mr. Kraemer from IEEE activities?

A.  Yes, I do know Mr. Kraemer.

Q.  And he works for Marvell.  They're a chipset manufacturer, correct?

52

A.   Yes, that's correct.

Q.   Mr. Kraemer writes that:  It has been brought to my attention that Ericsson may have essential patent claims.  Do you see that?

A.   Yes, I see that it says that.

Q.   And he wrote this in March of 2011 to Ericsson, didn't he?

A.   Yes, I see that.

Q.   Was Intel involved in any way, shape, or form in requesting or suggesting to the IEEE that this letter be written to Ericsson?

A.   I don't -- I don't have any knowledge of -- of that.

Q.   Have you heard that from anybody at Intel?

A.   No, I haven't heard that.

Q.   So you don't know either way whether Intel went to the IEEE and asked them to write a letter to Ericsson to have Ericsson verify its letter of assurance with regard to its patents?

A.   I -- I -- I can't recall any such communication that I would have seen.

Q.   Are you denying there was any such communication?

A.   No, I'm saying I can't remember having seen any such communication.

53

Q.   Have there ever been any discussions about changing the standard so that it doesn't infringe Ericsson's patents within the IEEE?

A.   I'm not aware of any such discussion.

Q.   Now, as we -- as we established during the trial, you work in the legal department of Intel, correct?

A.   Yes, that's correct.

Q.   You're not an attorney?

A.   That's correct.

Q.   You're not a patent agent?

A.   That's correct.

Q.   And Intel in this case has not produced as a defense to willfulness an opinion of counsel, correct?

A.   I -- I don't know all of the -- the evidence we might have produced.  I haven't been present during most of this trial.

Q.   Well, you understand, though, sir, that at least you have not seen in this lawsuit Intel produce and provide and rely upon an opinion of counsel as a defense to willful infringement.  Is that fair?

A.   That's correct, I have not seen such a thing.

Q.   Now, during this case Intel has basically been in the lead of the defense, hasn't it?

A.   I think so.

54

Q.   And you've been personally involved in the defense of this case from the Intel side, haven't you?

A.   Yes, I have.

Q.   And that's because you're a -- Intel is a chip maker, and it has the specifications and understanding of its product; is that right?

A.   Yes, that's correct.

Q.   Who is the person at Intel who made the decision to continue selling the infringing products after receiving notice of Ericsson's patent assertions?

A.   I -- I don't have any -- any idea of how that process would have worked.

Q.   Well, somebody at Intel or some people with Intel, after being made aware of this patent assertion, number one, made a decision to intervene in this case, didn't they?

A.   Yes, that's correct.

Q.   Number two, had to make a decision about whether or not the patent allegations had merit?

A.   Yes, that's correct.

Q.   Number three, then had to make a business decision as to whether they were going to continue selling allegedly infringing products, right?

A.   Yes, I presume there would have been such a decision.

55

Q.   Can you give me the names of any of those people at Intel who were responsible for any of those three things?

A.   I don't know exactly who it would have been, who would have had those discussions and made that decision, no.

Q.   Can't name a single name?

A.   Who would have made those decisions, no, I'm not aware of exactly what that process was.

Q.   Well, do you know whether the person who was responsible for making these decisions is going to come and testify and explain to the jury why Intel has done what it has done?

A.   No, I'm not aware of how that process worked.

Q.   But you're not that person?

A.   That's correct, I didn't make those decisions.

Q.   Now, Intel's chips are used in some but not all of the accused devices, right?

A.   I understand that to be the case, yes.

Q.   NETGEAR doesn't use any of Intel's chips, right?

A.   That may be correct.

Q.   D-Link doesn't use any of Intel's chips?

A.   Right, I think so.

Q.   And the three laptop companies in this case:

56

Acer, Dell and Toshiba, do use some of Intel's chips, correct?

A.   Yes, that's correct.

Q.   But they don't exclusively use Intel, they use other manufacturers as well, don't they?

A.   Yes, I believe that's correct.

Q.   Do you understand that the Intel percentage within the accused devices of chips is about 10 percent?

A.   I've seen that number during -- during this trial, yes.

Q.   You don't disagree with it?

A.   No, I don't have any basis to disagree with that.

Q.   The other companies with whom Intel competes who are supplying chipsets to the Defendants include Ralink; is that correct?

A.   I believe so, yes.

Q.   And they're located where, Mr. Kitchin?

A.   I'm not aware of where they're located.

Q.   Realtek is another chip supplier?

A.   Okay.

Q.   Do you know where they're located?

A.   I couldn't say I know where their headquarters are, no.

Q.   Broadcom is another chip supplier?

57

A.   That's correct.

Q.   Do you know where Broadcom is located?

A.   I believe their headquarters are in California, but I don't know exactly where.

Q.   And Atheros, do you know where they're located?

A.   I believe they're based in San Diego.

Q.   Do you know why the other four companies haven't intervened in this lawsuit, as well, to make their case or allegedly defend their customers?

A.   I don't have any insights into what the decision-making process was, no.

Q.   You have -- have you seen their technical documentation?

A.   No.  No, I have not seen it.

Q.   And do you have any idea what the Defendants in this case, the non-Intel Defendants, the companies who make routers and laptops, what they are thinking with regard to whether their non-Intel products infringe or don't infringe?

A.   I -- I can't say I know what they're thinking.

Q.   Okay.  And those are -- and that's 90 percent of the accused products in this case, are non-Intel products, right?

A.   Yes, that's correct.

58

MR. STEVENSON:  No further questions.

THE COURT:  All right.  Any redirect?

MR. AROVAS:  Just a little bit, Your Honor.

REDIRECT EXAMINATION

BY MR. AROVAS:

Q.  First, Mr. Kitchin, I'd like to take you back to some of the questions you were asked about some of the other Defendants in this case.

And I understand that, obviously, you don't work for any of those other parties, so let's just get sort of a baseline on the type of information you could provide.

First of all, you weren't part of the negotiations, to the extent they existed, between Ericsson and these other parties; is that right?

A.  Yes, that's correct.

Q.  So would you be -- would you know whether those parties, for example, gave to Ericsson documents that Mr. Stevenson didn't mention that, in fact, explain their views about the fact that they believed that these patents did not, in fact, cover the 802.11 products?

A.  No, I haven't seen any communications between the other parties.

Q.  Right.  And you wouldn't have those

59

communications because those communications would be with other companies and Mr. Stevenson's client, Ericsson, right?

A.    That's correct.

Q.    Okay.  Now are -- but are you aware generally that when these discussions happen, a lot of times there are agreements that are entered called NDAs or nondisclosure agreements?

A.    Yes, I understand that there are frequently NDAs in most discussions.

Q.    And you have heard or you know what an NDA is and have you heard of them generally?

A.    Yes, I've heard of NDAs.

Q.    And those are agreements that prohibit, when you're in negotiations, from disclosing to anybody else that -- the content of those discussions, right?

A.    Yes.

Q.    Okay.  And since you weren't part of these discussions, you also wouldn't know whether there were, in fact, nondisclosure agreements between Ericsson and these other companies that prohibited -- I'm sorry -- that prohibited those companies from disclosing to their suppliers the allegations that Ericsson was making about their patents?

A.    That's correct.

60

Q.    Okay.  Now let's talk about one of the things, though, that you do know.  You are aware that Ericsson, in fact, didn't give notice before this lawsuit to Intel at all that Ericsson believed Intel was using the patents; is that right?

A.    Yes, that's my understanding.

Q.    And, in fact, Intel had to voluntarily inject themselves into this case?

A.    Yes, that's my understanding.

Q.    And when Intel voluntarily injected them (sic) into this case, they came -- I mean, you were asked about lawyers, and were lawyers hired who voluntarily came into this case and presented the views of Intel as to why they thought their products were different?

A.    Yes, that's correct.

Q.    And as part of injecting themselves into the case, did they -- Intel open up their files and give their source code and their schematics and all that sort of information to Ericsson so this case could be presented to the Ladies and Gentleman of the Jury?

A.    Yes, that's my understanding.

Q.    And now with regard to the IEEE, Mr. Stevenson showed you a letter from the IEEE from 2011.  Now at that point in time, was this case already going?

A.    Yes, I think it was.

61

Q.   And does the IEEE itself have any mechanism, staff, or resources that are devoted to actually figuring out what the right answer is if there's a dispute between people over whether patents do or don't cover the standard or what the appropriate rate would be?

