**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| **ERICSSON INC., et al.,** | |
| **Plaintiffs,** | **Civil Action No. 6:10-cv-473** |
| **vs.** | **JURY TRIAL DEMANDED** |
| **D-LINK CORPORATION, et al.,** | |
| **Defendants.** | |

**PLAINTIFF ERICSSON'S SURREPLY IN OPPOSITION TO DEFENDANTS'**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OF NON-**
**INFRINGEMENT AND INVALIDITY AND MOTION FOR A NEW TRIAL**

McKool 907532v3

**TABLE OF CONTENTS**

I.    Introduction ................................................................................................................ 1

II.   Argument ..................................................................................................................... 1

      A.    Ericsson Introduced Sufficient Evidence to Support the
            Jury's Verdict of Infringement of the '215 Patent. ................................................ 1

      B.    Ericsson Introduced Sufficient Evidence to Support the
            Jury's Verdict of Infringement of the '568 Patent. ................................................ 3

      C.    Ericsson Introduced Sufficient Evidence to Support the
            Jury's Verdict of Infringement of the '625 Patent. ................................................ 4

            1.    Ericsson Presented Substantial Evidence of the
                  Command to Receive an Out of Sequence Packet. ...................................... 5

            2.    Defendants Raise a New Argument, Not Presented
                  at Trial, With Regard to Releasing Expectation and
                  the Court Should Find it Waived. ................................................................ 6

      D.    Ericsson Introduced Sufficient Evidence to Support the
            Jury's Verdict of Direct Infringement of the Asserted
            Method Claims. ..................................................................................................... 7

      E.    Ericsson Introduced Sufficient Evidence of Inducement ........................................ 8

      F.    The Court Should not Disturb the Jury's Verdict that the
            Asserted Claims of '625 and '435 Patents are not Invalid .................................... 10

            1.    Defendants Failed to Prove Invalidity of the '435
                  Patent by Clear and Convincing Evidence .................................................. 11

            2.    Defendants Failed to Prove Invalidity of the '435
                  Patent by Clear and Convincing Evidence .................................................. 13

            3.    Even if the Petras Reference was Prior Art, it is Not
                  Enabling ...................................................................................................... 14

III.  Conclusion ................................................................................................................ 14

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*AdvanceMe Inc. v. RapidPay, LLC*,
509 F. Supp. 2d 593 (E.D. Tex. 2007)...................................................................................10

*i4i Ltd. P'ship v. Microsoft Corp.*,
670 F. Supp. 2d 568 (E.D. Tex. 2009)...................................................................................9

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)...............................................................................................7

*Malta v. Schulmerich Carillons, Inc.*,
952 F.3d 1320 (Fed. Cir. 1991).............................................................................................7

*Metro-Goldwyn-Mayer Studios v. Grokster Ltd.*,
545 U.S. 913 (2005)...............................................................................................................9

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011)...........................................................................................................11

*Moleculon Research Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986).............................................................................................10

*Pineda v. United Postal Serv., Inc.*,
360 F.3d 483 (5th Cir. 2004) ................................................................................................10

*SiRF Tech. Inc. v. ITC*,
601 F.3d 1319 (Fed. Cir. 2010).............................................................................................8

*Versata Software, Inc. v. SAP Am., Inc.*,
Nos. 2012-1029, -1049, 2013 U.S. App. LEXIS 8838 (Fed. Cir. May 1, 2013)...................6, 7

*z4 Techs., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007)..............................................................................................4

McKool 907532v3

## I.     INTRODUCTION

Ericsson files this surreply in opposition to Defendants' motions for judgment as a matter of law of non-infringement and invalidity and Defendants' motion for new trial. For the reasons stated in Ericsson's opposition and set forth below, Ericsson respectfully requests that the Court deny Defendants' motions.

