1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION

 3

   ERICSSON, INC., ET AL          )
 4                                      DOCKET NO. 6:10cv473
      -vs-                        )
 5                                      Tyler, Texas
                                  )  9:00 a.m.
 6 D-LINK CORPORATION, ET AL         July 16, 2013

 7

            TRANSCRIPT OF POST-TRIAL MOTION HEARING
 8            BEFORE THE HONORABLE LEONARD DAVIS,
              UNITED STATES CHIEF DISTRICT JUDGE
 9

10                A  P  P  E  A  R  A  N  C  E  S

11      (SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES.)

12

13                         PRESENTERS

14
   FOR THE PLAINTIFF:
15

16 MR. THEODORE STEVENSON, III
   McKOOL SMITH
17 300 Crescent Court, Ste. 1500
   Dallas, Texas  75201
18

19 MR. JOHN B. CAMPBELL, JR.
   McKOOL SMITH
20 300 W. 6th Street, Suite 1700
   Austin, Texas  78701
21

22 COURT REPORTER:        MS. SHEA SLOAN
                          shea_sloan@txed.uscourts.gov
23

24 Proceedings taken by Machine Stenotype; transcript was
   produced by a Computer.
25
```

2

```
1   FOR THE DEFENDANTS:

2
    MR. LUKE DAUCHOT
3   KIRKLAND & ELLIS, LLP
    333 S. Hope Street
4   29th Floor
    Los Angeles, California  90071
5