A.   No.  As far as I know, they don't do that.

Q.   Okay.  And is that what we're here to do in this?

A.   Yes, that's my understanding.

Q.   And that's what we did do, right?

A.   That's correct.

Q.   Thank you.

MR. AROVAS:  No further questions.

THE COURT:  All right.  Thank you.

Anything further?

MR. STEVENSON:  Yes.

THE COURT:  All right.

CROSS-EXAMINATION

BY MR. STEVENSON:

Q.   I'd like to follow up on this point about learning from customers and NDAs.

Isn't it true Intel actually did learn from one of its customers about Ericsson's patent assertion?

A.   Yes, that's correct.

62

Q.   Who was that customer?

A.   I don't know.

Q.   Was it Hewlett-Packard?

A.   I don't know.

Q.   How do you know that Intel learned from a customer about Ericsson's patent assertions, but you don't know the name of the customer?

A.   It went to one of our attorneys who asked me for some technical advice on those -- those patents; but they didn't tell me who -- who had asked for it.

Q.   When did that happen?

A.   That was in early 2010, I believe.

Q.   Okay.  You're aware, though, that Hewlett-Packard is a customer of Intel?

A.   Yes, I'm aware of that.

Q.   You're aware they're a customer of Intel for the very chipsets that were assertive -- asserted as infringing in this case?

A.   Yes, that's correct.

Q.   Do you know whether that customer was Intel or not -- excuse me -- can you tell us that Intel was not the customer --

MR. VAN NEST:  You mean --

MR. STEVENSON:  Excuse me.

Q.   (By Mr. Stevenson) Can you tell us that

63

Hewlett-Packard was not the customer that came to Intel and asked for assistance in defending against these patents?

A.  No, I couldn't tell you that.

Q.  But you understood, don't you, that Hewlett-Packard did, in fact, reach a voluntary license agreement with Ericsson outside of litigation?

A.  I -- I have heard that stated.

Q.  And do you understand that as part of those negotiations there were technical meetings between Hewlett-Packard and Ericsson?

A.  There may have been.  I'm not aware of any such meetings.

Q.  Are you aware, sir, that Hewlett-Packard had an indemnity with Intel?

A.  I believe that's generally the case.

Q.  Do you understand there is, in fact, an indemnity when Intel sells chips to Hewlett-Packard?

A.  Yes, I understand that is generally the case.

Q.  Did Intel reimburse Hewlett-Packard for any of its license payment to Ericsson?

A.  I don't know.  I wouldn't have seen any such details.

Q.  Who's the person who knows that?

A.  I don't know.

64

MR. STEVENSON:  Nothing further.

THE COURT:  All right.  Anything further?

MR. AROVAS:  No, nothing further.

THE COURT:  All right.  If the jury would pass down their questions, please.

All right, Ladies and Gentleman of the Jury, I think we'll take about a 10-minute break at this time.

So, please remember my instructions -- well, my new instructions are to -- you not to discuss this aspect of the case again until you've heard all of the evidence.

So let's just not discuss the case any further among yourselves until after we finish the testimony.

But enjoy your break, and we'll see you back here in about 10 minutes.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  All right.  Please be seated.

All right.  The first question is: Ericsson allows in the patent for people to continue to manufacture under the agreement based on an idea that they will license to avoid infringement; is that correct?

65

Do you want me to read it again?

MR. VAN NEST:  Please.  Please, Your Honor.

THE COURT:  Ericsson allows in the patent for people to continue to manufacture under the agreement based on an idea that they will license to avoid infringement; is that correct?

MR. VAN NEST:  I'm not sure the witness knows the answer, but --

MR. STEVENSON:  I -- I think that may be outside the scope of his knowledge as well.

THE COURT:  All right.

MR. AROVAS:  If it's referring to the IEEE -- the question is a little inartfully drafted referring to the IEEE policy.

THE COURT:  I'm not sure what it's referring to, but do you -- I understood Mr. Van Nest to object to it.  Do you join in that objection?

MR. VAN NEST:  I'm not objecting, Your Honor.  I'm just not sure whether Mr. Kitchin knows the answer.  Perhaps we can ask him.

THE COURT:  Okay.  Do you know the answer to that, Mr. Kitchin?

THE WITNESS:  I'm not sure I do, Your Honor.

THE COURT:  All right.  Do you object to it, Mr. Van Nest?

MR. VAN NEST:  I don't object, Your Honor; but if he doesn't know the answer, I'm not sure why it would --

MR. STEVENSON:  I object, Your Honor.

THE COURT:  All right.  Objection's sustained.

All right.  Next question:  Are companies legally required or expected to immediately stop using or make changes to technology as soon as a patent assertion is made?

MR. STEVENSON:  I think that's a question of law that the Court should instruct the jury on as opposed to the witness, and so I object.

MR. VAN NEST:  I think that's custom and practice, Your Honor, and I think --

THE COURT:  You think what?

MR. VAN NEST:  I think that relates to custom and practice, and I think Mr. Kitchin should be able to answer it.  It's not a legal issue.

MR. STEVENSON:  I think the question was phrased, do companies legally require?  That would make it --

THE COURT:  Well, I can rephrase the

67

questions.

I'm going to take the "legally" out, and I'll ask the question:  Are companies required or expected to immediately stop using or make changes to technology as soon as a patent assertion is made.

MR. VAN NEST:  That's fine, Your Honor.

THE COURT:  Let's see.  We'll go ahead and take our -- our break now.

How much longer does -- do Defendant's anticipate they'll have testimony?

MR. VAN NEST:  I think it will be about another 30 minutes, Your Honor.

THE COURT:  All right.  Okay.

All right.  Well, we'll go ahead and take a break until 20 after.

COURT SECURITY OFFICER:  All rise.

(Recess.)

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

Bring the jury in.

(Jury in.)

THE COURT:  All right.  Please be seated.

All right, Mr. Kitchin.  Your question from the jury is:  Are companies required or expected to

immediately stop using or make changes to technology as soon as a patent assertion is made?

THE WITNESS:  My understanding is that there is no such expectation or obligation just because there's an assertion.

And in this particular case, as we've been -- been explaining, Intel arrived at the belief that there was no infringement in this case.

THE COURT:  All right.  Thank you.

All right.  Any follow-up questions by Defendant?

MR. AROVAS:  No, Your Honor.

THE COURT:  By Plaintiffs?

MR. STEVENSON:  No, Your Honor.

THE COURT:  All right.  You may step down.

Who will your next witness be?

MR. VAN NEST:  Your Honor, at this time, we would like to play a short videotape of the deposition testimony of Andreas Iwerback.

Our jurors saw him in video yesterday.  And he is -- actually, the day before.  He is the senior manager of patent assertions at Ericsson.

And 6 minutes and 11 seconds will be charged to the Defendants.

69

(Video playing.)

QUESTION:  If you look at -- let's see, what category is this?  If you look at Exhibit 1, Category 49 is:  Any and all bases for Ericsson's allegations that Defendants have willfully infringed any of the patents-in-suit.

You're the Ericsson representative to testify on willful infringement?

ANSWER:  That's correct.

QUESTION:  Does Ericsson contend that Intel willfully infringes the patents-in-suit?

ANSWER:  I'm not sure if I'm in a position to address that.

QUESTION:  As the corporate designee for Ericsson on willful infringement, you don't know whether Ericsson contends that Intel willfully infringes the patents-in-suit?

ANSWER:  No, I don't know that.

QUESTION:  Okay.  Has Ericsson ever given -- provided Intel with notice of the patents-in-suit?

ANSWER:  Not to my knowledge.

QUESTION:  In its original complaint, Ericsson was only accusing products that had Wi-Fi chips from Atheros, QMI, Ralink, Foxconn, Gemtek, Lite-On,

70

Marvell, Realtek, or Cambridge Silicon Radio; is that correct?

ANSWER:  Yes, that's correct.

QUESTION:  Ericsson, when it filed its original complaint in this case, was not accusing products that had Intel Wi-Fi chips in them, right?

ANSWER:  I believe that's correct.

QUESTION:  Ericsson, when it filed its original complaint in this action, was not accusing products that had Broadcom Wi-Fi chips in them, right?

ANSWER:  That's correct.

QUESTION:  And so -- so at some point in time, NETGEAR communicated to Ericsson its belief that it did not infringe the patents that were being asserted or that the patents were valid.  Is that an accurate summary?

ANSWER:  Yes, I believe so.  That's what NETGEAR tried to communicate to us.