## II.    ARGUMENT

### A.     Ericsson Introduced Sufficient Evidence to Support the Jury's Verdict of Infringement of the '215 Patent.

The Court rejected Defendants' view that claim 1 of the '215 patent requires a receiver to select the feedback response type from multiple types that are available to it each time the receiver generates a new feedback response. Dkt. No. 341 at 8-9. Despite Defendants' argument, Ericsson never agreed with Defendants' view of the claims. Ericsson said so explicitly in response to Defendants' motion for clarification of the Court's claim construction:

> Ericsson has consistently alleged that the '215 patent enables devices to choose between different feedback responses by using a type identifier field. **The patent enables this choice by providing a type identifier field that can identify a feedback response from among a number of different message types. This patent is standard essential because the 802.11n standard provides three choices of feedback responses—basic, compressed, and multi-TID Block ACK.** The standard also requires that, when a device generates a feedback response, it must identify the type of feedback response by using a field that identifies which of the three Block ACK variants is being used. **Even if Defendants hard-code their products to always choose compressed Block ACK, that does not negate infringement.** Each compressed Block ACK message sent by an accuse[d] device is generated in response to received packets. In addition, each compressed Block ACK message contains a BA Control Field. This field acts as a type identifier field because it identifies which of the three Block ACK variants the device is using. Thus, even if the accused devices always choose to use a single Block ACK variant, they infringe the '215 patent.

Dkt. No. 460 at 6 (emphasis added).

1

After receiving Ericsson's response, which sets out exactly the same theory of infringement Ericsson presented at trial, Defendants' voluntarily withdrew their motion. In doing so, Defendants affirmatively told the Court that they did not seek summary judgment, did not seek to strike Ericsson's expert, that Dr. Nettles was free to testify according to Ericsson's theory of infringement, and that "the only remaining issues appear to be disputes of fact." Dkt. No. 462 at 4; see also Dkt. No. 528 at Ex. J, May 29, 2013 E-mail from M. DeVries, counsel for Defendants, to J. Nemunaitis, counsel for Ericsson ("The parties further agree that neither side will object to the Court in connection with trial that the positions the other side is taking with respect to infringement or non-infringement of the '215 patent violate the Court's claim construction ruling."). By virtue of this agreement, Defendants waived any argument that Ericsson's infringement theory did not conform to the Court's claim construction as a matter of law. The jury then decided this fact issue in favor of Ericsson.

Defendants take issue with Ericsson's understanding of what it means to present a "choice" to the receiver. The choice is contained in the standard. Throughout the trial, Ericsson argued that the choice of various feedback types is reflected in the 802.11n standard, that the type identifier field sent by the accused devices identifies what type of feedback response is being used, and that the accused devices must check the type identifier field of incoming feedback messages in order to identify the type of feedback response being sent. *See* PX0286 at 32; Response Ex. B at 32:24-34:23, 39:1-41:15 (Nettles); Response Ex. C at 45:8-46:4, 90:3-97:21 (Nettles); Response Ex. G at 10:9-19:14 (Gibson); Response Ex. H at 103:5-105:11 (Nettles). The Court's construction merely requires "generating a message field including a field that identifies the message type of the feedback response message *from a number of different message types*." Dkt. No. 341 at 9 (emphasis added). As Ericsson argued at trial, there a number

2

of different message types defined by the standard. The type identifier field identifies the feedback response from those different message types. Indeed, other devices may be operating on the same network and sending different message types—which is why Defendants' receivers check the incoming type identifier fields. Response Ex. H at 103:5-105:11 (Nettles).

Defendants take a different view, claiming that the choices of different feedback types must appear in the code of the receiver itself rather than the communication protocol. Dkt. No. 592 at 2-3. The parties agreed this was a fact issue, and based on the verdict the jury rejected Defendants' non-infringement position and accepted Ericsson's infringement theory as a correct application of the facts to the claims as construed. Defendants cannot now "withdraw the withdrawal" of their claim construction motion and seek, yet again, to upset the Court's claim construction ruling after they agreed that this fact issue should proceed to the jury.