6

7   MR. ADAM ALPER
    KIRKLAND & ELLIS, LLP
8   555 California St.
    24th Floor
9   San Francisco, California  94104

10

11
    MR. ROBERT A. VAN NEST
12  KEKER & VAN NEST, LLP
    633 Sansome St.
13  San Francisco, California 94111

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              All right.  Ms. Ferguson, if you will
 4  call the case, please.
 5              THE CLERK:  Court calls Case No.
 6  6:10cv473, Ericsson, Inc. v. D-Link Corporation, et
 7  al.
 8              THE COURT:  All right.  Announcements.
 9              MR. STEVENSON:  Good morning, Your Honor.
10  Ted Stevenson for Ericsson.  Also presenting with me
11  today will be John Campbell.  We are ready to proceed.
12              THE COURT:  Okay.  Thank you.
13              MR. VAN NEST:  Good morning, Your Honor,
14  Bob Van Nest, Keker & Van Nest for Ericsson -- excuse
15  me -- for Acer, D-Link, and NETGEAR.  I'm here with
16  Matan Shacham, Trey Yarbrough; and Jonah Mitchell of the
17  Reed Smith Firm.
18              THE COURT:  Okay.  Thank you.
19              MR. JONES:  Your Honor, Mike Jones for
20  Intel.  I am here with Mr. Greg Arovas, Luke Dauchot,
21  Adam Alper, and Mike DeVries.  --
22              THE COURT:  Mr. Arovas and Mr. Jones, I'm
23  really getting tired of seeing y'all.  This is getting
24  to be a habit.
25                   [Laughter.]
```

4

1          MR. JONES:  I apologize, Your Honor.

2          THE COURT:  All right.  Very well.  We

3   have a lot of matters to cover this morning in a limited

4   amount of time.  So let's begin with Ericsson's motion

5   for compulsory future royalty and pre-judgment and

6   post-judgment interest, Docket No. 527.

7          All right.  You may proceed.

8          MR. CAMPBELL:  Good morning, Your Honor.

9          I don't think there is too much to say on

10   this motion.  Defendants' response -- and I will let

11   them go and respond if there is anything more -- but

12   basically said look at our motions for judgment as a

13   matter of law and, therefore, there shouldn't be a

14   compulsory royalty.

15          So I think if the Court denies the

16   motions for judgment as a matter of law, I'm not sure

17   that the parties are in disagreement that there should

18   be a compulsory royalty.  In fact, defendants have

19   argued in various briefing that because of the RAND

20   obligations, no injunction should be entered.

21          If no injunction should be entered, then

22   the appropriate remedy is a compulsory royalty.  So I'm

23   not sure, assuming how the JMOLs come out, that there is

24   a whole lot of dispute.

25          THE COURT:  All right.  Response.

5

1              MR. DeVRIES:  That's exactly right, Your

2      Honor.  The parties are in substantial agreement.  The

3      defendants have filed several post-trial motions that

4      are challenging the jury verdict.  And to the extent,

5      however, that those motions are overruled, we have no

6      additional objection to entry of the ongoing royalty in

7      the amount of the jury verdict, subject, of course, to

8      the arguments we raised in those other motions.

9              The parties are also in agreement that

10     the amount of the jury verdict should not be increased

11     on a going-forward basis beyond what the jury found, and

12     that is 15 cents a unit.  The reason for that is the

13     RAND obligation.  But I think it is an easy one.

14             THE COURT:  All right.  So to be sure I'm

15     clear, if the Court were to overrule the JMOLs, then

16     both sides agree that an ongoing royalty of 15 cents

17     would be appropriate, and there is no need for a period

18     of time to negotiate and then another hearing and all of

19     that stuff?

20             MR. DeVRIES:  That's correct, Your Honor,

21     subject to and without waiver of positions in those

22     other motions --

23             THE COURT:  Understood.

24             MR. DeVRIES:  -- that's correct.

25             MR. CAMPBELL:  Yes, Your Honor.

1                 THE COURT:  All right.  Very well.  We

2   will move on then.

3                 All right.  Next one will be defendants'

4   Rule 50(b) renewed motion for judgment as a matter of

5   law in favor of defendants and motion for new trial.  It

6   will be Docket No. 528.

7                 MR. VAN NEST:  Good morning, Your

8   Honor.

9                 THE COURT:  Good morning, Mr. Van Nest.

10                MR. VAN NEST:  I'm going to be speaking

11  for all of the defendants.  I am going to take on the

12  renewed motion for JMOL on liability and

13  non-infringement and invalidity.  And Mr. Dauchot and

14  Mr. Alper are going to handle the damages motions --

15                THE COURT:  Okay.

16                MR. VAN NEST:  -- which will follow, if

17  that is okay with the Court.  Again, we appreciate the

18  opportunity to present oral argument on these motions,

19  as they are very significant.

20                I know Your Honor is familiar with the

21  standard for judgment as a matter of law, so if the

22  Court will indulge me, I will get right into the merits

23  on the '215 patent, which the parties referred to during

24  the trial as the multiple feedback type patent.  This is

25  the '215 that involves a type identifier field in

7

1  generating a multiple types -- generating a field for
2  multiple types of feedback.
3                    So the evidence here doesn't support the
4  verdict, Your Honor, because the undisputed operation of
5  the devices simply fails to satisfy the requirements of
6  the claim.
7                    There is no dispute now that trial is
8  done as to how the devices in the 802.11n operated.
9  There is no dispute they are only capable of generating
10  a single type of feedback.  And under Your Honor's claim
11  construction that simply doesn't pass muster.
12                    Here is the relevant portion from the
13  claim construction:  Responsive to a receiving step
14  generating a message field including a field that
15  identifies the message type of a feedback response
16  message from a number of different message types.
17                    That language was proposed by both
18  parties in connection with the Markman and adopted by
19  the Magistrate and approved by Your Honor.
20                    Generating a feedback response from a
21  number of different message types.
22                    THE COURT:  What is your response to
23  their argument that, you know, even though you have one
24  message type, that is, in essence, a decision that's
25  been made and, therefore, you still infringe?

8

1              MR. VAN NEST:  The answer to that, Your

2    Honor, is that Ericsson before and during the trial

3    repeatedly represented that this patent and this

4    language requires that the receiver itself have a choice

5    in the feedback message.

6              If you will look at this next slide this

7    is from the claim construction order.  They got the

8    claim construction they got by indicating that the

9    invention was about creating the choice in the receiver

10   of multiple different formats of messages to use and

11   then also creating a type identifier field.  That was

12   the basis upon which the claim construction which has

13   this language, from a number of different message types,

14   was created.

15             Here is another example of what they told

16   Judge Gilstrap (sic) during the argument.  They said

17   this repeatedly:  The invention is, as expressed in the

18   claims, giving the receiver a choice and constructing a

19   message field so it can express what it has chosen.

20             Now, we came in and sought to clarify

21   this prior to trial, and they stipulated that the patent

22   enables devices to choose between different feedback

23   responses by using a type identifier field; not a

24   designer, not a body of standards folks --

25             THE COURT:  Let me hear plaintiff's

1  response.

2            MR. STEVENSON:  Throughout this case,

3  from Markman all the way through trial, we have

4  consistently taken the position that the standard

5  contains a number of choices; and if a receiver chooses

6  essentially what is in the standard --

7            (Microphone turned on.)

8            MR. STEVENSON:  Thank you.

9            If a receiver chooses a choice in the

10  standard and indicates it in the type identifier field

11  because the claim requires a type identifier field, then

12  there is infringement.

13            The claim -- which is up now -- basically

14  is a very short claim, and it has very few elements.

15            Sending a plurality of first data units

16  receiving that plurality.  Those are easy limitations.

17            And then:  Responsive to the receiving

18  step constructing a message field for a second data

19  unit, that field including a type identifier field and

20  at least one of a sequence number.

21            So the type identifier field, when that

22  is put in, is what causes infringement.

23            When we had our claim construction before

24  Magistrate Judge Giblin, this issue came up; and it was

25  met square on.

1             And the claim construction was:

2    Responsive to the receiving step generating a message

3    field, including a field that identifies the message

4    type from a number of different message types.

5             What that doesn't say is that all of the

6    particular message types need to be encoded on the chip,

7    as opposed to available within the protocol.

8             We showed to the jury, of course, and

9    Your Honor remembers seeing this, the different choices

10   that are available in the standard.  And it was clear

11   from the testimony of Dr. Gibson, as well as Dr.

12   Nettles, that each device has to put this type

13   identifier field in it so the device when it transmits a

14   block acknowledgement can inform the receiver of what

15   choice it has made.

16            Now, although the defendants contend --

17   and we don't disagree they have always chosen to use a

18   compressed block acknowledgement, they still have to

19   fill out that type identifier field.  It is required by

20   the standard.

21            And more importantly if they are sending

22   to a device that doesn't know what to expect, they have

23   to tell that device here comes a compressed block

24   acknowledgement instead of, for instance, a multi-TID or

25   a regular block acknowledgement.

1              THE COURT:  Okay.  Response?

2              MR. VAN NEST:  Your Honor, that doesn't

3  answer the question.  The question that flows from the

4  claim construction is:  Does the device give the

5  receiver a choice?  Is it capable of generating more

6  than one feedback type?  This is their testimony from

7  trial, Your Honor, from Dr. Nettles.

8              I asked him point-blank:  So this patent

9  requires that you have the capability to generate -- I

10  will quote it again -- multiple types of acknowledgement

11  messages, right?

12              Yes, sir, that's my understanding.

13              In other words, the device itself has to

14  have the capacity and the capability to generate

15  multiple feedback types.

16              And as Mr. Stevenson just conceded and

17  here is the quote from Dr. Nettles:  The devices don't

18  have that capability.  The receiver in the product that

19  you are accusing doesn't have a choice from among a

20  number of different message types.  It must send the one

21  that it has, right?

22              ANSWER:  It will always send a compressed

23  BlockAck.

24              Now, let me go back a slide.

25              Their expert fully understood Your

1  Honor's claim construction, and the parties understood

2  it.  The parties stipulated that it requires a choice in

3  the receiver of multiple different message types.  There

4  has to be the capability to do that.

5              Now, when they got to closing argument,

6  they completely contradicted Your Honor's claim

7  construction.  They completely contradicted the claim

8  construction.  They told the jury that the defendants'

9  argument was wrong because it misinterpreted and

10 misunderstood the claim construction, and they said that

11 you don't have to have multiple types of feedback

12 messages in the device, in the product.  They said it is

13 enough if it is in the standard.

14             How does that square with this testimony?

15 Their own expert said that as he understood the claim

16 and as he understood the patent, you have to have the

17 capability to generate multiple types of feedback.  And

18 they don't.

19             So for that reason, Your Honor, this is

20 no longer a question of fact.  We established in the

21 trial that the devices don't have the capability, and we

22 established in the trial that the capability is

23 required; and they established in the Markman by their

24 repeated representations and the stipulation they

25 entered, that having choices in the standard itself is

13

1  not enough, you have to have choices in the receiver.

2            Why?  It is a method claim.  The method

3  claim requires that you generate a feedback response in

4  response to receiving data.

5            So this is not something that a designer

6  can do years before.  It has got to be something that

7  the device itself does.  And we all understood that.  We

8  all acknowledged that.  They stipulated to that.  And

9  when we got to closing argument, they departed from Your

10 Honor's claim construction and argued that it wasn't

11 necessary; that all they had do was have a field type.

12            THE COURT:  Thank you.

13            Response?

14            MR. STEVENSON:  Well, Your Honor, I think

15 historically what Mr. Van Nest is telling the Court

16 isn't quite right.  This issue came up originally in the

17 Markman Hearing.  And the defendants were arguing that

18 the receiver had to be able to actively select between

19 different types of feedback messages, and they tried to

20 argue that as part of the claim construction.

21            And what you can see on the screen is

22 part of the claim construction order where the Court

23 says:  Plaintiff's first objection to defendants'

24 proposed construction is that it requires the type of

25 feedback response to be actively selected from multiple

1   available feedback responses, which we argued would

2   import an entirely additional step, the step of

3   selecting into the claim, violating the canons of claim

4   construction.

5              So what we said at Markman really clearly

6   was the accused device doesn't have to actively select.

7   They are trying to read that in.

8              The Court in the next -- or later in the

9   order said:  Defendants' proposed construction seems to

10  fall on the side of reading limitations into the claims

11  rather than reading the claims in light of the

12  specification.

13             So then we come close to trial, and the

14  defendants filed a motion to confirm, which is this next

15  slide.  They basically asked the Court to confirm its

16  claim construction.  And I think they were worried about

17  our expert had a disagreement with their expert over

18  application of the claim, and they were seeking

19  essentially a renewed or more granular claim

20  construction from the Court trying to revisit the

21  selection point.

22             And we responded.  Here is our response.

23  We said essentially to the Court here is what we are

24  going to be arguing, here is what we will be telling the

25  jury.  We think it is a fact issue.  What we said is,

15

1  even if defendants hard-code their products to always

2  choose compressed BlockAck -- which is what the

3  defendants have argued -- that does not negate

4  infringement.

5              Each compressed BlockAck message sent by

6  an accused device is generated in response to received

7  packets.  In addition, each compressed BlockAck message

8  contains a BA control field, and that field acts as a

9  type identifier field because it identifies which of the

10  three block acknowledgement variants the device is

11  using.  So even if the accused devices always choose a

12  single BlockAck variant, they infringe.

13              That is how we responded.  And we went on

14  to say that we have consistently taken this position.

15              Now, after the defendants got our

16  response, they filed a paper with the Court, their reply

17  brief.

18              What they said to the Court was, well,

19  now that Ericsson has confirmed, it will not take a

20  position inconsistent with the Court's claim

21  construction -- that is after seeing what we told them

22  our theory was -- or its assertions during the Markman

23  proceedings.  The only remaining issues appears to be

24  disputes of fact.

25              Ericsson's allegations regarding the

16

1  operation of defendants' products and the particular

2  implementation of the 802.11 standards at issue in those

3  products, are issues of fact for the jury.

4           And they went on to say in their reply:

5  Defendants do not seek summary judgment or to strike

6  Ericsson's expert who remains free to testify as to his

7  opinions about the import of how defendants' products

8  operate.

9           So at the end of the day what happened is

10 this came up before the Court.  The defendants chose not

11 to seek a claim construction under 02 Micro.  They

12 didn't want to get more granular on it.

13          After we told them exactly what our

14 theory was and we presented exactly the same evidence

15 and theory to the jury, having told the Court we don't

16 need a more detailed claim construction; we don't need

17 to address this, it is a fact issue for the jury; we are

18 not going to seek summary judgment; we are not going to

19 try to prevail as a matter of law; and we are not going

20 to try to strike Ericsson's expert, having lost the jury

21 verdict --

22          THE COURT:  What is your response to

23 their argument, well, but Dr. Nettles testified

24 consistent with our position?

25          MR. STEVENSON:  Well, I think for the

1  JMOL standard there is testimony on both sides.  And

2  obviously Mr. Van Nest has pointed to one Q and A --

3  which I disagree with the import of -- but throughout

4  the direct examination, Dr. Nettles said if they use a