QUESTION:  What happened between 2004, when Ericsson first approached NETGEAR, and in 2009, the year that you identified when Mr. Harris, you know, picked the thread back up?

ANSWER:  I believe we put most of the Wi-Fi licensing on ice because we didn't have any account responsibility in the U.S.  We focused on other

71

technologies and other geographic areas.

QUESTION:  Okay.  And did you notify NETGEAR that you were, in your words, putting it on ice?

ANSWER:  No, I don't think we did that actively.  I mean, we didn't actively put it on ice, but I'm not sure we ever conveyed anything to NETGEAR that we -- we never stopped licensing, but we stopped communicating with NETGEAR.

QUESTION:  Handing you now a document which has been marked as Exhibit 34, bears Bates range NETGEARINC 388039 through -98.  Do you recognize this document?

ANSWER:  Yes, I've seen this before.

QUESTION:  And do you see under the subheading (b), it says:  A previous claim chart by Ericsson proves that the '019 patent is invalid in light of a 1993 draft of the 802.11 standard?

ANSWER:  Yes, I see that.

QUESTION:  I've now handed you a document that's been marked Exhibit 41.  Have you ever seen this document before?

ANSWER:  No, I believe I have not seen this document before.

QUESTION:  In this letter, D-Link's communicating its belief to Ericsson that it does not

72

infringe the asserted patents, correct?

ANSWER:  I have not read the whole letter.

QUESTION:  From your review of it just now, can you tell?

ANSWER:  Yes.  It seems like it from the statement on Page 2.

QUESTION:  I kind of want to use that to ask you generally, is that sentiment that the functionality resides on the chip supplier's products, something Ericsson heard frequently in the course of its discussions with OEMs regarding the patents-in-suit?

ANSWER:  I would not say frequently, but we heard it before.

QUESTION:  So you heard it from D-Link, right?

ANSWER:  Yes.

QUESTION:  How about Acer?

ANSWER:  I believe Acer said so.

QUESTION:  Did -- in -- in response to those sentiments, did Ericsson communicate with any of the -- the OEMs' chip suppliers?

ANSWER:  I think not.

QUESTION:  Handing you a document that's been marked as Exhibit 44.

73

ANSWER:  Yes, I do.

QUESTION:  All right.  You're a recipient on this e-mail, right?

ANSWER:  Yes.  I'm on the CC list.

QUESTION:  Okay.  And what's Mr. Tu telling Kate Shang there, top e-mail?

ANSWER:  I wrote you saying that we don't agree that Acer would send our claim charts to the suppliers of Acer.

QUESTION:  And why wouldn't Ericsson allow that?

ANSWER:  Because we want that to be done under an NDA which we had not signed with Acer suppliers.

QUESTION:  Okay.  And did you receive assurances from Acer or any other OEM that they could get you the necessary NDA protections if you so desired?

ANSWER:  Yes, I can recall some of them saying that.

QUESTION:  Did you allow them to share the claim charts with their chip suppliers after they gave you assurances they could get you the necessary confidentiality you wanted?

ANSWER:  No, we didn't.

(End of video clip.)

74

THE COURT:  All right.  Who will be your next witness?

MR. VAN NEST:  Your Honor, we would like -- there were a number of exhibits shown in the video we'd like to move into evidence now, two of them Trial Exhibit DX 71 and Trial Exhibit DX 489.

THE COURT:  Any objection?

MS. MOORE:  Yes, Your Honor.  We have 408 objections to these documents.  They're settlement correspondence with Ericsson and various of the Defendants.

MR. VAN NEST:  May we approach, Your Honor?

THE COURT:  Yes, you may.

(Bench conference.)

THE COURT:  Let me see the exhibits.

MR. VAN NEST:  There's a third exhibit as well, Your Honor.  It's Trial Exhibit 460.

And what they are, these are attorney opinions that were given to Ericsson back in the day after Ericsson made the assertion.  All they are is letters -- or materials provided to them.  They were authenticated by Mr. Iwerback.

They opened the door by standing up and telling the jury that nobody got opinion letters and

that nobody consulted lawyers when, in fact, they knew that back in the day when these assertions were made, these two, NETGEAR and D-Link, got attorneys, put analyses together, said we don't infringe, and provided these to Ericsson back at the time.

There's no back and forth.  There's no correspondence.  It's simply a -- an analysis of non-infringement given to Ericsson back in the day.

THE COURT:  What's your objection?

MS. MOORE:  Our objection is that all of this was occurring during the time settlement negotiations were going on.  NETGEAR, I think, in particular, they were indicating four -- or three, four, five years at a time.

I have an opinion here.  It is very similar, on point, if you read the highlighted portions.  Samsung tried to do essentially the same thing.  It's a end-run around Rule 408, and in the Eastern District of Texas, that was found to be recent enough that these documents should not be admitted into evidence.

MR. VAN NEST:  Your Honor, they shouldn't have opened the door.  I mean, I objected to putting this issue of attorney opinions in at all.  Your Honor overruled that objection.  He stood up and told the jury we didn't have them.  I've got three of them right here

that they knew about.

Your Honor ruled that we would have a separate willfulness phase, so we wouldn't have this issue in phase one, but now we're into willfulness. They opened the door to this.

THE COURT:  Just a moment.  Let me read this.

MR. VAN NEST:  I haven't had an opportunity to read it yet, Your Honor, no.

(Pause in proceedings.)

THE COURT:  The objection's overruled.

MR. VAN NEST:  Thank you.

(Bench conference concluded.)

MR. VAN NEST:  Your Honor, for the record, I will reoffer Defendants' Exhibit 460, Defendants' Exhibit 71, and Defendants' Exhibit 489.

THE COURT:  All right.  They're admitted.

MR. VAN NEST:  At this time, Defendants call Mr. Matthew Shoemake.

THE COURT:  All right.  Has this witness been sworn?

MR. DAUCHOT:  Yes.  The witness was sworn.

MATTHEW SHOEMAKE, Ph.D., PLAINTIFFS' WITNESS,

PREVIOUSLY SWORN

77

DIRECT EXAMINATION

BY MR. DAUCHOT:

Q.   Good afternoon, Dr. Shoemake.

A.   Good afternoon.

Q.   You have done an analysis in this case.  And I know the jurors have not heard from you in this case, but you have, nevertheless, done an analysis in this case about IEEE issues and letters of assurances and how all of that relates to the patents that Ericsson has asserted in this case.

Am I right about that?

A.   I have, that's correct.

Q.   Now, do those opinions and that analysis bear, sir, on the question of whether it was appropriate for the Defendants to believe that they could continue to practice the 802.11n standard while this dispute that's been going on for three years or so was in the process of getting resolved in the courts in front of the Judge here and in front of the jury?

A.   Yes, they do.  The report does bear on that question.

Q.   All right.  And how so, Doctor?

A.   Well, it -- the -- the IEEE patent policy and the letters of assurance provide an assurance that the Defendants and the industry in general will not be

blocked in practicing the 802.11 standard.

Q.   All right, sir.  Now, before we get into that in some more detail, your analysis and the conclusions that you reached in this case, are they based on your background and experience?

A.   They are.

Q.   Okay.  Let's turn to that.  And briefly, where are you from, sir?

A.   I am originally from Mexia, Texas.  It's about halfway between Fairfield and Waco.

Q.   All right.  And can you give members of our jury just a brief background of your education.

A.   I'd be happy to.  I went to Texas A&M University in College Station.  I majored in -- double majored in electrical engineering and computer science, and graduated with honors.

I went to grad school in Upstate New York at Cornell University.  I also studied electrical engineering there.  I received a Master's degree and a Doctorate degree from Cornell.

Q.   In what area?

A.   Oh, I focused on communications theory and information theory.

Q.   All right, sir.  Can we -- can you walk us through your professional experience?

A.    Oh, I'd be happy to.

Early in my career I -- actually, when I was at Texas A&M, I also worked at Texas Instruments down in Houston, in Stafford, on the Southwest side in their digital signaling processing group where they built semiconductor chips.

Later, in the late '90s, I joined a startup company in California.  It was in the San Francisco Bay Area named Alantro Communications, and we built semiconductor chips as well, specifically semiconductor chips for the 802.11 standard and -- and for Wi-Fi.

In 2000, that company was acquired by Texas Instruments and so it gave me the opportunity to move back to Texas, which I did; and I worked at Texas Instruments' headquarters in Dallas for about three years managing a team of engineers, bunch of smart engineers working on Wi-Fi and wireless LAN development.