**B. Ericsson Introduced Sufficient Evidence to Support the Jury's Verdict of Infringement of the '568 Patent.**

In its response, Ericsson provided ample proof of both (1) actual, literal infringement and (2) capability of infringement of the '568 patent. Although not required for product claims 1 and 5, Ericsson marshaled sufficient evidence of actual, literal infringement. At trial Dr. Nettles testified regarding actual infringement based on his own testing of Ekiga, CSIPSimple, and qWAVE—all of which infringe because they use TID subfield values matching the type of data in the payload.[1] *See* Ericsson Response at 15 and Ex. B at 123:4-125:13. In addition, Defendants' own expert admitted infringement. He testified that his Ekiga testing resulted in a TID subfield value that identified the type of payload information. *See* Ericsson Response at 14-15 and Response Ex. G at 54:17-58:7 (Gibson). As such, Ericsson provided sufficient proof that Defendants' products literally infringe claims 1 and 5 of the '568 patent.

---

[1] Defendants do not appear to address this point in their Reply.

3

Defendants essentially argue that their products must ***always*** infringe in order to be capable of infringement. This is an incorrect statement of the law and it is not how the jury was instructed. Defendants' products infringe Ericsson's product claim "if [they are] reasonably capable of satisfying the claim limitations, ***even though [they] may also be capable of non-infringing modes of operation***." *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007) (emphasis added); *see also* the Court's jury instructions, Dkt. No. 504 at 13.

The evidence of actual infringement cited above goes beyond what Ericsson was legally obligated to present to the jury. Under the law and the Court's instruction Ericsson met its burden of proving infringement by presenting evidence that Defendants' accused devices are capable of infringing the '568 patent in their reasonable use. The evidence of this capability was abundant: in addition to Dr. Nettles opinion, Ericsson also cited evidence in the 802.11n standard, Defendants' 802.11n-compliance certifications, Defendants' 30(b)(6) deposition testimony, and Intel software development documents that recommend to developers the use of this feature. *See* Ericsson Response at 12-16 and Response Exs. A at 129:16-138:14, B at 108:14-119:14, G at 50:7-53:10, Q at p. 13, and X at 54:17-58:7. Defendants follow the 802.11n standard, and the accused devices are therefore capable of meeting the functional elements in the claim by using a TID subfield value that matches the type of traffic in the payload (*e.g.*, using a TID subfield value of 5 for video traffic as observed in Dr. Gibson's testing (*See* Response Ex. G at 54:17-58:7)). This is ample evidence of Defendants' capability of infringement. Ericsson requests that the Court deny Defendants' Motion as to the '568 patent.

   **C.    Ericsson Introduced Sufficient Evidence to Support the Jury's Verdict of Infringement of the '625 Patent.**

Ericsson introduced sufficient evidence to show that Defendants' accused products practiced all limitations of claim 1 of the '625 patent).

4

**1.      Ericsson Presented Substantial Evidence of the Command to Receive an Out of Sequence Packet.**

Ericsson presented sufficient evidence to support the jury's verdict that Defendants' products command a receiver to receive an out-of-sequence packet. There is no dispute about how the accused products work. As Dr. Nettles testified, the 802.11n standard requires receivers to receive all packets inside or outside of the reception window, the relevant sections of the 802.11n standard are mandatory, and the Defendants comply with the standard. *See, e.g.*, Response Ex. B at 94:8-12; 94:22-25; 95:1-5; Response Ex. C at 103:19-105:20. Dr. Nettles did not simply "characterize" all packets as commands, but rather explained to the jury that the programming within 802.11n receivers defines packets as commands to receive out of sequence. *See*, *e.g.*, Response Ex. B at 80:4-81:3; *see also id.* at 82:4-17; PX 286 at 171-172.

Contrary to Defendants' position, the accused products do not send ordinary data packets "just like the prior art packets in the '625 patents." Dr. Nettles explained that the 802.11n data packets are different from the prior art data packets because they *must* be received. Prior art systems lacked the programming to receive data packets out of sequence, and as a result, they were not commanded to receive them. In the exemplary embodiment of the'625 patent, the command to receive is sending an out of sequence data packet in a system that is programmed to require it to be received. Response Ex. H at 107:4-19. This is in accord with the preferred embodiment in the '625 patent, which discloses the command as data packets which include an "enforcement bit" which acted as a flag triggering programming within the receiver. *Id.* at 108:1-19. Dr. Nettles explained that in 802.11n, the receiver must treat *all* out of sequence packets received inside or beyond the window as commands, and therefore the "enforcement bit" is no longer necessary. *Id*. Therefore, 802.11n receivers are programmed to treat all packets as commands to receive.