5  type identifier field that indicates back in the

6  standard which one of certain variants they have chosen,

7  that is infringement.

8                In fact, there is a -- let me show you

9  what Dr. Nettles said about that.  I asked him the

10  question:  If defendants here are using the compressed

11  block acknowledgement option from the standard, why do

12  they need to transmit those two bits, that field, the

13  type identifier field that they're all using the

14  compressed BlockAck?

15                And he said:  Yes, sir, in 802.11, and

16  that's what they're transmitting, it's actually the

17  multi-TID and compressed BlockAck field, they need to

18  transmit that because there's a possibility that some

19  other manufacturer will be transmitting some other value

20  in that field; and they need to check that field to make

21  sure that their products are processing BlockAcks --

22  that their products understand how to deal with it.  So

23  it is important to process that field even though they

24  don't change it.

25                Dr. Nettles said in his testimony

1  repeatedly that there is infringement because the way he

2  mapped the claim was when they used the type identifier,

3  even though they choose the same one every time, it has

4  got to be received by a receiver which needs to then map

5  it to the variations in the standard.  So that is

6  infringement when they put that type identifier in

7  there.

8            THE COURT:  Okay.

9            Response?

10            MR. VAN NEST:  Your Honor, two points.

11  One, they stipulated in connection with the trial that

12  the patent enables devices to choose between different

13  feedback responses.  And when we got Dr. Nettles on the

14  stand, he conceded that he understood Your Honor's claim

15  construction in exactly that way.

16            THE COURT:  Okay.  Let me stop you right

17  there.  What is your response to the stipulation

18  argument?

19            MR. STEVENSON:  That is not the

20  stipulation we made.  The email that was sent, in

21  connection with them withdrawing their motion and making

22  the representation to the Court that this is a jury

23  issue, says that devices have a choice; and that choice

24  is in the standard.

25            The disagreement between the parties is,

1   is we have taken consistently the position that the

2   standard gives a choice to the receiver about what to

3   transmit.  All the choices don't necessarily have to be

4   hard-coded into that receiver for infringement as long

5   as it puts a type identifier field in there, and that

6   type identifier links back up to choices within the

7   standard.

8                   What the defendants want to argue -- and

9   this is not in the stipulation and it is not in Nettles'

10  testimony is, they want to argue that all of the choices

11  have to be coded into the receiver, which then has to

12  select between these choices.

13                  We have never, ever stipulated to that

14  and, in fact, that is what they lost at Markman.

15                  THE COURT:  Okay.  Final word.

16                  MR. VAN NEST:  Your Honor, two points.

17  Again, the stipulation is crystal clear.  The debate at

18  Markman was whether or not we would have additional

19  language talking about the advantages of the invention.

20  That is what the debate at Markman was about.

21                  They stipulated that the device had to

22  choose -- I think Your Honor knows from the trial that

23  the standard and those other various choices, they are

24  not implemented by any of the defendant devices.  It is

25  clear that they are conceding that the only type of

1   feedback that can ever be sent by an 802.11 device is

2   this compressed BlockAck.  The other options in the

3   standard were never implemented --

4              THE COURT:  Excuse me.  What is your

5   response that there -- to Dr. Nettles' testimony about

6   it has to be there in case another manufacturer?

7              MR. VAN NEST:  That may well be true,

8   although he didn't present any evidence of that.  There

9   is no evidence that that is ever done.  They didn't

10  present a single other manufacturer that is doing that,

11  number one.

12             And, number two, it doesn't matter

13  because if he concedes that the device has to have the

14  capability to generate multiple types of

15  acknowledgements, they concede that as not satisfied.

16  They concede that.  It only generates the one.  And

17  there is no evidence to the contrary.  And the other

18  potential types of feedback responses that the standard

19  allows are not in the devices.  They weren't

20  implemented, and it is the devices that are accused.

21  Not the standard.

22             THE COURT:  Okay.  Let's move on to the

23  next one, '568.

24             MR. VAN NEST:  With respect to the '568,

25  Your Honor, you will recall, this is the patent that we

1  all referred to as the service type identifier patent.

2  And, again, the parties don't dispute how the devices

3  operate.

4              What was accused here was the so-called

5  TID value, the transport identifier value -- traffic

6  identifier value; and it was established in the trial,

7  no debate, that it only does one thing.  It only

8  establishes a priority.  It never identifies the type of

9  information in the payload to the receiver or the

10  transmitter in the device.  And based on that, there is

11  no infringement and no evidence to support the verdict.

12              So here is Your Honor's claim

13  construction:  A service type identifier which

14  identifies a type of payload information.  And you were

15  clear:  The identifier that identifies the type of

16  information conveyed in the payload.  And you gave some

17  examples.

18              Now, since they are only accusing one

19  thing, this TID value, that means the TID value has to

20  meet this requirement.  It has to identify the type of

21  information conveyed in the payload.

22              And Your Honor made clear in overruling

23  plaintiff's objections to this, that this service type

24  identifier has to inform the device of what is in the

25  payload.  This is from your order overruling their

1  objection.

2            THE COURT:  Mr. Van Nest, doesn't it,

3  although perhaps not 100 percent of the time but a large

4  percentage of the time, do just that, inform the mobile

5  or base station?

6            MR. VAN NEST:  No, this is what -- this

7  is what Dr. Nettles conceded over and over.  TID values

8  determine how the data is to be treated.  They establish

9  the transmission queue.  They don't necessarily reflect

10  the type of data in the payload, right?  Right.

11            THE COURT:  But from an informative

12  standpoint, isn't it normally video, voice, or

13  corresponding to the same number?

14            MR. VAN NEST:  No.  No.  What he went on

15  to say, and this is a key admission, was someone running

16  voice, they can assign a 7, a 5, a 1, a 2, or anything

17  they want.

18            THE COURT:  They can, but do they?

19            MR. VAN NEST:  Well, in the one example

20  he gave, they do because in the one example he gave

21  which was from this Ekiga testing, in Ekiga he testified

22  that he ran video through it, and sometimes the TID

23  value was a 5 and sometimes it was a 0.

24            Now, the important thing, Your Honor, is

25  that whether or not an application designates it, the

1    claim construction requires that the value identify to

2    the device what is in the payload so that the device can

3    act appropriately.

4                         It is undisputed that this

5    element -- this feature never does that.  All it does is

6    say 5 goes in this transmission queue, 7 goes in this

7    transmission queue, 2 goes in this transmission queue.

8    And it doesn't matter whether it is voice, video,

9    multimedia, or something else.

10                        That was undisputed, now that we are

11   through the trial, that the device never learns, neither

12   the transmitter nor the receiver.  And what Your Honor's

13   claim construction requires is that the TID value itself

14   identify what is in the payload.  It doesn't do that,

15   because the device is set up so that it doesn't matter.

16   The device is set up to save a step, as Dr. Kitchen

17   testified, Gibson testified.

18                        And there is no dispute that the device

19   is set up so that if there is a 5, it doesn't matter

20   what is in the payload, it goes in a particular

21   transmission queue.  If there is a 2, it doesn't matter

22   what is in the payload, it goes in a different queue.

23                        Since Your Honor's claim construction

24   requires that this value identify the type of

25   information in the payload, then this admission from Dr.

1   Nettles is critical.

2                   The values determine how the data is

3   going to be treated, but they don't reflect the type of

4   data that is in the payload.

5                   THE COURT:  You left a word out there,

6   "necessarily."

7                   MR. VAN NEST:  That's right.  And --

8   well, take a look at this one.  I said:  Someone running

9   voice, they can assign anything.  And then I said:  As

10  you told me last week point blank, that's why a system,

11  an 802.11n system cannot determine from the TID value

12  whether the data in the payload is video, voice,

13  Internet, or multimedia.  It can't determine it.  Why?

14  Because the only function of that value is to establish

15  a transmission queue.

16                  This is an admission of non-infringement,

17  Your Honor.  He is admitting that because you can use

18  any number you want and there is no requirement that any

19  particular number be used with any particular type of

20  data, nothing in the operation of the device ever

21  informs the transmitter or the receiver as to the type

22  of information in the payload because we have a

23  different system.

24                  THE COURT:  Is there any other testimony

25  by Dr. Nettles or other, that would contradict what he

1   said there?

2                   MR. VAN NEST:  No.

3                   THE COURT:  Response --

4                   MR. VAN NEST:  There is none.  There is

5   testing data where he got up here on direct and said,

6   well, I tested Ekiga.  That's the only test results he

7   presented.  He said I tested -- and I think it was

8   video -- and I got a 5.

9                   On cross he conceded he got a 5, and he

10  also got a 0.  And then I said -- and this is the next

11  admission, Your Honor, after he conceded that sometimes

12  the value was 0 -- I said in the last Q and A:  Doesn't

13  that just prove what you told me last week, which is

14  that an application can assign any TID value it wants,

15  to any kind of data?

16                  Yes, it can.

17                  There is no contradiction to that.  There

18  is no evidence that the transmitter or the receiver are

19  ever told what is the type of information in the payload

20  and what it is.  They are only told put it in queue

21  number 1, put it in queue number 3, put it in queue

22  number 5 no matter what it is, because as Dr. Kitchen

23  testified, that takes out a step.

24                  THE COURT:  Thank you.

25                  Response?

1              MR. STEVENSON:  There is evidence that

2    Mr. Van Nest hasn't presented that contradicts this and

3    expounds upon it.

4              Let me direct you to, first, which is

5    during Dr. Nettles direct, I went through with him the

6    applications that actually use this feature.

7              Now, interestingly, this is an apparatus

8    claim.  And the apparatus to infringe needs merely be

9    capable of transmitting a type identifier field that

10   identifies the payload.  And it is undisputed and nobody

11   has ever disagreed that in every single MAC frame that

12   is sent, they have to have the type identifier field.

13   That TID value is in every single one.

14             We also showed them over and above the

15   proof of capability, that it is actually used.  And we

16   gave a number of actual applications.  So Ekiga is one

17   of them.  But there is others.  CSipSimple -- so this is

18   a question and answer.

19             Which ones have you identified that use

20   this capability?

21             Well, one example would be a program

22   called CSipSimple which runs on Android phones.

23             I kept going on and went down the list:

24   Are you aware of others that run on computers that take

25   advantage of this capability?

1                   Yes, sir, the Skype program that I

2    mentioned before and a program called Ekiga when running

3    on Linux takes advantage of these capabilities.

4                   So we have got two more programs, Skype

5    and Ekiga.

6                   I asked about Windows:  Does Windows have

7    programs that take advantage of the capability?

8                   Yes, sir.  Under Windows 7 and 8,

9    actually, there is a facility QA -- it should be

10   Q-Wave -- that once you start it, Windows Media will

11   take advantage of the quality of service to, for

12   example, stream video to an Xbox using quality of

13   service.

14                  Then on cross-examination I asked Dr.

15   Gibson about this.  And you may recall he had testified

16   on direct that he didn't think anything used this.  I

17   got up on cross and I said:  Well, Dr. Gibson, hang on a

18   second.  Didn't you, in fact, personally run a test with

19   Ekiga where Ekiga used the TID value of 5 for the video

20   conference it was having?

21                  And we went through.  He looked at his

22   report.  He couldn't remember it.  We showed him a page

23   from his report.  And then it dawned on him:  Yeah, I

24   did do a test, and it did work.

25                  And this is the Q and A -- or the Q and

1  A's:  What you wrote here --

2              THE COURT:  I have read that.  Thank

3  you.

4              Response?

5              MR. VAN NEST:  Your Honor, the key is,

6  two things.  One, it doesn't matter what these

7  applications do because it is undisputed that no matter

8  what they do, the TID value never identifies what is in

9  the payload as part of the operation of the device.

10              THE COURT:  What is your response,

11  though, to all this other testimony where you had said,

12  no, this is all that Dr. Nettles said?  Why isn't this

13  just a fact question for the jury to determine?  I mean,

14  granted you have got some, as in any cross-examination

15  by a good lawyer, you have got some good stuff on your

16  cross; but there is lots of other evidence going the

17  other way.

18              MR. VAN NEST:  There isn't any, Your

19  Honor.  Two points.  Again, all those other

20  applications -- which they presented no evidence on, by

21  the way.  There were no test results presented on any of

22  those --

23              THE COURT:  Isn't his testimony not

24  evidence?

25              MR. VAN NEST:  The testimony is they use

1   the feature.  They didn't show that in any of those,

2   including Ekiga that when they used the number, that it

3   then identified what is in the payload.  All the number

4   does is set a transmission queue.  That is it.

5               This is why this admission is so key.

6   There is no contradiction to this.  They are talking

7   about something that doesn't make a difference.  You can

8   use numbers all day long.  Your claim construction

9   requires that the number identify what is in the

10  payload, Your Honor, to the system.

11              THE COURT:  What is your response to

12  their argument that since this is an apparatus claim,

13  you are talking capability?

14              MR. VAN NEST:  Two things.  One, they

15  have to prove the capability, which they didn't do.

16  And, number two, there is no capability for the TID

17  value to identify what is in the payload.

18              Dr. -- Mr. Kitchen and all of the

19  witnesses, including Nettles, concede that the way the

20  TID value works in the devices, it establishes a

21  transmission queue.

22              The patent requires that you actually

23  tell the device:  I have got video data in the payload

24  so you have to treat it this way.  Or I have got voice

25  data in the payload, so you have to treat it that way.

1          As the witnesses all testified, the older

2  devices encrypted this stuff so that the device itself

3  had to be told what is in the payload.  802.11n devices

4  don't do that.  There is no fact dispute about that.

5          So it doesn't matter whether there are 50

6  applications out there where people are assigning

7  numbers because those numbers still only do one thing.

8  They identify a transmission queue which is how the data

9  is to be treated.  They never tell the system what is in

10  the payload; that it is voice, video, or otherwise.

11          THE COURT:  Response?  Final word.

12          MR. STEVENSON:  The only final word, Your

13  Honor, is that Mr. Van Nest has identified a couple

14  portions of the transcript, one asking necessarily; the

15  other asking, well, if somebody kind of got in the

16  system and tricked around with the numbers, couldn't

17  they send any number they wanted to through the Wi-Fi

18  regardless of what the data was?

19          But that doesn't, for the purposes of

20  JMOL, contradict and render as having no weight all of

21  the other evidence of actual use that Dr. Nettles

22  testified about, the actual use of it that Dr. Gibson

23  testified about on cross.

24          And then, finally, the final point is in

25  response to Mr. Van Nest saying, well, the numbers are

1  just numbers, they don't matter, why does the standard

2  and why does Intel in their developer notes identify

3  those as voice and video if the numbers aren't supposed

4  to be used for voice and video?  That is a reasonable

5  inference that the jury could have drawn from the

6  evidence.

7               THE COURT:  I'd like to hear a response

8  to that.

9               MR. VAN NEST:  I will give you a

10  response, Your Honor, which is the following:  Everyone

11  testified that the table he is referring to was

12  illustrative and not required, and the system doesn't