And since then, I have founded a couple of startup companies in the North Dallas area, in the Allen and McKinney area.

The -- the one I -- I currently run is named Biscotti.  We're in McKinney.  It's a startup company that -- that builds video-calling products.

Q.    All right.  Let's -- let's focus on your IEEE experience.  And can you give the members of the jury a

80

sense of -- of that experience and -- and your background with the IEEE --

A.   I'd be --

Q.   -- and as well 802.11 and "n" particular?

A.   I'd be happy to.

So I got involved in 802.11 in late 1997, early 1998.  I participated heavily in the development of 802.11b and 802.11a.  I, in fact, have essential patents with respect to 802.11, including 802.11b and "g."

After 802.11a and "b" were ratified, the members of 802.11 elected me as the chairperson of 802.11g, so I was the chairman of 802.11g from 2000 to 2003.

And after that was finished, I was elected as the chairman of 802.11n and so I was the first chairman of 802.11n.

Q.   All right, sir.  Now given your -- your -- your background and that work, did you -- did you get an appreciation for the IEEE from a historical perspective and from -- and from a policy perspective?

A.   I did.  In fact, I was responsible for enforcing it.

Q.   All right.  Well, let's start with the history briefly.

I think you put together a demonstrative to help us -- to help explain that on the -- on the historical part?

A.   I did.  I don't see them in front of me, but I know there are a couple of slides, yes.

Q.   Here we go.

A.   This is them.

MR. DAUCHOT:  And for the record, that is DDX 11-3.

Q.   (By Mr. Dauchot) So go ahead and describe what we're looking at, Dr. Shoemake, please.

A.   I'd be happy to.

I put together a couple of slides on the IEEE. If you look at the first bullet, the IEEE is a nonprofit organization.  It's a -- it's a U.S. corporation headquartered out of New Jersey.  It's been around for a long time; since about 1884.

It switched to its current name, the IEEE, in 1963.  And I like to think of the IEEE as the professional organization for -- for engineers like myself, or electrical engineers specifically.  It's got a lot of members.  It's got over 400,000 members.

It's a very international organization with members in over 160 countries.  And I showed here there are a couple of famous members.  Alexander Graham Bell

82

who invented telephone was a member, and also Thomas Edison who invented the light bulb.

Q. All right. Let's -- let's shift gears -- and we're not going to test the jurors' patience here because they have heard plenty about the IEEE during the -- during the course of this case. But, can you give us -- and -- and we all understand in this courtroom that the IEEE develops standards, and we've gone through that so we won't belabor that here.

But, from a policy perspective, can you -- can you approach it that way and explain to the jurors where the IEEE and -- and things like 802.11n come from a -- a policy perspective?

A. From --

Q. Did you put together a demonstrative for that?

A. I -- I do. I have -- I have another slide on the IEEE and I also have -- for example, this one I have -- I'm not sure exactly the question, but I have a slide here on the -- the mission statement --

Q. That's correct.

A. -- of the -- of the IEEE. So, I'd be happy to with respect to this. And -- and I'll try to be brief, per your request.

The -- you can see here the mission statement of the IEEE as a not-for-profit organization is -- and

83

I'll read it.  The IEEE's core purpose is to foster technological innovation and excellence for the benefit of humanity.

Q.   All right.  Now, we've, obviously, touched on the subject of patents some in this case.  And do the patents -- do patents from a -- from a general perspective, can they create issues when it comes to the IEEE's mission here and -- and the standard setting process in particular?

A.   Oh, they certainly can.

Q.   And how so?

A.   Well, a standard can be used to -- to block someone from -- from using a standard or building product compliant to -- to a standard.  So that's a -- a potential real problem for the standards organizations.

Q.   And how does that impact consumers in the -- in the standard setting process?

A.   Well, it means -- I mean, standards are -- are very -- are very valuable to consumers for interoperability.  And if someone could use a patent to kind of shut-down consumers from -- or the industry from -- from using -- from using a standard, that would be quite problematic.

Q.   All right.  Let's -- let's put -- does the IEEE deal with that question about how -- how to balance

84

this subject of patents on the one hand and -- and

the -- and the mission statement, the policies on the

other?

A.   We absolutely do.

Q.   Okay.

MR. DAUCHOT:  Can we put up DX 550,

please?  And turn to, let's see the -- there we go.

Q.   (By Mr. Dauchot) Now, can you explain what the

policy is of the IEEE with respect to balancing, if you

will, the competing interests between the patents on the

one hand and the standards on the other?

A.   Absolutely.  So the IEEE has a -- a patent

policy and -- and I mentioned those, without this type

of policy and letters of assurance could be used to --

to block consumers.  And so what we do is we -- we

request -- we have this policy where we ask people that

participate to submit letters of assurance.

Q.   All right.  Now -- and we've covered this

before during the context of the -- of the first part of

the trial, and that is that when the IEEE submits this

request for somebody to -- to give notice, that is -- is

that a statement on the part of the IEEE that the

patents or that's being -- what is being requested is,

in fact, a standard essential patent?

A.   Oh, no.  The IEEE renders no verdict on

essentiality.

Q.   All right.  And who ultimately makes that verdict?

A.   Well, if the parties can't agree, it comes here and the Judge and the jury get to decide.

Q.   All right, sir.

Now you described to the jury that at some point the IEEE, during the standard setting process, the IEEE tries to get a sense of the patents out there.  Now it -- does that happen after the standard has been developed or -- or before, sir?

A.   I'm sorry.  Could you repeat the question?

Q.   The question is:  You just testified that the -- at some point in the process the IEEE, the policies require that patents that cover the standard -- or allegedly cover the standard, I should say -- be disclosed, right?

A.   Right.

Q.   Now does that happen before the standard is adopted or -- or after the standard is adopted?

A.   On, before.  Before.

Q.   And what's the point?

A.   Well, the point is that the members are voting and setting a standard, and they want to be able to get as much information as they can about the patent

situation to make good decisions.

Q.   Now, once -- once those patents have been -- once we have members who come up and say, look, you know, we -- we have patents, what happens?  What's the next step?

A.   Well, they're asked to -- to put in a letter of assurance.

Q.   Okay.  And explain to the jurors what that letter of assurance is about, generally.  And I know the jurors have heard some of that during the trial.

A.   Okay.  So -- I'm sorry if this is repetitive.

The -- well, the letter of assurance is basically a promise.  We have a standardized form in the IEEE to make it easy for members to fill out; and -- and in that form you can put the entity you represent and which standard you're making an assurance with, with respect to, and then you make an assurance, basically a -- you're allowed to make an assurance or a promise that you will -- that you'll -- you'll license the -- your patents.

Q.   All right.  And the jurors have seen PX -- Plaintiff's Exhibit -- 293, 294.  Rather than showing it to the jurors because it's in the record and the jurors have seen it, you are aware that Ericsson submitted two such letters of assurance, correct?

A.    I am.

Q.    All right.  Now from -- from -- from the industry's perspective -- from the Defendants who are part of the industry, from their perspective, what does -- what do those letters of assurance tell them?

A.    Well, they -- they -- they tell them that they can get a license and they tell them that if there's a -- a dispute, they can continue to practice the standard and they won't be blocked.

Q.    All right.  Now is that -- is that -- the last part, is that expressly in these letters of assurance?

A.    Well, it's -- it's consistent with the overall policy of trying to -- to enable the industry.  And the -- if you look, the assurance to license is, in effect, an assurance not to block.

Q.    All right.  Now are the Defendants entitled to rely on that?

A.    Oh, they certainly are.  The Defendants -- everyone's entitled to rely upon it.

Q.    Everyone in the industry?

A.    Not just the industry.  Consumers also. Everyone.

Q.    All right.  Now, what happens in case of a dispute?  So we get -- we get to a point where someone's approached by, for example, Ericsson and Ericsson says,

88

hey, we have a standard essential patent here, and the party that's accused of -- of practicing the patent says, well, no, I don't think so and you're asking for too much.

How -- how does that -- how does that get resolved and how does the -- the -- the blocking issue tie there?

A.    Well, due to the letter of assurance, the -- the companies, for example, I guess the Defendants in this case, are assured that they can continue to practice while the dispute's resolved and -- and I guess this case, you know, we -- the -- come to the Court to have that resolved.

Q.    All right.  Now, I'm going to put up DX 78 and direct your attention to Page 6.

MR. DAUCHOT:  Now, can you blow up, Dave?

There we go.