Finally, Defendants argue that because out-of-sequence 802.11n packets must be received, the accused products do not suffer from deadlock. However, Dr. Nettles explained that the accused products do not suffer from deadlock *because* they infringe the '625 patent. *See* Response Ex. H at 111:1-8. Deadlock is avoided because the '625 patent teaches programming the receiver to shift its window forward and avoid deadlock. (PX0004). Without the programming in 802.11n receivers dictating that they receive these packets, the accused products would still suffer from deadlock. Response Ex. H at 111:1-8.

The infringement issue as to this patent boils down to whether sending packets, which are required to be received out of sequence due to programming, satisfies the "commanding to receive" requirement in the '625 patent. The jury accepted Dr. Nettles' testimony and rejected Defendants' argument. This was a fact issue within the province of the jury to resolve. Ericsson presented sufficient evidence at trial to support the jury's conclusion that the accused products command a receiver to receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet.

### 2.    Defendants Raise a New Argument, Not Presented at Trial, With Regard to Releasing Expectation and the Court Should Find it Waived.

Defendants argue in a footnote that they did not waive their non-infringement theories presented for the first time after the jury verdict. Contrary to Defendants arguments, Ericsson's cited cases are directly on point. In *Versata Software, Inc. v. SAP Am., Inc.*, Nos. 2012-1029, -1049, 2013 U.S. App. LEXIS 8838 (Fed. Cir. May 1, 2013), the Federal Circuit refused to consider a *Daubert* challenge not raised before or during trial. *Id.* at *20–22 The *Daubert* challenge was couched as an insufficiency-of-the-evidence challenge and raised for the first time in a post-verdict JMOL. *Id.* Similarly, in *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010), the Federal Circuit refused to consider issues raised for the time in a defendant's

6

post-verdict JMOL. *Id.* at 857. Both *Versata* and *i4i* consider the waiver of arguments not raised pre-verdict, which is exactly the point of contention here.

*Malta v. Schulmerich Carillons, Inc.*, 952 F.3d 1320, 1324-1325 (Fed. Cir. 1991), also supports Ericsson's position. The Federal Circuit in *Malta* concluded "that the ground stated in support of the [pre-verdict JMOL] and in support of the [renewed JMOL] were one and the same." *Id.* Unlike the defendant in *Malta*, Defendants here did not preserve their non-infringement arguments. In particular, they failed to allege Ericsson's evidence of the remaining limitations of the '625 patent was insufficient in their pre-verdict JMOL, raising the issue for the first time in post-verdict motions. Plainly stated, the grounds in Defendants' pre-verdict JMOL and their post-verdict JMOL are *not* "one and the same." *See id.*

**D.      Ericsson Introduced Sufficient Evidence to Support the Jury's Verdict of Direct Infringement of the Asserted Method Claims.**

The trial record contains legally sufficient evidence to support the jury's verdict that Defendants' directly infringe claims 1 and 2 of the '215 patent and claim 1 of the '625 patent, including: (i) the accused products were designed by Defendants, see Response Ex. B at 25:7–11; 49:15-18; 79:3-6; (ii) many accused products, specifically the accused routers, do little or nothing other than providing 802.11n wireless access--the infringing operation, *see* Response Ex. B at 25:8-26:2; and (iii) the accused products automatically perform the steps of the method claims whenever the accused products are used, without input or modification by the end-user s*ee e.g.* Response Ex. B at 11:20-12:5, 13:16-15:17, 25:2-11, 26:3-27:9 (regarding the '215 Patent); 25:8–26:2; 49:19–22; 79:3–10, 83:10-18 (regarding the '625 patent and the performance of the patented steps "without human intervention").

In other words, Defendants devices and software dictate the performance of the steps claimed by the '215 and '625 patents. Defendants sold 77 million infringing units. *See* Response

7

Ex. C at 133:13-23 (applying Ericsson's 50-cent rate to the accused products). Each of these units conforms to a standard that requires the performance of each step of the relevant method claims; Defendants advertise and certify their conformance with the standard; and, Dr. Nettles confirmed compliance via a review of Defendants' source code and testing. *See* Response Ex. A at 136:18-140:15.