13  require you use those.

14               And here is the admission that puts the

15  light to that, Dr. Nettles concedes that because anybody

16  can use anything, that is why an 802.11n system cannot

17  determine from the TID value whether the data is video,

18  voice, Internet -- there is no qualification.  It is not

19  necessarily, it not always, it is not sometimes.  He has

20  admitted -- and it is true -- the system itself can

21  never determine what is in the payload from the TID

22  value because there is no capability for the system to

23  make that identification.

24               It doesn't matter what the application

25  assigns to the data, the system is never told it is

1  voice.  The system is only told, put it in transmission

2  queue 2; and Nettles conceded that repeatedly and every

3  other witness testified to it, and there is no contrary

4  testimony.

5           THE COURT:  Okay.  Thank you.

6           Let's go to the '625.

7           MR. VAN NEST:  Your Honor, Ericsson's

8  position on the '625 is simply nonsense.  And I don't

9  say that lightly.  It is nonsense.  The undisputed

10  evidence on the '625 and about how the device operates

11  makes very, very clear that that is -- that we are

12  playing word games here.  This is the patent that we all

13  called the command to receive.

14           And the patent provides a very specific

15  solution to this problem of deadlock in transmission.

16  The transmitter is required to send a command to the

17  receiver to receive a packet that it would otherwise

18  reject.

19           Now, the defendants' products don't use a

20  command.  The undisputed testimony was that the

21  defendants' products found a completely different

22  solution.  They opened up the receiver so that it will

23  take any packet at any time in any order under any

24  situation without a command of any kind.

25           And once Ericsson recognized that fully

1   and once Ericsson recognized that their expert had

2   conceded non-infringement, they suddenly took the

3   position, oh, wait a minute.  This is not about the

4   receiver sending a command -- excuse me.  This is not

5   about the transmitter sending a command.  It is about

6   how you program the receiver.  And I think when we see

7   the progression of this, it becomes more clear.

8                    Here is the claim language, Your Honor.

9   The claim is crystal clear that the transmitter has to

10  command the receiver to do something.  And that requires

11  a specific command sent from the transmitter to force

12  the receiver to take something out of order that it

13  wouldn't otherwise take.

14                   Now, the claim construction -- excuse

15  me -- the patent was crystal clear that an ordinary data

16  packet that has data and a header and a sequence number,

17  is not a command.  It is in the prior art.  It is out

18  there.  It can't possibly be the invention.  And they

19  conceded that repeatedly.

20                   But now that -- once Nettles realized

21  that, hey, that is all these guys are sending, they are

22  only sending ordinary data packets, he reversed field

23  and said, so in your world every single packet that

24  carries data is a command.

25                   In their version, Your Honor, there is no

1   longer any packet that is not a command.  Every single

2   one is a command.  That is not what the patent requires.

3   The patent requires sending a command to receive

4   something out of order.

5                Now, we asked Dr. Nettles:  Would you

6   agree with the statement that a receiver in an 802.11

7   device is always ready to go?

8                Yes, it is.

9                And that is because it has the green

10  light to take packets in any order inside or outside the

11  window?

12               That's right.

13               That is a fundamentally different

14  solution to this problem.  That is not a solution that

15  requires you to change the command, change the packet

16  and add an enforcement bit or some other technique to

17  force it.  That is changing on the receiver side to

18  eliminate the deadlock problem in a fundamentally

19  different way.

20               And they admitted that.  Dr. Nettles and

21  the inventors admitted over and over -- and this is

22  before they understood where the devices were; that if

23  you had a receiver that would accept any packet, you

24  don't need a command.  That is what they said.

25               Dr. Nettles says here:  Okay.  And you

1  also said that if a receiver could already receive a

2  packet, you wouldn't need a command to receive it,

3  right?

4                    Right.

5                    QUESTION:  Now, I take it if the door is

6  always open -- that is the receiver we were talking

7  about and the so-called grocery store door -- you don't

8  need a command to open it?

9                    I would agree with that.

10                   This points out, Your Honor, this

11  fundamental point that creating an open receiver that

12  will take any packet in any order, is a fundamentally

13  different approach to the problem than the approach

14  required by the patent, which is a transmitter

15  commanding the receiver.  That is what the patent is all

16  about.

17                   Now, once this -- once the import of all

18  these admissions dawned on them, they ran from the

19  patent like rats from a fire.  Right?  They said, wait a

20  minute, this patent is now all about programming the

21  receivers and programming the devices with commands that

22  can make the packets act as commands.

23                   He said the '625 patent came along and

24  put logic, it put rules in the receiver through

25  programming.

1                    Your Honor, this patent, as I have

2    pointed out a couple of times, is not about what you do

3    with the receiver.  It is about creating a command from

4    the transmitter to overcome a receiver which has rules

5    about what it takes and in what order.  That is what

6    creates the deadlock.  The old style of receivers were

7    set up so they could only take packets in a particular

8    order; and if they didn't get it, they rejected the

9    patent.  That is the deadlock situation.  And the

10   solution in the patent is a command.

11                   And you recall, Your Honor, from the

12   testimony the only example anywhere in the patent is

13   using an enforcement bit with a standard packet, to

14   create a command.

15                   THE COURT:  Okay.

16                   MR. VAN NEST:  It's not about the

17   receiver.

18                   THE COURT:  Thank you.

19                   All right.  Mr. Stevenson, how can a

20   receiver making a decision to accept all packets,

21   constitute a command from the transmitter?

22                   MR. STEVENSON:  Because of the

23   programming that is put into it under the protocol.  If

24   the system is programmed such that the receiver is

25   required to accept out-of-sequence packets, then sending

1   the packet out of sequence that must be accepted, is

2   invocation of the command that is in there.  That is

3   exactly what Dr. Nettles said on direct.

4               We asked him:  What have you found that

5   satisfies the receive at least one packet having a

6   sequence number out of sequence?

7               That is met when you send an MPDU -- that

8   is a single packet or an A-MPDU -- that's a group of

9   packets -- which is not consecutive with a previously

10  delivered packet.

11              Okay.  What makes that a command?

12              Well, the system doesn't have any choice

13  about whether or not to accept that packet or not.  It

14  is required to do it.  That is what makes it a command.

15              Now, what is interesting is this --

16              THE COURT:  But is that the transmitter

17  submitting a command to receive, or is that the system

18  being designed to accept all packets?

19              MR. STEVENSON:  It is the system being

20  designed such that the receiver is required to accept an

21  out-of-sequence packet being transmitted by the

22  transmitter.

23              In addition, though, not all packets that

24  are out of sequence have to be received.  In other

25  words, if something is transmitted below the

1  transmission window, then that isn't received.

2              So it is wrong for them to say it is

3  always a green light 100 percent of the time.  It is a

4  green light if it is within the window or above the

5  transmission window.  And that is because of the

6  programming that is in the receivers in all of the

7  chips.

8              THE COURT:  But isn't that all on the

9  receiver where the claim calls for it to be in the

10 transmitter?

11             MR. STEVENSON:  Well, both -- all of the

12 chips are receivers and transmitters.  So every chip in

13 an 802.11 has a receiver and a transmitter

14 functionality.

15             And then what happens is if the receiver

16 logic is coded such that you have to receive

17 out-of-sequence packets, then when the transmitter which

18 has that same coding and knows the protocol sends a

19 packet to the receiver, it is invoking and commanding

20 the receiver to accept it.  It doesn't have a choice.

21 That is why it is a command.

22             What is interesting is this is almost

23 identical, except for one bit, almost identical to the

24 preferred embodiment.

25             And we talked about that at trial with

1 the jury.  In the preferred embodiment of the patent,

2 there is an enforcement bit.  It is either a 1 or a 0.

3 Here is what Dr. Nettles said about it.

4                    And in the case of defendants, do they

5 program in their receivers to make decisions about

6 packets?

7                    Yes, sir.  Of course, they have to.

8                    I asked him:  What kind of parallels can

9 you draw between the preferred embodiment and what the

10 defendants are doing?

11                    He said:  Well, the most obvious parallel

12 is, you could imagine that you always set the bit to 1.

13                    So let me back up and stop here and

14 explain what the preferred embodiment is.

15                    In the preferred embodiment, with every

16 packet there is either a 1 or a 0 with it called an

17 enforcement bit.  If it is a 1, it is accepted out of

18 sequence.  If it is a 0, it is not accepted.  That is

19 it.

20                    And then in the preferred embodiment the

21 system has to rely on programming that is contained

22 within the receiver, to make the logical decisions.

23                    So it is false to suggest that you can't

24 consider in evaluating whether something is a command,

25 the pre-existing logic that has to be built into every

40

1  one of these devices because they are all playing by

2  exactly the same rules.

3              So with that in mind, what Dr. Nettles

4  says is, so every packet is a command in the preferred

5  embodiment; and then he says not just the ones you set

6  to 1.

7              So what he says is if there was always a

8  1, then every packet would be a command; and that would

9  be just what the defendants are doing.

10              And I asked him:  If they are always

11  doing that -- excuse me -- if they are doing that --

12  meaning always set the bit to 1 -- why bother

13  transmitting the bit anymore?

14              Well, exactly.  Once you decide it's

15  always a 1, you don't need to transmit it.  And now you

16  have exactly the system that we're talking about in the

17  accused products.

18              So if you took the preferred embodiment

19  and decided we want to take ever packet out of sequence,

20  instead of setting a 1 every time, all you have to do is

21  eliminate that bit and tell the receiver in its

22  commands, just pretend you are always getting a 1, we

23  are going to take every packet out of sequence, that is

24  exactly what the defendants are doing, and it is within

25  the claims.

1                    THE COURT:  Final word, Mr. Van Nest.

2                    MR. VAN NEST:  Your Honor, you have it

3    right, and he didn't answer your question.  The patent

4    is about doing something on the transmitter side --

5                    THE COURT:  Well, what about the scenario

6    he just went through about the preferred embodiment

7    having the 1 or the 0; but that the logic is on the

8    receiver end that interprets that?  So if you are always

9    going to send a 1, if that is the protocol you set up,

10   then why even send a 1 or a 0?

11                   MR. VAN NEST:  The only preferred

12   embodiment, Your Honor, involved a specific enforcement

13   bit that was set in the command from the transmitter.

14                   THE COURT:  Okay.  But it is not limited

15   to that preferred embodiment.

16                   MR. VAN NEST:  No, but there is

17   absolutely no evidence and he hasn't provided any --

18                   THE COURT:  Isn't that evidence that this

19   command is somewhat defined on the receiver?

20                   MR. VAN NEST:  No, no, you could -- for

21   this reason, the admission I have got on the screen:

22   They acknowledge that opening up the receiver to accept

23   any packet in any order is designing the receiver to

24   avoid a command.  You don't need a command anymore.

25                   You only need a command if you have a

1   receiver that is insisting on specific rules.

2                 Nettles admits that if you have a

3   receiver that can already receive a packet, you don't

4   need a command to receive it?

5                 That's right.

6                 And you will remember, Your Honor, we

7   presented testimony from two of inventors to the same

8   effect; that opening up the receiver is a totally

9   different approach to a system where you use a

10  transmitter to send a specific command because the

11  receiver won't otherwise take it.

12                You can't turn a cat into a dog by

13  calling it a cat.  There is -- one way to solve it is

14  sending a command, which is the way that the patent

15  requires.  Another way to solve deadlock is to change

16  the receiver.  That is what the defendants did.  They

17  don't have a patent on that.  This is their patent, Your

18  Honor.

19                Their patent is on a transmitter that

20  commands the receiver to receive a packet having a

21  sequence number that is not consecutive.  You don't need

22  a command, and one is never sent in an 802.11n device

23  because the receiver is programmed to take any packet at

24  any time in any order.  That is a fundamentally

25  different approach to the problem.

43

1              And why have they acknowledged that

2  because they acknowledge that?  Because they acknowledge

3  that if you had a receiver that was always ready to go

4  and a receiver that could take any packet, you don't

5  need a command.  And that is how our devices are set up.

6  Absolutely no dispute about it.

7              THE COURT:  All right.  Thank you.

8              Anything further on infringement?

9              MR. VAN NEST:  No, Your Honor.

10             THE COURT:  All right.  Let's go to

11  validity.

12             MR. VAN NEST:  I am going to -- unless

13  the Court has questions with respect to validity of the

14  '625 or the '435, we are prepared to submit that on the

15  briefing.

16             THE COURT:  Is that acceptable?

17             MR. STEVENSON:  Acceptable.

18             THE COURT:  All right.  Very well.

19             Then let's go to the defendants' renewed

20  motion for judgment as a matter of law regarding

21  damages, Docket No. 529.

22             MR. DAUCHOT:  Good morning, Your Honor.

23             THE COURT:  Good morning.

24             MR. DAUCHOT:  Luke Dauchot on behalf of

25  Intel, but I do speak on behalf of all of the defendants

44

1  for the purposes of this.

2              I think on the damages side, Your Honor,

3  the jury damage award, the defendants are fine with

4  leaving it as to the briefs.

5              THE COURT:  Okay.  Very good.

6              Is that acceptable to plaintiffs?

7              MR. CAMPBELL:  Yes, Your Honor.

8              THE COURT:  All right.  Then that leaves

9  us with defendants' motion for judgment on post-trial

10  proposed findings of fact and conclusions of law, 588

11  and defendants' post-trial proposed findings of fact and

12  conclusions of law, Docket No. 539, dealing with the

13  RAND.

14              MR. DAUCHOT:  That is correct, Your

15  Honor.  And with respect to this motion, I am going to

16  be splitting the argument with my colleague Mr. Alper,

17  if that is okay with the Court.

18              THE COURT:  All right.

19              MR. DAUCHOT:  So we have some slides.

20  And I think hard copies were submitted to the Court and

21  Opposing Counsel.

22              Let me begin, if we can flip to the

23  second one.

24              Exactly what are we asking for here, Your

25  Honor?  I know quite a bit of paper has been submitted

1  on the issue.  And we thought it might be helpful to

2  help crystallize this.  And the defendants are

3  essentially looking for five points here.

4              Number one, specifically with respect to

5  Intel, the chip makers really, a finding that Ericsson

6  has a duty to offer a RAND license to the chip makers.

7              THE COURT:  Okay.  On that one do you

8  have any legal authority that says that?

9              MR. DAUCHOT:  Sure, Your Honor.  What we

10 have -- we have the two -- I was going to get into that

11 in a little bit.  We certainly have the letters of

12 assurances that as a matter of fact and law applying

13 contract law to it, certainly establish an obligation on

14 the part of Ericsson to offer the chip makers licenses,

15 RAND licenses on the 802.11 technology that is covered

16 by the two LOAs.  And if Your Honor would indulge me, I

17 will get to that in a second.

18             THE COURT:  What about legal authority?

19             MR. DAUCHOT:  Well, legal authority, we

20 have the Microsoft case, Judge Robart; and we also have

21 some Ninth Circuit authority for the proposition that

22 these sort of LOAs do bind parties contractually; and

23 that is in the briefing and conclusions of law we have

24 submitted to the Court.

25             THE COURT:  Go ahead.