Q.    (By Mr. Dauchot) All right.  Now, this is an internal Ericsson document.  And you've reviewed this document, sir?

A.    I have.

Q.    All right.  Now, does this document -- what does this document indicate to you as far as Ericsson's understanding of what its letters of assurance meant?

A.    Well, you can see it in the top bullet here.

It says FRAND, fair reasonable and non-discriminatory commitment means no blocking patents.

Q.   All right, sir.

MR. DAUCHOT:  I have no further questions.  Thank you.

THE WITNESS:   Thank you.

THE COURT:  Thank you.  Cross-exam.

MR. CAWLEY:  Yes, Your Honor.  Briefly.

CROSS-EXAMINATION

BY MR. CAWLEY:

Q.   Good afternoon, Dr. Shoemake.  Now, do I understand your testimony correctly that when members of an 802.11 meeting group decide what to put into the standard, they may be aware that what they put in may be covered by patents.  Is that what you just told us?

A.   They -- they may be aware that there are patents related to what they're standardizing, yes.

Q.   Okay.  In fact, let's look at Defendants' Exhibit 550.  This is the patent policy you were referring to, right, by the IEEE?

A.   It is, that's correct.

Q.   If we look at Page 3 of that policy, the very first line after the title, let's highlight that.

This very policy says that IEEE standards may be drafted in terms that include the use of essential

90

patent claims.  Is that right?

A.   That's true.

Q.   And who gets a copy of this policy?

A.   Oh, this policy is available on the IEEE's website, and -- and members are made aware of it at every session they attend.

Q.   Would Dell be made aware of it?

A.   If they -- if they were at an IEEE meeting, they would have been made aware of it.

Q.   Would Intel be aware of it?

A.   At a certain point in time, yeah, Intel would be aware of it.

Q.   All the Defendants in this case would be aware that there may be essential patent claims in these standards, correct?

A.   Well, if -- if they've attended an IEEE meeting, they would be aware.

Q.   Now, do I recall the timing correctly that the draft 2.0 of the 802.11n standard that we're talking about in this case was approved in 2007?

A.   Yes, that's correct.

Q.   And the standard "n" was finally approved in 2009.  Do I remember that correctly?

A.   Yes, it was ratified in 2009.

Q.   Okay.  But isn't it true, Dr. Shoemake, that

you stopped attending 802.11 meetings in 2004?

A.   Yes, that's true.

Q.   And no one in your company Biscotti, that's the company you're with today, goes to 802.11 meetings, do they?

A.   That's correct.

Q.   And, in fact, these days, in addition to working at Biscotti, some of the work you do is actually work of being a paid witness; is that correct?

A.   Some -- sometimes.

Q.   And in all the cases that you've worked on and which you've been paid to be a witness, have you represented the Plaintiffs and the Defendants about equally?

A.   No.

Q.   Well, who do you represent?

A.   Well, I've only been contacted by Defendants, and so I've looked at cases and then been -- I've represented Defendants.

Q.   So in all the cases that you've been paid to testify, you've been testifying on behalf of Defendants. Is that what you're telling us?

A.   Thus far in my career that's true.

Q.   And how much do you get paid for that?

A.   I'm $435 an hour?

92

Q.   Thank you, sir.

MR. CAWLEY:  Pass the witness.

THE COURT:  All right.  Any redirect?

MR. DAUCHOT:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. DAUCHOT:

Q.   Dr. Shoemake, the letters of assurance that have been marked as PX 293 and 294 in this case -- and I won't put them up because we've -- we've seen plenty of them -- they have language that these letters are irrevocable, right?

A.   They do, that's correct.

Q.   And can you explain to our jurors what that means?

A.   Irrevocable, it means it can't -- it can't be taken back.  And further, it's -- it's not only in the letter, it's in the IEEE policy as well.  So it means that once you've made this promise with your letter of assurance, you can't take it back as long as the standard is active.

Q.   All right.  Now, from an IEEE policy standpoint, folks out there who differ with a parties' position as to whether or not the patents are standard essential and who differ with the amount of the royalty being requested, have the right to challenge that,

93

right?  They have the right to dispute?

A.   They do.

Q.   And in -- and if they do dispute it, does the letter of assurance become revocable all of a sudden?

A.   No, it does not.

Q.   All right.  And just give us a sense from -- from your perspective here.  What takes place is back in 2000 -- let's go back to 2010 or -- or whatever the time was of the -- of the notice; that all of the Defendants in the room stop at that point, stop making the chips, what's the damage to the standard and to the -- ultimately to the consumers?

A.   Oh, there's a huge -- huge amount of damage. I mean, the industry has a stop-down.  Consumers can't buy 802.11-based products.  You lose the interoperability we were going after.  It creates an environment where it's very difficult to figure out even what RAND is.

Q.   And is that what the IEEE policy and the LOAs, the letters of assurance, are ultimately designed to prevent?

A.   Absolutely.

Q.   All right, sir.

MR. AROVAS:  I have no -- hold on one second.

94

That's all I have.  Thank you, sir.

THE WITNESS:  All right.  Thank you.

MR. CAWLEY:  No further questions, Your Honor.

THE COURT:  All right.  If the jury would pass down their questions, please.

(Pause in proceedings.)

THE COURT:  All right.  I have no questions.  Thank you.  You may step down.

THE WITNESS:  All right.  Thank you.

THE COURT:  Who will Defendants' next witness be?

MR. VAN NEST:  Your Honor, at this time we'd like to play a short video excerpt from the deposition of Christine Petersson.  She was here as the second witness in the trial last week.

THE COURT:  Uh-huh.

MR. VAN NEST:  And this is about one minute in time charged all to Defendants.

THE COURT:  All right.  You may proceed.

(Video clip playing).

QUESTION:  Well, you certainly understand who manufactures chipsets out there, and you have -- you have access to the -- to their patents, don't you?

ANSWER:  We don't have the ability to go

95

through the entire patent portfolios out there in the industry.

QUESTION:  And you don't have -- you don't have intelligence -- a company like Ericsson doesn't have people in the law department who make it their business to -- to see what patent covers what products to make sure that you respect other people's patent rights?  You don't have people like that at Ericsson, or is it that you just sell products without really caring as to who has what patents and whether or not you're infringing on other people's patents?

ANSWER:  It's not possible to do patent searches of that kind.

QUESTION:  So it's your testimony that Ericsson does not conduct due diligence to make sure that products that it sells do not infringe on other company's patents?

ANSWER:  As a general policy, that's correct.

(End of video clip).

THE COURT:  All right.  Who will your next witness be?

MR. VAN NEST:  Your Honor, at this time Defendants rest.

THE COURT:  All right.  You don't have

96

any other -- you still have some time left.  Do you have any other witnesses you wish to call?

MR. VAN NEST:  I don't believe so, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

Does Plaintiff have any rebuttal testimony?

MR. CAWLEY:  No, Your Honor.

THE COURT:  All right.  Thank you.

All right, Ladies and Gentleman, of the Jury, that concludes the testimony.

Let me read for you your instructions, and then we will hear closing arguments.  Again a copy of these --

Excuse me.

MR. VAN NEST:  Excuse me, Your Honor.

May we approach briefly?

THE COURT:  Yes.

(Bench conference.)

MR. VAN NEST:  I'd just like to reserve the opportunity to file a JMOL motion in writing and have it deemed submitted timely now before the case -- before the willfulness phase goes to the jury, and we can file it in writing.  An hour and a half at the latest.

97

THE COURT:  By 5:00 o'clock.

MR. VAN NEST:  Could we file it by 5:00?

MR. STEVENSON:  Agreed.

MR. VAN NEST:  Be deemed -- deemed filed timely then.

THE COURT:  Yes.

MR. VAN NEST:  Thank you, Your Honor.

(End of bench conference.)

THE COURT:  All right, Ladies and Gentleman, if you will please pay attention to my final instructions regarding willfulness.

You have heard the evidence in this phase of the trial regarding willfulness.  I will now instruct you on the law which you must apply.  It is your duty to follow the law as I give it to you.

Again, as I told you earlier, you, the jury, are the judges of the facts.  Do not consider any statement that I have made during the trial or make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments.  Again, statements and argument of attorneys are not evidence and are not instructions on the law but are intended to assist you in understanding the

98

evidence, the parties' contentions and what each party believes your verdict should be.

Ericsson claims that the Defendants willfully infringed the claims of the patents-in-suit that you have found were valid and infringed.

Defendants claim that they have not willfully infringed these patents.