Defendants actions constitute direct infringement *See SiRF Tech. Inc. v. ITC*, 601 F.3d 1319, 1331 (Fed. Cir. 2010). Contrary to Defendants' assertions, *SiRF* is directly on-point. *SiRF* makes clear that a party can perform a method step by placing an apparatus in the hands of an end user that is programmed to automatically perform the method step: "SiRF infringes as its devices and software dictate the performance of the 'processing' and 'representing' steps. Once the technology is enabled, SiRF's SiRFstarIII chip and software, designed and built by SiRF, automatically perform the disputed steps of the claims at issue . . ." *Id.*

The jury heard evidence that the Defendants' devices and programming directly infringe the asserted method claims. Under *SiRF*, the jury was entitled to credit this evidence and find that the Defendants were responsible for practicing the asserted method claims. The jury did so, and Defendants' motion for JMOL should therefore be denied.

### E.    Ericsson Introduced Sufficient Evidence of Inducement.

In addition to proving direct infringement as described in the previous section, Ericsson also asserted, in the alternative, inducing infringement. Ericsson has introduced sufficient evidence to support the jury's finding that Defendants intended to induce infringement by end-users of their products. As a threshold matter, Acer, Dell, Toshiba, D-Link, Netgear and Belkin, all stipulated to actual knowledge of the patents-in-suit. *See* PX-0554.[2] Having established actual

---

[2] Ericsson presented evidence that Intel likewise had notice of the patents-in-suit by "early 2010." *See* June 13 Trial Tr. (Willfulness) at 61:21-62:12 (Kitchin).

8

knowledge, Ericsson introduced ample evidence of Defendant' intent to induce infringement, including: testimony from Ericsson's experts; testimony from Intel's fact witness, Duncan Kitchin; evidence (including documentary evidence and testimony) that Defendants' actively seek certification of compliance with the 802.11n standard; evidence that defendants' market their products as standard-compliant; **and** user's manuals and other instructional material. *See* Response at 28-29.

In light of the evidence introduced by Ericsson, the *Grokster* case is inapposite. There, the Court held that "ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability **in themselves**." *Metro-Goldwyn-Mayer Studios v. Grokster Ltd.*, 545 U.S. 913, 937 (2005) (emphasis added). Ericsson has presented evidence that Defendants advertise the infringing properties or uses of their products. *See, e.g.*, Response Exs. A at 123:8-22; 130:18-136:17 (Nettles); C at 144:15-24 (Bone). Ericsson has presented evidence that Defendants likewise offer technical support. *See, e.g.*, PX0266, PX0398 and PX0538; Response Ex. A at 130:18-136:17 (Nettles). But, in addition to these points, Ericsson has introduced substantial additional evidence of Defendants culpable actions. *See* Response at 28-29; *infra*. Furthermore, "[e]vidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *Id.* (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 915 (2005)); see also *i4i LP v. Microsoft Corp.*, 670 F. Supp. 2d 568, 577 (E.D. Tex. 2009).

Additionally, Ericsson may rely on circumstantial evidence of inducement, in additional to the direct evidence listed above. *AdvanceMe Inc. v. RapidPay, LLC*, 509 F. Supp. 2d 593, 607 (E.D. Tex. 2007) (citing *DSU Med. Corp.*, 471 F.3d at 1304); *Moleculon Research Corp. v. CBS,*

*Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). Here defendants sold roughly 77 million infringing units after receiving notice of the patents in suit. Response Ex. C at 133:13-23 (Bone) (explaining damages as a multiple of units sold). Many of these products do little, if anything, other than providing access to 8002.11n networks. Response Ex. B at 25:18-24 (Nettles) (explaining that 802.11n functionality is "the whole reason for selling [the accused devices]"). This, and all the evidence Ericsson cites, goes far beyond what has been found sufficient to show inducement. *See* Response at 29 (citing *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1343 (Fed. Cir. 2008); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1323 (Fed. Cir. 2009)).

All evidence in the record must be taken in a light most favorable to Ericsson, and all evidence favorable to Defendants must be disregarded unless it is so compelling that the jury would be required to believe it. See *Reeves*, 530 U.S. at 150–51. Applying this standard, Ericsson presented more than sufficient evidence to establish inducement.