```
 1              MR. DAUCHOT:  I don't think, Your Honor,
 2    there is any issue as to these LOAs extending to the
 3    end-product users.  If there is an issue, I am sure we
 4    will hear about it.
 5              So what is the second thing that the
 6    defendants are looking for here, Your Honor?  A finding
 7    that Ericsson breached its RAND obligations in two
 8    respects:  Number one, refusing to license the chip
 9    makers; and number two refusing to offer a RAND rate.
10              As Your Honor knows, Ericsson's RAND
11    rate --
12              THE COURT:  Did they really refuse to
13    license the chip makers, or did they refuse to license
14    the chip makers at the rate that the chip makers wanted?
15    Because can't you make an argument that by offering to
16    license to the end users that would've, in essence,
17    absolved the chip makers for the number of chips they
18    had sold to that end user of any liability?
19              MR. DAUCHOT:  All right.  Well, two
20    points.  Number one, there was an outright refusal to
21    license the chip makers.  That was the policy, and we
22    heard testimony from two witnesses in particular on that
23    subject.  Ms. Petersson --
24              THE COURT:  To directly license them?
25              MR. DAUCHOT:  Correct.
```

1                    Now, the LOAs do entitle -- and I will

2    get to that in a second -- do require Ericsson to

3    license directly to the chip makers.

4                    Now, in direct response to Your Honor's

5    point, is this some formality?  And the answer is an

6    unequivocal no.  And we know that from Ericsson's own

7    documents because the very reason -- and I will get to

8    some documents here -- the very reason that Ericsson had

9    its policy not to license chip makers was because

10   Ericsson knew that if it did invite the chip makers into

11   the negotiation room or negotiate directly with the chip

12   makers, that the rate would be lower.

13                   The whole policy in avoiding the chip

14   maker was to be able to extract a higher licensing rate

15   than it otherwise could if it dealt with the chip

16   makers.

17                   THE COURT:  Well, but isn't the converse

18   of that true, the defendants are sort of wanting the

19   reverse of that, they are wanting to negotiate at the

20   chip maker rate rather than at the higher rate?

21                   MR. DAUCHOT:  That is a fair point, Your

22   Honor.  Of course, you have the doctrine of patent

23   exhaustion that plays into that.  I think Ericsson is

24   acutely aware of that issue.

25                   However, I think the short answer to that

1  is, if, in fact, that was a concern on the part of

2  Ericsson, it should have flat out said in its letter of

3  assurance --

4                    And if you could flip to the -- if you

5  could flip to 5, please.

6                    If we look at its letter of assurance --

7  and this is the 2003 letter of assurance, and we have a

8  2011 letter of assurance as well.

9                    It states:  The patent holder -- and that

10  is Ericsson -- is prepared to grant a license to an

11  unrestricted number of applicants.  Unrestricted, Your

12  Honor.

13                    And the same is true if we flip to 6, the

14  2011 letter of assurance, unrestricted.  It did not say

15  that the submitter in the case of the 2011 letter -- or

16  the language in the 2003 letter as a patent holder, was

17  prepared to grant a license to applicants who

18  make -- who happen to be end-product users.  There was

19  no limitation.

20                    And so Ericsson has to deal with the

21  consequence of the bargain it struck with the IEEE, a

22  bargain to which all of the applicants are third-party

23  beneficiaries.

24                    And as an aside -- so that is really the

25  contract theory and the specific performance theory if

1  for some reason the Court finds there is some

2  contractual -- some element that is missing from a

3  contract perspective -- and we don't believe there

4  is -- there is, of course, the promissory estoppel which

5  is the equitable approach to it; and that is a promise

6  made by Ericsson that was intended to induce reliance --

7  and, by the way, the LOAs specifically state that the

8  promise is going to be relied upon and, in fact, do

9  induce --

10            THE COURT:  Okay.  Let me hear a response

11  to that.

12            MR. CAMPBELL:  Your Honor, a couple of

13  responses to that.  The whole argument -- the whole

14  argument here has become all about Intel.  Okay?

15            And if we could go to Slide 5, please.

16            First of all, Your Honor is absolutely

17  right that a license to the end-product manufacturers

18  would extend to Intel.  Obviously, there couldn't be a

19  double-dip here.  To follow along on that point before I

20  get to Slide 5, your Honor granted Intel to intervene in

21  this case limited to the products in this case, limited

22  to the accused products in this case sold by the

23  defendants.

24            Intel is now way beyond that.  Intel now

25  wants Your Honor to award them a RAND license for all of

1  their chips; not just for the people in this case.  So

2  they are way beyond that because the defendants in this

3  case, they are not going to have a problem with those

4  chips.

5                 Those chips are, as Your Honor pointed

6  out, effectively licensed by the license to the end

7  product --

8                 THE COURT:  Let me ask Counsel, is that

9  what you are asking for, for a license for Intel as to

10  all chips, not just the ones involved in this lawsuit?

11                MR. DAUCHOT:  Well, we -- yes, Your

12  Honor.  We have -- the request is essentially for the

13  Court to set a rate at which Ericsson is required under

14  its LOAs to extend an offer, and it is a worldwide

15  portfolio offer.  And that is the way the evidence came

16  in, Your Honor, during the bench trial.

17                THE COURT:  Okay.  Go ahead.

18                MR. CAMPBELL:  So we are well beyond what

19  the Court allowed Intel in for.  We are well beyond what

20  the joint pretrial order allows.

21                But if we go to Slide 5, we see Ericsson

22  has offered a license to Intel.  The policy is there.

23  There is nothing wrong with the policy.  The policy is

24  so that there is defensive patent measures --

25                THE COURT:  This was way late in the game

1   though, wasn't it?

2                MR. CAMPBELL:   There was an offer in

3   March of 2013, and then there was another offer after

4   the jury's verdict in July of 2013.   There is no -- as

5   Judge Robart's found -- there is no, your initial offers

6   don't have to be RAND.   You just have to make a RAND

7   offer at some point.

8                Well, Ericsson has offered a license to

9   Intel.   And it couldn't be more clear that the letter

10  says Ericsson offers to grant Intel a worldwide license

11  under Ericsson's patents essential to the IEEE 802.11

12  standard at the rate of 50 cents per device.

13               On July 3rd, Ericsson having constantly

14  considered all new information from its licensees, from

15  negotiations, and from this jury's verdict, revised its

16  RAND rate to 35 cents and extended that offer to Intel.

17  So Intel has received --

18               THE COURT:   I'm curious.   How did you get

19  to 35 cents when the jury came in at 15 cents?

20               MR. CAMPBELL:   Well, The jury's award is

21  for three patents, right, the three standard essential

22  patents?   Ericsson has more than those three standard

23  essential patents in its portfolio.

24               So 15 cents sets a floor of the RAND

25  rate.   It has got to be at least 15 cents.   But there is

1  more than that.

2              Now, Mr. Bone testified that he

3  calculated the patents-in-suit to be 25 cents; and that

4  was apportioning 50 percent of the value of the

5  portfolio to the patents in this suit and 50 percent to

6  patents outside it.  You take the 25 plus the 15, you

7  are at 40.  Ericsson is offering a deal.  Instead of 40

8  cents a unit, it is 35 cents a unit for Intel to have a

9  license; and that is only considering the U.S. patents.

10              Of course, there are worldwide patents.

11  Ericsson has patents all over the world.  So that is how

12  you get to 35 to 40 cents.

13              You can also get there through the

14  licenses and through testimony from Dr. Perryman.  But

15  at the bottom line here we are arguing about giving the

16  chip makers a license.  Ericsson has offered Intel a

17  license.

18              What Intel hasn't come back and done

19  seeking specific performance has said, yes, if the Court

20  determines a reasonable RAND rate of 15 cents for the

21  three patents in this case -- because that is what

22  Intel's intervention is limited to -- we will take the

23  license.

24              And they need to do that when they are

25  seeking specific performance.  That is the law.  They

1  still haven't said that.

2                    THE COURT:  All right.  Response.

3                    MR. DAUCHOT:  Okay.  Your Honor, a couple

4  of points.  One on the intervention issue.

5                    The intervention order -- to go back in

6  time -- did permit Intel to come in on a limited basis.

7  The issue, though, Your Honor, the issue really was over

8  expanding the scope of the trial from the infringement

9  perspective.

10                    At the time that Intel intervened, there

11  were a number of other defendants in here with I think

12  their RAND defenses at the time.  This stuff was in

13  play.  The limitation in terms of limitation was really

14  geared to protect Ericsson from having to drag in other

15  customers it claimed that it would have a res judicata

16  problem if it didn't and to expand this trial from a

17  products standpoint.

18                    The idea really was not to create a limit

19  really, if you will, on the scope -- on the scope of

20  RAND, which, as it turns out, really did not result in

21  the inefficiencies and having Ericsson bring in

22  additional parties to the extent it required -- or it

23  claimed it would have to.

24                    Second point.  In the joint pretrial

25  order, it is final.  And I think Ericsson should stand

1  corrected on that because the joint pretrial order does

2  distinguish between patents-in-suit and patents.  And

3  when we are dealing with the RAND issues, the pretrial

4  order does refer to Ericsson's patents; namely, those

5  patents that it agreed to license under its LOAs.

6           Let me shift gears, Your Honor, to this

7  question about Ericsson having actually made an offer to

8  Intel in March of 2013.

9           Now, Your Honor may recall Mr.

10 Brismark's -- well, let's start with Ms. Petersson's

11 testimony on that.  Ms. Petersson testified that

12 Ericsson was justified in not -- and I think this is in

13 a slide here.  Let me just get to it right here.

14           16, please.

15           Ms. Petersson testified -- and this was

16 really their second excuse.  Their first excuse was this

17 downstream reciprocity, which I won't get into, other

18 than to say that it was an excuse, and Ericsson finally

19 abandoned it for trial purposes.

20           Ms. Petersson testified to the jury that

21 Ericsson was justified in pursuing its policy not to

22 license chip makers on the basis that the chips sold by

23 Intel and other chip makers were not, quote, unquote,

24 fully compliant.  In support of that, it pointed to its

25 2003 letter of assurance where there is an addendum to

1  the effect that Ericsson commits to license "fully

2  compliant" products.

3              The 2011 letter, Your Honor, has no such

4  addendum.  "Fully compliant" does not appear in the 2011

5  letter.  In fact, all it states is compliant.  I will

6  get to that in a second.

7              But Your Honor may recall that testimony.

8  Then what we had was Ms. Petersson testifying to the

9  jury that Intel -- or that Ericsson had, in fact,

10  extended an offer, a RAND offer to Intel, a license

11  to -- a license, if you will, for Intel's chips.

12              That's what Ms. Petersson testified to

13  the jury.

14              So what we had during Mr. Brismark's

15  testimony, I think you will recall it, Your Honor, is

16  that we actually put the license terms that Ericsson had

17  offered.  And lo and behold what did we find?  We find

18  that the proposal was basically one to the effect that

19  it would only license "fully compliant" products.

20              Slide 20, please.

21              I have attached a draft of terms for you

22  to consider.  Company products shall mean all products

23  that are fully compliant.

24              So Your Honor may recall the question I

25  posed to Mr. Brismark and said, well, wait a second, and

1  this is the offer that Ms. Petersson testified about to
2  the jury, I said is this an illusory license?  Is it a
3  license to nothing, given the way Ericsson construes
4  "fully compliant"?
5           And Your Honor may recall Mr. Brismark's
6  response which was:  Well, our intention was to keep on
7  negotiating; and at some point in the negotiation
8  process, this matter would get -- you know, we would get
9  to this matter.
10          Well, exactly -- you know, that is a far
11 cry from an offer.  In fact, what they have labeled as
12 an offer, is an offer to nothing.
13          And, by the way, Your Honor --
14          Next slide, please.
15          -- it does raise a troubling issue.
16 Either Ericsson's trial testimony concerning the chip
17 offer, Ms. Petersson's testimony, was just false or
18 Ericsson's "fully compliant" excuse that it brought
19 forth both in the bench and the jury trial, is just a
20 ruse.  It is one or the other because I don't think
21 Ericsson has ever taken the position that the "fully
22 compliant" language crept into there by accident.
23          So we get to the question, Your Honor --
24 and I'm jumping trying to deal with the specific
25 questions that were dealt with here by Counsel in this

1   35-cent offer.  Mr. Alper is going to get into the

2   details of why this 35-cent offer makes no sense.

3                   But it is not an offer.  It is a

4   letter -- the 35-cent letter looks -- is almost

5   identical to the letter we got in March of 2013 where we

6   had a follow-up and we said, hey, can we have some

7   additional details?  And then we got the details.  And

8   as it turned out, the devil was in the details.  There

9   really was no offer.

10                  THE COURT:  Has Intel made any

11  counter-proposals?

12                  MR. DAUCHOT:  We have, Your Honor.  We