The issue of willful infringement relates to the amount of damages Ericsson is entitled to recover in this lawsuit.  If you decide that one of -- or more of the Defendants willfully infringed the claims of one of the patents-in-suit, then it will be my job to decide whether or not this willful infringement has any affect on damages.

Willfulness requires you to determine by clear and convincing evidence that the particular Defendant you have found to be infringing, acted with reckless disregard to the patent and with respect to the claim you found infringed.

To prove that a Defendant acted willfully, Ericsson must prove by clear and convincing evidence that the particular Defendant actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid patent.

99

To determine whether the particular Defendant had this state of mind, consider all the facts, which may include, but are not limited to:

(1) Whether or not the Defendant acted in accordance with the standards of commerce for its industry;

(2) Whether or not there is a reasonable basis to believe that the Defendant did not infringe or had a reasonable defense, such as invalidity;

(3) Whether or not Defendant made a good-faith effort to avoid infringing the patents, for example, whether the Defendant attempted to design-around the patents; and

(4) Whether or not the Defendants tried to cover up its infringement.

None of these factors are determinative, and this list of factors is not an exhaustive list of things you should consider.

Your determination of willfulness should incorporate the totality of the circumstances based on the evidence presented during the trial.

Ericsson has the burden of proving willfulness by clear and convincing evidence.  When a party has a burden of proof by clear and convincing evidence, it means that the evidence must produce in

100

your minds a firm belief or conviction as to the matter sought to be established.

In other words, if you were to put the evidence for and against the party who must prove the fact on the opposite sides of a scale, clear and convincing evidence requires that the scale tip more heavily toward the party who has the burden of proof.

That concludes my instructions. In just a moment, you'll hear closing arguments from each side dealing solely with the issue of willfulness. Each side will have up to 10 minutes to present their argument.

After that, you will retire to the jury room to consider this final issue of willfulness. You will not reconsider any of the questions you've already reached a verdict on but just solely on this question of willfulness.

There will also be a verdict form provided for you.

Do we have copies to pass out to the jury?

Let me go ahead and pass those out to you, and I will go over it just so you'll know what the form looks like.

All right. You'll see willfulness verdict form. In answering these questions, you are to

follow the instructions I have given you in the Court's Charge.

Question No. 1, and the only question: Did Ericsson prove by clear and convincing evidence that D-Link Systems, Inc.'s, NETGEAR's, and Belkin International, Inc.'s infringement was willful?

Answer yes or no for each patent below.

Then it lists each patent and each of the three Defendants listed. And you will answer yes or no in the appropriate space.

And there is a Question 2 which is very similar. It says: Did Ericsson prove by clear and convincing evidence that Acer/Gateway, Dell, Toshiba, and Intel's infringement was willful?

Then you'll answer yes or no for each of the patents listed for each of the Defendants listed.

Are there any questions about the verdict form?

All right. The Court will recognize Mr. Cawley for purposes of closing argument.

MR. CAWLEY:  Thank you, Your Honor.

Ladies and Gentleman, I promised you that I would be as brief as possible, and I will.

Basically, I would just like to raise three questions for your consideration.

102

The first question is:  Why do you think that the IEEE found it necessary in 2011 to send Ericsson a letter saying:  Well, we understand you may have essential patent claims, and we're asking you to please renew your commitment for 802.11n?

I'd suggest to you, Ladies and Gentleman, that's evidence to you of what the IEEE recognized about Ericsson's patents.  And it's in flat contradiction to the claims of the Defendants that the IEEE does nothing about that; and therefore, the Defendants didn't know that they infringed.

They already had notice by that time. They had already received correspondence that you've seen from Ericsson informing them exactly how they infringed.

The second question is:  Where is the person from Intel who made the decision not to change their product, to keep selling it just like always even after they learned of Ericsson's patents?

Where's the person at Dell, at Acer, at NETGEAR, at Toshiba, and at D-Link who made those decisions?  And why haven't they come here to explain to you the basis on which they reasonably believed that they didn't infringe?

Now, the answer that we've heard is,

103

well, there's a commitment to the IEEE that at the end of the day, Ericsson will license on reasonable terms and not try and block us from selling, so we're just going to go on ahead willy-nilly.  We're just going to sell our product like always, even though we don't have a reason to believe we don't infringe.

Well, Ladies and Gentleman, it may be that at the end of the day that Ericsson doesn't block them from selling, but these Defendants' decision to go ahead and do that without a reasonable basis for believing that they don't infringe, is a perfect example of willful infringement.

They haven't given you any excuse, any explanation of a reason why they thought they didn't infringe; they just decided to go ahead and keep selling, even though they had every reason to believe they did infringe.

And the final question I would like to pose is:  Where are opinions of counsel?  Where are these Defendants able to show you that they consulted with legal counsel to get an opinion from them about whether or not they infringed or whether or not the patents were invalid?

We saw testimony from a lawyer inside Dell.  He didn't tell you that he had formed any opinion

104

at all and informed his superiors at Dell:  Don't worry; it's okay; we don't infringe.  He didn't say that.

We know that Mr. Kitchin at Intel works in the legal department.  He doesn't know that anything like that happened at Intel.

And you never heard anybody from D-Link or NETGEAR or any of these Defendants tell you that they had done the responsible thing and consulted attorneys to study the patents to advise them that they didn't infringe.

In short, Ladies and Gentleman, we think the evidence has shown you that these Defendants have not acted responsibly.

Yes, they may have had an assurance that at the end of the day Ericsson wouldn't stop -- block them from selling an infringing product, but the question really is:  What was their reasonable basis for believing that they didn't infringe?  And they didn't have any.

Ladies and Gentleman, we appreciate your extraordinary patience in bearing with us this afternoon; and on behalf of the people at Ericsson, we thank you.

THE COURT:  All right.  Thank you, Mr. Cawley.

Mr. Van Nest?

MR. VAN NEST:  Let me step over here.

Good afternoon again, Ladies and Gentleman.

Mr. Cawley had some questions; I've got some answers; and I have some evidence, too, that I'd like you to write down as we go through it.

First of all, let me say again, the Defendants respect your verdict.  Our system worked the way it should.  I don't think there's any great mystery to what happened.  I really don't.  The system worked the way it should, and it worked here in our jury -- in our courtroom and our jury box the same way.

There was a claim by Ericsson that patents were infringed.  Now, they came along years after the standard was set and everyone was out selling Wi-Fi and making products.

And in our system in the United States -- not just in patent cases, but in any cases -- if someone claims you're doing something wrong, you don't immediately have to shut down what you're doing.  You're selling a product; you either resolve your dispute or you come to court.  And that's what we did.  We came to court.

And I'm not sure what Mr. Cawley is

talking about; they don't have any reason.  I've been giving reasons, which I think are legitimate, and the Defendants thought were legitimate for the last eight days as to why we don't infringe.

And as I'm going to show you in a minute, these are the same reasons that we gave to Ericsson, many of these Defendants, way back when.  So they've known about these for a long time.

So with respect to how the system works, especially what you heard Dr. Shoemake say, Ericsson sent a letter saying:  We give you, IEEE, a letter of assurance that we'll license at RAND rates.

That means we're not going to ask anybody to shut down.  All we want is a reasonable royalty.  If we can't agree on the royalty, we'll come to court, and a jury will set it.

And you have set the royalty.  By my math -- or I'll say Mr. Jones' math, it looks like it's about 15 cents a product.  That's a lot less than the 50 cents that Ericsson has been demanding from all of us all these years.

Nobody had a chance to get it for any less.  That's why we came to court, and we got our answer, and now we're going to go forward.  So there's no big mystery about all of that.

107

And you heard Mr. Kitchin say people in the industry, engineers at all these companies, expect there to be disputes; but nobody is expected to immediately shut down what they're doing, especially when everyone in the industry has agreed to a standard and someone comes along later, like Ericsson has done, and says we want some money, too.

Now, this phase is very important. As you heard Judge Davis tell you, this is the phase that will determine whether the damages that you've assessed will be increased even more. That's what Ericsson wants. They want the damages to be increased even more.

So this is very, very important to all of us as Defendants, and that's why the standard is not the preponderance standard that you used to determine infringement. It's a much higher standard.

Number one, clear and convincing evidence. Clear and convincing evidence.

And, number two, the question isn't: Were Defendants reasonable? The question is, did they recklessly disregard something? Was it reckless disregard, willful infringement? A much higher standard, because this is a proceeding, in effect, for punitive damages to punish the Defendants. That's what this is all about. The standard is much higher.