**F.    The Court Should not Disturb the Jury's Verdict that the Asserted Claims of '625 and '435 Patents are not Invalid.**

The record contains sufficient evidence to support the jury's verdict that the Petras submission does not constitute invalidating prior art of the '625 patent. The jury "verdict is afforded great deference," and Defendants must now show that "'the facts and inferences point so strongly in [its] favor…that a rational jury could not reach a contrary verdict.'" *Pineda v. United Postal Serv., Inc.*, 360 F.3d 483, 486 (5th Cir. 2004). Defendants' burden is even greater in light of its obligation to prove invalidity by "clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

McKool 907532v3

The jury heard testimony from Dr. Nettles that the Petras submission (i) does not disclose a command to receive an out-of-sequence packet, as required by the '625 patent, (ii) does not disclose removing entries from a list of expect packets, as required by the '435 patent, and (iii) was not enabled. Defendants cannot satisfy the high burden of showing that *no rational jury* could credit Dr. Nettles' testimony over Defendants' expert, Dr. Heegard. Defendants' motion accordingly should be denied.

### 1. Defendants Failed to Prove Invalidity of the '435 Patent by Clear and Convincing Evidence.

Defendants failed to show that the Petras submission discloses a command to receive an out-of-sequence packet, as required by the '625 patent. The Petras reference describes a transmitter that sends a discard message to a receiver to indicate that it has discarded a packet. Dr. Nettles testified that he and Dr. Gibson agree that a discard message is not a command to receive any packets, but rather a notification that the transmitter has discarded a packet. Response Ex. H at 99:19-100:14; s*ee also* cross examination of Dr. Heegard, Response Ex. G at 158:19-159:9.

Defendants now argue that no rational jury could believe Dr. Nettles testimony because the jury *had to* believe Dr. Heegard's explanation of why he and Dr. Gibson disagree. After being confronted with Dr. Gibson's conflicting position, Dr. Heegard attempted to salvage his testimony with the following confusing explanation:

> Q. Isn't the packet itself the command?
>
> A. No. There's no – there's no delete – so you're asking me if a discard message is a command to receive, and generally speaking it's not. But in this particular scheme, this system, which has a discard message, it is, because this discard message is tacked on to a message and it's -- and when this system is working and there's a discard message, it is a command to receive. So generally is a discard message a command to receive, no. In this system, this message is a command to receive.

11

Ex. G at 160:16-161:2. Dr. Heegard argued that the discard message is a command to receive because it is "tacked on to a message." He failed to explain why tacking the discard notification onto a packet creates a command, but even if true, Dr. Heegard did not explain how the discard message commands the receiver to receive *out of sequence packets*. As shown below, packet 5, which is "tacked on" to the discard message in the Petras example, is not out-of-sequence because it is received in-sequence after packet 4:



Dr. Nettles, on the other hand, unambiguously testified that a discard message is not a command to receive, but rather a notification that a packet has been discarded. He further explained that the discard message has no impact on whether out-of-sequence packets are received, as required by the '625. *See* Response Ex. H at 100:7-14.

Defendants take the position that "the jury was not free to disregard Dr. Heegard's testimony." To the contrary, unless Defendants' proof was sufficiently "strong[] and overwhelming[]" or "uncontradicted and unimpeached" (Med. Care Am., Inc. v. Nat'l Union Fire Ins., 341 F.3d 415, 420 (5th Cir. 2003)), the jury was free to disregard Defendants' invalidity theories and testimony. Dr. Heegard's testimony was contradicted and impeached. The jury was free to disregard his testimony and did so, finding that Defendants did not prove invalidity by clear and convincing evidence.

McKool 907532v3

### 2.    Defendants Failed to Prove Invalidity of the '435 Patent by Clear and Convincing Evidence.

The Petras submission does not disclose removing entries from a list of expect packets, as required by the '435 patent. Defendants' expert Dr. Heegard changed his testimony on the stand numerous times and failed to identify a list in the Petras reference from which entries may be removed. Dr. Nettles, on the other hand, presented consistent and unchallenged testimony that the Petras reference does not disclose *removing entries* form a list of expected packets. Defendants must show that all rational jurors would accept Dr. Heegard's testimony, **and** that no person could rationally doubt that clear and convincing evidence supports his position. Defendants cannot satisfy this burden, and their motion should be denied.