13  have.  Well, counter-proposals --

14                  THE COURT:  Counter-proposals after the

15  March 13th -- or March 2013 letter or this more recent

16  letter of 35 cents?

17                  MR. DAUCHOT:  We had -- well, and this

18  gets us into a couple of issues.  We had -- there has

19  been a series of communications between Intel and

20  Ericsson that the parties -- that Ericsson has initiated

21  outside the context of the mediation privilege, but

22  there are -- have been other communications that have

23  taken place inside the context of the mediation

24  privilege, so that after we got --

25                  THE COURT:  So can the Court consider

1  things that happened within the mediation --

2              MR. DAUCHOT:  I think -- well, the answer

3  to that, Your Honor, I think is no, not for the purposes

4  of this proceeding.

5              THE COURT:  Then let's talk about outside

6  of the mediation?

7              MR. DAUCHOT:  Outside the mediation

8  privilege -- and I will specifically reference Your

9  Honor to a series of documents that were introduced as

10 part of the bench trial including Ericsson's

11 communication PX 593, 595 --

12             THE COURT:  My question was, has Intel

13 made an offer in response to the March 2013 or this most

14 recent July 2013 --

15             MR. DAUCHOT:  There has been no response

16 to the July offer.  And in response to the March offer,

17 yes, Intel's position was that the request for 50 cents

18 was way out of bounds.

19             THE COURT:  But doesn't even RAND require

20 some give-and-take and some negotiation back and forth.

21 I am hearing you saying that Intel -- is Intel's

22 position still a penny a chip?

23             MR. DAUCHOT:  Well, Intel's position is

24 that, generally speaking.

25             THE COURT:  All right --

1                    MR. DAUCHOT:  But the more important

2  point, Your Honor.

3                    THE COURT:  Okay.  Go ahead.

4                    MR. DAUCHOT:  I'm sorry.  Just one point

5  though.  From a refusal-to-deal standpoint, though, it

6  is important that we do not have in the record ever a

7  moment -- a point in time when Ericsson did make an

8  offer to a chip.

9                    The only thing that Ericsson points to is

10  that April 2013 proposal which has the "fully compliant"

11  language in which Ericsson testified at trial means no

12  chips.  There is no offer in the record.  And so it is

13  just non-existent.  Anyway with that --

14                    THE COURT:  Response?

15                    MR. CAMPBELL:  Your Honor, I think the

16  answer to your question was, no, Intel has never made a

17  counter-proposal saying strike this "fully compliant"

18  language and we will sign the deal.  If the "fully

19  compliant" language is the issue, we will take it out.

20                    An offer has been made twice.  Two

21  letters have been sent.  We will grant you a license.  I

22  don't think RAND obligations are such that you are

23  supposed to come into the court and say, we don't like

24  this language here so that is a violation of RAND.  We

25  are going to pick on this language here and this

1  license.  Take the "fully compliant" language out, send

2  the license back.

3            I will tell you right now Ericsson will

4  strike the "fully compliant" language if that is the

5  issue.  So two letters have been sent offering them a

6  license.  The "fully compliant" language was there.  It

7  can be taken out.

8            THE COURT:  Maybe we have got a deal.  If

9  we take the "fully compliant" language out, is that

10 acceptable to Intel?

11           MR. DAUCHOT:  Well, Your Honor, you are

12 going to put Judge Faulkner out of business.

13           THE COURT:  Well, he hasn't been doing

14 too good of a job.

15           [Laughter.]

16           MR. VAN NEST:  I hope that is on the

17 record.

18           THE COURT:  I will tell him that myself.

19           [Laughter.]

20           THE COURT:  So do we have a deal?

21           MR. DAUCHOT:  Well, Your Honor, let me

22 put it this way:  I would have to consult with the

23 client.

24           THE COURT:  Do you want to take a moment?

25           MR. DAUCHOT:  Well, Your Honor, I don't

1 think that we would be prepared to handle that right

2 now.  In fact, we don't have -- we don't have all of the

3 terms.

4            My point being this:  For the purposes of

5 the RAND bench trial, there are two issues going on

6 here, to sort of bring it back to the fundamentals.

7            What we have is a request for specific

8 performance where Ericsson is ordered to offer a license

9 to everyone on terms, on RAND terms.  And the RAND terms

10 are not 50 cents.  The RAND terms certainly aren't 35

11 cents.

12            I am actually intrigued by Counsel's

13 position here that, gee, it is not 15 and it is 35

14 because what was tried to the jury was only a portion of

15 Ericsson's portfolio.

16            You may recall, Your Honor, that Mr. Bone

17 justified his apportionment, his, quote, unquote,

18 apportionment -- and we take issue with that -- on the

19 basis that the five patents asserted in this case, the

20 five standard essential patents in this case, were the

21 crown jewels; and that it really didn't matter what

22 their other standard essential patents were.

23            They were sort of neither here nor there.

24 He had spoken with Mr. Brismark and others.  And they

25 said, look, these five patents being asserted in this

1  case are it.  That is why I don't need to do a

2  full-blown apportionment with respect to those other

3  licenses that cover portfolio-wide, you know, the entire

4  802.11 portfolio.

5             And so for Ericsson to come in now as

6  part of the bench trial and say, gee, we are entitled to

7  ask for 35 instead of 15 because the 15 reflects only a

8  fraction of our portfolio, gets them into a fundamental

9  bind, as I suspect Your Honor can appreciate.  It is

10 basically having your cake and eat it too.  So I did

11 want to make that point.

12             But based on the briefing, Your Honor,

13 Your Honor has the authority to establish a RAND rate as

14 a matter of law -- as a matter of specific performance,

15 I should say --

16             THE COURT:  What do you say that RAND

17 rate should be?

18             MR. DAUCHOT:  1.7 cents.  Something that

19 Mr. Alper can expand upon --

20             THE COURT:  What does plaintiff say it

21 should be?

22             MR. CAMPBELL:  35 cents for the worldwide

23 rate.  Because of the limited nature of this case, it

24 should be 15 cents for the three patents-at-suit.

25             THE COURT:  Y'all are pretty close

1  together?

2                MR. CAMPBELL:  We are getting there.

3                Your Honor, if I could, all joking aside,

4  I think Counsel's response was fairly enlightening.  I

5  think it points out two things.

6                One, the March 2013 letter is now four

7  months old, and they are still not willing to say, okay,

8  you can take the "fully compliant" out and we don't have

9  an issue there.

10               We are just arguing about language in a

11  contract.  That can't be a RAND violation.  We will take

12  it out.  Okay?

13               Secondly, they are seeking specific

14  performance.  They have to be able to come into this

15  Court under the law and say if Your Honor says 15 cents

16  RAND rate for these three patents, we will take a

17  license.  We will do our part.  We are here.  We are

18  ready.  We are willing to perform.

19               And Mr. Dauchot just said, well, I have

20  got to talk to my client.  I don't know if I can take

21  that or not.  If you can't say that, you can't seek

22  specific performance.

23               THE COURT:  Okay.  Is that correct that

24  you can't say that?

25               MR. DAUCHOT:  No, Your Honor, because the

64

1   specific performance we are requesting is an order

2   having them make an offer.  I mean, we are not asking

3   that the Court order us to perform and accept an

4   offer --

5               THE COURT:  You are asking the Court to

6   order specific performance that they have made an offer

7   when they have already made two and you haven't

8   responded to either one?

9               MR. DAUCHOT:  Well, first -- first --

10  first, Your Honor, it is a question of exactly what is

11  the -- is it even an offer of the chips?  The answer to

12  the March one is un -- is, no, based on the record.

13              As far as the July is one, I don't know.

14              On their "fully compliant" point, the

15  "fully compliant" excuse and exactly what they meant by

16  "fully compliant," the definition they aired at trial of

17  what "fully compliant" means -- and you will recall Mr.

18  Brismark's testimony about "fully compliant" -- it is

19  the first we heard of it.  That definition is the first

20  we'd heard of what "fully compliant" means.

21              THE COURT:  Okay.

22              MR. DAUCHOT:  Now, on the point about the

23  specific performance, Your Honor, the question is also

24  one of numbers.  The only offer that has been made --

25  let's call it an offer and ignore the fact that they

1   excluded out chips -- was for 50 cents.

2                  The jury rejected that.  The jury awarded

3   something far less than that.  So what they have done is

4   they have revised it to 35 cents.  The point is the 35

5   cents is still not part of the record.  It was made

6   after trial closed and the evidence was closed.

7                  So the record before the Court is one

8   where their offer is one for 50 cents.  Our position is

9   that that is not a RAND offer because 50 cents is not --

10                 THE COURT:  They filed a motion to

11  supplement the record, right?

12                 MR. DAUCHOT:  They did file a motion to

13  supplement the record.

14                 THE COURT:  Are you opposed to that?

15                 MR. DAUCHOT:  We are opposed to that?

16                 THE COURT:  Why is that?

17                 MR. DAUCHOT:  Well, we are opposed to

18  that because supplementing the record basically puts us

19  in a position where you now have this 35-cent offer.  We

20  have no ability to cross-examine Ericsson on it.  We

21  don't know where the number came from.  We don't know

22  what the logic is.  We can't test it.

23                 In fact, the 35-cent offer that they have

24  come up with now and some of the directions that they

25  intend to head in in terms of rationalization,

66

1   contradict documents that are, in fact, in evidence.

2              THE COURT:  But you are asking the Court

3   to set a RAND figure, right?

4              MR. DAUCHOT:  Correct.

5              THE COURT:  And you are saying it should

6   be to more than just what is involved in this case,

7   right?

8              MR. DAUCHOT:  Well, our position is that

9   it is part of this case by virtue of the RAND

10  counterclaim.

11             THE COURT:  But the evidence would have

12  reached beyond this case?

13             MR. DAUCHOT:  Yes, Your Honor.

14             THE COURT:  Okay.  But then you are

15  saying, though, that the Court shouldn't consider any

16  evidence that comes before it after the close of

17  evidence in this case?

18             MR. DAUCHOT:  I see your point.  When we

19  say it reaches beyond the case, I mean, obviously, we

20  have a case in which evidence was collected, positions

21  were taken, parties testified, et cetera, so certainly

22  from that perspective the RAND rate is within this case

23  for the purposes of this case.

24             Now, the -- so the evidence that goes

25  into that analysis, and all of that was part of a bench

1  trial and a jury trial.  And our position is that rate

2  can be determined from the evidence that was presented

3  at trial; and, in fact, litigated as part of the bench

4  trial, as well as part of the jury trial.  So that is

5  point number one.

6            But that is not to say that whatever rate

7  Your Honor specifically orders them to offer us is a

8  rate that will carry absolutely no repercussions outside

9  of this courtroom or outside the specific confines of

10  this case.  That is the point.

11            THE COURT:  Okay.  Thank you.

12            Final word.

13            MR. CAMPBELL:  Well, Your Honor,

14  apparently what Intel is asking for is a one-way street

15  here.  Make them offer us a license; and if we like it,

16  we will take it.  If we don't like it, we won't take it.

17            If we are talking about a contract here,

18  they have to come in and say if Your Honor says 15 cents

19  for those three patents based on the jury's verdict, we

20  will take a license.  They still can't say that.

21            THE COURT:  And you still can't say that;

22  is that correct?  Or you can?

23            MR. DAUCHOT:  Is the question would

24  Intel, in fact, accept an offer that the Court orders

25  Ericsson to make?

1            THE COURT:  The Court wouldn't be making

2   an offer.  The Court would be setting a rate.  And I

3   think his question is whatever that might end up being

4   is Ericsson -- I mean, is Intel as it sits here today

5   telling the Court that it will accept whatever the Court

6   determines, with regard to these three patents.

7            MR. DAUCHOT:  And the answer to that

8   question, Your Honor, is, we really do need to consult

9   not only with our own client but with the joint defense

10  group because, as Your Honor knows, the chips that some

11  of the defendants --

12           THE COURT:  Well, consult with them and

13  file by, say, noon tomorrow your response in answer to

14  that question, yes or no.

15           MR. DAUCHOT:  That's fine, Your Honor.

16           THE COURT:  Okay.  Thank you.

17           Anything further?

18           MR. CAMPBELL:  Finally, yes, Your Honor.

19  We are going outside the bounds of this case.  We are

20  going outside what Intel -- this is all about Intel now.

21  It is clear.  They want a special deal.  We are going

22  outside what the Court allowed them to intervene and

23  what the pretrial order says is to determine the maximum

24  royalty rate that Ericsson can recover as damages in

25  this case by virtue of its RAND obligations.

1                   In this case we are now at three patents,

2   15 cents a unit.  That is -- the jury was told, consider

3   Ericsson's RAND obligations in setting the rate.  So we

4   already know what that rate is.  That is the floor.  So

5   we are at least at 15 cents.  That is what the pretrial

6   order and Your Honor's limited intervention should

7   cover.  That is what should be issued.