108

So you heard Judge Davis give you some factors.  One factor was, what belief did the Defendants have, and was it reasonable?

Well, number one, you heard Mr. Kitchin testify, and he's probably the person most able to know, right?  He was there at the IEEE.  It was Intel technology that went into the standard.  He went through that with Mr. Arovas this afternoon.

So he's a perfect person to know:  Are we using it or aren't we?  And he's the one that looked at the patents when Ericsson first asserted them against the customers and said:  I don't think we're using this technology.  I know where it comes from.  It comes from Intel, not from Ericsson.  I see the patents.

He's an engineer, he reviewed the patents, and his conclusion at the time was completely reasonable; and that's one key factor in your analysis on willfulness.

Second factor.  We presented for the last eight days the testimony not only from Intel but from Atheros and from Dr. Gibson and from Dr. Heegard, who are all experienced folks in this technology -- they've all been a part of Wi-Fi -- that presented to you our defenses.

And I know you had a hard deliberation.

109

I know that on the five patents, you agreed with us on two of them.  But the question is:  On the three where you disagreed, were we reckless?  Were those defenses recklessly asserted?

I don't think so.  We had facts.  I went through the facts with you yesterday.  And, of course, we respect a disagreement; but the question now is different.  Are those defenses recklessly asserted, or was there a basis in fact to assert them?  And I think absolutely there was.

Three, with respect to reasonable belief, I think that Mr. Cawley told you in opening that nobody got opinions from lawyers.  You heard -- saw some video about some interplay between Ericsson and some of the Defendants.  And as I said at the top of the hour, we don't have time to cover everybody.

The Dell lawyer sat down with the Ericsson folks and said:  These are chips that we buy from Intel.  These are chips that we buy from the suppliers.  We are not the ones that make the trip -- chips.  You need to talk with Intel or Broadcom or Atheros.  They're the ones.

And as you heard throughout the trial, they didn't want to do that because they don't want to license to chip makers.

110

So in some cases, as in the case of Acer -- Acer said:  We don't think we infringe either. We'd like to share the claims you're making with our chip supplier.

Ericsson said:  No, you can't do that. We don't want the chip suppliers involved, even though they're the ones making the product, because we want more money than that.

Now, in some cases, NETGEAR, for example -- please take a look when you retire at Defendants' Exhibit 460 and Defendants' Exhibit 489.

These are both materials prepared at NETGEAR's request by lawyers representing NETGEAR that outline why these Wi-Fi chips do not infringe.

You'll see that at that time, Ericsson was asserting many more patents than the five that you heard about.  They came in and said:  We have lots of essential patents.  Now we're down to five.

And -- and you will see in these pic -- in these materials all the reasons -- the same thing that we've been saying for the last several days as to why the '625 -- we're not using a command, et cetera, et cetera.  These prepared and given to Ericsson back at the time.  So nobody was sitting around saying: We don't want to talk.

So two letters from NETGEAR and a letter from D-Link from Ms. Yang, who's an attorney. She prepared a letter. At that time, Ericsson had 11 patents they said were essential.

And this letter covers those patents, explains why D-Link is not infringing. And Ms. Yang says: In addition, please talk to our chip suppliers. We don't make these. We don't think they infringe based on what we know.

So the Defendants did the absolutely responsible thing. They referred Ericsson to the folks that make the product. They presented hard information, sometimes from lawyers; and laid out why they didn't think they infringe.

And, again, where did we end up? Right where we end up in the United States when we have a business dispute, in a courtroom in front of a jury where we resolve it.

Another factor that I think you should consider in terms of reasonableness is the royalty rate. They weren't willing to give anybody a rate below 50 cents.

Now, you've determined the rate is about 15 cents, and we very much appreciate the hard work that you did to get there. It is not reckless to refuse to

112

pay a royalty that's three-and-a-half times what the reasonable royalty is.  That's simply not reckless.  That's reasonable business conduct.

If someone says:  You owe me $10 and you only owe $3, it's not unreasonable to say:  Hey, I will pay the 3; I will not pay the 10.

And in this situation, given your deliberations and your conclusion, another key factor among the ones Judge Davis asked you to consider, Standards in the industry.  That's another factor that he mentioned.

And you heard from Mr. Kitchin, you heard from Mr. McFarland during the trial, you heard from Dr. Shoemake right now, the way industry works -- and this is Ericsson, too.

That last video clip from Ms. Petersson, they're not out looking to see whether their products infringe other patents.  There are thousands and thousands of patents around the world.

None of these companies are out there with their products looking at everything that might be there.  They wait till someone makes a claim.  They evaluate the claim.  These Defendants responded to the claim.  And that's how everybody behaves, including Ericsson.

113

THE COURT:  Mr. Van Nest --

MR. VAN NEST:  She indicated they operate --

THE COURT:  -- excuse me.  You've used about 10 minutes.

MR. VAN NEST:  Can I have one minute just to wrap up, Your Honor?

THE COURT:  Sure, uh-huh.

MR. VAN NEST:  So, again, given the belief the Defendants had and the strong defenses we've presented, given the fact that Ericsson committed to allow the products to be manufactured while a royalty was worked out, given the respect that the Defendants have for intellectual property -- you heard that they're paying other licenses on Wi-Fi as well -- we would ask you to take all that information into account in rendering your decision.

And, again, Ladies and Gentleman, thank you very much for the time and attention you've given to us, and we look forward to your verdict.

Thank you.

THE COURT:  Thank you, Mr. Van Nest.

Ladies and Gentleman, let me give you --

MR. CAWLEY:  Your Honor, may we approach?

THE COURT:  Yes, you may.

114

MR. CAWLEY:  You want to take that off?

MR. VAN NEST:  Good idea.

(Mr. Van Nest takes off lapel mic.)

(Bench conference.)

MR. CAWLEY:  Your Honor, Mr. Van Nest has just violated the Court's order in limine, which specifically prohibited referring to the possibility of enhanced damages.

We would request a curative instruction from the Court to the jury that they are not to consider the possibility of enhancing the damages; and that that is exclusively a matter for the Court.

MR. VAN NEST:  Your Honor, I didn't say anything in my opening about it, but --

THE COURT:  It was in my instructions, but I will reiterate that --

MR. CAWLEY:  Thank you.

THE COURT:  -- instruction.

MR. VAN NEST:  But just so Your Honor understands, I didn't say anything until I heard your instructions, which said that the purpose of this proceeding is to determine whether enhanced damages will be offered.  That's what -- I understood from your instruction that that was certainly within the bounds of argument.

115

THE COURT:  Okay.  I think the instructions I gave were agreed to by the parties, too.

MR. VAN NEST:  They were.  They were.

MR. CAWLEY:  Now, do I have any time left for rebuttal?

THE COURT:  Oh, yes, you do.

MR. CAWLEY:  Okay.  I just need one minute.

(Bench conference concluded.)

THE COURT:  All right.  The Court will recognize Mr. Cawley for purposes of rebuttal.

You will need the microphone.

MR. CAWLEY:  Okay.  I won't need the microphone.

THE COURT:  Oh, there it is.  She's got it right there.  It makes it easier on the Court Reporter and the Judge.

MR. CAWLEY:  Well, Ladies and Gentleman, here's what you've just heard the Defendants say:  We don't have to worry about anybody stopping us from making the product because Ericsson has agreed that we can keep making the product; and when Ericsson comes to us to negotiate a reasonable rate for being able to use Ericsson's patents, we can simply say what they did say: We're not paying you anything.  Take us to court.

116

Ladies and Gentleman, Ericsson doesn't want to be in court.  You heard Mr. Brismark testify on the very first day of the trial, it's a very rare thing for Ericsson to take anyone to court to try and recover fair value for the use of its patents.

They negotiate.  They have a lot of people whose job it is to negotiate agreements, and that's what they almost invariably do.

But in this case, the Defendants took advantage of the system.  They said:  We're not at risk for having to stop because Ericsson's made a commitment to the IEEE, so we just won't pay anything.

And the worst that's going to happen is, Ericsson will take us to court, and we'll go through two years of litigation, and let's see what the jury says.

Well, Ladies and Gentleman, of course, we all respect what you have decided; but the point is, the Defendants made a calculated decision that they were going to go ahead and infringe the patents and see what happened in court.

That, Ladies and Gentleman, is willful infringement.

THE COURT:  Okay.  Thank you, Mr. Cawley.

All right, Ladies and Gentleman of the Jury, let me give you a couple of additional

117

instructions before you retire.