Contrary to Defendants claims, Dr. Heegard changed his testimony on the stand multiple times. Dr. Heegard testified on direct examination that the list was the buffer, on cross examination that one of ordinary skill in the art would know to keep a list, and finally on redirect examination that the list was a data structure in an unrelated section of the Petras reference. Response Ex. G at 137:3-5; 162:20-163:2; 166:7-23. The jury was free to consider Dr. Heegard's changing positions when evaluating his credibility.

Dr. Nettles presented testimony that Dr. Heegard's list could not be the list required by the '435 patent because removing entries would result in an error condition. Response Ex. H at 101:14-20-102:6. Defendants did not challenge Dr. Nettles' position on cross-examination or otherwise contradict his assertions. Indeed, Defendants failed rebut Dr. Nettles' tetimony in their JMOL reply, arguing only that "the entire point of Dr. Heegard's testimony about the Petras Reference was that it solved the problem of deadlock . . . by allowing the receiver to change its expectations of what it was waiting to receive. . . ." Defendants now resort to generalities because they cannot point to a single piece of evidence that contradicts Dr. Nettles' testimony.

13

### 3.    Even if the Petras Reference was Prior Art, it is Not Enabling

Ericsson has provided undisputed testimony from Dr. Nettles that Petras was not enabled.

Specifically, Dr. Nettles testified:

> Q. Okay. What things are missing, for instance, information that you would need to see to actually build a system that works according to the Petras disclosure?
>
> A. Well, for example, there's no real discussion of how to set up the transmitter windows or the receiver windows or exactly how those windows communicate or coordinate. There are details missing about the exact nature of the messages. There's no description of any algorithms that would be involved, no pseudocode like we've been seeing in the patents; just a lot of technical detail that you would expect to see if it was really something you could build a system from.
>
> Q. And have you seen any evidence anywhere that anybody actually tried to take this disclosure and build a system and see if it actually worked?
>
> A. No, sir, I haven't.

Ex. H at 97:22-98:13. Defendants failed to cross-examine Dr. Nettles on this analysis or produce any evidence to contradict his assertions. Defendants address this key issue in a footnote at the end of their JMOL reply, pointing only to a vague statement by Dr. Heegard that the Petras submission "describes in sufficient detail that you could implement this protocol." Dr. Heegard does not address any of the issues raised by Dr. Nettles. He does not explain how to set up the transmitter or receiver windows or how the windows communicate or coordinate, nor does he identify the algorithms and pseudo-code necessary to implement such a protocol. Dr. Heegard's conclusory statement is not enough to disturb the jury's finding that the Petras submission does not anticipate the '625 and '435 patents.

## III.    CONCLUSION

For the foregoing reasons, Ericsson respectfully requests that the Court deny Defendants' motions for judgment as a matter of law and motion for a new trial.

14

McKool 907532v3

**DATED:** July 12, 2013

Respectfully submitted,

**McKOOL SMITH, P.C.**

By:  /s/ Theodore Stevenson III
Theodore Stevenson III,
Lead Attorney
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
Douglas A. Cawley
Texas State Bar No. 04035500
dcawley@mckoolsmith.com
Ashley N. Moore
Texas State Bar No. 24074748
amoore@mckoolsmith.com
Justin Nemunaitis
Texas State Bar No. 24065815
jnemunaitis@mckoolsmith.com
Travis DeArman
Texas State Bar No. 24074117
tdearman@mckoolsmith.com

300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Sam Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
104 E. Houston Street, Suite 300
P.O. Box 0
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

**ATTORNEYS FOR PLAINTIFFS
ERICSSON INC. and
TELEFONAKTIEBOLAGET LM
ERICSSON**

15

McKool 907532v3

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing document was served on counsel of record via the Court's ECF system and via electronic mail on July 12, 2013.

*/s/ Travis DeArman*
Travis DeArman

16