8                   If we are going to go beyond this case,

9   then we ought to consider evidence that has happened

10  after the jury's verdict where Ericsson didn't have the

11  opportunity to consider the jury's verdict, and is now

12  offering a worldwide rate of 35 cents a unit.

13                  THE COURT:  Okay.  All right.  Thank

14  you.

15                  All right.  Anything further with regard

16  to post-trial motions?

17                  MR. DAUCHOT:  Well, Mr. Alper, if Your

18  Honor is interested, was going to deal with the question

19  of why the 50 cents is not RAND; and he is prepared to

20  deal with that issue.

21                  THE COURT:  Why the 50 cents is not RAND.

22  Okay.  I will hear some very brief argument.

23                  MR. ALPER:  Your Honor, I will keep this

24  very brief.

25                  THE COURT:  Okay.  Thank you.

1          MR. ALPER:  Adam Alper for defendants.  I

2    will keep it brief, and I will keep it focused on the

3    issues we were just discussing.

4          And I would like to start with the

5    questions that were just being discussed about the

6    35-cent offer that came over from Ericsson.

7          And what is critical in evaluating that

8    35-cent offer, is 35 cents RAND?  Because that is

9    ultimately the question before us, what is exactly RAND?

10   If the 35 cents is not RAND, if it is not something in

11   the ballpark -- as Your Honor mentioned, doesn't RAND

12   require some give and take?

13         Even if that is true, the 35 cents falls

14   well far beyond the give-and-take zone.  That is what I

15   want to just address first, and I want to talk briefly

16   how to calculate RAND.

17         If we can go to Slide 40 in our

18   presentation.

19         So we do have an acknowledgment from

20   Ericsson that the jury came back with a rate of 15 cents

21   per unit that reflects their analysis of damages in this

22   case.  And, in fact, they say that is RAND.  According

23   to Ericsson, they say that is RAND.

24         And the way that they get to 35 cents, as

25   Counsel just mentioned, is that they increase that 15

1  cents to account for the full Ericsson Wi-Fi portfolio,

2  right?  And we don't have evidence of the --

3                    Withdrawn.

4                    We don't have them telling us here what

5  is the value of that portfolio that allows us to more

6  than double that rate; but that is what the general

7  thinking is, is we go ahead and expand it to account for

8  the full portfolio.

9                    But when we look at what they have said

10  in this case and what their expert has said about the

11  rest of the portfolio, what we are going to see is they

12  did a meticulous analysis of the remainder of that

13  portfolio, and they have told us the large majority of

14  the value of their Wi-Fi portfolio was in the patents

15  that were in suit that led to that 15-cent royalty.

16                    They actually go through all of the other

17  alleged portions of their Wi-Fi portfolio and say there

18  is no value there.

19                    So if we go to the next slide.

20                    This is excerpts from Ericsson's expert

21  report.  Now, this is not part of the record.  If Your

22  Honor grants Ericsson's motion to supplement the record

23  with their 35-cent-offer letters, then we would like

24  permission to supplement the record with these excerpts

25  or with excerpts from Ericsson's expert report because

1   he actually tells us that the value of their portfolio

2   was in the patents-in-suit.

3               So you can see it here, this is coming

4   right from their expert.  He says:  Ericsson believes

5   that the patents-in-suit represent a large majority of

6   the value of the Ericsson 802.11 portfolio.

7               He goes on and starts to go through the

8   rest of their portfolio and he says:  Ericsson had

9   little success in licensing what he is calling their

10  Legacy 802.11 patents, that is, patents other than

11  802.11n.  He says right there the patents related to

12  11a, 11b, 11g, but not 11n.  Had little value.

13              He goes on and analyzes specific patents

14  that were not in suit, one by one.  Here is an example.

15  You can see, it says that:  Ericsson knew that two of

16  its patents that were part of the Ericsson 11n

17  portfolio -- these are 11n patents that were not in this

18  case, right, were not in the trial -- had little or no

19  economic value.

20              So let's take a step back and look at

21  this 35-cent offer.  We have a verdict for 15 cents that

22  reflects the value of the portfolio because we know from

23  Ericsson that the rest of the portfolio has little to no

24  value.

25              THE COURT:  I mean, are you agreeing with

1   those statements or disagreeing with those statements?

2              MR. ALPER:  We -- we -- yes, we are -- we

3   are -- well, as you know, Your Honor, we have issues

4   with the value of the patents that were in suit; but we

5   agree that the rest of the portfolio has no value.

6              THE COURT:  So if the Court should just

7   set a RAND obligation for the patents in this suit, then

8   that would not, in your opinion, create any further

9   significant obligation beyond these patents?

10             MR. ALPER:  As a practical matter, that

11  is correct, although it is our position that we are

12  entitled to a license for the whole portfolio.  There is

13  no ambiguity as to what remains because Ericsson -- you

14  can see Ericsson is taking a different position now than

15  they were earlier in the case.

16             Earlier in the case the patents-in-suit

17  had all of the value.  Now they are saying there is more

18  than double the value in the other patents because we go

19  from 15 cents now to 35 cents.

20             And the point I want to circle back on

21  goes to the issue we are talking about -- Your Honor was

22  talking about with Mr. Dauchot, that is, is 35 cents an

23  actual offer?  Is that a bona fide offer?

24             So we kind of take stock of where we are.

25  We have a verdict for 15 cents.  We have Ericsson

74

1    requesting that 15 cents as an ongoing royalty going

2    forward, as their RAND royalty going forward.  Right?

3    That is them saying to us and asking the Court to say

4    you guys should pay 15 cents going forward for what we

5    know is the value of the entire portfolio.

6                    Then we have this RAND claim where we are

7    saying they are refusing to deal with us.  How do they

8    answer that?  They send over an offer for 35 cents.

9                    THE COURT:  Okay.

10                   Let me ask you to respond to that.

11                   MR. CAMPBELL:  I think that is great.

12   Let's take stock at where we are.  We have heard

13   repeatedly now 15 cents for three patents.  That is RAND

14   rate, so that is the floor.  Right?

15                   And then we know there is more value.

16   They want to point to statements of large majority.  Our

17   expert actually said 50 percent of the value, but we

18   know there is more value above the 15 cents.  We know

19   there is more there.  Ericsson has offered 35 cents.

20                   So somewhere -- maybe 35 cents is the

21   right number, but somewhere above 15 cents is certainly

22   the right number.  It is not 1.7 cents.  That is where

23   we are.  Okay?  The jury was asked to consider RAND

24   obligations.  That is where we are.  They have

25   considered those.  We are at 15 cents for three patents.

1          THE COURT:  Let me ask Counsel for

2   defendant then, do you agree with that statement that

3   the RAND obligations for the entire standard portfolio

4   would be somewhere between the 15 cents and the 35

5   cents?

6          MR. ALPER:  Your Honor, I actually

7   disagree that it would be any sort of material amount

8   above the 15 cents.

9          THE COURT:  But you do agree that 15

10  cents would be the floor?

11         MR. ALPER:  Well, I actually have two

12  points.  If we accept 15 cents as the RAND rate for the

13  patents that are in suit, then 15 cents would be the

14  floor.  But we don't accept 15 cents as the RAND rate.

15  After we get done with this issue, I would briefly like

16  to talk about that for a moment.

17         But the -- the -- the -- when it comes to

18  now we start with the patents-in-suit representing the

19  large value of the portfolio and we look at what else is

20  left, right, they are asking for a worldwide license for

21  35 cents.  They have no evidence --

22         THE COURT:  Well, I understand what they

23  are asking for and that you feel that is unreasonable.

24  But what I am really having trouble with is what is

25  Intel saying is reasonable and what does Intel say is a

1  reasonable rate in light of the jury verdict and

2  everything else?

3              MR. DAUCHOT:  Your Honor, Luke Dauchot,

4  if I could expand on one point here.

5              THE COURT:  Well, you could -- if you can

6  answer my question, I would appreciate it.

7              MR. DAUCHOT:  Well, what is reasonable is

8  1.7, and the question is how do you harmonize that with

9  the jury verdict?

10             THE COURT:  Well, if I don't throw out

11  the jury verdict -- let's assume for the sake of this

12  discussion that I don't and the jury verdict was

13  supported by evidence and stands, then what is your

14  position with regard to RAND?

15             MR. DAUCHOT:  The position with respect

16  to the jury verdict is as follows:  That jury verdict

17  did not find an Intel rate.  And if Your Honor will

18  recall --

19             THE COURT:  Well, you sure argued an

20  Intel rate, didn't you?

21             MR. DAUCHOT:  No, what we argued to the

22  jury -- what we argued to the Court was that Mr. Bone's

23  report and the hypothetical negotiation of

24  George-Pacific was fundamentally flawed because it

25  rested on the premise that Intel would not be -- and for

1  that matter any other chip maker -- would not be in the

2  negotiation room.  That is the George-Pacific model --

3              THE COURT:  But I thought I remembered a

4  lot of argument and testimony where defendants said that

5  the reasonable RAND rate would be one cent per chip.

6  Did I miss that?

7              MR. DAUCHOT:  No, you did not miss that.

8  But the point is, is that the jury verdict was

9  predicated on a George-Pacific model that assumed that

10  you just have the chip makers inside that negotiation

11  room -- that you don't have the chip makers in the

12  negotiation room.

13              And we know, we know that if the Court

14  finds, as the Court from our perspective should find,

15  that the LOAs impose on Ericsson an obligation to deal

16  with the chip makers.

17              Ericsson admits in its internal

18  documents --

19              THE COURT:  But are you saying deal with

20  the chip makers to the exclusion of the other downstream

21  manufacturers?

22              Well, not necessarily.  The other

23  downstream manufacturers can be at the table.  What we

24  do know is that ultimately if Intel -- if the chip

25  makers do get a license, you do have patent

1  exhaustion --

2          THE COURT:  And if the downstream people

3  get a license, you, likewise, have patent exhaustion,

4  right?

5          MR. DAUCHOT:  No.  Patent exhaustion

6  won't work up that way.  The best that Ericsson can say

7  is we are not going to sue you, Intel, by virtue of

8  whether -- two points there.

9          Number one, if -- in a world, in a

10  hypothetical world -- or in a natural world where they

11  are only negotiating with the end product -- the

12  customers, and we are not part of it and they are not

13  dealing with us, a number of customers, as came out

14  during trial, have indemnification obligation.

15          So there is precious little economic

16  incentive on the part of those customers to negotiate

17  the sort of deals that Intel and other chip makers would

18  be dealing with as they are entitled to do under these

19  LOAs.  That is point number one.

20          Point number two, the best that we have

21  is these customers have a have-made right.  They have a

22  right to have the chips made.  But I am not sure and I

23  haven't researched this personally, Your Honor, so I am

24  not going to be making representations to the Court, but

25  I don't know that that necessarily translates into no

1  legal exposure from a chip maker standpoint.  I just

2  don't know one way or the other.

3          What I do know is that Ericsson has not

4  extended the chip makers an offer; and that that

5  refusal -- and Ericsson admits this inside its own

6  documents that the whole reason for the policy --

7  remember the big dollar, little dollar sign and all of

8  that, why are we chasing after the customers?  Because

9  there is more money to be made there than Intel.

10          We do know that that refusal to deal with

11  us results in economic prejudice and results in a rate

12  that is artificially high, which is why the jury

13  verdict, Your Honor -- to bring it back to the question

14  of the jury verdict -- is not a substitute for a RAND

15  rate, because, again, that rate is predicated on an

16  argument by Ericsson that it had no, no requirement to

17  deal with the chip makers.

18          THE COURT:  Okay.  Response?

19          MR. CAMPBELL:  Your Honor, there was

20  extensive trial testimony from defendants about the

21  price of the chip and the value to the chip and how much

22  it should be based on third-party reports of the 2010

23  price of the chip.

24          The jury heard all this.  The jury said

25  the RAND rate for the three patents at issue is 15 cents

1  a unit.  It doesn't matter upstream -- we can quibble

2  over what the right terminology is, if it is exhaustion

3  in one direction and have-made rights in the other

4  direction.

5              But as Your Honor points out, if Dell and

6  Acer and Gateway and NETGEAR, if they have a license at

7  15 cents a unit for that chip on those three patents,

8  Intel has no exposure to those three patents anymore for

9  chips they sell to those customers.  And that is what

10 their intervention was limited to was for those

11 customers.  So that is done.  It is set.  The jury has

12 set the RAND rate at 15 cents.

13             To go back to the point that was being

14 made before, Mr. Bone said in the transcript on June 6th

15 at Page 19, Line 15 to Page 20, Line 5 that the value of

16 the patents-in-suit was 50 percent of the portfolio.  So

17 there is 50 percent more there.

18             If the defendants truly believe that all

19 of the value in the portfolio is in these three patents,