First of all, as I mentioned in my final instructions to you, your job is to decide where -- whether the infringement that you have found was willful.

You don't need to pay any attention to what effect, if any -- and it may not have -- on damages. That will be up to the Court to decide at a later date, if there is a finding. And there's certain criteria that I follow in that. It's all part of the process.

So your only decision is to decide whether or not the infringement was willful. The other thing I wanted to mention to you, you have heard evidence that there were other patents or other claims asserted, and I just want to tell you that in all of these patent cases -- not just this one, but there's always an effort by the parties on both sides to narrow the number of patents and narrow the number of claims and to number the -- a number of prior art references that apply on the invalidity side of the equation that the Defendants often assert.

Because as you know, with what we've had involved in this case, how long we've been here, and if we don't narrow those numbers down, as far as the number

118

of claims, the number of patents, the number of prior art references, then we could be here for months instead of days.

So don't read anything into that, and don't give that any weight, whether there were other claims or prior art references or other patents involved that were not asserted in this case.

Again, your job is to decide, with regard to the three patents that you've found were infringed, whether or not that infringement was willful.

So at this time, I will release you to the jury room to begin your deliberations; and as soon as you have a verdict, please let us know.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  Please be seated.

All right.  Is there anything from the Plaintiff before we recess?

MR. CAWLEY:  No, Your Honor.

THE COURT:  From the Defendant?

MR. VAN NEST:  Yes, Your Honor.  We have a number of exhibits that were admitted in connection with the willfulness phase we'd like to hand up, so that the jury may consider them.

THE COURT:  All right.  Both -- if both

119

sides will get their exhibits to Ms. Ferguson, she can send them in.

MR. VAN NEST:  Thank you very much.

THE COURT:  Let me just mention -- Blaine, if you would, pass out to the parties the post-trial juror questionnaire.

This is something that I have started doing, and I'm going to do it in this case, and you'll find I'm handing to you some questions that I will be submitting to the jury in the jury room after they have reached their final verdict.  It's just to help the Court better do a job of trying these cases.

And as you can see, it asks basic things like:  Did you feel that the trial took too long, about right, not long enough?

Would you like to have heard more evidence, less evidence, or about right?

How confident in your ability to decide the issues in this case did you feel on a scale of 1 to 10 that you were, with 1 being not confident and 10 being very confident?

Then a place for them to answer for before trial and after trial.

Did you find the juror questions helpful or not?

120

What things did the lawyers do that you liked or found helpful, and what things did you not like or found not helpful?

What additional evidence or witnesses would you have liked to have heard from?

Did you have any other comments, positive or negative, about the trial of this case and/or your experience as a juror?

Now, I plan to submit that to the jury and have them fill it out.  I always go back and visit with the jury afterwards.  Then I'm going to excuse them.

If counsel would like, I would be glad to come back into court -- I'm not going to give you copies of what they wrote; but if you would like any feedback on the trial, I would be glad to just read to you the comments of the jurors.  And I would take them one question at a time for each juror and go through that.

You don't have to stay, if you don't want to, but you're welcome to.

So would did Defendant --

MR. VAN NEST:  We'd like to have that.

THE COURT:  -- like to have that feedback?

MR. VAN NEST:  We would.

121

THE COURT:  Plaintiff?

MR. CAWLEY:  We, as well, Your Honor.

THE COURT:  All right.  Very well.  We'll be in recess until we get a jury verdict.

COURT SECURITY OFFICER:  All rise.

(Jury out - Deliberations.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  All right.  We have a verdict.  If you will bring the jury in, please.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  All right.  Please be seated.

All right.  I understand that you've reached a verdict?

THE FOREPERSON:  Yes, Your Honor.

THE COURT:  If you would, please hand the verdict to the Court Security Officer.

THE FOREPERSON:  (Complies.)

THE COURT:  All right, Ms. Ferguson.  If you would please read the verdict.

COURTROOM DEPUTY:  Willfulness verdict form.

As to Question No. 1:  Did Ericsson prove by clear and convincing evidence that D-Link Systems,

122

NETGEAR, and Belkin's infringement was willful?

Answer as to the '568, '625, '215 patent, the answer is no.

Answer to Question No. 2 as to Acer, Gateway, Dell, Toshiba, and Intel as to the '568, '625, '215 patents, the answers are no.

Thank you.

THE COURT:  All right.  Thank you.

Is there any request to poll the jury?

MR. CAWLEY:  Not from the Plaintiff, Your Honor.

MR. VAN NEST:  Nor from the Defendants, Your Honor.

THE COURT:  All right.  Very well.

Ladies and Gentleman of the Jury, you have worked very hard, and you've heard a lot of testimony.  You've deliberated hard, and I want to thank you so much for your service.

To show my appreciation, I have a little certificate here for you.

Ms. Ferguson, if you would, hold that up where they can see it.

And then it's even got a gold seal on it.

And she'll -- if you'll pass those out to the members of the jury.

123

And I'll just read it to you.  It says:

In the United States District Court, Eastern District of Texas, Tyler Division.

This is to acknowledge that -- and then the -- your name -- faithfully fulfilled her duties under the Eighth -- hers or his duties under the Eighth Amendment to the United States -- Eighth Amendment to the United States Constitution by serving on the jury which reached a verdict in the case of Ericsson, Inc., et al versus D-Link Corporation, et al, Cause No. 6:10-cv-473.

Without the participation of the citizens of this country, the unique right to trial by jury could not exist.

Accordingly, the Court expresses its gratitude for such service and sacrifice in fulfilling this important responsibility.

Signed and dated this date by myself, Leonard Davis, Chief Judge, Eastern District.

So thank you again for your service.

That's suitable for framing or the trash can --

[Laughter]

THE COURT:  -- or whatever you would like to do with it.  A dart board.  It's totally up to you.

124

I'm about to excuse you to the jury room. If you will go there, if you will wait there, someone will be there to dismiss you in a few moments.

And, again, once you are released -- you've been under my order not to discuss this case with anyone. You can discuss it with anyone you want to afterwards. But know you're not required to discuss it with anyone.

And none of the attorneys will -- or anybody will be contacting you. I always instruct them to respect your privacy. But know that you can discuss it with anyone you wish to.

So at this time, with the Court's thanks, the jury is excused to the jury room.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Please be seated.

All right. Sometimes parties settle their cases; sometimes juries settle their cases for them. And I think that that's what happened in this case.

So I'm going to order y'all back to mediation. Get with Judge Faulkner and get you a date between now and the end of the month and see if you can't get this resolved before everybody spends a whole

125

lot more money arguing over this case.

But if you can't get it resolved, we're going to have a hearing on July 16th to resolve your issues for you. So that will be the hearing on post-trial motions.

Surreplies will be due by July 12th at 4:00 p.m.

Y'all get together, meet and confer, and agree on a briefing schedule between now and then to accomplish that.

I want, again, to compliment not only the attorneys in this case, as I said earlier, for an exceptionally well-tried case; but I want to express special thanks to the paralegals and assistants for both sides.

My staff has told me that they have just been wonderful to work with, as far as helping take care of the jury, getting their food to them, getting it right, working with the Court Reporters to -- they say, if they need a video clip, they just e-mail somebody, and it's there to them like that.

And that makes our life much easier, and we do appreciate your staff. I know wherever all of them are, they often get overlooked, so the Court thanks all of you for a great job in supporting your lawyers.

126

All right.  I'm going to go visit with the jury.  I will be back with their questionnaire responses, and I'll go over those -- share those with you, if you would like to hear them.

Is there anything further from the Plaintiff?

MR. CAWLEY:  Your Honor, I know that Mr. Van Nest would join me in asking the Court, if the Court feels it appropriate, once visiting with the jurors, to express to them counsel's astonishment at their understanding of the facts in the case, as reflected by their questions.

MR. VAN NEST:  I know you will, Your Honor.

THE COURT:  Okay.  Very well.  I'll be happy to do that.  And I share that.  I thought the questions were absolutely very impressive for a lay jury.

All right.  I'll be back shortly.  We will be in recess.

COURT SECURITY OFFICER:  All rise.

(End of Trial.)

127

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of our abilities.

/s/ Shea Sloan
SHEA SLOAN, CSR
Official Court Reporter
State of Texas No.:  3081
Expiration Date:  12/31/14

/s/ Judith Werlinger
JUDITH WERLINGER, CSR
Deputy Official Court Reporter
State of Texas No.:  731
Expiration Date  12/31/14