20 well, Ericsson's in-house Counsel is here and has said

21 they can take a license to these three patents at 15

22 cents, that is what the case ought to be limited to,

23 that is what the jury said a RAND rate is, and we can be

24 done.  And if there is no more value in the rest of the

25 portfolio, then that will bear itself over time --

1             THE COURT:  What you are saying, from the

2    plaintiff's standpoint you feel that the Court should

3    set a RAND amount for these three patents?

4             MR. CAMPBELL:  For these three patents.

5    And the defendants asked for a jury instruction to

6    consider the RAND obligations.  The jury did that.  It

7    is 15 cents for these three patents.  If the Court wants

8    to go beyond that, 15 cents is where we start.

9             We know we have a portfolio that has more

10   value in it based on the existing licenses that are in

11   evidence, based on Mr. Bone's testimony that there is

12   another 50 percent of the value out there, based on Dr.

13   Perryman's testimony of there is more value -- there is

14   10 dollars more value of an "n" chip over a "g" chip and

15   that he thinks that Ericsson only has three percent of

16   the "n" patents, you get to 30 cents.  There is a lot of

17   ways, a number of ways we get to 30, 35, 40 cents as a

18   reasonable royalty for the portfolio.

19            And I don't think the Court has to set a

20   rate.  The Court needs to say whether Ericsson's offers

21   have been reasonable.  And 35 cents is clearly

22   reasonable, especially when you consider the jury

23   verdict.  1.7 cents is nowhere in the bounds.  And there

24   is no give and take here.

25            So 35 cents is the only reasonable offer

1  that has been made, the only reasonable offer by either

2  party.

3             THE COURT:  So plaintiff is not

4  necessarily wanting the Court to go beyond the three

5  patents and the jury determination; but if the Court

6  does go beyond that, you are saying it ought to be 35

7  cents?

8             MR. CAMPBELL:  It should be 35 cents --

9             THE COURT:  As to the worldwide --

10            MR. CAMPBELL:  As to the worldwide

11  portfolio.  And keep in mind that, as was pointed out to

12  me, the worldwide portfolio offer is for the U.S.

13  patents beyond the three.  It is for beyond U.S.

14  patents.  It is also when Ericsson makes an offer for

15  its standard essential patents, it is for any patents

16  that might issue during the term of the license.

17            So we are not even limited to the patents

18  that are out there today.  If patents issued during the

19  term of the license that are standard essential patents,

20  that license comes with that.

21            So that 35-cent offer, considering all of

22  the evidence and all of the patents that you are getting

23  rights to, is more than reasonable, especially

24  considering the jury's verdict.

25            And if I understand defendants correctly,

1  you are wanting the Court to go beyond these three

2  patents and determine a RAND license on a worldwide

3  basis?

4                    MR. ALPER:  We are asking for the Court

5  to go beyond these three patents and determine a

6  portfolio-wide, worldwide license.  And we are asking

7  the Court to do its own RAND analysis because the RAND

8  evidence was not presented to the jury; and what

9  Ericsson has done by proposing a 35-cent rate -- or even

10 if we back it up and start with a 15-cent rate --

11                    THE COURT:  Excuse me.  So if you want

12 the Court to go beyond, are you wanting the opportunity

13 to present more evidence on RAND for the worldwide

14 license and the other three patents?

15                    MR. ALPER:  We already did that, Your

16 Honor, in the context of the bench trial --

17                    THE COURT:  I'm sorry, what?

18                    MR. ALPER:  I'm sorry.  We already did

19 that in the context of the bench trial through two

20 experts and a few fact witnesses.  We have identified

21 that in our findings of fact and conclusions of law.

22                    THE COURT:  You are saying the record is

23 closed as to that?

24                    MR. ALPER:  The record is closed as to

25 that with the exception of some of the excerpts --

1                THE COURT:  You are saying the Court has

2      everything it needs to make that RAND decision beyond

3      these three patents and beyond the U.S.?

4                MR. ALPER:  That's absolutely right, Your

5      Honor.  It is there.  And if you would like, in a very

6      brief amount of time what I was prepared to do was

7      provide the framework that we are asking Your Honor to

8      adopt in looking at that evidence.  And I can kind of

9      mostly just give you a perspective of how it is

10     organized.

11               THE COURT:  Let me come back to that.  I

12     am just trying to figure out where you are and where

13     they are.

14               Now, they have filed this motion to

15     supplement the record with this most recent letter.  You

16     oppose that; but you say that if the Court allows that,

17     you would like to supplement the record with these

18     quotes from -- that you had up here on the screen a

19     moment ago?

20               MR. ALPER:  Yes, and there might be --

21     this is a few excerpts.  There might be some more

22     material from the --

23               THE COURT:  But, see, this is what we get

24     into here.  We had a trial.  We closed it off.  Now they

25     have a letter they want in.  Now you say I have got

1  these things on the screen.  But then you say there may

2  be more stuff.  Well, I am sure they will come back and

3  say, well, there may be more stuff.

4            MR. ALPER:  Right.

5            THE COURT:  So do y'all want to have a

6  trial on this issue and bring witnesses and testify

7  about it again?

8            MR. ALPER:  Well, this is a relatively

9  new development for us.  I think that if we have a

10  paragraph or two from Mr. Bone's report that covers --

11  it may all be in this paragraph --

12            THE COURT:  So your answer to my question

13  is, no, you don't want to have a further trial --

14            MR. ALPER:  No, we do not need a further

15  trial.

16            THE COURT:  -- and opportunity to present

17  further evidence?

18            MR. ALPER:  That's correct, Your Honor,

19  we do not need a further trial.

20            THE COURT:  And the Plaintiff doesn't

21  want to have a future trial, an opportunity to present

22  more evidence?

23            MR. CAMPBELL:  We don't believe it is

24  necessary.  The one piece of evidence we were asking to

25  put in happened after the trial.  It was considered in

1  light of the trial.

2              THE COURT:  I will grant your motion to

3  supplement the record with the letter that you are

4  requesting to supplement.

5              And I will grant your motion to

6  supplement it with what you had on the screen or one or

7  two paragraphs.

8              But if it goes beyond that, you can

9  object to it.

10             MR. CAMPBELL:  Your Honor, if I could,

11  they are cherry-picking the paragraphs to avoid Mr.

12  Bone's explanation that it is 50 percent of the value.

13  If they are going to put in some paragraphs, we would

14  really like -- I would rather have the whole report in,

15  but at least the opportunity to cherry-pick a few

16  paragraphs to show the context of the paragraphs they

17  are picking out to show what his opinion was.

18             THE COURT:  Okay.  Do you have any

19  objection to that, Counsel?

20             MR. ALPER:  No objection, Your Honor.

21             THE COURT:  All right.  You may -- after

22  you see what they put in, then you can file a brief

23  response with limited quotes to supplement the record.

24             MR. CAMPBELL:  I understand.

25             THE COURT:  All right.  Anything further?

1                    MR. ALPER:  And as he says, Your Honor,

2    we will meet and confer over all of this and resolve

3    objections --

4                    THE COURT:  All right.  Let's have all of

5    those in to me -- let's see.  What is today?  Tuesday.

6    In to me no later than noon on Thursday.

7                    MR. ALPER:  Yes, Your Honor.

8                    THE COURT:  We will be adjourned.  Thank

9    you.

10                   MR. VAN NEST:  Your Honor, are we

11   adjourned for the morning?

12                   THE COURT:  Yes, for the day.  Forever.

13                   MR. ALPER:  Your Honor, if I may --

14                   MR. VAN NEST:  Can I be heard on just two

15   points briefly?

16                   THE COURT:  No, but I would like to hear

17   from Mr. Arovas with regard to orthogonal codes and

18   overlay codes.  Oh, that was last week.

19                   [Laughter.]

20                   MR. AROVAS:  I have nothing more to say

21   in my life about --

22                   THE COURT:  Yes, you may --

23                   Be seated, please.

24                   Go ahead, Mr. Van Nest.

25                   MR. ALPER:  Your Honor, may I add one

1  thing to the RAND discussion before we close out on

2  that?

3                    THE COURT:  One thing.

4                    MR. ALPER:  Okay.  Yes.  The point that I

5  wanted to make is -- and we make this in our findings in

6  the brief, is that the 15-cent rate is not based on

7  RAND.  The jury wasn't presented with significant RAND

8  evidence, for instance, the non-infringing alternatives.

9  The proportionality evidence wasn't presented to the

10 jury and certainly not on a worldwide level.

11                   The 15 cents is a U.S. rate for the three

12 patents-in-suit.  You can't extrapolate that from

13 that -- a RAND rate using the RAND analysis and

14 certainly not a worldwide rate.  So that is just not a

15 good starting point.

16                   THE COURT:  You can't even say that is a

17 floor?

18                   MR. ALPER:  I'm sorry?

19                   THE COURT:  You couldn't say that is a

20 floor?

21                   MR. ALPER:  You can't say that is a floor

22 because of this reason:  The RAND analysis requires us

23 to determine whether there is holdup value in the rate,

24 and you have to employ techniques like proportionality

25 looking at how many --

1                    THE COURT:  How do you expect the Court

2    to do this then?

3                    MR. ALPER:  We presented two experts who

4    provided that analysis, and we lay it out in our papers.

5    And they went through and they looked at how many --

6    actually several experts -- how many patents there

7    were.

8                    THE COURT:  Okay.  Then that will be

9    before the Court.

10                   MR. ALPER:  Yes, Your Honor.

11                   THE COURT:  All right.  Anything further?

12                   MR. ALPER:  I believe that -- thank you

13   very much.

14                   MR. CAMPBELL:  Your Honor, can I respond

15   to that for 10 seconds?

16                   THE COURT:  Yes, you may.

17                   MR. CAMPBELL:  I would just like to point

18   out, Defendants asked for an instruction for the jury to

19   consider the RAND obligations.  The Court gave that

20   instruction.

21                   If there is any evidence that was not

22   before the jury for them to make that determination,

23   that's defendants' fault.  Not the jury's fault.

24                   THE COURT:  Thank you.

25                   All right.  Mr. Van Nest.

1              MR. VAN NEST:  Just two points of

2    procedure, Your Honor.

3              With respect to the answer to the

4    question you asked Mr. Dauchot in providing an answer by

5    noon tomorrow, at least one and possibly two of my

6    clients are overseas in Taiwan.  I am wondering since

7    you just set Thursday noon as the deadline for this

8    additional supplemental material, could we have until

9    Thursday noon to answer that question?  I am worried

10   about being able to get in touch with clients in Taiwan.

11             THE COURT:  Why don't we say Wednesday

12   noon.  How is that for a compromise?

13             MR. VAN NEST:  Wednesday noon is

14   tomorrow.

15             THE COURT:  That's tomorrow.

16             MR. VAN NEST:  That's what you said.

17             THE COURT:  That's tomorrow.  Today is

18   Tuesday.  All right.  Thursday at noon.

19             MR. VAN NEST:  Thank you very much.

20   That's great.

21             One other point just on procedure, and I

22   think this is in agreement, I think it is understood

23   with respect to the JMOLs -- but I want to be sure if it

24   is not -- with respect to our JMOL motion on

25   non-infringement and validity, I think we are all in

91

1  agreement that the way that the jury verdict came out at

2  15 cents, essentially they awarded five cents per

3  patent.

4              If Your Honor were to determine that one

5  or two of the patents was not supported in the evidence

6  and granted a judgment as a matter of law, the

7  defendants would be fine with Your Honor simply reducing

8  the compulsory license by that comparable amount.

9              If you said, for example, that the '568

10  and '215 weren't supported and granted JMOL on those, it

11  is not our position that your only option is a new

12  trial.  We would say we have already agreed --

13              THE COURT:  You would agree to a pro

14  rata --

15              MR. VAN NEST:  Yes, without a new trial.

16              THE COURT:  What about plaintiffs?

17              MR. CAMPBELL:  Your Honor, we have no

18  objections to that.

19              THE COURT:  Okay.

20              MR. VAN NEST:  I just wanted to be sure

21  Your Honor understood that was an option from our

22  standpoint since we have said we don't object --

23              THE COURT:  I don't think anybody wants a

24  new trial.

25              MR. VAN NEST:  I think that's right, Your

92

1   Honor.

2                   THE COURT:  Although I think you asked

3   for one, didn't you?

4                   MR. VAN NEST:  I did.  Yeah.

5                   THE COURT:  But you don't really want

6   one, right?

7                   [Laughter.]

8                   MR. VAN NEST:  I think you know what I

9   really want.

10                  (Hearing adjourned.)

11

12                       CERTIFICATION

13

14                  I HEREBY CERTIFY that the foregoing is a

15  true and correct transcript from the stenographic notes

16  of the proceedings in the above-entitled matter to the

17  best of my ability.

18

19  /s/ Shea Sloan
    SHEA SLOAN, CSR, RPR
20  Official Court Reporter
    State of Texas No.:  3081
21  Expiration Date:  12/31/14

22

23

24

25